**COMPLX, LEAD, COMPLX, APPEAL, APPEAL_NAT**

# U.S. Bankruptcy Court
## Southern District of Texas (Houston)
### Bankruptcy Petition #: 20-33233

*Date filed:* 06/28/2020
*Plan confirmed:* 01/16/2021

*Assigned to:* Bankruptcy Judge David R Jones
Chapter 11
Voluntary
Asset

| | |
|---|---|
| ***Debtor*** | represented **Matthew D Cavenaugh** |
| **Chesapeake Energy Corporation** | by Jackson Walker LLP |
| 6100 North Western Avenue | 1401 McKinney Street |
| Oklahoma City, OK 73118 | Ste 1900 |
| OKLAHOMA-OK | Houston, TX 77010 |
| Tax ID / EIN: 73-1395733 | 713-752-4200 |
| | Email: mcavenaugh@jw.com |

**Genevieve Marie Graham**
Jackson Walker LLP
1401 McKinney Street
Suite 1900
Houston, TX 77010
(713) 752-4231
Fax : (713) 308-4131
Email: ggraham@jw.com

**Fareed I Kaisani**
Platt Cheema Richmond PLLC
1201 N. Riverfront Blvd.
Suite 150
Dallas, TX 75207
214-559-2700
Fax : 214-559-4390
Email: fkaisani@pcrfirm.com

**Steven J Levitt**
Thompson & Knight LLP
1722 Routh Street
Suite 1500
Dallas, TX 75201-2533
214-969-1700
Fax : 214-969-1751
Email: steven.levitt@tklaw.com

**Kristhy M Peguero**
Jackson Walker LLP
1401 McKinney St
Ste 1900
Houston, TX 77010
713-752-4440
Email: kpeguero@jw.com

**Veronica Ann Polnick**
Jackson Walker, LLP
1401 McKinney St.
Suite 1900
Houston, TX 77010
713-752-4200
Fax : 713-754-6716
Email: vpolnick@jw.com

**Alexandra Schwarzman**
Kirkland & Ellis LLP
300 N LaSalle
Chicago, IL 60654
312-862-2000
Email: alexandra.schwarzman@kirkland.com

**Joshua Bacon Selig**
Bymes Keller et al
1000 Second Avenue
38th Floor
Seattle, WA 98104
206-622-2000
Email: jselig@byrneskeller.com

**Jennifer F Wertz**
Jackson Walker LLP
100 Congress Ave
Suite 1100
Austin, TX 78701
512-236-2247
Fax : 512-391-2147
Email: jwertz@jw.com

| | | |
|---|---|---|
| *Debtor*<br>**CHK Energy Holdings, Inc.**<br>6100 North Western Avenue<br>Oklahoma City, OK 73118<br>OKLAHOMA-OK<br>Tax ID / EIN: 46-1772347 | represented<br>by | **Matthew D Cavenaugh**<br>(See above for address)<br><br>**Jennifer F Wertz**<br>(See above for address) |

BK CM/ECF LIVE - US Bankruptcy Court-Texas Southern                    Page 3 of 579
Case 4:21-cv-01215   Document 8   Filed on 05/12/21 in TXSD   Page 3 of 1639

0003

*Debtor*
**Brazos Valley Longhorn Finance Corp.**
6100 North Western Avenue
Oklahoma City, OK 73118
OKLAHOMA-OK
Tax ID / EIN: 83-3311465

represented **Matthew D Cavenaugh**
by (See above for address)

**Kristhy M Peguero**
(See above for address)

**Jennifer F Wertz**
(See above for address)

*Debtor*
**Chesapeake AEZ Exploration, L.L.C.**
6100 North Western Avenue
Oklahoma City, OK 73118
OKLAHOMA-OK
Tax ID / EIN: 27-2151081

represented **Vienna Flores Anaya**
by Jackson Walker LLP
2323 Ross Avenue, Suite 600
Dallas, TX 75201
214-953-6047
Fax : 214-661-6647
Email: vanaya@jw.com

**Matthew D Cavenaugh**
(See above for address)

**Jennifer F Wertz**
(See above for address)

*Debtor*
**Brazos Valley Longhorn, L.L.C.**
6100 North Western Avenue
Oklahoma City, OK 73118
OKLAHOMA-OK
Tax ID / EIN: 83-3294278

represented **Matthew D Cavenaugh**
by (See above for address)

**Veronica Ann Polnick**
(See above for address)

**Jennifer F Wertz**
(See above for address)

*Debtor*
**Chesapeake E&P Holding, L.L.C.**
6100 North Western Avenue
Oklahoma City, OK 73118
OKLAHOMA-OK
Tax ID / EIN: 27-4485832

represented **Matthew D Cavenaugh**
by (See above for address)

**Jennifer F Wertz**
(See above for address)

*Debtor*
**Burleson Water Resources, LLC**
6100 North Western Avenue
Oklahoma City, OK 73118
OKLAHOMA-OK
Tax ID / EIN: 00-0000000

represented **Victoria Nicole Argeroplos**
by Jackson Walker LLP
1401 McKinney Street
Suite 1900
Houston, TX 77010
713-752-4334
Fax : 713-308-4134
Email: vargeroplos@jw.com

**Matthew D Cavenaugh**
(See above for address)

**Jennifer F Wertz**
(See above for address)

*Debtor*     represented **Anthony Frank Arguijo**
**Chesapeake Exploration, L.L.C.**    by Scott Douglass & McConnico LLP
6100 North Western Avenue         303 Colorado Street
Oklahoma City, OK 73118          Suite 2400
OKLAHOMA-OK                 Austin, TX 78701
Tax ID / EIN: 71-0934234        512-495-6300
                             Fax : 512-495-6399
                             Email: aarguijo@scottdoug.com

**Matthew D Cavenaugh**
(See above for address)

**Veronica Ann Polnick**
(See above for address)

**Jennifer F Wertz**
(See above for address)

*Debtor*     represented **Matthew D Cavenaugh**
**Chesapeake Energy Louisiana, LLC**   by (See above for address)

6100 North Western Avenue         **Jennifer F Wertz**
Oklahoma City, OK 73118          (See above for address)
OKLAHOMA-OK
Tax ID / EIN: 73-1524569
*fka* **Chesapeake Energy Louisiana**
**Corporation**

*Debtor*     represented **Matthew D Cavenaugh**
**Chesapeake VRT, L.L.C.**      by (See above for address)
6100 North Western Avenue
Oklahoma City, OK 73118         **Veronica Ann Polnick**
OKLAHOMA-OK             (See above for address)
Tax ID / EIN: 20-8380083
                         **Jennifer F Wertz**
                         (See above for address)

*Debtor*     represented **Victoria Nicole Argeroplos**
**Chesapeake Louisiana, L.P.**    by (See above for address)
6100 North Western Avenue
Oklahoma City, OK 73118         **Matthew D Cavenaugh**
OKLAHOMA-OK             (See above for address)

Tax ID / EIN: 73-1519126

**Jennifer F Wertz**
(See above for address)

*Debtor*
**Esquisto Resources II, LLC**
6100 North Western Avenue
Oklahoma City, OK 73118
OKLAHOMA-OK
Tax ID / EIN: 47-4429762

represented **Matthew D Cavenaugh**
by (See above for address)

**Veronica Ann Polnick**
(See above for address)

**Jennifer F Wertz**
(See above for address)

*Debtor*
**Chesapeake Energy Marketing, L.L.C.**
6100 North Western Avenue
Oklahoma City, OK 73118
OKLAHOMA-OK
Tax ID / EIN: 73-1439175
*fka* **Chesapeake Energy Marketing, Inc.**
*fka* **Chesapeake OK Nat Gas Supply, L.L.C.**
*fka* **Millennium Gas Partners LLC**

represented **Matthew D Cavenaugh**
by (See above for address)

**Kristhy M Peguero**
(See above for address)

**Jennifer F Wertz**
(See above for address)

*Debtor*
**Sparks Drive SWD, Inc.**
6100 North Western Avenue
Oklahoma City, OK 73118
OKLAHOMA-OK
Tax ID / EIN: 76-0722336

represented **Matthew D Cavenaugh**
by (See above for address)

**Veronica Ann Polnick**
(See above for address)

**Jennifer F Wertz**
(See above for address)

*Debtor*
**Chesapeake Midstream Development, L.L.C.**
6100 North Western Avenue
Oklahoma City, OK 73118
OKLAHOMA-OK
Tax ID / EIN: 46-1179116
*fka* **Chesapeake Midstream Development, L.P.**
*fka* **Arkansas Midstream Gas Services Corp.**
*fka* **Chesapeake Midstream Holdings, L.L.C.**

represented **Vienna Flores Anaya**
by (See above for address)

**Matthew D Cavenaugh**
(See above for address)

**Jennifer F Wertz**
(See above for address)

*fka* **Chesapeak West Texas**
**Gathering, L.L.C.**
*fka* **AMGS, L.L.C.**

*Debtor*

**Chesapeake Appalachia, L.L.C.**
6100 North Western Avenue
Oklahoma City, OK 73118
OKLAHOMA-OK
Tax ID / EIN: 20-3774650

represented **Matthew D Cavenaugh**
by (See above for address)

> **Cameron A. Secord**
> Jackson Walker LLP
> 1401 McKinney St
> Ste 1900
> Houston, TX 77010
> 713-752-4362
> Email: csecord@jw.com

> **Jennifer F Wertz**
> (See above for address)

*Debtor*

**Chesapeake NGV Leasing**
**Company, L.L.C.**
6100 North Western Avenue
Oklahoma City, OK 73118
OKLAHOMA-OK
Tax ID / EIN: 27-0206525

represented **Victoria Nicole Argeroplos**
by (See above for address)

*Debtor*

**Chesapeake Operating, L.L.C.**
6100 North Western Avenue
Oklahoma City, OK 73118
OKLAHOMA-OK
Tax ID / EIN: 73-1343196
*fka* **Chesapeake Operating, Inc.**
*fka* **Mineral Acquisition**
**Management, L.L.C.**
*fka* **Afterdot, L.L.C.**
*fka* **Eagle Well Service, Inc.**
*fka* **Castlebrook, L.L.C.**
*fka* **Chesapeake Plaza L.L.C.**
*fka* **CHK Services Holdings, L.L.C.**
*fka* **Chesapeake Equipment Finance,**
**L.L.C.**

represented **Anthony Frank Arguijo**
by (See above for address)

> **Matthew D Cavenaugh**
> (See above for address)

> **Jennifer F Wertz**
> (See above for address)

*Debtor*

**CHK Utica, L.L.C.**
6100 North Western Avenue
Oklahoma City, OK 73118
OKLAHOMA-OK

represented **Vienna Flores Anaya**
by (See above for address)

> **Matthew D Cavenaugh**
> (See above for address)

Tax ID / EIN: 36-4711997

**Jennifer F Wertz**
(See above for address)

*Debtor*
**Chesapeake Royalty, L.L.C.**
6100 North Western Avenue
Oklahoma City, OK 73118
OKLAHOMA-OK
Tax ID / EIN: 73-1549744
*fka* **Chesapeake Royalty Company**
*fka* **CHK-MAC, L.L.C.**

represented **Matthew D Cavenaugh**
by (See above for address)

**Kristhy M Peguero**
(See above for address)

**Jennifer F Wertz**
(See above for address)

*Debtor*
**Burleson Sand LLC**
6100 North Western Avenue
Oklahoma City, OK 73118
OKLAHOMA-OK
Tax ID / EIN: 00-0000000

represented **Matthew D Cavenaugh**
by (See above for address)

**Genevieve Marie Graham**
(See above for address)

**Jennifer F Wertz**
(See above for address)

*Debtor*
**MC Louisiana Minerals, L.L.C.**
6100 North Western Avenue
Oklahoma City, OK 73118
OKLAHOMA-OK
Tax ID / EIN: 26-3057487

represented **Victoria Nicole Argeroplos**
by (See above for address)

**Matthew D Cavenaugh**
(See above for address)

**Jennifer F Wertz**
(See above for address)

*Debtor*
**Chesapeake NG Ventures Corporation**
6100 North Western Avenue
Oklahoma City, OK 73118
OKLAHOMA-OK
Tax ID / EIN: 45-2354177

represented **Matthew D Cavenaugh**
by (See above for address)

**Cameron A. Secord**
(See above for address)

**Jennifer F Wertz**
(See above for address)

*Debtor*
**Empress, L.L.C.**
6100 North Western Avenue
Oklahoma City, OK 73118
OKLAHOMA-OK
Tax ID / EIN: 26-2809898

represented **Matthew D Cavenaugh**
by (See above for address)

**Kristhy M Peguero**
(See above for address)

**Jennifer F Wertz**
(See above for address)

*Debtor*
**MC Mineral Company, L.L.C.**
6100 North Western Avenue
Oklahoma City, OK 73118
OKLAHOMA-OK
Tax ID / EIN: 61-1448831

represented **Vienna Flores Anaya**
by (See above for address)

**Matthew D Cavenaugh**
(See above for address)

**Jennifer F Wertz**
(See above for address)

*Debtor*
**Compass Manufacturing, L.L.C.**
6100 North Western Avenue
Oklahoma City, OK 73118
OKLAHOMA-OK
Tax ID / EIN: 26-1455378

represented **Matthew D Cavenaugh**
by (See above for address)

**Cameron A. Secord**
(See above for address)

**Jennifer F Wertz**
(See above for address)

*Debtor*
**WHR Eagle Ford LLC**
6100 North Western Avenue
Oklahoma City, OK 73118
OKLAHOMA-OK
Tax ID / EIN: 00-0000000

represented **Victoria Nicole Argeroplos**
by (See above for address)

**Matthew D Cavenaugh**
(See above for address)

**Jennifer F Wertz**
(See above for address)

*Debtor*
**Wildhorse Resources II, LLC**
6100 North Western Avenue
Oklahoma City, OK 73118
OKLAHOMA-OK
Tax ID / EIN: 81-5318155
*fka* **WoldHorse Merger Sub, LLC**

represented **Vienna Flores Anaya**
by (See above for address)

**Matthew D Cavenaugh**
(See above for address)

**Jennifer F Wertz**
(See above for address)

*Debtor*
**Chesapeake Plains, L.L.C.**
6100 North Western Avenue
Oklahoma City, OK 73118
OKLAHOMA-OK
Tax ID / EIN: 81-3212038

represented **Matthew D Cavenaugh**
by (See above for address)

**Jennifer F Wertz**
(See above for address)

*Debtor*
**Petromax E&P Burleson, LLC**
6100 North Western Avenue
Oklahoma City, OK 73118

represented **Matthew D Cavenaugh**
by (See above for address)

**Kristhy M Peguero**

OKLAHOMA-OK            (See above for address)
Tax ID / EIN: 00-0000000

                                **Jennifer F Wertz**
                                (See above for address)

*Debtor*                 represented **Matthew D Cavenaugh**
**Chesapeake Land Development**      by (See above for address)
**Company, L.L.C.**
6100 North Western Avenue          **Genevieve Marie Graham**
Oklahoma City, OK 73118           (See above for address)
OKLAHOMA-OK
SSN / ITIN: xxx-xx-9392            **Jennifer F Wertz**
*fka* **Wilshire Holdings, L.L.C.**      (See above for address)
*fka* **Property Development Capital,**
**L.L.C.p**
*fka* **Boyington Land, L.L.C.**
*fka* **Eastn Classen Propeprty**
**Development, L.L.C.**
*fka* **Nichols Hills Market, L.L.C.**
*fka* **Atrium Towers, L.L.C.**
*fka* **Sayre Property Development,**
**L.L.C.**
*fka* **Paradise Road Real Estate**
**Company, L.L.C.**
*fka* **Grandmark Acquisition, L.L.C.**
*fka* **Barnes Veritas Holdings, L.L.C.**
*fka* **Waterford Land Company, LLC**

*Debtor*                 represented **Matthew D Cavenaugh**
**Midcon Compression, L.L.C.**       by (See above for address)
6100 North Western Avenue
Oklahoma City, OK 73118           **Cameron A. Secord**
OKLAHOMA-OK                   (See above for address)
Tax ID / EIN: 20-0299525

                                **Jennifer F Wertz**
                                (See above for address)

*Debtor*                 represented **Matthew D Cavenaugh**
**Chesapeake-Clements Acquisition,**   by (See above for address)
**L.L.C.**
6100 North Western Avenue          **Genevieve Marie Graham**
Oklahoma City, OK 73118           (See above for address)
OKLAHOMA-OK
Tax ID / EIN: 20-8716794          **Jennifer F Wertz**
                                (See above for address)

*Debtor*                 represented **Matthew D Cavenaugh**
**EMLP, L.L.C.**                  by (See above for address)

6100 North Western Avenue
Oklahoma City, OK 73118
OKLAHOMA-OK
Tax ID / EIN: 27-0581428

**Jennifer F Wertz**
(See above for address)

*Debtor*
**Wildhorse Resources Management Company, LLC**
6100 North Western Avenue
Oklahoma City, OK 73118
OKLAHOMA-OK
Tax ID / EIN: 61-1695582

represented **Matthew D Cavenaugh**
by (See above for address)

**Cameron A. Secord**
(See above for address)

**Jennifer F Wertz**
(See above for address)

*Debtor*
**GSF, L.L.C.**
6100 North Western Avenue
Oklahoma City, OK 73118
OKLAHOMA-OK
Tax ID / EIN: 26-2762867

represented **Matthew D Cavenaugh**
by (See above for address)

**Genevieve Marie Graham**
(See above for address)

**Jennifer F Wertz**
(See above for address)

*Debtor*
**WHE ACQCO., LLC**
6100 North Western Avenue
Oklahoma City, OK 73118
OKLAHOMA-OK
Tax ID / EIN: 00-0000000

represented **Matthew D Cavenaugh**
by (See above for address)

**Genevieve Marie Graham**
(See above for address)

**Jennifer F Wertz**
(See above for address)

*Debtor*
**Empress Louisiana Properties, L,P.**
6100 North Western Avenue
Oklahoma City, OK 73118
OKLAHOMA-OK
Tax ID / EIN: 20-1993109

represented **Matthew D Cavenaugh**
by (See above for address)

**Jennifer F Wertz**
(See above for address)

*Debtor*
**Nomac Services, L.L.C.**
611 North Western Avenue
Oklahoma City, OK 73118
OKLAHOMA-OK
Tax ID / EIN: 45-1157545

represented **Matthew D Cavenaugh**
by (See above for address)

**Jennifer F Wertz**
(See above for address)

*Debtor*
**Northern Michigan Exploration**

represented **Matthew D Cavenaugh**
by (See above for address)

**Company, L.L.C.**
6100 North Western Avenue                          **Jennifer F Wertz**
Oklahoma City, OK 73118                            (See above for address)
OKLAHOMA-OK
Tax ID / EIN: 27-2462483


*Debtor*                                 represented **Matthew D Cavenaugh**
**Winter Moon Energy Corporation**       by (See above for address)
6100 North Western Avenue
Oklahoma City, OK 73118                            **Jennifer F Wertz**
OKLAHOMA-OK                                        (See above for address)
Tax ID / EIN: 26-1939483
*fka* **Green Mountain Drilling, L.L.C.**


*Debtor*                                 represented **Matthew D Cavenaugh**
**CHK NGV Leasing Company, LLC**         by (See above for address)
OUTSIDE U. S.
                                                   **Jennifer F Wertz**
                                                   (See above for address)


*Defendant*                              represented **JGC Exploration Eagle Ford, LLC**
**JGC Exploration Eagle Ford, LLC**      by PRO SE

                                                   **Alexander David Burch**
                                                   *TERMINATED: 03/26/2021*


*U.S. Trustee*                           represented **Hector Duran, Jr**
**US Trustee**                           by U.S. Trustee
Office of the US Trustee                           515 Rusk
515 Rusk Ave                                       Ste 3516
Ste 3516                                           Houston, Tx 77002
Houston, TX 77002                                  7137184650
(713) 718-4650                                     Email: Hector.Duran.Jr@usdoj.gov

                                                   **Stephen Douglas Statham**
                                                   Office of US Trustee
                                                   515 Rusk
                                                   Ste 3516
                                                   Houston, TX 77002
                                                   713-718-4650 Ext 252
                                                   Fax : 713-718-4670
                                                   Email: stephen.statham@usdoj.gov


*Creditor Committee*                     represented **Jason Lee Boland**
**Official Committee Of Unsecured**      by Norton Rose Fulbright US LLP
**Creditors**                                      1301 McKinney
                                                   Ste 5100
                                                   Houston, TX 77010

713-651-3769
Fax : 713-651-5246
Email: jason.boland@nortonrosefulbright.com

**Robert Bernard Bruner**
Norton Rose Fulbright US LLP
1301 McKinney
Suite 5100
Houston, TX 77010
713-651-5216
Email: bob.bruner@nortonrosefulbright.com

**Kristian W. Gluck**
Norton Rose Fulbright US LLP
2200 Ross Ave
Suite 3600
Dallas, TX 75201-2784
214-855-8210
Fax : 214-855-8200
Email: kristian.gluck@nortonrosefulbright.com

**William R Greendyke**
Norton Rose Fulbright US LLP
1301 McKinney Street
Suite 5100
Houston, TX 77010
713-651-5193
Fax : 713-651-5193
Email: william.greendyke@nortonrosefulbright.com

**Julie Goodrich Harrison**
Norton Rose Fulbright US LLP
1301 McKinney St
Ste 5100
Houston, TX 77010
713-651-5434
Email: julie.harrison@nortonrosefulbright.com

**Maria Barbara Mokrzycka**
Norton Rose et al
1301 McKinney St 5100
Houston, TX 77010
804-426-7906
Email: maria.mokrzycka@nortonrosefulbright.com

**Justin E Rawlins**
Paul Hastings LLP
515 South Flower Street
Twenty-Fifth Floor

Los Angeles, CA 90071
213-683-6130
Email: justinrawlins@paulhastings.com

| Filing Date | # | Docket Text |
|---|---|---|
| 06/28/2020 | ● 1<br>(26 pgs) | Chapter 11 Voluntary Petition Non-Individual Fee Amount $1717 Filed by Chesapeake Energy Corporation. (Cavenaugh, Matthew) (Entered: 06/28/2020) |
| 06/28/2020 | | Receipt of Voluntary Petition (Chapter 11)(20-33233) [misc,volp11] (1717.00) Filing Fee. Receipt number 22229825. Fee amount $1717.00. (U.S. Treasury) (Entered: 06/28/2020) |
| 06/28/2020 | ● 2<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Patricia Williams Prewitt Filed by on behalf of Plains Marketing, L.P. (Prewitt, Patricia) (Entered: 06/28/2020) |
| 06/28/2020 | ● 3<br>(4 pgs; 2 docs) | Notice of Designation as Complex Chapter 11 Bankruptcy Case (Filed By Chesapeake Energy Corporation ). (Attachments: # 1 Proposed Order) (Peguero, Kristhy) (Entered: 06/28/2020) |
| 06/28/2020 | ● 4<br>(28 pgs; 2 docs) | Emergency Motion *for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation Hearing scheduled for 6/29/2020 at 02:30 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 06/28/2020) |
| 06/28/2020 | ● 5<br>(20 pgs; 2 docs) | Emergency Motion *for Entry of a Limited Interim Order Authorizing the Debtors to Maintain Their Fuel Card Program in the Ordinary Course of Business* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 06/28/2020) |
| 06/28/2020 | ● | Judge David R Jones added to case. Involvement of Judge Marvin Isgur Terminated. (LinhthuDo) (Entered: 06/28/2020) |

| | | |
|---|---|---|
| 06/28/2020 | 6<br>(48 pgs; 2 docs) | Emergency Motion *for Order Appointing Epiq Corporate Restructuring, LLC as Claims, Noticing, Solicitation, and Administrative Agent, Effective as of June 28, 2020* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 06/28/2020) |
| 06/28/2020 | 7<br>(19 pgs; 2 docs) | Emergency Motion *for Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of Creditors and a Consolidated List of the 50 Largest Unsecured Creditors, (II) Waiving the Requirement to File a List of Equity Security Holders, and (III) Authorizing the Debtors to Redact Certain Personal Identification Information* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 06/28/2020) |
| 06/28/2020 | 8<br>(10 pgs; 2 docs) | Emergency Motion *for Entry of an Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 06/28/2020) |
| 06/28/2020 | 9<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Duston K McFaul Filed by on behalf of MUFG Union Bank, N.A. (McFaul, Duston) (Entered: 06/28/2020) |
| 06/28/2020 | 10<br>(40 pgs; 2 docs) | Emergency Motion *for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 06/28/2020) |
| | 11<br>(69 pgs; 2 docs) | Emergency Motion *for Entry of an Order (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, |

| 06/28/2020 | | Matthew) (Entered: 06/28/2020) |
|---|---|---|
| 06/28/2020 | 🌐 12<br>(22 pgs; 2 docs) | Emergency Motion *for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 06/28/2020) |
| 06/28/2020 | 🌐 13<br>(39 pgs; 2 docs) | Emergency Motion *for Entry of an Order (I) Approving Continuation of the Surety Bond Program and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 06/28/2020) |
| 06/28/2020 | 🌐 14<br>(53 pgs; 3 docs) | Emergency Motion *for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts and (B) Continue to Perform Intercompany Transactions and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order Interim Order # 2 Proposed Order Final Order) (Cavenaugh, Matthew) (Entered: 06/28/2020) |
| 06/28/2020 | 🌐 15<br>(35 pgs; 3 docs) | Emergency Motion *for Entry of Interim and Final Orders (A) Authorizing the Payment of (A) Operating Expenses, (B) Marketing Expenses, (C) Shipping and Warehousing Claims, (D) 503(b)(9) Claims, and (E) Outstanding Orders and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order Interim Order # 2 Proposed Order Final Order) (Cavenaugh, Matthew) (Entered: 06/28/2020) |
| | 🌐 16<br>(19 pgs; 2 docs) | Emergency Motion *for Entry of an Order (I) Authorizing Payment of (A) Obligations Owed to Holders of Mineral and Other Interests and Non-Op Working Interests and (B) Joint Interest Billings, and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation |

| 06/28/2020 | | (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 06/28/2020) |
|---|---|---|
| 06/28/2020 | 🔵17 (46 pgs; 2 docs) | Emergency Motion *for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 06/28/2020) |
| 06/28/2020 | 🔵18 (46 pgs; 2 docs) | Emergency Motion *for Entry of an Order (I) Approving Notification and Hearing Procedures for Certain Transfers of Common Stock and Preferred Stock and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 06/28/2020) |
| 06/28/2020 | 🔵19 (21 pgs; 2 docs) | Emergency Motion *for Entry of an Order (I) Authorizing the Debtors to (A) Enter Into and Perform Under Hedge Agreements, (B) Grant Liens and Super-Priority Claims, and (C) Modify the Automatic Stay, and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 06/28/2020) |
| 06/28/2020 | 🔵20 (2 pgs) | Notice of Appearance and Request for Notice Filed by Julie Ann Walker Filed by on behalf of J-W Power Company (Walker, Julie) (Entered: 06/28/2020) |
| 06/28/2020 | 🔵21 (3 pgs) | Notice of Appearance and Request for Notice Filed by T. Josh Judd Filed by on behalf of Enterprise Texas Pipeline LLC (Judd, T.) (Entered: 06/28/2020) |
| | 🔵22 (316 pgs; 2 docs) | Emergency Motion *for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority* |

| | | |
|---|---|---|
| 06/28/2020 | | *Administrative Expense Status, (IV) Granting Adequate Protection to the Existing Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order Interim Order) (Cavenaugh, Matthew) (Entered: 06/28/2020) |
| 06/28/2020 | 23<br>(4 pgs) | Limited Interim Order Authorizing Debtors to Maintain Their Fuel Card Program in the Ordinary Course of Business (Related Doc # 5) Signed on 6/28/2020. (aalo) (Entered: 06/28/2020) |
| 06/28/2020 | | Notice of Appearance and Request for Notice Filed by Hector Duran Jr (Duran, Hector) (Entered: 06/28/2020) |
| 06/28/2020 | 24<br>(11 pgs) | Sealed Document *Fee Letters* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 06/28/2020) |
| 06/28/2020 | 25<br>(14 pgs; 2 docs) | Motion to Seal *Certain Information in Certain Confidential Letters Related to the Proposed Debtor-in-Possession Financing* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 06/28/2020) |
| 06/28/2020 | 26<br>(4 pgs) | Notice of Appearance and Request for Notice Filed by Kiran K Vakamudi Filed by on behalf of Ad Hoc Group of FLLO Term Loan Lenders (Vakamudi, Kiran) (Entered: 06/28/2020) |
| 06/28/2020 | 27<br>(18 pgs; 2 docs) | Emergency Motion *for Entry of an Order (I) Authorizing Rejection of Certain Executory Contracts Effective as of July 1, 2020 and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 06/28/2020) |
| 06/28/2020 | 28<br>(1 pg) | Motion to Appear pro hac vice *Aryeh Ethan Falk*. Filed by Creditor Ad Hoc Group of FLLO Term Loan Lenders (Vakamudi, Kiran) (Entered: 06/28/2020) |

| | | |
|---|---|---|
| 06/28/2020 | 🔵 29<br>(1 pg) | Motion to Appear pro hac vice *Benjamin S. Kaminetzky*. Filed by Creditor Ad Hoc Group of FLLO Term Loan Lenders (Vakamudi, Kiran) (Entered: 06/28/2020) |
| 06/28/2020 | 🔵 30<br>(1 pg) | Motion to Appear pro hac vice *Darren S. Klein*. Filed by Creditor Ad Hoc Group of FLLO Term Loan Lenders (Vakamudi, Kiran) (Entered: 06/28/2020) |
| 06/28/2020 | 🔵 31<br>(1 pg) | Motion to Appear pro hac vice *David S. Meyer*. Filed by Creditor Ad Hoc Group of FLLO Term Loan Lenders (Vakamudi, Kiran) (Entered: 06/28/2020) |
| 06/28/2020 | 🔵 32<br>(1 pg) | Motion to Appear pro hac vice *Daniel Rudewicz*. Filed by Creditor Ad Hoc Group of FLLO Term Loan Lenders (Vakamudi, Kiran) (Entered: 06/28/2020) |
| 06/28/2020 | 🔵 33<br>(1 pg) | Motion to Appear pro hac vice *Damian S. Schaible*. Filed by Creditor Ad Hoc Group of FLLO Term Loan Lenders (Vakamudi, Kiran) (Entered: 06/28/2020) |
| 06/28/2020 | 🔵 34<br>(1 pg) | Motion to Appear pro hac vice *Emily S. Tomlinson*. Filed by Creditor Ad Hoc Group of FLLO Term Loan Lenders (Vakamudi, Kiran) (Entered: 06/28/2020) |
| 06/28/2020 | 🔵 35<br>(97 pgs; 6 docs) | Motion to Assume/Reject *Motion of Chesapeake Energy Corporation for Entry of an Order (I) Authorizing Rejection of the Negotiated Rate Firm Transportation Agreements and Related Contracts Effective as of July 1, 2020 and (II) Granting Related Relief*. Objections/Request for Hearing Due in 21 days. Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Proposed Order) (Cavenaugh, Matthew) (Entered: 06/28/2020) |
| | 🔵 36<br>(21 pgs; 2 docs) | Motion *for Entry of an Order Establishing a Record Date for Notice and Sell-Down Procedures for Trading in Certain Claims Against the Debtors' Estates* Filed by Debtor Chesapeake Energy |

| 06/28/2020 | | Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 06/28/2020) |
|---|---|---|
| 06/28/2020 | 🔘37 (293 pgs) | Declaration re: *Declaration of Domenic J. Dell'Osso, Jr., Executive Vice President and Chief Financial Officer of Chesapeake Energy Corporation in Support of Chapter 11 Petitions and First Day Motions* (Filed By Chesapeake Energy Corporation ). (Peguero, Kristhy) (Entered: 06/28/2020) |
| 06/28/2020 | 🔘38 (191 pgs; 2 docs) | Adversary case 20-03231. Nature of Suit: (91 (Declaratory judgment)),(72 (Injunctive relief - other)) Complaint *for Declaratory Judgment, Ex Parte Temporary Restraining Order, and Preliminary and Permanent Injunction* by Chesapeake Energy Corporation against Federal Energy Regulatory Commission. Fee Amount $350 (Attachments: # 1 Adversary Cover Sheet) (Cavenaugh, Matthew) (Entered: 06/28/2020) |
| 06/28/2020 | 🔘39 (1 pg) | Motion to Appear pro hac vice *Stephen L. Iacovo*. Filed by Debtor Chesapeake Energy Corporation (Peguero, Kristhy) (Entered: 06/28/2020) |
| 06/28/2020 | 🔘40 (1 pg) | Motion to Appear pro hac vice *Patrick J. Nash, Jr*. Filed by Debtor Chesapeake Energy Corporation (Peguero, Kristhy) (Entered: 06/28/2020) |
| 06/28/2020 | 🔘41 (1 pg) | Motion to Appear pro hac vice *Marc Keiselstein*. Filed by Debtor Chesapeake Energy Corporation (Peguero, Kristhy) (Entered: 06/28/2020) |
| 06/28/2020 | 🔘42 (7 pgs) | Notice *of Electronic Hearing*. Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 06/28/2020) |
| 06/28/2020 | 🔘43 (1 pg) | Motion to Appear pro hac vice *Judson Brown*. Filed by Debtor Chesapeake Energy Corporation (Peguero, Kristhy) (Entered: 06/28/2020) |
| 06/28/2020 | 🔘44 (6 pgs) | Agenda for Hearing on 6/29/2020 (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 06/28/2020) |
| | 🔘45 | Motion to Appear pro hac vice *Jennifer C. Hagle*. |

| | | |
|---|---|---|
| 06/28/2020 | (1 pg) | Filed by Creditor MUFG Union Bank, N.A. (Quejada, Maegan) (Entered: 06/28/2020) |
| 06/28/2020 | 46 (1 pg) | Motion to Appear pro hac vice *Daniel T. Donovan*. Filed by Debtor Chesapeake Energy Corporation (Peguero, Kristhy) (Entered: 06/28/2020) |
| 06/28/2020 | 47 (1 pg) | Motion to Appear pro hac vice *Annie Dreisbach*. Filed by Debtor Chesapeake Energy Corporation (Peguero, Kristhy) (Entered: 06/28/2020) |
| 06/28/2020 | 48 (1 pg) | Motion to Appear pro hac vice *Alexandra Schwarzman*. Filed by Debtor Chesapeake Energy Corporation (Peguero, Kristhy) (Entered: 06/28/2020) |
| 06/28/2020 | 49 (316 pgs; 3 docs) | Exhibit List, Witness List (Filed By Chesapeake Energy Corporation ).(Related document(s):42 Notice, 44 Agenda) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2) (Cavenaugh, Matthew) (Entered: 06/28/2020) |
| 06/28/2020 | 82 (1 pg) | Order Granting Complex Chapter 11 Bankruptcy Case Treatment Signed on 6/28/2020 (Related document(s):3 Notice of Designation as Complex Chapter 11 Bankruptcy Case) (emiller) (Entered: 06/29/2020) |
| 06/28/2020 | 91 (12 pgs) | Order for Joint Administration Signed on 6/28/2020 (Related Doc # 4). (aaloadi) (Entered: 06/29/2020) |
| 06/29/2020 | | Notice of Appearance and Request for Notice Filed by Stephen Douglas Statham (Statham, Stephen) (Entered: 06/29/2020) |
| 06/29/2020 | 50 (1 pg) | Notice and Order regarding exchanging of exhibits and witness lists in all contested matters and adversary proceedings. (Entered: 06/29/2020) |
| 06/29/2020 | 51 (3 pgs) | Notice of Appearance and Request for Notice Filed by Jason S Brookner Filed by on behalf of Stagecoach Pipeline & Storage Company LLC, Jackalope Gas Gathering Services, L.L.C. (Brookner, Jason) (Entered: 06/29/2020) |

| | | |
|---|---|---|
| 06/29/2020 | 52<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Owen Mark Sonik Filed by on behalf of Sheldon Independent School District (Sonik, Owen) (Entered: 06/29/2020) |
| 06/29/2020 | 53<br>(4 pgs) | Notice of Appearance and Request for Notice Filed by Jason Bradley Binford Filed by on behalf of Texas Comptroller of Public Accounts, Unclaimed Property Division (Binford, Jason) (Entered: 06/29/2020) |
| 06/29/2020 | 54<br>(4 pgs) | Notice of Appearance and Request for Notice Filed by Marty L Brimmage Filed by on behalf of Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts (Brimmage, Marty) (Entered: 06/29/2020) |
| 06/29/2020 | 55<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Aryeh Ethan Falk (Related Doc # 28) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | 56<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Benjamin S. Kaminetzky (Related Doc # 29) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | 57<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Darren S. Klein (Related Doc # 30) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | 58<br>(1 pg) | Order Granting Motion To Appear pro hac vice - David S. Meyer (Related Doc # 31) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | 59<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Daniel Rudewicz (Related Doc # 32) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | 60<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Damian S. Schaible (Related Doc # 33) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | 61<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Emily S. Tomlinson (Related Doc # 34) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |

| | | |
|---|---|---|
| 06/29/2020 | ⬤ 62<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Stephen L. Iacovo (Related Doc # 39) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | ⬤ 63<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Patrick J. Nash (Related Doc # 40) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | ⬤ 64<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Marc Keiselstein (Related Doc # 41) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | ⬤ 65<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Judson Brown (Related Doc # 43) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | ⬤ 66<br>(3 pgs) | Notice *of Perfection of Lien Pursuant to 11 U.S.C. § 546(b)(2)*. Filed by Enterprise Texas Pipeline LLC (Judd, T.) (Entered: 06/29/2020) |
| 06/29/2020 | ⬤ 67<br>(1 pg) | Order Granting Motion To Appear pro hac vice (Related Doc # 45) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | ⬤ 68<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Daniel T. Donovan (Related Doc # 46) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | ⬤ 69<br>(5 pgs) | Notice of Appearance and Request for Notice Filed by Michael D Warner Filed by on behalf of Glas USA LLC (Warner, Michael) (Entered: 06/29/2020) |
| 06/29/2020 | ⬤ 70<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Annie Dreisbach (Related Doc # 47) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | ⬤ 71<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Alexandra Schwarzman (Related Doc # 48) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | ⬤ 72<br>(1 pg) | Motion to Appear pro hac vice *Gary A. Ritacco*. Filed by Interested Party Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts (Brimmage, Marty) (Entered: 06/29/2020) |

| | | |
|---|---|---|
| 06/29/2020 | 🔘73<br>(1 pg) | Motion to Appear pro hac vice *Meredith A. Lahaie*. Filed by Interested Party Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts (Brimmage, Marty) (Entered: 06/29/2020) |
| 06/29/2020 | 🔘74<br>(1 pg) | Motion to Appear pro hac vice *of Jonathan Levine/Arnold & Porter Kaye Scholer LLP*. Filed by Interested Party Glas USA LLC (Warner, Michael) (Entered: 06/29/2020) |
| 06/29/2020 | 🔘75<br>(1 pg) | Motion to Appear pro hac vice *Michael S. Stamer*. Filed by Interested Party Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts (Brimmage, Marty) (Entered: 06/29/2020) |
| 06/29/2020 | 🔘76<br>(1 pg) | Motion to Appear pro hac vice *of Ginger Clements/Arnold & Porter Kaye Scholer LLP*. Filed by Interested Party Glas USA LLC (Warner, Michael) (Entered: 06/29/2020) |
| 06/29/2020 | 🔘77<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Charles A Beckham Jr Filed by on behalf of The Williams Companies, Inc. (Beckham, Charles) (Entered: 06/29/2020) |
| 06/29/2020 | 🔘78<br>(1 pg) | Motion to Appear pro hac vice *of Brian M. Resnick*. Filed by Creditor The Williams Companies, Inc. (Beckham, Charles) (Entered: 06/29/2020) |
| 06/29/2020 | 🔘79<br>(1 pg) | Motion to Appear pro hac vice *of Lara Samet Buchwald*. Filed by Creditor The Williams Companies, Inc. (Beckham, Charles) (Entered: 06/29/2020) |
| 06/29/2020 | 🔘80<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Michael D Rubenstein Filed by on behalf of BP America Production Company (Rubenstein, Michael) (Entered: 06/29/2020) |
| 06/29/2020 | 🔘81<br>(1 pg) | Motion to Appear pro hac vice *of Angela M. Libby*. Filed by Creditor The Williams Companies, Inc. (Beckham, Charles) (Entered: 06/29/2020) |

| | | |
|---|---|---|
| 06/29/2020 | 83<br>(39 pgs) | Affidavit Re: *Affidavit of Service of Marc Orfitelli of First Day Pleadings* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):4 Emergency Motion, 6 Emergency Motion, 7 Emergency Motion, 8 Emergency Motion, 10 Emergency Motion, 11 Emergency Motion, 12 Emergency Motion, 13 Emergency Motion, 14 Emergency Motion, 15 Emergency Motion, 16 Emergency Motion, 17 Emergency Motion, 18 Emergency Motion, 19 Emergency Motion, 22 Emergency Motion, 23 Order on Emergency Motion, 25 Motion to Seal, 27 Emergency Motion, 35 Motion to Assume/Reject, 36 Generic Motion, 37 Declaration, 42 Notice, 44 Agenda, 49 Exhibit List, Witness List) (Garabato, Sid) (Entered: 06/29/2020) |
| 06/29/2020 | 84<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Gary A. Ritacco (Related Doc # 72) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | 85<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Meredith A. Lahaie (Related Doc # 73) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | 86<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Jonathan Levine (Related Doc # 74) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | 87<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Michael S. Stamer (Related Doc # 75) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | 88<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Ginger Clements (Related Doc # 76) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | 89<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Phillip L Lamberson Filed by on behalf of Wells Fargo Bank, National Association (Lamberson, Phillip) (Entered: 06/29/2020) |
| 06/29/2020 | 90<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Annmarie Antoinette Chiarello Filed by on behalf of Wells Fargo Bank, National Association (Chiarello, Annmarie) (Entered: 06/29/2020) |

| | | |
|---|---|---|
| 06/29/2020 | 92<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Brian M. Resnick (Related Doc # 78) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | 93<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Lara Samet Buchwald (Related Doc # 79) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | 94<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Angela M. Libby (Related Doc # 81) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | 95<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Andrew A Braun Filed by on behalf of Westerngeco LLC (Braun, Andrew) (Entered: 06/29/2020) |
| 06/29/2020 | 96<br>(1 pg) | Notice of Appearance and Request for Notice Filed by PRA Receivables Management, LLC (Smith, Valerie) (Entered: 06/29/2020) |
| 06/29/2020 | 97<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Shelley B Marmon Filed by on behalf of James Wendell West, Faith Ranch, LP, Faith Operating Company, LP, Wesley West Minerals, Ltd. (Marmon, Shelley) (Entered: 06/29/2020) |
| 06/29/2020 | 98<br>(16 pgs; 2 docs) | Proposed Order RE: *Order (I) Authorizing the Debtors to (A) Enter Into and Perform Under Hedge Agreements, (B) Grant Liens and Super-Priority Claims, and (C) Modify the Automatic Stay, and (II) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):19 Emergency Motion) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 06/29/2020) |
| 06/29/2020 | 99<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Ryan Michael Seidemann Filed by on behalf of State of Louisiana, Department of Natural Resources, Office of Mineral Resources (Seidemann, Ryan) (Entered: 06/29/2020) |
| | 100<br>(4 pgs) | Notice of Appearance and Request for Notice Filed by Ryan Coel Wooten Filed by on behalf of Royal Bank of Canada (Wooten, Ryan) (Entered: |

| 06/29/2020 | | 06/29/2020) |
|---|---|---|
| 06/29/2020 | 🔵 101<br>(1 pg) | Motion to Appear pro hac vice *for Laura Metzger*. Filed by Creditor Royal Bank of Canada (Wooten, Ryan) (Entered: 06/29/2020) |
| 06/29/2020 | 🔵 102<br>(1 pg) | Motion to Appear pro hac vice *for Raniero D'Aversa*. Filed by Creditor Royal Bank of Canada (Wooten, Ryan) (Entered: 06/29/2020) |
| 06/29/2020 | 🔵 103<br>(1 pg) | Motion to Appear pro hac vice *Lena K. Seward*. Filed by Creditor Commonwealth Of Kentucky (mmap) (Entered: 06/29/2020) |
| 06/29/2020 | 🔵 104<br>(1 pg) | Motion to Appear pro hac vice *Timothy J. Mayer*. Filed by Creditor Commonwealth Of Kentucky (mmap) (Entered: 06/29/2020) |
| 06/29/2020 | 🔵 105<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Laura Metzger (Related Doc # 101) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | 🔵 106<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Raniero D'Aversa (Related Doc # 102) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | 🔵 107<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Lena K. Seward (Related Doc # 103) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | 🔵 108<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Timothy J. Mayer (Related Doc # 104) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | 🔵 109<br>(7 pgs) | Order Appointing Epiq Corporate Restructuring, LLC as Claims, Noticing, Solicitation, and Administrative Agent, Effective as of June 28, 2020 (Related Doc # 6) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| | 🔵 110<br>(20 pgs; 2 docs) | Proposed Order RE: *Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, and (II) Granting Related* (Filed By |

| | | |
|---|---|---|
| 06/29/2020 | | Chesapeake Energy Corporation ).(Related document(s):12 Emergency Motion) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 06/29/2020) |
| 06/29/2020 | 111 (324 pgs; 2 docs) | Proposed Order RE: *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Existing Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):22 Emergency Motion) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 06/29/2020) |
| 06/29/2020 | 112 (1 pg) | Motion to Appear pro hac vice *Anthony Thomas Kovalchick*. Filed by Creditor Commonwealth of Pennsylvania (Kovalchick, Anthony) (Entered: 06/29/2020) |
| 06/29/2020 | 113 (1 pg) | Motion to Appear pro hac vice *Jason L. Swartley*. Filed by Creditor Commonwealth of Pennsylvania (Kovalchick, Anthony) (Entered: 06/29/2020) |
| 06/29/2020 | 114 (1 pg) | Motion to Appear pro hac vice *Carol E. Momjian*. Filed by Creditor Commonwealth of Pennsylvania (Kovalchick, Anthony) (Entered: 06/29/2020) |
| 06/29/2020 | 115 (1 pg) | Motion to Appear pro hac vice *Lauren A. Michaels*. Filed by Creditor Commonwealth of Pennsylvania (Kovalchick, Anthony) (Entered: 06/29/2020) |
| 06/29/2020 | 116 (3 pgs) | Notice of Appearance and Request for Notice Filed by Mark J. Chaney, III III Filed by on behalf of ARI Fleet LT, Automotive Rentals, Inc. (Chaney, III, Mark) (Entered: 06/29/2020) |
| 06/29/2020 | 117 (1 pg) | Motion to Appear pro hac vice *(Mark J. Chaney, III)*. Filed by Creditors ARI Fleet LT, Automotive Rentals, Inc. (Chaney, III, Mark) (Entered: 06/29/2020) |
| | 118 | Statement *Verified Statement Pursuant to Federal* |

| | | |
|---|---|---|
| 06/29/2020 | (11 pgs) | *Rule of Bankruptcy Procedure 2019* (Filed By Ad Hoc Group of FLLO Term Loan Lenders ). (Vakamudi, Kiran) (Entered: 06/29/2020) |
| 06/29/2020 | 119 (1 pg) | Motion to Appear pro hac vice *Chad L. Schexnayder*. Filed by Creditors Liberty Mutual Insurance Company, Safeco Insurance Company of America (Schexnayder, Chad) (Entered: 06/29/2020) |
| 06/29/2020 | 120 (1 pg) | Notice of Appearance and Request for Notice Filed by Don Stecker Filed by on behalf of Bexar County (Stecker, Don) (Entered: 06/29/2020) |
| 06/29/2020 | 121 (1 pg) | Order Granting Motion To Appear pro hac vice - Anthony Thomas Kovalchick (Related Doc # 112) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | 122 (1 pg) | Order Granting Motion To Appear pro hac vice - Jason L. Swartley (Related Doc # 113) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | 123 (1 pg) | Order Granting Motion To Appear pro hac vice - Carol E. Momjian (Related Doc # 114) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | 124 (1 pg) | Order Granting Motion To Appear pro hac vice - Lauren A. Michaels (Related Doc # 115) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | 125 (1 pg) | Order Granting Motion To Appear pro hac vice - Mark J. Chaney, III (Related Doc # 117) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | 126 (1 pg) | Order Granting Motion To Appear pro hac vice - Chad J. Schexnayder (Related Doc # 119) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | 127 (3 pgs) | Notice of Appearance and Request for Notice Filed by Kiran A Phansalkar Filed by on behalf of Big Star Transportation LLC d/b/a Big Star Crude Co., LLC (Phansalkar, Kiran) (Entered: 06/29/2020) |
| | 128 (235 pgs) | Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the |

| | | |
|---|---|---|
| 06/29/2020 | | Debtors to Use Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Existing Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief Signed on 6/29/2020 (Related document(s):22 Emergency Motion) **Final Hearing scheduled for 7/20/2020 at 11:30 AM at Houston, Courtroom 400 (DRJ).** (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | 129 (8 pgs) | Order (I) Authorizing the Debtors to (A) Enter into and Perform Under Hedge Agreements, (B) Grant Liens and Super-Priority Claims, and (C) Modify the Automatic Stay, and (II) Granting Related Relief (Related Doc # 19) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | 130 (3 pgs) | Notice of Appearance and Request for Notice Filed by Kiran A Phansalkar Filed by on behalf of Plains Marketing, L.P. (Phansalkar, Kiran) (Entered: 06/29/2020) |
| 06/29/2020 | 131 (6 pgs) | Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief (Related Doc # 10) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | 132 (5 pgs) | Order (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief (Related Doc # 11) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | 133 (9 pgs) | Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, and (II) Granting Related Relief (Related Doc # 12) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| | 134 (2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Jacqueline Kindler. This is to order a transcript of 6/29/2020, Hearing before Judge |

| | | |
|---|---|---|
| 06/29/2020 | | David R. Jones. Court Reporter/Transcriber: Access Transcripts. (mmap) Electronically forwarded to Access Transcripts, LLC on June 29, 2020. Estimated completion date: June 30, 2020. Modified on 6/29/2020 (ClaudiaGutierrez). (Entered: 06/29/2020) |
| 06/29/2020 | 🌐 135 (5 pgs) | Courtroom Minutes. Time Hearing Held: 2:57 PM. Appearances: see attached. First Day Declarations: Declaration of Domenic J. DellOsso, Jr., and Stephen J. Antinelli. The Court has approved the DIP Motion 22 and Cash Management Motion 14 on an interim basis with a **Final Hearing set for 7/20/2020 at 11:30 AM by telephone and video conference**. The Court has approved the following motions on a final basis, the Hedging Motion 19, Wages Motion 10, Taxes Motion 11, Insurance Motion 12, Surety Bond Motion 13, Creditor Matrix Motion 7, SOFA Motion 8, Lienholders Motion 15, Royalty Payments Motion 16, Utilities Motion 17, NOL Motion 18. All orders signed and to be entered by the court. (aalo) (Entered: 06/29/2020) |
| 06/29/2020 | 🌐 136 (3 pgs) | Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedule3 of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs (Related Doc # 8) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | 🌐 137 (8 pgs) | Order (I) Authorizing the Debtors to File a Consolidated List of Creditors and a Consolidated List of the 50 Largest Unsecured Creditors, (II) Waiving the Requirement to File a List of Equity Security Holders, and (III) Authorizing the Debtors to Redact Certain Personal Identification Information (Related Doc # 7) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | 🌐 138 (25 pgs) | Order (I) Approving Continuation of the Surety Bond Program and (II) Granting Related Relief (Related Doc # 13) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| | 🌐 139 (11 pgs) | Interim Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management |

| | | |
|---|---|---|
| 06/29/2020 | | System and Maintain Existing Bank Accounts and (B) Continue to Perform Intercompany Transactions and (II) Granting Related Relief Signed on 6/29/2020 (Related document(s):14 Emergency Motion **Final Hearing scheduled for 7/20/2020 at 11:30 AM at Houston, Courtroom 400 (DRJ).** (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | 🔵 140 (7 pgs) | Final Order (I) Authorizing the Payment of (A) Operating Expenses, (B) Marketing Expenses, (C) Shipping and Warehousing Claims, (D) 503(b)(9) Claims, and (E) Outstanding Orders, and (II) Granting Related Relief (Related Doc # 15) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | 🔵 141 (6 pgs) | Order (I) Authorizing Payment of (A) Obligations Owed to Holders of Mineral and Other Interests and Non-Op Working Interests (B) Joint Interest Billings, and (II) Granting Related Relief (Related Doc # 16) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | 🔵 142 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Marty L. Brimmage, Jr.. This is to order a transcript of the June 29, 2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts ). (Brimmage, Marty) Copy request forwarded to Access Transcripts, LLC on June 30, 2020. Estimated completion date: July 1, 2020. Modified on 6/30/2020 (ClaudiaGutierrez). (Entered: 06/29/2020) |
| 06/29/2020 | 🔵 143 (31 pgs) | Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief (Related Doc # 17) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| | 🔵 144 (28 pgs) | Order (I) Approving Notification and Hearing Procedures for Certain Transfers of Common Stock and Preferred Stock and (II) Granting Related |

| | | |
|---|---|---|
| 06/29/2020 | | Relief (Related Doc # 18) Signed on 6/29/2020. (emiller) (Entered: 06/29/2020) |
| 06/29/2020 | 145 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew Cavenaugh. This is to order a transcript of 6/29/2020 before Judge David R. Jones. Court Reporter/Transcriber: Veritext Legal Solutions (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) Copy request forwarded to original transcription provider, Access Transcripts, LLC on June 30, 2020. Estimated completion date: July, 1, 2020. Modified on 6/30/2020 (ClaudiaGutierrez). (Entered: 06/29/2020) |
| 06/29/2020 | 146 (2 pgs) | AO 435 TRANSCRIPT ORDER FORM (3-Day) by John E. Mitchell. This is to order a transcript of First Day Hearing - 6/29/2020 before Judge David R. Jones. Court Reporter/Transcriber: Veritext Legal Solutions (Filed By Energy Transfer Fuel, LP ). (Mitchell, John) Copy request forwarded to original transcription provider, Access Transcripts, LLC on June 30, 2020. Estimated completion date: July, 1, 2020. Modified on 6/30/2020 (ClaudiaGutierrez). (Entered: 06/29/2020) |
| 06/29/2020 | 147 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by M. Quejada. This is to order a transcript of First Day Hearing held on June 29, 2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By MUFG Union Bank, N.A. ). (Quejada, Maegan) Copy request forwarded to Access Transcripts, LLC on June 30, 2020. Estimated completion date: July 1, 2020. Modified on 6/30/2020 (ClaudiaGutierrez). (Entered: 06/29/2020) |
| 06/29/2020 | 148 (3 pgs) | Notice of Appearance and Request for Notice Filed by Chad L Schexnayder Filed by on behalf of Liberty Mutual Insurance Company, Safeco Insurance Company of America (Schexnayder, Chad) (Entered: 06/29/2020) |
| 06/30/2020 | 149 (1 pg) | Notice of Appearance and Request for Notice Filed by Lisa Large Cockrell Filed by on behalf of Grayson county, Gregg County, Parker CAD, Hood CAD (Cockrell, Lisa) (Entered: 06/30/2020) |

| | | |
|---|---|---|
| 06/30/2020 | 150 (3 pgs) | Notice of Appearance and Request for Notice Filed by Rudy Cerone Filed by on behalf of ARI Fleet LT, Automotive Rentals, Inc. (Cerone, Rudy) (Entered: 06/30/2020) |
| 06/30/2020 | 151 (1 pg) | Motion to Appear pro hac vice *(Rudy J. Cerone)*. Filed by Creditors ARI Fleet LT, Automotive Rentals, Inc. (Cerone, Rudy) (Entered: 06/30/2020) |
| 06/30/2020 | 152 (3 pgs) | Notice of Appearance and Request for Notice Filed by Kevin M Maraist Filed by on behalf of Archrock Partners Operating, LLC (Maraist, Kevin) (Entered: 06/30/2020) |
| 06/30/2020 | 153 (3 pgs) | Statement *of Crady Jewett McCulley & Houren LLP* (Filed By Faith Operating Company, LP, Faith Ranch, LP, Wesley West Minerals, Ltd., James Wendell West ). (Marmon, Shelley) (Entered: 06/30/2020) |
| 06/30/2020 | 154 (3 pgs) | Notice of Appearance and Request for Notice Filed by Mark A Weisbart Filed by on behalf of Mesa Natural Gas Solutions, LLC (Weisbart, Mark) (Entered: 06/30/2020) |
| 06/30/2020 | 155 (2 pgs) | Notice of Appearance and Request for Notice Filed by Laura J Monroe Filed by on behalf of Dawson County Central Appraisal District, et al (Monroe, Laura) (Entered: 06/30/2020) |
| 06/30/2020 | 156 (3 pgs) | Notice of Appearance and Request for Notice Filed by Edward L Ripley Filed by on behalf of CNOOC Energy U.S.A. LLC (Ripley, Edward) (Entered: 06/30/2020) |
| 06/30/2020 | 157 (1 pg) | PDF with attached Audio File. Court Date & Time [ 6/29/2020 2:56:40 PM ]. File Size [ 40326 KB ]. Run Time [ 01:24:01 ]. (In ref to first day hearing. Hearing held June 29, 2020.). (admin). (Entered: 06/30/2020) |
| | 158 (3 pgs) | Notice of Appearance and Request for Notice Filed by John E Mitchell Filed by on behalf of Oasis Pipeline L.P., Houston Pipe Line Company, LP, ETC Katy Pipeline, Ltd., ETC Texas Pipeline Ltd., Energy Transfer Fuel, LP (Mitchell, John) |

| | | |
|---|---|---|
| 06/30/2020 | | (Entered: 06/30/2020) |
| 06/30/2020 | 🔘 159<br>(1 pg) | Motion to Appear pro hac vice *Evelina Gentry*. Filed by Creditors ETC Katy Pipeline, Ltd., ETC Texas Pipeline Ltd., Energy Transfer Fuel, LP, Houston Pipe Line Company, LP, Oasis Pipeline L.P. (Mitchell, John) (Entered: 06/30/2020) |
| 06/30/2020 | 🔘 160<br>(1 pg) | Motion to Appear pro hac vice *Katherine C. Fackler*. Filed by Creditors ETC Katy Pipeline, Ltd., ETC Texas Pipeline Ltd., Energy Transfer Fuel, LP, Houston Pipe Line Company, LP, Oasis Pipeline L.P. (Mitchell, John) (Entered: 06/30/2020) |
| 06/30/2020 | 🔘 161<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Jennifer Nicole Huckleberry Filed by on behalf of Wilmington Savings Fund Society, FSB (Huckleberry, Jennifer) (Entered: 06/30/2020) |
| 06/30/2020 | 🔘 162<br>(1 pg) | Motion to Appear pro hac vice *of Harold Kaplan*. Filed by Creditor Wilmington Savings Fund Society, FSB (Huckleberry, Jennifer) (Entered: 06/30/2020) |
| 06/30/2020 | 🔘 163<br>(1 pg) | Motion to Appear pro hac vice *of Mark Hebbeln*. Filed by Creditor Wilmington Savings Fund Society, FSB (Huckleberry, Jennifer) (Entered: 06/30/2020) |
| 06/30/2020 | 🔘 164<br>(37 pgs) | Debtors Master Service List (Filed By Epiq Corporate Restructuring LLC ). (Garabato, Sid) (Entered: 06/30/2020) |
| 06/30/2020 | 🔘 165<br>(1 pg) | Motion to Appear pro hac vice *of Justin Rawlins*. Filed by Creditor MUFG Union Bank, N.A. (Wilson, Broocks) (Entered: 06/30/2020) |
| 06/30/2020 | 🔘 166<br>(1 pg) | Motion to Appear pro hac vice *of Aaron Gober-Sims*. Filed by Creditor MUFG Union Bank, N.A. (Wilson, Broocks) (Entered: 06/30/2020) |
| 06/30/2020 | 🔘 167<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Broocks McClure Wilson Filed by on behalf of MUFG Union Bank, N.A. (Wilson, Broocks) (Entered: 07/01/2020) |

| | | |
|---|---|---|
| 06/30/2020 | 248<br>(1 pg) | Motion to Appear pro hac vice , *Alana L Porrazo*. Filed by Creditors Liberty Mutual Insurance Company, Safeco Insurance Company of America (rcas) (Entered: 07/02/2020) |
| 07/01/2020 | 168<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Richard A. Kincheloe Filed by on behalf of Federal Energy Regulatory Commission (Kincheloe, Richard) (Entered: 07/01/2020) |
| 07/01/2020 | 169<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Richard A Aguilar Filed by on behalf of ARI Fleet LT, Automotive Rentals, Inc. (Aguilar, Richard) (Entered: 07/01/2020) |
| 07/01/2020 | 170<br>(1 pg) | Motion to Appear pro hac vice *(Richard A. Aguilar)*. Filed by Creditors ARI Fleet LT, Automotive Rentals, Inc. (Aguilar, Richard) (Entered: 07/01/2020) |
| 07/01/2020 | 171<br>(1 pg) | Corrected Motion to Appear pro hac vice . Filed by Creditor Commonwealth of Pennsylvania (Swartley, Jason) (Entered: 07/01/2020) |
| 07/01/2020 | 172<br>(4 pgs) | Notice of Appearance and Request for Notice Filed by Winstol Dean Carter Jr. Filed by on behalf of Deutsche Bank Trust Company Americas (Carter, Winstol) (Entered: 07/01/2020) |
| 07/01/2020 | 173<br>(1 pg) | Motion to Appear pro hac vice *David M. Riley*. Filed by Trustee Deutsche Bank Trust Company Americas (Carter, Winstol) (Entered: 07/01/2020) |
| 07/01/2020 | 174<br>(1 pg) | Motion to Appear pro hac vice *Glenn E. Siegel*. Filed by Trustee Deutsche Bank Trust Company Americas (Carter, Winstol) (Entered: 07/01/2020) |
| 07/01/2020 | 175<br>(1 pg) | Motion to Appear pro hac vice *Rachel J. Mauceri*. Filed by Trustee Deutsche Bank Trust Company Americas (Carter, Winstol) (Entered: 07/01/2020) |
| | 176<br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Ad Hoc Group of FLLO Term Loan Lenders. This is to order a transcript of First Day Hearing held on June 29, 2020 before Judge David R. Jones. Court Reporter/Transcriber: Veritext |

| | | |
|---|---|---|
| 07/01/2020 | | Legal Solutions (Filed By Ad Hoc Group of FLLO Term Loan Lenders ). (Vakamudi, Kiran) Copy request forwarded to original transcription company, Access Transcripts, LLC on July 1, 2020. Estimated completion date: July 2, 2020. Modified on 7/1/2020 (ClaudiaGutierrez). (Entered: 07/01/2020) |
| 07/01/2020 | 177 (3 pgs) | Notice of Appearance and Request for Notice Filed by Judith W Ross Filed by on behalf of Petty Business Enterprises, LP, Petty Energy L.P. and their related entities (Ross, Judith) (Entered: 07/01/2020) |
| 07/01/2020 | 178 (3 pgs) | Notice of Appearance and Request for Notice Filed by Tiffiney Frances Carney Filed by on behalf of Department of Interior United States (Carney, Tiffiney) (Entered: 07/01/2020) |
| 07/01/2020 | 179 (3 pgs) | Order Authorizing the Debtors to File Under Seal Certain Information in Certain Confidential Letters Related to the Proposed Debtor-In-Possession Financing (Related Doc # 25) Signed on 7/1/2020. (emiller) (Entered: 07/01/2020) |
| 07/01/2020 | 180 (2 pgs) | Notice of Appearance and Request for Notice Filed by Steven W Soule Filed by on behalf of Targa Pipeline Mid-Continent WestOk LLC (Soule, Steven) (Entered: 07/01/2020) |
| 07/01/2020 | 181 (1 pg) | Motion to Appear pro hac vice *Grant E. Summers*. Filed by Creditors CoVal Leasing Company, LLC, BRP, LLC (Hearne, William) (Entered: 07/01/2020) |
| 07/01/2020 | 182 (2 pgs) | Notice of Appearance and Request for Notice Filed by William Lake Hearne Filed by on behalf of BRP, LLC, CoVal Leasing Company, LLC (Hearne, William) (Entered: 07/01/2020) |
| | 183 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Nova A Alindogan. This is to order a transcript of 6/29/2020, hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts. (mmap) Electronically forwarded to the original transcriber: Access |

| | | |
|---|---|---|
| 07/01/2020 | | Transcripts on 7-1-2020. Estimated completion date: 7-2-2020. Modified on 7/1/2020 (MelissaMorgan). (Entered: 07/01/2020) |
| 07/01/2020 | 184 (2 pgs) | Notice of Appearance and Request for Notice Filed by Paul Joseph Goodwine Filed by on behalf of Argonaut Insurance Company (Goodwine, Paul) (Entered: 07/01/2020) |
| 07/01/2020 | 185 (5 pgs) | Proposed Order RE: *Motion to Assume/Reject Motion of Chesapeake Energy Corporation for Entry of an Order (I) Authorizing Rejection of the Negotiated Rate Firm Transportation Agreements and Related Contracts Effective as of July 1, 2020 and (II) Granting Related Relief.* (Filed By Chesapeake Energy Corporation ).(Related document(s):35 Motion to Assume/Reject) (Cavenaugh, Matthew) (Entered: 07/01/2020) |
| 07/01/2020 | 186 (63 pgs) | Transcript RE: First Day Hearing held on 6/29/20 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 09/29/2020. (AccessTranscripts) (Entered: 07/01/2020) |
| 07/01/2020 | 187 (5 pgs) | Agreed Order (I) Authorizing the Rejection of the Gulf South Agreements Effective as of July 1, 2020 and (II) Granting Related Relief (Related Doc # 35) Signed on 7/1/2020. (emiller) (Entered: 07/01/2020) |
| 07/01/2020 | 188 (2 pgs) | BNC Certificate of Mailing. (Related document (s):50 Order Regarding the Exchange of Exhibits and Witness lists in all contested matters and adversary proceedings) No. of Notices: 3. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | 189 (14 pgs) | BNC Certificate of Mailing. (Related document (s):91 Order for Joint Administration) No. of Notices: 9. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| | 190 (5 pgs) | BNC Certificate of Mailing. (Related document (s):23 Order on Emergency Motion) No. of Notices: 3. Notice Date 07/01/2020. (Admin.) |

| 07/01/2020 | | (Entered: 07/01/2020) |
|---|---|---|
| 07/01/2020 | 🔵 191 (3 pgs) | BNC Certificate of Mailing. (Related document (s):55 Order on Motion to Appear pro hac vice) No. of Notices: 8. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | 🔵 192 (3 pgs) | BNC Certificate of Mailing. (Related document (s):56 Order on Motion to Appear pro hac vice) No. of Notices: 8. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | 🔵 193 (3 pgs) | BNC Certificate of Mailing. (Related document (s):57 Order on Motion to Appear pro hac vice) No. of Notices: 8. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | 🔵 194 (3 pgs) | BNC Certificate of Mailing. (Related document (s):58 Order on Motion to Appear pro hac vice) No. of Notices: 8. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | 🔵 195 (3 pgs) | BNC Certificate of Mailing. (Related document (s):59 Order on Motion to Appear pro hac vice) No. of Notices: 8. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | 🔵 196 (3 pgs) | BNC Certificate of Mailing. (Related document (s):60 Order on Motion to Appear pro hac vice) No. of Notices: 8. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | 🔵 197 (3 pgs) | BNC Certificate of Mailing. (Related document (s):61 Order on Motion to Appear pro hac vice) No. of Notices: 8. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | 🔵 198 (3 pgs) | BNC Certificate of Mailing. (Related document (s):62 Order on Motion to Appear pro hac vice) No. of Notices: 8. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | 🔵 199 (3 pgs) | BNC Certificate of Mailing. (Related document (s):63 Order on Motion to Appear pro hac vice) No. of Notices: 8. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |

| | | |
|---|---|---|
| 07/01/2020 | 🔵 200 (3 pgs) | BNC Certificate of Mailing. (Related document (s):64 Order on Motion to Appear pro hac vice) No. of Notices: 8. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | 🔵 201 (3 pgs) | BNC Certificate of Mailing. (Related document (s):65 Order on Motion to Appear pro hac vice) No. of Notices: 8. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | 🔵 202 (3 pgs) | BNC Certificate of Mailing. (Related document (s):67 Order on Motion to Appear pro hac vice) No. of Notices: 8. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | 🔵 203 (3 pgs) | BNC Certificate of Mailing. (Related document (s):68 Order on Motion to Appear pro hac vice) No. of Notices: 8. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | 🔵 204 (3 pgs) | BNC Certificate of Mailing. (Related document (s):70 Order on Motion to Appear pro hac vice) No. of Notices: 9. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | 🔵 205 (3 pgs) | BNC Certificate of Mailing. (Related document (s):71 Order on Motion to Appear pro hac vice) No. of Notices: 9. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | 🔵 206 (3 pgs) | BNC Certificate of Mailing. (Related document (s):82 Generic Order) No. of Notices: 9. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | 🔵 207 (3 pgs) | BNC Certificate of Mailing. (Related document (s):84 Order on Motion to Appear pro hac vice) No. of Notices: 9. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | 🔵 208 (3 pgs) | BNC Certificate of Mailing. (Related document (s):85 Order on Motion to Appear pro hac vice) No. of Notices: 9. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| | 🔵 209 (3 pgs) | BNC Certificate of Mailing. (Related document (s):86 Order on Motion to Appear pro hac vice) No. |

| 07/01/2020 | | of Notices: 9. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
|---|---|---|
| 07/01/2020 | ⬤210 (3 pgs) | BNC Certificate of Mailing. (Related document (s):87 Order on Motion to Appear pro hac vice) No. of Notices: 9. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | ⬤211 (3 pgs) | BNC Certificate of Mailing. (Related document (s):88 Order on Motion to Appear pro hac vice) No. of Notices: 9. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | ⬤212 (3 pgs) | BNC Certificate of Mailing. (Related document (s):92 Order on Motion to Appear pro hac vice) No. of Notices: 9. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | ⬤213 (3 pgs) | BNC Certificate of Mailing. (Related document (s):93 Order on Motion to Appear pro hac vice) No. of Notices: 9. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | ⬤214 (3 pgs) | BNC Certificate of Mailing. (Related document (s):94 Order on Motion to Appear pro hac vice) No. of Notices: 9. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | ⬤215 (4 pgs) | BNC Certificate of Mailing. (Related document (s):105 Order on Motion to Appear pro hac vice) No. of Notices: 17. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | ⬤216 (4 pgs) | BNC Certificate of Mailing. (Related document (s):106 Order on Motion to Appear pro hac vice) No. of Notices: 17. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | ⬤217 (4 pgs) | BNC Certificate of Mailing. (Related document (s):107 Order on Motion to Appear pro hac vice) No. of Notices: 17. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| | ⬤218 (4 pgs) | BNC Certificate of Mailing. (Related document (s):108 Order on Motion to Appear pro hac vice) No. of Notices: 17. Notice Date 07/01/2020. |

| 07/01/2020 | | (Admin.) (Entered: 07/01/2020) |
|---|---|---|
| 07/01/2020 | ⚫219<br>(10 pgs) | BNC Certificate of Mailing. (Related document (s):109 Order on Emergency Motion) No. of Notices: 17. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | ⚫220<br>(4 pgs) | BNC Certificate of Mailing. (Related document (s):121 Order on Motion to Appear pro hac vice) No. of Notices: 18. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | ⚫221<br>(4 pgs) | BNC Certificate of Mailing. (Related document (s):122 Order on Motion to Appear pro hac vice) No. of Notices: 18. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | ⚫222<br>(4 pgs) | BNC Certificate of Mailing. (Related document (s):123 Order on Motion to Appear pro hac vice) No. of Notices: 18. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | ⚫223<br>(4 pgs) | BNC Certificate of Mailing. (Related document (s):124 Order on Motion to Appear pro hac vice) No. of Notices: 18. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | ⚫224<br>(4 pgs) | BNC Certificate of Mailing. (Related document (s):125 Order on Motion to Appear pro hac vice) No. of Notices: 18. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | ⚫225<br>(4 pgs) | BNC Certificate of Mailing. (Related document (s):126 Order on Motion to Appear pro hac vice) No. of Notices: 18. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | ⚫226<br>(237 pgs) | BNC Certificate of Mailing. (Related document (s):128 Order Setting Hearing) No. of Notices: 19. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | ⚫227<br>(10 pgs) | BNC Certificate of Mailing. (Related document (s):129 Order on Emergency Motion) No. of Notices: 19. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |

| | | |
|---|---|---|
| 07/01/2020 | 228 (8 pgs) | BNC Certificate of Mailing. (Related document (s):131 Order on Emergency Motion) No. of Notices: 19. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | 229 (9 pgs) | BNC Certificate of Mailing. (Related document (s):132 Order on Emergency Motion) No. of Notices: 19. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | 230 (11 pgs) | BNC Certificate of Mailing. (Related document (s):133 Order on Emergency Motion) No. of Notices: 19. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | 231 (7 pgs) | BNC Certificate of Mailing. (Related document (s):136 Order on Emergency Motion) No. of Notices: 19. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | 232 (10 pgs) | BNC Certificate of Mailing. (Related document (s):137 Order on Emergency Motion) No. of Notices: 19. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | 233 (27 pgs) | BNC Certificate of Mailing. (Related document (s):138 Order on Emergency Motion) No. of Notices: 19. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | 234 (9 pgs) | BNC Certificate of Mailing. (Related document (s):140 Order on Emergency Motion) No. of Notices: 19. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | 235 (8 pgs) | BNC Certificate of Mailing. (Related document (s):141 Order on Emergency Motion) No. of Notices: 19. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/01/2020 | 236 (33 pgs) | BNC Certificate of Mailing. (Related document (s):143 Order on Emergency Motion) No. of Notices: 19. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| | 237 | BNC Certificate of Mailing. (Related document |

| | | |
|---|---|---|
| 07/01/2020 | (32 pgs) | (s):144 Order on Emergency Motion) No. of Notices: 19. Notice Date 07/01/2020. (Admin.) (Entered: 07/01/2020) |
| 07/02/2020 | 238 (2 pgs) | Notice of Appearance and Request for Notice Filed by Simon W Hendershot III Filed by on behalf of Jason Dean (Hendershot, Simon) (Entered: 07/02/2020) |
| 07/02/2020 | 239 (1 pg) | Notice of Filing of Official Transcript as to 186 Transcript. Parties notified (Related document (s):186 Transcript) (jdav) (Entered: 07/02/2020) |
| 07/02/2020 | 240 (1 pg) | Order Granting Motion To Appear pro hac vice - Rudy J. Cerone (Related Doc # 151) Signed on 7/2/2020. (emiller) (Entered: 07/02/2020) |
| 07/02/2020 | 241 (1 pg) | Order Granting Motion To Appear pro hac vice - Evelina Gentry (Related Doc # 159) Signed on 7/2/2020. (emiller) (Entered: 07/02/2020) |
| 07/02/2020 | 242 (1 pg) | Order Granting Motion To Appear pro hac vice - Katherine C. Fackler (Related Doc # 160) Signed on 7/2/2020. (emiller) (Entered: 07/02/2020) |
| 07/02/2020 | 243 (1 pg) | Order Granting Motion To Appear pro hac vice - Harold Kaplan (Related Doc # 162) Signed on 7/2/2020. (emiller) (Entered: 07/02/2020) |
| 07/02/2020 | 244 (1 pg) | Order Granting Motion To Appear pro hac vice - Mark Hebbeln (Related Doc # 163) Signed on 7/2/2020. (emiller) (Entered: 07/02/2020) |
| 07/02/2020 | 245 (1 pg) | Order Granting Motion To Appear pro hac vice - Justin Rawlins (Related Doc # 165) Signed on 7/2/2020. (emiller) (Entered: 07/02/2020) |
| 07/02/2020 | 246 (1 pg) | Order Granting Motion To Appear pro hac vice - Aaron Gober-Sims (Related Doc # 166) Signed on 7/2/2020. (emiller) (Entered: 07/02/2020) |
| 07/02/2020 | 247 (3 pgs) | Affidavit Re: *Affidavit of Publication* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 07/02/2020) |
| | 249 | Notice of Appearance and Request for Notice Filed |

| | | |
|---|---|---|
| 07/02/2020 | (2 pgs) | by Patrick Holder Autry Filed by on behalf of Mary Wheeler Family Limited Partnership (Autry, Patrick) (Entered: 07/02/2020) |
| 07/02/2020 | 250 (4 pgs) | Notice of Appearance and Request for Notice Filed by Jason Bradley Binford Filed by on behalf of Railroad Commission of Texas (Binford, Jason) (Entered: 07/02/2020) |
| 07/02/2020 | 251 (2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Charmaine Thomas. This is to order a transcript of 6/29/2020, Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts. (mmap) Electronically forwarded to the original transcriber: Access Transcripts on 7-6-2020. Estimated completion date: 7-7-2020. Modified on 7/6/2020 (MelissaMorgan). (Entered: 07/02/2020) |
| 07/02/2020 | 252 (4 pgs) | Notice of Appearance and Request for Notice Filed by John E Mitchell Filed by on behalf of ETC Katy Pipeline, Ltd., ETC Texas Pipeline Ltd., Energy Transfer Fuel, LP, Houston Pipe Line Company, LP, Oasis Pipeline L.P. (Mitchell, John) (Entered: 07/02/2020) |
| 07/02/2020 | 253 (4 pgs) | Notice of Appearance and Request for Notice Filed by John E Mitchell Filed by on behalf of ETC Katy Pipeline, Ltd., ETC Texas Pipeline Ltd., Energy Transfer Fuel, LP, Houston Pipe Line Company, LP, Oasis Pipeline L.P. (Mitchell, John) (Entered: 07/02/2020) |
| 07/02/2020 | 254 (15 pgs) | BNC Certificate of Mailing. (Related document (s):139 Order Setting Hearing) No. of Notices: 25. Notice Date 07/02/2020. (Admin.) (Entered: 07/02/2020) |
| 07/03/2020 | 255 (1 pg) | Notice of Appearance and Request for Notice Filed by Tara L Grundemeier Filed by on behalf of Galveston County, Washington County, Houston CAD, Jasper County, Madison County, Cypress-Fairbanks ISD, Montgomery County, Harris County, Tyler County, San Augustine County, Liberty County, Polk County, Fort Bend County, Shelby County, Angelina County, Sabine County, Matagorda County (Grundemeier, Tara) (Entered: 07/03/2020) |

| | | |
|---|---|---|
| 07/03/2020 | 🔵256<br>(4 pgs) | BNC Certificate of Mailing. (Related document (s):179 Order on Motion to Seal) No. of Notices: 1. Notice Date 07/03/2020. (Admin.) (Entered: 07/03/2020) |
| 07/04/2020 | 🔵257<br>(3 pgs) | BNC Certificate of Mailing. (Related document (s):239 Notice of Filing of Official Transcript (Form)) No. of Notices: 27. Notice Date 07/04/2020. (Admin.) (Entered: 07/04/2020) |
| 07/04/2020 | 🔵258<br>(7 pgs) | BNC Certificate of Mailing. (Related document (s):187 Order on Motion to Assume/Reject) No. of Notices: 26. Notice Date 07/04/2020. (Admin.) (Entered: 07/04/2020) |
| 07/04/2020 | 🔵259<br>(3 pgs) | BNC Certificate of Mailing. (Related document (s):240 Order on Motion to Appear pro hac vice) No. of Notices: 27. Notice Date 07/04/2020. (Admin.) (Entered: 07/04/2020) |
| 07/04/2020 | 🔵260<br>(3 pgs) | BNC Certificate of Mailing. (Related document (s):241 Order on Motion to Appear pro hac vice) No. of Notices: 27. Notice Date 07/04/2020. (Admin.) (Entered: 07/04/2020) |
| 07/04/2020 | 🔵261<br>(3 pgs) | BNC Certificate of Mailing. (Related document (s):242 Order on Motion to Appear pro hac vice) No. of Notices: 27. Notice Date 07/04/2020. (Admin.) (Entered: 07/04/2020) |
| 07/04/2020 | 🔵262<br>(3 pgs) | BNC Certificate of Mailing. (Related document (s):243 Order on Motion to Appear pro hac vice) No. of Notices: 27. Notice Date 07/04/2020. (Admin.) (Entered: 07/04/2020) |
| 07/04/2020 | 🔵263<br>(3 pgs) | BNC Certificate of Mailing. (Related document (s):244 Order on Motion to Appear pro hac vice) No. of Notices: 27. Notice Date 07/04/2020. (Admin.) (Entered: 07/04/2020) |
| 07/04/2020 | 🔵264<br>(3 pgs) | BNC Certificate of Mailing. (Related document (s):245 Order on Motion to Appear pro hac vice) No. of Notices: 27. Notice Date 07/04/2020. (Admin.) (Entered: 07/04/2020) |
| | 🔵265 | BNC Certificate of Mailing. (Related document |

| | | |
|---|---|---|
| 07/04/2020 | (3 pgs) | (s):246 Order on Motion to Appear pro hac vice) No. of Notices: 27. Notice Date 07/04/2020. (Admin.) (Entered: 07/04/2020) |
| 07/06/2020 | 266 (2 pgs) | Notice of Appearance and Request for Notice Filed by Ryan Dodson Dry Filed by on behalf of RLI Insurance Company (Dry, Ryan) (Entered: 07/06/2020) |
| 07/06/2020 | 267 (1 pg) | Motion to Appear pro hac vice *of Elliot Scharfenberg*. Filed by Interested Party RLI Insurance Company (Dry, Ryan) (Entered: 07/06/2020) |
| 07/06/2020 | 268 (1 pg) | Motion to Appear pro hac vice *of Jon Ord*. Filed by Interested Party RLI Insurance Company (Dry, Ryan) (Entered: 07/06/2020) |
| 07/06/2020 | 269 (1 pg) | Notice of Appearance and Request for Notice Filed by John S Mayer Filed by on behalf of Caterpillar Financial Services Corporation (Mayer, John) (Entered: 07/06/2020) |
| 07/06/2020 | 270 (1 pg) | Letter from Shareholder Mallinath Suralikal (JeannieAndresen) (Entered: 07/06/2020) |
| 07/06/2020 | 271 (3 pgs) | Notice of Appearance and Request for Notice Filed by Michael Edward Collins Filed by on behalf of Philadelphia Indemnity Insurance Company (Collins, Michael) (Entered: 07/06/2020) |
| 07/06/2020 | 272 (2 pgs) | Notice of Appearance and Request for Notice Filed by Carol E Momjian Filed by on behalf of Commonwealth of Pennsylvania (Momjian, Carol) (Entered: 07/06/2020) |
| 07/06/2020 | 273 (14 pgs; 2 docs) | Notice *of Filing Response to Appellants Notice of Suggestion of Pendency of Bankruptcy and Automatic Stay of Proceedings*. Filed by Commonwealth of Pennsylvania (Attachments: # 1 Exhibit Response filed in Supreme Court of Pennsylvania Middle District) (Swartley, Jason) (Entered: 07/06/2020) |
| | 274 (1 pg) | Order Granting Motion To Appear pro hac vice - Richard A. Aguilar (Related Doc # 170) Signed on |

| 07/06/2020 | | 7/6/2020. (emiller) (Entered: 07/06/2020) |
|---|---|---|
| 07/06/2020 | 275<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Jason L. Swartley (Related Doc # 171) Signed on 7/6/2020. (emiller) (Entered: 07/06/2020) |
| 07/06/2020 | 276<br>(1 pg) | Order Granting Motion To Appear pro hac vice - David M. Riley (Related Doc # 173) Signed on 7/6/2020. (emiller) (Entered: 07/06/2020) |
| 07/06/2020 | 277<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Glenn E. Siegel (Related Doc # 174) Signed on 7/6/2020. (emiller) (Entered: 07/06/2020) |
| 07/06/2020 | 278<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Rachel J. Mauceri (Related Doc # 175) Signed on 7/6/2020. (emiller) (Entered: 07/06/2020) |
| 07/06/2020 | 279<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Grant E. Summers (Related Doc # 181) Signed on 7/6/2020. (emiller) (Entered: 07/06/2020) |
| 07/06/2020 | 280<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Alana L. Porrazo (Related Doc # 248) Signed on 7/6/2020. (emiller) (Entered: 07/06/2020) |
| 07/07/2020 | 281<br>(1 pg) | Notice of Appearance and Request for Notice Filed by Diane Wade Sanders Filed by on behalf of Lee County, Zapata County, Webb CISD, DeWitt County, Goliad County, Robertson County, Nueces County, Jim Wells CAD (Sanders, Diane) (Entered: 07/07/2020) |
| 07/07/2020 | 282<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Tara LeDay Filed by on behalf of Texas Taxing Authorities (LeDay, Tara) (Entered: 07/07/2020) |
| 07/07/2020 | 283<br>(1 pg) | Motion to Appear pro hac vice . Filed by Interested Party Jolene Wise U.S. Securities and Exchange Commission (Wise, Jolene) (Entered: 07/07/2020) |
| 07/07/2020 | 284<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Jolene M Wise Filed by on behalf of Jolene Wise U.S. Securities and Exchange Commission (Wise, Jolene) (Entered: 07/07/2020) |

| | | |
|---|---|---|
| 07/07/2020 | 285<br>(1 pg) | Motion to Appear pro hac vice *Brian L. Greenert*. Filed by Interested Party Commonwealth of Pennsylvania (mmap) (Entered: 07/07/2020) |
| 07/07/2020 | 286<br>(42 pgs) | Debtors Master Service List (Filed By Epiq Corporate Restructuring LLC ). (Garabato, Sid) (Entered: 07/07/2020) |
| 07/07/2020 | 287<br>(25 pgs; 2 docs) | Motion *Debtors' Motion to Approve Procedures for De Minimis Asset Transactions* Filed by Debtor Chesapeake Energy Corporation Hearing scheduled for 7/31/2020 at 11:00 AM at Houston, Courtroom 400 (DRJ. (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 07/07/2020) |
| 07/07/2020 | 288<br>(25 pgs; 2 docs) | Motion *Debtors' Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 07/07/2020) |
| 07/07/2020 | 289<br>(17 pgs; 2 docs) | Motion *Debtors' Motion for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 07/07/2020) |
| 07/07/2020 | 290<br>(47 pgs; 2 docs) | Motion *Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' Non-Insider Retention Programs and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation Hearing scheduled for 7/31/2020 at 11:00 AM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 07/07/2020) |
| 07/08/2020 | 291<br>(1 pg) | Motion to Appear pro hac vice *by Vera N. Kanova*. Filed by Creditor Pennsylvania Dept. of Environmental Protection (jdav) (Entered: 07/08/2020) |
| | 292<br>(5 pgs) | Notice of Appearance and Request for Notice Filed by Scott Robert Cheatham Filed by on behalf of |

| 07/08/2020 | | CCG Land (U.S.), Inc. (Cheatham, Scott) (Entered: 07/08/2020) |
|---|---|---|
| 07/08/2020 | �e 293 (2 pgs) | Notice of Appearance and Request for Notice Filed by Thomas Pitta Filed by on behalf of The Bank of New York Mellon Trust Company, N.A. (Pitta, Thomas) (Entered: 07/08/2020) |
| 07/08/2020 | �e 294 (4 pgs) | Letter from Shareholder Krishna Bangera (JeannieAndresen) (Entered: 07/08/2020) |
| 07/08/2020 | �e 295 (2 pgs) | Letter from Shareholder David Del Valle (JeannieAndresen) (Entered: 07/08/2020) |
| 07/08/2020 | �e 296 (8 pgs) | Letter from Shareholder John Brydels Jr. (JeannieAndresen) (Entered: 07/08/2020) |
| 07/08/2020 | �e 297 (13 pgs; 2 docs) | Letter from Shareholder Jason Dean (Attachments: # 1 Exhibit) (JeannieAndresen) (Entered: 07/08/2020) |
| 07/08/2020 | �e 298 (1 pg) | Order Granting Motion To Appear pro hac vice - Elliot Scharfenberg (Related Doc # 267) Signed on 7/8/2020. (emiller) (Entered: 07/08/2020) |
| 07/08/2020 | �e 299 (3 pgs) | Notice of Appearance and Request for Notice Filed by Bernard R. Given II Filed by on behalf of U.S. Bank National Association, as Indenture Trustee (Given, Bernard) (Entered: 07/08/2020) |
| 07/08/2020 | �e 300 (1 pg) | Order Granting Motion To Appear pro hac vice - Jon Ord (Related Doc # 268) Signed on 7/8/2020. (emiller) (Entered: 07/08/2020) |
| 07/09/2020 | �e 301 (4 pgs) | Notice of Appointment of Creditors' Committee (Duran, Hector) (Entered: 07/09/2020) |
| 07/09/2020 | �e 302 (1 pg) | Notice *of Organizational Meeting of the Official Unsecured Creditors' Committee scheduled via telephone conference call on July 10, 2020, at 3:00 p.m. (Houston Time)*. Filed by US Trustee (Duran, Hector) (Entered: 07/09/2020) |
| 07/09/2020 | �e 303 (2 pgs) | Affidavit Re: *Affidavit of Publication* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 07/09/2020) |

| | | |
|---|---|---|
| 07/09/2020 | 🔵 304<br>(4 pgs) | BNC Certificate of Mailing. (Related document (s):274 Order on Motion to Appear pro hac vice) No. of Notices: 29. Notice Date 07/09/2020. (Admin.) (Entered: 07/09/2020) |
| 07/09/2020 | 🔵 305<br>(4 pgs) | BNC Certificate of Mailing. (Related document (s):275 Order on Motion to Appear pro hac vice) No. of Notices: 29. Notice Date 07/09/2020. (Admin.) (Entered: 07/09/2020) |
| 07/09/2020 | 🔵 306<br>(4 pgs) | BNC Certificate of Mailing. (Related document (s):276 Order on Motion to Appear pro hac vice) No. of Notices: 29. Notice Date 07/09/2020. (Admin.) (Entered: 07/09/2020) |
| 07/09/2020 | 🔵 307<br>(4 pgs) | BNC Certificate of Mailing. (Related document (s):277 Order on Motion to Appear pro hac vice) No. of Notices: 29. Notice Date 07/09/2020. (Admin.) (Entered: 07/09/2020) |
| 07/09/2020 | 🔵 308<br>(4 pgs) | BNC Certificate of Mailing. (Related document (s):278 Order on Motion to Appear pro hac vice) No. of Notices: 29. Notice Date 07/09/2020. (Admin.) (Entered: 07/09/2020) |
| 07/09/2020 | 🔵 309<br>(4 pgs) | BNC Certificate of Mailing. (Related document (s):279 Order on Motion to Appear pro hac vice) No. of Notices: 29. Notice Date 07/09/2020. (Admin.) (Entered: 07/09/2020) |
| 07/09/2020 | 🔵 310<br>(4 pgs) | BNC Certificate of Mailing. (Related document (s):280 Order on Motion to Appear pro hac vice) No. of Notices: 29. Notice Date 07/09/2020. (Admin.) (Entered: 07/09/2020) |
| 07/10/2020 | 🔵 311<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Jean Paul Picou Overton Filed by on behalf of SPN Well Services, Inc., Complete Energy Services, Inc., Complete Energy Services, Inc., H.B. Rentals, L.C., Workstrings International, L.L.C. (Overton, Jean Paul) (Entered: 07/10/2020) |
| | 🔵 312<br>(4 pgs) | Stipulation By Chesapeake Energy Corporation and Federal Regulatory Commission. Does this document include an agreed order or otherwise |

| | | |
|---|---|---|
| 07/10/2020 | | request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 07/10/2020) |
| 07/10/2020 | 🔘313 (4 pgs) | BNC Certificate of Mailing. (Related document (s):298 Order on Motion to Appear pro hac vice) No. of Notices: 33. Notice Date 07/10/2020. (Admin.) (Entered: 07/10/2020) |
| 07/10/2020 | 🔘314 (4 pgs) | BNC Certificate of Mailing. (Related document (s):300 Order on Motion to Appear pro hac vice) No. of Notices: 33. Notice Date 07/10/2020. (Admin.) (Entered: 07/10/2020) |
| 07/11/2020 | 🔘315 (2 pgs) | Notice of Appearance and Request for Notice Filed by Misti Lachelle Beanland Filed by on behalf of Elliott Electric Supply, Inc. (Beanland, Misti) (Entered: 07/11/2020) |
| 07/13/2020 | 🔘316 (3 pgs) | Notice of Appearance and Request for Notice Filed by Michael E. Idzkowski Filed by on behalf of State of Ohio (Idzkowski, Michael) (Entered: 07/13/2020) |
| 07/13/2020 | 🔘317 (1 pg) | Motion to Appear pro hac vice *State of Ohio OEPA & ODNR*. Filed by Attorney Ohio Environmental Protection Agency (Idzkowski, Michael) (Entered: 07/13/2020) |
| 07/13/2020 | 🔘318 (3 pgs) | Notice of Appearance and Request for Notice Filed by Timothy James Kern Filed by on behalf of State of Ohio OEPA & ODNR (Kern, Timothy) (Entered: 07/13/2020) |
| 07/13/2020 | 🔘319 (1 pg) | Motion to Appear pro hac vice . Filed by Attorney State of Ohio OEPA & ODNR (Kern, Timothy) (Entered: 07/13/2020) |
| 07/13/2020 | 🔘320 (1 pg) | Motion to Appear pro hac vice *Andrew D. Martin*. Filed by Creditor Saundra Nelson (Hearne, William) (Entered: 07/13/2020) |
| 07/13/2020 | 🔘321 (3 pgs) | Notice of Appearance and Request for Notice Filed by William Lake Hearne Filed by on behalf of Saundra Nelson (Hearne, William) (Entered: 07/13/2020) |

| | | |
|---|---|---|
| 07/14/2020 | 322 (2 pgs) | Notice of Appearance and Request for Notice Filed by Jarrod B. Martin Filed by on behalf of Tributary Resources, LLC (Martin, Jarrod) (Entered: 07/14/2020) |
| 07/14/2020 | 323 (72 pgs; 4 docs) | Emergency Motion *for Entry of an Order Enforcing the Automatic Stay Against the Office of The Attorney General of the Commonwealth of Pennsylvania* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Proposed Order) (Cavenaugh, Matthew) (Entered: 07/14/2020) |
| 07/14/2020 | | Certificate of Telephone Notice. Contacted Veronica Polnick. At the request of the parties, the hearings scheduled for 7/20/2020 at 11:30 regarding Docket Nos. 14 and 22 have been rescheduled. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):14 Emergency Motion, 22 Emergency Motion) **Hearing rescheduled for 7/31/2020 at 11:00 AM at Houston, Courtroom 400 (DRJ).** (emiller) (Entered: 07/14/2020) |
| 07/14/2020 | 324 (2 pgs) | Notice of Appearance and Request for Notice Filed by Andrew G Edson Filed by on behalf of Waste Management, Inc. (Edson, Andrew) (Entered: 07/14/2020) |
| 07/14/2020 | 325 (7 pgs; 2 docs) | Objection *Limited Objection and Reservation of Rights* (related document(s):22 Emergency Motion). Filed by Dimmit County, et al (Attachments: # 1 Exhibit A. Certain Texas Taxing Entities' List of Claims) (Sonik, Owen) (Entered: 07/14/2020) |
| 07/14/2020 | 326 (44 pgs) | Debtors Master Service List (Filed By Epiq Corporate Restructuring LLC ). (Garabato, Sid) (Entered: 07/14/2020) |
| 07/14/2020 | 327 (7 pgs; 2 docs) | Motion to Reconsider (related document(s):187 Order on Motion to Assume/Reject). Filed by Interested Party Federal Energy Regulatory Commission (Attachments: # 1 Proposed Order) (Kincheloe, Richard) (Entered: 07/14/2020) |

| | | |
|---|---|---|
| 07/14/2020 | ● 328<br>(4 pgs) | Notice *of Reset of Hearing of Cash Management Motion and DIP Motion.* (Related document(s):14 Emergency Motion, 22 Emergency Motion) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 07/14/2020) |
| 07/14/2020 | ● 329<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Jolene M. Wise (Related Doc # 283) Signed on 7/14/2020. (emiller) (Entered: 07/14/2020) |
| 07/14/2020 | ● 330<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Brian L. Greenert (Related Doc # 285) Signed on 7/14/2020. (emiller) (Entered: 07/14/2020) |
| 07/14/2020 | ● 331<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Vera N. Kanova (Related Doc # 291) Signed on 7/14/2020. (emiller) (Entered: 07/14/2020) |
| 07/14/2020 | ● 332<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Michael E. Idzkowski (Related Doc # 317) Signed on 7/14/2020. (emiller) (Entered: 07/14/2020) |
| 07/14/2020 | ● 333<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Timothy J. Kern (Related Doc # 319) Signed on 7/14/2020. (emiller) (Entered: 07/14/2020) |
| 07/14/2020 | ● 334<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Andrew D. Martin (Related Doc # 320) Signed on 7/14/2020. (emiller) (Entered: 07/14/2020) |
| 07/15/2020 | ● 335<br>(57 pgs; 3 docs) | Witness List, Exhibit List (Filed By Chesapeake Energy Corporation ).(Related document(s):323 Emergency Motion) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2) (Cavenaugh, Matthew) (Entered: 07/15/2020) |
| 07/15/2020 | ● 336<br>(1 pg) | Motion to Appear pro hac vice . Filed by Creditor Commonwealth of Pennsylvania (Michaels, Lauren) (Entered: 07/15/2020) |
| 07/15/2020 | ● 337<br>(1 pg) | Motion to Appear pro hac vice *for David D. Piper.* (JeannieAndresen) (Entered: 07/15/2020) |
| 07/15/2020 | ● 338<br>(1 pg) | Motion to Appear pro hac vice *for Stefan Perovich.* (JeannieAndresen) (Entered: 07/15/2020) |

| | | |
|---|---|---|
| 07/15/2020 | 🔵 339<br>(1 pg) | Motion to Appear pro hac vice *for Bryce Cullinane*. (JeannieAndresen) (Entered: 07/15/2020) |
| 07/15/2020 | 🔵 340<br>(9 pgs) | Objection *Limited Objection to the Debtors Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Existing Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (related document(s):22 Emergency Motion). Filed by Trade Star, LLC, Sunoco Pipeline L.P., ETC Katy Pipeline, Ltd., ETC Texas Pipeline Ltd., Energy Transfer Fuel, LP, Houston Pipe Line Company, LP, Oasis Pipeline L.P. (Mitchell, John) (Entered: 07/15/2020) |
| 07/15/2020 | 🔵 341<br>(3 pgs) | Response/Objection Filed by Texas Taxing Authorities. (Related document(s):128 Order Setting Hearing) (LeDay, Tara) (Entered: 07/15/2020) |
| 07/15/2020 | 🔵 342<br>(11 pgs) | Objection *Cactus Wellhead, LLC's Reservation of Rights and Limited Objection to DIP Financing and Cash Collateral Motion* (related document (s):22 Emergency Motion). Filed by Cactus Wellhead, LLC (Bailey, James) (Entered: 07/15/2020) |
| 07/15/2020 | 🔵 | Certificate of Telephone Notice. Contacted Veronica Polnick. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):27 Emergency Motion, 35 Motion to Assume/Reject, 36 Generic Motion) **Hearing scheduled for 7/31/2020 at 11:00 AM at Houston, Courtroom 400 (DRJ).** (emiller) (Entered: 07/15/2020) |
| | 🔵 343<br>(4 pgs) | Notice *of Electronic Hearing on Contract Rejection, Transportation Rejection and Sell-Down Procedures Motions*. (Related document (s):27 Emergency Motion, 35 Motion to |

| 07/15/2020 | | Assume/Reject, 36 Generic Motion) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 07/15/2020) |
|---|---|---|
| 07/15/2020 | 344 (16 pgs; 3 docs) | Objection (related document(s):22 Emergency Motion). Filed by c/o Annie Catmull Royalty Owner Plaintiffs c/o (Attachments: # 1 Exhibit A - plaintiffs # 2 Exhibit B - admissions and denials) (Catmull, Annie) (Entered: 07/15/2020) |
| 07/15/2020 | 345 (199 pgs; 5 docs) | Objection (related document(s):22 Emergency Motion). Filed by Allen Johnson, Rodney Hudson, Ruth Middleton, Saundra Nelson (Attachments: # 1 Exhibit A - List of Objectors # 2 Exhibit B- Johnson Ruling # 3 Exhibit C - Pleadings # 4 Exhibit D - Unit Orders) (Hearne, William) (Entered: 07/15/2020) |
| 07/15/2020 | 346 (5 pgs) | Objection *Archrock Partners Operating, LLC's Limited Objection and Reservation of Rights to Debtors' DIP Financing and Cash Collateral Motion* (related document(s):22 Emergency Motion). Filed by Archrock Partners Operating, LLC (Maraist, Kevin) (Entered: 07/15/2020) |
| 07/15/2020 | 347 (12 pgs) | Certificate *of Service* (Filed By c/o Annie Catmull Royalty Owner Plaintiffs c/o ).(Related document(s):344 Objection) (Catmull, Annie) (Entered: 07/15/2020) |
| 07/15/2020 | 348 (3 pgs) | Objection *J-W Power Company's Limited Objection and Reservation of Rights* (related document(s):22 Emergency Motion). Filed by J-W Power Company (Walker, Julie) (Entered: 07/15/2020) |
| 07/15/2020 | 349 (3 pgs) | Notice of Appearance and Request for Notice Filed by Mary Elizabeth Heard Filed by on behalf of Gates Mineral Company, LTD and related entities and individuals (Heard, Mary) (Entered: 07/15/2020) |
| | 350 (3 pgs) | Notice of Appearance and Request for Notice Filed by Mary Elizabeth Heard Filed by on behalf of Dan W. Kinsel III, Trustee of the 2009 Dan and Leslie Kinsel Childrens Trust and Karl Gene |

| 07/15/2020 | | Kinsel, Trustee of the 2009 Karl Gene Kinsel Childs Trust (Heard, Mary) (Entered: 07/15/2020) |
|---|---|---|
| 07/15/2020 | 351 (3 pgs) | Notice of Appearance and Request for Notice Filed by Mary Elizabeth Heard Filed by on behalf of MBF Holdings La Salle LP, formerly MBF Partnership (Heard, Mary) (Entered: 07/15/2020) |
| 07/15/2020 | 352 (3 pgs) | Notice of Appearance and Request for Notice Filed by Mary Elizabeth Heard Filed by on behalf of Kelly Vesper, as Trustee of the Kelly Vesper Heritage Trust, and as Executrix of the Estate of John B. Vesper, Deceased and the Estate of Leslie T. Vesper, Deceased (Heard, Mary) (Entered: 07/15/2020) |
| 07/15/2020 | 353 (4 pgs) | Notice of Appearance and Request for Notice Filed by Jason Lee Boland Filed by on behalf of Official Committee Of Unsecured Creditors (Boland, Jason) (Entered: 07/15/2020) |
| 07/15/2020 | 354 (1 pg) | Motion to Appear pro hac vice *Robert J. Stark*. Filed by Creditor Committee Official Committee Of Unsecured Creditors (Boland, Jason) (Entered: 07/15/2020) |
| 07/15/2020 | 355 (1 pg) | Motion to Appear pro hac vice *Bennett S. Silverberg*. Filed by Creditor Committee Official Committee Of Unsecured Creditors (Boland, Jason) (Entered: 07/15/2020) |
| 07/15/2020 | 356 (1 pg) | Notice of Video Platform Upgrade. Effective August 1, 2020, the Court will utilize GoToMeeting for all video hearings. See attached. (emiller) (Entered: 07/15/2020) |
| 07/15/2020 | 359 (1 pg) | Motion to Appear pro hac vice *Daniel A. Lowenthal*. Filed by Creditor Brandes Investment Partners LP (BeverlyWright) (Entered: 07/16/2020) |
| 07/15/2020 | 360 (1 pg) | Motion to Appear pro hac vice *Lance M. Kodish*. Filed by Creditor Brandes Investment Partners LP (BeverlyWright) (Entered: 07/16/2020) |
| | 357 | *Motion to Appear pro hac vice Jeffrey L. Jonas.* |

| | | |
|---|---|---|
| 07/16/2020 | (1 pg) | Filed by Creditor Committee Official Committee Of Unsecured Creditors (Gluck, Kristian) (Entered: 07/16/2020) |
| 07/16/2020 | 358 (1 pg) | Motion to Appear pro hac vice *Sunni P. Beville*. Filed by Creditor Committee Official Committee Of Unsecured Creditors (Gluck, Kristian) (Entered: 07/16/2020) |
| 07/16/2020 | 361 (1 pg) | Notice of Appearance and Request for Notice Filed by Chrysanthe E Vassiles Filed by on behalf of Douglas Houck Trust (Vassiles, Chrysanthe) (Entered: 07/16/2020) |
| 07/16/2020 | 362 (212 pgs; 4 docs) | Response *Response by the Commonwealth of Pennsylvania in Opposition to the Debtors' Emergency Motion for Entry of an Order Enforcing the Automatic Stay Against the Office of the Attorney General of the Commonwealth of Pennsylvania* (related document(s):323 Emergency Motion. Filed by Commonwealth of Pennsylvania (Attachments: # 1 Exhibit # 2 Exhibit # 3 Proposed Order) (Kovalchick, Anthony) (Entered: 07/16/2020) |
| 07/16/2020 | 363 (17 pgs) | Brief (Filed By Commonwealth of Pennsylvania ).(Related document(s):362 Response) (Kovalchick, Anthony) (Entered: 07/16/2020) |
| 07/16/2020 | 364 (271 pgs; 14 docs) | Witness List, Exhibit List (Filed By Commonwealth of Pennsylvania ).(Related document(s):362 Response) (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H # 9 Exhibit I # 10 Exhibit J # 11 Exhibit K # 12 Exhibit L # 13 Exhibit M) (Swartley, Jason) (Entered: 07/16/2020) |
| 07/16/2020 | 365 (2 pgs) | Creditor Request for Notices (Filed By Oracle America, Inc. ). (Christianson, Shawn) (Entered: 07/16/2020) |
| 07/16/2020 | 366 (62 pgs) | Affidavit Re: *Affidavit of Service of Marc Orfitelli* (Filed By Epiq Corporate Restructuring LLC ). (Related document(s):14 Emergency Motion, 22 |

| | | |
|---|---|---|
| 07/16/2020 | | Emergency Motion, 27 Emergency Motion, 35 Motion to Assume/Reject, 36 Generic Motion, 37 Declaration, 42 Notice, 44 Agenda, 49 Exhibit List, Witness List, 82 Generic Order, 91 Order for Joint Administration, 109 Order on Emergency Motion, 128 Order Setting Hearing, 129 Order on Emergency Motion, 131 Order on Emergency Motion, 132 Order on Emergency Motion, 133 Order on Emergency Motion, 136 Order on Emergency Motion, 137 Order on Emergency Motion, 138 Order on Emergency Motion, 139 Order Setting Hearing, 140 Order on Emergency Motion, 141 Order on Emergency Motion, 143 Order on Emergency Motion, 144 Order on Emergency Motion, 179 Order on Motion to Seal) (Garabato, Sid) (Entered: 07/16/2020) |
| 07/16/2020 | 367 (59 pgs; 2 docs) | Motion *for Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, (IV) Approving Notice of Bar Dates, and (V) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 07/16/2020) |
| 07/16/2020 | 368 (69 pgs; 2 docs) | Application to Employ Alvarez & Marsal North America, LLC as Restructuring Advisors. Objections/Request for Hearing Due in 21 days. Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 07/16/2020) |
| 07/16/2020 | 369 (235 pgs; 2 docs) | Application to Employ Rothschild & Co US Inc. and Intrepid Partners, LLC as Investment Bankers. Objections/Request for Hearing Due in 21 days. Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 07/16/2020) |
| | 370 (67 pgs; 2 docs) | Application to Employ Jackson Walker LLP as Co-Counsel and Conflicts Counsel for the Debtors and Debtors In Possession. Objections/Request |

| | | |
|---|---|---|
| 07/16/2020 | | for Hearing Due in 21 days. Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 07/16/2020) |
| 07/16/2020 | 371 (4 pgs) | Objection *(Limited)* (related document(s):27 Emergency Motion). Filed by Federal Energy Regulatory Commission (Kincheloe, Richard) (Entered: 07/16/2020) |
| 07/16/2020 | 372 (154 pgs; 2 docs) | Application to Employ Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Attorneys for the Debtors and Debtors In Possession. Objections/Request for Hearing Due in 21 days. Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 07/16/2020) |
| 07/16/2020 | 373 (1 pg) | Motion to Appear pro hac vice *Mark A. Speiser*. Filed by Creditor Castleton Commodities Merchant Trading L.P. (Merola, Frank) (Entered: 07/16/2020) |
| 07/16/2020 | 374 (1 pg) | Motion to Appear pro hac vice *Harold A. Olsen*. Filed by Creditor Castleton Commodities Merchant Trading L.P. (Merola, Frank) (Entered: 07/16/2020) |
| 07/16/2020 | 375 (6998 pgs) | Affidavit Re: *Affidavit of Service of Marc Orfitelli* (Filed By Epiq Corporate Restructuring LLC ). (Related document(s):82 Generic Order) (Garabato, Sid) (Entered: 07/16/2020) |
| 07/16/2020 | 376 (229 pgs) | Affidavit Re: *Affidavit of Service of Marc Orfitelli* (Filed By Epiq Corporate Restructuring LLC ). (Related document(s):82 Generic Order) (Garabato, Sid) (Entered: 07/16/2020) |
| 07/16/2020 | 377 (3 pgs) | Notice of Appearance and Request for Notice Filed by Mary Elizabeth Heard Filed by on behalf of Kelly Vesper, Individually, as Trustee of the Kelly Vesper Heritage Trust, and as Executrix of the Estate of John B. Vesper, Deceased and the Estate of Leslie T. Vesper, Deceased (Heard, Mary) (Entered: 07/16/2020) |
| | | |

| | | |
|---|---|---|
| 07/16/2020 | 🔵 378 (3 pgs) | Notice of Appearance and Request for Notice Filed by Mary Elizabeth Heard Filed by on behalf of Leojua, Ltd. (Heard, Mary) (Entered: 07/16/2020) |
| 07/16/2020 | 🔵 379 (18 pgs) | Affidavit Re: *Affidavit of Service of Marc Orfitelli* (Filed By Epiq Corporate Restructuring LLC ). (Related document(s):287 Generic Motion, 288 Generic Motion, 289 Generic Motion, 290 Generic Motion) (Garabato, Sid) (Entered: 07/16/2020) |
| 07/16/2020 | 🔵 380 (15 pgs) | Affidavit Re: *Affidavit of Service of Marc Orfitelli* (Filed By Epiq Corporate Restructuring LLC ). (Related document(s):312 Stipulation) (Garabato, Sid) (Entered: 07/16/2020) |
| 07/16/2020 | 🔵 381 (12 pgs; 2 docs) | Motion to Seal *the Names of Certain Confidential Parties In Interest Related to Kirkland & Ellis LLP and Kirkland & Ellis International LLP's Retention Application* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 07/16/2020) |
| 07/16/2020 | 🔵 382 (115 pgs) | Sealed Document *Exhibit A to Kirkland & Ellis LLP and Kirkland & Ellis International LLP Retention Application* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 07/16/2020) |
| 07/16/2020 | 🔵 383 (1 pg) | Order Granting Motion To Appear pro hac vice - Joseph Betsko (Related Doc # 336) Signed on 7/16/2020. (emiller) (Entered: 07/16/2020) |
| 07/16/2020 | 🔵 384 (1 pg) | Order Granting Motion To Appear pro hac vice - David D. Piper (Related Doc # 337) Signed on 7/16/2020. (emiller) (Entered: 07/16/2020) |
| 07/16/2020 | 🔵 385 (1 pg) | Order Granting Motion To Appear pro hac vice - Stefan Perovich (Related Doc # 338) Signed on 7/16/2020. (emiller) (Entered: 07/16/2020) |
| 07/16/2020 | 🔵 386 (1 pg) | Order Granting Motion To Appear pro hac vice - Bryce Cullinane (Related Doc # 339) Signed on 7/16/2020. (emiller) (Entered: 07/16/2020) |

| | | |
|---|---|---|
| 07/16/2020 | ⬤ 387 (1 pg) | Order Granting Motion To Appear pro hac vice - Robert J. Stark (Related Doc # 354) Signed on 7/16/2020. (emiller) (Entered: 07/16/2020) |
| 07/16/2020 | ⬤ 388 (1 pg) | Order Granting Motion To Appear pro hac vice - Bennett S. Silverberg (Related Doc # 355) Signed on 7/16/2020. (emiller) (Entered: 07/16/2020) |
| 07/16/2020 | ⬤ 389 (1 pg) | Order Granting Motion To Appear pro hac vice - Jeffrey L. Jonas (Related Doc # 357) Signed on 7/16/2020. (emiller) (Entered: 07/16/2020) |
| 07/16/2020 | ⬤ 390 (1 pg) | Order Granting Motion To Appear pro hac vice - Sunni P. Beville (Related Doc # 358) Signed on 7/16/2020. (emiller) (Entered: 07/16/2020) |
| 07/16/2020 | ⬤ 391 (1 pg) | Order Granting Motion To Appear pro hac vice - Daniel A. Lowenthal (Related Doc # 359) Signed on 7/16/2020. (emiller) (Entered: 07/16/2020) |
| 07/16/2020 | ⬤ 392 (1 pg) | Order Granting Motion To Appear pro hac vice - Lance M. Kodish (Related Doc # 360) Signed on 7/16/2020. (emiller) (Entered: 07/16/2020) |
| 07/16/2020 | ⬤ 393 (1 pg) | Order Granting Motion To Appear pro hac vice - Mark A. Speiser (Related Doc # 373) Signed on 7/16/2020. (emiller) (Entered: 07/16/2020) |
| 07/16/2020 | ⬤ 394 (1 pg) | Order Granting Motion To Appear pro hac vice - Harold A. Olsen (Related Doc # 374) Signed on 7/16/2020. (emiller) (Entered: 07/16/2020) |
| 07/17/2020 | ⬤ 395 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew D. Cavenaugh. This is to order a transcript of 07/17/2020 before Judge David R. Jones. Court Reporter/Transcriber: Veritext Legal Solutions (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) Electronically forwarded to Veritext Legal Solutions on July 20, 2020. Estimated completion date: July 21, 2020. Modified on 7/20/2020 (ClaudiaGutierrez). (Entered: 07/17/2020) |
| | ⬤ 396 (1 pg) | Notice of Appearance and Request for Notice Filed by Tara L Grundemeier Filed by on behalf of Orange County (Grundemeier, Tara) (Entered: |

| 07/17/2020 | | 07/17/2020) |
|---|---|---|
| 07/17/2020 | 🔵 397<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Mary Elizabeth Heard Filed by on behalf of MBF Holdings La Salle LP, formerly MBF Partnership (Heard, Mary) (Entered: 07/17/2020) |
| 07/17/2020 | 🔵 398<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Mary Elizabeth Heard Filed by on behalf of Dan W. Kinsel III, Trustee of the 2009 Dan and Leslie Kinsel Childrens Trust and Karl Gene Kinsel, Trustee of the 2009 Karl Gene Kinsel Childs Trust (Heard, Mary) (Entered: 07/17/2020) |
| 07/17/2020 | 🔵 399<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Mary Elizabeth Heard Filed by on behalf of Gates Mineral Company, LTD and related entities and individuals (Heard, Mary) (Entered: 07/17/2020) |
| 07/17/2020 | 🔵 400<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Mary Elizabeth Heard Filed by on behalf of Dilworth Group (Heard, Mary) (Entered: 07/17/2020) |
| 07/17/2020 | 🔵 401<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Mary Elizabeth Heard Filed by on behalf of Wier Group (Heard, Mary) (Entered: 07/17/2020) |
| 07/17/2020 | 🔵 402<br>(1 pg) | Motion to Appear pro hac vice . Filed by Creditor The Bank of New York Mellon Trust Company, N.A. (Pitta, Thomas) (Entered: 07/17/2020) |
| 07/17/2020 | 🔵 403<br>(1 pg) | Motion to Appear pro hac vice . Filed by Creditor Dallas/Fort Worth International Airport Board, City of Dallas, City of Fort Worth (Orenstein, Rosa) (Entered: 07/17/2020) |
| 07/17/2020 | 🔵 404<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Rosa R Orenstein Filed by on behalf of Dallas/Fort Worth International Airport Board, City of Dallas, City of Fort Worth (Orenstein, Rosa) (Entered: 07/17/2020) |
| | 🔵 405 | Statement *in Accordance with FRBP 2019(a)* |

| | | |
|---|---|---|
| 07/17/2020 | (8 pgs) | (Filed By Dan W. Kinsel III, Trustee of the 2009 Dan and Leslie Kinsel Childrens Trust and Karl Gene Kinsel, Trustee of the 2009 Karl Gene Kinsel Childs Trust, Dilworth Group, Gates Mineral Company, LTD and related entities and individuals, Kelly Vesper, Individually, as Trustee of the Kelly Vesper Heritage Trust, and as Executrix of the Estate of John B. Vesper, Deceased and the Estate of Leslie T. Vesper, Deceased, Leojua, Ltd., MBF Holdings La Salle LP, formerly MBF Partnership, Wier Group ). (Heard, Mary) (Entered: 07/17/2020) |
| 07/17/2020 | 406 (2 pgs) | Notice of Appearance and Request for Notice Filed by Duane J Brescia Filed by on behalf of Seitel Data, Ltd. (Brescia, Duane) (Entered: 07/17/2020) |
| 07/17/2020 | 407 (52 pgs; 5 docs) | Motion for Relief from Stay *to Permit a Pending Appeal to Proceed*. Fee Amount $181. Filed by Creditor Dallas/Fort Worth International Airport Board, City of Dallas, City of Fort Worth Hearing scheduled for 8/12/2020 at 02:00 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Declaration in Support (Part 1) # 2 Declaration in Support (Part 2) # 3 Proposed Order # 4 Service List) (Orenstein, Rosa) (Entered: 07/17/2020) |
| 07/17/2020 | 408 (2 pgs) | Notice of Appearance and Request for Notice Filed by Michael P Ridulfo Filed by on behalf of VFS Leasing Co. (Ridulfo, Michael) (Entered: 07/17/2020) |
| 07/17/2020 | 409 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Jason L. Swartley. This is to order a transcript of 07/17/2020 Debtors' Emergency Hrg to Enforce Automatic Stay before Judge David R. Jones. Court Reporter/Transcriber: Veritext Legal Solutions (Filed By Commonwealth of Pennsylvania ). (Swartley, Jason) Copy request forwarded to Veritext Legal Solutions on July 20, 2020. Estimated completion date: July 21, 2020. Modified on 7/20/2020 (ClaudiaGutierrez). (Entered: 07/17/2020) |
| | 410 (1 pg) | Motion to Appear pro hac vice *Michael R. Proctor*. Filed by Creditor ECorp Resource |

| | | |
|---|---|---|
| 07/17/2020 | | Partners 1, LP (BeverlyWright) (Entered: 07/17/2020) |
| 07/17/2020 | 411 (1 pg) | Motion to Appear pro hac vice *Michael R. Proctor*. Filed by Creditor Minion Trail Ltd (BeverlyWright) (Entered: 07/17/2020) |
| 07/17/2020 | 412 (1 pg) | Motion to Appear pro hac vice *Michael R. Proctor*. Filed by Creditor Rock Creek Ranch Ltd (BeverlyWright) (Entered: 07/17/2020) |
| 07/17/2020 | 413 (2 pgs) | Courtroom Minutes. Time Hearing Held: 9:00 am. Appearances: SEE ATTACHED. (Related document(s):323 Emergency Motion) For the reasons stated on the record, the motion is granted. Mr. Donovan to submit a proposed form of order with Mr. Kovalchick approving as to form only by Wednesday, 7/22. (emiller) (Entered: 07/17/2020) |
| 07/17/2020 | 414 (1 pg) | PDF with attached Audio File. Court Date & Time [ 7/17/2020 8:58:40 AM ]. File Size [ 16648 KB ]. Run Time [ 00:34:41 ]. (Motion to Enforce Automatic Stay). (admin). (Entered: 07/17/2020) |
| 07/17/2020 | 415 (207 pgs) | Notice *Cactus Wellhead, LLC's Notice of Reclamation Demand*. Filed by Cactus Wellhead, LLC (Bailey, James) (Entered: 07/17/2020) |
| 07/17/2020 | 416 (2 pgs) | Notice of Appearance and Request for Notice Filed by Joseph S Betsko Filed by on behalf of Commonwealth of Pennsylvania (Betsko, Joseph) (Entered: 07/17/2020) |
| 07/17/2020 | 417 (4 pgs) | Stipulation and Agreed Order Signed on 7/17/2020 (Related document(s):312 Stipulation) (emiller) (Entered: 07/17/2020) |
| 07/17/2020 | 418 (4 pgs) | BNC Certificate of Mailing. (Related document (s):329 Order on Motion to Appear pro hac vice) No. of Notices: 41. Notice Date 07/17/2020. (Admin.) (Entered: 07/17/2020) |
| | 419 (4 pgs) | BNC Certificate of Mailing. (Related document (s):330 Order on Motion to Appear pro hac vice) No. of Notices: 41. Notice Date 07/17/2020. |

| 07/17/2020 | | (Admin.) (Entered: 07/17/2020) |
|---|---|---|
| 07/17/2020 | 🔵420<br>(4 pgs) | BNC Certificate of Mailing. (Related document (s):331 Order on Motion to Appear pro hac vice) No. of Notices. 41. Notice Date 07/17/2020. (Admin.) (Entered: 07/17/2020) |
| 07/17/2020 | 🔵421<br>(4 pgs) | BNC Certificate of Mailing. (Related document (s):332 Order on Motion to Appear pro hac vice) No. of Notices. 41. Notice Date 07/17/2020. (Admin.) (Entered: 07/17/2020) |
| 07/17/2020 | 🔵422<br>(4 pgs) | BNC Certificate of Mailing. (Related document (s):333 Order on Motion to Appear pro hac vice) No. of Notices. 41. Notice Date 07/17/2020. (Admin.) (Entered: 07/17/2020) |
| 07/17/2020 | 🔵423<br>(4 pgs) | BNC Certificate of Mailing. (Related document (s):334 Order on Motion to Appear pro hac vice) No. of Notices. 41. Notice Date 07/17/2020. (Admin.) (Entered: 07/17/2020) |
| 07/18/2020 | 🔵424<br>(289 pgs; 15 docs) | Motion for Relief from Stay *Eagle Ford Royalty Owner Plaintiffs' MDL Litigation*. Fee Amount $181. Filed by Creditor c/o Annie Catmull Royalty Owner Plaintiffs c/o Hearing scheduled for 8/12/2020 at 02:00 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Exhibit B # 2 Exhibit C # 3 Exhibit D # 4 Exhibit E # 5 Exhibit F # 6 Exhibit G # 7 Exhibit H # 8 Exhibit I # 9 Exhibit J # 10 Exhibit K # 11 Exhibit L # 12 Exhibit M # 13 Exhibit N # 14 Proposed Order) (Catmull, Annie) (Entered: 07/18/2020) |
| 07/19/2020 | | Receipt of Motion for Relief From Stay(20-33233) [motion,mrlfsty] ( 181.00) Filing Fee. Receipt number 22286254. Fee amount $ 181.00. (U.S. Treasury) (Entered: 07/19/2020) |
| 07/19/2020 | 🔵425<br>(14 pgs) | Certificate *of Service* (Filed By c/o Annie Catmull Royalty Owner Plaintiffs c/o ).(Related document (s):424 Motion for Relief From Stay) (Catmull, Annie) (Entered: 07/19/2020) |
| | 🔵426<br>(5 pgs) | BNC Certificate of Mailing. (Related document (s):383 Order on Motion to Appear pro hac vice) |

| 07/19/2020 | | No. of Notices: 55. Notice Date 07/19/2020. (Admin.) (Entered: 07/19/2020) |
|---|---|---|
| 07/19/2020 | 427 (5 pgs) | BNC Certificate of Mailing. (Related document (s):384 Order on Motion to Appear pro hac vice) No. of Notices: 55. Notice Date 07/19/2020. (Admin.) (Entered: 07/19/2020) |
| 07/19/2020 | 428 (5 pgs) | BNC Certificate of Mailing. (Related document (s):385 Order on Motion to Appear pro hac vice) No. of Notices: 55. Notice Date 07/19/2020. (Admin.) (Entered: 07/19/2020) |
| 07/19/2020 | 429 (5 pgs) | BNC Certificate of Mailing. (Related document (s):386 Order on Motion to Appear pro hac vice) No. of Notices: 55. Notice Date 07/19/2020. (Admin.) (Entered: 07/19/2020) |
| 07/19/2020 | 430 (5 pgs) | BNC Certificate of Mailing. (Related document (s):387 Order on Motion to Appear pro hac vice) No. of Notices: 55. Notice Date 07/19/2020. (Admin.) (Entered: 07/19/2020) |
| 07/19/2020 | 431 (5 pgs) | BNC Certificate of Mailing. (Related document (s):388 Order on Motion to Appear pro hac vice) No. of Notices: 55. Notice Date 07/19/2020. (Admin.) (Entered: 07/19/2020) |
| 07/19/2020 | 432 (5 pgs) | BNC Certificate of Mailing. (Related document (s):389 Order on Motion to Appear pro hac vice) No. of Notices: 55. Notice Date 07/19/2020. (Admin.) (Entered: 07/19/2020) |
| 07/19/2020 | 433 (5 pgs) | BNC Certificate of Mailing. (Related document (s):390 Order on Motion to Appear pro hac vice) No. of Notices: 55. Notice Date 07/19/2020. (Admin.) (Entered: 07/19/2020) |
| 07/19/2020 | 434 (5 pgs) | BNC Certificate of Mailing. (Related document (s):391 Order on Motion to Appear pro hac vice) No. of Notices: 55. Notice Date 07/19/2020. (Admin.) (Entered: 07/19/2020) |
| | 435 (5 pgs) | BNC Certificate of Mailing. (Related document (s):392 Order on Motion to Appear pro hac vice) No. of Notices: 55. Notice Date 07/19/2020. |

| 07/19/2020 | | (Admin.) (Entered: 07/19/2020) |
|---|---|---|
| 07/19/2020 | 436<br>(9 pgs) | BNC Certificate of Mailing. (Related document (s):393 Order on Motion to Appear pro hac vice) No. of Notices: 55. Notice Date 07/19/2020. (Admin.) (Entered: 07/19/2020) |
| 07/19/2020 | 437<br>(5 pgs) | BNC Certificate of Mailing. (Related document (s):394 Order on Motion to Appear pro hac vice) No. of Notices: 55. Notice Date 07/19/2020. (Admin.) (Entered: 07/19/2020) |
| 07/20/2020 | 438<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by James Paul Barnett Jr Filed by on behalf of Joey Gloyna (Barnett, James) (Entered: 07/20/2020) |
| 07/20/2020 | 439<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by James Paul Barnett Jr Filed by on behalf of Joey Gloyna (Barnett, James) (Entered: 07/20/2020) |
| 07/20/2020 | | Receipt Number 190174, Fee Amount $181 re: 407 Motion for Relief. (Olin) (Entered: 07/20/2020) |
| 07/20/2020 | 440<br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Marty L. Brimmage, Jr.. This is to order a transcript of the July 17, 2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Veritext Legal Solutions (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts ). (Brimmage, Marty) Copy request forwarded to Veritext Legal Solutions on July 21, 2020. Estimated completion date: July 22, 2020. Modified on 7/21/2020 (ClaudiaGutierrez). (Entered: 07/20/2020) |
| 07/20/2020 | 441<br>(4 pgs) | Objection (Limited) (related document(s):35 Motion to Assume/Reject). Filed by Federal Energy Regulatory Commission (Kincheloe, Richard) (Entered: 07/20/2020) |
| | 442<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Thomas A. Pitta (Related Doc # 402) Signed on |

| | | |
|---|---|---|
| 07/20/2020 | | 7/20/2020. (emiller) (Entered: 07/20/2020) |
| 07/20/2020 | 443<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Nathan M. Nichols (Related Doc # 403) Signed on 7/20/2020. (emiller) (Entered: 07/20/2020) |
| 07/20/2020 | 444<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Michael R. Proctor (Related Doc # 410) Signed on 7/20/2020. (emiller) (Entered: 07/20/2020) |
| 07/20/2020 | 445<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Michael R. Proctor (Related Doc # 411) Signed on 7/20/2020. (emiller) (Entered: 07/20/2020) |
| 07/20/2020 | 446<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Michael R. Proctor (Related Doc # 412) Signed on 7/20/2020. (emiller) (Entered: 07/20/2020) |
| 07/20/2020 | 447<br>(66 pgs; 3 docs) | Emergency Motion *to Amend the Order (I) Approving Notification and Hearing Procedures for Certain Transfers of Common Stock and Preferred Stock and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order # 2 Redline) (Cavenaugh, Matthew) (Entered: 07/20/2020) |
| 07/20/2020 | 448<br>(3 pgs) | Order Authorizing the Debtors to File Under Seal the Names of Certain Confidential Parties in Interest Related to Kirkland & Ellis, LLP and Kirkland & Ellis, LLP's Retention Application (Related Doc # 381) Signed on 7/20/2020. (emiller) (Entered: 07/21/2020) |
| 07/21/2020 | 449<br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Jason Boland. This is to order a transcript of June 29, 2020 hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Official Committee Of Unsecured Creditors ). (Boland, Jason) Electronically forwarded to the original transcriber: Access Transcripts on 7-21-2020. Estimated completion date: 7-22-2020. Modified on 7/21/2020 (MelissaMorgan). (Entered: 07/21/2020) |
| | 450 | AO 435 TRANSCRIPT ORDER FORM (Daily |

| | | |
|---|---|---|
| 07/21/2020 | (1 pg) | (24 hours)) by Jason Boland. This is to order a transcript of July 17, 2020 hearing before Judge David R. Jones. Court Reporter/Transcriber: Veritext Legal Solutions (Filed By Official Committee Of Unsecured Creditors ). (Boland, Jason) Electronically forwarded to Veritext Legal Solutions on 7-21-2020. Estimated completion date: 7-22-2020. Modified on 7/21/2020 (MelissaMorgan). (Entered: 07/21/2020) |
| 07/21/2020 | 451 (2 pgs) | Declaration re: *Service* (Filed By c/o Annie Catmull Royalty Owner Plaintiffs c/o ).(Related document(s):424 Motion for Relief From Stay, 425 Certificate) (Catmull, Annie) (Entered: 07/21/2020) |
| 07/21/2020 | 452 (13 pgs; 2 docs) | Motion to Seal *Debtors' Motion for Entry of an Order Authorizing the Debtors to File Under Seal the Names of Certain Confidential Parties In Interest Related to Rothschild & Co US Inc. and Intrepid Partners, LLC's Retention Application* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 07/21/2020) |
| 07/21/2020 | 453 (84 pgs) | Sealed Document *Related to ECF No. 452* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 07/21/2020) |
| 07/21/2020 | 454 (94 pgs) | Sealed Document *Related to ECF No. 452* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 07/21/2020) |
| 07/21/2020 | 455 (3 pgs) | Letter from Shareholder Mary Margaret Nilan (JeannieAndresen) (Entered: 07/21/2020) |
| 07/21/2020 | 456 (29 pgs) | Amended Order (I) Approving Notification and Hearing Procedures for Certain Transfers of Common Stock and Preferred Stock (II) Granting Related Relief Granting Emergency Motion (Related Doc # 447) Signed on 7/21/2020. (emiller) (Entered: 07/21/2020) |
| | 457 (2 pgs) | Notice of Appearance and Request for Notice Filed by Callan Clark Searcy Filed by on behalf of Genesis Endeavors, LLC (Searcy, Callan) |

| | | |
|---|---|---|
| 07/21/2020 | | (Entered: 07/21/2020) |
| 07/21/2020 | ● 458<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by John Thomas Oldham Filed by on behalf of Well Water Solutions and Rentals, Inc. (Oldham, John Thomas) (Entered: 07/21/2020) |
| 07/21/2020 | ● 459<br>(6 pgs) | Stipulation By Chesapeake Energy Corporation and Castleton Commodities Merchant Trading L.P.. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 07/21/2020) |
| 07/22/2020 | ● 460<br>(50 pgs; 2 docs) | Proposed Order RE: *Amended Order (I) Approving Continuation of the Surety Bond Program and (II) Granting Related Relief* (Filed By Chesapeake Energy Corporation ). (Related document(s):13 Emergency Motion, 138 Order on Emergency Motion) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 07/22/2020) |
| 07/22/2020 | ● 461<br>(7 pgs) | Letter from Shareholder Jason Dean (JeannieAndresen) (Entered: 07/22/2020) |
| 07/22/2020 | ● 462<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Nicholas Christian Glenos Filed by on behalf of Cactus Wellhead, LLC (Glenos, Nicholas) (Entered: 07/22/2020) |
| 07/22/2020 | ● | Adversary Case 4:20-ap-3231 Closed. (aalo) (Entered: 07/22/2020) |
| 07/22/2020 | ● 463<br>(46 pgs) | Debtors Master Service List (Filed By Epiq Corporate Restructuring LLC ). (Garabato, Sid) (Entered: 07/22/2020) |
| 07/22/2020 | ● 464<br>(3 pgs) | Proposed Order Submission After Hearing (Filed By Chesapeake Energy Corporation ). (Related document(s):323 Emergency Motion) (Cavenaugh, Matthew) (Entered: 07/22/2020) |
| | ● 465<br>(8 pgs; 2 docs) | Notice *to Chesapeake Energy Corporation of Rule 30(b)(6) Deposition.* Filed by Official Committee Of Unsecured Creditors (Attachments: |

| | | |
|---|---|---|
| 07/22/2020 | | # 1 Exhibit A) (Harrison, Julie) (Entered: 07/22/2020) |
| 07/22/2020 | 🔵466 (182 pgs; 5 docs) | Witness List (Filed By Ruth Middleton ).(Related document(s):22 Emergency Motion) (Attachments: # 1 Exhibit A - List of Objectors # 2 Exhibit B - Memorandum Ruling # 3 Exhibit C - Pleadings # 4 Exhibit D - Unit Orders) (Hearne, William) (Entered: 07/22/2020) |
| 07/22/2020 | 🔵467 (3 pgs) | Order Regarding Motion to Enforce the Automatic Stay Against the Office of The Attorney General of the Commonwealth of Pennsylvania (Related Doc # 323) Signed on 7/22/2020. (aalo) (Entered: 07/22/2020) |
| 07/22/2020 | 🔵468 (6 pgs) | Stipulation and Agreed Order Signed on 7/22/2020 (aalo) (Entered: 07/22/2020) |
| 07/22/2020 | 🔵469 (25 pgs) | Amended Order (I) Approving Continuation of the Surety Bond Program and (II) Granting Related Relief Signed on 7/22/2020 (Related document(s):13 Emergency Motion, 138 Order on Emergency Motion) (aalo) (Entered: 07/22/2020) |
| 07/22/2020 | 🔵470 (8 pgs) | BNC Certificate of Mailing. (Related document(s):417 Generic Order) No. of Notices: 57. Notice Date 07/22/2020. (Admin.) (Entered: 07/22/2020) |
| 07/23/2020 | | Receipt of Motion for Relief From Stay(20-33233) [motion,mrlfsty] ( 181.00) Filing Fee. Receipt number 22296954. Fee amount $ 181.00. (U.S. Treasury) (Entered: 07/23/2020) |
| 07/23/2020 | 🔵471 (1 pg) | Motion to Appear pro hac vice *Steven B. Levine*. Filed by Creditor Committee Official Committee Of Unsecured Creditors (Harrison, Julie) (Entered: 07/23/2020) |
| 07/23/2020 | 🔵472 (1 pg) | Motion to Appear pro hac vice *Kenneth J. Aulet*. Filed by Creditor Committee Official Committee Of Unsecured Creditors (Harrison, Julie) (Entered: 07/23/2020) |
| 07/23/2020 | 🔵473 (1 pg) | Motion to Appear pro hac vice *Andrew M. Carty*. Filed by Creditor Committee Official Committee |

| 07/23/2020 | | Of Unsecured Creditors (Harrison, Julie) (Entered: 07/23/2020) |
|---|---|---|
| 07/23/2020 | 🌐474 (1 pg) | Motion to Appear pro hac vice *Michael Winograd*. Filed by Creditor Committee Official Committee Of Unsecured Creditors (Harrison, Julie) (Entered: 07/23/2020) |
| 07/23/2020 | 🌐475 (1 pg) | Motion to Appear pro hac vice *Sigmund Wissner-Gross*. Filed by Creditor Committee Official Committee Of Unsecured Creditors (Harrison, Julie) (Entered: 07/23/2020) |
| 07/23/2020 | 🌐476 (2 pgs) | Letter from Shareholder Tim Cowen (JeannieAndresen) (Entered: 07/23/2020) |
| 07/23/2020 | 🌐477 (1 pg) | Motion to Appear pro hac vice *by Stephen M. Nagle, New York State Office of the Attorney General*. Filed by Interested Party New York State Department of Environmental Conservation (Nagle, Stephen) (Entered: 07/23/2020) |
| 07/23/2020 | 🌐478 (5 pgs) | BNC Certificate of Mailing. (Related document (s):442 Order on Motion to Appear pro hac vice) No. of Notices: 56. Notice Date 07/23/2020. (Admin.) (Entered: 07/23/2020) |
| 07/23/2020 | 🌐479 (5 pgs) | BNC Certificate of Mailing. (Related document (s):443 Order on Motion to Appear pro hac vice) No. of Notices: 56. Notice Date 07/23/2020. (Admin.) (Entered: 07/23/2020) |
| 07/23/2020 | 🌐480 (5 pgs) | BNC Certificate of Mailing. (Related document (s):444 Order on Motion to Appear pro hac vice) No. of Notices: 56. Notice Date 07/23/2020. (Admin.) (Entered: 07/23/2020) |
| 07/23/2020 | 🌐481 (5 pgs) | BNC Certificate of Mailing. (Related document (s):445 Order on Motion to Appear pro hac vice) No. of Notices: 56. Notice Date 07/23/2020. (Admin.) (Entered: 07/23/2020) |
| 07/23/2020 | 🌐482 (5 pgs) | BNC Certificate of Mailing. (Related document (s):446 Order on Motion to Appear pro hac vice) No. of Notices: 56. Notice Date 07/23/2020. (Admin.) (Entered: 07/23/2020) |

| | | |
|---|---|---|
| 07/23/2020 | ● 483 (33 pgs) | BNC Certificate of Mailing. (Related document (s):456 Order on Emergency Motion) No. of Notices: 56. Notice Date 07/23/2020. (Admin.) (Entered: 07/23/2020) |
| 07/23/2020 | ● 484 (4 pgs) | BNC Certificate of Mailing. (Related document (s):448 Order on Motion to Seal) No. of Notices: 1. Notice Date 07/23/2020. (Admin.) (Entered: 07/23/2020) |
| 07/24/2020 | ● 485 (4 pgs) | Stipulation By Chesapeake Energy Corporation and ETC Texas Pipeline, Ltd.. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 07/24/2020) |
| 07/24/2020 | ● 486 (4 pgs) | Objection *Limited Objection of Oasis Pipeline to Debtors' Motion for Entry of an Order (I) Authorizing Rejection of Certain Executory Contracts Effective as of July 1, 2020 and (II) Granting Related Relief* (related document(s):27 Emergency Motion). Filed by Oasis Pipeline L.P. (Mitchell, John) (Entered: 07/24/2020) |
| 07/24/2020 | ● 487 (18 pgs) | Objection *of ETC Texas Pipeline, Ltd. to Debtors' Motion for Entry of an Order (I) Authorizing Rejection of Certain Executory Contracts Effective as of July 1, 2020 and (II) Granting Related Relief* (related document(s):27 Emergency Motion). Filed by ETC Texas Pipeline Ltd. (Mitchell, John) (Entered: 07/24/2020) |
| 07/24/2020 | ● 488 (5 pgs) | US Trustee's Notice *of Appointment of the Committee of Royalty Owners*. (Duran, Hector) (Entered: 07/24/2020) |
| 07/24/2020 | ● 489 (4 pgs) | Letter from Shareholder John Dough (JeannieAndresen) (Entered: 07/24/2020) |
| | ● 490 (60 pgs; 4 docs) | Motion for Withdrawal of Reference. Objections/Request for Hearing Due in 21 days. Fee Amount: $ 181. Filed by Creditor ETC Tiger Pipeline LLC (Attachments: # 1 Exhibit A - Declaration of Luke Fletcher # 2 Exhibit B- Tiger Order # 3 Exhibit C - Order on Motion to |

| 07/24/2020 | | Withdraw) (Mitchell, John) (Entered: 07/24/2020) |
|---|---|---|
| 07/24/2020 | | Receipt of Motion for Withdrawal of Reference (20-33233) [motion,mwdref] ( 181.00) Filing Fee. Receipt number 22302419. Fee amount $ 181.00. (U.S. Treasury) (Entered: 07/24/2020) |
| 07/24/2020 | 491 (8 pgs; 2 docs) | Emergency Motion *ETC Tiger Pipeline LLC's Emergency Motion for: (A) Scheduling Confrence on ETC Tiger Pipeline LLC's Motion to Withdraw Reference of the Debtors' Motion for Entry of an Order (I) Authorizing Rejection of the Negotiated Rate Firm Transportation Agreements and Related Contracts Effective as of July 1, 2020 and (II) Related Relief; (B) a Continuance and Resetting of the Hearing Currently Set for July 31, 2020 On the Motion to Reject; and (C) Related Relief* Filed by Creditor ETC Tiger Pipeline LLC (Attachments: # 1 Exhibit [Proposed] Order Setting Status Conference) (Mitchell, John) (Entered: 07/24/2020) |
| 07/24/2020 | 492 (140 pgs; 4 docs) | Objection *ETC Tiger Pipeline LLC's Objection to Debtors' Motion for Entry of an Order (I) Authorizing Rejection of the Negotiated Rate Firm Transportation Agreements and Related Contracts Effective as of July 1, 2020 and (II) Granting Related Relief* (related document(s):35 Motion to Assume/Reject. Filed by ETC Tiger Pipeline LLC (Attachments: # 1 Exhibit A - ETC Tiger Order # 2 Exhibit B - Fletcher Declaration # 3 Exhibit C - Declaration of Steven Hearn) (Mitchell, John) (Entered: 07/24/2020) |
| 07/24/2020 | 493 (5 pgs) | Notice of Appearance and Request for Notice Filed by Scott Robert Cheatham Filed by on behalf of CGG Services (U.S.), Inc. f/k/a Digicon Geophysical Corp. (Cheatham, Scott) (Entered: 07/24/2020) |
| 07/24/2020 | 494 (7 pgs) | BNC Certificate of Mailing. (Related document (s):467 Order on Emergency Motion) No. of Notices: 57. Notice Date 07/24/2020. (Admin.) (Entered: 07/24/2020) |
| | 495 | BNC Certificate of Mailing. (Related document |

| | | |
|---|---|---|
| 07/24/2020 | (10 pgs) | (s):468 Generic Order) No. of Notices: 57. Notice Date 07/24/2020. (Admin.) (Entered: 07/24/2020) |
| 07/24/2020 | 496 (29 pgs) | BNC Certificate of Mailing. (Related document (s):469 Amended Order) No. of Notices: 57. Notice Date 07/24/2020. (Admin.) (Entered: 07/24/2020) |
| 07/25/2020 | 497 (2 pgs) | Notice *of Participation in Deposition*. (Related document(s):465 Notice) Filed by Official Committee of Royalty Owners (Forshey, J) (Entered: 07/25/2020) |
| 07/26/2020 | 498 (1 pg) | Motion to Appear pro hac vice - *James W. Ducayet*. Filed by Creditor MUFG Union Bank, N.A. (Quejada, Maegan) (Entered: 07/26/2020) |
| 07/26/2020 | 499 (3 pgs) | Notice of Appearance and Request for Notice Filed by J Robert Forshey Filed by on behalf of Official Committee of Royalty Owners (Forshey, J) (Entered: 07/26/2020) |
| 07/26/2020 | 500 (3 pgs) | Notice of Appearance and Request for Notice Filed by Suzanne K. Rosen Filed by on behalf of Official Committee of Royalty Owners (Rosen, Suzanne) (Entered: 07/26/2020) |
| 07/26/2020 | 501 (3 pgs) | Notice of Appearance and Request for Notice Filed by Deirdre Carey Brown, pllc Filed by on behalf of Official Committee of Royalty Owners (Brown, pllc, Deirdre) (Entered: 07/26/2020) |
| 07/26/2020 | 502 (3 pgs) | Notice of Appearance and Request for Notice Filed by Jeffrey Philipp Prostok Filed by on behalf of Official Committee of Royalty Owners (Prostok, Jeffrey) (Entered: 07/26/2020) |
| 07/27/2020 | 503 (1 pg) | Motion to Appear pro hac vice *Abid Quershi*. Filed by Interested Party Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts (Brimmage, Marty) (Entered: 07/27/2020) |
| | | Certificate of Email Notice. Contacted Veronica Polnick. Movant to notice all interested parties |

| | | |
|---|---|---|
| 07/27/2020 | | and file a certificate of service with the court (Related document(s):287 Generic Motion) **Hearing scheduled for 8/12/2020 at 02:00 PM by telephone and video conference.** (aalo) (Entered: 07/27/2020) |
| 07/27/2020 | 504 (1 pg) | Order Granting Motion To Appear pro hac vice - Steven B. Levine (Related Doc # 471) Signed on 7/27/2020. (emiller) (Entered: 07/27/2020) |
| 07/27/2020 | 505 (1 pg) | Order Granting Motion To Appear pro hac vice - Kenneth J. Aulet (Related Doc # 472) Signed on 7/27/2020. (emiller) (Entered: 07/27/2020) |
| 07/27/2020 | 506 (1 pg) | Order Granting Motion To Appear pro hac vice - Andrew M. Carty (Related Doc # 473) Signed on 7/27/2020. (emiller) (Entered: 07/27/2020) |
| 07/27/2020 | 507 (1 pg) | Order Granting Motion To Appear pro hac vice - Michael Winograd (Related Doc # 474) Signed on 7/27/2020. (emiller) (Entered: 07/27/2020) |
| 07/27/2020 | 508 (1 pg) | Order Granting Motion To Appear pro hac vice - Sigmund Wissner-Gross (Related Doc # 475) Signed on 7/27/2020. (emiller) (Entered: 07/27/2020) |
| 07/27/2020 | 509 (1 pg) | Order Granting Motion To Appear pro hac vice - Stephen M. Nagle (Related Doc # 477) Signed on 7/27/2020. (emiller) (Entered: 07/27/2020) |
| 07/27/2020 | 510 (4 pgs) | Notice *of Reset Hearing on Motion to Approve Procedures For De Minimis Asset Transactions*. (Related document(s):287 Generic Motion) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 07/27/2020) |
| 07/27/2020 | 511 (4 pgs) | Notice of Appearance and Request for Notice Filed by Union Pacific Railroad Company (sgue) (Entered: 07/27/2020) |
| | 512 (9 pgs; 2 docs) | Emergency Motion *of the Official Committee of Unsecured Creditors to File Under Seal Objection to Debtors Emergency Motion For Entry Of Interim And Final Orders (i) Authorizing The Debtors To Obtain Postpetition* |

| | | |
|---|---|---|
| 07/27/2020 | | *Financing, (ii) Authorizing The Debtors To Use Cash Collateral, (iii) Granting Liens And Providing Claims With Superpriority Administrative Expense Status, (iv) Granting Adequate Protection To The Existing Secured Parties, (V) Modifying The Automatic Stay, (vi) Scheduling A Final Hearing, And (vii) Granting Related Relief* Filed by Creditor Committee Official Committee Of Unsecured Creditors (Attachments: # 1 Proposed Order) (Harrison, Julie) (Entered: 07/27/2020) |
| 07/27/2020 | 🌐 513 (59 pgs; 3 docs) | Sealed Document *Sealed Objection to Debtors Emergency Motion For Entry Of Interim And Final Orders (i) Authorizing The Debtors To Obtain Postpetition Financing, (ii) Authorizing The Debtors To Use Cash Collateral, (iii) Granting Liens And Providing Claims With Superpriority Administrative Expense Status, (iv) Granting Adequate Protection To The Existing Secured Parties, (V) Modifying The Automatic Stay, (vi) Scheduling A Final Hearing, And (vii) Granting Related Relief* (Filed By Official Committee Of Unsecured Creditors ). (Attachments: # 1 Exhibit A # 2 Declaration of Robert Albergotti in Support of Objection) (Harrison, Julie) (Entered: 07/27/2020) |
| 07/27/2020 | 🌐 514 (59 pgs; 3 docs) | Objection *to Debtors Emergency Motion For Entry Of Interim And Final Orders (i) Authorizing The Debtors To Obtain Postpetition Financing, (ii) Authorizing The Debtors To Use Cash Collateral, (iii) Granting Liens And Providing Claims With Superpriority Administrative Expense Status, (iv) Granting Adequate Protection To The Existing Secured Parties, (V) Modifying The Automatic Stay, (vi) Scheduling A Final Hearing, And (vii) Granting Related Relief* (related document(s):22 Emergency Motion). Filed by Official Committee Of Unsecured Creditors (Attachments: # 1 Exhibit A # 2 Declaration of Robert Albergotti in Support of Objection) (Harrison, Julie) (Entered: 07/27/2020) |
| 07/28/2020 | 🌐 515 (1 pg) | Order (Related Doc # 327) Signed on 7/28/2020. (aalo) (Entered: 07/28/2020) |

| | | |
|---|---|---|
| 07/28/2020 | 516 (53 pgs) | Debtors Master Service List (Filed By Epiq Corporate Restructuring LLC ). (Garabato, Sid) (Entered: 07/28/2020) |
| 07/28/2020 | 517 (28 pgs) | Objection - *Preliminary Objection and Reservation of Rights* (related document(s):22 Emergency Motion). Filed by Official Committee of Royalty Owners (Forshey, J) (Entered: 07/28/2020) |
| 07/28/2020 | 518 (84 pgs; 3 docs) | Sealed Document *Amended Objection to the Debtors Emergency Motion For Entry Of Interim And Final Orders (i) Authorizing The Debtors To Obtain Postpetition Financing, (ii) Authorizing The Debtors To Use Cash Collateral, (iii) Granting Liens And Providing Claims With Superpriority Administrative Expense Status, (iv) Granting Adequate Protection To The Existing Secured Parties, (v) Modifying The Automatic Stay, (vi) Scheduling A Final Hearing, And (vii) Granting Related Relief (Relates to Dkt Nos. 512 & 513]* (Filed By Official Committee Of Unsecured Creditors ). (Attachments: # 1 Exhibit A # 2 Redline) (Harrison, Julie) (Entered: 07/28/2020) |
| 07/28/2020 | 519 (84 pgs; 3 docs) | Amended Objection *to the Debtors Emergency Motion For Entry Of Interim And Final Orders (i) Authorizing The Debtors To Obtain Postpetition Financing, (ii) Authorizing The Debtors To Use Cash Collateral, (iii) Granting Liens And Providing Claims With Superpriority Administrative Expense Status, (iv) Granting Adequate Protection To The Existing Secured Parties, (v) Modifying The Automatic Stay, (vi) Scheduling A Final Hearing, And (vii) Granting Related Relief (relates to Dkt. No. 514)* (related document(s):22 Emergency Motion). Filed by Official Committee Of Unsecured Creditors (Attachments: # 1 Exhibit A # 2 Redline) (Harrison, Julie) (Entered: 07/28/2020) |
| | 520 (112 pgs; 2 docs) | Motion *for Entry of an Order (I) Authorizing Entry Into the Backstop Commitment Agreement, (II) Approving the Payment of Fees and Expenses Related Thereto, and (III) Granting Related Relief* Filed by Debtor Chesapeake |

| | | |
|---|---|---|
| 07/28/2020 | | Energy Corporation Hearing scheduled for 8/21/2020 at 09:30 AM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 07/28/2020) |
| 07/28/2020 | 521 (1 pg) | Order Granting Motion To Appear pro hac vice - James W. Ducayet (Related Doc # 498) Signed on 7/28/2020. (emiller) (Entered: 07/28/2020) |
| 07/28/2020 | 522 (1 pg) | Order Granting Motion To Appear pro hac vice - Abid Quershi (Related Doc # 503) Signed on 7/28/2020. (emiller) (Entered: 07/28/2020) |
| 07/28/2020 | 523 (28 pgs; 3 docs) | Motion *for Entry of an Order (I) Authorizing the Debtors to Incur and Pay Fees, Indemnities, and Expenses Related to the Exit Facilities and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation Hearing scheduled for 7/21/2020 at 09:30 AM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order # 2 Exhibit A) (Cavenaugh, Matthew) (Entered: 07/29/2020) |
| 07/29/2020 | 524 (12 pgs; 2 docs) | Motion *for Entry of an Order (I) Authorizing the Debtors to File Fee Letters Under Seal and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 07/29/2020) |
| 07/29/2020 | 525 (28 pgs) | Sealed Motion *for Entry of an Order (I) Authorizing the Debtors to Incur and Pay Fees, Indemnities, and Expenses Related to the Exit Facilities and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 07/29/2020) |
| 07/29/2020 | 526 (6 pgs) | Sealed Document *Fee Letter* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 07/29/2020) |
| 07/29/2020 | 527 (5 pgs) | Sealed Document *Fee Letter* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 07/29/2020) |
| | 528 | Motion to Appear pro hac vice . Filed by |

| | | |
|---|---|---|
| 07/29/2020 | (1 pg) | Interested Party New York State Department of Environmental Conservation (Gore, Christopher) (Entered: 07/29/2020) |
| 07/29/2020 | 529 (773 pgs; 31 docs) | Exhibit List, Witness List (Filed By c/o Annie Catmull Royalty Owner Plaintiffs c/o ).(Related document(s):22 Emergency Motion, 128 Order Setting Hearing, 344 Objection) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16, part 1 of 9 # 17 Exhibit 16, part 2 of 9 # 18 Exhibit 16 part 3 of 9 # 19 Exhibit 16, part 4 of 9 # 20 Exhibit 16, part 5 of 9 # 21 Exhibit 16, part 6 of 9 # 22 Exhibit 16, part 7 of 9 # 23 Exhibit 16, part 8 of 9 # 24 Exhibit 16, part 9 of 9 # 25 Exhibit 17 # 26 Exhibit 18 # 27 Exhibit 19 # 28 Exhibit 20 # 29 Exhibit 21 # 30 Exhibit 22) (Catmull, Annie) (Entered: 07/29/2020) |
| 07/29/2020 | 530 (333 pgs; 5 docs) | Witness List, Exhibit List (Filed By Chesapeake Energy Corporation ).(Related document(s):287 Generic Motion, 290 Generic Motion, Certificate of Notice, Certificate of Notice) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4) (Cavenaugh, Matthew) (Entered: 07/29/2020) |
| 07/29/2020 | 531 (9 pgs; 2 docs) | Emergency Motion *of the Official Committee of Unsecured Creditors to File Under Seal Exhibits for Hearing on July 31, 2020* Filed by Creditor Committee Official Committee Of Unsecured Creditors (Attachments: # 1 Proposed Order) (Boland, Jason) (Entered: 07/29/2020) |
| | 532 (1220 pgs; 13 docs) | Exhibit List, Witness List (Filed By Official Committee of Royalty Owners ).(Related document(s):22 Emergency Motion, 517 Objection, 519 Objection) (Attachments: # 1 Exhibit 1_DIP Motion # 2 Exhibit 2_Affidavit of Service of First Day Motions # 3 Exhibit 3 CHK 10K 2020 # 4 Exhibit 4 - CHK 10Q 3 31 20 # 5 Exhibit 5 Notice Appointing Royalty Owners Committee # 6 Exhibit 6 - Docket # 7 Exhibit 7 Mailing list # 8 Exhibit 8 Mailing list # 9 Exhibit |

| | | |
|---|---|---|
| 07/29/2020 | | 9 - Mailing List # 10 Exhibit 10 - Mailing List # 11 Exhibit 11 - Mailing list # 12 Exhibit 12_Affidavit of Service (Doc. No. 366)) (Brown, pllc, Deirdre) (Entered: 07/29/2020) |
| 07/29/2020 | ● 533 (2 pgs) | Notice of Appearance and Request for Notice Filed by Matthew Scott Okin Filed by on behalf of Well Water Solutions and Rentals, Inc. (Okin, Matthew) (Entered: 07/29/2020) |
| | ● 534 (3441 pgs; 57 docs) | Witness List, Exhibit List (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):22 Emergency Motion, 513 Sealed Document, 514 Objection, 518 Sealed Document, 519 Objection) (Attachments: # 1 Exhibit 1 - UCC 30(b)(6) Notice to Debtors # 2 Exhibit 2 - Debtors Rs&Os to UCC 30(b)(6) # 3 Exhibit 3 - Stephen Antinelli Declaration # 4 Exhibit 4 - Dell-Osso First Day Declaration # 5 Exhibit 5 - UNDER SEAL # 6 Exhibit 6 - UNDER SEAL # 7 Exhibit 7 - UNDER SEAL # 8 Exhibit 8 - UNDER SEAL # 9 Exhibit 9 - UNDER SEAL # 10 Exhibit 10 - UNDER SEAL # 11 Exhibit 11 - UNDER SEAL # 12 Exhibit 12 - UNDER SEAL # 13 Exhibit 13 - UNDER SEAL # 14 Exhibit 14 - UNDER SEAL # 15 Exhibit 15 - UNDER SEAL # 16 Exhibit 16 - UNDER SEAL # 17 Exhibit 17 - UNDER SEAL # 18 Exhibit 18 - UNDER SEAL # 19 Exhibit 19 - UNDER SEAL # 20 Exhibit 20 - UNDER SEAL # 21 Exhibit 21 - UNDER SEAL # 22 Exhibit 22 - Albergotti Declaration (Redacted) # 23 Exhibit 23 - UNDER SEAL # 24 Exhibit 24 - UNDER SEAL # 25 Exhibit 25 - DIP Budget # 26 Exhibit 26 - UNDER SEAL # 27 Exhibit 27 - UNDER SEAL # 28 Exhibit 28 - Reserved # 29 Exhibit 29 - Reserved # 30 Exhibit 30 - PG&E Final DIP Order # 31 Exhibit 31 - Frontier Interim DIP Order # 32 Exhibit 32 - Intelsat Final DIP Order # 33 Exhibit 33 - Peabody Final DIP Order # 34 Exhibit 34 - SunEdison Final DIP Order # 35 Exhibit 35 - Windstream Final DIP Order # 36 Exhibit 36 - Neiman Marcus Final DIP Order # 37 Exhibit 37 - McDermott Final DIP Order # 38 Exhibit 38 - Sanchez Energy Final DIP Order # 39 Exhibit 39 - Foresight Energy Final DIP Order # 40 Exhibit |

| | | |
|---|---|---|
| 07/29/2020 | | 40 - EXCO Resources Final DIP Order # 41 Exhibit 41 - Sheridan Holding Co II Final DIP Order # 42 Exhibit 42 - Vanguard Natural Resources Final DIP Order # 43 Exhibit 43 - Arch Coal Final DIP Order # 44 Exhibit 44 - EP Energy Final DIP Order # 45 Exhibit 45 - Murray Energy Final DIP Order # 46 Exhibit 46 - iHeart Media Final DIP Order # 47 Exhibit 47 - Weatherford International Final DIP Order # 48 Exhibit 48 - Avaya Final DIP Order # 49 Exhibit 49 - Windstream Final DIP Order # 50 Exhibit 50 - UNDER SEAL # 51 Exhibit 51 - UNDER SEAL # 52 Exhibit 52 - UNDER SEAL # 53 Exhibit 53 - UNDER SEAL # 54 Exhibit 54 - UNDER SEAL # 55 Exhibit 55 - UNDER SEAL # 56 Exhibit 56 - Supplemental Declaration of Robert Albergotti) (Boland, Jason) (Entered: 07/29/2020) |
| 07/29/2020 | 535 (3958 pgs; 57 docs) | Sealed Document *Sealed Exhibits for July 31 Hearing* (Filed By Official Committee Of Unsecured Creditors ). (Attachments: # 1 Exhibit # 1 # 2 Exhibit # 2 # 3 Exhibit # 3 # 4 Exhibit # 4 # 5 Exhibit # 5 # 6 Exhibit # 6 # 7 Exhibit # 7 # 8 Exhibit # 8 # 9 Exhibit # 9 # 10 Exhibit # 10 # 11 Exhibit # 11 # 12 Exhibit # 12 # 13 Exhibit # 13 # 14 Exhibit # 14 # 15 Exhibit # 15 # 16 Exhibit # 16 # 17 Exhibit # 17 # 18 Exhibit # 18 # 19 Exhibit # 19 # 20 Exhibit # 20 # 21 Exhibit # 21 # 22 Exhibit # 22 # 23 Exhibit # 23 # 24 Exhibit # 24 # 25 Exhibit # 25 # 26 Exhibit # 26 # 27 Exhibit # 27 # 28 Exhibit # 28 # 29 Exhibit # 29 # 30 Exhibit # 30 # 31 Exhibit # 31 # 32 Exhibit # 32 # 33 Exhibit # 33 # 34 Exhibit # 34 # 35 Exhibit # 35 # 36 Exhibit # 36 # 37 Exhibit # 37 # 38 Exhibit # 38 # 39 Exhibit # 39 # 40 Exhibit # 40 # 41 Exhibit # 41 # 42 Exhibit # 42 # 43 Exhibit # 43 # 44 Exhibit # 44 # 45 Exhibit # 45 # 46 Exhibit # 46 # 47 Exhibit # 47 # 48 Exhibit # 48 # 49 Exhibit # 49 # 50 Exhibit # 50 # 51 Exhibit # 51 # 52 Exhibit # 52 # 53 Exhibit # 53 # 54 Exhibit # 54 # 55 Exhibit # 55 # 56 Exhibit # 56) (Bruner, Robert) (Entered: 07/29/2020) |
| | 536 (3 pgs) | Notice of Appearance and Request for Notice Filed by Kerry L Haliburton Filed by on behalf |

| | | |
|---|---|---|
| 07/29/2020 | | of Sara Ann Ware Harrison (Haliburton, Kerry) (Entered: 07/29/2020) |
| 07/29/2020 | 🌑 537 (5 pgs) | BNC Certificate of Mailing. (Related document (s):504 Order on Motion to Appear pro hac vice) No. of Notices: 58. Notice Date 07/29/2020. (Admin.) (Entered: 07/29/2020) |
| 07/29/2020 | 🌑 538 (5 pgs) | BNC Certificate of Mailing. (Related document (s):505 Order on Motion to Appear pro hac vice) No. of Notices: 58. Notice Date 07/29/2020. (Admin.) (Entered: 07/29/2020) |
| 07/29/2020 | 🌑 539 (5 pgs) | BNC Certificate of Mailing. (Related document (s):506 Order on Motion to Appear pro hac vice) No. of Notices: 58. Notice Date 07/29/2020. (Admin.) (Entered: 07/29/2020) |
| 07/29/2020 | 🌑 540 (5 pgs) | BNC Certificate of Mailing. (Related document (s):507 Order on Motion to Appear pro hac vice) No. of Notices: 58. Notice Date 07/29/2020. (Admin.) (Entered: 07/29/2020) |
| 07/29/2020 | 🌑 541 (5 pgs) | BNC Certificate of Mailing. (Related document (s):508 Order on Motion to Appear pro hac vice) No. of Notices: 58. Notice Date 07/29/2020. (Admin.) (Entered: 07/29/2020) |
| 07/29/2020 | 🌑 542 (5 pgs) | BNC Certificate of Mailing. (Related document (s):509 Order on Motion to Appear pro hac vice) No. of Notices: 58. Notice Date 07/29/2020. (Admin.) (Entered: 07/29/2020) |
| 07/30/2020 | 🌑 543 (1 pg) | Motion to Appear pro hac vice *Alexandra I. Russell*. Filed by Debtor Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 07/30/2020) |
| | 🌑 544 (48 pgs; 5 docs) | Certificate *of Counsel with Respect to (I) Ordinary Course Professionals Motion and (II) Interim Compensation Motion* (Filed By Chesapeake Energy Corporation ).(Related document(s):288 Generic Motion, 289 Generic Motion) (Attachments: # 1 Proposed Order Ordinary Course Professional # 2 Proposed Order Interim Compensation # 3 OCP - Redline |

| | | |
|---|---|---|
| 07/30/2020 | | # 4 Interim Compensation - Redline) (Cavenaugh, Matthew) (Entered: 07/30/2020) |
| 07/30/2020 | 🌐 545 (22 pgs; 2 docs) | Proposed Order RE: *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts and (B) Continue to Perform Intercompany Transactions and (II) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):14 Emergency Motion, 139 Order Setting Hearing) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 07/30/2020) |
| 07/30/2020 | 🌐 546 (6 pgs; 2 docs) | Proposed Order RE: *Motion Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' Non-Insider Retention Programs and (II) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):290 Generic Motion) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 07/30/2020) |
| 07/30/2020 | 🌐 547 (1 pg) | Motion to Appear pro hac vice - *Brian W. Tobin*. Filed by Creditor MUFG Union Bank, N.A. (Quejada, Maegan) (Entered: 07/30/2020) |
| 07/30/2020 | 🌐 548 (9 pgs) | Agenda for Hearing on 7/31/2020 (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 07/30/2020) |
| 07/30/2020 | 🌐 549 (2 pgs) | Withdraw Document (Filed By Cactus Wellhead, LLC ).(Related document(s):342 Objection, 415 Notice) (Bailey, James) (Entered: 07/30/2020) |
| 07/30/2020 | 🌐 550 (3 pgs) | Notice of Appearance and Request for Notice Filed by Lance M. Kodish, Daniel A. Lowenthal Filed by on behalf of Brandes Investment Partners LP (Lowenthal, Daniel) (Entered: 07/30/2020) |
| | 🌐 551 (3 pgs) | Notice *of Joinder by Tributary Resources, LLC to Objections to Motion for Entry of Interim and Final Orders Authorizing Debtors to Obtain* |

| | | |
|---|---|---|
| 07/30/2020 | | *Postpetition Financing and Related Relief.* (Related document(s):22 Emergency Motion, 517 Objection, 519 Objection) Filed by Tributary Resources, LLC (Martin, Jarrod) (Entered: 07/30/2020) |
| 07/30/2020 | 552 (4 pgs) | Supplemental Objection *Supplement To Preliminary And Limited Objection of ETC Texas Pipeline Ltd., et al., to Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Expenses Status, (IV) Granting Adequae Protection to the Existing Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief [related Docket Nos. 22 and 340]* (related document(s):22 Emergency Motion). Filed by ETC Katy Pipeline, Ltd., ETC Texas Pipeline Ltd., Energy Transfer Fuel, LP, Houston Pipe Line Company, LP, Oasis Pipeline L.P., Sunoco Pipeline L.P., Trade Star, LLC (Mitchell, John) (Entered: 07/30/2020) |
| 07/30/2020 | 553 (3 pgs) | Supplemental Objection (related document(s):22 Emergency Motion). Filed by Rodney Hudson, Allen Johnson, Ruth Middleton, Saundra Nelson (Hearne, William) (Entered: 07/30/2020) |
| 07/30/2020 | 554 (1 pg) | Order Granting Motion To Appear pro hac vice - Christopher C. Gore (Related Doc # 528) Signed on 7/30/2020. (emiller) (Entered: 07/30/2020) |
| 07/30/2020 | 555 (1 pg) | Order Granting Motion To Appear pro hac vice - Alexandra I. Russell (Related Doc # 543) Signed on 7/30/2020. (emiller) (Entered: 07/30/2020) |
| 07/30/2020 | 556 (1 pg) | Order Granting Motion To Appear pro hac vice - Brian W. Tobin (Related Doc # 547) Signed on 7/30/2020. (emiller) (Entered: 07/30/2020) |
| | 557 (33 pgs) | Application to Employ Forshey & Prostok, LLP as Attorneys for the Official Committee of Royalty Owners. Objections/Request for |

| | | |
|---|---|---|
| 07/30/2020 | | Hearing Due in 21 days. Filed by Creditor Official Committee of Royalty Owners (Prostok, Jeffrey) (Entered: 07/30/2020) |
| 07/30/2020 | 558 (74 pgs) | Reply *Debtors' Omnibus Reply in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Existing Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (related document(s):22 Emergency Motion). Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 07/30/2020) |
| 07/30/2020 | 559 (12 pgs; 2 docs) | Emergency Motion *for Entry of an Order (I) Authorizing the Debtors to File Deposition Transcripts Under Seal and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 07/30/2020) |
| 07/30/2020 | 560 (32 pgs) | Sealed Document *Related to ECF No. 559* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 07/30/2020) |
| 07/30/2020 | 561 (32 pgs) | Sealed Document *Related to ECF No. 559* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 07/30/2020) |
| 07/30/2020 | 562 (26 pgs) | Sealed Document *Related to ECF No. 559* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 07/30/2020) |
| 07/30/2020 | 563 (4 pgs) | Affidavit Re: *Affidavit of Service of Marc Orfitelli* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):82 Generic Order) (Garabato, Sid) (Entered: 07/30/2020) |
| | 564 (20 pgs) | Affidavit Re: *Affidavit of Service of Marc Orfitelli* (Filed By Epiq Corporate Restructuring |

| 07/30/2020 | | LLC ).(Related document(s):328 Notice) (Garabato, Sid) (Entered: 07/30/2020) |
|---|---|---|
| 07/30/2020 | 🔵 565 (16 pgs) | Affidavit Re: *Affidavit of Service of Marc Orfitelli* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):335 Witness List, Exhibit List, 343 Notice) (Garabato, Sid) (Entered: 07/30/2020) |
| 07/30/2020 | 🔵 566 (16 pgs) | Affidavit Re: *Affidavit of Service of Marc Orfitelli* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):367 Generic Motion, 368 Application to Employ, 369 Application to Employ, 370 Application to Employ, 372 Application to Employ) (Garabato, Sid) (Entered: 07/30/2020) |
| 07/30/2020 | 🔵 567 (40 pgs; 4 docs) | Emergency Motion *for Entry of an Order Disbanding the Royalty Committee* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Exhibit A- Royalty Committee Letter # 2 Exhibit B- Debtors' Response to Royalty Committee Letter # 3 Proposed Order) (Peguero, Kristhy) (Entered: 07/30/2020) |
| 07/30/2020 | 🔵 568 (200 pgs; 2 docs) | Proposed Order RE: *Final Order (i) Authorizing the Debtors to Obtain Postpetition Financing, (ii) Authorizing the Debtors to use Cash Collateral, (iii) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (iv) Granting Adequate Protection to the Existing Secured Parties, (v) Modifying the Automatic Stay, and (vi) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):22 Emergency Motion) (Attachments: # 1 Exhibit Redline) (Peguero, Kristhy) (Entered: 07/30/2020) |
| 07/30/2020 | 🔵 569 (19 pgs) | Reply *and Joinder of MUFG Union Bank, N.A. In Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority* |

| | | |
|---|---|---|
| 07/30/2020 | | *Administrative Expense Status, (IV) Granting Adequate Protection to the Existing Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (related document(s):22 Emergency Motion). Filed by MUFG Union Bank, N.A. (Quejada, Maegan) (Entered: 07/30/2020) |
| 07/30/2020 | 570 (7 pgs) | Reply *and Joinder of Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts, in Support of the Debtors' Emergency DIP Financing Motion and Reply to the Objection of the Official Committee of Unsecured Creditors Thereto* (related document (s):22 Emergency Motion). Filed by Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts (Brimmage, Marty) (Entered: 07/30/2020) |
| 07/30/2020 | 571 (11 pgs; 2 docs) | Proposed Order RE: *(I) Authorizing Rejection of Certain Executory Contracts Effective as of July 1, 2020 and (II) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):27 Emergency Motion) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 07/30/2020) |
| 07/30/2020 | 572 (14 pgs) | Reply *of Ad Hoc Group of Secured FLLO Term Loan Lenders in Support of the DIP Motion and in Opposition to the Creditors' Committee's Objection.* Filed by Ad Hoc Group of FLLO Term Loan Lenders (Morgan, John) (Entered: 07/30/2020) |
| 07/30/2020 | 573 (3 pgs) | Objection *Joinder to the Objections filed by the Official Committee of Unsecured Creditors [Docket No. 519] and the Official Committee of Royalty Owners [Docket No. 517]* (related document(s):22 Emergency Motion). Filed by Stephanie Delasandro (Mayer, Simon) (Entered: 07/30/2020) |
| | 574 (158 pgs; 2 docs) | Additional Attachments Re: *Senior Secured Super-Priority Debtor-In-Possession Credit Agreement* (related document(s):128 Order Setting Hearing) (Filed By Chesapeake Energy |

| 07/30/2020 | | Corporation ).(Related document(s):128 Order Setting Hearing) (Attachments: # 1 Redline) (Peguero, Kristhy) (Entered: 07/30/2020) |
|---|---|---|
| 07/30/2020 | 575 (1 pg) | Motion to Appear pro hac vice *Whitney Fogelberg*. Filed by Debtor Chesapeake Energy Corporation (Peguero, Kristhy) (Entered: 07/30/2020) |
| 07/30/2020 | 576 (10 pgs) | Amended Agenda for Hearing on 7/31/2020 (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 07/30/2020) |
| 07/30/2020 | 577 (5 pgs) | BNC Certificate of Mailing. (Related document (s):515 Order on Motion To Reconsider) No. of Notices: 59. Notice Date 07/30/2020. (Admin.) (Entered: 07/30/2020) |
| 07/30/2020 | 578 (14 pgs) | BNC Certificate of Mailing. (Related document (s):488 US Trustee's Notice) No. of Notices: 89. Notice Date 07/30/2020. (Admin.) (Entered: 07/30/2020) |
| 07/31/2020 | 579 (5795 pgs) | Affidavit Re: *Affidavit of Service of Marc Orfitelli* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):82 Generic Order) (Garabato, Sid) (Entered: 07/31/2020) |
| 07/31/2020 | 580 (3 pgs) | Notice of Appearance and Request for Notice Filed by Gartner, Inc. (Goldstein, Eric) (Entered: 07/31/2020) |
| 07/31/2020 | 581 (2 pgs) | Withdraw Document (Filed By Archrock Partners Operating, LLC ).(Related document (s):346 Objection) (Maraist, Kevin) (Entered: 07/31/2020) |
| | 582 (8219 pgs; 15 docs) | Witness List, Exhibit List (Filed By Official Committee of Royalty Owners ).(Related document(s):22 Emergency Motion) (Attachments: # 1 Exhibit 1_DIP Motion # 2 Exhibit 2_Affidavit of Service of First Day Motions # 3 Exhibit 3 CHK 10K 2020 # 4 Exhibit 4 - CHK 10Q 3 31 20 # 5 Exhibit 5 Notice Appointing Royalty Owners Committee # 6 Exhibit 6 - Docket # 7 Exhibit 7 Mailing list # |

| | | |
|---|---|---|
| 07/31/2020 | | 8 Exhibit 8 Mailing list # 9 Exhibit 9 - Mailing List # 10 Exhibit 10 - Mailing List # 11 Exhibit 11 - Mailing list # 12 Exhibit 12_Affidavit of Service - (Doc. No. 366) # 13 Exhibit 13 - Letter to Royalty Owners # 14 Exhibit 14 - Service of Royalty Owner Letter - See, Exhibit D) (Brown, pllc, Deirdre) (Entered: 07/31/2020) |
| 07/31/2020 | 583 (1 pg) | Order Granting Motion To Appear pro hac vice - Whitney Fogelberg (Related Doc # 575) Signed on 7/31/2020. (emiller) (Entered: 07/31/2020) |
| 07/31/2020 | 584 (3 pgs) | Notice of Appearance and Request for Notice Filed by William Alfred Wood III Filed by on behalf of Hiland Crude, LLC, Midcontinent Express Pipeline LLC, Wyoming Interstate Company, L.L.C., Tennessee Gas Pipeline Company, L.L.C., Camino Real Gas Gathering Company, LLC, El Paso Marketing Company, L.L.C., Scissortail Energy, LLC, Kinderhawk Field Services, LLC, Eagle Ford Gathering, LLC, Kinder Morgan Tejas Pipeline LLC, Kinder Morgan Texas Pipeline LLC (Wood, William) (Entered: 07/31/2020) |
| 07/31/2020 | 585 (1 pg) | Motion to Appear pro hac vice *Jonathan L. Lozano*. Filed by Creditors Camino Real Gas Gathering Company, LLC, Eagle Ford Gathering, LLC, El Paso Marketing Company, L.L.C., Hiland Crude, LLC, Kinder Morgan Tejas Pipeline LLC, Kinder Morgan Texas Pipeline LLC, Kinderhawk Field Services, LLC, Midcontinent Express Pipeline LLC, Scissortail Energy, LLC, Tennessee Gas Pipeline Company, L.L.C., Wyoming Interstate Company, L.L.C. (Wood, William) (Entered: 07/31/2020) |
| 07/31/2020 | 586 (12 pgs) | Letter from Shareholder Krishna Bangera (Related document(s):294 Letter) (JeannieAndresen) (Entered: 07/31/2020) |
| | 587 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew Cavenaugh. This is to order a transcript of 7/31/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) |

| | | |
|---|---|---|
| 07/31/2020 | | Electronically forwarded to Access Transcripts on 8-3-2020. Estimated completion date: 8-4-2020. Modified on 8/3/2020 (MelissaMorgan). (Entered: 07/31/2020) |
| 07/31/2020 | 🔵 588 (2 pgs) | Notice *of Agreed DIP Order Language*. (Related document(s):344 Objection) Filed by c/o Annie Catmull Royalty Owner Plaintiffs c/o (Catmull, Annie) (Entered: 07/31/2020) |
| 07/31/2020 | 🔵 589 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Marty L. Brimmage, Jr.. This is to order a transcript of the July 31, 2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts ). (Brimmage, Marty) Electronically forwarded to original transcriber: Access Transcripts on 8-3-2020. Estimated completion date: 8-4-2020. Modified on 8/3/2020 (MelissaMorgan). (Entered: 07/31/2020) |
| 07/31/2020 | 🔵 590 (353 pgs; 2 docs) | Proposed Order RE: *(I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Existing Secured Parties, (V) Modifying the Automatic Stay, and (VI) Granting Related* (Filed By Chesapeake Energy Corporation ). (Related document(s):22 Emergency Motion) (Attachments: # 1 Redline) (Peguero, Kristhy) (Entered: 07/31/2020) |
| 07/31/2020 | 🔵 591 (353 pgs; 2 docs) | Proposed Order Submission After Hearing (Filed By Chesapeake Energy Corporation ).(Related document(s):22 Emergency Motion, 128 Order Setting Hearing, 325 Objection, 340 Objection, 341 Response/Objection, 344 Objection, 345 Objection, 517 Objection, 519 Objection, 551 Notice, 552 Objection) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 07/31/2020) |
| 07/31/2020 | 🔵 592 | AO 435 TRANSCRIPT ORDER FORM (Daily |

| | | |
|---|---|---|
| 07/31/2020 | (1 pg) | (24 hours)) by M. Quejada. This is to order a transcript of July 31, 2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By MUFG Union Bank, N.A. ). (Quejada, Maegan) Electronically forwarded to the original transcriber: Access Transcripts on 8-3-2020. Estimated completion date: 8-4-2020. Modified on 8/3/2020 (MelissaMorgan). (Entered: 07/31/2020) |
| 07/31/2020 | 593 (7 pgs) | Order Establishing a Record Date for Notice and Sell-Down Procedure for Trading in Certain Claims Against the Debtors' Estates (Related Doc # 36) Signed on 7/31/2020. (emiller) (Entered: 07/31/2020) |
| 07/31/2020 | 594 (11 pgs) | Final Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts and (B) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief (Related Doc # 14) Signed on 7/31/2020. (emiller) (Entered: 07/31/2020) |
| 07/31/2020 | 595 (3 pgs) | Order (I) Authorizing and Approving the Debtors' Non-Insider Retention Programs and (II) Granting Related Relief (Related Doc # 290) Signed on 7/31/2020. (emiller) (Entered: 07/31/2020) |
| 07/31/2020 | 596 (5 pgs) | Order (I) Authorizing Rejection of Certain Executory Contracts Effective as of July 1, 2020 and (II) Granting Related Relief (Related Doc # 27) Signed on 7/31/2020. (emiller) (Entered: 07/31/2020) |
| 07/31/2020 | 597 (248 pgs) | Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Existing Secured Parties (V) Modifying the Automatic Stay, and (VI) Granting Related Relief (Related Doc # 22) Signed on 7/31/2020. (emiller) (Entered: 07/31/2020) |

| | | |
|---|---|---|
| 07/31/2020 | 🔵 <u>598</u><br>(14 pgs; 2 docs) | Motion *for Entry of an Order (I) Authorizing the Rejection of Certain Sand Mine Contracts Effective As of July 31, 2020 and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Attachments: # <u>1</u> Proposed Order) (Cavenaugh, Matthew) (Entered: 07/31/2020) |
| 07/31/2020 | 🔵 <u>599</u><br>(6 pgs) | Declaration re: *Declaration of John Stuart in Support of the Debtors' Motion for Entry of an Order (I) Authorizing the Rejection of Certain Sand Mine Contracts Effective as of July 31, 2020 and (II) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):<u>598</u> Generic Motion) (Cavenaugh, Matthew) (Entered: 07/31/2020) |
| 07/31/2020 | 🔵 <u>600</u><br>(5 pgs) | BNC Certificate of Mailing. (Related document (s):<u>521</u> Order on Motion to Appear pro hac vice) No. of Notices: 59. Notice Date 07/31/2020. (Admin.) (Entered: 07/31/2020) |
| 07/31/2020 | 🔵 <u>601</u><br>(5 pgs) | BNC Certificate of Mailing. (Related document (s):<u>522</u> Order on Motion to Appear pro hac vice) No. of Notices: 59. Notice Date 07/31/2020. (Admin.) (Entered: 07/31/2020) |
| | 🔵 <u>624</u><br>(5 pgs) | Courtroom Minutes. For the reasons stated on the record, the Court has approved the Motion for Entry of an Order Establishing a Record Date for Notice and Sell-Down Procedures <u>36</u>, the Motion for Entry of an Order (I) Authorizing and Approving the Debtors' Non-Insider Retention Programs <u>290</u>. Orders to be entered. Additionally, the Court has set a scheduling conference on August 18, 2020 at 1:00 PM. With respect to the Motion to Use Cash Collateral. The Court heard testimony from Robert Albergotti, Dominic DellOsso and Stephen Antinelli and has granted the motion with the changes as stated on the record. **Note:**The Court has set a Final Trial on 8/31 at 9:00 AM on a to be filed adversary to reject ETC contracts. If ETC wants to proceed on the motion itself, the substance of that dispute is set for a final trial at 9:00 AM. Stipulated facts to be filed by Friday, August 28, 2020. If an adversary is filed, the |

| | | |
|---|---|---|
| 07/31/2020 | | Plaintiff to contact the case manager to alert him to the filing. (aalo) (Entered: 08/05/2020) |
| 08/01/2020 | 602<br>(9 pgs; 2 docs) | Objection (related document(s):452 Motion to Seal). Filed by US Trustee (Attachments: # 1 Proposed Order) (Statham, Stephen) (Entered: 08/01/2020) |
| 08/01/2020 | 603<br>(5 pgs) | BNC Certificate of Mailing. (Related document (s):554 Order on Motion to Appear pro hac vice) No. of Notices: 60. Notice Date 08/01/2020. (Admin.) (Entered: 08/01/2020) |
| 08/01/2020 | 604<br>(5 pgs) | BNC Certificate of Mailing. (Related document (s):555 Order on Motion to Appear pro hac vice) No. of Notices: 60. Notice Date 08/01/2020. (Admin.) (Entered: 08/01/2020) |
| 08/01/2020 | 605<br>(5 pgs) | BNC Certificate of Mailing. (Related document (s):556 Order on Motion to Appear pro hac vice) No. of Notices: 60. Notice Date 08/01/2020. (Admin.) (Entered: 08/01/2020) |
| 08/02/2020 | 606<br>(5 pgs) | BNC Certificate of Mailing. (Related document (s):583 Order on Motion to Appear pro hac vice) No. of Notices: 61. Notice Date 08/02/2020. (Admin.) (Entered: 08/02/2020) |
| 08/03/2020 | 607<br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Jason Boland. This is to order a transcript of July 31, 2020 hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Official Committee Of Unsecured Creditors ). (Boland, Jason) Electronically forwarded to the original transcriber: Access Transcripts on 8-3-2020. Estimated completion date: 8-4-2020. Modified on 8/3/2020 (MelissaMorgan). (Entered: 08/03/2020) |
| | 608<br>(2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Jacqueline Kindler. This is to order a transcript of July 31, 2020, Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts. (mmap) Electronically forwarded to the original |

| | | |
|---|---|---|
| 08/03/2020 | | transcriber: Access Transcripts on 8-3-2020. Estimated completion date: 8-4-2020. Modified on 8/3/2020 (MelissaMorgan). (Entered: 08/03/2020) |
| 08/03/2020 | 609 (6 pgs; 2 docs) | Notice of Appeal filed. (related document(s):467 Order on Emergency Motion). Fee Amount $298. Appellant Designation due by 08/17/2020. (Attachments: # 1 Exhibit Chesapeake Enforcement Order)(Swartley, Jason) (Entered: 08/03/2020) |
| 08/03/2020 | | Receipt of Notice of Appeal(20-33233) [appeal,ntcapl] ( 298.00) Filing Fee. Receipt number 22325477. Fee amount $ 298.00. (U.S. Treasury) (Entered: 08/03/2020) |
| 08/03/2020 | 610 (3 pgs) | Notice of Appearance and Request for Notice Filed by Corey Michael Weideman Filed by on behalf of Kinetic Energy Services LLC (Weideman, Corey) (Entered: 08/03/2020) |
| 08/03/2020 | 611 (1 pg) | Motion to Appear pro hac vice *D. Alexander Barnes*. Filed by Creditor Demchak Partners Limited Partnership et al Class Action Plaintiffs and Settlement Class (JenniferOlson) (Entered: 08/03/2020) |
| 08/03/2020 | 612 (1 pg) | Motion to Appear pro hac vice *Jarret P. Hitchings*. Filed by Creditor Kinetic Energy Services LLC (Weideman, Corey) (Entered: 08/03/2020) |
| 08/04/2020 | 613 (2 pgs) | Letter from Shareholder Mary Margaret Nilan (Related document(s):455 Letter) (JeannieAndresen) (Entered: 08/04/2020) |
| 08/04/2020 | 614 (4 pgs) | Letter from Shareholder John Dough (JeannieAndresen) (Entered: 08/04/2020) |
| 08/04/2020 | 615 (208 pgs) | Transcript RE: Motions Hearing held on 07/31/2020 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 11/2/2020. (AccessTranscripts) (Entered: 08/04/2020) |

| | | |
|---|---|---|
| 08/04/2020 | ⬤616 | Election to Appeal to District Court . (ShoshanaArnow) (Entered: 08/04/2020) |
| 08/04/2020 | ⬤617<br>(1 pg) | Clerk's Notice of Filing of an Appeal. On 8/3/2020, Commonwealth of Pennsylvania filed a notice of appeal. The appeal has been assigned to U.S. District Judge Keith P Ellison, Civil Action 4:20-cv-02725. Parties notified (Related document(s):609 Notice of Appeal) (ShoshanaArnow) (Entered: 08/04/2020) |
| 08/05/2020 | ⬤618<br>(1 pg) | Notice of Filing of Official Transcript as to 615 Transcript. Parties notified (Related document (s):615 Transcript) (mmap) (Entered: 08/05/2020) |
| 08/05/2020 | ⬤619<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Donald Prichard Bevis Jr Filed by on behalf of Byrd Family Limited Partnership, Four P Family Holdings, LP (Bevis, Donald) (Entered: 08/05/2020) |
| 08/05/2020 | ⬤620<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Patricia Baron Tomasco Filed by on behalf of Brigade Capital Management, LP (Tomasco, Patricia) (Entered: 08/05/2020) |
| 08/05/2020 | ⬤621<br>(1 pg) | Motion to Appear pro hac vice *Chrysanthe E. Vassiles*. Filed by Creditor Douglas Houck Trust (mmap) (Entered: 08/05/2020) |
| 08/05/2020 | ⬤622<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Mark Curtis Taylor Filed by on behalf of Rancho La Cochina Minerals, Ltd., Briscoe Ranch, Inc. (Taylor, Mark) (Entered: 08/05/2020) |
| 08/05/2020 | ⬤623<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Stefan Perovich Filed by on behalf of Wier Group (Perovich, Stefan) (Entered: 08/05/2020) |
| 08/05/2020 | ⬤625<br>(1 pg) | Motion to Appear pro hac vice *filed on behalf of Kate Scherling*. Filed by Creditor Brigade Capital Management, LP (Tomasco, Patricia) (Entered: 08/05/2020) |

| | | |
|---|---|---|
| 08/05/2020 | 626<br>(1 pg) | Motion to Appear pro hac vice *filed on behalf of Benjamin I. Finestone*. Filed by Creditor Brigade Capital Management, LP (Tomasco, Patricia) (Entered: 08/05/2020) |
| 08/05/2020 | 627<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Jonathan L. Lozano (Related Doc # 585) Signed on 8/5/2020. (emiller) (Entered: 08/05/2020) |
| 08/05/2020 | 628<br>(6 pgs) | First Motion for Relief from Stay *Partial Lift of Automatic Stay*. Fee Amount $181. Filed by Creditor JUAN CARLOS ALANIZ (Elizondo, Luis) (Entered: 08/05/2020) |
| 08/05/2020 | | Receipt of Motion for Relief From Stay(20-33233) [motion,mrlfsty] ( 181.00) Filing Fee. Receipt number 22332235. Fee amount $ 181.00. (U.S. Treasury) (Entered: 08/05/2020) |
| 08/05/2020 | 629<br>(1 pg) | Order Granting Motion To Appear pro hac vice - D. Alexander Barnes (Related Doc # 611) Signed on 8/5/2020. (emiller) (Entered: 08/05/2020) |
| 08/05/2020 | 630<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Jarret P. Hitchings (Related Doc # 612) Signed on 8/5/2020. (emiller) (Entered: 08/05/2020) |
| 08/05/2020 | 631<br>(1 pg) | Proposed Motion for Relief from Stay *Order On Motion for Partial Lift of Automatic Stay*. Fee Amount $181. Filed by Creditor JUAN CARLOS ALANIZ (Elizondo, Luis) (Entered: 08/05/2020) |
| 08/05/2020 | 632<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Joshua Nielson Eppich Filed by on behalf of Pilot Thomas Logistics, LLC (Eppich, Joshua) (Entered: 08/05/2020) |
| 08/05/2020 | 633<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Bryan Christopher Assink Filed by on behalf of Pilot Thomas Logistics, LLC (Assink, Bryan) (Entered: 08/05/2020) |
| | 634<br>(4 pgs) | Notice of Appearance and Request for Notice Filed by David Harlan Ammons Filed by on |

| 08/05/2020 | | behalf of TOTAL E&P USA, INC. (Ammons, David) (Entered: 08/05/2020) |
|---|---|---|
| 08/05/2020 | ⚫635 (1 pg) | Motion to Appear pro hac vice *of Jane VanLare*. Filed by Creditor TOTAL E&P USA, INC. (Ammons, David) (Entered: 08/05/2020) |
| 08/05/2020 | ⚫636 (7 pgs) | Response *and Limited Objection to DFW's Motion for Relief From Automatic Stay to Permit a Pending Appeal to Proceed* (related document (s):407 Motion for Relief From Stay). Filed by TOTAL E&P USA, INC. (Ammons, David) (Entered: 08/05/2020) |
| 08/05/2020 | ⚫637 (25 pgs) | Declaration re: - *Amended Declaration of Jeff P. Prostok in Support of the Official Committee of Royalty Owners' Application for Entry of Order Auithorizing Retention and Employment of Forshey & Prostok, LLP as Attorneys for the Official Committee of Royalty Owners Effective as of July 25, 2020* (Filed By Official Committee of Royalty Owners ).(Related document(s):557 Application to Employ) (Prostok, Jeffrey) (Entered: 08/05/2020) |
| 08/05/2020 | ⚫638 (1 pg) | Motion to Appear pro hac vice *by Caroline B. Stern*. Filed by Creditor Ad Hoc Group of FLLO Term Loan Lenders (Morgan, John) (Entered: 08/05/2020) |
| 08/05/2020 | ⚫639 (11 pgs) | BNC Certificate of Mailing. (Related document (s):593 Generic Order) No. of Notices: 61. Notice Date 08/05/2020. (Admin.) (Entered: 08/05/2020) |
| 08/05/2020 | ⚫640 (15 pgs) | BNC Certificate of Mailing. (Related document (s):594 Order on Emergency Motion) No. of Notices: 61. Notice Date 08/05/2020. (Admin.) (Entered: 08/05/2020) |
| 08/05/2020 | ⚫641 (7 pgs) | BNC Certificate of Mailing. (Related document (s):595 Generic Order) No. of Notices: 61. Notice Date 08/05/2020. (Admin.) (Entered: 08/05/2020) |
| | ⚫642 | BNC Certificate of Mailing. (Related document |

| | | |
|---|---|---|
| 08/05/2020 | (9 pgs) | (s):596 Order on Emergency Motion) No. of Notices: 61. Notice Date 08/05/2020. (Admin.) (Entered: 08/05/2020) |
| 08/05/2020 | 643 (252 pgs) | BNC Certificate of Mailing. (Related document (s):597 Order on Emergency Motion) No. of Notices: 61. Notice Date 08/05/2020. (Admin.) (Entered: 08/05/2020) |
| 08/06/2020 | 644 (1 pg) | Notice of Appearance and Request for Notice Filed by Barry Pierce Broughton Filed by on behalf of Henry Newton Bell III (Broughton, Barry) (Entered: 08/06/2020) |
| 08/06/2020 | 645 (15 pgs; 2 docs) | Notice *of Rule 2004 Requests on Franklin Advisers, Inc.*. Filed by Official Committee Of Unsecured Creditors (Attachments: # 1 Exhibit A) (Harrison, Julie) (Entered: 08/06/2020) |
| 08/06/2020 | 646 (14 pgs; 2 docs) | Notice *of Rule 2004 Requests on the Ad Hoc Group of Secured FLLO Term Loan Lenders*. Filed by Official Committee Of Unsecured Creditors (Attachments: # 1 Exhibit A) (Harrison, Julie) (Entered: 08/06/2020) |
| 08/06/2020 | 647 (11 pgs; 2 docs) | Response *CORRECTED Response and Limited Objection to DFW's Motion for Relief from Automatic Stay to Permit a Pending Appeal to Proceed (Relates to Doc. Nos. 407 and 636)*. Filed by TOTAL E&P USA, INC. (Attachments: # 1 Exhibit A) (Ammons, David) (Entered: 08/06/2020) |
| 08/06/2020 | 648 (1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 7/31/2020 11:00:18 AM ]. File Size [ 183780 KB ]. Run Time [ 06:22:52 ]. (In ref to doc nos. 36 and 290. Hearing held July 31, 2020.). (admin). (Entered: 08/06/2020) |
| 08/06/2020 | 649 (17 pgs) | Affidavit Re: *of Marc Orfitelli* (Filed By Epiq Corporate Restructuring LLC ). (Garabato, Sid) (Entered: 08/06/2020) |
| | 650 (24 pgs) | Objection - *Limited Objection to Motion to Set Bar Dates* (related document(s):367 Generic Motion). Filed by Official Committee of Royalty |

| | | |
|---|---|---|
| 08/06/2020 | | Owners (Brown, pllc, Deirdre) (Entered: 08/06/2020) |
| 08/06/2020 | 651 (379 pgs; 7 docs) | Objection *Limited Objections of Eagle Ford MDL Royalty Owner Plaintiffs* (related document(s):367 Generic Motion). Filed by c/o Annie Catmull Royalty Owner Plaintiffs c/o (Attachments: # 1 Exhibit A - list of Eagle Ford royalty owner plaintiffs # 2 Exhibit B - Motion to Transfer to MDL court # 3 Exhibit C - Opinion # 4 Exhibit D - Hearing Transcript # 5 Exhibit E - Damage Expert Reports # 6 Exhibit F - Harper check stub) (Catmull, Annie) (Entered: 08/06/2020) |
| 08/06/2020 | 652 (16 pgs) | Affidavit Re: *Affidavit of Service of Marc Orfitelli* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):485 Stipulation) (Garabato, Sid) (Entered: 08/06/2020) |
| 08/06/2020 | 653 (16 pgs) | Affidavit Re: *Affidavit of Service of Marc Orfitelli* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):510 Notice) (Garabato, Sid) (Entered: 08/06/2020) |
| 08/06/2020 | 654 (381 pgs; 8 docs) | Supplemental Brief (Filed By c/o Annie Catmull Royalty Owner Plaintiffs c/o ).(Related document(s):424 Motion for Relief From Stay) (Attachments: # 1 Exhibit 651 # 2 Exhibit 651-1 # 3 Exhibit 651-2 # 4 Exhibit 651-3 # 5 Exhibit 651-5 # 6 Exhibit 651-5 # 7 Exhibit 651-6) (Catmull, Annie) (Entered: 08/06/2020) |
| 08/06/2020 | 655 (15 pgs) | Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business (Related Doc # 288) Signed on 8/6/2020. (emiller) (Entered: 08/06/2020) |
| 08/06/2020 | 656 (7 pgs) | Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals (Related Doc # 289) Signed on 8/6/2020. (emiller) (Entered: 08/06/2020) |
| | 657 (17 pgs) | Affidavit Re: *Affidavit of Service of Marc Orfitelli* (Filed By Epiq Corporate Restructuring |

| | | |
|---|---|---|
| 08/06/2020 | | LLC ).(Related document(s):520 Generic Motion, 523 Generic Motion, 524 Generic Motion) (Garabato, Sid) (Entered: 08/06/2020) |
| 08/06/2020 | 🔵 658 (19 pgs) | Affidavit Re: *Affidavit of Service of Marc Orfitelli* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):571 Proposed Order) (Garabato, Sid) (Entered: 08/06/2020) |
| 08/06/2020 | 🔵 659 (7 pgs) | BNC Certificate of Mailing. (Related document (s):617 Clerk's Notice of Filing of an Appeal) No. of Notices: 102. Notice Date 08/06/2020. (Admin.) (Entered: 08/06/2020) |
| 08/06/2020 | 🔵 660 (6 pgs; 2 docs) | Notice of Appearance and Request for Notice Filed by Oklahoma County Treasurer (Attachments: # 1 Exhibit) (mmap) (Entered: 08/07/2020) |
| 08/07/2020 | 🔵 661 (3 pgs) | Notice of Appearance and Request for Notice Filed by Luis Alberto Elizondo Filed by on behalf of JUAN CARLOS ALANIZ (Elizondo, Luis) (Entered: 08/07/2020) |
| 08/07/2020 | 🔵 662 (2 pgs) | Withdraw Document (Filed By Texas Taxing Authorities ).(Related document(s):341 Response/Objection) (LeDay, Tara) (Entered: 08/07/2020) |
| 08/07/2020 | 🔵 663 (1 pg) | Letters and Emails from Multiple Shareholders (JeannieAndresen) (Entered: 08/07/2020) |
| 08/07/2020 | 🔵 | Certificate of Telephone Notice. Contacted Veronica Polnick. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):367 Generic Motion) Hearing scheduled for 8/12/2020 at 02:00 PM via telephone and video conference. (emiller) (Entered: 08/07/2020) |
| 08/07/2020 | 🔵 664 (12 pgs; 2 docs) | Notice *of Rule 2004 Requests on MUFG Union Bank, N.A.*. Filed by Official Committee Of Unsecured Creditors (Attachments: # 1 Exhibit A) (Harrison, Julie) (Entered: 08/07/2020) |
| | 🔵 665 | Objection *to DFW's Motion for Relief from* |

| | | |
|---|---|---|
| 08/07/2020 | (15 pgs) | *Automatic Stay to Permit a Pending Appeal to Proceed* (related document(s):407 Motion for Relief From Stay). Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 08/07/2020) |
| 08/07/2020 | 666 (68 pgs) | Objection *to Eagle Ford Royalty Owner Plaintiff's Motion for Relief from the Automatic Stay as to Debtors Chesapeake Energy Corporation; Chesapeake Operating, L.L.C., f/k/a Chesapeake Operating, Inc.; Chesapeake Exploration, L.L.C. as Successor by Merger to Chesapeake Exploration, L.P.; and Chesapeake Energy Marketing, L.L.C. f/k/a Chesapeake Energy Marketing, Inc.* (related document(s):424 Motion for Relief From Stay). Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 08/07/2020) |
| 08/07/2020 | 667 (4 pgs) | Notice *of Joinder by CNOOC Energy U.S.A. LLC to Debtors' Objection to Eagle Ford Royalty Owner Plaintiffs' Motion for Relief from the Automatic Stay.* (Related document(s):424 Motion for Relief From Stay, 666 Objection) Filed by CNOOC Energy U.S.A. LLC (Ripley, Edward) (Entered: 08/07/2020) |
| 08/07/2020 | 668 (7 pgs) | BNC Certificate of Mailing. (Related document (s):618 Notice of Filing of Official Transcript (Form)) No. of Notices: 102. Notice Date 08/07/2020. (Admin.) (Entered: 08/07/2020) |
| 08/07/2020 | 669 (7 pgs) | BNC Certificate of Mailing. (Related document (s):627 Order on Motion to Appear pro hac vice) No. of Notices: 105. Notice Date 08/07/2020. (Admin.) (Entered: 08/07/2020) |
| 08/07/2020 | 670 (7 pgs) | BNC Certificate of Mailing. (Related document (s):629 Order on Motion to Appear pro hac vice) No. of Notices: 106. Notice Date 08/07/2020. (Admin.) (Entered: 08/07/2020) |
| 08/07/2020 | 671 (7 pgs) | BNC Certificate of Mailing. (Related document (s):630 Order on Motion to Appear pro hac vice) No. of Notices: 106. Notice Date 08/07/2020. (Admin.) (Entered: 08/07/2020) |

| | | |
|---|---|---|
| 08/07/2020 | 🔘704 (4 pgs) | Letter from Kevin Carpenter, Trust Fund Dissolved (gkel) (Entered: 08/11/2020) |
| 08/08/2020 | 🔘672 (5 pgs) | Notice *of Hearing on Bar Date Motion*. (Related document(s):367 Generic Motion) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 08/08/2020) |
| 08/09/2020 | | Receipt of Motion for Relief From Stay(20-33233) [motion,mrlfsty] ( 181.00) Filing Fee. Receipt number 22340654. Fee amount $ 181.00. (U.S. Treasury) (Entered: 08/09/2020) |
| 08/09/2020 | 🔘673 (1 pg) | Order Granting Motion To Appear pro hac vice - Chrysanthe E. Vassiles (Related Doc # 621) Signed on 8/9/2020. (emiller) (Entered: 08/09/2020) |
| 08/09/2020 | 🔘674 (1 pg) | Order Granting Motion To Appear pro hac vice - Kate Scherling (Related Doc # 625) Signed on 8/9/2020. (emiller) (Entered: 08/09/2020) |
| 08/09/2020 | 🔘675 (1 pg) | Order Granting Motion To Appear pro hac vice - Benjamin I. Firestone (Related Doc # 626) Signed on 8/9/2020. (emiller) (Entered: 08/09/2020) |
| 08/09/2020 | 🔘676 (1 pg) | Order Granting Motion To Appear pro hac vice - Jane VanLare (Related Doc # 635) Signed on 8/9/2020. (emiller) (Entered: 08/09/2020) |
| 08/09/2020 | 🔘677 (1 pg) | Order Granting Motion To Appear pro hac vice - Caroline B. Stern (Related Doc # 638) Signed on 8/9/2020. (emiller) (Entered: 08/09/2020) |
| 08/09/2020 | 🔘678 (21 pgs) | BNC Certificate of Mailing. (Related document (s):655 Generic Order) No. of Notices: 107. Notice Date 08/09/2020. (Admin.) (Entered: 08/09/2020) |
| 08/09/2020 | 🔘679 (13 pgs) | BNC Certificate of Mailing. (Related document (s):656 Generic Order) No. of Notices: 107. Notice Date 08/09/2020. (Admin.) (Entered: 08/09/2020) |
| | 🔘680 | Notice of Appearance and Request for Notice |

| | | |
|---|---|---|
| 08/10/2020 | (6 pgs) | Filed by Chrysanthe E Vassiles Filed by on behalf of Douglas Houck Trust (Vassiles, Chrysanthe) (Entered: 08/10/2020) |
| 08/10/2020 | 681 (38 pgs) | Objection *by the Official Committee of Royalty Owners to Debtors' Emergency Motion for Entry of an Order Disbanding the Royalty Committee* (related document(s):567 Emergency Motion). Filed by Official Committee of Royalty Owners (Forshey, J) (Entered: 08/10/2020) |
| 08/10/2020 | 682 (1 pg) | Proposed Order RE: *Denying Motion to Disband* (Filed By Official Committee of Royalty Owners ).(Related document(s):567 Emergency Motion, 681 Objection) (Brown, pllc, Deirdre) (Entered: 08/10/2020) |
| 08/10/2020 | 683 (8368 pgs; 25 docs) | Exhibit List, Witness List (Filed By Official Committee of Royalty Owners ).(Related document(s):367 Generic Motion, 567 Emergency Motion) (Attachments: # 1 Ex. 01 Motion to Disband # 2 Ex. 02 - Objection and Proposed Order # 3 Ex. 03 - Notice of Appt of Comm # 4 Ex. 05 - List of Chesapeake Lawsuits # 5 Ex. 06 - Declaration of Kelli Walter # 6 Ex. 07 - Chesapeake's 2019 10-K # 7 Ex. 08 - Chesapeake's 2020 10-Q 1st Qtr # 8 Ex. 09A - Letter from Key & Charest # 9 Ex. 09B - Letter from Sharp # 10 Ex. 09C - Letter from Burnett # 11 Ex. 09D - Letter from Hentges # 12 Ex. 09E - Letter from McNamara # 13 Ex. 09F - Letter from Forshey # 14 Ex. 10 - Affidavit of Service part 1 # 15 Ex. 10 - Affidavit of Service part 2 # 16 Ex. 10 - Affidavit of Service part 3 # 17 Ex. 10 - Affidavit of Service part 4 # 18 Ex. 11 - Hovan Lease # 19 Ex. 12 Declaration of Aaron Hovan # 20 Ex. 13 - Chesapeake Ltr to Royalty Owners # 21 Ex. 14 - Complex Case Procedures # 22 Ex. 15 - Second Amended Complaint # 23 Ex. 16 - DIP budget # 24 Ex. 17 - Demonstrative) (Forshey, J) (Entered: 08/10/2020) |
| 08/10/2020 | 684 (3 pgs) | Exhibit List (Filed By Dallas/Fort Worth International Airport Board, City of Dallas, City of Fort Worth ).(Related document(s):407 Motion for Relief From Stay) (Orenstein, Rosa) |

| 08/10/2020 | | (Entered: 08/10/2020) |
|---|---|---|
| | 🔵685<br>(5812 pgs; 135 docs) | Exhibit List, Witness List (Filed By c/o Annie Catmull Royalty Owner Plaintiffs c/o ).(Related document(s):424 Motion for Relief From Stay) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31 # 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34 # 35 Exhibit 35 # 36 Exhibit 36 # 37 Exhibit 37 # 38 Exhibit 38 # 39 Exhibit 39 # 40 Exhibit 40 # 41 Exhibit 41 # 42 Exhibit 42 # 43 Exhibit 43 # 44 Exhibit 44 # 45 Exhibit 45 # 46 Exhibit 46 # 47 Exhibit 47 # 48 Exhibit 48 # 49 Exhibit 49 # 50 Exhibit 50 # 51 Exhibit 51 # 52 Exhibit 52 # 53 Exhibit 53 # 54 Exhibit 54 # 55 Exhibit 55 # 56 Exhibit 56 # 57 Exhibit 57 # 58 Exhibit 58 # 59 Exhibit 59 # 60 Exhibit 60 # 61 Exhibit 61 # 62 Exhibit 62 # 63 Exhibit 63 # 64 Exhibit 64 # 65 Exhibit 65 # 66 Exhibit 66 # 67 Exhibit 67 # 68 Exhibit 68 # 69 Exhibit 69 # 70 Exhibit 70 # 71 Exhibit 71 # 72 Exhibit 72 # 73 Exhibit 73 # 74 Exhibit # 75 Exhibit 75 # 76 Exhibit 76 # 77 Exhibit 77 # 78 Exhibit 78 # 79 Exhibit 79 # 80 Exhibit 80 # 81 Exhibit 81 # 82 Exhibit 82 # 83 Exhibit 83 # 84 Exhibit 84 # 85 Exhibit 85 # 86 Exhibit 86 # 87 Exhibit 87 # 88 Exhibit 88 # 89 Exhibit 89 # 90 Exhibit 90 # 91 Exhibit 91 # 92 Exhibit 92 # 93 Exhibit 93 # 94 Exhibit 94 # 95 Exhibit 95 # 96 Exhibit 96 # 97 Exhibit 97 # 98 Exhibit 98 # 99 Exhibit 99 # 100 Exhibit 100 # 101 Exhibit 101 # 102 Exhibit 102 # 103 Exhibit 103 # 104 Exhibit 104 # 105 Exhibit 105 # 106 Exhibit 106 # 107 Exhibit 107 # 108 Exhibit 108 # 109 Exhibit 109 # 110 Exhibit 110 # 111 Exhibit 111 # 112 Exhibit 112 # 113 Exhibit 113 # 114 Exhibit 114 # 115 Exhibit 115 # 116 Exhibit 116 # 117 Exhibit 117 # 118 Exhibit 118 # 119 Exhibit 119 # 120 Exhibit 120 # 121 Exhibit 122 # 122 Exhibit 123 # 123 Exhibit 124 # 124 |

| | | |
|---|---|---|
| | | Exhibit 125 # 125 Exhibit 126 # 126 Exhibit 127 # 127 Exhibit 128 # 128 Exhibit 130 # 129 Exhibit 131 # 130 Exhibit 132 # 131 Exhibit 133 # 132 Exhibit 135 # 133 Exhibit 136 # 134 Exhibit 137) (Catmull, Annie) (Entered: 08/10/2020) |
| 08/10/2020 | 686 (330 pgs; 6 docs) | Witness List, Exhibit List (Filed By Chesapeake Energy Corporation ).(Related document(s): Certificate of Notice) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 4 # 4 Exhibit 6 # 5 Exhibit 7) (Peguero, Kristhy) (Entered: 08/10/2020) |
| 08/10/2020 | 687 (4 pgs) | Witness List, Exhibit List (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) (Entered: 08/10/2020) |
| 08/10/2020 | 688 (2 pgs) | Exhibit List, Witness List (Filed By US Trustee ).(Related document(s):567 Emergency Motion) (Duran, Hector) (Entered: 08/10/2020) |
| 08/10/2020 | 689 (64 pgs; 3 docs) | Exhibit List, Witness List (Filed By US Trustee ).(Related document(s):567 Emergency Motion) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2) (Duran, Hector) (Entered: 08/10/2020) |
| 08/10/2020 | 690 (12793 pgs; 4 docs) | Additional Attachments Re: (related document(s):686 Witness List, Exhibit List) (Filed By Chesapeake Energy Corporation ).(Related document(s):686 Witness List, Exhibit List) (Attachments: # 1 Exhibit 3, Part 2 # 2 Exhibit 5, Part 1 # 3 Exhibit 5, Part 2) (Peguero, Kristhy) (Entered: 08/10/2020) |
| 08/10/2020 | 691 (77 pgs; 3 docs) | Notice *Eagle Ford Royalty Owner MDL Plaintiffs' Exhibits 129 and 134*. (Related document(s):424 Motion for Relief From Stay, 685 Exhibit List, Witness List) Filed by c/o Annie Catmull Royalty Owner Plaintiffs c/o (Attachments: # 1 Exhibit 129 # 2 Exhibit 134) (Catmull, Annie) (Entered: 08/10/2020) |
| | 692 (10 pgs) | Objection / *Limited Objection of the Official Committee of Unsecured Creditors to Debtors'* |

| | | |
|---|---|---|
| 08/10/2020 | | *Application for Entry of an Order Authorizing the Employment and Retention of Rothschild & Co US Inc. and Intrepid Partners, LLC as Investment Bankers to the Debtors, Effective as of June 28, 2020* (related document(s):369 Application to Employ). Filed by Official Committee Of Unsecured Creditors (Harrison, Julie) (Entered: 08/10/2020) |
| 08/10/2020 | 🌐 693 (18 pgs) | Affidavit Re: *Affidavit of Service of Geoff Zahm* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):557 Application to Employ) (Garabato, Sid) (Entered: 08/10/2020) |
| 08/10/2020 | 🌐 694 (11 pgs) | Reply *to Responses to DFW's Motion for Relief from Stay* (related document(s):407 Motion for Relief From Stay). Filed by Dallas/Fort Worth International Airport Board, City of Dallas, City of Fort Worth (Orenstein, Rosa) (Entered: 08/10/2020) |
| 08/10/2020 | 🌐 695 (4 pgs) | Notice of Appearance and Request for Notice Filed by Mary Elizabeth Heard Filed by on behalf of PMBG Parties (Heard, Mary) (Entered: 08/10/2020) |
| 08/10/2020 | 🌐 696 (4 pgs) | Response (Filed By PMBG Parties ).(Related document(s):567 Emergency Motion) (Heard, Mary) (Entered: 08/10/2020) |
| 08/10/2020 | 🌐 697 (4 pgs) | Stipulation By Chesapeake Energy Corporation and ETC Texas Pipeline, Ltd.. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Peguero, Kristhy) (Entered: 08/10/2020) |
| 08/11/2020 | 🌐 698 (4 pgs) | Notice *of Reconstituted Committee of Royalty Owners*. Filed by US Trustee (Duran, Hector) (Entered: 08/11/2020) |
| 08/11/2020 | 🌐 699 (17 pgs; 2 docs) | Objection (related document(s):567 Emergency Motion). Filed by US Trustee (Attachments: # 1 Proposed Order) (Duran, Hector) (Entered: 08/11/2020) |
| | | |

| | | |
|---|---|---|
| 08/11/2020 | 700<br>(14 pgs; 2 docs) | Proposed Order RE: *Order (I) Authorizing Entry Into the Backstop Commitment Agreement, (II) Approving the Payment of Fees and Expenses Related Thereto, and (III) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):520 Generic Motion) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 08/11/2020) |
| 08/11/2020 | 701<br>(5 pgs) | Statement *Verified Statement of Frances A. Smith and Disclosures of Ross & Smith, PC Pursuant to Fed. R. of Bankr. P. 2019* (Filed By Petty Business Enterprises, LP, Petty Energy L.P. and their related entities ). (Smith, Frances) (Entered: 08/11/2020) |
| 08/11/2020 | 702<br>(42 pgs; 5 docs) | Exhibit List (Filed By Dallas/Fort Worth International Airport Board, City of Dallas, City of Fort Worth ).(Related document(s):684 Exhibit List) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4) (Orenstein, Rosa) (Entered: 08/11/2020) |
| 08/11/2020 | 703<br>(32 pgs; 3 docs) | Appellant Designation of Contents For Inclusion in Record On Appeal (related document(s):609 Notice of Appeal). (Attachments: # 1 Exhibit # 2 Certificate of Service)(Swartley, Jason) (Entered: 08/11/2020) |
| 08/11/2020 | 705<br>(4 pgs) | Notice *of Joinder to the Objection to the Debtors Emergency Motion for Entry of an Order Disbanding the Committee of Royalty Holders*. (Related document(s):699 Objection) Filed by Railroad Commission of Texas (Binford, Jason) (Entered: 08/11/2020) |
| 08/11/2020 | 706<br>(33 pgs; 2 docs) | Proposed Order RE: *Order to Approve Procedures for De Minimis Asset Transactions* (Filed By Chesapeake Energy Corporation ). (Related document(s):287 Generic Motion) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 08/11/2020) |
| | 707<br>(9 pgs) | Statement - *Verified Statement of the Official Committee of Royalty Owners of Chesapeake Energy Corporation, et al., Pursuant to* |

| | | |
|---|---|---|
| 08/11/2020 | | *Bankruptcy Rule 2019* (Filed By Official Committee of Royalty Owners ). (Forshey, J) (Entered: 08/11/2020) |
| 08/11/2020 | 🔘 708 (22 pgs; 4 docs) | Reply *in Support of Request for Stay Relief at 424 and Supplemental Brief at 654* (related document(s):424 Motion for Relief From Stay). Filed by c/o Annie Catmull Royalty Owner Plaintiffs c/o (Attachments: # 1 Exhibit 138 # 2 Exhibit # 3 Exhibit) (Catmull, Annie) (Entered: 08/11/2020) |
| 08/11/2020 | 🔘 709 (17 pgs; 4 docs) | Exhibit List (Filed By c/o Annie Catmull Royalty Owner Plaintiffs c/o ).(Related document(s):424 Motion for Relief From Stay, 685 Exhibit List, Witness List) (Attachments: # 1 Exhibit 138 # 2 Exhibit 139 # 3 Exhibit 140) (Catmull, Annie) (Entered: 08/11/2020) |
| 08/11/2020 | 🔘 710 (6 pgs) | Stipulation By Chesapeake Energy Corporation and BP Energy Company. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/11/2020) |
| 08/11/2020 | 🔘 711 (9 pgs) | Omnibus Reply *in Support of Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, (IV) Approving Notice of Bar Dates, and (V) Granting Related Relief* (related document (s):367 Generic Motion). Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 08/11/2020) |
| | 🔘 712 (48 pgs; 2 docs) | Proposed Order RE: *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9)* |

| | | |
|---|---|---|
| 08/11/2020 | | *Requests, (IV) Approving Notice of Bar Dates, and (V) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):367 Generic Motion) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 08/11/2020) |
| 08/11/2020 | 713 (78 pgs; 2 docs) | Proposed Order RE: *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, (IV) Approving Notice of Bar Dates, and (V) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):367 Generic Motion) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 08/11/2020) |
| 08/11/2020 | 714 (6 pgs) | Agenda for Hearing on 8/12/2020 (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/11/2020) |
| 08/12/2020 | 715 (16 pgs) | Order to Approve Procedures for De Minimis Asset Transactions (Related Doc # 287) Signed on 8/12/2020. (emiller) (Entered: 08/12/2020) |
| 08/12/2020 | 716 (38 pgs) | Proposed Order RE: *Motion to Set Bar Date with redlines to Doc. No. 713* (Filed By Official Committee of Royalty Owners ).(Related document(s):367 Generic Motion, 650 Objection, 713 Proposed Order) (Brown, pllc, Deirdre) (Entered: 08/12/2020) |
| 08/12/2020 | 717 (32 pgs; 3 docs) | Certificate *of Counsel with Respect to the Retention Application of Kirkland & Ellis LLP* (Filed By Chesapeake Energy Corporation ). (Related document(s):372 Application to Employ) (Attachments: # 1 Proposed Order # 2 Redline) (Cavenaugh, Matthew) (Entered: 08/12/2020) |
| | 718 (21 pgs; 3 docs) | Certificate of No Objection *with Respect to the Retention Application of Alvarez & Marsal North America, LLC and Jackson Walker LLP* |

| | | |
|---|---|---|
| 08/12/2020 | | (Filed By Chesapeake Energy Corporation ). (Related document(s):368 Application to Employ, 370 Application to Employ) (Attachments: # 1 Proposed Order Alvarez & Marsal North America, LLC # 2 Proposed Order Jackson Walker LLP) (Cavenaugh, Matthew) (Entered: 08/12/2020) |
| 08/12/2020 | 🌐 719 (15 pgs) | Order Authorizing the Debtors to Employ and Retain Alvarez & Marsal North America, LLC as Restructuring Advisors Pursuant to Sections 327(a) and 328 of the Bankruptcy Code Effective as of June 28, 2020 (Related Doc # 368) Signed on 8/12/2020. (emiller) (Entered: 08/12/2020) |
| 08/12/2020 | 🌐 720 (3 pgs) | Order Granting the Application of Debtors and Debtors in Possession to Retain Jackson Walker LLP as Co-Counsel and Conflicts Counsel for Debtors and Debtors in Possession (Related Doc # 370) Signed on 8/12/2020. (emiller) (Entered: 08/12/2020) |
| 08/12/2020 | 🌐 721 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew Cavenaugh. This is to order a transcript of 8/12/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) Electronically forwarded to Access Transcripts on 8-13-2020. Estimated completion date: 8-14-2020. Modified on 8/13/2020 (MelissaMorgan). (Entered: 08/12/2020) |
| 08/12/2020 | 🌐 722 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Jason Boland. This is to order a transcript of August 12, 2020 hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Official Committee Of Unsecured Creditors ). (Boland, Jason) Copy Request electronically forwarded to Access Transcripts, LLC on August 13, 2020. Estimated completion date: August 14, 2020. Modified on 8/13/2020 (ClaudiaGutierrez). (Entered: 08/12/2020) |

| 08/12/2020 | 723 (5 pgs) | Motion *for Partial Release of Mineral Interests* (sgue) (Entered: 08/12/2020) |
|---|---|---|
| 08/12/2020 | 724 (52 pgs) | Debtors Master Service List (Filed By Epiq Corporate Restructuring LLC ). (Garabato, Sid) (Entered: 08/12/2020) |
| 08/12/2020 | 725 (145 pgs; 4 docs) | Application to Employ Brown Rudnick LLP as Counsel to the Official Committee of Unsecured Creditors. Objections/Request for Hearing Due in 21 days. Filed by Creditor Committee Official Committee Of Unsecured Creditors (Attachments: # 1 Exhibit A: Declaration of Robert J. Stark # 2 Exhibit B: Declaration of Patrick J. Healy # 3 Proposed Order) (Harrison, Julie) (Entered: 08/12/2020) |
| 08/12/2020 | 726 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Mary Elizabeth Heard. This is to order a transcript of August 12, 2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By PMBG Parties ). (Heard, Mary) Copy Request electronically forwarded to Access Transcripts, LLC on August 13, 2020. Estimated completion date: August 14, 2020. Modified on 8/13/2020 (ClaudiaGutierrez). (Entered: 08/12/2020) |
| 08/12/2020 | 727 (93 pgs; 4 docs) | Application to Employ Norton Rose Fulbright US LLP as Co-Counsel to the Official Committee of Unsecured Creditors. Objections/Request for Hearing Due in 21 days. Filed by Creditor Committee Official Committee Of Unsecured Creditors (Attachments: # 1 Proposed Order # 2 Exhibit B: Declaration of Louis R. Strubeck, Jr. # 3 Exhibit C: Declaration of Patrick J. Healy) (Harrison, Julie) (Entered: 08/12/2020) |
| 08/12/2020 | 728 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Expedited (7 days)) by M. Quejada. This is to order a transcript of Entire Hearing held on August 12, 2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By MUFG Union Bank, N.A. ). (Quejada, Maegan) Copy Request |

| 08/12/2020 | | electronically forwarded to Access Transcripts, LLC on August 13, 2020. Estimated completion date: August 20, 2020. Modified on 8/13/2020 (ClaudiaGutierrez). (Entered: 08/12/2020) |
|---|---|---|
| 08/12/2020 | 729 (4 pgs) | Courtroom Minutes. Time Hearing Held: 2:00 pm. Appearances: SEE ATTACHED. (Related document(s):367 Generic Motion, 407 Motion for Relief From Stay, 424 Motion for Relief From Stay, 567 Emergency Motion) The Bar Date Motion filed at Docket No. 367 is granted. Order to be submitted. Regarding the Motion to Lift Stay filed at Docket No. 407, exhibits 702-1 and 702-3 were admitted. The motion is denied. Order to be submitted. Regarding the Motion to Lift Stay filed at Docket No. 424, exhibit 691-2 was admitted. The Court took judicial notice of exhibits 685-48, 685-51 and 685-52. Witness: Vincent Circelli. The motion is denied. Order to be submitted. The Motion to Disband the Royalty Committee filed at Docket No. 567 is denied as stated on the record. The US Trustee is to reconstitute the committee as stated on the record. Ms. Brown to submit a proposed form of order. (emiller) (Entered: 08/12/2020) |
| 08/12/2020 | 730 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Marty L. Brimmage. This is to order a transcript of the August 12, 2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts ). (Brimmage, Marty) Copy Request electronically forwarded to Access Transcripts, LLC on August 13, 2020. Estimated completion date: August 14, 2020. Modified on 8/13/2020 (ClaudiaGutierrez). (Entered: 08/12/2020) |
| 08/12/2020 | 731 (1 pg) | PDF with attached Audio File. Court Date & Time [ 8/12/2020 2:05:21 PM ]. File Size [ 85516 KB ]. Run Time [ 02:58:10 ]. (admin). (Entered: 08/12/2020) |

| | | |
|---|---|---|
| 08/12/2020 | 732<br>(7 pgs) | BNC Certificate of Mailing. (Related document (s):673 Order on Motion to Appear pro hac vice) No. of Notices: 108. Notice Date 08/12/2020. (Admin.) (Entered: 08/12/2020) |
| 08/12/2020 | 733<br>(7 pgs) | BNC Certificate of Mailing. (Related document (s):674 Order on Motion to Appear pro hac vice) No. of Notices: 108. Notice Date 08/12/2020. (Admin.) (Entered: 08/12/2020) |
| 08/12/2020 | 734<br>(7 pgs) | BNC Certificate of Mailing. (Related document (s):675 Order on Motion to Appear pro hac vice) No. of Notices: 108. Notice Date 08/12/2020. (Admin.) (Entered: 08/12/2020) |
| 08/12/2020 | 735<br>(7 pgs) | BNC Certificate of Mailing. (Related document (s):676 Order on Motion to Appear pro hac vice) No. of Notices: 108. Notice Date 08/12/2020. (Admin.) (Entered: 08/12/2020) |
| 08/12/2020 | 736<br>(7 pgs) | BNC Certificate of Mailing. (Related document (s):677 Order on Motion to Appear pro hac vice) No. of Notices: 108. Notice Date 08/12/2020. (Admin.) (Entered: 08/12/2020) |
| 08/12/2020 | 786<br>(22 pgs) | Order Authorizing the Retention and Employment of Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Attorneys for the Debtors and Debtors in Possession Effective as of June 28, 2020 (Related Doc # 372) Signed on 8/12/2020. (emiller) (Entered: 08/14/2020) |
| 08/13/2020 | 737<br>(79 pgs; 2 docs) | Proposed Order RE: *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, (IV) Approving Notice of Bar Dates, and (V) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):367 Generic Motion) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 08/13/2020) |

| | | |
|---|---|---|
| 08/13/2020 | 🔵 738<br>(4 pgs) | Declaration re: *Declaration of Disinterestedness of Amini Law Firm PLLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/13/2020 | 🔵 739<br>(4 pgs) | Declaration re: *Declaration of Disinterestedness of Babst Calland, P.C., Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/13/2020 | 🔵 740<br>(3 pgs) | Declaration re: *Declaration of Disinterestedness of Baker, Donelson, Bearman, Caldwell & Berkowitz, PC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/13/2020 | 🔵 741<br>(3 pgs) | Declaration re: *Declaration of Disinterestedness of Blake Smith Law, PLLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/13/2020 | 🔵 742<br>(4 pgs) | Declaration re: *Declaration of Disinterestedness of Blanchard, Walker, O'Quin & Roberts, A Professional Law Corporation, Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| | 🔵 743 | Declaration re: *Declaration of* |

| | | |
|---|---|---|
| 08/13/2020 | (4 pgs) | *Disinterestedness of Brown & Fortunato, P.C. Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/13/2020 | 744 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Childers, Hewett, Myers & Slagle, PLLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/13/2020 | 745 (3 pgs) | Declaration re: *Declaration of Disinterestedness of Conner & Winters, LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/13/2020 | 746 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Edinger Leonard & Blakley PLLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/13/2020 | 747 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Fleischer, Fleischer, Painter & Cantrell, PLLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| | 748 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Freeman Mills PC Pursuant to the Order Authorizing the* |

| | | |
|---|---|---|
| 08/13/2020 | | *Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/13/2020 | 749 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Gary C. Franks, P.C. Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/13/2020 | 750 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Gauntt, Koen, Binney & Kidd, LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/13/2020 | 751 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Gray Reed Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/13/2020 | 752 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Hargrove, Smelley & Strickland Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| | 753 (3 pgs) | Declaration re: *Declaration of Disinterestedness of Jones Walker LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy |

| | | |
|---|---|---|
| 08/13/2020 | | Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/13/2020 | 🌐 754 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Kean Miller LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/13/2020 | 🌐 755 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Kennedy Law Firm Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/13/2020 | 🌐 756 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Kohm & Associates, P.C. Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/13/2020 | 🌐 757 (4 pgs) | Declaration re: *Declaration of Disinterestedness of The Lanier Law Firm, P.C. Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/13/2020 | 🌐 758 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C. Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |

| | | |
|---|---|---|
| 08/13/2020 | <u>759</u><br>(4 pgs) | Declaration re: *Declaration of Disinterestedness of Mowry Law LLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/13/2020 | <u>760</u><br>(4 pgs) | Declaration re: *Declaration of Disinterestedness of Myers, Brier & Kelly, LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/13/2020 | <u>761</u><br>(4 pgs) | Declaration re: *Declaration of Disinterestedness of Onebane Law Firm Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/13/2020 | <u>762</u><br>(3 pgs) | Declaration re: *Declaration of Disinterestedness of Ottinger Hebert, LLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/13/2020 | <u>763</u><br>(3 pgs) | Declaration re: *Declaration of Disinterestedness of Randazzo Giglio & Bailey LLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| | <u>764</u><br>(4 pgs) | Declaration re: *Declaration of Disinterestedness of Reed Smith LLP Pursuant to the Order Authorizing the Retention and* |

| | | |
|---|---|---|
| 08/13/2020 | | *Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/13/2020 | 🔵 765 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Santoyo Wehmeyer P.C. Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/13/2020 | 🔵 766 (3 pgs) | Declaration re: *Declaration of Disinterestedness of Scott Douglass & McConnico LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/13/2020 | 🔵 767 (6 pgs) | Declaration re: *Declaration of Disinterestedness of Saul Ewing Arnstein & Lehr LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/13/2020 | 🔵 768 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Steven S. Toeppich & Associates, PLLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| | 🔵 769 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Talasaz & Finkbeiner PLLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy |

| | | |
|---|---|---|
| 08/13/2020 | | Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/13/2020 | 🔵 770 (3 pgs) | Declaration re: *Declaration of Disinterestedness of Tellie & Coleman, P.C. Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/13/2020 | 🔵 771 (4 pgs) | Declaration re: *Declaration of Disinterestedness of The Shanor Group LLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/13/2020 | 🔵 772 (4 pgs) | Declaration re: *Declaration of Disinterestedness of The Title Law Group, PLLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/13/2020 | 🔵 773 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Trimble Law Group, PLLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/13/2020 | 🔵 774 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Watson Law Firm, LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |

| | | |
|---|---|---|
| 08/13/2020 | 🔵 775<br>(3 pgs) | Declaration re: *Declaration of Disinterestedness of Williams, Porter, Day and Neville, P.C. Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/13/2020 | 🔵 776<br>(4 pgs) | Declaration re: *Declaration of Disinterestedness of Williams Legal Services, PLLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/13/2020 | 🔵 777<br>(4 pgs) | Declaration re: *Declaration of Disinterestedness of Mowry Law LLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/13/2020 | 🔵 778<br>(4 pgs) | Declaration re: *Declaration of Disinterestedness of James Lynn Franks Attorney at Law, P.C. Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020i |
| 08/13/2020 | 🔵 779<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Bradley Clay Knapp Filed by on behalf of Rodney Hudson, Allen Johnson (Knapp, Bradley) (Entered: 08/13/2020) |
| | 🔵 780<br>(102 pgs; 4 docs) | Application to Employ AlixPartners, LLP as Financial Advisor to the Official Committee of Unsecured Creditors. Objections/Request for Hearing Due in 21 days. Filed by Creditor Committee Official Committee Of Unsecured Creditors (Attachments: # 1 Exhibit A: Declaration of David MacGreevey # 2 Exhibit |

| | | |
|---|---|---|
| 08/13/2020 | | B: Engagement Letter # 3 Proposed Order) (Harrison, Julie) (Entered: 08/13/2020) |
| 08/13/2020 | 781 (7 pgs; 2 docs) | Notice *to Chesapeake Energy Corporation of Rule 30(b)(6) Deposition.* Filed by Official Committee Of Unsecured Creditors (Attachments: # 1 Exhibit A) (Harrison, Julie) (Entered: 08/13/2020) |
| 08/13/2020 | 782 (39 pgs) | Affidavit Re: *Affidavit of Service of Marc Orfitelli* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):574 Additional Attachments, 576 Agenda, 593 Generic Order, 594 Order on Emergency Motion, 595 Generic Order, 596 Order on Emergency Motion, 597 Order on Emergency Motion, 598 Generic Motion, 599 Declaration) (Garabato, Sid) (Entered: 08/13/2020) |
| 08/13/2020 | 783 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Sherman & Sterling LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/13/2020) |
| 08/13/2020 | 784 (26 pgs) | Affidavit Re: *Affidavit of Service of Marc Orfitelli* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):655 Generic Order, 656 Generic Order) (Garabato, Sid) (Entered: 08/13/2020) |
| 08/13/2020 | 787 (39 pgs) | Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, (IV) Approving Notice of Bar Dates, and (V) Granting Related Relief (Related Doc # 367) Signed on 8/13/2020. (emiller) (Entered: 08/14/2020) |
| | 785 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Thompson & Knight, LLP Pursuant to the* |

| | | |
|---|---|---|
| 08/14/2020 | | *Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Levitt, Steven) (Entered: 08/14/2020) |
| 08/14/2020 | 788 (9 pgs) | Declaration re: - *Second Amended Declaration of Jeff P. Prostok in Support of the Official Committee of Royalty Owners' Application for Entry of Order Authorizing Retention and Employment of Forshey & Prostok, LLP as Attorneys for the Official Committee of Royalty Owners Effective as of July 25, 2020* (Filed By Official Committee of Royalty Owners ). (Related document(s):557 Application to Employ) (Prostok, Jeffrey) (Entered: 08/14/2020) |
| 08/14/2020 | 789 (6 pgs) | Response/Objection Filed by MUFG Union Bank, N.A.. (Related document(s):664 Notice) (Quejada, Maegan) (Entered: 08/14/2020) |
| 08/14/2020 | 790 (134 pgs) | Transcript RE: Motion Hearing held on 08/12/2020 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 11/12/2020. (AccessTranscripts) (Entered: 08/14/2020) |
| 08/14/2020 | 791 (22 pgs) | BNC Certificate of Mailing. (Related document (s):715 Generic Order) No. of Notices: 109. Notice Date 08/14/2020. (Admin.) (Entered: 08/14/2020) |
| 08/14/2020 | 792 (21 pgs) | BNC Certificate of Mailing. (Related document (s):719 Order on Application to Employ) No. of Notices: 109. Notice Date 08/14/2020. (Admin.) (Entered: 08/14/2020) |
| 08/14/2020 | 793 (9 pgs) | BNC Certificate of Mailing. (Related document (s):720 Order on Application to Employ) No. of Notices: 109. Notice Date 08/14/2020. (Admin.) (Entered: 08/14/2020) |
| | 822 (4 pgs) | Stipulation and Agreed Scheduling Order Signed on 8/14/2020 (Related document(s):697 |

| | | |
|---|---|---|
| 08/14/2020 | | Stipulation) **Hearing scheduled for 8/31/2020 at 09:00 AM via telephone and video conference.** (emiller) (Entered: 08/18/2020) |
| 08/16/2020 | 794 (3 pgs) | Notice of Appearance and Request for Notice Filed by John E. Johnson Filed by on behalf of Johnson Oil Partnership, John E. Johnson (Johnson, John) (Entered: 08/16/2020) |
| 08/16/2020 | 795 (1 pg) | Proposed Order Submission After Hearing (Filed By Official Committee of Royalty Owners ). (Related document(s):567 Emergency Motion) (Brown, pllc, Deirdre) (Entered: 08/16/2020) |
| 08/16/2020 | 796 (28 pgs) | BNC Certificate of Mailing. (Related document (s):786 Order on Application to Employ) No. of Notices: 109. Notice Date 08/16/2020. (Admin.) (Entered: 08/16/2020) |
| 08/16/2020 | 797 (45 pgs) | BNC Certificate of Mailing. (Related document (s):787 Generic Order) No. of Notices: 109. Notice Date 08/16/2020. (Admin.) (Entered: 08/16/2020) |
| 08/17/2020 | 798 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Baker Botts LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ).(Related document(s):655 Generic Order) (Kaisani, Fareed) (Entered: 08/17/2020) |
| 08/17/2020 | 799 (39 pgs; 10 docs) | Emergency Motion *to (I) Compel Discovery Responses and Deposition; and (II) Continue Hearing on Backstop Motion* Filed by Creditor Brigade Capital Management, LP (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H # 9 Proposed Order) (Tomasco, Patricia) (Entered: 08/17/2020) |
| | 800 (4 pgs) | Declaration re: *Declaration of Disinterestedness of McAfee & Taft Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary* |

| 08/17/2020 | | *Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/17/2020) |
|---|---|---|
| 08/17/2020 | ⬤801 (3 pgs) | Declaration re: *Declaration of Disinterestedness of Dickinson Wright PLLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/17/2020) |
| 08/17/2020 | ⬤802 (1 pg) | Notice of Filing of Official Transcript as to 790 Transcript. Parties notified (Related document (s):790 Transcript) (jdav) (Entered: 08/17/2020) |
| 08/17/2020 | ⬤ | Certificate of Telephone Notice. Contacted Devin Hahn. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):799 Emergency Motion) **Hearing scheduled for 8/18/2020 at 01:00 PM by telephone and video conference.** (aalo) (Entered: 08/17/2020) |
| 08/17/2020 | ⬤803 (3 pgs) | Notice *of Electronic Hearing on Application to Employ Forshey & Prostok, L.L.P. on August 31, 2020 at 9:00 a.m.*. (Related document(s):557 Application to Employ, 788 Declaration) Filed by Official Committee of Royalty Owners (Forshey, J) (Entered: 08/17/2020) |
| 08/17/2020 | ⬤804 (3 pgs) | Notice *of Hearing*. (Related document(s):799 Emergency Motion) Filed by Brigade Capital Management, LP (Tomasco, Patricia) (Entered: 08/17/2020) |
| 08/17/2020 | ⬤805 (6 pgs; 2 docs) | Declaration re: *Amended Declaration of Disinterestedness of Conner & Winters, LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Related document(s):745 Declaration) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 08/17/2020) |
| | | |

| | | |
|---|---|---|
| 08/17/2020 | 806<br>(22 pgs) | Stipulation By Chesapeake Energy Corporation and MUFG Union Bank N.A., Franklin Advisers, Inc., the Official Committee of Unsecured Creditors and Ad Hoc Group of FLLO Term Loan Lenders. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/17/2020) |
| 08/17/2020 | 807<br>(4 pgs) | Notice *of Additional Ordinary Course Professionals Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business*. (Related document(s):655 Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 08/17/2020) |
| 08/17/2020 | 808<br>(1 pg) | Motion to Appear pro hac vice *Mark S. Baldwin*. Filed by Creditor Committee Official Committee Of Unsecured Creditors (Harrison, Julie) (Entered: 08/17/2020) |
| 08/17/2020 | 809<br>(1 pg) | Motion to Appear pro hac vice *James W. Stoll*. Filed by Creditor Committee Official Committee Of Unsecured Creditors (Harrison, Julie) (Entered: 08/17/2020) |
| 08/17/2020 | 810<br>(196 pgs) | Brief (Filed By ETC Texas Pipeline Ltd. ). (Mitchell, John) (Entered: 08/17/2020) |
| 08/17/2020 | 811<br>(3 pgs) | Order Authorizing the Debtors to File Under Seal the Names of Certain Confidential Parties in Interest Related to Rothschild & Co US Inc. and Intrepid Partners, LLC's Retention Application (Related Doc # 452) Signed on 8/17/2020. (emiller) (Entered: 08/17/2020) |
| 08/17/2020 | 812<br>(2 pgs) | Order Granting Emergency Motion to File Under Seal Objection to Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Existing Secured |

| | | |
|---|---|---|
| 08/17/2020 | | Parties, (I) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing and (VII) Granting Related Relief (Related Doc # 512) Signed on 8/17/2020. (emiller) (Entered: 08/17/2020) |
| 08/17/2020 | 🔵 813 (120 pgs) | Reply *Debtors' Memorandum of Law in Support of Debtors' Motion for Entry of an Order (I) Authorizing Rejection of Certain Executory Contracts Effective as of July 1, 2020 and (II) Granting Related Relief*. Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 08/17/2020) |
| 08/17/2020 | 🔵 814 (16 pgs; 2 docs) | Motion *Debtors' Motion for Entry of an Order (I) Authorizing the Rejection of Certain Executory Contracts and Unexpired Leases Effective as of August 17, 2020 and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 08/17/2020) |
| 08/17/2020 | 🔵 815 (7 pgs) | Declaration re: *Declaration of John Stuart in Support of the Debtors' Motion for Entry of an Order (I) Authorizing the Rejection of Certain Executory Contracts and Unexpired Leases Effective as of August 17, 2020 and (II) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):814 Generic Motion) (Cavenaugh, Matthew) (Entered: 08/17/2020) |
| 08/17/2020 | 🔵 816 (3 pgs) | Order (I) Authorizing the Debtors to File Fee Letters Under Seal and (II) Granting Related Relief (Related Doc # 524) Signed on 8/17/2020. (emiller) (Entered: 08/18/2020) |
| 08/17/2020 | 🔵 817 (2 pgs) | Order Granting Emergency Motion of the Official Committee of Unsecured Creditors to File Under Seal Exhibits for Hearing on July 31, 2020 (Related Doc # 531) Signed on 8/17/2020. (emiller) (Entered: 08/18/2020) |
| 08/17/2020 | 🔵 818 (3 pgs) | Order (I) Authorizing the Debtors to File Deposition Transcripts Under Seal and (II) Granting Related Relief (Related Doc # 559) Signed on 8/17/2020. (emiller) (Entered: |

| 08/17/2020 | | 08/18/2020) |
|---|---|---|
| 08/17/2020 | 🔵 819 (1 pg) | Order Denying Motion to Disband the Official Committee of Royalty Owners Except as Set Forth Herein (Related Doc # 567) Signed on 8/17/2020. (emiller) (Entered: 08/18/2020) |
| 08/17/2020 | 🔵 831 (1 pg) | Motion to Appear pro hac vice *Anthony Richardson II*. Filed by Creditor Rebecca Corso (BeverlyWright) (Entered: 08/18/2020) |
| 08/17/2020 | 🔵 832 (1 pg) | Motion to Appear pro hac vice *Anthony Richardson II*. Filed by Creditor Paula Modransky (BeverlyWright) (Entered: 08/18/2020) |
| 08/17/2020 | 🔵 840 (1 pg) | Notice of Change of Address filed by Colleen Ansbaugh. (rcas) (Entered: 08/19/2020) |
| 08/18/2020 | 🔵 820 (1 pg) | Order Granting Motion To Appear pro hac vice - Mark S. Baldwin (Related Doc # 808) Signed on 8/18/2020. (emiller) (Entered: 08/18/2020) |
| 08/18/2020 | 🔵 821 (1 pg) | Order Granting Motion To Appear pro hac vice - James W. Stoll (Related Doc # 809) Signed on 8/18/2020. (emiller) (Entered: 08/18/2020) |
| 08/18/2020 | 🔵 823 (58 pgs; 4 docs) | Response (Filed By Ad Hoc Group of FLLO Term Loan Lenders ).(Related document(s):799 Emergency Motion) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3) (Morgan, John) (Entered: 08/18/2020) |
| 08/18/2020 | 🔵 824 (1 pg) | Motion to Appear pro hac vice *Joshua B. Selig*. Filed by Debtor Chesapeake Energy Corporation (hler) (Entered: 08/18/2020) |
| 08/18/2020 | 🔵 825 (2 pgs) | Notice - *ETC Tiger Pipeline LLC's Proposed Discovery and Hearing Schedule on the Motion of the Debtors for Entry of an Order (I) Authorizing Rejection of the Negotiated Firm Rate Transportation Agreements and Related Contracts Effective asof July 1, 2020 and (II) Grantig Related Relief*. Filed by ETC Texas Pipeline Ltd. (Mitchell, John) (Entered: 08/18/2020) |

| | | |
|---|---|---|
| 08/18/2020 | 🔵 826 (3 pgs) | Notice *of Debtors' Proposed Discovery and Hearing Schedule on the Motion of Chesapeake Energy Corporation for Entry of an Order (I) Authorizing Rejection of the Negotiated Rate Firm Transportation Agreements and Related Contracts Effective as of July 1, 2020 and (II) Granting Related Relief.* (Related document (s):35 Motion to Assume/Reject) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 08/18/2020) |
| 08/18/2020 | 🔵 827 (2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Patricia B. Tomasco. This is to order a transcript of Hearing held on August 18, 2020, before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Brigade Capital Management, LP ). (Tomasco, Patricia) Electronically forwarded to Judicial Transcribers of Texas on 8-18-2020. Estimated completion date: 8-19-2020. Modified on 8/18/2020 (MelissaMorgan). (Entered: 08/18/2020) |
| 08/18/2020 | 🔵 828 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by M. Quejada. This is to order a transcript of Hearing held on August 18, 2020 before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By MUFG Union Bank, N.A. ). (Quejada, Maegan) Copy request was electronically forwarded to Judicial Transcribers of Texas on 8-18-2020. Estimated completion date: 8-19-2020. Modified on 8/18/2020 (MelissaMorgan). (Entered: 08/18/2020) |
| 08/18/2020 | 🔵 829 (1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 8/18/2020 12:57:36 PM ]. File Size [ 25395 KB ]. Run Time [ 00:52:54 ]. (admin). (Entered: 08/18/2020) |
| | 🔵 830 (2 pgs) | Courtroom Minutes. Time Hearing Held: 1:00 PM. Appearances: see attached. With respect to the motion to compel, the Court has ruled and production of documents will begin. The parties to hold a deposition Thursday afternoon. If a hearing is necessary, the parties are instructed to contact the Courts case manager for an expedited |

| | | |
|---|---|---|
| 08/18/2020 | | hearing. The Court has set 490 for hearing on 8/31/2020 at 9:00 AM by telephone and video conference. Responses to 490 due by 8/20 and any reply by 8/25. Note: Discovery has been opened up as of 8/18/2020. (aalo) (Entered: 08/18/2020) |
| 08/18/2020 | ◉ 833 (3 pgs) | Notice of Appearance and Request for Notice Filed by Davor Rukavina Filed by on behalf of Linda Milanovich, Kristine Cobb, Justin Cobb (Rukavina, Davor) (Entered: 08/18/2020) |
| 08/18/2020 | ◉ 834 (8 pgs; 2 docs) | Emergency Motion *Of The Official Committee Of Unsecured Creditors To File Under Seal Omnibus Objection To: (a) Debtors Motion For Entry Of An Order (i) Authorizing Entry Into The Backstop Commitment Agreement, (II) Approving The Payment Of Fees And Expenses Related Thereto, And (III) Granting Related Relief And (b) Debtors Motion For Entry Of An Order (I) Authorizing The Debtors To Incur And Pay The Fees, Indemnities, And Expenses Related To The Exit Facilities And (II) Granting Related Relief* Filed by Creditor Committee Official Committee Of Unsecured Creditors (Attachments: # 1 Proposed Order) (Harrison, Julie) (Entered: 08/18/2020) |
| 08/18/2020 | ◉ 835 (31 pgs) | Sealed Document *Sealed Omnibus Objection To (a) Debtors Motion For Entry Of An Order (i) Authorizing Entry Into The Backstop Commitment Agreement, (II) Approving The Payment Of Fees And Expenses Related Thereto, And (III) Granting Related Relief And (b) Debtors Motion For Entry Of An Order (I) Authorizing The Debtors To Incur And Pay The Fees, Indemnities, And Expenses Related To The Exit Facilities And (II) Granting Related Relief* (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) (Entered: 08/18/2020) |
| | ◉ 836 (31 pgs) | Omnibus Objection *To (a) Debtors Motion For Entry Of An Order (i) Authorizing Entry Into The Backstop Commitment Agreement, (II) Approving The Payment Of Fees And Expenses Related Thereto, And (III) Granting Related* |

| | | |
|---|---|---|
| 08/18/2020 | | *Relief And (b) Debtors Motion For Entry Of An Order (I) Authorizing The Debtors To Incur And Pay The Fees, Indemnities, And Expenses Related To The Exit Facilities And (II) Granting Related Relief* (related document(s):520 Generic Motion, 523 Generic Motion). Filed by Official Committee Of Unsecured Creditors (Harrison, Julie) (Entered: 08/18/2020) |
| 08/18/2020 | 837 (2 pgs) | Notice *Of Withdrawal Of Ad Hoc Group Of FLLO Term Loan Lenders' Opposition To Brigade Capital Management, LP's Emergency Motion To (I) Compel Discovery Responses And Deposition; And (II) Continue Hearing On Backstop Motion [Docket No. 823].* (Related document(s):823 Response) Filed by Ad Hoc Group of FLLO Term Loan Lenders (Morgan, John) (Entered: 08/18/2020) |
| 08/18/2020 | 838 (2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by John Morgan. This is to order a transcript of Hearing held on August 18, 2020 before Judge David R. Jones. Court Reporter/Transcriber: Veritext Legal Solutions (Filed By Ad Hoc Group of FLLO Term Loan Lenders ). (Morgan, John) Copy request was electronically forwarded to Judicial Transcribers of Texas on 8-19-2020. Estimated completion date: 8-20-2020. Modified on 8/19/2020 (MelissaMorgan). (Entered: 08/18/2020) |
| 08/19/2020 | 839 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Julie Harrison. This is to order a transcript of August 18, 2020 hearing before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) Copy request was electronically forwarded to Judicial Transcribers of Texas on 8-19-2020. Estimated completion date: 8-20-2020. Modified on 8/19/2020 (MelissaMorgan). (Entered: 08/19/2020) |
| | 841 (8 pgs; 2 docs) | Emergency Motion *of Official Committee of Unsecured Creditors to File Under Seal Exhibits for Hearing on August 21, 2020* Filed by |

| | | |
|---|---|---|
| 08/19/2020 | | Creditor Committee Official Committee Of Unsecured Creditors (Attachments: # 1 Proposed Order) (Harrison, Julie) (Entered: 08/19/2020) |
| 08/19/2020 | ⬤ 842<br>(1203 pgs; 21 docs) | Sealed Document *Sealed Witness and Exhibit List for Hearing Scheduled August 21, 2020 at 9:30 a.m. with Sealed Exhibits* (Filed By Official Committee Of Unsecured Creditors ). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Index 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19 # 20 Exhibit 20) (Harrison, Julie) (Entered: 08/19/2020) |
| 08/19/2020 | ⬤ 843<br>(970 pgs; 21 docs) | Witness List, Exhibit List (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):520 Generic Motion, 523 Generic Motion, 835 Sealed Document, 836 Objection) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19 # 20 Exhibit 20) (Harrison, Julie) (Entered: 08/19/2020) |
| 08/19/2020 | ⬤ 844<br>(2 pgs) | Witness List, Exhibit List (Filed By MUFG Union Bank, N.A. ).(Related document(s):520 Generic Motion, 523 Generic Motion) (Quejada, Maegan) (Entered: 08/19/2020) |
| 08/19/2020 | ⬤ 845<br>(251 pgs; 2 docs) | Witness List, Exhibit List (Filed By Official Committee of Royalty Owners ).(Related document(s):520 Generic Motion, 523 Generic Motion) (Attachments: # 1 Exhibit 1_DIP ORDER Doc. No. 597) (Brown, pllc, Deirdre) (Entered: 08/19/2020) |
| 08/19/2020 | ⬤ 846<br>(124 pgs; 5 docs) | Exhibit List, Witness List (Filed By Chesapeake Energy Corporation ). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 14) (Polnick, Veronica) (Entered: 08/19/2020) |

| | | |
|---|---|---|
| 08/19/2020 | 🔵 847<br>(143 pgs; 9 docs) | Sealed Document *related to Debtors' Witness and Exhibit List for Hearing Schedules for August 21, 2020 at 9:30 A.M.* (Filed By Chesapeake Energy Corporation ). (Attachments: # 1 Exhibit 5 # 2 Exhibit 7 # 3 Exhibit 8 # 4 Exhibit 9 # 5 Exhibit 10 # 6 Exhibit 11 # 7 Exhibit 12 # 8 Exhibit 13) (Polnick, Veronica) (Entered: 08/19/2020) |
| 08/19/2020 | 🔵 848<br>(2 pgs) | AO 435 TRANSCRIPT ORDER FORM (3-Day) by William A. (Trey) Wood III. This is to order a transcript of Hearing on July 31, 2020 at 11:00 a.m. CT before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Camino Real Gas Gathering Company, LLC, Eagle Ford Gathering, LLC, El Paso Marketing Company, L.L.C., Hiland Crude, LLC, Kinder Morgan Tejas Pipeline LLC, Kinder Morgan Texas Pipeline LLC, Kinderhawk Field Services, LLC, Midcontinent Express Pipeline LLC, Scissortail Energy, LLC, Tennessee Gas Pipeline Company, L.L.C., Wyoming Interstate Company, L.L.C. ). (Wood, William) Copy request was electronically forwarded to Access Transcripts on 8-19-2020. Estimated completion date: 8-20-2020. Modified on 8/19/2020 (MelissaMorgan). (Entered: 08/19/2020) |
| 08/19/2020 | 🔵 849<br>(1 pg) | Letter from Shareholder Frank Siciliano (JeannieAndresen) (Entered: 08/19/2020) |
| 08/19/2020 | 🔵 850<br>(7 pgs) | Letter from Shareholder Jason Dean (JeannieAndresen) (Entered: 08/19/2020) |
| 08/19/2020 | 🔵 851<br>(3 pgs) | Letter from Shareholder (JeannieAndresen) (Entered: 08/19/2020) |
| 08/19/2020 | 🔵 852<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Charles E Lauffer Jr Filed by on behalf of Frank Blazek (Lauffer, Charles) (Entered: 08/19/2020) |
| 08/19/2020 | 🔵 853<br>(6 pgs) | Objection - *Limited Objection* (related document (s):520 Generic Motion, 523 Generic Motion). Filed by Official Committee of Royalty Owners (Brown, pllc, Deirdre) (Entered: 08/19/2020) |

| | | |
|---|---|---|
| 08/19/2020 | ● 854<br>(40 pgs) | Transcript RE: Motion Hearing / Status Conference / Scheduling Conference (Telephonic Conference) held on August 18, 2020 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 11/17/2020. (mhen) (Entered: 08/19/2020) |
| 08/19/2020 | ● 855<br>(4 pgs) | Declaration re: *Declaration of Disinterestedness of Jost Energy Law, P.C. Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Wertz, Jennifer) (Entered: 08/19/2020) |
| 08/19/2020 | ● 856<br>(7 pgs) | BNC Certificate of Mailing. (Related document (s):802 Notice of Filing of Official Transcript (Form)) No. of Notices: 111. Notice Date 08/19/2020. (Admin.) (Entered: 08/19/2020) |
| 08/19/2020 | ● 857<br>(8 pgs) | BNC Certificate of Mailing. (Related document (s):812 Order on Emergency Motion) No. of Notices: 111. Notice Date 08/19/2020. (Admin.) (Entered: 08/19/2020) |
| 08/19/2020 | ● 858<br>(6 pgs) | BNC Certificate of Mailing. (Related document (s):811 Order on Motion to Seal) No. of Notices: 41. Notice Date 08/19/2020. (Admin.) (Entered: 08/19/2020) |
| 08/20/2020 | ● 859<br>(1 pg) | Notice of Filing of Official Transcript as to 854 Transcript. Parties notified (Related document (s):854 Transcript) (JenniferOlson) (Entered: 08/20/2020) |
| 08/20/2020 | ● 860<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Howard C Rubin Filed by on behalf of Melissa Wood, Randy Wood (Rubin, Howard) (Entered: 08/20/2020) |
| 08/20/2020 | ● 861<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Joshua B. Selig (Related Doc # 824) Signed on 8/20/2020. (emiller) (Entered: 08/20/2020) |
| | ● 862 | Order Granting Motion To Appear pro hac vice - |

| | | |
|---|---|---|
| 08/20/2020 | (1 pg) | Anthony Richardson II (Related Doc # 831) Signed on 8/20/2020. (emiller) (Entered: 08/20/2020) |
| 08/20/2020 | 863 (1 pg) | Order Granting Motion To Appear pro hac vice - Anthony Richardson II (Related Doc # 832) Signed on 8/20/2020. (emiller) (Entered: 08/20/2020) |
| 08/20/2020 | 864 (5 pgs) | Letter from Shareholder John Dough (JeannieAndresen) (Entered: 08/20/2020) |
| 08/20/2020 | 865 (19 pgs) | Reply *Debtors' Omnibus Reply in Support of (I) the Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to Incur and Pay the Fees, Indemnities, and Expenses Related to the Exit Facilities and (B) Granting Related Relief and (II) the Debtors' Motion for Entry of an Order (A) Authorizing Entry Into the Backstop Commitment Agreement, (B) Approving the Payment of Fees and Expenses Related Thereto, and (C) Granting Related Relief* (related document(s):520 Generic Motion, 523 Generic Motion). Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 08/20/2020) |
| 08/20/2020 | 866 (12 pgs) | Reply *and Joinder of MUFG Union Bank, N.A. in Support of Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Incur and Pay the Fees, Indemnities, and Expenses Related to the Exit Facilities and (II) Granting Related Relief* (related document(s):523 Generic Motion). Filed by MUFG Union Bank, N.A. (McFaul, Duston) (Entered: 08/20/2020) |
| 08/20/2020 | 867 (14 pgs; 2 docs) | Proposed Order RE: *Order (I) Authorizing Entry Into Backstop Commitment Agreement, (II) Approving the Payment of Fees and Expenses Related Thereto, and (III) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):520 Generic Motion, 700 Proposed Order) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 08/20/2020) |
| 08/20/2020 | 868 | Proposed Order RE: *Order (I) Authorizing the* |

| | | |
|---|---|---|
| 08/20/2020 | (7 pgs; 2 docs) | *Debtors to Incur and Pay Fees, Indemnities, and Expenses Related to the Exit Facilities and (II) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):523 Generic Motion) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 08/20/2020) |
| 08/20/2020 | 869<br>(69 pgs; 3 docs) | Exhibit List, Witness List (Filed By Chesapeake Energy Corporation ).(Related document(s):846 Exhibit List, Witness List) (Attachments: # 1 Exhibit 6 # 2 Exhibit 15) (Cavenaugh, Matthew) (Entered: 08/20/2020) |
| 08/20/2020 | 870<br>(18 pgs) | Objection *to ETC Tiger Pipeline LLC's Motion to Withdraw the Reference of the Debtors' Motion for Entry of an Order (I) Authorizing Rejection of the Negotiated Rate Firm Transportation Agreements and Related Contracts Effective as of July 1, 2020 and (II) Granting Related Relief* (related document (s):490 Motion for Withdrawal of Reference). Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 08/20/2020) |
| 08/20/2020 | 871<br>(39 pgs; 4 docs) | Notice *of Joinder to the Debtors' Reply in Support of the Exit Facilities and Backstop Approval Motions.* Filed by Ad Hoc Group of FLLO Term Loan Lenders (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3) (Morgan, John) (Entered: 08/20/2020) |
| 08/20/2020 | 872<br>(11 pgs) | Statement */Amended Verified Statement of Davis Polk & Wardwell LLP and Vinson & Elkins LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019* (Filed By Ad Hoc Group of FLLO Term Loan Lenders ). (Morgan, John) (Entered: 08/20/2020) |
| 08/20/2020 | 873<br>(4 pgs) | Reply *and Joinder of Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts, to (I) the Debtors' Omnibus Reply in Support of the Exit Facilities and Backstop Approval Motions and (II) the Joinder to the Debtors' Reply Filed by the Ad Hoc Group of Secured FLLO Term Loan Lenders* (related document(s):520 Generic Motion, 523 Generic Motion). Filed by Franklin Advisers, Inc., as |

| 08/20/2020 | | Investment Manager on Behalf of Certain Funds and Accounts (Brimmage, Marty) (Entered: 08/20/2020) |
|---|---|---|
| 08/20/2020 | 874 (6 pgs) | Stipulation and Agreed Order (I) Authorizing the Debtors to Perform Under Prepetition Forward Contract and Enter Into and Perform Under Postpetition Transactions and Agreements with BP Energy Company, (II) Granting Administrative Expense Claims, and (III) Granting Related Relief Signed on 8/20/2020 (Related document(s):710 Stipulation) (VrianaPortillo) (Entered: 08/20/2020) |
| 08/20/2020 | 875 (6 pgs; 2 docs) | Witness List, Exhibit List (Filed By Chesapeake Energy Corporation ). (Attachments: # 1 Exhibit 16) (Wertz, Jennifer) (Entered: 08/20/2020) |
| 08/20/2020 | 876 (9 pgs) | BNC Certificate of Mailing. (Related document (s):816 Generic Order) No. of Notices: 111. Notice Date 08/20/2020. (Admin.) (Entered: 08/20/2020) |
| 08/20/2020 | 877 (8 pgs) | BNC Certificate of Mailing. (Related document (s):817 Order on Emergency Motion) No. of Notices: 111. Notice Date 08/20/2020. (Admin.) (Entered: 08/20/2020) |
| 08/20/2020 | 878 (9 pgs) | BNC Certificate of Mailing. (Related document (s):818 Order on Emergency Motion) No. of Notices: 111. Notice Date 08/20/2020. (Admin.) (Entered: 08/20/2020) |
| 08/20/2020 | 879 (7 pgs) | BNC Certificate of Mailing. (Related document (s):819 Order on Emergency Motion) No. of Notices: 111. Notice Date 08/20/2020. (Admin.) (Entered: 08/20/2020) |
| 08/20/2020 | 880 (7 pgs) | BNC Certificate of Mailing. (Related document (s):820 Order on Motion to Appear pro hac vice) No. of Notices: 111. Notice Date 08/20/2020. (Admin.) (Entered: 08/20/2020) |
| | 881 (7 pgs) | BNC Certificate of Mailing. (Related document (s):821 Order on Motion to Appear pro hac vice) No. of Notices: 111. Notice Date 08/20/2020. |

| | | |
|---|---|---|
| 08/20/2020 | | (Admin.) (Entered: 08/20/2020) |
| 08/20/2020 | 🔘882<br>(10 pgs) | BNC Certificate of Mailing. (Related document (s):822 Order Setting Hearing) No. of Notices: 111. Notice Date 08/20/2020. (Admin.) (Entered: 08/20/2020) |
| 08/20/2020 | 🔘892<br>(1 pg) | Motion to Appear pro hac vice *Donald F Campbell Jr*. Filed by Interested Party Estate of Edward Martin (hler) (Entered: 08/21/2020) |
| 08/20/2020 | 🔘994<br>(1 pg) | Motion to Appear pro hac vice *Gary E. English*. Filed by Creditor 4E Holding LLC (BeverlyWright) (Entered: 08/24/2020) |
| 08/20/2020 | 🔘1004<br><br>(1 pg) | Letter from Joe Pearson requesting lease agreement be released and contract not be reinstated. (DawnWaggoner) (Entered: 08/25/2020) |
| 08/21/2020 | 🔘883<br>(11 pgs; 2 docs) | Emergency Motion *Pursuant to Section 107(b) of the Bankruptcy Code and Bankruptcy Rule 9018 for an Order Authorizing the Filing of Exhibit Under Seal* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 884<br>(7 pgs) | Agenda for Hearing on 8/21/2020 (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 🔘885<br>(1 pg) | Sealed Document *Related to ECF No. 875 - Exhibit 16* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 🔘886<br>(7 pgs) | Proposed Order RE: *Backstop Agreement with suggested para. 18 to address objection at Doc. No. 853* (Filed By Official Committee of Royalty Owners ).(Related document(s):520 Generic Motion) (Brown, pllc, Deirdre) (Entered: 08/21/2020) |
| 08/21/2020 | 🔘887<br>(8 pgs) | Affidavit Re: *Affidavit of Service of Panagiota Manatakis* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):883 Emergency Motion, 884 Agenda) (Garabato, Sid) (Entered: 08/21/2020) |

| | | |
|---|---|---|
| 08/21/2020 | 🔵 888 (3 pgs) | Order Approving Debtors' Emergency Motion Pursuant to Section 107(b) of the Bankruptcy Code and Bankruptcy Rule 9018 for an Order Authorizing the Filing of Exhibits Under Seal (Related Doc # 883) Signed on 8/21/2020. (emiller) (Entered: 08/21/2020) |
| 08/21/2020 | 🔵 889 (2 pgs) | Order Granting Emergency Motion of the Official Committee of Unsecured Creditors to File Under Seal Exhibits for Hearing on August 21, 2020 (Related Doc # 841) Signed on 8/21/2020. (emiller) (Entered: 08/21/2020) |
| 08/21/2020 | 🔵 890 (16 pgs) | Notice *of Periodic Report Regarding Value, Operations, and Profitability of Entities in Which the Debtor's Estate Holds a Substantial or Controlling Interest*. Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 🔵 891 (13 pgs) | Operating Report for Filing Period July 2020, $214,607 disbursed (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 🔵 893 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew Cavenaugh. This is to order a transcript of 8/21/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) Electronically forwarded to Access Transcripts on 8-21-2020. Estimated completion date: 8-22-2020. Modified on 8/21/2020 (MelissaMorgan). (Entered: 08/21/2020) |
| 08/21/2020 | 🔵 894 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Marty L. Brimmage, Jr.. This is to order a transcript of the August 21, 2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts ). (Brimmage, Marty) Copy request was electronically forwarded to Access Transcripts on 8-21-2020. Estimated completion date: 8-22-2020. Modified on 8/21/2020 (MelissaMorgan). (Entered: 08/21/2020) |

| | | |
|---|---|---|
| 08/21/2020 | ● 895<br>(16 pgs; 2 docs) | Proposed Order Submission After Hearing (Filed By Chesapeake Energy Corporation ).(Related document(s):520 Generic Motion, 700 Proposed Order, 867 Proposed Order) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | ● 896<br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Julie Harrison. This is to order a transcript of August 21, 2020 hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) Copy request was electronically forwarded to Access Transcripts on 8-21-2020. Estimated completion date: 8-22-2020. Modified on 8/21/2020 (MelissaMorgan). (Entered: 08/21/2020) |
| 08/21/2020 | ● 897<br>(3 pgs) | Courtroom Minutes. Time Hearing Held: 9:30 am. Appearances: SEE ATTACHED. (Related document (s):520 Generic Motion, 523 Generic Motion) Witness: Stephen Antinelli. Exhibits 869-2, 847-4, 847-5, 847-5, 847-6 were admitted. The exit financing motion at docket 523 was approved. The backstop motion at docket 520 was approved. The parties have agreed to language to add to the order and will be uploading a revised proposed order. (emiller) (Entered: 08/21/2020) |
| 08/21/2020 | ● 898<br>(3 pgs) | Order (I) Authorizing the Debtors to Incur and Pay the Fees, Indemnities, and Expenses Related to the Exit Facilities, and (II) Granting Related Relief (Related Doc # 523) Signed on 8/21/2020. (emiller) (Entered: 08/21/2020) |
| 08/21/2020 | ● 899<br>(8 pgs) | Order (I) Authorizing Entry into the Backstop Commitment Agreement, (II) Approving the Payment of Fees and Expenses Related Thereto, and (III) Granting Related Relief (Related Doc # 520) Signed on 8/21/2020. (emiller) (Entered: 08/21/2020) |
| 08/21/2020 | ● 900<br>(1 pg) | ●))) PDF with attached Audio File. Court Date & Time [ 8/21/2020 9:29:36 AM ]. File Size [ 100082 KB ]. Run Time [ 03:28:30 ]. (admin). (Entered: 08/21/2020) |

| | | |
|---|---|---|
| 08/21/2020 | 🔵 901<br>(102 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By Northern Michigan Exploration Company, L.L.C. ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 🔵 902<br>(71 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By Nomac Services, L.L.C. ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 🔵 903<br>(88 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By Midcon Compression, L.L.C. ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 🔵 904<br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by M. Quejada. This is to order a transcript of hearing held on August 21, 2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By MUFG Union Bank, N.A. ). (Quejada, Maegan) Copy Request forwarded to Access Transcripts, LLC on August 24, 2020. Estimated completion date: August 25, 2020. Modified on 8/24/2020 (ClaudiaGutierrez). (Entered: 08/21/2020) |
| 08/21/2020 | 🔵 905<br>(1371 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By MC Mineral Company, L.L.C. ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |

| | | |
|---|---|---|
| 08/21/2020 | 906 (210 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By MC Louisiana Minerals, L.L.C. ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 907 (115 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By GSF, L.L.C. ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 908 (79 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By Esquisto Resources II, LLC ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 909 (279 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By Empress Louisiana Properties, L,P. ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 910 (318 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By Empress, L.L.C. ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| | 911 (71 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured |

| | | |
|---|---|---|
| 08/21/2020 | | by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By EMLP, L.L.C. ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 🔵912 (81 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By Compass Manufacturing, L.L.C. ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 913 (203 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By CHK Utica, L.L.C. ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 🔵914 (40 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By CHK NGV Leasing Company, LLC ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 🔵915 (77 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By CHK Energy Holdings, Inc. ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| | 🔵916 (364 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G |

| | | |
|---|---|---|
| 08/21/2020 | | Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By Chesapeake-Clements Acquisition, L.L.C. ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 917 (73 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By Chesapeake VRT, L.L.C. ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 918 (1591 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By Chesapeake Royalty, L.L.C. ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 919 (3042 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By Chesapeake Plains, L.L.C. ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 920 (4076 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By Chesapeake Operating, L.L.C. ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 921 (39 pgs) | Statement of Financial Affairs for Non-Individual (Filed By Nomac Services, L.L.C. ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| 08/21/2020 | 922 | Schedule A/B: Property Non-Individual , Schedule |

| | | |
|---|---|---|
| 08/21/2020 | (72 pgs) | D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By Chesapeake NG Ventures Corporation ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 923 (48 pgs) | Statement of Financial Affairs for Non-Individual (Filed By Midcon Compression, L.L.C. ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| 08/21/2020 | 924 (106 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By Chesapeake Midstream Development, L.L.C. ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 925 (43 pgs) | Statement of Financial Affairs for Non-Individual (Filed By MC Mineral Company, L.L.C. ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| 08/21/2020 | 926 (3644 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By Chesapeake Louisiana, L.P. ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 927 (43 pgs) | Statement of Financial Affairs for Non-Individual (Filed By MC Louisiana Minerals, L.L.C. ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| | 928 (271 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By Chesapeake Land Development Company, L.L.C. ). (Cavenaugh, Matthew) (Entered: |

| 08/21/2020 | | 08/21/2020) |
|---|---|---|
| 08/21/2020 | 🔵929<br>(42 pgs) | Statement of Financial Affairs for Non-Individual (Filed By GSF, L.L.C. ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| 08/21/2020 | 🔵930<br>(44 pgs) | Statement of Financial Affairs for Non-Individual (Filed By Esquisto Resources II, LLC ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| 08/21/2020 | 🔵931<br>(42 pgs) | Statement of Financial Affairs for Non-Individual (Filed By Empress Louisiana Properties, L,P. ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| 08/21/2020 | 🔵932<br>(73 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By Brazos Valley Longhorn, L.L.C. ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 🔵933<br>(63 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By Brazos Valley Longhorn Finance Corp. ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 934<br>(91 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By Burleson Sand LLC ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 🔵935<br>(43 pgs) | Statement of Financial Affairs for Non-Individual (Filed By Empress, L.L.C. ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| | 🔵936 | Schedule A/B: Property Non-Individual , Schedule |

| | | |
|---|---|---|
| 08/21/2020 | (63 pgs) | D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By Burleson Water Resources, LLC ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 937 (39 pgs) | Statement of Financial Affairs for Non-Individual (Filed By EMLP, L.L.C. ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| 08/21/2020 | 938 (618 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By Chesapeake AEZ Exploration, L.L.C. ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 939 (56 pgs) | Statement of Financial Affairs for Non-Individual (Filed By Compass Manufacturing, L.L.C. ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| 08/21/2020 | 940 (4223 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By Chesapeake Appalachia, L.L.C. ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 941 (489 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By Chesapeake E&P Holding, L.L.C. ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 942 (44 pgs) | Statement of Financial Affairs for Non-Individual (Filed By CHK Utica, L.L.C. ). (Wertz, Jennifer) (Entered: 08/21/2020) |

| | | |
|---|---|---|
| 08/21/2020 | 943<br>(76 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By Chesapeake Energy Louisiana, LLC ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 944<br>(40 pgs) | Statement of Financial Affairs for Non-Individual (Filed By CHK NGV Leasing Company, LLC ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| 08/21/2020 | 945<br>(823 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By Chesapeake Energy Marketing, L.L.C. ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 946<br>(43 pgs) | Statement of Financial Affairs for Non-Individual (Filed By CHK Energy Holdings, Inc. ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| 08/21/2020 | 947<br>(891 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 948<br>(41 pgs) | Statement of Financial Affairs for Non-Individual (Filed By Chesapeake-Clements Acquisition, L.L.C. ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| 08/21/2020 | 949<br>(41 pgs) | Statement of Financial Affairs for Non-Individual (Filed By Chesapeake VRT, L.L.C. ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| 08/21/2020 | 950<br>(43 pgs) | Statement of Financial Affairs for Non-Individual (Filed By Chesapeake Royalty, L.L.C. ). (Wertz, Jennifer) (Entered: 08/21/2020) |

| | | |
|---|---|---|
| 08/21/2020 | 951 (63 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By Petromax E&P Burleson, LLC ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 952 (42 pgs) | Statement of Financial Affairs for Non-Individual (Filed By Chesapeake Plains, L.L.C. ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| 08/21/2020 | 953 (70 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By Sparks Drive SWD, Inc. ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 954 (67 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By WHE ACQCO., LLC ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 955 (1725 pgs) | Statement of Financial Affairs for Non-Individual (Filed By Chesapeake Operating, L.L.C. ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| 08/21/2020 | 956 (2916 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By WHR Eagle Ford LLC ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 957 (42 pgs) | Statement of Financial Affairs for Non-Individual (Filed By Chesapeake NG Ventures Corporation ). (Wertz, Jennifer) (Entered: 08/21/2020) |

| | | |
|---|---|---|
| 08/21/2020 | 958 (65 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By Wildhorse Resources II, LLC ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 959 (81 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By Wildhorse Resources Management Company, LLC ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 960 (42 pgs) | Statement of Financial Affairs for Non-Individual (Filed By Chesapeake Midstream Development, L.L.C. ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| 08/21/2020 | 961 (74 pgs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By Winter Moon Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/21/2020 | 962 (54 pgs) | Statement of Financial Affairs for Non-Individual (Filed By Chesapeake Louisiana, L.P. ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| 08/21/2020 | 963 (49 pgs) | Statement of Financial Affairs for Non-Individual (Filed By Chesapeake Land Development Company, L.L.C. ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| 08/21/2020 | 964 (68 pgs) | Statement of Financial Affairs for Non-Individual (Filed By Chesapeake Exploration, L.L.C. ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| | 965 (65 pgs) | Statement of Financial Affairs for Non-Individual (Filed By Chesapeake Energy Marketing, L.L.C. ). |

| 08/21/2020 | | (Wertz, Jennifer) (Entered: 08/21/2020) |
|---|---|---|
| 08/21/2020 | 🔵966<br>(44 pgs) | Statement of Financial Affairs for Non-Individual (Filed By Chesapeake Energy Louisiana, LLC ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| 08/21/2020 | 🔵967<br>(74 pgs) | Statement of Financial Affairs for Non-Individual (Filed By Chesapeake Energy Corporation ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| 08/21/2020 | 🔵968<br>(44 pgs) | Statement of Financial Affairs for Non-Individual (Filed By Chesapeake E&P Holding, L.L.C. ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| 08/21/2020 | 🔵969<br>(146 pgs) | Statement of Financial Affairs for Non-Individual (Filed By Chesapeake Appalachia, L.L.C. ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| 08/21/2020 | 🔵970<br>(41 pgs) | Statement of Financial Affairs for Non-Individual (Filed By Chesapeake AEZ Exploration, L.L.C. ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| 08/21/2020 | 🔵971<br>(42 pgs) | Statement of Financial Affairs for Non-Individual (Filed By Burleson Water Resources, LLC ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| 08/21/2020 | 🔵972<br>(57 pgs) | Statement of Financial Affairs for Non-Individual (Filed By Burleson Sand LLC ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| 08/21/2020 | 🔵973<br>(40 pgs) | Statement of Financial Affairs for Non-Individual (Filed By Brazos Valley Longhorn Finance Corp. ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| 08/21/2020 | 🔵974<br>(48 pgs) | Statement of Financial Affairs for Non-Individual (Filed By Brazos Valley Longhorn, L.L.C. ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| 08/21/2020 | 🔵975<br>(41 pgs) | Statement of Financial Affairs for Non-Individual (Filed By Winter Moon Energy Corporation ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| 08/21/2020 | 🔵976<br>(49 pgs) | Statement of Financial Affairs for Non-Individual (Filed By Wildhorse Resources Management Company, LLC ). (Wertz, Jennifer) (Entered: 08/21/2020) |

| 08/21/2020 | ● 977<br>(43 pgs) | Statement of Financial Affairs for Non-Individual (Filed By Wildhorse Resources II, LLC ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| 08/21/2020 | ● 978<br>(46 pgs) | Statement of Financial Affairs for Non-Individual (Filed By WHR Eagle Ford LLC ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| 08/21/2020 | ● 979<br>(42 pgs) | Statement of Financial Affairs for Non-Individual (Filed By WHE ACQCO., LLC ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| 08/21/2020 | ● 980<br>(40 pgs) | Statement of Financial Affairs for Non-Individual (Filed By Sparks Drive SWD, Inc. ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| 08/21/2020 | ● 981<br>(42 pgs) | Statement of Financial Affairs for Non-Individual (Filed By Petromax E&P Burleson, LLC ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| 08/21/2020 | ● 982<br>(41 pgs) | Statement of Financial Affairs for Non-Individual (Filed By Northern Michigan Exploration Company, L.L.C. ). (Wertz, Jennifer) (Entered: 08/21/2020) |
| 08/21/2020 | ● 983<br>(14565 pgs; 2 docs) | Schedule A/B: Property Non-Individual , Schedule D Non-Individual- Creditors Having Claims Secured by Property , Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Schedule G Non-Individual- Executory Contracts and Unexpired Leases , Schedule H Non-Individual- Codebtors (Filed By Chesapeake Exploration, L.L.C. ). (Attachments: # 1 Part II) (Cavenaugh, Matthew) (Entered: 08/21/2020) |
| 08/22/2020 | ● 984<br>(140 pgs) | Transcript RE: Motion Hearing held on 08/21/20 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 11/20/2020. (AccessTranscripts) (Entered: 08/22/2020) |
| | ● 985<br>(7 pgs) | BNC Certificate of Mailing. (Related document (s):859 Notice of Filing of Official Transcript (Form)) No. of Notices: 114. Notice Date |

| | | |
|---|---|---|
| 08/22/2020 | | 08/22/2020. (Admin.) (Entered: 08/22/2020) |
| 08/22/2020 | ● 986<br>(7 pgs) | BNC Certificate of Mailing. (Related document (s):861 Order on Motion to Appear pro hac vice) No. of Notices: 116. Notice Date 08/22/2020. (Admin.) (Entered: 08/22/2020) |
| 08/22/2020 | ● 987<br>(7 pgs) | BNC Certificate of Mailing. (Related document (s):862 Order on Motion to Appear pro hac vice) No. of Notices: 116. Notice Date 08/22/2020. (Admin.) (Entered: 08/22/2020) |
| 08/22/2020 | ● 988<br>(7 pgs) | BNC Certificate of Mailing. (Related document (s):863 Order on Motion to Appear pro hac vice) No. of Notices: 116. Notice Date 08/22/2020. (Admin.) (Entered: 08/22/2020) |
| 08/23/2020 | ● 989<br>(12 pgs) | BNC Certificate of Mailing. (Related document (s):874 Generic Order) No. of Notices: 116. Notice Date 08/23/2020. (Admin.) (Entered: 08/23/2020) |
| 08/23/2020 | ● 990<br>(9 pgs) | BNC Certificate of Mailing. (Related document (s):888 Order on Emergency Motion) No. of Notices: 116. Notice Date 08/23/2020. (Admin.) (Entered: 08/23/2020) |
| 08/23/2020 | ● 991<br>(8 pgs) | BNC Certificate of Mailing. (Related document (s):889 Order on Emergency Motion) No. of Notices: 116. Notice Date 08/23/2020. (Admin.) (Entered: 08/23/2020) |
| 08/23/2020 | ● 992<br>(9 pgs) | BNC Certificate of Mailing. (Related document (s):898 Generic Order) No. of Notices: 117. Notice Date 08/23/2020. (Admin.) (Entered: 08/23/2020) |
| 08/23/2020 | ● 993<br>(14 pgs) | BNC Certificate of Mailing. (Related document (s):899 Generic Order) No. of Notices: 117. Notice Date 08/23/2020. (Admin.) (Entered: 08/23/2020) |
| 08/24/2020 | ● 995<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by John Y Bonds III Filed by on behalf of City of Cleburne (Bonds, John) (Entered: 08/24/2020) |

BK CM/ECF LIVE - US Bankruptcy Court-Texas Southern    Page 155 of 579
Case 4:21-cv-01215   Document 8   Filed on 05/12/21 in TXSD   Page 155 of 1639

0155

| 08/24/2020 | 🔵 996 (3 pgs) | Letter from Shareholder David Knight (JeannieAndresen) (Entered: 08/24/2020) |
|---|---|---|
| 08/24/2020 | 🔵 997 (3 pgs) | Letter from Shareholder John Dough (JeannieAndresen) (Entered: 08/24/2020) |
| 08/24/2020 | 🔵 998 (1 pg) | Order Granting Motion To Appear pro hac vice - Donald F. Campbell, Jr. (Related Doc # 892) Signed on 8/24/2020. (emiller) (Entered: 08/24/2020) |
| 08/24/2020 | 🔵 999 (39 pgs) | Response *to Memorandum of Law in Support of ETC Texas Pipeline, Ltd.'s Objection to Debtors' Motion for Entry of an Order (I) Authorizing Rejection of Certain Executory Contracts Effective as of July 1, 2020 and (II) Granting Related Relief*. Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 08/24/2020) |
| 08/24/2020 | 🔵 1000 (1 pg) | Order Granting Motion To Appear pro hac vice - Gary E. English (Related Doc # 994) Signed on 8/24/2020. (emiller) (Entered: 08/24/2020) |
| 08/24/2020 | 🔵 1001 (27 pgs) | Response *to Debtors' Memorandum of Law In Support of Debtors' Motion for Entry of an Order (i) Authorizing Rejection of Certain Executory Contracts Effective as of July 1, 2020 and (ii) Granting Related Relief*. Filed by ETC Texas Pipeline Ltd. (Yetter, R) (Entered: 08/24/2020) |
| | 🔵 1002 (932 pgs; 27 docs) | Adversary case 20-03399. Nature of Suit: (91 (Declaratory judgment)) Complaint *Debtors Emergency Motion for Entry of an Order Enforcing the Automatic Stay Against Petty Business Enterprises, LP and Mary Elizabeth Sheldon Wier, in the Alternative, Granting Declaratory Relief* by Chesapeake Energy Corporation, Chesapeake Energy Corporation against Petty Business Enterprises, LP, Catherine Lilley Shelton, Diana Rose Sims Lewis, Elizabeth Sims Hufft, James Edward Shelton, Leighton Arthur Wier, Leonard H. Sims, III, Mary Elizabeth Sheldon Wier, Max Weir, Ronald Hargis Wier, Vicki Grace Gilbert. Fee Amount $350 (Attachments: # 1 Exhibit A # |

| | | |
|---|---|---|
| 08/24/2020 | | 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H # 9 Exhibit I # 10 Exhibit J # 11 Exhibit K # 12 Exhibit L # 13 Exhibit M # 14 Exhibit N # 15 Exhibit O # 16 Exhibit P # 17 Exhibit Q # 18 Exhibit R # 19 Exhibit S # 20 Exhibit T # 21 Exhibit U # 22 Exhibit V # 23 Exhibit W # 24 Exhibit X # 25 Proposed Order # 26 Cover Sheet) (Greco, Christopher) (Entered: 08/24/2020) |
| 08/24/2020 | ⬤ 1003<br><br>(3 pgs) | Declaration re: *Declaration of Disinterestedness of Vorys, Sater, Seymour and Pease LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/24/2020) |
| 08/25/2020 | ⬤ 1005<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Expedited (7 days)) by CNOOC Energy U.S.A. LLC/Edward L. Ripley. This is to order a transcript of 8/12/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By CNOOC Energy U.S.A. LLC ). (Ripley, Edward) Copy request was electronically forwarded to Access Transcripts on 8-26-2020. Estimated completion date: 8-27-2020. Modified on 8/26/2020 (MelissaMorgan). (Entered: 08/25/2020) |
| 08/25/2020 | ⬤ 1006<br><br>(4 pgs) | Proposed Order RE: *Order Denying DFW's Motion for Relief from Automatic Stay to Permit a Pending Appeal to Proceed* (Filed By Chesapeake Energy Corporation ).(Related document(s):407 Motion for Relief From Stay, 647 Response, 665 Objection, 694 Reply) (Cavenaugh, Matthew) (Entered: 08/25/2020) |
| 08/25/2020 | ⬤ 1007<br><br>(4 pgs) | Proposed Order RE: *Order Denying Eagle Ford Royalty Owner Plaintiffs' Motion for Relief from the Automatic Stay as to the Debtors Chesapeake Energy Corporation; Chesapeake Operations, L.L.C., f/k/a Chesapeake Operating, Inc.; Chesapeake Exploration, L.L.C. as Successor by Merger to Chesapeake Exploration, L.P.; and Chesapeake Energy* |

| | | |
|---|---|---|
| 08/25/2020 | | *Marketing, L.L.C., f/k/a Chesapeake Energy Marketing, Inc.* (Filed By Chesapeake Energy Corporation ).(Related document(s):424 Motion for Relief From Stay, 651 Objection, 666 Objection, 667 Notice, 708 Reply) (Cavenaugh, Matthew) (Entered: 08/25/2020) |
| 08/25/2020 | 🔵 1008<br><br>(20 pgs) | Notice *of Appellee's Designation of Additional Items to be Included in the Record on Appeal.* Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 08/25/2020) |
| 08/25/2020 | 🔵 1009<br><br>(23 pgs) | Affidavit Re: *Affidavit of Service of Marc Orfitelli* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):665 Objection, 666 Objection) (Garabato, Sid) (Entered: 08/25/2020) |
| 08/25/2020 | 🔵 1010<br><br>(21 pgs) | Affidavit Re: *Affidavit of Service of Geoff Zahm* (Filed By Epiq Corporate Restructuring LLC ). (Related document(s):672 Notice) (Garabato, Sid) (Entered: 08/25/2020) |
| 08/25/2020 | 🔵 1011<br><br>(35 pgs) | Reply *in Support of Motion for Entry of an Order (I) Authorizing Rejection of the Negotiated Rate Firm Transportation Agreements and Related Contracts Effective as of July 1, 2020 and (II) Granting Related Relief* (related document(s):35 Motion to Assume/Reject). Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 08/25/2020) |
| 08/25/2020 | 🔵 1012<br><br>(4 pgs) | Order Denying DFW's Motion For Relief From Automatic Stay to Permit a Pending Appeal to Proceed (Related Doc # 407) Signed on 8/25/2020. (emiller) (Entered: 08/26/2020) |
| 08/25/2020 | 🔵 1013<br><br>(4 pgs) | Order Denying Eagle Ford Royalty Owner Plaintiffs' Motion For Relief From The Automatic Stay (Related Doc # 424) Signed on 8/25/2020. (emiller) (Entered: 08/26/2020) |
| | 🔵 1014<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Julie Harrison. This is to order a transcript of August 25, 2020 hearing before |

| | | |
|---|---|---|
| 08/26/2020 | | Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) Electronically forwarded to Judicial Transcribers of Texas on August 27, 2020. Estimated completion date: August 28, 2020. Modified on 8/27/2020 (ClaudiaGutierrez). (Entered: 08/26/2020) |
| 08/26/2020 | 1015<br><br>(3 pgs) | Declaration re: *Declaration of Disinterestedness of Fuller Tubb Bickford Warmington & Panach, PLLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/26/2020) |
| 08/26/2020 | 1016<br><br>(54 pgs) | Debtors Master Service List (Filed By Epiq Corporate Restructuring LLC ). (Garabato, Sid) (Entered: 08/26/2020) |
| 08/26/2020 | 1017<br><br>(4 pgs) | Declaration re: *Declaration of Disinterestedness of Pillsbury Winthrop Shaw Pittman LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corpo²ation ). (Cavenaugh, Matthew) (Entered: 08/26/2020) |
| 08/26/2020 | 1018<br><br>(7 pgs; 2 docs) | Certificate of No Objection *with Respect to the Motion Authorizing the Rejection of Certain Sand Mine Contracts Effective as of July 31, 2020* (Filed By Chesapeake Energy Corporation ).(Related document(s):598 Generic Motion) (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 08/26/2020) |
| 08/26/2020 | 1019<br><br>(7 pgs) | BNC Certificate of Mailing. (Related document (s):998 Order on Motion to Appear pro hac vice) No. of Notices: 79. Notice Date 08/26/2020. (Admin.) (Entered: 08/26/2020) |
| 08/26/2020 | 1020<br><br>(7 pgs) | BNC Certificate of Mailing. (Related document (s):1000 Order on Motion to Appear pro hac vice) No. of Notices: 79. Notice Date |

| 08/26/2020 | | 08/26/2020. (Admin.) (Entered: 08/26/2020) |
|---|---|---|
| 08/26/2020 | 🔘 1028<br><br>(6 pgs) | Letter re: Proof of Claim from Beverly Huddleston. (rcas) (Entered: 08/27/2020) |
| 08/27/2020 | 🔘 1021<br><br>(1 pg) | Proposed Order RE: *(also filed as Exhibit to Doc. No. 557)* (Filed By Official Committee of Royalty Owners ).(Related document(s):557 Application to Employ) (Brown, pllc, Deirdre) (Entered: 08/27/2020) |
| 08/27/2020 | 🔘 1022<br><br>(67 pgs; 5 docs) | Witness List, Exhibit List (Filed By Official Committee of Royalty Owners ).(Related document(s):557 Application to Employ, 803 Notice) (Attachments: # 1 Exhibit 1 - Application to Employ Doc. no. 557 # 2 Exhibit 2 - Affidavit of Service # 3 Exhibit 3_Declaration # 4 Exhibit Notice of Hearing) (Brown, pllc, Deirdre) (Entered: 08/27/2020) |
| 08/27/2020 | 🔘 1023<br><br>(2 pgs) | Certificate of No Objection (Filed By Official Committee of Royalty Owners ).(Related document(s):557 Application to Employ) (Brown, pllc, Deirdre) (Entered: 08/27/2020) |
| 08/27/2020 | 🔘 1024<br><br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Lance H. Beshara Filed by on behalf of Stockyards Investment (Beshara, Lance) (Entered: 08/27/2020) |
| 08/27/2020 | 🔘 1025<br><br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Lance H. Beshara Filed by on behalf of Forward Fort Worth LTD a/k/a Forward Fort Worth River Project, Ltd or Forward Fort Worth Development, L.C.C. (Beshara, Lance) (Entered: 08/27/2020) |
| 08/27/2020 | 🔘 1026<br><br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Lance H. Beshara Filed by on behalf of TCB Farm & Ranchland (Beshara, Lance) (Entered: 08/27/2020) |
| | 🔘 1027<br><br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Lance H. Beshara Filed by on behalf of Keith Allen Kidwill (Beshara, Lance) (Entered: |

| 08/27/2020 | | 08/27/2020) |
|---|---|---|
| 08/27/2020 | 🔵 1029 (2 pgs) | Notice of Appearance and Request for Notice Filed by J Frasher Murphy Filed by on behalf of Enable Midstream Partners, LP (Murphy, J) (Entered: 08/27/2020) |
| 08/27/2020 | 🔵 1030 (3 pgs) | Declaration re: *Disinterestedness of Byrnes Keller Cromwell LLP* (Filed By Byrnes Keller Cromwell LLP ).(Related document(s):655 Generic Order) (Selig, Joshua) (Entered: 08/27/2020) |
| 08/27/2020 | 🔵 1031 (4 pgs) | Response (Filed By Federal Energy Regulatory Commission ).(Related document(s):870 Objection) (Kincheloe, Richard) (Entered: 08/27/2020) |
| 08/27/2020 | 🔵 1032 (32 pgs) | Response (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/27/2020) |
| 08/27/2020 | 🔵 1033 (27 pgs) | Reply */ETC Texas Pipeline Ltd. Reply In Support of Its Objection to the Motion of Debtors for Entry of an Order Authorizing Rejection of Certain Executory Contracts Effective as of July 1, 2020 and Granting Related Relief.* Filed by ETC Texas Pipeline Ltd. (Yetter, R) (Entered: 08/27/2020) |
| 08/27/2020 | 🔵 1034 (366 pgs; 4 docs) | Witness List, Exhibit List (Filed By Chesapeake Energy Corporation ). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3) (Cavenaugh, Matthew) (Entered: 08/27/2020) |
| 08/27/2020 | 🔵 1035 (173 pgs; 6 docs) | Witness List (Filed By ETC Texas Pipeline Ltd. ). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2a # 3 Exhibit 2b # 4 Exhibit 2c # 5 Exhibit 3) (Mitchell, John) (Entered: 08/27/2020) |
| 08/27/2020 | 🔵 1036 (94 pgs; 6 docs) | Witness List (Filed By ETC Texas Pipeline Ltd. ). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5) (Mitchell, John) (Entered: 08/27/2020) |
| | 🔵 1037 | Reply *to Debtors' Objection to ETC Tiger* |

| | | |
|---|---|---|
| 08/28/2020 | (49 pgs) | *Pipeline, LLC's Motion to Withdraw Reference of the Debtors' Motion for Entry of An Order (I) Authorizing Rejection of the Negotiated Rate Firm Transportation Agreements and Related Contracts Effective as of July 1, 2020 and (II) Granting Related Relief* (related document (s):490 Motion for Withdrawal of Reference). Filed by ETC Tiger Pipeline LLC (Mitchell, John) (Entered: 08/28/2020) |
| 08/28/2020 | 🌐 1038<br><br>(112 pgs; 5 docs) | Stipulation By Chesapeake Energy Corporation and ETC Texas Pipeline, Ltd.. Does this document include an agreed order or otherwise request that the judge sign a document? No. (Filed By Chesapeake Energy Corporation ). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 4 # 4 Exhibit 5) (Cavenaugh, Matthew) (Entered: 08/28/2020) |
| 08/28/2020 | 🌐 1039<br><br>(89 pgs) | Additional Attachments Re: *Exhibit 3* (related document(s):1038 Stipulation) (Filed By Chesapeake Energy Corporation ).(Related document(s):1038 Stipulation) (Cavenaugh, Matthew) (Entered: 08/28/2020) |
| 08/28/2020 | 🌐 1040<br><br>(3 pgs) | Notice *of Reconstituted Committee of Royalty Owners*. Filed by US Trustee (Duran, Hector) (Entered: 08/28/2020) |
| 08/28/2020 | 🌐 1041<br><br>(19 pgs) | Affidavit Re: *Affidavit of Service of Geoff Zahm* (Filed By Epiq Corporate Restructuring LLC ). (Related document(s):711 Reply) (Garabato, Sid) (Entered: 08/28/2020) |
| 08/28/2020 | 🌐 1042<br><br>(34 pgs) | Affidavit Re: *Affidavit of Service of Marc Orfitelli* (Filed By Epiq Corporate Restructuring LLC ). (Garabato, Sid) (Entered: 08/28/2020) |
| 08/28/2020 | 🌐 1043<br><br>(10 pgs) | BNC Certificate of Mailing. (Related document (s):1012 Order on Motion For Relief From Stay) No. of Notices: 80. Notice Date 08/28/2020. (Admin.) (Entered: 08/28/2020) |
| | 🌐 1044<br><br>(10 pgs) | BNC Certificate of Mailing. (Related document (s):1013 Order on Motion For Relief From Stay) No. of Notices: 80. Notice Date 08/28/2020. |

| 08/28/2020 | | (Admin.) (Entered: 08/28/2020) |
|---|---|---|
| 08/31/2020 | 1045<br><br>(6 pgs) | Agenda for Hearing on 8/31/2020 (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/31/2020) |
| 08/31/2020 | 1046<br><br>(8 pgs; 2 docs) | Proposed Order RE: *Order (I) Authorizing Rejection of Certain Executory Contracts Effective as of July 1, 2020 and (II) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):27 Emergency Motion) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 08/31/2020) |
| 08/31/2020 | 1047<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew D. Cavenaugh. This is to order a transcript of 08/31/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) Electronically forwarded to Access Transcripts on 8-31-2020. Estimated completion date: 9-1-2020. Modified on 8/31/2020 (MelissaMorgan). (Entered: 08/31/2020) |
| 08/31/2020 | 1048<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Marty L. Brimmage, Jr.. This is to order a transcript of the August 31, 2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts ). (Brimmage, Marty) Copy request was electronically forwarded to Access Transcripts on 8-31-2020. Estimated completion date: 9-1-2020. Modified on 8/31/2020 (MelissaMorgan). (Entered: 08/31/2020) |
| 08/31/2020 | 1049<br><br>(6 pgs) | Declaration re: *of Disinterestedness* (Filed By Beatty & Wozniak PC ). (Sparks, William) (Entered: 08/31/2020) |
| | 1050<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Jason Boland. This is to order a transcript of August 31, 2020 hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed |

| | | |
|---|---|---|
| 08/31/2020 | | By Official Committee Of Unsecured Creditors ). (Boland, Jason) Copy request was electronically forwarded to Access Transcripts on 8-31-2020. Estimated completion date: 9-1-2020. Modified on 8/31/2020 (MelissaMorgan). (Entered: 08/31/2020) |
| 08/31/2020 | 1051 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Bracewell LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Peguero, Kristhy) (Entered: 08/31/2020) |
| 08/31/2020 | 1052 (2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Anna Marie Hearn-Darst. This is to order a transcript of 8/31/2020, hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts. (mmap) Copy request was electronically forwarded to Access Transcripts on 8-31-2020. Estimated completion date: 9-1-2020. Modified on 8/31/2020 (MelissaMorgan). (Entered: 08/31/2020) |
| 08/31/2020 | 1053 (1 pg) | PDF with attached Audio File. Court Date & Time [ 8/31/2020 9:00:22 AM ]. File Size [ 72028 KB ]. Run Time [ 02:30:03 ]. (admin). (Entered: 08/31/2020) |
| 08/31/2020 | 1054 (4 pgs) | Order (I) Authorizing the Rejection of Certain Sand Mine Contracts Effective As of July 31, 2020 and (II) Granting Related Relief (Related Doc # 598) Signed on 8/31/2020. (aalo) (Entered: 08/31/2020) |
| 08/31/2020 | 1055 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Larry R. Veselka. This is to order a transcript of Hearing on 8/31/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Petty Business Enterprises, LP, Petty Energy L.P. and their related entities ). (Veselka, Larry) Copy request was electronically forwarded to Access Transcripts on 8-31-2020. Estimated |

| | | |
|---|---|---|
| 08/31/2020 | | completion date: 9-1-2020. Modified on 8/31/2020 (MelissaMorgan). (Entered: 08/31/2020) |
| 08/31/2020 | 🌐 1056 (4 pgs) | Courtroom Minutes. Time Hearing Held: 9:00 AM. Appearances: see attached. (Related document(s):27 Emergency Motion, 490 Motion for Withdrawal of Reference). The Court heard two contested matters todays and will issue a Report and Recommendation with respect to the Motion for Withdrawal of the Reference. Additionally, the Court will issue a written opinion with respect to the 27 Emergency Motion to Reject Certain Executory Contracts. (aalo) Additional attachment(s) added on 9/1/2020 (aalo). (Entered: 08/31/2020) |
| 08/31/2020 | 🌐 1057 (5 pgs) | Stipulation By Chesapeake Energy Corporation and Certain of its Subsidiaries and Affiliates. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/31/2020) |
| 08/31/2020 | 🌐 1058 (5 pgs) | Stipulation By Chesapeake Energy Corporation and CNOOC Energy U.S.A. LLC f/k/a OOGC America LLC. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 08/31/2020) |
| 09/01/2020 | 🌐 1059 (102 pgs) | Transcript RE: Emergency Motion to Reject Certain Executory Contracts; Motion for Withdrawal of Reference held on 08/31/2020 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 11/30/2020. (AccessTranscripts) (Entered: 09/01/2020) |
| 09/01/2020 | 🌐 1060 (2 pgs) | Notice of Appearance and Request for Notice Filed by Alison White Haynes Filed by on behalf of Howland Engineering and Surveying Co Inc (Haynes, Alison) (Entered: 09/01/2020) |

| 09/01/2020 | 🌐 1061<br><br>(3 pgs) | Declaration re: *Declaration of Disinterestedness of Gungoll, Jackson, Box & Devoll, P.C. Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 09/01/2020) |
| 09/01/2020 | 🌐 1062<br><br>(4 pgs) | Declaration re: *Declaration of Disinterestedness of KPMG LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 09/01/2020) |
| 09/01/2020 | 🌐 1063<br><br>(2 pgs) | AO 435 TRANSCRIPT ORDER FORM (14-Day) by Steven Vacek. This is to order a transcript of 8/31/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts. (BrendaLacy) Copy Request electronically forwarded to Access Transcripts, LLC on September 1, 2020. Estimated completion date: September 15, 2020. Modified on 9/1/2020 (ClaudiaGutierrez). (Entered: 09/01/2020) |
| 09/01/2020 | 🌐 1064<br><br>(8 pgs) | Notice *to Ad Hoc Group of Secured FLLO Term Loan Lenders of Rule 30(b)(6) Deposition*. Filed by Official Committee Of Unsecured Creditors (Harrison, Julie) (Entered: 09/01/2020) |
| 09/01/2020 | 🌐 1065<br><br>(9 pgs) | Notice *to Chesapeake Energy Corporation of Rule 30(b)(6) Deposition*. Filed by Official Committee Of Unsecured Creditors (Harrison, Julie) (Entered: 09/01/2020) |
| 09/01/2020 | 🌐 1066<br><br>(9 pgs) | Notice *to MUFG Union Bank, N.A. of Rule 30(b)(6) Deposition*. Filed by Official Committee Of Unsecured Creditors (Harrison, Julie) (Entered: 09/01/2020) |
| 09/01/2020 | 🌐 1067<br><br>(1 pg) | Motion to Appear pro hac vice *R. Joseph Naus of Wiener, Weiss & Madison, APC*. Filed by Creditor Parish of Caddo (Naus, R) (Entered: 09/01/2020) |

| | | |
|---|---|---|
| 09/01/2020 | 🌐 1068 <br><br> (1 pg) | Motion to Appear pro hac vice *for R. Joseph Naus of Wiener, Weiss & Madison, APC*. Filed by Creditor Industrial Development Board of the Parish of Caddo, Inc. (Naus, R) (Entered: 09/01/2020) |
| 09/01/2020 | 🌐 1069 <br><br> (9 pgs) | Notice *to Franklin Advisers, Inc. of Rule 30(b)(6) Deposition*. Filed by Official Committee Of Unsecured Creditors (Harrison, Julie) (Entered: 09/01/2020) |
| 09/01/2020 | 🌐 1070 <br><br> (9 pgs; 2 docs) | Motion to Extend Time *Within Which the Debtors May Remove Actions and Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 09/01/2020) |
| 09/02/2020 | 🌐 1071 <br><br> (1 pg) | Notice of Filing of Official Transcript as to 1059 Transcript. Parties notified (Related document (s):1059 Transcript) (jdav) (Entered: 09/02/2020) |
| 09/02/2020 | 🌐 1072 <br><br> (4 pgs) | Declaration re: *Declaration of Disinterestedness of Steidley & Neal, PLLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 09/02/2020) |
| 09/02/2020 | 🌐 1073 <br><br> (4 pgs) | Declaration re: *Declaration of Disinterestedness of AECOM Technical Services, Inc. Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 09/02/2020) |
| 09/02/2020 | 🌐 1074 <br><br> (3 pgs) | Declaration re: *Declaration of Disinterestedness of Preis PLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 09/02/2020) |

| | | |
|---|---|---|
| 09/02/2020 | 🌐 1075 <br><br> (3 pgs) | Notice of Appearance and Request for Notice Filed by Patrick Lawrence McCune Filed by on behalf of Industrial Development Board of the Parish of Caddo, Inc., Parish of Caddo (McCune, Patrick) (Entered: 09/02/2020) |
| 09/02/2020 | 🌐 1076 <br><br> (4 pgs) | Declaration re: *of Disinsterestedness of Floom Energy Law PLLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By John Paul Floom ). (mmap) (Entered: 09/02/2020) |
| 09/02/2020 | 🌐 1077 <br><br> (13 pgs; 4 docs) | Opposition Response/Objection Filed by Stephanie Delasandro. (Related document (s):1057 Stipulation) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3)(Mayer, Simon) (Entered: 09/02/2020) |
| 09/02/2020 | 🌐 1078 <br><br> (30 pgs) | Declaration re: *Supplemental Declaration of David MacGreevey of AlixPartners, LLP* (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):780 Application to Employ) (Boland, Jason) (Entered: 09/02/2020) |
| 09/02/2020 | 🌐 1079 <br><br> (4 pgs) | Declaration re: *Declaration of Disinterestedness of Kelly Hart & Hallman LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 09/02/2020) |
| 09/02/2020 | 🌐 1080 <br><br> (3 pgs) | Declaration re: *Declaration of Disinterestedness of Holland & Hart LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 09/02/2020) |
| 09/02/2020 | 🌐 1081 <br><br> (10 pgs) | BNC Certificate of Mailing. (Related document (s):1054 Generic Order) No. of Notices: 84. Notice Date 09/02/2020. (Admin.) (Entered: 09/02/2020) |

| | | |
|---|---|---|
| 09/03/2020 | 🔵 1082<br><br>(2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Anna Marie Hearn-Darst. This is to order a transcript of 8/18/2020 before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas. (mmap) Copy request was electronically forwarded to Judicial Transcribers of Texas on 9-3-2020. Estimated completion date: 9-4-2020. Modified on 9/3/2020 (MelissaMorgan). (Entered: 09/03/2020) |
| 09/03/2020 | 🔵 1083<br><br>(4 pgs) | Notice of Appearance and Request for Notice Filed by Lloyd A. Lim Filed by on behalf of Bank of America, N.A., in its capacity as trustee to the Lee Wiley Moncrief Trust (Lim, Lloyd) (Entered: 09/03/2020) |
| 09/03/2020 | 🔵 1084<br><br>(4 pgs) | Notice *of Transaction*. Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 09/03/2020) |
| 09/03/2020 | 🔵 1085<br><br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Christopher M Staine Filed by on behalf of Pelican Energy, LLC, Larchmont Resources, LLC, Jamestown Resources, LLC (Staine, Christopher) (Entered: 09/03/2020) |
| 09/03/2020 | 🔵 1086<br><br>(1 pg) | Motion to Appear pro hac vice *of William H. Hoch, III*. Filed by Creditors Jamestown Resources, LLC, Larchmont Resources, LLC, Pelican Energy, LLC (Staine, Christopher) (Entered: 09/03/2020) |
| 09/03/2020 | 🔵 1087<br><br>(1 pg) | Motion to Appear pro hac vice *of Tim J. Gallegly*. Filed by Creditors Jamestown Resources, LLC, Larchmont Resources, LLC, Pelican Energy, LLC (Staine, Christopher) (Entered: 09/03/2020) |
| 09/03/2020 | 🔵 1088<br><br>(1 pg) | Motion to Appear pro hac vice *of Margaret M. Sine*. Filed by Creditors Jamestown Resources, LLC, Larchmont Resources, LLC, Pelican Energy, LLC (Staine, Christopher) (Entered: 09/03/2020) |
| | 🔵 1089<br><br>(4 pgs) | Declaration re: *Declaration of Disinterestedness of Orrick, Herrington & Sutcliffe LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary* |

| | | |
|---|---|---|
| 09/03/2020 | | *Course of Business* (Filed By Chesapeake Energy Corporation ). (Peguero, Kristhy) (Entered: 09/03/2020) |
| 09/03/2020 | 1090 <br><br> (4 pgs) | Declaration re: *Declaration of Disinterestedness of Daily & Woods, PLLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Peguero, Kristhy) (Entered: 09/03/2020) |
| 09/03/2020 | 1091 <br><br> (5 pgs) | Stipulation and Order Signed on 9/3/2020 (Related document(s):1057 Stipulation) (aalo) (Entered: 09/03/2020) |
| 09/03/2020 | 1092 <br><br> (4 pgs) | Report and Recommendation Signed on 9/3/2020 (Related document(s):490 Motion for Withdrawal of Reference) (aalo) (Entered: 09/03/2020) |
| 09/03/2020 | 1093 <br><br> (3 pgs) | Declaration re: *of Disinterestedness of Gungoll, Jackson, Box & Devoll, P. C. Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Eric Money ). (mmap) (Entered: 09/03/2020) |
| 09/03/2020 | 1094 <br><br> (4 pgs) | Order Granting Application to Employ (Related Doc # 557) Signed on 9/3/2020. (aalo) (Entered: 09/03/2020) |
| 09/03/2020 | 1095 <br><br> (2 pgs) | Notice of Appearance and Request for Notice Filed by Jason Starks Filed by on behalf of Travis County (Starks, Jason) (Entered: 09/03/2020) |
| 09/03/2020 | 1096 <br><br> (3 pgs) | Affidavit Re: *Affidavit of Publication of The Billings Gazette* (Filed By Chesapeake Energy Corporation ).(Related document(s):787 Generic Order) (Peguero, Kristhy) (Entered: 09/03/2020) |
| 09/03/2020 | 1097 <br><br> (3 pgs) | Affidavit Re: *Affidavit of Publication of The Canton Repository* (Filed By Chesapeake Energy Corporation ).(Related document(s):787 Generic Order) (Peguero, Kristhy) (Entered: 09/03/2020) |
| | 1098 | Affidavit Re: *Affidavit of Publication of The New* |

| | | |
|---|---|---|
| 09/03/2020 | (3 pgs) | *York Times* (Filed By Chesapeake Energy Corporation ).(Related document(s):787 Generic Order) (Peguero, Kristhy) (Entered: 09/03/2020) |
| 09/03/2020 | 1099<br><br>(3 pgs) | Affidavit Re: *Affidavit of Publication of The Philadelphia Inquirer* (Filed By Chesapeake Energy Corporation ).(Related document(s):787 Generic Order) (Peguero, Kristhy) (Entered: 09/03/2020) |
| 09/03/2020 | 1100<br><br>(4 pgs) | Notice *of Additional Ordinary Course Professionals Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business.* (Related document(s):655 Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 09/03/2020) |
| 09/03/2020 | 1101<br><br>(9 pgs) | Notice *to Chesapeake Energy Corporation of Examination Under Fed. R. Bankr. P. 2004.* (Related document(s):1065 Notice) Filed by Official Committee Of Unsecured Creditors (Harrison, Julie) (Entered: 09/03/2020) |
| 09/03/2020 | 1102<br><br>(9 pgs) | Notice *to MUFG Union Bank, N.A. of Examination Under Fed. R. Bankr. P. 2004.* (Related document (s):1066 Notice) Filed by Official Committee Of Unsecured Creditors (Harrison, Julie) (Entered: 09/03/2020) |
| 09/03/2020 | 1103<br><br>(3 pgs) | Declaration re: *Declaration of Disinterestedness of Durbin Larimore & Bialick, P.C. Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ).(Related document(s):655 Generic Order) (Cavenaugh, Matthew) (Entered: 09/03/2020) |
| 09/03/2020 | 1104<br><br>(4 pgs) | Declaration re: *Declaration of Disinterestedness of Spencer Fane LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 09/03/2020) |

| | | |
|---|---|---|
| 09/04/2020 | 🌐 1105 <br><br> (12 pgs; 3 docs) | Certificate of No Objection *Regarding Application to Employ Brown Rudnick LLP as Counsel to the Official Committee of Unsecured Creditors.* (Filed By Official Committee Of Unsecured Creditors ). (Related document(s):725 Application to Employ) (Attachments: # 1 Proposed Order # 2 Redline) (Harrison, Julie) (Entered: 09/04/2020) |
| 09/04/2020 | 🌐 1106 <br><br> (6 pgs; 2 docs) | Certificate of No Objection *Regarding Application to Employ Norton Rose Fulbright US LLP as Co-Counsel to the Official Committee of Unsecured Creditors.* (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):727 Application to Employ) (Attachments: # 1 Proposed Order) (Harrison, Julie) (Entered: 09/04/2020) |
| 09/04/2020 | 🌐 1107 <br><br> (2 pgs) | Notice of Appearance and Request for Notice Filed by William Henry Daniel Filed by on behalf of Karnes Electric Cooperative Inc. (Daniel, William) (Entered: 09/04/2020) |
| 09/04/2020 | 🌐 1108 <br><br> (2 pgs) | Notice of Appearance and Request for Notice Filed by Christopher Lance Halgren Filed by on behalf of Karnes Electric Cooperative Inc. (Halgren, Christopher) (Entered: 09/04/2020) |
| 09/04/2020 | 🌐 1109 <br><br> (2 pgs) | Notice *of Continued Meeting of Creditors Pursuant to 11 U.S.C. §§ 341, 343 and Fed. R. Bankr. P. 2003(e).* Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 09/04/2020) |
| 09/04/2020 | 🌐 1110 <br><br> (2 pgs) | Motion to Appear pro hac vice *Callie Papoulas.* Filed by Interested Party Wyoming Department of Environmental Quality (hler) (Entered: 09/04/2020) |
| 09/04/2020 | 🌐 1111 <br><br> (54 pgs) | Statement / *First Monthly Fee Statement of Brown Rudnick LLP for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses as Co-Counsel for the Official Committee of Unsecured Creditors for the Period from July 13, 2020 through July 31, 2020* (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) (Entered: 09/04/2020) |
| | | |

| | | |
|---|---|---|
| 09/04/2020 | 🔵 1112<br><br>(7 pgs) | BNC Certificate of Mailing. (Related document (s):1071 Notice of Filing of Official Transcript (Form)) No. of Notices: 85. Notice Date 09/04/2020. (Admin.) (Entered: 09/04/2020) |
| 09/04/2020 | 🔵 1116<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - R. Joseph Naus (Related Doc # 1067) Signed on 9/4/2020. (emiller) (Entered: 09/07/2020) |
| 09/04/2020 | 🔵 1117<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - R. Joseph Naus (Related Doc # 1068) Signed on 9/4/2020. (emiller) (Entered: 09/07/2020) |
| 09/04/2020 | 🔵 1118<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - William H. Hoch, III (Related Doc # 1086) Signed on 9/4/2020. (emiller) (Entered: 09/07/2020) |
| 09/04/2020 | 🔵 1119<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Tim J. Gallegly (Related Doc # 1087) Signed on 9/4/2020. (emiller) (Entered: 09/07/2020) |
| 09/04/2020 | 🔵 1120<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Margaret M. Sine (Related Doc # 1088) Signed on 9/4/2020. (emiller) (Entered: 09/07/2020) |
| 09/05/2020 | 🔵 1113<br><br>(11 pgs) | BNC Certificate of Mailing. (Related document (s):1091 Generic Order) No. of Notices: 89. Notice Date 09/05/2020. (Admin.) (Entered: 09/05/2020) |
| 09/05/2020 | 🔵 1114<br><br>(10 pgs) | BNC Certificate of Mailing. (Related document (s):1092 Report and Recommendation) No. of Notices: 89. Notice Date 09/05/2020. (Admin.) (Entered: 09/05/2020) |
| 09/05/2020 | 🔵 1115<br><br>(10 pgs) | BNC Certificate of Mailing. (Related document (s):1094 Order on Application to Employ) No. of Notices: 89. Notice Date 09/05/2020. (Admin.) (Entered: 09/05/2020) |
| 09/07/2020 | 🔵 1121<br><br>(2 pgs) | Order Granting Motion To Appear pro hac vice - Callie Papoulas (Related Doc # 1110) Signed on 9/7/2020. (emiller) (Entered: 09/08/2020) |
| 09/08/2020 | 🔵 | Civil Action 4:20-cv-3125 Re: Motion to Withdraw Reference. Judge Keith P Ellison assigned. (ShoshanaArnow) (Entered: 09/08/2020) |

| | | |
|---|---|---|
| 09/08/2020 | 1122<br><br>(4 pgs) | Declaration re: *Declaration of Disinterestedness of Hughes Lawyers, LLC, Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 09/08/2020) |
| 09/08/2020 | 1123<br><br>(3 pgs) | Notice of Appearance and Request for Notice Filed by R Joseph Naus Filed by on behalf of Parish of Caddo (Naus, R) (Entered: 09/08/2020) |
| 09/08/2020 | 1124<br><br>(3 pgs) | Notice of Appearance and Request for Notice Filed by R Joseph Naus Filed by on behalf of Industrial Development Board of the Parish of Caddo, Inc. (Naus, R) (Entered: 09/08/2020) |
| 09/08/2020 | 1125<br><br>(3 pgs) | Affidavit Re: *Affidavit of Publication - Casper Star Tribune* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 09/08/2020) |
| 09/08/2020 | 1126<br><br>(5 pgs) | Affidavit Re: *Affidavit of Publication - Houston Chronicle* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 09/08/2020) |
| 09/08/2020 | 1127<br><br>(6 pgs) | Affidavit Re: *Affidavit of Publication - Oklahoman* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 09/08/2020) |
| 09/08/2020 | 1128<br><br>(24 pgs) | Notice *of Jackson Walker LLP's First Monthly Fee Statement for Compensation of Services and Reimbursement of Expenses as Co-Counsel and Conflicts Counsel to the Debtors for the Period from June 28, 2020 Through July 31, 2020.* (Related document(s):656 Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 09/08/2020) |
| 09/08/2020 | | Meeting of Creditors Held. Debtor appeared. Hearing concluded on 9/8/2020. (Duran, Hector) (Entered: 09/08/2020) |
| | 1129 | Notice of Change of Address (sgue) (Entered: |

| 09/08/2020 | (3 pgs) | 09/09/2020) |
|---|---|---|
| 09/09/2020 | 🔘 1130<br><br>(5 pgs) | Stipulation and Agreed Order by and Among Debtors and CNOOC Energy U.S.A. LLC Granting Relief From Automatic Stay Signed on 9/9/2020 (Related document(s):1058 Stipulation) (emiller) (Entered: 09/10/2020) |
| 09/09/2020 | 🔘 1144<br><br>(3 pgs) | Notice of Change of Address (BrendaLacy) (Entered: 09/11/2020) |
| 09/10/2020 | 🔘 1131<br><br>(4 pgs) | Order Authorizing the Employment and Retention of Brown Rudnick LLP as Co-Counsel for the Official Committee of Unsecured Creditors of Chesapeake Energy Corporation, et al. Nunc Pro Tunc to July 13, 2020 (Related Doc # 725) Signed on 9/10/2020. (emiller) (Entered: 09/10/2020) |
| 09/10/2020 | 🔘 1132<br><br>(4 pgs) | Order Granting Application of the Official Committee of Unsecured Creditors of Chesapeake Energy Corporation, et al for Entry of an Order Authorizing the Employment and Retention of Norton Rose Fulbright US LLP as Co-Counsel, Nunc Pro Tunc to July 13, 2020 (Related Doc # 727) Signed on 9/10/2020. (emiller) (Entered: 09/10/2020) |
| 09/10/2020 | 🔘 1133<br><br>(3 pgs) | Declaration re: *Second Supplemental Declaration of David MacGreevey of AlixPartners, LLP* (Filed By Official Committee Of Unsecured Creditors ). (Related document(s):780 Application to Employ, 1078 Declaration) (Harrison, Julie) (Entered: 09/10/2020) |
| 09/10/2020 | 🔘 1134<br><br>(54 pgs) | Debtors Master Service List (Filed By Epiq Corporate Restructuring LLC ). (Garabato, Sid) (Entered: 09/10/2020) |
| 09/10/2020 | 🔘 1135<br><br>(6 pgs) | Response (Filed By MUFG Union Bank, N.A. ). (Related document(s):1066 Notice) (Quejada, Maegan) (Entered: 09/10/2020) |
| | 🔘 1136<br><br>(15 pgs) | Notice / *Official Committee of Unsecured Creditors' Notice of Rule 2004 Requests and Subpoena Duces Tecum to JPMorgan Chase Bank,* |

| | | |
|---|---|---|
| 09/10/2020 | | *N.A..* Filed by Official Committee Of Unsecured Creditors (Harrison, Julie) (Entered: 09/10/2020) |
| 09/10/2020 | ⊙ 1137<br><br>(14 pgs; 3 docs) | Certificate of No Objection *Regarding Application for Entry of an Order Authorizing the Official Committee of Unsecured Creditors to Employ and Retain AlixPartners, LLP As Its Financial Advisor Nunc Pro Tunc to July 14, 2020* (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):780 Application to Employ) (Attachments: # 1 Redline # 2 Proposed Order) (Harrison, Julie) (Entered: 09/10/2020) |
| 09/10/2020 | ⊙ 1138<br><br>(7 pgs) | BNC Certificate of Mailing. (Related document(s):1116 Order on Motion to Appear pro hac vice) No. of Notices: 91. Notice Date 09/10/2020. (Admin.) (Entered: 09/10/2020) |
| 09/10/2020 | ⊙ 1139<br><br>(7 pgs) | BNC Certificate of Mailing. (Related document(s):1117 Order on Motion to Appear pro hac vice) No. of Notices: 91. Notice Date 09/10/2020. (Admin.) (Entered: 09/10/2020) |
| 09/10/2020 | ⊙ 1140<br><br>(7 pgs) | BNC Certificate of Mailing. (Related document(s):1118 Order on Motion to Appear pro hac vice) No. of Notices: 91. Notice Date 09/10/2020. (Admin.) (Entered: 09/10/2020) |
| 09/10/2020 | ⊙ 1141<br><br>(7 pgs) | BNC Certificate of Mailing. (Related document(s):1119 Order on Motion to Appear pro hac vice) No. of Notices: 91. Notice Date 09/10/2020. (Admin.) (Entered: 09/10/2020) |
| 09/10/2020 | ⊙ 1142<br><br>(7 pgs) | BNC Certificate of Mailing. (Related document(s):1120 Order on Motion to Appear pro hac vice) No. of Notices: 91. Notice Date 09/10/2020. (Admin.) (Entered: 09/10/2020) |
| 09/10/2020 | ⊙ 1143<br><br>(8 pgs) | BNC Certificate of Mailing. (Related document(s):1121 Order on Motion to Appear pro hac vice) No. of Notices: 91. Notice Date 09/10/2020. (Admin.) (Entered: 09/10/2020) |
| | ⊙ 1145<br><br>(4 pgs) | Notice of Appearance and Request for Notice Filed by John E Mitchell Filed by on behalf of ETC Katy Pipeline, Ltd., ETC Texas Pipeline Ltd., Energy |

| | | |
|---|---|---|
| 09/11/2020 | | Transfer Fuel, LP, Houston Pipe Line Company, LP, Oasis Pipeline L.P. (Mitchell, John) (Entered: 09/11/2020) |
| 09/11/2020 | 🔘 1146<br><br>(12 pgs; 3 docs) | Agreed Order and Certificate of Counsel (Filed By Chesapeake Energy Corporation ).(Related document(s):814 Generic Motion) (Attachments: # 1 Proposed Order # 2 Redline) (Cavenaugh, Matthew) (Entered: 09/11/2020) |
| 09/11/2020 | 🔘 1147<br><br>(66 pgs; 2 docs) | Motion *for Entry of (A) an Order (I) Approving the Bidding Procedures for the Sale of the Debtors' Mid-Con Assets, (II) Approving Bid Protections, (III) Scheduling Certain Dates with Respect Thereto, (IV) Approving the Form and Manner of Notice Thereof, and (V) Approving Contract Assumption and Assignment Procedures, and (B) an Order Authorizing the Debtors to Enter Into a Definitive Purchase Agreement* Filed by Debtor Chesapeake Energy Corporation Hearing scheduled for 10/6/2020 at 10:30 AM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 09/11/2020) |
| 09/11/2020 | 🔘 1148<br><br>(104 pgs; 2 docs) | Application to Employ PricewaterhouseCoopers LLP as Auditors and Tax Consulting Service Provider. Objections/Request for Hearing Due in 21 days. Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 09/11/2020) |
| 09/11/2020 | 🔘 1149<br><br>(207 pgs; 2 docs) | Motion *for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation Procedures with Respect to the Confirmation of the Debtors' Proposed Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Approving the Rights Offering Procedures and Related Materials, (V) Scheduling Certain Dates with Respect Thereto, and (VI) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation Hearing scheduled for 10/14/2020 at 11:00 AM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 09/11/2020) |

| | | |
|---|---|---|
| 09/11/2020 | 🌐1150<br><br>(60 pgs) | Chapter 11 Plan of Reorganization Filed by Chesapeake Energy Corporation. (Cavenaugh, Matthew) (Entered: 09/11/2020) |
| 09/11/2020 | 🌐1151<br><br>(104 pgs) | Disclosure Statement Filed by Chesapeake Energy Corporation. (Cavenaugh, Matthew) (Entered: 09/11/2020) |
| 09/12/2020 | 🌐1152<br><br>(11 pgs) | BNC Certificate of Mailing. (Related document (s):1130 Generic Order) No. of Notices: 90. Notice Date 09/12/2020. (Admin.) (Entered: 09/12/2020) |
| 09/12/2020 | 🌐1153<br><br>(10 pgs) | BNC Certificate of Mailing. (Related document (s):1131 Order on Application to Employ) No. of Notices: 90. Notice Date 09/12/2020. (Admin.) (Entered: 09/12/2020) |
| 09/12/2020 | 🌐1154<br><br>(10 pgs) | BNC Certificate of Mailing. (Related document (s):1132 Order on Application to Employ) No. of Notices: 90. Notice Date 09/12/2020. (Admin.) (Entered: 09/12/2020) |
| 09/14/2020 | 🌐1155<br><br>(2 pgs) | Letter from Shareholder Mary Margaret Nilan (JeannieAndresen) (Entered: 09/14/2020) |
| 09/14/2020 | 🌐1156<br><br>(11 pgs) | Stipulation By Chesapeake Energy Corporation and Maricela H. Lombrana, Individually and as a Representative of the Estate of Guadalupe Lombrana, Genesis Lombrana and Maricela Lombrana. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 09/14/2020) |
| 09/14/2020 | 🌐1157<br><br>(4 pgs) | Affidavit Re: *Affidavit of Publication - The Advocate* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 09/14/2020) |
| | 🌐1158<br><br>(31 pgs) | Affidavit Re: *Affidavit of Service of Marc Orfitelli* (Filed By Epiq Corporate Restructuring LLC ). (Related document(s):800 Declaration, 801 Declaration, 805 Declaration, 807 Notice, 813 Reply, 814 Generic Motion, 815 Declaration) |

| 09/14/2020 | | (Garabato, Sid) (Entered: 09/14/2020) |
|---|---|---|
| 09/14/2020 | ● 1159<br><br>(17 pgs) | Affidavit Re: *Affidavit of Gregory Winter* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):869 Exhibit List, Witness List, 870 Objection) (Garabato, Sid) (Entered: 09/14/2020) |
| 09/14/2020 | ● 1160<br><br>(19 pgs) | Affidavit Re: *Affidavit of Service of Gregory Winter* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):999 Response, 1003 Declaration) (Garabato, Sid) (Entered: 09/14/2020) |
| 09/14/2020 | ● 1161<br><br>(4 pgs) | Declaration re: *Declaration of Disinterestedness of Bradford & Wilson PLLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 09/14/2020) |
| 09/14/2020 | ● 1162<br><br>(4 pgs) | Notice *of Additional Ordinary Course Professionals Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business*. (Related document(s):655 Generic Order, 805 Declaration, 1100 Notice) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 09/14/2020) |
| 09/14/2020 | ● 1163<br><br>(5 pgs) | Notice *of Filing Monthly Report Pursuant to the Order to Approve Procedures for De Minimis Asset Transactions*. (Related document(s):715 Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 09/14/2020) |
| 09/15/2020 | ● 1164<br><br>(3 pgs) | Notice of Appearance and Request for Notice Filed by David Richard Taggart Filed by on behalf of J. Fleet Oil & Gas Production Company, L.L.C., Martin Producing, L.L.C. (Taggart, David) (Entered: 09/15/2020) |
| 09/15/2020 | ● 1165<br><br>(3 pgs) | Notice of Appearance and Request for Notice Filed by William H Hoch Filed by on behalf of Jamestown Resources, LLC, Larchmont Resources, LLC, Pelican Energy, LLC (Hoch, William) (Entered: 09/15/2020) |

| | | |
|---|---|---|
| 09/15/2020 | ⦾ 1166<br><br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Tim J Gallegly Filed by on behalf of Jamestown Resources, LLC, Larchmont Resources, LLC, Pelican Energy, LLC (Gallegly, Tim) (Entered: 09/15/2020) |
| 09/15/2020 | ⦾ 1167<br><br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Margaret M Sine Filed by on behalf of Jamestown Resources, LLC, Larchmont Resources, LLC, Pelican Energy, LLC (Sine, Margaret) (Entered: 09/15/2020) |
| 09/15/2020 | ⦾ 1168<br><br>(4 pgs) | Declaration re: *Declaration of Disinterestedness of Stout Risius Ross LLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ).(Related document(s):655 Generic Order) (Peguero, Kristhy) (Entered: 09/15/2020) |
| 09/16/2020 | ⦾ 1169<br><br>(4 pgs) | Notice *of Disclosure Statement Hearing*. (Related document(s):1149 Generic Motion, 1151 Disclosure Statement) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 09/16/2020) |
| 09/16/2020 | ⦾ 1170<br><br>(4 pgs) | Declaration re: *Declaration of Disinterestedness of Davis Graham & Stubbs LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 09/16/2020) |
| 09/16/2020 | ⦾ 1171<br><br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Clay Marshall Taylor Filed by on behalf of Marathon Oil Company (Taylor, Clay) (Entered: 09/16/2020) |
| 09/16/2020 | ⦾ 1172<br><br>(18 pgs) | Affidavit Re: *Affidavit of Service of Marc Orfitelli* (Filed By Epiq Corporate Restructuring LLC ). (Garabato, Sid) (Entered: 09/16/2020) |
| | ⦾ 1173<br><br>(18 pgs) | Affidavit Re: *Affidavit of Service of Geoff Zahm* (Filed By Epiq Corporate Restructuring LLC ). (Related document(s):780 Application to Employ) |

| | | |
|---|---|---|
| 09/16/2020 | | (Garabato, Sid) (Entered: 09/16/2020) |
| 09/17/2020 | 🔘 1174<br><br>(17 pgs) | Affidavit Re: *Affidavit of Service of Geoff Zahm* (Filed By Epiq Corporate Restructuring LLC ). (Related document(s):1011 Reply) (Garabato, Sid) (Entered: 09/17/2020) |
| 09/17/2020 | 🔘 1175<br><br>(34 pgs; 5 docs) | Motion to Reconsider (related document(s):1091 Generic Order). Filed by Interested Party Stephanie Delasandro (Attachments: # 1 Exhibit Exhibit A # 2 Exhibit Exhibit B # 3 Exhibit Exhibit C # 4 Exhibit Exhibit D) (Warman, Lynnette) (Entered: 09/17/2020) |
| 09/17/2020 | 🔘 1176<br><br>(139 pgs; 2 docs) | Application to Employ Ernst & Young LLP as Restructuring, Accounting, Tax and Advisory Services Provider to the Debtors. Objections/Request for Hearing Due in 21 days. Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 09/17/2020) |
| 09/17/2020 | 🔘 1177<br><br>(5783 pgs) | Affidavit Re: *Affidavit of Service of Marc Orfitelli* (Filed By Epiq Corporate Restructuring LLC ). (Garabato, Sid) (Entered: 09/17/2020) |
| 09/17/2020 | 🔘 1178<br><br>(19 pgs) | Affidavit Re: *Affidavit of Service of Gregory Winter* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1002 Complaint) (Garabato, Sid) (Entered: 09/17/2020) |
| 09/17/2020 | 🔘 1179<br><br>(21 pgs) | Affidavit Re: *Affidavit of Service of Geoff Zahm* (Filed By Epiq Corporate Restructuring LLC ). (Related document(s):1015 Declaration) (Garabato, Sid) (Entered: 09/17/2020) |
| 09/17/2020 | 🔘 1180<br><br>(21 pgs) | Affidavit Re: *Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1051 Declaration) (Garabato, Sid) (Entered: 09/17/2020) |
| 09/18/2020 | 🔘 1181<br><br>(1 pg) | Motion to Appear pro hac vice *for Martha B. Chovanes, Esquire*. Filed by Creditor AuditBoard, Inc. (Monsour, Trey) (Entered: 09/18/2020) |
| | 🔘 1182 | Motion to Appear pro hac vice *for George Robert* |

| | | |
|---|---|---|
| 09/18/2020 | (1 pg) | *Parrott II.* Filed by Creditor CGG Services (U.S.), Inc. f/k/a Digicon Geophysical Corp. (Parrott, George) (Entered: 09/18/2020) |
| 09/18/2020 | 1183<br><br>(23 pgs; 2 docs) | Motion *for Entry of an Order (I) Authorizing the Rejection of Certain Tower Leases Effective as of September 18, 2020 and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 09/18/2020) |
| 09/18/2020 | 1187<br><br>(4 pgs) | Order (I) Authorizing the Rejection of Certain Executory Contracts and Unexpired Leases Effective as of August 17, 2020 and (II) Granting Related Relief (Related Doc # 814) Signed on 9/18/2020. (VrianaPortillo) (Entered: 09/21/2020) |
| 09/20/2020 | 1184<br><br>(2 pgs) | Notice - *Joinder to Notices filed by UCC.* (Related document(s):1069 Notice, 1136 Notice) Filed by Official Committee of Royalty Owners (Brown, pllc, Deirdre) (Entered: 09/20/2020) |
| 09/21/2020 | 1185<br><br>(13 pgs) | Operating Report for Filing Period August 2020, $330,156 disbursed (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 09/21/2020) |
| 09/21/2020 | 1186<br><br>(6 pgs) | Order Authorizing the Official Committee of Unsecured Creditors to Employ and Retain Alixpartners, LLP as its Financial Advisors Nunc Pro Tunc to July 14, 2020 Signed on 9/21/2020 (Related document(s):780 Application to Employ, 1137 Certificate of No Objection) (VrianaPortillo) (Entered: 09/21/2020) |
| | 1188<br><br>(2 pgs) | Order Granting Emergency Motion of the Official Committee of Unsecured Creditors to File Under Seal Objection to (A) Debtors' Motion for Entry of an Order (I) Authorizing Entry into the Backstop Commitment Agreement, (II) Authorizing the Payment of Fees and Expenses Related Thereto, and (III) Granting Related Relief (B) Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Incur and Pay the Fees, Indemnities, and Expenses Related to the Exit Facilities and (II) Granting Related Relief (Related Doc # 834) Signed on 9/21/2020. (VrianaPortillo) (Entered: |

| 09/21/2020 | | 09/21/2020) |
|---|---|---|
| 09/21/2020 | 🔵 1189<br><br>(28 pgs) | Affidavit Re: *Affidavit of Service of Gregory Winter* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1061 Declaration, 1062 Declaration, 1070 Motion to Extend Time) (Garabato, Sid) (Entered: 09/21/2020) |
| 09/21/2020 | 🔵 1190<br><br>(20 pgs) | Affidavit Re: *Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1072 Declaration, 1073 Declaration, 1074 Declaration) (Garabato, Sid) (Entered: 09/21/2020) |
| 09/21/2020 | 🔵 1191<br><br>(21 pgs) | Affidavit Re: *Affidavit of Service of Geoff Zahm* (Filed By Epiq Corporate Restructuring LLC ). (Related document(s):1084 Notice, 1089 Declaration, 1090 Declaration, 1100 Notice, 1103 Declaration) (Garabato, Sid) (Entered: 09/21/2020) |
| 09/21/2020 | 🔵 1206<br><br>(2 pgs) | Letter from Gaynell Spigner Re: TFU Stolen (ShoshanaArnow) (Entered: 09/24/2020) |
| 09/22/2020 | 🔵 1192<br><br>(5 pgs) | Statement *Verified Statement of Frances A. Smith and Supplemental Disclosures of Ross & Smith, PC Pursuant to Federal Rule of Bankruptcy Procedure 2019* (Filed By Petty Business Enterprises, LP, Petty Energy L.P. and their related entities ). (Related document(s):701 Statement) (Smith, Frances) (Entered: 09/22/2020) |
| 09/22/2020 | 🔵 1193<br><br>(3 pgs) | Certificate of No Objection *Regarding First Monthly Fee Statement of Brown Rudnick LLP for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses as Co-Counsel for the Official Committee of Unsecured Creditors for the Period from July 13, 2020 through July 31, 2020* (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):1111 Statement) (Harrison, Julie) (Entered: 09/22/2020) |
| 09/22/2020 | 🔵 1194<br><br>(3 pgs) | Notice of Appearance and Request for Notice Filed by John James Sparacino Filed by on behalf of Cabot Oil & Gas Corp. (Sparacino, John) (Entered: 09/22/2020) |

| | | |
|---|---|---|
| 09/22/2020 | 🔵 1195<br><br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Henry Flores Filed by on behalf of Eric Petroleum Utica, LLC, Eric Petroleum Corporation (Flores, Henry) (Entered: 09/22/2020) |
| 09/22/2020 | 🔵 1196<br><br>(1 pg) | Record Transmitted under Rule 8010(b). On 9/22/2020, the appeal was transmitted to the U.S. District Court, assigned Judge Keith P Ellison, Civil Action 4:20-cv-2725. All appellate filings must now be made in the United States District Court with the civil action caption and case number. (Related document(s):609 Notice of Appeal). (ShoshanaArnow) (Entered: 09/22/2020) |
| 09/22/2020 | 🔵 1197<br><br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Lynn Hamilton Butler Filed by on behalf of Commonwealth of Pennsylvania (Butler, Lynn) (Entered: 09/22/2020) |
| 09/23/2020 | 🔵 1198<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Martha B. Chovanes (Related Doc # 1181) Signed on 9/23/2020. (emiller) (Entered: 09/23/2020) |
| 09/23/2020 | 🔵 1199<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - George Robert Parrott II (Related Doc # 1182) Signed on 9/23/2020. (emiller) (Entered: 09/23/2020) |
| 09/23/2020 | 🔵 1200<br><br>(35 pgs; 3 docs) | Motion for Relief from Stay *Regarding Oil and Gas Proceeds*. Fee Amount $181. Filed by Creditors Rodney Hudson, Allen Johnson Hearing scheduled for 10/22/2020 at 09:00 AM at telephone and video conference. (Attachments: # 1 Exhibit A # 2 Proposed Order) (Eisenberg, Philip) (Entered: 09/23/2020) |
| 09/23/2020 | | Receipt of Motion for Relief From Stay(20-33233) [motion,mrlfsty] ( 181.00) Filing Fee. Receipt number 22453251. Fee amount $ 181.00. (U.S. Treasury) (Entered: 09/23/2020) |
| 09/23/2020 | 🔵 1201<br><br>(20 pgs; 3 docs) | Motion for Adequate Protection. Objections/Request for Hearing Due in 21 days. Filed by Creditors Rodney Hudson, Allen Johnson Hearing scheduled for 10/22/2020 at 09:00 AM at telephone and video conference. (Attachments: # 1 |

| | | |
|---|---|---|
| 09/23/2020 | | Exhibit A # 2 Proposed Order) (Eisenberg, Philip) (Entered: 09/23/2020) |
| 09/23/2020 | 1202<br><br>(64 pgs; 3 docs) | Certificate *of Service* (Filed By Rodney Hudson, Allen Johnson ).(Related document(s):1200 Motion for Relief From Stay, 1201 Motion for Adequate Protection) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2) (Eisenberg, Philip) (Entered: 09/23/2020) |
| 09/23/2020 | 1203<br><br>(12 pgs) | BNC Certificate of Mailing. (Related document (s):1186 Generic Order) No. of Notices: 130. Notice Date 09/23/2020. (Admin.) (Entered: 09/23/2020) |
| 09/23/2020 | 1204<br><br>(10 pgs) | BNC Certificate of Mailing. (Related document (s):1187 Generic Order) No. of Notices: 130. Notice Date 09/23/2020. (Admin.) (Entered: 09/23/2020) |
| 09/23/2020 | 1205<br><br>(8 pgs) | BNC Certificate of Mailing. (Related document (s):1188 Order on Emergency Motion) No. of Notices: 130. Notice Date 09/23/2020. (Admin.) (Entered: 09/23/2020) |
| 09/24/2020 | 1207<br><br>(9 pgs; 3 docs) | Agreed Order and Certificate of Counsel (Filed By Chesapeake Energy Corporation ).(Related document(s):1070 Motion to Extend Time) (Attachments: # 1 Proposed Order # 2 Redline) (Cavenaugh, Matthew) (Entered: 09/24/2020) |
| 09/24/2020 | 1208<br><br>(252 pgs) | Affidavit Re: *Affidavit of Service of Marc Orfitelli* (Filed By Epiq Corporate Restructuring LLC ). (Garabato, Sid) (Entered: 09/24/2020) |
| 09/24/2020 | 1209<br><br>(7 pgs) | Affidavit Re: *Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1109 Notice) (Garabato, Sid) (Entered: 09/24/2020) |
| 09/24/2020 | 1210<br><br>(21 pgs) | Affidavit Re: *Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1122 Declaration) (Garabato, Sid) (Entered: 09/24/2020) |
| | 1211 | Affidavit Re: *Affidavit of Service of Gregory Winter* (Filed By Epiq Corporate Restructuring |

| | | |
|---|---|---|
| 09/24/2020 | (26 pgs) | LLC ).(Related document(s):1161 Declaration, 1162 Notice, 1163 Notice) (Garabato, Sid) (Entered: 09/24/2020) |
| 09/24/2020 | 1212<br>(4 pgs) | Affidavit Re: *Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1168 Declaration) (Garabato, Sid) (Entered: 09/24/2020) |
| 09/24/2020 | 1213<br>(77 pgs) | Statement / *Second Monthly Fee Statement of Brown Rudnick LLP for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses as Co-Counsel for the Official Committee of Unsecured Creditors for the Period from August 1, 2020 through August 31, 2020* (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) (Entered: 09/24/2020) |
| 09/25/2020 | 1214<br>(1 pg) | Motion to Appear pro hac vice - *Joshua E. O'Farrell*. Filed by Interested Parties Eric Petroleum Corporation, Eric Petroleum Utica, LLC (Flores, Henry) (Entered: 09/25/2020) |
| 09/25/2020 | 1215<br>(1 pg) | Motion to Appear pro hac vice - *Jude B. Streb*. Filed by Interested Parties Eric Petroleum Corporation, Eric Petroleum Utica, LLC (Flores, Henry) (Entered: 09/25/2020) |
| 09/25/2020 | 1216<br>(1 pg) | Motion to Appear pro hac vice - *Patrick J. Keating*. Filed by Interested Parties Eric Petroleum Corporation, Eric Petroleum Utica, LLC (Flores, Henry) (Entered: 09/25/2020) |
| 09/25/2020 | 1217<br>(6 pgs) | Affidavit Re: *Supplemental Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1084 Notice) (Garabato, Sid) (Entered: 09/25/2020) |
| 09/25/2020 | 1218<br>(1 pg) | Letter from Shareholder Mallinath Suralikal (JeannieAndresen) (Entered: 09/25/2020) |
| 09/25/2020 | 1219<br>(27 pgs) | Affidavit Re: *Affidavit of Service of Gregory Winter* (Filed By Epiq Corporate Restructuring LLC ). (Garabato, Sid) (Entered: 09/25/2020) |

| | | |
|---|---|---|
| 09/25/2020 | 🌑 1220<br><br>(2 pgs) | Withdrawal of Claim: *10031 filed by Epiq Corporate Restructuring, LLC on behalf of Quick Pump Service LLC* (Garabato, Sid) (Entered: 09/25/2020) |
| 09/25/2020 | 🌑 1221<br><br>(2 pgs) | Withdrawal of Claim: *10108 & 10109 filed by Epiq Corporate Restructuring, LLC on behalf of Heatro Pipeline Services LLC* (Garabato, Sid) (Entered: 09/25/2020) |
| 09/25/2020 | 🌑 1222<br><br>(1 pg) | E-Mail to the Courts from Gaynell Spigner (mmap) (Entered: 09/25/2020) |
| 09/25/2020 | 🌑 1223<br><br>(4 pgs) | Affidavit Re: *Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1170 Declaration) (Garabato, Sid) (Entered: 09/25/2020) |
| 09/25/2020 | 🌑 1224<br><br>(146 pgs; 3 docs) | Adversary case 20-03425. Nature of Suit: (91 (Declaratory judgment)) Notice of Removal Kelly Vesper, Kelly Vesper as Trustee of the Kelly Vesper Heritage Trust, Kelly Vesper as Executrix of the Estate of John B. Vesper, Deceased, Kelly Vesper as Executrix of Estate of Leslie T. Vesper, Deceased. Fee Amount $350 (Attachments: # 1 Exhibit A - Dimmit County District Court File # 2 Adversary Proceeding Cover Sheet) (Luttrell, Leslie) (Entered: 09/25/2020) |
| 09/25/2020 | 🌑 1225<br><br>(187 pgs) | Notice *of First Monthly Fee Statement of Alvarez & Marsal North America, LLC for Compensation for Services and Reimbursement of Expenses as Restructuring and Financial Advisors to the Debtors and Debtors In Possession for the Period from June 28, 2020 Through July 31, 2020.* Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 09/25/2020) |
| 09/25/2020 | 🌑 1226<br><br>(56 pgs) | Debtors Master Service List (Filed By Epiq Corporate Restructuring LLC ). (Garabato, Sid) (Entered: 09/25/2020) |
| 09/25/2020 | 🌑 1227<br><br>(14 pgs; 2 docs) | Motion *Debtors' Motion to Extend the Exclusivity Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* Filed by Debtor Chesapeake |

| | | |
|---|---|---|
| 09/25/2020 | | Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 09/25/2020) |
| 09/25/2020 | 1228 <br><br> (14 pgs; 2 docs) | Motion *Debtors' Motion for Entry of an Order (I) Extending the Time Within Which the Debtors Must Assume or Reject Unexpired Leases of Nonresidential Real Property and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 09/25/2020) |
| 09/25/2020 | 1229 <br><br> (7 pgs) | BNC Certificate of Mailing. (Related document(s):1198 Order on Motion to Appear pro hac vice) No. of Notices: 130. Notice Date 09/25/2020. (Admin.) (Entered: 09/25/2020) |
| 09/25/2020 | 1230 <br><br> (7 pgs) | BNC Certificate of Mailing. (Related document(s):1199 Order on Motion to Appear pro hac vice) No. of Notices: 130. Notice Date 09/25/2020. (Admin.) (Entered: 09/25/2020) |
| 09/25/2020 | 1231 <br><br> (3 pgs) | Order (I) Extending the Time Within Which the Debtors May Remove Actions and (II) Granting Related Relief (Related Doc # 1070) Signed on 9/25/2020. (emiller) (Entered: 09/27/2020) |
| 09/28/2020 | 1232 <br><br> (2 pgs) | Creditor Request for Notices (Filed By Mansfield Oil Company of Gainesville Inc ). (Nasuti, Albert) (Entered: 09/28/2020) |
| 09/28/2020 | 1233 <br><br> (1 pg) | E-Mail to Honorable Trustees (mmap) (Entered: 09/28/2020) |
| 09/28/2020 | 1234 <br><br> (244 pgs) | Notice *of Fee Statement of Kirkland & Ellis LLP and Kirkland & Ellis International LLP for Compensation for Services and Reimbursement of Expenses as Attorneys to the Debtors and Debtors In Possession for the Period from June 28, 2020 through July 31, 2020.* Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 09/28/2020) |
| | 1235 | Motion for Relief from Stay . Fee Amount $181. Filed by Creditor Saundra Nelson Hearing |

| | | |
|---|---|---|
| 09/28/2020 | (69 pgs; 3 docs) | scheduled for 10/22/2020 at 02:00 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Exhibit in globo # 2 Proposed Order) (Hearne, William) (Entered: 09/28/2020) |
| 09/28/2020 | | Receipt of Motion for Relief From Stay(20-33233) [motion,mrlfsty] ( 181.00) Filing Fee. Receipt number 22464510. Fee amount $ 181.00. (U.S. Treasury) (Entered: 09/28/2020) |
| 09/28/2020 | 🔵 1236<br><br>(18 pgs; 3 docs) | Motion for Adequate Protection. Objections/Request for Hearing Due in 21 days. Filed by Creditor Saundra Nelson Hearing scheduled for 10/22/2020 at 02:00 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Exhibit A # 2 Proposed Order) (Hearne, William) (Entered: 09/28/2020) |
| 09/28/2020 | 🔵 1237<br><br>(31 pgs; 3 docs) | Emergency Motion *to Expedite Discovery* Filed by Creditors Rodney Hudson, Allen Johnson Hearing scheduled for 9/30/2020 at 10:00 AM at telephone conference. (Attachments: # 1 Exhibit A # 2 Proposed Order) (Knapp, Bradley) (Entered: 09/28/2020) |
| 09/28/2020 | 🔵 1238<br><br>(10 pgs; 2 docs) | Motion for Relief from Stay . Fee Amount $181. Filed by Creditor J. Fleet Oil & Gas Production Company, L.L.C. Hearing scheduled for 10/22/2020 at 02:00 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order) (Taggart, David) (Entered: 09/28/2020) |
| 09/28/2020 | | Receipt of Motion for Relief From Stay(20-33233) [motion,mrlfsty] ( 181.00) Filing Fee. Receipt number 22465156. Fee amount $ 181.00. (U.S. Treasury) (Entered: 09/28/2020) |
| 09/28/2020 | 🔵 1239<br><br>(19 pgs) | Affidavit Re: *Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1176 Application to Employ) (Garabato, Sid) (Entered: 09/28/2020) |
| 09/28/2020 | 🔵 1240<br><br>(19 pgs) | Affidavit Re: *Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1183 Generic Motion) (Garabato, Sid) (Entered: 09/28/2020) |

| | | |
|---|---|---|
| 09/28/2020 | 🔵 1241<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Joshua E. O'Farrell (Related Doc # 1214) Signed on 9/28/2020. (emiller) (Entered: 09/29/2020) |
| 09/28/2020 | 🔵 1242<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Jude B. Streb (Related Doc # 1215) Signed on 9/28/2020. (emiller) (Entered: 09/29/2020) |
| 09/28/2020 | 🔵 1243<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Patrick J. Keating (Related Doc # 1216) Signed on 9/28/2020. (emiller) (Entered: 09/29/2020) |
| 09/29/2020 | 🔵 1244<br><br>(1 pg) | Motion to Appear pro hac vice *for Sharon I. Dwoskin*. Filed by Creditor Committee Official Committee Of Unsecured Creditors (Boland, Jason) (Entered: 09/29/2020) |
| 09/29/2020 | 🔵 1245<br><br>(3 pgs) | Declaration re: *Declaration of Disinterestedness of Derrick & Briggs, LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 09/29/2020) |
| 09/30/2020 | 🔵 1246<br><br>(2 pgs) | Courtroom Minutes. Time Hearing Held: 10:00 AM. Appearances: see attached. (Related document(s): 1 Complaint). A combined hearing was held with adversary case 20-3399. With respect to the main case, the Court has set a hearing on a to be filed motion as well as the motion filed at 1237 for 10/7/2020 at 3:30 PM by telephone and video conference. (aalo)**Note: Audio of todays hearing can be found in Adversary Case No. 20-3399** (Entered: 09/30/2020) |
| 09/30/2020 | 🔵 1247<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew Cavenaugh. This is to order a transcript of 9/30/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) Electronically forwarded to Access Transcripts, LLC on September 30, 2020. Estimated completion date: October 1, 2020. Modified on 9/30/2020 (ClaudiaGutierrez). (Entered: 09/30/2020) |

| | | |
|---|---|---|
| 09/30/2020 | ● 1248 <br><br> (94 pgs; 5 docs) | First Motion for Relief from Stay . Fee Amount $181. Filed by Creditor John H. Bedsole Hearing scheduled for 10/28/2020 at 02:00 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Exhibit Petition filed by Bedsole # 2 Exhibit Answer filed by Chesapeake # 3 Exhibit Letter from Pesnell Law Firm to attorneys # 4 Exhibit Response from Attorneys) (Pesnell, John) (Entered: 09/30/2020) |
| 09/30/2020 | | Receipt of Motion for Relief From Stay(20-33233) [motion,mrlfsty] ( 181.00) Filing Fee. Receipt number 22471935. Fee amount $ 181.00. (U.S. Treasury) (Entered: 09/30/2020) |
| 09/30/2020 | ● 1249 <br><br> (44 pgs; 7 docs) | First Motion for Relief from Stay . Fee Amount $181. Filed by Creditor Rosa M Byers Hearing scheduled for 10/28/2020 at 02:00 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Exhibit Petition for Concursus # 2 Exhibit Answer filed by Chesapeake # 3 Exhibit Motion to Sever filed by Byers # 4 Exhibit Letter from Pesnell Law Firm to attorneys # 5 Exhibit Letter from Attorney Bush # 6 Exhibit Letter from Kenneth Klemm) (Pesnell, John) (Entered: 09/30/2020) |
| 09/30/2020 | | Receipt of Motion for Relief From Stay(20-33233) [motion,mrlfsty] ( 181.00) Filing Fee. Receipt number 22471986. Fee amount $ 181.00. (U.S. Treasury) (Entered: 09/30/2020) |
| 09/30/2020 | ● 1250 <br><br> (10 pgs) | BNC Certificate of Mailing. (Related document (s):1231 Order on Motion to Extend Time) No. of Notices: 131. Notice Date 09/30/2020. (Admin.) (Entered: 10/01/2020) |
| 10/01/2020 | ● 1251 <br><br> (1 pg) | Letter from Gaynell Spigner (mmap) (Entered: 10/01/2020) |
| 10/01/2020 | ● 1252 <br><br> (4 pgs) | Declaration re: *Declaration of Disinterestedness of K&L Gates, LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 10/01/2020) |

| | | |
|---|---|---|
| 10/01/2020 | 🌐 <u>1253</u><br><br>(22 pgs) | Transcript RE: Adversary Emergency Motion Hearing held on 09/30/20 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 12/30/2020. (AccessTranscripts) (Entered: 10/01/2020) |
| 10/01/2020 | 🌐 <u>1254</u><br><br>(6678 pgs) | Affidavit Re: *Affidavit of Service of Gregory Winter* (Filed By Epiq Corporate Restructuring LLC ). (Garabato, Sid) (Entered: 10/01/2020) |
| 10/01/2020 | 🌐 <u>1255</u><br><br>(74 pgs; 4 docs) | Application to Employ. Objections/Request for Hearing Due in 21 days. Filed by Creditor Committee Official Committee Of Unsecured Creditors (Attachments: # <u>1</u> Exhibit A - Declaration # <u>2</u> Exhibit B - Engagement Letter # <u>3</u> Proposed Order) (Boland, Jason) (Entered: 10/01/2020) |
| 10/01/2020 | 🌐 <u>1256</u><br><br>(87 pgs; 4 docs) | Application to Employ. Objections/Request for Hearing Due in 21 days. Filed by Creditor Committee Official Committee Of Unsecured Creditors (Attachments: # <u>1</u> Exhibit A - Declaration # <u>2</u> Exhibit B - Engagement Letter # <u>3</u> Proposed Order) (Boland, Jason) (Entered: 10/01/2020) |
| 10/01/2020 | 🌐 <u>1257</u><br><br>(8 pgs) | BNC Certificate of Mailing. (Related document (s):<u>1241</u> Order on Motion to Appear pro hac vice) No. of Notices: 131. Notice Date 10/01/2020. (Admin.) (Entered: 10/02/2020) |
| 10/01/2020 | 🌐 <u>1258</u><br><br>(8 pgs) | BNC Certificate of Mailing. (Related document (s):<u>1242</u> Order on Motion to Appear pro hac vice) No. of Notices: 131. Notice Date 10/01/2020. (Admin.) (Entered: 10/02/2020) |
| 10/01/2020 | 🌐 <u>1259</u><br><br>(8 pgs) | BNC Certificate of Mailing. (Related document (s):<u>1243</u> Order on Motion to Appear pro hac vice) No. of Notices: 131. Notice Date 10/01/2020. (Admin.) (Entered: 10/02/2020) |
| 10/02/2020 | 🌐 <u>1260</u><br><br>(1 pg) | Notice of Filing of Official Transcript as to <u>1253</u> Transcript. Parties notified (Related document (s):<u>1253</u> Transcript) (jdav) (Entered: 10/02/2020) |
| | | |

| | | |
|---|---|---|
| 10/02/2020 | 🌐 1261<br><br>(4 pgs) | Exhibit List, Witness List (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 10/02/2020) |
| 10/02/2020 | 🌐 1262<br><br>(4 pgs) | Exhibit List, Witness List (Filed By Official Committee of Royalty Owners ).(Related document (s):1147 Generic Motion) (Brown, pllc, Deirdre) (Entered: 10/02/2020) |
| 10/02/2020 | 🌐 1263<br><br>(83 pgs) | Affidavit Re: *Affidavit of Service of Gregory Winter* (Filed By Epiq Corporate Restructuring LLC ). (Garabato, Sid) (Entered: 10/02/2020) |
| 10/02/2020 | 🌐 1264<br><br>(2 pgs) | Letter from Gaynell Spigner (mmap) (Entered: 10/02/2020) |
| 10/02/2020 | 🌐 1265<br><br>(8 pgs; 2 docs) | Stipulation By Wier Group and Chesapeake Energy Corporation, Chesapeake Exploration LLC, and certain of their affiliates. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Wier Group ). (Attachments: # 1 Proposed Order) (Luttrell, Leslie) (Entered: 10/02/2020) |
| 10/02/2020 | 🌐 1266<br><br>(27 pgs; 4 docs) | Objection *Stone Creek Operating, LLC's Limited Objection to (1) Debtors' Motion for Entry of (A) an Order (I) Approving Bidding Procedures for the Sale of the Debtors' Mid-Con Assets, (II) Approving Bid Protections, (III) Scheduling Certain Dates with Respect Thereto (IV) Approving the Form and Manner of Notice Thereof, and (V) Approving Contract Assumption and Assignment Procedures, and (B) an Order Authorizing the Debtors to Entry Into a Definitive Purchase Agreement and (2) Any Sale Pursuant Thereto* (related document(s):1147 Generic Motion). Filed by Stone Creek Operating LLC (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C) (Gaither, John) (Entered: 10/02/2020) |
| 10/02/2020 | 🌐 1267<br><br>(2 pgs) | Notice of Appearance and Request for Notice Filed by John Gaither Filed by on behalf of Stone Creek Operating LLC (Gaither, John) (Entered: 10/02/2020) |
| | | |

| | | |
|---|---|---|
| 10/02/2020 | �’1268<br><br>(2 pgs) | Notice of Appearance and Request for Notice Filed by John Gaither Filed by on behalf of Stone Creek Operating LLC (Gaither, John) (Entered: 10/02/2020) |
| 10/02/2020 | �’1269<br><br>(2 pgs) | Notice of Appearance and Request for Notice Filed by John Gaither Filed by on behalf of Stone Creek Operating LLC (Gaither, John) (Entered: 10/02/2020) |
| 10/02/2020 | �’1270<br><br>(1 pg) | Motion to Appear pro hac vice *(Travis P. Brown)*. Filed by Interested Party Stone Creek Operating LLC (Gaither, John) (Entered: 10/02/2020) |
| 10/02/2020 | �’1271<br><br>(1 pg) | Motion to Appear pro hac vice *(Caleb A. Hartwell)*. Filed by Interested Party Stone Creek Operating LLC (Gaither, John) (Entered: 10/02/2020) |
| 10/02/2020 | �’1272<br><br>(1 pg) | Notice of Appearance and Request for Notice Filed by John Gaither Filed by on behalf of Stone Creek Operating LLC (Gaither, John) (Entered: 10/02/2020) |
| 10/02/2020 | �’1273<br><br>(1 pg) | Motion to Appear pro hac vice *(Jeffrey E. Tate)*. Filed by Interested Party Stone Creek Operating LLC (Gaither, John) (Entered: 10/02/2020) |
| 10/02/2020 | �’1274<br><br>(42 pgs; 3 docs) | Agreed Order and Certificate of Counsel (Filed By Chesapeake Energy Corporation ).(Related document(s):369 Application to Employ) (Attachments: # 1 Proposed Order # 2 Redline) (Cavenaugh, Matthew) (Entered: 10/02/2020) |
| 10/02/2020 | �’1275<br><br>(4 pgs) | Declaration re: *Supplemental Declaration of Stephen Antinelli in Support of the Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Rothschild & Co US Inc. and Intrepid Partners, LLC as Investment Bankers to the Debtors* (Filed By Chesapeake Energy Corporation ).(Related document(s):369 Application to Employ) (Cavenaugh, Matthew) (Entered: 10/02/2020) |
| | �’1276 | Declaration re: *Supplemental Declaration of Adam Miller in Suuport of the Debtors' Application for* |

| | | |
|---|---|---|
| 10/02/2020 | (4 pgs) | *Entry of an Order Authorizing the Employment and Retention of Rothschild & Co. US Inc. and Intrepid Partners, LLC as Investment Bankers to the Debtors* (Filed By Chesapeake Energy Corporation ).(Related document(s):369 Application to Employ) (Cavenaugh, Matthew) (Entered: 10/02/2020) |
| 10/02/2020 | 1277 <br><br> (14 pgs; 2 docs) | Emergency Motion *for a Protective Order Limiting Allen Johnson, et al. and Rodney Hudson et al.'s First Set of Discovery Requests* Filed by Debtor Chesapeake Energy Corporation Hearing scheduled for 10/7/2020 at 03:30 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 10/02/2020) |
| 10/02/2020 | 1278 <br><br> (5 pgs) | Objection - *Limited Objection* (related document (s):1147 Generic Motion). Filed by Official Committee of Royalty Owners (Brown, pllc, Deirdre) (Entered: 10/02/2020) |
| 10/03/2020 | 1279 <br><br> (170 pgs) | Notice *of Second Monthly Fee Statement of Alvarez & Marsal North America, LLC for Compensation for Services and Reimbursement of Expenses as Restructuring and Financial Advisors to the Debtors and Debtors in Possession for the Period From August 1, 2020 Through August 31, 2020.* (Related document(s):656 Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 10/03/2020) |
| 10/04/2020 | 1280 <br><br> (2 pgs) | Objection *(Limited) and Reservation of Rights* (related document(s):1147 Generic Motion). Filed by Tributary Resources, LLC (Martin, Jarrod) (Entered: 10/04/2020) |
| 10/04/2020 | 1281 <br><br> (76 pgs; 6 docs) | Emergency Motion *for Entry of an Order Enforcing the Stipulation and Agreed Order* Filed by Debtor Chesapeake Energy Corporation Hearing scheduled for 10/15/2020 at 10:30 AM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Proposed Order) (Cavenaugh, Matthew) (Entered: 10/04/2020) |
| | 1282 | BNC Certificate of Mailing. (Related document (s):1260 Notice of Filing of Official Transcript |

| | | |
|---|---|---|
| 10/04/2020 | (8 pgs) | (Form)) No. of Notices: 133. Notice Date 10/04/2020. (Admin.) (Entered: 10/05/2020) |
| 10/04/2020 | 1284 <br><br> (1 pg) | Order Granting Motion To Appear pro hac vice - Sharon I. Dwoskin (Related Doc # 1244) Signed on 10/4/2020. (emiller) (Entered: 10/05/2020) |
| 10/04/2020 | 1286 <br><br> (1 pg) | Order Granting Motion To Appear pro hac vice - Travis P. Brown (Related Doc # 1270) Signed on 10/4/2020. (emiller) (Entered: 10/05/2020) |
| 10/04/2020 | 1287 <br><br> (1 pg) | Order Granting Motion To Appear pro hac vice - Caleb A. Hartwell (Related Doc # 1271) Signed on 10/4/2020. (emiller) (Entered: 10/05/2020) |
| 10/04/2020 | 1288 <br><br> (1 pg) | Order Granting Motion To Appear pro hac vice - Jeffrey E. Tate (Related Doc # 1273) Signed on 10/4/2020. (emiller) (Entered: 10/05/2020) |
| 10/05/2020 | 1283 <br><br> (19 pgs) | Affidavit Re: *Affidavit of Service of Marc Orfitelli* (Filed By Epiq Corporate Restructuring LLC ). (Related document(s):1147 Generic Motion, 1148 Application to Employ, 1149 Generic Motion, 1150 Chapter 11 Plan, 1151 Disclosure Statement) (Garabato, Sid) (Entered: 10/05/2020) |
| 10/05/2020 | 1285 <br><br> (3 pgs) | Witness List, Exhibit List (Filed By Chesapeake Energy Corporation ).(Related document(s):1277 Emergency Motion (with hearing date)) (Cavenaugh, Matthew) (Entered: 10/05/2020) |
| 10/05/2020 | 1289 <br><br> (9 pgs) | Letter from John Dough (JeannieAndresen) (Entered: 10/05/2020) |
| 10/05/2020 | 1290 <br><br> (2 pgs) | Letter from Gaynell Spigner (mmap) (Entered: 10/05/2020) |
| 10/05/2020 | 1291 <br><br> (2 pgs) | Letter from Gaynell Spigner (mmap) (Entered: 10/05/2020) |
| | 1292 <br><br> (4 pgs) | Witness List, Exhibit List (Filed By Rodney Hudson, Allen Johnson ).(Related document (s):1237 Emergency Motion (with hearing date), |

| | | |
|---|---|---|
| 10/05/2020 | | 1277 Emergency Motion (with hearing date)) (Knapp, Bradley) (Entered: 10/05/2020) |
| 10/05/2020 | 1293 (229 pgs; 3 docs) | Motion for Relief from Stay . Fee Amount $181. Filed by Interested Party Stephanie Delasandro Hearing scheduled for 11/6/2020 at 02:00 PM at telephone and video conference. (Attachments: # 1 Exhibit Exhibit A # 2 Proposed Order Exhibit B) (Warman, Lynnette) (Entered: 10/05/2020) |
| 10/05/2020 | | Receipt of Motion for Relief From Stay(20-33233) [motion,mrlfsty] ( 181.00) Filing Fee. Receipt number 22482769. Fee amount $ 181.00. (U.S. Treasury) (Entered: 10/05/2020) |
| 10/05/2020 | 1294 (7 pgs) | Response *to Debtors' Emergency Motion for Protective Order Limiting Allen Johnson, et al., and Rodney Hudson, et al.'s First Set of Discovery Requests* (related document(s):1277 Emergency Motion (with hearing date)). Filed by Rodney Hudson, Allen Johnson (Knapp, Bradley) (Entered: 10/05/2020) |
| 10/05/2020 | 1295 (38 pgs; 3 docs) | Motion *to Certify Class of Unleased Mineral Interest Owners for Purposes of Filing a Class Proof of Claim* Filed by Creditor Rodney Hudson Hearing scheduled for 10/28/2020 at 02:00 PM at telephone and video conference. (Attachments: # 1 Exhibit A # 2 Proposed Order) (Eisenberg, Philip) (Entered: 10/05/2020) |
| 10/05/2020 | 1296 (2 pgs) | Letter from Gaynell Spigner (mmap) (Entered: 10/05/2020) |
| 10/06/2020 | 1297 (2 pgs) | Letter from Gaynell Spigner (mmap) (Entered: 10/06/2020) |
| 10/06/2020 | 1298 (11 pgs) | Joint Stipulation and Agreed Order Signed on 10/6/2020 (Related document(s):1156 Stipulation) (aalo) (Entered: 10/06/2020) |
| | 1299 (78 pgs; 2 docs) | Proposed Order RE: *Order (I) Approving the Bidding Procedures for the Sale of the Debtors' Mid-Con Assets, (II) Approving Bid Protections,* |

| | | |
|---|---|---|
| 10/06/2020 | | *(III) Scheduling Certain Dates with Respect Thereto, (IV) Approving the Form and Manner of Notice Thereof, and (V) Approving Contract Assumption and Assignment Procedures* (Filed By Chesapeake Energy Corporation ).(Related document(s):1147 Generic Motion) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 10/06/2020) |
| 10/06/2020 | 1300<br><br>(3 pgs) | Agenda for Hearing on 10/6/2020 (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 10/06/2020) |
| 10/06/2020 | 1301<br><br>(8 pgs) | Stipulation By Chesapeake Energy Corporation and the Creditors' Committee, the Existing RBL Agent, the Existing RBL Lenders, the FLLO Ad Hoc Group and Franklin. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 10/06/2020) |
| 10/06/2020 | 1302<br><br>(2 pgs) | Withdrawal of Claim: *10153 filed by Epiq Corporate Restructuring, LLC on behalf of CNC Oilfield Services LLC* (Garabato, Sid) (Entered: 10/06/2020) |
| 10/06/2020 | 1303<br><br>(67 pgs; 3 docs) | Certificate *of Service* (Filed By Rodney Hudson, Allen Johnson ).(Related document(s):1294 Response, 1295 Generic Motion) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2) (Knapp, Bradley) (Entered: 10/06/2020) |
| 10/06/2020 | 1304<br><br>(1 pg) | Motion to Appear pro hac vice *McClain Thompson*. Filed by Debtor Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 10/06/2020) |
| 10/06/2020 | 1305<br><br>(39 pgs) | Order (I) Approving the Bidding Procedures for the Sale of the Debtors' Mid-Con Assets (Related Doc # 1147) Signed on 10/6/2020. (aalo) (Entered: 10/06/2020) |
| 10/06/2020 | 1306<br><br>(8 pgs) | Stipulation and Agreed Order Signed on 10/6/2020 (aalo) (Entered: 10/06/2020) |

| | | |
|---|---|---|
| 10/06/2020 | ⬤ 1307<br><br>(3 pgs) | Agenda for Hearing on 10/7/2020 (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 10/06/2020) |
| 10/06/2020 | ⬤ 1308<br><br>(6 pgs) | Stipulation By Chesapeake Energy Corporation and Juan Carlos Alaniz. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 10/06/2020) |
| 10/06/2020 | ⬤ 1309<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - McClain Thompson (Related Doc # 1304) Signed on 10/6/2020. (emiller) (Entered: 10/06/2020) |
| 10/06/2020 | ⬤ 1312<br><br>(2 pgs) | Courtroom Minutes. Time Hearing Held: 10:30 AM. Appearances: see attached. (Related: 1147 Bid Procedures Motion). For the reasons stated on the record, the Court has approved the proposed bid procedures motion filed at 1147. **Final Sale Hearing scheduled for 11/13/2020 at 09:00 AM by telephone and video conference.** (aalo) (Entered: 10/07/2020) |
| 10/07/2020 | ⬤ 1310<br><br>(2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Marty L. Brimmage, Jr.. This is to order a transcript of the October 6, 2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts ). (Brimmage, Marty) Electronically forwarded to Access Transcripts on 10-7-2020. Estimated completion date: 10-8-2020. Modified on 10/7/2020 (MelissaMorgan). (Entered: 10/07/2020) |
| 10/07/2020 | ⬤ 1311<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Jason Boland. This is to order a transcript of October 6, 2020 hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Official Committee Of Unsecured Creditors ). (Boland, Jason)Copy request was electronically forwarded to Access Transcripts on 10-7-2020. Estimated completion date: 10-8-2020. Modified on 10/7/2020 (MelissaMorgan). (Entered: 10/07/2020) |

| | | |
|---|---|---|
| 10/07/2020 | 🔵 <u>1313</u><br><br>(5 pgs) | Declaration re: *Declaration of Disinterestedness of Protiviti Inc. Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 10/07/2020) |
| 10/07/2020 | 🔵 <u>1314</u><br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew Cavenaugh. This is to order a transcript of 10/6/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) Copy request was electronically forwarded to Access Transcripts on 10-8-2020. Estimated completion date: 10-9-2020. Modified on 10/8/2020 (MelissaMorgan). (Entered: 10/07/2020) |
| 10/07/2020 | 🔵 <u>1315</u><br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew Cavenaugh. This is to order a transcript of 10/7/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) Electronically forwarded to Access Transcripts on 10-8-2020. Estimated completion date: 10-9-2020. Modified on 10/8/2020 (MelissaMorgan). (Entered: 10/07/2020) |
| 10/07/2020 | 🔵 <u>1316</u><br><br>(1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 10/7/2020 3:30:07 PM ]. File Size [ 15455 KB ]. Run Time [ 00:32:12 ]. (In ref to doc nos. 1237 and 1277. Hearing held October 7, 2020.). (admin). (Entered: 10/07/2020) |
| 10/07/2020 | 🔵 <u>1317</u><br><br>(1 pg) | Courtroom Minutes. Time Hearing Held: 3:30 PM. Appearances: SEE ATTACHED. (Related document(s):<u>1237</u> Emergency Motion (with hearing date), <u>1277</u> Emergency Motion (with hearing date)) The Court granted the motion for request for admissions nos. 2, 3, 11, 12, 13, and 16. Denied the request for protection as to request for admission no. 14 and overruled the request for protection as to request for admission no. 15. The Court sustain the request of protection as to interrogatory nos. 1,2, 4, and 5. The Court |

| | | |
|---|---|---|
| 10/07/2020 | | sustained the request for production as to request of production nos. 1, 3, and 4. (VrianaPortillo) (Entered: 10/07/2020) |
| 10/07/2020 | 🔵 1318<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Marty L. Brimmage, Jr.. This is to order a transcript of the October 7, 2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts ). (Brimmage, Marty) Copy request was electronically forwarded to Access Transcripts on 10-8-2020. Estimated completion date: 10-9-2020. Modified on 10/8/2020 (MelissaMorgan). (Entered: 10/07/2020) |
| 10/07/2020 | 🔵 1319<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Jason Boland. This is to order a transcript of October 7, 2020 hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Official Committee Of Unsecured Creditors ). (Boland, Jason) Copy request was electronically forwarded to Access Transcripts on 10-8-2020. Estimated completion date: 10-9-2020. Modified on 10/8/2020 (MelissaMorgan). (Entered: 10/07/2020) |
| 10/07/2020 | 🔵 1320<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (3-Day) by Mary Elizabeth Heard. This is to order a transcript of October 7, 2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By PMBG Parties ). (Heard, Mary) Copy request was electronically forwarded to Access Transcripts on 10-8-2020. Estimated completion date: 10-9-2020. Modified on 10/8/2020 (MelissaMorgan). (Entered: 10/07/2020) |
| 10/07/2020 | 🔵 1321<br><br>(8 pgs) | BNC Certificate of Mailing. (Related document (s):1284 Order on Motion to Appear pro hac vice) No. of Notices: 134. Notice Date 10/07/2020. (Admin.) (Entered: 10/08/2020) |
| 10/07/2020 | 🔵 1322<br><br>(8 pgs) | BNC Certificate of Mailing. (Related document (s):1286 Order on Motion to Appear pro hac vice) No. of Notices: 134. Notice Date 10/07/2020. (Admin.) (Entered: 10/08/2020) |

| | | |
|---|---|---|
| 10/07/2020 | 🔵 1323 <br><br> (8 pgs) | BNC Certificate of Mailing. (Related document (s):1287 Order on Motion to Appear pro hac vice) No. of Notices: 134. Notice Date 10/07/2020. (Admin.) (Entered: 10/08/2020) |
| 10/07/2020 | 🔵 1324 <br><br> (8 pgs) | BNC Certificate of Mailing. (Related document (s):1288 Order on Motion to Appear pro hac vice) No. of Notices: 134. Notice Date 10/07/2020. (Admin.) (Entered: 10/08/2020) |
| 10/08/2020 | 🔵 1325 <br><br> (5 pgs) | Notice of Appearance and Request for Notice Filed by Anthony Frank Arguijo Filed by on behalf of Chesapeake Exploration, L.L.C., Chesapeake Operating, L.L.C. (Arguijo, Anthony) (Entered: 10/08/2020) |
| 10/08/2020 | 🔵 1326 <br><br> (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by John D. Gaither. This is to order a transcript of Bankruptcy 10/6/2020 before Judge David R. Jones. Court Reporter/Transcriber: Veritext Legal Solutions (Filed By Stone Creek Operating LLC ). (Gaither, John) Copy request was electronically forwarded to Access Transcripts on 10-8-2020. Estimated completion date: 10-9-2020. Modified on 10/8/2020 (MelissaMorgan). (Entered: 10/08/2020) |
| 10/08/2020 | 🔵 1327 <br><br> (20 pgs) | Transcript RE: Motion Hearing held on 10/6/20 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 01/6/2021. (AccessTranscripts) (Entered: 10/08/2020) |
| 10/08/2020 | 🔵 1328 <br><br> (6 pgs) | Stipulation By Chesapeake Energy Corporation and Eloy Fira. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Peguero, Kristhy) (Entered: 10/08/2020) |
| | 🔵 1329 <br><br> (9 pgs) | Objection *Debtors' Objection to the Delasandros' Motion for Rehearing or to Alter or Amend that Certain "Stipulation and Order by The Debtors Granting Relief from Automatic Stay" [Docket No. 1091], Entered September 3, 2020, Pursuant to Fed. R. Bankr. P. 9023, or In The Alternative, For* |

| | | |
|---|---|---|
| 10/08/2020 | | *Relief from Such Order Pursuant to Fed. R. Bankr. P. 9024* (related document(s):1175 Motion to Reconsider). Filed by Chesapeake Energy Corporation (Peguero, Kristhy) (Entered: 10/08/2020) |
| 10/08/2020 | 1330<br><br>(125 pgs; 2 docs) | Amended Chapter 11 Plan Filed by Chesapeake Energy Corporation. (Related document(s):1150 Chapter 11 Plan) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 10/08/2020) |
| 10/08/2020 | 1331<br><br>(243 pgs; 2 docs) | Disclosure Statement Filed by Chesapeake Energy Corporation. (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 10/08/2020) |
| 10/08/2020 | 1332<br><br>(375 pgs; 2 docs) | Proposed Order RE: *Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation Procedures with Respect to the Confirmation of the Debtors' Proposed Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Approving the Rights Offering Procedures and Related Materials, (V) Scheduling Certain Dates with Respect Thereto, and (VI) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):1149 Generic Motion) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 10/08/2020) |
| 10/08/2020 | 1333<br><br>(18 pgs) | BNC Certificate of Mailing. (Related document(s):1298 Generic Order) No. of Notices: 134. Notice Date 10/08/2020. (Admin.) (Entered: 10/09/2020) |
| 10/08/2020 | 1334<br><br>(46 pgs) | BNC Certificate of Mailing. (Related document(s):1305 Generic Order) No. of Notices: 134. Notice Date 10/08/2020. (Admin.) (Entered: 10/09/2020) |
| 10/08/2020 | 1335<br><br>(15 pgs) | BNC Certificate of Mailing. (Related document(s):1306 Generic Order) No. of Notices: 134. Notice Date 10/08/2020. (Admin.) (Entered: 10/09/2020) |
| | 1336 | Book by Gaynell Spiger (Attachments: # 1 |

| | | |
|---|---|---|
| 10/09/2020 | (2 pgs; 2 docs) | Exhibit) (mmap) (Entered: 10/09/2020) |
| 10/09/2020 | 1337 (1 pg) | Motion to Appear pro hac vice *Christos A. Katsaonis*. Filed by Creditor Commonwealth of Pennsylvania (mmap) (Entered: 10/09/2020) |
| 10/09/2020 | 1338 (3 pgs) | Affidavit Re: *Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1225 Notice) (Garabato, Sid) (Entered: 10/09/2020) |
| 10/09/2020 | 1339 (19 pgs) | Affidavit Re: *Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1227 Generic Motion, 1228 Generic Motion) (Garabato, Sid) (Entered: 10/09/2020) |
| 10/09/2020 | 1340 (3 pgs) | Affidavit Re: *Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1234 Notice) (Garabato, Sid) (Entered: 10/09/2020) |
| 10/09/2020 | 1341 (21 pgs) | Affidavit Re: *Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1245 Declaration) (Garabato, Sid) (Entered: 10/09/2020) |
| 10/09/2020 | 1342 (5 pgs) | Affidavit Re: *Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1252 Declaration) (Garabato, Sid) (Entered: 10/09/2020) |
| 10/09/2020 | 1343 (3 pgs) | Letter from John Dough (JeannieAndresen) (Entered: 10/09/2020) |
| 10/09/2020 | 1344 (95 pgs) | Statement *Third Monthly Fee Statement of Brown Rudnick LLP for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses as Co-Counsel for the Official Committee of Unsecured Creditors for the Period from September 1, 2020 through September 30, 2020* (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) (Entered: 10/09/2020) |
| 10/09/2020 | 1345 | Statement / *First Monthly Fee Statement of Norton* |

| | | |
|---|---|---|
| 10/09/2020 | (28 pgs) | *Rose Fulbright US LLP for Allowance of Compensation for Services Rendered and Reimbursement of Expenses Incurred as Co-Counsel to the Official Committee of Unsecured Creditors for the Period from July 13, 2020 to July 31, 2020* (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) (Entered: 10/09/2020) |
| 10/09/2020 | 🔵 1346<br><br>(35 pgs) | Statement / *Second Monthly Fee Statement of Norton Rose Fulbright US LLP for Allowance of Compensation for Services Rendered and Reimbursement of Expenses Incurred as Co-Counsel to the Official Committee of Unsecured Creditors for the Period from August 1, 2020 to August 31, 2020* (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) (Entered: 10/09/2020) |
| 10/09/2020 | 🔵 1347<br><br>(26 pgs) | Transcript RE: Emergency Motion Hearing held on 10/7/20 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 01/7/2021. (AccessTranscripts) (Entered: 10/09/2020) |
| 10/09/2020 | 🔵 1348<br><br>(8 pgs) | BNC Certificate of Mailing. (Related document (s):1309 Order on Motion to Appear pro hac vice) No. of Notices: 134. Notice Date 10/09/2020. (Admin.) (Entered: 10/10/2020) |
| 10/09/2020 | 🔵 1350<br><br>(31 pgs) | Order Authorizing the Employment and Retention of Rothschild & Co US Inc. and Intrepid Partners, LLC as Investment Bankers to the Debtors, Effective June 28, 2020 (Related Doc # 369) Signed on 10/9/2020. (emiller) (Entered: 10/11/2020) |
| 10/11/2020 | 🔵 1349<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Christos A. Katsaounis (Related Doc # 1337) Signed on 10/11/2020. (emiller) (Entered: 10/11/2020) |
| | 🔵 1351<br><br>(35 pgs) | Statement *Corrected Second Monthly Fee Statement of Norton Rose Fulbright US LLP for Allowance of Compensation for Services Rendered and Reimbursement of Expenses Incurred as Co-* |

| | | |
|---|---|---|
| 10/12/2020 | | *Counsel to the Official Committee of Unsecured Creditors for the Period from August 1, 2020 to August 31, 2020* (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):1346 Statement) (Harrison, Julie) (Entered: 10/12/2020) |
| 10/12/2020 | 1352<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (3-Day) by Eagle Ford Royalty Owner MDL Plaintiffs. This is to order a transcript of 7/31/20 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By c/o Annie Catmull Royalty Owner Plaintiffs c/o ). (Catmull, Annie) Copy Request electronically forwarded to Access Transcripts, LLC on October 14, 2020. Estimated completion date: October 17, 2020. Modified on 10/14/2020 (ClaudiaGutierrez). (Entered: 10/12/2020) |
| 10/12/2020 | 1353<br><br>(4 pgs) | Notice *of Additional Ordinary Course Professionals Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business.* (Related document(s):655 Generic Order, 807 Notice, 1100 Notice, 1162 Notice) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 10/12/2020) |
| 10/12/2020 | 1354<br><br>(45 pgs; 2 docs) | Proposed Order RE: *Order Authorizing the Retention and Employment of PricewaterhouseCoopers LLP as Audit Services and Tax Consulting Services Provider to the Debtors Effective as of June 28, 2020* (Filed By Chesapeake Energy Corporation ).(Related document(s):1148 Application to Employ) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 10/12/2020) |
| 10/12/2020 | 1355<br><br>(48 pgs; 3 docs) | Agreed Order and Certificate of Counsel (Filed By Chesapeake Energy Corporation ).(Related document(s):1148 Application to Employ) (Attachments: # 1 Proposed Order # 2 Redline) (Cavenaugh, Matthew) (Entered: 10/12/2020) |
| 10/12/2020 | 1356<br><br>(10 pgs) | Notice *to Chesapeake Energy Corporation of Examination Under Fed. R. Bankr. P. 2004.* Filed by Eric Petroleum Corporation (Flores, Henry) (Entered: 10/12/2020) |

| | | |
|---|---|---|
| 10/12/2020 | �e 1357<br><br>(8 pgs) | Stipulation By Chesapeake Energy Corporation and the Committee, Existing RBL Agent, Existing RBL Lenders, the FLLO Ad Hoc Group, and Franklin. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 10/12/2020) |
| 10/13/2020 | �e 1358<br><br>(1 pg) | Notice of Filing of Official Transcript as to 1327 Transcript, 1347 Transcript. Parties notified (Related document(s):1327 Transcript, 1347 Transcript) (dhan) (Entered: 10/13/2020) |
| 10/13/2020 | �e 1359<br><br>(37 pgs; 2 docs) | Carter#3 by Gaynell Spigner (mmap) Additional attachment(s) added on 10/14/2020 (mmap). (Entered: 10/13/2020) |
| 10/13/2020 | �e 1360<br><br>(1 pg) | Notice of Filing of Official Transcript as to 1347 Transcript. Parties notified (Related document (s):1347 Transcript) (dhan) (Entered: 10/13/2020) |
| 10/13/2020 | �e 1361<br><br>(5 pgs) | Reply *to Debtors' Objection* (related document (s):1175 Motion to Reconsider). Filed by Stephanie Delasandro (Warman, Lynnette) (Entered: 10/13/2020) |
| 10/13/2020 | �e 1362<br><br>(43 pgs; 4 docs) | Witness List, Exhibit List (Filed By Chesapeake Energy Corporation ).(Related document(s):1281 Emergency Motion (with hearing date)) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3) (Cavenaugh, Matthew) (Entered: 10/13/2020) |
| 10/13/2020 | �e 1363<br><br>(6 pgs) | Notice *of Auction for the Sale of the Debtors' Mid-Con Assets Free and Clear of Any and All Claims, Interests, and Encumbrances*. Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 10/13/2020) |
| | �e | Certificate of Telephone Notice. Contacted Veronica Polnick. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):1331 Disclosure Statement) Hearing scheduled for 10/30/2020 at 09:30 AM at telephone and video conference. |

| 10/13/2020 | | (aalo) (Entered: 10/13/2020) |
|---|---|---|
| 10/13/2020 | ○ | Certificate of Telephone Notice. By agreement of all parties, the hearing on the motion to certify class has been adjourned. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):1295 Generic Motion) **Hearing rescheduled for 11/6/2020 at 02:00 PM by telephone and video conference.** (aalo) (Entered: 10/13/2020) |
| 10/13/2020 | 1364<br><br>(90 pgs; 8 docs) | Exhibit List, Witness List (Filed By Federal Energy Regulatory Commission ).(Related document (s):1281 Emergency Motion (with hearing date)) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Kincheloe, Richard) (Entered: 10/13/2020) |
| 10/13/2020 | 1365<br><br>(5 pgs) | Notice *of Reset of Disclosure Statement Hearing*. (Related document(s): Certificate of Notice) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 10/13/2020) |
| 10/13/2020 | 1366<br><br>(1074 pgs) | Notice *of Selection of Stalking Horse Bidder*. Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 10/13/2020) |
| 10/13/2020 | 1367<br><br>(1070 pgs) | Proposed Order RE: *Order (I) Authorizing the Sale of the Debtors' Mid-Con Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (II) Authorizing the Debtors to Enter Into and Perform Under a Definitive Purchase Agreement, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):1147 Generic Motion) (Cavenaugh, Matthew) (Entered: 10/13/2020) |
| 10/13/2020 | 1368<br><br>(164 pgs) | Notice *of Third Monthly Fee Statement of Alvarez & Marsal North America, LLC for Compensation for Services and Reimbursement of Expenses as Restructuring and Financial Advisors to the Debtors and Debtors In Possession for the Period from September 1, 2020 Through September 30, 2020*. Filed by Chesapeake Energy Corporation |

| | | |
|---|---|---|
| 10/13/2020 | | (Cavenaugh, Matthew) (Entered: 10/13/2020) |
| 10/13/2020 | 🔘 1386<br><br>(1 pg) | Notice of Change of Address Filed by Holly Lynne Musick (agou) (Entered: 10/15/2020) |
| 10/14/2020 | 🔘 1369<br><br>(55 pgs) | Witness List, Exhibit List (Filed By ETC Tiger Pipeline LLC ).(Related document(s):417 Generic Order, 1281 Emergency Motion (with hearing date)) (Mitchell, John) (Entered: 10/14/2020) |
| 10/14/2020 | 🔘 1370<br><br>(5 pgs; 2 docs) | Motion To Substitute Attorney. Filed by Creditors ECorp Resource Partners 1, LP, Minion Trail Ltd, Rock Creek Ranch Ltd (Attachments: # 1 Proposed Order) (Skelton, Barnet) (Entered: 10/14/2020) |
| 10/14/2020 | 🔘 1371<br><br>(3 pgs) | Notice *of Reset Hearing on Motion to Certify Class of Unleased Mineral Interest Owners for Purposes of Filing a Class Proof of Claim* . (Related document(s):1295 Generic Motion) Filed by Rodney Hudson (Knapp, Bradley) (Entered: 10/14/2020) |
| 10/14/2020 | 🔘 1372<br><br>(7191 pgs) | Affidavit Re: *Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ). (Garabato, Sid) (Entered: 10/14/2020) |
| 10/14/2020 | 🔘 1373<br><br>(37 pgs) | Order Authorizing the Retention and Employment of Pricewaterhousecoopers LLP as Audit Services and Tax Consulting Services Provider to the Debtors Effective as June 28, 2020 (Related Doc # 1148) Signed on 10/14/2020. (VrianaPortillo) (Entered: 10/14/2020) |
| 10/14/2020 | 🔘 1374<br><br>(86 pgs; 3 docs) | Agreed Order and Certificate of Counsel (Filed By Chesapeake Energy Corporation ).(Related document(s):1176 Application to Employ) (Attachments: # 1 Proposed Order # 2 Redline) (Cavenaugh, Matthew) (Entered: 10/14/2020) |
| 10/14/2020 | 🔘 1375<br><br>(14 pgs) | Objection *to Debtors' Disclosure Statement* (related document(s):1149 Generic Motion). Filed by Jackalope Gas Gathering Services, L.L.C., Stagecoach Pipeline & Storage Company LLC (Brookner, Jason) (Entered: 10/14/2020) |
| | | |

| | | |
|---|---|---|
| 10/14/2020 | 🔘 1376<br><br>(84 pgs; 5 docs) | Response *to Debtors' Emergency Motion for Entry of an Order Enforcing the Stipulation and Agreed Order (ECF 417)* (related document (s):1281 Emergency Motion (with hearing date)). Filed by ETC Tiger Pipeline LLC (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit B) (Moore, William) (Entered: 10/14/2020) |
| 10/14/2020 | 🔘 1377<br><br>(34 pgs; 2 docs) | Motion to Approve Compromise under Rule 9019 */ Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Settlement By and Among the Debtors and the Wier Group, and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Schwarzman, Alexandra) (Entered: 10/14/2020) |
| 10/14/2020 | 🔘 1378<br><br>(1 pg) | Motion to Appear pro hac vice *Brooksany Barrowes*. Filed by Debtor Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 10/14/2020) |
| 10/14/2020 | 🔘 1379<br><br>(68 pgs; 5 docs) | Response (related document(s):1281 Emergency Motion (with hearing date)). Filed by Federal Energy Regulatory Commission (Attachments: # 1 Proposed Order # 2 Exhibit A # 3 Exhibit B # 4 Exhibit C) (Kincheloe, Richard) (Entered: 10/14/2020) |
| 10/14/2020 | 🔘 1380<br><br>(3 pgs) | Agenda for Hearing on 10/15/2020 (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 10/14/2020) |
| 10/15/2020 | 🔘 1381<br><br>(1 pg) | Motion to Appear pro hac vice *Joshua E. Austin*. Filed by Creditor EJS Investment Holdings, LLC (Towber, Preston) (Entered: 10/15/2020) |
| 10/15/2020 | 🔘 1382<br><br>(24 pgs; 3 docs) | Response/Objection Filed by Commonwealth of Pennsylvania, Department of Revenue. (Related document(s):1149 Generic Motion, 1330 Amended Chapter 11 Plan, 1331 Disclosure Statement) (Attachments: # 1 Proposed Order # 2 Certificate of Service)(Katsaounis, Christos) (Entered: 10/15/2020) |
| | | |

| | | |
|---|---|---|
| 10/15/2020 | 1383 <br><br> (32 pgs) | Objection *Debtors' Objection to (I) Allen Johnson, et al., and Rodney Hudson et al.'s Motion for Relief from Stay and (II) Allen Johnson, et al., and Rodney Hudson et al.'s Motion for Adequate Protection* (related document(s):1200 Motion for Relief From Stay, 1201 Motion for Adequate Protection). Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 10/15/2020) |
| 10/15/2020 | 1384 <br><br> (3 pgs) | Notice of Appearance and Request for Notice Filed by Michael Vincent Fitzpatrick Filed by on behalf of Garanak, L.P., Mansfield Independent School District, City of Burleson, Texas, Union Pacific Railroad Company (Fitzpatrick, Michael) (Entered: 10/15/2020) |
| 10/15/2020 | 1385 <br><br> (1 pg) | Motion to Appear pro hac vice *James E. Key*. Filed by Creditors City of Burleson, Texas, Garanak, L.P., Mansfield Independent School District, Union Pacific Railroad Company (Fitzpatrick, Michael) (Entered: 10/15/2020) |
| 10/15/2020 | 1387 <br><br> (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew Cavenaugh. This is to order a transcript of 10/15/2020 before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) Electronically forwarded to Judicial Transcribers of Texas on 10-15-2020. Estimated completion date: 10-16-2020. Modified on 10/15/2020 (MelissaMorgan). (Entered: 10/15/2020) |
| 10/15/2020 | 1388 <br><br> (5 pgs) | Stipulation By Chesapeake Energy Corporation and Morgan Stanley Capital Group Inc.. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 10/15/2020) |
| 10/15/2020 | 1389 <br><br> (69 pgs; 5 docs) | Response/Objection Filed by c/o Annie Catmull Royalty Owner Plaintiffs c/o. (Related document (s):1149 Generic Motion, 1151 Disclosure Statement, 1331 Disclosure Statement) (Attachments: # 1 Exhibit Texas MDL Plaintiffs # |

| | | |
|---|---|---|
| 10/15/2020 | | 2 Exhibit Transcript Excerpt 7-31-20 # 3 Exhibit Severance Order # 4 Exhibit Sample Lease) (Catmull, Annie) (Entered: 10/15/2020) |
| 10/15/2020 | 🔘 1390<br><br>(1 pg) | Courtroom Minutes. Time Hearing Held: 10:30 am. Appearances: SEE ATTACHED.. (Related document(s):1281 Emergency Motion (with hearing date)) For the reasons stated on the record, the motion is denied. The Court to enter an order.(emiller) (Entered: 10/15/2020) |
| 10/15/2020 | 🔘 1391<br><br>(1 pg) | Order (Related Doc # 1281) Signed on 10/15/2020. (emiller) (Entered: 10/15/2020) |
| 10/15/2020 | 🔘 1392<br><br>(1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 10/15/2020 10:28:50 AM ]. File Size [ 9975 KB ]. Run Time [ 00:20:47 ]. (admin). (Entered: 10/15/2020) |
| 10/15/2020 | 🔘 1393<br><br>(16 pgs) | Response/Objection Filed by James J Angel. (Related document(s):1331 Disclosure Statement) (mmap) (Entered: 10/15/2020) |
| 10/15/2020 | 🔘 1394<br><br>(5 pgs) | Affidavit Re: *Affidavit of Publication of The Philadelphia Inquirer* (Filed By Chesapeake Energy Corporation ).(Related document(s):1305 Generic Order) (Cavenaugh, Matthew) (Entered: 10/15/2020) |
| 10/15/2020 | 🔘 1395<br><br>(3 pgs) | Affidavit Re: *Affidavit of Publication of The New York Times* (Filed By Chesapeake Energy Corporation ).(Related document(s):1305 Generic Order) (Cavenaugh, Matthew) (Entered: 10/15/2020) |
| 10/15/2020 | 🔘 1396<br><br>(4 pgs) | Affidavit Re: *Affidavit of Publication of the Houston Chronicle* (Filed By Chesapeake Energy Corporation ).(Related document(s):1305 Generic Order) (Cavenaugh, Matthew) (Entered: 10/15/2020) |
| | 🔘 1397<br><br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Vickie L Driver Filed by on behalf of Jamestown Resources, LLC, Larchmont Resources, LLC, Pelican Energy, LLC (Driver, |

| 10/15/2020 | | Vickie) (Entered: 10/15/2020) |
|---|---|---|
| 10/15/2020 | ⚫ 1398<br><br>(4 pgs) | Notice of Appearance and Request for Notice Filed by William Lake Hearne Filed by on behalf of Louisiana Ad Hoc Royalty Group (Hearne, William) (Entered: 10/15/2020) |
| 10/15/2020 | ⚫ 1399<br><br>(15 pgs) | Response (Filed By Louisiana Ad Hoc Royalty Group ).(Related document(s):1150 Chapter 11 Plan, 1151 Disclosure Statement, 1330 Amended Chapter 11 Plan, 1331 Disclosure Statement) (Hearne, William) (Entered: 10/15/2020) |
| 10/15/2020 | ⚫ 1400<br><br>(8 pgs) | Response/Objection Filed by Jamestown Resources, LLC, Larchmont Resources, LLC, Pelican Energy, LLC. (Related document(s):1149 Generic Motion, 1331 Disclosure Statement) (Hoch, William) (Entered: 10/15/2020) |
| 10/15/2020 | ⚫ 1401<br><br>(16 pgs) | Response/Objection Filed by EJS Investment Holdings, LLC. (Related document(s):1331 Disclosure Statement) (Towber, Preston) (Entered: 10/15/2020) |
| 10/15/2020 | ⚫ 1402<br><br>(9 pgs) | Response/Objection Filed by Rodney Hudson, Allen Johnson. (Related document(s):1331 Disclosure Statement) (Knapp, Bradley) (Entered: 10/15/2020) |
| 10/15/2020 | ⚫ 1403<br><br>(74 pgs; 3 docs) | Certificate *of Service* (Filed By Rodney Hudson, Allen Johnson ).(Relate$ document(s):1371 Notice) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2) (Knapp, Bradley) (Entered: 10/15/2020) |
| 10/15/2020 | ⚫ 1404<br><br>(2 pgs) | E-Mail sent to Court by Gaynell Spigner (mmap) (Entered: 10/15/2020) |
| 10/15/2020 | ⚫ 1405<br><br>(2 pgs) | Response/Objection Filed by Byrd Family Limited Partnership, Four P Family Holdings, LP. (Related document(s):1331 Disclosure Statement) (Bevis, Donald) (Entered: 10/15/2020) |
| | ⚫ 1406<br><br>(5 pgs) | Objection *Delasandro Objection to Disclosure Statement [Doc. 1151 and 1331]* (related document(s):1149 Generic Motion). Filed by |

| 10/15/2020 | | Stephanie Delasandro (Warman, Lynnette) (Entered: 10/15/2020) |
|---|---|---|
| 10/15/2020 | 1407<br><br>(25 pgs) | Response/Objection Filed by PMBG Parties. (Related document(s):1331 Disclosure Statement) (Heard, Mary) (Entered: 10/15/2020) |
| 10/15/2020 | 1408<br><br>(18 pgs) | Transcript RE: Motion Hearing Via Zoom/Video held on October 15, 2020 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 01/13/2021. (mhen) (Entered: 10/15/2020) |
| 10/15/2020 | 1409<br><br>(26 pgs) | Response *Debtors' Objection to (I) Saundra Nelson's Motion for Relief from Stay and (II) Saundra Nelson's Motion for Adequate Protection* (related document(s):1236 Motion for Adequate Protection). Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 10/15/2020) |
| 10/15/2020 | 1410<br><br>(14 pgs) | Response *Debtors' Objection to J. Fleet Oil & Gas Production Company, LLC and Martin Producing, LLC's Motion for Relief from the Automatic Stay as to the Debtors Chesapeake Louisiana, LP, Chesapeake Operating, Inc., Chesapeake Energy Corporation, and Chesapeake Energy Marketing, Inc.* (related document(s):1238 Motion for Relief From Stay). Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 10/15/2020) |
| 10/15/2020 | 1411<br><br>(12 pgs) | Response/Objection Filed by Petty Business Enterprises, LP, Petty Energy L.P. and their related entities. (Related document(s):1149 Generic Motion, 1331 Disclosure Statement) (Smith, Frances) (Entered: 10/15/2020) |
| 10/15/2020 | 1412<br><br>(1 pg) | Motion to Appear pro hac vice *Andrew J. Simpson*. Filed by Creditor Committee Official Committee Of Unsecured Creditors (Harrison, Julie) (Entered: 10/15/2020) |
| | 1413 | Motion to Appear pro hac vice *Uchechi Egeonuigwe*. Filed by Creditor Committee |

| | | |
|---|---|---|
| 10/15/2020 | (1 pg) | Official Committee Of Unsecured Creditors (Harrison, Julie) (Entered: 10/15/2020) |
| 10/15/2020 | 1414<br><br>(2 pgs) | Notice *of Deposition Schedule*. Filed by Official Committee Of Unsecured Creditors (Harrison, Julie) (Entered: 10/15/2020) |
| 10/15/2020 | 1415<br><br>(25 pgs) | Amended Response/Objection Filed by PMBG Parties. (Related document(s):1331 Disclosure Statement) (Heard, Mary) (Entered: 10/15/2020) |
| 10/15/2020 | 1416<br><br>(2 pgs) | AO 435 TRANSCRIPT ORDER FORM (3-Day) by William A. (Trey) Wood III. This is to order a transcript of Hearing on October 15, 2020 at 10:30 a.m. CT before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Kinder Morgan Texas Pipeline LLC ). (Wood, William) Copy Request electronically forwarded to Judicial Transcribers of Texas on October 16, 2020. Estimated completion date: October 19, 2020 Modified on 10/16/2020 (ClaudiaGutierrez). (Entered: 10/15/2020) |
| 10/15/2020 | 1417<br><br>(70 pgs; 2 docs) | Objection *by Tributary Resources, LLC to Debtors' Disclosure Statement* (related document(s):1149 Generic Motion). Filed by Tributary Resources, LLC (Attachments: # 1 Exhibits 1-11) (Martin, Jarrod) (Entered: 10/15/2020) |
| 10/15/2020 | 1418<br><br>(70 pgs; 2 docs) | Corrected Objection *by Tributary Resources, LLC to Debtors' Disclosure Statement* (related document(s):1149 Generic Motion). Filed by Tributary Resources, LLC (Attachments: # 1 Exhibits 1-11) (Martin, Jarrod) (Entered: 10/15/2020) |
| 10/15/2020 | 1419<br><br>(12 pgs) | Response/Objection Filed by Official Committee of Royalty Owners. (Related document(s):1330 Amended Chapter 11 Plan, 1331 Disclosure Statement) (Brown, pllc, Deirdre) (Entered: 10/15/2020) |
| 10/15/2020 | 1420<br><br>(8 pgs) | BNC Certificate of Mailing. (Related document(s):1358 Notice of Filing of Official Transcript (Form)) No. of Notices: 134. Notice Date 10/15/2020. (Admin.) (Entered: 10/16/2020) |

| | | |
|---|---|---|
| 10/15/2020 | 🔵 1421<br><br>(8 pgs) | BNC Certificate of Mailing. (Related document (s):1360 Notice of Filing of Official Transcript (Form)) No. of Notices: 134. Notice Date 10/15/2020. (Admin.) (Entered: 10/16/2020) |
| 10/15/2020 | 🔵 1422<br><br>(8 pgs) | BNC Certificate of Mailing. (Related document (s):1349 Order on Motion to Appear pro hac vice) No. of Notices: 134. Notice Date 10/15/2020. (Admin.) (Entered: 10/16/2020) |
| 10/15/2020 | 🔵 1423<br><br>(38 pgs) | BNC Certificate of Mailing. (Related document (s):1350 Order on Application to Employ) No. of Notices: 134. Notice Date 10/15/2020. (Admin.) (Entered: 10/16/2020) |
| 10/15/2020 | 🔵 1426<br><br>(24 pgs) | Response/Objection Filed by Commonwealth of Pennsylvania, Department of Revenue. (Related document(s):1330 Amended Chapter 11 Plan) (BrendaLacy) (Entered: 10/16/2020) |
| 10/15/2020 | 🔵 1428<br><br>(1 pg) | Motion to Appear pro hac vice *Gregory W Watts*. (BrendaLacy) (Entered: 10/16/2020) |
| 10/16/2020 | 🔵 1424<br><br>(1 pg) | Notice of Filing of Official Transcript as to 1408 Transcript. Parties notified (Related document (s):1408 Transcript) (dhan) (Entered: 10/16/2020) |
| 10/16/2020 | 🔵 1425<br><br>(2 pgs) | E-Mail to the Court by Gaynell Spigner (mmap) (Entered: 10/16/2020) |
| 10/16/2020 | 🔵 1427<br><br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Tyler William Greenwood Filed by on behalf of Tributary Resources, LLC (Greenwood, Tyler) (Entered: 10/16/2020) |
| 10/16/2020 | 🔵 1429<br><br>(7 pgs; 2 docs) | Certificate of No Objection (Filed By Chesapeake Energy Corporation ).(Related document(s):1183 Generic Motion) (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 10/16/2020) |
| | 🔵 1430<br><br>(95 pgs) | Statement / *First Monthly Fee Statement of AlixPartners, LLP, Financial Advisor to the Official Committee of Unsecured Creditors for* |

| | | |
|---|---|---|
| 10/16/2020 | | *Allowance of Compensation for Services Rendered and for Reimbursement of Expenses for the Period July 14, 2020 through July 31, 2020* (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) (Entered: 10/16/2020) |
| 10/16/2020 | 1431 (14 pgs) | Objection *to Debtors' Motion to Extend Time to Reject or Assume Unexpired Nonresidential Real Property Leases with certificate of service* (related do#ument(s):1228 Generic Motion). Filed by PMBG Parties (Heard, Mary) (Entered: 10/16/2020) |
| 10/16/2020 | 1432 (847 pgs) | Affidavit Re: *Affidavit of Service of Marc Orfitelli* (Filed By Epiq Corporate Restructuring LLC ). (Garabato, Sid) (Entered: 10/16/2020) |
| 10/16/2020 | 1433 (8 pgs; 2 docs) | Objection *OFFICIAL COMMITTEE OF ROYALTY OWNERS LIMITED OBJECTION TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) EXTENDING THE TIME WITHIN WHICH THE DEBTORS MUST ASSUME OR REJECT UNEXPIRED LEASES OF NONRESIDENTIAL REAL PROPERTY AND (II) GRANTING RELATED RELIEF* (related document(s):1228 Generic Motion). Filed by Official Committee of Royalty Owners (Attachments: # 1 Proposed Order) (Brown, pllc, Deirdre) (Entered: 10/16/2020) |
| 10/16/2020 | 1434 (44 pgs) | BNC Certificate of Mailing. (Related document (s):1373 Order on Application to Employ) No. of Notices: 134. Notice Date 10/16/2020. (Admin.) (Entered: 10/17/2020) |
| 10/17/2020 | 1435 (8 pgs) | BNC Certificate of Mailing. (Related document (s):1391 Order on Emergency Motion) No. of Notices: 135. Notice Date 10/17/2020. (Admin.) (Entered: 10/18/2020) |
| | 1436 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Jason Boland. This is to order a transcript of the October 15, 2020 hearing before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Official Committee Of |

| | | |
|---|---|---|
| 10/18/2020 | | Unsecured Creditors ). (Boland, Jason) Copy Request electronically forwarded to Judicial Transcribers of Texas on October 21, 2020. Estimated completion date: October 22, 2020. Modified on 10/21/2020 (ClaudiaGutierrez). (Entered: 10/18/2020) |
| 10/18/2020 | 1437 (8 pgs) | BNC Certificate of Mailing. (Related document (s):1424 Notice of Filing of Official Transcript (Form)) No. of Notices: 137. Notice Date 10/18/2020. (Admin.) (Entered: 10/19/2020) |
| 10/18/2020 | 1438 (1 pg) | Order Granting Motion To Appear pro hac vice - Brooksany Barrowes (Related Doc # 1378) Signed on 10/18/2020. (emiller) (Entered: 10/19/2020) |
| 10/18/2020 | 1439 (1 pg) | Order Granting Motion To Appear pro hac vice - Joshua E. Austin (Related Doc # 1381) Signed on 10/18/2020. (emiller) (Entered: 10/19/2020) |
| 10/18/2020 | 1440 (1 pg) | Order Granting Motion To Appear pro hac vice - James E. Key (Related Doc # 1385) Signed on 10/18/2020. (emiller) (Entered: 10/19/2020) |
| 10/18/2020 | 1441 (1 pg) | Order Granting Motion To Appear pro hac vice - Andrew J. Simpson (Related Doc # 1412) Signed on 10/18/2020. (emiller) (Entered: 10/19/2020) |
| 10/18/2020 | 1442 (1 pg) | Order Granting Motion To Appear pro hac vice - Uchechi Egeonuigwe (Related Doc # 1413) Signed on 10/18/2020. (emiller) (Entered: 10/19/2020) |
| 10/19/2020 | 1443 (1 pg) | Order Granting Motion To Appear pro hac vice - Gregory W. Watts (Related Doc # 1428) Signed on 10/19/2020. (emiller) (Entered: 10/19/2020) |
| 10/19/2020 | 1444 (9 pgs) | Declaration re: *Declaration of John Stuart in Support of Debtors' Application to Employ and Retain Alvarez & Marsal North America, LLC as Restructuring Advisors Pursuant to Sections 327 (a) and 328 of the Bankruptcy Code Effective as of June 28, 2020* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 10/19/2020) |

| | | |
|---|---|---|
| 10/19/2020 | 🔵 1445<br><br>(2 pgs) | E-Mail sent to Court (mmap) (Entered: 10/19/2020) |
| 10/19/2020 | 🔵 1446<br><br>(5 pgs) | Letter from John Dough (JeannieAndresen) (Entered: 10/19/2020) |
| 10/19/2020 | 🔵 1447<br><br>(2 pgs) | Letter from Eric Magnusson (JeannieAndresen) (Entered: 10/19/2020) |
| 10/19/2020 | 🔵 1448<br><br>(67 pgs; 4 docs) | Motion for Relief from Stay . Fee Amount $181. Filed by Creditors Justin Cobb, Kristine Cobb, Linda Milanovich Hearing scheduled for 11/20/2020 at 02:00 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Exhibit A # 2 Proposed Order # 3 Service List) (Rukavina, Davor) (Entered: 10/19/2020) |
| 10/19/2020 | | Receipt of Motion for Relief From Stay(20-33233) [motion,mrlfsty] ( 181.00) Filing Fee. Receipt number 22519329. Fee amount $ 181.00. (U.S. Treasury) (Entered: 10/19/2020) |
| 10/19/2020 | 🔵 1449<br><br>(6 pgs; 2 docs) | Motion *to Extend Deadline Under 11 U.S.C. § 523 and Bankruptcy Rule 4007* Filed by Creditor Tributary Resources, LLC (Attachments: # 1 Proposed Order) (Martin, Jarrod) (Entered: 10/19/2020) |
| 10/19/2020 | 🔵 1450<br><br>(82 pgs; 3 docs) | Application for Administrative Expenses *Claim Pursuant to § 503(B)*. Objections/Request for Hearing Due in 21 days. Filed by Creditor Tributary Resources, LLC (Attachments: # 1 Exhibits 1-11 # 2 Proposed Order) (Martin, Jarrod) (Entered: 10/19/2020) |
| 10/19/2020 | 🔵 1451<br><br>(86 pgs; 3 docs) | Motion for Relief from Stay *to Pursue Quiet Title Action*. Fee Amount $181. Filed by Creditor Tributary Resources, LLC Hearing scheduled for 11/20/2020 at 02:00 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Exhibits 1-11 # 2 Proposed Order) (Martin, Jarrod) (Entered: 10/19/2020) |
| | | |

| | | |
|---|---|---|
| 10/19/2020 | | Receipt of Motion for Relief From Stay(20-33233) [motion,mrlfsty] ( 181.00) Filing Fee. Receipt number 22520148. Fee amount $ 181.00. (U.S. Treasury) (Entered: 10/19/2020) |
| 10/19/2020 | 🔵 1452<br><br>(71 pgs) | Order Authorizing the Retention and Employment of Ernst & Young LLP as Restructuring, Accounting, Tax and Advisory Services Provider to the Debtors Effective as of June 29, 2020 (Related Doc # 1176) Signed on 10/19/2020. (emiller) (Entered: 10/19/2020) |
| 10/19/2020 | 🔵 1453<br><br>(5 pgs) | Stipulation and Agreed Order (I) Authorizing the Debtors to Enter into and Perform Under Postpetition Transactions and Agreements with Morgan Stanley Capital Group, Inc., (II) Granting Administrative Expense Claims, and (III) Granting Related Relief Signed on 10/19/2020 (Related document(s):1388 Stipulation) (emiller) (Entered: 10/19/2020) |
| 10/19/2020 | 🔵 1454<br><br>(4185 pgs; 4 docs) | Exhibit List, Witness List (Filed By Official Committee of Royalty Owners ).(Related document(s):1228 Generic Motion, 1431 Objection, 1433 Objection) (Attachments: # 1 Exhibit 1_Schedules CHK Operating # 2 Exhibit 2_Schedules (first filed) # 3 Exhibit 3_Email with 341 Questions) (Brown, pllc, Deirdre) (Entered: 10/19/2020) |
| 10/20/2020 | 🔵 1455<br><br>(289 pgs) | Sealed Document - *ROC Exhibit 4 _Dell Osso Deposition Transcript (without exhibits)* (Filed By Official Committee of Royalty Owners ). (Brown, pllc, Deirdre) (Entered: 10/20/2020) |
| 10/20/2020 | 🔵 1456<br><br>(5 pgs) | Notice *of Electronic Hearing on 365(d)(4) Motion*. (Related document(s):1228 Generic Motion) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 10/20/2020) |
| 10/20/2020 | 🔵 1457<br><br>(2 pgs) | Notice of Appearance and Request for Notice Filed by William Lake Hearne Filed by on behalf of Saundra Nelson (Hearne, William) (Entered: 10/20/2020) |
| | 🔵 1458 | Witness List (Filed By Saundra Nelson ).(Related |

| | | |
|---|---|---|
| 10/20/2020 | (5 pgs) | document(s):1235 Motion for Relief From Stay, 1236 Motion for Adequate Protection) (Hearne, William) (Entered: 10/20/2020) |
| 10/20/2020 | 1459<br><br>(3 pgs) | Witness List, Exhibit List (Filed By Chesapeake Energy Corporation ).(Related document(s):1200 Motion for Relief From Stay, 1201 Motion for Adequate Protection) (Cavenaugh, Matthew) (Entered: 10/20/2020) |
| 10/20/2020 | 1460<br><br>(3 pgs) | Witness List, Exhibit List (Filed By Chesapeake Energy Corporation ).(Related document(s):1235 Motion for Relief From Stay, 1236 Motion for Adequate Protection, 1238 Motion for Relief From Stay, 1456 Notice) (Cavenaugh, Matthew) (Entered: 10/20/2020) |
| 10/20/2020 | 1461<br><br>(312 pgs; 25 docs) | Witness List, Exhibit List (Filed By Rodney Hudson, Allen Johnson ).(Related document (s):1200 Motion for Relief From Stay, 1201 Motion for Adequate Protection) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24) (Knapp, Bradley) (Entered: 10/20/2020) |
| 10/20/2020 | 1462<br><br>(4 pgs) | Sealed Document *UMO Exhibit 25 to Allen Johnson, et al. and Rodney Hudson, et al.'s Witness and Exhibit List for Hearing Scheduled for October 22, 2020 at 9:00 a.m.* (Filed By Rodney Hudson, Allen Johnson ). (Knapp, Bradley) (Entered: 10/20/2020) |
| 10/20/2020 | 1463<br><br>(2 pgs) | E-Mail by Gaynell Spigner (mmap) (Entered: 10/20/2020) |
| | 1464<br><br>(5 pgs; 2 docs) | Certificate of No Objection *with Respect to the Motion to Extend the Exclusivity Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* (Filed By Chesapeake Energy Corporation ). (Related document(s):1227 Generic Motion) |

| | | |
|---|---|---|
| 10/20/2020 | | (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 10/20/2020) |
| 10/20/2020 | 🌑 1465<br><br>(5 pgs) | Stipulation By Chesapeake Energy Corporation and Gavilan Resources, LLC. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 10/20/2020) |
| 10/20/2020 | 🌑 1466<br><br>(20 pgs; 2 docs) | Motion *for Entry of an Order (I) Authorizing the Rejection of the Houston Lease and Sublease Effective as of October 30, 2020 and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 10/20/2020) |
| 10/20/2020 | 🌑 1467<br><br>(6 pgs) | Joint Stipulation and Agreed Order by and Among Debtors and Eloy Fira Granting Relief from the Automatic Stay Signed on 10/20/2020 (Related document(s):1328 Stipulation) (VrianaPortillo) (Entered: 10/20/2020) |
| 10/20/2020 | 🌑 1468<br><br>(50 pgs; 10 docs) | Exhibit List (Filed By Rodney Hudson, Allen Johnson ).(Related document(s):1200 Motion for Relief From Stay, 1201 Motion for Adequate Protection, 1461 Witness List, 1462 Sealed Document) (Attachments: # 1 Exhibit 26 # 2 Exhibit 27 # 3 Exhibit 28 # 4 Exhibit 29 # 5 Exhibit 30 # 6 Exhibit 31 # 7 Exhibit 32 # 8 Exhibit 33 # 9 Exhibit 34) (Knapp, Bradley) (Entered: 10/20/2020) |
| 10/21/2020 | 🌑 1469<br><br>(16 pgs) | Reply *in Support of the Motion for Relief from Stay (Dkt. 1200) and Motion for Adequate Protection (Dkt. 1201)* (related document(s):1200 Motion for Relief From Stay, 1201 Motion for Adequate Protection). Filed by Rodney Hudson, Allen Johnson (Knapp, Bradley) (Entered: 10/21/2020) |
| | 🌑 1470<br><br>(16 pgs; 3 docs) | Reply *in Support of Debtors' Motion for Entry of an Order (I) Extending the Time Within Which the Debtors Must Assume or Reject Unexpired Leases of Nonresidential Real Property and (II) Granting Related Relief* (related document(s):1228 Generic |

| | | |
|---|---|---|
| 10/21/2020 | | Motion). Filed by Chesapeake Energy Corporation (Attachments: # 1 Proposed Order # 2 Exhibit B - Redline) (Cavenaugh, Matthew) (Entered: 10/21/2020) |
| 10/21/2020 | 🔵 1471 <br><br> (2 pgs) | Letter from John Dough (JeannieAndresen) (Entered: 10/21/2020) |
| 10/21/2020 | 🔵 1472 <br><br> (4 pgs) | Declaration re: *Declaration of Disinterestedness of Littler Mendelson, PC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 10/21/2020) |
| 10/21/2020 | 🔵 1473 <br><br> (5 pgs) | Declaration re: *Declaration of Disinterestedness of Merit Advisors, LLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 10/21/2020) |
| 10/21/2020 | 🔵 1474 <br><br> (6 pgs) | Witness List (Filed By Saundra Nelson ). (Hearne, William) (Entered: 10/21/2020) |
| 10/21/2020 | 🔵 1475 <br><br> (8 pgs; 2 docs) | Proposed Order RE: *Order (I) Extending the Time Within Which the Debtors Must Assume or Reject Unexpired Leases of Nonresidential Real Property and (II) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):1228 Generic Motion) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 10/21/2020) |
| 10/21/2020 | 🔵 1476 <br><br> (30 pgs) | Motion to Set Hearing. Filed by Interested Party Kenneth Stewart (JenniferLongoria) (Entered: 10/21/2020) |
| 10/21/2020 | 🔵 1477 <br><br> (2 pgs) | Withdraw Document (Filed By Tributary Resources, LLC ).(Related document(s):1449 Generic Motion) (Martin, Jarrod) (Entered: 10/21/2020) |

| | | |
|---|---|---|
| 10/21/2020 | 🔘1478<br><br>(4 pgs) | Agenda for Hearing on 10/22/2020 (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 10/21/2020) |
| 10/21/2020 | 🔘1479<br><br>(4 pgs) | Agenda for Hearing on 10/22/2020 (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 10/21/2020) |
| 10/21/2020 | 🔘1480<br><br>(8 pgs) | BNC Certificate of Mailing. (Related document (s):1438 Order on Motion to Appear pro hac vice) No. of Notices: 137. Notice Date 10/21/2020. (Admin.) (Entered: 10/22/2020) |
| 10/21/2020 | 🔘1481<br><br>(8 pgs) | BNC Certificate of Mailing. (Related document (s):1439 Order on Motion to Appear pro hac vice) No. of Notices: 137. Notice Date 10/21/2020. (Admin.) (Entered: 10/22/2020) |
| 10/21/2020 | 🔘1482<br><br>(8 pgs) | BNC Certificate of Mailing. (Related document (s):1440 Order on Motion to Appear pro hac vice) No. of Notices: 137. Notice Date 10/21/2020. (Admin.) (Entered: 10/22/2020) |
| 10/21/2020 | 🔘1483<br><br>(8 pgs) | BNC Certificate of Mailing. (Related document (s):1441 Order on Motion to Appear pro hac vice) No. of Notices: 137. Notice Date 10/21/2020. (Admin.) (Entered: 10/22/2020) |
| 10/21/2020 | 🔘1484<br><br>(8 pgs) | BNC Certificate of Mailing. (Related document (s):1442 Order on Motion to Appear pro hac vice) No. of Notices: 137. Notice Date 10/21/2020. (Admin.) (Entered: 10/22/2020) |
| 10/21/2020 | 🔘1485<br><br>(8 pgs) | BNC Certificate of Mailing. (Related document (s):1443 Order on Motion to Appear pro hac vice) No. of Notices: 137. Notice Date 10/21/2020. (Admin.) (Entered: 10/22/2020) |
| | 🔘1486<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew D. Cavenaugh. This is to order a transcript of 10/22/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) Electronically forwarded to Access Transcripts on 10-27-2020. Estimated completion date: 10- |

| | | |
|---|---|---|
| 10/22/2020 | | 28-2020. Modified on 10/27/2020 (MelissaMorgan). (Entered: 10/22/2020) |
| 10/22/2020 | 1487<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Jason Boland. This is to order a transcript of the October 22, 2020 hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Official Committee Of Unsecured Creditors ). (Boland, Jason) Copy Request electronically forwarded to Access Transcripts on October 27, 2020. Estimated completion date: October 28, 2020. Modified on 10/27/2020 (ClaudiaGutierrez). (Entered: 10/22/2020) |
| 10/22/2020 | 1488<br><br>(2 pgs) | Courtroom Minutes. Time Hearing Held: 9:00 AM. Appearances: see attached. After conferring, the parties have agreed to continue today's hearing. (Related document(s):1200 Motion for Relief From Stay, 1201 Motion for Adequate Protection, 1235 Motion for Relief From Stay, 1236 Motion for Adequate Protection) **Hearing rescheduled for 10/30/2020 at 09:30 AM by telephone and video conference.** (aalo) (Entered: 10/22/2020) |
| 10/22/2020 | 1489<br><br>(1 pg) | PDF with attached Audio File. Court Date & Time [ 10/22/2020 8:58:00 AM ]. File Size [ 13880 KB ]. Run Time [ 00:28:55 ]. (admin). (Entered: 10/22/2020) |
| 10/22/2020 | 1490<br><br>(1 pg) | PDF with attached Audio File. Court Date & Time [ 10/22/2020 10:31:05 AM ]. File Size [ 10255 KB ]. Run Time [ 00:21:22 ]. (admin). (Entered: 10/22/2020) |
| 10/22/2020 | 1491<br><br>(54 pgs) | Notice *to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases*. (Related document(s):1305 Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 10/22/2020) |
| 10/22/2020 | 1492<br><br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Ekaterina Long Filed by on behalf of Robert L Bennett (Long, Ekaterina) (Entered: 10/22/2020) |

| | | |
|---|---|---|
| 10/22/2020 | 🔵1493<br><br>(3 pgs) | Affidavit Re: *Affidavit of Publication - The Oklahoman* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 10/22/2020) |
| 10/22/2020 | 🔵1494<br><br>(4 pgs) | Affidavit Re: *Affidavit of Publication - The Advocate* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 10/22/2020) |
| 10/22/2020 | 🔵1495<br><br>(3 pgs) | Affidavit Re: *Affidavit of Publication - Billings Gazette* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 10/22/2020) |
| 10/22/2020 | 🔵1496<br><br>(3 pgs) | Affidavit Re: *Affidavit of Publication - Canton Repository* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 10/22/2020) |
| 10/22/2020 | 🔵1497<br><br>(8 pgs) | E-Mail by Gaynell Spigner (mmap) (Entered: 10/22/2020) |
| 10/22/2020 | 🔵1498<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Marty L. Brimmage, Jr.. This is to order a transcript of the October 22, 2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts ). (Brimmage, Marty) Copy request was electronically forwarded to Access Transcripts on 10-27-2020. Estimated completion date: 10-28-2020. Modified on 10/27/2020 (MelissaMorgan). (Entered: 10/22/2020) |
| 10/22/2020 | 🔵1499<br><br>(2 pgs) | Courtroom Minutes. Time Hearing Held: 2:00 PM. Appearances: see attached. (Related document(s):1228 Generic Motion, 1475 Proposed Order) For the reasons stated on the record, the Court has approved the relief requested at docket 1228. Additionally, it has denied the motion for relief filed at 1238. (aalo) (Entered: 10/22/2020) |

| 10/22/2020 | ⬤1500 (4 pgs) | Affidavit Re: *Affidavit of Publication - Casper Star Tribune* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 10/22/2020) |
|---|---|---|
| 10/22/2020 | ⬤1501 (22 pgs) | Affidavit Re: *Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1261 Exhibit List, Witness List, 1275 Declaration, 1276 Declaration, 1277 Emergency Motion (with hearing date)) (Garabato, Sid) (Entered: 10/22/2020) |
| 10/22/2020 | ⬤1502 (7 pgs) | Affidavit Re: *Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1308 Stipulation, 1313 Declaration) (Garabato, Sid) (Entered: 10/22/2020) |
| 10/22/2020 | ⬤1503 (21 pgs) | Affidavit Re: *Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1353 Notice) (Garabato, Sid) (Entered: 10/22/2020) |
| 10/22/2020 | ⬤1504 (21 pgs) | Objection (related document(s):1149 Generic Motion). Filed by Paul M. Davis as Executor of the Succession of John P. Davis, Jr., Coushatta Bayou Land Co., JDP Real Estate, LLC, Industrial Dev. Bd. of the Parish of Caddo, Inc., Caddo Parish (McCune, Patrick) (Entered: 10/22/2020) |
| 10/22/2020 | ⬤1505 (78 pgs) | BNC Certificate of Mailing. (Related document (s):1452 Order on Application to Employ) No. of Notices: 137. Notice Date 10/22/2020. (Admin.) (Entered: 10/23/2020) |
| 10/22/2020 | ⬤1506 (12 pgs) | BNC Certificate of Mailing. (Related document (s):1453 Generic Order) No. of Notices: 137. Notice Date 10/22/2020. (Admin.) (Entered: 10/23/2020) |
| 10/22/2020 | ⬤1507 (13 pgs) | BNC Certificate of Mailing. (Related document (s):1467 Generic Order) No. of Notices: 137. Notice Date 10/22/2020. (Admin.) (Entered: 10/23/2020) |

| | | |
|---|---|---|
| 10/23/2020 | 🌑1508<br><br>(1 pg) | Motion *to Redact all Sensitive Information* Filed by Interested Party Gaynell Spigner (mmap) (Entered: 10/23/2020) |
| 10/23/2020 | 🌑1509<br><br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Michael A Shiner Filed by on behalf of Kenneth Alan Goddard, Phyllis Welcher, Paulette Parker, Sarah Lynn Moxley, Susan Gordon, Harry C. Crone, Bobby D. Crone, Susan Goddard Martin, Bruce Goddard Sr., Ronald William Goddard, Francis R. Goddard, Ronald Goddard, Shelton Goddard, Woodrow Bailey, Wanda Sue Sayers, Judy Prock, Janet Bullis (Shiner, Michael) (Entered: 10/23/2020) |
| 10/23/2020 | 🌑1510<br><br>(2 pgs) | Motion to Appear pro hac vice *of Michael A. Shiner.* Filed by Creditors Woodrow Bailey, Janet Bullis, Bobby D. Crone, Harry C. Crone, Bruce Goddard Sr., Francis R. Goddard, Kenneth Alan Goddard, Ronald Goddard, Ronald William Goddard, Shelton Goddard, Susan Gordon, Susan Goddard Martin, Sarah Lynn Moxley, Paulette Parker, Judy Prock, Wanda Sue Sayers, Phyllis Welcher (Shiner, Michael) (Entered: 10/23/2020) |
| 10/23/2020 | 🌑1511<br><br>(3 pgs) | E-Mail by Gaynell Spigner (mmap) (Entered: 10/23/2020) |
| 10/23/2020 | 🌑1512<br><br>(22 pgs; 2 docs) | Objection (related document(s):1149 Generic Motion). Filed by Deutsche Bank Trust Company Americas (Attachments: # 1 Exhibit A) (Carter, Winstol) (Entered: 10/23/2020) |
| 10/23/2020 | 🌑1513<br><br>(4 pgs) | Notice *of Reset Hearing on Motions to Lift the Automatic Stay of John H. Bedsole and Bedsole Land Company and Rosa M. Byers.* (Related document(s):1248 Motion for Relief From Stay, 1249 Motion for Relief From Stay) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 10/23/2020) |
| 10/23/2020 | 🌑1514<br><br>(34 pgs) | Notice *of Perfection of Mineral Lien by Pilot Thomas Logistics, LLC Pursuant to 11 U.S.C. 546(b)(2).* Filed by Pilot Thomas Logistics, LLC (Assink, Bryan) (Entered: 10/23/2020) |

| | | |
|---|---|---|
| 10/23/2020 | 🔘 1515<br><br>(3 pgs) | Response/Objection Filed by Brandes Investment Partners LP. (Related document (s):1512 Objection) (Lowenthal, Daniel) (Entered: 10/23/2020) |
| 10/23/2020 | 🔘 1516<br><br>(5 pgs) | E-Mail by Gaynell Spigner (mmap) (Entered: 10/23/2020) |
| 10/23/2020 | 🔘 1517<br><br>(58 pgs) | Debtors Master Service List (Filed By Epiq Corporate Restructuring LLC ). (Garabato, Sid) (Entered: 10/23/2020) |
| 10/23/2020 | 🔘 1518<br><br>(24 pgs) | Affidavit Re: *Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1279 Notice, 1285 Witness List, Exhibit List) (Garabato, Sid) (Entered: 10/23/2020) |
| 10/23/2020 | 🔘 1519<br><br>(3 pgs) | Affidavit Re: *Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1368 Notice) (Garabato, Sid) (Entered: 10/23/2020) |
| 10/23/2020 | 🔘 1520<br><br>(19 pgs) | Affidavit Re: *Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1377 Motion to Approve Compromise under Rule 9019, 1380 Agenda) (Garabato, Sid) (Entered: 10/23/2020) |
| 10/23/2020 | 🔘 1521<br><br>(23 pgs) | Affidavit Re: *Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1456 Notice, 1465 Stipulation) (Garabato, Sid) (Entered: 10/23/2020) |
| 10/23/2020 | 🔘 1522<br><br>(9 pgs) | Affidavit Re: *Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1478 Agenda, 1479 Agenda) (Garabato, Sid) (Entered: 10/23/2020) |
| | 🔘 1523<br><br>(19 pgs; 3 docs) | Certificate of No Objection *to Application of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing the Retention of Opportune LLP as Special Valuation and Industry Advisor Effective as of September 1,* |

| | | |
|---|---|---|
| 10/24/2020 | | *2020* (Filed By Official Committee Of Unsecured Creditors ).(Related document (s):1256 Application to Employ) (Attachments: # 1 Redline # 2 Proposed Order) (Harrison, Julie) (Entered: 10/24/2020) |
| 10/24/2020 | 1524<br><br>(19 pgs; 3 docs) | Certificate of No Objection *to Application of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing the Retention of Back Bay Management Corporation and its Division, the Michel-Shaked Group, as Expert Valuation Consultant Effective as of September 1, 2020* (Filed By Official Committee Of Unsecured Creditors ).(Related document (s):1255 Application to Employ) (Attachments: # 1 Redline # 2 Proposed Order) (Harrison, Julie) (Entered: 10/24/2020) |
| 10/25/2020 | 1527<br><br>(2 pgs) | Order Granting Motion To Appear pro hac vice - Michael A. Shiner (Related Doc # 1510) Signed on 10/25/2020. (emiller) (Entered: 10/26/2020) |
| 10/26/2020 | 1525<br><br>(4 pgs) | Proposed Order RE: *Order Denying J. Fleet Oil & Gas Production Company, L.L.C. and Martin Producing, L.L.C.'s Motion for Relief from the Automatic Stay as to the Debtors Chesapeake Louisiana, L.P., Chesapeake Operating, Inc., Chesapeake Energy Corporation, and Chesapeake Energy Marketing, Inc.* (Filed By Chesapeake Energy Corporation ).(Related document(s):1238 Motion for Relief From Stay, 1410 Response) (Cavenaugh, Matthew) (Entered: 10/26/2020) |
| 10/26/2020 | 1526<br><br>(17 pgs) | E-Mail to the Court by Gaynell Spigner (mmap) (Entered: 10/26/2020) |
| 10/26/2020 | 1528<br><br>(1 pg) | Letter from Trang Nguyen (JeannieAndresen) (Entered: 10/26/2020) |
| | 1529<br><br>(16 pgs) | Objection *(Energy Transfers Objection to the (I) Amended Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates and (II) Proposed Solicitation* |

| | | |
|---|---|---|
| 10/26/2020 | | *Procedures*) (related document(s):1149 Generic Motion). Filed by Sunoco Partners Marketing & Terminals L.P., Regency Marcellus Gas Gathering LLC, Regency Intrastate Gas LP, ETC Marketing, Ltd., ETC Katy Pipeline, Ltd., ETC Texas Pipeline Ltd., Energy Transfer Fuel, LP, Houston Pipe Line Company, LP, Oasis Pipeline L.P. (Crocker, Michaela) (Entered: 10/26/2020) |
| 10/26/2020 | 1530 (19 pgs; 3 docs) | Emergency Motion *TO CERTIFY CLASS OF ROYALTY OWNERS FOR PURPOSES OF FILING A CLASS PROOF OF CLAIM* Filed by Creditor Zehentbauer Family Land LP, et al (Attachments: # 1 Exhibit 1 Class Members # 2 Proposed Order) (Watts, Gregory) (Entered: 10/26/2020) |
| 10/26/2020 | 1531 (2 pgs) | Order (Related Doc # 1227) Signed on 10/26/2020. (aalo) (Entered: 10/26/2020) |
| 10/26/2020 | 1532 (4 pgs) | Order (Related Doc # 1228) Signed on 10/26/2020. (aalo) (Entered: 10/26/2020) |
| 10/26/2020 | 1533 (7 pgs) | Order (Related Doc # 1256) Signed on 10/26/2020. (aalo) (Entered: 10/26/2020) |
| 10/26/2020 | 1534 (6 pgs) | Order (Related Doc # 1255) Signed on 10/26/2020. (aalo) (Entered: 10/26/2020) |
| 10/26/2020 | 1535 (5 pgs) | Response/Objection Filed by The Bank of New York Mellon Trust Company, N.A., Wilmington Savings Fund Society, FSB. (Related document (s):1331 Disclosure Statement) (Huckleberry, Jennifer) (Entered: 10/26/2020) |
| 10/26/2020 | 1536 (2 pgs) | E-Mail by Gaynell Spigner (mmap) (Entered: 10/26/2020) |
| | 1537 (2 pgs) | Certificate *of Service* (Filed By Deutsche Bank Trust Company Americas ).(Related document (s):1512 Objection) (Carter, Winstol) (Entered: |

| 10/26/2020 | | 10/26/2020) |
|---|---|---|
| 10/26/2020 | 🔵 1538 <br><br> (2 pgs) | Notice of Appearance and Request for Notice Filed by Garland Doty Murphy Filed by on behalf of BP America Production Company (Murphy, Garland) (Entered: 10/26/2020) |
| 10/26/2020 | 🔵 1539 <br><br> (9 pgs; 3 docs) | Motion for 2004 Examination. Filed by Creditor BP America Production Company (Attachments: # 1 Exhibit A # 2 Exhibit B) (Murphy, Garland) (Entered: 10/26/2020) |
| 10/26/2020 | 🔵 1540 <br><br> (3 pgs) | Stipulation By Chesapeake Energy Corporation and Official Committee of Unsecured Creditors. Does this document include an agreed order or otherwise request that the judge sign a document? No. (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 10/26/2020) |
| 10/26/2020 | 🔵 1541 <br><br> (2 pgs) | Withdraw Document (Filed By Pilot Thomas Logistics, LLC ).(Related document(s):1514 Notice) (Assink, Bryan) (Entered: 10/26/2020) |
| 10/26/2020 | 🔵 1542 <br><br> (2 pgs; 2 docs) | E-mail by Gaynell Spigner (Attachments: # 1 drawing) (mmap) (Entered: 10/26/2020) |
| 10/26/2020 | 🔵 | Certificate of Telephone Notice. Contacted Veronica Polnick. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):1151 Disclosure Statement, 1248 Motion for Relief From Stay, 1249 Motion for Relief From Stay) Hearing scheduled for 11/6/2020 at 02:00 PM at telephone and video conference. (aalo) (Entered: 10/26/2020) |
| | 🔵 1543 <br><br> (10 pgs; 2 docs) | Emergency Motion *of the Official Committee of Unsecured Creditors to File Under Seal the Emergency Motions of the Official Committee of Unsecured Creditors for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of the Debtors' Estates and (II) Exclusive Settlement Authority, and Related Complaints* |

| | | |
|---|---|---|
| 10/26/2020 | | Filed by Creditor Committee Official Committee Of Unsecured Creditors (Attachments: # 1 Proposed Order) (Harrison, Julie) (Entered: 10/26/2020) |
| 10/26/2020 | 🔵 1544 <br><br> (181 pgs; 3 docs) | Sealed Document *Sealed Emergency Motion of the Official Committee of Unsecured Creditors for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of the Debtors' Estates and (II) Exclusive Settlement Authority* (Filed By Official Committee Of Unsecured Creditors ). (Attachments: # 1 Exhibit A: Proposed Order # 2 Exhibit B: Complaint) (Harrison, Julie) (Entered: 10/26/2020) |
| 10/26/2020 | 🔵 1545 <br><br> (83 pgs; 3 docs) | Emergency Motion *of the Official Committee of Unsecured Creditors for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of the Debtors' Estates and (II) Exclusive Settlement Authority* Filed by Creditor Committee Official Committee Of Unsecured Creditors (Attachments: # 1 Exhibit A: Proposed Order # 2 Exhibit B: Complaint) (Harrison, Julie) (Entered: 10/26/2020) |
| | 🔵 1546 <br><br> (3463 pgs; 27 docs) | Sealed Document *Sealed Emergency Motion of the Official Committee of Unsecured Creditors for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Lien Claims and Causes of Action on Behalf of the Debtors' Estates and (II) Exclusive Settlement Authority* (Filed By Official Committee Of Unsecured Creditors ). (Attachments: # 1 Exhibit A: Proposed Order # 2 Exhibit B: Complaint # 3 Exhibit A to Complaint # 4 Exhibit B to Complaint # 5 Exhibit C to Complaint # 6 Exhibit D to Complaint # 7 Exhibit E to Complaint # 8 Exhibit F to Complaint # 9 Exhibit G to Complaint # 10 Exhibit H to Complaint # 11 Exhibit I to Complaint # 12 Exhibit J to Complaint # 13 Exhibit K to Complaint # 14 Exhibit L to Complaint # 15 Exhibit M to Complaint # 16 Exhibit N to Complaint # 17 Exhibit O to Complaint # 18 Exhibit P to Complaint # 19 Exhibit Q to |

| | | |
|---|---|---|
| 10/26/2020 | | Complaint # 20 Exhibit R to Complaint # 21 Exhibit S to Complaint # 22 Exhibit T to Complaint # 23 Exhibit U to Complaint # 24 Exhibit V to Complaint # 25 Exhibit W to Complaint # 26 Exhibit X to Complaint) (Harrison, Julie) (Entered: 10/26/2020) |
| 10/26/2020 | 🌐1547<br><br>(3143 pgs; 27 docs) | Emergency Motion *of the Official Committee of Unsecured Creditors for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Lien Claims and Causes of Action on Behalf of the Debtors' Estates and (II) Exclusive Settlement Authority* Filed by Creditor Committee Official Committee Of Unsecured Creditors (Attachments: # 1 Exhibit A: Proposed Order # 2 Exhibit B: Complaint # 3 Exhibit A to Complaint # 4 Exhibit B to Complaint # 5 Exhibit C to Complaint # 6 Exhibit D to Complaint # 7 Exhibit E to Complaint # 8 Exhibit F to Complaint # 9 Exhibit G to Complaint # 10 Exhibit H to Complaint # 11 Exhibit I to Complaint # 12 Exhibit J to Complaint # 13 Exhibit K to Complaint # 14 Exhibit L to Complaint # 15 Exhibit M to Complaint # 16 Exhibit N to Complaint # 17 Exhibit O to Complaint # 18 Exhibit P to Complaint # 19 Exhibit Q to Complaint # 20 Exhibit R to Complaint # 21 Exhibit S to Complaint # 22 Exhibit T to Complaint # 23 Exhibit U to Complaint # 24 Exhibit V to Complaint # 25 Exhibit W to Complaint # 26 Exhibit X to Complaint) (Harrison, Julie) (Entered: 10/26/2020) |
| | 🌐1548<br><br>(9 pgs; 2 docs) | Emergency Motion *of the Official Committee of Unsecured Creditors to File Under Seal Objection to the Debtors' Motion For Entry Of An Order (I) Approving The Adequacy Of The Disclosure Statement, (II) Approving The Solicitation Procedures With Respect To Confirmation Of The Debtors Proposed Chapter 11 Plan, (III) Approving The Forms Of Ballots And Notices In Connection Therewith, (IV) Approving The Rights Offering Procedures And Related Materials, (V) Scheduling Certain Dates With Respect Thereto, And (VI) Granting Related Relief* Filed by Creditor Committee |

| | | |
|---|---|---|
| 10/26/2020 | | Official Committee Of Unsecured Creditors (Attachments: # 1 Proposed Order) (Harrison, Julie) (Entered: 10/26/2020) |
| 10/26/2020 | 1549<br><br>(40 pgs; 2 docs) | Sealed Document *Sealed Objection of the Official Committee of Unsecured Creditors to Debtors Motion For Entry Of An Order (I) Approving The Adequacy Of The Disclosure Statement, (II) Approving The Solicitation Procedures With Respect To Confirmation Of The Debtors Proposed Chapter 11 Plan, (III) Approving The Forms Of Ballots And Notices In Connection Therewith, (IV) Approving The Rights Offering Procedures And Related Materials, (V) Scheduling Certain Dates With Respect Thereto, And (VI) Granting Related Relief* (Filed By Official Committee Of Unsecured Creditors ). (Attachments: # 1 Exhibit A) (Harrison, Julie) (Entered: 10/26/2020) |
| 10/26/2020 | 1550<br><br>(40 pgs; 2 docs) | Objection *of the Official Committee of Unsecured Creditors to the Debtors Motion For Entry Of An Order (I) Approving The Adequacy Of The Disclosure Statement, (II) Approving The Solicitation Procedures With Respect To Confirmation Of The Debtors Proposed Chapter 11 Plan, (III) Approving The Forms Of Ballots And Notices In Connection Therewith, (IV) Approving The Rights Offering Procedures And Related Materials, (V) Scheduling Certain Dates With Respect Thereto, And (VI) Granting Related Relief* (related document(s):1149 Generic Motion). Filed by Official Committee Of Unsecured Creditors (Attachments: # 1 Exhibit A) (Harrison, Julie) (Entered: 10/26/2020) |
| 10/27/2020 | 1551<br><br>(2 pgs) | E-Mail by Gaynell Spigner (mmap) (Entered: 10/27/2020) |
| 10/27/2020 | 1552<br><br>(1 pg) | Notice of Change of Address Filed by Joe Gordon Hoffman Trust (JosephWells) (Entered: 10/27/2020) |
| | 1553 | Letter from Shareholder John Dough |

| 10/27/2020 | (5 pgs) | (JeannieAndresen) (Entered: 10/27/2020) |
|---|---|---|
| 10/27/2020 | ⦿ | Certificate of Telephone Notice. Contacted Veronica Polnick. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):1331 Disclosure Statement) **The Disclosure Statement Hearing is scheduled for 10/30/2020 at 09:30 AM by telephone and video conference. (aalo)** (Entered: 10/27/2020) |
| 10/27/2020 | ⦿ | Certificate of Telephone Notice. By agreement of the parties, the hearing on the motion for relief from stay has been adjourned to 11/20/2020 at 2:00 PM. The parties have also agreed to a response deadline of 11/13/2020. The Movant to notice all interested parties and file a certificate of service with the court (Related document(s):1249 Motion for Relief From Stay) **Hearing scheduled for 11/20/2020 at 02:00 PM by telephone and video conference.** (aalo) (Entered: 10/27/2020) |
| 10/27/2020 | ⦿1554 (5 pgs) | Stipulation By Chesapeake Energy Corporation and Liberty Mutual Insurance Company. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 10/27/2020) |
| 10/27/2020 | ⦿1555 (67 pgs) | Certificate *of Service of Emergency Motion to Certify Class of Royalty Owners for Purposes of Filing a Class Proof of Claim* (Filed By Zehentbauer Family Land LP, et al ).(Related document(s):1530 Emergency Motion) (Watts, Gregory) (Entered: 10/27/2020) |
| 10/27/2020 | ⦿1556 (2 pgs) | Order Approving Joint Stipulation Extending the Proof of Claim Filing Deadline for the Wier Group Signed on 10/27/2020 (Related document(s):1265 Stipulation) (VrianaPortillo) (Entered: 10/27/2020) |
| 10/27/2020 | ⦿1557 (5 pgs) | Joint Stipulation and Agreed Order by and Among Debtors and Juan Carlos Alaniz Granting Relief from the Automatic Stay Signed |

| | | |
|---|---|---|
| 10/27/2020 | | on 10/27/2020 (Related document(s):1308 Stipulation) (VrianaPortillo) (Entered: 10/27/2020) |
| 10/27/2020 | 🔘 1558 (20 pgs; 2 docs) | Motion for Relief from Stay . Fee Amount $181. Filed by Interested Party Madison Hendrix Hearing scheduled for 11/20/2020 at 02:00 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order) (Wexler, Noah) (Entered: 10/27/2020) |
| 10/27/2020 | | Receipt of Motion for Relief From Stay(20-33233) [motion,mrlfsty] ( 181.00) Filing Fee. Receipt number 22542466. Fee amount $ 181.00. (U.S. Treasury) (Entered: 10/27/2020) |
| 10/27/2020 | 🔘 1559 (7 pgs) | Supplemental Notice *of Auction for the Sale of the Debtors' Mid-Con Assets Free and Clear of any and all Claims, Interests, and Encumbrances*. (Related document(s):1305 Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 10/27/2020) |
| 10/27/2020 | 🔘 1560 (39 pgs; 5 docs) | Emergency Motion *to Quash Eric Petroleum Corporation and Eric Petroleum Utica, LLC's Rule 2004 Notice* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Proposed Order) (Cavenaugh, Matthew) (Entered: 10/27/2020) |
| 10/27/2020 | 🔘 1561 (5 pgs) | Stipulation By Chesapeake Energy Corporation and CNOOC Energy U.S.A. LLC f/k/a OOGC America LLC, Jamestown Resources, L.L.C., Larchmont Resources, L.L.C., Petty Business Enterprises, LP. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ).(Related document(s):787 Generic Order) (Cavenaugh, Matthew) (Entered: 10/27/2020) |
| 10/27/2020 | 🔘 1562 (4 pgs; 2 docs) | Notice of Appearance and Request for Notice Filed by Louis J. Ebert Filed by on behalf of Rummel Klepper & Kahl (DawnWaggoner) Additional attachment(s) added on 10/28/2020 (DawnWaggoner). (Entered: 10/28/2020) |

| | | |
|---|---|---|
| 10/28/2020 | 🔵 1563<br><br>(1 pg) | Motion to Appear pro hac vice *of Chad J. Kutmas*. Filed by Creditor Traci Hendrix (Kutmas, Chad) (Entered: 10/28/2020) |
| 10/28/2020 | 🔵 | Certificate of Telephone Notice. Contacted Veronica Polnick. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):1560 Emergency Motion) Hearing scheduled for 10/28/2020 at 03:00 PM by telephone and video conference. (aalo) (Entered: 10/28/2020) |
| 10/28/2020 | 🔵 1564<br><br>(1 pg) | E-Mail Objections to Midcon Tom Ward by Gaynell Spigner (Related document(s):1559 Notice) (mmap) (Entered: 10/28/2020) |
| 10/28/2020 | 🔵 1565<br><br>(3 pgs) | Exhibit List, Witness List (Filed By Official Committee of Royalty Owners ).(Related document(s):1149 Generic Motion, 1330 Amended Chapter 11 Plan, 1331 Disclosure Statement, 1332 Proposed Order) (Brown, pllc, Deirdre) (Entered: 10/28/2020) |
| 10/28/2020 | 🔵 1566<br><br>(4 pgs) | Notice *of Hearing*. (Related document(s):1560 Emergency Motion, Certificate of Notice) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 10/28/2020) |
| 10/28/2020 | 🔵 1567<br><br>(394 pgs; 7 docs) | Witness List, Exhibit List (Filed By Chesapeake Energy Corporation ).(Related document(s): Certificate of Notice, Certificate of Notice) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6) (Cavenaugh, Matthew) (Entered: 10/28/2020) |
| 10/28/2020 | 🔵 1568<br><br>(4 pgs) | Witness List, Exhibit List (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):1149 Generic Motion, 1549 Sealed Document, 1550 Objection) (Harrison, Julie) (Entered: 10/28/2020) |
| 10/28/2020 | 🔵 1569<br><br>(4 pgs) | Notice *of Reset Hearing on Allen Johnson, et al., and Rodney Hudson, et al.'s Motion for Relief from Stay and Motion for Adequate Protection*. (Related document(s):1200 Motion for Relief From Stay, 1201 Motion for Adequate Protection) Filed by |

| | | |
|---|---|---|
| 10/28/2020 | | Rodney Hudson, Allen Johnson (Knapp, Bradley) (Entered: 10/28/2020) |
| 10/28/2020 | 1570<br><br>(34 pgs; 4 docs) | Witness List, Exhibit List (Filed By Chesapeake Energy Corporation ).(Related document(s):1560 Emergency Motion, Certificate of Notice, 1566 Notice) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3) (Cavenaugh, Matthew) (Entered: 10/28/2020) |
| 10/28/2020 | 1571<br><br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Lynnette Randee Warman Filed by on behalf of Stephanie Delasandro (Warman, Lynnette) (Entered: 10/28/2020) |
| 10/28/2020 | 1572<br><br>(3 pgs) | Courtroom Minutes. Time Hearing Held: 3:00 pm. Appearances: SEE ATTACHED. (Related document(s):1560 Emergency Motion) The motion to quash is granted and the proposed order was signed as modified on the record. (emiller) (Entered: 10/28/2020) |
| 10/28/2020 | 1573<br><br>(135 pgs) | Statement / *Second Monthly Fee Statement of AlixPartners, LLP, Financial Advisor to the Official Committee of Unsecured Creditors for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses for the Period August 1, 2020 through August 31, 2020* (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) (Entered: 10/28/2020) |
| 10/28/2020 | 1574<br><br>(1 pg) | Order Granting Emergency Motion to Quash Eric Petroleum Corporation and Eric Petroleum Utica, LLC's Rule 2004 Notice (Related Doc # 1560) Signed on 10/28/2020. (emiller) (Entered: 10/28/2020) |
| 10/28/2020 | 1575<br><br>(1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 10/28/2020 2:57:02 PM ]. File Size [ 10087 KB ]. Run Time [ 00:21:01 ]. (admin). (Entered: 10/28/2020) |
| 10/28/2020 | 1576<br><br>(38 pgs) | Transcript RE: Motion Hearing held on 10/22/20 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through |

| 10/28/2020 | | 01/26/2021. (AccessTranscripts) (Entered: 10/28/2020) |
|---|---|---|
| 10/28/2020 | ⚫ 1577<br><br>(21 pgs) | Affidavit Re: *Service of Docket Number 1513; Affidavit by Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document (s):1513 Notice) (Garabato, Sid) (Entered: 10/28/2020) |
| 10/28/2020 | ⚫ 1578<br><br>(26 pgs) | Affidavit Re: *Service of Docket Numbers 1470, 1472 and 1473; Affidavit by Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1470 Reply, 1472 Declaration, 1473 Declaration) (Garabato, Sid) (Entered: 10/28/2020) |
| 10/28/2020 | ⚫ 1579<br><br>(9 pgs) | Memorandum Opinion Signed on 10/28/2020 (Related document(s):27 Emergency Motion) (emiller) (Entered: 10/28/2020) |
| 10/28/2020 | ⚫ 1580<br><br>(1 pg) | Order Signed on 10/28/2020 (Related document (s):27 Emergency Motion) (emiller) (Entered: 10/28/2020) |
| 10/28/2020 | ⚫ 1581<br><br>(5 pgs) | Stipulation By Chesapeake Energy Corporation and Rodney Hudson, et al.. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 10/28/2020) |
| 10/28/2020 | ⚫ 1582<br><br>(9 pgs; 2 docs) | Emergency Motion *of the Official Committee of Unsecured Creditors to File Under Seal Amended Objection to the Debtors' Motion For Entry Of An Order (I) Approving The Adequacy Of The Disclosure Statement, (II) Approving The Solicitation Procedures With Respect To Confirmation Of The Debtors Proposed Chapter 11 Plan, (III) Approving The Forms Of Ballots And Notices In Connection Therewith, (IV) Approving The Rights Offering Procedures And Related Materials, (V) Scheduling Certain Dates With Respect Thereto, And (VI) Granting Related Relief* Filed by Creditor Committee Official Committee Of Unsecured Creditors (Attachments: # 1 Proposed Order) (Harrison, Julie) (Entered: 10/28/2020) |

| | | |
|---|---|---|
| 10/28/2020 | ● 1583<br><br>(41 pgs; 2 docs) | Sealed Document / *Sealed Amended Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation Procedures with Respect to Confirmation of the Debtors' Proposed Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Approving the Rights Offering Procedures and Related Materials, (V) Scheduling Certain Dates with Respect Thereto, and (VI) Granting Related Relief* (Filed By Official Committee Of Unsecured Creditors ). (Attachments: # 1 Exhibit A) (Harrison, Julie) (Entered: 10/28/2020) |
| 10/28/2020 | ● 1584<br><br>(41 pgs; 2 docs) | Objection / *Amended Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation Procedures with Respect to Confirmation of the Debtors' Proposed Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Approving the Rights Offering Procedures and Related Materials, (V) Scheduling Certain Dates with Respect Thereto, and (VI) Granting Related Relief* (related document(s):1149 Generic Motion). Filed by Official Committee Of Unsecured Creditors (Attachments: # 1 Exhibit A) (Harrison, Julie) (Entered: 10/28/2020) |
| 10/28/2020 | ● 1585<br><br>(9 pgs) | BNC Certificate of Mailing. (Related document(s):1527 Order on Motion to Appear pro hac vice) No. of Notices: 144. Notice Date 10/28/2020. (Admin.) (Entered: 10/29/2020) |
| 10/28/2020 | ● 1586<br><br>(9 pgs) | BNC Certificate of Mailing. (Related document(s):1531 Generic Order) No. of Notices: 146. Notice Date 10/28/2020. (Admin.) (Entered: 10/29/2020) |
| 10/28/2020 | ● 1587<br><br>(11 pgs) | BNC Certificate of Mailing. (Related document(s):1532 Generic Order) No. of Notices: 146. Notice Date 10/28/2020. (Admin.) (Entered: 10/29/2020) |

| | | |
|---|---|---|
| 10/28/2020 | 🔵1588<br><br>(14 pgs) | BNC Certificate of Mailing. (Related document (s):1533 Order on Application to Employ) No. of Notices: 146. Notice Date 10/28/2020. (Admin.) (Entered: 10/29/2020) |
| 10/28/2020 | 🔵1589<br><br>(13 pgs) | BNC Certificate of Mailing. (Related document (s):1534 Order on Application to Employ) No. of Notices: 146. Notice Date 10/28/2020. (Admin.) (Entered: 10/29/2020) |
| 10/29/2020 | 🔵1590<br><br>(9 pgs; 3 docs) | E-Mail by Gaynell Spigner (Attachments: # 1 Exhibit # 2 Exhibit) (mmap) (Entered: 10/29/2020) |
| 10/29/2020 | 🔵1591<br><br>(1 pg) | Notice of Filing of Official Transcript as to 1576 Transcript. Parties notified (Related document (s):1576 Transcript) (dhan) (Entered: 10/29/2020) |
| 10/29/2020 | 🔵1592<br><br>(5 pgs) | Stipulation By RLI Insurance Company and Chesapeake Energy Corporation. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By RLI Insurance Company ). (Dry, Ryan) (Entered: 10/29/2020) |
| 10/29/2020 | 🔵1593<br><br>(1 pg) | Motion to Appear pro hac vice *Montgomery L Lair*. Filed by Creditor Traci Hendrix (mmap) (Entered: 10/29/2020) |
| 10/29/2020 | 🔵1594<br><br>(1 pg) | Motion to Appear pro hac vice *Guy A. Fortney*. Filed by Creditor Traci Hendrix (mmap) (Entered: 10/29/2020) |
| 10/29/2020 | 🔵1595<br><br>(1 pg) | Motion to Appear pro hac vice *Clark O Brewster*. Filed by Creditor Traci Hendrix (mmap) (Entered: 10/29/2020) |
| 10/29/2020 | 🔵1596<br><br>(3 pgs) | Notice *of Hearings*. (Related document(s):1175 Motion to Reconsider, 1293 Motion for Relief From Stay) Filed by Stephanie Delasandro (Warman, Lynnette) (Entered: 10/29/2020) |
| 10/29/2020 | 🔵1597<br><br>(1 pg) | Motion to Appear pro hac vice *Beth E. Levine*. Filed by Interested Party Madison Hendrix (mmap) (Entered: 10/29/2020) |

| | | |
|---|---|---|
| 10/29/2020 | 🔘1598<br><br>(1 pg) | Motion to Appear pro hac vice *Laura Davis Jones*. Filed by Interested Party Madison Hendrix (mmap) (Entered: 10/29/2020) |
| 10/29/r 020 | 🔘1599<br><br>(125 pgs; 2 docs) | Second Amended Chapter 11 Plan Filed by Chesapeake Energy Corporation. (Attachments: # 1 Redline)(Peguero, Kristhy) (Entered: 10/29/2020) |
| 10/29/2020 | 🔘1600<br><br>(288 pgs; 2 docs) | Disclosure Statement Filed by Chesapeake Energy Corporation. (Attachments: # 1 Redline)(Peguero, Kristhy) (Entered: 10/29/2020) |
| 10/29/2020 | 🔘1601<br><br>(9 pgs) | Notice *of Objection*. Filed by Lonzell Johnson Jr. (dnor) (Entered: 10/29/2020) |
| 10/29/2020 | 🔘1602<br><br>(403 pgs; 2 docs) | Proposed Order RE: *Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation Procedures with Respect to the Confirmation of the Debtors' Proposed Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Approving the Rights Offering Procedures and Related Materials, (V) Scheduling Certain Dates with Respect Thereto, and (VI) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):1149 Generic Motion) (Attachments: # 1 Redline) (Peguero, Kristhy) (Entered: 10/29/2020) |
| 10/29/2020 | 🔘1603<br><br>(193 pgs) | Omnibus Reply *in Support of and in Response to Objections to Approval of the Adequacy of the Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* (related document(s):1149 Generic Motion). Filed by Chesapeake Energy Corporation (Peguero, Kristhy) (Entered: 10/29/2020) |
| 10/29/20r 0 | 🔘1604<br><br>(11 pgs) | Withdrawal of Claim: *10022 filed by Epiq Corporate Restructuring, LLC on behalf of J&J Excavating & Materials Co* (Garabato, Sid) (Entered: 10/29/2020) |
| | 🔘1605 | Response - *Joinder of MUFG Union Bank, N.A. In Support of Debtors' Disclosure Statement Motion* |

| | | |
|---|---|---|
| 10/29/2020 | (4 pgs) | (related document(s):1149 Generic Motion). Filed by MUFG Union Bank, N.A. (Quejada, Maegan) (Entered: 10/29/2020) |
| 10/29/2020 | 1606<br><br>(11 pgs; 2 docs) | Motion for Relief from Stay . Fee Amount $181. Filed by Creditor Catherine Ramirez Hearing scheduled for 12/4/2020 at 02:00 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order) (Lindauer, Joyce) (Entered: 10/29/2020) |
| 10/29/2020 | 1607<br><br>(8 pgs) | Notice /*Joinder to the Debtors' Motion and Reply and Statement in Support of the Disclosure Statement*. Filed by Ad Hoc Group of FLLO Term Loan Lenders (Perrin, Harry) (Entered: 10/29/2020) |
| 10/29/2020 | 1608<br><br>(7 pgs) | Response *Joinder and Reply of Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts, to the Debtors' Omnibus Reply in Support of and in Response to Objections to Approval of the Adequacy of the Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates (related document(s): [1584 and 1603]* (related document (s):1149 Generic Motion). Filed by Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts (Brimmage, Marty) (Entered: 10/29/2020) |
| 10/29/2020 | 1609<br><br>(3 pgs) | Notice of Appearance and Request for Notice Filed by John R Lane Jr Filed by on behalf of Lisa L. Conway (Lane, John) (Entered: 10/29/2020) |
| 10/29/2020 | 1610<br><br>(3 pgs) | Notice of Appearance and Request for Notice Filed by John R Lane Jr Filed by on behalf of Diane Marie Law Denton (Lane, John) (Entered: 10/29/2020) |
| 10/29/2020 | 1611<br><br>(7 pgs) | Agenda for Hearing on 10/30/2020 (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 10/29/2020) |
| | 1612<br><br>(96 pgs; 8 docs) | Adversary case 20-03451. Nature of Suit: (02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy))), |

| | | |
|---|---|---|
| 10/29/2020 | | (21 (Validity, priority or extent of lien or other interest in property)), (91 (Declaratory judgment)) Complaint by Gates Mineral Company, Ltd., Gates Production Company EF, LLC, Donald G. Elliott, Jannifer M. Elliott, David B. Elliott, Richard J. Gates, Linda A. Pederson, Louise G. Davis, Thomas A. Gates, Terri S. Gates, Kevin Kennedy against Chesapeake Energy Corporation, Chesapeake Exploration, LLC, Chesapeake Energy Marketing, LLC, Chesapeake Operating, LLC, CNOOC ENERGY USA, LLC, Larchmont Resources, LLC. Fee Amount $350 (Attachments: # 1 Exhibit # 2 Exhibit # 3 Exhibit # 4 Exhibit # 5 Exhibit # 6 Exhibit # 7 Exhibit) (Gutierrez, Albert) (Entered: 10/29/2020) |
| 10/29/2020 | 1613<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Chad J. Kutmas (Related Doc # 1563) Signed on 10/29/2020. (emiller) (Entered: 10/29/2020) |
| 10/29/2020 | 1614<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Montgomery L. Lair (Related Doc # 1593) Signed on 10/29/2020. (emiller) (Entered: 10/29/2020) |
| 10/29/2020 | 1615<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Guy A. Fortney (Related Doc # 1594) Signed on 10/29/2020. (emiller) (Entered: 10/29/2020) |
| 10/29/2020 | 1616<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Clark O. Brewster (Related Doc # 1595) Signed on 10/29/2020. (emiller) (Entered: 10/29/2020) |
| 10/29/2020 | 1617<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Beth E. Levine (Related Doc # 1597) Signed on 10/29/2020. (emiller) (Entered: 10/29/2020) |
| 10/29/2020 | 1618<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Laura Davis Jones (Related Doc # 1598) Signed on 10/29/2020. (emiller) (Entered: 10/29/2020) |
| | 1619<br><br>(12 pgs) | Statement *Second Amended Verified Statement of Davis Polk & Wardwell LLP and Vinson & Elkins LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019* (Filed By Ad Hoc Group of FLLO Term Loan Lenders ).(Related document(s):872 Statement) (Vakamudi, Kiran) (Entered: |

| 10/29/2020 | | 10/29/2020) |
|---|---|---|
| 10/29/2020 | 🔵 1620<br><br>(9 pgs) | BNC Certificate of Mailing. (Related document (s):1556 Generic Order) No. of Notices: 147. Notice Date 10/29/2020. (Admin.) (Entered: 10/30/2020) |
| 10/29/2020 | 🔵 1621<br><br>(12 pgs) | BNC Certificate of Mailing. (Related document (s):1557 Generic Order) No. of Notices: 147. Notice Date 10/29/2020. (Admin.) (Entered: 10/30/2020) |
| 10/30/2020 | 🔵 1622<br><br>(432 pgs; 3 docs) | Amended Disclosure Statement Filed by Chesapeake Energy Corporation. (Attachments: # 1 Redline to 10/29 # 2 Cumulative Redline) (Cavenaugh, Matthew) (Entered: 10/30/2020) |
| 10/30/2020 | 🔵 1623<br><br>(2 pgs) | Notice *Partial Joinder*. (Related document(s):1584 Objection) Filed by c/o Annie Catmull Royalty Owner Plaintiffs c/o (Catmull, Annie) (Entered: 10/30/2020) |
| 10/30/2020 | 🔵 1624<br><br>(625 pgs; 2 docs) | Proposed Order RE: *Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation Procedures with Respect to the Confirmation of the Debtors' Proposed Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Approving the Rights Offering Procedures and Related Materials, (V) Scheduling Certain Dates with Respect Thereto, and (VI) Granting Related Relie* (Filed By Chesapeake Energy Corporation ).(Related document(s):1149 Generic Motion) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 10/30/2020) |
| 10/30/2020 | 🔵 1625<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Marty L. Brimmage, Jr.. This is to order a transcript of the October 30, 2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts ). (Brimmage, Marty) Electronically forwarded to Access Transcripts on 11-2-2020. Estimated completion date: 11-3-2020. Modified on 11/2/2020 (MelissaMorgan). (Entered: 10/30/2020) |

| | | |
|---|---|---|
| 10/30/2020 | 🔵1626<br><br>(24 pgs) | Sent document by e-mail by Gaynell Spigner (mmap) (Entered: 10/30/2020) |
| 10/30/2020 | 🔵1627<br><br>(5 pgs) | Courtroom Minutes. Time Hearing Held: 9:30 AM. Appearances: SEE ATTACHED. (Related document(s):1149 Generic Motion) Mr. Dell'Osso's testimony was proffered in support of approval of disclosure statement. For the reasons stated on the record, the Court approved the disclosure statement. **Confirmation hearing is scheduled for 12/15/2020 at 12:00 PM at Houston, Courtroom 400 (DRJ).** A **Status conference to be held on 12/4/2020 at 10:00 AM at Houston, Courtroom 400 (DRJ)** for any request for temporary allowance for voting purposes. **A second status conference is scheduled for 12/14/2020 at 02:00 PM at Houston, Courtroom 400 (DRJ).** The hearing on the standing motion 1546 1547 scheduled for 11/09/2020 is cancelled. The parties to contact the Court's case manager to obtain a new hearing date. Any objections to the standing motion must be filed by 12/10/2020. (VrianaPortillo) (Entered: 10/30/2020) |
| 10/30/2020 | 🔵1628<br><br>(2 pgs) | Letter from Jason Dean (JeannieAndresen) (Entered: 10/30/2020) |
| 10/30/2020 | 🔵1629<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Jason Boland. This is to order a transcript of the October 30, 2020 hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Official Committee Of Unsecured Creditors ). (Boland, Jason) Copy request was electronically forwarded to Access Transcripts on 11-2-2020. Estimated completion date: 11-3-2020. Modified on 11/2/2020 (MelissaMorgan). (Entered: 10/30/2020) |
| 10/30/2020 | 1630<br><br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Reese W Baker Filed by on behalf of Sheila Bartek (Baker, Reese) (Entered: 10/30/2020) |
| 10/30/2020 | 🔵1631<br><br>(2 pgs) | Withdrawal of Claim: 167,171,173 *of John N. Tyler* (Hamm, Holly) (Entered: 10/30/2020) |

| | | |
|---|---|---|
| 10/30/2020 | 🌐 1632<br><br>(5 pgs) | Stipulation and Agreed Order by and Among the Debtors, the Co-Interest Owners, and Petty Extending Bar Date to File Proof of Claim Signed on 10/30/2020 (Related document(s):1561 Stipulation) (VrianaPortillo) (Entered: 10/30/2020) |
| 10/30/2020 | 🌐 1633<br><br>(416 pgs) | Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation Procedures with Respect to Confirmation of the Debtors' Proposed Chapter 11 plan, (III) Approving the Forms of Ballots and Notices in Connection therewith, (IV) Approving the Rights Offering Procedures and Related Materials, (V) Scheduling Certain Dates with Respect thereto, and (VI) Granting Related Relief Signed on 10/30/2020 (Related document(s):1149 Generic Motion **Confirmation hearing to be held on 12/15/2020 at 12:00 PM at Houston, Courtroom 400 (DRJ).** Last day to Object to Confirmation 12/7/2020. (VrianaPortillo) (Entered: 10/30/2020) |
| 10/30/2020 | 🌐 1634<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Che H Lee. This is to order a transcript of 10/30/2020, hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts. (mmap) Copy request was electronically forwarded to Access Transcripts on 11-2-2020. Estimated completion date: 11-3-2020. Modified on 11/2/2020 (MelissaMorgan). (Entered: 10/30/2020) |
| 10/30/2020 | 🌐 1635<br><br>(15 pgs; 2 docs) | Objection to *John H. Bedsole and Bedsole Land Company's Motion for Relief From the Automatic Stay as to Debtor Chesapeake Louisiana, L.P.* (related document(s):1248 Motion for Relief From Stay). Filed by Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 10/30/2020) |
| 10/30/2020 | 🌐 1636<br><br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Aaron Matthew Guerrero Filed by on behalf of TEP Anadarko Basin North III LLC (Guerrero, Aaron) (Entered: 10/30/2020) |
| | 🌐 1637 | Notice *of Filing Quarterly Statement Pursuant to the Order Authorizing the Retention and* |

| | | |
|---|---|---|
| 10/30/2020 | (5 pgs) | *Compensation of Certain Professionals Utilized in the Ordinary Course of Business*. (Related document(s):655 Generic Order) Filed by Chesapeake Energy Corporation (Peguero, Kristhy) (Entered: 10/30/2020) |
| 10/30/2020 | 1638<br><br>(18 pgs) | Objection *to Rodney Hudson, et al.'s Motion to Certify Class of Unleased Mineral Interest Owners for Purposes of Filing a Class Proof of Claim* (related document(s):1295 Generic Motion). Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 10/30/2020) |
| 10/30/2020 | 1639<br><br>(5 pgs) | Notice *of Filing Monthly Report Pursuant to the Order to Approve Procedures for De Minimis Asset Transactions*. (Related document(s):715 Generic Order) Filed by Chesapeake Energy Corporation (Peguero, Kristhy) (Entered: 10/30/2020) |
| 10/30/2020 | 1640<br><br>(19 pgs; 2 docs) | Motion *for Entry of an Order (I) Authorizing the Rejection of Certain Executory Contracts Effective as of October 30, 2020 and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 10/30/2020) |
| 10/30/2020 | 1641<br><br>(1 pg) | PDF with attached Audio File. Court Date & Time [ 10/30/2020 9:29:47 AM ]. File Size [ 76928 KB ]. Run Time [ 02:40:16 ]. (In ref to doc no. 1149. Hearing held October 30, 2020.). (admin). (Entered: 10/30/2020) |
| 10/30/2020 | 1642<br><br>(18 pgs) | Objection *Debtors' Objection to Stefanie Delasandro's Motion for Relief from the Automatic Stay as to Esquisto Resources II, LLC, Wildhorse Resources Management, LLC, WHR Eagle Ford LLC and Chesapeake Operating, LLC* (related document(s):1293 Motion for Relief From Stay). Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 10/30/2020) |
| | 1643<br><br>(2 pgs) | Notice *of Withdrawal of Its Motion for Order Directing Chesapeake Exploration, L.L.C. to Produce Documents Pursuant to Federal Rule of Bankruptcy Procedure 2004*. Filed by BP America Production Company (Murphy, Garland) (Entered: |

| 10/30/2020 | | 10/30/2020) |
|---|---|---|
| 10/30/2020 | 🔵 1644<br><br>(62 pgs) | Second Amended Chapter 11 Plan Filed by Chesapeake Energy Corporation. (Cavenaugh, Matthew) (Entered: 10/30/2020) |
| 10/30/2020 | 🔵 1645<br><br>(206 pgs) | Disclosure Statement Filed by Chesapeake Energy Corporation. (Cavenaugh, Matthew) (Entered: 10/30/2020) |
| 10/30/2020 | 🔵 1646<br><br>(8 pgs) | BNC Certificate of Mailing. (Related document (s):1574 Order on Emergency Motion) No. of Notices: 149. Notice Date 10/30/2020. (Admin.) (Entered: 10/31/2020) |
| 10/30/2020 | 🔵 1650<br><br>(2 pgs) | Order Granting Emergency Motion of the Official Committee of Unsecured Creditors to File Under Seal Amended Objection (Related Doc # 1582) Signed on 10/30/2020. (emiller) (Entered: 11/01/2020) |
| 10/31/2020 | 🔵 1647<br><br>(8 pgs) | BNC Certificate of Mailing. (Related document (s):1591 Notice of Filing of Official Transcript (Form)) No. of Notices: 149. Notice Date 10/31/2020. (Admin.) (Entered: 10/31/2020) |
| 10/31/2020 | 🔵 1648<br><br>(16 pgs) | BNC Certificate of Mailing. (Related document (s):1579 Opinion) No. of Notices: 149. Notice Date 10/31/2020. (Admin.) (Entered: 10/31/2020) |
| 10/31/2020 | 🔵 1649<br><br>(8 pgs) | BNC Certificate of Mailing. (Related document (s):1580 Generic Order) No. of Notices: 149. Notice Date 10/31/2020. (Admin.) (Entered: 10/31/2020) |
| 11/01/2020 | | Receipt of Motion for Relief From Stay(20-33233) [motion,mrlfsty] ( 181.00) Filing Fee. Receipt number 22557819. Fee amount $ 181.00. (U.S. Treasury) (Entered: 11/01/2020) |
| 11/01/2020 | 🔵 1651<br><br>(8 pgs) | BNC Certificate of Mailing. (Related document (s):1613 Order on Motion to Appear pro hac vice) No. of Notices: 157. Notice Date 11/01/2020. (Admin.) (Entered: 11/01/2020) |
| | 🔵 1652 | BNC Certificate of Mailing. (Related document |

| | | |
|---|---|---|
| 11/01/2020 | (8 pgs) | (s):1614 Order on Motion to Appear pro hac vice) No. of Notices: 157. Notice Date 11/01/2020. (Admin.) (Entered: 11/01/2020) |
| 11/01/2020 | 🔵 1653<br><br>(8 pgs) | BNC Certificate of Mailing. (Related document (s):1615 Order on Motion to Appear pro hac vice) No. of Notices: 157. Notice Date 11/01/2020. (Admin.) (Entered: 11/01/2020) |
| 11/01/2020 | 🔵 1654<br><br>(8 pgs) | BNC Certificate of Mailing. (Related document (s):1616 Order on Motion to Appear pro hac vice) No. of Notices: 157. Notice Date 11/01/2020. (Admin.) (Entered: 11/01/2020) |
| 11/01/2020 | 🔵 1655<br><br>(8 pgs) | BNC Certificate of Mailing. (Related document (s):1617 Order on Motion to Appear pro hac vice) No. of Notices: 157. Notice Date 11/01/2020. (Admin.) (Entered: 11/01/2020) |
| 11/01/2020 | 🔵 1656<br><br>(8 pgs) | BNC Certificate of Mailing. (Related document (s):1618 Order on Motion to Appear pro hac vice) No. of Notices: 157. Notice Date 11/01/2020. (Admin.) (Entered: 11/01/2020) |
| 11/01/2020 | 🔵 1657<br><br>(12 pgs) | BNC Certificate of Mailing. (Related document (s):1632 Generic Order) No. of Notices: 159. Notice Date 11/01/2020. (Admin.) (Entered: 11/01/2020) |
| 11/02/2020 | 🔵 1658<br><br>(5 pgs) | Stipulation and Agreed Order By and Among the Debtors and Rodney Hudson, et al (I) Bifurcating the Briefing and Hearing on the Class Claim Motion and (II) Extending the Bar Date to File Proofs of Claim Signed on 11/2/2020 (Related document(s):1581 Stipulation) (emiller) (Entered: 11/02/2020) |
| 11/02/2020 | 🔵 1659<br><br>(5 pgs) | Stipulation and Agreed Order Permitting RLI Insurance Company to File Consolidated Proof of Claim Signed on 11/2/2020 (Related document (s):1592 Stipulation) (emiller) (Entered: 11/02/2020) |
| | 🔵 1660<br><br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Joshua Nielson Eppich Filed by on behalf of EOG Resources, Inc. (Eppich, Joshua) (Entered: |

| 11/02/2020 | | 11/02/2020) |
|---|---|---|
| 11/02/2020 | 🔘 1661<br><br>(4 pgs) | Notice *of Reset Hearing on Motion for Partial Relief from Automatic Stay Filed by Rosa M. Byers and The State of Louisiana*. (Related document (s):1249 Motion for Relief From Stay, 1513 Notice) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 11/02/2020) |
| 11/02/2020 | 🔘 1662<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Chesapeake Energy Corporation / John Morgan. This is to order a transcript of hearing held on October 30, 2020 before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Chesapeake Energy Corporation ). (Morgan, John) Copy request electronically forwarded to original transcription company, Access Transcripts, LLC on November 4, 2020. Estimated completion date: November 5, 2020. Modified on 11/4/2020 (ClaudiaGutierrez). (Entered: 11/02/2020) |
| 11/02/2020 | 🔘 1689<br><br>(4 pgs) | Order (I) Authorizing the Rejection of Certain Tower Leases Effective as of September 18, 2020 and (II) Granting Related Relief (Related Doc # 1183) Signed on 11/2/2020. (VrianaPortillo) (Entered: 11/04/2020) |
| 11/03/2020 | 🔘 1663<br><br>(1 pg) | Motion to Appear pro hac vice *Ragan Naresh*. Filed by Debtor Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 11/03/2020) |
| 11/03/2020 | 🔘 1664<br><br>(39 pgs) | Statement *Third Monthly Fee Statement of Norton Rose Fulbright US LLP for Allowance of Compensation for Services Rendered and Reimbursement of Expenses Incurred as Co-Counsel to the Official Committee of Unsecured Creditors for the Period from September 1, 2020 through September 30, 2020* (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) (Entered: 11/03/2020) |
| | 🔘 1665<br><br>(120 pgs) | Transcript RE: Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation Procedures with Respect to the Confirmation of the Debtors' Proposed Chapter 11 Plan, (III) |

| | | |
|---|---|---|
| 11/03/2020 | | Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Approving the Rights Offering Procedures and Related Materials, (V) Scheduling Certain Dates with Respect Thereto, and (VI) Granting Related Relief held on 10/30/20 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 02/1/2021. (AccessTranscripts) (Entered: 11/03/2020) |
| 11/03/2020 | 1666 <br><br> (2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Daniel Garcia. This is to order a transcript of 10/30/2020, Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts. (mmap) Copy request electronically forwarded to Access Transcripts, LLC on November 4, 2020. Estimated completion date: November 5, 2020. Modified on 11/4/2020 (ClaudiaGutierrez). (Entered: 11/03/2020) |
| 11/03/2020 | 1667 <br><br> (33 pgs; 4 docs) | E-Mails by Gaynell Spigner (Attachments: # 1 Exhibit # 2 Exhibit # 3 Exhibit) (mmap) (Entered: 11/03/2020) |
| 11/03/2020 | 1668 <br><br> (1 pg) | Withdrawal of Claim: *1 filed by Epiq Corporate Restructuring, LLC on behalf of Deljanovan Trucking LLC* (Suarez, Hugo) (Entered: 11/03/2020) |
| 11/03/2020 | 1669 <br><br> (1 pg) | Withdrawal of Claim: *43 filed by Epiq Corporate Restructuring, LLC on behalf of Energes Services LLC* (Suarez, Hugo) (Entered: 11/03/2020) |
| 11/03/2020 | 1670 <br><br> (1 pg) | Withdrawal of Claim: *60 filed by Epiq Corporate Restructuring, LLC on behalf of Applied US Energy Oklahoma LLC* (Suarez, Hugo) (Entered: 11/03/2020) |
| 11/03/2020 | 1671 <br><br> (1 pg) | Withdrawal of Claim: *101 filed by Epiq Corporate Restructuring, LLC on behalf of Summit Casing Equipment* (Suarez, Hugo) (Entered: 11/03/2020) |
| | | |

| | | |
|---|---|---|
| 11/03/2020 | 🔵 1672 <br><br> (1 pg) | Withdrawal of Claim: *10067 filed by Epiq Corporate Restructuring, LLC on behalf of Arrow Engine Company* (Suarez, Hugo) (Entered: 11/03/2020) |
| 11/03/2020 | 🔵 1673 <br><br> (1 pg) | Withdrawal of Claim: *10144 filed by Epiq Corporate Restructuring, LLC on behalf of Broken Spoke Welding & Construction Inc* (Suarez, Hugo) (Entered: 11/03/2020) |
| 11/03/2020 | 🔵 1674 <br><br> (1 pg) | Withdrawal of Claim: *10152 filed by Epiq Corporate Restructuring, LLC on behalf of 4X Industrial LLC* (Suarez, Hugo) (Entered: 11/03/2020) |
| 11/03/2020 | 🔵 1675 <br><br> (1 pg) | Withdrawal of Claim: *10216 filed by Epiq Corporate Restructuring, LLC on behalf of Permian Tank & Manufacturing Inc* (Suarez, Hugo) (Entered: 11/03/2020) |
| 11/03/2020 | 🔵 1676 <br><br> (4 pgs) | Notice of Appearance and Request for Notice Filed by Leslie M. Luttrell Filed by on behalf of TB Harris Mineral, LP, Talbert Operations, LLC, Haynes Mineral Trust, Dan W. Kinsel III, Trustee of the 2009 Dan and Leslie Kinsel Childrens Trust and Karl Gene Kinsel, Trustee of the 2009 Karl Gene Kinsel Childs Trust, Dilworth Group, Gates Mineral Company, LTD and related entities and individuals, Kelly Vesper, Individually, as Trustee of the Kelly Vesper Heritage Trust, and as Executrix of the Estate of John B. Vesper, Deceased and the Estate of Leslie T. Vesper, Deceased, Kelly Vesper, as Trustee of the Kelly Vesper Heritage Trust, and as Executrix of the Estate of John B. Vesper, Deceased and the Estate of Leslie T. Vesper, Deceased, Leojua, Ltd., MBF Holdings La Salle LP, formerly MBF Partnership, Wier Group (Luttrell, Leslie) (Entered: 11/03/2020) |
| 11/03/2020 | 🔵 1677 <br><br> (1 pg) | Withdrawal of Claim: *10258 filed by Epiq Corporate Restructuring, LLC on behalf of Titan Solutions LLC* (Suarez, Hugo) (Entered: 11/03/2020) |
| | 🔵 1678 | Withdrawal of Claim: *10301 filed by Epiq Corporate Restructuring, LLC on behalf of* |

| | | |
|---|---|---|
| 11/03/2020 | (1 pg) | *Coastal Chemical Company LLC* (Suarez, Hugo) (Entered: 11/03/2020) |
| 11/03/2020 | 1679<br><br>(1 pg) | Motion to Appear pro hac vice *Michael Miller.* Filed by Creditor Omar Balboa (mmap) (Entered: 11/03/2020) |
| 11/03/2020 | 1680<br><br>(2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Expedited (7 days)) by Leslie M. Luttrell. This is to order a transcript of Hearing on the Disclosure Statement held October 30, 2020 before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Dan W. Kinsel III, Trustee of the 2009 Dan and Leslie Kinsel Childrens Trust and Karl Gene Kinsel, Trustee of the 2009 Karl Gene Kinsel Childs Trust, Dilworth Group, Gates Mineral Company, LTD and related entities and individuals, Haynes Mineral Trust, Kelly Vesper, Individually, as Trustee of the Kelly Vesper Heritage Trust, and as Executrix of the Estate of John B. Vesper, Deceased and the Estate of Leslie T. Vesper, Deceased, Leojua, Ltd., MBF Holdings La Salle LP, formerly MBF Partnership, TB Harris Mineral, LP, Talbert Operations, LLC, Wier Group ). (Luttrell, Leslie) Copy request electronically forwarded to original transcription company, Access Transcripts, LLC on November 4, 2020. Estimated completion date: November 11, 2020. Modified on 11/4/2020 (ClaudiaGutierrez). (Entered: 11/03/2020) |
| 11/04/2020 | 1681<br><br>(1 pg) | Notice of Filing of Official Transcript as to 1665 Transcript. Parties notified (Related document(s):1665 Transcript) (hcar) (Entered: 11/04/2020) |
| | 1682<br><br>(181 pgs; 3 docs) | Motion *of the Official Committee of Unsecured Creditors for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of the Debtors' Estates and (II) Exclusive Settlement Authority* Filed by Creditor Committee Official Committee Of Unsecured Creditors Hearing scheduled for 12/15/2020 at 12:00 PM at Houston, Courtroom 400 (DRJ). (Attachments: |

| | | |
|---|---|---|
| 11/04/2020 | | # 1 Exhibit A: Proposed Order # 2 Exhibit B: Proposed Complaint) (Harrison, Julie) (Entered: 11/04/2020) |
| 11/04/2020 | 1683 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (14-Day) by Kurt Stephen. This is to order a transcript of October 30, 2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By R.A.W. Oilfield Services, L.L.C. ). (Stephen, John) Copy request electronically forwarded to Access Transcripts on November 5, 2020. Estimated completion date: November 19, 2020. Modified on 11/5/2020 (ClaudiaGutierrez). (Entered: 11/04/2020) |
| 11/04/2020 | 1684 (12592 pgs; 16 docs) | Exhibit List, Witness List (Filed By Chesapeake Energy Corporation ). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 - Part 1 # 3 Exhibit 2 - Part 2 # 4 Exhibit 2 - Part 3 # 5 Exhibit 2 - Part 4 # 6 Exhibit 3 # 7 Exhibit 4 # 8 Exhibit 5 # 9 Exhibit 6 # 10 Exhibit 7 # 11 Exhibit 8 # 12 Exhibit 9 # 13 Exhibit 10 # 14 Exhibit 11 # 15 Exhibit 12) (Cavenaugh, Matthew) (Entered: 11/04/2020) |
| 11/04/2020 | 1685 (22 pgs; 3 docs) | Witness List, Exhibit List (Filed By Rodney Hudson, Allen Johnson ).(Related document (s):1200 Motion for Relief From Stay, 1201 Motion for Adequate Protection, 1295 Generic Motion) (Attachments: # 1 Exhibit 35 # 2 Exhibit 37) (Knapp, Bradley) (Entered: 11/04/2020) |
| 11/04/2020 | 1686 (2 pgs) | Sealed Document *UMO Exhibit 36 to Allen Johnson, et al. and Rodney Hudson, et al.'s Witness and Exhibit List for Hearing Scheduled for November 6, 2020 at 2:00 p.m.* (Filed By Rodney Hudson, Allen Johnson ). (Knapp, Bradley) (Entered: 11/04/2020) |
| 11/04/2020 | 1687 (1 pg) | Motion to Appear pro hac vice *John D. Mashburn*. Filed by Creditors Greg and Janice Depew, Lisa Griggs (mmap) (Entered: 11/04/2020) |
| | 1688 | Motion on an e-mail by Gaynell Spigner |

| | | |
|---|---|---|
| 11/04/2020 | (5 pgs; 2 docs) | (Attachments: # 1 Exhibit) (mmap) (Entered: 11/04/2020) |
| 11/04/2020 | 1690<br><br>(1 pg) | Motion to Appear pro hac vice *Michael R. Proctor*. Filed by Creditor Robert R Luchetti (mmap) (Entered: 11/04/2020) |
| 11/04/2020 | 1691<br><br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Leslie C Heilman Filed by on behalf of Plasma Processing Corporation (Heilman, Leslie) (Entered: 11/04/2020) |
| 11/04/2020 | 1692<br><br>(94 pgs) | Notice *of First Monthly Fee Statement of PricewaterhouseCoopers LLP for Services Rendered and Reimbursement of Expenses as Audit Services and Tax Consulting Services Provider for the Debtors for the Period June 28, 2020 Through July 31, 2020*. Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 11/04/2020) |
| 11/04/2020 | 1693<br><br>(82 pgs) | Notice *of Second Monthly Fee Statement of PricewaterhouseCoopers LLP for Services Rendered and Reimbursement of Expenses as Audit Services and Tax Consulting Services Provider for the Debtors for the Period August 1, 2020 Through August 31, 2020*. Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 11/04/2020) |
| 11/04/2020 | 1694<br><br>(10 pgs) | BNC Certificate of Mailing. (Related document (s):1650 Order on Emergency Motion) No. of Notices: 160. Notice Date 11/04/2020. (Admin.) (Entered: 11/05/2020) |
| 11/04/2020 | 1695<br><br>(13 pgs) | BNC Certificate of Mailing. (Related document (s):1658 Generic Order) No. of Notices: 160. Notice Date 11/04/2020. (Admin.) (Entered: 11/05/2020) |
| 11/04/2020 | 1696<br><br>(13 pgs) | BNC Certificate of Mailing. (Related document (s):1659 Generic Order) No. of Notices: 160. Notice Date 11/04/2020. (Admin.) (Entered: 11/05/2020) |
| | 1716 | Order Granting Motion To Appear pro hac vice |

| | | |
|---|---|---|
| 11/04/2020 | (1 pg) | - Ragan Naresh (Related Doc # 1663) Signed on 11/4/2020. (emiller) (Entered: 11/06/2020) |
| 11/04/2020 | 🌑 1717<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Michael Miller (Related Doc # 1679) Signed on 11/4/2020. (emiller) (Entered: 11/06/2020) |
| 11/05/2020 | 🌑 1697<br><br>(83 pgs; 4 docs) | Objection *(Limited) to Notice of Possible Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with Sale.* Filed by ARI Fleet LT, Automotive Rentals, Inc. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3) (Aguilar, Richard) (Entered: 11/05/2020) |
| 11/05/2020 | 🌑 1698<br><br>(19 pgs) | Objection *TO THE DEBTORS PROPOSED SALE OF THE DEBTORS MID-CON ASSETS, AND TO ASSUMPTION AND ASSIGNMENT OF THEIR SEISMIC LICENSE AGREEMENTS TO THE SUCCESSFUL BIDDER THEREOF [Related to ECF Nos. 1147, 1366 & 1491].* Filed by Vector Seismic Data Processing Inc., Westerngeco LLC (Braun, Andrew) (Entered: 11/05/2020) |
| 11/05/2020 | 🌑 1699<br><br>(19 pgs) | Objection *TO THE DEBTORS PROPOSED SALE OF THE DEBTORS MID-CON ASSETS, AND TO ASSUMPTION AND ASSIGNMENT OF THEIR LICENSE AGREEMENTS TO THE SUCCESSFUL BIDDER THEREOF [Related to ECF Nos. 1147, 1366 & 1491].* Filed by A2D TECHNOLOGIES, INC. D/B/A TGS GEOLOGICAL PRODUCTS AND SERVICES, TGS-NOPEC Geophysical Company ASA (Braun, Andrew) (Entered: 11/05/2020) |
| 11/05/2020 | 🌑 1700<br><br>(3 pgs) | Statement *OF MULTIPLE REPRESENTATION PURSUANT TO F.R. BANKR. P. 2019* (Filed By A2D TECHNOLOGIES, INC. D/B/A TGS GEOLOGICAL PRODUCTS AND SERVICES, TGS-NOPEC Geophysical Company ASA, Vector Seismic Data Processing Inc., Westerngeco LLC ). (Braun, Andrew) (Entered: 11/05/2020) |
| | 🌑 1701 | Withdrawal of Claim: *10095 filed by Epiq* |

| 11/05/2020 | (1 pg) | *Corporate Restructuring, LLC on behalf of Sky-Lin Services LLC* (Suarez, Hugo) (Entered: 11/05/2020) |
|---|---|---|
| 11/05/2020 | 1702 (12 pgs; 2 docs) | E-Mail to the Court by Gaynell Spigner (Attachments: # 1 Exhibit) (mmap) (Entered: 11/05/2020) |
| 11/05/2020 | 1703 (1 pg) | Withdrawal of Claim: *10118 filed by Epiq Corporate Restructuring, LLC on behalf of Sky-Lin Services LLC* (Suarez, Hugo) (Entered: 11/05/2020) |
| 11/05/2020 | 1704 (9 pgs) | Notice of Appearance and Request for Notice Filed by John Mark Stern Filed by on behalf of Texas Comptroller of Public Accounts, Revenue Accounting Division (Stern, John) (Entered: 11/05/2020) |
| 11/05/2020 | 1705 (2 pgs) | Letter from Shareholder Donald K. Natale (JeannieAndresen) (Entered: 11/05/2020) |
| 11/05/2020 | 1706 (2 pgs) | Letter from Shareholder Jason Dean (JeannieAndresen) (Entered: 11/05/2020) |
| 11/05/2020 | 1707 (7 pgs) | Letter from John Dough (JeannieAndresen) (Entered: 11/05/2020) |
| 11/05/2020 | 1708 (6 pgs) | Stipulation By Chesapeake Energy Corporation and Direct Energy Business Marketing, LLC. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 11/05/2020) |
| 11/05/2020 | 1709 (6 pgs) | Statement *and Disclosure Pursuant to Federal Rule of Bankruptcy Procedure 2019* (Filed By Dan W. Kinsel III, Trustee of the 2009 Dan and Leslie Kinsel Childrens Trust and Karl Gene Kinsel, Trustee of the 2009 Karl Gene Kinsel Childs Trust, Dilworth Group, Gates Mineral Company, LTD and related entities and |

| | | |
|---|---|---|
| 11/05/2020 | | individuals, Haynes Mineral Trust, Kelly Vesper, Individually, as Trustee of the Kelly Vesper Heritage Trust, and as Executrix of the Estate of John B. Vesper, Deceased and the Estate of Leslie T. Vesper, Deceased, Leojua, Ltd., MBF Holdings La Salle LP, formerly MBF Partnership, TB Harris Mineral, LP, Talbert Operations, LLC, Wier Group ). (Luttrell, Leslie) (Entered: 11/05/2020) |
| 11/05/2020 | 🔵 1710<br><br>(164 pgs; 8 docs) | Adversary case 20-03458. Nature of Suit: (91 (Declaratory judgment)) Complaint by Chesapeake Energy Corporation, Chesapeake Operating L.L.C. against Starr Indemnity & Liability Company. Fee Amount $350 (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Adversary Cover Sheet) (Cavenaugh, Matthew) (Entered: 11/05/2020) |
| 11/06/2020 | 🔵 1711<br><br>(38 pgs; 3 docs) | Withdrawal of Claim: *Waste Management* (Attachments: # 1 Exhibit Withdrawal of Claim Form # 2 Exhibit Filed POC)(Mills, Jacquolyn) (Entered: 11/06/2020) |
| 11/06/2020 | 🔵 1712<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Winn Carter. This is to order a transcript of Bankruptcy Hearing-10-30-20 before Judge David R. Jones. Court Reporter/Transcriber: Veritext Legal Solutions (Filed By Deutsche Bank Trust Company Americas ). (Carter, Winstol) Copy request electronically forwarded to original transcribing company, Access Transcripts, LLC on November 6, 2020. Estimated completion date: November 7, 2020. Modified on 11/6/2020 (ClaudiaGutierrez). (Entered: 11/06/2020) |
| | 🔵 | Certificate of Telephone Notice. Contacted Veronica Polnick. At the request of the parties, the hearing set for 11/6/2020 has been continued to 11/20/2020 at 2:00 pm. Movant to notice all interested parties and file a certificate of service with the court (Related document (s):1248 Motion for Relief From Stay) **Hearing rescheduled for 11/20/2020 at 02:00 PM by telephone and video conference.** (emiller |

| 11/06/2020 | | (Entered: 11/06/2020) |
|---|---|---|
| 11/06/2020 | 1713<br><br>(1 pg) | Notice *of Consent to Reset Hearing*. (Related document(s):1248 Motion for Relief From Stay) Filed by John H. Bedsole (Pesnell, John) (Entered: 11/06/2020) |
| 11/06/2020 | 1714<br><br>(6 pgs; 2 docs) | E-Mail by Gaynell Spigner (Attachments: # 1 Exhibit) (mmap) (Entered: 11/06/2020) |
| 11/06/2020 | 1715<br><br>(1 pg) | Motion to Appear pro hac vice *of Lucas Barrett/Arnold & Porter Kaye Scholer LLP*. Filed by Interested Party Glas USA LLC (Warner, Michael) (Entered: 11/06/2020) |
| 11/06/2020 | 1718<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - John D. Mashburn (Related Doc # 1687) Signed on 11/6/2020. (emiller) (Entered: 11/06/2020) |
| 11/06/2020 | 1719<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Michael R. Proctor (Related Doc # 1690) Signed on 11/6/2020. (emiller) (Entered: 11/06/2020) |
| 11/06/2020 | 1720<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Lucas Barrett (Related Doc # 1715) Signed on 11/6/2020. (emiller) (Entered: 11/06/2020) |
| 11/06/2020 | 1721<br><br>(11 pgs) | Notice *of Intent to Serve Subpoena Duces Tecum and Request for Production to Wells Fargo Bank, National Association*. Filed by Official Committee Of Unsecured Creditors (Harrison, Julie) (Entered: 11/06/2020) |
| 11/06/2020 | 1722<br><br>(3 pgs) | Objection / *EOG Resources, Inc.'s Limited Objection and Reservation of Rights to Debtors' Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases*. Filed by EOG Resources, Inc. (Eppich, Joshua) (Entered: 11/06/2020) |
| | 1723<br><br>(3 pgs) | Objection / *Marathon Oil Company's Limited Objection and Reservation of Rights to Debtors' Notice to Contract Parties to* |

| | | |
|---|---|---|
| 11/06/2020 | | *Potentially Assumed Executory Contracts and Unexpired Leases*. Filed by Marathon Oil Company (Taylor, Clay) (Entered: 11/06/2020) |
| 11/06/2020 | 🌀1724 (2 pgs) | Motion to Withdraw as Attorney. Objections/Request for Hearing Due in 21 days. Filed by Creditor Cactus Wellhead, LLC (Glenos, Nicholas) (Entered: 11/06/2020) |
| 11/06/2020 | 🌀1725 (1 pg) | Proposed Order RE: *Motion to Withdraw* (Filed By Cactus Wellhead, LLC ).(Related document (s):1724 Motion to Withdraw as Attorney) (Glenos, Nicholas) (Entered: 11/06/2020) |
| 11/06/2020 | 🌀1726 (7 pgs) | Objection /*Limited Objection of Targa Pipeline Mid-Continent Westok LLC to the sale of the Debtors' Mid-Con Assets Free and Clear of Any and All Claims, Interests, and Encumbrances*. Filed by Targa Pipeline Mid-Continent WestOk LLC (Soule, Steven) (Entered: 11/06/2020) |
| 11/06/2020 | 🌀1727 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew Cavenaugh. This is to order a transcript of 11/6/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) Electronically forwarded to Access Transcripts, LLC on November 6, 2020. Estimated completion date: November 7, 2020. Modified on 11/6/2020 (ClaudiaGutierrez). (Entered: 11/06/2020) |
| 11/06/2020 | 🌀1728 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Jason Boland. This is to order a transcript of the November 6, 2020 hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Official Committee Of Unsecured Creditors ). (Boland, Jason) Copy request electronically forwarded to Access Transcripts, LLC on November 6, 2020. Estimated completion date: November 7, 2020. Modified on 11/6/2020 (ClaudiaGutierrez). (Entered: 11/06/2020) |

| | | |
|---|---|---|
| 11/06/2020 | 🌑1729<br><br>(1 pg) | Courtroom Minutes. Time Hearing Held: 2:00 pm. Appearances: SEE ATTACHED. (Related document(s):1295 Generic Motion) Witnesses: Rodney Hudson, Allen Johnson. Movants presented evidence and testimony. The Debtors made a motion pursuant to Rule 52(c) and the motion was granted. The motion to certify is denied. Ms. Schwarzman is to prepare an order with Mr. Summers approving as to form only. (emiller) (Entered: 11/06/2020) |
| 11/06/2020 | 🌑1730<br><br>(8 pgs) | Objection *(Energy Transfers Limited Objection Regarding the Debtors Proposed Sale of Mid-Con Assets)*. Filed by Panhandle Eastern Pipe Line Company, LP., Fayetteville Express Pipeline LLC, ETC Texas Pipeline Ltd., Sunoco Partners Marketing & Terminals L.P. (Crocker, Michaela) (Entered: 11/06/2020) |
| 11/06/2020 | 🌑1731<br><br>(5 pgs) | Stipulation and Agreed Order Permitting Liberty Mutual Insurance Company to File Consolidated Proof of Claim Signed on 11/6/2020 (Related document(s):1554 Stipulation) (emiller) (Entered: 11/06/2020) |
| 11/06/2020 | 🌑1732<br><br>(8 pgs) | Response *Reservation of Rights of the Williams Companies, Inc. to Debtors' Motion for Entry of (A) An Order (I) Approving Bidding Procedures for the Sale of the Debtors' Mid-Con Assets, (II) Approving Bid Protections, (III) Scheduling Certain Dates with Respect Thereto, (IV) Approving the Form and Manner of Notice Thereof, and (V) Approving Contract Assumption and Assignment Procedures, and (B) An Order Authorizing the Debtors to Enter Into a Definitive Purchase Agreement*. Filed by Williams MLP Operating, LLC (Muhammad, Arsalan) (Entered: 11/06/2020) |
| 11/06/2020 | 🌑1733<br><br>(1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 11/6/2020 1:59:15 PM ]. File Size [ 19567 KB ]. Run Time [ 00:40:46 ]. (admin). (Entered: 11/06/2020) |
| | 🌑1734 | Response (Filed By The Royalty Owners ). (Related document(s):1305 Generic Order, |

| | | |
|---|---|---|
| 11/06/2020 | (4 pgs) | 1367 Proposed Order) (Lee, Kyung) (Entered: 11/06/2020) |
| 11/06/2020 | 1735<br><br>(5 pgs; 2 docs) | Certificate of No Objection *Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Settlement By and Among the Debtors and the Wier Group and (II) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):1377 Motion to Approve Compromise under Rule 9019 (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 11/06/2020) |
| 11/06/2020 | 1736<br><br>(9 pgs) | BNC Certificate of Mailing. (Related document (s):1681 Notice of Filing of Official Transcript (Form)) No. of Notices: 165. Notice Date 11/06/2020. (Admin.) (Entered: 11/07/2020) |
| 11/06/2020 | 1737<br><br>(12 pgs) | BNC Certificate of Mailing. (Related document (s):1689 Generic Order) No. of Notices: 167. Notice Date 11/06/2020. (Admin.) (Entered: 11/07/2020) |
| 11/08/2020 | 1738<br><br>(9 pgs) | BNC Certificate of Mailing. (Related document (s):1716 Order on Motion to Appear pro hac vice) No. of Notices: 172. Notice Date 11/08/2020. (Admin.) (Entered: 11/08/2020) |
| 11/08/2020 | 1739<br><br>(9 pgs) | BNC Certificate of Mailing. (Related document (s):1717 Order on Motion to Appear pro hac vice) No. of Notices: 172. Notice Date 11/08/2020. (Admin.) (Entered: 11/08/2020) |
| 11/08/2020 | 1740<br><br>(9 pgs) | BNC Certificate of Mailing. (Related document (s):1718 Order on Motion to Appear pro hac vice) No. of Notices: 172. Notice Date 11/08/2020. (Admin.) (Entered: 11/08/2020) |
| 11/08/2020 | 1741<br><br>(9 pgs) | BNC Certificate of Mailing. (Related document (s):1719 Order on Motion to Appear pro hac vice) No. of Notices: 172. Notice Date 11/08/2020. (Admin.) (Entered: 11/08/2020) |
| | 1742<br><br>(9 pgs) | BNC Certificate of Mailing. (Related document (s):1720 Order on Motion to Appear pro hac vice) No. of Notices: 172. Notice Date |

| 11/08/2020 | | 11/08/2020. (Admin.) (Entered: 11/08/2020) |
|---|---|---|
| 11/08/2020 | 🔵 1743<br><br>(13 pgs) | BNC Certificate of Mailing. (Related document (s):1731 Generic Order) No. of Notices: 172. Notice Date 11/08/2020. (Admin.) (Entered: 11/08/2020) |
| 11/09/2020 | 🔵 1744<br><br>(4 pgs; 2 docs) | E-Mail by Gaynell Spigner (Attachments: # 1 Exhibit) (mmap) (Entered: 11/09/2020) |
| 11/09/2020 | 🔵 1745<br><br>(6 pgs) | Stipulation and Agreed Order (I) Authorizing the Debtors to Perform Under Prepetition Forward Contracts and Enter Into and Perform Under Postpetition Transactions and Agreements with Direct Energy Business Marketing, LLC (II) Granting Administrative Expense Claims, and (III) Granting Related Relief Signed on 11/9/2020 (Related document (s):1708 Stipulation) (VrianaPortillo) (Entered: 11/09/2020) |
| 11/09/2020 | 🔵 1746<br><br>(2 pgs) | Order (I) Authorizing and Approving the Settlement by and Among the Debtors and the Wier Group, and (II) Granting Related Relief (Related Doc # 1377) Signed on 11/9/2020. (VrianaPortillo) (Entered: 11/09/2020) |
| | 🔵 1747<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (3-Day) by John E. Mitchell. This is to order a transcript of Motion for Entry of Order (I) Approving Adequacy of Disclosure Statement, (II) Approving Solicitation Procedures, (III) Approving the Form of Ballots and Notices, (IV) Approving the Rights Offering Procedures, (V) Scheduling of Certain Dates, and (VI) Granting Related Relief on 10/30/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By ETC Katy Pipeline, Ltd., ETC Texas Pipeline Ltd., ETC Tiger Pipeline LLC, Energy Transfer Fuel, LP, Houston Pipe Line Company, LP, Oasis Pipeline L.P., Sunoco Pipeline L.P., Trade Star, LLC ). (Mitchell, John) Copy request electronically forwarded to Access Transcripts, LLC on November 10, 2020. Estimated completion date: November |

| | | |
|---|---|---|
| 11/09/2020 | | 13, 2020. Modified on 11/10/2020 (ClaudiaGutierrez). (Entered: 11/09/2020) |
| 11/09/2020 | 1748<br><br>(5 pgs) | Objection *to the Debtors Sale of Mid-Con Assets*. Filed by Railroad Commission of Texas (Milligan, Layla) (Entered: 11/09/2020) |
| 11/09/2020 | 1749<br><br>(143 pgs) | Statement *Third Monthly Fee Statement of AlixPartners, LLP, Financial Advisor to the Official Committee of Unsecured Creditors for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses for the Period September 1, 2020 through September 30, 2020* (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) (Entered: 11/09/2020) |
| 11/09/2020 | 1750<br><br>(44 pgs; 3 docs) | Objection *United States' Protective Objection to Debtors' Sale of the Mid-Con Assets*. Filed by Department of Interior United States (Attachments: # 1 Exhibit 1 - Debtors' List of Mid-Con Federal Leases # 2 Exhibit 2 - Declaration of Cindy Hergenreder (ONRR)) (Carney, Tiffiney) (Entered: 11/09/2020) |
| 11/09/2020 | 1751<br><br>(34 pgs) | Transcript RE: Evidentiary Hearing on Motion to Certify Class of Unleased Mineral Interest Owners held on 11/6/20 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 02/8/2021. (AccessTranscripts) (Entered: 11/09/2020) |
| 11/09/2020 | 1752<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Marty L. Brimmage, Jr.. This is to order a transcript of the November 6, 2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts ). (Brimmage, Marty) Copy request electronically forwarded to Access Transcripts, LLC on November 10, 2020. Estimated completion date: November 11, 2020. Modified on 11/10/2020 (ClaudiaGutierrez). (Entered: 11/09/2020) |

| | | |
|---|---|---|
| 11/09/2020 | 🔵 1753<br><br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Stephen Lynn Williamson Filed by on behalf of CEOG, LLC (Williamson, Stephen) (Entered: 11/09/2020) |
| 11/09/2020 | 🔵 1754<br><br>(4 pgs) | Proposed Order RE: *Order Denying Rodney Hudson, et al.'s Motion to Certify Class of Unleased Mineral Interest Owners for Purposes of Filing a Class Proof of Claim* (Filed By Chesapeake Energy Corporation ). (Related document(s):1295 Generic Motion, 1638 Objection) (Cavenaugh, Matthew) (Entered: 11/09/2020) |
| 11/10/2020 | 🔵 1755<br><br>(4 pgs) | Stipulation By Chesapeake Energy Corporation and Texas MDL Royalty Owner Plaintiffs. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ).(Related document(s):1231 Order on Motion to Extend Time) (Cavenaugh, Matthew) (Entered: 11/10/2020) |
| 11/10/2020 | 🔵 1756<br><br>(1 pg) | Motion to Appear pro hac vice *Amy R. Wolf*. Filed by Debtor Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 11/10/2020) |
| 11/10/2020 | 🔵 1757<br><br>(1 pg) | Motion to Appear pro hac vice *Joseph C. Celentino*. Filed by Debtor Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 11/10/2020) |
| 11/10/2020 | 🔵 1758<br><br>(1 pg) | Motion to Appear pro hac vice *John F. Lynch*. Filed by Debtor Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 11/10/2020) |
| 11/10/2020 | 🔵 1759<br><br>(1 pg) | Motion to Appear pro hac vice *Richard G. Mason*. Filed by Debtor Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 11/10/2020) |
| | 🔵 1760<br><br>(1 pg) | Motion to Appear pro hac vice *David Zensky*. Filed by Interested Party Franklin Advisers, Inc., as Investment Manager on Behalf of |

| | | |
|---|---|---|
| 11/10/2020 | | Certain Funds and Accounts (Brimmage, Marty) (Entered: 11/10/2020) |
| 11/10/2020 | 🌀1761<br><br>(1 pg) | Notice of Filing of Official Transcript as to 1751 Transcript. Parties notified (Related document(s):1751 Transcript) (jdav) (Entered: 11/10/2020) |
| 11/10/2020 | 🌀1762<br><br>(17 pgs) | Notice of Appeal filed. (related document (s):1579 Opinion, 1580 Generic Order). Fee Amount $298. Appellant Designation due by 11/24/2020. (Yetter, R) (Entered: 11/10/2020) |
| 11/10/2020 | 🌀1763<br><br>(1282 pgs; 8 docs) | Exhibit List, Witness List (Filed By Vector Seismic Data Processing Inc., Westerngeco LLC ).(Related document(s):1698 Objection) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 7 # 7 Exhibit 9) (Braun, Andrew) (Entered: 11/10/2020) |
| 11/10/2020 | | Receipt of Notice of Appeal(20-33233) [appeal,ntcapl] ( 298.00) Filing Fee. Receipt number 22586263. Fee amount $ 298.00. (U.S. Treasury) (Entered: 11/10/2020) |
| 11/10/2020 | 🌀1764<br><br>(77 pgs) | Statement / *Fourth Monthly Fee Statement of Brown Rudnick LLP for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses as Co-Counsel for the Official Committee of Unsecured Creditors for the Period from October 1, 2020 through October 31, 2020* (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) (Entered: 11/10/2020) |
| 11/10/2020 | 🌀1765<br><br>(1 pg) | Motion to Appear pro hac vice *Joshua B. Ebersole*. Filed by Creditor Pennsylvania Department of Conservation and Natural Resources (mmap) (Entered: 11/10/2020) |
| 11/10/2020 | 🌀1766<br><br>(2 pgs) | E-mail by Gaynell Spigner (mmap) (Entered: 11/10/2020) |
| | 🌀1767 | Notice *of Successful Bidders and Backup Bidder* |

| | | |
|---|---|---|
| 11/10/2020 | (3 pgs) | *With Respect to the Auction of the Debtors' Mid-Con Assets*. Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 11/10/2020) |
| 11/10/2020 | 2164<br><br>(4257 pgs; 13 docs) | Adversary case 20-03491. Nature of Suit: (01 (Determination of removed claim or cause)) Notice of Removal filed by Texas Eagle Ford MDL Royalty Owners . Receipt Number 21950014, Fee Amount $350 (Attachments: # 1 Docket Sheet # 2 Orders # 3 Pleadings 1 of 3 # 4 Pleadings 2 of 3 # 5 Pleadings 3 of 3 # 6 Appeal Item 1 of 6 # 7 Appeal Item 2 of 6 # 8 Appeal Item 3 of 6 # 9 Appeal Item 4 of 6 # 10 Appeal Item 5-1 of 6 # 11 Appeal Item 5-2 of 6 # 12 Appeal Item 6 of 6) This document was originally filed electronically in Western District of Texas Adversary No. 20-5064. (ltie) (Entered: 12/07/2020) |
| 11/11/2020 | 1768<br><br>(110 pgs; 2 docs) | Application to Employ Shearman & Sterling LLP as Special Counsel for the Debtors Effective as of October 11, 2020. Objections/Request for Hearing Due in 21 days. Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 11/11/2020) |
| 11/11/2020 | 1769<br><br>(1208 pgs; 6 docs) | Exhibit List, Witness List (Filed By A2D TECHNOLOGIES, INC. D/B/A TGS GEOLOGICAL PRODUCTS AND SERVICES, TGS-NOPEC Geophysical Company ASA ). (Related document(s):1699 Objection) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5) (Braun, Andrew) (Entered: 11/11/2020) |
| 11/11/2020 | 1770<br><br>(4 pgs) | Witness List, Exhibit List (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 11/11/2020) |
| 11/11/2020 | 1771<br><br>(1191 pgs; 15 docs) | Witness List, Exhibit List (Filed By Chesapeake Energy Corporation ).(Related document(s):1770 Witness List, Exhibit List) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 |

| | | |
|---|---|---|
| 11/11/2020 | | Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Cavenaugh, Matthew) (Entered: 11/11/2020) |
| 11/11/2020 | 🌐 1772 (7 pgs) | Statement *Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure* (Filed By Caddo Parish, Coushatta Bayou Land Co., Industrial Dev. Bd. of the Parish of Caddo, Inc., Industrial Development Board of the Parish of Caddo, Inc., Parish of Caddo, Paul M. Davis as Executor of the Succession of John P. Davis, Jr. ). (Naus, R) (Entered: 11/11/2020) |
| 11/11/2020 | 🌐 1773 (8 pgs) | Notice *to Akin Gump Strauss Hauer & Feld LLP of Rule 30(b)(6) Deposition*. Filed by Official Committee Of Unsecured Creditors (Harrison, Julie) (Entered: 11/11/2020) |
| 11/11/2020 | 🌐 1774 (3 pgs) | Notice of Appearance and Request for Notice Filed by Sarah A Schultz Filed by on behalf of Tapstone Energy, LLC and KL CHK SPV LLC (Schultz, Sarah) (Entered: 11/11/2020) |
| 11/11/2020 | 🌐 1775 (3 pgs) | Exhibit List, Witness List (Filed By Tapstone Energy, LLC and KL CHK SPV LLC ). (Schultz, Sarah) (Entered: 11/11/2020) |
| 11/11/2020 | 🌐 1776 (9 pgs) | Notice *to Davis Polk & Wardwell LLP of Rule 30(b)(6) Deposition*. Filed by Official Committee Of Unsecured Creditors (Harrison, Julie) (Entered: 11/11/2020) |
| 11/11/2020 | 🌐 1777 (9 pgs) | Notice *to Wachtell, Lipton, Rosen & Katz of Rule 30(b)(6) Deposition*. Filed by Official Committee Of Unsecured Creditors (Harrison, Julie) (Entered: 11/11/2020) |
| 11/11/2020 | 🌐 1778 (9 pgs) | Notice *to Kirkland & Ellis LLP of Rule 30(b)(6) Deposition*. Filed by Official Committee Of Unsecured Creditors (Harrison, Julie) (Entered: 11/11/2020) |
| 11/11/2020 | 🌐 1779 (2 pgs) | Affidavit Re: *Affidavit of Publication - The Billings Gazette* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 11/11/2020) |

| | | |
|---|---|---|
| 11/11/2020 | 🔵 <u>1780</u><br><br>(2 pgs) | Affidavit Re: *Affidavit of Publication - Canton Repository* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 11/11/2020) |
| 11/11/2020 | 🔵 <u>1781</u><br><br>(3 pgs) | Affidavit Re: *Affidavit of Publication - The Philadelphia Inquirer* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 11/11/2020) |
| 11/11/2020 | 🔵 <u>1782</u><br><br>(2 pgs) | Affidavit Re: *Affidavit of Publication - The Caster Star Tribune* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 11/11/2020) |
| 11/11/2020 | 🔵 <u>1783</u><br><br>(5 pgs) | Affidavit Re: *Affidavit of Publication - The Houston Chronicle* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 11/11/2020) |
| 11/11/2020 | 🔵 <u>1784</u><br><br>(2 pgs) | Affidavit Re: *Affidavit of Publication - The New York Times* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 11/11/2020) |
| 11/11/2020 | 🔵 <u>1785</u><br><br>(3 pgs) | Affidavit Re: *Affidavit of Publication - The Oklahoman* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 11/11/2020) |
| 11/11/2020 | 🔵 <u>1786</u><br><br>(14 pgs) | BNC Certificate of Mailing. (Related document (s):<u>1745</u> Generic Order) No. of Notices: 172. Notice Date 11/11/2020. (Admin.) (Entered: 11/11/2020) |
| 11/11/2020 | 🔵 <u>1787</u><br><br>(10 pgs) | BNC Certificate of Mailing. (Related document (s):<u>1746</u> Order on Motion to Approve Compromise under Rule 9019) No. of Notices: 172. Notice Date 11/11/2020. (Admin.) (Entered: 11/11/2020) |
| 11/12/2020 | 🔵 1788 | Election to Appeal to District Court . (ShoshanaArnow) (Entered: 11/12/2020) |
| | 🔵 <u>1789</u> | E-Mail by Gaynell Spigner (mmap) (Entered: |

| 11/12/2020 | (2 pgs) | 11/12/2020 |
| --- | --- | --- |
| 11/12/2020 | 🔵 1790<br><br>(1 pg) | Clerk's Notice of Filing of an Appeal. On 11/10/2020, ETC Texas Pipeline, Ltd. filed a notice of appeal. The appeal has been assigned to U.S. District Judge Keith Ellison, Civil Action 4:20-cv-3843. Parties notified (Related document(s):1762 Notice of Appeal) (ShoshanaArnow) (Entered: 11/12/2020) |
| 11/12/2020 | 🔵 1791<br><br>(2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by CEOG, LLC/Stephen Williamson. This is to order a transcript of Evidentiary Hearing on Motion to Certify Class of Unleased Mineral Interest Owners on 11/6/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By CEOG, LLC ). (Williamson, Stephen) Electronically forwarded to Access on 11/12/2020. Estimated completion date 11/13/2020. Modified on 11/12/2020 (ShoshanaArnow). (Entered: 11/12/2020) |
| 11/12/2020 | 🔵 1792<br><br>(2 pgs) | Motion to Appear pro hac vice *by Mark E. Walraven*. Filed by Creditor The Royalty Owners (Shannon, R.J.) (Entered: 11/12/2020) |
| 11/12/2020 | 🔵 1793<br><br>(9 pgs) | Response (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 11/12/2020) |
| 11/12/2020 | 🔵 1794<br><br>(13 pgs) | Operating Report for Filing Period September 2020, $349,121 disbursed (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 11/12/2020) |
| 11/12/2020 | 🔵 1795<br><br>(12 pgs) | Notice *of Periodic Report Regarding Value, Operations, and Profitability of Entities in Which the Debtor's Estate Holds a Substantial or Controlling Interest*. Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 11/12/2020) |
| 11/12/2020 | 🔵 1796<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Amy R. Wolf (Related Doc # 1756) Signed on 11/12/2020. (emiller) (Entered: 11/12/2020) |

| | | |
|---|---|---|
| 11/12/2020 | 🔘 1797<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Joseph C. Celentino (Related Doc # 1757) Signed on 11/12/2020. (emiller) (Entered: 11/12/2020) |
| 11/12/2020 | 🔘 1798<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - John F. Lynch (Related Doc # 1758) Signed on 11/12/2020. (emiller) (Entered: 11/12/2020) |
| 11/12/2020 | 🔘 1799<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Richard G. Mason (Related Doc # 1759) Signed on 11/12/2020. (emiller) (Entered: 11/12/2020) |
| 11/12/2020 | 🔘 1800<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - David Zensky (Related Doc # 1760) Signed on 11/12/2020. (emiller) (Entered: 11/12/2020) |
| 11/12/2020 | 🔘 1801<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Joshua B. Ebersole (Related Doc # 1765) Signed on 11/12/2020. (emiller) (Entered: 11/12/2020) |
| 11/12/2020 | 🔘 1802<br><br>(2 pgs) | Order Granting Motion To Appear pro hac vice - Mark E. Walraven (Related Doc # 1792) Signed on 11/12/2020. (emiller) (Entered: 11/12/2020) |
| 11/12/2020 | 🔘 1803<br><br>(2278 pgs; 2 docs) | Proposed Order RE: *Order (I) Authorizing the Sale of the Debtors' Mid-Con Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (II) Authorizing the Debtors to Enter Into and Perform Under the Definitive Purchase Agreements, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):1147 Generic Motion) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 11/12/2020) |
| 11/12/2020 | 🔘 1804<br><br>(1251 pgs; 15 docs) | Exhibit List, Witness List (Filed By Chesapeake Energy Corporation ).(Related document(s):1771 Witness List, Exhibit List) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Cavenaugh, Matthew) (Entered: |

| 11/12/2020 | | 11/12/2020) |
|---|---|---|
| 11/12/2020 | 🌐 1805<br><br>(6 pgs) | Agenda for Hearing on 11/13/2020 (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 11/12/2020) |
| 11/12/2020 | 🌐 1806<br><br>(9 pgs) | BNC Certificate of Mailing. (Related document (s):1761 Notice of Filing of Official Transcript (Form)) No. of Notices: 171. Notice Date 11/12/2020. (Admin.) (Entered: 11/13/2020) |
| 11/13/2020 | 🌐 1807<br><br>(3455 pgs; 27 docs) | Motion / *Unsealed Motion of the Official Committee of Unsecured Creditors for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Lien Claims and Causes of Action on Behalf of the Debtors' Estates and (II) Exclusive Settlement Authority [Relates to Dkt. Nos. 1546, 1547]* Filed by Creditor Committee Official Committee Of Unsecured Creditors Hearing scheduled for 12/15/2020 at 12:00 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Exhibit A: Proposed Order # 2 Exhibit B: Complaint # 3 Exhibit A to Complaint # 4 Exhibit B to Complaint # 5 Exhibit C to Complaint # 6 Exhibit D to Complaint # 7 Exhibit E to Complaint # 8 Exhibit F to Complaint # 9 Exhibit G to Complaint # 10 Exhibit H to Complaint # 11 Exhibit I to Complaint # 12 Exhibit J to Complaint # 13 Exhibit K to Complaint # 14 Exhibit L to Complaint # 15 Exhibit M to Complaint # 16 Exhibit N to Complaint # 17 Exhibit O to Complaint # 18 Exhibit P to Complaint # 19 Exhibit Q to Complaint # 20 Exhibit R to Complaint # 21 Exhibit S to Complaint # 22 Exhibit T to Complaint # 23 Exhibit U to Complaint # 24 Exhibit V to Complaint # 25 Exhibit W to Complaint # 26 Exhibit X to Complaint) (Harrison, Julie) (Entered: 11/13/2020) |
| | 🌐 1808<br><br>(2278 pgs; 2 docs) | Proposed Order RE: *Order (I) Approving the Bidding Procedures for the Sale of the Debtors' Mid-Con Assets, (II) Approving Bid Protections, (III) Scheduling Certain Dates with Respect Thereto, (IV) Approving the Form and Manner of Notice Thereof, and (V) Approving Contract* |

| | | |
|---|---|---|
| 11/13/2020 | | *Assumption and Assignment Procedures, and (B) an Order Authorizing the Debtors to Enter Into a Definitive Purchase Agreement* (Filed By Chesapeake Energy Corporation ).(Related document(s):1147 Generic Motion) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 11/13/2020) |
| 11/13/2020 | 🌐1809<br><br>(7 pgs; 3 docs) | E-Mails by Gaynell Spigner (Attachments: # 1 Exhibit # 2 Exhibit) (mmap) (Entered: 11/13/2020) |
| 11/13/2020 | 🌐1810<br><br>(1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 11/13/2020 8:59:47 AM ]. File Size [ 17903 KB ]. Run Time [ 00:37:18 ]. (admin). (Entered: 11/13/2020) |
| 11/13/2020 | 🌐1811<br><br>(256 pgs) | Notice *of Fee Statement of Kirkland & Ellis LLP and Kirkland & Ellis International LLP for Compensation for Services and Reimbursement of Expenses as Attorneys to the Debtors and Debtors in Possession for the Period From August 1, 2020 Through August 31, 2020.* (Related document(s):656 Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 11/13/2020) |
| 11/13/2020 | 🌐1812<br><br>(3 pgs) | Courtroom Minutes. Time Hearing Held: 9:00 AM. Appearances: see attached. (Related document(s):1147 Motion) Witness: Antonio Fernandez. For the reasons stated on the record, the Court has approved the bidding procedures for the sale. Order signed on the record. (aalo) (Entered: 11/13/2020) |
| 11/13/2020 | 🌐1813<br><br>(7 pgs) | Objection *Debtors' Limited Objection and Reservation of Rights to the Motion of Madison Hendrix; Traci Hendrix, Individually and as Next of Kin to the Estate of Bradley Hendrix; Norma Lyn Maldonado, Individually and as Representative of the Estate of Brian Amador Maldonado; and Erika Beddingfield, Individually, and as Next Friend of M.B., a Minor, and as Representative of the Estate of Windell Beddingfield, Deceased for Relief from Stay to Conclude Pending Texas State Court* |

| | | |
|---|---|---|
| 11/13/2020 | | *Litigation* (related document(s):1558 Motion for Relief From Stay). Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 11/13/2020) |
| 11/13/2020 | 1814<br><br>(26 pgs; 2 docs) | Motion *for Entry of an Order (I) Authorizing the Assumption and Assignment of Certain Bureau of Land Management and Bureau of Indian Affairs Oil and Gas Leases and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 11/13/2020) |
| 11/13/2020 | 1815<br><br>(4 pgs) | Notice *of Reset of Hearing on Motion of Justin Cobb, Kristine Cobb and Linda Milanovich for Relief from the Automatic Stay*. (Related document(s):1448 Motion for Relief From Stay) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 11/13/2020) |
| 11/13/2020 | 1817<br><br>(2237 pgs) | Order (I) Authorizing the Sale of the Debtors' Mid-Con Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (II) Authorizing the Debtors to Enter Into and Perform Under the Definitive Purchase Agreements, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief (Related Doc # 1147) Signed on 11/13/2020. (emiller) (Entered: 11/15/2020) |
| 11/14/2020 | 1816<br><br>(9 pgs) | BNC Certificate of Mailing. (Related document (s):1790 Clerk's Notice of Filing of an Appeal) No. of Notices: 173. Notice Date 11/14/2020. (Admin.) (Entered: 11/15/2020) |
| 11/15/2020 | 1818<br><br>(9 pgs) | BNC Certificate of Mailing. (Related document (s):1796 Order on Motion to Appear pro hac vice) No. of Notices: 173. Notice Date 11/15/2020. (Admin.) (Entered: 11/15/2020) |
| 11/15/2020 | 1819<br><br>(9 pgs) | BNC Certificate of Mailing. (Related document (s):1797 Order on Motion to Appear pro hac vice) No. of Notices: 173. Notice Date 11/15/2020. (Admin.) (Entered: 11/15/2020) |

| | | |
|---|---|---|
| 11/15/2020 | 🔘1820<br><br>(9 pgs) | BNC Certificate of Mailing. (Related document (s):1798 Order on Motion to Appear pro hac vice) No. of Notices: 173. Notice Date 11/15/2020. (Admin.) (Entered: 11/15/2020) |
| 11/15/2020 | 🔘1821<br><br>(9 pgs) | BNC Certificate of Mailing. (Related document (s):1799 Order on Motion to Appear pro hac vice) No. of Notices: 173. Notice Date 11/15/2020. (Admin.) (Entered: 11/15/2020) |
| 11/15/2020 | 🔘1822<br><br>(9 pgs) | BNC Certificate of Mailing. (Related document (s):1800 Order on Motion to Appear pro hac vice) No. of Notices: 173. Notice Date 11/15/2020. (Admin.) (Entered: 11/15/2020) |
| 11/15/2020 | 🔘1823<br><br>(9 pgs) | BNC Certificate of Mailing. (Related document (s):1801 Order on Motion to Appear pro hac vice) No. of Notices: 173. Notice Date 11/15/2020. (Admin.) (Entered: 11/15/2020) |
| 11/15/2020 | 🔘1824<br><br>(10 pgs) | BNC Certificate of Mailing. (Related document (s):1802 Order on Motion to Appear pro hac vice) No. of Notices: 173. Notice Date 11/15/2020. (Admin.) (Entered: 11/15/2020) |
| 11/16/2020 | 🔘1825<br><br>(12 pgs; 6 docs) | E-Mails by Gaynell Spigner (Related document (s):1809 Document) (Attachments: # 1 Exhibit # 2 Exhibit # 3 Exhibit # 4 Exhibit # 5 Exhibit) (mmap) (Entered: 11/16/2020) |
| 11/16/2020 | 🔘1826<br><br>(2 pgs) | Letter from Gaynell Spigner to the Court (mmap) (Entered: 11/16/2020) |
| 11/16/2020 | 🔘1827<br><br>(1 pg) | Statement *Arrington Oil & Gas Royalty Fund, LLC's Election to Opt Out of Releases* (Filed By Arrington Oil & Gas Royalty Fund, LLC ). (Holzer, Nathaniel) (Entered: 11/16/2020) |
| 11/16/2020 | 🔘1828<br><br>(1 pg) | Statement *The Monument ABO Company's Election to Opt Out of Releases* (Filed By The Monument ABO Company ). (Holzer, Nathaniel) (Entered: 11/16/2020) |
| | 🔘1829 | Motion to Appear pro hac vice *Ira Neil Richards*. Filed by Creditor William R Ruark |

| | | |
|---|---|---|
| 11/16/2020 | (2 pgs) | (mmap) A list of creditors attached (Entered: 11/16/2020) |
| 11/16/2020 | 1830<br><br>(2 pgs) | Motion to Appear pro hac vice *Arleigh P Helfer, III*. Filed by Creditor WLR Family Partnership (mmap) A list of creditors attached (Entered: 11/16/2020) |
| 11/16/2020 | 1831<br><br>(2 pgs) | Motion to Appear pro hac vice *Richard Barkasy*. Filed by Creditor Raynold W Wilson (mmap) A list of creditors attached (Entered: 11/16/2020) |
| 11/16/2020 | 1832<br><br>(1 pg) | Letter from Gaynell Spigner to the Judge (mmap) (Entered: 11/16/2020) |
| 11/16/2020 | 1833<br><br>(72 pgs; 4 docs) | Application to Employ BBG, Inc. as Real Estate Appraiser/Valuation Expert. Objections/Request for Hearing Due in 21 days. Filed by Creditor Committee Official Committee Of Unsecured Creditors (Attachments: # 1 Exhibit A: Yorey Declaration # 2 Exhibit B: Engagement Letter # 3 Proposed Order) (Harrison, Julie) (Entered: 11/16/2020) |
| 11/16/2020 | 1834<br><br>(20 pgs) | Declaration re: *Supplemental Declaration of Patrick J. Nash, Jr. in Support of the Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Attorneys for the Debtors and Debtors In Possession Effective as of June 28, 2020* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 11/16/2020) |
| 11/16/2020 | 1835<br><br>(7 pgs; 2 docs) | Certificate of No Objection *with Respect to the Motion for Entry of an Order (I) Authorizing the Rejection of the Houston Lease and Sublease Effective as of October 30, 2020 and (II) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):1466 Generic Motion) (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 11/16/2020) |
| | 1836 | Notice *of Third Monthly Fee Statement of* |

| | | |
|---|---|---|
| 11/17/2020 | (99 pgs) | *PricewaterhouseCoopers LLP for Services Rendered and Reimbursement of Expenses as Audit Services and Tax Consulting Services Provider for the Debtors for the Period September 1, 2020 Through September 30, 2020.* Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 11/17/2020) |
| 11/17/2020 | 1837 (2 pgs) | E-Mail sent to the Court by Gaynell Spigner (mmap) (Entered: 11/17/2020) |
| 11/17/2020 | 1838 (3 pgs) | Letter from John Dough (JeannieAndresen) (Entered: 11/17/2020) |
| 11/17/2020 | 1839 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew Cavenaugh. This is to order a transcript of 11/13/2020 before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) Electronically forwarded to Judicial Transcribers of Texas on November 19, 2020. Estimated completion date: November 20, 2020. Modified on 11/19/2020 (ClaudiaGutierrez). (Entered: 11/17/2020) |
| 11/17/2020 | 1840 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by M. Quejada. This is to order a transcript of October 30, 2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By MUFG Union Bank, N.A. ). (Quejada, Maegan) Copy request electronically forwarded to Access Transcripts, LLC on November 19, 2020. Estimated completion date: November 20, 2020. Modified on 11/19/2020 (ClaudiaGutierrez). (Entered: 11/17/2020) |
| | 1841 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by M. Quejada. This is to order a transcript of November 13, 2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By MUFG Union Bank, N.A. ). (Quejada, Maegan) Copy request electronically |

| Date | Doc | Description |
|---|---|---|
| 11/17/2020 | | forwarded to Judicial Transcribers of Texas on November 19, 2020. Estimated completion date: November 20,2020. Modified on 11/19/2020 (ClaudiaGutierrez). (Entered: 11/17/2020) |
| 11/17/2020 | 1842 (4 pgs) | Notice of Appearance and Request for Notice Filed by Mary Elizabeth Heard Filed by on behalf of PMBG Parties (Heard, Mary) (Entered: 11/17/2020) |
| 11/17/2020 | 1843 (5 pgs) | Stipulation and Agreed Order Signed on 11/17/2020 (Related document(s):1465 Stipulation) (aalo) (Entered: 11/17/2020) |
| 11/17/2020 | 1844 (3 pgs) | Affidavit Re: *Affidavit of Publication of The Advocate* (Filed By Chesapeake Energy Corporation ).(Related document(s):1633 Order Approving Disclosure Statement) (Cavenaugh, Matthew) (Entered: 11/17/2020) |
| 11/17/2020 | 1845 (367 pgs; 12 docs) | Adversary case 20-03467. Nature of Suit: (91 (Declaratory judgment)) Complaint by c/o Annie Catmull Royalty Owner Plaintiffs c/o against Chesapeake Exploration, L.L.C., Chesapeake Operating L.L.C.. Fee Amount $350 (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11) (Catmull, Annie) (Entered: 11/17/2020) |
| 11/17/2020 | 1846 (2 pgs) | Order Granting Motion To Appear pro hac vice - Ira Neil Richards (Related Doc # 1829) Signed on 11/17/2020. (emiller) (Entered: 11/18/2020) |
| 11/17/2020 | 1847 (2 pgs) | Order Granting Motion To Appear pro hac vice - Arleigh P. Helfer III (Related Doc # 1830) Signed on 11/17/2020. (emiller) (Entered: 11/18/2020) |
| 11/17/2020 | 1848 (2 pgs) | Order Granting Motion To Appear pro hac vice - Richard Barkasy (Related Doc # 1831) Signed on 11/17/2020. (emiller) (Entered: 11/18/2020) |
| | 1851 | Stipulation and Agreed Order by and Among the Debtors and the Texas MDL Royalty Owner |

| | | |
|---|---|---|
| 11/17/2020 | (4 pgs) | Plaintiffs Extending the Removal Period for the Texas MDL Signed on 11/17/2020 (Related document(s):1755 Stipulation) (VrianaPortillo) (Entered: 11/18/2020) |
| 11/18/2020 | 1849<br><br>(175 pgs; 3 docs) | Witness List, Exhibit List (Filed By Chesapeake Energy Corporation ). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2) (Cavenaugh, Matthew) (Entered: 11/18/2020) |
| 11/18/2020 | 1850<br><br>(67 pgs; 6 docs) | Exhibit List, Witness List (Filed By Madison Hendrix ).(Related document(s):1558 Motion for Relief From Stay) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5) (Itkin, Jason) (Entered: 11/18/2020) |
| 11/18/2020 | | Certificate of Email Notice. Due to the Courts schedule, the hearing on the motions filed at docket nos. 1293 and 1175 have been reset. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):1175 Motion to Reconsider, 1293 Motion for Relief From Stay) **Hearing rescheduled for 12/14/2020 at 02:00 PM at telephone and video conference.** (aalo) (Entered: 11/18/2020) |
| 11/18/2020 | | Certificate of Email Notice. Due to the Courts schedule, the hearing on the motions for relief from stay filed at docket nos. 1248, 1249, 1448 1451 and 1558 have been reset. Movants to notice all interested parties and file a certificate of service with the court (Related document (s):1248 Motion for Relief From Stay, 1249 Motion for Relief From Stay, 1448 Motion for Relief From Stay, 1451 Motion for Relief From Stay, 1558 Motion for Relief From Stay) **Hearing rescheduled for 12/10/2020 at 09:00 AM at telephone and video conference.** (aalo) (Entered: 11/18/2020) |
| 11/18/2020 | 1852<br><br>(5 pgs) | Stipulation By Chesapeake Energy Corporation and Rodney Hudson, et al., Allen Johnson, et al., and Sandra Louise Woods-Nelson. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). |

| 11/18/2020 | | (Cavenaugh, Matthew) (Entered: 11/18/2020) |
|---|---|---|
| 11/18/2020 | 1853<br><br>(17 pgs; 2 docs) | Motion *for Entry of an Agreed Order (I) Authorizing the Rejection of the TETCO Agreement Effective as of November 1, 2021 and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 11/18/2020) |
| 11/18/2020 | 1854<br><br>(2 pgs) | E-Mail to the Court by Gaynell Spigner (mmap) (Entered: 11/18/2020) |
| 11/18/2020 | 1855<br><br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Timothy Aaron Million Filed by on behalf of C.C. Forbes, LLC (Million, Timothy) (Entered: 11/18/2020) |
| 11/18/2020 | 1856<br><br>(5 pgs) | Notice *of Transaction*. (Related document(s):715 Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 11/18/2020) |
| 11/18/2020 | 1857<br><br>(19 pgs; 2 docs) | Motion *for Entry of an Order (I) Authorizing the Rejection of the Ryan Tax Contracts Effective as of November 18, 2020, and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 11/18/2020) |
| 11/19/2020 | 1858<br><br>(3 pgs) | E-Mail to the Court by Gaynell Spigner (Related document(s):1817 Order) (mmap) (Entered: 11/19/2020) |
| 11/19/2020 | 1859<br><br>(6 pgs) | Letter from Victor Franjul to Judge (mmap) (Entered: 11/19/2020) |
| 11/19/2020 | 1860<br><br>(1 pg) | Withdrawal of Claim: *Claim No. 10013 with claims agent in the amount of $4,765.70 for Bexar County* (Stecker, Don) (Entered: 11/19/2020) |
| | 1861 | Motion to Appear pro hac vice Arleigh P. Helfer III . Filed by Creditor William R Ruark, et al. |

| | | |
|---|---|---|
| 11/19/2020 | (2 pgs) | (ChristopherSarrat) Modified on 11/19/2020 (ChristopherSarrat). Modified on 11/19/2020 (ChristopherSarrat). Modified on 11/19/2020 (ChristopherSarrat). Modified on 11/24/2020 (ChristopherSarrat). (Entered: 11/19/2020) |
| 11/19/2020 | 🔵1862<br><br>(13 pgs) | Operating Report for Filing Period October 2020, $404,703 disbursed (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 11/19/2020) |
| 11/19/2020 | 🔵1863<br><br>(24 pgs) | Notice *of Jackson Walker LLP's Second Monthly Fee Statement for Compensation of Services Rendered and Reimbursement of Expenses as Co-Counsel and Conflicts Counsel to the Debtors for the Period From August 1, 2020 Through August 31, 2020.* (Related document (s):656 Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 11/19/2020) |
| 11/19/2020 | 🔵1864<br><br>(18 pgs) | Notice *of Jackson Walker LLP's Third Monthly Fee Statement for Compensation of Services Rendered and Reimbursement of Expenses as Co-Counsel and Conflicts Counsel to the Debtors for the Period from September 1, 2020 Through September 30, 2020.* (Related document(s):656 Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 11/19/2020) |
| 11/19/2020 | 🔵1865<br><br>(24 pgs) | Notice *of Forshey & Prostok, LLP's Monthly Fee Statement for Compensation for Services Rendered and for Reimbursement of Expenses as Attorneys for the Official Committee of Royalty Owners for the period from October 1, 2020 through October 31, 2020.* (Related document (s):656 Generic Order) Filed by Forshey & Prostok, LLP (Prostok, Jeffrey) (Entered: 11/19/2020) |
| 11/19/2020 | 🔵1866<br><br>(6 pgs) | Statement *in Accordance with FRBP 2019(a)* (Filed By PMBG Parties ). (Heard, Mary) (Entered: 11/19/2020) |
| | 🔵1867 | Affidavit Re: *Service of Docket Numbers 1531, 1532, 1559 and 1560* (Filed By Epiq Corporate |

| | | |
|---|---|---|
| 11/19/2020 | (20 pgs) | Restructuring LLC ).(Related document(s):1531 Generic Order, 1532 Generic Order, 1559 Notice) (Garabato, Sid) (Entered: 11/19/2020) |
| 11/19/2020 | 1868 <br><br> (7 pgs) | Affidavit Re: *Service of Docket Number 1566* (Filed By Epiq Corporate Restructuring LLC ). (Related document(s):1566 Notice) (Garabato, Sid) (Entered: 11/19/2020) |
| 11/19/2020 | 1869 <br><br> (21 pgs) | Affidavit Re: *Service of Docket Number 1661* (Filed By Epiq Corporate Restructuring LLC ). (Related document(s):1661 Notice) (Garabato, Sid) (Entered: 11/19/2020) |
| 11/19/2020 | 1870 <br><br> (13 pgs) | BNC Certificate of Mailing. (Related document (s):1843 Generic Order) No. of Notices: 173. Notice Date 11/19/2020. (Admin.) (Entered: 11/19/2020) |
| 11/19/2020 | 1915 <br><br> (2 pgs) | Motion to Appear pro hac vice *Ira Neil Richards*. Filed by Creditors William R. Ruark, Jesse C. Place, Charlotte E. Place Trust, Richard E. Place Trust, Charlotte E. Place, Richard E. Place, Placewood Resources, L.P., Placewood Resource Management, LLC, Leola B. Steele, Herbert D. Steele, Sally Steele, Esquire, Cemetery Road Hunt Club, Inc., R&J Partners, L.P., Judith A. Wilson, WLR Family Partnership, Raynold W Wilson (JacquelineMata) (Entered: 11/24/2020) |
| 11/20/2020 | 1871 <br><br> (5 pgs) | Affidavit Re: *Service of Docket Number 1491 on October 28, 2020* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1491 Notice) (Garabato, Sid) (Entered: 11/20/2020) |
| 11/20/2020 | 1872 <br><br> (4 pgs) | Affidavit Re: *Service of Docket Number 1491 on November 2, 2020* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1491 Notice) (Garabato, Sid) (Entered: 11/20/2020) |
| 11/20/2020 | 1873 <br><br> (20 pgs) | Affidavit Re: *Affidavit of Service of Gregory Winter* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1531 Generic Order, 1532 Generic Order, 1559 Notice) (Garabato, Sid) (Entered: 11/20/2020) |

| | | |
|---|---|---|
| 11/20/2020 | 1874<br><br>(37 pgs) | Affidavit Re: *Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1305 Generic Order, 1363 Notice, 1366 Notice, 1559 Notice) (Garabato, Sid) (Entered: 11/20/2020) |
| 11/20/2020 | 1875<br><br>(16 pgs) | Declaration re: *Declaration of Disinterestedness of Riveron Consulting, LLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 11/20/2020) |
| 11/20/2020 | 1876<br><br>(6 pgs) | Stipulation By Chesapeake Energy Corporation and Zehentbauer Family Land LP, et al.. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 11/20/2020) |
| 11/20/2020 | 1877<br><br>(279 pgs; 8 docs) | Application for Compensation / *First Interim Application of Brown Rudnick LLP, as Co-Counsel to the Official Committee of Unsecured Creditors, for the Period From July 13, 2020 Through and Including September 30, 2020.* Objections/Request for Hearing Due in 21 days. (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Proposed Order) (Harrison, Julie) (Entered: 11/20/2020) |
| 11/20/2020 | 1878<br><br>(313 pgs; 4 docs) | Application for Compensation / *First Interim Fee Application of AlixPartners, LLP, Financial Advisor to the Official Committee of Unsecured Creditors for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses for the Period July 14, 2020 through September 30, 2020.* Objections/Request for Hearing Due in 21 days. (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Proposed Order) (Harrison, Julie) (Entered: 11/20/2020) |
| | 1879<br><br>(7 pgs) | Statement of Issues on Appeal (related document (s):1762 Notice of Appeal)., Appellant Designation of Contents For Inclusion in Record |

| 11/20/2020 | | On Appeal (related document(s):1762 Notice of Appeal). (Yetter, R) (Entered: 11/20/2020) |
|---|---|---|
| 11/20/2020 | 1880<br><br>(186 pgs; 8 docs) | Application for Compensation / *First Interim Fee Application of Opportune LLP for Allowance of Compensation and Reimbursement of Expenses as Special Valuation and Industry Advisor to the Official Committee of Unsecured Creditors for the Period September 1, 2020 through September 30, 2020*. Objections/Request for Hearing Due in 21 days. (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Proposed Order) (Harrison, Julie) (Entered: 11/20/2020) |
| 11/20/2020 | 1881<br><br>(3 pgs) | Joint Certification (Form 24) to Court of Appeals by All Parties *Certification to Court of Appeals by Appellant ETC Texas Pipeline, Ltd. and Appellees Debtors and Debtors in Possession* (Yetter, R) (Entered: 11/20/2020) |
| 11/20/2020 | 1882<br><br>(6 pgs) | Supplemental Notice *to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases*. Filed by Chesapeake Energy Corporation (Peguero, Kristhy) (Entered: 11/20/2020) |
| 11/20/2020 | 1883<br><br>(5 pgs) | Stipulation By Chesapeake Energy Corporation and Rosa M. Byers and the State of Louisiana. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ).(Related document(s):1249 Motion for Relief From Stay) (Cavenaugh, Matthew) (Entered: 11/20/2020) |
| 11/20/2020 | 1884<br><br>(6 pgs; 2 docs) | Joint Emergency Motion *of the Debtors and Deutsche Bank Trust Company Americas for a Status Conference* Filed by Debtor Chesapeake Energy Corporation Hearing scheduled for 11/23/2020 at 03:00 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 11/20/2020) |
| | 1885 | BNC Certificate of Mailing. (Related document (s):1846 Order on Motion to Appear pro hac |

| | | |
|---|---|---|
| 11/20/2020 | (10 pgs) | vice) No. of Notices: 173. Notice Date 11/20/2020. (Admin.) (Entered: 11/20/2020) |
| 11/20/2020 | 🔵 1886<br><br>(10 pgs) | BNC Certificate of Mailing. (Related document (s):1847 Order on Motion to Appear pro hac vice) No. of Notices: 173. Notice Date 11/20/2020. (Admin.) (Entered: 11/20/2020) |
| 11/20/2020 | 🔵 1887<br><br>(10 pgs) | BNC Certificate of Mailing. (Related document (s):1848 Order on Motion to Appear pro hac vice) No. of Notices: 173. Notice Date 11/20/2020. (Admin.) (Entered: 11/20/2020) |
| 11/20/2020 | 🔵 1888<br><br>(12 pgs) | BNC Certificate of Mailing. (Related document (s):1851 Generic Order) No. of Notices: 173. Notice Date 11/20/2020. (Admin.) (Entered: 11/20/2020) |
| 11/20/2020 | 🔵 1891<br><br>(2 pgs) | Order Granting Motion To Appear pro hac vice - Arleigh P. Helfer III (Related Doc # 1861) Signed on 11/20/2020. (emiller) (Entered: 11/22/2020) |
| 11/20/2020 | 🔵 1899<br><br>(2 pgs) | E-Mail by Gaynell Spigner (mmap) (Entered: 11/23/2020) |
| 11/21/2020 | 🔵 1889<br><br>(30 pgs) | Transcript RE: Approval of the Sale of Chesapeake Mid-Con Assets (Via Zoom) held on November 13, 2020 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 02/19/2021. (mhen) (Entered: 11/21/2020) |
| 11/21/2020 | 🔵 1890<br><br>(7 pgs) | Notice *of Hearing to Consider Confirmation of the Chapter 11 Plan filed by the Debtors and Related Voting and Objection Deadlines*. Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 11/21/2020) |
| | 🔵 1892<br><br>(440 pgs; 7 docs) | Motion */ Debtors' Motion for Entry of an Order (I) Authorizing (A) the Assumption of Certain Williams Agreements, (B) Entry into the Firm Sale Agreement, (C) the Private Sale of Certain Real Estate Assets Free and Clear of Liens,* |

| | | |
|---|---|---|
| 11/22/2020 | | *Claims, Encumbrances, and Interests, and (D) the Resolution of the Williams Indemnification Claims and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation Hearing scheduled for 12/15/2020 at 12:00 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Exhibit A - Williams Contracts # 2 Exhibit B - Cure Amounts # 3 Exhibit C - Form of Sale Notice # 4 Exhibit D - Form of Cure Notice # 5 Exhibit E - Williams Indemnification Claims # 6 Proposed Order) (Schwarzman, Alexandra) (Entered: 11/22/2020) |
| 11/22/2020 | 1893 (11 pgs; 2 docs) | Motion to Seal */ Debtors' Motion for Entry of an Order Authorizing the Debtors to File Under Seal* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Schwarzman, Alexandra) (Entered: 11/22/2020) |
| 11/22/2020 | 1894 (441 pgs) | Sealed Document (Filed By Chesapeake Energy Corporation ). (Schwarzman, Alexandra) (Entered: 11/22/2020) |
| 11/23/2020 | 1895 (6 pgs) | Notice */ Notice of the Sale of the Debtors' South Mansfield Assets Free and Clear of Any and All Liens, Claims, Encumbrances, and Interests*. (Related document(s):1892 Generic Motion) Filed by Chesapeake Energy Corporation (Schwarzman, Alexandra) (Entered: 11/23/2020) |
| 11/23/2020 | 1896 (7 pgs; 2 docs) | Notice */ Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases*. (Related document(s):1892 Generic Motion) Filed by Chesapeake Energy Corporation (Attachments: # 1 Exhibit A - Assigned Contracts Schedule) (Schwarzman, Alexandra) (Entered: 11/23/2020) |
| 11/23/2020 | 1897 (1 pg) | Notice of Filing of Official Transcript as to 1889 Transcript. Parties notified (Related document (s):1889 Transcript) (jdav) (Entered: 11/23/2020) |
| | 1898 (141 pgs; 9 docs) | Application for Compensation */ First Interim Fee Application of Norton Rose Fulbright US LLP for Allowance of Compensation and Reimbursement of Expenses as Co-Counsel to* |

| | | |
|---|---|---|
| 11/23/2020 | | *the Official Committee of Unsecured Creditors for the Period July 13, 2020 through September 30, 2020.* Objections/Request for Hearing Due in 21 days. (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Proposed Order) (Harrison, Julie) (Entered: 11/23/2020) |
| 11/23/2020 | 🌐 1900 <br><br> (5 pgs; 2 docs) | Motion To Substitute Attorney. Filed by Creditor CGG Services (U.S.), Inc. f/k/a Digicon Geophysical Corp. (Attachments: # 1 Proposed Order) (Platt, Mark) (Entered: 11/23/2020) |
| 11/23/2020 | 🌐 1901 <br><br> (5 pgs) | Objection to Confirmation of Plan Filed by Texas Taxing Authorities. (Related document (s):1644 Amended Chapter 11 Plan) (LeDay, Tara) (Entered: 11/23/2020) |
| 11/23/2020 | 🌐 1902 <br><br> (1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 11/23/2020 3:05:55 PM ]. File Size [ 11520 KB ]. Run Time [ 00:24:00 ]. (admin). (Entered: 11/23/2020) |
| 11/23/2020 | 🌐 1903 <br><br> (3 pgs) | Courtroom Minutes. Time Hearing Held: 3:00 PM. Appearances: see attached. (Related document(s):1884 Emergency Motion (with hearing date)) Status conference held, no further action taken. (aalo) (Entered: 11/23/2020) |
| 11/23/2020 | 🌐 1904 <br><br> (2 pgs) | Notice of Appearance and Request for Notice Filed by John E.W. Baay II Filed by on behalf of A2D TECHNOLOGIES, INC. D/B/A TGS GEOLOGICAL PRODUCTS AND SERVICES, TGS-NOPEC Geophysical Company ASA, Vector Seismic Data Processing Inc., Westerngeco LLC (Baay, John) (Entered: 11/23/2020) |
| 11/23/2020 | 🌐 1905 <br><br> (4 pgs; 2 docs) | Letter from Gaynell Spigner (Attachments: # 1 Exhibit) (mmap) (Entered: 11/23/2020) |
| 11/23/2020 | 🌐 1906 <br><br> (61 pgs) | Debtors Master Service List (Filed By Epiq Corporate Restructuring LLC ). (Garabato, Sid) (Entered: 11/23/2020) |

| | | |
|---|---|---|
| 11/23/2020 | 🔘 1907<br><br>(1650 pgs) | Notice *of Plan Supplement for the Second Amended Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates*. (Related document(s):1644 Amended Chapter 11 Plan) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 11/23/2020) |
| 11/23/2020 | 🔘 1908<br><br>(3 pgs) | Order Authorizing the Debtors to File Under Seal (Related Doc 1893) Signed on 11/23/2020. (emiller) (Entered: 11/23/2020) |
| 11/23/2020 | 🔘 1909<br><br>(31 pgs) | Affidavit Re: *Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1574 Order on Emergency Motion, 1579 Opinion, 1580 Generic Order, 1599 Amended Chapter 11 Plan, 1622 Amended Disclosure Statement, 1633 Order Approving Disclosure Statement) (Garabato, Sid) (Entered: 11/23/2020) |
| 11/23/2020 | 🔘 1910<br><br>(30 pgs) | Affidavit Re: *Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1635 Objection, 1638 Objection, 1640 Generic Motion) (Garabato, Sid) (Entered: 11/23/2020) |
| 11/23/2020 | 🔘 1911<br><br>(4 pgs) | Affidavit Re: *Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1692 Notice, 1693 Notice) (Garabato, Sid) (Entered: 11/23/2020) |
| 11/24/2020 | 🔘 1912<br><br>(3 pgs) | Letter from Gaynell Spigner (mmap) (Entered: 11/24/2020) |
| 11/24/2020 | 🔘 1913<br><br>(1 pg) | Motion to Appear pro hac vice *Karen McCartan DeSantis*. Filed by Debtor Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 11/24/2020) |
| 11/24/2020 | 🔘 1914<br><br>(32 pgs) | Notice *of Additional Supplemental Agreement*. (Related document(s):1452 Order on Application to Employ) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 11/24/2020) |

| | | |
|---|---|---|
| 11/24/2020 | 🔘 1916<br><br>(25 pgs; 2 docs) | Proposed Order RE: *Order (I) Authorizing the Assumption and Assignment of Certain Bureau of Land Management and Bureau of Indian Affairs Oil and Gas Leases and (II) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):1814 Generic Motion) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 11/24/2020) |
| 11/24/2020 | 🔘 1917<br><br>(2 pgs) | Letter from John Dough (mmap) (Entered: 11/24/2020) |
| 11/24/2020 | 🔘 1918<br><br>(2 pgs) | E-Mail by Gaynell Spigner (mmap) (Entered: 11/24/2020) |
| 11/24/2020 | 🔘 1919<br><br>(51 pgs) | Statement / *Fourth Monthly Fee Statement of Norton Rose Fulbright US LLP for Allowance of Compensation for Services Rendered and Reimbursement of Expenses Incurred as Co-Counsel to the Official Committee of Unsecured Creditors for the Period from October 1, 2020 to October 31, 2020* (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) (Entered: 11/24/2020) |
| 11/24/2020 | 🔘 1920<br><br>(2 pgs) | Withdrawal of Claim: *12563 filed by Epiq Corporate Restructuring, LLC on behalf of Albert G Sims Mineral Trust* (Garabato, Sid) (Entered: 11/24/2020) |
| 11/24/2020 | 🔘 1921<br><br>(73 pgs; 7 docs) | Application for Compensation - *First Interim Application of Forshey & Prostok, LLP, as Attorneys for the Official Committee of Royalty Owners* for Forshey & Prostok, LLP, Attorney, Period: 7/25/2020 to 9/30/2020, Fee: $346,458.00, Expenses: $22,584.58. Objections/Request for Hearing Due in 21 days. Filed by Attorney Forshey & Prostok, LLP (Attachments: # 1 Ex. A # 2 Ex. B # 3 Ex. C # 4 Ex. D # 5 Ex. E # 6 Ex. F) (Prostok, Jeffrey) (Entered: 11/24/2020) |
| 11/24/2020 | 🔘 1922<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Marty L. Brimmage, Jr.. This is to order a transcript of the November 23, 2020 |

| | | |
|---|---|---|
| 11/25/2020 | | Hearing before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts ). (Brimmage, Marty) Electronically forwarded to Judicial Transcribers of Texas on November 25, 2020. Estimated completion date: November 26, 2020. Modified on 11/25/2020 (ClaudiaGutierrez). (Entered: 11/25/2020) |
| 11/25/2020 | 🌐1923<br><br>(7 pgs; 2 docs) | Certificate of No Objection *with Respect to the Motion for Entry of an Order (I) Authorizing the Rejection of Certain Executory Contracts Effective as of October 30, 2020 and (II) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):1640 Generic Motion) (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 11/25/2020) |
| 11/25/2020 | 🌐1924<br><br>(5 pgs) | Notice *of Filing Monthly Report Pursuant to the Order to Approve Procedures for De Minimis Asset Transactions*. (Related document(s):715 Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 11/25/2020) |
| 11/25/2020 | 🌐1925<br><br>(104 pgs; 2 docs) | Application for Compensation *First Interim Application of Ernst & Young LLP for Compensation and Reimbursement of Expenses for the Period from June 29, 2020 Through September 30, 2020*. Objections/Request for Hearing Due in 21 days. Filed by Attorney Matthew D Cavenaugh (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 11/25/2020) |
| 11/25/2020 | 🌐1926<br><br>(27 pgs) | Notice *of First Monthly Fee Statement of Ernst & Young LLP for Compensation and Reimbursement of Expenses for the Period From October 1, 2020 Through October 31, 2020*. (Related document(s):656 Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 11/25/2020) |
| | 🌐1927 | Notice *of the Official Committee of Unsecured* |

| | | |
|---|---|---|
| 11/25/2020 | (4 pgs) | *Creditors Exchange of Preliminary List of Fact Witnesses for Confirmation Hearing*. Filed by Official Committee Of Unsecured Creditors (Harrison, Julie) (Entered: 11/25/2020) |
| 11/25/2020 | 1928 <br> (104 pgs; 2 docs) | Application for Compensation *Jackson Walker LLP's First Interim Fee Application for Allowance and Payment of Fees and Expenses as Co-Counsel to the Debtors for the Period From June 28, 2020 Through September 30, 2020*. Objections/Request for Hearing Due in 21 days. Filed by Attorney Matthew D Cavenaugh (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 11/25/2020) |
| 11/25/2020 | 1929 <br> (3 pgs) | Notice *of Supplemental Disclosure to Holders of FLLO Term Loan Facility Claims Regarding Plan Solicitation Materials and Rights Offering Procedures*. Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 11/25/2020) |
| 11/25/2020 | 1930 <br> (3 pgs) | Notice *of Supplemental Disclosure to Holders of Second Lien Notes Regarding Plan Solicitation Materials and Rights Offering Procedures*. Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 11/25/2020) |
| 11/25/2020 | 1931 <br> (3033 pgs) | Notice *of Corrected Exhibit C to the Plan Supplement*. (Related document(s):1633 Order Approving Disclosure Statement, 1907 Notice) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 11/25/2020) |
| 11/25/2020 | 1932 <br> (4 pgs) | Witness List (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 11/25/2020) |
| 11/25/2020 | 1933 <br> (3 pgs) | Notice *and Reservation of Rights of the Ad Hoc Group of FLLO Term Loan Lenders Regarding Preliminary Lists of Fact Witnesses for Confirmation Hearing*. (Related document (s):1540 Stipulation) Filed by Ad Hoc Group of FLLO Term Loan Lenders (Vakamudi, Kiran) (Entered: 11/25/2020) |
| | | |

| | | |
|---|---|---|
| 11/25/2020 | 🖰 1934<br><br>(9 pgs) | BNC Certificate of Mailing. (Related document (s):1897 Notice of Filing of Official Transcript (Form)) No. of Notices: 174. Notice Date 11/25/2020. (Admin.) (Entered: 11/25/2020) |
| 11/25/2020 | 🖰 1935<br><br>(10 pgs) | BNC Certificate of Mailing. (Related document (s):1891 Order on Motion to Appear pro hac vice) No. of Notices: 174. Notice Date 11/25/2020. (Admin.) (Entered: 11/25/2020) |
| 11/26/2020 | 🖰 1936<br><br>(38 pgs) | BNC Certificate of Mailing. (Related document (s):1908 Order on Motion to Seal) No. of Notices: 41. Notice Date 11/26/2020. (Admin.) (Entered: 11/26/2020) |
| 11/27/2020 | 🖰 1937<br><br>(26 pgs) | Affidavit Re: *of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1814 Generic Motion, 1815 Notice) (Garabato, Sid) (Entered: 11/27/2020) |
| 11/27/2020 | 🖰 1938<br><br>(19 pgs) | Letter from Victor Franjul (mmap) (Entered: 11/27/2020) |
| 11/27/2020 | 🖰 1939<br><br>(1234 pgs; 2 docs) | Amended Schedule A/B: Property Non-Individual , Amended Schedule D Non-Individual- Creditors Having Claims Secured by Property , Amended Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Amended Schedule G Non-Individual-Executory Contracts and Unexpired Leases , Amended Schedule H Non-Individual-Codebtors (Filed By Chesapeake AEZ Exploration, L.L.C. ). (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 11/27/2020) |
| | 🖰 1940<br><br>(8454 pgs; 2 docs) | Amended Schedule A/B: Property Non-Individual , Amended Schedule D Non-Individual- Creditors Having Claims Secured by Property , Amended Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Amended Schedule G Non-Individual-Executory Contracts and Unexpired Leases , Amended Schedule H Non-Individual-Codebtors (Filed By Chesapeake Appalachia, L.L.C. ). (Attachments: # 1 Redline) |

| | | |
|---|---|---|
| 11/27/2020 | | (Cavenaugh, Matthew) (Entered: 11/27/2020) |
| 11/27/2020 | 🔵 1941<br><br>(1782 pgs; 2 docs) | Amended Schedule A/B: Property Non-Individual , Amended Schedule D Non-Individual- Creditors Having Claims Secured by Property , Amended Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Amended Schedule G Non-Individual-Executory Contracts and Unexpired Leases , Amended Schedule H Non-Individual-Codebtors (Filed By Chesapeake Energy Corporation ). (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 11/27/2020) |
| 11/27/2020 | 🔵 1942<br><br>(539 pgs; 2 docs) | Amended Schedule A/B: Property Non-Individual , Amended Schedule D Non-Individual- Creditors Having Claims Secured by Property , Amended Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Amended Schedule G Non-Individual-Executory Contracts and Unexpired Leases , Amended Schedule H Non-Individual-Codebtors (Filed By Chesapeake Land Development Company, L.L.C. ). (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 11/27/2020) |
| 11/27/2020 | 🔵 1943<br><br>(7302 pgs; 2 docs) | Amended Schedule A/B: Property Non-Individual , Amended Schedule D Non-Individual- Creditors Having Claims Secured by Property , Amended Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Amended Schedule G Non-Individual-Executory Contracts and Unexpired Leases , Amended Schedule H Non-Individual-Codebtors (Filed By Chesapeake Louisiana, L.P. ). (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 11/27/2020) |
| | 🔵 1944<br><br>(8151 pgs; 2 docs) | Amended Schedule A/B: Property Non-Individual , Amended Schedule D Non-Individual- Creditors Having Claims Secured by Property , Amended Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Amended Schedule G Non-Individual-Executory Contracts and Unexpired Leases , Amended Schedule H Non-Individual- |

| Date | Doc | Description |
|---|---|---|
| 11/27/2020 | | Codebtors (Filed By Chesapeake Operating, L.L.C. ). (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 11/27/2020) |
| 11/27/2020 | 🔵 1945 (3180 pgs; 2 docs) | Amended Schedule A/B: Property Non-Individual , Amended Schedule D Non-Individual- Creditors Having Claims Secured by Property , Amended Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Amended Schedule G Non-Individual-Executory Contracts and Unexpired Leases , Amended Schedule H Non-Individual-Codebtors (Filed By Chesapeake Royalty, L.L.C. ). (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 11/27/2020) |
| 11/27/2020 | 🔵 1946 (406 pgs; 2 docs) | Amended Schedule A/B: Property Non-Individual , Amended Schedule D Non-Individual- Creditors Having Claims Secured by Property , Amended Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Amended Schedule G Non-Individual-Executory Contracts and Unexpired Leases , Amended Schedule H Non-Individual-Codebtors (Filed By CHK Utica, L.L.C. ). (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 11/27/2020) |
| 11/27/2020 | 🔵 1947 (634 pgs; 2 docs) | Amended Schedule A/B: Property Non-Individual , Amended Schedule D Non-Individual- Creditors Having Claims Secured by Property , Amended Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Amended Schedule G Non-Individual-Executory Contracts and Unexpired Leases , Amended Schedule H Non-Individual-Codebtors (Filed By Empress, L.L.C. ). (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 11/27/2020) |
| | 🔵 1948 (556 pgs; 2 docs) | Amended Schedule A/B: Property Non-Individual , Amended Schedule D Non-Individual- Creditors Having Claims Secured by Property , Amended Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Amended Schedule G Non-Individual-Executory Contracts and Unexpired Leases , |

| | | |
|---|---|---|
| 11/27/2020 | | Amended Schedule H Non-Individual-Codebtors (Filed By Empress Louisiana Properties, L.P. ). (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 11/27/2020) |
| 11/27/2020 | 1949 (228 pgs; 2 docs) | Amended Schedule A/B: Property Non-Individual , Amended Schedule D Non-Individual- Creditors Having Claims Secured by Property , Amended Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Amended Schedule G Non-Individual-Executory Contracts and Unexpired Leases , Amended Schedule H Non-Individual-Codebtors (Filed By GSF, L.L.C. ). (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 11/27/2020) |
| 11/27/2020 | 1950 (174 pgs; 2 docs) | Amended Schedule A/B: Property Non-Individual , Amended Schedule D Non-Individual- Creditors Having Claims Secured by Property , Amended Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Amended Schedule G Non-Individual-Executory Contracts and Unexpired Leases , Amended Schedule H Non-Individual-Codebtors (Filed By Midcon Compression, L.L.C. ). (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 11/27/2020) |
| 11/27/2020 | 1951 (6085 pgs; 2 docs) | Amended Schedule A/B: Property Non-Individual , Amended Schedule D Non-Individual- Creditors Having Claims Secured by Property , Amended Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Amended Schedule G Non-Individual-Executory Contracts and Unexpired Leases , Amended Schedule H Non-Individual-Codebtors (Filed By Chesapeake Plains, L.L.C. ). (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 11/27/2020) |
| | 1952 (29144 pgs; 4 docs) | Amended Schedule A/B: Property Non-Individual , Amended Schedule D Non-Individual- Creditors Having Claims Secured by Property , Amended Schedule E/F: Creditors Who Have Unsecured Claims Non-Individual , Amended Schedule G Non-Individual- |

| | | |
|---|---|---|
| 11/27/2020 | | Executory Contracts and Unexpired Leases , Amended Schedule H Non-Individual-Codebtors (Filed By Chesapeake Exploration, L.L.C. ). (Attachments: # 1 Amended Schedules Part 2 # 2 Redline Part 1 # 3 Redline Part 2) (Cavenaugh, Matthew) (Entered: 11/27/2020) |
| 11/27/2020 | 🌀 1953<br><br>(62 pgs) | Affidavit Re: *Various Filings* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1567 Witness List, Exhibit List, 1574 Order on Emergency Motion, 1579 Opinion, 1580 Generic Order, 1599 Amended Chapter 11 Plan, 1600 Disclosure Statement, 1602 Proposed Order, 1603 Reply, 1611 Agenda) (Garabato, Sid) (Entered: 11/27/2020) |
| 11/27/2020 | 🌀 1954<br><br>(7217 pgs) | Affidavit Re: *Order (I) Approving the Bidding Procedures for the Sale of the Debtors' Mid-Con Assets* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1305 Generic Order) (Garabato, Sid) (Entered: 11/27/2020) |
| 11/30/2020 | 🌀 1955<br><br>(2 pgs) | Withdrawal of Claim: *filed by Epiq Corporate Restructuring, LLC on behalf of Union Pacific Railroad Company (See Schedule 1 for Claims)* (Garabato, Sid) (Entered: 11/30/2020) |
| 11/30/2020 | 🌀 1956<br><br>(129 pgs) | Statement / *Second Monthly Fee Statement of Opportune LLP for Allowance of Compensation for Services Rendered and Reimbursement of Expenses Incurred as Special Valuation and Industry Advisor to the Official Committee of Unsecured Creditors for the Period From October 1, 2020 to October 31, 2020* (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) (Entered: 11/30/2020) |
| 11/30/2020 | 🌀 1957<br><br>(1 pg) | Motion to Appear pro hac vice *Christina L. Chen*. Filed by Trustee Deutsche Bank Trust Company Americas (Carter, Winstol) (Entered: 11/30/2020) |
| 11/30/2020 | 🌀 1958<br><br>(1 pg) | Motion to Appear pro hac vice *Joshua Dorchak*. Filed by Trustee Deutsche Bank Trust Company Americas (Carter, Winstol) (Entered: 11/30/2020) |

| | | |
|---|---|---|
| 11/30/2020 | 🔵 1959<br><br>(21 pgs) | Transcript RE: Motion Hearing (Video Conference) held on November 23, 2020 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 03/1/2021. (mhen) (Entered: 11/30/2020) |
| 11/30/2020 | 🔵 1960<br><br>(21 pgs; 2 docs) | Objection to Claim Number by Claimant *Debtors' Limited Objection to Proof of Claim No. 12696 Filed by Shermaine Newman* Hearing scheduled for 12/4/2020 at 10:00 AM at telephone and video conference. (Attachments: # 1 Proposed Order)(Cavenaugh, Matthew) (Entered: 11/30/2020) |
| 11/30/2020 | 🔵 1961<br><br>(6 pgs) | Notice *Second Supplemental Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases*. Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 11/30/2020) |
| 11/30/2020 | 🔵 1962<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Karen McCartan DeSantis (Related Doc # 1913) Signed on 11/30/2020. (emiller) (Entered: 11/30/2020) |
| 11/30/2020 | 🔵 1963<br><br>(2 pgs) | Order Granting Motion To Appear pro hac vice - Ira Neil Richards (Related Doc # 1915) Signed on 11/30/2020. (emiller) (Entered: 11/30/2020) |
| 11/30/2020 | 🔵 1964<br><br>(22 pgs; 2 docs) | Motion *for Entry of an Order (I) Authorizing the Rejection of the Tiger IT Agreement Effective as of December 1, 2020 and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 11/30/2020) |
| 11/30/2020 | 🔵 1965<br><br>(1 pg) | Motion to Appear pro hac vice *Marc J. Tobak*. Filed by Creditor Ad Hoc Group of FLLO Term Loan Lenders Hearing scheduled for 12/4/2020 at 10:00 AM at Houston, Courtroom 400 (DRJ). (Morgan, John) (Entered: 11/30/2020) |
| | 🔵 1966<br><br>(1 pg) | Notice of Filing of Official Transcript as to 1959 Transcript. Parties notified (Related document (s):1959 Transcript) (Olin) (Entered: |

| 12/01/2020 | | 12/01/2020) |
|---|---|---|
| 12/01/2020 | 🔘 1967 <br><br> (2 pgs) | Withdrawal of Claim: *2455 filed by Epiq Corporate Restructuring, LLC on behalf of Louisiana Department of Revenue* (Suarez, Hugo) (Entered: 12/01/2020) |
| 12/01/2020 | 🔘 1968 <br><br> (2 pgs) | Withdrawal of Claim: *2460 filed by Epiq Corporate Restructuring, LLC on behalf of Louisiana Department of Revenue* (Suarez, Hugo) (Entered: 12/01/2020) |
| 12/01/2020 | 🔘 1969 <br><br> (8 pgs) | Declaration re: *Second Supplemental Declaration of John Stuart in Support of Debtors' Application to Employ and Retain Alvarez & Marsal North America, LLC as Restructuring Advisors Pursuant to Sections 327 (A) and 328 of the Bankruptcy Code Effective as of June 28, 2020* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 12/01/2020) |
| 12/01/2020 | 🔘 1970 <br><br> (3 pgs) | Second Notice . (Related document(s):1175 Motion to Reconsider, 1293 Motion for Relief From Stay) Filed by Stephanie Delasandro (Warman, Lynnette) (Entered: 12/01/2020) |
| 12/01/2020 | 🔘 1971 <br><br> (109 pgs) | Objection *Debtors' Opposition to the Emergency Motion of the Official Committee of Unsecured Creditors for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of the Debtors' Estates and (II) Exclusive Settlement Authority*. Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 12/01/2020) |
| 12/01/2020 | 🔘 1972 <br><br> (67 pgs) | Objection *Debtors' Opposition to the Emergency Motion of the Official Committee of Unsecured Creditors for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of the Debtors' Estates and (II) Exclusive Settlement Authority*. Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 12/01/2020) |
| | 🔘 1973 | Objection *of Franklin Advisers, Inc., as* |

| | | |
|---|---|---|
| 12/01/2020 | (105 pgs) | *Investment Manager on Behalf of Certain Funds and Accounts, to the Standing Motion of the Official Committee of Unsecured Creditors* (related document(s):1545 Emergency Motion). Filed by Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts (Brimmage, Marty) (Entered: 12/01/2020) |
| 12/01/2020 | 1974<br>(4 pgs) | Affidavit Re: *Fee Applications* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1925 Application for Compensation, 1926 Notice, 1928 Application for Compensation) (Garabato, Sid) (Entered: 12/01/2020) |
| 12/01/2020 | 1975<br>(5 pgs) | Response *and Joinder of Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts, to the Objections of (I) the Debtors, (II) MUFG Union Bank, N.A., (III) Deutsche Bank Trust Company Americas, and (IV) the FLLO Ad Hoc Group to the Emergency Standing Motion of the Official Committee of Unsecured Creditors to Prosecute Certain Lien Claims ((related document(s):[1546 and 1972].* Filed by Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts (Brimmage, Marty) (Entered: 12/01/2020) |
| 12/01/2020 | 1976<br>(34 pgs) | Objection *of MUFG Union Bank, N.A. to the Emergency Motion of the Official Committee of Unsecured Creditors for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Lien Claims and Causes of Action on Behalf of the Debtors' Estates and (II) Exclusive Settlement Authority and Joinder to Debtors' Objection* (related document(s):1547 Emergency Motion, 1807 Generic Motion). Filed by MUFG Union Bank, N.A. (McFaul, Duston) (Entered: 12/01/2020) |
| | 1977<br>(4 pgs) | Emergency Motion *for Status Conference Regarding Reciprocal Exchange of Certain Expert Materials* Filed by Debtor Chesapeake Energy Corporation Hearing scheduled for 12/2/2020 at 11:00 AM at telephone and video |

| 12/01/2020 | | conference. (Cavenaugh, Matthew) (Entered: 12/01/2020) |
|---|---|---|
| 12/01/2020 | 🌐 1978<br><br>(25 pgs) | Affidavit Re: *Notice of Successful Bidders and Backup Bidder with Respect to the Auction of the Debtors Mid-Con Assets; Debtors Application for Entry of an Order Under 11 U.S.C. § 327(e) Authorizing the Retention and Employment of Shearman & Sterling LLP as Special Counsel for the Debtors Effective as of October 11, 2020* (Filed By Epiq Corporate Restructuring LLC ). (Related document(s):1767 Notice, 1768 Application to Employ) (Garabato, Sid) (Entered: 12/01/2020) |
| 12/01/2020 | 🌐 1979<br><br>(3 pgs) | Affidavit Re: *Notice of Fee Statement of Kirkland & Ellis LLP and Kirkland & Ellis International LLP for Compensation for Services and Reimbursement of Expenses as Attorneys to the Debtors and Debtors in Possession for the Period From August 1, 2020 Through August 31, 2020.* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1811 Notice) (Garabato, Sid) (Entered: 12/01/2020) |
| 12/01/2020 | 🌐 1980<br><br>(7 pgs) | Affidavit Re: *Third Monthly Fee Statement of PricewaterhouseCoopers LLP for Services Rendered and Reimbursement of Expenses as Audit Services and Tax Consulting Services Provider for the Debtors for the Period September 1, 2020 Through September 30, 2020* (Filed By Epiq Corporate Restructuring LLC ). (Related document(s):1836 Notice) (Garabato, Sid) (Entered: 12/01/2020) |
| | 🌐 1981<br><br>(2659 pgs; 23 docs) | Objection *Objection of the FLLO Ad Hoc Group to the Emergency Motions of the Official Committee of Unsecured Creditors for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of the Debtors' Estates and (II) Exclusive Settlement Authority* (related document(s):1682 Generic Motion). Filed by Ad Hoc Group of FLLO Term Loan Lenders (Attachments: # 1 Exhibit Exhibit A - FLLO Credit Agreement # 2 Exhibit Exhibit B - Term Loan Agreement Announcement # 3 Exhibit |

| | | |
|---|---|---|
| 12/01/2020 | | Exhibit C - Tender Offer Announcement & Consent Solicitation # 4 Exhibit Exhibit D - Private Exchange Offer Announcement # 5 Exhibit Exhibit E - 10-Q Q3 2019 # 6 Exhibit Exhibit F - 2018.12.09 8-K/A&R Credit Agreement # 7 Exhibit Exhibit G - 6.875% 2025 Senior Notes Indenture/10-K 2019 # 8 Exhibit Exhibit H - 2nd A&R Credit Agreement/8-K # 9 Exhibit Exhibit I - Domenic Dell Osso Declaration # 10 Exhibit Exhibit J - Article: Chesapeake Taps Restructuring Advisors # 11 Exhibit Exhibit K - Antonelli Testimony # 12 Exhibit Exhibit L - FLLO Collateral Agreement # 13 Exhibit Exhibit M - Collateral Trust Agreement # 14 Exhibit Exhibit N - National Banks # 15 Exhibit Exhibit O - 2019.12.12 8-K # 16 Exhibit Exhibit P - 2020.02.17 Article: Moodys Alters Outlook # 17 Exhibit Exhibit Q - 2nd Lien Indenture # 18 Exhibit Exhibit R - Linn Energy 2L Notes Indenture # 19 Exhibit Exhibit S - Midstates Petroleum 2L Notes Indenture # 20 Exhibit Exhibit T - Goodrich Petroleum 2L Notes Indenture # 21 Exhibit Exhibit U - Comstock Credit Agreement # 22 Exhibit Exhibit V - FLLO Facility Agreement) (Morgan, John) (Entered: 12/01/2020) |
| 12/01/2020 | 🌑 1982<br><br>(25 pgs) | Affidavit Re: *Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1767 Notice, 1768 Application to Employ) (Garabato, Sid) (Entered: 12/01/2020) |
| 12/01/2020 | 🌑 1983<br><br>(18 pgs) | Objection *to Emergency Motion of the Official Committee of Unsecured Creditors for (I) Leave, Standing and Authority to Commence and Prosecute Certain Lien Claims and Causes of Action on Behalf of the Debtors Estates and (II) Exclusive Settlement Authority* (related document(s):1547 Emergency Motion, 1807 Generic Motion). Filed by Deutsche Bank Trust Company Americas (Carter, Winstol) (Entered: 12/01/2020) |
| | 🌑 1984<br><br>(29 pgs) | Objection *to Emergency Motion of the Official Committee of Unsecured Creditors for (I) Leave, Standing and Authority to Commence and* |

| | | |
|---|---|---|
| 12/01/2020 | | *Prosecute Certain Claims and Causes of Action on Behalf of the Debtors Estates and (II) Exclusive Settlement Authority* (related document(s):1682 Generic Motion). Filed by Deutsche Bank Trust Company Americas (Carter, Winstol) (Entered: 12/01/2020) |
| 12/02/2020 | 1985 (29 pgs) | Affidavit Re: *Stipulation, Motion, Transaction Notice, and Rejection Notice* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1852 Stipulation, 1853 Generic Motion, 1857 Generic Motion, 1858 Document) (Garabato, Sid) (Entered: 12/02/2020) |
| 12/02/2020 | 1986 (7 pgs) | Affidavit Re: *Notice of Jackson Walker LLPs Second Monthly Fee Statement for Compensation of Services Rendered and Reimbursement of Expenses as Co-Counsel and Conflicts Counsel to the Debtors for the Period from August 1, 2020 Through August 31, 2020; Notice of Jackson Walker LLPs Third Monthly Fee Statement for Compensation of Services Rendered and Reimbursement of Expenses as Co-Counsel and Conflicts Counsel to the Debtors for the Period from September 1, 2020 Through September 30, 2020* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1863 Notice, 1864 Notice) (Garabato, Sid) (Entered: 12/02/2020) |
| 12/02/2020 | 1987 (1 pg) | Motion to Appear pro hac vice *for Benjamin Mintz.* Filed by Interested Party Glas USA LLC (Warner, Michael) (Entered: 12/02/2020) |
| 12/02/2020 | 1988 (1 pg) | Order Granting Motion To Appear pro hac vice - Christina L. Chen (Related Doc # 1957) Signed on 12/2/2020. (emiller) (Entered: 12/02/2020) |
| 12/02/2020 | 1989 (1 pg) | Order Granting Motion To Appear pro hac vice - Joshua Dorchak (Related Doc # 1958) Signed on 12/2/2020. (emiller) (Entered: 12/02/2020) |
| 12/02/2020 | 1990 (1 pg) | Order Granting Motion To Appear pro hac vice - Marc J. Tobak (Related Doc # 1965) Signed on 12/2/2020. (emiller) (Entered: 12/02/2020) |
| | | |

| | | |
|---|---|---|
| 12/02/2020 | 🔘 1991<br><br>(21 pgs; 3 docs) | Witness List, Exhibit List (Filed By Chesapeake Energy Corporation ).(Related document(s):1977 Emergency Motion (with hearing date)) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2) (Cavenaugh, Matthew) (Entered: 12/02/2020) |
| 12/02/2020 | 🔘 1992<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Benjamin Mintz (Related Doc # 1987) Signed on 12/2/2020. (emiller) (Entered: 12/02/2020) |
| 12/02/2020 | 🔘 1993<br><br>(1 pg) | Courtroom Minutes. Time Hearing Held: 11:00 AM. Appearances: SEE ATTACHED. (Related document(s):1977 Emergency Motion (with hearing date)) Mr. Donovan informed the Court an agreement has been reached. No further hearing is needed. (VrianaPortillo) (Entered: 12/02/2020) |
| 12/02/2020 | 🔘 1994<br><br>(1 pg) | Motion to Appear pro hac vice *for Jeffrey A. Fuisz*. Filed by Interested Party Glas USA LLC (Warner, Michael) (Entered: 12/02/2020) |
| 12/02/2020 | 🔘 1995<br><br>(1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 12/2/2020 11:00:21 AM ]. File Size [ 857 KB ]. Run Time [ 00:01:47 ]. (In ref to doc no. 1977. Hearing held December 2, 2020.). (admin). (Entered: 12/02/2020) |
| 12/02/2020 | 🔘 1996<br><br>(5 pgs) | Objection to Confirmation of Plan Filed by Dimmit County, Sheldon Independent School District, Crosby Independent School District, Midland County, Grey County Tax Office, Hansford County Tax Office, Nacogdoches County, et al, Houston County T. (Related document(s):1644 Amended Chapter 11 Plan) (Sonik, Owen) (Entered: 12/02/2020) |
| 12/02/2020 | 🔘 1997<br><br>(1 pg) | Motion to Appear pro hac vice *Antonio M. Haynes*. Filed by Creditor Ad Hoc Group of FLLO Term Loan Lenders Hearing scheduled for 12/4/2020 at 10:00 AM at Houston, Courtroom 400 (DRJ). (Morgan, John) (Entered: 12/02/2020) |
| | 🔘 1998 | Motion to Appear pro hac vice *Victor Obasaju*. Filed by Creditor Ad Hoc Group of FLLO Term |

| | | |
|---|---|---|
| 12/02/2020 | (1 pg) | Loan Lenders Hearing scheduled for 12/4/2020 at 10:00 AM at Houston, Courtroom 400 (DRJ). (Morgan, John) (Entered: 12/02/2020) |
| 12/02/2020 | 1999<br><br>(1 pg) | Motion to Appear pro hac vice *Daniel T. Finnegan*. Filed by Creditor Ad Hoc Group of FLLO Term Loan Lenders Hearing scheduled for 12/4/2020 at 10:00 AM at Houston, Courtroom 400 (DRJ). (Morgan, John) (Entered: 12/02/2020) |
| 12/02/2020 | 2000<br><br>(1 pg) | Motion to Appear pro hac vice *Nicholas D'Angelo*. Filed by Creditor Ad Hoc Group of FLLO Term Loan Lenders Hearing scheduled for 12/4/2020 at 10:00 AM at Houston, Courtroom 400 (DRJ). (Morgan, John) (Entered: 12/02/2020) |
| 12/02/2020 | 2001<br><br>(27 pgs) | Affidavit Re: *Declaration, Notice, and Motion* (Filed By Epiq Corporate Restructuring LLC ). (Related document(s):1875 Declaration, 1882 Notice, 1883 Stipulation) (Garabato, Sid) (Entered: 12/02/2020) |
| 12/03/2020 | 2002<br><br>(1 pg) | Motion to Appear pro hac vice *of Avram E. Luft*. Filed by Creditor MUFG Union Bank, N.A. (Wilson, Broocks) (Entered: 12/03/2020) |
| 12/03/2020 | 2003<br><br>(6 pgs) | Notice *Third Supplemental Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases.* (Related document(s):1305 Generic Order, 1491 Notice) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 12/03/2020) |
| 12/03/2020 | 2004<br><br>(2 pgs) | Objection to Confirmation of Plan Filed by Clifford Ray McTee III. (Related document (s):1599 Amended Chapter 11 Plan) (Autry, Patrick) (Entered: 12/03/2020) |
| 12/03/2020 | 2005<br><br>(2 pgs) | Objection to Confirmation of Plan Filed by Mary Wheeler Family Limited Partnership. (Related document(s):1599 Amended Chapter 11 Plan) (Autry, Patrick) (Entered: 12/03/2020) |
| | 2006 | Objection to Confirmation of Plan Filed by |

| | | |
|---|---|---|
| 12/03/2020 | (2 pgs) | McTee L7 Ranch, Ltd.. (Related document (s):1599 Amended Chapter 11 Plan) (Autry, Patrick) (Entered: 12/03/2020) |
| 12/03/2020 | 2007<br>(3 pgs) | Withdraw Document (Filed By Chesapeake Energy Corporation ).(Related document(s):1960 Objection to Claim) (Cavenaugh, Matthew) (Entered: 12/03/2020) |
| 12/03/2020 | 2008<br>(2 pgs) | Objection to Confirmation of Plan Filed by Estate of Robert Yeates Wheeler. (Related document(s):1599 Amended Chapter 11 Plan) (Autry, Patrick) (Entered: 12/03/2020) |
| 12/03/2020 | 2009<br>(2 pgs) | Objection to Confirmation of Plan Filed by Shelly Marie McTee. (Related document(s):1599 Amended Chapter 11 Plan) (Autry, Patrick) (Entered: 12/03/2020) |
| 12/03/2020 | 2010<br>(2 pgs) | Objection to Confirmation of Plan Filed by Charles Dewey McTee. (Related document (s):1599 Amended Chapter 11 Plan) (Autry, Patrick) (Entered: 12/03/2020) |
| 12/03/2020 | 2011<br>(2 pgs) | Objection to Confirmation of Plan Filed by CLSCM Ltd.. (Related document(s):1599 Amended Chapter 11 Plan) (Autry, Patrick) (Entered: 12/03/2020) |
| 12/03/2020 | 2012<br>(2 pgs) | Objection to Confirmation of Plan Filed by Oakes David Edwards Jr.. (Related document (s):1599 Amended Chapter 11 Plan) (Autry, Patrick) (Entered: 12/03/2020) |
| 12/03/2020 | 2013<br>(2 pgs) | Objection to Confirmation of Plan Filed by Jason Shely Edwards. (Related document (s):1599 Amended Chapter 11 Plan) (Autry, Patrick) (Entered: 12/03/2020) |
| 12/03/2020 | 2014<br>(2 pgs) | Objection to Confirmation of Plan Filed by Kendall Arnim Young. (Related document (s):1599 Amended Chapter 11 Plan) (Autry, Patrick) (Entered: 12/03/2020) |
| | 2015 | Objection to Confirmation of Plan Filed by Clinton Michael Wilson. (Related document |

| | | |
|---|---|---|
| 12/03/2020 | (2 pgs) | (s):1599 Amended Chapter 11 Plan) (Autry, Patrick) (Entered: 12/03/2020) |
| 12/03/2020 | | Certificate of Telephone Notice. By agreement of the parties, the hearing set for 12/4/2020 at 10:00 AM has been adjourned. Movant to notice all interested parties and file a certificate of service with the court (Related document (s):1606 Motion for Relief From Stay) **Hearing rescheduled for 12/14/2020 at 02:00 PM by telephone and video conference.** (aalo) (Entered: 12/03/2020) |
| 12/03/2020 | 2016 <br> (2 pgs) | Objection to Confirmation of Plan Filed by Oakes David Edwards III. (Related document (s):1599 Amended Chapter 11 Plan) (Autry, Patrick) (Entered: 12/03/2020) |
| 12/03/2020 | 2017 <br> (2 pgs) | Objection to Confirmation of Plan Filed by Jacqueline Elizabeth Ballard. (Related document (s):1599 Amended Chapter 11 Plan) (Autry, Patrick) (Entered: 12/03/2020) |
| 12/03/2020 | 2018 <br> (2 pgs) | Objection to Confirmation of Plan Filed by Jeff Jones. (Related document(s):1599 Amended Chapter 11 Plan) (Autry, Patrick) (Entered: 12/03/2020) |
| 12/03/2020 | 2019 <br> (2 pgs) | Objection to Confirmation of Plan Filed by Kim Byers. (Related document(s):1599 Amended Chapter 11 Plan) (Autry, Patrick) (Entered: 12/03/2020) |
| 12/03/2020 | 2020 <br> (2 pgs) | Objection to Confirmation of Plan Filed by Brenda C. Cuvelier. (Related document(s):1599 Amended Chapter 11 Plan) (Autry, Patrick) (Entered: 12/03/2020) |
| 12/03/2020 | 2021 <br> (2 pgs) | Objection to Confirmation of Plan Filed by Jeana Martin. (Related document(s):1599 Amended Chapter 11 Plan) (Autry, Patrick) (Entered: 12/03/2020) |
| | 2022 <br> (2 pgs) | Objection to Confirmation of Plan Filed by Hatch Family Mineral Trust. (Related document (s):1599 Amended Chapter 11 Plan) (Autry, |

| | | |
|---|---|---|
| 12/03/2020 | | Patrick) (Entered: 12/03/2020) |
| 12/03/2020 | 🔘 2023<br><br>(21 pgs) | Affidavit Re: *Notice of Additional Supplemental Agreement* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1914 Notice) (Garabato, Sid) (Entered: 12/03/2020) |
| 12/03/2020 | 🔘 2024<br><br>(16 pgs) | Objection to Confirmation of Plan Filed by Justin Cobb, Kristine Cobb, Linda Milanovich. (Related document(s):1599 Amended Chapter 11 Plan, 1644 Amended Chapter 11 Plan) (Rukavina, Davor) (Entered: 12/03/2020) |
| 12/03/2020 | 🔘 2025<br><br>(4 pgs) | Order (I) Authorizing the Rejection of Certain Executory Contracts Effective as of October 30, 2020 and (II) Granting Related Relief (Related Doc # 1640) Signed on 12/3/2020. (aalo) (Entered: 12/03/2020) |
| 12/03/2020 | 🔘 2026<br><br>(1 pg) | Statement *Election to Opt Out of Releases* (Filed By Journey Acquisition - II LP, Jetta Production Company Inc., Jetta Operating Company Inc., Bird 2000 LP, Jetta X-2 LP ). (Devenport, Russell) (Entered: 12/03/2020) |
| 12/03/2020 | 🔘 2027<br><br>(2 pgs) | Notice *Request for Withdrawal from Service List.* Filed by Robert L Bennett (Long, Ekaterina) (Entered: 12/03/2020) |
| 12/03/2020 | 🔘 2028<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Jeffrey A. Fuisz (Related Doc # 1994) Signed on 12/3/2020. (emiller) (Entered: 12/03/2020) |
| 12/03/2020 | 🔘 2029<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Antonio M. Haynes (Related Doc # 1997) Signed on 12/3/2020. (emiller) (Entered: 12/03/2020) |
| 12/03/2020 | 🔘 2030<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Victor Obasaju (Related Doc # 1998) Signed on 12/3/2020. (emiller) (Entered: 12/03/2020) |
| 12/03/2020 | 🔘 2031<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Daniel T. Finnegan (Related Doc # 1999) Signed on 12/3/2020. (emiller) (Entered: 12/03/2020) |

| | | |
|---|---|---|
| 12/03/2020 | 2032<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Nicholas D'Angelo (Related Doc # 2000) Signed on 12/3/2020. (emiller) (Entered: 12/03/2020) |
| 12/03/2020 | 2033<br>(1 pg) | Order Granting Motion To Appear pro hac vice - Avram E. Luft (Related Doc # 2002) Signed on 12/3/2020. (emiller) (Entered: 12/03/2020) |
| 12/03/2020 | 2034<br>(6985 pgs) | Affidavit Re: *Affidavit of Service of Solicitation Materials of Stephenie Kjontvedt* (Filed By Epiq Corporate Restructuring LLC ). (Garabato, Sid) (Entered: 12/03/2020) |
| 12/03/2020 | 2035<br>(9 pgs) | BNC Certificate of Mailing. (Related document (s):1966 Notice of Filing of Official Transcript (Form)) No. of Notices: 174. Notice Date 12/03/2020. (Admin.) (Entered: 12/04/2020) |
| 12/03/2020 | 2036<br>(9 pgs) | BNC Certificate of Mailing. (Related document (s):1962 Order on Motion to Appear pro hac vice) No. of Notices: 174. Notice Date 12/03/2020. (Admin.) (Entered: 12/04/2020) |
| 12/03/2020 | 2037<br>(10 pgs) | BNC Certificate of Mailing. (Related document (s):1963 Order on Motion to Appear pro hac vice) No. of Notices: 174. Notice Date 12/03/2020. (Admin.) (Entered: 12/04/2020) |
| 12/04/2020 | 2038<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Jonathan D Baughman Filed by on behalf of Murphy Exploration & Production Company-USA (Baughman, Jonathan) (Entered: 12/04/2020) |
| 12/04/2020 | 2039<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by William Grubb Filed by on behalf of Murphy Exploration & Production Company-USA (Grubb, William) (Entered: 12/04/2020) |
| 12/04/2020 | 2040<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Christopher Lance Halgren Filed by on behalf of Murphy Exploration & Production Company-USA (Halgren, Christopher) (Entered: 12/04/2020) |
| | 2041 | AO 435 TRANSCRIPT ORDER FORM (Daily |

| | | |
|---|---|---|
| 12/04/2020 | (1 pg) | (24 hours)) by Matthew Cavenaugh. This is to order a transcript of 12/4/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) Electronically forwarded to Access Transcripts, LLC on December 4, 2020. Estimated completion date: December 5, 2020. Modified on 12/4/2020 (ClaudiaGutierrez). (Entered: 12/04/2020) |
| 12/04/2020 | 2042 (2 pgs) | Notice of Appearance and Request for Notice Filed by William Henry Daniel Filed by on behalf of Murphy Exploration & Production Company-USA (Daniel, William) (Entered: 12/04/2020) |
| 12/04/2020 | 2043 (2 pgs) | Objection to Confirmation of Plan Filed by Nora Davidson Harris. (Related document(s):1599 Amended Chapter 11 Plan) (Autry, Patrick) (Entered: 12/04/2020) |
| 12/04/2020 | 2044 (2 pgs) | Objection to Confirmation of Plan Filed by Diane Davidson. (Related document(s):1599 Amended Chapter 11 Plan) (Autry, Patrick) (Entered: 12/04/2020) |
| 12/04/2020 | 2045 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Mary Elizabeth Heard. This is to order a transcript of 12/4/2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By PMBG Parties ). (Heard, Mary) Copy request electronically forwarded to Access Transcripts, LLC on December 4, 2020. Estimated completion date: December 5, 2020. Modified on 12/4/2020 (ClaudiaGutierrez). (Entered: 12/04/2020) |
| | 2046 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by M. Quejada. This is to order a transcript of December 4, 2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By MUFG Union Bank, N.A. ). (Quejada, Maegan) Copy request electronically forwarded to Access Transcripts, LLC on December 4, |

| | | |
|---|---|---|
| 12/04/2020 | | 2020. Estimated completion date: December 5, 2020. Modified on 12/4/2020 (ClaudiaGutierrez). (Entered: 12/04/2020) |
| 12/04/2020 | 2047<br><br>(4 pgs) | Notice *of Rule 2004 Requests on Debtor, Chesapeake Operating, L.L.C.*. Filed by Greg and Janice Depew, Lisa Griggs (Mashburn, John) (Entered: 12/04/2020) |
| 12/04/2020 | 2048<br><br>(1 pg) | Motion to Appear pro hac vice *Aaron Hovan*. Filed by Creditors Tim & Terri Family LP, Dianna Mowry, Rodney Mowry, The 5 Family LP, Terri Denise Tyler, Timothy A Tyler (hler) (Entered: 12/04/2020) |
| 12/04/2020 | 2049<br><br>(1 pg) | Motion to Appear pro hac vice *for Timothy P. Palmer, Esq*. Filed by Creditor Repsol Oil & Gas USA, LLC (Palmer, Timothy) (Entered: 12/04/2020) |
| 12/04/2020 | 2050<br><br>(76 pgs; 3 docs) | Objection to Confirmation of Plan Filed by ARI Fleet LT, Automotive Rentals, Inc.. (Related document(s):1644 Amended Chapter 11 Plan, 1645 Disclosure Statement) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2)(Aguilar, Richard) (Entered: 12/04/2020) |
| 12/04/2020 | 2051<br><br>(26 pgs) | Notice *of Jackson Walker LLP's Fourth Monthly Fee Statement for Compensation of Services Rendered and Reimbursement of Expenses as Co-Counsel and Conflicts Counsel to the Debtors for the Period From October 1, 2020 Through October 31, 2020*. (Related document (s):656 Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 12/04/2020) |
| 12/04/2020 | 2052<br><br>(3 pgs) | Courtroom Minutes. Time Hearing Held: 10:00 AM. Appearances: see attached. Hearing held and the Court has laid out the schedule for trial. Opening statements will begin on 12/15 at 1:00 PM. Witnesses will be called on 12/16. The Court has reserved all day on 12/17 as well as 12/23 and will attempt to clear additional time for trial. No further action taken today. (aalo) (Entered: 12/04/2020) |

| | | |
|---|---|---|
| 12/04/2020 | 🔊 2053<br><br>(4 pgs) | Objection to Confirmation of Plan Filed by CNOOC Energy U.S.A. LLC. (Related document(s):1599 Amended Chapter 11 Plan, 1907 Notice, 1961 Notice) (Ripley, Edward) (Entered: 12/04/2020) |
| 12/04/2020 | 🔊 2054<br><br>(1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 12/4/2020 9:59:37 AM ]. File Size [ 24823 KB ]. Run Time [ 00:51:43 ]. (admin). (Entered: 12/04/2020) |
| 12/04/2020 | 🔊 2055<br><br>(54 pgs) | Notice *to Contract Parties to Assumed Executory Contracts and Unexpired Leases*. Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 12/04/2020) |
| 12/04/2020 | 🔊 2056<br><br>(5 pgs) | Response/Objection Filed by EOG Resources, Inc.. (Related document(s):1644 Amended Chapter 11 Plan, 1931 Notice) (Eppich, Joshua) (Entered: 12/04/2020) |
| 12/04/2020 | 🔊 2057<br><br>(2 pgs) | Notice *of Extended Class 6 Voting Deadline*. (Related document(s):1633 Order Approving Disclosure Statement) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 12/04/2020) |
| 12/04/2020 | 🔊 2058<br><br>(4 pgs) | Appellee Designation of Contents for Inclusion in Record of Appeal (related document(s):1762 Notice of Appeal). (Cavenaugh, Matthew) (Entered: 12/04/2020) |
| 12/04/2020 | 🔊 2059<br><br>(60 pgs; 2 docs) | Application for Compensation *First Interim Fee Application of Intrepid Partners, LLC as Investment Banker to the Debtors, for Allowance and Payment of Compensation for Professional Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred From June 28, 2020 Through and Including September 20, 2020*. Objections/Request for Hearing Due in 21 days. Filed by Attorney Matthew D Cavenaugh (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 12/04/2020) |
| | 🔊 2060 | Application for Compensation *First Interim Application of Rothschild & Co US Inc. as* |

| | | |
|---|---|---|
| 12/04/2020 | (50 pgs; 2 docs) | *Investment Banker to the Debtors for Allowance and Payment of Compensation for Professional Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred From June 28, 2020 Through and Including September 30, 2020.* Objections/Request for Hearing Due in 21 days. Filed by Attorney Matthew D Cavenaugh (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 12/04/2020) |
| 12/04/2020 | 2061 (9 pgs) | BNC Certificate of Mailing. (Related document (s):1988 Order on Motion to Appear pro hac vice) No. of Notices: 174. Notice Date 12/04/2020. (Admin.) (Entered: 12/04/2020) |
| 12/04/2020 | 2062 (9 pgs) | BNC Certificate of Mailing. (Related document (s):1989 Order on Motion to Appear pro hac vice) No. of Notices: 174. Notice Date 12/04/2020. (Admin.) (Entered: 12/04/2020) |
| 12/04/2020 | 2063 (9 pgs) | BNC Certificate of Mailing. (Related document (s):1990 Order on Motion to Appear pro hac vice) No. of Notices: 174. Notice Date 12/04/2020. (Admin.) (Entered: 12/04/2020) |
| 12/04/2020 | 2064 (9 pgs) | BNC Certificate of Mailing. (Related document (s):1992 Order on Motion to Appear pro hac vice) No. of Notices: 174. Notice Date 12/04/2020. (Admin.) (Entered: 12/04/2020) |
| 12/04/2020 | 2078 (2 pgs; 2 docs) | Motion to Appear pro hac vice *Mark Pfeiffer*. Filed by Creditor Repsol Oil & Gas USA, LLC (hler) Additional attachment(s) added on 12/7/2020 (ShadiaNash). (Entered: 12/07/2020) |
| 12/04/2020 | 2089 (5 pgs) | Copy MEMORANDUM AND ORDER entered in 4:20cv2725 affirming Bankruptcy Court's order of July 22, 2020.(Signed by Judge Keith P Ellison) (Related document(s):609 Notice of Appeal) (hcar) (Entered: 12/07/2020) |
| | 2065 (39 pgs) | Transcript RE: Pretrial Conference held on 12/04/20 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 03/5/2021. (AccessTranscripts) (Entered: |

| | | |
|---|---|---|
| 12/05/2020 | | 12/05/2020) |
| 12/05/2020 | 🔘2066<br><br>(13 pgs) | BNC Certificate of Mailing. (Related document (s):2025 Generic Order) No. of Notices: 175. Notice Date 12/05/2020. (Admin.) (Entered: 12/06/2020) |
| 12/06/2020 | 🔘2067<br><br>(2 pgs) | Objection to Confirmation of Plan Filed by ECorp Resource Partners 1, LP. and Texas ePartners X, LLC(Related document(s):1644 Amended Chapter 11 Plan) (Skelton, Barnet) (Entered: 12/06/2020) |
| 12/06/2020 | 🔘2068<br><br>(3 pgs) | Objection to Confirmation of Plan Filed by Plains South Texas Gathering. (Related document(s):1644 Amended Chapter 11 Plan) (Prewitt, Patricia) (Entered: 12/06/2020) |
| 12/06/2020 | 🔘2069<br><br>(10 pgs) | BNC Certificate of Mailing. (Related document (s):2028 Order on Motion to Appear pro hac vice) No. of Notices: 176. Notice Date 12/06/2020. (Admin.) (Entered: 12/06/2020) |
| 12/06/2020 | 🔘2070<br><br>(10 pgs) | BNC Certificate of Mailing. (Related document (s):2029 Order on Motion to Appear pro hac vice) No. of Notices: 176. Notice Date 12/06/2020. (Admin.) (Entered: 12/06/2020) |
| 12/06/2020 | 🔘2071<br><br>(10 pgs) | BNC Certificate of Mailing. (Related document (s):2030 Order on Motion to Appear pro hac vice) No. of Notices: 176. Notice Date 12/06/2020. (Admin.) (Entered: 12/06/2020) |
| 12/06/2020 | 🔘2072<br><br>(10 pgs) | BNC Certificate of Mailing. (Related document (s):2031 Order on Motion to Appear pro hac vice) No. of Notices: 176. Notice Date 12/06/2020. (Admin.) (Entered: 12/06/2020) |
| 12/06/2020 | 🔘2073<br><br>(10 pgs) | BNC Certificate of Mailing. (Related document (s):2032 Order on Motion to Appear pro hac vice) No. of Notices: 176. Notice Date 12/06/2020. (Admin.) (Entered: 12/06/2020) |
| 12/06/2020 | 🔘2074<br><br>(10 pgs) | BNC Certificate of Mailing. (Related document (s):2033 Order on Motion to Appear pro hac vice) No. of Notices: 176. Notice Date 12/06/2020. (Admin.) (Entered: 12/06/2020) |

| | | |
|---|---|---|
| 12/07/2020 | 2075<br><br>(1 pg) | Motion to Appear pro hac vice *of Brendan M. Gage*. Filed by Creditor MUFG Union Bank, N.A. (Wilson, Broocks) (Entered: 12/07/2020) |
| 12/07/2020 | 2076<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Jason Boland. This is to order a transcript of the 12/4/20 hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Official Committee Of Unsecured Creditors ). (Boland, Jason) Copy request electronically forwarded to Access Transcripts on December 7, 2020. Estimated completion date: December 8, 2020. Modified on 12/7/2020 (ClaudiaGutierrez). (Entered: 12/07/2020) |
| 12/07/2020 | 2077<br><br>(3 pgs) | Objection to Confirmation of Plan Filed by Eagle Ford Pipeline LLC. (Related document(s):1644 Amended Chapter 11 Plan) (Prewitt, Patricia) (Entered: 12/07/2020) |
| 12/07/2020 | 2079<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Jason Boland. This is to order a transcript of the November 13, 2020 hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Official Committee Of Unsecured Creditors ). (Boland, Jason) Copy request electronically forwarded to original transcription company Judicial Transcribers of Texas on December 7, 2020. Estimated completion date: December 8, 2020. Modified on 12/7/2020 (ClaudiaGutierrez). (Entered: 12/07/2020) |
| 12/07/2020 | 2080<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Jason Boland. This is to order a transcript of the November 23, 2020 hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Official Committee Of Unsecured Creditors ). (Boland, Jason) Copy request electronically forwarded to original transcription company Judicial Transcriber of Texas on December 7, 2020. Estimated completion date: December 8, 2020. Modified on 12/7/2020 (ClaudiaGutierrez). (Entered: 12/07/2020) |
| | 2081 | Notice of Filing of Official Transcript as to 2065 Transcript. Parties notified (Related document |

| | | |
|---|---|---|
| 12/07/2020 | (1 pg) | (s):2065 Transcript) (dhan) (Entered: 12/07/2020) |
| 12/07/2020 | 2082<br><br>(2 pgs) | Notice *of Tributary Resources, LLC's Election to Opt Out of Releases*. (Related document(s):1644 Amended Chapter 11 Plan) Filed by Tributary Resources, LLC (Martin, Jarrod) (Entered: 12/07/2020) |
| 12/07/2020 | 2083<br><br>(7 pgs; 2 docs) | Objection to Confirmation of Plan Filed by Federal Energy Regulatory Commission. (Related document(s):1644 Amended Chapter 11 Plan) (Attachments: # 1 Proposed Order)(Kincheloe, Richard) (Entered: 12/07/2020) |
| 12/07/2020 | 2084<br><br>(27 pgs) | Response/Objection Filed by Microsoft Corporation and Microsoft Licensing. (Related document(s):1931 Notice) (Monsour, Trey) (Entered: 12/07/2020) |
| 12/07/2020 | 2085<br><br>(2 pgs) | Notice *of Reset Hearing on Motion for Relief from the Automatic Stay*. (Related document(s):1606 Motion for Relief From Stay) Filed by Catherine Ramirez (Lindauer, Joyce) (Entered: 12/07/2020) |
| 12/07/2020 | 2086<br><br>(5 pgs) | Joint Objection *to Confirmation of Second Amended Plan of Reorganization*. Filed by Tornado Venture Quatro, LLC and Tornado Venture Cinco LLC (Kingman, William) (Entered: 12/07/2020) |
| 12/07/2020 | 2087<br><br>(5 pgs) | Objection *to Confirmation of Second Amended Plan of Reorganization*. Filed by Tornado Venture Seis, LP (Kingman, William) (Entered: 12/07/2020) |
| 12/07/2020 | 2088<br><br>(9 pgs) | Notice of Appearance and Request for Notice Filed by Frank F McGinn Filed by on behalf of Iron Mountain Information Management, Inc. (McGinn, Frank) (Entered: 12/07/2020) |
| | 2090<br><br>(10 pgs) | Objection *TO ASSUMPTION OR ASSUMPTION AND ASSIGNMENT OF ITS PROCESSING AGREEMENTS WITH THE DEBTORS, NOTICE OF OPT-OUT REGARDING AND OBJECTION TO PLAN RELEASES, AND RESERVATION OF RIGHTS [Related to Dkt. Nos. 1599, 1633, 1907 &* |

| | | |
|---|---|---|
| 12/07/2020 | | *1931].* Filed by TGS Canada Corp. (Braun, Andrew) (Entered: 12/07/2020) |
| 12/07/2020 | 2091<br><br>(1 pg) | Statement *Election to OPT OUT of Releases* (Filed By R.A.W. Oilfield Services, L.L.C. ). (Stephen, John) (Entered: 12/07/2020) |
| 12/07/2020 | 2092<br><br>(5 pgs) | Response/Objection Filed by Marathon Oil Company. (Related document(s):1644 Amended Chapter 11 Plan, 1931 Notice) (Taylor, Clay) (Entered: 12/07/2020) |
| 12/07/2020 | 2093<br><br>(3 pgs) | Objection to Confirmation of Plan Filed by Catherine Ramirez. (Related document(s):1644 Amended Chapter 11 Plan) (Lindauer, Joyce) (Entered: 12/07/2020) |
| 12/07/2020 | 2094<br><br>(4 pgs) | Response (Filed By Fairfield Industries Incorporated ).(Related document(s):1644 Amended Chapter 11 Plan, 1645 Disclosure Statement, 1907 Notice, 1931 Notice) (Kirkendall, Thomas) (Entered: 12/07/2020) |
| 12/07/2020 | 2095<br><br>(4 pgs) | Response (Filed By Geophysical Pursuit, Inc. ). (Related document(s):1644 Amended Chapter 11 Plan, 1645 Disclosure Statement, 1907 Notice, 1931 Notice) (Kirkendall, Thomas) (Entered: 12/07/2020) |
| 12/07/2020 | 2096<br><br>(1 pg) | Motion to Appear pro hac vice *for Peyton Lambert.* Filed by Creditor Cecil Blount Farms, LLC, et al. (Knapp, Bradley) (Entered: 12/07/2020) |
| 12/07/2020 | 2097<br><br>(15 pgs; 3 docs) | Response/Objection Filed by Archrock Partners Operating, LLC. (Related document(s):1644 Amended Chapter 11 Plan) (Attachments: # 1 Exhibit -A # 2 Exhibit -B)(Maraist, Kevin) (Entered: 12/07/2020) |
| | 2098<br><br>(6 pgs) | Statement *Deutsche Bank Trust Company of Americas' Reservation of Rights with Respect to Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates.n* (Filed By Deutsche Bank Trust Company Americas ).(Related document(s):1644 Amended Chapter 11 Plan) (Carter, |

| 12/07/2020 | | Winstol) (Entered: 12/07/2020) |
|---|---|---|
| 12/07/2020 | 2099 <br><br>(5 pgs) | Objection to Confirmation of Plan Filed by SWN Production Company, LLC. (Related document (s):1599 Amended Chapter 11 Plan) (Cohen, Jason) (Entered: 12/07/2020) |
| 12/07/2020 | 2100 <br><br>(6 pgs) | Statement *Reservation of Rights of Brandes Investment Partners, L.P. with Respect to Vote On and Confirmation of Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* (Filed By Brandes Investment Partners LP ).(Related document(s):1644 Amended Chapter 11 Plan) (Lowenthal, Daniel) (Entered: 12/07/2020) |
| 12/07/2020 | 2101 <br><br>(127 pgs; 2 docs) | Objection to Confirmation of Plan Filed by Commonwealth of Pennsylvania. (Related document(s):1599 Amended Chapter 11 Plan, 1644 Amended Chapter 11 Plan) (Attachments: # 1 Exhibit 1)(Butler, Lynn) (Entered: 12/07/2020) |
| 12/07/2020 | 2102 <br><br>(3 pgs) | Notice *Hess Corporation's Election to Opt Out of Certain Releases Under the Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates (As May Be Amended).* (Related document(s):1644 Amended Chapter 11 Plan) Filed by Hess Corporation (Wyrick, Martha) (Entered: 12/07/2020) |
| 12/07/2020 | 2103 <br><br>(5 pgs) | Amended Objection *to Confirmation of Second Amended Plan of Reorganization.* Filed by Tornado Venture Quatro, LLC and Tornado Venture Cinco LLC (Kingman, William) (Entered: 12/07/2020) |
| 12/07/2020 | 2104 <br><br>(5 pgs) | Response/Objection Filed by Byrd Family Limited Partnership, Four P Family Holdings, LP. (Related document(s):1644 Amended Chapter 11 Plan) (Bevis, Donald) (Entered: 12/07/2020) |
| 12/07/2020 | 2105 <br><br>(4 pgs) | Amended Objection *to Confirmation of Second Amended Plan of Reorganization.* Filed by Tornado Venture Seis, LP (Kingman, William) (Entered: 12/07/2020) |

| | | |
|---|---|---|
| 12/07/2020 | 2106 (28 pgs) | Objection *TO CONFIRMATION OF THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF CHESAPEAKE ENERGY CORPORATION AND ITS DEBTOR AFFILATES, AND TO ASSUMPTION OR ASSUMPTION AND ASSIGNMENT OF THEIR LICENSE AGREEMENTS WITH THE DEBTORS, NOTICE OF OPT-OUT FROM PLAN RELEASES, AND RESERVATION OF RIGHTS [Related to Dkt. Nos. 1599, 1633, 1907 & 1931].* Filed by Vector Seismic Data Processing Inc., Westerngeco LLC (Braun, Andrew) (Entered: 12/07/2020) |
| 12/07/2020 | 2107 (5 pgs) | Statement - *Supplement To Verified Statement of Wiener, Weiss & Madison, A Professional Corporation, Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure Regarding Representation of Multiple Creditors* (Filed By Powers Investments, LLC, Kingwood Business Center Limited Partnership, Charles S Powers ). (Related document(s):1772 Statement) (Naus, R) (Entered: 12/07/2020) |
| 12/07/2020 | 2108 (32 pgs) | Objection to Confirmation of Plan Filed by EJS Investment Holdings, LLC. (Related document (s):1644 Amended Chapter 11 Plan) (Towber, Preston) (Entered: 12/07/2020) |
| 12/07/2020 | 2109 (222 pgs; 9 docs) | Motion *for Mandatory Abstention and Supporting Brief* Filed by Creditor Commonwealth of Pennsylvania (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Proposed Order) (Butler, Lynn) (Entered: 12/07/2020) |
| 12/07/2020 | 2110 (12 pgs) | Objection to Confirmation of Plan Filed by Seitel Data, Ltd.. (Related document(s):1644 Amended Chapter 11 Plan, 1907 Notice, 1931 Notice) (Brescia, Duane) (Entered: 12/07/2020) |
| 12/07/2020 | 2111 (5 pgs) | Objection to Confirmation of Plan Filed by Cactus Wellhead, LLC. (Related document(s):1644 Amended Chapter 11 Plan) (Bailey, James) (Entered: 12/07/2020) |
| | 2112 | Objection to Confirmation of Plan Filed by Jamestown Resources, LLC, Larchmont Resources, |

| | | |
|---|---|---|
| 12/07/2020 | (9 pgs) | LLC, Pelican Energy, LLC. (Related document (s):1599 Amended Chapter 11 Plan, 1644 Amended Chapter 11 Plan, 1907 Notice) (Driver, Vickie) (Entered: 12/07/2020) |
| 12/07/2020 | 2113 (5 pgs) | Objection *to Confirmation of Plan (Related documents: 1599 Second Amended Chapter 11 Plan)*. Filed by Enterprise Texas Pipeline LLC (Judd, T.) (Entered: 12/07/2020) |
| 12/07/2020 | 2114 (4 pgs) | Objection to Confirmation of Plan Filed by Robert Aiello. (Related document(s):1644 Amended Chapter 11 Plan) (Martin, Andrew) (Entered: 12/07/2020) |
| 12/07/2020 | 2115 (12 pgs) | Response/Objection Filed by Wyoming Royalty Owners. (Related document(s):1644 Amended Chapter 11 Plan) (Howley, Thomas) (Entered: 12/07/2020) |
| 12/07/2020 | 2116 (164 pgs; 7 docs) | Objection to Confirmation of Plan Filed by BRP, LLC, CoVal Leasing Company, L.L.C.. (Related document(s):1644 Amended Chapter 11 Plan) (Attachments: # 1 Exhibit "A" # 2 Exhibit "B" # 3 Exhibit "C" # 4 Exhibit D-1 # 5 Exhibit "D-2" # 6 Exhibit "E")(Cohen, Jason) (Entered: 12/07/2020) |
| 12/07/2020 | 2117 (4 pgs) | Objection to Confirmation of Plan Filed by 2005 Seminar Complex LP. (Related document(s):1644 Amended Chapter 11 Plan) (Martin, Andrew) (Entered: 12/07/2020) |
| 12/07/2020 | 2118 (2 pgs) | Notice of Appearance and Request for Notice Filed by Brian Wesley Farabough Filed by on behalf of R. L. Kirkwood, Jr., WTG Exploration, Inc., August Resources, Ltd., Sheep Mountain, Ltd., WI-CCS, L.P., Third Coast Minerals, Ltd., SOOL, Ltd., Quien Sabe Oil & Gas Company, LLC, QPC3, L.P., LHS Family, LLC, David Munson, Jr. (Farabough, Brian) (Entered: 12/07/2020) |
| 12/07/2020 | 2119 (1 pg) | Motion to Appear pro hac vice *Stephen R. Winship*. Filed by Creditor Wyoming Royalty Owners (Howley, Thomas) (Entered: 12/07/2020) |
| | 2120 | Notice *to Opt Out of Releases*. (Related document |

| | | |
|---|---|---|
| 12/07/2020 | (2 pgs) | (s):1599 Amended Chapter 11 Plan) Filed by Briscoe Ranch, Inc., Rancho La Cochina Minerals, Ltd. (Taylor, Mark) (Entered: 12/07/2020) |
| 12/07/2020 | 2121 (3 pgs) | Objection to Confirmation of Plan, Disclosure Statement Filed by R. L. Kirkwood, Jr.. (Related document(s):1622 Amended Disclosure Statement, 1644 Amended Chapter 11 Plan) (Farabough, Brian) (Entered: 12/07/2020) |
| 12/07/2020 | 2122 (8 pgs) | Response/Objection Filed by Dianna Mowry, Rodney Mowry, Tim & Terri Family LP, Terri Denise Tyler, Timothy A Tyler. (Related document (s):1599 Amended Chapter 11 Plan, 1644 Amended Chapter 11 Plan) (Helfer, Arleigh) (Entered: 12/07/2020) |
| 12/07/2020 | 2123 (4 pgs) | Objection to Confirmation of Plan Filed by Atomic Capital Minerals, LLC. (Related document(s):1644 Amended Chapter 11 Plan) (Martin, Andrew) (Entered: 12/07/2020) |
| 12/07/2020 | 2124 (5 pgs) | Response/Objection Filed by Murphy Exploration & Production Company-USA. (Related document (s):1644 Amended Chapter 11 Plan) (Baughman, Jonathan) (Entered: 12/07/2020) |
| 12/07/2020 | 2125 (14 pgs) | Objection to Confirmation of Plan Filed by Texas Comptroller of Public Accounts, Revenue Accounting Division. (Related document(s):1599 Amended Chapter 11 Plan) (Stern, John) (Entered: 12/07/2020) |
| 12/07/2020 | 2126 (3 pgs) | Objection to Confirmation of Plan, Response/Objection Filed by August Resources, Ltd., LHS Family, LLC, David Munson, Jr., QPC3, L.P., Quien Sabe Oil & Gas Company, LLC, SOOL, Ltd., Sheep Mountain, Ltd., Third Coast Minerals, Ltd., WI-CCS, L.P., WTG Exploration, Inc.. (Related document(s):1622 Amended Disclosure Statement, 1644 Amended Chapter 11 Plan) (Farabough, Brian) (Entered: 12/07/2020) |
| | 2127 (5 pgs) | Response/Objection Filed by Kimmeridge Powder Minerals, LLC. (Related document(s):2115 Response/Objection) (Howley, Thomas) (Entered: |

| 12/07/2020 | | 12/07/2020) |
|---|---|---|
| 12/07/2020 | 🔘 2128<br><br>(9 pgs) | Response/Objection Filed by Cemetery Road Hunt Club, Inc., Charlotte E. Place, Jesse C. Place, Richard E. Place, Charlotte E. Place Trust, Richard E. Place Trust, Placewood Resource Management, LLC, Placewood Resources, L.P., R&J Partners, L.P., William R Ruark, William R. Ruark, Herbert D. Steele, Leola B. Steele, WLR Family Partnership, Judith A. Wilson, Raynold W Wilson. (Related document(s):1599 Amended Chapter 11 Plan, 1644 Amended Chapter 11 Plan) (Helfer, Arleigh) (Entered: 12/07/2020) |
| 12/07/2020 | 🔘 2129<br><br>(4 pgs) | Response/Objection Filed by Cecil Blount Farms, LLC, et al.. (Related document(s):1644 Amended Chapter 11 Plan) (Knapp, Bradley) (Entered: 12/07/2020) |
| 12/07/2020 | 🔘 2130<br><br>(238 pgs; 8 docs) | Adversary case 20-03489. Nature of Suit: (91 (Declaratory judgment)),(14 (Recovery of money/property - other)) Complaint by Oklahoma Office of State Treasurer against Chesapeake Operating, L.L.C.. Fee Amount $350 (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Adversary Cover Sheet) (Butler, Lynn) (Entered: 12/07/2020) |
| 12/07/2020 | 🔘 2131<br><br>(76 pgs; 3 docs) | Objection to Confirmation of Plan Filed by Oklahoma Office of State Treasurer. (Related document(s):1599 Amended Chapter 11 Plan, 1644 Amended Chapter 11 Plan) (Attachments: # 1 Exhibit A # 2 Exhibit B)(Butler, Lynn) (Entered: 12/07/2020) |
| 12/07/2020 | 🔘 2132<br><br>(7 pgs) | Response/Objection Filed by c/o Annie Catmull Royalty Owner Plaintiffs c/o. (Related document (s):1644 Amended Chapter 11 Plan) (Catmull, Annie) (Entered: 12/07/2020) |
| 12/07/2020 | 🔘 2133<br><br>(6 pgs) | Objection to Confirmation of Plan Filed by Jackalope Gas Gathering Services, L.L.C., Stagecoach Pipeline & Storage Company LLC. (Related document(s):1644 Amended Chapter 11 Plan) (Brookner, Jason) (Entered: 12/07/2020) |

| | | |
|---|---|---|
| 12/07/2020 | ⚫2134<br><br>(25 pgs) | Objection to Confirmation of Plan Filed by Caddo Parish, Industrial Development Board of the Parish of Caddo, Inc., Paul M. Davis, Paul M. Davis, solely in his capacity as the independent administrator of the Succession of John P. Davis, Jr.; Coushatta Bayou Land Company, LLC; Caspiana Interests, LLC; Bugg DeSoto, LLC, Kingwood Business Center Ltd. Partnership; Charles Steven Powers; Powers Investments, L.L.C.; and Sonja Bott, on behalf of the Succession of Gregary Roy Bott. (Related document(s):1644 Amended Chapter 11 Plan) (McCune, Patrick) (Entered: 12/07/2020) |
| 12/07/2020 | ⚫2135<br><br>(17 pgs) | Additional Attachments Re: *Objection to Second Amended Joint Chapter 11 Plan* (related document(s):2110 Objection to Confirmation of the Plan) (Filed By Seitel Data, Ltd. ).(Related document(s):2110 Objection to Confirmation of the Plan) (Brescia, Duane) (Entered: 12/07/2020) |
| 12/07/2020 | ⚫2136<br><br>(13 pgs) | Response/Objection Filed by Rodney Hudson, Allen Johnson. (Related document(s):1644 Amended Chapter 11 Plan) (Knapp, Bradley) (Entered: 12/07/2020) |
| 12/07/2020 | ⚫2137<br><br>(4 pgs) | Statement */Limited Joinder Of GLAS USA LLC To Deutsche Bank Trust Company Americas Reservation Of Rights With Respect To Second Amended Joint Chapter 11 Plan Of Reorganization Of Chesapeake Energy Corporation And Its Debtor Affiliates* (Filed By Glas USA LLC ).(Related document(s):1644 Amended Chapter 11 Plan, 2098 Statement) (Warner, Michael) (Entered: 12/07/2020) |
| 12/07/2020 | ⚫2138<br><br>(30 pgs) | Objection to Confirmation of Plan Filed by PMBG Parties. (Related document(s):1644 Amended Chapter 11 Plan) (Heard, Mary) (Entered: 12/07/2020) |
| | ⚫2139<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Ad Hoc Group of FLLO Term Loan / Kiran Vakamudi. This is to order a transcript of hearing held on December 4, 2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Ad Hoc Group of |

| | | |
|---|---|---|
| 12/07/2020 | | FLLO Term Loan Lenders ). (Vakamudi, Kiran) Copy request was electronically forwarded to Access Transcripts on 12-8-2020. Estimated completion date: 12-9-2020. Modified on 12/8/2020 (MelissaMorgan). (Entered: 12/07/2020) |
| 12/07/2020 | 🔵 2140<br><br>(9 pgs) | Objection *Delasandro objection to plan*. Filed by Stephanie Delasandro (Warman, Lynnette) (Entered: 12/07/2020) |
| 12/07/2020 | 🔵 2141<br><br>(3 pgs) | Statement *Commonwealth of Pennsylvania's Election to Opt Out of Third-Party Releases* (Filed By Commonwealth of Pennsylvania ).(Related document(s):1599 Amended Chapter 11 Plan, 1644 Amended Chapter 11 Plan) (Butler, Lynn) (Entered: 12/07/2020) |
| 12/07/2020 | 🔵 2142<br><br>(2 pgs) | Response/Objection Filed by Dianna Mowry, Rodney Mowry, Charlotte E. Place, Jesse C. Place, Richard E. Place, William R Ruark, William R. Ruark, Herbert D. Steele, Leola B. Steele, Tim & Terri Family LP, Terri Denise Tyler, Timothy A Tyler, Judith A. Wilson, Raynold W Wilson. (Related document(s):1599 Amended Chapter 11 Plan, 1644 Amended Chapter 11 Plan) (Helfer, Arleigh) (Entered: 12/07/2020) |
| 12/07/2020 | 🔵 2143<br><br>(18 pgs) | Objection to Confirmation of Plan Filed by Official Committee of Royalty Owners. (Related document(s):1644 Amended Chapter 11 Plan) (Brown, pllc, Deirdre) (Entered: 12/07/2020) |
| 12/07/2020 | 🔵 2144<br><br>(51 pgs; 4 docs) | Response/Objection Filed by Petty Business Enterprises, LP, Petty Energy L.P. and their related entities. (Related document(s):1644 Amended Chapter 11 Plan) (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C)(Smith, Frances) (Entered: 12/07/2020) |
| 12/07/2020 | 🔵 2145<br><br>(3 pgs) | Notice of Appearance and Request for Notice Filed by William Ross Spence Filed by on behalf of Aparicion Minerals, LP et al (Spence, William) (Entered: 12/07/2020) |
| | 🔵 2146 | Statement *Oklahoma Office of State Treasurer's Election to Opt Out of Third-Party Releases* (Filed |

| | | |
|---|---|---|
| 12/07/2020 | (2 pgs) | By Oklahoma Office of State Treasurer ).(Related document(s):1599 Amended Chapter 11 Plan, 1644 Amended Chapter 11 Plan) (Watts, Jameson) (Entered: 12/07/2020) |
| 12/07/2020 | 2147<br>(2 pgs) | Objection to Confirmation of Plan Filed by Saundra Nelson. (Related document(s):1644 Amended Chapter 11 Plan) (Martin, Andrew) (Entered: 12/07/2020) |
| 12/07/2020 | 2148<br>(40 pgs; 4 docs) | Objection to Confirmation of Plan Filed by CCG Land (U.S.), Inc.. (Related document(s):1599 Amended Chapter 11 Plan, 1644 Amended Chapter 11 Plan) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3)(Platt, Mark) (Entered: 12/07/2020) |
| 12/07/2020 | 2149<br>(2 pgs) | Objection to Confirmation of Plan Filed by Tyler/Mowry Lessors, Pennsylvania Oil and gas lessors. (Related document(s):1644 Amended Chapter 11 Plan) (mmap) (Entered: 12/07/2020) |
| 12/07/2020 | 2150<br>(8 pgs) | Objection to Confirmation of Plan Filed by Independent Trading & Transportation Company, L.L.C., Camino Real Gas Gathering Company, LLC, Eagle Ford Gathering, LLC, El Paso Marketing Company, L.L.C., Hiland Crude, LLC, Kinder Morgan Tejas Pipeline LLC, Kinder Morgan Texas Pipeline LLC, Kinderhawk Field Services, LLC, Midcontinent Express Pipeline LLC, Scissortail Energy, LLC, Tennessee Gas Pipeline Company, L.L.C., Wyoming Interstate Company, L.L.C.. (Related document(s):1599 Amended Chapter 11 Plan) (Wood, William) (Entered: 12/07/2020) |
| 12/07/2020 | 2151<br>(4 pgs) | Objection to Confirmation of Plan Filed by Texas Taxing Authorities. (Related document(s):1644 Amended Chapter 11 Plan) (Grundemeier, Tara) (Entered: 12/07/2020) |
| 12/07/2020 | 2152<br>(4 pgs) | Objection *to Chesapeake Appalachia, LLC's Assumption of Their Executory Contracts with a Zero Cure Amount*. Filed by Michael Vanderpool, et al (Lynch, Patrick) (Entered: 12/07/2020) |
| | 2153 | Objection to Confirmation of Plan Filed by |

BK CM/ECF LIVE - US Bankruptcy Court-Texas Southern            Page 326 of 579
Case 4:21-cv-01215   Document 8   Filed on 05/12/21 in TXSD   Page 326 of 1639

0326

| | | |
|---|---|---|
| 12/07/2020 | (45 pgs; 3 docs) | Dallas/Fort Worth International Airport Board, City of Dallas, City of Fort Worth. (Related document(s):1644 Amended Chapter 11 Plan) (Attachments: # 1 Exhibit A # 2 Exhibit B) (Orenstein, Rosa) (Entered: 12/07/2020) |
| 12/07/2020 | 2154 (14 pgs; 6 docs) | Objection to Confirmation of Plan Filed by Louisiana Department of Revenue. (Related document(s):1644 Amended Chapter 11 Plan) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5)(Bonaccorso-Saenz, Florence) (Entered: 12/07/2020) |
| 12/07/2020 | 2155 (173 pgs; 7 docs) | Objection to Confirmation of Plan Filed by Aparicion Minerals, LP et al. (Related document (s):1599 Amended Chapter 11 Plan, 1644 Amended Chapter 11 Plan, 1645 Disclosure Statement) (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F)(Spence, William) (Entered: 12/07/2020) |
| 12/07/2020 | 2156 (3 pgs) | Notice of Appearance and Request for Notice Filed by William Ross Spence Filed by on behalf of Citizen Energy III, LLC (Spence, William) (Entered: 12/07/2020) |
| 12/07/2020 | 2157 (2 pgs) | Response/Objection Filed by Natalie O. Ginn. (Related document(s):1644 Amended Chapter 11 Plan) (Eppich, Joshua) (Entered: 12/07/2020) |
| 12/07/2020 | 2158 (19 pgs; 3 docs) | Objection to Confirmation of Plan Filed by Citizen Energy III, LLC. (Related document(s):1599 Amended Chapter 11 Plan, 1644 Amended Chapter 11 Plan, 1645 Disclosure Statement) (Attachments: # 1 Exhibit A # 2 Exhibit B)(Spence, William) (Entered: 12/07/2020) |
| 12/07/2020 | 2159 (45 pgs; 3 docs) | Response/Objection Filed by Dallas/Fort Worth International Airport Board, City of Dallas, City of Fort Worth. (Related document(s):1599 Amended Chapter 11 Plan, 1644 Amended Chapter 11 Plan) (Attachments: # 1 Exhibit # 2 Exhibit)(mmap) (Entered: 12/07/2020) |
| | 2160 | Ex Parte Motion to Appear pro hac vice *of Florence Bonaccorso-Saenz to appear on behalf* |

| | (2 pgs; 2 docs) | *of the Louisiana Department of Revenue.* Filed by Creditor Louisiana Department of Revenue (Attachments: # 1 Proposed Order) (Bonaccorso-Saenz, Florence) (Entered: 12/07/2020) |
| 12/07/2020 | | |
| 12/07/2020 | 2161 (14 pgs; 6 docs) | Amended Objection to Confirmation of Plan Filed by Louisiana Department of Revenue. (Related document(s):2154 Objection to Confirmation of the Plan) (Attachments: # 1 Exhibit 1 - Determined Claim Summary # 2 Exhibit 2 - Estimated Claim Summary # 3 Exhibit 3 - Undetermined Audit in Progress Claim Summary # 4 Exhibit 4 - Refund Claim Summary # 5 Exhibit 5 - Summary of Board of Tax Appeal Pre-petition Cases of the Debtor) (Bonaccorso-Saenz, Florence) (Entered: 12/07/2020) |
| 12/07/2020 | 2162 (19 pgs) | Statement - *Monthly Fee Statement of Forshey & Prostok, LLP for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses as Attorneys for the Official Committee of Royalty Owners for the Period from November 1, 2020 through and including November 30, 2020* (Filed By Forshey & Prostok, LLP ). (Prostok, Jeffrey) (Entered: 12/07/2020) |
| 12/07/2020 | 2163 (3 pgs) | Certificate *of Service* (Filed By Louisiana Department of Revenue ).(Related document (s):2154 Objection to Confirmation of the Plan, 2161 Objection to Confirmation of the Plan) (Bonaccorso-Saenz, Florence) (Entered: 12/07/2020) |
| 12/07/2020 | 2165 (9 pgs; 2 docs) | Motion to Seal *Exhibits for Confirmation Hearing Scheduled for December 15, 2020* Filed by Creditor PMBG Parties (Attachments: # 1 Proposed Order) (Heard, Mary) (Entered: 12/07/2020) |
| 12/07/2020 | 2166 (5 pgs) | Witness List, Exhibit List (Filed By PMBG Parties ).(Related document(s):2138 Objection to Confirmation of the Plan) (Heard, Mary) (Entered: 12/07/2020) |
| | 2167 | Order Granting Motion To Appear pro hac vice - |

| | | |
|---|---|---|
| 12/07/2020 | (1 pg) | Aaron D. Hovan (Related Doc # 2048) Signed on 12/7/2020. (emiller) (Entered: 12/07/2020) |
| 12/07/2020 | 2168 (1 pg) | Order Granting Motion To Appear pro hac vice - Timothy P. Palmer (Related Doc # 2049) Signed on 12/7/2020. (emiller) (Entered: 12/07/2020) |
| 12/08/2020 | 2169 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Marty L. Brimmage, Jr.. This is to order a transcript of the December 4, 2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts ). (Brimmage, Marty) Copy request was electronically forwarded to Access Transcripts on 12-8-2020. Estimated completion date: 12-9-2020. Modified on 12/8/2020 (MelissaMorgan). (Entered: 12/08/2020) |
| 12/08/2020 | 2170 (76 pgs; 3 docs) | Objection *of Automotive Rentals, Inc. and ARI Fleet LT to Third Notice to Contract Parties to Assumed Executory Contracts and Unexpired Leases [Doc. 2055]*. Filed by ARI Fleet LT, Automotive Rentals, Inc. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2) (Aguilar, Richard) (Entered: 12/08/2020) |
| 12/08/2020 | 2171 (13 pgs; 3 docs) | Agreed Order and Certificate of Counsel (Filed By Chesapeake Energy Corporation ).(Related document(s):1768 Application to Employ) (Attachments: # 1 Proposed Order # 2 Redline) (Cavenaugh, Matthew) (Entered: 12/08/2020) |
| 12/08/2020 | 2172 (2 pgs) | Notice of Appearance and Request for Notice Filed by Donald K Ludman Filed by on behalf of SAP America, Inc. (Ludman, Donald) (Entered: 12/08/2020) |
| 12/08/2020 | 2173 (1 pg) | Motion to Appear pro hac vice *and Order for Donald K. Ludman, Esquire*. Filed by Creditor SAP America, Inc. (Ludman, Donald) (Entered: 12/08/2020) |
| | 2174 | Witness List (Filed By PMBG Parties ).(Related document(s):2138 Objection to Confirmation of |

| 12/08/2020 | (5 pgs) | the Plan) (Heard, Mary) (Entered: 12/08/2020) |
| 12/08/2020 | 🔘 2175 (4 pgs) | Witness List, Exhibit List (Filed By Chesapeake Energy Corporation ).(Related document(s): Certificate of Notice) (Cavenaugh, Matthew) (Entered: 12/08/2020) |
| 12/08/2020 | 🔘 2176 (2 pgs) | Response/Objection Filed by Eagle Ford Pipeline LLC. (Related document(s):1644 Amended Chapter 11 Plan) (Prewitt, Patricia) (Entered: 12/08/2020) |
| 12/08/2020 | 🔘 2177 (2 pgs) | Response/Objection Filed by Plains South Texas Gathering. (Related document(s):1644 Amended Chapter 11 Plan) (Prewitt, Patricia) (Entered: 12/08/2020) |
| 12/08/2020 | 🔘 2178 (4 pgs) | Witness List, Exhibit List (Filed By Rodney Hudson, Allen Johnson ).(Related document (s):1644 Amended Chapter 11 Plan) (Knapp, Bradley) (Entered: 12/08/2020) |
| 12/08/2020 | 🔘 2179 (30 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1907 Notice) (Garabato, Sid) (Entered: 12/08/2020) |
| 12/08/2020 | 🔘 2180 (6 pgs) | Notice */ Notice to Contract Parties to Assumed Executory Contracts and Unexpired Leases.* (Related document(s):1892 Generic Motion, 1896 Notice) Filed by Chesapeake Energy Corporation (Schwarzman, Alexandra) (Entered: 12/08/2020) |
| 12/09/2020 | 🔘 2181 (3 pgs) | Withdrawal of Claim: *90 filed by Epiq Corporate Restructuring, LLC on behalf of Wilbarger County* (Garabato, Sid) (Entered: 12/09/2020) |
| 12/09/2020 | 🔘 2182 (2 pgs) | Statement *C.C. Forbes, LLC's Election to Opt Out of Third-Party Releases* (Filed By C.C. Forbes, LLC ).(Related document(s):1599 Amended Chapter 11 Plan, 1644 Amended Chapter 11 Plan) (Million, Timothy) (Entered: 12/09/2020) |

| | | |
|---|---|---|
| 12/09/2020 | 🔵2183<br><br>(161 pgs; 4 docs) | Exhibit List, Witness List (Filed By EJS Investment Holdings, LLC ).(Related document (s):1644 Amended Chapter 11 Plan, 1645 Disclosure Statement, 2108 Objection to Confirmation of the Plan) (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C) (Towber, Preston) (Entered: 12/09/2020) |
| 12/09/2020 | 🔵2184<br><br>(5 pgs) | Proposed Order RE: *Agreed Order Granting (I) Relief from the Automatic Stay, Effective as of January 4, 2021, and (II) Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):1448 Motion for Relief From Stay) (Cavenaugh, Matthew) (Entered: 12/09/2020) |
| 12/09/2020 | 🔵2185<br><br>(2 pgs) | Letter from John Dough (mmap) (Entered: 12/09/2020) |
| 12/09/2020 | 🔵2186<br><br>(11 pgs; 3 docs) | Objection to Confirmation of Plan Filed by Repsol Oil & Gas USA, LLC. (Related document(s):1644 Amended Chapter 11 Plan) (Attachments: # 1 Exhibit A - Proposed Confirmation Order Provisions # 2 Certificate of Service)(Palmer, Timothy) (Entered: 12/09/2020) |
| 12/09/2020 | 🔵 | Certificate of Email Notice. Due to the Courts schedule, the hearing on the motion for relief from stay has been rescheduled. Movant to notice all interested parties and file a certificate of service with the court (Related document (s):1248 Motion for Relief From Stay) **Hearing rescheduled for 12/14/2020 at 01:30 PM by telephone and video conference.** (aalo) (Entered: 12/09/2020) |
| 12/09/2020 | 🔵 | Certificate of Telephone Notice. Due to the Courts schedule, the hearing on the motion for relief from stay has been continued. Movant to notice all interested parties and file a certificate of service with the court (Related document (s):1558 Motion for Relief From Stay) **Hearing rescheduled for 12/14/2020 at 01:30 PM by telephone and video conference.** (aalo) (Entered: 12/09/2020) |

| | | |
|---|---|---|
| 12/09/2020 | | Certificate of Email and Telephone Notice. Contacted Jarrod Martin. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):1451 Motion for Relief From Stay **Hearing rescheduled for 12/14/2020 at 01:30 PM by telephone and video conference.** (aalo) (Entered: 12/09/2020) |
| 12/09/2020 | 2187 (25 pgs) | Objection *to Debtors' Second Amended Joint Chapter 11 Plan of Reorganization*. Filed by Pennsylvania Department of Conservation and Natural Resources (Ebersole, Joshua) (Entered: 12/09/2020) |
| 12/09/2020 | 2188 (12 pgs) | Objection to Confirmation of Plan Filed by Texas Comptroller of Public Accounts, Unclaimed Property Division. (Related document(s):1644 Amended Chapter 11 Plan) (Milligan, Layla) (Entered: 12/09/2020) |
| 12/09/2020 | 2189 (5 pgs) | Joint Stipulation and Agreed Order Signed on 12/9/2020 (Related document(s):1249 Motion for Relief From Stay) (aalo) (Entered: 12/09/2020) |
| 12/09/2020 | 2190 (5 pgs) | Agreed Order Granting Motion For Relief From Stay (Related Doc # 1448) Signed on 12/9/2020. (aalo) (Entered: 12/09/2020) |
| 12/09/2020 | 2191 (1 pg) | Agreed Notice *of Consent to Reset Hearing*. Filed by John H. Bedsole (Pesnell, John) (Entered: 12/09/2020) |
| 12/09/2020 | 2192 (5 pgs) | Affidavit Re: *by Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):2051 Notice, 2059 Application for Compensation, 2060 Application for Compensation) (Garabato, Sid) (Entered: 12/09/2020) |
| 12/09/2020 | 2193 (4 pgs) | Witness List (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 12/09/2020) |
| | 2194 | Objection to Confirmation of Plan Filed by State |

| | | |
|---|---|---|
| 12/09/2020 | (11 pgs) | of Texas. (Related document(s):1644 Amended Chapter 11 Plan) (Ryan, Abigail) (Entered: 12/09/2020) |
| 12/09/2020 | ● | Certificate of Email Notice. By agreement, the hearing on the motion for relief from stay has adjourned. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):1451 Motion for Relief From Stay) **Hearing rescheduled for 1/11/2021 at 09:00 AM by telephone and video conference.** (aalo) (Entered: 12/09/2020) |
| 12/09/2020 | ●2195 (5 pgs) | Witness List (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) (Entered: 12/09/2020) |
| 12/09/2020 | ●2196 (2 pgs) | Statement *Stone Creek Operating, LLC's Statement Regarding Class 7 Ballot and Reservation of Rights with Respect to Claim Amount* (Filed By Stone Creek Operating LLC ). (Gaither, John) (Entered: 12/09/2020) |
| 12/09/2020 | ●2197 (16 pgs; 3 docs) | Certificate of No Objection *to Application to Employ BBG, Inc. as Real Estate Appraiser/Valuation Expert Effective as of November 2, 2020* (Filed By Official Committee Of Unsecured Creditors ).(Related document (s):1833 Application to Employ) (Attachments: # 1 Redline # 2 Proposed Order) (Boland, Jason) (Entered: 12/09/2020) |
| 12/09/2020 | ●2198 (161 pgs) | Statement *Fourth Monthly Fee Statement of AlixPartners, LLP, Financial Advisor to the Official Committee of Unsecured Creditors for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses for the Period October 1, 2020 through October 31, 2020* (Filed By Official Committee Of Unsecured Creditors ). (Boland, Jason) (Entered: 12/09/2020) |
| 12/09/2020 | ●2199 (4 pgs) | Witness List (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts ). (Brimmage, Marty) (Entered: 12/09/2020) |

| | | |
|---|---|---|
| 12/09/2020 | 🔵 2200<br><br>(4 pgs) | Witness List (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts ). (Brimmage, Marty) (Entered: 12/09/2020) |
| 12/09/2020 | 🔵 2201<br><br>(2 pgs) | Witness List (Filed By Ad Hoc Group of FLLO Term Loan Lenders ). (Perrin, Harry) (Entered: 12/09/2020) |
| 12/09/2020 | 🔵 2202<br><br>(23 pgs) | Objection *GLAS USA LLCs Objection to the Emergency Motions of the Official Committee of Unsecured Creditors for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of the Debtors Estates and (II) Exclusive Settlement Authority, Joinder in Support of the FLLO Ad Hoc Groups Objection and Limited Joinder in Support of the Debtors Oppositions* (related document(s):1682 Generic Motion, 1807 Generic Motion). Filed by Glas USA LLC (Warner, Michael) (Entered: 12/09/2020) |
| 12/09/2020 | 🔵 2203<br><br>(10 pgs) | BNC Certificate of Mailing. (Related document (s):2081 Notice of Filing of Official Transcript (Form)) No. of Notices: 181. Notice Date 12/09/2020. (Admin.) (Entered: 12/09/2020) |
| 12/09/2020 | 🔵 2204<br><br>(14 pgs) | BNC Certificate of Mailing. (Related document (s):2089 Generic Order) No. of Notices: 185. Notice Date 12/09/2020. (Admin.) (Entered: 12/09/2020) |
| 12/09/2020 | 🔵 2258<br><br>(4 pgs) | Order (I) Authorizing the Rejection of the Houston Lease and Sublease Effective as of October 30, 2020 and (II) Granting Related Relief (Related Doc # 1466) Signed on 12/9/2020. (emiller) (Entered: 12/11/2020) |
| 12/10/2020 | 🔵 2205<br><br>(7 pgs) | Notice *of Delinquent Payments Due, Preceding Debt and Demand for Payment*. Filed by James McFarlane Grizzard (JesusGuajardo) (Entered: 12/10/2020) |
| | 🔵 2206<br><br>(3 pgs) | Witness List, Exhibit List (Filed By Cecil Blount Farms, LLC, et al. ).(Related document(s):1644 Amended Chapter 11 Plan) (Knapp, Bradley) |

| | | |
|---|---|---|
| 12/10/2020 | | (Entered: 12/10/2020) |
| 12/10/2020 | 🌑2207<br><br>(66 pgs; 3 docs) | Objection to Confirmation of Plan Filed by Regency NEPA Gas Gathering LLC, ETC Katy Pipeline, Ltd., ETC Marketing, Ltd., ETC Texas Pipeline Ltd., Energy Transfer Fuel, LP, Houston Pipe Line Company, LP, Oasis Pipeline L.P., Regency Intrastate Gas LP, Regency Marcellus Gas Gathering LLC, Sunoco Partners Marketing & Terminals L.P.. (Related document (s):1644 Amended Chapter 11 Plan) (Attachments: # 1 Exhibit A # 2 Exhibit B) (Mitchell, John) (Entered: 12/10/2020) |
| 12/10/2020 | 🌑2208<br><br>(157 pgs) | Objection to Confirmation of Plan Filed by ETC Tiger Pipeline LLC. (Related document(s):1644 Amended Chapter 11 Plan) (Mitchell, John) (Entered: 12/10/2020) |
| 12/10/2020 | 🌑2209<br><br>(4 pgs) | Witness List, Exhibit List (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 12/10/2020) |
| 12/10/2020 | 🌑2210<br><br>(11 pgs) | Objection to Confirmation of Plan Filed by Wilmington Savings Fund Society, FSB. (Related document(s):1599 Amended Chapter 11 Plan) (Huckleberry, Jennifer) (Entered: 12/10/2020) |
| 12/10/2020 | 🌑2211<br><br>(9 pgs; 2 docs) | Emergency Motion *of the Official Committee of Unsecured Creditors to File Under Seal Objection of the Official Committee of Unsecured Creditors to the Debtors' Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* Filed by Creditor Committee Official Committee Of Unsecured Creditors Hearing scheduled for 12/15/2020 at 12:00 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order) (Harrison, Julie) (Entered: 12/10/2020) |
| | 🌑2212<br><br>(103 pgs) | Sealed Document */ Sealed Objection of the Official Committee of Unsecured Creditors to Debtors' Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* (Filed By |

| | | |
|---|---|---|
| 12/10/2020 | | Official Committee Of Unsecured Creditors ). (Harrison, Julie) (Entered: 12/10/2020) |
| 12/10/2020 | 🔵 2213<br><br>(6 pgs) | Response/Objection Filed by Whiskey Bay Gathering Company, LLC, Regency Field Services, LLC, Trunkline Gas Company, LLC, ETC Katy Pipeline, Ltd., ETC Marketing, Ltd., ETC Texas Pipeline Ltd., Energy Transfer Fuel, LP, Fayetteville Express Pipeline LLC, Houston Pipe Line Company, LP, Oasis Pipeline L.P., Regency Intrastate Gas LP, Regency Marcellus Gas Gathering LLC, Regency NEPA Gas Gathering LLC, Sunoco Partners Marketing & Terminals L.P., Trade Star, LLC. (Related document(s):1931 Notice) (Mitchell, John) (Entered: 12/10/2020) |
| 12/10/2020 | 🔵 2214<br><br>(4 pgs) | Witness List (Filed By Glas USA LLC ). (Warner, Michael) (Entered: 12/10/2020) |
| 12/10/2020 | 🔵 2215<br><br>(6 pgs) | Proposed Order RE: *Agreed Order Granting (I) Relief from the Automatic Stay, Effective as of January 4, 2021, and (II) Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):1558 Motion for Relief From Stay) (Cavenaugh, Matthew) (Entered: 12/10/2020) |
| 12/10/2020 | 🔵 2216<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Expedited (7 days)) by John E. Mitchell. This is to order a transcript of Hearing dated 12/4/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Energy Transfer Fuel, LP ). (Mitchell, John) Copy request was electronically forwarded to Access Transcripts on 12-11-2020. Estimated completion date: 12-18-2020. Modified on 12/11/2020 (MelissaMorgan). (Entered: 12/10/2020) |
| 12/10/2020 | 🔵 2217<br><br>(58 pgs; 3 docs) | Witness List, Exhibit List (Filed By Oklahoma Office of State Treasurer ).(Related document (s):1644 Amended Chapter 11 Plan, 2131 Objection to Confirmation of the Plan) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2) (Butler, Lynn) (Entered: 12/10/2020) |

| | | |
|---|---|---|
| 12/10/2020 | 🔵 2218<br><br>(116 pgs; 2 docs) | Witness List, Exhibit List (Filed By Commonwealth of Pennsylvania ).(Related document(s):1644 Amended Chapter 11 Plan, 2101 Objection to Confirmation of the Plan) (Attachments: # 1 Exhibit 1) (Butler, Lynn) (Entered: 12/10/2020) |
| 12/10/2020 | 🔵 2219<br><br>(15 pgs; 2 docs) | Motion for Relief from Stay . Fee Amount $188. Filed by Creditor Omar Balboa Hearing scheduled for 12/14/2020 at 01:30 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order) (Miller, Michael) (Entered: 12/10/2020) |
| 12/10/2020 | | Receipt of Motion for Relief From Stay(20-33233) [motion,mrlfsty] ( 188.00) Filing Fee. Receipt number 22669252. Fee amount $ 188.00. (U.S. Treasury) (Entered: 12/10/2020) |
| 12/10/2020 | 🔵 2220<br><br>(3 pgs) | Objection (related document(s):2211 Emergency Motion (with hearing date)). Filed by c/o Annie Catmull Royalty Owner Plaintiffs c/o (Catmull, Annie) (Entered: 12/10/2020) |
| 12/10/2020 | 🔵 2221<br><br>(3 pgs) | Exhibit List, Witness List (Filed By Brandes Investment Partners LP ). (Lowenthal, Daniel) (Entered: 12/10/2020) |
| 12/10/2020 | 🔵 2222<br><br>(6 pgs) | Stipulation By Chesapeake Energy Corporation and Tributary Resources, LLC. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Related document(s):1450 Application for Administrative Expenses, 1451 Motion for Relief From Stay) (Cavenaugh, Matthew) (Entered: 12/10/2020) |
| 12/10/2020 | 🔵 2223<br><br>(103 pgs) | Notice *to Contract Parties to Assumed Executory Contracts and Unexpired Leases of the Corrected Assigned Contracts Schedule*. Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 12/10/2020) |
| | 🔵 2224 | Application for Compensation */ First Interim Fee Application of Back Bay Management* |

| | | |
|---|---|---|
| | (62 pgs; 8 docs) | *Corporation and its Division, the Michel-Shaked Group, for Allowance of Compensation and Reimbursement of Expenses as Expert Valuation Consultant to the Official Committee of Unsecured Creditors for the Period September 1, 2020 through September 30, 2020.* Objections/Request for Hearing Due in 21 days. (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Proposed Order) (Harrison, Julie) (Entered: 12/10/2020) |
| 12/10/2020 | | |
| 12/10/2020 | 2225 (3 pgs) | Docketed in Error - Objection *of MUFG Union Bank, N.A., in Its Capacity as Collateral Trustee Under the Collateral Trust Agreement, to the Emergency Motions of the Official Committee of Unsecured Creditors for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Lien Claims and Causes of Action on Behalf of the Debtors Estates and (II) Exclusive Settlement Authority and Joinder to Objections Thereto.* Filed by Official Committee Of Unsecured Creditors (Rawlins, Justin) Modified on 12/11/2020 (hler). (Entered: 12/10/2020) |
| 12/10/2020 | 2226 (3 pgs) | Objection *of MUFG Union Bank, N.A., in Its Capacity as Collateral Trustee Under the Collateral Trust Agreement, to the Emergency Motions of the Official Committee of Unsecured Creditors for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Lien Claims and Causes of Action on Behalf of the Debtors Estates and (II) Exclusive Settlement Authority and Joinder to Objections Thereto.* Filed by MUFG Union Bank, N.A. (Rawlins, Justin) (Entered: 12/10/2020) |
| 12/10/2020 | 2227 (4 pgs) | Exhibit List, Witness List (Filed By Deutsche Bank Trust Company Americas ).(Related document(s):1644 Amended Chapter 11 Plan, 2098 Statement) (Riley, David) (Entered: 12/10/2020) |
| | 2228 (5 pgs) | Response - *Reservation of Rights of MUFG Union Bank, N.A. to the First Interim Fee Applications of the Professionals for the Official Committee of Unsecured Creditors* (related |

| | | |
|---|---|---|
| 12/10/2020 | | document(s):1877 Application for Compensation, 1878 Application for Compensation, 1880 Application for Compensation, 1898 Application for Compensation, 2224 Application for Compensation). Filed by MUFG Union Bank, N.A. (McFaul, Duston) (Entered: 12/10/2020) |
| 12/10/2020 | 🌐2229<br><br>(28 pgs; 3 docs) | Agreed Order and Certificate of Counsel (Filed By Chesapeake Energy Corporation ).(Related document(s):1814 Generic Motion) (Attachments: # 1 Proposed Order # 2 Redline) (Cavenaugh, Matthew) (Entered: 12/10/2020) |
| 12/10/2020 | 🌐2230<br><br>(11 pgs) | BNC Certificate of Mailing. (Related document (s):2167 Order on Motion to Appear pro hac vice) No. of Notices: 200. Notice Date 12/10/2020. (Admin.) (Entered: 12/11/2020) |
| 12/10/2020 | 🌐2231<br><br>(11 pgs) | BNC Certificate of Mailing. (Related document (s):2168 Order on Motion to Appear pro hac vice) No. of Notices: 200. Notice Date 12/10/2020. (Admin.) (Entered: 12/11/2020) |
| 12/10/2020 | 🌐2259<br><br>(2 pgs) | Order Granting Motion of PMBG Client Group to File Under Seal Exhibits for Confirmation Hearing Scheduled for December 15, 2020 (Related Doc # 2165) Signed on 12/10/2020. (emiller) (Entered: 12/11/2020) |
| 12/11/2020 | 🌐2232<br><br>(5 pgs) | Joint Stipulation and Agreed Order Signed on 12/9/2020 (Related document(s):1249 Motion for Relief From Stay) (aalo) (Entered: 12/11/2020) |
| 12/11/2020 | 🌐2233<br><br>(3096 pgs; 11 docs) | Exhibit List, Witness List (Filed By Vector Seismic Data Processing Inc., Westerngeco LLC ).(Related document(s):1599 Amended Chapter 11 Plan, 1633 Order Approving Disclosure Statement, 2106 Objection) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 9 # 9 Exhibit 10 # 10 Exhibit 11) (Braun, Andrew) (Entered: 12/11/2020) |
| | | |

| | | |
|---|---|---|
| 12/11/2020 | 2234<br><br>(74 pgs) | Witness List (Filed By Petty Business Enterprises, LP, Petty Energy L.P. and their related entities ).(Related document(s):1644 Amended Chapter 11 Plan, 1645 Disclosure Statement, 2144 Response/Objection) (Smith, Frances) (Entered: 12/11/2020) |
| 12/11/2020 | 2235<br><br>(167 pgs; 7 docs) | Objection *to Debtors' Motion for Sale and Assumption of Contracts* (related document(s):1892 Generic Motion). Filed by CoVal Leasing Company, L.L.C., BRP, LLC (Attachments: # 1 Exhibit "A" # 2 Exhibit "B" # 3 Exhibit "C" # 4 Exhibit "D-1" # 5 Exhibit "D-2" # 6 Exhibit "E") (Cohen, Jason) (Entered: 12/11/2020) |
| 12/11/2020 | 2236<br><br>(3 pgs) | Witness List (Filed By Kimmeridge Powder Minerals, LLC ).(Related document(s):2127 Response/Objection) (Howley, Thomas) (Entered: 12/11/2020) |
| 12/11/2020 | 2237<br><br>(3 pgs) | Exhibit List, Witness List (Filed By Texas Comptroller of Public Accounts, Unclaimed Property Division ).(Related document(s):2188 Objection to Confirmation of the Plan) (Milligan, Layla) (Entered: 12/11/2020) |
| 12/11/2020 | 2238<br><br>(3 pgs) | Witness List (Filed By Wyoming Royalty Owners ).(Related document(s):2115 Response/Objection) (Howley, Thomas) (Entered: 12/11/2020) |
| 12/11/2020 | 2239<br><br>(4 pgs) | Exhibit List (Filed By Tornado Venture Quatro, LLC and Tornado Venture Cinco LLC ).(Related document(s):2103 Objection) (Kingman, William) (Entered: 12/11/2020) |
| 12/11/2020 | 2240<br><br>(4 pgs) | Statement *Verified Statement of Multiple Representation Pursuant to Fed. R. Bankr. P. 2019* (Filed By Wyoming Royalty Owners ). (Howley, Thomas) (Entered: 12/11/2020) |
| | 2241<br><br>(77 pgs; 5 docs) | Exhibit List (Filed By Tornado Venture Quatro, LLC and Tornado Venture Cinco LLC ).(Related document(s):2103 Objection) (Attachments: # 1 Exhibit Exhibit T-1 # 2 Exhibit Exhibit T-2 # 3 |

| | | |
|---|---|---|
| 12/11/2020 | | Exhibit Exhibit T-3 # 4 Exhibit Exhibit T-4) (Kingman, William) (Entered: 12/11/2020) |
| 12/11/2020 | ⚫ 2242 <br><br> (1 pg) | Order Granting Motion To Appear pro hac vice - Brendan M. Gage (Related Doc # 2075) Signed on 12/11/2020. (emiller) (Entered: 12/11/2020) |
| 12/11/2020 | ⚫ 2243 <br><br> (1 pg) | Order Granting Motion To Appear pro hac vice - Mark Pfeiffer (Related Doc # 2078) Signed on 12/11/2020. (emiller) (Entered: 12/11/2020) |
| 12/11/2020 | ⚫ 2244 <br><br> (1 pg) | Order Granting Motion To Appear pro hac vice - Peyton Lambert (Related Doc # 2096) Signed on 12/11/2020. (emiller) (Entered: 12/11/2020) |
| 12/11/2020 | ⚫ 2245 <br><br> (1 pg) | Order Granting Motion To Appear pro hac vice - Stephen R. Winship (Related Doc # 2119) Signed on 12/11/2020. (emiller) (Entered: 12/11/2020) |
| 12/11/2020 | ⚫ 2246 <br><br> (1 pg) | Order Granting Motion To Appear pro hac vice - Florence Bonaccorso-Saenz (Related Doc # 2160) Signed on 12/11/2020. (emiller) (Entered: 12/11/2020) |
| 12/11/2020 | ⚫ 2247 <br><br> (4 pgs) | Witness List (Filed By Stephanie Delasandro ). (Related document(s):1175 Motion to Reconsider, 1293 Motion for Relief From Stay) (Warman, Lynnette) (Entered: 12/11/2020) |
| 12/11/2020 | ⚫ 2248 <br><br> (101 pgs; 2 docs) | Exhibit List, Witness List (Filed By Camino Real Gas Gathering Company, LLC, Eagle Ford Gathering, LLC, El Paso Marketing Company, L.L.C., Hiland Crude, LLC, Independent Trading & Transportation Company, L.L.C., Kinder Morgan Tejas Pipeline LLC, Kinder Morgan Texas Pipeline LLC, Kinderhawk Field Services, LLC, Midcontinent Express Pipeline LLC, Scissortail Energy, LLC, Tennessee Gas Pipeline Company, L.L.C., Wyoming Interstate Company, L.L.C. ). (Attachments: # 1 Exhibit "1") (Wood, William) (Entered: 12/11/2020) |
| | ⚫ 2249 <br><br> (7 pgs; 2 docs) | Certificate of No Objection *with Respect to the Debtors' Motion for Entry of an Order (I) Authorizing the Rejection of the Ryan Tax* |

| | | |
|---|---|---|
| 12/11/2020 | | *Contracts Effective as of November 18, 2020, and (II) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):1857 Generic Motion) (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 12/11/2020) |
| 12/11/2020 | 2250 <br><br> (4 pgs) | Exhibit List, Witness List (Filed By Sonja Bott, on behalf of the Succession of Gregary Roy Bott, Powers Investments, L.L.C., Charles Steven Powers, Kingwood Business Center Ltd. Partnership, Bugg DeSoto, LLC, Caspiana Interests, LLC, Coushatta Bayou Land Company, L.L.C., Paul M. Davis, solely in his capacity as the independent administrator of the Succession of John P. Davis, Jr, Paul M. Davis, Caddo Parish, Industrial Development Board of the Parish of Caddo, Inc. ).(Related document (s):1633 Order Approving Disclosure Statement, 1644 Amended Chapter 11 Plan, 2134 Objection to Confirmation of the Plan) (McCune, Patrick) (Entered: 12/11/2020) |
| 12/11/2020 | 2251 <br><br> (5 pgs; 2 docs) | Certificate of No Objection *with Respect to the Debtors' Motion for Entry of an Agreed Order (I) Authorizing the Rejection of the TETCO Agreement Effective as of November 1, 2021 and (II) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):1853 Generic Motion) (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 12/11/2020) |
| 12/11/2020 | 2252 <br><br> (75 pgs) | Witness List, Exhibit List (Filed By c/o Annie Catmull Royalty Owner Plaintiffs c/o ).(Related document(s):2132 Response/Objection) (Catmull, Annie) (Entered: 12/11/2020) |
| 12/11/2020 | 2253 <br><br> (30 pgs; 4 docs) | Exhibit List, Witness List (Filed By CGG Land (U.S.) Inc. ).(Related document(s):1599 Amended Chapter 11 Plan, 1633 Order Approving Disclosure Statement, 1644 Amended Chapter 11 Plan, 2148 Objection to Confirmation of the Plan) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3) (Platt, Mark) (Entered: 12/11/2020) |

| | | |
|---|---|---|
| 12/11/2020 | 🔵 2254<br><br>(1115 pgs; 19 docs) | Witness List, Exhibit List (Filed By Official Committee of Royalty Owners ).(Related document(s):1644 Amended Chapter 11 Plan) (Attachments: # 1 Exhibit 1_notice of reconstituted committee # 2 Exhibit 2 341 Meeting Transcript # 3 Exhibit 3 Royalty Letter # 4 Exhibit 4 Antinelli Declaration # 5 Exhibit 5 Dell Osso Declaration # 6 Exhibit 6 Zacharias Proof of Claim # 7 Exhibit Bride and Brandenburg POCs # 8 Exhibit 8 Kimmeridge POC # 9 Exhibit 9 Royalty Statement # 10 Exhibit 10 Kuffa Proof of Claim # 11 Exhibit 14 CHK land dev # 12 Exhibit 15 CHK Utica # 13 Exhibit 16 OK Docket # 14 Exhibit 18 # 15 Exhibit 19 # 16 Exhibit 20 # 17 Exhibit 21 # 18 Exhibit 22) (Brown, pllc, Deirdre) (Entered: 12/11/2020) |
| 12/11/2020 | 🔵 2255<br><br>(138 pgs) | Exhibit List, Witness List (Filed By Murphy Exploration & Production Company-USA ). (Related document(s):1644 Amended Chapter 11 Plan, 2124 Response/Objection) (Baughman, Jonathan) (Entered: 12/11/2020) |
| 12/11/2020 | 🔵 2256<br><br>(81 pgs; 4 docs) | Exhibit List, Witness List (Filed By Dallas/Fort Worth International Airport Board, City of Dallas, City of Fort Worth ).(Related document(s):1633 Order Approving Disclosure Statement) (Attachments: # 1 Exhibit Hight Low Agreement # 2 Exhibit SJ Order # 3 Exhibit Order of Severance) (Orenstein, Rosa) (Entered: 12/11/2020) |
| 12/11/2020 | 🔵 2257<br><br>(4076 pgs) | Additional Attachments Re: *Exhibit 12 to ROC Exhibit List* (related document(s):2254 Witness List, Exhibit List) (Filed By Official Committee of Royalty Owners ).(Related document(s):2254 Witness List, Exhibit List) (Brown, pllc, Deirdre) (Entered: 12/11/2020) |
| 12/11/2020 | 🔵 2260<br><br>(155 pgs; 4 docs) | Exhibit List, Witness List (Filed By Jamestown Resources, LLC, Larchmont Resources, LLC, Pelican Energy, LLC ).(Related document(s):1644 Amended Chapter 11 Plan, 2112 Objection to Confirmation of the Plan) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3) (Driver, Vickie) (Entered: |

| 12/11/2020 | | 12/11/2020) |
|---|---|---|
| 12/11/2020 | 🔵 2261 <br><br> (41 pgs) | Certificate *of Service.* (Filed By Deutsche Bank Trust Company Americas ).(Related document (s):2098 Statement) (Riley, David) (Entered: 12/11/2020) |
| | 🔵 2262 <br><br> (6397 pgs; 101 docs) | Exhibit List (Filed By Petty Business Enterprises, LP, Petty Energy L.P. and their related entities ).(Related document(s):1644 Amended Chapter 11 Plan, 1645 Disclosure Statement, 2144 Response/Objection) (Attachments: # 1 Exhibit PBE-1 # 2 Exhibit PBE-2 # 3 Exhibit PBE-3 # 4 Exhibit PBE-4 # 5 Exhibit PBE-5 # 6 Exhibit PBE-6 # 7 Exhibit PBE-7 # 8 Exhibit PBE-8 # 9 Exhibit PBE-9 # 10 Exhibit PBE-10 # 11 Exhibit PBE-11 # 12 Exhibit PBE-12 # 13 Exhibit PBE-13 # 14 Exhibit PBE-14 # 15 Exhibit PBE-15 # 16 Exhibit PBE-16 # 17 Exhibit PBE-17 # 18 Exhibit PBE-18 # 19 Exhibit PBE-19 # 20 Exhibit PBE-20 # 21 Exhibit PBE-21 # 22 Exhibit PBE-22 # 23 Exhibit PBE-23 # 24 Exhibit PBE-24 # 25 Exhibit PBE-25 # 26 Exhibit PBE-26 # 27 Exhibit PBE-27 # 28 Exhibit PBE-28 # 29 Exhibit PBE-29 # 30 Exhibit PBE-30 # 31 Exhibit PBE-31 # 32 Exhibit PBE-32 # 33 Exhibit PBE-33 # 34 Exhibit PBE-34 # 35 Exhibit PBE-35 # 36 Exhibit PBE-36 # 37 Exhibit PBE-37 # 38 Exhibit PBE-38 # 39 Exhibit PBE-39 # 40 Exhibit PBE-40 # 41 Exhibit PBE-41 # 42 Exhibit PBE-42 # 43 Exhibit PBE-43 # 44 Exhibit PBE-44 # 45 Exhibit PBE-45 # 46 Exhibit PBE-46 # 47 Exhibit PBE-47 # 48 Exhibit PBE-48 # 49 Exhibit PBE-49 # 50 Exhibit PBE-50 # 51 Exhibit PBE-51 # 52 Exhibit PBE-52 # 53 Exhibit PBE-53 # 54 Exhibit PBE-54 # 55 Exhibit PBE-55 # 56 Exhibit PBE-56 # 57 Exhibit PBE-57 # 58 Exhibit PBE-58 # 59 Exhibit PBE-59 # 60 Exhibit PBE-60 # 61 Exhibit PBE-61 # 62 Exhibit PBE-62 # 63 Exhibit PBE-63 # 64 Exhibit PBE-64 # 65 Exhibit PBE-65 # 66 Exhibit PBE-66 # 67 Exhibit PBE-67 # 68 Exhibit PBE-68 # 69 Exhibit PBE-69 # 70 Exhibit PBE-70 # 71 Exhibit PBE-71 # 72 |

| | | |
|---|---|---|
| 12/11/2020 | | Exhibit PBE-72 # 73 Exhibit PBE-73 # 74 Exhibit PBE-74 # 75 Exhibit PBE-75 # 76 Exhibit PBE-76 # 77 Exhibit PBE-77 # 78 Exhibit PBE-78 # 79 Exhibit PBE-79 # 80 Exhibit PBE-80 # 81 Exhibit PBE-81 # 82 Exhibit PBE-82 # 83 Exhibit PBE-83 # 84 Exhibit PBE-84 # 85 Exhibit PBE-85 # 86 Exhibit PBE-86 # 87 Exhibit PBE-87 # 88 Exhibit PBE-88 # 89 Exhibit PBE-89 # 90 Exhibit PBE-90 # 91 Exhibit PBE-91 # 92 Exhibit PBE-92 # 93 Exhibit PBE-93 # 94 Exhibit PBE-94 # 95 Exhibit PBE-95 # 96 Exhibit PBE-96 # 97 Exhibit PBE-97 # 98 Exhibit PBE-98 # 99 Exhibit PBE-99 # 100 Exhibit PBE-100) (Smith, Frances) (Entered: 12/11/2020) |
| 12/11/2020 | ⬤2263 (2 pgs) | Witness List (Filed By Dianna Mowry, Rodney Mowry, Tim & Terri Family LP, Terri Denise Tyler, Timothy A Tyler, Tyler/Mowry Lessors ). (Helfer, Arleigh) (Entered: 12/11/2020) |
| 12/11/2020 | ⬤2264 (2 pgs) | Witness List (Filed By Cemetery Road Hunt Club, Inc., Charlotte E. Place, Jesse C. Place, Richard E. Place, Charlotte E. Place Trust, Richard E. Place Trust, Placewood Resource Management, LLC, Placewood Resources, L.P., R&J Partners, L.P., William R Ruark, William R. Ruark, Herbert D. Steele, Leola B. Steele, Judith A. Wilson, Raynold W Wilson ). (Helfer, Arleigh) (Entered: 12/11/2020) |
| 12/11/2020 | ⬤2265 (23 pgs) | Exhibit List, Witness List (Filed By Seitel Data, Ltd. ). (Brescia, Duane) (Entered: 12/11/2020) |
| | ⬤2266 (5228 pgs; 101 docs) | Exhibit List (Filed By Petty Business Enterprises, LP, Petty Energy L.P. and their related entities ).(Related document(s):1644 Amended Chapter 11 Plan, 1645 Disclosure Statement, 2144 Response/Objection) (Attachments: # 1 Exhibit PBE-101 # 2 Exhibit PBE-102 # 3 Exhibit PBE-103 # 4 Exhibit PBE-104 # 5 Exhibit PBE-105 # 6 Exhibit PBE-106 # 7 Exhibit PBE-107 # 8 Exhibit PBE-108 # 9 Exhibit PBE-109 # 10 Exhibit |

| | | |
|---|---|---|
| | | PBE-110 # 11 Exhibit PBE-111 # 12 Exhibit PBE-112 # 13 Exhibit PBE-113 # 14 Exhibit PBE-114 # 15 Exhibit PBE-115 # 16 Exhibit PBE-116 # 17 Exhibit PBE-117 # 18 Exhibit PBE-118 # 19 Exhibit PBE-119 # 20 Exhibit PBE-120 # 21 Exhibit PBE-121 # 22 Exhibit PBE-122 # 23 Exhibit PBE-123 # 24 Exhibit OBE-124 # 25 Exhibit PBE-125 # 26 Exhibit PBE-126 # 27 Exhibit PBE-127 # 28 Exhibit PBE-128 # 29 Exhibit PBE-129 # 30 Exhibit PBE-130 # 31 Exhibit PBE-131 # 32 Exhibit PBE-132 # 33 Exhibit PBE-133 # 34 Exhibit PBE-134 # 35 Exhibit PBE-135 # 36 Exhibit PBE-136 # 37 Exhibit PBE-137 # 38 Exhibit PBE-138 # 39 Exhibit PBE-139 # 40 Exhibit PBE-140 # 41 Exhibit PBE-141 # 42 Exhibit PBE-142 # 43 Exhibit PBE-143 # 44 Exhibit PBE-144 # 45 Exhibit PBE-145 # 46 Exhibit PBE-146 # 47 Exhibit PBE-147 # 48 Exhibit PBE-148 # 49 Exhibit PBE-149 # 50 Exhibit PBE-150 # 51 Exhibit PBE-151 # 52 Exhibit PBE-152 # 53 Exhibit PBE-153 # 54 Exhibit PBE-154 # 55 Exhibit PBE-155 # 56 Exhibit PBE-156 # 57 Exhibit PBE-157 # 58 Exhibit PBE-158 # 59 Exhibit PBE-159 # 60 Exhibit PBE-160 # 61 Exhibit PBE-161 # 62 Exhibit PBE-162 # 63 Exhibit PBE-163 # 64 Exhibit PBE-164 # 65 Exhibit PBE-165 # 66 Exhibit PBE-166 # 67 Exhibit PBE-167 # 68 Exhibit PBE-168 # 69 Exhibit PBE-169 # 70 Exhibit PBE-170 # 71 Exhibit PBE-171 # 72 Exhibit PBE-172 # 73 Exhibit PBE-173 # 74 Exhibit PBE-174 # 75 Exhibit PBE-175 # 76 Exhibit PBE-176 # 77 Exhibit PBE-177 # 78 Exhibit PBE-178 # 79 Exhibit PBE-179 # 80 Exhibit PBE-180 # 81 Exhibit PBE-181 # 82 Exhibit PBE-182 # 83 Exhibit PBE-183 # 84 Exhibit PBE-184 # 85 Exhibit PBE-185 # 86 Exhibit PBE-186 # 87 Exhibit PBE-187 # 88 Exhibit PBE-188 # 89 Exhibit PBE-189 # 90 Exhibit PBE-190 # 91 Exhibit PBE-191 # 92 Exhibit PBE-192 # 93 Exhibit PBE-193 # 94 Exhibit PBE-194 # 95 Exhibit PBE-195 # 96 Exhibit PBE-196 # 97 Exhibit PBE-197 # 98 Exhibit PBE-198 # 99 Exhibit PBE-199 # 100 Exhibit PBE-200) (Smith, Frances) (Entered: 12/11/2020) |
| 12/11/2020 | | |

| | | |
|---|---|---|
| 12/11/2020 | 🌐 2267<br><br>(100 pgs; 8 docs) | Exhibit List, Witness List (Filed By SWN Production Company, LLC ). (Attachments: # 1 Exhibit "1" # 2 Exhibit "2" # 3 Exhibit "3" # 4 Exhibit "4" # 5 Exhibit "5" # 6 Exhibit "6" # 7 Exhibit "7") (Cohen, Jason) (Entered: 12/11/2020) |
| | 🌐 2268<br><br>(2469 pgs; 101 docs) | Exhibit List (Filed By Petty Business Enterprises, LP, Petty Energy L.P. and their related entities ).(Related document(s):1644 Amended Chapter 11 Plan, 1645 Disclosure Statement, 2144 Response/Objection) (Attachments: # 1 Exhibit PBE-201 # 2 Exhibit PBE-202 # 3 Exhibit PBE-203 # 4 Exhibit PBE-204 # 5 Exhibit PBE-205 # 6 Exhibit PBE-206 # 7 Exhibit PBE-207 # 8 Exhibit PBE-208 # 9 Exhibit PBE-209 # 10 Exhibit PBE-210 # 11 Exhibit PBE-211 # 12 Index PBE-212 # 13 Exhibit PBE-213 # 14 Exhibit PBE-214 # 15 Exhibit PBE-215 # 16 Exhibit PBE-216 # 17 Exhibit PBE-217 # 18 Exhibit PBE-218 # 19 Exhibit PBE-219 # 20 Exhibit PBE-220 # 21 Exhibit PBE-221 # 22 Exhibit PBE-222 # 23 Exhibit PBE-223 # 24 Exhibit PBE-224 # 25 Exhibit PBE-225 # 26 Exhibit PBE-226 # 27 Exhibit PBE-227 # 28 Exhibit PBE-228 # 29 Exhibit PBE-229 # 30 Exhibit PBE-230 # 31 Exhibit PBE-231 # 32 Exhibit PBE-232 # 33 Exhibit PBE-233 # 34 Exhibit PBE-234 # 35 Exhibit PBE-235 # 36 Exhibit PBE-236 # 37 Exhibit PBE-237 # 38 Exhibit PBE-238 # 39 Exhibit PBE-239 # 40 Exhibit PBE-240 # 41 Exhibit PBE-241 # 42 Exhibit PBE-242 # 43 Exhibit PBE-243 # 44 Exhibit PBE-244 # 45 Exhibit PBE-245 # 46 Exhibit PBE-246 # 47 Exhibit PBE-247 # 48 Exhibit PBE-248 # 49 Exhibit PBE-249 # 50 Exhibit PBE-250 # 51 Exhibit PBE-251 # 52 Exhibit PBE-252 # 53 Exhibit PBE-253 # 54 Exhibit PBE-254 # 55 Exhibit PBE-255 # 56 Exhibit PBE-256 # 57 Exhibit PBE-257 # 58 Exhibit PBE-258 # 59 Exhibit PBE-259 # 60 Exhibit PBE-260 # 61 Exhibit PBE-261 # 62 Exhibit PBE-262 # 63 Exhibit PBE-263 # 64 Exhibit PBE-264 # 65 Exhibit PBE-265 # 66 Exhibit PBE-266 # 67 Exhibit PBE-267 # 68 Exhibit PBE-268 # 69 Exhibit PBE-269 # 70 Exhibit PBE-270 # 71 Exhibit PBE-271 # 72 Exhibit |

| | | |
|---|---|---|
| 12/11/2020 | | PBE-272 # [73] Exhibit PBE-273 # [74] Exhibit PBE-274 # [75] Exhibit PBE-275 # [76] Exhibit PBE-276 # [77] Exhibit PBE-277 # [78] Exhibit PBE-278 # [79] Exhibit PBE-279 # [80] Exhibit PBE-280 # [81] Exhibit PBE-281 # [82] Exhibit PBE-282 # [83] Exhibit PBE-283 # [84] Exhibit PBE-284 # [85] Exhibit PBE-285 # [86] Exhibit PBE-286 # [87] Exhibit PBE-287 # [88] Exhibit PBE-288 # [89] Exhibit PBE-289 # [90] Exhibit PBE-290 # [91] Exhibit PBE-291 # [92] Exhibit PBE-292 # [93] Exhibit PBE-293 # [94] Exhibit PBE-294 # [95] Exhibit PBE-295 # [96] Exhibit PBE-296 # [97] Exhibit PBE-297 # [98] Exhibit PBE-298 # [99] Exhibit PBE-299 # [100] Exhibit PBE-300) (Smith, Frances) (Entered: 12/11/2020) |
| 12/11/2020 | [2269]<br><br>(21 pgs) | Affidavit Re: *Affidavit of Service of Notice of Rejection and Notice of Filing of Plan Supplement of Geoff Zahm* (Filed By Epiq Corporate Restructuring LLC ). (Garabato, Sid) (Entered: 12/11/2020) |
| 12/11/2020 | [2270]<br><br>(426 pgs; 10 docs) | Exhibit List, Witness List (Filed By BRP, LLC, CoVal Leasing Company, L.L.C. ). (Attachments: # [1] Exhibit "1" # [2] Exhibit "2" # [3] Exhibit "3" # [4] Exhibit "4" # [5] Exhibit "5" # [6] Exhibit "6" # [7] Exhibit "7" # [8] Exhibit "8" # [9] Exhibit "9") (Cohen, Jason) (Entered: 12/11/2020) |
| 12/11/2020 | [2271]<br><br>(623 pgs; 101 docs) | Exhibit List (Filed By Petty Business Enterprises, LP, Petty Energy L.P. and their related entities ).(Related document(s):[1644] Amended Chapter 11 Plan, [1645] Disclosure Statement, [2144] Response/Objection) (Attachments: # [1] Exhibit PBE-301 # [2] Exhibit PBE-302 # [3] Exhibit PBE-303 # [4] Exhibit PBE-304 # [5] Exhibit PBE-305 # [6] Exhibit PBE-306 # [7] Exhibit PBE-307 # [8] Exhibit PBE-308 # [9] Exhibit pbe-309 # [10] Exhibit PBE-310 # [11] Exhibit pbe-311 # [12] Exhibit PBE-312 # [13] Exhibit PBE-313 # [14] Exhibit PBE-314 # [15] Exhibit PBE-315 # [16] Exhibit PBE-316 # [17] Exhibit PBE-317 # [18] Exhibit PBE-318 # [19] Exhibit PBE-319 # [20] Exhibit PBE-320 # [21] Exhibit PBE-321 # [22] Exhibit |

| | | |
|---|---|---|
| | | PBE-322 # 23 Exhibit PBE-323 # 24 Exhibit PBE-324 # 25 Exhibit PBE-325 # 26 Exhibit PBE-326 # 27 Exhibit PBE-327 # 28 Exhibit PBE-328 # 29 Exhibit PBE-329 # 30 Exhibit PBE-330 # 31 Exhibit PBE-331 # 32 Exhibit PBE-332 # 33 Exhibit PBE-333 # 34 Exhibit PBE-334 # 35 Exhibit PBE-335 # 36 Exhibit PBE-336 # 37 Exhibit PBE-337 # 38 Exhibit PBE-338 # 39 Exhibit PBE-339 # 40 Exhibit PBE-340 # 41 Exhibit PBE-341 # 42 Exhibit PBE-342 # 43 Exhibit PBE-343 # 44 Exhibit PBE-344 # 45 Exhibit PBE-345 # 46 Exhibit PBE-346 # 47 Exhibit PBE-347 # 48 Exhibit PBE-348 # 49 Exhibit PBE-349 # 50 Exhibit PBE-350 # 51 Exhibit PBE-351 # 52 Exhibit PBE-352 # 53 Exhibit PBE-353 # 54 Exhibit PBE-354 # 55 Exhibit PBE-355 # 56 Exhibit PBE-356 # 57 Exhibit PBE-357 # 58 Exhibit PBE-358 # 59 Exhibit PBE-359 # 60 Exhibit PBE-360 # 61 Exhibit PBE-361 # 62 Exhibit PBE-362 # 63 Exhibit PBE-363 # 64 Exhibit PBE-364 # 65 Exhibit PBE-365 # 66 Exhibit PBE-366 # 67 Exhibit PBE-367 # 68 Exhibit PBE-368 # 69 Exhibit PBE-369 # 70 Exhibit PBE-370 # 71 Exhibit PBE-371 # 72 Exhibit PBE-372 # 73 Exhibit PBE-373 # 74 Exhibit PBE-374 # 75 Exhibit PBE-375 # 76 Exhibit PBE-376 # 77 Exhibit PBE-377 # 78 Exhibit PBE-378 # 79 Exhibit PBE-379 # 80 Exhibit PBE-380 # 81 Exhibit PBE-381 # 82 Exhibit PBE-382 # 83 Exhibit PBE-383 # 84 Exhibit PBE-384 # 85 Exhibit PBE-385 # 86 Exhibit PBE-386 # 87 Exhibit PBE-387 # 88 Exhibit PBE-388 # 89 Exhibit PBE-389 # 90 Exhibit PBE-390 # 91 Exhibit PBE-391 # 92 Exhibit PBE-392 # 93 Exhibit PBE-393 # 94 Exhibit PBE-394 # 95 Exhibit PBE-395 # 96 Exhibit PBE-396 # 97 Exhibit PBE-397 # 98 Exhibit PBE-398 # 99 Exhibit PBE-399 # 100 Exhibit PBE-400) (Smith, Frances) (Entered: 12/11/2020) |
| 12/11/2020 | | |
| | 2272 (39 pgs) | Declaration re: *Declaration of Jane Sullivan of Epiq Corporate Restructuring, LLC Regarding Voting and Tabulation of Certain Ballots Cast on the Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates* (Filed By |

| | | |
|---|---|---|
| 12/11/2020 | | Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 12/11/2020) |
| 12/11/2020 | 🌐 2273<br><br>(1001 pgs; 57 docs) | Exhibit List (Filed By Stephanie Delasandro ). (Related document(s):1175 Motion to Reconsider, 1293 Motion for Relief From Stay) (Attachments: # 1 Exhibit Exhibit 1 # 2 Exhibit Exhibit 2 # 3 Exhibit Exhibit 3 # 4 Exhibit Exhibit 6 # 5 Exhibit Exhibit 9 # 6 Exhibit Exhibit 12 # 7 Exhibit Exhibit 13 # 8 Exhibit Exhibit 14 # 9 Exhibit Exhibit 15 # 10 Exhibit Exhibit 16 # 11 Exhibit Exhibit 17 # 12 Exhibit Exhibit 18 # 13 Exhibit Exhibit 19 # 14 Exhibit Exhibit 20 # 15 Exhibit Exhibit 21 # 16 Exhibit Exhibit 22 # 17 Exhibit Exhibit 23 # 18 Exhibit Exhibit 24 # 19 Exhibit Exhibit 25 # 20 Exhibit Exhibit 26 # 21 Exhibit Exhibit 27 # 22 Exhibit Exhibit 27.2 # 23 Exhibit Exhibit 27 # 24 Exhibit Exhibit 28 # 25 Exhibit Exhibit 29 # 26 Exhibit Exhibit 30 # 27 Exhibit Exhibit 31 # 28 Exhibit Exhibit 32.1 # 29 Exhibit Exhibit 32.2 # 30 Exhibit Exhibit 32.3 # 31 Exhibit Exhibit 32.4 # 32 Exhibit Exhibit 32.5 # 33 Exhibit Exhibit 32.6 # 34 Exhibit Exhibit 32.7 # 35 Exhibit Exhibit 32.8 # 36 Exhibit Exhibit 32.9 # 37 Exhibit Exhibit 32.10 # 38 Exhibit Exhibit 32.11 # 39 Exhibit Exhibit 32.12 # 40 Exhibit Exhibit 33 # 41 Exhibit Exhibit 34 # 42 Exhibit Exhibit 35 # 43 Exhibit Exhibit 36 # 44 Exhibit Exhibit 37 # 45 Exhibit Exhibit 38 # 46 Exhibit Exhibit 39 # 47 Exhibit Exhibit 39.1 # 48 Exhibit Exhibit 40 # 49 Exhibit Exhibit 41 # 50 Exhibit Exhibit 42 # 51 Exhibit Exhibit 43 # 52 Exhibit Exhibit 44 # 53 Exhibit Exhibit 45 # 54 Exhibit Exhibit 46 # 55 Exhibit Exhibit 47 # 56 Exhibit Exhibit 48) (Warman, Lynnette) (Entered: 12/11/2020) |
| | 🌐 2274<br><br>(488 pgs; 65 docs) | Exhibit List (Filed By Petty Business Enterprises, LP, Petty Energy L.P. and their related entities ).(Related document(s):1644 Amended Chapter 11 Plan, 1645 Disclosure Statement, 2144 Response/Objection) (Attachments: # 1 Exhibit PBE-401 # 2 Exhibit PBE-402 # 3 Exhibit PBE-403 # 4 Exhibit PBE-404 # 5 Exhibit PBE-405 # 6 Exhibit PBE-406 # 7 Exhibit PBE-407 # 8 Exhibit |

| | | |
|---|---|---|
| 12/11/2020 | | PBE-408 # 9 Exhibit PBE-409 # 10 Exhibit PBE-410 # 11 Exhibit PBE-411 # 12 Exhibit PBE-412 # 13 Exhibit PBE-413 # 14 Exhibit PBE-414 # 15 Exhibit PBE-415 # 16 Exhibit PBE-416 # 17 Exhibit PBE-417 # 18 Exhibit PBE-418 # 19 Exhibit PBE-419 # 20 Exhibit PBE-420 # 21 Exhibit PBE-421 # 22 Exhibit PBE-422 # 23 Exhibit PBE-423 # 24 Exhibit PBE-424 # 25 Exhibit PBE-425 # 26 Exhibit PBE-426 # 27 Exhibit PBE-427 # 28 Exhibit PBE-428 # 29 Exhibit PBE-429 # 30 Exhibit PBE-430 # 31 Exhibit PBE-431 # 32 Exhibit PBE-432 # 33 Exhibit PBE-433 # 34 Exhibit PBE-434 # 35 Exhibit PBE-435 # 36 Exhibit PBE-436 # 37 Exhibit PBE-437 # 38 Exhibit PBE-438 # 39 Exhibit PBE-439 # 40 Exhibit PBE-440 # 41 Exhibit PBE-441 # 42 Exhibit PBE-443 # 43 Exhibit PBE-443 # 44 Exhibit PBE-444 # 45 Exhibit PBE-445 # 46 Exhibit PBE-446 # 47 Exhibit PBE-447 # 48 Exhibit PBE-448 # 49 Exhibit PBE-449 # 50 Exhibit PBE-450 # 51 Exhibit PBE-451 # 52 Exhibit PBE-452 # 53 Exhibit PBE-453 # 54 Exhibit PBE-454 # 55 Exhibit PBE-455 # 56 Exhibit PBE-456 # 57 Exhibit PBE-457 # 58 Exhibit PBE-458 # 59 Exhibit PBE-459 # 60 Exhibit PBE-460 # 61 Exhibit PBE-461 # 62 Exhibit PBE-462 # 63 Exhibit PBE-463 # 64 Exhibit PBE-464) (Smith, Frances) (Entered: 12/11/2020) |
| 12/11/2020 | 2275 (16 pgs; 3 docs) | Objection *to Debtors Second Amended Joint Chapter 11 Reorganization Plan*. Filed by Department of Interior United States (Attachments: # 1 Exhibit USA Opt Out Form # 2 Exhibit USA-Debtors Agreed Language) (Carney, Tiffiney) (Entered: 12/11/2020) |
| | 2276 (76 pgs; 5 docs) | Witness List, Exhibit List (Filed By PMBG Parties ).(Related document(s):2138 Objection to Confirmation of the Plan) (Attachments: # 1 Exhibit PMBG 1 All documents filed in the above-captioned case # 2 Exhibit PMBG 2 All Proofs of Claim filed on behalf of the PMBG Parties and the Exhibits attached thereto # 3 Exhibit PMBG 3 through PMBG 11 to be filed under seal # 4 Exhibit PMBG 12 Lien analysis |

| | | |
|---|---|---|
| 12/11/2020 | | prepared by Nils Pearson for counties in which PMBG Clients have leases) (Heard, Mary) (Entered: 12/11/2020) |
| 12/11/2020 | ⚫2277<br><br>(591 pgs; 85 docs) | Exhibit List, Witness List (Filed By CGG Land (U.S.) Inc. ).(Related document(s):1599 Amended Chapter 11 Plan, 1633 Order Approving Disclosure Statement, 1644 Amended Chapter 11 Plan, 2148 Objection to Confirmation of the Plan, 2253 Exhibit List, Witness List) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31 # 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34 # 35 Exhibit 35 # 36 Exhibit 36 # 37 Exhibit 37 # 38 Exhibit 38 # 39 Exhibit 39 # 40 Exhibit 40 # 41 Exhibit 41 # 42 Exhibit 42 # 43 Exhibit 43 # 44 Exhibit 44 # 45 Exhibit 45 # 46 Exhibit 46 # 47 Exhibit 47 # 48 Exhibit 48 # 49 Exhibit 49 # 50 Exhibit 50 # 51 Exhibit 51 # 52 Exhibit 52 # 53 Exhibit 53 # 54 Exhibit 54 # 55 Exhibit 55 # 56 Exhibit 56 # 57 Exhibit 57 # 58 Exhibit 58 # 59 Exhibit 59 # 60 Exhibit 60 # 61 Exhibit 61 # 62 Exhibit 62 # 63 Exhibit 63 # 64 Exhibit 64 # 65 Exhibit 65 # 66 Exhibit 66 # 67 Exhibit 67 # 68 Exhibit 68 # 69 Exhibit 69 # 70 Exhibit 70 # 71 Exhibit 71 # 72 Exhibit 72 # 73 Exhibit 73 # 74 Exhibit 74 # 75 Exhibit 75 # 76 Exhibit 76 # 77 Exhibit 77 # 78 Exhibit 78 # 79 Exhibit 79 # 80 Exhibit 80 # 81 Exhibit 81 # 82 Exhibit 82 # 83 Exhibit 83 # 84 Exhibit 84) (Platt, Mark) (Entered: 12/11/2020) |
| 12/11/2020 | ⚫2278<br><br>(33 pgs; 7 docs) | Exhibit List (Filed By Stephanie Delasandro ). (Related document(s):1175 Motion to Reconsider, 1293 Motion for Relief From Stay) (Attachments: # 1 Exhibit 4 # 2 Exhibit 5 # 3 Exhibit 7 # 4 Exhibit 8 # 5 Exhibit 10 # 6 Exhibit 11) (Warman, Lynnette) (Entered: |

| 12/11/2020 | | 12/11/2020) |
|---|---|---|
| 12/11/2020 | 🔘 2279<br><br>(3 pgs) | Objection to Confirmation of Plan Filed by Ryan, LLC. (Related document(s):1599 Amended Chapter 11 Plan) (Jobe, Heather) (Entered: 12/11/2020) |
| 12/11/2020 | 🔘 2280<br><br>(1 pg) | Sealed Document *Exhibits PMBG 3 through PMBG 11 to PMBG Parties' Witness and Exhibit List* (Filed By PMBG Parties ). (Heard, Mary) (Entered: 12/11/2020) |
| 12/11/2020 | 🔘 2281<br><br>(6 pgs) | Stipulation By Chesapeake Energy Corporation and Catherine Ramirez. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ).(Related document(s):1606 Motion for Relief From Stay) (Cavenaugh, Matthew) (Entered: 12/11/2020) |
| 12/11/2020 | 🔘 2282<br><br>(103 pgs) | Objection to Confirmation of Plan Filed by Official Committee Of Unsecured Creditors. (Related document(s):2212 Sealed Document) (Harrison, Julie) (Entered: 12/11/2020) |
| 12/11/2020 | 🔘 2283<br><br>(25 pgs; 2 docs) | Motion to Assume/Reject *Debtors' Motion for Entry of an Order (I) Authorizing the Rejection of Certain Executory Contracts Effective as of December 11, 2020 and (II) Granting Related Relief.* Objections/Request for Hearing Due in 21 days. Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 12/11/2020) |
| 12/11/2020 | 🔘 2284<br><br>(5 pgs) | Proposed Order RE: *Agreed Order Granting (I) Relief from the Automatic Stay, Effective as of January 4, 2021, and (II) Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):2219 Motion for Relief From Stay) (Cavenaugh, Matthew) (Entered: 12/11/2020) |
| | 🔘 2285<br><br>(15 pgs) | BNC Certificate of Mailing. (Related document (s):2189 Generic Order) No. of Notices: 199. Notice Date 12/11/2020. (Admin.) (Entered: |

| 12/11/2020 | | 12/12/2020) |
|---|---|---|
| 12/11/2020 | �e 2286<br><br>(15 pgs) | BNC Certificate of Mailing. (Related document (s):2190 Order on Motion For Relief From Stay) No. of Notices: 199. Notice Date 12/11/2020. (Admin.) (Entered: 12/12/2020) |
| 12/12/2020 | �e 2287<br><br>(31 pgs) | Additional Attachments Re: *Seitel Exhibit 2* (related document(s):2265 Exhibit List, Witness List) (Filed By Seitel Data, Ltd. ). (Related document(s):2265 Exhibit List, Witness List) (Brescia, Duane) (Entered: 12/12/2020) |
| 12/12/2020 | �e 2288<br><br>(6 pgs) | Supplemental Response/Objection Filed by Dallas/Fort Worth International Airport Board, City of Dallas, City of Fort Worth. (Related document(s):1644 Amended Chapter 11 Plan) (Orenstein, Rosa) (Entered: 12/12/2020) |
| 12/12/2020 | �e 2289<br><br>(13 pgs; 2 docs) | Emergency Motion *for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 365(a) and Fed. R. Bankr. P. 6006 Authorizing (I) Assumption of Certain Agreements with Stagecoach Pipeline & Storage Company LLC, (II) Entry Into Replacement Stagecoach Agreements, (III) Cancellation of Existing Stagecoach MARC 1 Agreement, and (IV) Payment of All Obligations Thereunder* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 12/12/2020) |
| 12/12/2020 | �e 2290<br><br>(27 pgs) | Witness List, Exhibit List (Filed By Chesapeake Energy Corporation ).(Related document(s):1540 Stipulation, 1644 Amended Chapter 11 Plan) (Cavenaugh, Matthew) (Entered: 12/12/2020) |
| 12/12/2020 | �e 2291<br><br>(10 pgs; 2 docs) | Emergency Motion *for Entry of an Order Authorizing the Debtors to File the Debtors' Exhibits List Under Seal* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 12/12/2020) |
| | | |

| | | |
|---|---|---|
| 12/12/2020 | 2292<br><br>(841 pgs; 22 docs) | Exhibit List (Filed By Chesapeake Energy Corporation ).(Related document(s):2290 Witness List, Exhibit List) (Attachments: # 1 Exhibit 31 # 2 Exhibit 32 # 3 Exhibit 33 # 4 Exhibit 34 # 5 Exhibit 35 # 6 Exhibit 36 # 7 Exhibit 37 # 8 Exhibit 38 # 9 Exhibit 40 # 10 Exhibit 41 # 11 Exhibit 42 # 12 Exhibit 44 # 13 Exhibit 45 # 14 Exhibit 47 # 15 Exhibit 48 # 16 Exhibit 49 # 17 Exhibit 50 # 18 Exhibit 51 # 19 Exhibit 52 # 20 Exhibit 53 # 21 Exhibit 59) (Graham, Genevieve) (Entered: 12/12/2020) |
| 12/12/2020 | 2293<br><br>(1300 pgs; 27 docs) | Exhibit List (Filed By Chesapeake Energy Corporation ).(Related document(s):2290 Witness List, Exhibit List) (Attachments: # 1 Exhibit 2 # 2 Exhibit 3 # 3 Exhibit 4 # 4 Exhibit 5 # 5 Exhibit 6 # 6 Exhibit 7 # 7 Exhibit 8 # 8 Exhibit 9 # 9 Exhibit 10 # 10 Exhibit 11 # 11 Exhibit 12 # 12 Exhibit 13 # 13 Exhibit 14 # 14 Exhibit 15 # 15 Exhibit 16 # 16 Exhibit 17 # 17 Exhibit 18 # 18 Exhibit 19 # 19 Exhibit 20 # 20 Exhibit 21 # 21 Exhibit 22 # 22 Exhibit 24 # 23 Exhibit 26 # 24 Exhibit 27 # 25 Exhibit 28 # 26 Exhibit 29) (Wertz, Jennifer) (Entered: 12/12/2020) |
| 12/12/2020 | 2294<br><br>(1830 pgs; 9 docs) | Exhibit List (Filed By Chesapeake Energy Corporation ).(Related document(s):2290 Witness List, Exhibit List) (Attachments: # 1 Exhibit 376 # 2 Exhibit 381 # 3 Exhibit 382 # 4 Exhibit 383 # 5 Exhibit 384 # 6 Exhibit 385 # 7 Exhibit 386 # 8 Exhibit 390) (Graham, Genevieve) (Entered: 12/12/2020) |
| | 2295<br><br>(1121 pgs; 29 docs) | Exhibit List (Filed By Chesapeake Energy Corporation ).(Related document(s):2290 Witness List, Exhibit List) (Attachments: # 1 Exhibit 77 # 2 Exhibit 86 # 3 Exhibit 92 # 4 Exhibit 106 # 5 Exhibit 112 # 6 Exhibit 116 # 7 Exhibit 117 # 8 Exhibit 118 # 9 Exhibit 119 # 10 Exhibit 120 # 11 Exhibit 124 # 12 Exhibit 125 # 13 Exhibit 126 # 14 Exhibit 127 # 15 Exhibit 128 # 16 Exhibit 129 # 17 Exhibit 130 # 18 Exhibit 131 # 19 Exhibit 132 # 20 Exhibit 133 # 21 Exhibit 138 # 22 Exhibit 140 # 23 Exhibit 147 # 24 Exhibit 158 # 25 Exhibit 160 # 26 Exhibit 161 # 27 Exhibit 172 # 28 Exhibit |

| | | |
|---|---|---|
| 12/12/2020 | | 178) (Polnick, Veronica) (Entered: 12/12/2020) |
| 12/12/2020 | ● 2296<br><br>(107 pgs; 8 docs) | Exhibit List (Filed By Chesapeake Energy Corporation ).(Related document(s):2290 Witness List, Exhibit List) (Attachments: # 1 Exhibit 332 # 2 Exhibit 333 # 3 Exhibit 336 # 4 Exhibit 337 # 5 Exhibit 338 # 6 Exhibit 337 # 7 Exhibit 338 # 8 Exhibit 366 # 9 # 10 # 11 # 12) (Wertz, Jennifer) (Entered: 12/12/2020) |
| 12/12/2020 | ● 2297<br><br>(1281 pgs; 29 docs) | Exhibit List (Filed By Chesapeake Energy Corporation ).(Related document(s):2290 Witness List, Exhibit List) (Attachments: # 1 Exhibit 239 # 2 Exhibit 259 # 3 Exhibit 260 # 4 Exhibit 262 # 5 Exhibit 264 # 6 Exhibit 272 # 7 Exhibit 274 # 8 Exhibit 275 # 9 Exhibit 276 # 10 Exhibit 277 # 11 Exhibit 281 # 12 Exhibit 282 # 13 Exhibit 283 # 14 Exhibit 290 # 15 Exhibit 291 # 16 Exhibit 294 # 17 Exhibit 295 # 18 Exhibit 296 # 19 Exhibit 299 # 20 Exhibit 307 # 21 Exhibit 308 # 22 Exhibit 309 # 23 Exhibit 310 # 24 Exhibit 311 # 25 Exhibit 312 # 26 Exhibit 313 # 27 Exhibit 328 # 28 Exhibit 329) (Cavenaugh, Matthew) (Entered: 12/12/2020) |
| 12/12/2020 | ● 2298<br><br>(455 pgs; 23 docs) | Sealed Document *Debtors' Exhibits 101-169 for Confirmation Hearing Set December 15, 2020* (Filed By Chesapeake Energy Corporation ). (Attachments: # 1 Exhibit 102 # 2 Exhibit 103 # 3 Exhibit 104 # 4 Exhibit 105 # 5 Exhibit 107 # 6 Exhibit 108 # 7 Exhibit 109 # 8 Exhibit 110 # 9 Exhibit 111 # 10 Exhibit 113 # 11 Exhibit 114 # 12 Exhibit 115 # 13 Exhibit 115A # 14 Exhibit 121 # 15 Exhibit 122 # 16 Exhibit 123 # 17 Exhibit 134 # 18 Exhibit 135 # 19 Exhibit 136 # 20 Exhibit 137 # 21 Exhibit 139 # 22 Exhibit 141) (Graham, Genevieve) (Entered: 12/12/2020) |
| 12/12/2020 | ● 2299<br><br>(7404 pgs; 17 docs) | Exhibit List (Filed By Chesapeake Energy Corporation ).(Related document(s):2290 Witness List, Exhibit List) (Attachments: # 1 Exhibit 392 # 2 Exhibit 393 # 3 Exhibit 394 # 4 Exhibit 395 # 5 Exhibit 396 # 6 Exhibit 397 # 7 Exhibit 398 # 8 Exhibit 399 # 9 Exhibit 401 # 10 Exhibit 402 # 11 Exhibit 403 # 12 Exhibit |

| | | |
|---|---|---|
| 12/12/2020 | | 404 # 13 Exhibit 405 # 14 Exhibit 406 # 15 Exhibit 407 # 16 Exhibit 408) (Peguero, Kristhy) (Entered: 12/12/2020) |
| 12/12/2020 | 2300<br><br>(346 pgs; 18 docs) | Sealed Document *Debtors Exhibits 171, 173-177, 179-189 for Confirmation Hearing Set December 15, 2020* (Filed By Chesapeake Energy Corporation ). (Attachments: # 1 Exhibit 171 # 2 Exhibit 173 # 3 Exhibit 174 # 4 Exhibit 175 # 5 Exhibit 176 # 6 Exhibit 177 # 7 Exhibit 179 # 8 Exhibit 180 # 9 Exhibit 181 # 10 Exhibit 182 # 11 Exhibit 183 # 12 Exhibit 184 # 13 Exhibit 185 # 14 Exhibit 186 # 15 Exhibit 187 # 16 Exhibit 188 # 17 Exhibit 189) (Polnick, Veronica) (Entered: 12/12/2020) |
| 12/12/2020 | 2301<br><br>(96 pgs; 5 docs) | Sealed Document *Debtors' Exhibits 273, 278-280 and 284 for Confirmation Hearing Set December 15, 2020* (Filed By Chesapeake Energy Corporation ). (Attachments: # 1 Exhibit 278 # 2 Exhibit 279 # 3 Exhibit 280 # 4 Exhibit 284) (Peguero, Kristhy) (Entered: 12/12/2020) |
| 12/12/2020 | 2302<br><br>(60 pgs; 6 docs) | Sealed Document *Debtors Sealed Exhibits 23, 25, 39, 43, 46, 54, 55, 56, 57, 58, 61 and 62* (Filed By Chesapeake Energy Corporation ). (Attachments: # 1 Exhibit 25 # 2 Exhibit 39 # 3 Exhibit 43 # 4 Exhibit 39 # 5 Exhibit 43 # 6 Exhibit 62 # 7 # 8 # 9 # 10 # 11) (Wertz, Jennifer) (Entered: 12/12/2020) |
| 12/12/2020 | 2303<br><br>(62 pgs; 10 docs) | Sealed Document *Debtors' Exhibits 143-146, 148-152 for Confirmation Hearing Set December 15, 2020* (Filed By Chesapeake Energy Corporation ). (Attachments: # 1 Exhibit 143 # 2 Exhibit 144 # 3 Exhibit 145 # 4 Exhibit 146 # 5 Exhibit 148 # 6 Exhibit 149 # 7 Exhibit 150 # 8 Exhibit 151 # 9 Exhibit 152) (Graham, Genevieve) (Entered: 12/12/2020) |
| | 2304<br><br>(451 pgs; 20 docs) | Sealed Document *Debtors' Exhibits 219-226, 228-238, and 240 for Confirmation Hearing Set December 15, 2020* (Filed By Chesapeake Energy Corporation ). (Attachments: # 1 Exhibit 220 # 2 Exhibit 221 # 3 Exhibit 222 # 4 Exhibit 223 # 5 Exhibit 224 # 6 Exhibit 225 # 7 Exhibit |

| | | |
|---|---|---|
| 12/12/2020 | | 226 # 8 Exhibit 228 # 9 Exhibit 229 # 10 Exhibit 230 # 11 Exhibit 231 # 12 Exhibit 232 # 13 Exhibit 233 # 14 Exhibit 234 # 15 Exhibit 235 # 16 Exhibit 236 # 17 Exhibit 237 # 18 Exhibit 238 # 19 Exhibit 240) (Cavenaugh, Matthew) (Entered: 12/12/2020) |
| 12/12/2020 | 2305<br><br>(8 pgs; 8 docs) | Sealed Document *Debtors' Exhibits 285-289, 292 and 293 for Confirmation Hearing Set December 15, 2020* (Filed By Chesapeake Energy Corporation ). (Attachments: # 1 Exhibit 286 # 2 Exhibit 287 # 3 Exhibit 288 # 4 Exhibit 289 # 5 Exhibit 292 # 6 Exhibit 293 # 7 Exhibit 297) (Peguero, Kristhy) (Entered: 12/12/2020) |
| 12/12/2020 | 2306<br><br>(248 pgs; 16 docs) | Sealed Document *Debtors Exhibits 191-205 for Confirmation Hearing Set December 15, 2020* (Filed By Chesapeake Energy Corporation ). (Attachments: # 1 Exhibit 191 # 2 Exhibit 192 # 3 Exhibit 193 # 4 Exhibit 194 # 5 Exhibit 195 # 6 Exhibit 196 # 7 Exhibit 197 # 8 Exhibit 198 # 9 Exhibit 199 # 10 Exhibit 200 # 11 Exhibit 201 # 12 Exhibit 202 # 13 Exhibit 203 # 14 Exhibit 204 # 15 Exhibit 205) (Polnick, Veronica) (Entered: 12/12/2020) |
| 12/12/2020 | 2307<br><br>(338 pgs; 14 docs) | Sealed Document *Debtors' Exhibits 153-157, 159, 162-169 for Confirmation Hearing Set December 15, 2020* (Filed By Chesapeake Energy Corporation ). (Attachments: # 1 Exhibit 154 # 2 Exhibit 155 # 3 Exhibit 156 # 4 Exhibit 157 # 5 Exhibit 159 # 6 Exhibit 162 # 7 Exhibit 163 # 8 Exhibit 164 # 9 Exhibit 165 # 10 Exhibit 166 # 11 Exhibit 167 # 12 Exhibit 168 # 13 Exhibit 169) (Graham, Genevieve) (Entered: 12/12/2020) |
| 12/12/2020 | 2308<br><br>(441 pgs; 27 docs) | Sealed Document *Debtors' Exhibits 241-258, 261, 263, 266-271 for Confirmation Hearing Set December 15, 2020* (Filed By Chesapeake Energy Corporation ). (Attachments: # 1 Exhibit 242 # 2 Exhibit 243 # 3 Exhibit 244 # 4 Exhibit 245 # 5 Exhibit 246 # 6 Exhibit 247 # 7 Exhibit 248 # 8 Exhibit 249 # 9 Exhibit 250 # 10 Exhibit 251 # 11 Exhibit 252 # 12 Exhibit 253 # 13 Exhibit 254 # 14 Exhibit 255 # 15 |

| | | |
|---|---|---|
| 12/12/2020 | | Exhibit 256 # 16 Exhibit 257 # 17 Exhibit 258 # 18 Exhibit 261 # 19 Exhibit 263 # 20 Exhibit 265 # 21 Exhibit 266 # 22 Exhibit 267 # 23 Exhibit 268 # 24 Exhibit 269 # 25 Exhibit 270 # 26 Exhibit 271) (Cavenaugh, Matthew) (Entered: 12/12/2020) |
| 12/12/2020 | 2309 (276 pgs; 13 docs) | Sealed Document *Debtors Exhibits 206-218 for Confirmation Hearing Set December 15, 2020* (Filed By Chesapeake Energy Corporation ). (Attachments: # 1 Exhibit 207 # 2 Exhibit 208 # 3 Exhibit 209 # 4 Exhibit 210 # 5 Exhibit 211 # 6 Exhibit 212 # 7 Exhibit 213 # 8 Exhibit 214 # 9 Exhibit 215 # 10 Exhibit 216 # 11 Exhibit 217 # 12 Exhibit 218) (Polnick, Veronica) (Entered: 12/12/2020) |
| 12/12/2020 | 2310 (257 pgs; 35 docs) | Sealed Document *Debtors' Exhibits 298, 304, 306, 314-320, 324,341, 346-350, 361, 364-372, 374, 375, 377-380, 388, 389, and 400* (Filed By Chesapeake Energy Corporation ). (Attachments: # 1 Exhibit 304 # 2 Exhibit 306 # 3 Exhibit 314 # 4 Exhibit 315 # 5 Exhibit 316 # 6 Exhibit 317 # 7 Exhibit 318 # 8 Exhibit 319 # 9 Exhibit 320 # 10 Exhibit 324 # 11 Exhibit 341 # 12 Exhibit 346 # 13 Exhibit 347 # 14 Exhibit 348 # 15 Exhibit 349 # 16 Exhibit 350 # 17 Exhibit 361 # 18 Exhibit 364 # 19 Exhibit 365 # 20 Exhibit 367 # 21 Exhibit 368 # 22 Exhibit 369 # 23 Exhibit 370 # 24 Exhibit 371 # 25 Exhibit 372 # 26 Exhibit 374 # 27 Exhibit 375 # 28 Exhibit 377 # 29 Exhibit 378 # 30 Exhibit 379 # 31 Exhibit 380 # 32 Exhibit 388 # 33 Exhibit 389 # 34 Exhibit 400) (Peguero, Kristhy) (Entered: 12/12/2020) |
| | 2311 (380 pgs; 33 docs) | Sealed Motion *Debtors' Sealed Exhibits 63, 64, 65, 66, 67, 69, 70, 71, 72, 73, 74, 76, 78, 79, 80, 81, 82, 83, 84, 85, 87, 89, 90, 91, 93, 94, 95, 96, 97, 98, 99, 100* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Exhibit 64 # 2 Exhibit 65 # 3 Exhibit 66 # 4 Exhibit 67 # 5 Exhibit 69 # 6 Exhibit 70 # 7 Exhibit 71 # 8 Exhibit 72 # 9 73 # 10 74 # 11 Exhibit 75 # 12 Exhibit 76 # 13 Exhibit 78 # 14 79 # 15 Exhibit 80 # 16 Exhibit 81 # 17 Exhibit 82 # 18 Exhibit 83 # 19 Exhibit 84 # 20 Exhibit |

| | | |
|---|---|---|
| 12/12/2020 | | 85 # 21 Exhibit 87 # 22 Exhibit 89 # 23 Exhibit 90 # 24 Exhibit 91 # 25 Exhibit 93 # 26 Exhibit 94 # 27 Exhibit 95 # 28 Exhibit 96 # 29 Exhibit 97 # 30 Exhibit 98 # 31 Exhibit 99 # 32 Exhibit 100) (Wertz, Jennifer) (Entered: 12/12/2020) |
| 12/12/2020 | ⬤ 2312<br><br>(51 pgs) | Notice *of Amended Plan Supplement for the Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates*. (Related document(s):1599 Amended Chapter 11 Plan) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 12/12/2020) |
| 12/13/2020 | ⬤ 2313<br><br>(72 pgs) | Witness List, Exhibit List (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):2195 Witness List) (Harrison, Julie) (Entered: 12/13/2020) |
| 12/13/2020 | ⬤ 2314<br><br>(536 pgs; 51 docs) | Additional Attachments Re: *UCC Exhibits 1-50* (related document(s):2313 Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ).(Related document (s):2313 Witness List, Exhibit List) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31 # 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34 # 35 Exhibit 35 # 36 Exhibit 36 # 37 Exhibit 37 # 38 Exhibit 38 # 39 Exhibit 39 # 40 Exhibit 40 # 41 Exhibit 41 # 42 Exhibit 42 # 43 Exhibit 43 # 44 Exhibit 44 # 45 Exhibit 45 # 46 Exhibit 46 # 47 Exhibit 47 # 48 Exhibit 48 # 49 Exhibit 49 # 50 Exhibit 50) (Harrison, Julie) (Entered: 12/13/2020) |
| | ⬤ 2315<br><br>(75 pgs; 51 docs) | Additional Attachments Re: *UCC Exhibits 51-100* (related document(s):2313 Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ).(Related document |

| | | |
|---|---|---|
| 12/13/2020 | | (s):2313 Witness List, Exhibit List) (Attachments: # 1 Exhibit 51 # 2 Exhibit 52 # 3 Exhibit 53 # 4 Exhibit 54 # 5 Exhibit 55 # 6 Exhibit 56 # 7 Exhibit 57 # 8 Exhibit 58 # 9 Exhibit 59 # 10 Exhibit 60 # 11 Exhibit 61 # 12 Exhibit 62 # 13 Exhibit 63 # 14 Exhibit 64 # 15 Exhibit 65 # 16 Exhibit 66 # 17 Exhibit 67 # 18 Exhibit 68 # 19 Exhibit 69 # 20 Exhibit 70 # 21 Exhibit 71 # 22 Exhibit 72 # 23 Exhibit 73 # 24 Exhibit 74 # 25 Exhibit 75 # 26 Exhibit 76 # 27 Exhibit 77 # 28 Exhibit 78 # 29 Exhibit 79 # 30 Exhibit 80 # 31 Exhibit 81 # 32 Exhibit 82 # 33 Exhibit 83 # 34 Exhibit 84 # 35 Exhibit 85 # 36 Exhibit 86 # 37 Exhibit 87 # 38 Exhibit 88 # 39 Exhibit 89 # 40 Exhibit 90 # 41 Exhibit 91 # 42 Exhibit 92 # 43 Exhibit 93 # 44 Exhibit 94 # 45 Exhibit 95 # 46 Exhibit 96 # 47 Exhibit 97 # 48 Exhibit 98 # 49 Exhibit 99 # 50 Exhibit 100) (Harrison, Julie) (Entered: 12/13/2020) |
| 12/13/2020 | 🌑2316 (59 pgs; 51 docs) | Additional Attachments Re: *UCC Exhibits 101-150* (related document(s):2313 Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ).(Related document (s):2313 Witness List, Exhibit List) (Attachments: # 1 Exhibit 101 # 2 Exhibit 102 # 3 Exhibit 103 # 4 Exhibit 104 # 5 Exhibit 105 # 6 Exhibit 106 # 7 Exhibit 107 # 8 Exhibit 108 # 9 Exhibit 109 # 10 Exhibit 110 # 11 Exhibit 111 # 12 Exhibit 112 # 13 Exhibit 113 # 14 Exhibit 114 # 15 Exhibit 115 # 16 Exhibit 116 # 17 Exhibit 117 # 18 Exhibit 118 # 19 Exhibit 119 # 20 Exhibit 120 # 21 Exhibit 121 # 22 Exhibit 122 # 23 Exhibit 123 # 24 Exhibit 124 # 25 Exhibit 125 # 26 Exhibit 126 # 27 Exhibit 127 # 28 Exhibit 128 # 29 Exhibit 129 # 30 Exhibit 130 # 31 Exhibit 131 # 32 Exhibit 132 # 33 Exhibit 133 # 34 Exhibit 134 # 35 Exhibit 135 # 36 Exhibit 136 # 37 Exhibit 137 # 38 Exhibit 138 # 39 Exhibit 139 # 40 Exhibit 140 # 41 Exhibit 141 # 42 Exhibit 142 # 43 Exhibit 143 # 44 Exhibit 144 # 45 Exhibit 145 # 46 Exhibit 146 # 47 Exhibit 147 # 48 Exhibit 148 # 49 Exhibit 149 # 50 Exhibit 150) (Harrison, Julie) (Entered: 12/13/2020) |
| | 🌑2317 | Additional Attachments Re: *UCC Exhibits 151-* |

| | | |
|---|---|---|
| 12/13/2020 | (368 pgs; 51 docs) | *200* (related document(s):2313 Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ).(Related document (s):2313 Witness List, Exhibit List) (Attachments: # 1 Exhibit 151 # 2 Exhibit 152 # 3 Exhibit 153 # 4 Exhibit 154 # 5 Exhibit 155 # 6 Exhibit 156 # 7 Exhibit 157 # 8 Exhibit 158 # 9 Exhibit 159 # 10 Exhibit 160 # 11 Exhibit 161 # 12 Exhibit 162 # 13 Exhibit 163 # 14 Exhibit 164 # 15 Exhibit 165 # 16 Exhibit 166 # 17 Exhibit 167 # 18 Exhibit 168 # 19 Exhibit 169 # 20 Exhibit 170 # 21 Exhibit 171 # 22 Exhibit 172 # 23 Exhibit 173 # 24 Exhibit 174 # 25 Exhibit 175 # 26 Exhibit 176 # 27 Exhibit 177 # 28 Exhibit 178 # 29 Exhibit 179 # 30 Exhibit 180 # 31 Exhibit 181 # 32 Exhibit 182 # 33 Exhibit 183 # 34 Exhibit 184 # 35 Exhibit 185 # 36 Exhibit 186 # 37 Exhibit 187 # 38 Exhibit 188 # 39 Exhibit 189 # 40 Exhibit 190 # 41 Exhibit 191 # 42 Exhibit 192 # 43 Exhibit 193 # 44 Exhibit 194 # 45 Exhibit 195 # 46 Exhibit 196 # 47 Exhibit 197 # 48 Exhibit 198 # 49 Exhibit 199 # 50 Exhibit 200) (Harrison, Julie) (Entered: 12/13/2020) |
| | 2318 (51 pgs; 51 docs) | Additional Attachments Re: *UCC Exhibits 201-250* (related document(s):2313 Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ).(Related document (s):2313 Witness List, Exhibit List) (Attachments: # 1 Exhibit 201 # 2 Exhibit 202 # 3 Exhibit 203 # 4 Exhibit 204 # 5 Exhibit 205 # 6 Exhibit 206 # 7 Exhibit 207 # 8 Exhibit 208 # 9 Exhibit 209 # 10 Exhibit 210 # 11 Exhibit 211 # 12 Exhibit 212 # 13 Exhibit 213 # 14 Exhibit 214 # 15 Exhibit 215 # 16 Exhibit 216 # 17 Exhibit 217 # 18 Exhibit 218 # 19 Exhibit 219 # 20 Exhibit 220 # 21 Exhibit 221 # 22 Exhibit 222 # 23 Exhibit 223 # 24 Exhibit 224 # 25 Exhibit 225 # 26 Exhibit 226 # 27 Exhibit 227 # 28 Exhibit 228 # 29 Exhibit 229 # 30 Exhibit 230 # 31 Exhibit 231 # 32 Exhibit 232 # 33 Exhibit 233 # 34 Exhibit 234 # 35 Exhibit 235 # 36 Exhibit 236 # 37 Exhibit 237 # 38 Exhibit 238 # 39 Exhibit 239 # 40 Exhibit 240 # 41 Exhibit 241 # 42 Exhibit 242 # 43 Exhibit 243 # 44 Exhibit 244 # 45 Exhibit 245 # 46 Exhibit 246 # 47 Exhibit 247 # 48 Exhibit 248 # 49 |

| | | |
|---|---|---|
| 12/13/2020 | | Exhibit 249 # 50 Exhibit 250) (Mokrzycka, Maria) (Entered: 12/13/2020) |
| 12/13/2020 | 🜨 2319<br><br>(2858 pgs; 52 docs) | Additional Attachments Re: *UCC Exhibits 251-300* (related document(s):2313 Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ).(Related document (s):2313 Witness List, Exhibit List) (Attachments: # 1 Exhibit 251 # 2 Exhibit 252 # 3 Exhibit 253 # 4 Exhibit 254 # 5 Exhibit 255 # 6 Exhibit 256 # 7 Exhibit 257 # 8 Exhibit 258 # 9 Exhibit 259 (part1) # 10 Exhibit 259 (part 2) # 11 Exhibit 260 # 12 Exhibit 261 # 13 Exhibit 262 # 14 Exhibit 263 # 15 Exhibit 264 # 16 Exhibit 265 # 17 Exhibit 266 # 18 Exhibit 267 # 19 Exhibit 268 # 20 Exhibit 269 # 21 Exhibit 270 # 22 Exhibit 271 # 23 Exhibit 272 # 24 Exhibit 273 # 25 Exhibit 274 # 26 Exhibit 275 # 27 Exhibit 276 # 28 Exhibit 277 # 29 Exhibit 278 # 30 Exhibit 279 # 31 Exhibit 280 # 32 Exhibit 281 # 33 Exhibit 282 # 34 Exhibit 283 # 35 Exhibit 284 # 36 Exhibit 285 # 37 Exhibit 286 # 38 Exhibit 287 # 39 Exhibit 288 # 40 Exhibit 289 # 41 Exhibit 290 # 42 Exhibit 291 # 43 Exhibit 292 # 44 Exhibit 293 # 45 Exhibit 294 # 46 Exhibit 295 # 47 Exhibit 296 # 48 Exhibit 297 # 49 Exhibit 298 # 50 Exhibit 299 # 51 Exhibit 300) (Mokrzycka, Maria) (Entered: 12/13/2020) |
| | 🜨 2320<br><br>(670 pgs; 51 docs) | Additional Attachments Re: *UCC Exhibits 301-350* (related document(s):2313 Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ).(Related document (s):2313 Witness List, Exhibit List) (Attachments: # 1 Exhibit 301 # 2 Exhibit 302 # 3 Exhibit 303 # 4 Exhibit 304 # 5 Exhibit 305 # 6 Exhibit 306 # 7 Exhibit 307 # 8 Exhibit 308 # 9 Exhibit 309 # 10 Exhibit 310 # 11 Exhibit 311 # 12 Exhibit 312 # 13 Exhibit 313 # 14 Exhibit 314 # 15 Exhibit 315 # 16 Exhibit 316 # 17 Exhibit 317 # 18 Exhibit 318 # 19 Exhibit 319 # 20 Exhibit 320 # 21 Exhibit 321 # 22 Exhibit 322 # 23 Exhibit 323 # 24 Exhibit 324 # 25 Exhibit 325 # 26 Exhibit 326 # 27 Exhibit 327 # 28 Exhibit 328 # 29 Exhibit 329 # 30 Exhibit 330 # 31 Exhibit 331 # 32 Exhibit 332 # 33 |

| | | |
|---|---|---|
| 12/13/2020 | | Exhibit 333 # 34 Exhibit 334 # 35 Exhibit 335 # 36 Exhibit 336 # 37 Exhibit 337 # 38 Exhibit 338 # 39 Exhibit 339 # 40 Exhibit 340 # 41 Exhibit 341 # 42 Exhibit 342 # 43 Exhibit 343 # 44 Exhibit 344 # 45 Exhibit 345 # 46 Exhibit 346 # 47 Exhibit 347 # 48 Exhibit 348 # 49 Exhibit 349 # 50 Exhibit 350) (Mokrzycka, Maria) (Entered: 12/13/2020) |
| 12/13/2020 | 2321<br><br>(4521 pgs; 51 docs) | Additional Attachments Re: *UCC Exhibits 351-400* (related document(s):2313 Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):2313 Witness List, Exhibit List) (Attachments: # 1 Exhibit 351 # 2 Exhibit 352 # 3 Exhibit 353 # 4 Exhibit 354 # 5 Exhibit 355 # 6 Exhibit 356 # 7 Exhibit 357 # 8 Exhibit 358 # 9 Exhibit 359 # 10 Exhibit 360 # 11 Exhibit 361 # 12 Exhibit 362 # 13 Exhibit 363 # 14 Exhibit 364 # 15 Exhibit 365 # 16 Exhibit 366 # 17 Exhibit 367 # 18 Exhibit 368 # 19 Exhibit 369 # 20 Exhibit 370 # 21 Exhibit 371 # 22 Exhibit 372 # 23 Exhibit 373 # 24 Exhibit 374 # 25 Exhibit 375 # 26 Exhibit 376 # 27 Exhibit 377 # 28 Exhibit 378 # 29 Exhibit 379 # 30 Exhibit 380 # 31 Exhibit 381 # 32 Exhibit 382 # 33 Exhibit 383 # 34 Exhibit 384 # 35 Exhibit 385 # 36 Exhibit 386 # 37 Exhibit 387 # 38 Exhibit 388 # 39 Exhibit 389 # 40 Exhibit 390 # 41 Exhibit 391 # 42 Exhibit 392 # 43 Exhibit 393 # 44 Exhibit 394 # 45 Exhibit 395 # 46 Exhibit 396 # 47 Exhibit 397 # 48 Exhibit 398 # 49 Exhibit 399 # 50 Exhibit 400) (Mokrzycka, Maria) (Entered: 12/13/2020) |
| 12/13/2020 | 2322<br><br>(3042 pgs; 8 docs) | Exhibit List (Filed By Chesapeake Energy Corporation ).(Related document(s):2290 Witness List, Exhibit List) (Attachments: # 1 Exhibit 343 # 2 Exhibit 344 # 3 Exhibit 345 # 4 Exhibit 362 # 5 Exhibit 363 # 6 Exhibit 366 # 7 Exhibit 387) (Cavenaugh, Matthew) (Entered: 12/13/2020) |
| | 2323<br><br>(8030 pgs; 51 docs) | Additional Attachments Re: *UCC Exhibits 0401-0450* (related document(s):2313 Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ).(Related |

| | | |
|---|---|---|
| 12/13/2020 | | document(s):2313 Witness List, Exhibit List) (Attachments: # 1 Exhibit 401 # 2 Exhibit 402 # 3 Exhibit 403 # 4 Exhibit 404 # 5 Exhibit 405 # 6 Exhibit 406 # 7 Exhibit 407 # 8 Exhibit 408 # 9 Exhibit 409 # 10 Exhibit 410 # 11 Exhibit 411 # 12 Exhibit 412 # 13 Exhibit 413 # 14 Exhibit 414 # 15 415 # 16 Exhibit 416 # 17 Exhibit 417 # 18 Exhibit 418 # 19 Exhibit 419 # 20 Exhibit 420 # 21 Exhibit 421 # 22 Exhibit 422 # 23 Exhibit 423 # 24 Exhibit 424 # 25 Exhibit 425 # 26 Exhibit 426 # 27 Exhibit 427 # 28 Exhibit 428 # 29 Exhibit 429 # 30 Exhibit 430 # 31 Exhibit 431 # 32 Exhibit 432 # 33 Exhibit 433 # 34 Exhibit 434 # 35 Exhibit 435 # 36 Exhibit 436 # 37 Exhibit 437 # 38 Exhibit 438 # 39 Exhibit 439 # 40 Exhibit 440 # 41 Exhibit 441 # 42 Exhibit 442 # 43 Exhibit 443 # 44 Exhibit 444 # 45 Exhibit 445 # 46 Exhibit 446 # 47 Exhibit 447 # 48 Exhibit 448 # 49 Exhibit 449 # 50 Exhibit 450) (Boland, Jason) (Entered: 12/13/2020) |
| 12/13/2020 | 🌐 2324 <br><br> (4 pgs) | Exhibit List, Witness List (Filed By MUFG Union Bank, N.A. ).(Related document(s):2313 Witness List, Exhibit List) (Quejada, Maegan) (Entered: 12/13/2020) |
| | 🌐 2325 <br><br> (5428 pgs; 51 docs) | Additional Attachments Re: *UCC Exhibits 451-500* (related document(s):2313 Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ).(Related document (s):2313 Witness List, Exhibit List) (Attachments: # 1 Exhibit 451 # 2 Exhibit 452 # 3 Exhibit 453 # 4 Exhibit 454 # 5 Exhibit 455 # 6 Exhibit 456 # 7 Exhibit 457 # 8 Exhibit 458 # 9 Exhibit 459 # 10 Exhibit 460 # 11 Exhibit 461 # 12 Exhibit 462 # 13 Exhibit 463 # 14 Exhibit 464 # 15 Exhibit 465 # 16 Exhibit 466 # 17 Exhibit 467 # 18 Exhibit 468 # 19 Exhibit 469 # 20 Exhibit 470 # 21 Exhibit 471 # 22 Exhibit 472 # 23 Exhibit 473 # 24 Exhibit 474 # 25 Exhibit 475 # 26 Exhibit 476 # 27 Exhibit 477 # 28 Exhibit 478 # 29 Exhibit 479 # 30 Exhibit 480 # 31 Exhibit 481 # 32 Exhibit 482 # 33 Exhibit 483 # 34 Exhibit 484 # 35 Exhibit 485 # 36 Exhibit 486 # 37 Exhibit 487 # 38 Exhibit 488 # 39 Exhibit 489 # 40 Exhibit 490 # 41 |

| | | |
|---|---|---|
| 12/13/2020 | | Exhibit 491 # 42 Exhibit 492 # 43 Exhibit 493 # 44 Exhibit 494 # 45 Exhibit 495 # 46 Exhibit 496 # 47 Exhibit 497 # 48 Exhibit 498 # 49 Exhibit 499 # 50 Exhibit 500) (Boland, Jason) (Entered: 12/13/2020) |
| 12/13/2020 | 🌑 2326<br><br>(1633 pgs; 51 docs) | Additional Attachments Re: *UCC Exhibits 501-550* (related document(s):2313 Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ).(Related document (s):2313 Witness List, Exhibit List) (Attachments: # 1 Exhibit 501 # 2 Exhibit 502 # 3 Exhibit 503 # 4 Exhibit 504 # 5 Exhibit 505 # 6 Exhibit 506 # 7 Exhibit 507 # 8 Exhibit 508 # 9 Exhibit 509 # 10 Exhibit 510 # 11 Exhibit 511 # 12 Exhibit 512 # 13 Exhibit 513 # 14 Exhibit 514 # 15 Exhibit 515 # 16 Exhibit 516 # 17 Exhibit 517 # 18 Exhibit 518 # 19 Exhibit 519 # 20 Exhibit 520 # 21 Exhibit 521 # 22 Exhibit 522 # 23 Exhibit 523 # 24 Exhibit 524 # 25 Exhibit 525 # 26 Exhibit 526 # 27 Exhibit 527 # 28 Exhibit 528 # 29 Exhibit 529 # 30 Exhibit 530 # 31 Exhibit 531 # 32 Exhibit 532 # 33 Exhibit 533 # 34 Exhibit 534 # 35 Exhibit 535 # 36 Exhibit 536 # 37 Exhibit 537 # 38 Exhibit 538 # 39 Exhibit 539 # 40 Exhibit 540 # 41 Exhibit 541 # 42 Exhibit 542 # 43 Exhibit 543 # 44 Exhibit 544 # 45 Exhibit 545 # 46 Exhibit 546 # 47 Exhibit 547 # 48 Exhibit 548 # 49 Exhibit 549 # 50 Exhibit 550) (Harrison, Julie) (Entered: 12/13/2020) |
| 12/13/2020 | 🌑 2327<br><br>(2502 pgs; 51 docs) | Additional Attachments Re: *UCC Exhibits 551-600* (related document(s):2313 Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ).(Related document (s):2313 Witness List, Exhibit List) (Attachments: # 1 Exhibit 551 # 2 Exhibit 552 # 3 Exhibit 553 # 4 Exhibit 554 # 5 Exhibit 555 # 6 Exhibit 556 # 7 Exhibit 557 # 8 Exhibit 558 # 9 Exhibit 559 # 10 Exhibit 560 # 11 Exhibit 561 # 12 Exhibit 562 # 13 Exhibit 563 # 14 Exhibit 564 # 15 Exhibit 565 # 16 Exhibit 566 # 17 Exhibit 567 # 18 Exhibit 568 # 19 Exhibit 569 # 20 Exhibit 570 # 21 Exhibit 571 # 22 Exhibit 572 # 23 Exhibit 573 # 24 Exhibit 574 # 25 Exhibit 575 # 26 Exhibit 576 # 27 Exhibit 577 # |

| 12/13/2020 | | 28 Exhibit 578 # 29 Exhibit 579 # 30 Exhibit 580 # 31 Exhibit 581 # 32 Exhibit 582 # 33 Exhibit 583 # 34 Exhibit 584 # 35 Exhibit 585 # 36 Exhibit 586 # 37 Exhibit 587 # 38 Exhibit 588 # 39 Exhibit 589 # 40 Exhibit 590 # 41 Exhibit 591 # 42 Exhibit 592 # 43 Exhibit 593 # 44 Exhibit 594 # 45 Exhibit 595 # 46 Exhibit 596 # 47 Exhibit 597 # 48 Exhibit 598 # 49 Exhibit 599 # 50 Exhibit 600) (Gluck, Kristian) (Entered: 12/13/2020) |
| 12/13/2020 | 🔘 2328<br><br>(503 pgs; 51 docs) | Additional Attachments Re: *UCC Exhibits 601-650* (related document(s):2313 Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ).(Related document (s):2313 Witness List, Exhibit List) (Attachments: # 1 Exhibit 601 # 2 Exhibit 602 # 3 Exhibit 603 # 4 Exhibit 604 # 5 Exhibit 605 # 6 Exhibit 606 # 7 Exhibit 607 # 8 Exhibit 608 # 9 Exhibit 609 # 10 Exhibit 610 # 11 Exhibit 611 # 12 Exhibit 612 # 13 Exhibit 613 # 14 Exhibit 614 # 15 Exhibit 615 # 16 Exhibit 616 # 17 Exhibit 617 # 18 Exhibit 618 # 19 Exhibit 619 # 20 Exhibit 620 # 21 Exhibit 621 # 22 Exhibit 622 # 23 Exhibit 623 # 24 Exhibit 624 # 25 Exhibit 625 # 26 Exhibit 626 # 27 Exhibit 627 # 28 Exhibit 628 # 29 Exhibit 629 # 30 Exhibit 630 # 31 Exhibit 631 # 32 Exhibit 632 # 33 Exhibit 633 # 34 Exhibit 634 # 35 Exhibit 635 # 36 Exhibit 636 # 37 Exhibit 637 # 38 Exhibit 638 # 39 Exhibit 639 # 40 Exhibit 640 # 41 Exhibit 641 # 42 Exhibit 642 # 43 Exhibit 643 # 44 Exhibit 644 # 45 Exhibit 645 # 46 Exhibit 646 # 47 Exhibit 647 # 48 Exhibit 648 # 49 Exhibit 649 # 50 Exhibit 650) (Bruner, Robert) (Entered: 12/13/2020) |
| | 🔘 2329<br><br>(1684 pgs; 51 docs) | Additional Attachments Re: *UCC Exhibits 651-700* (related document(s):2313 Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ).(Related document (s):2313 Witness List, Exhibit List) (Attachments: # 1 Exhibit 651 # 2 Exhibit 652 # 3 Exhibit 653 # 4 Exhibit 654 # 5 Exhibit 655 # 6 Exhibit 656 # 7 Exhibit 657 # 8 Exhibit 658 # 9 Exhibit 659 # 10 Exhibit 660 # 11 Exhibit 661 # 12 Exhibit 662 # 13 Exhibit 663 # 14 Exhibit |

| | | |
|---|---|---|
| 12/13/2020 | | 664 # 15 Exhibit 665 # 16 Exhibit 666 # 17 Exhibit 667 # 18 Exhibit 668 # 19 Exhibit 669 # 20 Exhibit 670 # 21 Exhibit 671 # 22 Exhibit 672 # 23 Exhibit 673 # 24 Exhibit 674 # 25 Exhibit 675 # 26 Exhibit 676 # 27 Exhibit 677 # 28 Exhibit 678 # 29 Exhibit 679 # 30 Exhibit 680 # 31 Exhibit 681 # 32 Exhibit 683 # 33 Exhibit 684 # 34 Exhibit 685 # 35 Exhibit 686 # 36 Exhibit 687 # 37 Exhibit 688 # 38 Exhibit 689 # 39 Exhibit 690 # 40 Exhibit 691 # 41 Exhibit 692 Pt. 1 # 42 Exhibit 692 Pt. 2 # 43 Exhibit 693 # 44 Exhibit 694 # 45 Exhibit 695 # 46 Exhibit 696 # 47 Exhibit 697 # 48 Exhibit 698 # 49 Exhibit 699 # 50 Exhibit 700) (Harrison, Julie) (Entered: 12/13/2020) |
| 12/13/2020 | 2330<br><br>(11 pgs; 8 docs) | Exhibit List (Filed By Stephanie Delasandro ). (Related document(s):1175 Motion to Reconsider, 1293 Motion for Relief From Stay) (Attachments: # 1 Exhibit 27.4 # 2 Exhibit 33.2 # 3 Exhibit 33.3 # 4 Exhibit 33.4 # 5 Exhibit 33.5 # 6 Exhibit 33.6 # 7 Exhibit 33.7) (Warman, Lynnette) (Entered: 12/13/2020) |
| | 2331<br><br>(892 pgs; 51 docs) | Additional Attachments Re: *UCC Exhibits 701-750* (related document(s):2313 Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ).(Related document (s):2313 Witness List, Exhibit List) (Attachments: # 1 Exhibit 701 # 2 Exhibit 702 # 3 Exhibit 703 # 4 Exhibit 704 # 5 Exhibit 705 # 6 Exhibit 706 # 7 Exhibit 707 # 8 Exhibit 708 # 9 Exhibit 709 # 10 Exhibit 710 # 11 Exhibit 711 # 12 Exhibit 712 # 13 Exhibit 713 # 14 Exhibit 714 # 15 Appendix 715 # 16 Appendix 716 # 17 Exhibit 717 # 18 Exhibit 718 # 19 Exhibit 719 # 20 Exhibit 720 # 21 Exhibit 721 # 22 Exhibit 722 # 23 Exhibit 723 # 24 Exhibit 724 # 25 Exhibit 725 # 26 Exhibit 726 # 27 Exhibit 727 # 28 Exhibit 728 # 29 Exhibit 729 # 30 Exhibit 730 # 31 Exhibit 731 # 32 Exhibit 732 # 33 Exhibit 733 # 34 Exhibit 734 # 35 Exhibit 735 # 36 Exhibit 736 # 37 Exhibit 737 # 38 Exhibit 738 # 39 Exhibit 739 # 40 Exhibit 740 # 41 Exhibit 741 # 42 Exhibit 742 # 43 Exhibit 743 # 44 Exhibit 744 # 45 Exhibit 745 # 46 Exhibit 746 # 47 Exhibit 747 # 48 Exhibit 748 # |

| | | |
|---|---|---|
| 12/13/2020 | | 49 Exhibit 749 # 50 Exhibit 750) (Gluck, Kristian) (Entered: 12/13/2020) |
| 12/13/2020 | 🌑 2332 <br><br> (6 pgs) | Exhibit List (Filed By Glas USA LLC ). (Related document(s):2214 Witness List) (Warner, Michael) (Entered: 12/13/2020) |
| 12/13/2020 | 🌑 2333 <br><br> (3044 pgs; 59 docs) | Additional Attachments Re: *UCC Exhibits 751-800* (related document(s):2313 Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ).(Related document (s):2313 Witness List, Exhibit List) (Attachments: # 1 Exhibit 751 # 2 Exhibit 752 (Part 1) # 3 Exhibit 752 (Part 2) # 4 Exhibit 753 (Part 1) # 5 Exhibit 753 (Part 2) # 6 Exhibit 753 (Part 3) # 7 Exhibit 754 # 8 Exhibit 755 # 9 Exhibit 756 # 10 Exhibit 757 # 11 Exhibit 758 # 12 Exhibit 759 # 13 Exhibit 760 # 14 Exhibit 761 # 15 Exhibit 762 # 16 Exhibit 763 # 17 Exhibit 764 # 18 Exhibit 765 (Part 1) # 19 Exhibit 765 (Part 2) # 20 Exhibit 765 (Part 3) # 21 Exhibit 766 # 22 Exhibit 767 (Part 1) # 23 Exhibit 767 (Part 2) # 24 Exhibit 768 (Part 1) # 25 Exhibit 768 (Part 2) # 26 Exhibit 769 (Part 1) # 27 Exhibit 769 (Part 2) # 28 Exhibit 770 # 29 Exhibit 771 # 30 Exhibit 772 # 31 Exhibit 773 # 32 Exhibit 774 # 33 Exhibit 775 # 34 Exhibit 776 # 35 Exhibit 777 # 36 Exhibit 778 # 37 Exhibit 779 # 38 Exhibit 780 # 39 Exhibit 781 # 40 Exhibit 782 # 41 Exhibit 783 # 42 Exhibit 784 # 43 Exhibit 785 # 44 Exhibit 786 # 45 Exhibit 787 # 46 Exhibit 788 # 47 Exhibit 789 # 48 Exhibit 790 # 49 Exhibit 791 # 50 Exhibit 792 # 51 Exhibit 793 # 52 Exhibit 794 # 53 Exhibit 795 # 54 Exhibit 796 # 55 Exhibit 797 # 56 Exhibit 798 # 57 Exhibit 799 # 58 Exhibit 800) (Bruner, Robert) (Entered: 12/13/2020) |
| | 🌑 2334 <br><br> (1915 pgs; 51 docs) | Additional Attachments Re: *UCC Exhibits 801-850* (related document(s):2313 Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ).(Related document (s):2313 Witness List, Exhibit List) (Attachments: # 1 Exhibit 801 # 2 Exhibit 802 # 3 Exhibit 803 # 4 Exhibit 804 # 5 Exhibit 805 # 6 Exhibit 806 # 7 Exhibit 807 # 8 Exhibit 808 # |

| | | |
|---|---|---|
| 12/13/2020 | | 9 Exhibit 809 # 10 Exhibit 810 # 11 Exhibit 811 # 12 Exhibit 812 # 13 Exhibit 813 # 14 Exhibit 814 # 15 Exhibit 815 # 16 Exhibit 816 # 17 Exhibit 817 # 18 Exhibit 818 # 19 Exhibit 819 # 20 Exhibit 820 # 21 Exhibit 821 # 22 Exhibit 822 # 23 Exhibit 823 # 24 Exhibit 824 # 25 Exhibit 825 # 26 Exhibit 826 # 27 Exhibit 827 # 28 Exhibit 828 # 29 Exhibit 829 # 30 Exhibit 830 # 31 Exhibit 831 # 32 Exhibit 832 # 33 Exhibit 833 # 34 Exhibit 834 # 35 Exhibit 835 # 36 Exhibit 836 # 37 Exhibit 837 # 38 Exhibit 838 # 39 Exhibit 839 # 40 Exhibit 840 # 41 Exhibit 841 # 42 Exhibit 842 # 43 Exhibit 843 # 44 Exhibit 844 # 45 Exhibit 845 # 46 Exhibit 846 # 47 Exhibit 847 # 48 Exhibit 848 # 49 Exhibit 849 # 50 Exhibit 850) (Harrison, Julie) (Entered: 12/13/2020) |
| 12/13/2020 | 2335<br><br>(6852 pgs; 51 docs) | Additional Attachments Re: *UCC Exhibits 850-900* (related document(s):2313 Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ).(Related document (s):2313 Witness List, Exhibit List) (Attachments: # 1 Exhibit 851 # 2 Exhibit 852 # 3 Exhibit 853 # 4 Exhibit 854 # 5 Exhibit 855 # 6 Exhibit 856 # 7 Exhibit 857 # 8 Exhibit 858 # 9 Exhibit 858 # 10 Exhibit 860 # 11 Exhibit 861 # 12 Exhibit 862 # 13 Exhibit 863 # 14 Exhibit 864 # 15 Exhibit 865 # 16 Exhibit 866 # 17 Exhibit 867 # 18 Exhibit 868 # 19 Exhibit 869 # 20 Exhibit 870 # 21 Exhibit 871 # 22 Exhibit 872 # 23 Exhibit 873 # 24 Exhibit 874 # 25 Exhibit 875 # 26 Exhibit 876 # 27 Exhibit 877 # 28 Exhibit 878 # 29 Exhibit 879 # 30 Exhibit 880 # 31 Exhibit 881 # 32 Exhibit 882 # 33 Exhibit 883 # 34 Exhibit 884 # 35 Exhibit 885 # 36 Exhibit 886 # 37 Exhibit 887 # 38 Exhibit 888 # 39 Exhibit 889 # 40 Exhibit 890 # 41 Exhibit 891 # 42 Exhibit 892 # 43 Exhibit 893 # 44 Exhibit 894 # 45 Exhibit 895 # 46 Exhibit 896 # 47 Exhibit 897 # 48 Exhibit 898 # 49 Exhibit 899 # 50 Exhibit 900) (Gluck, Kristian) (Entered: 12/13/2020) |
| | 2336<br><br>(126 pgs; 2 docs) | Third Amended Chapter 11 Plan Filed by Chesapeake Energy Corporation. (Attachments: # 1 Redline)(Cavenaugh, Matthew) (Entered: |

| 12/13/2020 | | 12/13/2020) |
|---|---|---|
| 12/13/2020 | 🔵 2337<br><br>(132 pgs; 49 docs) | Additional Attachments Re: *UCC Exhibits 901-950* (related document(s):2313 Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ).(Related document (s):r 313 Witness List, Exhibit List) (Attachments: # 1 Exhibit 901 # 2 Exhibit 902 # 3 Exhibit 903 # 4 Exhibit 904 # 5 Exhibit 905 # 6 Exhibit 906 # 7 Exhibit 907 # 8 Exhibit 908 # 9 Exhibit 909 # 10 Exhibit 910 # 11 Exhibit 911 # 12 Exhibit 912 # 13 Exhibit 913 # 14 Exhibit 914 # 15 Exhibit 915 # 16 Exhibit 916 # 17 Exhibit 917 # 18 Exhibit 918 # 19 Exhibit 920 # 20 Exhibit 920 # 21 Exhibit 921 # 22 Exhibit 922 # 23 Exhibit 923 # 24 Exhibit 924 # 25 Exhibit 925 # 26 Exhibit 926 # 27 Exhibit 927 # 28 Exhibit 928 # 29 Exhibit 929 # 30 Exhibit 930 # 31 Exhibit 931 # 32 Exhibit 932 # 33 Exhibit 933 # 34 Exhibit 934 # 35 Exhibit 935 # 36 Exhibit 936 # 37 Exhibit 937 # 38 Exhibit 940 # 39 Exhibit 941 # 40 Exhibit 942 # 41 Exhibit 943 # 42 Exhibit 944 # 43 Exhibit 945 # 44 Exhibit 946 # 45 Exhibit 947 # 46 Exhibit 948 # 47 Exhibit 949 # 48 Exhibit 950) (Harrison, Julie) (Entered: 12/13/2020) |
| 12/13/2020 | 🔵 2338<br><br>(89 pgs; 5 docs) | Exhibit List, Witness List (Filed By Energy Transfer Fuel, LP ). (Attachments: # 1 Exhibit ET-11 # 2 Exhibit ET-12 # 3 Exhibit ET-13 # 4 Exhibit ET-31) (Mitchell, John) (Entered: 12/13/2020) |
| 12/13/2020 | 🔵 2339<br><br>(95 pgs) | Sealed Document *Official Committee of Unsecured Creditors' Reply to Objections to the Motion of the Official Committee of Unsecured Creditors for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of the Debtors' Estates and (II) Exclusive Settlement Authority* (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) (Entered: 12/13/2020) |
| | 🔵 2340<br><br>(6060 pgs; 25 docs) | Witness List, Exhibit List (Filed By Official Committee of Royalty Owners ).(Related document(s):1644 Amended Chapter 11 Plan) |

| | | |
|---|---|---|
| | | (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 12 # 12 Exhibit 13 # 13 Exhibit 14 # 14 Exhibit 15 # 15 Exhibit 16 # 16 Exhibit 17 # 17 Exhibit 18 # 18 Exhibit 19 # 19 Exhibit 20 # 20 Exhibit 21 # 21 Exhibit 24 # 22 Exhibit 25 # 23 Exhibit 26 # 24 Exhibit 27) (Brown, pllc, Deirdre) (Entered: 12/13/2020) |
| 12/13/2020 | 🔘 2341 <br><br> (14 pgs; 2 docs) | Emergency Motion *of the FLLO Ad Hoc Group for Entry of an Order (I) Authorizing the FLLO Ad Hoc Group to File Certain Exhibits Under Seal and (II) Granting Related Relief* Filed by Creditor Ad Hoc Group of FLLO Term Loan Lenders (Attachments: # 1 Proposed Order) (Perrin, Harry) (Entered: 12/13/2020) |
| 12/13/2020 | 🔘 2342 <br><br> (10 pgs; 2 docs) | Emergency Motion *of Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts, to File Under Seal Certain Exhibits for the Hearing Scheduled for December 15, 2020 at 12:00 P.M. CT Under Seal* Filed by Interested Party Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts Hearing scheduled for 12/15/2020 at 12:00 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order) (Brimmage, Marty) (Entered: 12/13/2020) |
| 12/13/2020 | 🔘 2343 <br><br> (5 pgs) | Exhibit List (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts ). (Brimmage, Marty) (Entered: 12/13/2020) |
| 12/13/2020 | 🔘 2344 <br><br> (1276 pgs; 51 docs) | Additional Attachments Re: *UCC Exhibits 951-1000* (related document(s):2313 Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ).(Related document (s):2313 Witness List, Exhibit List) (Attachments: # 1 Exhibit 951 # 2 Exhibit 952 # 3 Exhibit 953 # 4 Exhibit 954 # 5 Exhibit 955 # 6 Exhibit 956 # 7 Exhibit 957 # 8 Exhibit 958 # 9 Exhibit 959 # 10 Exhibit 960 # 11 Exhibit 961 # 12 Exhibit 962 # 13 Exhibit 963 # 14 Exhibit |

| | | |
|---|---|---|
| 12/13/2020 | | 964 # 15 Exhibit 965 # 16 Exhibit 966 # 17 Exhibit 957 # 18 Exhibit 968 # 19 Exhibit 969 # 20 Exhibit 970 # 21 Exhibit 971 # 22 Exhibit 972 # 23 Exhibit 973 # 24 Exhibit 974 # 25 Exhibit 975 # 26 Exhibit 976 # 27 Exhibit 977 # 28 Exhibit 978 # 29 Exhibit 979 # 30 Appendix 980 # 31 Exhibit 981 # 32 Exhibit 982 # 33 Appendix 983 # 34 Exhibit 984 # 35 Exhibit 985 # 36 Exhibit 986 # 37 Exhibit 987 # 38 Appendix 988 # 39 Exhibit 989 # 40 Exhibit 990 # 41 Exhibit 991 # 42 Exhibit 992 # 43 Exhibit 993 # 44 Exhibit 994 # 45 Exhibit 995 # 46 Exhibit 996 # 47 Exhibit 997 # 48 Exhibit 998 # 49 Exhibit 999 # 50 Exhibit 1000) (Gluck, Kristian) (Entered: 12/13/2020) |
| 12/13/2020 | 🌑 2345 (1028 pgs; 10 docs) | Sealed Document *Debtors' Exhibits 46, 54-58, 61, 62, 68, and 88 for Confirmation Hearing Set December 15, 2020* (Filed By Chesapeake Energy Corporation ). (Attachments: # 1 Exhibit 54 # 2 Exhibit 55 # 3 Exhibit 56 # 4 Exhibit 57 # 5 Exhibit 58 # 6 Exhibit 61 # 7 Exhibit 62 # 8 Exhibit 68 # 9 Exhibit 88) (Cavenaugh, Matthew) (Entered: 12/13/2020) |
| | 🌑 2346 (232 pgs; 51 docs) | Additional Attachments Re: *UCC_1001 - UCC_1050* (related document(s):2313 Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):2313 Witness List, Exhibit List) (Attachments: # 1 Exhibit 1001 # 2 Exhibit 1002 # 3 Exhibit 1003 # 4 Exhibit 1004 # 5 Exhibit 1005 # 6 Exhibit 1006 # 7 Exhibit 1007 # 8 Exhibit 1008 # 9 Exhibit 1009a # 10 Exhibit 1010 # 11 Exhibit 1011 # 12 Exhibit 1012 # 13 Exhibit 1013 # 14 Exhibit 1014 # 15 Exhibit 1015 # 16 Exhibit 1016 # 17 Exhibit 1017 # 18 Exhibit 1018 # 19 Exhibit 1019 # 20 Exhibit 1020 # 21 Exhibit 1021 # 22 Exhibit 1022 # 23 Exhibit 1023 # 24 Exhibit 1024 # 25 Exhibit 1025 # 26 Exhibit 1026 # 27 Exhibit 1027 # 28 Exhibit 1028 # 29 Exhibit 1029 # 30 Exhibit 1030 # 31 Exhibit 1031 # 32 Exhibit 1032 # 33 Exhibit 1033 # 34 Exhibit 1034 # 35 Exhibit 1035 # 36 Exhibit 1036 # 37 Exhibit 1037 # 38 Exhibit 1038 # 39 Exhibit 1039 # 40 Exhibit 1040 # 41 Exhibit 1041 # 42 Exhibit |

| | | |
|---|---|---|
| 12/13/2020 | | 1042 # 43 Exhibit 1043 # 44 Exhibit 1044 # 45 Exhibit 1045 # 46 Exhibit 1046 # 47 Exhibit 1047 # 48 Exhibit 1048 # 49 Exhibit 1049 # 50 Exhibit 1050) (Greendyke, William) (Entered: 12/13/2020) |
| 12/13/2020 | ⏺ 2347<br><br>(55 pgs; 51 docs) | Additional Attachments Re: *UCC Exhibits 1051-1100* (related document(s):2313 Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):2313 Witness List, Exhibit List) (Attachments: # 1 Exhibit 1051 # 2 Exhibit 1052 # 3 Exhibit 1053 # 4 Exhibit 1054 # 5 Exhibit 1055 # 6 Exhibit 1056 # 7 Exhibit 1057 # 8 Exhibit 1058 # 9 Exhibit 1059 # 10 Exhibit 1060 # 11 Exhibit 1061 # 12 Exhibit 1062 # 13 Exhibit 1063 # 14 Exhibit 1064 # 15 Exhibit 1065 # 16 Exhibit 1066 # 17 Exhibit 1067 # 18 Exhibit 1068 # 19 Exhibit 1069 # 20 Exhibit 1070 # 21 Exhibit 1071 # 22 Exhibit 1072 # 23 Exhibit 1073 # 24 Exhibit 1074 # 25 Exhibit 1075 # 26 Exhibit 1076 # 27 Exhibit 1077 # 28 Exhibit 1078 # 29 Exhibit 1079 # 30 Exhibit 1080 # 31 Exhibit 1081 # 32 Exhibit 1082 # 33 Exhibit 1083 # 34 Exhibit 1084 # 35 Exhibit 1085 # 36 Exhibit 1086 # 37 Exhibit 1087 # 38 Exhibit 1088 # 39 Exhibit 1089 # 40 Exhibit 1090 # 41 Exhibit 1091 # 42 Exhibit 1092 # 43 Exhibit 1093 # 44 Exhibit 1094 # 45 Exhibit 1095 # 46 Exhibit 1096 # 47 Exhibit 1097 # 48 Exhibit 1098 # 49 Exhibit 1099 # 50 Exhibit 1100) (Mokrzycka, Maria) (Entered: 12/13/2020) |
| | ⏺ 2348<br><br>(29879 pgs; 51 docs) | Additional Attachments Re: *UCC Exhibits 1101-1150* (related document(s):2313 Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):2313 Witness List, Exhibit List) (Attachments: # 1 Exhibit 1101 # 2 Exhibit 1102 # 3 Exhibit 1103 # 4 Exhibit 1104 # 5 Exhibit 1105 # 6 Exhibit 1106 # 7 Exhibit 1107 # 8 Exhibit 1108 # 9 Exhibit 1109 # 10 Exhibit 1110 # 11 Exhibit 1111 # 12 Exhibit 1112 # 13 Exhibit 1113 # 14 Exhibit 1114 # 15 Exhibit 1115 # 16 Exhibit 1116 # 17 Exhibit 1117 # 18 Exhibit 1118 # 19 Exhibit 1119 # 20 Exhibit |

| | | |
|---|---|---|
| 12/13/2020 | | 1120 # <u>21</u> Exhibit 1121 # <u>22</u> Exhibit 1122 # <u>23</u> Exhibit 1123 # <u>24</u> Exhibit 1124 # <u>25</u> Exhibit 1125 # <u>26</u> Exhibit 1126 # <u>27</u> Exhibit 1127 # <u>28</u> Exhibit 1128 # <u>29</u> Exhibit 1129 # <u>30</u> Exhibit 1130 # <u>31</u> Exhibit 1131 # <u>32</u> Exhibit 1132 # <u>33</u> Exhibit 1133 # <u>34</u> Exhibit 1134 # <u>35</u> Exhibit 1135 # <u>36</u> Exhibit 1136 # <u>37</u> Exhibit 1137 # <u>38</u> Exhibit 1138 # <u>39</u> Exhibit 1139 # <u>40</u> Exhibit 1140 # <u>41</u> Exhibit 1141 # <u>42</u> Exhibit 1142 # <u>43</u> Exhibit 1143 # <u>44</u> Exhibit 1144 # <u>45</u> Exhibit 1145 # <u>46</u> Exhibit 1146 # <u>47</u> Exhibit 1147 # <u>48</u> Exhibit 1148 # <u>49</u> Exhibit 1149 # <u>50</u> Exhibit 1150) (Boland, Jason) (Entered: 12/13/2020) |
| 12/13/2020 | 🔵 <u>2349</u><br><br>(8 pgs; 2 docs) | Emergency Motion *of the Official Committee of Unsecured Creditors to File Under Seal Exhibits for Confirmation Hearing* Filed by Creditor Committee Official Committee Of Unsecured Creditors Hearing scheduled for 12/15/2020 at 12:00 PM at Houston, Courtroom 400 (DRJ). (Attachments: # <u>1</u> Proposed Order) (Harrison, Julie) (Entered: 12/13/2020) |
| 12/13/2020 | 🔵 <u>2350</u><br><br>(34 pgs) | Sealed Document *(Omnibus Reply of the Official Committee of Unsecured Creditors in Support of and in Response to Objections to Emergency Motion for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Lien Claims and Causes of Action on Behalf of the Debtors' Estates and (II) Exclusive Settlement Authority)* (Filed By Official Committee Of Unsecured Creditors ). (Boland, Jason) (Entered: 12/13/2020) |
| 12/13/2020 | 🔵 <u>2351</u><br><br>(2018 pgs; 11 docs) | Additional Attachments Re: *Franklin Advisers, Inc. Exhibits 10-20* (related document(s):<u>2343</u> Exhibit List) (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts ).(Related document (s):<u>2343</u> Exhibit List) (Attachments: # <u>1</u> Exhibit 11 # <u>2</u> Exhibit 12 # <u>3</u> Exhibit 13 # <u>4</u> Exhibit 14 # <u>5</u> Exhibit 15 # <u>6</u> Exhibit 16 # <u>7</u> Exhibit 17 # <u>8</u> Exhibit 18 # <u>9</u> Exhibit 19 # <u>10</u> Exhibit 20) (Brimmage, Marty) (Entered: 12/13/2020) |
| | | |

| | | |
|---|---|---|
| | 🌐 2352<br><br>(10934 pgs; 82 docs) | Sealed Document / *Ad Hoc Group of FLLO Term Loan Lenders' Exhibit List for the Plan Confirmation Hearing Scheduled for December 15, 2020* (Filed By Ad Hoc Group of FLLO Term Loan Lenders ). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31 # 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34 # 35 Exhibit 35 # 36 Exhibit 36 # 37 Exhibit 37 # 38 Exhibit 38 # 39 Exhibit 39 # 40 Exhibit 40 # 41 Exhibit 41 # 42 Exhibit 42 # 43 Exhibit 43 # 44 Exhibit 44 # 45 Exhibit 45 # 46 Exhibit 46 # 47 Exhibit 47 # 48 Exhibit 48 # 49 Exhibit 49 # 50 Exhibit 50 # 51 Exhibit 51 # 52 Exhibit 52 # 53 Exhibit 53-A # 54 Exhibit 53-B # 55 Exhibit 53-C # 56 Exhibit 53-D # 57 Exhibit 53-E # 58 Exhibit 53-F # 59 Exhibit 53-G # 60 Exhibit H # 61 Exhibit 53-I # 62 Exhibit 53-J # 63 Exhibit 53-K # 64 Exhibit 53-L # 65 Exhibit 53-M # 66 Exhibit 53-N # 67 Exhibit 53-O # 68 Exhibit 53-P # 69 Exhibit 53-Q # 70 Exhibit 53-R # 71 Exhibit 53-S # 72 Exhibit 53-T # 73 Exhibit 53-U # 74 Exhibit 54 # 75 Exhibit 55 # 76 Exhibit 56 # 77 Exhibit 57 # 78 Exhibit 58 # 79 Exhibit 59 # 80 Exhibit 60 # 81 Exhibit 61) (Perrin, Harry) (Entered: 12/13/2020) |
| 12/13/2020 | | |
| | 🌐 2353<br><br>(10 pgs; 2 docs) | Emergency Motion *of the Official Committee of Unsecured Creditors to File Under Seal: (A) the Official Committee of Unsecured Creditors Omnibus Reply to Objections to the Motion of the Official Committee of Unsecured Creditors for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of the Debtors Estates and (II) Exclusive Settlement Authority; and (B) Omnibus Reply of the Official Committee of Unsecured Creditors in Support of and in Response to Objections to Emergency* |

| | | |
|---|---|---|
| 12/13/2020 | | *Motion for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Lien Claims and Causes of Action on Behalf of the Debtors Estates and (II) Exclusive Settlement Authority* Filed by Creditor Committee Official Committee Of Unsecured Creditors Hearing scheduled for 12/15/2020 at 12:00 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order) (Boland, Jason) (Entered: 12/13/2020) |
| 12/13/2020 | ⚙2354<br><br>(210 pgs) | Brief (Filed By Chesapeake Energy Corporation ).(Related document(s):2336 Amended Chapter 11 Plan) (Cavenaugh, Matthew) (Entered: 12/13/2020) |
| 12/13/2020 | ⚙2355<br><br>(101 pgs; 10 docs) | Sealed Document *Franklin Advisers, Inc. Exhibits 1-9 and 21 for the Confirmation Hearing Set for December 15, 2020* (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts ). (Attachments: # 1 Exhibit 2 # 2 Exhibit 3 # 3 Exhibit 4 # 4 Exhibit 5 # 5 Exhibit 6 # 6 Exhibit 7 # 7 Exhibit 8 # 8 Exhibit 9 # 9 Exhibit 21) (Brimmage, Marty) (Entered: 12/13/2020) |
| 12/13/2020 | ⚙2356<br><br>(15 pgs) | BNC Certificate of Mailing. (Related document (s):2232 Generic Order) No. of Notices: 204. Notice Date 12/13/2020. (Admin.) (Entered: 12/13/2020) |
| 12/13/2020 | ⚙2357<br><br>(11 pgs) | BNC Certificate of Mailing. (Related document (s):2242 Order on Motion to Appear pro hac vice) No. of Notices: 204. Notice Date 12/13/2020. (Admin.) (Entered: 12/13/2020) |
| 12/13/2020 | ⚙2358<br><br>(11 pgs) | BNC Certificate of Mailing. (Related document (s):2243 Order on Motion to Appear pro hac vice) No. of Notices: 204. Notice Date 12/13/2020. (Admin.) (Entered: 12/13/2020) |
| 12/13/2020 | ⚙2359<br><br>(11 pgs) | BNC Certificate of Mailing. (Related document (s):2244 Order on Motion to Appear pro hac vice) No. of Notices: 204. Notice Date 12/13/2020. (Admin.) (Entered: 12/13/2020) |

| | | |
|---|---|---|
| 12/13/2020 | 🔵 2360 <br><br> (11 pgs) | BNC Certificate of Mailing. (Related document (s):2245 Order on Motion to Appear pro hac vice) No. of Notices: 204. Notice Date 12/13/2020. (Admin.) (Entered: 12/13/2020) |
| 12/13/2020 | 🔵 2361 <br><br> (11 pgs) | BNC Certificate of Mailing. (Related document (s):2246 Order on Motion to Appear pro hac vice) No. of Notices: 204. Notice Date 12/13/2020. (Admin.) (Entered: 12/13/2020) |
| 12/13/2020 | 🔵 2362 <br><br> (14 pgs) | BNC Certificate of Mailing. (Related document (s):2258 Generic Order) No. of Notices: 213. Notice Date 12/13/2020. (Admin.) (Entered: 12/13/2020) |
| 12/13/2020 | 🔵 2363 <br><br> (4 pgs) | BNC Certificate of Mailing. (Related document (s):2259 Order on Motion to Seal) No. of Notices: 41. Notice Date 12/13/2020. (Admin.) (Entered: 12/13/2020) |
| 12/14/2020 | 🔵 2364 <br><br> (42 pgs) | *Reply of the FLLO Ad Hoc Group to Confirmation Objections of the Official Committee of Unsecured Creditors and Other Parties and Joinder to the Debtors' Confirmation Brief.* Filed by Ad Hoc Group of FLLO Term Loan Lenders (Perrin, Harry) (Entered: 12/14/2020) |
| 12/14/2020 | 🔵 2365 <br><br> (19 pgs) | *Reply and Joinder of Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts, in Support of Confirmation of the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization (related document(s): [2354, 2336 and 2122].* Filed by Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts (Brimmage, Marty) (Entered: 12/14/2020) |
| | 🔵 2366 <br><br> (5057 pgs; 30 docs) | Additional Attachments Re: *UCC Exhibits 1151-1175* (related document(s):2313 Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ).(Related document (s):2313 Witness List, Exhibit List) (Attachments: # 1 Exhibit 1151 # 2 Exhibit 1152 # 3 Exhibit 1153 Pt. 1 # 4 Exhibit 1153 Pt. 2 # 5 Exhibit 1154 # 6 Exhibit 1155 # 7 Exhibit 1156 # 8 Exhibit 1157 Pt. 1 # 9 Exhibit 1157 Pt. 2 # 10 |

| | | |
|---|---|---|
| 12/14/2020 | | Exhibit 1158 # 11 Exhibit 1159 # 12 Exhibit 1160 Pt. 1 # 13 Exhibit 1160 Pt. 2 # 14 Exhibit 1161 # 15 Exhibit 1162 # 16 Exhibit 1163 # 17 Exhibit 1164 # 18 Exhibit 1165 # 19 Exhibit 1166 # 20 Exhibit 1167 # 21 Exhibit 1168 # 22 Exhibit 1169 # 23 Exhibit 1170 # 24 Exhibit 1171 # 25 Exhibit 1172 # 26 Exhibit 1173 Pt. 1 # 27 Exhibit 1173 Pt. 2 # 28 Exhibit 1174 # 29 Exhibit 1175) (Harrison, Julie) (Entered: 12/14/2020) |
| 12/14/2020 | 2367<br><br>(6407 pgs; 29 docs) | Additional Attachments Re: *UCC 1176-1200* (related document(s):2313 Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ).(Related document (s):2313 Witness List, Exhibit List) (Attachments: # 1 Exhibit 1176 # 2 Exhibit 1177 # 3 Exhibit 1178 # 4 Exhibit 1179 Pt. 1 # 5 Exhibit 1179 Pt. 2 # 6 Exhibit 1180 # 7 Exhibit 1181 # 8 Exhibit 1182 # 9 Exhibit 1183 # 10 Exhibit 1184 # 11 Exhibit 1185 # 12 Exhibit 1186 # 13 Exhibit 1187 # 14 Exhibit 1188 # 15 Exhibit 1189 Pt. 1 # 16 Exhibit 1189 Pt. 2 # 17 Exhibit 1190 # 18 Exhibit 1191 # 19 Exhibit 1192 # 20 Exhibit 1193 # 21 Exhibit 1194 # 22 Exhibit 1195 # 23 Exhibit 1196 # 24 Exhibit 1197 Pt. 1 # 25 Exhibit 1197 Pt. 2 # 26 Exhibit 1198 # 27 Exhibit 1199 # 28 Exhibit 1200) (Harrison, Julie) (Entered: 12/14/2020) |
| | 2368<br><br>(8204 pgs; 29 docs) | Additional Attachments Re: *UCC Exhibits 1201-1225* (related document(s):2313 Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ).(Related document (s):2313 Witness List, Exhibit List) (Attachments: # 1 Exhibit 1201 # 2 Exhibit 1202 # 3 Exhibit 1203 # 4 Exhibit 1204 # 5 Exhibit 1205 # 6 Exhibit 1206 # 7 Exhibit 1207 # 8 Exhibit 1208 # 9 Exhibit 1209 # 10 Exhibit 1210 # 11 Exhibit 1211 Part 1 # 12 Exhibit 1211 (Part 2) # 13 Exhibit 1212 # 14 Exhibit 1213 (Part 1) # 15 Exhibit 1213 (Part 2) # 16 Exhibit 1214 # 17 Exhibit 1215 # 18 Exhibit 1216 # 19 Exhibit 1217 Part 1 # 20 Exhibit 1217 Part 2 # 21 Exhibit 1218 # 22 Exhibit 1219 # 23 Exhibit 1220 # 24 Exhibit 1221 # 25 Exhibit 1222 # 26 Exhibit 1223 # 27 Exhibit 1224 # 28 Exhibit 1225) |

| | | |
|---|---|---|
| 12/14/2020 | | (Mokrzycka, Maria) (Entered: 12/14/2020) |
| 12/14/2020 | 🔵 2369<br><br>(2478 pgs; 26 docs) | Additional Attachments Re: *UCC Exhibits 1226-1250* (related document(s):2313 Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ).(Related document (s):2313 Witness List, Exhibit List) (Attachments: # 1 Exhibit 1226 # 2 Exhibit 1227 # 3 Exhibit 1228 # 4 Exhibit 1229 # 5 Exhibit 1230 # 6 Exhibit 1231 # 7 Exhibit 1232 # 8 Exhibit 1233 # 9 Exhibit 1234 # 10 Exhibit 1235 # 11 Exhibit 1236 # 12 Exhibit 1237 # 13 Exhibit 1238 # 14 Exhibit 1239 # 15 Exhibit 1240 # 16 Exhibit 1241 # 17 Exhibit 1242 # 18 Exhibit 1243 # 19 Exhibit 1244 # 20 Exhibit 1245 # 21 Exhibit 1246 # 22 Exhibit 1247 # 23 Exhibit 1248 # 24 Exhibit 1249 # 25 Exhibit 1250) (Boland, Jason) (Entered: 12/14/2020) |
| 12/14/2020 | 🔵 2370<br><br>(6402 pgs; 52 docs) | Additional Attachments Re: *UCC Exhibits 1251-1300* (related document(s):2313 Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ).(Related document (s):2313 Witness List, Exhibit List) (Attachments: # 1 Exhibit 1251 # 2 Exhibit 1252 # 3 Exhibit 1253 # 4 Exhibit 1254 # 5 Exhibit 1255 # 6 Exhibit 1256 # 7 Exhibit 1257 # 8 Exhibit 1258 # 9 Exhibit 1259 # 10 Exhibit 1260 # 11 Exhibit 1261 # 12 Exhibit 1262 # 13 Exhibit 1263 # 14 Exhibit 1264 # 15 Exhibit 1265 # 16 Exhibit 1266 # 17 Exhibit 1267 # 18 Exhibit 1268 # 19 Exhibit 1269 # 20 Exhibit 1270 # 21 Exhibit 1271 # 22 Exhibit 1272 # 23 Exhibit 1273 # 24 Exhibit 1274 # 25 Exhibit 1275 # 26 Exhibit 1276 # 27 Exhibit 1277 # 28 Exhibit 1278 # 29 Exhibit 1279 Pt. 1 # 30 Exhibit 1279 Pt. 2 # 31 Exhibit 1280 # 32 Exhibit 1281 # 33 Exhibit 1282 # 34 Exhibit 1283 # 35 Exhibit 1284 # 36 Exhibit 1285 # 37 Exhibit 1286 # 38 Exhibit 1287 # 39 Exhibit 1288 # 40 Exhibit 1289 # 41 Exhibit 1290 # 42 Exhibit 1291 # 43 Exhibit 1292 # 44 Exhibit 1293 # 45 Exhibit 1294 # 46 Exhibit 1295 # 47 Exhibit 1296 # 48 Exhibit 1297 # 49 Exhibit 1298 # 50 Exhibit 1299 # 51 Exhibit 1300) (Harrison, Julie) (Entered: 12/14/2020) |

| | | |
|---|---|---|
| 12/14/2020 | ● [2371](#)<br><br>(6 pgs) | Agenda for Hearing on 12/14/2020 (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 12/14/2020) |
| 12/14/2020 | ● [2372](#)<br><br>(8 pgs; 2 docs) | Motion to Seal *Energy Transfers Emergency Motion for Entry of an Order Authorizing Energy Transfer to File Energy Transfers Exhibit List Under Seal* Filed by Creditors ETC Katy Pipeline, Ltd., ETC Marketing, Ltd., ETC Texas Pipeline Ltd., Energy Transfer Fuel, LP, Fayetteville Express Pipeline LLC, Houston Pipe Line Company, LP, Oasis Pipeline L.P., Regency Field Services, LLC, Regency Intrastate Gas LP, Regency Marcellus Gas Gathering LLC, Regency NEPA Gas Gathering LLC, Sunoco Partners Marketing & Terminals L.P., Trade Star, LLC, Trunkline Gas Company, LLC, Whiskey Bay Gathering Company, LLC (Attachments: # [1](#) Proposed Order) (Mitchell, John) (Entered: 12/14/2020) |
| 12/14/2020 | ● [2373](#)<br><br>(505 pgs; 14 docs) | Additional Attachments Re: *UCC Exhibits 1301-1313* (related document(s):[2313](#) Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ).(Related document (s):[2313](#) Witness List, Exhibit List) (Attachments: # [1](#) Exhibit 1301 # [2](#) Exhibit 1302 # [3](#) Exhibit 1303 # [4](#) Exhibit 1304 # [5](#) Exhibit 1305 # [6](#) Exhibit 1306 # [7](#) Exhibit 1307 # [8](#) Exhibit 1308 # [9](#) Exhibit 1309 # [10](#) Exhibit 1310 # [11](#) Exhibit 1311 # [12](#) Exhibit 1312 # [13](#) Exhibit 1313) (Mokrzycka, Maria) (Entered: 12/14/2020) |
| 12/14/2020 | ● [2374](#)<br><br>(16 pgs) | Sealed Document *Energy Transfer Exhibit ET-11* (Filed By ETC Katy Pipeline, Ltd., ETC Marketing, Ltd., ETC Texas Pipeline Ltd., Energy Transfer Fuel, LP, Fayetteville Express Pipeline LLC, Houston Pipe Line Company, LP, Oasis Pipeline L.P., Regency Field Services, LLC, Regency Intrastate Gas LP, Regency Marcellus Gas Gathering LLC, Regency NEPA Gas Gathering LLC, Sunoco Partners Marketing & Terminals L.P., Trade Star, LLC, Trunkline Gas Company, LLC, Whiskey Bay Gathering Company, LLC ). (Mitchell, John) (Entered: 12/14/2020) |

| | | |
|---|---|---|
| 12/14/2020 | 2375<br><br>(3 pgs) | Withdraw Document (Filed By Texas Taxing Authorities ).(Related document(s):1901 Objection to Confirmation of the Plan) (LeDay, Tara) (Entered: 12/14/2020) |
| 12/14/2020 | 2376<br><br>(88 pgs; 2 docs) | Emergency Motion *for Entry of an Order (I) Authorizing (A) Rejection of the Crude Agreement, (B) Assumption, As Modified, of the Transporation Agreement, (C) Entry Into the Processing Agreement, and (D) Provision of the Enterprise Release, and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 12/14/2020) |
| 12/14/2020 | 2377<br><br>(12 pgs; 2 docs) | Emergency Motion *for Entry of an Order Authorizing the Debtors to File the Transporation Agreement Under Seal* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 12/14/2020) |
| 12/14/2020 | 2378<br><br>(236 pgs) | Sealed Document *Debtors' Emergency Motion for Entry of an Order (I) Authorizing (A) Rejection of the Crude Agreement, (B) Assumption, As Modified, of the Transporation Agreement, (C) Entry Into the Processing Agreement, and (D) Provision of the Enterprise Release, and (II) Granting Related Relief* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 12/14/2020) |
| 12/14/2020 | 2379<br><br>(2 pgs) | Withdraw Document (Filed By Texas Taxing Authorities ).(Related document(s):2151 Objection to Confirmation of the Plan) (Grundemeier, Tara) (Entered: 12/14/2020) |
| 12/14/2020 | 2380<br><br>(1047 pgs; 20 docs) | Additional Attachments Re: *Sealed UCC Exhibits 1-25* (related document(s):2313 Witness List, Exhibit List, 2314 Additional Attachments), Sealed Document (Filed By Official Committee Of Unsecured Creditors ).(Related document (s):2313 Witness List, Exhibit List, 2314 Additional Attachments) (Attachments: # 1 Exhibit 1 # 2 Exhibit 3 # 3 Exhibit 6 # 4 Exhibit 7 # 5 Exhibit 9 # 6 Exhibit 10 # 7 Exhibit 12 # 8 Exhibit 14 # 9 Exhibit 15 # 10 Exhibit 16 # 11 |

| | | |
|---|---|---|
| 12/14/2020 | | Exhibit 17 # 12 Exhibit 18 # 13 Exhibit 19 # 14 Exhibit 20 # 15 Exhibit 21 # 16 Exhibit 22 # 17 Exhibit 23 # 18 Exhibit 24 # 19 Exhibit 25) (Bruner, Robert) (Entered: 12/14/2020) |
| 12/14/2020 | 🔵2381<br><br>(1579 pgs; 23 docs) | Sealed Document *Sealed UCC Exhibits 26-50*, Additional Attachments Re: (related document (s):2313 Witness List, Exhibit List, 2314 Additional Attachments) (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):2313 Witness List, Exhibit List, 2314 Additional Attachments) (Attachments: # 1 Exhibit 26 # 2 Exhibit 27 # 3 Exhibit 28 # 4 Exhibit 31 # 5 Exhibit 32 # 6 Exhibit 33 # 7 Exhibit 34 # 8 Exhibit 35 # 9 Exhibit 36 # 10 Exhibit 37 # 11 Exhibit 38 # 12 Exhibit 39 # 13 Exhibit 40 # 14 Exhibit 41 # 15 Exhibit 42 # 16 Exhibit 43 # 17 Exhibit 44 # 18 Exhibit 45 # 19 Exhibit 47 # 20 Exhibit 48 # 21 Exhibit 49 # 22 Exhibit 50) (Gluck, Kristian) (Entered: 12/14/2020) |
| 12/14/2020 | 🔵2382<br><br>(977 pgs; 22 docs) | Additional Attachments Re: *Sealed UCC Exhibits 51-75* (related document(s):2313 Witness List, Exhibit List, 2315 Additional Attachments), Sealed Document (Filed By Official Committee Of Unsecured Creditors ). (Related document(s):2313 Witness List, Exhibit List, 2315 Additional Attachments) (Attachments: # 1 Exhibit 51 # 2 Exhibit 52 # 3 Exhibit 54 # 4 Exhibit 55 # 5 Exhibit 57 # 6 Exhibit 58 # 7 Exhibit 59 # 8 Exhibit 60 # 9 Exhibit 61 # 10 Exhibit 62 # 11 Exhibit 63 # 12 Exhibit 65 # 13 Exhibit 66 # 14 Exhibit 67 # 15 Exhibit 68 # 16 Exhibit 69 # 17 Exhibit 70 # 18 Exhibit 71 # 19 Exhibit 72 # 20 Exhibit 73 # 21 Exhibit 74) (Harrison, Julie) (Entered: 12/14/2020) |
| | 🔵2383<br><br>(287 pgs; 26 docs) | Sealed Document , Additional Attachments Re: *Sealed UCC Exhibits 76-100* (related document (s):2313 Witness List, Exhibit List, 2315 Additional Attachments) (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):2313 Witness List, Exhibit List, 2315 Additional Attachments) (Attachments: # 1 Exhibit 76 # 2 Exhibit 77 # 3 Exhibit 78 # 4 |

| | | |
|---|---|---|
| 12/14/2020 | | Exhibit 79 # 5 Exhibit 80 # 6 Exhibit 81 # 7 Exhibit 82 # 8 Exhibit 83 # 9 Exhibit 84 # 10 Exhibit 85 # 11 Exhibit 86 # 12 Exhibit 87 # 13 Exhibit 88 # 14 Exhibit 89 # 15 Exhibit 90 # 16 Exhibit 91 # 17 Exhibit 92 # 18 Exhibit 93 # 19 Exhibit 94 # 20 Exhibit 95 # 21 Exhibit 96 # 22 Exhibit 97 # 23 Exhibit 98 # 24 Exhibit 99 # 25 Exhibit 100) (Mokrzycka, Maria) (Entered: 12/14/2020) |
| 12/14/2020 | 2384 (737 pgs; 25 docs) | Additional Attachments Re: *Sealed UCC Exhibits 101-125* (related document(s):2313 Witness List, Exhibit List, 2316 Additional Attachments), Sealed Document (Filed By Official Committee Of Unsecured Creditors ). (Related document(s):2313 Witness List, Exhibit List, 2316 Additional Attachments) (Attachments: # 1 Exhibit 101 # 2 Exhibit 102 # 3 Exhibit 103 # 4 Exhibit 104 # 5 Exhibit 106 # 6 Exhibit 107 # 7 Exhibit 108 # 8 Exhibit 109 # 9 Exhibit 110 # 10 Exhibit 111 # 11 Exhibit 112 # 12 Exhibit 113 # 13 Exhibit 114 # 14 Exhibit 115 # 15 Exhibit 116 # 16 Exhibit 117 # 17 Exhibit 118 # 18 Exhibit 119 # 19 Exhibit 120 # 20 Exhibit 121 # 21 Exhibit 122 # 22 Exhibit 123 # 23 Exhibit 124 # 24 Exhibit 125) (Bruner, Robert) (Entered: 12/14/2020) |
| 12/14/2020 | 2385 (1391 pgs; 26 docs) | Sealed Document *Sealed UCC Exhibits 126-150*, Additional Attachments Re: (related document(s):2313 Witness List, Exhibit List, 2316 Additional Attachments) (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):2313 Witness List, Exhibit List, 2316 Additional Attachments) (Attachments: # 1 Exhibit 126 # 2 Exhibit 127 # 3 Exhibit 128 # 4 Exhibit 129 # 5 Exhibit 130 # 6 Exhibit 131 # 7 Exhibit 132 # 8 Exhibit 133 # 9 Exhibit 134 # 10 Exhibit 135 # 11 Exhibit 136 # 12 Exhibit 137 # 13 Exhibit 138 # 14 Exhibit 139 # 15 Exhibit 140 # 16 Exhibit 141 # 17 Exhibit 142 # 18 Exhibit 143 # 19 Exhibit 144 # 20 Exhibit 145 # 21 Exhibit 146 # 22 Exhibit 147 # 23 Exhibit 148 # 24 Exhibit 149 # 25 Exhibit 150) (Gluck, Kristian) (Entered: 12/14/2020) |
| | 2386 | Sealed Document *Sealed UCC Exhibits 151-175*, |

| | | |
|---|---|---|
| 12/14/2020 | (571 pgs; 25 docs) | Additional Attachments Re: (related document (s):2313 Witness List, Exhibit List, 2317 Additional Attachments) (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):2313 Witness List, Exhibit List, 2317 Additional Attachments) (Attachments: # 1 Exhibit 151 # 2 Exhibit 152 # 3 Exhibit 153 # 4 Exhibit 154 # 5 Exhibit 156 # 6 Exhibit 157 # 7 Exhibit 158 # 8 Exhibit 159 # 9 Exhibit 160 # 10 Exhibit 161 # 11 Exhibit 162 # 12 Exhibit 163 # 13 Exhibit 164 # 14 Exhibit 165 # 15 Exhibit 166 # 16 Exhibit 167 # 17 Exhibit 168 # 18 Exhibit 169 # 19 Exhibit 170 # 20 Exhibit 171 # 21 Exhibit 172 # 22 Exhibit 173 # 23 Exhibit 174 # 24 Exhibit 175) (Harrison, Julie) (Entered: 12/14/2020) |
| 12/14/2020 | ⬤2387 (807 pgs; 23 docs) | Additional Attachments Re: *Sealed UCC Exhibits 176-200* (related document(s):2313 Witness List, Exhibit List, 2317 Additional Attachments), Sealed Document (Filed By Official Committee Of Unsecured Creditors ). (Related document(s):2313 Witness List, Exhibit List, 2317 Additional Attachments) (Attachments: # 1 Exhibit 176 # 2 Exhibit 178 # 3 Exhibit 180 # 4 Exhibit 181 # 5 Exhibit 182 # 6 Exhibit 183 # 7 Exhibit 184 # 8 Exhibit 185 # 9 Exhibit 187 # 10 Exhibit 188 # 11 Exhibit 189 # 12 Exhibit 190 # 13 Exhibit 191 # 14 Exhibit 192 # 15 Exhibit 193 # 16 Exhibit 194 # 17 Exhibit 195 # 18 Exhibit 196 # 19 Exhibit 197 # 20 Exhibit 198 # 21 Exhibit 199 # 22 Exhibit 200) (Mokrzycka, Maria) (Entered: 12/14/2020) |
| 12/14/2020 | ⬤2388 (764 pgs; 26 docs) | Additional Attachments Re: *Sealed UCC Exhibits 201-225* (related document(s):2313 Witness List, Exhibit List, 2318 Additional Attachments), Sealed Document (Filed By Official Committee Of Unsecured Creditors ). (Related document(s):2313 Witness List, Exhibit List, 2318 Additional Attachments) (Attachments: # 1 Exhibit 201 # 2 Exhibit 202 # 3 Exhibit 203 # 4 Exhibit 204 # 5 Exhibit 205 # 6 Exhibit 206 # 7 Exhibit 207 # 8 Exhibit 208 # 9 Exhibit 209 # 10 Exhibit 210 # 11 Exhibit 211 # 12 Exhibit 212 # 13 Exhibit 213 # 14 Exhibit 214 # 15 Exhibit 215 # 16 Exhibit 216 # 17 |

| 12/14/2020 | | Exhibit 217 # 18 Exhibit 218 # 19 Exhibit 219 # 20 Exhibit 220 # 21 Exhibit 221 # 22 Exhibit 222 # 23 Exhibit 223 # 24 Exhibit 224 # 25 Exhibit 225) (Bruner, Robert) (Entered: 12/14/2020) |
| --- | --- | --- |
| 12/14/2020 | 2389 (1464 pgs; 27 docs) | Sealed Document *Sealed UCC Exhibits 226-250*, Additional Attachments Re: (related document (s):2313 Witness List, Exhibit List, 2318 Additional Attachments) (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):2313 Witness List, Exhibit List, 2318 Additional Attachments) (Attachments: # 1 Exhibit 226 # 2 Exhibit 227 # 3 Exhibit 228 # 4 Exhibit 229 # 5 Exhibit 230 # 6 Exhibit 231 # 7 Exhibit 232 # 8 Exhibit 233 # 9 Exhibit 234 - Part 1 # 10 Exhibit 234 - Part 2 # 11 Exhibit 235 # 12 Exhibit 236 # 13 Exhibit 237 # 14 Exhibit 238 # 15 Exhibit 239 # 16 Exhibit 240 # 17 Exhibit 241 # 18 Exhibit 242 # 19 Exhibit 243 # 20 Exhibit 244 # 21 Exhibit 245 # 22 Exhibit 246 # 23 Exhibit 247 # 24 Exhibit 248 # 25 Exhibit 249 # 26 Exhibit 250) (Gluck, Kristian) (Entered: 12/14/2020) |
| 12/14/2020 | 2390 (12 pgs) | Statement *Third Amended Verified Statement of Davis Polk & Wardwell LLP and Vinson & Elkins LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019* (Filed By Ad Hoc Group of FLLO Term Loan Lenders ).(Related document(s):1619 Statement) (Morgan, John) (Entered: 12/14/2020) |
| | 2391 (1086 pgs; 35 docs) | Additional Attachments Re: *Sealed UCC Exhibits 251-300* (related document(s):2313 Witness List, Exhibit List, 2319 Additional Attachments), Sealed Document (Filed By Official Committee Of Unsecured Creditors ). (Related document(s):2313 Witness List, Exhibit List, 2319 Additional Attachments) (Attachments: # 1 Exhibit 251 # 2 Exhibit 252 # 3 Exhibit 254 # 4 Exhibit 255 # 5 Exhibit 256 # 6 Exhibit 257 # 7 Exhibit 260 # 8 Exhibit 262 # 9 Exhibit 263 # 10 Exhibit 264 # 11 Exhibit 265 # 12 Exhibit 267 # 13 Exhibit 268 # 14 Exhibit 269 # 15 Exhibit 270 # 16 Exhibit 271 # 17 Exhibit 272 # 18 Exhibit 273 # 19 Exhibit 274 # |

| | | |
|---|---|---|
| 12/14/2020 | | 20 Exhibit 275 # 21 Exhibit 276 # 22 Exhibit 277 # 23 Exhibit 278 # 24 Exhibit 279 # 25 Exhibit 280 # 26 Exhibit 281 # 27 Exhibit 282 # 28 Exhibit 283 # 29 Exhibit 284 # 30 Exhibit 285 # 31 Exhibit 287 # 32 Exhibit 288 # 33 Exhibit 289 # 34 Exhibit 298) (Harrison, Julie) (Entered: 12/14/2020) |
| 12/14/2020 | 2392 <br><br> (1867 pgs; 44 docs) | Sealed Document , Additional Attachments Re: *Sealed UCC Exhibits 300-350* (related document (s):2313 Witness List, Exhibit List, 2320 Additional Attachments) (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):2313 Witness List, Exhibit List, 2320 Additional Attachments) (Attachments: # 1 Exhibit 301 # 2 Exhibit 303 # 3 Exhibit 304 # 4 Exhibit 305 # 5 Exhibit 306 # 6 Exhibit 307 # 7 Exhibit 308 # 8 Exhibit 309 # 9 Exhibit 310 # 10 Exhibit 312 # 11 Exhibit 313 # 12 Exhibit 314 # 13 Exhibit 315 # 14 Exhibit 316 # 15 Exhibit 317 # 16 Exhibit 318 # 17 Exhibit 319 # 18 Exhibit 320 # 19 Exhibit 321 # 20 Exhibit 323 # 21 Exhibit 324 # 22 Exhibit 325 # 23 Exhibit 326 # 24 Exhibit 327 # 25 Exhibit 328 # 26 Exhibit 329 # 27 Exhibit 330 # 28 Exhibit 331 # 29 Exhibit 332 # 30 Exhibit 333 # 31 Exhibit 334 # 32 Exhibit 335 # 33 Exhibit 336 # 34 Exhibit 337 # 35 Exhibit 338 # 36 Exhibit 339 # 37 Exhibit 340 # 38 Exhibit 341 # 39 Exhibit 342 # 40 Exhibit 343 # 41 Exhibit 344 # 42 Exhibit 345 # 43 Exhibit 348) (Mokrzycka, Maria) (Entered: 12/14/2020) |
| 12/14/2020 | 2393 <br><br> (657 pgs; 22 docs) | Additional Attachments Re: *Sealed UCC Exhibits 351-400* (related document(s):2313 Witness List, Exhibit List, 2321 Additional Attachments), Sealed Document (Filed By Official Committee Of Unsecured Creditors ). (Related document(s):2313 Witness List, Exhibit List, 2321 Additional Attachments) (Attachments: # 1 Exhibit 351 # 2 Exhibit 352 # 3 Exhibit 353 # 4 Exhibit 354 # 5 Exhibit 362 # 6 Exhibit 363 # 7 Exhibit 364 # 8 Exhibit 365 # 9 Exhibit 366 # 10 Exhibit 367 # 11 Exhibit 368 # 12 369 # 13 Exhibit 370 # 14 Exhibit 371 # 15 Exhibit 372 # 16 Exhibit 373 # 17 Exhibit 374 # 18 Exhibit 375 # 19 Exhibit 376 # 20 Exhibit |

| | | |
|---|---|---|
| 12/14/2020 | | 379 # 21 Exhibit 397) (Bruner, Robert) (Entered: 12/14/2020) |
| 12/14/2020 | 🌑 2394<br><br>(43 pgs; 3 docs) | Sealed Document *Sealed UCC Exhibits 401-450*, Additional Attachments Re: (related document(s):2313 Witness List, Exhibit List, 2323 Additional Attachments) (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):2313 Witness List, Exhibit List, 2323 Additional Attachments) (Attachments: # 1 Exhibit 405 # 2 Exhibit 420) (Gluck, Kristian) (Entered: 12/14/2020) |
| 12/14/2020 | 🌑 2395<br><br>(188 pgs; 21 docs) | Additional Attachments Re: *Sealed UCC Exhibits 451-500* (related document(s):2313 Witness List, Exhibit List, 2325 Additional Attachments), Sealed Document (Filed By Official Committee Of Unsecured Creditors ). (Related document(s):2313 Witness List, Exhibit List, 2325 Additional Attachments) (Attachments: # 1 Exhibit 451 # 2 Exhibit 452 # 3 Exhibit 453 # 4 Exhibit 454 # 5 Exhibit 455 # 6 Exhibit 456 # 7 Exhibit 457 # 8 Exhibit 458 # 9 Exhibit 460 # 10 Exhibit 461 # 11 Exhibit 462 # 12 Exhibit 463 # 13 Exhibit 464 # 14 Exhibit 465 # 15 Exhibit 466 # 16 Exhibit 467 # 17 Exhibit 468 # 18 Exhibit 469 # 19 Exhibit 470 # 20 Exhibit 471) (Harrison, Julie) (Entered: 12/14/2020) |
| 12/14/2020 | 🌑 2396<br><br>(9605 pgs; 41 docs) | Witness List, Exhibit List (Filed By Ad Hoc Group of FLLO Term Loan Lenders ). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11-52 # 12 Exhibit 53 - A # 13 Exhibit 53-B # 14 Exhibit 53-C # 15 Exhibit 53-D # 16 Exhibit 53-E # 17 Exhibit 53-F # 18 Exhibit 53-G # 19 Exhibit 53-H # 20 Exhibit 53-I # 21 Exhibit 53-J # 22 Exhibit 53-K # 23 Exhibit 53-L # 24 Exhibit 53-M # 25 Exhibit 53-N # 26 Exhibit 53-O # 27 Exhibit 53-P # 28 Exhibit 53-Q # 29 Exhibit 53-R # 30 Exhibit 53-S # 31 Exhibit 53-T # 32 Exhibit 53-U # 33 Exhibit 54 # 34 Exhibit 55 # 35 Exhibit 56 # 36 Exhibit 57 # 37 Exhibit 58 # 38 Exhibit 59 # 39 Exhibit 60 # 40 Exhibit 61) (Perrin, |

| | | |
|---|---|---|
| 12/14/2020 | | Harry) (Entered: 12/14/2020) |
| 12/14/2020 | 🌐 2397<br><br>(2 pgs) | Notice *Joinder and Agreement by the Eagle Ford Royalty Owner MDL Plaintiffs to the Stipulated Confidentiality Agreement and Protective Order*. (Related document(s):806 Stipulation) Filed by c/o Annie Catmull Royalty Owner Plaintiffs c/o (Catmull, Annie) (Entered: 12/14/2020) |
| 12/14/2020 | 🌐 2398<br><br>(907 pgs; 30 docs) | Sealed Document , Additional Attachments Re: *Sealed UCC Exhibits 501-550* (related document(s):2313 Witness List, Exhibit List, 2326 Additional Attachments) (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):2313 Witness List, Exhibit List, 2326 Additional Attachments) (Attachments: # 1 Exhibit 502 # 2 Exhibit 509 # 3 Exhibit 510 # 4 Exhibit 511 # 5 Exhibit 520 # 6 Exhibit 521 # 7 Exhibit 522 # 8 Exhibit 523 # 9 Exhibit 524 # 10 Exhibit 525 # 11 Exhibit 526 # 12 Exhibit 527 # 13 Exhibit 528 # 14 Exhibit 529 # 15 Exhibit 530 # 16 Exhibit 532 # 17 Exhibit 534 # 18 Exhibit 535 # 19 Exhibit 538 # 20 Exhibit 540 # 21 Exhibit 541 # 22 Exhibit 543 # 23 Exhibit 544 # 24 Exhibit 545 # 25 Exhibit 546 # 26 Exhibit 547 # 27 Exhibit 548 # 28 Exhibit 549 # 29 Exhibit 550) (Mokrzycka, Maria) (Entered: 12/14/2020) |
| 12/14/2020 | 🌐 2399<br><br>(200 pgs; 17 docs) | Additional Attachments Re: *Sealed UCC Exhibits 551-600* (related document(s):2313 Witness List, Exhibit List, 2327 Additional Attachments), Sealed Document (Filed By Official Committee Of Unsecured Creditors ). (Related document(s):2313 Witness List, Exhibit List, 2327 Additional Attachments) (Attachments: # 1 Exhibit 551 # 2 Exhibit 552 # 3 Exhibit 553 # 4 Exhibit 554 # 5 Exhibit 555 # 6 Exhibit 556 # 7 Exhibit 590 # 8 Exhibit 591 # 9 Exhibit 592 # 10 Exhibit 593 # 11 Exhibit 594 # 12 Exhibit 595 # 13 Exhibit 596 # 14 Exhibit 597 # 15 Exhibit 599 # 16 Exhibit 600) (Bruner, Robert) (Entered: 12/14/2020) |
| 12/14/2020 | 🌐 2400 | Sealed Document *Sealed UCC Exhibits 601-650*, Additional Attachments Re: (related document |

| | | |
|---|---|---|
| 12/14/2020 | (711 pgs; 40 docs) | (s):2313 Witness List, Exhibit List, 2328 Additional Attachments) (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):2313 Witness List, Exhibit List, 2328 Additional Attachments) (Attachments: # 1 Exhibit 601 # 2 Exhibit 603 # 3 Appendix 605 # 4 Appendix 606 # 5 Exhibit 607 # 6 Exhibit 608 # 7 Appendix 609 # 8 Exhibit 610 # 9 Exhibit 611 # 10 Exhibit 612 # 11 Exhibit 613 # 12 Exhibit 614 # 13 Exhibit 615 # 14 Exhibit 616 # 15 Exhibit 617 # 16 Exhibit 618 # 17 Exhibit 619 # 18 Exhibit 620 # 19 Exhibit 622 # 20 Exhibit 623 # 21 Exhibit 626 # 22 Exhibit 632 # 23 Exhibit 634 # 24 Exhibit 635 # 25 Exhibit 636 # 26 Exhibit 637 # 27 Exhibit 638 # 28 Exhibit 639 # 29 Exhibit 640 # 30 Exhibit 641 # 31 Exhibit 642 # 32 Exhibit 643 # 33 Exhibit 644 # 34 Exhibit 645 # 35 Exhibit 646 # 36 Exhibit 647 # 37 Exhibit 648 # 38 Exhibit 649 # 39 Exhibit 650) (Gluck, Kristian) (Entered: 12/14/2020) |
| 12/14/2020 | 2401<br><br>(641 pgs; 23 docs) | Additional Attachments Re: *Sealed UCC Exhibits 651-700* (related document(s):2313 Witness List, Exhibit List, 2329 Additional Attachments), Sealed Document (Filed By Official Committee Of Unsecured Creditors ). (Related document(s):2313 Witness List, Exhibit List, 2329 Additional Attachments) (Attachments: # 1 Exhibit 651 # 2 Exhibit 652 # 3 Exhibit 653 # 4 Exhibit 654 # 5 Exhibit 660 # 6 Exhibit 661 # 7 Exhibit 662 # 8 Exhibit 663 # 9 Exhibit 664 # 10 Exhibit 665 # 11 Exhibit 666 # 12 Exhibit 667 # 13 Exhibit 668 # 14 Exhibit 669 # 15 Exhibit 670 # 16 Exhibit 671 # 17 Exhibit 673 # 18 Exhibit 674 # 19 Exhibit 675 # 20 Exhibit 677 # 21 Exhibit 678 # 22 Exhibit 700) (Harrison, Julie) (Entered: 12/14/2020) |
| | 2402<br><br>(284 pgs; 25 docs) | Sealed Document , Additional Attachments Re: *Sealed UCC Exhibits 701- 750* (related document(s):2313 Witness List, Exhibit List, 2331 Additional Attachments) (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):2313 Witness List, Exhibit List, 2331 Additional Attachments) (Attachments: # 1 Exhibit 703 # 2 Exhibit 704 # 3 Exhibit 705 # 4 |

| | | |
|---|---|---|
| 12/14/2020 | | Exhibit 706 # 5 Exhibit 707 # 6 Exhibit 709 # 7 Exhibit 718 # 8 Exhibit 719 # 9 Exhibit 720 # 10 Exhibit 721 # 11 Exhibit 722 # 12 Exhibit 723 # 13 Exhibit 727 # 14 Exhibit 728 # 15 Exhibit 729 # 16 Exhibit 730 # 17 Exhibit 731 # 18 Exhibit 733 # 19 Exhibit 734 # 20 Exhibit 736 # 21 Exhibit 742 # 22 Exhibit 744 # 23 Exhibit 748 # 24 Exhibit 750) (Mokrzycka, Maria) (Entered: 12/14/2020) |
| 12/14/2020 | 🌑 2403<br><br>(80 pgs; 9 docs) | Witness List, Exhibit List (Filed By ARI Fleet LT, Automotive Rentals, Inc. ).(Related document(s):1644 Amended Chapter 11 Plan) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8) (Aguilar, Richard) (Entered: 12/14/2020) |
| 12/14/2020 | 🌑 2404<br><br>(2 pgs) | Withdraw Document (Filed By Dimmit County, et al ).(Related document(s):1996 Objection to Confirmation of the Plan) (Sonik, Owen) (Entered: 12/14/2020) |
| 12/14/2020 | 🌑 2405<br><br>(106 pgs) | Proposed Order RE: *Order Confirming Third Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates* (Filed By Chesapeake Energy Corporation ).(Related document(s):2336 Amended Chapter 11 Plan) (Cavenaugh, Matthew) (Entered: 12/14/2020) |
| | 🌑 2406<br><br>(266 pgs; 25 docs) | Additional Attachments Re: *Sealed UCC Exhibits 751-800* (related document(s):2313 Witness List, Exhibit List, 2333 Additional Attachments), Sealed Document (Filed By Official Committee Of Unsecured Creditors ). (Related document(s):2313 Witness List, Exhibit List, 2333 Additional Attachments) (Attachments: # 1 Exhibit 751 # 2 Exhibit 756 # 3 Exhibit 762 # 4 Exhibit 763 # 5 Exhibit 772 # 6 Exhibit 773 # 7 Exhibit 775 # 8 Exhibit 776 # 9 Exhibit 780 # 10 Exhibit 781 # 11 Exhibit 782 # 12 Exhibit 785 # 13 Exhibit 786 # 14 Exhibit 787 # 15 Exhibit 789 # 16 Exhibit 792 # 17 Exhibit 793 # 18 Exhibit 794 # 19 Exhibit 795 # 20 Exhibit 796 # 21 Exhibit 797 # 22 Exhibit 798 # 23 Exhibit 799 # 24 Exhibit 800) (Bruner, |

| 12/14/2020 | | Robert) (Entered: 12/14/2020) |
|---|---|---|
| 12/14/2020 | 🌐 2407<br><br>(408 pgs; 35 docs) | Sealed Document *Sealed UCC Exhibits 801-850*, Additional Attachments Re: (related document (s):2313 Witness List, Exhibit List, 2334 Additional Attachments) (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):2313 Witness List, Exhibit List, 2334 Additional Attachments) (Attachments: # 1 Exhibit 801 # 2 Exhibit 802 # 3 Exhibit 803 # 4 Exhibit 804 # 5 Exhibit 805 # 6 Exhibit 806 # 7 Exhibit 807 # 8 Exhibit 808 # 9 Exhibit 809 # 10 Exhibit 810 # 11 Exhibit 811 # 12 Exhibit 812 # 13 Exhibit 813 # 14 Exhibit 814 # 15 Exhibit 815 # 16 Exhibit 816 # 17 Exhibit 817 # 18 Exhibit 818 # 19 Exhibit 819 # 20 Exhibit 820 # 21 Exhibit 821 # 22 Exhibit 822 # 23 Exhibit 823 # 24 Exhibit 824 # 25 Exhibit 825 # 26 Exhibit 826 # 27 Exhibit 827 # 28 Exhibit 828 # 29 Exhibit 829 # 30 Exhibit 830 # 31 Exhibit 844 # 32 Exhibit 845 # 33 Exhibit 849 # 34 Exhibit 850) (Gluck, Kristian) (Entered: 12/14/2020) |
| 12/14/2020 | 🌐 2408<br><br>(45 pgs; 3 docs) | Additional Attachments Re: *SEALED UCC Exhibits 851-900* (related document(s):2313 Witness List, Exhibit List, 2335 Additional Attachments), Sealed Document (Filed By Official Committee Of Unsecured Creditors ). (Related document(s):2313 Witness List, Exhibit List, 2335 Additional Attachments) (Attachments: # 1 Exhibit 856 # 2 Exhibit 857) (Harrison, Julie) (Entered: 12/14/2020) |
| 12/14/2020 | 🌐 2409<br><br>(73 pgs; 45 docs) | Additional Attachments Re: *Sealed UCC Exhibits 901-950* (related document(s):2313 Witness List, Exhibit List, 2337 Additional Attachments), Sealed Document (Filed By Official Committee Of Unsecured Creditors ). (Related document(s):2313 Witness List, Exhibit List, 2337 Additional Attachments) (Attachments: # 1 Exhibit 907 # 2 Exhibit 908 # 3 Exhibit 909 # 4 Exhibit 910 # 5 Exhibit 911 # 6 Exhibit 912 # 7 Exhibit 913 # 8 Exhibit 914 # 9 Exhibit 915 # 10 Exhibit 916 # 11 Exhibit 917 # 12 Exhibit 918 # 13 Exhibit 919 # 14 Exhibit 920 # 15 Exhibit 921 # 16 Exhibit 922 # 17 |

| | | |
|---|---|---|
| 12/14/2020 | | Exhibit 923 # 18 Exhibit 924 # 19 Exhibit 925 # 20 Exhibit 926 # 21 Exhibit 927 # 22 Exhibit 928 # 23 Exhibit 929 # 24 Exhibit 930 # 25 Exhibit 931 # 26 Exhibit 932 # 27 Exhibit 933 # 28 Exhibit 934 # 29 Exhibit 935 # 30 Exhibit 936 # 31 Exhibit 937 # 32 Exhibit 938 # 33 Exhibit 939 # 34 Exhibit 940 # 35 Exhibit 941 # 36 Exhibit 942 # 37 Exhibit 943 # 38 Exhibit 944 # 39 Exhibit 945 # 40 Exhibit 946 # 41 Exhibit 947 # 42 Exhibit 948 # 43 Exhibit 949 # 44 Exhibit 950) (Boland, Jason) (Entered: 12/14/2020) |
| 12/14/2020 | 2410<br><br>(122 pgs; 37 docs) | Sealed Document , Additional Attachments Re: *Sealed UCC Exhibits 951-1000* (related document(s):2313 Witness List, Exhibit List, 2344 Additional Attachments) (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):2313 Witness List, Exhibit List, 2344 Additional Attachments) (Attachments: # 1 Exhibit 951 # 2 Exhibit 952 # 3 Exhibit 953 # 4 Exhibit 954 # 5 Exhibit 955 # 6 Exhibit 956 # 7 Exhibit 957 # 8 Exhibit 958 # 9 Exhibit 959 # 10 Exhibit 960 # 11 Exhibit 961 # 12 Exhibit 962 # 13 Exhibit 963 # 14 Exhibit 964 # 15 Exhibit 965 # 16 Exhibit 966 # 17 Exhibit 967 # 18 Exhibit 968 # 19 Exhibit 969 # 20 Exhibit 970 # 21 Exhibit 971 # 22 Exhibit 972 # 23 Exhibit 973 # 24 Exhibit 974 # 25 Exhibit 975 # 26 Exhibit 976 # 27 Exhibit 977 # 28 Exhibit 978 # 29 Exhibit 979 # 30 Exhibit 980 # 31 Exhibit 984 # 32 Exhibit 985 # 33 Exhibit 986 # 34 Exhibit 992 # 35 Exhibit 994 # 36 Exhibit 995) (Mokrzycka, Maria) (Entered: 12/14/2020) |
| 12/14/2020 | 2411<br><br>(16 pgs) | Statement *of MUFG Union Bank, N.A. in Support of Confirmation and Joinder to the Debtors' Memorandum of Law in Support of Confirmation* (Filed By MUFG Union Bank, N.A. ).(Related document(s):2354 Brief) (McFaul, Duston) (Entered: 12/14/2020) |
| | 2412<br><br>(747 pgs; 33 docs) | Additional Attachments Re: *Sealed UCC Exhibits 1001-1050* (related document(s):2313 Witness List, Exhibit List, 2346 Additional Attachments), Sealed Document (Filed By Official Committee Of Unsecured Creditors ). |

| | | |
|---|---|---|
| 12/14/2020 | | (Related document(s):2313 Witness List, Exhibit List, 2346 Additional Attachments) (Attachments: # 1 Exhibit 1001 # 2 Exhibit 1005 # 3 Exhibit 1006 # 4 Exhibit 1013 # 5 Exhibit 1014 # 6 Exhibit 1015 # 7 Exhibit 1016 # 8 Exhibit 1017 # 9 Exhibit 1021 # 10 Exhibit 1022 # 11 Exhibit 1023 # 12 Exhibit 1025 Part 1 # 13 Exhibit 1025 Part 2 # 14 Exhibit 1025 Part 3 # 15 Exhibit 1026 # 16 Exhibit 1027 # 17 Exhibit 1028 # 18 Exhibit 1029 # 19 Exhibit 1030 # 20 Exhibit 1031 # 21 Exhibit 1032 # 22 Exhibit 1033 # 23 Exhibit 1034 # 24 Exhibit 1035 # 25 Exhibit 1036 # 26 Exhibit 1037 # 27 Exhibit 1038 # 28 Exhibit 1040 # 29 Exhibit 1041 # 30 Exhibit 1042 # 31 Exhibit 1043 # 32 Exhibit 1050) (Bruner, Robert) (Entered: 12/14/2020) |
| 12/14/2020 | ⬤2413<br><br>(4 pgs) | Objection *of Core Laboratories, LP, to the Third Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates [Docket No. 2336]*. Filed by Core Laboratories, LP (Burrer, Karl) (Entered: 12/14/2020) |
| | ⬤2414<br><br>(730 pgs; 50 docs) | Sealed Document *Sealed UCC Exhibits 1051-1100*, Additional Attachments Re: (related document(s):2313 Witness List, Exhibit List, 2347 Additional Attachments) (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):2313 Witness List, Exhibit List, 2347 Additional Attachments) (Attachments: # 1 Exhibit 1051 # 2 Exhibit 1052 # 3 Exhibit 1053 # 4 Exhibit 1054 # 5 Exhibit 1055 # 6 Exhibit 1056 # 7 Exhibit 1057 # 8 Exhibit 1058 # 9 Exhibit 1059 # 10 Exhibit 1060 # 11 Exhibit 1061 # 12 Exhibit 1062 # 13 Exhibit 1063 # 14 Exhibit 1064 # 15 Exhibit 1065 # 16 Exhibit 1066 # 17 Exhibit 1067 # 18 Exhibit 1068 # 19 Exhibit 1069 # 20 Exhibit 1070 # 21 Exhibit 1071 # 22 Exhibit 1072 # 23 Exhibit 1073 # 24 Exhibit 1074 # 25 Exhibit 1075 # 26 Exhibit 1076 # 27 Exhibit 1077 # 28 Exhibit 1078 # 29 Exhibit 1079 # 30 Exhibit 1080 # 31 Exhibit 1081 # 32 Exhibit 1082 # 33 Exhibit 1083 # 34 Exhibit 1084 # 35 Exhibit 1085 # 36 Exhibit 1086 # 37 Exhibit 1087 # 38 Exhibit 1088 # 39 Exhibit 1089 # 40 Exhibit 1090 # 41 Exhibit |

| | | |
|---|---|---|
| 12/14/2020 | | 1091 # 42 Exhibit 1092 # 43 Exhibit 1093 # 44 Exhibit 1094 # 45 Exhibit 1095 # 46 Exhibit 1096 # 47 Exhibit 1097 # 48 Exhibit 1099 # 49 Exhibit 1100) (Gluck, Kristian) (Entered: 12/14/2020) |
| 12/14/2020 | ● 2415 (57 pgs; 4 docs) | Additional Attachments Re: *Sealed UCC Exhibits 1101-1150* (related document:2313 Witness List, Exhibit List, 2348 Additional Attachments), Sealed Document (Filed By Official Committee Of Unsecured Creditors ). (Related document(s):2313 Witness List, Exhibit List, 2348 Additional Attachments) (Attachments: # 1 Exhibit 1117 # 2 Exhibit 1122 # 3 Exhibit 1127) (Harrison, Julie) (Entered: 12/14/2020) |
| 12/14/2020 | ● 2416 (384 pgs; 9 docs) | Additional Attachments Re: *Sealed UCC Exhibits 1251-1300* (related document(s):2313 Witness List, Exhibit List, 2370 Additional Attachments), Sealed Document (Filed By Official Committee Of Unsecured Creditors ). (Related document(s):2313 Witness List, Exhibit List, 2370 Additional Attachments) (Attachments: # 1 Exhibit 1284 # 2 Exhibit 1285 # 3 Exhibit 1288 # 4 Exhibit 1291 # 5 Exhibit 1292 # 6 Exhibit 1295 # 7 Exhibit 1296 # 8 Exhibit 1297) (Boland, Jason) (Entered: 12/14/2020) |
| 12/14/2020 | ● 2417 (4 pgs) | Statement *[Verified] Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure Regarding Representation of Multiple Creditors* (Filed By C.C. Forbes, LLC, Commonwealth of Pennsylvania, Oklahoma Office of State Treasurer ). (Butler, Lynn) (Entered: 12/14/2020) |
| 12/14/2020 | ● 2418 (2 pgs) | Withdraw Document (Filed By Archrock Partners Operating, LLC ).(Related document (s):2097 Response/Objection) (Maraist, Kevin) (Entered: 12/14/2020) |
| | ● 2419 (1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 12/14/2020 1:30:31 PM ]. File Size [ 48790 KB ]. Run Time [ 01:41:39 ]. (In ref to |

| Date | Doc | Description |
|---|---|---|
| 12/14/2020 | | Pre-Trial Conference held December 14, 2020 and to doc nos. 1293, 1175, 1248, 1558, 1606, and 2219.). (admin). (Entered: 12/14/2020) |
| 12/14/2020 | 2420 (4 pgs; 2 docs) | Letter from Gaynell Spigner (Attachments: # 1 Exhibit) (mmap) (Entered: 12/14/2020) |
| 12/14/2020 | 2421 (6 pgs) | Order Authorizing Retention of BBG, INC., as Real Estate Appraiser/Valuation Expert Effective as of November 2, 2020 (Related Doc # 1833) Signed on 12/14/2020. (VrianaPortillo) (Entered: 12/14/2020) |
| 12/14/2020 | 2422 (12 pgs) | Order (I) Authorizing the Assumption and Assignment of Certain Bureau of Land Management and Bureau of Indian Affairs Oil and Gas Leases and (II) Granting Related Relief (Related Doc # 1814) Signed on 12/14/2020. (VrianaPortillo) (Entered: 12/14/2020) |
| 12/14/2020 | 2423 (4 pgs) | Order (I) Authorizing the Rejection of the Ryan Tax Contracts Effective as of November 18, 2020 and (II) Granting Related Relief (Related Doc # 1857) Signed on 12/14/2020. (VrianaPortillo) (Entered: 12/14/2020) |
| 12/14/2020 | 2424 (2 pgs) | Agreed Order (I) Authorizing the Rejection of the Tetco Agreement Effective as of November 1, 2021 and (II) Granting Related Relief Signed on 12/14/2020 (Related document(s):1853 Generic Motion) (VrianaPortillo) (Entered: 12/14/2020) |
| 12/14/2020 | 2425 (1 pg) | AO 435 T ANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew Cavenaugh. This is to order a transcript of 12/14/2020 before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) Electronically forwarded to Judicial Transcribers of Texas on December 14, 2020. Estimated completion date: December 15, 2020. Modified on 12/14/2020 (ClaudiaGutierrez). (Entered: 12/14/2020) |
| | | |

| | | |
|---|---|---|
| 12/14/2020 | 2426<br><br>(6 pgs) | Joint Stipulation and Agreed Order by and Among Debtors and Catherine Ramirez Granting Relief from the Automatic Stay Signed on 12/14/2020 (Related document(s):1606 Motion for Relief From Stay, 2281 Stipulation) (VrianaPortillo) (Entered: 12/14/2020) |
| 12/14/2020 | 2427<br><br>(5 pgs) | Agreed Order Granting (I) Relief from the Automatic Stay, Effective as of January 4, 2021, and (II) Related Relief Signed on 12/14/2020 (Related document(s):2219 Motion for Relief From Stay) (VrianaPortillo) (Entered: 12/14/2020) |
| 12/14/2020 | 2428<br><br>(3 pgs) | Order Authorizing the Debtors to File Certain Documents Identified on the Debtors' Exhibit List Under Seal Signed on 12/14/2020 (Related document(s):2291 Emergency Motion) (VrianaPortillo) (Entered: 12/14/2020) |
| 12/14/2020 | 2429<br><br>(4 pgs) | Order Under 11 U.S.C. § 327(e) Authorizing the Retention and Employment of Shearman & Sterling LLP as Special Counsel for the Debtors Effective as of October 11, 2020 (Related Doc # 1768) Signed on 12/14/2020. (VrianaPortillo) (Entered: 12/14/2020) |
| 12/14/2020 | 2430<br><br>(23 pgs; 3 docs) | Adversary case 20-03499. Nature of Suit: (91 (Declaratory judgment)) Complaint by Texas Comptroller of Public Accounts against Chesapeake Energy Corporation. Fee Amount $350 (Attachments: # 1 AP Cover Sheet # 2 Exhibit A) (Binford, Jason) (Entered: 12/14/2020) |
| 12/14/2020 | 2431<br><br>(6 pgs) | Agreed Order Granting (I) Relief from the Automatic Stay, Effective as of January 4, 2021, and (II) Related Relief Signed on 12/14/2020 (Related document(s):1558 Motion for Relief From Stay) (VrianaPortillo) (Entered: 12/14/2020) |
| | 2432<br><br>(2 pgs) | Objection *ETC Texas Pipeline, Ltd.'s Partial Joinder in Objection of ETC Tiger Pipeline, LLC to Confirmation of the Second Amended Joint Chapter 11 Plan of Reorganization*. Filed by ETC Texas Pipeline Ltd. (Crocker, Michaela) |

| 12/14/2020 | | (Entered: 12/14/2020) |
|---|---|---|
| 12/14/2020 | 2433<br><br>(6 pgs) | Joint Stipulation and Agreed Order by and Among Debtors and Catherine Ramirez Granting Relief from the Automatic Stay Signed on 12/14/2020 (Related document(s):1606 Motion for Relief From Stay) (VrianaPortillo) (Entered: 12/14/2020) |
| 12/14/2020 | 2434<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Marty L. Brimmage, Jr.. This is to order a transcript of the December 14, 2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts ). (Brimmage, Marty) Copy Request Electronically forwarded to Judicial Transcribers of Texas on December 14, 2020. Estimated completion date: December 15, 2020. Modified on 12/14/2020 (ClaudiaGutierrez). (Entered: 12/14/2020) |
| 12/14/2020 | 2435<br><br>(5 pgs) | Agreed Order Granting (I) Relief from the Automatic Stay, Effective as of January 4, 2021, and (II) Related Relief Signed on 12/14/2020 (Related document(s):2219 Motion for Relief From Stay) (VrianaPortillo) (Entered: 12/14/2020) |
| 12/14/2020 | 2436<br><br>(3 pgs) | Order Authorizing the Debtors to File the Transportation Agreement Under Seal (Related Doc # 2377) Signed on 12/14/2020. (VrianaPortillo) (Entered: 12/14/2020) |
| | 2437<br><br>(6 pgs) | Courtroom Minutes. Time Hearing Held: 1:30 PM. Appearances: SEE ATTACHED. (Related document(s):1175 Motion to Reconsider, 1248 Motion for Relief From Stay, 1293 Motion for Relief From Stay) The Court signed the proposed agreed orders submitted at docket nos. 2215, 2281, 2284, and 2222. For the reasons stated on the record, the Court vacated the order submitted at docket no. 1091 in ref to the Delasandro Reconsider Motion 1175. **The Delasandro Stay Motion filed at docket no. 1293 has been set for a hearing on 02/02/2021** |

| 12/14/2020 | | at 1:00 PM by telephone and video conference. The hearing on the Motion for Relief filed at docket no. **1248** has been continued to 01/05/2021 at 1:00 PM by telephone and video conference. (VrianaPortillo) (Entered: 12/14/2020) |
|---|---|---|
| 12/14/2020 | 2438 <br><br> (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Julie Harrison. This is to order a transcript of the December 14, 2020 hearing before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) Copy request electronically forwarded to Judicial Transcribers of Texas on December 15, 2020. Estimated completion date: December 16, 2020. Modified on 12/15/2020 (ClaudiaGutierrez). (Entered: 12/14/2020) |
| 12/14/2020 | 2439 <br><br> (7 pgs; 2 docs) | Certificate of No Objection *to First Interim Application of Brown Rudnick LLP, as Co-Counsel to the Official Committee of Unsecured Creditors, for the Period From July 13, 2020 Through and Including September 30, 2020* (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):1877 Application for Compensation) (Attachments: # 1 Proposed Order) (Boland, Jason) (Entered: 12/14/2020) |
| 12/14/2020 | 2440 <br><br> (7 pgs; 2 docs) | Certificate of No Objection *to First Interim Fee Application of AlixPartners, LLP, Financial Advisor to the Official Committee of Unsecured Creditors for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses for the Period July 14, 2020 through September 30, 2020* (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):1878 Application for Compensation) (Attachments: # 1 Proposed Order) (Boland, Jason) (Entered: 12/14/2020) |
| | 2441 <br><br> (7 pgs; 2 docs) | Certificate of No Objection *to First Interim Fee Application of Opportune LLP for Allowance of Compensation and Reimbursement of Expenses as Special Valuation and Industry Advisor to the* |

| | | |
|---|---|---|
| 12/14/2020 | | *Official Committee of Unsecured Creditors for the Period September 1, 2020 through September 30, 2020.* (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):1880 Application for Compensation) (Attachments: # 1 Proposed Order) (Boland, Jason) (Entered: 12/14/2020) |
| 12/14/2020 | 2442<br><br>(2514 pgs; 24 docs) | Exhibit List (Filed By Chesapeake Energy Corporation ).(Related document(s):2290 Witness List, Exhibit List) (Attachments: # 1 Exhibit 410 # 2 Exhibit 411 # 3 Exhibit 412 # 4 Exhibit 413 # 5 Exhibit 414 # 6 Exhibit 415 # 7 Exhibit 416 # 8 Exhibit 417 # 9 Exhibit 418 # 10 Exhibit 419 # 11 Exhibit 420 # 12 Complaint 421 # 13 Exhibit 422 # 14 Exhibit 423 # 15 Exhibit 424 # 16 Exhibit 425 # 17 Exhibit 426 # 18 Exhibit 427 # 19 Exhibit 428 # 20 Exhibit 429 # 21 Exhibit 430 # 22 Exhibit 431 # 23 Exhibit 432) (Cavenaugh, Matthew) (Entered: 12/14/2020) |
| 12/14/2020 | 2443<br><br>(24 pgs) | Affidavit Re: *First Interim Application of Forshey & Prostok, LLP, as Attorneys for the Official Committee of Royalty Owners* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1921 Application for Compensation) (Garabato, Sid) (Entered: 12/14/2020) |
| 12/14/2020 | 2444<br><br>(7 pgs) | Affidavit Re: *Notice of Corrected Exhibit C to the Plan Supplement* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1931 Notice) (Garabato, Sid) (Entered: 12/14/2020) |
| 12/14/2020 | 2445<br><br>(3 pgs) | Affidavit Re: *Affidavit of Publication of The New York Times* (Filed By Chesapeake Energy Corporation ).(Related document(s):1892 Generic Motion) (Cavenaugh, Matthew) (Entered: 12/14/2020) |
| 12/14/2020 | 2446<br><br>(4 pgs) | Affidavit Re: *Affidavit of Publication of The Times* (Filed By Chesapeake Energy Corporation ).(Related document(s):1892 Generic Motion) (Cavenaugh, Matthew) (Entered: 12/14/2020) |

| | | |
|---|---|---|
| 12/14/2020 | 2447<br><br>(4 pgs) | Notice *of Additional Ordinary Course Professionals Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business.* (Related document(s):655 Generic Order, 807 Notice, 1100 Notice, 1162 Notice, 1353 Notice) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 12/14/2020) |
| 12/14/2020 | 2448<br><br>(8 pgs) | Affidavit Re: *Business Record Certification - J. David Hershberger* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 12/14/2020) |
| 12/14/2020 | 2449<br><br>(2 pgs) | Affidavit Re: *Business Record Certification - Bradley D. Sylvester* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 12/14/2020) |
| 12/14/2020 | 2450<br><br>(10 pgs; 2 docs) | Exhibit List (Filed By Chesapeake Energy Corporation ).(Related document(s):2290 Witness List, Exhibit List) (Attachments: # 1 Exhibit 434) (Cavenaugh, Matthew) (Entered: 12/14/2020) |
| 12/14/2020 | 2451<br><br>(3 pgs) | Stipulation By Chesapeake Energy Corporation and Official Committee of Unsecured Creditors. Does this document include an agreed order or otherwise request that the judge sign a document? No. (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 12/14/2020) |
| 12/14/2020 | 2452<br><br>(27 pgs) | Exhibit List, Witness List (Filed By Chesapeake Energy Corporation ).(Related document(s):2290 Witness List, Exhibit List) (Cavenaugh, Matthew) (Entered: 12/14/2020) |
| | 2453<br><br>(19 pgs) | Declaration re: *Supplemental Voting Declaration of Jane Sullivan of Epiq Corporate Restructuring, LLC Regarding Voting and Tabulation of Certain Ballots Cast on the Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, |

| | | |
|---|---|---|
| 12/14/2020 | | Matthew) (Entered: 12/14/2020) |
| 12/15/2020 | 🔵 2454<br><br>(4 pgs) | Motion *to Enter Dec 15, 2020 hearing* Filed by Interested Party Gaynell Spigner (mmap) (Entered: 12/15/2020) |
| 12/15/2020 | 🔵 2455<br><br>(2 pgs) | Withdraw Document (Filed By Justin Cobb, Kristine Cobb, Linda Milanovich ).(Related document(s):2024 Objection to Confirmation of the Plan) (Rukavina, Davor) (Entered: 12/15/2020) |
| 12/15/2020 | 🔵 2456<br><br>(9 pgs; 3 docs) | Additional Attachments Re: *GLAS USA LLC Exhibit List (Exhibits 38 and 41)* (related document(s):2332 Exhibit List) (Filed By Glas USA LLC ).(Related document(s):2332 Exhibit List) (Attachments: # 1 Exhibit 38 - Closing Certificate dated December 19, 2019 # 2 Exhibit 41 - Collateral Trust Joinder dated December 23, 2019) (Warner, Michael) (Entered: 12/15/2020) |
| 12/15/2020 | 🔵 2457<br><br>(2762 pgs) | Notice *of Second Amended Plan Supplement for the Third Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates*. Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 12/15/2020) |
| 12/15/2020 | 🔵 2458<br><br>(33 pgs; 2 docs) | Exhibit List, Witness List (Filed By Vector Seismic Data Processing Inc., Westerngeco LLC ).(Related document(s):1599 Amended Chapter 11 Plan, 1633 Order Approving Disclosure Statement, 2106 Objection, 2233 Exhibit List, Witness List) (Attachments: # 1 Exhibit 15) (Braun, Andrew) (Entered: 12/15/2020) |
| 12/15/2020 | 🔵 2459<br><br>(116 pgs; 9 docs) | Additional Attachments Re: *Sealed UCC Exhibits 1024, 1039, 1044, 1045, 1046, 1047, 1048, 1049* (related document(s):2313 Witness List, Exhibit List, 2346 Additional Attachments, 2412 Additional Attachments, Sealed Document), Sealed Document (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):2313 Witness List, Exhibit List, 2346 Additional Attachments, 2412 Additional Attachments, Sealed Document) (Attachments: # |

| | | |
|---|---|---|
| 12/15/2020 | | [1](#) Exhibit 1024 # [2](#) Exhibit 1039 # [3](#) Exhibit 1044 # [4](#) Exhibit 1045 # [5](#) Exhibit 1046 # [6](#) Exhibit 1047 # [7](#) Exhibit 1048 # [8](#) Exhibit 1049) (Harrison, Julie) (Entered: 12/15/2020) |
| 12/15/2020 | 2460<br><br>(2 pgs) | Letter from Jason Dean (JeannieAndresen) (Entered: 12/15/2020) |
| 12/15/2020 | 2461<br><br>(422 pgs; 2 docs) | Proposed Order RE: / *Proposed Order (I) Authorizing (A) the Assumption of Certain Williams Agreements, (B) Entry into the Firm Sale Agreement, (C) the Private Sale of Certain Real Estate Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, and (D) the Resolution of the Williams Indemnification Claims and (II) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):1892 Generic Motion) (Attachments: # [1](#) Redline) (Schwarzman, Alexandra) (Entered: 12/15/2020) |
| 12/15/2020 | 2462<br><br>(36 pgs) | Sealed Document *UCC Exhibit 1314* (Filed By Official Committee Of Unsecured Creditors ). (Gluck, Kristian) (Entered: 12/15/2020) |
| 12/15/2020 | 2463<br><br>(6 pgs; 2 docs) | Additional Attachments Re: *UCC Exhibits 1315 and 1316* (related document(s):2313 Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):2313 Witness List, Exhibit List) (Attachments: # [1](#) Exhibit 1316) (Harrison, Julie) (Entered: 12/15/2020) |
| 12/15/2020 | 2464<br><br>(79 pgs) | Witness List, Exhibit List (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):2313 Witness List, Exhibit List) (Harrison, Julie) (Entered: 12/15/2020) |
| 12/15/2020 | 2465<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew Cavenaugh. This is to order a transcript of 12/15/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) Electronically forwarded to Access Transcripts, LLC on December 16, 2020. Estimated |

| | | |
|---|---|---|
| 12/15/2020 | | completion date: December 17, 2020. Modified on 12/16/2020 (ClaudiaGutierrez). (Entered: 12/15/2020) |
| 12/15/2020 | 🔵2466<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Jason Boland. This is to order a transcript of the December 15, 2020 hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Official Committee Of Unsecured Creditors ). (Boland, Jason) Copy request electronically forwarded to Access Transcripts, LLC on December 16, 2020. Estimated completion date: December 17, 2020. Modified on 12/16/2020 (ClaudiaGutierrez). (Entered: 12/15/2020) |
| 12/15/2020 | 🔵2467<br><br>(2 pgs) | Withdrawal of Claim: *13355 filed by Epiq Corporate Restructuring, LLC on behalf of Tarrant County* (Garabato, Sid) (Entered: 12/15/2020) |
| 12/15/2020 | 🔵2468<br><br>(8 pgs) | Withdraw Document (Filed By Texas Comptroller of Public Accounts, Revenue Accounting Division ).(Related document (s):2125 Objection to Confirmation of the Plan) (Stern, John) (Entered: 12/15/2020) |
| 12/15/2020 | 🔵2469<br><br>(80 pgs) | Transcript RE: Pretrial and Motion Hearing Via Zoom held on December 14, 2020 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 03/15/2021. (mhen) (Entered: 12/15/2020) |
| | 🔵2470<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Marty L. Brimmage, Jr.. This is to order a transcript of the December 15, 2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts ). (Brimmage, Marty) Copy request electronically forwarded to Access Transcripts, LLC on December 16, 2020. Estimated completion date: December 17, 2020. Modified on 12/16/2020 (ClaudiaGutierrez). (Entered: |

| 12/15/2020 | | 12/15/2020 |
|---|---|---|
| 12/15/2020 | 🔵 2471<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Justin Rawlins. This is to order a transcript of Confirmation Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By MUFG Union Bank, N.A. ). (Rawlins, Justin) Copy request electronically forwarded to Access Transcripts, LLC on December 16, 2020. Estimated completion date: December 17, 2020. Modified on 12/16/2020 (ClaudiaGutierrez). (Entered: 12/15/2020) |
| 12/15/2020 | 🔵 2472<br><br>(36 pgs) | Affidavit Re: *Affidavit of Service by Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1960 Objection to Claim, 1961 Notice, 1964 Generic Motion) (Garabato, Sid) (Entered: 12/15/2020) |
| 12/15/2020 | 🔵 2473<br><br>(22 pgs) | Affidavit Re: *Affidavit of Service by Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):2003 Notice) (Garabato, Sid) (Entered: 12/15/2020) |
| 12/15/2020 | 🔵 2474<br><br>(21 pgs) | Affidavit Re: *Affidavit of Service by Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1971 Objection, 1972 Objection) (Garabato, Sid) (Entered: 12/15/2020) |
| 12/15/2020 | 🔵 2475<br><br>(17 pgs; 3 docs) | Objection to Confirmation of Plan Filed by State of Louisiana, Department of Natural Resources, Office of Mineral Resources. (Related document(s):2336 Amended Chapter 11 Plan) (Attachments: # 1 Exhibit # 2 Exhibit) (Seidemann, Ryan) (Entered: 12/15/2020) |
| | 🔵 2476<br><br>(4 pgs) | Order Pursuant to 11 U.S.C. §§ 105(a), 363(b), AND 365(a) ANDFED. R. BANKR. P. 6006 Authorizing (I) Assumption of Certain Agreements with Stagecoach Pipeline & Storage Company LLC, (II) Entry Into Replacement Stagecoach Agreements, (III) Cancellation of Existing Stagecoach Marc 1 Agreement, and (IV) Payment of all Obligations Thereunder (Related Doc # 2289) Signed on 12/15/2020. |

| | | |
|---|---|---|
| 12/15/2020 | | (VrianaPortillo) (Entered: 12/15/2020) |
| 12/15/2020 | ⬤ 2477 <br><br> (3 pgs) | Order (I) Authorizing the FLLO AD HOC Group to File Confidential Exhibits Under Seal and (II) Granting Related Relief (Related Doc # 2341) Signed on 12/15/2020. (VrianaPortillo) (Entered: 12/15/2020) |
| 12/15/2020 | ⬤ 2478 <br><br> (3 pgs) | Order Authorizing Energy Transfer to File Exhibit Identified on Energy Transfer's Exhibit List Under Seal (Related Doc # 2372) Signed on 12/15/2020. (VrianaPortillo) (Entered: 12/15/2020) |
| 12/15/2020 | ⬤ 2479 <br><br> (405 pgs) | Order (I) Authorizing (A) The Assumption of Certain Williams Agreements, (B) Entry into the Firm Sale Agreement, (C) The Private Sale of Certain Real Estate Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, and (D) The Resolution of the Williams Indemnification Claims and (II) Granting Related Relief (Related Doc # 1892) Signed on 12/15/2020. (VrianaPortillo) (Entered: 12/15/2020) |
| 12/15/2020 | ⬤ 2480 <br><br> (9 pgs) | Courtroom Minutes. Time Hearing Held: 12-6:00 PM. Appearances: see attached. Opening arguments made. Trial to begin as scheduled on 12/16/2020 at 9:00 AM. (aalo) (Entered: 12/15/2020) |
| 12/15/2020 | ⬤ 2481 <br><br> (1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 12/15/2020 12:06:11 PM ]. File Size [ 174320 KB ]. Run Time [ 06:03:10 ]. (admin). (Entered: 12/15/2020) |
| 12/15/2020 | ⬤ 2482 <br><br> (19 pgs) | Additional Attachments Re: *Debtors' Exhibit 435 for Confirmation Hearing Set December 15, 2020* (related document(s):2290 Witness List, Exhibit List) (Filed By Chesapeake Energy Corporation ).(Related document(s):2290 Witness List, Exhibit List) (Cavenaugh, Matthew) (Entered: 12/15/2020) |
| | ⬤ 2483 | Sealed Document *Debtors' Exhibit 436 for Confirmation Hearing Set December 15, 2020* |

| | | |
|---|---|---|
| 12/15/2020 | (67 pgs) | (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 12/15/2020) |
| 12/15/2020 | 2484 <br><br> (28 pgs) | Exhibit List, Witness List (Filed By Chesapeake Energy Corporation ).(Related document(s):2290 Witness List, Exhibit List) (Cavenaugh, Matthew) (Entered: 12/15/2020) |
| 12/15/2020 | 2485 <br><br> (5 pgs) | Stipulation and Agreed Order By and Among the Debtors and Rodney Hudson, et al., Allen Johnson, et al., and Saundra Louise Woods-Nelson Resolving Motions for Relief from Stay and Motions for Adequate Protection Signed on 12/15/2020 (Related document(s):1200 Motion for Relief From Stay, 1201 Motion for Adequate Protection, 1235 Motion for Relief From Stay, 1236 Motion for Adequate Protection, 1852 Stipulation) (emiller) (Entered: 12/15/2020) |
| 12/16/2020 | 2486 <br><br> (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours) by M. Quejada. This is to order a transcript of December 15, 2020 hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By MUFG Union Bank, N.A. ). (Quejada, Maegan) Electronically forwarded to Access Transcripts, LLC on December 16, 2020. Estimated completion date: December 17, 2020. Modified on 12/16/2020 (ClaudiaGutierrez). (Entered: 12/16/2020) |
| 12/16/2020 | 2487 <br><br> (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew D. Cavenaugh. This is to order a transcript of 12/16/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) Copy request electronically forwarded to Access Transcripts, LLC on December 16, 2020. Estimated completion date: December 17, 2020 Modified on 12/16/2020 (ClaudiaGutierrez). (Entered: 12/16/2020) |
| | 2488 <br><br> (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Jason Boland. This is to order a transcript of the December 16, 2020 hearing before Judge David R. Jones. Court |

| | | |
|---|---|---|
| 12/16/2020 | | Reporter/Transcriber: Access Transcripts (Filed By Official Committee Of Unsecured Creditors ). (Boland, Jason) Copy request electronically forwarded to Access Transcripts, LLC on December 16, 2020. Estimated completion date: December 17, 2020 Modified on 12/16/2020 (ClaudiaGutierrez). (Entered: 12/16/2020) |
| 12/16/2020 | 🔵2489<br><br>(1 pg) | Notice of Filing of Official Transcript as to 2469 Transcript. Parties notified (Related document (s):2469 Transcript) (dhan) (Entered: 12/16/2020) |
| 12/16/2020 | 🔵2490<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Marty L. Brimmage, Jr.. This is to order a transcript of the December 16, 2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts ). (Brimmage, Marty) Copy request electronically forwarded to Access Transcripts, LLC on December 16, 2020. Estimated completion date: December 17, 2020 Modified on 12/16/2020 (ClaudiaGutierrez). (Entered: 12/16/2020) |
| 12/16/2020 | 🔵2491<br><br>(2 pgs) | Letter from Gaynell Spigner (mmap) (Entered: 12/16/2020) |
| 12/16/2020 | 🔵2492<br><br>(1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 12/16/2020 8:58:33 AM ]. File Size [ 82480 KB ]. Run Time [ 02:51:50 ]. (Trial Day 2 - Morning Session). (admin). (Entered: 12/16/2020) |
| | 🔵2493<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Mary Elizabeth Heard. This is to order a transcript of December 15, 2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By PMBG Parties ). (Heard, Mary) Copy request electronically forwarded to Access Transcripts, LLC on December 16, 2020. Estimated |

| | | |
|---|---|---|
| 12/16/2020 | | completion date: December 17, 2020 Modified on 12/16/2020 (ClaudiaGutierrez). (Entered: 12/16/2020) |
| 12/16/2020 | 🔘2494<br><br>(6 pgs; 2 docs) | Certificate of No Objection *to First Interim Application of Forshey & Prostok, LLP* (Filed By Forshey & Prostok, LLP ).(Related document (s):1921 Application for Compensation) (Attachments: # 1 Proposed Order) (Prostok, Jeffrey) (Entered: 12/16/2020) |
| 12/16/2020 | 🔘2495<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by M. Quejada. This is to order a transcript of December 16, 2020 hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By MUFG Union Bank, N.A. ). (Quejada, Maegan) Copy request electronically forwarded to Access Transcripts, LLC on December 16, 2020. Estimated completion date: December 17, 2020. Modified on 12/16/2020 (ClaudiaGutierrez). (Entered: 12/16/2020) |
| 12/16/2020 | 🔘2496<br><br>(7 pgs; 2 docs) | Certificate of No Objection *to First Interim Fee Application of Norton Rose Fulbright US LLP for Allowance of Compensation and Reimbursement of Expenses as Co-Counsel to the Official Committee of Unsecured Creditors for the Period July 13, 2020 through September 30, 2020.* (Filed By Official Committee Of Unsecured Creditors ).(Related document (s):1898 Application for Compensation) (Attachments: # 1 Proposed Order) (Boland, Jason) (Entered: 12/16/2020) |
| 12/16/2020 | 🔘2497<br><br>(2 pgs) | Letter from Gaynell Spigner Plan of Restitution & recovery of our property- Tatum OK (mmap) (Entered: 12/16/2020) |
| | 🔘2498<br><br>(5 pgs) | Courtroom Minutes. Time Hearing Held: 9:00 am. Appearances: SEE ATTACHED. (Related document(s):2336 Amended Chapter 11 Plan) Witnesses: Doug Lawler, Domenic Dell'Osso. DAY 2 - Concluded the testimony of Doug Lawler, completed the direct of Mr. Dell'Osso. Will continue with the testimony of Domenic Dell'Osso 12/17 at 9 am. **Continued Trial** |

| | | |
|---|---|---|
| 12/16/2020 | | **scheduled for 12/17/2020 at 09:00 AM by telephone and video conference.** (emiller) (Entered: 12/16/2020) |
| 12/16/2020 | 🔵2499<br><br>(1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 12/16/2020 12:59:08 PM ]. File Size [ 102788 KB ]. Run Time [ 03:34:08 ]. (Day 2 - Afternoon Session). (admin). (Entered: 12/16/2020) |
| 12/16/2020 | 🔵2500<br><br>(6 pgs; 2 docs) | Additional Attachments Re: *UCC Exhibits 1317 and 1318* (related document(s):2313 Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):2313 Witness List, Exhibit List) (Attachments: # 1 Exhibit 1318) (Harrison, Julie) (Entered: 12/16/2020) |
| 12/16/2020 | 🔵2501<br><br>(79 pgs) | Witness List, Exhibit List (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):2313 Witness List, Exhibit List) (Harrison, Julie) (Entered: 12/16/2020) |
| 12/16/2020 | 🔵2502<br><br>(16 pgs) | BNC Certificate of Mailing. (Related document (s):2421 Order on Application to Employ) No. of Notices: 215. Notice Date 12/16/2020. (Admin.) (Entered: 12/17/2020) |
| 12/16/2020 | 🔵2503<br><br>(22 pgs) | BNC Certificate of Mailing. (Related document (s):2422 Generic Order) No. of Notices: 215. Notice Date 12/16/2020. (Admin.) (Entered: 12/17/2020) |
| 12/16/2020 | 🔵2504<br><br>(14 pgs) | BNC Certificate of Mailing. (Related document (s):2423 Generic Order) No. of Notices: 215. Notice Date 12/16/2020. (Admin.) (Entered: 12/17/2020) |
| 12/16/2020 | 🔵2505<br><br>(12 pgs) | BNC Certificate of Mailing. (Related document (s):2424 Generic Order) No. of Notices: 215. Notice Date 12/16/2020. (Admin.) (Entered: 12/17/2020) |
| | 🔵2506<br><br>(16 pgs) | BNC Certificate of Mailing. (Related document (s):2426 Generic Order) No. of Notices: 215. Notice Date 12/16/2020. (Admin.) (Entered: |

| 12/16/2020 | | 12/17/2020) |
|---|---|---|
| 12/16/2020 | 2507<br><br>(15 pgs) | BNC Certificate of Mailing. (Related document (s):2427 Generic Order) No. of Notices: 215. Notice Date 12/16/2020. (Admin.) (Entered: 12/17/2020) |
| 12/16/2020 | 2508<br><br>(13 pgs) | BNC Certificate of Mailing. (Related document (s):2428 Generic Order) No. of Notices: 215. Notice Date 12/16/2020. (Admin.) (Entered: 12/17/2020) |
| 12/16/2020 | 2509<br><br>(14 pgs) | BNC Certificate of Mailing. (Related document (s):2429 Order on Application to Employ) No. of Notices: 215. Notice Date 12/16/2020. (Admin.) (Entered: 12/17/2020) |
| 12/16/2020 | 2510<br><br>(16 pgs) | BNC Certificate of Mailing. (Related document (s):2431 Generic Order) No. of Notices: 215. Notice Date 12/16/2020. (Admin.) (Entered: 12/17/2020) |
| 12/16/2020 | 2511<br><br>(16 pgs) | BNC Certificate of Mailing. (Related document (s):2433 Generic Order) No. of Notices: 215. Notice Date 12/16/2020. (Admin.) (Entered: 12/17/2020) |
| 12/16/2020 | 2512<br><br>(15 pgs) | BNC Certificate of Mailing. (Related document (s):2435 Generic Order) No. of Notices: 215. Notice Date 12/16/2020. (Admin.) (Entered: 12/17/2020) |
| 12/16/2020 | 2513<br><br>(13 pgs) | BNC Certificate of Mailing. (Related document (s):2436 Order on Emergency Motion) No. of Notices: 215. Notice Date 12/16/2020. (Admin.) (Entered: 12/17/2020) |
| 12/16/2020 | 2554<br><br>(8 pgs) | Sealed Document (Filed By Charlie Wiggins ). (ShoshanaArnow) (Entered: 12/18/2020) |
| | 2514<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew D. Cavenaugh. This is to order a transcript of 12/17/2020 before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By |

| | | |
|---|---|---|
| 12/17/2020 | | Chesapeake Energy Corporation ). (Cavenaugh, Matthew) Electronically forwarded to Judicial Transcribers of Texas on 12-17-2020. Estimated completion date: 12-18-2020. Modified on 12/17/2020 (MelissaMorgan). (Entered: 12/17/2020) |
| 12/17/2020 | 2515 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Julie Harrison. This is to order a transcript of the December 17, 2020 hearing before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) Copy request was electronically forwarded to Judicial Transcribers of Texas on 12-17-2020. Estimated completion date: 12-18-2020. Modified on 12/17/2020 (MelissaMorgan). (Entered: 12/17/2020) |
| 12/17/2020 | 2516 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Marty L. Brimmage, Jr.. This is to order a transcript of the December 17, 2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts ). (Brimmage, Marty) Copy request was electronically forwarded to Judicial Transcribers of Texas on 12-17-2020. Estimated completion date: 12-18-2020. Modified on 12/17/2020 (MelissaMorgan). (Entered: 12/17/2020) |
| 12/17/2020 | 2517 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by M. Quejada. This is to order a transcript of December 17, 2020 hearing before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By MUFG Union Bank, N.A. ). (Quejada, Maegan) Copy request was electronically forwarded to Judicial Transcribers of Texas on 12-17-2020. Estimated completion date: 12-18-2020. Modified on 12/17/2020 (MelissaMorgan). (Entered: 12/17/2020) |
| | 2518 | Notice . Filed by Complete Energy Services, |

| | | |
|---|---|---|
| 12/17/2020 | (1 pg) | Inc., Complete Energy Services, Inc., H.B. Rentals, L.C., SPN Well Services, Inc., Workstrings International, L.L.C. (Overton, Jean Paul) (Entered: 12/17/2020) |
| 12/17/2020 | 2519<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by John E. Mitchell. This is to order a transcript of Confirmation Hearing - 12/15/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Energy Transfer Fuel, LP ). (Mitchell, John) Copy request was electronically forwarded to Access Transcripts on 12-17-2020. Estimated completion date: 12-18-2020. Modified on 12/17/2020 (MelissaMorgan). (Entered: 12/17/2020) |
| 12/17/2020 | 2520<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by John E. Mitchell. This is to order a transcript of Confirmation Hearing - 12/16/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Energy Transfer Fuel, LP ). (Mitchell, John) (Entered: 12/17/2020) |
| 12/17/2020 | 2521<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by John E. Mitchell. This is to order a transcript of Confirmation Hearing - 12/17/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Energy Transfer Fuel, LP ). (Mitchell, John) Copy request was electronically forwarded to Judicial Transcribers of Texas on 12-17-2020. Estimated completion date: 12-18-2020. Modified on 12/17/2020 (MelissaMorgan). (Entered: 12/17/2020) |
| | 2522<br><br>(6037 pgs; 25 docs) | Exhibit List (Filed By Official Committee of Royalty Owners ).(Related document(s):1644 Amended Chapter 11 Plan, 2336 Amended Chapter 11 Plan) (Attachments: # 1 Exhibit 1 - Notice of Reconstituted Committee # 2 Exhibit 2 - 341 Meeting # 3 Exhibit 3 Royalty Owner Letter # 4 Exhibit 4 - Antinelli Declaration # 5 Exhibit 5 Dell Osso Declaration # 6 Exhibit 6 Zacharias # 7 Exhibit 7 Bride and Brandenburg # 8 Exhibit 8 Kimmeridge # 9 Exhibit 9 RO |

| | | |
|---|---|---|
| 12/17/2020 | | Statement # 10 Exhibit 10 Kuffa Proof of Claim # 11 Exhibit 12 - CHK Operating Schedules # 12 Exhibit 13 CHK Energy Mktg Schedules # 13 Exhibit 14 CHK Land Schedules # 14 Exhibit 15 CHK Utica Schedules # 15 Exhibit 16 OK Docket # 16 Exhibit 17 - Ok Complaint # 17 Exhibit 18 Complaint AP 20-03467 # 18 Exhibit 19 - Gates Complaint 20-03451 # 19 Exhibit 20 - State Court Petition # 20 Exhibit 21 - Motion to Certify Class 1295 # 21 Exhibit 24 RO Q&A # 22 Exhibit 25 - Owners Relations Website Page # 23 Exhibit 26 - First Day Motion royalty # 24 Exhibit 27 - order) (Brown, pllc, Deirdre) (Entered: 12/17/2020) |
| 12/17/2020 | 2523<br><br>(244 pgs) | Transcript RE: Confirmation Hearing - Day 1 held on 12/15/20 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 03/17/2021. (AccessTranscripts) (Entered: 12/17/2020) |
| 12/17/2020 | 2524<br><br>(43 pgs) | Notice *of Second Monthly Fee Statement of Ernst & Young LLP for Compensation and Reimbursement of Expenses for the Period From November 1, 2020 Through November 30, 2020.* (Related document(s):656 Generic Order) Filed by Chesapeake Energy Corporation (Peguero, Kristhy) (Entered: 12/17/2020) |
| 12/17/2020 | 2525<br><br>(1 pg) | PDF with attached Audio File. Court Date & Time [ 12/17/2020 8:57:55 AM ]. File Size [ 104130 KB ]. Run Time [ 03:36:56 ]. (admin). (Entered: 12/17/2020) |
| 12/17/2020 | 2526<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Justin Rawlins. This is to order a transcript of December 14, 2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By MUFG Union Bank, N.A. ). (Rawlins, Justin) Copy request was electronically forwarded to Judicial Transcribers of Texas on 12-17-2020. Estimated completion date: 12-18-2020. Modified on 12/17/2020 (MelissaMorgan). (Entered: 12/17/2020) |

| | | |
|---|---|---|
| 12/17/2020 | 🔵 2527<br><br>(2 pgs) | Statement (Filed By United States of America ). (Kincheloe, Richard) (Entered: 12/17/2020) |
| 12/17/2020 | 🔵 2528<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Justin Rawlins. This is to order a transcript of December 16, 2020 Confirmation Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By MUFG Union Bank, N.A. ). (Rawlins, Justin) Copy request was electronically forwarded to Access Transcripts on 12-17-2020. Estimated completion date: 12-18-202020. Modified on 12/17/2020 (MelissaMorgan). (Entered: 12/17/2020) |
| 12/17/2020 | 🔵 2529<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Justin Rawlins. This is to order a transcript of December 17, 2020 Confirmation Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By MUFG Union Bank, N.A. ). (Rawlins, Justin)Copy request was electronically forwarded to Judicial Transcribers of Texas on 12-17-2020. Estimated completion date: 12-18-2020. Modified on 12/17/2020 (MelissaMorgan). (Entered: 12/17/2020) |
| 12/17/2020 | 🔵 2530<br><br>(2 pgs) | Stipulation By Chesapeake Energy Corporation and Petty Business Enterprises, LP. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Schwarzman, Alexandra) (Entered: 12/17/2020) |
| 12/17/2020 | 🔵 2531<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Mary Elizabeth Heard. This is to order a transcript of December 17, 2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By PMBG Parties ). (Heard, Mary) Copy request was electronically forwarded to Judicial Transcribers of Texas on 12-17-2020. Estimated completion date: 12-18-20202. Modified on 12/17/2020 (MelissaMorgan). (Entered: 12/17/2020) |

| | | |
|---|---|---|
| 12/17/2020 | ● 2532<br><br>(5 pgs) | Courtroom Minutes. Time Hearing Held: 9:00 AM - 12:45 PM & 2:00 PM- 4:40 PM. Appearances: see attached. (Related document (s):2336 Amended Chapter 11 Plan) Witnesses: Domenic Dell'Osso. DAY 3 - Concluded the testimony of Domenic Dell'Osso. Will begin Day 4 of Trial with the testimony of Stephen Antinelli on 12/18 at 9:00 AM by telephone and video conference. (aalo) (Entered: 12/17/2020) |
| 12/17/2020 | ● 2533<br><br>(1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 12/17/2020 2:39:43 PM ]. File Size [ 51346 KB ]. Run Time [ 01:46:58 ]. (admin). (Entered: 12/17/2020) |
| 12/17/2020 | ● 2534<br><br>(2 pgs) | Notice *Request for Withdrawal from Service List*. Filed by Wier Group (Perovich, Stefan) (Entered: 12/17/2020) |
| 12/17/2020 | ● 2535<br><br>(4 pgs) | Declaration re: *Second Supplemental Declaration of Patrick J. Nash, Jr. In Support of the Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Kirkland & Ellis LLP as Attorneys for the Debtors and Debtors In Possession Effective as of June 28, 2020* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 12/17/2020) |
| 12/17/2020 | ● 2536<br><br>(442 pgs; 2 docs) | Application for Compensation *First Interim Fee Application of Alvarez & Marsal North America, LLC as Restructuring Advisor for the Debtors and Debtors In Possession for the Period from June 28, 2020 Through and Including September 30, 2020*. Objections/Request for Hearing Due in 21 days. Filed by Attorney Matthew D Cavenaugh (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 12/17/2020) |
| 12/17/2020 | ● 2537<br><br>(259 pgs) | Transcript RE: Confirmation Hearing - Day 2 held on 12/16/20 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 03/17/2021. (AccessTranscripts) (Entered: 12/17/2020) |
| | | |

| | | |
|---|---|---|
| 12/17/2020 | 2538<br><br>(6393 pgs) | Affidavit Re: *Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1895 Notice, 1896 Notice, 1907 Notice) (Garabato, Sid) (Entered: 12/17/2020) |
| 12/17/2020 | 2539<br><br>(14 pgs) | BNC Certificate of Mailing. (Related document (s):2476 Order on Emergency Motion) No. of Notices: 215. Notice Date 12/17/2020. (Admin.) (Entered: 12/18/2020) |
| 12/17/2020 | 2540<br><br>(13 pgs) | BNC Certificate of Mailing. (Related document (s):2477 Order on Emergency Motion) No. of Notices: 215. Notice Date 12/17/2020. (Admin.) (Entered: 12/18/2020) |
| 12/17/2020 | 2541<br><br>(5 pgs) | BNC Certificate of Mailing. (Related document (s):2478 Order on Motion to Seal) No. of Notices: 41. Notice Date 12/17/2020. (Admin.) (Entered: 12/18/2020) |
| 12/17/2020 | 2545<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Jacqueline Kindler. This is to order a transcript of Confirmation hearing held on 12/15/20, 12/16/20 and 12/17/20 before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Chesapeake Energy Corporation ). (MarcelleLaBee) Copy request for 12-15-2020 and 12-16-2020 electronically forwarded to original transcription company Access Transcripts, LLC. Copy request for 12-17-2020 electronically forwarded to Judicial Transcribers of Texas. Estimated completion date: December 19, 2020. Modified on 12/18/2020 (ClaudiaGutierrez). (Entered: 12/18/2020) |
| 12/17/2020 | 2547<br><br>(2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Anne Marie Hern-Darst. This is to order a transcript of Hearing held on 12/17/20 before Judge David R. Jones. Court Reporter/Transcriber: Digital Scroll Transcription (Filed By Chesapeake Energy Corporation ). (MarcelleLaBee) Copy request electronically forwarded to original transcription company Judicial Transcribers of Texas on |

| | | |
|---|---|---|
| 12/17/2020 | | December 18, 2020. Estimated completion date: December 19, 2020. Modified on 12/18/2020 (ClaudiaGutierrez). (Entered: 12/18/2020) |
| 12/17/2020 | 2550<br><br>(2 pgs) | Order Granting Application For Compensation (Related Doc # 1921). Signed on 12/17/2020. (aalo) (Entered: 12/18/2020) |
| 12/17/2020 | 2556<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Linda Breedlove. This is to order a transcript of Hearing held on 12/17/20 before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Chesapeake Energy Corporation ). (MarcelleLaBee) Copy request electronically forwarded to Judicial Transcribers of Texas on December 18, 2020. Estimated completion date: December 19, 2020. Modified on 12/18/2020 (ClaudiaGutierrez). (Entered: 12/18/2020) |
| 12/18/2020 | 2542<br><br>(1 pg) | Notice of Filing of Official Transcript as to 2523 Transcript, 2537 Transcript. Parties notified (Related document(s):2523 Transcript, 2537 Transcript) (dhan) (Entered: 12/18/2020) |
| 12/18/2020 | 2543<br><br>(7 pgs) | Stipulation By Chesapeake Energy Corporation and Christopher Wilson. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 12/18/2020) |
| 12/18/2020 | 2544<br><br>(13 pgs) | Debtor-In-Possession Monthly Operating Report for Filing Period ending 11/30/2020, $415,438 disbursed (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 12/18/2020) |
| | 2546<br><br>(9 pgs; 3 docs) | Certificate of No Objection *Jackson Walker LLP's First Interim Fee Application for Allowance and Payment of Fees and Expenses as Co-Counsel to the Debtors for the Period From June 28, 2020 Through September 30, 2020.* (Filed By Chesapeake Energy Corporation ).(Related document(s):1928 Application for Compensation) (Attachments: # |

| | | |
|---|---|---|
| 12/18/2020 | | 1 Proposed Order # 2 Redline) (Cavenaugh, Matthew) (Entered: 12/18/2020) |
| 12/18/2020 | 2548 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew D. Cavenaugh. This is to order a transcript of 12/18/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) Electronically forwarded to Access Transcripts, LLC on December 18, 2020. Estimated completion date: December 19, 2020. Modified on 12/18/2020 (ClaudiaGutierrez). (Entered: 12/18/2020) |
| 12/18/2020 | 2549 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Marty L. Brimmage, Jr.. This is to order a transcript of the December 18, 2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts ). (Brimmage, Marty) Copy request electronically forwarded to Access Transcripts, LLC on December 18, 2020. Estimated completion date: December 19, 2020. Modified on 12/18/2020 (ClaudiaGutierrez). (Entered: 12/18/2020) |
| 12/18/2020 | 2551 (2 pgs) | Order Granting Application for Compensation Signed 12/18/2020 (Related document (s):1898 Application for Compensation) (aalo) (Entered: 12/18/2020) |
| 12/18/2020 | 2552 (105 pgs) | Statement *Fifth Monthly Fee Statement Of Brown Rudnick LLP For Allowance Of Compensation For Services Rendered And For Reimbursement Of Expenses As Co-Counsel For The Official Committee Of Unsecured Creditors For The Period From November 1, 2020 Through November 30, 2020* (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) (Entered: 12/18/2020) |
| 12/18/2020 | 2553 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Julie Harrison. This is to order a transcript of the December 18, 2020 hearing |

| | | |
|---|---|---|
| 12/18/2020 | | before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) Copy request electronically forwarded to Access Transcripts, LLC on December 18, 2020. Estimated completion date: December 19, 2020. Modified on 12/18/2020 (ClaudiaGutierrez). (Entered: 12/18/2020) |
| 12/18/2020 | 2555 (1 pg) | PDF with attached Audio File. Court Date & Time [ 12/18/2020 9:00:17 AM ]. File Size [ 77459 KB ]. Run Time [ 02:41:22 ]. (admin). (Entered: 12/18/2020) |
| 12/18/2020 | 2557 (2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Anna Marie Hearn-Darst. This is to order a transcript of 12/17/2020 before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas. (ShoshanaArnow) Copy request electronically forwarded to Judicial Transcribers of Texas on December 18, 2020. Estimated completion date: December 19, 2020. Modified on 12/18/2020 (ClaudiaGutierrez). (Entered: 12/18/2020) |
| 12/18/2020 | 2558 (127 pgs) | Notice *of Fourth Monthly Fee Statement of PricewaterhouseCoopers LLP for Services Rendered and Reimbursement of Expenses as Audit Services and Tax Consulting Services Provider for the Debtors for the Period from October 1, 2020 Through October 31, 2020*. Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 12/18/2020) |
| 12/18/2020 | 2559 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by M. Quejada. This is to order a transcript of December 18, 2020 hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By MUFG Union Bank, N.A. ). (Quejada, Maegan) Copy request electronically forwarded to Access Transcripts, LLC on December 18, 2020. Estimated completion date: December 19, 2020. Modified on 12/18/2020 (ClaudiaGutierrez). (Entered: 12/18/2020) |

| | | |
|---|---|---|
| 12/18/2020 | 2560<br><br>(5 pgs; 2 docs) | Certificate of No Objection *with Respect to the First Interim Application of Ernst & Young LLP for Compensation and Reimbursement of Expenses for the Period from June 29,2020 Through September 30, 2020* (Filed By Chesapeake Energy Corporation ).(Related document(s):1925 Application for Compensation) (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 12/18/2020) |
| 12/18/2020 | 2561<br><br>(304 pgs; 2 docs) | Application for Compensation *First Interim Application of PricewaterhouseCoopers LLP for Compensation and Reimbursement of Expenses as Audit Services and Tax Consulting Services Provider for the Debtors for the Period from June 28, 2020 Through September 30, 2020.* Objections/Request for Hearing Due in 21 days. Filed by Attorney Matthew D Cavenaugh (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 12/18/2020) |
| 12/18/2020 | 2562<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by John E. Mitchell. This is to order a transcript of Confirmation Hearing - 12/18/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Energy Transfer Fuel, LP ). (Mitchell, John) Copy request electronically forwarded to Access Transcripts, LLC on December 18, 2020. Estimated completion date: December 19, 2020. Modified on 12/18/2020 (ClaudiaGutierrez). (Entered: 12/18/2020) |
| 12/18/2020 | 2563<br><br>(4 pgs) | Courtroom Minutes. Time Hearing Held: 9:00-4:16 PM. Appearances: see attached. (Related document (s):2336 Amended Chapter 11 Plan) **Day 4 of Trial.** Witness: Stephen Antinelli. Day 5 of Trial will begin on Wednesday, December 23, 2020 at 9:00 AM with the continued cross of Mr. Antinelli. (aalo) (Entered: 12/18/2020) |
| 12/18/2020 | 2564<br><br>(1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 12/18/2020 1:57:57 PM ]. File Size [ 66589 KB ]. Run Time [ 02:18:44 ]. (admin). (Entered: 12/18/2020) |
| | | |

| | | |
|---|---|---|
| 12/18/2020 | 🌐 2565<br><br>(6 pgs; 2 docs) | Motion for Relief from Stay *To Pursue Johnson Parties Louisiana Pre-Petition Litigation*. Fee Amount $188. Filed by Interested Party Aarie Johnson Hearing scheduled for 1/15/2021 at 02:00 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order) (Akard, John) (Entered: 12/18/2020) |
| 12/18/2020 | 🌐 2566<br><br>(5 pgs; 2 docs) | Motion for Relief from Stay *For Luba Casualty Insurance to Pursue Louisiana Pre-Petition Litigation*. Fee Amount $188. Filed by Interested Party Luba Casualty Insurance Company Hearing scheduled for 1/15/2021 at 02:00 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order) (Akard, John) (Entered: 12/18/2020) |
| 12/18/2020 | | Receipt of Motion for Relief From Stay(20-33233) [motion,mrlfsty] ( 188.00) Filing Fee. Receipt number 22691720. Fee amount $ 188.00. (U.S. Treasury) (Entered: 12/18/2020) |
| 12/18/2020 | | Receipt of Motion for Relief From Stay(20-33233) [motion,mrlfsty] ( 188.00) Filing Fee. Receipt number 22691720. Fee amount $ 188.00. (U.S. Treasury) (Entered: 12/18/2020) |
| 12/18/2020 | 🌐 2567<br><br>(11 pgs) | BNC Certificate of Mailing. (Related document (s):2489 Notice of Filing of Official Transcript (Form)) No. of Notices: 215. Notice Date 12/18/2020. (Admin.) (Entered: 12/18/2020) |
| 12/18/2020 | 🌐 2568<br><br>(15 pgs) | BNC Certificate of Mailing. (Related document (s):2485 Generic Order) No. of Notices: 215. Notice Date 12/18/2020. (Admin.) (Entered: 12/18/2020) |
| 12/19/2020 | 🌐 2569<br><br>(151 pgs) | Transcript RE: Confirmation Hearing Day Three - Morning Session (Via Zoom) held on December 17, 2020 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 03/19/2021. (mhen) (Entered: 12/19/2020) |
| | 🌐 2570<br><br>(78 pgs) | Transcript RE: Confirmation Hearing Day Three - Afternoon Session (Via Zoom) held on December 17, 2020 before Judge David R. Jones. Transcript |

| | | |
|---|---|---|
| 12/19/2020 | | is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 03/19/2021. (mhen) (Entered: 12/19/2020) |
| 12/19/2020 | 2571<br><br>(202 pgs) | Transcript RE: Confirmation Hearing - Day 4 held on 12/18/20 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 03/19/2021. (AccessTranscripts) (Entered: 12/19/2020) |
| 12/20/2020 | 2572<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Donald K. Ludman (Related Doc # 2173) Signed on 12/20/2020. (emiller) (Entered: 12/20/2020) |
| 12/20/2020 | 2573<br><br>(11 pgs) | BNC Certificate of Mailing. (Related document (s):2542 Notice of Filing of Official Transcript (Form)) No. of Notices: 215. Notice Date 12/20/2020. (Admin.) (Entered: 12/20/2020) |
| 12/20/2020 | 2574<br><br>(12 pgs) | BNC Certificate of Mailing. (Related document (s):2550 Order on Application for Compensation) No. of Notices: 215. Notice Date 12/20/2020. (Admin.) (Entered: 12/20/2020) |
| 12/20/2020 | 2575<br><br>(12 pgs) | BNC Certificate of Mailing. (Related document (s):2551 Generic Order) No. of Notices: 215. Notice Date 12/20/2020. (Admin.) (Entered: 12/20/2020) |
| 12/21/2020 | 2576<br><br>(1 pg) | Notice of Filing of Official Transcript as to 2570 Transcript, 2571 Transcript. Parties notified (Related document(s):2570 Transcript, 2571 Transcript) (dhan) (Entered: 12/21/2020) |
| 12/21/2020 | 2577<br><br>(1227 pgs) | Affidavit Re: *Affidavit of Service of Custom Cure Notices of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ). (Garabato, Sid) (Entered: 12/21/2020) |
| | 2578<br><br>(134 pgs) | Notice *of Fourth Monthly Fee Statement of Alvarez & Marsal North America, LLC for Compensation for Services and Reimbursement of Expenses as Restructuring and Financial Advisors to the Debtors and Debtors in Possession for the Period From October 1, 2020 Through October 31, 2020.* |

| | | |
|---|---|---|
| 12/21/2020 | | (Related document(s):656 Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 12/21/2020) |
| 12/21/2020 | 2579<br><br>(60 pgs) | Affidavit Re: *Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):1491 Notice) (Garabato, Sid) (Entered: 12/21/2020) |
| 12/21/2020 | 2580<br><br>(24 pgs) | Affidavit Re: *Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):2180 Notice) (Garabato, Sid) (Entered: 12/21/2020) |
| 12/21/2020 | 2581<br><br>(26 pgs) | Affidavit Re: *Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):2223 Notice) (Garabato, Sid) (Entered: 12/21/2020) |
| 12/21/2020 | 2582<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (3-Day) by Jacqueline Kindler. This is to order a transcript of Confirmation Hearing held on 12/18/20 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts. (than) Copy request was electronically forwarded to Access Transcripts on 12-22-2020. Estimated completion date: 12-25-2020. Modified on 12/22/2020 (MelissaMorgan). (Entered: 12/21/2020) |
| 12/21/2020 | 2583<br><br>(2 pgs) | Order Granting Jackson Walker LLP's First Interim Fee Application for Allowance and Payment of Fees and Expenses as Co-Counsel to the Debtors for the Period from June 28, 2020 through September 30, 2020 (Related Doc # 1928) Signed on 12/21/2020. (emiller) (Entered: 12/21/2020) |
| 12/21/2020 | 2584<br><br>(2 pgs) | Order Granting First Interim Application of Ernst & Young LLP for Compensation and Reimbursement of Expenses for the Period from June 29, 2020 through September 30, 2020 (Related Doc # 1925) Signed on 12/21/2020. (emiller) (Entered: 12/21/2020) |
| | 2585<br><br>(23 pgs) | Affidavit Re: *Affidavit of Service of Docket No. 2283 by Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document |

| | | |
|---|---|---|
| 12/22/2020 | | (s):2283 Motion to Assume/Reject) (Garabato, Sid) (Entered: 12/22/2020) |
| 12/22/2020 | 2586<br><br>(6 pgs) | Stipulation and Agreed Order Signed on 12/22/2020 (Related document(s):1876 Stipulation) (aalo) (Entered: 12/22/2020) |
| 12/22/2020 | 2587<br><br>(6 pgs) | Stipulation and Agreed Order Signed on 12/22/2020 (aalo) (Entered: 12/22/2020) |
| 12/22/2020 | 2588<br><br>(62 pgs) | Debtors Master Service List (Filed By Epiq Corporate Restructuring LLC ). (Garabato, Sid) (Entered: 12/22/2020) |
| 12/22/2020 | 2589<br><br>(2 pgs) | Notice *of Withdrawal*. (Related document(s):1450 Application for Administrative Expenses, 1451 Motion for Relief From Stay) Filed by Tributary Resources, LLC (Martin, Jarrod) (Entered: 12/22/2020) |
| 12/22/2020 | 2590<br><br>(113 pgs) | Notice *of Filing Franklin Exhibit 10*. (Related document(s):2351 Additional Attachments) Filed by Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts (Brimmage, Marty) (Entered: 12/22/2020) |
| 12/22/2020 | 2591<br><br>(2 pgs) | Declaration re: *Business Record Certification* (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts ). (Brimmage, Marty) (Entered: 12/22/2020) |
| 12/22/2020 | 2592<br><br>(27 pgs) | Affidavit Re: *Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):2447 Notice) (Garabato, Sid) (Entered: 12/22/2020) |
| 12/22/2020 | 2593<br><br>(5 pgs) | Affidavit Re: *Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):2524 Notice, 2536 Application for Compensation) (Garabato, Sid) (Entered: 12/22/2020) |
| | 2594 | Proposed Order Submission After Hearing (Filed By Stephanie Delasandro ).(Related document |

| | | |
|---|---|---|
| 12/23/2020 | (2 pgs) | (s):1175 Motion to Reconsider) (Warman, Lynnette) (Entered: 12/23/2020) |
| 12/23/2020 | 2595 <br><br> (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Justin Rawlins. This is to order a transcript of December 23, 2020 before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By MUFG Union Bank, N.A. ). (Rawlins, Justin) Electronically forwarded to Judicial Transcribers of Texas on 12-28-2020. Estimated completion date: 12-29-2020. Modified on 12/28/2020 (MelissaMorgan). (Entered: 12/23/2020) |
| 12/23/2020 | 2596 <br><br> (10 pgs; 2 docs) | Proposed Order RE: *Order (I) Authorizing (A) Rejection of the Crude Agreement, (B) Assumption, As Modified, of the Transporation Agreement, (C) Entry Into the Processing Agreement, and (D) Provision of the Enterprise Release, and (II) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):2376 Emergency Motion) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 12/23/2020) |
| 12/23/2020 | 2597 <br><br> (10 pgs) | Notice *of First Monthly Fee Statement of Intrepid Partners, LLC as Investment Banker to the Debtors, for Allowance and Payment of Compensation for Professional Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred From October 1, 2020 Through October 31, 2020.* (Related document(s):656 Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 12/23/2020) |
| 12/23/2020 | 2598 <br><br> (10 pgs) | Notice *of Monthly Fee Statement of Intrepid Partners, LLC as Investment Banker to the Debtors, for Allowance and Payment of Compensation for Professional Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred From November 1, 2020 Through and Including November 30, 2020.* (Related document(s):656 Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 12/23/2020) |
| | 2599 | AO 435 TRANSCRIPT ORDER FORM (Daily (24 |

| | | |
|---|---|---|
| 12/23/2020 | (1 pg) | hours)) by John E. Mitchell. This is to order a transcript of Confirmation Trial 12-23-2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Energy Transfer Fuel, LP ). (Mitchell, John) Copy request was electronically forwarded to Judicial Transcribers of Texas on 12-28-2020. Estimated completion date: 12-29-2020. Modified on 12/28/2020 (MelissaMorgan). (Entered: 12/23/2020) |
| 12/23/2020 | 2600<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew D. Cavenaugh. This is to order a transcript of 12/23/2020 before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) Copy request was electronically forwarded to Judicial Transcribers of Texas on 12-29-2020. Modified on 12/28/2020 (MelissaMorgan). (Entered: 12/23/2020) |
| 12/23/2020 | 2601<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Marty L. Brimmage, Jr.. This is to order a transcript of the December 23, 2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts ). (Brimmage, Marty) Copy request was electronically forwarded to Judicial Transcribers of Texas on 12-28-2020. Estimated completion date: 12-29-2020. Modified on 12/28/2020 (MelissaMorgan). (Entered: 12/23/2020) |
| 12/23/2020 | 2602<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by M. Quejada. This is to order a transcript of December 23, 2020 hearing before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By MUFG Union Bank, N.A. ). (Quejada, Maegan)Copy request was electronically forwarded to Judicial Transcribers of Texas on 12-28-2020. Estimated completion date: 12-29-2020. Modified on 12/28/2020 (MelissaMorgan). (Entered: 12/23/2020) |
| | 2603 | PDF with attached Audio File. Court Date & |

| | | |
|---|---|---|
| 12/23/2020 | (1 pg) | Time [ 12/23/2020 8:57:35 AM ]. File Size [ 98456 KB ]. Run Time [ 03:25:07 ]. (TRIAL DAY 5 - MORNING SESSION). (admin). (Entered: 12/23/2020) |
| 12/23/2020 | 2604 <br> (2 pgs) | Declaration re: *Amended Business Record Certification* (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts ).(Related document(s):2591 Declaration) (Brimmage, Marty) (Entered: 12/23/2020) |
| 12/23/2020 | 2605 <br> (8 pgs; 2 docs) | Proposed Order RE: *Amended Order Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 365(a) and Fed. R. Bankr. P. 6006 Authorizing (I) Assumption of Certain Agreements with Stagecoach Pipeline & Storage Company LLC, (II) Entry Into Replacement Stagecoach Agreements, (III) Cancellation of Existing Stagecoach MARC 1 Agreement, and (IV) Payment of All Obligations Thereunder* (Filed By Chesapeake Energy Corporation ).(Related document(s):2289 Emergency Motion) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 12/23/2020) |
| 12/23/2020 | 2606 <br> (101 pgs) | Notice *of Fifth Monthly Fee Statement of PricewaterhouseCoopers LLP for Services Rendered and Reimbursement of Expenses as Audit Services and Tax Consulting Services Provider for the Debtors for the Period From November 1, 2020 Through November 30, 2020.* (Related document(s):656 Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 12/23/2020) |
| 12/23/2020 | 2607 <br> (5 pgs) | Notice *of Filing Monthly Report Pursuant to the Order to Approve Procedures for De Minimis Asset Transactions.* (Related document(s):715 Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 12/23/2020) |
| | 2608 <br> (4 pgs) | Declaration re: *Declaration of Disinterestedness of Cobb & Counsel, PLLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ).(Related document(s):655 Generic |

| | | |
|---|---|---|
| 12/23/2020 | | Order) (Cavenaugh, Matthew) (Entered: 12/23/2020) |
| 12/23/2020 | 2609 (4 pgs) | Declaration re: *Declaration of Disinterestedness of Royston Rayzor Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ).(Related document(s):655 Generic Order) (Cavenaugh, Matthew) (Entered: 12/23/2020) |
| 12/23/2020 | 2610 (2 pgs) | Notice *of Increase of Hourly Rates of Professionals*. Filed by Official Committee Of Unsecured Creditors (Harrison, Julie) (Entered: 12/23/2020) |
| 12/23/2020 | 2611 (5 pgs) | Courtroom Minutes. Time Hearing Held: 9:00 am. Appearances: SEE ATTACHED. (Related document(s):2336 Amended Chapter 11 Plan) **TRIAL DAY 5** - Concluded the testimony of Mr. Antinelli and Mr. Martin. **Continued Trial set for 12/28/2020 at 09:00 AM by telephone and video conference.** (emiller) (Entered: 12/23/2020) |
| 12/23/2020 | 2612 (1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 12/23/2020 1:45:46 PM ]. File Size [ 92012 KB ]. Run Time [ 03:11:41 ]. (TRIAL DAY 5 - AFTERNOON SESSION). (admin). (Entered: 12/23/2020) |
| 12/23/2020 | 2613 (32 pgs) | Notice *of Fee Statement of Shearman & Sterling LLP for Compensation for Services and Reimbursement of Expenses as Special Counsel to the Debtors and Debtors in Possession for the Period From October 1, 2020 Through October 31, 2020*. (Related document(s):656 Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 12/23/2020) |
| | 2614 (35 pgs) | Notice *of Fee Statement of Shearman & Sterling LLP for Compensation for Services and Reimbursement of Expenses as Special Counsel to the Debtors and Debtors in Possession for the Period From November 1, 2020 Through November 30, 2020*. (Related document(s):656 |

| | | |
|---|---|---|
| 12/23/2020 | | Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 12/23/2020) |
| 12/23/2020 | 🌐2615 <br><br> (259 pgs; 2 docs) | Proposed Order RE: *Order Confirming Third Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* (Filed By Chesapeake Energy Corporation ).(Related document(s):2336 Amended Chapter 11 Plan) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 12/23/2020) |
| 12/23/2020 | 🌐2616 <br><br> (11 pgs) | BNC Certificate of Mailing. (Related document (s):2576 Notice of Filing of Official Transcript (Form)) No. of Notices: 216. Notice Date 12/23/2020. (Admin.) (Entered: 12/23/2020) |
| 12/23/2020 | 🌐2617 <br><br> (11 pgs) | BNC Certificate of Mailing. (Related document (s):2572 Order on Motion to Appear pro hac vice) No. of Notices: 216. Notice Date 12/23/2020. (Admin.) (Entered: 12/23/2020) |
| 12/23/2020 | 🌐2657 <br><br> (1 pg) | Objection *to Sale* re: 1895. Filed by Shirley Gilliam Walton (ShadiaNash) Modified on 12/29/2020 (ShadiaNash). (Entered: 12/29/2020) |
| 12/24/2020 | 🌐2618 <br><br> (24 pgs) | Sealed Document *Debtors' Exhibit 437 for Continued Confirmation Hearing Set December 28, 2020* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 12/24/2020) |
| 12/24/2020 | 🌐2619 <br><br> (28 pgs) | Exhibit List, Witness List (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 12/24/2020) |
| 12/24/2020 | 🌐2620 <br><br> (77 pgs) | Affidavit Re: *of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):2055 Notice, 2057 Notice) (Garabato, Sid) (Entered: 12/24/2020) |
| | 🌐2621 <br><br> (11 pgs) | Emergency Motion *DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365(a) AND FED. R. BANKR. P. 6006 AUTHORIZING (I) ENTRY INTO AND ASSUMPTION OF AMENDED AND RESTATED* |

| | | |
|---|---|---|
| 12/24/2020 | | *GAS GATHERING AND PROCESSING CONTRACT WITH JACKALOPE GAS GATHERING SERVICES, L.L.C., AND (II) PAYMENT OF ALL OBLIGATIONS THEREUNDER* Filed by Debtor Chesapeake Energy Corporation (Graham, Genevieve) (Entered: 12/24/2020) |
| 12/24/2020 | 2622 (12 pgs) | BNC Certificate of Mailing. (Related document (s):2583 Order on Application for Compensation) No. of Notices: 216. Notice Date 12/24/2020. (Admin.) (Entered: 12/24/2020) |
| 12/24/2020 | 2623 (12 pgs) | BNC Certificate of Mailing. (Related document (s):2584 Order on Application for Compensation) No. of Notices: 216. Notice Date 12/24/2020. (Admin.) (Entered: 12/24/2020) |
| 12/24/2020 | 2624 (16 pgs) | BNC Certificate of Mailing. (Related document (s):2586 Generic Order) No. of Notices: 216. Notice Date 12/24/2020. (Admin.) (Entered: 12/24/2020) |
| 12/24/2020 | 2625 (16 pgs) | BNC Certificate of Mailing. (Related document (s):2587 Generic Order) No. of Notices: 216. Notice Date 12/24/2020. (Admin.) (Entered: 12/24/2020) |
| 12/27/2020 | 2626 (4 pgs) | Objection *Limited Objection of Official Committee of Unsecured Creditors to Debtors' Emergency Motion for Entry of an Order (I) Authorizing (A) Rejection of the Crude Agreement, (B) Assumption, As Modified, of the Transporation Agreement, (C) Entry Into the Processing Agreement, and (D) Provision of the Enterprise Release, and (II) Granting Related Relief* (related document(s):2376 Emergency Motion). Filed by Official Committee Of Unsecured Creditors (Harrison, Julie) (Entered: 12/27/2020) |
| | 2627 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Julie Harrison. This is to order a transcript of the December 23, 2020 hearing before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) Copy request was electronically forwarded to |

| | | |
|---|---|---|
| 12/27/2020 | | Judicial Transcribers of Texas on 12-28-2020. Estimated completion date: 12-29-2020. Modified on 12/28/2020 (MelissaMorgan). (Entered: 12/27/2020) |
| 12/27/2020 | 2628<br><br>(12 pgs; 2 docs) | Additional Attachments Re: *UCC Exhibits 1319 and 1320* (related document(s):2313 Witness List, Exhibit List, 2464 Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):2313 Witness List, Exhibit List, 2464 Witness List, Exhibit List) (Attachments: # 1 Exhibit 1320) (Harrison, Julie) (Entered: 12/27/2020) |
| 12/27/2020 | 2629<br><br>(7 pgs) | Sealed Document *UCC Sealed Exhibit 1321* (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) (Entered: 12/27/2020) |
| 12/27/2020 | 2630<br><br>(129 pgs; 2 docs) | Fourth Amended Chapter 11 Plan Filed by Chesapeake Energy Corporation. (Related document(s):1150 Chapter 11 Plan) (Attachments: # 1 Exhibit Redline)(Cavenaugh, Matthew) (Entered: 12/27/2020) |
| 12/28/2020 | 2631<br><br>(103 pgs) | Witness List, Exhibit List (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):2313 Witness List, Exhibit List, 2464 Witness List, Exhibit List) (Harrison, Julie) (Entered: 12/28/2020) |
| 12/28/2020 | 2632<br><br>(69 pgs; 6 docs) | Exhibit List (Filed By Chesapeake Energy Corporation ).(Related document(s):2290 Witness List, Exhibit List) (Attachments: # 1 Exhibit 439 # 2 Exhibit 440 # 3 Exhibit 441 # 4 Exhibit 442 # 5 Exhibit 443) (Cavenaugh, Matthew) (Entered: 12/28/2020) |
| 12/28/2020 | 2633<br><br>(28 pgs) | Exhibit List, Witness List (Filed By Chesapeake Energy Corporation ).(Related document(s):2290 Witness List, Exhibit List) (Cavenaugh, Matthew) (Entered: 12/28/2020) |
| | 2634<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew D. Cavenaugh. This is to order a transcript of 12/28/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access |

| | | |
|---|---|---|
| 12/28/2020 | | Transcripts (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) Electronically forwarded to Access Transcripts on 12-28-2020. Estimated completion dater: 12-29-2020. Modified on 12/28/2020 (MelissaMorgan). (Entered: 12/28/2020) |
| 12/28/2020 | 🔵2635<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Marty L. Brimmage, Jr.. This is to order a transcript of the December 28, 2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts ). (Brimmage, Marty) Copy request was electronically forwarded to Access Transcripts on 12-28-2020. Estimated completion date: 12-29-2020. Modified on 12/28/2020 (MelissaMorgan). (Entered: 12/28/2020) |
| 12/28/2020 | 🔵2636<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by M. Quejada. This is to order a transcript of December 28, 2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By MUFG Union Bank, N.A. ). (Quejada, Maegan) Copy request was electronically forwarded to Access Transcripts on 12-28-2020. Estimated completion date: 12-29-2020. Modified on 12/28/2020 (MelissaMorgan). (Entered: 12/28/2020) |
| 12/28/2020 | 🔵2637<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Julie Harrison. This is to order a transcript of the December 28, 2020 hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) Copy request was electronically forwarded to Access Transcripts on 12-28-2020. Estimated completion date: 12-29-2020. Modified on 12/28/2020 (MelissaMorgan). (Entered: 12/28/2020) |
| 12/28/2020 | 🔵2638<br><br>(1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 12/28/2020 9:00:05 AM ]. File Size [ 72762 KB ]. Run Time [ 02:31:35 ]. **(CONFIRMATION TRIAL DAY 6 - MORNING SESSION.).** (admin). (Entered: 12/28/2020) |

| | | |
|---|---|---|
| 12/28/2020 | 🔵 2639 <br><br> (3 pgs) | Stipulation By Chesapeake Energy Corporation and Official Committee of Unsecured Creditors. Does this document include an agreed order or otherwise request that the judge sign a document? No. (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 12/28/2020) |
| 12/28/2020 | 🔵 2640 <br><br> (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Justin Rawlins. This is to order a transcript of Hearing on December 28, 2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By MUFG Union Bank, N.A. ). (Rawlins, Justin) Copy request was electronically forwarded to Access Transcripts on 12-28-2020. Estimated completion date: 12-29-2020. Modified on 12/28/2020 (MelissaMorgan). (Entered: 12/28/2020) |
| 12/28/2020 | 🔵 2641 <br><br> (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by John E. Mitchell. This is to order a transcript of Hearing dated 12/28/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Energy Transfer Fuel, LP ). (Mitchell, John) Copy request was electronically forwarded to Access Transcripts on 12-28-2020. Estimated completion date: 12-29-2020. Modified on 12/28/2020 (MelissaMorgan). (Entered: 12/28/2020) |
| 12/28/2020 | 🔵 2642 <br><br> (6479 pgs) | Sealed Document *Unredacted Creditor Matrix* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 12/28/2020) |
| 12/28/2020 | 🔵 2643 <br><br> (4 pgs) | Courtroom Minutes. Time Hearing Held: 9:00 AM. Appearances: SEE ATTACHED. (Related document(s):2336 Amended Chapter 11 Plan) **TRIAL DAY 6.** Witness: Brendan Circle and Adam Miller. Direct and cross examination of Brendan Circle was concluded. Direct examination of Adam Miller was concluded. Will continue with the testimony of Adam Miller 12/29/2020 at 9:00 AM. **Continued trial is scheduled for 12/29/2020 at 09:00 AM by telephone and video conference.** (VrianaPortillo) (Entered: 12/28/2020) |
| | 🔵 2644 | 🔊 PDF with attached Audio File. Court Date & |

| | | |
|---|---|---|
| 12/28/2020 | (1 pg) | Time [ 12/28/2020 1:00:34 PM ]. File Size [ 92403 KB ]. Run Time [ 03:12:30 ]. (CONFIRMATION TRIAL DAY 6 - AFTERNOON SESSION.). (admin). (Entered: 12/28/2020) |
| 12/28/2020 | 2645 (35 pgs) | Motion to Reconsider (related document(s):2423 Generic Order). Filed by Creditor Ryan, LLC (Hales, Troy) (Entered: 12/28/2020) |
| 12/28/2020 | 2646 (44 pgs; 2 docs) | Motion *for Entry of an Order Approving (I) the Omnibus Claims Objection Procedures, (II) the Form of Notice of Objection, (III) the Satisfaction Procedures, and (IV) the Form of Notice of Satisfaction* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 12/28/2020) |
| 12/29/2020 | | Certificate of Telephone Notice. Contacted Pat Nash. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):2376 Emergency Motion) **Hearing scheduled for 1/28/2021 at 02:30 PM by telephone and video conference.** (aalo) (Entered: 12/29/2020) |
| 12/29/2020 | 2647 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew D. Cavenaugh. This is to order a transcript of 12/29/2020 before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) Electronically forwarded to Judicial Transcribers of Texas on December 29, 2020. Estimated completion date: December 30, 2020. Modified on 12/29/2020 (ClaudiaGutierrez). (Entered: 12/29/2020) |
| | 2648 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by M. Quejada. This is to order a transcript of December 29, 2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By MUFG Union Bank, N.A. ). (Quejada, Maegan) Copy request electronically forwarded to Judicial Transcribers of Texas on December 29, 2020. Estimated completion date: December 30, 2020. Modified on 12/29/2020 (ClaudiaGutierrez). (Entered: |

| 12/29/2020 | | 12/29/2020) |
|---|---|---|
| 12/29/2020 | 🔵 2649<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Marty L. Brimmage, Jr.. This is to order a transcript of the December 29, 2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts ). (Brimmage, Marty) Copy request electronically forwarded to Judicial Transcribers of Texas on December 29, 2020. Estimated completion date: December 30, 2020. Modified on 12/29/2020 (ClaudiaGutierrez). (Entered: 12/29/2020) |
| 12/29/2020 | 🔵 2650<br><br>(1 pg) | Exhibit List (Filed By Chesapeake Energy Corporation ).(Related document(s):2290 Witness List, Exhibit List) (Cavenaugh, Matthew) (Entered: 12/29/2020) |
| 12/29/2020 | 🔵 2651<br><br>(254 pgs) | Transcript RE: Confirmation Hearing Day Five (Via Zoom) held on December 23, 2020 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 03/29/2021. (mhen) (Entered: 12/29/2020) |
| 12/29/2020 | 🔵 2652<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Julie Harrison. This is to order a transcript of the December 29, 2020 hearing before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) Copy request electronically forwarded to Judicial Transcribers of Texas on December 29, 2020. Estimated completion date: December 30, 2020. Modified on 12/29/2020 (ClaudiaGutierrez). (Entered: 12/29/2020) |
| | 🔵 2653<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Justin Rawlins. This is to order a transcript of Hearing on December 29, 2020 before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By MUFG Union Bank, N.A. ). |

| | | |
|---|---|---|
| 12/29/2020 | | (Rawlins, Justin) Copy request electronically forwarded to Judicial Transcribers of Texas on December 29, 2020. Estimated completion date: December 30, 2020. Modified on 12/29/2020 (ClaudiaGutierrez). (Entered: 12/29/2020) |
| 12/29/2020 | 2654 (4 pgs) | Objection *Debtors' Objection to The Commonwealth of Pennsylvania's Motion for Mandatory Abstention* (related document(s):2109 Generic Motion). Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 12/29/2020) |
| 12/29/2020 | 2655 (2 pgs) | Notice *of Withdrawal of Motion for Relief from Automatic Stay (ECF No. 1606)*. Filed by Catherine Ramirez (Lindauer, Joyce) (Entered: 12/29/2020) |
| 12/29/2020 | 2656 (1 pg) | PDF with attached Audio File. Court Date & Time [ 12/29/2020 8:54:51 AM ]. File Size [ 70045 KB ]. Run Time [ 02:25:56 ]. (admin). (Entered: 12/29/2020) |
| 12/29/2020 | 2658 (7 pgs) | Joint Stipulation and Agreed Order Signed on 12/29/2020 (Related document(s):2543 Stipulation) (aalo) (Entered: 12/29/2020) |
| 12/29/2020 | 2659 (4 pgs) | Amended Order Pursuant to 11 U.S.C. §§ 105(a), 363(b), AND 365(a) ANDFED. R. BANKR. P. 6006 Authorizing (I) Assumption of Certain Agreements with Stagecoach Pipeline & Storage Company LLC, (II) Entry Into Replacement Stagecoach Agreements, (III) Cancellation of Existing Stagecoach Marc 1 Agreement, and (IV) Payment of all Obligations Thereunder Signed on 12/29/2020 (Related document(s):2476 Order on Emergency Motion) (aalo) (Entered: 12/29/2020) |
| 12/29/2020 | 2660 (4 pgs) | Notice *of Enterprise Rejection Hearing*. (Related document(s):2376 Emergency Motion) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 12/29/2020) |
| 12/29/2020 | 2661 (35 pgs) | Affidavit Re: *Notice of Transaction* (Filed By Epiq Corporate Restructuring LLC ). (Garabato, Sid) (Entered: 12/29/2020) |

| | | |
|---|---|---|
| 12/29/2020 | 🔵 2662 <br><br> (2 pgs) | Proposed Order RE: *Ryan, LLC's Motion to Reconsider* (Filed By Ryan, LLC ).(Related document(s):2645 Motion to Reconsider) (Hales, Troy) (Entered: 12/29/2020) |
| 12/29/2020 | 🔵 2663 <br><br> (4 pgs) | Courtroom Minutes. Time Hearing Held: 9-4PM. Appearances: see attached. **Day 7 of Trial.** Witness: Adam Miller. Testimony from Mr. Miller has concluded. The declarations at 2299-14,2482, 2299-3, 2299-1 have been admitted. Proof of Publications filed at 2297-19, 21,22,23,24,25,26 and 2322-1 have been admitted. **Day 8 of Trial to begin on 12/30/2020 at 9:00 AM.** . (aalo) (Entered: 12/29/2020) |
| 12/29/2020 | 🔵 2664 <br><br> (43 pgs) | Declaration re: *Supplemental Declaration of Helen Mason of Riveron Consulting LLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 12/29/2020) |
| 12/29/2020 | 🔵 2665 <br><br> (1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 12/29/2020 1:23:12 PM ]. File Size [ 64099 KB ]. Run Time [ 02:13:32 ]. (admin). (Entered: 12/29/2020) |
| 12/29/2020 | 🔵 2666 <br><br> (110 pgs) | Witness List, Exhibit List (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):2313 Witness List, Exhibit List, 2464 Witness List, Exhibit List, 2631 Witness List, Exhibit List) (Harrison, Julie) (Entered: 12/29/2020) |
| 12/29/2020 | 🔵 2667 <br><br> (225 pgs) | Transcript RE: Confirmation Hearing - Day 6 held on 12/28/20 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 03/29/2021. (AccessTranscripts) (Entered: 12/29/2020) |
| | 🔵 2668 <br><br> (1 pg) | Additional Attachments Re: *UCC Exhibit 1418* (related document(s):2666 Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):2666 Witness |

| | | |
|---|---|---|
| 12/30/2020 | | List, Exhibit List) (Harrison, Julie) (Entered: 12/30/2020) |
| 12/30/2020 | 2669<br><br>(110 pgs) | Witness List, Exhibit List (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):2313 Witness List, Exhibit List, 2464 Witness List, Exhibit List, 2631 Witness List, Exhibit List, 2666 Witness List, Exhibit List) (Harrison, Julie) (Entered: 12/30/2020) |
| 12/30/2020 | 2670<br><br>(1 pg) | Notice of Filing of Official Transcript as to 2651 Transcript, 2667 Transcript. Parties notified (Related document(s):2651 Transcript, 2667 Transcript) (Olin) (Entered: 12/30/2020) |
| 12/30/2020 | 2671<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew D. Cavenaugh. This is to order a transcript of 12/30/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) Electronically forwarded to Access Transcript on 12-30-2020. Estimated completion date: 12-31-20. Modified on 12/30/2020 (MelissaMorgan). (Entered: 12/30/2020) |
| 12/30/2020 | 2672<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Marty L. Brimmage, Jr.. This is to order a transcript of the December 30, 2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts ). (Brimmage, Marty) Copy request was electronically forwarded to Access Transcripts on 12-30-2020. Estimated completion date: 12-31-2020. Modified on 12/30/2020 (MelissaMorgan). (Entered: 12/30/2020) |
| 12/30/2020 | 2673<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by John E. Mitchell. This is to order a transcript of Hearing dated12/29/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Energy Transfer Fuel, LP ). (Mitchell, John) Copy request was electronically forwarded to Judicial Transcribers of Texas on 12-30-2020. |

| | | |
|---|---|---|
| 12/30/2020 | | Estimated completion date: 12-31-2020. Modified on 12/30/2020 (MelissaMorgan). (Entered: 12/30/2020) |
| 12/30/2020 | 2674<br><br>(3 pgs) | Withdrawal of Claim: *91 filed by Epiq Corporate Restructuring, LLC on behalf of Young County* (Garabato, Sid) (Entered: 12/30/2020) |
| 12/30/2020 | 2675<br><br>(2 pgs) | Withdrawal of Claim: *4365 filed by Epiq Corporate Restructuring, LLC on behalf of Louisiana Department of Revenue* (Garabato, Sid) (Entered: 12/30/2020) |
| 12/30/2020 | 2676<br><br>(2 pgs) | Withdrawal of Claim: *4543 filed by Epiq Corporate Restructuring, LLC on behalf of Department of the Interior/Office of Natural Resources Revenue* (Garabato, Sid) (Entered: 12/30/2020) |
| 12/30/2020 | 2677<br><br>(8 pgs; 3 docs) | Certificate of No Objection *with Respect to First Interim Fee Applications of Intrepid Partners, LLC and Rothschild & Co US Inc.* (Filed By Chesapeake Energy Corporation ).(Related document(s):2059 Application for Compensation, 2060 Application for Compensation) (Attachments: # 1 Proposed Order Intrepid Partners, LLC # 2 Proposed Order Rothschild & Co US Inc.) (Cavenaugh, Matthew) (Entered: 12/30/2020) |
| 12/30/2020 | 2678<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by John E. Mitchell. This is to order a transcript of Hearing - 12/30/2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Energy Transfer Fuel, LP ). (Mitchell, John) Copy request was electronically forwarded to Access Transcripts on 12-30-2020. Estimated completion date: 12-31-2020. Modified on 12/30/2020 (MelissaMorgan). (Entered: 12/30/2020) |
| 12/30/2020 | 2679<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by M. Quejada. This is to order a transcript of December 30, 2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By MUFG Union Bank, N.A. ). (Quejada, |

| | | |
|---|---|---|
| 12/30/2020 | | Maegan) Copy request was electronically forwarded to Access Transcripts on 12-30-2020. Estimated completion date: 12-31-2020. Modified on 12/30/2020 (MelissaMorgan). (Entered: 12/30/2020) |
| 12/30/2020 | 2680 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Justin Rawlins. This is to order a transcript of Hearing on December 30, 2020 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By MUFG Union Bank, N.A. ). (Rawlins, Justin) Copy request was electronically forwarded to Access Transcripts on 12-30-2020. Estimated completion date: 12-31-2020. Modified on 12/30/2020 (MelissaMorgan). (Entered: 12/30/2020) |
| 12/30/2020 | 2681 (1 pg) | PDF with attached Audio File. Court Date & Time [ 12/30/2020 8:59:40 AM ]. File Size [ 81965 KB ]. Run Time [ 02:50:46 ]. (Trial Day 8 - Morning Session). (admin). (Entered: 12/30/2020) |
| 12/30/2020 | 2682 (250 pgs; 10 docs) | Motion for Relief from Stay *to allow litigation to proceed in Pennsylvania state court*. Fee Amount $188. Filed by Creditor Commonwealth of Pennsylvania Hearing scheduled for 1/25/2021 at 02:00 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Proposed Order) (Butler, Lynn) (Entered: 12/30/2020) |
| 12/30/2020 | | Receipt of Motion for Relief From Stay(20-33233) [motion,mrlfsty] ( 188.00) Filing Fee. Receipt number 22711482. Fee amount $ 188.00. (U.S. Treasury) (Entered: 12/30/2020) |
| 12/30/2020 | 2683 (2 pgs) | Order Granting Application For Compensation (Related Doc # 1877). Signed on 12/30/2020. (aalo) (Entered: 12/30/2020) |
| 12/30/2020 | 2684 (2 pgs) | Order Granting Application For Compensation (Related Doc # 1878). Signed on 12/30/2020. (aalo) (Entered: 12/30/2020) |

| | | |
|---|---|---|
| 12/30/2020 | 🔵2685 (2 pgs) | Order Granting Application For Compensation (Related Doc # 1880). Signed on 12/30/2020. (aalo) (Entered: 12/30/2020) |
| 12/30/2020 | 🔵2686 (2 pgs) | Order Granting Application For Compensation (Related Doc # 2059). Signed on 12/30/2020. (aalo) (Entered: 12/30/2020) |
| 12/30/2020 | 🔵2687 (2 pgs) | Order Granting Application For Compensation (Related Doc # 2060). Signed on 12/30/2020. (aalo) (Entered: 12/30/2020) |
| 12/30/2020 | 🔵2688 (4 pgs) | Courtroom Minutes. Time Hearing Held: 9:00 am. Appearances: SEE ATTACHED.**Trial - Day 8** Witness: John Stuart. Concluded the testimony of Mr. Stuart. **Trial Day 9 set to begin 1/4/2021 at 09:00 AM by telephone and video conference.** (emiller) (Entered: 12/30/2020) |
| 12/30/2020 | 🔵2689 (1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 12/30/2020 1:44:27 PM ]. File Size [ 43068 KB ]. Run Time [ 01:29:44 ]. (Trial Day 8 - Afternoon Session). (admin). (Entered: 12/30/2020) |
| 12/30/2020 | 🔵2690 (3 pgs) | Withdrawal of Claim: *53 filed by Epiq Corporate Restructuring, LLC on behalf of KLX Energy Services LLC* (Garabato, Sid) (Entered: 12/30/2020) |
| 12/30/2020 | 🔵2691 (3 pgs) | Withdrawal of Claim: *4280 filed by Epiq Corporate Restructuring, LLC on behalf of Texas Comptroller of Public Accounts* (Garabato, Sid) (Entered: 12/30/2020) |
| 12/30/2020 | 🔵2692 (3 pgs) | Withdrawal of Claim: *4281 filed by Epiq Corporate Restructuring, LLC on behalf of Texas Comptroller of Public Accounts* (Garabato, Sid) (Entered: 12/30/2020) |
| 12/30/2020 | 🔵2693 (3 pgs) | Withdrawal of Claim: *4282 filed by Epiq Corporate Restructuring, LLC on behalf of Texas Comptroller of Public Accounts* (Garabato, Sid) (Entered: 12/30/2020) |
| | 🔵2694 | Withdrawal of Claim: *4283 filed by Epiq |

| | | |
|---|---|---|
| 12/30/2020 | (4 pgs) | *Corporate Restructuring, LLC on behalf of Texas Comptroller of Public Accounts* (Garabato, Sid) (Entered: 12/30/2020) |
| 12/30/2020 | 🌑2695<br>(2 pgs) | Withdrawal of Claim: *4366 filed by Epiq Corporate Restructuring, LLC on behalf of Louisiana Department of Revenue* (Garabato, Sid) (Entered: 12/30/2020) |
| 12/30/2020 | 🌑2736<br>(2 pgs) | Order Vacating Docket No. 1091 the Stipulation and Order by the Debtors Granting Relief from Automatic Stay (Related Doc # 1175) Signed on 12/30/2020. (emiller) (Entered: 01/05/2021) |
| 12/31/2020 | 🌑2696<br>(170 pgs) | Transcript RE: Confirmation Hearing Day Seven (Via Zoom) held on December 29, 2020 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 03/31/2021. (mhen) (Entered: 12/31/2020) |
| 12/31/2020 | 🌑2697<br>(178 pgs) | Transcript RE: Confirmation Hearing - Day 8 held on 12/30/20 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 03/31/2021. (AccessTranscripts) (Entered: 12/31/2020) |
| 12/31/2020 | 🌑2698<br>(51 pgs) | BNC Certificate of Mailing. (Related document (s):2658 Generic Order) No. of Notices: 216. Notice Date 12/31/2020. (Admin.) (Entered: 12/31/2020) |
| 12/31/2020 | 🌑2699<br>(14 pgs) | BNC Certificate of Mailing. (Related document (s):2659 Amended Order) No. of Notices: 216. Notice Date 12/31/2020. (Admin.) (Entered: 12/31/2020) |
| 01/01/2021 | 🌑2700<br>(11 pgs) | BNC Certificate of Mailing. (Related document (s):2670 Notice of Filing of Official Transcript (Form)) No. of Notices: 216. Notice Date 01/01/2021. (Admin.) (Entered: 01/02/2021) |
| | 🌑2701<br>(12 pgs) | BNC Certificate of Mailing. (Related document (s):2683 Order on Application for Compensation) No. of Notices: 216. Notice Date 01/01/2021. |

| | | |
|---|---|---|
| 01/01/2021 | | (Admin.) (Entered: 01/02/2021) |
| 01/01/2021 | ◉ 2702<br><br>(12 pgs) | BNC Certificate of Mailing. (Related document (s):2684 Order on Application for Compensation) No. of Notices: 216. Notice Date 01/01/2021. (Admin.) (Entered: 01/02/2021) |
| 01/01/2021 | ◉ 2703<br><br>(12 pgs) | BNC Certificate of Mailing. (Related document (s):2685 Order on Application for Compensation) No. of Notices: 216. Notice Date 01/01/2021. (Admin.) (Entered: 01/02/2021) |
| 01/01/2021 | ◉ 2704<br><br>(12 pgs) | BNC Certificate of Mailing. (Related document (s):2686 Order on Application for Compensation) No. of Notices: 216. Notice Date 01/01/2021. (Admin.) (Entered: 01/02/2021) |
| 01/01/2021 | ◉ 2705<br><br>(12 pgs) | BNC Certificate of Mailing. (Related document (s):2687 Order on Application for Compensation) No. of Notices: 216. Notice Date 01/01/2021. (Admin.) (Entered: 01/02/2021) |
| 01/03/2021 | ◉ 2706<br><br>(118 pgs; 6 docs) | Additional Attachments Re: *UCC Exhibits 1419, 1420, 1421, 1422, 1423, 1424* (related document (s):2669 Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ). (Related document(s):2669 Witness List, Exhibit List) (Attachments: # 1 Exhibit 1420 # 2 Exhibit 1421 # 3 Exhibit 1422 # 4 Exhibit 1423 # 5 Exhibit 1424) (Harrison, Julie) (Entered: 01/03/2021) |
| 01/03/2021 | ◉ 2707<br><br>(111 pgs) | Witness List, Exhibit List (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):2313 Witness List, Exhibit List, 2464 Witness List, Exhibit List, 2631 Witness List, Exhibit List, 2666 Witness List, Exhibit List) (Harrison, Julie) (Entered: 01/03/2021) |
| | ◉ 2708<br><br>(7 pgs; 2 docs) | Certificate of No Objection *Regarding First Interim Fee Application of Back Bay Management Corporation and its Division, the Michel-Shaked Group, for Allowance of Compensation and Reimbursement of Expenses as Expert Valuation Consultant to the Official Committee of Unsecured Creditors for the Period September 1, 2020* |

| | | |
|---|---|---|
| 01/04/2021 | | *through September 30, 2020* (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):2224 Application for Compensation) (Attachments: # 1 Proposed Order) (Harrison, Julie) (Entered: 01/04/2021) |
| 01/04/2021 | 🔵 2709<br><br>(96 pgs; 25 docs) | Sealed Document *Debtors' Exhibits 444-460 for Continued Confirmation Hearing Set January 4, 2021* (Filed By Chesapeake Energy Corporation ). (Attachments: # 1 Exhibit 444a # 2 Exhibit 445 # 3 Exhibit 446 # 4 Exhibit 447 # 5 Exhibit 448 # 6 Exhibit 448a # 7 Exhibit 448b # 8 Exhibit 449 # 9 Exhibit 449a # 10 Exhibit 450 # 11 Exhibit 450a # 12 Exhibit 450b # 13 Exhibit 451 # 14 Exhibit 451a # 15 Exhibit 451b # 16 Exhibit 452 # 17 Exhibit 453 # 18 Exhibit 454 # 19 Exhibit 455 # 20 Exhibit 456 # 21 Exhibit 457 # 22 Exhibit 458 # 23 Exhibit 459 # 24 Exhibit 460) (Cavenaugh, Matthew) (Entered: 01/04/2021) |
| 01/04/2021 | 🔵 2710<br><br>(1 pg) | Notice of Filing of Official Transcript as to 2696 Transcript, 2697 Transcript. Parties notified (Related document(s):2696 Transcript, 2697 Transcript) (jdav) (Entered: 01/04/2021) |
| 01/04/2021 | 🔵 2711<br><br>(29 pgs) | Exhibit List, Witness List (Filed By Chesapeake Energy Corporation ).(Related document(s):2290 Witness List, Exhibit List) (Cavenaugh, Matthew) (Entered: 01/04/2021) |
| 01/04/2021 | 🔵 2712<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew D. Cavenaugh. This is to order a transcript of 01/04/2021 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) Electronically forwarded to Access Transcripts, LLC on January 4, 2021. Estimated completion date" January 5, 2021. Modified on 1/4/2021 (ClaudiaGutierrez). (Entered: 01/04/2021) |
| | 🔵 2713<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Marty L. Brimmage, Jr.. This is to order a transcript of the January 4, 2021 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Franklin Advisers, Inc., as Investment |

| | | |
|---|---|---|
| 01/04/2021 | | Manager on Behalf of Certain Funds and Accounts ). (Brimmage, Marty) Copy request electronically forwarded to Access Transcripts, LLC on January 4, 2021. Estimated completion date: January 5, 2021. Modified on 1/4/2021 (ClaudiaGutierrez). (Entered: 01/04/2021) |
| 01/04/2021 | 2714 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by John E. Mitchell. This is to order a transcript of Confirmation Hearing - 1/4/2021 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Energy Transfer Fuel, LP ). (Mitchell, John) Copy request electronically forwarded to Access Transcripts, LLC on January 4, 2021. Estimated completion date: January 5, 2021. Modified on 1/4/2021 (ClaudiaGutierrez). (Entered: 01/04/2021) |
| 01/04/2021 | 2715 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (3-Day) by Mary Elizabeth Heard. This is to order a transcript of December 30, 2020 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By PMBG Parties ). (Heard, Mary) Copy request electronically forwarded to Access Transcripts, LLC on January 4, 2021. Estimated completion date: January 5, 2021. Modified on 1/4/2021 (ClaudiaGutierrez). (Entered: 01/04/2021) |
| 01/04/2021 | 2716 (1 pg) | PDF with attached Audio File. Court Date & Time [ 1/4/2021 9:01:03 AM ]. File Size [ 94216 KB ]. Run Time [ 03:16:17 ]. (Confirmation Trial Day 9 - Morning Session.). (admin). (Entered: 01/04/2021) |
| 01/04/2021 | 2717 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by M. Quejada. This is to order a transcript of January 4, 2021 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By MUFG Union Bank, N.A. ). (Quejada, Maegan) Copy request electronically forwarded to Access Transcripts, LLC on January 4, 2021. Estimated completion date: January 5, 2021. Modified on 1/4/2021 (ClaudiaGutierrez). (Entered: 01/04/2021) |

| | | |
|---|---|---|
| | 🔵2718<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Julie Harrison. This is to order a transcript of the January 4, 2021 hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) Copy request electronically forwarded to Access Transcripts, LLC on January 4, 2021. Estimated completion date: January 5, 2021. Modified on 1/4/2021 (ClaudiaGutierrez). (Entered: 01/04/2021) |
| 01/04/2021 | | |
| 01/04/2021 | 🔵2719<br><br>(3 pgs; 2 docs) | Letter from Gaynell Spigner (Attachments: # 1 Exhibit) (mmap) (Entered: 01/04/2021) |
| 01/04/2021 | 🔵2720<br><br>(1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 1/4/2021 2:00:06 PM ]. File Size [ 56327 KB ]. Run Time [ 01:57:21 ]. (Confirmation Trial Day 9 - Afternoon session.). (admin). (Entered: 01/04/2021) |
| 01/04/2021 | 🔵2721<br><br>(4 pgs) | Courtroom Minutes. Time Hearing Held: 9:00 AM. Appearances: SEE ATTACHED. Witnesses: John Creighton, Marc Brown, David MacGreevey. **Trial day 9.** Testimonies of John Creighton, Marc Brown and David MacGreevey were concluded. **Trial set to begin 1/5/2021 at 09:00 AM by telephone and video conference.** (VrianaPortillo) (Entered: 01/04/2021) |
| 01/04/2021 | 🔵2722<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Jacqueline Kindler. This is to order a transcript of Hearing held 12/28/2020 - 12/30-2020 before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas. (jdav) Copy request was electronically forwarded to original transcribers- Access Transcripts and Judicial Transcribers of Texas on 1-5-2021. Estimated completion date: 1-6-2021. Modified on 1/5/2021 (MelissaMorgan). (Entered: 01/04/2021) |
| 01/04/2021 | 🔵2723<br><br>(1 pg) | Withdrawal of Claim: 43 *Howland Engineering and Surveying Co.* (Haynes, Alison) (Entered: 01/04/2021) |

| | | |
|---|---|---|
| 01/04/2021 | 🔵 <u>2724</u><br><br>(5 pgs) | Affidavit Re: *4th Monthly PwC Fee Statement/1st Interim PwC Fee Application* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):<u>2558</u> Notice, <u>2561</u> Application for Compensation) (Garabato, Sid) (Entered: 01/04/2021) |
| 01/04/2021 | 🔵 <u>2725</u><br><br>(5 pgs) | Affidavit Re: *4th Monthly A&M Fee Statement* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):<u>2578</u> Notice) (Garabato, Sid) (Entered: 01/04/2021) |
| 01/04/2021 | 🔵 <u>2726</u><br><br>(31 pgs) | Affidavit Re: *De Minimis Notice/Cobb & Counsel OCP Declaration/Royston Rayzor OCP Declaration* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):<u>2607</u> Notice, <u>2608</u> Declaration, <u>2609</u> Declaration) (Garabato, Sid) (Entered: 01/04/2021) |
| 01/04/2021 | 🔵 <u>2727</u><br><br>(25 pgs) | Affidavit Re: *Motion for Entry of an Order Approving (I) the Omnibus Claims Objection Procedures, (II) the Form of Notice of Objection, (III) the Satisfaction Procedures, and (IV) the Form of Notice of Satisfaction* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):<u>2646</u> Generic Motion) (Garabato, Sid) (Entered: 01/04/2021) |
| 01/04/2021 | 🔵 <u>2728</u><br><br>(318 pgs; 2 docs) | Additional Attachments Re: *Sealed UCC Exhibits 1425 and 1426* (related document(s):<u>2707</u> Witness List, Exhibit List), Sealed Document (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):<u>2707</u> Witness List, Exhibit List) (Attachments: # <u>1</u> Exhibit 1426) (Harrison, Julie) (Entered: 01/04/2021) |
| 01/04/2021 | 🔵 <u>2729</u><br><br>(10 pgs; 7 docs) | Additional Attachments Re: *UCC Exhibits 1427, 1428, 1429, 1430, 1431, 1432, 1433* (related document(s):<u>2707</u> Witness List, Exhibit List) (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):<u>2707</u> Witness List, Exhibit List) (Attachments: # <u>1</u> Exhibit 1428 # <u>2</u> Exhibit 1429 # <u>3</u> Exhibit 1430 # <u>4</u> Exhibit 1431 # <u>5</u> Exhibit 1432 # <u>6</u> Exhibit 1433) (Harrison, Julie) (Entered: 01/04/2021) |
| | 🔵 <u>2730</u> | Witness List, Exhibit List (Filed By Official |

| | | |
|---|---|---|
| 01/04/2021 | (111 pgs) | Committee Of Unsecured Creditors ).(Related document(s):2313 Witness List, Exhibit List, 2464 Witness List, Exhibit List, 2631 Witness List, Exhibit List, 2666 Witness List, Exhibit List, 2707 Witness List, Exhibit List) (Harrison, Julie) (Entered: 01/04/2021) |
| 01/04/2021 | ⚫ 2732 <br> (4 pgs; 2 docs) | Letter from Gaynell Spigner (Attachments: # 1 Exhibit) (mmap) (Entered: 01/05/2021) |
| 01/04/2021 | ⚫ 2734 <br> (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Jacqueline Kindler. This is to order a transcript of 1/4/2020,Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts. (mmap) Copy request was electronically forwarded to Access Transcripts on 1-5-2021. Estimated completion date: 1-6-2021. Modified on 1/5/2021 (MelissaMorgan). (Entered: 01/05/2021) |
| 01/05/2021 | ⚫ 2731 <br> (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew D. Cavenaugh. This is to order a transcript of 01/05/2021 before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) Electronically forwarded to Judicial Transcribers of Texas on 1-5-2021. Estimated completion date: 1-6-2021. Modified on 1/5/2021 (MelissaMorgan). (Entered: 01/05/2021) |
| 01/05/2021 | ⚫ 2733 <br> (201 pgs) | Notice *of Fee Statement of Kirkland & Ellis LLP and Kirkland & Ellis International LLP for Compensation for Services and Reimbursement of Expenses as Attorneys to the Debtors and Debtors in Possession for the Period From September 1, 2020 Through September 30, 2020*. (Related document(s):656 Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 01/05/2021) |
| | ⚫ | Certificate of Telephone Notice. By agreement of the parties, the hearing o the motion for relief from stay has been adjourned. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):1248 |

| | | |
|---|---|---|
| 01/05/2021 | | Motion for Relief From Stay) **Hearing rescheduled for 1/12/2021 at 01:00 PM by telephone and video conference.** (aalo) (Entered: 01/05/2021) |
| 01/05/2021 | 2735 <br><br> (4 pgs) | Notice *of Reset Hearing on Motion of John H. Bedsole and Bedsole Land Company for Relief from the Automatic Stay.* (Related document (s):1248 Motion for Relief From Stay, Certificate of Notice) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 01/05/2021) |
| 01/05/2021 | 2737 <br><br> (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Jacqueline Kindler. This is to order a transcript of 12/23/2020, hearing before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas. (mmap) Copy request was electronically forwarded to Judicial Transcribers of Texas on 1-5-2021. Estimated completion date: 1-6-2021. Modified on 1/5/2021 (MelissaMorgan). (Entered: 01/05/2021) |
| 01/05/2021 | 2738 <br><br> (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Marty L. Brimmage, Jr.. This is to order a transcript of the January 5, 2021 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts ). (Brimmage, Marty) Copy request was electronically forwarded to Judicial Transcribers of Texas on 1-5-2021. Estimated completion date: 1-6-2021. Modified on 1/5/2021 (MelissaMorgan). (Entered: 01/05/2021) |
| | 2739 <br><br> (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Ordinary (30 days)) by William A. (Trey) Wood III. This is to order a transcript of January 4, 2021 (morning and afternoon sessions) before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Kinder Morgan Texas Pipeline LLC ). (Wood, William) Copy request electronically forwarded to Access Transcripts, LLC on January 5, 2021. Estimated completion date: February 4, 2021. Modified on 1/5/2021 (ClaudiaGutierrez). (Entered: |

| 01/05/2021 | | 01/05/2021) |
|---|---|---|
| 01/05/2021 | 2740 <br><br> (1 pg) | PDF with attached Audio File. Court Date & Time [ 1/5/2021 9:00:53 AM ]. File Size [ 72109 KB ]. Run Time [ 02:30:14 ]. (admin). (Entered: 01/05/2021) |
| 01/05/2021 | 2741 <br><br> (2 pgs) | Notice of Change of Address Filed by Plains Marketing, L.P. (Prewitt, Patricia) (Entered: 01/05/2021) |
| 01/05/2021 | 2742 <br><br> (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by M. Quejada. This is to order a transcript of January 5, 2021 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By MUFG Union Bank, N.A. ). (Quejada, Maegan) Copy request was electronically forwarded to Judicial Transcribers of Texas on 1-6-2021. Estimated completion date: 1-7-2021. Modified on 1/6/2021 (MelissaMorgan). (Entered: 01/05/2021) |
| 01/05/2021 | 2743 <br><br> (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Jacqueline Kindler. This is to order a transcript of 1/5/2021, hearing before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas. (mmap) Copy request was electronically forwarded to Judicial Transcribers of Texas on 1-6-2021. Estimated completion date: 1-7-2021. Modified on 1/6/2021 (MelissaMorgan). (Entered: 01/05/2021) |
| 01/05/2021 | 2744 <br><br> (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by John E. Mitchell. This is to order a transcript of Confirmation Hearing - 1/5/2021 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Energy Transfer Fuel, LP ). (Mitchell, John) Copy request was electronically forwarded to Judicial Transcribers of Texas on 1-6-2021. Estimated completion date: 1-7-2021. Modified on 1/6/2021 (MelissaMorgan). (Entered: 01/05/2021) |
| | 2745 | AO 435 TRANSCRIPT ORDER FORM (Daily |

| | | |
|---|---|---|
| 01/05/2021 | (1 pg) | (24 hours)) by Justin Rawlins. This is to order a transcript of Hearing on January 4, 2021 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By MUFG Union Bank, N.A. ). (Rawlins, Justin) Copy request was electronically forwarded to Access Transcripts on 1-6-2021. Estimated completion date: 1-7-2021. Modified on 1/6/2021 (MelissaMorgan). (Entered: 01/05/2021) |
| 01/05/2021 | 2746 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Justin Rawlins. This is to order a transcript of Hearing on January 5, 2021 before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By MUFG Union Bank, N.A. ). (Rawlins, Justin) Copy request was electronically forwarded to Judicial Transcribers of Texas on 1-6-2021. Estimated completion date: 1-7-2021. Modified on 1/6/2021 (MelissaMorgan). (Entered: 01/05/2021) |
| 01/05/2021 | 2747 (218 pgs) | Transcript RE: Confirmation Hearing - Day 9 held on 1/4/21 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 04/5/2021. (AccessTranscripts) (Entered: 01/05/2021) |
| 01/05/2021 | 2748 (3 pgs) | Courtroom Minutes. **Day 10 of Trial**. Trial Time: 9:00 - 5:15 PM. Appearances: see attached. Witnesses: Bill Ebanks and David Baggett. Testimony from Mr. Ebanks has concluded. Direct examination for Mr. Baggett has concluded. **Trial will resume on 1/6/2021 at 9:00 AM with cross examination of David Baggett by telephone and video conference.** (aalo) (Entered: 01/05/2021) |
| 01/05/2021 | 2749 (1 pg) | PDF with attached Audio File. Court Date & Time [ 1/5/2021 1:30:03 PM ]. File Size [ 103106 KB ]. Run Time [ 03:34:48 ]. (admin). (Entered: 01/05/2021) |
| | 2750 | AO 435 TRANSCRIPT ORDER FORM (Expedited (7 days)) by Mary Elizabeth Heard. |

| | | |
|---|---|---|
| 01/05/2021 | (1 pg) | This is to order a transcript of January 5, 2021 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By PMBG Parties ). (Heard, Mary) Copy request was electronically forwarded to Judicial Transcribers of Texas on 1-6-2021. Estimated completion date: 1-7-2021.Modified on 1/6/2021 (MelissaMorgan). (Entered: 01/05/2021) |
| 01/05/2021 | 2751<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Julie Harrison. This is to order a transcript of the December 30, 2020 hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) Copy request was electronically forwarded to Access Transcripts on 1-6-2021. Estimated completion date: 1-7-2021. Modified on 1/6/2021 (MelissaMorgan). (Entered: 01/05/2021) |
| 01/05/2021 | 2752<br><br>(7 pgs) | Stipulation By Chesapeake Energy Corporation and Eagle Ford MDL Royalty Owner Plaintiffs, CNOOC Energy U.S.A. LLC, Jamestown Resources, L.L.C., Larchmont Resources, LLC, and Pelican Energy, L.L.C.. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 01/05/2021) |
| 01/05/2021 | 2753<br><br>(15 pgs; 2 docs) | Notice *of the Official Committee of Unsecured Creditors' Submission of Deposition Designations for Confirmation Hearing and Joint Stipulation Regarding the Testimony of David Helffrich*. Filed by Official Committee Of Unsecured Creditors (Attachments: # 1 Exhibit 1) (Harrison, Julie) (Entered: 01/05/2021) |
| 01/06/2021 | 2754<br><br>(105 pgs) | Transcript RE: Confirmation Hearing Day Ten -- Morning Session Only (VIA ZOOM) held on January 5, 2021 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 04/6/2021. (mhen) (Entered: 01/06/2021) |
| | 2755 | Statement *First Monthly Fee Statement of BBG, Inc. for Allowance of Compensation for Services* |

| | | |
|---|---|---|
| 01/06/2021 | (14 pgs) | *Rendered and Reimbursement of Expenses Incurred as Real Estate Appraiser/Valuation Expert to the Official Committee of Unsecured Creditors for the Period from November 2, 2020 to November 30, 2020* (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) (Entered: 01/06/2021) |
| 01/06/2021 | 🌐 2756<br><br>(9 pgs) | Statement *Second Monthly Fee Statement of BBG, Inc. for Allowance of Compensation for Services Rendered and Reimbursement of Expenses Incurred as Real Estate Appraiser/Valuation Expert to the Official Committee of Unsecured Creditors for the Period from December 1, 2020 to December 31, 2020* (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) (Entered: 01/06/2021) |
| 01/06/2021 | 🌐 2757<br><br>(7 pgs; 3 docs) | Exhibit List (Filed By Chesapeake Energy Corporation ).(Related document(s):2290 Witness List, Exhibit List) (Attachments: # 1 Exhibit 462 # 2 Exhibit 463) (Cavenaugh, Matthew) (Entered: 01/06/2021) |
| 01/06/2021 | 🌐 2758<br><br>(15 pgs; 2 docs) | Notice *of the Official Committee of Unsecured Creditors' Corrected Submission of Deposition Designations for Confirmation Hearing and Joint Stipulation Regarding the Testimony of David Helffrich.*. (Related document(s):2753 Notice) Filed by Official Committee Of Unsecured Creditors (Attachments: # 1 Exhibit 1 (Corrected)) (Harrison, Julie) (Entered: 01/06/2021) |
| 01/06/2021 | 🌐 2759<br><br>(29 pgs) | Exhibit List, Witness List (Filed By Chesapeake Energy Corporation ).(Related document(s):2290 Witness List, Exhibit List) (Cavenaugh, Matthew) (Entered: 01/06/2021) |
| 01/06/2021 | 🌐 2760<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew D. Cavenaugh. This is to order a transcript of 01/06/2021 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) Electronically forwarded to Access Transcripts on 1-6-2021. Estimated completion date: 1-7-2021.Modified on 1/6/2021 (MelissaMorgan). |

| 01/06/2021 | | (Entered: 01/06/2021) |
|---|---|---|
| 01/06/2021 | 2761 <br><br> (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Marty L. Brimmage, Jr.. This is to order a transcript of the January 6, 2021 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts ). (Brimmage, Marty) Copy request was electronically forwarded to Access Transcripts on 1-6-2021. Estimated completion date: 1-7-2021. Modified on 1/6/2021 (MelissaMorgan). (Entered: 01/06/2021) |
| 01/06/2021 | 2762 <br><br> (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Julie Harrison. This is to order a transcript of the January 6, 2021 hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) Copy request was electronically forwarded to Access Transcripts on 1-6-2021. Estimated completion date: 1-7-2021. Modified on 1/6/2021 (MelissaMorgan). (Entered: 01/06/2021) |
| 01/06/2021 | 2763 <br><br> (7 pgs) | Stipulation and Agreed Order By and Among the Debtors, the Eagle Ford MDL Royalty Owner Plaintiffs, CEU, and JLP Signed on 1/6/2021 (Related document(s):2752 Stipulation) (emiller) (Entered: 01/06/2021) |
| 01/06/2021 | 2764 <br><br> (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by M. Quejada. This is to order a transcript of January 6, 2021 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By MUFG Union Bank, N.A. ). (Quejada, Maegan) Copy request was electronically forwarded to Access Transcripts on 1-6-2021. Estimated completion date: 1-7-2021. Modified on 1/6/2021 (MelissaMorgan). (Entered: 01/06/2021) |
| | 2765 <br><br> (1 pg) | PDF with attached Audio File. Court Date & Time [ 1/6/2021 9:00:11 AM ]. File Size [ 65527 KB ]. Run Time [ 02:16:31 ]. (Confirmation Trial Day 11 -- Morning Session). (admin). (Entered: |

| 01/06/2021 | | 01/06/2021) |
|---|---|---|
| 01/06/2021 | 2766<br>(6 pgs) | Letter from Jason Dean (JeannieAndresen) (Entered: 01/06/2021) |
| 01/06/2021 | 2767<br>(23 pgs) | Affidavit Re: *Supplemental Declaration of Helen Mason of Riveron Consulting LLC Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Epiq Corporate Restructuring LLC ).(Related document (s):2664 Declaration) (Garabato, Sid) (Entered: 01/06/2021) |
| 01/06/2021 | 2768<br>(8 pgs) | Stipulation By Chesapeake Energy Corporation and Kimmeridge Powder Minerals, LLC. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 01/06/2021) |
| 01/06/2021 | 2769<br>(1 pg) | Notice of Filing of Official Transcript as to 2747 Transcript, 2754 Transcript. Parties notified (Related document(s):2747 Transcript, 2754 Transcript) (Olin) (Entered: 01/06/2021) |
| 01/06/2021 | 2770<br>(4 pgs) | Courtroom Minutes. Time Hearing Held: 9:00 AM. Appearances: SEE ATTACHED. **Trial Day 11.**Witness: David Baggett. The testimony of Mr. Baggett was concluded. **Trial will resume 1/8/2021 at 08:00 AM by telephone and video conference.** (VrianaPortillo) (Entered: 01/06/2021) |
| 01/06/2021 | 2771<br>(1 pg) | PDF with attached Audio File. Court Date & Time [ 1/6/2021 1:00:17 PM ]. File Size [ 45122 KB ]. Run Time [ 01:34:00 ]. (Confirmation Trial Day 11 -- First Afternoon Session.). (admin). (Entered: 01/06/2021) |
| 01/06/2021 | 2772<br>(1 pg) | PDF with attached Audio File. Court Date & Time [ 1/6/2021 3:59:03 PM ]. File Size [ 17086 KB ]. Run Time [ 00:35:36 ]. (Confirmation Trial Day 11 -- Second Afternoon session.). (admin). (Entered: 01/06/2021) |

| | | |
|---|---|---|
| 01/06/2021 | 2773<br><br>(127 pgs) | Transcript RE: Confirmation Hearing Day Ten -- Afternoon Session (Via Zoom) held on January 5, 2021 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 04/6/2021. (mhen) (Entered: 01/06/2021) |
| 01/06/2021 | 2774<br><br>(11 pgs) | BNC Certificate of Mailing. (Related document (s):2710 Notice of Filing of Official Transcript (Form)) No. of Notices: 216. Notice Date 01/06/2021. (Admin.) (Entered: 01/07/2021) |
| 01/07/2021 | 2775<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Justin Rawlins. This is to order a transcript of Hearing on January 6, 2021 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By MUFG Union Bank, N.A. ). (Rawlins, Justin) Copy request was electronically forwarded to Access Transcripts on 1-8-2021. Estimated completion date: 1-9-2021. Modified on 1/8/2021 (MelissaMorgan). (Entered: 01/07/2021) |
| 01/07/2021 | 2776<br><br>(3 pgs) | Letter from Gaynell Spigner (mmap) (Entered: 01/07/2021) |
| 01/07/2021 | 2777<br><br>(5 pgs) | Letter from Gaynell Spigner (mmap) (Entered: 01/07/2021) |
| 01/07/2021 | 2778<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Jacqueline Kindler. This is to order a transcript of 1/6/2021, hearing before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas. (mmap) Copy request was electronically forwarded to Access Transcripts on 1-8-2021. Estimated completion date: 1-9-2021. Modified on 1/8/2021 (MelissaMorgan). (Entered: 01/07/2021) |
| | 2779<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Aparicion Minerals, LP et. al. / Ross Spence. This is to order a transcript of Confirmation Hearing 12/15/20 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Aparicion Minerals, |

| | | |
|---|---|---|
| 01/07/2021 | | LP et al ). (Spence, William) Copy request was electronically forwarded to Access Transcripts on 1-8-2021. Estimated completion date: 1-9-2021. Modified on 1/8/2021 (MelissaMorgan). (Entered: 01/07/2021) |
| 01/07/2021 | 2780<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Aparicion Minerals, LP et. al. / Ross Spence. This is to order a transcript of Confirmation Hearing 12/17/20 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Aparicion Minerals, LP et al ). (Spence, William) Copy request was electronically forwarded to Judicial Transcribers of Texas on 1-8-2021. Estimated completion date: 1-9-2021. Transcripts on 1- Modified on 1/8/2021 (MelissaMorgan). (Entered: 01/07/2021) |
| 01/07/2021 | 2781<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by John E. Mitchell. This is to order a transcript of Hearing January 6, 2021 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Energy Transfer Fuel, LP ). (Mitchell, John) Electronically forwarded to Access Transcripts on 1-8-2021. Estimated completion date: 1-9-2021. Modified on 1/8/2021 (MelissaMorgan). (Entered: 01/07/2021) |
| 01/07/2021 | 2782<br><br>(8 pgs) | Notice of Third Amended Plan Supplement for the Fourth Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates. Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 01/07/2021) |
| 01/07/2021 | 2783<br><br>(103 pgs) | Statement Sixth Monthly Fee Statement of Brown Rudnick LLP for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses as Co-Counsel for the Official Committee of Unsecured Creditors for the Period from December 1, 2020 through December 31, 2020 (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) (Entered: 01/07/2021) |
| | 2784<br><br>(1 pg) | Notice of Filing of Official Transcript as to 2754 Transcript, 2773 Transcript. Parties notified (Related document(s):2754 Transcript, 2773 |

| | | |
|---|---|---|
| 01/07/2021 | | Transcript) (hcar) (Entered: 01/07/2021) |
| 01/07/2021 | 🔵 2785<br><br>(50 pgs; 2 docs) | Motion *for Entry of an Order (I) Authorizing and Approving the Consent Decree and Environmental Settlement Agreement By and Among the Debtors and The United States on Behalf of the Environmental Protection Agency, and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 01/07/2021) |
| 01/07/2021 | 🔵 2786<br><br>(197 pgs) | Transcript RE: Confirmation Hearing - Day 11 held on 1/6/21 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 04/7/2021. (AccessTranscripts) (Entered: 01/07/2021) |
| 01/07/2021 | 🔵 2787<br><br>(7 pgs; 3 docs) | Notice *of Submission of the Official Committee of Unsecured Creditors' Deposition Designations and Debtors' Counter-Designations.* Filed by Official Committee Of Unsecured Creditors (Attachments: # 1 Exhibit A # 2 Exhibit B) (Harrison, Julie) (Entered: 01/07/2021) |
| 01/07/2021 | 🔵 2788<br><br>(12 pgs) | BNC Certificate of Mailing. (Related document (s):2736 Order on Motion To Reconsider) No. of Notices: 216. Notice Date 01/07/2021. (Admin.) (Entered: 01/07/2021) |
| 01/08/2021 | 🔵 2789<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew D. Cavenaugh. This is to order a transcript of 01/08/2021 before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) Electronically forwarded to Judicial Transcribers of Texas on 1-8-2021. Estimated completion date: 1-9-2021. Modified on 1/8/2021 (MelissaMorgan). (Entered: 01/08/2021) |
| 01/08/2021 | 🔵 2790<br><br>(6 pgs; 4 docs) | Statement *of David MacGreevey* (Filed By Official Committee Of Unsecured Creditors ). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C) (Harrison, Julie) (Entered: 01/08/2021) |

| | | |
|---|---|---|
| 01/08/2021 | 2791<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by M. Quejada. This is to order a transcript of January 8, 2021 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By MUFG Union Bank, N.A. ). (Quejada, Maegan) Copy request was electronically forwarded to Judicial Transcribers of Texas on 1-8-2021. Estimated completion date: 1-9-2021. Modified on 1/8/2021 (MelissaMorgan). (Entered: 01/08/2021) |
| 01/08/2021 | 2792<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Julie Harrison. This is to order a transcript of the January 8, 2021 hearing before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) Copy request was electronically forwarded to Judicial Transcribers of Texas on 1-8-2021. Estimated completion date: 1-9-2021. Modified on 1/8/2021 (MelissaMorgan). (Entered: 01/08/2021) |
| 01/08/2021 | 2793<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Justin Rawlins. This is to order a transcript of Hearing on January 8, 2021 before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By MUFG Union Bank, N.A. ). (Rawlins, Justin) Copy request was electronically forwarded to Judicial Transcribers of Texas on 1-8-2021. Estimated completion date: 1-9-2021. Modified on 1/8/2021 (MelissaMorgan). (Entered: 01/08/2021) |
| 01/08/2021 | 2794<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Marty L. Brimmage, Jr.. This is to order a transcript of Hearing on January 8, 2021 before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts ). (Brimmage, Marty) Copy request was electronically forwarded to Judicial Transcribers of Texas on 1-8-2021. Estimated completion date: 1-9-2021. Modified on 1/8/2021 (MelissaMorgan). (Entered: 01/08/2021) |
| | 2795 | Notice of Filing of Official Transcript as to 2786 Transcript. Parties notified (Related document |

| | | |
|---|---|---|
| 01/08/2021 | (1 pg) | (s):2786 Transcript) (dhan) (Entered: 01/08/2021) |
| 01/08/2021 | 2796<br><br>(9 pgs) | Stipulation By Official Committee Of Unsecured Creditors and The Debtors. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) (Entered: 01/08/2021) |
| 01/08/2021 | 2797<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by John E. Mitchell. This is to order a transcript of Hearing - 1/8/2021 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Energy Transfer Fuel, LP ). (Mitchell, John) Judicial Transcribers of Texas on 1-8-2021. Estimated completion date: 1-9-2021.Modified on 1/8/2021 (MelissaMorgan). (Entered: 01/08/2021) |
| 01/08/2021 | 2798 | Receipt of Sealed Document retained in Clerk's office. (than) (Entered: 01/08/2021) |
| 01/08/2021 | 2799<br><br>(1 pg) | PDF with attached Audio File. Court Date & Time [ 1/8/2021 7:45:01 AM ]. File Size [ 107606 KB ]. Run Time [ 03:44:11 ]. (Trial Day 12 - morning session). (admin). (Entered: 01/08/2021) |
| 01/08/2021 | 2800<br><br>(5 pgs) | Stipulation By Chesapeake Energy Corporation and CNOOC Energy U.S.A. LLC f/k/a OOGC America LLC, Jamestown Resources, L.L.C., Larchmont Resources, L.L.C., Petty Business Enterprises, LP. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ).(Related document(s):1561 Stipulation, 1632 Generic Order) (Schwarzman, Alexandra) (Entered: 01/08/2021) |
| 01/08/2021 | 2801<br><br>(9 pgs) | Joint Stipulation and Agreed Order between the Debtors and the Official Committee of Unsecured Creditors' Regarding Admission of Exhibits Signed on 1/8/2021 (Related document(s):2796 Stipulation) (emiller) (Entered: 01/08/2021) |
| | 2802 | Courtroom Minutes. Time Hearing Held: 8:00 am. Appearances: SEE ATTACHED. (Related |

| | | |
|---|---|---|
| 01/08/2021 | (4 pgs) | document(s):2770 Courtroom Minutes) **Trial Day 12** Witness: Dr. Israel Shaked. The testimony of Dr. Shaked was concluded. Closing to begin on Wednesday. **Trial will continue 1/13/2021 at 09:00 AM by telephone and video conference.** (emiller) (Entered: 01/08/2021) |
| 01/08/2021 | 2803 (1 pg) | PDF with attached Audio File. Court Date & Time [ 1/8/2021 1:58:48 PM ]. File Size [ 123768 KB ]. Run Time [ 04:17:51 ]. (Trial Day 12 - afternoon session). (admin). (Entered: 01/08/2021) |
| 01/08/2021 | 2804 (11 pgs) | BNC Certificate of Mailing. (Related document (s):2769 Notice of Filing of Official Transcript (Form)) No. of Notices: 216. Notice Date 01/08/2021. (Admin.) (Entered: 01/08/2021) |
| 01/08/2021 | 2805 (17 pgs) | BNC Certificate of Mailing. (Related document (s):2763 Generic Order) No. of Notices: 216. Notice Date 01/08/2021. (Admin.) (Entered: 01/08/2021) |
| 01/08/2021 | 2813 (2 pgs) | Notice of Change of Address Filed by David W Chinn (JesusGuajardo) (Entered: 01/11/2021) |
| 01/09/2021 | 2806 (7 pgs) | Objection (related document(s):2646 Generic Motion). Filed by United States of America (Kincheloe, Richard) (Entered: 01/09/2021) |
| 01/09/2021 | 2807 (9 pgs) | Stipulation By Chesapeake Energy Corporation and Wyoming Royalty Owners. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 01/09/2021) |
| 01/09/2021 | 2808 (11 pgs) | BNC Certificate of Mailing. (Related document (s):2784 Notice of Filing of Official Transcript (Form)) No. of Notices: 216. Notice Date 01/09/2021. (Admin.) (Entered: 01/09/2021) |
| 01/09/2021 | 2816 (5 pgs) | Email to the Court from Mr. Jason Dean. (aalo) (Entered: 01/11/2021) |

| | | |
|---|---|---|
| 01/10/2021 | ⬤ 2809<br><br>(11 pgs) | BNC Certificate of Mailing. (Related document (s):2795 Notice of Filing of Official Transcript (Form)) No. of Notices: 216. Notice Date 01/10/2021. (Admin.) (Entered: 01/10/2021) |
| 01/10/2021 | ⬤ 2810<br><br>(19 pgs) | BNC Certificate of Mailing. (Related document (s):2801 Generic Order) No. of Notices: 216. Notice Date 01/10/2021. (Admin.) (Entered: 01/10/2021) |
| 01/11/2021 | ⬤ 2811<br><br>(3 pgs) | Response *Aparicion Minerals et al Royalty Owners' Joinder to the United States Objection to Debtors' Motion for Entry of an Order Approving (I) the Omnibus Claims Objection Procedures, (II) the Form of Notice of Objection, (III) the Satisfaction Procedures, and (IV) the Form of Notice of Satisfaction* (related document(s):2646 Generic Motion). Filed by Aparicion Minerals, LP et al (Spence, William) (Entered: 01/11/2021) |
| 01/11/2021 | ⬤ 2812<br><br>(2 pgs) | Withdraw Document (Filed By SWN Production Company, LLC ).(Related document(s):2099 Objection to Confirmation of the Plan) (Cohen, Jason) (Entered: 01/11/2021) |
| 01/11/2021 | ⬤ 2814<br><br>(3 pgs) | Letter from John Brydels Jr (mmap) (Entered: 01/11/2021) |
| 01/11/2021 | ⬤ 2815<br><br>(337 pgs) | Transcript RE: Confirmation Hearing Day Twelve (Via Zoom) held on January 8, 2021 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 04/12/2021. (mhen) (Entered: 01/11/2021) |
| 01/11/2021 | ⬤ 2817<br><br>(3 pgs) | Order Pursuant to 11 U.S.C. §§ 105(a), 363(b), AND 365(a) AND FED. R. BANKR. P. 6006 Authorizing (I) Entry Into and Assumption of Amended and Restated Gas Gathering and Processing Contract with Jackalope Gas Gathering Services, L.L.C., and (II) Payment of all Obligations Thereunder (Related Doc # 2621) Signed on 1/11/2021. (VrianaPortillo) (Entered: 01/11/2021) |
| | | |

| | | |
|---|---|---|
| 01/11/2021 | ⬤2818<br><br>(8 pgs) | Stipulation and Agreed Order Regarding the Kimmeridge Confirmation Objection and Proofs of Claim No. 11288, 11289, 13347, 13348, and 13349 Signed on 1/11/2021 (VrianaPortillo) (Entered: 01/11/2021) |
| 01/11/2021 | ⬤2819<br><br>(9 pgs) | Stipulation and Agreed Order Regarding the Wyoming Royalty Owners' Confirmation Objection and Proofs of Claim No. 1560, 1561, 1562, 1829, 1951, 1952, 1953, 1954, AND 1955 Signed on 1/11/2021 (Related document(s):2807 Stipulation) (VrianaPortillo) (Entered: 01/11/2021) |
| 01/11/2021 | ⬤2820<br><br>(253 pgs; 6 docs) | Supplemental Objection to Confirmation of Plan Filed by Aparicion Minerals, LP et al. (Related document(s):1599 Amended Chapter 11 Plan, 2155 Objection to Confirmation of the Plan, 2630 Amended Chapter 11 Plan) (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E)(Spence, William) (Entered: 01/11/2021) |
| 01/12/2021 | ⬤2821<br><br>(151 pgs; 9 docs) | Notice *of Filing of Official Committee of Unsecured Creditors' Trial Demonstratives*. Filed by Official Committee Of Unsecured Creditors (Attachments: # 1 Exhibit A: Ebanks Demonstratives # 2 Exhibit B: Brown Demonstratives # 3 Complaint C: MacGreevey Demonstratives # 4 Exhibit D: Baggett Solvency Demonstratives # 5 Exhibit E: Baggett Valuation Demonstratives # 6 Exhibit F: Shaked Demonstratives # 7 Exhibit G: Lawler Cross Demonstratives # 8 Exhibit H: Miller Cross Demonstratives) (Harrison, Julie) (Entered: 01/12/2021) |
| 01/12/2021 | ⬤2822<br><br>(4 pgs) | Letter from John Dough (mmap) (Entered: 01/12/2021) |
| 01/12/2021 | ⬤2823<br><br>(1 pg) | Notice of Filing of Official Transcript as to 2815 Transcript. Parties notified (Related document (s):2815 Transcript) (Olin) (Entered: 01/12/2021) |
| | ⬤ | Certificate of Telephone Notice. By agreement of the parties, the hearing on the motion for relief from stay set for 1/12/21 at 1PM has been |

| | | |
|---|---|---|
| 01/12/2021 | | adjourned. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):1248 Motion for Relief From Stay) **Hearing rescheduled for 2/1/2021 at 02:00 PM by telephone and video conference.** (aalo) (Entered: 01/12/2021) |
| 01/12/2021 | 2824<br><br>(4 pgs) | Notice *of Reset Hearing on Motion of John H. Bedsole and Bedsole Land Company for Relief from the Automatic Stay.* (Related document (s):1248 Motion for Relief From Stay) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 01/12/2021) |
| 01/12/2021 | 2825 | Receipt of Sealed Document retained in Clerk's office. (than) (Entered: 01/12/2021) |
| 01/12/2021 | 2826<br><br>(78 pgs) | Notice *of Filing of Debtors' Trial Demonstratives.* (Related document(s):1544 Sealed Document, 1546 Sealed Document, 2630 Amended Chapter 11 Plan) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 01/12/2021) |
| 01/12/2021 | 2827<br><br>(8 pgs) | Supplemental Objection *and Joinder by Delasandros to Fourth Amended Plan Docs. 2140 & 2630.* Filed by Stephanie Delasandro (Warman, Lynnette) (Entered: 01/12/2021) |
| 01/12/2021 | 2828<br><br>(2 pgs) | Objection *Joinder in United States Objection (Doc. 2806) to Omnibus Claim Procedure Motion (Doc. 2646)* (related document(s):2646 Generic Motion). Filed by Stephanie Delasandro (Warman, Lynnette) (Entered: 01/12/2021) |
| 01/12/2021 | 2829<br><br>(12 pgs) | Statement *Fourth Amended Verified Statement of David Polk & Wardwell LLP and Vinson & Elkins LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019* (Filed By Ad Hoc Group of FLLO Term Loan Lenders ). (Morgan, John) (Entered: 01/12/2021) |
| 01/12/2021 | 2830<br><br>(3 pgs) | Response (Filed By PMBG Parties ).(Related document(s):2646 Generic Motion, 2806 Objection) (Heard, Mary) (Entered: 01/12/2021) |
| | 2831 | Notice *of Filing Franklin Advisers, Inc.'s Trial* |

| | | |
|---|---|---|
| 01/12/2021 | (8 pgs) | *Demonstratives*. (Related document(s):1544 Sealed Document, 1546 Sealed Document, 2630 Amended Chapter 11 Plan) Filed by Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts (Brimmage, Marty) (Entered: 01/12/2021) |
| 01/12/2021 | 2832<br>(131 pgs) | Statement *Fifth Monthly Statement of AlixPartners, LLP* (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) (Entered: 01/12/2021) |
| 01/12/2021 | 2833<br>(128 pgs; 2 docs) | Fifth Amended Chapter 11 Plan Filed by Chesapeake Energy Corporation. (Attachments: # 1 Redline)(Cavenaugh, Matthew) (Entered: 01/12/2021) |
| 01/12/2021 | 2834<br>(347 pgs; 2 docs) | Proposed Order RE: *Order Confirming Fifth Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* (Filed By Chesapeake Energy Corporation ).(Related document(s):2833 Amended Chapter 11 Plan) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 01/12/2021) |
| 01/12/2021 | 2945<br>(2 pgs) | Letter from Richard Maszota (gkel) (Entered: 01/20/2021) |
| 01/13/2021 | 2835<br>(46 pgs; 2 docs) | Supplemental Objection to Confirmation of Plan Filed by EJS Investment Holdings, LLC. (Related document(s):2108 Objection to Confirmation of the Plan, 2833 Amended Chapter 11 Plan) (Attachments: # 1 Exhibit A)(Towber, Preston) (Entered: 01/13/2021) |
| 01/13/2021 | 2836<br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew D. Cavenaugh. This is to order a transcript of 01/13/2021 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) Electronically forwarded to Access Transcripts on 1-13-2021. Estimated completion date: 1-14-2021. Modified on 1/13/2021 (MelissaMorgan). (Entered: 01/13/2021) |
| | | |

| | | |
|---|---|---|
| 01/13/2021 | 🌐 2837<br><br>(21 pgs) | Affidavit Re: *Stipulation By Chesapeake Energy Corporation and CNOOC Energy U.S.A. LLC f/k/a OOGC America LLC, Jamestown Resources, L.L.C., Larchmont Resources, L.L.C., Petty Business Enterprises, LP* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):2800 Stipulation) (Garabato, Sid) (Entered: 01/13/2021) |
| 01/13/2021 | 🌐 2838<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Justin Rawlins. This is to order a transcript of Hearing on January 13, 2021 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By MUFG Union Bank, N.A. ). (Rawlins, Justin)Copy request was electronically forwarded to Access Transcripts on 1-13-20221. Estimated completion date: 1-14-2021. Modified on 1/13/2021 (MelissaMorgan). (Entered: 01/13/2021) |
| 01/13/2021 | 🌐 2839<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Julie Harrison. This is to order a transcript of the January 13, 2021 hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie)Copy request was electronically forwarded to Access Transcripts on 1-13-2021. Estimated completion date: 1-14-2021. Modified on 1/13/2021 (MelissaMorgan). (Entered: 01/13/2021) |
| 01/13/2021 | 🌐 2840<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by John E. Mitchell. This is to order a transcript of Hearing - 1/13/2021 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Energy Transfer Fuel, LP ). (Mitchell, John) Copy request was electronically forwarded to Access Transcripts on 1-13-2021. Estimated completion date: 1-14-2021. Modified on 1/13/2021 (MelissaMorgan). (Entered: 01/13/2021) |
| 01/13/2021 | 🌐 2841<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Marty L. Brimmage, Jr.. This is to order a transcript of January 13, 2021 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain |

| | | |
|---|---|---|
| 01/13/2021 | | Funds and Accounts ). (Brimmage, Marty) Copy request was electronically forwarded to Access Transcripts on 1-13-2021. Estimated completion date: 1-14-2021. Modified on 1/13/2021 (MelissaMorgan). (Entered: 01/13/2021) |
| 01/13/2021 | 2842 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by M. Quejada. This is to order a transcript of January 13, 2021 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By MUFG Union Bank, N.A. ). (Quejada, Maegan) Copy request was electronically forwarded to Access Transcripts on 1-13-2021. Estimated completion date: 1-14-2021. Modified on 1/13/2021 (MelissaMorgan). (Entered: 01/13/2021) |
| 01/13/2021 | 2843 (30 pgs) | Notice *of Third Monthly Fee Statement of Ernst & Young LLP for Compensation and Reimbursement of Expenses for the Period from December 1, 2020 Through December 31, 2020.* Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 01/13/2021) |
| 01/13/2021 | 2844 (5 pgs; 2 docs) | Certificate of No Objection *with Respect to the First Interim Application of PricewaterhouseCoopers LLP for Compensation and Reimbursement of Expenses as Audit Services and Tax Consulting Services Provider for the Debtors for the Period from June 28, 2020 Through September 30, 2020* (Filed By Chesapeake Energy Corporation ).(Related document(s):2561 Application for Compensation) (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 01/13/2021) |
| 01/13/2021 | 2845 (359 pgs; 2 docs) | Proposed Order RE: *Order Confirming Fifth Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* (Filed By Chesapeake Energy Corporation ).(Related document(s):2833 Amended Chapter 11 Plan) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 01/13/2021) |
| 01/13/2021 | 2846 (1 pg) | PDF with attached Audio File. Court Date & Time [ 1/13/2021 9:00:11 AM ]. File Size [ 99570 |

| | | |
|---|---|---|
| 01/13/2021 | | KB ]. Run Time [ 03:27:26 ]. (Trial Day 13 -- Morning Session.). (admin). (Entered: 01/13/2021) |
| 01/13/2021 | ⚫2847<br><br>(359 pgs; 2 docs) | Proposed Order RE: *Order Confirming Fifth Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* (Filed By Chesapeake Energy Corporation ).(Related document(s):2833 Amended Chapter 11 Plan) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 01/13/2021) |
| 01/13/2021 | ⚫2848<br><br>(1 pg) | Withdrawal of Claim: *68 filed by Epiq Corporate Restructuring, LLC on behalf of HILBERLING PACKER SERVICES INC* (Suarez, Hugo) (Entered: 01/13/2021) |
| 01/13/2021 | ⚫2849<br><br>(1 pg) | Withdrawal of Claim: *114 filed by Epiq Corporate Restructuring, LLC on behalf of MUSTANG MACHINERY COMPANY LLC* (Suarez, Hugo) (Entered: 01/13/2021) |
| 01/13/2021 | ⚫2850<br><br>(1 pg) | Withdrawal of Claim: *219 filed by Epiq Corporate Restructuring, LLC on behalf of RKK PRODUCTION COMPANY* (Suarez, Hugo) (Entered: 01/13/2021) |
| 01/13/2021 | ⚫2851<br><br>(1 pg) | Withdrawal of Claim: *441 filed by Epiq Corporate Restructuring, LLC on behalf of DAVIS GRAHAM AND STUBBS LLP* (Suarez, Hugo) (Entered: 01/13/2021) |
| 01/13/2021 | ⚫2852<br><br>(1 pg) | Withdrawal of Claim: *457 filed by Epiq Corporate Restructuring, LLC on behalf of CREST RESOURCES INC* (Suarez, Hugo) (Entered: 01/13/2021) |
| 01/13/2021 | ⚫2853<br><br>(1 pg) | Withdrawal of Claim: *458 filed by Epiq Corporate Restructuring, LLC on behalf of CREST RESOURCES INC* (Suarez, Hugo) (Entered: 01/13/2021) |
| 01/13/2021 | ⚫2854<br><br>(1 pg) | Withdrawal of Claim: *10005 filed by Epiq Corporate Restructuring, LLC on behalf of H & E EQUIPMENT SERVICES INC* (Suarez, Hugo) (Entered: 01/13/2021) |

| | | |
|---|---|---|
| 01/13/2021 | 2855<br><br>(1 pg) | Withdrawal of Claim: *10008 filed by Epiq Corporate Restructuring, LLC on behalf of HOLCOMBE ENERGY RESOURCE LLC* (Suarez, Hugo) (Entered: 01/13/2021) |
| 01/13/2021 | 2856<br><br>(1 pg) | Withdrawal of Claim: *10011 filed by Epiq Corporate Restructuring, LLC on behalf of LUGREG TRUCKING LLC* (Suarez, Hugo) (Entered: 01/13/2021) |
| 01/13/2021 | 2857<br><br>(1 pg) | Withdrawal of Claim: *10016 filed by Epiq Corporate Restructuring, LLC on behalf of EAGLE AUTOMATION* (Suarez, Hugo) (Entered: 01/13/2021) |
| 01/13/2021 | 2858<br><br>(1 pg) | Withdrawal of Claim: *10023 filed by Epiq Corporate Restructuring, LLC on behalf of CLEMENTS FLUIDS SOUTH TEXAS LTD* (Suarez, Hugo) (Entered: 01/13/2021) |
| 01/13/2021 | 2859<br><br>(1 pg) | Withdrawal of Claim: *10064 filed by Epiq Corporate Restructuring, LLC on behalf of FECHNER PUMP & SUPPLY INC* (Suarez, Hugo) (Entered: 01/13/2021) |
| 01/13/2021 | 2860<br><br>(1 pg) | Withdrawal of Claim: *10101 filed by Epiq Corporate Restructuring, LLC on behalf of SKY-LIN SERVICES LLC* (Suarez, Hugo) (Entered: 01/13/2021) |
| 01/13/2021 | 2861<br><br>(2 pgs) | Withdrawal of Claim: *Multiple Claims- see attached Exhibit- filed by Epiq Corporate Restructuring, LLC on behalf of SKY-LIN SERVICES LLC* (Suarez, Hugo) (Entered: 01/13/2021) |
| 01/13/2021 | 2862<br><br>(1 pg) | Withdrawal of Claim: *10151 filed by Epiq Corporate Restructuring, LLC on behalf of BESTEBIT LLC* (Suarez, Hugo) (Entered: 01/13/2021) |
| 01/13/2021 | 2863<br><br>(1 pg) | Withdrawal of Claim: *10155 filed by Epiq Corporate Restructuring, LLC on behalf of NABORS DRILLING TECHNOLOGIES USA INC* (Suarez, Hugo) (Entered: 01/13/2021) |

| | | |
|---|---|---|
| 01/13/2021 | 🔵 2864<br><br>(1 pg) | Withdrawal of Claim: *10156 filed by Epiq Corporate Restructuring, LLC on behalf of CANRIG DRILLING TECHNOLOGY LTD* (Suarez, Hugo) (Entered: 01/13/2021) |
| 01/13/2021 | 🔵 2865<br><br>(1 pg) | Withdrawal of Claim: *10177 filed by Epiq Corporate Restructuring, LLC on behalf of TESSCO TECHNOLOGIES INC* (Suarez, Hugo) (Entered: 01/13/2021) |
| 01/13/2021 | 🔵 2866<br><br>(1 pg) | Withdrawal of Claim: *10218 filed by Epiq Corporate Restructuring, LLC on behalf of WORKOVER SOLUTIONS INC* (Suarez, Hugo) (Entered: 01/13/2021) |
| 01/13/2021 | 🔵 2867<br><br>(1 pg) | Withdrawal of Claim: *10252 filed by Epiq Corporate Restructuring, LLC on behalf of CARETTA ENTERPRISES INC* (Suarez, Hugo) (Entered: 01/13/2021) |
| 01/13/2021 | 🔵 2868<br><br>(1 pg) | Withdrawal of Claim: *10279 filed by Epiq Corporate Restructuring, LLC on behalf of CARETTA ENTERPRISES INC* (Suarez, Hugo) (Entered: 01/13/2021) |
| 01/13/2021 | 🔵 2869<br><br>(1 pg) | Withdrawal of Claim: *10365 filed by Epiq Corporate Restructuring, LLC on behalf of FLOW CONTROL EQUIPMENT LLC* (Suarez, Hugo) (Entered: 01/13/2021) |
| 01/13/2021 | 🔵 2870<br><br>(1 pg) | Withdrawal of Claim: *10876 filed by Epiq Corporate Restructuring, LLC on behalf of R&D LLC* (Suarez, Hugo) (Entered: 01/13/2021) |
| 01/13/2021 | 🔵 2871<br><br>(2 pgs) | Withdrawal of Claim: *13255 filed by Epiq Corporate Restructuring, LLC on behalf of DANIEL LAMBORN* (Suarez, Hugo) (Entered: 01/13/2021) |
| 01/13/2021 | 🔵 2872<br><br>(3 pgs) | Notice *Plaintiffs Counsel George Parker Youngs Notice Of Change of Address and Appearance Of Counsel.* Filed by c/o Annie Catmull Royalty Owner Plaintiffs c/o (Catmull, Annie) (Entered: 01/13/2021) |
| | 🔵 2873 | AO 435 TRANSCRIPT ORDER FORM (Daily |

| | | |
|---|---|---|
| 01/13/2021 | (1 pg) | (24 hours)) by Mary Elizabeth Heard. This is to order a transcript of January 13, 2021 Afternoon Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By PMBG Parties ). (Heard, Mary) Electronically forwarded to Access Transcripts on 1-14-2021. Estimated completion date: 1-15-2021. Modified on 1/14/2021 (MelissaMorgan). (Entered: 01/13/2021) |
| 01/13/2021 | 2874 (13 pgs) | BNC Certificate of Mailing. (Related document (s):2817 Order on Emergency Motion) No. of Notices: 217. Notice Date 01/13/2021. (Admin.) (Entered: 01/14/2021) |
| 01/13/2021 | 2875 (18 pgs) | BNC Certificate of Mailing. (Related document (s):2818 Generic Order) No. of Notices: 217. Notice Date 01/13/2021. (Admin.) (Entered: 01/14/2021) |
| 01/13/2021 | 2876 (19 pgs) | BNC Certificate of Mailing. (Related document (s):2819 Generic Order) No. of Notices: 217. Notice Date 01/13/2021. (Admin.) (Entered: 01/14/2021) |
| 01/13/2021 | 2880 (7 pgs) | Letter from Gaynell Spigner (mmap) (Entered: 01/14/2021) |
| 01/13/2021 | 2885 (6 pgs) | Courtroom Minutes. Time Hearing Held: 9:00 AM. Appearances: SEE ATTACHED. **Trial Day 13.**Closing arguments held, the Court has approved the plan. Additionally, the Motion for Standing has been denied. Parties to upload a proposed confirmation order by 12:00 PM on 01/14/2021. (VrianaPortillo) (Entered: 01/14/2021) |
| 01/14/2021 | 2877 (1 pg) | Letter from John Dough (mmap) (Entered: 01/14/2021) |
| 01/14/2021 | 2878 (1 pg) | PDF with attached Audio File. Court Date & Time [ 1/13/2021 1:15:54 PM ]. File Size [ 136289 KB ]. Run Time [ 04:43:56 ]. (admin). (Entered: 01/14/2021) |

| | | |
|---|---|---|
| 01/14/2021 | 🔵 2879<br><br>(5 pgs) | Proposed Order RE: *Agreed Order Granting (I) Relief from the Automatic Stay and (II) Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):2565 Motion for Relief From Stay, 2566 Motion for Relief From Stay) (Cavenaugh, Matthew) (Entered: 01/14/2021) |
| 01/14/2021 | 🔵 2881<br><br>(103 pgs; 2 docs) | Reply *TO THE DEBTORS MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF THE THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF CHESAPEAKE ENERGY CORPORATION AND ITS DEBTOR AFFILIATES AND OMNIBUS REPLY TO OBJECTIONS THERETO [Related to Dkt. Nos. 2106 & 2354]*. Filed by Vector Seismic Data Processing Inc., Westerngeco LLC (Attachments: # 1 Exhibit A) (Braun, Andrew) (Entered: 01/14/2021) |
| 01/14/2021 | 🔵 2882<br><br>(5 pgs) | Agreed Order Granting Motion For Relief From Stay (Related Doc # 2565), (Related Doc # 2566) Signed on 1/14/2021. (aalo) (Entered: 01/14/2021) |
| 01/14/2021 | 🔵 2883<br><br>(1 pg) | Order (Related Doc # 1545) Signed on 1/14/2021. (aalo) (Entered: 01/14/2021) |
| 01/14/2021 | 🔵 2884<br><br>(2 pgs) | Letter from Gaynell Spigner (mmap) (Entered: 01/14/2021) |
| 01/14/2021 | 🔵 2886<br><br>(119 pgs) | Declaration re: *Declaration of Disinterestedness of Deloitte Tax LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 01/14/2021) |
| 01/14/2021 | 🔵 2887<br><br>(3 pgs) | Withdrawal of Claim: *7 filed by Epiq Corporate Restructuring, LLC on behalf of BIGHORN CONSTRUCTION & RECLAMATION LLC* (Suarez, Hugo) (Entered: 01/14/2021) |
| | | |

| | | |
|---|---|---|
| 01/14/2021 | 🔵 2888<br><br>(1 pg) | Withdrawal of Claim: *62 filed by Epiq Corporate Restructuring, LLC on behalf of TRI-STATE INDUSTRIES INC* (Suarez, Hugo) (Entered: 01/14/2021) |
| 01/14/2021 | 🔵 2889<br><br>(1 pg) | Withdrawal of Claim: *2370 filed by Epiq Corporate Restructuring, LLC on behalf of CHAPARRAL ENERGY LLC* (Suarez, Hugo) (Entered: 01/14/2021) |
| 01/14/2021 | 🔵 2890<br><br>(1 pg) | Withdrawal of Claim: *2887 filed by Epiq Corporate Restructuring, LLC on behalf of SHELBY BOSWELL OPERATOR LLC* (Suarez, Hugo) (Entered: 01/14/2021) |
| 01/14/2021 | 🔵 2891<br><br>(1 pg) | Withdrawal of Claim: *3960 filed by Epiq Corporate Restructuring, LLC on behalf of WILLIAMS COMPANIES INC, THE* (Suarez, Hugo) (Entered: 01/14/2021) |
| 01/14/2021 | 🔵 2892<br><br>(1 pg) | Withdrawal of Claim: *3998 filed by Epiq Corporate Restructuring, LLC on behalf of WILLIAMS COMPANIES INC, THE* (Suarez, Hugo) (Entered: 01/14/2021) |
| 01/14/2021 | 🔵 2893<br><br>(1 pg) | Withdrawal of Claim: *4065 filed by Epiq Corporate Restructuring, LLC on behalf of WILLIAMS COMPANIES INC, THE* (Suarez, Hugo) (Entered: 01/14/2021) |
| 01/14/2021 | 🔵 2894<br><br>(1 pg) | Withdrawal of Claim: *4141 filed by Epiq Corporate Restructuring, LLC on behalf of WILLIAMS COMPANIES INC, THE* (Suarez, Hugo) (Entered: 01/14/2021) |
| 01/14/2021 | 🔵 2895<br><br>(1 pg) | Withdrawal of Claim: *4201 filed by Epiq Corporate Restructuring, LLC on behalf of WILLIAMS COMPANIES INC, THE* (Suarez, Hugo) (Entered: 01/14/2021) |
| 01/14/2021 | 🔵 2896<br><br>(1 pg) | Withdrawal of Claim: *4249 filed by Epiq Corporate Restructuring, LLC on behalf of WILLIAMS COMPANIES INC, THE* (Suarez, Hugo) (Entered: 01/14/2021) |
| | 🔵 2897 | Withdrawal of Claim: *10006 filed by Epiq* |

| | | |
|---|---|---|
| 01/14/2021 | (1 pg) | *Corporate Restructuring, LLC on behalf of JW WILLIAMS INC* (Suarez, Hugo) (Entered: 01/14/2021) |
| 01/14/2021 | 2898 <br> (1 pg) | Withdrawal of Claim: *10059 filed by Epiq Corporate Restructuring, LLC on behalf of LATX OPERATIONS LLC* (Suarez, Hugo) (Entered: 01/14/2021) |
| 01/14/2021 | 2899 <br> (1 pg) | Withdrawal of Claim: *10107 filed by Epiq Corporate Restructuring, LLC on behalf of C&M OILFIELD RENTALS, LLC* (Suarez, Hugo) (Entered: 01/14/2021) |
| 01/14/2021 | 2900 <br> (1 pg) | Withdrawal of Claim: *10110 filed by Epiq Corporate Restructuring, LLC on behalf of L&C SAFETY INC* (Suarez, Hugo) (Entered: 01/14/2021) |
| 01/14/2021 | 2901 <br> (1 pg) | Withdrawal of Claim: *10142 filed by Epiq Corporate Restructuring, LLC on behalf of KSA ENGINEERS INC* (Suarez, Hugo) (Entered: 01/14/2021) |
| 01/14/2021 | 2902 <br> (1 pg) | Withdrawal of Claim: *10174 filed by Epiq Corporate Restructuring, LLC on behalf of LARM ENTERPRISES INC* (Suarez, Hugo) (Entered: 01/14/2021) |
| 01/14/2021 | 2903 <br> (1 pg) | Withdrawal of Claim: *10209 filed by Epiq Corporate Restructuring, LLC on behalf of DIANE SORENSON* (Suarez, Hugo) (Entered: 01/14/2021) |
| 01/14/2021 | 2904 <br> (1 pg) | Withdrawal of Claim: *10236 filed by Epiq Corporate Restructuring, LLC on behalf of SUPREME SERVICE & SPECIALTY CO INC* (Suarez, Hugo) (Entered: 01/14/2021) |
| 01/14/2021 | 2905 <br> (1 pg) | Withdrawal of Claim: *12131 filed by Epiq Corporate Restructuring, LLC on behalf of SHERIDAN PRODUCTION COMPANY III LLC* (Suarez, Hugo) (Entered: 01/14/2021) |
| | 2906 | Transcript RE: Confirmation Hearing - Day 13 held on 01/13/21 before Judge David R. Jones. |

| | | |
|---|---|---|
| 01/14/2021 | (336 pgs) | Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 04/14/2021. (AccessTranscripts) (Entered: 01/14/2021) |
| 01/14/2021 | 2907<br><br>(11 pgs) | BNC Certificate of Mailing. (Related document (s):2823 Notice of Filing of Official Transcript (Form)) No. of Notices: 217. Notice Date 01/14/2021. (Admin.) (Entered: 01/14/2021) |
| 01/15/2021 | 2908<br><br>(17 pgs) | Reply *TO DEBTORS MEMORANDUM OF LAW IN SUPPORT OF THE THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF CHESAPEAKE ENERGY CORPORATION AND ITS DEBTOR AFFILIATES AND OMNIBUS REPLY TO OBJECTIONS THERETO [Related to Docket Nos. 2148 and 2354].* Filed by CGG Land (U.S.) Inc. (Platt, Mark) (Entered: 01/15/2021) |
| 01/15/2021 | 2909<br><br>(6 pgs) | Response (related document(s):1907 Notice). (Ziemianski, Joseph) (Entered: 01/15/2021) |
| 01/15/2021 | 2910<br><br>(359 pgs; 2 docs) | Proposed Order RE: *Order Confirming Fifth Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates* (Filed By Chesapeake Energy Corporation ).(Related document(s):2833 Amended Chapter 11 Plan) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 01/15/2021) |
| 01/15/2021 | 2911<br><br>(113 pgs; 4 docs) | Brief (Filed By Seitel Data, Ltd. ).(Related document(s):1644 Amended Chapter 11 Plan, 1907 Notice, 1931 Notice, 2110 Objection to Confirmation of the Plan, 2354 Brief) (Attachments: # 1 Exhibit Exhibit A # 2 Exhibit Exhibit B-1 # 3 Exhibit Exhibit B-2) (Brescia, Duane) (Entered: 01/15/2021) |
| 01/15/2021 | 2912<br><br>(2 pgs) | Proposed Order Submission After Hearing (Filed By Petty Business Enterprises, LP, Petty Energy L.P. and their related entities ). (Ross, Judith) (Entered: 01/15/2021) |
| | | |

| | | |
|---|---|---|
| 01/15/2021 | 2913<br><br>(140 pgs) | Notice *of Fifth Monthly Fee Statement of Alvarez & Marsal North America, LLC for Compensation for Services and Reimbursement of Expenses as Restructuring and Financial Advisors to the Debtors and Debtors in Possession for the Period From November 1, 2020 Through November 30, 2020.* (Related document(s):656 Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 01/15/2021) |
| 01/15/2021 | 2914<br><br>(4 pgs) | Notice *of Hearing*. Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 01/15/2021) |
| 01/16/2021 | 2915<br><br>(211 pgs) | Order Confirming Fifth Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates Signed on 1/16/2021 (Related document(s):1633 Order Approving Disclosure Statement, 2833 Amended Chapter 11 Plan) (aalo) (Entered: 01/16/2021) |
| 01/16/2021 | 2916<br><br>(15 pgs) | BNC Certificate of Mailing. (Related document (s):2882 Order on Motion For Relief From Stay) No. of Notices: 217. Notice Date 01/16/2021. (Admin.) (Entered: 01/16/2021) |
| 01/16/2021 | 2917<br><br>(11 pgs) | BNC Certificate of Mailing. (Related document (s):2883 Order on Emergency Motion) No. of Notices: 217. Notice Date 01/16/2021. (Admin.) (Entered: 01/16/2021) |
| 01/18/2021 | 2918<br><br>(23 pgs) | Statement - *Monthly Fee Statement of Forshey & Prostok, LLP for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses as Attorneys for the Official Committee of Royalty Owners for the Period from December 1, 2020 through and including December 31, 2020* (Filed By Forshey & Prostok, LLP ). (Prostok, Jeffrey) (Entered: 01/18/2021) |
| | 2919<br><br>(3 pgs) | Objection *to Debtors Motion for Entry of an Order* (related document(s):2646 Generic Motion). Filed by Dallas/Fort Worth International Airport Board, City of Dallas, City |

| | | |
|---|---|---|
| 01/18/2021 | | of Fort Worth (Orenstein, Rosa) (Entered: 01/18/2021) |
| 01/18/2021 | 🌑 2920<br><br>(5 pgs) | Objection *and Joinder* (related document (s):2646 Generic Motion). Filed by c/o Annie Catmull Royalty Owner Plaintiffs c/o (Catmull, Annie) (Entered: 01/18/2021) |
| 01/18/2021 | 🌑 2921<br><br>(48 pgs) | Objection *to the Commonwealth of Pennsylvania's Motion for Relief from the Automatic Stay* (related document(s):2682 Motion for Relief From Stay). Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 01/18/2021) |
| 01/18/2021 | 🌑 2922<br><br>(8 pgs) | Objection (related document(s):2646 Generic Motion). Filed by Bugg DeSoto, LLC, Caddo Parish, Caspiana Interests, LLC, Coushatta Bayou Land Company, L.L.C., Paul M. Davis, Industrial Dev. Bd. of the Parish of Caddo, Inc., Kingwood Business Center Ltd. Partnership, Paul M. Davis, solely in his capacity as the independent administrator of the Succession of John P. Davis, Jr, Charles Steven Powers, Powers Investments, L.L.C., Sonja Bott, on behalf of the Succession of Gregary Roy Bott (McCune, Patrick) (Entered: 01/18/2021) |
| 01/18/2021 | 🌑 2923<br><br>(5 pgs) | Objection -- *OFFICIAL COMMITTEE OF ROYALTY OWNERS LIMITED OBJECTION TO DEBTORS MOTION FOR ENTRY OF AN ORDER APPROVING (I) THE OMNIBUS CLAIMS OBJECTION PROCEDURES, (II) THE FORM OF NOTICE OF OBJECTION, (III) THE SATISFACTION PROCEDURES, AND (IV) THE FORM OF NOTICE OF SATISFACTION* (related document(s):2646 Generic Motion). Filed by Official Committee of Royalty Owners (Brown, pllc, Deirdre) (Entered: 01/18/2021) |
| 01/19/2021 | 🌑 2924<br><br>(5 pgs) | Affidavit Re: *Affidavit of Service of Geoff Zahm* (Filed By Epiq Corporate Restructuring LLC ). (Related document(s):2597 Notice, 2598 Notice, 2606 Notice, 2613 Notice, 2614 Notice) (Garabato, Sid) (Entered: 01/19/2021) |
| | 🌑 2925 | Affidavit Re: *Affidavit of Service of Geoff Zahm* |

| | | |
|---|---|---|
| 01/19/2021 | (21 pgs) | (Filed By Epiq Corporate Restructuring LLC ). (Related document(s):2654 Objection) (Garabato, Sid) (Entered: 01/19/2021) |
| 01/19/2021 | 2926<br><br>(676 pgs; 88 docs) | Exhibit List, Witness List (Filed By CGG Land (U.S.) Inc. ).(Related document(s):2148 Objection to Confirmation of the Plan, 2908 Reply) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31 # 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34 # 35 Exhibit 35 # 36 Exhibit 36 # 37 Exhibit 37 # 38 Exhibit 38 # 39 Exhibit 39 # 40 Exhibit 40 # 41 Exhibit 41 # 42 Exhibit 42 # 43 Exhibit 43 # 44 Exhibit 44 # 45 Exhibit 45 # 46 Exhibit 46 # 47 Exhibit 47 # 48 Exhibit 48 # 49 Exhibit 49 # 50 Exhibit 50 # 51 Exhibit 51 # 52 Exhibit 52 # 53 Exhibit 53 # 54 Exhibit 54 # 55 Exhibit 55 # 56 Exhibit 56 # 57 Exhibit 57 # 58 Exhibit 58 # 59 Exhibit 59 # 60 Exhibit 60 # 61 Exhibit 61 # 62 Exhibit 62 # 63 Exhibit 63 # 64 Exhibit 64 # 65 Exhibit 65 # 66 Exhibit 66 # 67 Exhibit 67 # 68 Exhibit 68 # 69 Exhibit 69 # 70 Exhibit 70 # 71 Exhibit 71 # 72 Exhibit 72 # 73 Exhibit 73 # 74 Exhibit 74 # 75 Exhibit 75 # 76 Exhibit 76 # 77 Exhibit 77 # 78 Exhibit 78 # 79 Exhibit 79 # 80 Exhibit 80 # 81 Exhibit 81 # 82 Exhibit 82 # 83 Exhibit 83 # 84 Exhibit 84 # 85 Exhibit 85 # 86 Exhibit 86 # 87 Exhibit 87) (Platt, Mark) (Entered: 01/19/2021) |
| 01/19/2021 | 2927<br><br>(1 pg) | Withdrawal of Claim: 18 (Peeples Carter, D Layne) (Entered: 01/19/2021) |
| 01/19/2021 | 2928<br><br>(253 pgs; 4 docs) | Letter from Malinath Suralikal (Attachments: # 1 Exhibit # 2 Exhibit # 3 Exhibit) (mmap) (Entered: 01/19/2021) |
| | 2929 | Exhibit List, Witness List (Filed By Vector |

| | | |
|---|---|---|
| 01/19/2021 | (3341 pgs; 14 docs) | Seismic Data Processing Inc., Westerngeco LLC ).(Related document(s):2106 Objection, 2881 Reply, 2915 Order Confirming Chapter 11 Plan) (Attachments: # 1 Exhibit W1 # 2 Exhibit W2 # 3 Exhibit W3 # 4 Exhibit W4 # 5 Exhibit W5 # 6 Exhibit W6 # 7 Exhibit W7 # 8 Exhibit W9 # 9 Exhibit W10 # 10 Exhibit W11 # 11 Exhibit W13 # 12 Exhibit W15 # 13 Exhibit W16) (Braun, Andrew) (Entered: 01/19/2021) |
| 01/19/2021 | 🌐 2930<br><br>(1 pg) | Motion to Appear pro hac vice *for Hunter M. Barrow*. Filed by Creditor Enterprise Crude Oil LLC (Judd, T.) (Entered: 01/19/2021) |
| 01/19/2021 | 🌐 2931<br><br>(4 pgs) | Notice *of Additional Ordinary Course Professionals Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business*. (Related document(s):655 Generic Order, 807 Notice, 1100 Notice, 1162 Notice, 1353 Notice, 2447 Notice) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 01/19/2021) |
| 01/19/2021 | 🌐 2932<br><br>(5 pgs) | Notice *JOINDER OF THE TEXAS COMPTROLLER OF PUBLIC ACCOUNTS, UNCLAIMED PROPERTY DIVISION IN THE OBJECTION BY THE UNITED STATES TO DEBTORS MOTION FOR ENTRY OF AN ORDER APROVING (i) THE OMNIBUS CLAIMS OBJECTION PROCEDURES, (ii) THE FORM OF NOTICE OF OBJECTION, (iii) THE SATISFACTION PROCEDURES, AND (iv) THE FORM OF NOTICE OF SATISFACTION*. (Related document(s):2646 Generic Motion, 2806 Objection) Filed by Texas Comptroller of Public Accounts, Unclaimed Property Division (Milligan, Layla) (Entered: 01/19/2021) |
| 01/19/2021 | 🌐 2933<br><br>(4 pgs) | Declaration re: *Declaration of Disinterestedness of Keller and Heckman LLP Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ).(Related document(s):655 Generic Order) (Cavenaugh, Matthew) (Entered: 01/19/2021) |

| | | |
|---|---|---|
| 01/19/2021 | 🔘 2934<br><br>(4 pgs) | Declaration re: *Declaration of Disinterestedness of Applied Economics Consulting Group, Inc. Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Filed By Chesapeake Energy Corporation ). (Related document(s):655 Generic Order) (Cavenaugh, Matthew) (Entered: 01/19/2021) |
| 01/19/2021 | 🔘 2935<br><br>(2775 pgs; 4 docs) | Exhibit List, Witness List (Filed By Vector Seismic Data Processing Inc., Westerngeco LLC ).(Related document(s):2106 Objection, 2457 Notice, 2881 Reply, 2915 Order Confirming Chapter 11 Plan, 2929 Exhibit List, Witness List) (Attachments: # 1 Exhibit W12 - Part A # 2 Exhibit W12 - Part B # 3 Exhibit W13) (Braun, Andrew) (Entered: 01/19/2021) |
| 01/19/2021 | 🔘 2936<br><br>(5 pgs; 2 docs) | Motion To Substitute Attorney. Filed by Creditor Ryan, LLC (Attachments: # 1 Proposed Order) (Keiffer, Edwin) (Entered: 01/19/2021) |
| 01/19/2021 | 🔘 2937<br><br>(53 pgs; 3 docs) | Witness List, Exhibit List (Filed By Seitel Data, Ltd. ). (Attachments: # 1 Exhibit # 2 Exhibit) (Brescia, Duane) (Entered: 01/19/2021) |
| 01/19/2021 | 🔘 2938<br><br>(2 pgs) | Notice *TEXAS COMPTROLLER OF PUBLIC ACCOUNTS JOINDER IN THE OBJECTION BY THE UNITED STATES TO DEBTORS MOTION FOR ENTRY OF AN ORDER APPROVING (I) THE OMNIBUS CLAIMS OBJECTION PROCEDURES, (II) THE FORM OF NOTICE OF OBJECTION, (III) THE SATISFACTION PROCEDURES, AND (IV) THE FORM OF NOTICE OF SATISFACTION.* (Related document(s):2646 Generic Motion, 2806 Objection) Filed by Texas Comptroller of Public Accounts, Revenue Accounting Division (Stern, John) (Entered: 01/19/2021) |
| 01/19/2021 | 🔘 2939<br><br>(38 pgs; 2 docs) | Amended Motion to Reconsider (related document(s):2423 Generic Order). Filed by Creditor Ryan, LLC (Attachments: # 1 Proposed Order) (Keiffer, Edwin) (Entered: 01/19/2021) |
| | 🔘 2940 | Adversary case 21-03008. Nature of Suit: (91 (Declaratory judgment)) Complaint *(RYAN,* |

| | | |
|---|---|---|
| 01/19/2021 | (21 pgs; 2 docs) | *LLC'S COMPLAINT FOR DECLARATORY JUDGMENT)* by Ryan, LLC against Wildhorse Resources Management Company, LLC. Fee Amount $350 (Attachments: # 1 Adversary Proceeding Cover Sheet) (Keiffer, Edwin) (Entered: 01/19/2021) |
| 01/19/2021 | 🔵 2941<br><br>(13581 pgs; 2 docs) | Affidavit Re: *Affidavit of Service of Angarahad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):2312 Notice, 2354 Brief) (Attachments: # 1 Exhibit) (Garabato, Sid) (Entered: 01/19/2021) |
| 01/19/2021 | 🔵 2942<br><br>(6460 pgs) | Response *Debtors' Opposition to Ryan, LLC's Motion to Reconsider* (related document(s):2645 Motion to Reconsider). Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 01/19/2021) |
| 01/20/2021 | 🔵 2943<br><br>(1 pg) | Withdrawal of Claim: *63 filed by Epiq Corporate Restructuring on behalf of RMS Instrument & Electric LLC* (Garabato, Sid) (Entered: 01/20/2021) |
| 01/20/2021 | 🔵 2944<br><br>(215 pgs; 2 docs) | Exhibit List, Witness List (Filed By Chesapeake Energy Corporation ).(Related document(s):2915 Order Confirming Chapter 11 Plan) (Attachments: # 1 Exhibit 1) (Cavenaugh, Matthew) (Entered: 01/20/2021) |
| 01/20/2021 | 🔵 2946<br><br>(4 pgs) | Notice *of Reset of Hearing on Seismic Agreements*. (Related document(s):2914 Notice, 2915 Order Confirming Chapter 11 Plan) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 01/20/2021) |
| 01/20/2021 | 🔵 2947<br><br>(784 pgs; 5 docs) | Adversary case 21-03009. Nature of Suit: (01 (Determination of removed claim or cause)),(02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy))) Notice of Removal Stephanie Lyn Porterfield Delasandro. Fee Amount $350 (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 - Part 1 # 3 Exhibit 2 - Part 2 # 4 Adversary Cover Sheet) (Cavenaugh, Matthew) (Entered: 01/20/2021) |

| | | |
|---|---|---|
| 01/20/2021 | 🔵 2948<br><br>(8 pgs; 2 docs) | Certificate of No Objection *with Respect to the Debtors' Motion for Entry of an Order (I) Authorizing the Rejection of Certain Executory Contracts Effective as of December 11, 2020 and (II) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):2283 Motion to Assume/Reject) (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 01/20/2021) |
| 01/20/2021 | 🔵 2949<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Hunter M. Barrow (Related Doc # 2930) Signed on 1/20/2021. (emiller) (Entered: 01/20/2021) |
| 01/21/2021 | 🔵 2950<br><br>(3 pgs) | Witness List, Exhibit List (Filed By Commonwealth of Pennsylvania ).(Related document(s):2682 Motion for Relief From Stay) (Butler, Lynn) (Entered: 01/21/2021) |
| 01/21/2021 | 🔵 2951<br><br>(10 pgs; 2 docs) | Motion to Extend Time *Debtors' Motion for Entry of an Order (I) Further Extending the Time Within Which the Debtors May Remove Actions and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 01/21/2021) |
| 01/21/2021 | 🔵 | Certificate of Email Notice. By agreement of the parties, the hearing on the motion for relief from stay has been moved up. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):1293 Motion for Relief From Stay) **Hearing rescheduled for 1/28/2021 at 02:30 PM by telephone and video conference.** (aalo) (Entered: 01/21/2021) |
| 01/21/2021 | 🔵 2952<br><br>(5 pgs) | Order (I) Authorizing the Rejection of Certain Executory Contracts Effective as of December 11, 2020 and (II) Granting Related Relief (Related Doc # 2283) Signed on 1/21/2021. (VrianaPortillo) (Entered: 01/21/2021) |
| | 🔵 2953<br><br>(72 pgs) | Stipulation By Stephanie Delasandro and debtors. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Stephanie Delasandro ).(Related document(s):1293 Motion for Relief From Stay) |

| 01/21/2021 | | (Warman, Lynnette) (Entered: 01/21/2021) |
|---|---|---|
| 01/21/2021 | ⚫2954<br><br>(2 pgs) | Motion to Appear pro hac vice . Filed by Interested Party Wyoming Department of Environmental Quality (ckrus) (Entered: 01/21/2021) |
| 01/22/2021 | ⚫2955<br><br>(3 pgs) | Notice *of Reset Hearing on the Commonwealth of Pennsylvania's Motion for Relief From the Automatic Stay and Motion for Mandatory Abstention*. (Related document(s):2109 Generic Motion, 2682 Motion for Relief From Stay) Filed by Commonwealth of Pennsylvania (Butler, Lynn) (Entered: 01/22/2021) |
| 01/22/2021 | ⚫2956<br><br>(47 pgs) | Statement *Second Monthly Fee Statement of Back Bay Management Corporation and its Division, the Michel-Shaked Group, for Allowance of Compensation and Reimbursement of Expenses as Expert Valuation Consultant to the Official Committee of Unsecured Creditors for the Period October 1, 2020 through October 31, 2020* (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) (Entered: 01/22/2021) |
| 01/22/2021 | ⚫2957<br><br>(3 pgs) | Third Notice *of Hearing*. (Related document (s):1293 Motion for Relief From Stay) Filed by Stephanie Delasandro (Warman, Lynnette) (Entered: 01/22/2021) |
| 01/22/2021 | ⚫2958<br><br>(31 pgs) | Statement *Fifth Monthly Fee Statement of Norton Rose Fulbright US LLP* (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) (Entered: 01/22/2021) |
| 01/22/2021 | ⚫2959<br><br>(45 pgs) | Statement *Sixth Monthly Fee Statement of Norton Rose Fulbright US LLP* (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) (Entered: 01/22/2021) |
| | ⚫2960<br><br>(5 pgs) | Notice *of Filing of Quarterly Statement Pursuant to the Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business*. (Related document(s):655 Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, |

| 01/22/2021 | | Matthew) (Entered: 01/22/2021) |
|---|---|---|
| 01/22/2021 | 2961<br><br>(62 pgs) | Debtors Master Service List (Filed By Epiq Corporate Restructuring LLC ). (Garabato, Sid) (Entered: 01/22/2021) |
| 01/22/2021 | 2962<br><br>(2 pgs) | Order Granting Motion To Appear pro hac vice - Kelly Shaw (Related Doc # 2954) Signed on 1/22/2021. (emiller) (Entered: 01/22/2021) |
| 01/24/2021 | | Certificate of Email Notice. Contacted Lynn Butler. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):2109 Generic Motion, 2682 Motion for Relief From Stay) **Hearing rescheduled for 1/28/2021 at 02:30 PM at telephone and video conference.** (aalo) (Entered: 01/24/2021) |
| 01/25/2021 | 2963<br><br>(5 pgs) | Notice *of Filing Monthly Report Pursuant to the Order to Approve Procedures for De Minimis Asset Transactions*. (Related document(s):715 Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 01/25/2021) |
| 01/25/2021 | 2964<br><br>(2 pgs) | Notice *of Withdrawal of Claim 126 filed in Chesapeake Energy Exploration, LLC, Case No. 20-33239*. Filed by Eric Petroleum Corporation (Flores, Henry) (Entered: 01/25/2021) |
| 01/25/2021 | 2965<br><br>(2 pgs) | Withdrawal of Claim: 175 *of Eric Petroleum Corporation* (Flores, Henry) (Entered: 01/25/2021) |
| 01/25/2021 | 2966<br><br>(33 pgs; 2 docs) | Objection to Claim Number by Claimant Petty Business Enterprises, LP. Petty Business Enterprises, LP. */ Debtors' Objection to Proofs of Claim Filed by Petty* (Attachments: # 1 Proposed Order)(Schwarzman, Alexandra) (Entered: 01/25/2021) |
| 01/25/2021 | 2980<br><br>(72 pgs) | Joint Stipulation Between Debtors and Stefanie Delasandro Regarding Certain Business Records Signed on 1/25/2021 (Related document(s):2953 Stipulation) (emiller) (Entered: 01/26/2021) |
| | | |

| | |
|---|---|
| 🔵 [2967](#)<br><br>(10 pgs; 2 docs)<br><br>01/26/2021 | Proposed Order RE: *Order (I) Authorizing (A) Rejection of the Crude Agreement, (B) Assumption, As Modified, of the Transporation Agreement, (C) Entry Into the Processing Agreement, and (D) Provision of the Enterprise Release, and (II) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):[2376](#) Emergency Motion, [2596](#) Proposed Order) (Attachments: # [1](#) Redline) (Cavenaugh, Matthew) (Entered: 01/26/2021) |
| 🔵 [2968](#)<br><br>(1 pg)<br><br>01/26/2021 | AO 435 TRANSCRIPT ORDER FORM (14-Day) by Rick Kincheloe. This is to order a transcript of Confirmation Hearing on January 13, 2021 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Federal Energy Regulatory Commission ). (Kincheloe, Richard) Copy request was electronically forwarded to Access Transcripts on 1-26-2021. Estimated completion date: 2-9-2021. Modified on 1/26/2021 (MelissaMorgan). (Entered: 01/26/2021) |
| 🔵 [2969](#)<br><br>(233 pgs; 8 docs)<br><br>01/26/2021 | Additional Attachments Re: (related document (s):[2950](#) Witness List, Exhibit List) (Filed By Commonwealth of Pennsylvania ).(Related document(s):[2950](#) Witness List, Exhibit List) (Attachments: # [1](#) Exhibit COPA-2 # [2](#) Exhibit COPA-3 # [3](#) Exhibit COPA-4 # [4](#) Exhibit COPA-5 # [5](#) Exhibit COPA-6 # [6](#) Exhibit COPA-7 # [7](#) Exhibit COPA-8) (Butler, Lynn) (Entered: 01/26/2021) |
| 🔵 [2970](#)<br><br>(63 pgs; 5 docs)<br><br>01/26/2021 | Exhibit List, Witness List (Filed By Enterprise Crude Oil LLC ).(Related document(s):[2376](#) Emergency Motion) (Attachments: # [1](#) Exhibit 1 # [2](#) Exhibit 2 # [3](#) Exhibit 3 # [4](#) Exhibit 4) (Judd, T.) (Entered: 01/26/2021) |
| 🔵 [2971](#)<br><br>(4 pgs)<br><br>01/26/2021 | Witness List, Exhibit List (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 01/26/2021) |
| 🔵 [2972](#)<br><br>(5 pgs)<br><br>01/26/2021 | Non-Opposition Motion to Withdraw as Attorney. Objections/Request for Hearing Due in 21 days. Filed by Creditor The Royalty Owners (Jewell, Gary) (Entered: 01/26/2021) |

| | | |
|---|---|---|
| 01/26/2021 | 🔵 2973<br><br>(3 pgs) | Witness List, Exhibit List (Filed By Commonwealth of Pennsylvania ).(Related document(s):2109 Generic Motion, 2682 Motion for Relief From Stay) (Butler, Lynn) (Entered: 01/26/2021) |
| 01/26/2021 | 🔵 2974<br><br>(9 pgs) | Notice *of Third Monthly Fee Statement of Intrepid Partners, LLC as Investment Banker to the Debtors, for Allowance and Payment of Compensation for Professional Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred from December 1, 2020 Through and Including December 31, 2020.* Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 01/26/2021) |
| 01/26/2021 | 🔵 2975<br><br>(23 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):2733 Notice, 2735 Notice) (Garabato, Sid) (Entered: 01/26/2021) |
| 01/26/2021 | 🔵 2976<br><br>(889 pgs; 50 docs) | Exhibit List (Filed By Stephanie Delasandro ). (Related document(s):1293 Motion for Relief From Stay) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31 # 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34 # 35 Exhibit 35 # 36 Exhibit 36 # 37 Exhibit 37 # 38 Exhibit 38 # 39 Exhibit 39 # 40 Exhibit 40 # 41 Exhibit 41 # 42 Exhibit 42 # 43 Exhibit 43 # 44 Exhibit 44 # 45 Exhibit 45 # 46 Exhibit 46 # 47 Exhibit 47 # 48 Exhibit 48 # 49 Exhibit 49) (Warman, Lynnette) (Entered: 01/26/2021) |
| | 🔵 2977<br><br>(768 pgs; 2 docs) | Application for Compensation *First Interim Fee Application of Kirkland & Ellis LLP and Kirkland & Ellis International LLP, Attorneys for the Debtors and Debtors in Possession, for the Period from June 28, 2020 Through and Including* |

| | | |
|---|---|---|
| 01/26/2021 | | *September 30, 2020.* Objections/Request for Hearing Due in 21 days. Filed by Attorney Matthew D Cavenaugh (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 01/26/2021) |
| 01/26/2021 | 2978<br><br>(6202 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):2782 Notice, 2785 Generic Motion) (Garabato, Sid) (Entered: 01/26/2021) |
| 01/26/2021 | 2979<br><br>(22 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):2824 Notice, 2826 Notice) (Garabato, Sid) (Entered: 01/26/2021) |
| 01/27/2021 | 2981<br><br>(210 pgs; 24 docs) | Emergency Motion *to remand* Filed by Creditor Stephanie Delasandro (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23) (Warman, Lynnette) (Entered: 01/27/2021) |
| 01/27/2021 | 2982<br><br>(3 pgs) | Notice *of Hearing.* (Related document(s):2981 Emergency Motion) Filed by Stephanie Delasandro (Warman, Lynnette) (Entered: 01/27/2021) |
| 01/27/2021 | 2983<br><br>(5 pgs) | Exhibit List (Filed By Stephanie Delasandro ). (Related document(s):2981 Emergency Motion) (Warman, Lynnette) (Entered: 01/27/2021) |
| 01/27/2021 | 2984<br><br>(2 pgs) | Order (I) Further Extending the time Within Which the Debtors May Remove Actions and (II) Granting Related Relief (Related Doc # 2951) Signed on 1/27/2021. (VrianaPortillo) (Entered: 01/27/2021) |
| | 2985<br><br>(4 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):2843 Notice) |

| 01/27/2021 | | (Garabato, Sid) (Entered: 01/27/2021) |
|---|---|---|
| 01/27/2021 | 🔵 2986<br><br>(26 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):2886 Declaration) (Garabato, Sid) (Entered: 01/27/2021) |
| 01/27/2021 | 🔵 2987<br><br>(12 pgs) | BNC Certificate of Mailing. (Related document (s):2962 Order on Motion to Appear pro hac vice) No. of Notices: 218. Notice Date 01/27/2021. (Admin.) (Entered: 01/28/2021) |
| 01/28/2021 | 🔵 2988<br><br>(504 pgs; 3 docs) | Objection *Debtors' Objection to Plaintiff's Emergency Motion to Remand Texas State Court Case* (related document(s):2981 Emergency Motion). Filed by Chesapeake Energy Corporation (Attachments: # 1 Exhibit A # 2 Exhibit A) (Cavenaugh, Matthew) (Entered: 01/28/2021) |
| 01/28/2021 | 🔵 2989<br><br>(6 pgs) | Agenda for Hearing on 1/28/2021 (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 01/28/2021) |
| 01/28/2021 | 🔵 2990<br><br>(4 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):2913 Notice) (Garabato, Sid) (Entered: 01/28/2021) |
| 01/28/2021 | 🔵 2991<br><br>(31 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):2914 Notice) (Garabato, Sid) (Entered: 01/28/2021) |
| 01/28/2021 | 🔵 | Receipt Number 190399, Fee Amount $207. (Olin) (Entered: 01/28/2021) |
| 01/28/2021 | 🔵 2992<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew Cavenaugh. This is to order a transcript of 1/28/2021 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) Electronically forwarded to Access Transcripts, LLC on January 29, 2021. Estimated completion date: January 30, 2021. Modified on 1/29/2021 |

| 01/28/2021 | | (ClaudiaGutierrez). (Entered: 01/28/2021) |
|---|---|---|
| 01/28/2021 | 2993<br><br>(21 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):2921 Objection) (Garabato, Sid) (Entered: 01/28/2021) |
| 01/28/2021 | 2994<br><br>(24 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):2931 Notice, 2933 Declaration, 2934 Declaration) (Garabato, Sid) (Entered: 01/28/2021) |
| 01/28/2021 | 2995<br><br>(2 pgs) | Courtroom Minutes. Time Hearing Held: 2:30 pm. Appearances: SEE ATTACHED. (Related document(s):1293 Motion for Relief From Stay, 2109 Generic Motion, 2376 Emergency Motion, 2682 Motion for Relief From Stay, 2967 Proposed Order, 2981 Emergency Motion) The Enterprise 9019 motion at dkt 2376 was granted and the order at dkt 2967 was signed on the record. The Court heard oral argument regarding the Pennsylvania Lift Stay Motion 2682 and Abstention Motion 2109. Both motions were denied for the reasons stated on the record. Mr. Donovan to prepare an order consistent with the Court's ruling. The Delasandro matters are continued to tomorrow at 3:00 pm so the parties may contact Judge Isgur regarding mediation dates. **Continued hearing scheduled for 1/29/2021 at 03:00 PM by telephone and video conference.** (emiller) (Entered: 01/28/2021) |
| 01/28/2021 | 2996<br><br>(5 pgs) | Order (I) Authorizing (A) Rejection of the Crude Agreement, (B) Assumption, as Modified, of the Transportation Agreement, (C) Entry into the Processing Agreement, and (D) Provision of the Enterprise Release, and (II) Granting Related Relief (Related Doc # 2376) Signed on 1/28/2021. (emiller) (Entered: 01/28/2021) |
| 01/28/2021 | 2997<br><br>(1 pg) | PDF with attached Audio File. Court Date & Time [ 1/28/2021 2:20:56 PM ]. File Size [ 55596 KB ]. Run Time [ 01:55:50 ]. (admin). (Entered: 01/28/2021) |

| | | |
|---|---|---|
| 01/28/2021 | 🌐 2998<br><br>(4 pgs) | Withdrawal of Claim: *1468 & 1470 filed by Epiq Corporate Restructuring, LLC on behalf of DCP Midstream LP* (Garabato, Sid) (Entered: 01/28/2021) |
| 01/28/2021 | 🌐 2999<br><br>(1 pg) | Withdrawal of Claim: *1686 filed by Epiq Corporate Restructuring, LLC on behalf of Octane Environmental LLC* (Garabato, Sid) (Entered: 01/28/2021) |
| 01/28/2021 | 🌐 3000<br><br>(3 pgs) | Withdrawal of Claim: *10637, 10638, & 10640 filed by Epiq Corporate Restructuring, LLC on behalf of White Rock Oil & Gas LLC* (Garabato, Sid) (Entered: 01/28/2021) |
| 01/28/2021 | 🌐 3001<br><br>(5 pgs) | Stipulation By Chesapeake Energy Corporation and CNOOC Energy U.S.A. LLC f/k/a OOGC America LLC. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ).(Related document(s):1130 Generic Order) (Cavenaugh, Matthew) (Entered: 01/28/2021) |
| 01/29/2021 | 🌐 3002<br><br>(1 pg) | Courtroom Minutes. Time Hearing Held: 3:00 PM. Appearances: see attached. (Related document(s):1293 Motion for Relief From Stay, 2981 Emergency Motion)The parties have agreed to go to mediation. Todays hearing has been continued to 3/31/2021 at 09:00 AM by telephone and video conference. (aalo) Additional attachment(s) added on 1/29/2021 (aalo). (Entered: 01/29/2021) |
| 01/29/2021 | 🌐 3003<br><br>(83 pgs) | Statement *Third Monthly Fee Statement of Back Bay Management Corporation and its Division, the Michel-Shaked Group* (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) (Entered: 01/29/2021) |
| 01/29/2021 | 🌐 3004<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew Cavenaugh. This is to order a transcript of 1/29/2021 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 01/29/2021) |

| | | |
|---|---|---|
| 01/29/2021 | 🌑3005<br><br>(21 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):2946 Notice) (Garabato, Sid) (Entered: 01/29/2021) |
| 01/29/2021 | 🌑3006<br><br>(2 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):2947 Notice of Removal) (Garabato, Sid) (Entered: 01/29/2021) |
| 01/30/2021 | 🌑3007<br><br>(84 pgs) | Transcript RE: Motion Hearing held on 01/28/21 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 04/30/2021. (AccessTranscripts) (Entered: 01/30/2021) |
| 01/30/2021 | 🌑3008<br><br>(15 pgs) | BNC Certificate of Mailing. (Related document (s):2996 Order on Emergency Motion) No. of Notices: 218. Notice Date 01/30/2021. (Admin.) (Entered: 01/30/2021) |
| 02/01/2021 | 🌑3009<br><br>(1 pg) | Notice of Filing of Official Transcript as to 3007 Transcript. Parties notified (Related document (s):3007 Transcript) (dhan) (Entered: 02/01/2021) |
| 02/01/2021 | 🌑3010<br><br>(4 pgs) | Notice *of Reset Hearing on Motion of John H. Bedsole and Bedsole Land Company for Relief from the Automatic Stay*. (Related document (s):1248 Motion for Relief From Stay) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 02/01/2021) |
| 02/01/2021 | 🌑3011<br><br>(2 pgs) | AO 435 TRANSCRIPT ORDER FORM (3-Day) by Commonwealth of Pennsylvania. This is to order a transcript of Hearing dated 1/28/2021 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Commonwealth of Pennsylvania ). (Betsko, Joseph) Copy request electronically forwarded to Access Transcripts, LLC on February 2, 2021. Estimated completion date: February 5, 2021. Modified on 2/2/2021 (ClaudiaGutierrez). (Entered: 02/01/2021) |
| | 🌑 | Certificate of Telephone Notice. Contacted |

| | | |
|---|---|---|
| 02/01/2021 | | Veronica Polnick. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):1248 Motion for Relief From Stay) **Hearing scheduled for 2/17/2021 at 03:00 PM by telephone and video conference.** (aalo) (Entered: 02/01/2021) |
| 02/01/2021 | 3012 <br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Marty L. Brimmage, Jr.. This is to order a transcript of the January 29, 2021 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts ). (Brimmage, Marty) Copy request electronically forwarded to Access Transcripts, LLC on February 5, 2021. Estimated completion date: February 6, 2021. Modified on 2/5/2021 (ClaudiaGutierrez). (Entered: 02/01/2021) |
| 02/01/2021 | 3013 <br><br>(5 pgs) | Stipulation By Chesapeake Energy Corporation and Eagle Ford MDL, CNOOC Energy U.S.A. LLC f/k/a OOGC America LLC, Jamestown Resources, L.L.C., Larchmont Resources, LLC, and Pelican Energy, L.L.C., Eagle Ford MDL Royalty Owner Plaintiffs. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 02/01/2021) |
| 02/02/2021 | 3014 <br><br>(8 pgs) | Transcript RE: Motion for Relief from Stay; Emergency Motion to Remand held on 01/29/21 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 05/3/2021. (AccessTranscripts) (Entered: 02/02/2021) |
| | 3015 <br><br>(108 pgs; 2 docs) | Motion *for Entry of an Order (I) Authorizing and Approving the Debtors' Entry Into a Consent Decree By and Among the Debtors and the United States on Behalf of the Environmental Protection Agency and the Commonwealth of Pennsylvania, Department of Environmental Protection and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Attachments: # |

| | | |
|---|---|---|
| 02/02/2021 | | [1](#) Proposed Order) (Cavenaugh, Matthew) (Entered: 02/02/2021) |
| 02/02/2021 | 🔘 3016 (5 pgs) | Declaration re: *Third Supplemental Declaration of David MacGreevey of AlixPartners, LLP* (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) (Entered: 02/02/2021) |
| 02/03/2021 | 🔘 3017 (1 pg) | Withdrawal of Claim: *11258 filed by Epiq Corporate Restructuring, LLC on behalf of Enterprise Texas Pipeline LLC* (Suarez, Hugo) (Entered: 02/03/2021) |
| 02/03/2021 | 🔘 3018 (3 pgs) | Proposed Order RE: *Agreed Order Appointing Judge Marvin Mediator* (Filed By Chesapeake Energy Corporation ).(Related document(s):1293 Motion for Relief From Stay, 2981 Emergency Motion) (Cavenaugh, Matthew) (Entered: 02/03/2021) |
| 02/03/2021 | 🔘 3019 (112 pgs) | Notice *of Sixth Monthly Fee Statement of Alvarez & Marsal North America, LLC for Compensation for Services and Reimbursement of Expenses as Restructuring and Financial Advisors to the Debtors and Debtors in Possession for the Period From December 1, 2020 Through December 31, 2020*. (Related document(s):656 Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 02/03/2021) |
| 02/03/2021 | 🔘 3020 (14 pgs) | Notice *of First Monthly Fee Statement of Rothschild & Co US Inc. as Investment Banker to the Debtors, for Allowance and Payment of Compensation for Professional Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred From October 1, 2020 Through October 31, 2020*. (Related document (s):656 Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 02/03/2021) |
| | 🔘 3021 (14 pgs) | Notice *of Second Monthly Fee Statement of Rothschild & Co US Inc. as Investment Banker to the Debtors for Allowance and Payment of Compensation for Professional Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred From November 1, 2020* |

| | | |
|---|---|---|
| 02/03/2021 | | *Through November 30, 2020.* (Related document (s):656 Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 02/03/2021) |
| 02/03/2021 | 3022 <br><br> (15 pgs) | Notice *of Third Monthly Fee Statement of Rothschild & Co US Inc. as Investment Banker to the Debtors for Allowance and Payment of Compensation for Professional Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred From December 1, 2020 Through December 31, 2020.* (Related document (s):656 Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 02/03/2021) |
| 02/03/2021 | 3023 <br><br> (1 pg) | Withdrawal of Claim: *11838 filed by Epiq Corporate Restructuring, LLC on behalf of Enterprise Gathering LLC* (Garabato, Sid) (Entered: 02/03/2021) |
| 02/03/2021 | 3024 <br><br> (1 pg) | Withdrawal of Claim: *12287 filed by Epiq Corporate Restructuring, LLC on behalf of Enterprise Texas Pipeline LLC* (Garabato, Sid) (Entered: 02/03/2021) |
| 02/03/2021 | 3025 <br><br> (19 pgs) | Stipulation By Chesapeake Energy Corporation and Seitel Data, Ltd., Seitel Data Corp., Seitel Offshore Corp.. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 02/03/2021) |
| 02/03/2021 | 3026 <br><br> (2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Michaela C. Crocker and Travis L. Gray. This is to order a transcript of 07/31/2020 Hearing on Debtors' Emergency Motion for Entry of Interim and Final Orders; and 08/31/2020 Hearing on Emergency Motion to Reject Certain Executory Contracts before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By ETC Texas Pipeline Ltd. ). (Crocker, Michaela)Copy request was electronically forwarded to Access Transcripts on 2-5-2021. Estimated completion date: 2-6-2021. Modified on 2/5/2021 (MelissaMorgan). (Entered: |

| 02/03/2021 | | 02/03/2021) |
|---|---|---|
| 02/03/2021 | 🌑3027<br><br>(11 pgs) | BNC Certificate of Mailing. (Related document (s):3009 Notice of Filing of Official Transcript (Form)) No. of Notices: 218. Notice Date 02/03/2021. (Admin.) (Entered: 02/04/2021) |
| 02/04/2021 | 🌑3028<br><br>(8 pgs; 3 docs) | Letter from Gaynell Spigner (Attachments: # 1 Exhibit # 2 Exhibit) (mmap) (Entered: 02/04/2021) |
| 02/04/2021 | 🌑3029<br><br>(1 pg) | Notice of Filing of Official Transcript as to 3014 Transcript. Parties notified (Related document (s):3014 Transcript) (Olin) (Entered: 02/04/2021) |
| 02/04/2021 | 🌑3030<br><br>(4 pgs) | Proposed Order RE: *Order Denying The Commonwealth of Pennsylvania's (I) Motion for Mandatory Abstention and (II) Motion for Relief from Automatic Stay* (Filed By Chesapeake Energy Corporation ).(Related document(s):2109 Generic Motion, 2654 Objection, 2682 Motion for Relief From Stay, 2921 Objection) (Cavenaugh, Matthew) (Entered: 02/04/2021) |
| 02/04/2021 | 🌑3031<br><br>(6 pgs) | Notice of Appearance and Request for Notice Filed by Lakia S McCline Filed by on behalf of Deutsche Bank National Trust Company, as Trustee for Ameriquest Mortgage Securities Inc., Asset-Backed Pass-Through Certificates, Series 2003-11 (McCline, Lakia) (Entered: 02/04/2021) |
| 02/04/2021 | 🌑 | Certificate of Email Notice. Contacted E. Keiffer. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):2939 Motion to Reconsider) **Hearing scheduled for 2/17/2021 at 03:00 PM at telephone and video conference.** (aalo) (Entered: 02/04/2021) |
| 02/04/2021 | 🌑3032<br><br>(3 pgs) | Notice *of Hearing on Amended Motion to Reconsider and Brief in Support and Certificate of Service*. (Related document(s):2939 Motion to Reconsider) Filed by Ryan, LLC (Keiffer, Edwin) (Entered: 02/04/2021) |
| | 🌑3033 | |

| | | |
|---|---|---|
| 02/04/2021 | (5 pgs; 2 docs) | Letter from Gaynell Spigner (Attachments: # 1 Exhibit) (mmap) (Entered: 02/04/2021) |
| 02/04/2021 | 🔘 3034 (52 pgs) | Statement *Seventh Monthly Fee Statement of Brown Rudnick LLP for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses as Co-Counsel for the Official Committee of Unsecured Creditors for the Period from January 1, 2021 through January 31, 2021* (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) (Entered: 02/04/2021) |
| 02/04/2021 | 🔘 3035 (824 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler (Related document(s):2951)* (Filed By Epiq Corporate Restructuring LLC ). (Garabato, Sid) (Entered: 02/04/2021) |
| 02/05/2021 | 🔘 3036 (8 pgs) | Statement *of Issues and Designation of Items to be Included in Record of Appeal* (Filed By ETC Texas Pipeline Ltd. ). (Mitchell, John) (Entered: 02/05/2021) |
| 02/06/2021 | 🔘 3037 (11 pgs) | BNC Certificate of Mailing. (Related document (s):3029 Notice of Filing of Official Transcript (Form)) No. of Notices: 218. Notice Date 02/06/2021. (Admin.) (Entered: 02/06/2021) |
| 02/08/2021 | 🔘 3038 (5 pgs; 2 docs) | Letter from Gaynell Spigner (Attachments: # 1 Exhibit) (mmap) (Entered: 02/08/2021) |
| 02/08/2021 | 🔘 3039 (6 pgs; 2 docs) | Letter from Gaynell Spigner (Attachments: # 1 Exhibit) (mmap) (Entered: 02/08/2021) |
| 02/08/2021 | 🔘 3040 (3 pgs; 2 docs) | Letter from Gaynell Spigner (Attachments: # 1 Exhibit) (mmap) (Entered: 02/08/2021) |
| 02/08/2021 | 🔘 3041 (58 pgs; 3 docs) | Agreed Order and Certificate of Counsel (Filed By Chesapeake Energy Corporation ).(Related document(s):2646 Generic Motion) (Attachments: # 1 Proposed Order # 2 Redline) (Cavenaugh, Matthew) (Entered: 02/08/2021) |
| | | |

| | | |
|---|---|---|
| 02/08/2021 | 🔵3042<br><br>(263 pgs) | Notice *of Fee Statement of Kirkland & Ellis LLP and Kirkland & Ellis International LLP for Compensation for Services and Reimbursement of Expenses as Attorneys to the Debtors and Debtors In Possession for the Period from October 1, 2020, Through October 31, 2020.* Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 02/08/2021) |
| 02/08/2021 | 🔵3043<br><br>(15 pgs; 3 docs) | Motion for Relief from Stay *to proceed with pending state court litigation.* Fee Amount $188. Filed by Creditor John Smith, R.J. Smith, Barbara A. Smith, Linda Beran, Debbie Colley and Jamo Enterprise Hearing scheduled for 3/11/2021 at 10:00 AM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Exhibit A # 2 Proposed Order) (Lauffer, Charles) (Entered: 02/08/2021) |
| 02/08/2021 | | Receipt of Motion for Relief From Stay(20-33233) [motion,mrlfsty] ( 188.00) Filing Fee. Receipt number 22805038. Fee amount $ 188.00. (U.S. Treasury) (Entered: 02/08/2021) |
| 02/08/2021 | 🔵3044<br><br>(16 pgs) | Declaration re: *Second Supplemental Declaration of Adam Miller in Support of the Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Rothschild & Co US Inc. and Intrepid Partners, LLC as Investment Bankers to the Debtors* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 02/08/2021) |
| 02/08/2021 | 🔵3045<br><br>(9 pgs) | Declaration re: *Second Supplemental Declaration of Stephen Antinelli in Support of the Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Rothschild & Co US Inc. and Intrepid Partners, LLC as Investment Bankers to the Debtors* (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 02/08/2021) |
| | 🔵3046<br><br>(14 pgs) | Statement - *Monthly Fee Statement of Forshey & Prostok, LLP for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses as Attorneys for the Official Committee of Royalty Owners for the Period from January 1, 2021 through and including January 31, 2021* |

| | | |
|---|---|---|
| 02/08/2021 | | (Filed By Forshey & Prostok, LLP ).(Related document(s):656 Generic Order) (Prostok, Jeffrey) (Entered: 02/08/2021) |
| 02/08/2021 | 3047 (27 pgs; 2 docs) | Emergency Motion *for Entry of an Order (I) Authorizing and Approving the Settlement By and Among the Debtors, The Co-Lessees, and Tornado Venture Seis, LP and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 02/08/2021) |
| 02/08/2021 | 3048 (30 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):2963 Notice, 2966 Objection to Claim) (Garabato, Sid) (Entered: 02/08/2021) |
| 02/09/2021 | 3049 (2 pgs) | Order (I) Authorizing and Approving the Settlement By and Among the Debtors, the Co-Lessees, and Tornado Venture Seis, and (II) Granting Related Relief (Related Doc # 3047) Signed on 2/9/2021. (emiller) (Entered: 02/09/2021) |
| 02/09/2021 | 3050 (20 pgs) | Order Approving (I) the Omnibus Claims Objection Procedures and (II) the Form of Notice of Objection (Related Doc # 2646) Signed on 2/9/2021. (emiller) (Entered: 02/09/2021) |
| 02/09/2021 | 3051 (5 pgs; 2 docs) | Letter from Gaynell Spigner (Attachments: # 1 Exhibit) (mmap) (Entered: 02/09/2021) |
| 02/09/2021 | 3052 (35 pgs) | Statement *Fourth Monthly Fee Statement of Back Bay Management Corporation and its Division, the Michel-Shaked Group* (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) (Entered: 02/09/2021) |
| | | Certificate of Telephone Notice. Contacted Veronica Polnick. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):2914 Notice, 2915 Order Confirming Chapter 11 Plan, 2946 Notice) Hearing scheduled for 2/22/2021 at 02:30 PM at |

| 02/09/2021 | | telephone conference. (aalo) (Entered: 02/09/2021) |
|---|---|---|
| 02/09/2021 | 🔘 3053<br><br>(6472 pgs) | Objection *Debtors' Opposition to Ryan, LLC's Amended Motion to Reconsider* (related document (s):2645 Motion to Reconsider, 2939 Motion to Reconsider). Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 02/09/2021) |
| 02/09/2021 | 🔘 3054<br><br>(23 pgs) | Notice *of Fee Statement of Sherman & Sterling LLP for Compensation for Services and Reimbursement of Expenses as Special Counsel to the Debtors and Debtors In Possession for the Period from December 1, 2020, through December 31, 2020.* Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 02/09/2021) |
| 02/09/2021 | 🔘 3055<br><br>(3 pgs) | Objection (related document(s):2951 Motion to Extend Time). Filed by John Smith, R.J. Smith, Barbara A. Smith, Linda Beran, Debbie Colley and Jamo Enterprise (Lauffer, Charles) (Entered: 02/09/2021) |
| 02/09/2021 | 🔘 3056<br><br>(2 pgs) | Order Granting First Interim Fee Application of Back Bay Management Corporation and its Division, the Michel-Shaked Group, for Allowance of Compensation and Reimbursement of Expenses as Expert Valuation Consultant to the Official Committee of Unsecured Creditors for the Period September 1, 2020 through September 30, 2020 (Related Doc # 2224). Signed on 2/9/2021. (VrianaPortillo) (Entered: 02/09/2021) |
| 02/09/2021 | 🔘 3057<br><br>(4 pgs) | Notice *of Reset Hearing on Seismic Agreements.* (Related document(s):2914 Notice, 2915 Order Confirming Chapter 11 Plan) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 02/09/2021) |
| 02/09/2021 | 🔘 3058<br><br>(4 pgs) | Notice *of Entry of Order Confirming the Fifth Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates.* Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 02/09/2021) |
| | 🔘 3059 | |

| | | |
|---|---|---|
| 02/10/2021 | (1 pg) | Withdrawal of Claim: *17* (Peeples Carter, D Layne) (Entered: 02/10/2021) |
| 02/10/2021 | ⚫ 3060<br><br>(19 pgs) | Stipulation and Agreed Order Regarding the Memorandum of Law in Support of Seitel Data, Ltd.'s Objection to (I) the Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates, (II) the Assumption or Assumption and Assignment of Seitel's Master License Agreement, as Amended and (III) Notice of Opt Out Signed on 2/10/2021 (Related document(s):3025 Stipulation) (emiller) (Entered: 02/11/2021) |
| 02/10/2021 | ⚫ 3061<br><br>(4 pgs) | Order Denying the Commonwealth of Pennsylvania's (1) Motion for Mandatory Abstention and (2) Motion for Relief from Automatic Stay (Related Doc # 2109)(Related Doc # 2682) Signed on 2/10/2021. (emiller) (Entered: 02/11/2021) |
| 02/11/2021 | ⚫ 3062<br><br>(3 pgs) | Letter from Gaynell Spigner (mmap) (Entered: 02/11/2021) |
| 02/11/2021 | ⚫ 3063<br><br>(4 pgs; 2 docs) | Letter from Gaynell Spigner (Attachments: # 1 Exhibit) (mmap) (Entered: 02/11/2021) |
| 02/12/2021 | ⚫ 3064<br><br>(3 pgs) | Notice *of Stephen L. Iacovo Withdrawal as Counsel.* Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 02/12/2021) |
| 02/12/2021 | ⚫ 3065<br><br>(1 pg) | Withdrawal of Claim: *Karnes City ISD claim number 10041 with claims agent in the amount of $1,841.79* (Stecker, Don) (Entered: 02/12/2021) |
| 02/12/2021 | ⚫ 3066<br><br>(1 pg) | Withdrawal of Claim: *Karnes City ISD claim number 13296 with claims agent in the amount of $1,420.48* (Stecker, Don) (Entered: 02/12/2021) |
| 02/12/2021 | ⚫ 3067<br><br>(1 pg) | Withdrawal of Claim: *Zavala CAD claim number 10043 with claims agent in the amount of $587.43* (Stecker, Don) (Entered: 02/12/2021) |
| | ⚫ 3068 | Withdrawal of Claim: *Zavala CAD claim number* |

| | | |
|---|---|---|
| 02/12/2021 | (1 pg) | *13292 with claims agent in the amount of $559.65* (Stecker, Don) (Entered: 02/12/2021) |
| 02/12/2021 | ⚲3069 (1 pg) | Withdrawal of Claim: *Culberson County claim number 10146 with claims agent in the amount of $994.07* (Stecker, Don) (Entered: 02/12/2021) |
| 02/12/2021 | ⚲3070 (1 pg) | Withdrawal of Claim: *Cotulla ISD claim number 10054 with claims agent in the amount of $2,937.11* (Stecker, Don) (Entered: 02/12/2021) |
| 02/12/2021 | ⚲3071 (1 pg) | Withdrawal of Claim: *Cotulla ISD claim number 13325 with claims agent in the amount of $2,813.46* (Stecker, Don) (Entered: 02/12/2021) |
| 02/12/2021 | ⚲3072 (1 pg) | Withdrawal of Claim: *Dilley ISD claim number 10055 with claims agent in the amount of $2,414.53* (Stecker, Don) (Entered: 02/12/2021) |
| 02/12/2021 | ⚲3073 (1 pg) | Withdrawal of Claim: *Dilley ISD claim number 13323 with claims agent in the amount of $2,390.84* (Stecker, Don) (Entered: 02/12/2021) |
| 02/12/2021 | ⚲3074 (1 pg) | Withdrawal of Claim: *La Salle County claim number 10057 with claims agent in the amount of $1,092.31* (Stecker, Don) (Entered: 02/12/2021) |
| 02/12/2021 | ⚲3075 (1 pg) | Withdrawal of Claim: *La Salle County claim number 13320 with claims agent in the amount of $1,356.41* (Stecker, Don) (Entered: 02/12/2021) |
| 02/12/2021 | ⚲3076 (1 pg) | Withdrawal of Claim: *Pearsall ISD claim number 13319 with claims agent in the amount of $7,364.13* (Stecker, Don) (Entered: 02/12/2021) |
| 02/12/2021 | ⚲3077 (1 pg) | Withdrawal of Claim: *Atascosa County claim number 13293 with claims agent in the amount of $210,262.29* (Stecker, Don) (Entered: 02/12/2021) |
| 02/12/2021 | ⚲3078 (1 pg) | Withdrawal of Claim: *Cotulla ISD claim number 10046 with claims agent in the amount of $4,271,465.84* (Stecker, Don) (Entered: 02/12/2021) |
| | ⚲3079 | Withdrawal of Claim: *Cotulla ISD claim number 13365 with claims agent in the amount of* |

| | | |
|---|---|---|
| 02/12/2021 | (1 pg) | *$2,655,814.69* (Stecker, Don) (Entered: 02/12/2021) |
| 02/12/2021 | 🌑3080<br><br>(1 pg) | Withdrawal of Claim: *Dilley ISD claim number 10047 with claims agent in the amount of $2,955,286.53* (Stecker, Don) (Entered: 02/12/2021) |
| 02/12/2021 | 🌑3081<br><br>(1 pg) | Withdrawal of Claim: *Dilley ISD claim number 13324 with claims agent in the amount of $2,559,033.60* (Stecker, Don) (Entered: 02/12/2021) |
| 02/12/2021 | 🌑3082<br><br>(1 pg) | Withdrawal of Claim: *Frio Hospital District claim number 10048 with claims agent in the amount of $692.11* (Stecker, Don) (Entered: 02/12/2021) |
| 02/12/2021 | 🌑3083<br><br>(1 pg) | Withdrawal of Claim: *Frio Hospital District claim number 13294 with claims agent in the amount of $692.11* (Stecker, Don) (Entered: 02/12/2021) |
| 02/12/2021 | 🌑3084<br><br>(1 pg) | Withdrawal of Claim: *La Salle County claim number 10049 with claims agent in the amount of $1,420,950.10* (Stecker, Don) (Entered: 02/12/2021) |
| 02/12/2021 | 🌑3085<br><br>(1 pg) | Withdrawal of Claim: *La Salle County claim number 13364 with claims agent in the amount of $2,138,057.34* (Stecker, Don) (Entered: 02/12/2021) |
| 02/12/2021 | 🌑3086<br><br>(1 pg) | Withdrawal of Claim: *McMullen County claim number 10050 with claims agent in the amount of $1,713,847.94* (Stecker, Don) (Entered: 02/12/2021) |
| 02/12/2021 | 🌑3087<br><br>(1 pg) | Withdrawal of Claim: *McMullen County claim number 13297 with claims agent in the amount of $6,930,219.38* (Stecker, Don) (Entered: 02/12/2021) |
| 02/12/2021 | 🌑3088<br><br>(1 pg) | Withdrawal of Claim: *Zavala CAD claim number 10052 with claims agent in the amount of $154,443.36* (Stecker, Don) (Entered: 02/12/2021) |
| | 🌑3089 | Withdrawal of Claim: *Zavala CAD claim number* |

| | | |
|---|---|---|
| 02/12/2021 | (1 pg) | *13295 with claims agent in the amount of $145,823.52* (Stecker, Don) (Entered: 02/12/2021) |
| 02/12/2021 | 🌐 3090<br><br>(2 pgs) | Withdrawal of Claim: *3786 filed by Epiq Corporate Restructuring, LLC on behalf of Grouse Ridge LLC* (Suarez, Hugo) (Entered: 02/12/2021) |
| 02/15/2021 | 🌐 3091<br><br>(5 pgs) | Notice *of Amended Ordinary Course Professional List*. Filed by Chesapeake Energy Corporation (Polnick, Veronica) (Entered: 02/15/2021) |
| 02/15/2021 | 🌐 3092<br><br>(4 pgs) | Declaration re: *Declaration of Disinterestedness of Wachtell, Lipton, Rosen & Katz* (Filed By Chesapeake Energy Corporation ). (Polnick, Veronica) (Entered: 02/15/2021) |
| 02/15/2021 | 🌐 3093<br><br>(5 pgs) | Stipulation By Chesapeake Energy Corporation and The Reorganized Debtors, the Eagle Ford MDL Royalty Owner Plaintiffs, CNOOC Energy U.S.A. LLC, and Jamestown Resources, L.L.C., Larchmont Resources, L.L.C, and Pelican Energy, L.L.C.. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Polnick, Veronica) (Entered: 02/15/2021) |
| 02/15/2021 | 🌐 3094<br><br>(7 pgs) | Proposed Order RE: *Agreed Amended Order (I) Authorizing the Rejection of the Ryan Tax Contracts Effective as of November 18, 2020 and (II) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):2939 Motion to Reconsider) (Polnick, Veronica) (Entered: 02/15/2021) |
| 02/16/2021 | 🌐 3095<br><br>(104 pgs) | Statement *Sixth Monthly Fee Statement of AlixPartners, LLP, Financial Advisor to the Official Committee Of Unsecured Creditors for Allowance of Compensation for Services Rendered for the Period December 1, 2020 through December 31, 2020* (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) (Entered: 02/16/2021) |
| | 🌐 3096 | Agenda for Hearing on 2/17/2021 (Filed By Chesapeake Energy Corporation ). (Cavenaugh, |

| 02/16/2021 | (4 pgs) | Matthew) (Entered: 02/16/2021) |
|---|---|---|
| 02/17/2021 | 🌑 3097<br><br>(3 pgs) | Notice of Appearance and Request for Notice Filed by William H Hoch Filed by on behalf of Specketer Energy, LLC (Hoch, William) (Entered: 02/17/2021) |
| 02/17/2021 | 🌑 3098<br><br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Tim J Gallegly Filed by on behalf of Specketer Energy, LLC (Gallegly, Tim) (Entered: 02/17/2021) |
| 02/17/2021 | 🌑 3099<br><br>(2 pgs) | Notice *of Cancellation of Hearing on Ryan, LLC's Amended Motion to Reconsider and Brief in Support*. (Related document(s):3032 Notice) Filed by Ryan, LLC (Keiffer, Edwin) (Entered: 02/17/2021) |
| 02/17/2021 | 🌑 | Certificate of Email Notice. Contacted John Pesnell and Matthew Cavenaugh. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):1248 Motion for Relief From Stay) Hearing rescheduled for 2/23/2021 at 04:00 PM by telephone and video conference. (aalo) (Entered: 02/17/2021) |
| 02/17/2021 | 🌑 3100<br><br>(2 pgs) | Letter from Mohamed Eltaramsi (Related document(s):2833 Amended Chapter 11 Plan) (mmap) (Entered: 02/18/2021) |
| 02/18/2021 | 🌑 3101<br><br>(88 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):2942 Response) (Garabato, Sid) (Entered: 02/18/2021) |
| 02/18/2021 | 🌑 3102<br><br>(25 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):3010 Notice) (Garabato, Sid) (Entered: 02/18/2021) |
| 02/18/2021 | 🌑 3103<br><br>(25 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):3015 Generic Motion) (Garabato, Sid) (Entered: 02/18/2021) |
| | 🌑 3104 | |

| | | |
|---|---|---|
| 02/19/2021 | (1 pg) | Notice of Change of Address Filed by Michael Antonio Anderson (mmap) (Entered: 02/19/2021) |
| 02/19/2021 | ⬤3105 <br> (5 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):3019 Notice, 3020 Notice, 3021 Notice, 3022 Notice) (Garabato, Sid) (Entered: 02/19/2021) |
| 02/19/2021 | ⬤3106 <br> (4 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):3042 Notice) (Garabato, Sid) (Entered: 02/19/2021) |
| 02/19/2021 | ⬤3107 <br> (26 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):3041 Agreed Order and Certificate of Counsel, 3044 Declaration, 3045 Declaration) (Garabato, Sid) (Entered: 02/19/2021) |
| 02/20/2021 | ⬤3108 <br> (5 pgs; 2 docs) | Certificate of No Objection *with Respect to the First Interim Fee Application of Alvarez & Marsal North America, LLC* (Filed By Chesapeake Energy Corporation ).(Related document(s):2536 Application for Compensation) (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 02/20/2021) |
| 02/22/2021 | ⬤ | Certificate of Email Notice. Contacted Veronica Polnick. The hearing scheduled for 2/22/2021 at 2:30 PM has been adjourned by agreement. Movant to notice all interested parties and file a certificate of service with the court (Related document (s):2914 Notice, 2915 Order Confirming Chapter 11 Plan, Certificate of Notice) **Hearing rescheduled for 3/12/2021 at 09:00 AM by telephone and video conference.** (aalo) (Entered: 02/22/2021) |
| 02/22/2021 | ⬤3109 <br> (3 pgs) | Notice *of Reset of Hearing on Seismic Agreements*. (Related document(s):2914 Notice, 2915 Order Confirming Chapter 11 Plan) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 02/22/2021) |
| | ⬤3110 | Notice *of Sixth Monthly Fee Statement of* |

| | | |
|---|---|---|
| 02/22/2021 | (100 pgs) | *PricewaterhouseCoopers LLP for Services Rendered and Reimbursement of Expenses as Audit Services and Tax Consulting Services Provider for the Debtors for the Period December 1, 2020 Through December 31, 2020.* (Related document (s):656 Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 02/22/2021) |
| 02/22/2021 | 3111<br><br>(33 pgs; 2 docs) | Objection to Claim Number by Claimant *Reorganized Debtors' Third Omnibus Objection to Certain Proofs of Claim (Amended Claims)* Hearing scheduled for 3/29/2021 at 02:30 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order)(Cavenaugh, Matthew) (Entered: 02/22/2021) |
| 02/22/2021 | 3112<br><br>(212 pgs; 2 docs) | Objection to Claim Number by Claimant *Reorganized Debtors' First Omnibus Objection to Certain Proofs of Claim (Beneficial Bondholder Duplicate Claims)* Hearing scheduled for 3/29/2021 at 02:30 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 02/22/2021) |
| 02/22/2021 | 3113<br><br>(27 pgs; 2 docs) | Objection to Claim Number by Claimant *Reorganized Debtors' Second Omnibus Objection to Certain Proofs of Claim (Duplicate Claims)* Hearing scheduled for 3/29/2021 at 02:30 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order)(Cavenaugh, Matthew) (Entered: 02/22/2021) |
| 02/22/2021 | 3114<br><br>(110 pgs; 2 docs) | Objection to Claim Number by Claimant *Reorganized Debtors' Fourth Omnibus Objection to Certain Proofs of Claim (Equity Interest Claims)* Hearing scheduled for 3/29/2021 at 02:30 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order)(Cavenaugh, Matthew) (Entered: 02/22/2021) |
| 02/22/2021 | 3115<br><br>(1 pg) | Withdrawal of Claim: *Amended Notice of Withdrawal for Frio Hospital District claim number 13294 with claims agent in the amount of $828.64 (related document 3083)* (Stecker, Don) (Entered: 02/22/2021) |

| | | |
|---|---|---|
| 02/22/2021 | 🌐 3116 <br><br> (1 pg) | Withdrawal of Claim: *Amended Notice of Withdrawal for McMullen County claim number 10050 with claims agent in the amount of $1,719,847.94 (related document 3086)* (Stecker, Don) (Entered: 02/22/2021) |
| 02/22/2021 | 🌐 3117 <br><br> (62 pgs) | Debtors Master Service List (Filed By Epiq Corporate Restructuring LLC ). (Garabato, Sid) (Entered: 02/22/2021) |
| 02/22/2021 | 🌐 3118 <br><br> (6 pgs) | Stipulation By Chesapeake Energy Corporation and WesternGeco LLC. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ).(Related document(s):2106 Objection) (Cavenaugh, Matthew) (Entered: 02/22/2021) |
| 02/22/2021 | 🌐 3119 <br><br> (6 pgs; 2 docs) | Certificate of No Objection *with Respect to the First Interim Fee Application of Kirkland & Ellis LLP and Kirkland & Ellis International LLP, Attorneys for the Debtors and Debtors in Possession, for the Period from June 28, 2020 Through and Including September 30, 2020* (Filed By Chesapeake Energy Corporation ).(Related document(s):2977 Application for Compensation) (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 02/22/2021) |
| 02/23/2021 | 🌐 3120 <br><br> (4 pgs) | Stipulation By Chesapeake Energy Corporation and CGG Land (U.S.) Inc.. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 02/23/2021) |
| 02/23/2021 | 🌐 3121 <br><br> (1 pg) | Motion to Appear pro hac vice *Kevin Liang*. Filed by Debtor Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 02/23/2021) |
| | 🌐 3122 <br><br> (6 pgs) | Stipulation and Agreed Order Regarding Westerngeco LLC's Objection to (I) the Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates, (II) the Assumption or Assumption and Assignment of Westerngeco LLC's Master License Agreement, as Amended and (III) Notice of OPT |

| | | |
|---|---|---|
| 02/23/2021 | | Out Signed on 2/23/2021 (Related document (s):3118 Stipulation) (VrianaPortillo) (Entered: 02/23/2021) |
| 02/23/2021 | 🌐 3123 <br><br> (2 pgs) | Order Granting First Interim Fee Application of Kirkland & Ellis LLP and Kirland & Ellis International LLP, Attorneys for the Debtors and Debtors in Possession, for the Period from June 28, 2020 through and Including September 30, 2020 (Related Doc # 2977). Signed on 2/23/2021. (VrianaPortillo) (Entered: 02/23/2021) |
| 02/23/2021 | 🌐 3124 <br><br> (7 pgs) | Agreed Amended Order (I) Authorizing the Rejection of the Ryan Tax Contracts Effective as of November 18, 2020 and (II) Granting Related Relief Signed on 2/23/2021 (Related document (s):1857 Generic Motion, 2645 Motion to Reconsider, 2939 Motion to Reconsider) (VrianaPortillo) (Entered: 02/23/2021) |
| 02/23/2021 | 🌐 3125 <br><br> (3 pgs) | Agreed Notice *of Withdrawal*. (Related document (s):1248 Motion for Relief From Stay) Filed by John H. Bedsole (Pesnell, John) (Entered: 02/23/2021) |
| 02/23/2021 | 🌐 3126 <br><br> (12 pgs) | Stipulation By Chesapeake Energy Corporation and Aparicion Royalty Owners. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 02/23/2021) |
| 02/25/2021 | 🌐 3127 <br><br> (2 pgs) | Order Granting First Interim Fee Application of Alvarez & Marsal North America, LLC as the Debtors' Restructuring Advisor for Allowance of Compensation and Reimbursement of Expenses for the Period June 28, 2020 through September 30, 2020 (Related Doc # 2536). Signed on 2/25/2021. (VrianaPortillo) (Entered: 02/25/2021) |
| 02/25/2021 | 🌐 3133 <br><br> (1 pg) | Notice of Change of Address Filed by Michael Antonio Anderson (ShadiaNash) (Entered: 02/26/2021) |
| | 🌐 3128 | Motion to Withdraw as Attorney. Objections/Request for Hearing Due in 21 days. |

| | | |
|---|---|---|
| 02/26/2021 | (3 pgs; 2 docs) | Filed by Interested Party Wyoming Department of Environmental Quality (Attachments: # 1 Proposed Order) (Shaw, Kelly) (Entered: 02/26/2021) |
| 02/26/2021 | 3129 (1 pg) | Withdrawal of Claim: *Bexar County Claim Number 10014 with claims agent in the amount of $4,699.38* (Stecker, Don) (Entered: 02/26/2021) |
| 02/26/2021 | 3130 (1 pg) | Withdrawal of Claim: *Bexar County Claim Number 13327 with claims agent in the amount of $4,660.24* (Stecker, Don) (Entered: 02/26/2021) |
| 02/26/2021 | | Certificate of Telephone Notice. Contacted Veronica Polnick. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):3111 Objection to Claim, 3112 Objection to Claim, 3113 Objection to Claim, 3114 Objection to Claim) **Hearing rescheduled for 4/8/2021 at 02:30 PM by telephone and video conference.** (aalo) (Entered: 02/26/2021) |
| 02/26/2021 | 3131 (4 pgs; 2 docs) | Motion for 2004 Examination. Filed by Creditor Robert R Luchetti (Attachments: # 1 Exhibit) (Proctor, Michael) (Entered: 02/26/2021) |
| 02/26/2021 | 3132 (9 pgs; 2 docs) | Motion *Reorganized Debtors' Motion for Entry of an Order (I) Further Extending the Time Within Which the Reorganized Debtors May Remove Actions and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 02/26/2021) |
| 02/27/2021 | 3134 (2 pgs) | Withdrawal of Claim: *12799 filed by Epiq Corporate Restructuring, LLC on behalf of SBA Monarch Towers I LLC* (Suarez, Hugo) (Entered: 02/27/2021) |
| 02/27/2021 | 3135 (3171 pgs) | Notice *of Fourth Amended Plan Supplement for the Fifth Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates*. (Related document(s):2833 Amended Chapter 11 Plan) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 02/27/2021) |

| | | |
|---|---|---|
| 02/28/2021 | ⬤ 3136<br><br>(3 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):3110 Notice) (Garabato, Sid) (Entered: 02/28/2021) |
| 02/28/2021 | ⬤ 3137<br><br>(11 pgs; 2 docs) | Emergency Motion *Reorganized Debtors' Emergency Motion for Entry of an Order Authorizing the Reorganized Debtors to File the ET Settlement Motion Under Seal* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 02/28/2021) |
| 02/28/2021 | ⬤ 3138<br><br>(35 pgs; 2 docs) | Emergency Motion *Reorganized Debtors' Motion for Entry of an Order (I) Approving the Settlement By and Among the Reorganized Debtors and ET, (II) Authorizing the Reorganized Debtors' Performance of Obligations Thereunder, and (III) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 02/28/2021) |
| 03/01/2021 | ⬤ 3139<br><br>(2 pgs) | Letter from William King (mmap) (Entered: 03/01/2021) |
| 03/01/2021 | ⬤ 3140<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Kevin Liang (Related Doc # 3121) Signed on 3/1/2021. (emiller) (Entered: 03/01/2021) |
| 03/01/2021 | ⬤ 3141<br><br>(1 pg) | Withdrawal of Claim: *12507 filed by Epiq Corporate Restructuring, LLC on behalf of Larchmont Resources LLC* (Suarez, Hugo) (Entered: 03/01/2021) |
| 03/01/2021 | ⬤ 3142<br><br>(1 pg) | Withdrawal of Claim: *12513 filed by Epiq Corporate Restructuring, LLC on behalf of Pelican Energy LLC* (Suarez, Hugo) (Entered: 03/01/2021) |
| 03/01/2021 | ⬤ 3143<br><br>(1 pg) | Withdrawal of Claim: *12525 filed by Epiq Corporate Restructuring, LLC on behalf of Pelican Energy LLC* (Suarez, Hugo) (Entered: 03/01/2021) |
| | ⬤ 3147 | Agreed Order Appointing Judge Marvin Mediator Signed on 3/1/2021 (Related document(s):1293 |

| | | |
|---|---|---|
| 03/01/2021 | (3 pgs) | Motion for Relief From Stay, 2981 Emergency Motion) (VrianaPortillo) (Entered: 03/02/2021) |
| 03/02/2021 | 3144<br><br>(15 pgs; 3 docs) | Notice *of Removal to the United States Bankruptcy Court for the Western District of Oklahoma*. Filed by Chesapeake Exploration, L.L.C., Chesapeake Operating, L.L.C. (Attachments: # 1 Exhibit A # 2 Exhibit B) (Cavenaugh, Matthew) (Entered: 03/02/2021) |
| 03/02/2021 | 3145<br><br>(56 pgs; 3 docs) | Objection to Claim Number by Claimant *Reorganized Debtors' Amended Second Omnibus Objection to Certain Proofs of Claim (Duplicate Claims)* Hearing scheduled for 4/8/2021 at 02:30 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order # 2 Redline) (Cavenaugh, Matthew) (Entered: 03/02/2021) |
| 03/02/2021 | 3146<br><br>(69 pgs; 3 docs) | Objection to Claim Number by Claimant *Reorganized Debtors' Amended Third Omnibus Objection to Certain Proofs of Claim (Amended Claims)* Hearing scheduled for 4/8/2021 at 02:30 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order # 2 Redline) (Cavenaugh, Matthew) (Entered: 03/02/2021) |
| 03/02/2021 | 3148<br><br>(279 pgs; 3 docs) | Objection to Claim Number by Claimant *Reorganized Debtors' Amended Fourth Omnibus Objection to Certain Proofs of Claim (Equity Interest Claims)* Hearing scheduled for 4/8/2021 at 02:30 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order # 2 Redline) (Cavenaugh, Matthew) (Entered: 03/02/2021) |
| 03/02/2021 | 3149<br><br>(2 pgs) | Withdraw Document (Filed By John Smith, R.J. Smith, Barbara A. Smith, Linda Beran, Debbie Colley and Jamo Enterprise ).(Related document (s):3043 Motion for Relief From Stay) (Lauffer, Charles) (Entered: 03/02/2021) |
| 03/02/2021 | 3150<br><br>(12 pgs) | Stipulation and Agreed Order Regarding the Aparicion Royalty Owners' Proofs of Claim No. 12862, 12872, 12917, 12924, 12933, and 12943 Signed on 3/2/2021 (Related document(s):3126 Stipulation) (VrianaPortillo) (Entered: 03/02/2021) |
| | | |

| | | |
|---|---|---|
| 03/02/2021 | 🔵3151<br><br>(4 pgs) | Notice *of Hearing on Omnibus Claim Objections.* (Related document(s):3111 Objection to Claim, 3112 Objection to Claim, 3113 Objection to Claim, 3114 Objection to Claim, 3145 Objection to Claim, 3146 Objection to Claim, 3148 Objection to Claim) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 03/02/2021) |
| 03/02/2021 | 🔵3152<br><br>(24 pgs) | Stipulation By Chesapeake Energy Corporation and Dwight Lewis Lumber Company, Inc. and Dwight G. Lewis Testamentary Business Asset Marital Trust. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 03/02/2021) |
| 03/02/2021 | 🔵3153<br><br>(5 pgs) | Stipulation By Chesapeake Energy Corporation and The Eagle Ford MDL Royalty Owner Plaintiffs, CEU, and JLP. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 03/02/2021) |
| 03/02/2021 | 🔵3154<br><br>(112 pgs; 2 docs) | Motion *Reorganized Debtors' Motion for Entry of an Order (I) Authorizing (A) Allowance of the Faith Ranch Claim and (B) Assumption of the Supplemental Joint Operating Services Agreements, By and Between the Reorganized Debtors and Jamestown Resources, L.L.C., Larchmont Resources, L.L.C. and Pelican Resources, L.L.C., Each as Amended, and (II) Granting Related Relief* Filed by Debtor Chesapeake Energy Corporation Hearing scheduled for 3/26/2021 at 10:45 AM at telephone and video conference. (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 03/02/2021) |
| 03/03/2021 | 🔵3155<br><br>(2 pgs) | Withdrawal of Claim: *12923 filed by Epiq Corporate Restructuring, LLC on behalf of Anadarko E&P Onshore LLC* (Suarez, Hugo) (Entered: 03/03/2021) |
| | 🔵3156<br><br>(2 pgs) | Withdrawal of Claim: *12939 filed by Epiq Corporate Restructuring, LLC on behalf of Anadarko E&P Onshore LLC* (Suarez, Hugo) |

| 03/03/2021 | | (Entered: 03/03/2021) |
|---|---|---|
| 03/03/2021 | 🌐 3157<br><br>(2 pgs) | Letter from Gaynell Spigner (mmap) (Entered: 03/03/2021) |
| 03/03/2021 | 🌐 3158<br><br>(4 pgs) | Notice *of Joinder*. (Related document(s):2785 Generic Motion) Filed by United States of America (Kincheloe, Richard) (Entered: 03/03/2021) |
| 03/03/2021 | 🌐 3159<br><br>(1 pg) | Withdrawal of Claim: *11929 filed by Epiq Corporate Restructuring, LLC on behalf of Diversified Production LLC* (Suarez, Hugo) (Entered: 03/03/2021) |
| 03/03/2021 | 🌐 3160<br><br>(1 pg) | Withdrawal of Claim: *12326 filed by Epiq Corporate Restructuring, LLC on behalf of Diversified Production LLC* (Suarez, Hugo) (Entered: 03/03/2021) |
| 03/03/2021 | 🌐 3161<br><br>(1 pg) | Withdrawal of Claim: *128 filed by Epiq Corporate Restructuring, LLC on behalf of Taylor Strategies & Consulting LLC* (Suarez, Hugo) (Entered: 03/03/2021) |
| 03/03/2021 | 🌐 3162<br><br>(1 pg) | Withdrawal of Claim: *1471 filed by Epiq Corporate Restructuring, LLC on behalf of DCP Operating Company LP* (Suarez, Hugo) (Entered: 03/03/2021) |
| 03/03/2021 | 🌐 3163<br><br>(1 pg) | Withdrawal of Claim: *3 filed by Epiq Corporate Restructuring, LLC on behalf of Accounting Principals* (Suarez, Hugo) (Entered: 03/03/2021) |
| 03/03/2021 | 🌐 3164<br><br>(1 pg) | Withdrawal of Claim: *12579 filed by Epiq Corporate Restructuring, LLC on behalf of Contango Oil & Gas* (Suarez, Hugo) (Entered: 03/03/2021) |
| 03/04/2021 | 🌐 3165<br><br>(11 pgs; 2 docs) | Emergency Motion *for Entry of an Order Authorizing the Reorganized Debtors to File the Reorganized Debtors' and ET's Exhibit List Under Seal* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 03/04/2021) |

| | | |
|---|---|---|
| 03/04/2021 | 3166<br><br>(42 pgs; 15 docs) | Exhibit List, Witness List (Filed By Chesapeake Energy Corporation ).(Related document(s):3137 Emergency Motion, 3138 Emergency Motion) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14) (Cavenaugh, Matthew) (Entered: 03/04/2021) |
| 03/04/2021 | 3167<br><br>(17 pgs; 3 docs) | Notice *Notification of Removal to the United States Bankruptcy Court for The Western District of Oklahoma*. Filed by Chesapeake Energy Corporation (Attachments: # 1 Exhibit A # 2 Exhibit B) (Cavenaugh, Matthew) (Entered: 03/04/2021) |
| 03/04/2021 | 3168<br><br>(6 pgs) | Notice of Change of Address Filed by Eddye Dreyer Financial Services (mmap) (Entered: 03/04/2021) |
| 03/04/2021 | 3169<br><br>(42 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):3053 Objection, 3057 Notice) (Garabato, Sid) (Entered: 03/04/2021) |
| 03/04/2021 | 3170<br><br>(4 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):3054 Notice) (Garabato, Sid) (Entered: 03/04/2021) |
| 03/04/2021 | 3171<br><br>(14 pgs) | BNC Certificate of Mailing. (Related document (s):3147 Generic Order) No. of Notices: 222. Notice Date 03/04/2021. (Admin.) (Entered: 03/04/2021) |
| 03/04/2021 | 3172<br><br>(23 pgs) | BNC Certificate of Mailing. (Related document (s):3150 Generic Order) No. of Notices: 222. Notice Date 03/04/2021. (Admin.) (Entered: 03/04/2021) |
| 03/04/2021 | 3174<br><br>(2 pgs) | Letter from Eric Hall re: Claim #10380. (ShadiaNash) (Entered: 03/05/2021) |
| | 3173 | Proposed Order RE: *Order (I) Authorizing and* |

| | | |
|---|---|---|
| 03/05/2021 | (6 pgs; 2 docs) | *Approving the Consent Decree and Environmental Settlement Agreement By and Among the Debtors and The United States on Behalf of The Environmental Protection Agency, and (II) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):2785 Generic Motion, 3158 Notice) (Attachments: # 1 Redline) (Peguero, Kristhy) (Entered: 03/05/2021) |
| 03/05/2021 | 🌐 3175 <br><br> (156 pgs; 5 docs) | Application to Compromise Controversy *Reorganized Debtors' Motion for Entry of Orders (I) Authorizing and Approving (A) the PG AG Settlement, (B) the MEC Settlement, and (C) the Non-MEC Settlement, and (II) Granting Related Relief*. Objections/Request for Hearing Due in 21 days. Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4) (Cavenaugh, Matthew) (Entered: 03/05/2021) |
| 03/05/2021 | 🌐 3176 <br><br> (12 pgs) | Notice *of Periodic Report Regarding Value, Operations, and Profitability of Entities in Which the Debtor's Estate Holds a Substantial or Controlling Interest*. Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 03/05/2021) |
| 03/05/2021 | 🌐 3177 <br><br> (13 pgs) | Debtor-In-Possession Monthly Operating Report for Filing Period ending 12/31/2020, $536,355 disbursed (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 03/05/2021) |
| 03/05/2021 | 🌐 3178 <br><br> (3 pgs) | Notice *of Hearing on Emergency Motion Approving the Settlement By and Among the Reorganized Debtors and ET*. (Related document (s):3138 Emergency Motion) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 03/05/2021) |
| 03/08/2021 | 🌐 3179 <br><br> (5 pgs; 2 docs) | Motion To Substitute Attorney. Filed by Interested Parties Eric Petroleum Corporation, Eric Petroleum Utica, LLC (Attachments: # 1 Proposed Order) (Flores, Henry) (Entered: 03/08/2021) |
| | 🌐 3180 | Motion to Appear pro hac vice *of Randolph L. Snow*. Filed by Interested Parties Eric Petroleum |

| 03/08/2021 | (1 pg) | Corporation, Eric Petroleum Utica, LLC (Flores, Henry) (Entered: 03/08/2021) |
|---|---|---|
| 03/08/2021 | 3181<br><br>(1 pg) | Motion to Appear pro hac vice *of Chrysanthe E. Vassiles*. Filed by Interested Parties Eric Petroleum Corporation, Eric Petroleum Utica, LLC (Flores, Henry) (Entered: 03/08/2021) |
| 03/08/2021 | 3182<br><br>(1 pg) | Motion to Appear pro hac vice *of James M. Wherley, Jr.*. Filed by Interested Parties Eric Petroleum Corporation, Eric Petroleum Utica, LLC (Flores, Henry) (Entered: 03/08/2021) |
| 03/08/2021 | 3183<br><br>(78 pgs) | Notice *of Seventh Monthly Fee Statement of PricewaterhouseCoopers LLP for Services Rendered and Reimbursement of Expenses as Audit Services and Tax Consulting Services Provider for the Debtors for the Period January 1, 2021 Through January 31, 2021*. (Related document (s):656 Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 03/08/2021) |
| 03/08/2021 | 3184<br><br>(23 pgs) | Response (related document(s):3050 Generic Order). (mmap) (Entered: 03/08/2021) |
| 03/08/2021 | 3185<br><br>(78 pgs) | Notice *of Seventh Montly Fee Statement of PricewaterhouseCoopers LLP for Services Rendered and Reimbursement of Expenses as Audit Services and Tax Consulting Services Provider for the Debtors for the Period January 1, 2021 Through January 15, 2021*. Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 03/08/2021) |
| 03/08/2021 | 3186<br><br>(3 pgs) | Statement *Reservation of Rights of Epsilon Energy USA, Inc. to Assert Administrative Expense Claim* (Filed By Epsilon Energy USA, Inc. ).(Related document(s):3058 Notice) (McGavran, A) (Entered: 03/08/2021) |
| 03/08/2021 | 3187<br><br>(3 pgs) | Order Authorizing the Reorganized Debtors to File the ET Settlement Motion Under Seal (Related Doc # 3137) Signed on 3/8/2021. (emiller) (Entered: 03/08/2021) |

| | | |
|---|---|---|
| 03/08/2021 | 🔵3188<br><br>(24 pgs) | Stipulation and Agreed Order Regarding the Lewis Lumber Proof of Claims No. 2815 and 2816 Signed on 3/8/2021 (Related document(s):3152 Stipulation) (emiller) (Entered: 03/08/2021) |
| 03/08/2021 | 🔵3189<br><br>(2 pgs) | Withdrawal of Claim: *10288 filed by Epiq Corporate Restructuring, LLC on behalf of Nelson Chen* (Suarez, Hugo) (Entered: 03/08/2021) |
| 03/08/2021 | 🔵3190<br><br>(2 pgs) | Withdrawal of Claim: *10304 filed by Epiq Corporate Restructuring, LLC on behalf of Hui Chuan Chen* (Suarez, Hugo) (Entered: 03/08/2021) |
| 03/08/2021 | 🔵3191<br><br>(5 pgs) | Third Supplemental Stipulation and Agreed Order By and Among the Reorganized Debtors, the Eagle Ford MDL Royalty Owner Plaintiffs, CEU, and JLP Signed on 3/8/2021 (Related document (s):3153 Stipulation) (emiller) (Entered: 03/08/2021) |
| 03/08/2021 | 🔵3192<br><br>(3 pgs) | Order Authorizing the Reorganized Debtors to File the Reorganized Debtors' and ET's Exhibit List Under Seal (Related Doc # 3165) Signed on 3/8/2021. (emiller) (Entered: 03/08/2021) |
| 03/08/2021 | 🔵3193<br><br>(3 pgs) | Order (I) Authorizing and Approving the Consent Decree and Environmental Settlement Agreement By and Among the Debtors and the United States on Behalf of the Environmental Protection Agency, and (II) Granting Related Relief (Related Doc # 2785) Signed on 3/8/2021. (emiller) (Entered: 03/08/2021) |
| 03/08/2021 | 🔵3194<br><br>(2 pgs) | Courtroom Minutes. Time Hearing Held: 3:30 PM. Appearances: SEE ATTACHED. (Related document(s):3138 Emergency Motion) For reasons stated on the record, the Court approved the Emergency Motion Reorganized Debtors' Motion for Entry of an Order (I) Approving the Settlement By and Among the Reorganized Debtors and ET, (II) Authorizing the Reorganized Debtors' Performance of Obligations Thereunder, and (III) Granting Related Relief 3138. Order to be entered. (VrianaPortillo) (Entered: 03/08/2021) |
| | 🔵3195 | 🔊 PDF with attached Audio File. Court Date & |

| | | |
|---|---|---|
| 03/08/2021 | (1 pg) | Time [ 3/8/2021 3:30:04 PM ]. File Size [ 2912 KB ]. Run Time [ 00:06:04 ]. (In ref to doc no. 3138. Hearing held March 8, 2021.). (admin). (Entered: 03/08/2021) |
| 03/08/2021 | 🔵3196<br><br>(8 pgs) | Agreed Order (I) Approving the Settlement by and Among the Reorganized Debtors and ET, by and Among the Reorganized Debtors' Performance of Obligations thereunder, and (III) Granting Related Relief (Related Doc # 3138) Signed on 3/8/2021. (VrianaPortillo) (Entered: 03/08/2021) |
| 03/08/2021 | 🔵3197<br><br>(55 pgs) | Statement *Seventh Monthly Fee Statement of AlixPartners, LLP* (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) (Entered: 03/08/2021) |
| 03/08/2021 | 🔵3198<br><br>(7 pgs; 2 docs) | Certificate of No Objection *with Respect to the Motion for Entry of an Order (I) Authorizing and Approving the Debtors' Entry Into a Consent Decree By and Among the Debtors and the United States on Behalf of the Environmental Protection Agency and the Commonwealth of Pennsylvania, Department of Environmental Protection and (II) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):3015 Generic Motion) (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 03/08/2021) |
| 03/08/2021 | 🔵3206<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Randolph L. Snow (Related Doc # 3180) Signed on 3/8/2021. (emiller) (Entered: 03/09/2021) |
| 03/08/2021 | 🔵3207<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Chrysanthe E. Vassiles (Related Doc # 3181) Signed on 3/8/2021. (emiller) (Entered: 03/09/2021) |
| 03/08/2021 | 🔵3208<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - James M. Wherley, Jr. (Related Doc # 3182) Signed on 3/8/2021. (emiller) (Entered: 03/09/2021) |
| | 🔵3213 | Response (related document(s):2024 Objection to Confirmation of the Plan, 2155 Objection to |

| | | |
|---|---|---|
| 03/08/2021 | (1 pg) | Confirmation of the Plan). (mmap) (Entered: 03/10/2021) |
| 03/09/2021 | ☉ 3199<br><br>(2 pgs) | Notice of Change of Address Filed by Mary Wheeler Family Limited Partnership (Autry, Patrick) (Entered: 03/09/2021) |
| 03/09/2021 | ☉ 3200<br><br>(1 pg) | Withdrawal of Claim: *Frio Hospital District claim number 10056 with claims agent in amount of $1,941.02* (Stecker, Don) (Entered: 03/09/2021) |
| 03/09/2021 | ☉ 3201<br><br>(1 pg) | Withdrawal of Claim: *Frio Hospital District claim number 13321 with claims agent in amount of $1,848.00* (Stecker, Don) (Entered: 03/09/2021) |
| 03/09/2021 | ☉ 3202<br><br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Larry Glenn Ball Filed by on behalf of HGB Properties, LLC (Ball, Larry) (Entered: 03/09/2021) |
| 03/09/2021 | ☉ 3203<br><br>(3 pgs) | Order (I) Authorizing and Approving the Debtors' Entry Into a Consent Decree by and Among the Debtors and the United States on Behalf of the Environmental Protection Agency and the Commonwealth of Pennsylvania, and (II) Granting Related Relief (Related Doc # 3015) Signed on 3/9/2021. (VrianaPortillo) (Entered: 03/09/2021) |
| 03/09/2021 | ☉ 3204<br><br>(1 pg) | Withdrawal of Claim: 200 *on Behalf of CEOG, LLC* (Williamson, Stephen) (Entered: 03/09/2021) |
| 03/09/2021 | ☉ 3205<br><br>(1 pg) | Withdrawal of Claim: 203 *on Behalf of COEG, LLC* (Williamson, Stephen) (Entered: 03/09/2021) |
| 03/09/2021 | ☉ 3209<br><br>(5 pgs) | Stipulation By Chesapeake Energy Corporation and eCorp Resource Partners I, LP, Texas ePartners X, LP and eCorp Resource Partners. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 03/09/2021) |
| | ☉ 3210 | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring |

| | | |
|---|---|---|
| 03/09/2021 | (6289 pgs) | LLC ).(Related document(s):3058 Notice) (Garabato, Sid) (Entered: 03/09/2021) |
| 03/09/2021 | 3211<br><br>(28 pgs) | Affidavit Re: *Affidavit of Service of Geoff Zahm* (Filed By Epiq Corporate Restructuring LLC ). (Related document(s):3091 Notice, 3092 Declaration) (Garabato, Sid) (Entered: 03/09/2021) |
| 03/10/2021 | 3212<br><br>(5 pgs; 2 docs) | Motion to Withdraw Document (related document(s):490 Motion for Withdrawal of Reference). Filed by Creditor ETC Tiger Pipeline LLC (Attachments: # 1 Proposed Order) (Mitchell, John) (Entered: 03/10/2021) |
| 03/10/2021 | 3214<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew Cavenaugh. This is to order a transcript of 3/8/2021 before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) Electronically forwarded to Judicial Transcribers of Texas on 3-10-2021. Estimated completion date: 3-11-2021. Modified on 3/10/2021 (MelissaMorgan). (Entered: 03/10/2021) |
| 03/10/2021 | 3215<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Marty L. Brimmage, Jr.. This is to order a transcript of the March 8, 2021 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Franklin Advisers, Inc., as Investment Manager on Behalf of Certain Funds and Accounts ). (Brimmage, Marty) Copy request was electronically forwarded to Judicial Transcribers of Texas on 3-11-2021. Estimated completion date: 3-12-2021. Modified on 3/11/2021 (MelissaMorgan). (Entered: 03/10/2021) |
| 03/10/2021 | 3216<br><br>(2 pgs) | Order Authorizing ETC Tiger Pipeline LLC to Withdraw its Motion to Withdraw Reference (Related Doc # 3212) Signed on 3/10/2021. (emiller) (Entered: 03/10/2021) |
| | 3217<br><br>(5 pgs) | Second Supplemental Stipulation and Agreed Order by and Among the Reorganized Debtors, the Eagle Ford MDL Royalty Owner Plaintiffs, CEU, and JLP Signed on 3/10/2021 (Related document |

| | | |
|---|---|---|
| 03/10/2021 | | (s):3093 Stipulation) (VrianaPortillo) (Entered: 03/10/2021) |
| 03/10/2021 | 🔘3218<br><br>(4 pgs) | Stipulation and Agreed Order Regarding CGG Land (U.S.) Inc.'s Reply to Debtors' Memorandum of Law in Support of the Third Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates and Omnibus Reply to Objections Thereto Signed on 3/10/2021 (Related document(s):3120 Stipulation) (VrianaPortillo) (Entered: 03/10/2021) |
| 03/10/2021 | 🔘3219<br><br>(21 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):3109 Notice) (Garabato, Sid) (Entered: 03/10/2021) |
| 03/10/2021 | 🔘3220<br><br>(4 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):3127 Order on Application for Compensation) (Garabato, Sid) (Entered: 03/10/2021) |
| 03/10/2021 | 🔘3221<br><br>(32 pgs) | Statement *Eighth Monthly Fee Statement of AlixPartners, LLP* (Filed By Official Committee Of Unsecured Creditors ). (Harrison, Julie) (Entered: 03/10/2021) |
| 03/10/2021 | 🔘3222<br><br>(119 pgs; 2 docs) | Application for Compensation *Second Interim and Final Fee Application of Intrepid Partners, LLC as Investment Banker to the Debtors, for Allowance and Payment of Compensation for Professional Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred From June 28, 2020 Through and Including February 9, 2021.* Objections/Request for Hearing Due in 21 days. Filed by Attorney Matthew D Cavenaugh (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 03/10/2021) |
| 03/10/2021 | 🔘3223<br><br>(130 pgs; 2 docs) | Application for Compensation *Second Interim and Final Fee Application of Rothschild & Co US Inc. as Investment Banker to the Debtors for Allowance and Payment of Compensation for Professional Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred From June 28, 2020 Through and Including February 9, 2021.* |

| | | |
|---|---|---|
| 03/10/2021 | | Objections/Request for Hearing Due in 21 days. Filed by Attorney Matthew D Cavenaugh (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 03/10/2021) |
| 03/10/2021 | 🌐3244<br><br>(3 pgs; 2 docs) | Order from Circuit Court Re: Appeal on Appellate Case Number: 21-20017, Appeal is Dismissed. Signed on 3/10/2021 (Related document(s):1762 Notice of Appeal) (Attachments: # 1 Letter) (ShoshanaArnow) (Entered: 03/15/2021) |
| 03/11/2021 | 🌐3224<br><br>(3 pgs) | Response (Filed By CERES Resource Partners, LP ).(Related document(s):1907 Notice) (Drawhorn, Lauren) (Entered: 03/11/2021) |
| 03/11/2021 | 🌐3225<br><br>(9 pgs) | Application for Administrative Expenses . Objections/Request for Hearing Due in 21 days. Filed by Creditor Targa Pipeline Mid-Continent WestOk LLC Hearing scheduled for 4/30/2021 at 02:00 PM at telephone and video conference. (Soule, Steven) (Entered: 03/11/2021) |
| 03/11/2021 | 🌐3226<br><br>(96 pgs; 5 docs) | Application for Administrative Expenses . Objections/Request for Hearing Due in 21 days. Filed by Creditor Archrock Partners Operating, LLC (Attachments: # 1 Affidavit -Ex A # 2 Exhibit - (A-1) # 3 Exhibit - (A-2) # 4 Proposed Order - Order) (Maraist, Kevin) (Entered: 03/11/2021) |
| 03/11/2021 | 🌐3227<br><br>(11 pgs; 2 docs) | Notice of Appearance and Request for Notice Filed by Eva Gibbons (Attachments: # 1 Exhibit) (mmap) (Entered: 03/11/2021) |
| 03/11/2021 | 🌐3228<br><br>(2 pgs) | Withdrawal of Claim: (Schexnayder, Chad) (Entered: 03/11/2021) |
| 03/11/2021 | 🌐3229<br><br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Lauren Kessler Drawhorn Filed by on behalf of CERES Resource Partners, LP (Drawhorn, Lauren) (Entered: 03/11/2021) |
| | 🌐3230<br><br>(135 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):3111 Objection to Claim, 3112 Objection to Claim, 3113 Objection to |

| | | |
|---|---|---|
| 03/11/2021 | | Claim, 3114 Objection to Claim) (Garabato, Sid) (Entered: 03/11/2021) |
| 03/11/2021 | 3231<br><br>(27 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):3154 Generic Motion) (Garabato, Sid) (Entered: 03/11/2021) |
| 03/11/2021 | 3232<br><br>(9 pgs) | Transcript RE: Energy Transfer 9019 Motion Hearing held on March 8, 2021 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 06/9/2021. (mhen) (Entered: 03/11/2021) |
| 03/11/2021 | 3233<br><br>(12 pgs) | BNC Certificate of Mailing. (Related document (s):3206 Order on Motion to Appear pro hac vice) No. of Notices: 222. Notice Date 03/11/2021. (Admin.) (Entered: 03/12/2021) |
| 03/11/2021 | 3234<br><br>(12 pgs) | BNC Certificate of Mailing. (Related document (s):3207 Order on Motion to Appear pro hac vice) No. of Notices: 222. Notice Date 03/11/2021. (Admin.) (Entered: 03/12/2021) |
| 03/11/2021 | 3235<br><br>(12 pgs) | BNC Certificate of Mailing. (Related document (s):3208 Order on Motion to Appear pro hac vice) No. of Notices: 222. Notice Date 03/11/2021. (Admin.) (Entered: 03/12/2021) |
| 03/11/2021 | 3239<br><br>(2 pgs) | Final Order of Dismissal by District Court Judge Alfred Bennett, Re: Withdrawal of Reference on Civil Action Number: 4:20-cv-3125 , Signed on 3/11/2021. (ShoshanaArnow) (Entered: 03/12/2021) |
| 03/12/2021 | 3236<br><br>(1 pg) | Notice of Filing of Official Transcript as to 3232 Transcript. Parties notified (Related document (s):3232 Transcript) (jdav) (Entered: 03/12/2021) |
| 03/12/2021 | 3237<br><br>(5 pgs; 2 docs) | Letter from Gaynell Spigner (Attachments: # 1 Exhibit) (mmap) (Entered: 03/12/2021) |
| | 3238 | Declaration re: *Second Supplemental Declaration of Thierry Caruso in Support of Debtors'* |

| | | |
|---|---|---|
| 03/12/2021 | (9 pgs) | *Application for Entry of an Order Authorizing the Retention and Employment of Ernst & Young LLP as Restructuring, Accounting, Tax, and Advisory Services Provider to the Debtors Effective as of June 29, 2020* (Filed By Chesapeake Energy Corporation ).(Related document(s):1452 Order on Application to Employ) (Cavenaugh, Matthew) (Entered: 03/12/2021) |
| 03/12/2021 | 3240 (17 pgs) | Response (related document(s):3114 Objection to Claim). (aalo) (Entered: 03/12/2021) |
| 03/12/2021 | | Certificate of Email Notice. Contacted Veronica Polnick. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):3175 Application to Compromise Controversy) Hearing scheduled for 3/31/2021 at 09:00 AM at telephone and video conference. (aalo) (Entered: 03/12/2021) |
| 03/12/2021 | 3241 (16 pgs) | BNC Certificate of Mailing. (Related document (s):3217 Generic Order) No. of Notices: 223. Notice Date 03/12/2021. (Admin.) (Entered: 03/12/2021) |
| 03/12/2021 | 3242 (15 pgs) | BNC Certificate of Mailing. (Related document (s):3218 Generic Order) No. of Notices: 223. Notice Date 03/12/2021. (Admin.) (Entered: 03/12/2021) |
| 03/14/2021 | 3243 (12 pgs) | BNC Certificate of Mailing. (Related document (s):3236 Notice of Filing of Official Transcript (Form)) No. of Notices: 224. Notice Date 03/14/2021. (Admin.) (Entered: 03/15/2021) |
| 03/15/2021 | 3245 (3 pgs) | Notice *of Hearing on Reorganized Debtors' Motion for Entry of Orders (I) Authorizing and Approving (A) the PG AG Settlement, (B) the MEC Settlement, and (C) the Non-MEC Settlement, and (II) Granting Related Relief.* (Related document(s):3175 Application to Compromise Controversy) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 03/15/2021) |
| | | |

| | | |
|---|---|---|
| 03/15/2021 | 3246 (19 pgs) | Reply (related document(s):3112 Objection to Claim). (JosephWells) (Entered: 03/15/2021) |
| 03/16/2021 | 3247 (1 pg) | Proposed Order RE: *Unopposed Motion to Withdraw as Counsel for Good Cause* (Filed By The Royalty Owners ).(Related document(s):2972 Motion to Withdraw as Attorney) (Jewell, Gary) (Entered: 03/16/2021) |
| 03/16/2021 | 3248 (2 pgs) | Withdrawal of Claim: *Philadelphia Indemnity Insurance Company* (Collins, Michael) (Entered: 03/16/2021) |
| 03/16/2021 | 3249 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Expedited (7 days)) by Roni Pollina-Mageros. This is to order a transcript of 1/8/2021 and 01/13/2021, hearing before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas. (mmap) Copy request electronically forwarded to Judicial Transcribers of Texas and Access Transcripts, LLC on March 17, 2021. Estimated completion date: March 24, 2021. Modified on 3/17/2021 (ClaudiaGutierrez). (Entered: 03/16/2021) |
| 03/16/2021 | 3250 (1 pg) | Withdrawal of Claim: *10149 filed by Epiq Corporate Restructuring, LLC on behalf of Yellowjacket Oilfield Services* (Suarez, Hugo) (Entered: 03/16/2021) |
| 03/16/2021 | 3251 (2 pgs) | Withdrawal of Claim: *1749 filed by Epiq Corporate Restructuring, LLC on behalf of Clifford Ray McTee III* (Suarez, Hugo) (Entered: 03/16/2021) |
| 03/16/2021 | 3252 (2 pgs) | Withdrawal of Claim: *1750 filed by Epiq Corporate Restructuring, LLC on behalf of Mary Ann Wheeler Family LP* (Suarez, Hugo) (Entered: 03/16/2021) |
| 03/16/2021 | 3253 (2 pgs) | Withdrawal of Claim: *1751 filed by Epiq Corporate Restructuring, LLC on behalf of McTee L7 Ranch Ltd* (Suarez, Hugo) (Entered: 03/16/2021) |
| | | |

| | | |
|---|---|---|
| 03/16/2021 | 🔵 3254<br><br>(2 pgs) | Withdrawal of Claim: *1752 filed by Epiq Corporate Restructuring, LLC on behalf of Estate of Robert Yeates Wheeler* (Suarez, Hugo) (Entered: 03/16/2021) |
| 03/16/2021 | 🔵 3255<br><br>(2 pgs) | Withdrawal of Claim: *1753 filed by Epiq Corporate Restructuring, LLC on behalf of Shelly Marie McTee* (Suarez, Hugo) (Entered: 03/16/2021) |
| 03/16/2021 | 🔵 3256<br><br>(2 pgs) | Withdrawal of Claim: *1754 filed by Epiq Corporate Restructuring, LLC on behalf of Charles Dewey McTee* (Suarez, Hugo) (Entered: 03/16/2021) |
| 03/16/2021 | 🔵 3257<br><br>(2 pgs) | Withdrawal of Claim: *1755 filed by Epiq Corporate Restructuring, LLC on behalf of CLSCM Ltd* (Suarez, Hugo) (Entered: 03/16/2021) |
| 03/16/2021 | 🔵 3258<br><br>(2 pgs) | Withdrawal of Claim: *1756 filed by Epiq Corporate Restructuring, LLC on behalf of CLSCM Ltd* (Suarez, Hugo) (Entered: 03/16/2021) |
| 03/16/2021 | 🔵 3259<br><br>(2 pgs) | Withdrawal of Claim: *2090 filed by Epiq Corporate Restructuring, LLC on behalf of Oakes David Edwards Jr* (Suarez, Hugo) (Entered: 03/16/2021) |
| 03/16/2021 | 🔵 3260<br><br>(2 pgs) | Withdrawal of Claim: *2091 filed by Epiq Corporate Restructuring, LLC on behalf of Jason Shely Edwards* (Suarez, Hugo) (Entered: 03/16/2021) |
| 03/16/2021 | 🔵 3261<br><br>(2 pgs) | Withdrawal of Claim: *2092 filed by Epiq Corporate Restructuring, LLC on behalf of Kendall Arnim Young* (Suarez, Hugo) (Entered: 03/16/2021) |
| 03/16/2021 | 🔵 3262<br><br>(2 pgs) | Withdrawal of Claim: *2093 filed by Epiq Corporate Restructuring, LLC on behalf of Clinton Michael Wilson* (Suarez, Hugo) (Entered: 03/16/2021) |
| | 🔵 3263 | Withdrawal of Claim: *2094 filed by Epiq |

| | | |
|---|---|---|
| 03/16/2021 | (2 pgs) | *Corporate Restructuring, LLC on behalf of Oakes David Edwards III* (Suarez, Hugo) (Entered: 03/16/2021) |
| 03/16/2021 | 3264<br><br>(2 pgs) | Withdrawal of Claim: *2095 filed by Epiq Corporate Restructuring, LLC on behalf of Jacqueline Elizabeth Ballard* (Suarez, Hugo) (Entered: 03/16/2021) |
| 03/16/2021 | 3272<br><br>(3 pgs; 2 docs) | Response to the Objection of claim #1665 (related document(s):3148 Objection to Claim). (Attachments: # 1 Exhibit)(mmap) (Entered: 03/18/2021) |
| 03/17/2021 | 3265<br><br>(20 pgs) | Affidavit Re: *Affidavit of Service of Geoff Zahm* (Filed By Epiq Corporate Restructuring LLC ). (Related document(s):3135 Notice) (Garabato, Sid) (Entered: 03/17/2021) |
| 03/17/2021 | 3266<br><br>(14 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):3135 Notice) (Garabato, Sid) (Entered: 03/17/2021) |
| 03/17/2021 | 3267<br><br>(2 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):3058 Notice, 3135 Notice) (Garabato, Sid) (Entered: 03/17/2021) |
| 03/17/2021 | 3268<br><br>(17 pgs) | Notice *of Jackson Walker LLP's Fifth Monthly Fee Statement for Compensation of Services Rendered and Reimbursement of Expenses as Co-Counsel and Conflicts Counsel to the Debtors for the Period From November 1, 2020 Through November 30, 2020.* (Related document(s):656 Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 03/17/2021) |
| 03/17/2021 | 3269<br><br>(22 pgs) | Notice *of Jackson Walker LLP's Sixth Monthly Fee Statement for Compensation of Services Rendered and Reimbursement of Expenses as Co-Counsel and Conflicts Counsel to the Debtors for the Period From December 1, 2020 Through December 31, 2020.* (Related document(s):656 Generic Order) Filed by Chesapeake Energy |

| 03/17/2021 | | Corporation (Cavenaugh, Matthew) (Entered: 03/17/2021) |
|---|---|---|
| 03/17/2021 | 🌐 3270 <br><br> (898 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):3132 Generic Motion) (Garabato, Sid) (Entered: 03/17/2021) |
| 03/18/2021 | 🌐 3271 <br><br> (2 pgs) | Withdrawal of Claim: 184 (Scharfenberg, Elliot) (Entered: 03/18/2021) |
| 03/18/2021 | 🌐 3273 <br><br> (2 pgs) | Response (related document(s):3148 Objection to Claim). (JosephWells) (Entered: 03/18/2021) |
| 03/18/2021 | 🌐 3274 <br><br> (247 pgs) | Notice *of Fee Statement of Kirkland & Ellis LLP and Kirkland & Ellis International LLP for Compensation for Services and Reimbursement of Expense as Attorneys to the Debtors and Debtors in Possession for the Period From November 1, 2020 Through November 30, 2020.* (Related document(s):656 Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 03/18/2021) |
| 03/18/2021 | 🌐 3275 <br><br> (247 pgs) | Notice *of Fee Statement of Kirkland & Ellis LLP and Kirkland & Ellis International LLP for Compensation for Services and Reimbursement of Expenses as Attorneys to the Debtors and Debtors in Possession for the Period From December 1, 2020 Through December 31, 2020.* (Related document(s):656 Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 03/18/2021) |
| 03/18/2021 | 🌐 3276 <br><br> (6286 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):3135 Notice) (Garabato, Sid) (Entered: 03/18/2021) |
| | 🌐 3277 <br><br> (141 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):3112 Objection to Claim, 3145 Objection to Claim, 3146 Objection to Claim, 3148 Objection to Claim, 3151 Notice) |

| | | |
|---|---|---|
| 03/19/2021 | | (Garabato, Sid) (Entered: 03/19/2021) |
| 03/19/2021 | 3278<br><br>(12 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):3135 Notice) (Garabato, Sid) (Entered: 03/19/2021) |
| 03/19/2021 | 3279<br><br>(14 pgs) | Notice *of Jackson Walker LLP's Seventh Monthly Fee Statement for Compensation of Services Rendered and Reimbursement of Expenses as Co-Counsel and Conflicts Counsel to the Debtors for the Period From January 1, 2021 Through January 16, 2021*. (Related document(s):656 Generic Order) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 03/19/2021) |
| 03/19/2021 | 3280<br><br>(7 pgs) | Joint Stipulation and Agreed Order by and Among Debtors and Christopher Wilson Granting Relief from Automatic Stay, Effective as of January 4, 2021 Signed on 3/19/2021 (Related document(s):2543 Stipulation) (VrianaPortillo) (Entered: 03/19/2021) |
| 03/19/2021 | 3281<br><br>(5 pgs) | Stipulation and Agreed Order Regarding Ecorp Resource Partners I, LP and Texas Epartners X, LP Proofs of Claim No. 13071, 13086, 13098, nd 13109 Signed on 3/19/2021 (Related document (s):3209 Stipulation) (VrianaPortillo) (Entered: 03/19/2021) |
| 03/19/2021 | 3282<br><br>(2 pgs) | Notice of Response to Reorganized Debtors Amended Fourth Omnibus Claims (related document(s):3114 Objection to Claim). (mmap) (Entered: 03/22/2021) |
| 03/22/2021 | 3283<br><br>(35 pgs) | Debtors Master Service List (Filed By Epiq Corporate Restructuring LLC ). (Garabato, Sid) (Entered: 03/22/2021) |
| 03/22/2021 | 3284<br><br>(2 pgs) | Withdrawal of Claim: *Argonaut Insurance Company* (Goodwine, Paul) (Entered: 03/22/2021) |
| | 3285 | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring |

| 03/22/2021 | (361 pgs) | LLC ).(Related document(s):3135 Notice) (Garabato, Sid) (Entered: 03/22/2021) |
|---|---|---|
| 03/22/2021 | 3286<br><br>(24 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):3175 Application to Compromise Controversy, 3178 Notice) (Garabato, Sid) (Entered: 03/22/2021) |
| 03/22/2021 | 3287<br><br>(5 pgs; 2 docs) | Certificate of No Objection *with Respect to the Reorganized Debtors' Motion for Entry of an Order (I) Further Extending the Time Within Which the Reorganized Debtors May Remove Actions and (II) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):3132 Generic Motion) (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 03/22/2021) |
| 03/22/2021 | 3294<br><br>(1 pg) | Response (related document(s):3148 Objection to Claim). (JosephWells) (Entered: 03/23/2021) |
| 03/23/2021 | 3288<br><br>(2 pgs) | Withdrawal of Claim: *2643 filed by Epiq Corporate Restructuring, LLC on behalf of Jeff Jones* (Garabato, Sid) (Entered: 03/23/2021) |
| 03/23/2021 | 3289<br><br>(2 pgs) | Withdrawal of Claim: *2103 filed by Epiq Corporate Restructuring, LLC on behalf of Diane Davidson* (Garabato, Sid) (Entered: 03/23/2021) |
| 03/23/2021 | 3290<br><br>(2 pgs) | Withdrawal of Claim: *2104 filed by Epiq Corporate Restructuring, LLC on behalf of Nora Faye Davidson Harris* (Garabato, Sid) (Entered: 03/23/2021) |
| 03/23/2021 | 3291<br><br>(2 pgs) | Withdrawal of Claim: *2644 filed by Epiq Corporate Restructuring, LLC on behalf of Kim Byers* (Garabato, Sid) (Entered: 03/23/2021) |
| 03/23/2021 | 3292<br><br>(2 pgs) | Withdrawal of Claim: *2645 filed by Epiq Corporate Restructuring, LLC on behalf of Brenda C Cuvelier* (Garabato, Sid) (Entered: 03/23/2021) |
| | 3293 | Withdrawal of Claim: *2646 filed by Epiq |

| | | |
|---|---|---|
| 03/23/2021 | (2 pgs) | *Corporate Restructuring, LLC on behalf of Jeana Martin* (Garabato, Sid) (Entered: 03/23/2021) |
| 03/23/2021 | 🔵 3295<br><br>(2 pgs) | Order (I) Further Extending the Time Within Which the Reorganized Debtors May Remove Actions and (II) Granting Related Relief (Related Doc # 3132) Signed on 3/23/2021. (VrianaPortillo) (Entered: 03/23/2021) |
| 03/24/2021 | 🔵 3296<br><br>(114 pgs; 2 docs) | Objection to Claim Number by Claimant *Reorganized Debtors' Fifth Omnibus Objection to Certain Proofs of Claim (Cross-Debtor Duplicate Claims)* Hearing scheduled for 4/29/2021 at 01:00 PM at telephone and video conference. (Attachments: # 1 Proposed Order)(Peguero, Kristhy) (Entered: 03/24/2021) |
| 03/24/2021 | 🔵 3297<br><br>(251 pgs; 2 docs) | Objection to Claim Number by Claimant *Reorganized Debtors' Sixth Omnibus Objection to Certain Proofs of Claim (Satisfied Claims)* Hearing scheduled for 4/29/2021 at 01:00 PM at telephone and video conference. (Attachments: # 1 Proposed Order)(Peguero, Kristhy) (Entered: 03/24/2021) |
| 03/24/2021 | 🔵 3298<br><br>(186 pgs; 2 docs) | Objection to Claim Number by Claimant *Reorganized Debtors' Seventh Omnibus Objection to Certain Proofs of Claim (Equity Interest Claims)* Hearing scheduled for 4/29/2021 at 01:00 PM at telephone and video conference. (Attachments: # 1 Proposed Order)(Peguero, Kristhy) (Entered: 03/24/2021) |
| 03/24/2021 | 🔵 3299<br><br>(32 pgs; 2 docs) | Objection to Claim Number by Claimant *Reorganized Debtors' Eighth Omnibus Objection to Certain Proofs of Claim (Beneficial Bondholder Duplicate Claims)* Hearing scheduled for 4/29/2021 at 01:00 PM at telephone and video conference. (Attachments: # 1 Proposed Order) (Peguero, Kristhy) (Entered: 03/24/2021) |
| | 🔵 3300<br><br>(17 pgs; 2 docs) | Objection to Claim Number by Claimant *Reorganized Debtors' Ninth Omnibus Objection to Certain Proofs of Claim (Duplicate Claims)* Hearing scheduled for 4/29/2021 at 01:00 PM at telephone and video conference. (Attachments: # 1 Proposed Order)(Peguero, Kristhy) (Entered: |

| 03/24/2021 | | 03/24/2021) |
|---|---|---|
| 03/24/2021 | 🔵 3301<br><br>(17 pgs; 2 docs) | Objection to Claim Number by Claimant *Reorganized Debtors' Tenth Omnibus Objection to Certain Proofs of Claim (Amended Claims)* Hearing scheduled for 4/29/2021 at 01:00 PM at telephone and video conference. (Attachments: # 1 Proposed Order)(Peguero, Kristhy) (Entered: 03/24/2021) |
| 03/24/2021 | 🔵 3302<br><br>(126 pgs; 6 docs) | Witness List, Exhibit List (Filed By Chesapeake Energy Corporation ).(Related document(s):3154 Generic Motion) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5) (Cavenaugh, Matthew) (Entered: 03/24/2021) |
| 03/24/2021 | 🔵 3303<br><br>(118 pgs; 2 docs) | Application for Compensation *Jackson Walker LLP's Second Interim and Final Fee Application for Allowance and Payment of Fees and Expenses as Co-Counsel to the Debtors for the Period From June 28, 2020 Through January 16, 2021.* Objections/Request for Hearing Due in 21 days. Filed by Attorney Matthew D Cavenaugh (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 03/24/2021) |
| 03/24/2021 | 🔵 3304<br><br>(89 pgs) | Application for Compensation - *Second Interim and Final Application of Forshey & Prostok, LLP, as Attorneys for the Official Committee of Royalty Owners for the Period from July 25, 2020 through and including February 9, 2021* for Forshey & Prostok, LLP, Attorney, Period: 7/25/2020 to 2/9/2021, Fee: $769,543.50, Expenses: $56,984.29. Objections/Request for Hearing Due in 21 days. Filed by Attorney Forshey & Prostok, LLP (Prostok, Jeffrey) (Entered: 03/24/2021) |
| 03/24/2021 | 🔵 3305<br><br>(2 pgs) | Proposed Order RE: (Filed By Forshey & Prostok, LLP ).(Related document(s):3304 Application for Compensation) (Prostok, Jeffrey) (Entered: 03/24/2021) |
| | 🔵 3306<br><br>(2 pgs) | Notice *of Filing Forshey & Prostok, LLP's Second and Final Fee Application.* (Related document(s):3304 Application for Compensation) Filed by Forshey & Prostok, LLP (Prostok, |

| 03/24/2021 | | Jeffrey) (Entered: 03/24/2021) |
|---|---|---|
| 03/24/2021 | 🔘 3307<br><br>(4 pgs) | Notice of Appearance and Request for Notice Filed by Alexander David Burch Filed by on behalf of JGC Exploration Eagle Ford, LLC (Burch, Alexander) (Entered: 03/24/2021) |
| 03/24/2021 | 🔘 3308<br><br>(1 pg) | Notice of Appearance and Request for Notice Filed by Martin Darren Woodward Filed by on behalf of Non-MEC Class (PA), Alice R. Brown, James L. Brown (Woodward, Martin) (Entered: 03/24/2021) |
| 03/24/2021 | 🔘 3309<br><br>(1 pg) | Motion to Appear pro hac vice *of Michael D. Donovan*. Filed by Creditors Alice R. Brown, James L. Brown, Non-MEC Class (PA) (Woodward, Martin) (Entered: 03/24/2021) |
| 03/24/2021 | 🔘 3310<br><br>(59 pgs; 2 docs) | Emergency Motion *Reorganized Debtors' Emergency Motion to Enforce Confirmation Order* Filed by Debtor Chesapeake Energy Corporation Hearing scheduled for 3/30/2021 at 11:30 AM at telephone and video conference. (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 03/24/2021) |
| 03/25/2021 | 🔘 3311<br><br>(7 pgs; 2 docs) | Certificate of No Objection *with Respect to the Reorganized Debtors' Motion for Entry of an Order (I) Authorizing (A) Allowance of the Faith Ranch Claim and (B) Assumption of the Supplemental Joint Operating Services Agreements, By and Between the Reorganized Debtors and Jamestown Resources, L.L.C., Larchmont Resources, L.L.C. and Pelican Resources, L.L.C., Each as Amended, and (II) Granting Related Relief* (Filed By Chesapeake Energy Corporation ).(Related document(s):3154 Generic Motion) (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 03/25/2021) |
| 03/25/2021 | 🔘 3312<br><br>(1 pg) | Withdrawal of Claim: *2161 filed by Epiq Corporate Restructuring, LLC on behalf of Illinois Department of Revenue* (Suarez, Hugo) (Entered: 03/25/2021) |
| | | |

| | 🔘 <u>3313</u><br><br>(2 pgs)<br><br>03/25/2021 | Order Approving First Interim Application of Pricewaterhousecoopers LLP for Compensation and Reimbursement of Expenses as Audit Services and Tax Consulting Services Provider for the Debtors for the Period from June 28, 2020 through September 30, 2020 (Related Doc # <u>2561</u>). Granting for Chesapeake Energy Corporation, fees awarded: $, expenses awarded: $ Signed on 3/25/2021. (VrianaPortillo) (Entered: 03/25/2021) |
| --- | --- | --- |
| | 🔘 <u>3314</u><br><br>(1 pg)<br><br>03/25/2021 | Order Granting Motion To Appear pro hac vice - Michael D. Donovan (Related Doc # <u>3309</u>) Signed on 3/25/2021. (emiller) (Entered: 03/25/2021) |
| | 🔘 <u>3315</u><br><br>(4 pgs)<br><br>03/25/2021 | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):<u>3183</u> Notice) (Garabato, Sid) (Entered: 03/25/2021) |
| | 🔘 <u>3316</u><br><br>(4 pgs)<br><br>03/25/2021 | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):<u>3221</u> Statement, <u>3222</u> Application for Compensation, <u>3223</u> Application for Compensation) (Garabato, Sid) (Entered: 03/25/2021) |
| | 🔘 <u>3317</u><br><br>(17 pgs)<br><br>03/25/2021 | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):<u>3245</u> Notice) (Garabato, Sid) (Entered: 03/25/2021) |
| | 🔘 <u>3318</u><br><br>(4 pgs)<br><br>03/25/2021 | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):<u>3268</u> Notice, <u>3269</u> Notice) (Garabato, Sid) (Entered: 03/25/2021) |
| | 🔘 <u>3321</u><br><br>(7 pgs; 2 docs)<br><br>03/25/2021 | Response and addendum to claim 10956 (related document(s):<u>3114</u> Objection to Claim). (Attachments: # <u>1</u> Exhibit)(mmap) (Entered: 03/26/2021) |
| | 🔘 <u>3319</u><br><br>(3 pgs) | Order (I) Authorizing (A) Allowance of the Faith Ranch Claim and (B) Assumption of the Supplemental Joint Operating Services |

| | | |
|---|---|---|
| 03/26/2021 | | Agreements, By and Between the Reorganized Debtors and Jamestown Resources, L.L.C., Larchmont Resources, L.L.C. and Pelican Resources, L.L.C., Each as Amended, and (II) Granting Related Relief (Related Doc # 3154) Signed on 3/26/2021. (aalo) (Entered: 03/26/2021) |
| 03/26/2021 | 3320<br><br>(5 pgs) | Stipulation and Agreed Order Signed on 3/26/2021 (Related document(s):3001 Stipulation) (aalo) (Entered: 03/26/2021) |
| 03/26/2021 | 3322<br><br>(3 pgs) | Declaration re: *Supplemental Declaration of Jeremy R. Kennedy in Support of the Debtors' Application for Entry of an Order Under 11 U.S.C. § 327(e) Authorizing the Retention and Employment of Shearman & Sterling LLP as Special Counsel for the Debtors Effective as of October 11, 2020* (Filed By Chesapeake Energy Corporation ).(Related document(s):2429 Order on Application to Employ) (Cavenaugh, Matthew) (Entered: 03/26/2021) |
| 03/26/2021 | 3323<br><br>(110 pgs; 2 docs) | Application for Compensation *First and Final Fee Application of Shearman & Sterling LLP, Special Counsel for the Debtors in Possession, for the Period From October 11, 2020 Through and Including January 16, 2021.* Objections/Request for Hearing Due in 21 days. Filed by Attorney Matthew D Cavenaugh (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 03/26/2021) |
| 03/26/2021 | 3324<br><br>(997 pgs; 2 docs) | Application for Compensation *AlixPartners, LLP's Joint (I) Second Interim Fee Application for the Period October 1, 2020 through February 9, 2021 and (II) Final Fee Application for the Period July 14, 2020 through February 9, 2021 for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses Incurred as Financial Advisor to the Official Committee of Unsecured Creditors.* Objections/Request for Hearing Due in 21 days. (Attachments: # 1 Proposed Order) (Harrison, Julie) (Entered: 03/26/2021) |
| 03/26/2021 | 3325 | Application for Compensation *Combined Third* |

| | | |
|---|---|---|
| 03/26/2021 | (205 pgs; 2 docs) | *Monthly, Fourth Monthly, Fifth Monthly, Sixth Monthly, and Final Fee Application of Opportune LLP for Allowance of Compensation and Reimbursement of Expenses as Special Valuation and Industry Advisor to the Official Committee of Unsecured Creditors for the Period September 1, 2020 through February 6, 2021.* Objections/Request for Hearing Due in 21 days. (Attachments: # 1 Proposed Order) (Harrison, Julie) (Entered: 03/26/2021) |
| 03/26/2021 | 🌐3326<br><br>(55 pgs; 2 docs) | Application for Compensation *Final Application of BBG, Inc. for Allowance of Compensation for Services Rendered and Reimbursement of Expenses as Real Estate Appraiser / Valuation Expert to the Official Committee of Unsecured Creditors for the Period from November 2, 2020 through December 31, 2020.* Objections/Request for Hearing Due in 21 days. (Attachments: # 1 Proposed Order) (Harrison, Julie) (Entered: 03/26/2021) |
| 03/26/2021 | 🌐3327<br><br>(285 pgs; 2 docs) | Application for Compensation *Second Interim and Final Fee Application of Norton Rose Fulbright US LLP for Allowance of Compensation and Reimbursement of Expenses as Co-Counsel to the Official Committee of Unsecured Creditors for the Period July 13, 2020 through February 9, 2021.* Objections/Request for Hearing Due in 21 days. (Attachments: # 1 Proposed Order) (Harrison, Julie) (Entered: 03/26/2021) |
| 03/26/2021 | 🌐3328<br><br>(199 pgs; 2 docs) | Application for Compensation *Final Fee Application of Back Bay Management and its Division, the Michel-Shaked Group, for Allowance of Compensation for Services Rendered and Reimbursement of Expenses as Expert Valuation Consultant to the Official Committee of Unsecured Creditors for the Period from September 1, 2020 through February 9, 2021.* Objections/Request for Hearing Due in 21 days. (Attachments: # 1 Proposed Order) (Harrison, Julie) (Entered: 03/26/2021) |
| | 🌐3329 | Motion to Appear pro hac vice *Daniel Seltz.* Filed by Creditor Demchak Plaintiffs (mmap) (Entered: |

| 03/26/2021 | (1 pg) | 03/26/2021 |
| --- | --- | --- |
| 03/26/2021 | 🔘 3330<br><br>(657 pgs; 2 docs) | Application for Compensation *Second Interim and Final Fee Application of PricewaterhouseCoopers LLP for Services Rendered and Reimbursement of Expenses as Audit Services and Tax Consulting Services Provider for the Debtors for the Period June 28, 2020 Through and Including January 16, 2021*. Objections/Request for Hearing Due in 21 days. Filed by Attorney Matthew D Cavenaugh (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 03/26/2021) |
| 03/26/2021 | 🔘 3331<br><br>(172 pgs; 2 docs) | Application for Compensation *Second Interim and Final Fee Application of Ernst & Young LLP for Compensation and Reimbursement of Expenses for the Period From June 29, 2020 Through and Including January 16, 2021*. Objections/Request for Hearing Due in 21 days. Filed by Attorney Matthew D Cavenaugh (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 03/26/2021) |
| 03/26/2021 | 🔘 3332<br><br>(1 pg) | Motion to Appear pro hac vice *Larry D Moffett*. Filed by Creditor Demchak Plaintiffs (mmap) (Entered: 03/26/2021) |
| 03/26/2021 | 🔘 3333<br><br>(1629 pgs; 2 docs) | Application for Compensation *Second Interim and Final Fee Application of Kirkland & Ellis LLP and Kirkland & Ellis International LLP, Attorneys for the Debtors and Debtors in Possession for (I) the Second Interim Fee Period From October 1, 2020 Through and Including January 16, 2021 and (II) the Fee Period from June 28, 2020 Through and Including January 16, 2021*. Objections/Request for Hearing Due in 21 days. Filed by Attorney Matthew D Cavenaugh (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 03/26/2021) |
| | 🔘 3334<br><br>(419 pgs; 2 docs) | Application for Compensation *Final Application of Brown Rudnick LLP, as Co-Counsel to the Official Committee of Unsecured Creditors, for the Period from July 13, 2020 Through and Including February 9, 2021*. Objections/Request for Hearing Due in 21 days. (Attachments: # 1 |

| 03/26/2021 | | Proposed Order) (Harrison, Julie) (Entered: 03/26/2021) |
|---|---|---|
| 03/26/2021 | ○ 3335 (298 pgs; 5 docs) | Joint Objection (related document(s):3175 Application to Compromise Controversy). Filed by Dianna Mowry, Rodney Mowry, Charlotte E. Place, Jesse C. Place, Richard E. Place, Charlotte E. Place Trust, Richard E. Place Trust, Placewood Resource Management, LLC, Placewood Resources, L.P., William R Ruark, William R. Ruark, Herbert D. Steele, Leola B. Steele, The 5 Family LP, Tim & Terri Family LP, Terri Denise Tyler, Timothy A Tyler, Judith A. Wilson, Raynold W Wilson (Attachments: # 1 Exhibit A -- List of Pennsylvania Proof of Claim Lessors # 2 Exhibit B -- Tyler/Mowry Lessors Proofs of Claim # 3 Exhibit C -- Kuffa WCLG Lease # 4 Exhibit D -- Kuffa Confirmed Arbitration Award) (Helfer, Arleigh) (Entered: 03/26/2021) |
| 03/26/2021 | ○ 3336 (4 pgs) | Letter from Kazuto and Renate Yamamoto (mmap) (Entered: 03/26/2021) |
| 03/26/2021 | ○ 3337 (777 pgs; 2 docs) | Application for Compensation *Second Interim and Final Fee Application of Alvarez & Marsal North America, LLC as Restructuring Advisor for the Debtors and Debtors in Possession for the Period From June 28, 2020 Through and Including January 16, 2021.* Objections/Request for Hearing Due in 21 days. Filed by Attorney Matthew D Cavenaugh (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 03/26/2021) |
| 03/26/2021 | ○ 3338 (2699 pgs) | Notice *of Fifth Amended Plan Supplement for the Fifth Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and its Debtor Affiliates*. (Related document(s):2833 Amended Chapter 11 Plan) Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 03/26/2021) |
| | ○ 3339 (5 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document (s):3274 Notice, 3275 Notice) (Garabato, Sid) |

| 03/26/2021 | | (Entered: 03/26/2021) |
|---|---|---|
| 03/26/2021 | 🔵 3340<br><br>(4 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document (s):3279 Notice) (Garabato, Sid) (Entered: 03/26/2021) |
| 03/29/2021 | 🔵 3341<br><br>(1 pg) | Motion to Appear pro hac vice *of Douglas M. Foley*. Filed by Interested Party Epsilon Energy USA, Inc. (Farrell, Thomas) (Entered: 03/29/2021) |
| 03/29/2021 | 🔵 3342<br><br>(1 pg) | Withdrawal of Claim: *2473 filed by Epiq Corporate Restructuring, LLC on behalf of Ohio Department of Taxation* (Suarez, Hugo) (Entered: 03/29/2021) |
| 03/29/2021 | 🔵 3343<br><br>(268 pgs; 5 docs) | Exhibit List, Witness List (Filed By Dianna Mowry, Rodney Mowry, Charlotte E. Place, Jesse C. Place, Richard E. Place, Charlotte E. Place Trust, Richard E. Place Trust, Placewood Resource Management, LLC, Placewood Resources, L.P., William R Ruark, William R. Ruark, Herbert D. Steele, Leola B. Steele, Tim & Terri Family LP, Terri Denise Tyler, Timothy A Tyler, Tyler/Mowry Lessors, Judith A. Wilson, Raynold W Wilson ). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D) (Helfer, Arleigh) (Entered: 03/29/2021) |
| 03/29/2021 | 🔵 3344<br><br>(4 pgs) | Witness List, Exhibit List (Filed By Chesapeake Energy Corporation ).(Related document(s):3310 Emergency Motion (with hearing date)) (Cavenaugh, Matthew) (Entered: 03/29/2021) |
| 03/29/2021 | 🔵 3345<br><br>(27580 pgs; 11 docs) | Witness List, Exhibit List (Filed By Chesapeake Energy Corporation ).(Related document(s):3344 Witness List, Exhibit List) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 - part 1 # 7 Exhibit 6 - part 2 # 8 Exhibit 7 # 9 Exhibit 8 # 10 Exhibit 9) (Cavenaugh, Matthew) (Entered: 03/29/2021) |

| | | |
|---|---|---|
| 03/29/2021 | 🔵 3346<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Daniel Seltz (Related Doc # 3329) Signed on 3/29/2021. (emiller) (Entered: 03/29/2021) |
| 03/29/2021 | 🔵 3347<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Larry D. Moffett (Related Doc # 3332) Signed on 3/29/2021. (emiller) (Entered: 03/29/2021) |
| 03/29/2021 | 🔵 3348<br><br>(352 pgs; 5 docs) | Motion to Compel *Arbitration, or Alternatively, for Permissive Abstention* Filed by Creditors Cemetery Road Hunt Club, Inc., Charlotte E. Place, Jesse C. Place, Richard E. Place, Charlotte E. Place Trust, Richard E. Place Trust, Placewood Resource Management, LLC, Placewood Resources, L.P., R&J Partners, L.P., William R Ruark, William R. Ruark, Herbert D. Steele, Leola B. Steele, Judith A. Wilson, Raynold W Wilson Hearing scheduled for 4/28/2021 at 02:00 PM at Houston. (Attachments: # 1 Proposed Order # 2 Exhibit A - Leases -- 1 of 2 # 3 Exhibit A -- Leases - 2 of 2 # 4 Exhibit B -- Carlucci Declarations) (Helfer, Arleigh) (Entered: 03/29/2021) |
| 03/29/2021 | 🔵 3349<br><br>(56 pgs) | Objection *to Reorganized Debtors' Emergency Motion to Enforce Confirmation Order* (related document(s):3310 Emergency Motion (with hearing date)). Filed by Epsilon Energy USA, Inc. (Farrell, Thomas) (Entered: 03/29/2021) |
| 03/29/2021 | 🔵 3350<br><br>(4 pgs) | Response/Objection Filed by John Winston. (Related document(s):3112 Objection to Claim) (dnor) (Entered: 03/29/2021) |
| 03/29/2021 | 🔵 3351<br><br>(1 pg) | Motion to Appear pro hac vice *Charles E. Schaffer*. Filed by Creditor Demchak Plaintiffs (DesireeSillas) (Entered: 03/29/2021) |
| 03/29/2021 | 🔵 3352<br><br>(14 pgs; 2 docs) | Emergency Motion *Reorganized Debtors' Emergency Motion for Entry of an Order Authorizing the Reorganized Debtors to File the Reorganized Debtors' Amended Witness and Exhibit List Under Seal* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 03/29/2021) |

| | | |
|---|---|---|
| 03/29/2021 | ⚫ 3353<br><br>(847 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document (s):3295 Generic Order) (Garabato, Sid) (Entered: 03/29/2021) |
| 03/29/2021 | ⚫ 3354<br><br>(27586 pgs; 16 docs) | Witness List, Exhibit List (Filed By Chesapeake Energy Corporation ).(Related document(s):3344 Witness List, Exhibit List, 3345 Witness List, Exhibit List) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 - part 1 # 7 Exhibit 6 - part 2 # 8 Exhibit 7 # 9 Exhibit 8 # 10 Exhibit 9 # 11 Exhibit 10 # 12 Exhibit 11 # 13 Exhibit 12 # 14 Exhibit 13 # 15 Exhibit 14) (Cavenaugh, Matthew) (Entered: 03/29/2021) |
| 03/29/2021 | ⚫ 3356<br><br>(1 pg) | Motion to Appear pro hac vice Charles LaDuca . Filed by Creditors Demchak Plaintiffs (ChristopherSarrat) Modified on 3/30/2021 (ChristopherSarrat). (Entered: 03/30/2021) |
| 03/30/2021 | ⚫ 3355 | Receipt of Sealed Document retained in Clerk's office(#3354). (rcas) (Entered: 03/30/2021) |
| 03/30/2021 | ⚫ 3357<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew Cavenaugh. This is to order a transcript of 3/30/2021 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) Electronically forwarded to Access Transcripts on 3-31-2021. Estimated completion date: 4-1-2021. Modified on 3/31/2021 (MelissaMorgan). (Entered: 03/30/2021) |
| 03/30/2021 | ⚫ 3358<br><br>(2 pgs) | Courtroom Minutes. Time Hearing Held: 11:30 AM. Appearances: see attached. (Related document(s):3310 Emergency Motion (with hearing date)) For the reasons stated on the record, the Court has granted the motion in part. The parties to confer and craft an order reflecting the Courts ruling. (aalo) (Entered: 03/30/2021) |
| | ⚫ | Certificate of Email Notice. By agreement of |

| | | |
|---|---|---|
| 03/30/2021 | | the parties, the hearing on the motion for relief from stay has been adjourned. Movant to notice all interested parties and file a certificate of service with the court (Related document (s):1293 Motion for Relief From Stay) **Status/ Scheduling Hearing scheduled for 4/21/2021 at 09:30 AM at telephone and video conference.** (aalo) (Entered: 03/30/2021) |
| 03/30/2021 | 🔵3359<br><br>(59 pgs; 3 docs) | Motion to Abstain. Objections/Request for Hearing Due in 21 days. Filed by Creditors Dianna Mowry, Rodney Mowry, Tim & Terri Family LP, Terri Denise Tyler, Timothy A Tyler Hearing scheduled for 4/28/2021 at 02:00 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order # 2 Exhibit A -- Leases) (Helfer, Arleigh) (Entered: 03/30/2021) |
| 03/30/2021 | 🔵3360<br><br>(1 pg) | Motion to Appear pro hac vice *Michelle R. O'Brien*. Filed by Creditor Demchak Plaintiffs (ChristopherSarrat) (Entered: 03/30/2021) |
| 03/30/2021 | 🔵3361<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Douglas M. Foley (Related Doc # 3341) Signed on 3/30/2021. (emiller) (Entered: 03/30/2021) |
| 03/30/2021 | 🔵3362<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Charles E. Schaffer (Related Doc # 3351) Signed on 3/30/2021. (emiller) (Entered: 03/30/2021) |
| 03/30/2021 | 🔵3363<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Charles LaDuca (Related Doc # 3356) Signed on 3/30/2021. (emiller) (Entered: 03/30/2021) |
| 03/30/2021 | 🔵3364<br><br>(1 pg) | Order Granting Motion To Appear pro hac vice - Michelle R. O'Brien (Related Doc # 3360) Signed on 3/30/2021. (emiller) (Entered: 03/30/2021) |
| 03/30/2021 | 🔵3365<br><br>(51 pgs; 3 docs) | Reply (related document(s):3335 Objection). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2) (Cavenaugh, Matthew) (Entered: 03/30/2021) |
| | | |

| | | |
|---|---|---|
| 03/30/2021 | 🔘3366<br><br>(1 pg) | Order Granting Motion to Withdraw as Counsel for Good Cause (Related Doc # 2972) Signed on 3/30/2021. (emiller) (Entered: 03/30/2021) |
| 03/30/2021 | 🔘3367<br><br>(3 pgs) | Order Authorizing the Reorganized Debtors to File the Reorganized Debtors' Amended Witness and Exhibit List Under Seal (Related Doc # 3352) Signed on 3/30/2021. (emiller) (Entered: 03/30/2021) |
| 03/31/2021 | 🔘3368<br><br>(117 pgs; 2 docs) | Additional Attachments Re: *Amended Exhibits 1 and 2 to Reorganized Debtors' Motion for Entry of Orders (I) Authorizing and Approving (A) the PG AG Settlement, (B) the MEC Settlement, and (C) the Non-MEC Settlement, and (II) Granting Related Relief* (related document(s):3175 Application to Compromise Controversy) (Filed By Chesapeake Energy Corporation ).(Related document(s):3175 Application to Compromise Controversy) (Attachments: # 1 Exhibit 2) (Cavenaugh, Matthew) (Entered: 03/31/2021) |
| 03/31/2021 | 🔘3369<br><br>(5 pgs) | Withdrawal of Claim: *716 filed by Epiq Corporate Restructuring, LLC on behalf of Ohio Bureau of Workers' Compensation* (Suarez, Hugo) (Entered: 03/31/2021) |
| 03/31/2021 | 🔘3370<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Thomas M. Farrell. This is to order a transcript of 03/30/2021 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Epsilon Energy USA, Inc. ). (Farrell, Thomas) Copy request was electronically forwarded to Access Transcripts on 3-31-2021. Estimated completion date: 4-1-2021. Modified on 3/31/2021 (MelissaMorgan). (Entered: 03/31/2021) |
| 03/31/2021 | 🔘3371<br><br>(2 pgs) | Order (I) Authorizing and Approving the PA AG Settlement on a Final Basis, and (II) Granting Related Relief (Related Doc # 3175) Signed on 3/31/2021. (emiller) (Entered: 03/31/2021) |
| | 🔘3372 | Affidavit Re: *Affidavit of Service of Angharad* |

| | | |
|---|---|---|
| 03/31/2021 | (341 pgs) | *Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document (s):3296 Objection to Claim, 3297 Objection to Claim, 3298 Objection to Claim, 3299 Objection to Claim, 3300 Objection to Claim, 3301 Objection to Claim) (Garabato, Sid) (Entered: 03/31/2021) |
| 03/31/2021 | 3373 (3 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document (s):3303 Application for Compensation) (Garabato, Sid) (Entered: 03/31/2021) |
| 03/31/2021 | 3374 (24 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document (s):3310 Emergency Motion (with hearing date)) (Garabato, Sid) (Entered: 03/31/2021) |
| 03/31/2021 | 3375 (10 pgs) | Stipulation By Chesapeake Energy Corporation and The Addax Claimants. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 03/31/2021) |
| 03/31/2021 | 3376 (16 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document (s):3306 Notice) (Garabato, Sid) (Entered: 03/31/2021) |
| 03/31/2021 | 3382 (1 pg) | Courtroom Minutes. Time Hearing Held: 9:30 AM. Appearances: see attached. (Related Document 3175 Motion) For the reasons stated on the record, the Court has approved the settlement, the Order (I) Authorizing and Approving the PA AG Settlement has been signed. The Court to contact the District Court regarding the class certification. Order to be entered. (aalo) Additional attachment(s) added on 4/5/2021 (aalo). (Entered: 04/02/2021) |
| | 3377 (26 pgs) | Transcript RE: Emergency Motion Hearing held on 03/30/21 before Judge David R. Jones. Transcript is available for viewing in the |

| 04/01/2021 | | Clerk's Office. Filed by Transcript access will be restricted through 06/30/2021. (AccessTranscripts) (Entered: 04/01/2021) |
|---|---|---|
| 04/01/2021 | 3378<br><br>(3 pgs) | Notice *of Hearing*. (Related document(s):3348 Motion to Compel) Filed by Cemetery Road Hunt Club, Inc., Charlotte E. Place, Jesse C. Place, Richard E. Place, Charlotte E. Place Trust, Richard E. Place Trust, Placewood Resource Management, LLC, Placewood Resources, L.P., R&J Partners, L.P., William R Ruark, William R. Ruark, Herbert D. Steele, Leola B. Steele, Judith A. Wilson, Raynold W Wilson (Helfer, Arleigh) (Entered: 04/01/2021) |
| 04/01/2021 | 3379<br><br>(3 pgs) | Notice *of Hearing on Motion for Permissive Abstention*. (Related document(s):3359 Motion to Abstain) Filed by Tim & Terri Family LP, Terri Denise Tyler, Timothy A Tyler, Tyler/Mowry Lessors (Helfer, Arleigh) (Entered: 04/01/2021) |
| 04/01/2021 | 3380<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew D. Cavenaugh. This is to order a transcript of 03/31/2021 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) Electronically forwarded to Access Transcripts on 4-1-2021. Estimated completion date: 4-2-2021. Modified on 4/1/2021 (MelissaMorgan). (Entered: 04/01/2021) |
| 04/01/2021 | 3381<br><br>(26 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):3322 Declaration, 3323 Application for Compensation, 3330 Application for Compensation, 3331 Application for Compensation, 3333 Application for Compensation, 3337 Application for Compensation, 3338 Notice) (Garabato, Sid) (Entered: 04/01/2021) |
| 04/01/2021 | 3383<br><br>(1 pg) | Notice of Filing of Official Transcript as to 3377 Transcript. Parties notified (Related document(s):3377 Transcript) (dhan) (Entered: |

| 04/02/2021 | | 04/02/2021) |
|---|---|---|
| 04/02/2021 | 🌐 3384 <br><br> (5 pgs; 3 docs) | Certificate of No Objection *with Respect to the Intrepid Partners, LLC Fee Application and Rothschild & Co US Inc. Fee Application* (Filed By Chesapeake Energy Corporation ). (Related document(s):3222 Application for Compensation, 3223 Application for Compensation) (Attachments: # 1 Proposed Order Intrepid Application # 2 Proposed Order Rothschild Application) (Cavenaugh, Matthew) (Entered: 04/02/2021) |
| 04/02/2021 | 🌐 3385 <br><br> (15 pgs) | Complaint with Objection to the Omnibus Objection to the Creditors (related document (s):1633 Order Approving Disclosure Statement). (mmap) (Entered: 04/02/2021) |
| 04/02/2021 | 🌐 3386 <br><br> (62 pgs) | Transcript RE: Settlement Conference held on 03/31/21 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 07/1/2021. (AccessTranscripts) (Entered: 04/02/2021) |
| 04/02/2021 | 🌐 3387 <br><br> (2 pgs) | Stipulation By Chesapeake Energy Corporation and Robert R. Luchetti. Does this document include an agreed order or otherwise request that the judge sign a document? No. (Filed By Chesapeake Energy Corporation ).(Related document(s):3131 Motion for Examination) (Cavenaugh, Matthew) (Entered: 04/02/2021) |
| 04/02/2021 | 🌐 3390 <br><br> (5 pgs) | Withdrawal of Claim: 63 (jtab) (Entered: 04/05/2021) |
| 04/04/2021 | 🌐 3388 <br><br> (12 pgs) | BNC Certificate of Mailing. (Related document (s):3383 Notice of Filing of Official Transcript (Form)) No. of Notices: 235. Notice Date 04/04/2021. (Admin.) (Entered: 04/04/2021) |
| 04/05/2021 | 🌐 3389 <br><br> (1 pg) | Notice of Filing of Official Transcript as to 3386 Transcript. Parties notified (Related document(s):3386 Transcript) (dhan) (Entered: 04/05/2021) |

| Date | Doc | Description |
|---|---|---|
| 04/05/2021 | 🔵 3391<br><br>(1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 3/30/2021 11:39:08 AM ]. File Size [ 17644 KB ]. Run Time [ 00:36:46 ]. (admin). (Entered: 04/05/2021) |
| 04/05/2021 | 🔵 3392<br><br>(3 pgs) | Proposed Order RE: *Order Enforcing Confirmation Order* (Filed By Chesapeake Energy Corporation ).(Related document (s):3310 Emergency Motion (with hearing date), 3349 Objection) (Cavenaugh, Matthew) (Entered: 04/05/2021) |
| 04/05/2021 | 🔵 3393<br><br>(492 pgs; 20 docs) | Emergency Motion *of Epsilon Energy USA, Inc. for an Order Authorizing the Filing and Prosecution of Complaint for Equitable Relief* Filed by Interested Party Epsilon Energy USA, Inc. Hearing scheduled for 4/7/2021 at 11:00 AM at telephone and video conference. (Attachments: # 1 Exhibit A - March 30, 2021 Hearing Transcript # 2 Exhibit B - Proposed Complaint # 3 Exhibit 1 to Proposed Complaint # 4 Exhibit 2 to Proposed Complaint # 5 Exhibit 3 to Proposed Complaint # 6 Exhibit 4 to Proposed Complaint # 7 Exhibit 5 to Proposed Complaint # 8 Exhibit 6 to Proposed Complaint # 9 Exhibit 7 to Proposed Complaint # 10 Exhibit 8 to Proposed Complaint # 11 Exhibit 9 to Proposed Complaint # 12 Exhibit 10 to Proposed Complaint # 13 Exhibit 11 to Proposed Complaint # 14 Exhibit 12 to Proposed Complaint # 15 Exhibit 13 to Proposed Complaint # 16 Exhibit 14 to Proposed Complaint # 17 Exhibit 15 to Proposed Complaint # 18 Exhibit 16 to Proposed Complaint # 19 Proposed Order) (Gibbs, Charles) (Entered: 04/05/2021) |
| 04/05/2021 | 🔵 3394<br><br>(7 pgs; 2 docs) | Non-Opposition Motion to Withdraw as Attorney. Objections/Request for Hearing Due in 21 days. Filed by Creditor PMBG Parties (Attachments: # 1 Proposed Order) (Heard, Mary) (Entered: 04/05/2021) |
| 04/05/2021 | 🔵 3395<br><br>(12 pgs; 2 docs) | Emergency Motion *// Epsilon Energy USA, Inc.'s Emergency Motion for Entry of an Order Authorizing the Filing under Seal of Certain Exhibits to the Emergency Motion for an Order* |

| | | |
|---|---|---|
| 04/05/2021 | | *Authorizing the Filing and Prosecution of Complaint for Equitable Relief (Related document(s): 3393 Emergency Motion (with hearing date))* Filed by Interested Party Epsilon Energy USA, Inc. (Attachments: # 1 Proposed Order) (Gibbs, Charles) (Entered: 04/05/2021) |
| 04/05/2021 | 3396 (16 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler (Related document: 3352)* (Filed By Epiq Corporate Restructuring LLC ). (Garabato, Sid) (Entered: 04/05/2021) |
| 04/05/2021 | 3397 (2 pgs) | Response to the Objection of Claim #1104 and #1318 by Cynthia Sacco and Kapp Schwebke (related document(s):3114 Objection to Claim). (mmap) (Entered: 04/06/2021) |
| 04/06/2021 | 3398 (3 pgs) | Withdrawal of Claim: 15 *IRION COUNTY, TEXAS* (LeDay, Tara) (Entered: 04/06/2021) |
| 04/06/2021 | 3399 (2 pgs) | Notice *of Withdrawal of Reservation of Rights of Epsilon Energy USA, Inc. to Assert Administrative Expense Claim.* (Related document(s):3186 Statement) Filed by Epsilon Energy USA, Inc. (Gibbs, Charles) (Entered: 04/06/2021) |
| 04/06/2021 | 3400 (3 pgs; 2 docs) | Certificate of No Objection *regarding Motion for Withdrawal and Substitution of Counsel and Request for Notices* (Filed By Eric Petroleum Corporation, Eric Petroleum Utica, LLC ).(Related document(s):3179 Motion to Substitute Attorney) (Attachments: # 1 Proposed Order) (Flores, Henry) (Entered: 04/06/2021) |
| 04/06/2021 | 3401 (7432 pgs; 16 docs) | Witness List, Exhibit List (Filed By Chesapeake Energy Corporation ). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 and 16) (Cavenaugh, Matthew) (Entered: 04/06/2021) |

| | | |
|---|---|---|
| 04/06/2021 | 🖱 3402<br><br>(5 pgs) | Withdrawal of Claim: *1473 filed by Epiq Corporate Restructuring, LLC on behalf of Ohio Bureau of Workers' Compensation* (Suarez, Hugo) (Entered: 04/06/2021) |
| 04/06/2021 | 🖱 3403<br><br>(473 pgs; 4 docs) | Witness List, Exhibit List (Filed By Epsilon Energy USA, Inc. ).(Related document(s):3393 Emergency Motion (with hearing date)) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2, Part 1 # 3 Exhibit 2, Part 2) (Gibbs, Charles) (Entered: 04/06/2021) |
| 04/06/2021 | 🖱 3404<br><br>(3 pgs) | Notice *of Withdrawal as Counsel of Kevin Liang*. Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 04/06/2021) |
| 04/06/2021 | 🖱 3405 | Receipt of Sealed Document retained in Clerk's office. (BrendaLacy) (Entered: 04/06/2021) |
| 04/06/2021 | 🖱 3406<br><br>(5 pgs) | Proposed Order Submission After Hearing (Filed By Chesapeake Energy Corporation ). (Related document(s):3175 Application to Compromise Controversy) (Cavenaugh, Matthew) (Entered: 04/06/2021) |
| 04/06/2021 | 🖱 3407<br><br>(5 pgs) | Proposed Order Submission After Hearing (Filed By Chesapeake Energy Corporation ). (Related document(s):3175 Application to Compromise Controversy) (Cavenaugh, Matthew) (Entered: 04/06/2021) |
| 04/06/2021 | 🖱 3408<br><br>(6 pgs) | Objection *of the Reorganized Debtors to Epsilon Energy USA, Inc.'s Emergency Motion for an Order Authorizing the Filing and Prosecution of Complaint for Equitable Relief* (related document(s):3393 Emergency Motion (with hearing date)). Filed by Chesapeake Energy Corporation (Cavenaugh, Matthew) (Entered: 04/06/2021) |
| | 🖱 3409<br><br>(475 pgs; 5 docs) | Exhibit List, Witness List (Filed By Chesapeake Energy Corporation ).(Related document(s):3393 Emergency Motion (with hearing date)) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 - Part 1 # 3 Exhibit 2 - Part 2 # 4 |

| 04/06/2021 | | Exhibit 3) (Cavenaugh, Matthew) (Entered: 04/06/2021) |
|---|---|---|
| 04/07/2021 | ⬤ 3410<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew Cavenaugh. This is to order a transcript of 4/7/2021 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) Electronically forwarded to Access Transcripts, LLC on April 8, 2021. Estimated completion date: April 9, 2021. Modified on 4/8/2021 (ClaudiaGutierrez). (Entered: 04/07/2021) |
| 04/07/2021 | ⬤ 3411<br><br>(1 pg) | Courtroom Minutes. Time Hearing Held: 11:00 AM. Appearances: see attached. (Related document(s):3393 Emergency Motion (with hearing date)) Hearing held, the parties to upload a proposed order with respect to 3393. **Status conference to be held on 4/9/2021 at 09:00 AM by telephone and video conference.** (aalo) (Entered: 04/07/2021) |
| 04/07/2021 | ⬤ 3412<br><br>(1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 4/7/2021 11:02:14 AM ]. File Size [ 21137 KB ]. Run Time [ 00:44:02 ]. (admin). (Entered: 04/07/2021) |
| 04/07/2021 | ⬤ 3413<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Thomas M. Farrell. This is to order a transcript of 04/07/2021 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Veritext Legal Solutions (Filed By Epsilon Energy USA, Inc. ). (Farrell, Thomas) Copy request electronically forwarded to original transcription company Access Transcripts, LLC on April 8, 2021. Estimated completion date: April 9, 2021. Modified on 4/8/2021 (ClaudiaGutierrez). (Entered: 04/07/2021) |
| 04/07/2021 | ⬤ 3414<br><br>(2 pgs) | Withdrawal of Claim: *of Robert R. Luchetti* (Proctor, Michael) (Entered: 04/07/2021) |
| | ⬤ 3415 | Order Signed on 4/7/2021 (Related document |

| | | |
|---|---|---|
| 04/07/2021 | (5 pgs) | (s):3406 Proposed Order Submission After Hearing (Greensheet)) (aalo) (Entered: 04/07/2021) |
| 04/07/2021 | 3416<br><br>(5 pgs) | Order (I) Directing the Application of Rules 9014, 9019, and 7023, (II) Granting Preliminary Approval of Class Action Settlement, (III) Preliminarily Certifying a Class for Settlement Purposes, (IV) Approving Form and Manner of Class Notice, and (V) Setting Date for Final Approval Hearing on Final Approval of Settlement Signed on 4/7/2021 (aalo) (Entered: 04/07/2021) |
| 04/07/2021 | 3417<br><br>(3 pgs) | Order Authorizing Epsilon to File Under Seal (Related Doc # 3395) Signed on 4/7/2021. (VrianaPortillo) (Entered: 04/07/2021) |
| 04/07/2021 | 3418<br><br>(45 pgs; 8 docs) | Exhibit List, Witness List (Filed By Chesapeake Energy Corporation ).(Related document(s):3401 Witness List, Exhibit List) (Attachments: # 1 Exhibit 17 # 2 Exhibit 18 # 3 Exhibit 19 # 4 Exhibit 20 # 5 Exhibit 21 # 6 Exhibit 22 # 7 Exhibit 23) (Cavenaugh, Matthew) (Entered: 04/07/2021) |
| 04/07/2021 | 3419<br><br>(2 pgs) | Withdrawal of Claim: 134 *Janet D. Bullis* (Shiner, Michael) (Entered: 04/07/2021) |
| 04/07/2021 | 3420<br><br>(66 pgs; 5 docs) | Certificate of No Objection *with Respect to the Second and Third Omnibus Objection to Certain Proofs of Claim* (Filed By Chesapeake Energy Corporation ).(Related document (s):3145 Objection to Claim, 3146 Objection to Claim) (Attachments: # 1 Proposed Order Second Omnibus Objection # 2 Redline - Second Omnibus Objection # 3 Proposed Order Third Omnibus Objection # 4 Redline - Third Omnibus Objection) (Cavenaugh, Matthew) (Entered: 04/07/2021) |
| 04/07/2021 | 3421<br><br>(223 pgs; 2 docs) | Proposed Order RE: *Sustaining Reorganized Debtors' Amended Fourth Omnibus Objection to Certain Proofs of Claim (Equity Interest Claims)* (Filed By Chesapeake Energy Corporation ).(Related document(s):3148 |

| | | |
|---|---|---|
| 04/07/2021 | | Objection to Claim) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 04/07/2021) |
| 04/07/2021 | ⚫ 3422<br><br>(389 pgs; 2 docs) | Proposed Order RE: *Sustaining Reorganized Debtors' First Omnibus Objection to Certain Proofs of Claim (Beneficial Bondholder Duplicate Claims)* (Filed By Chesapeake Energy Corporation ).(Related document (s):3112 Objection to Claim) (Attachments: # 1 Redline) (Cavenaugh, Matthew) (Entered: 04/07/2021) |
| 04/07/2021 | ⚫ 3423<br><br>(2 pgs) | Withdrawal of Claim: 130 *Bobby D. Crone* (Shiner, Michael) (Entered: 04/07/2021) |
| 04/07/2021 | ⚫ 3424<br><br>(2 pgs) | Withdrawal of Claim: 133 *Harry C. Crone* (Shiner, Michael) (Entered: 04/07/2021) |
| 04/07/2021 | ⚫ 3425<br><br>(2 pgs) | Withdrawal of Claim: 135 *Judy Prock* (Shiner, Michael) (Entered: 04/07/2021) |
| 04/07/2021 | ⚫ 3426<br><br>(2 pgs) | Withdrawal of Claim: 137 *Paulette F. Parker* (Shiner, Michael) (Entered: 04/07/2021) |
| 04/07/2021 | ⚫ 3427<br><br>(5 pgs) | Agenda for Hearing on 4/8/2021 (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 04/07/2021) |
| 04/07/2021 | ⚫ 3428<br><br>(2 pgs) | Withdrawal of Claim: 138 *Phyllis Welcher* (Shiner, Michael) (Entered: 04/07/2021) |
| 04/07/2021 | ⚫ 3429<br><br>(2 pgs) | Withdrawal of Claim: 140 *Ronald William Goddard* (Shiner, Michael) (Entered: 04/07/2021) |
| 04/07/2021 | ⚫ 3430<br><br>(2 pgs) | Withdrawal of Claim: 141 *Sarah Lynn Moxley* (Shiner, Michael) (Entered: 04/07/2021) |
| | ⚫ 3431 | Withdrawal of Claim: 129 *Shelton Goddard* |

| 04/07/2021 | (2 pgs) | (Shiner, Michael) (Entered: 04/07/2021) |
|---|---|---|
| 04/07/2021 | 3432<br>(2 pgs) | Withdrawal of Claim: 142 *Susan Goddard Martin* (Shiner, Michael) (Entered: 04/07/2021) |
| 04/07/2021 | 3433<br>(2 pgs) | Withdrawal of Claim: 143 *Susan Gordon* (Shiner, Michael) (Entered: 04/07/2021) |
| 04/07/2021 | 3434<br>(2 pgs) | Withdrawal of Claim: 145 *Woodrow James Bailey* (Shiner, Michael) (Entered: 04/07/2021) |
| 04/07/2021 | 3435<br>(12 pgs) | BNC Certificate of Mailing. (Related document (s):3389 Notice of Filing of Official Transcript (Form)) No. of Notices: 235. Notice Date 04/07/2021. (Admin.) (Entered: 04/07/2021) |
| 04/08/2021 | 3436<br>(2 pgs) | Withdrawal of Claim: 131 *Bruce Goddard, Sr.* (Shiner, Michael) (Entered: 04/08/2021) |
| 04/08/2021 | 3437<br>(13 pgs) | Order Sustaining Reorganized Debtors' Amended Second Omnibus Objection to Certain Proofs of Claim (Duplicate Claims) Signed on 4/8/2021 (Related document(s):3145 Objection to Claim) (emiller) (Entered: 04/08/2021) |
| 04/08/2021 | 3438<br>(16 pgs) | Order Sustaining Reorganized Debtors' Amended Third Omnibus Objection to Certain Proofs of Claim (Amended Claims) Signed on 4/8/2021 (Related document(s):3146 Objection to Claim) (emiller) (Entered: 04/08/2021) |
| 04/08/2021 | 3439<br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew Cavenaugh. This is to order a transcript of 4/8/2021 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) Electronically forwarded to Access Transcripts, LLC on April 9, 2021. Estimated completion date: April 10, 2021. Modified on 4/9/2021 (ClaudiaGutierrez). (Entered: 04/08/2021) |

| | | |
|---|---|---|
| 04/08/2021 | 🌐 3440<br><br>(10 pgs) | Stipulation and Agreed Order Regarding the Addax Claimants' Proofs of Claim Signed on 4/8/2021 (Related document(s):3375 Stipulation) (emiller) (Entered: 04/08/2021) |
| 04/08/2021 | 🌐 3441<br><br>(1 pg) | Order Granting Second Interim and Final Application of Intrepid Partners, LLC as Investment Banker to the Debtors, for Allowance and Payment of Compensation for Professional Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred from June 28, 2020 through and including February 9, 2021 (Related Doc # 3222) Signed on 4/8/2021. (emiller) (Entered: 04/08/2021) |
| 04/08/2021 | 🌐 3442<br><br>(1 pg) | Order Granting Second Interim and Final Application of Rothschild & Co US Inc. as Investment Banker to the Debtors, for Allowance and Payment of Compensation for Professional Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred from June 28, 2020 through and including February 9, 2021 (Related Doc # 3223) Signed on 4/8/2021. (emiller) (Entered: 04/08/2021) |
| 04/08/2021 | 🌐 3443<br><br>(3 pgs) | Order Enforcing Confirmation Order (Related Doc # 3310) Signed on 4/8/2021. (emiller) (Entered: 04/08/2021) |
| 04/08/2021 | 🌐 3444<br><br>(1 pg) | Order Granting Withdrawal and Substitution of Counsel (Related Doc # 3179) Signed on 4/8/2021. (emiller) (Entered: 04/08/2021) |
| 04/08/2021 | 🌐 3445<br><br>(194 pgs) | Order Sustaining Reorganized Debtors' Amended First Omnibus Objection to Certain Proofs of Claim (Beneficial Bondholder Duplicate Claims) Signed on 4/8/2021 (Related document(s):3112 Objection to Claim) (emiller) (Entered: 04/08/2021) |
| 04/08/2021 | 🌐 3446<br><br>(1 pg) | Courtroom Minutes. Time Hearing Held: 2:30 PM. Appearances: Annie Dreisbach. (Related document (s):3111 Objection to Claim, 3148 Objection to Claim) For the reasons stated n the record, the Court has sustained the objections. Orders to be entered. (aalo) Additional attachment(s) added on 4/8/2021 (aalo). (Entered: 04/08/2021) |
| | | |

| | | |
|---|---|---|
| 04/08/2021 | 🔵 3447<br><br>(99 pgs) | Order Sustaining Reorganized Debtors' Amended Fourth Omnibus Objection to Certain Proofs of Claim (Equity Interest Claims) Signed on 4/8/2021 (Related document(s):3148 Objection to Claim) (emiller) (Entered: 04/08/2021) |
| 04/08/2021 | 🔵 3448<br><br>(1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 4/8/2021 2:30:25 PM ]. File Size [ 44808 KB ]. Run Time [ 01:33:21 ]. (admin). (Entered: 04/08/2021) |
| 04/08/2021 | 🔵 3449<br><br>(20 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):3368 Additional Attachments, 3371 Order on Application to Compromise Controversy) (Garabato, Sid) (Entered: 04/08/2021) |
| 04/09/2021 | 🔵 3450<br><br>(33 pgs) | Transcript RE: Emergency Motion Hearing held on 04/07/21 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 07/8/2021. (AccessTranscripts) (Entered: 04/09/2021) |
| 04/09/2021 | 🔵 3451<br><br>(2 pgs) | Proposed Order RE: *Consent Order Regarding Epsilon Energy USA, Inc.'s Emergency Motion for an Order Authorizing the Filing and Prosecution of Complaint for Equitable Relief* (Filed By Epsilon Energy USA, Inc. ).(Related document(s):3395 Emergency Motion) (Gibbs, Charles) (Entered: 04/09/2021) |
| 04/09/2021 | 🔵 3452<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Daniel Northrop. This is to order a transcript of the Status Conference held on April 9, 2021 before Judge David R. Jones. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Epsilon Energy USA, Inc. ). (Gibbs, Charles) (Entered: 04/09/2021) |
| | 🔵 3453<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew Cavenaugh. This is to order a transcript of 4/9/2021 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Chesapeake Energy Corporation ). |

| 04/09/2021 | | (Cavenaugh, Matthew) (Entered: 04/09/2021) |
|---|---|---|
| 04/09/2021 | 🔵 3454 (1 pg) | Courtroom Minutes. Time Hearing Held: 9:00 AM. Appearances: see attached. (Related document(s):3451 Proposed Order) Status conference held, the court has approved and signed the order. Order to be entered. (aalo) Additional attachment(s) added on 4/12/2021 (VrianaPortillo). (Entered: 04/09/2021) |
| 04/09/2021 | 🔵 3455 (2 pgs) | Withdrawal of Claim: 144 *Wanda Sue Sayers* (Shiner, Michael) (Entered: 04/09/2021) |
| 04/09/2021 | 🔵 3456 (2 pgs) | Withdrawal of Claim: 136 *Kenneth Alan Goddard* (Shiner, Michael) (Entered: 04/09/2021) |
| 04/09/2021 | 🔵 3457 (2 pgs) | Consent Order Regarding Epsilon Energy USA, Inc.'s Emergency Motion for an Order Authorizing the Filing and Prosecution of Complaint for Equitable Relief (Related Doc # 3393) Signed on 4/9/2021. (emiller) (Entered: 04/09/2021) |
| 04/09/2021 | 🔵 3458 (12 pgs; 3 docs) | Notice of Appeal filed. (related document(s):3415 Generic Order). Fee Amount $298. Appellant Designation due by 04/23/2021. (Attachments: # 1 Exhibit A -- Court Order Appealed From # 2 Certificate of Service)(Helfer, Arleigh) (Entered: 04/09/2021) |
| 04/09/2021 | | Receipt of Notice of Appeal(20-33233) [appeal,ntcapl] ( 298.00) Filing Fee. Receipt number 22951057. Fee amount $ 298.00. (U.S. Treasury) (Entered: 04/09/2021) |
| 04/09/2021 | 🔵 3459 (15 pgs; 3 docs) | Notice of Appeal filed. (related document(s):3416 Generic Order). Fee Amount $298. Appellant Designation due by 04/23/2021. (Attachments: # 1 Exhibit A - List of Appellants # 2 Exhibit B -- Order appealed from)(Helfer, Arleigh) (Entered: 04/09/2021) |
| 04/09/2021 | | Receipt of Notice of Appeal(20-33233) [appeal,ntcapl] ( 298.00) Filing Fee. Receipt number 22951109. Fee amount $ 298.00. (U.S. Treasury) |

| 04/09/2021 | | (Entered: 04/09/2021) |
|---|---|---|
| 04/09/2021 | 🌐 3460 (1 pg) | Certificate *of Service* (Filed By Pennsylvania Oil and gas lessors ).(Related document(s):3459 Notice of Appeal) (Helfer, Arleigh) (Entered: 04/09/2021) |
| 04/09/2021 | 🌐 3461 (5 pgs) | Withdrawal of Claim: *#1473 by State of Ohio, Bureau of Workers Compensation* (mmap) (Entered: 04/09/2021) |
| 04/09/2021 | 🌐 3462 (18 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):3408 Objection) (Garabato, Sid) (Entered: 04/09/2021) |
| 04/09/2021 | 🌐 3463 (16 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):3415 Generic Order, 3416 Generic Order, 3418 Exhibit List, Witness List, 3427 Agenda) (Garabato, Sid) (Entered: 04/09/2021) |
| 04/10/2021 | 🌐 3464 (72 pgs) | Transcript RE: Objection to Claims Hearing held on 04/08/21 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 07/9/2021. (AccessTranscripts) (Entered: 04/10/2021) |
| 04/10/2021 | 🌐 3465 (110 pgs) | BNC Certificate of Mailing. (Related document (s):3447 Generic Order) No. of Notices: 235. Notice Date 04/10/2021. (Admin.) (Entered: 04/10/2021) |
| 04/11/2021 | 🌐 3466 (2 pgs) | Withdrawal of Claim: *Lawrence J. Fechko claim number 12477 with claims agent in the amount of $541,932.58* (Rubio, Charles) (Entered: 04/11/2021) |
| 04/11/2021 | 🌐 3467 (2 pgs) | Withdrawal of Claim: *CTF, Ltd. claim number 12502 with claims agent in the amount of $5,165,029.04* (Rubio, Charles) (Entered: 04/11/2021) |
| 04/11/2021 | 🌐 3468 (2 pgs) | Withdrawal of Claim: *Catherine B. Carlton claim number 12666 with claims agent in the amount of $180,644.19* (Rubio, Charles) (Entered: 04/11/2021) |

| | | |
|---|---|---|
| 04/11/2021 | 3469 <br> (2 pgs) | Withdrawal of Claim: *Bruce D. Carlton claim number 12737 with claims agent in the amount of $180,644.19* (Rubio, Charles) (Entered: 04/11/2021) |
| 04/11/2021 | 3470 <br> (2 pgs) | Withdrawal of Claim: *Catherine A. Carlton claim number 12739 with claims agent in the amount of $578,504.71* (Rubio, Charles) (Entered: 04/11/2021) |
| 04/11/2021 | 3471 <br> (2 pgs) | Withdrawal of Claim: *Richard A. Carlton claim number 12740 with claims agent in the amount of $578,504.71* (Rubio, Charles) (Entered: 04/11/2021) |
| 04/11/2021 | 3472 <br> (2 pgs) | Withdrawal of Claim: *Judy L. Carlton claim number 12743 with claims agent in the amount of $79,793.75* (Rubio, Charles) (Entered: 04/11/2021) |
| 04/11/2021 | 3473 <br> (2 pgs) | Withdrawal of Claim: *Ronald E. Carlton claim number 12746 with claims agent in the amount of $79,793.75* (Rubio, Charles) (Entered: 04/11/2021) |
| 04/12/2021 | 3474 <br> (1 pg) | Notice of Filing of Official Transcript as to 3450 Transcript, 3464 Transcript. Parties notified (Related document(s):3450 Transcript, 3464 Transcript) (dhan) (Entered: 04/12/2021) |
| 04/12/2021 | 3475 <br> (6 pgs; 2 docs) | Notice *of Praecipe to Substitute Exhibit.* (Related document(s):3459 Notice of Appeal) Filed by R&J Partners, L.P. (Attachments: # 1 Exhibit A -- Corrected List of Appellants) (Helfer, Arleigh) (Entered: 04/12/2021) |
| 04/12/2021 | 3484 <br> (2 pgs) | Response to the Objection of Claim 126 by Kevin and Cynthia Ehart(related document(s):3050 Generic Order). (mmap) (Entered: 04/14/2021) |
| 04/13/2021 | 3476 <br> (2 pgs) | Withdrawal of Claim: *192 (Epiq Claim No. 4674); Oklahoma Office of State Treasurer* (Watts, Jameson) (Entered: 04/13/2021) |
| 04/13/2021 | 3477 <br> (9 pgs) | Transcript RE: Motion Hearing (Via Zoom) held on April 9, 2021 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 07/12/2021. (mhen) (Entered: 04/13/2021) |
| | 3478 | Withdrawal of Claim: *253 filed by Epiq Corporate* |

| | | |
|---|---|---|
| 04/13/2021 | (2 pgs) | *Restructuring, LLC on behalf of Texas Comptroller of Public Accounts* (Suarez, Hugo) (Entered: 04/13/2021) |
| 04/13/2021 | 3479 <br> (3 pgs) | Withdrawal of Claim: *13501 and 13505 filed by Epiq Corporate Restructuring, LLC on behalf of Joseph Lesieur* (Suarez, Hugo) (Entered: 04/13/2021) |
| 04/13/2021 | 3480 <br> (1 pg) | Clerk's Notice of Filing of an Appeal. On 4/92021, RDNJ Trowbridge, Robert Dunlap and Wendy Dunlap filed a notice of appeal. The appeal has been assigned to U.S. District Judge Keith Ellison, Civil Action 4:21-cv-1215. Parties notified (Related document(s):3458 Notice of Appeal) (ShoshanaArnow) (Entered: 04/13/2021) |
| 04/13/2021 | 3481 <br> (1 pg) | Clerk's Notice of Filing of an Appeal. On 4/9/2021, Pennsylvania Proof of Claim Lessors filed a notice of appeal. The appeal has been assigned to U.S. District Judge Keith Ellison, Civil Action 4:21-cv-1218. Parties notified (Related document(s):3459 Notice of Appeal) (ShoshanaArnow) (Entered: 04/13/2021) |
| 04/13/2021 | 3482 | Election to Appeal to District Court . (ShoshanaArnow) (Entered: 04/13/2021) |
| 04/14/2021 | 3483 <br> (1 pg) | Notice of Filing of Official Transcript as to 3477 Transcript. Parties notified (Related document (s):3477 Transcript) (jdav) (Entered: 04/14/2021) |
| 04/14/2021 | 3485 <br> (12 pgs) | BNC Certificate of Mailing. (Related document (s):3474 Notice of Filing of Official Transcript (Form)) No. of Notices: 245. Notice Date 04/14/2021. (Admin.) (Entered: 04/14/2021) |
| 04/14/2021 | 3486 <br> (1 pg) | Response to the Objection of Claim 1539 by Tracy L. Nolley(related document(s):3146 Objection to Claim). (mmap) (Entered: 04/15/2021) |
| 04/15/2021 | 3487 <br> (1 pg) | Response to the Objection of Claim #1738 by Vanessa Perez Weiss (related document(s):3146 Objection to Claim). (mmap) (Entered: 04/15/2021) |
| | 3488 | Certificate of No Objection *to Second Interim and* |

| | | |
|---|---|---|
| 04/15/2021 | (4 pgs) | *Final Application of Forshey & Prostok, LLP* (Filed By Forshey & Prostok, LLP ).(Related document (s):3304 Application for Compensation) (Prostok, Jeffrey) (Entered: 04/15/2021) |
| 04/15/2021 | 3489<br><br>(4 pgs) | Certificate of No Objection *to Second Interim and Final Application of Forshey & Prostok, LLP* (Filed By Forshey & Prostok, LLP ).(Related document (s):3304 Application for Compensation) (Prostok, Jeffrey) (Entered: 04/15/2021) |
| 04/15/2021 | 3490<br><br>(2 pgs) | Proposed Order RE: *Order Granting Forshey & Prostok, LLP's Second Interim and Final Application for Payment of Compensation and Reimbursement of Expenses for the Period from July 25, 2020 through and including February 9, 2021* (Filed By Forshey & Prostok, LLP ).(Related document(s):3304 Application for Compensation, 3489 Certificate of No Objection) (Prostok, Jeffrey) (Entered: 04/15/2021) |
| 04/15/2021 | 3491<br><br>(23 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):3437 Generic Order, 3438 Generic Order, 3440 Generic Order, 3441 Order on Application for Compensation, 3442 Order on Application for Compensation, 3443 Order on Emergency Motion, 3445 Generic Order, 3447 Generic Order) (Garabato, Sid) (Entered: 04/15/2021) |
| 04/15/2021 | 3492<br><br>(40 pgs) | Affidavit Re: *Affidavit of Service of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ).(Related document(s):3437 Generic Order, 3438 Generic Order, 3445 Generic Order, 3447 Generic Order) (Garabato, Sid) (Entered: 04/15/2021) |
| 04/15/2021 | 3493<br><br>(12 pgs) | BNC Certificate of Mailing. (Related document (s):3480 Clerk's Notice of Filing of an Appeal) No. of Notices: 245. Notice Date 04/15/2021. (Admin.) (Entered: 04/15/2021) |
| 04/15/2021 | 3494<br><br>(12 pgs) | BNC Certificate of Mailing. (Related document (s):3481 Clerk's Notice of Filing of an Appeal) No. of Notices: 245. Notice Date 04/15/2021. (Admin.) (Entered: 04/15/2021) |

| | | |
|---|---|---|
| 04/16/2021 | 🌐 3495<br><br>(7 pgs; 3 docs) | Certificate of No Objection *With Respect to Jackson Walker LLP's Second Interim and Final Fee Application* (Filed By Chesapeake Energy Corporation ).(Related document(s):3303 Application for Compensation) (Attachments: # 1 Proposed Order # 2 Redline) (Cavenaugh, Matthew) (Entered: 04/16/2021) |
| 04/16/2021 | 🌐 3496<br><br>(4 pgs) | Response (related document(s):3296 Objection to Claim). (Gutierrez, Albert) (Entered: 04/16/2021) |
| 04/16/2021 | 🌐 3497<br><br>(12 pgs) | BNC Certificate of Mailing. (Related document (s):3483 Notice of Filing of Official Transcript (Form)) No. of Notices: 245. Notice Date 04/16/2021. (Admin.) (Entered: 04/16/2021) |
| 04/16/2021 | 🌐 3498<br><br>(1 pg) | Letter from Michele E Schirru (scas) (Entered: 04/19/2021) |
| 04/16/2021 | 🌐 3499<br><br>(4 pgs) | Letter from Vasile Nica (scas) (Entered: 04/19/2021) |
| 04/19/2021 | 🌐 3500<br><br>(10 pgs; 4 docs) | Certificate of No Objection (Filed By Chesapeake Energy Corporation ).(Related document(s):3330 Application for Compensation, 3331 Application for Compensation, 3337 Application for Compensation) (Attachments: # 1 Proposed Order PricewaterhouseCoopers LLP # 2 Proposed Order Ernst & Young LLP # 3 Proposed Order Ivarez & Marsal North America, LLC) (Cavenaugh, Matthew) (Entered: 04/19/2021) |
| 04/19/2021 | 🌐 3501<br><br>(2 pgs) | Withdraw Document (Filed By Archrock Partners Operating, LLC ).(Related document(s):3226 Application for Administrative Expenses) (Maraist, Kevin) (Entered: 04/19/2021) |
| | 🌐 3502<br><br>(7 pgs; 2 docs) | Certificate of No Objection *Regarding Second Interim and Final Fee Application of Norton Rose Fulbright US LLP for Allowance of Compensation and Reimbursement of Expenses as Co-Counsel to the Official Committee of Unsecured Creditors for the Period July 13, 2020 through February 9, 2021* |

| | | |
|---|---|---|
| 04/19/2021 | | (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):3327 Application for Compensation) (Attachments: # 1 Proposed Order) (Mokrzycka, Maria) (Entered: 04/19/2021) |
| 04/19/2021 | 🔵 3503 <br><br> (7 pgs; 2 docs) | Certificate of No Objection *Regarding Final Application of Brown Rudnick LLP, as Co-Counsel to the Official Committee of Unsecured Creditors, for the Period from July 13, 2020 Through and Including February 9, 2021* (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):3334 Application for Compensation) (Attachments: # 1 Proposed Order) (Mokrzycka, Maria) (Entered: 04/19/2021) |
| 04/19/2021 | 🔵 3504 <br><br> (7 pgs; 2 docs) | Certificate of No Objection *Regarding Final Application of BBG, Inc. for Allowance of Compensation for Services Rendered and Reimbursement of Expenses as Real Estate Appraiser / Valuation Expert to the Official Committee of Unsecured Creditors for the Period from November 2, 2020 through December 31, 2020* (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):3326 Application for Compensation) (Attachments: # 1 Proposed Order) (Mokrzycka, Maria) (Entered: 04/19/2021) |
| 04/19/2021 | 🔵 3505 <br><br> (7 pgs; 2 docs) | Certificate of No Objection *Regarding Combined Third Monthly, Fourth Monthly, Fifth Monthly, Sixth Monthly, and Final Fee Application of Opportune LLP for Allowance of Compensation and Reimbursement of Expenses as Special Valuation and Industry Advisor to the Official Committee of Unsecured Creditors for the Period September 1, 2020 through February 6, 2021* (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):3325 Application for Compensation) (Attachments: # 1 Proposed Order) (Mokrzycka, Maria) (Entered: 04/19/2021) |
| | 🔵 3506 <br><br> (7 pgs; 2 docs) | Certificate of No Objection *Regarding Final Fee Application of Back Bay Management and its Division, the Michel-Shaked Group, for Allowance of Compensation for Services Rendered and Reimbursement of Expenses as Expert Valuation Consultant to the Official Committee of Unsecured Creditors for the Period from September 1, 2020* |

| | | |
|---|---|---|
| 04/19/2021 | | *through February 9, 2021* (Filed By Official Committee Of Unsecured Creditors ).(Related document(s):3328 Application for Compensation) (Attachments: # 1 Proposed Order) (Mokrzycka, Maria) (Entered: 04/19/2021) |
| 04/19/2021 | 🌑3507<br><br>(8 pgs; 2 docs) | Certificate of No Objection *Regarding AlixPartners, LLP's Joint (I) Second Interim Fee Application for the Period October 1, 2020 through February 9, 2021 and (II) Final Fee Application for the Period July 14, 2020 through February 9, 2021 for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses Incurred as Financial Advisor to the Official Committee of Unsecured Creditors* (Filed By Official Committee Of Unsecured Creditors ).(Related document (s):3324 Application for Compensation) (Attachments: # 1 Proposed Order) (Mokrzycka, Maria) (Entered: 04/19/2021) |
| 04/19/2021 | 🌑3513<br><br>(2 pgs) | Response to Objection Filed with Respect to Claim 1738 (related document(s):3146 Objection to Claim). (jtab) (Entered: 04/21/2021) |
| 04/20/2021 | 🌑3508<br><br>(2 pgs) | Withdrawal of Claim: *192 (Epiq Claim No. 4682); Oklahoma Office of State Treasurer* (Watts, Jameson) (Entered: 04/20/2021) |
| 04/20/2021 | 🌑 | Certificate of Email Notice. By agreement of the parties, the hearing set for 4/21/2021 has been adjourned. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):1293 Motion for Relief From Stay) **Status Hearing rescheduled for 5/25/2021 at 03:00 PM by telephone and video conference.** (aalo) (Entered: 04/20/2021) |
| 04/20/2021 | 🌑3509<br><br>(2 pgs) | Order Approving Jackson Walker LLP's Second Interim and Final Application for Allowance and Payment of Fees and Expenses as Co-Counsel to the Debtors for the Period from June 28, 2020 through January 16, 2021 (Related Doc # 3303). Signed on 4/20/2021. (VrianaPortillo) (Entered: 04/21/2021) |
| 04/20/2021 | 🌑3510<br><br>(2 pgs) | Order Granting Second Interim and Final Fee Application of Pricewaterhousecoopers for Services Rendered and Reimbursement of Expenses to |

| | | |
|---|---|---|
| 04/20/2021 | | Provide Audit Services and Tax Consulting Services for the Debtors for the Period June 28, 2020 though and Including January 16, 2021 (Related Doc # 3330). Signed on 4/20/2021. (VrianaPortillo) (Entered: 04/21/2021) |
| 04/20/2021 | 3511 (2 pgs) | Order Granting Second Interim and Final Application of Ernst & Young LLP for Compensation and Reimbursement of Expenses for the Period from June 29, 2020 through and Including January 16, 2021 (Related Doc # 3331). Signed on 4/20/2021. (VrianaPortillo) (Entered: 04/21/2021) |
| 04/20/2021 | 3512 (2 pgs) | Order Granting Second and Final Interim Fee Application of Alvarez & Marsal North America, LLC as the Debtors' Restructuring Advisor for Allowance of Compensation and Reimbursement of Expenses for the Period October 1, 2020 through January 16, 2021 (Related Doc # 3337). Signed on 4/20/2021. (VrianaPortillo) (Entered: 04/21/2021) |
| 04/20/2021 | 3515 (2 pgs) | Second Granting Second Interim and Final Fee Application of Norton Rose Fulbright US LLP for Allowance of Compensation and Reimbursement of Expenses as Co-Counsel to Official Committee of Unsecured Creditors for the period July 13, 2020 through February 9, 2021 (Related Doc # 3327). Signed on 4/20/2021. (VrianaPortillo) (Entered: 04/21/2021) |
| 04/20/2021 | 3517 (2 pgs) | Order Granting Brown Rudnick LLP's Final Application for Payment of Compensation and Reimbursement of Expenses for the Period from July 13, 2020 through and Including February 9, 2021 (Related Doc # 3334). Signed on 4/20/2021. (VrianaPortillo) (Entered: 04/21/2021) |
| 04/20/2021 | 3518 (2 pgs) | Order Granting First Interim and Final Fee Application of BBG, INC. for Allowance of Compensation and Reimbursement of Expenses as Real Estate Appraiser/Valuation Expert to the Official Committee of Unsecured Creditors for the Period November 2, 2020 through December 31, 2020 (Related Doc # 3326). Signed on 4/20/2021. (VrianaPortillo) (Entered: 04/21/2021) |

| | | |
|---|---|---|
| 04/20/2021 | ◉3519<br><br>(2 pgs) | Order Granting Combined Third Monthly, Fourth Monthly, Fifth Monthly, Sixth Monthly and Final Fee Application of Opportune LLP for Allowance of Compensation and Reimbursement of Expenses as Special Valuation and Industry Advisor to the Official Committee of Unsecured Creditors for the Period September 1, 2020 through February 6, 2021 (Related Doc # 3325). Signed on 4/20/2021. (VrianaPortillo) (Entered: 04/21/2021) |
| 04/20/2021 | ◉3520<br><br>(2 pgs) | Order Granting Second Interim and Final Fee Application of Back Bay Management and its Division, the Michel-Shaked Group, for Allowance of Compensation and Reimbursement of Expenses as Valuation Expert to the Official Committee of Unsecured Creditors for the Period September 1, 2020 through February 9, 2021 (Related Doc # 3328). Signed on 4/20/2021. (VrianaPortillo) (Entered: 04/21/2021) |
| 04/20/2021 | ◉3521<br><br>(3 pgs) | Order Granting AlixPartners, LLP's Joint (I) Second Interim Fee Application for the Period October 1, 2020 through February 9, 2021 and (II) Final Fee Application for the Period July 14, 2020 though February 9, 2021 for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses Incurred as Financial Advisor to the Official Committee of Unsecured Creditors (Related Doc # 3324).Signed on 4/20/2021. (VrianaPortillo) (Entered: 04/21/2021) |
| 04/20/2021 | ◉3528<br><br>(13 pgs) | Response (related document(s):3297 Objection to Claim) filed by Hubert Bell, Jr. (rcas) (Entered: 04/23/2021) |
| 04/21/2021 | ◉3514<br><br>(4 pgs) | Stipulation By Chesapeake Energy Corporation and Four P Family Holdings LP and Byrd Family Limited Partnership. Does this document include an agreed order or otherwise request that the judge sign a document? No. (Filed By Chesapeake Energy Corporation ).(Related document(s):3296 Objection to Claim) (Cavenaugh, Matthew) (Entered: 04/21/2021) |
| | ◉3516<br><br>(5 pgs) | Chapter 11 Post-Confirmation Report for Quarter Ended 3/31/2021 (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: |

| 04/21/2021 | | 04/21/2021) |
|---|---|---|
| 04/21/2021 | 3522<br><br>(35 pgs) | Debtors Master Service List (Filed By Epiq Corporate Restructuring LLC ). (Garabato, Sid) (Entered: 04/21/2021) |
| 04/22/2021 | 3523<br><br>(2 pgs) | Order Granting Application For Compensation (Related Doc # 3304). Signed on 4/22/2021. (aalo) (Entered: 04/22/2021) |
| 04/22/2021 | 3524<br><br>(1 pg) | Withdrawal of Claim: *2647 filed by Epiq Corporate Restructuring, LLC on behalf of Hatch Family Mineral Trust* (Suarez, Hugo) (Entered: 04/22/2021) |
| 04/22/2021 | 3525<br><br>(2 pgs) | Notice *of Cancellation of Hearing Scheduled for April 30, 2021 at 2:00 p.m..* (Related document (s):3225 Application for Administrative Expenses) Filed by Targa Pipeline Mid-Continent WestOk LLC (Soule, Steven) (Entered: 04/22/2021) |
| 04/22/2021 | 3526<br><br>(22 pgs) | Response (related document(s):3296 Objection to Claim). (Haliburton, Kerry) (Entered: 04/22/2021) |
| 04/22/2021 | 3527<br><br>(12 pgs) | Response (related document(s):3297 Objection to Claim). (Haliburton, Kerry) (Entered: 04/22/2021) |
| 04/23/2021 | | Certificate of Email Notice. By agreement of the parties, the hearing on the following matters has been adjourned. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):3348 Motion to Compel, 3359 Motion to Abstain) **Hearing rescheduled for 6/2/2021 at 02:00 PM by telephone and video conference.** (aalo) (Entered: 04/23/2021) |
| 04/23/2021 | 3529<br><br>(61 pgs; 2 docs) | Response (related document(s):3296 Objection to Claim). (Attachments: # 1 Exhibit A: Declaration of David DeCristo)(Haliburton, Kerry) (Entered: 04/23/2021) |
| 04/23/2021 | 3530<br><br>(61 pgs; 2 docs) | Response (related document(s):3296 Objection to Claim). (Attachments: # 1 Exhibit A: Declaration of Amy DeCristo)(Haliburton, Kerry) (Entered: 04/23/2021) |

| | | |
|---|---|---|
| 04/23/2021 | ◉3531<br><br>(6 pgs; 2 docs) | Response (related document(s):3297 Objection to Claim). (Attachments: # 1 Affidavit Declaration) (Lauffer, Charles) (Entered: 04/23/2021) |
| 04/23/2021 | ◉3532<br><br>(8 pgs; 3 docs) | Certificate of No Objection *Omnibus Certificate of No Objection* (Filed By Chesapeake Energy Corporation ).(Related document(s):3323 Application for Compensation, 3333 Application for Compensation) (Attachments: # 1 Proposed Order Shearman Application # 2 Proposed Order Kirkland & Ellis, LLP Application) (Cavenaugh, Matthew) (Entered: 04/23/2021) |
| 04/23/2021 | ◉3533<br><br>(5 pgs) | Stipulation By Chesapeake Energy Corporation and Aparicion Minerals, LP, EBS Mineral Holdings, and Diana M. Stumberg. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 04/23/2021) |
| 04/23/2021 | ◉3534<br><br>(4 pgs) | Appellant Designation of Contents For Inclusion in Record On Appeal (related document(s):3458 Notice of Appeal)., Statement of Issues on Appeal (related document(s):3458 Notice of Appeal)., Certification of No Transcript Ordered under FRBP 8009. (related document(s):3458 Notice of Appeal). (Helfer, Arleigh) (Entered: 04/23/2021) |
| 04/23/2021 | ◉3535<br><br>(4 pgs) | Appellant Designation of Contents For Inclusion in Record On Appeal (related document(s):3459 Notice of Appeal)., Statement of Issues on Appeal (related document(s):3459 Notice of Appeal)., Certification of No Transcript Ordered under FRBP 8009. (related document(s):3459 Notice of Appeal). (Helfer, Arleigh) (Entered: 04/23/2021) |
| 04/26/2021 | ◉3536<br><br>(1 pg) | Withdrawal of Claim: *12544 filed by Epiq Corporate Restructuring, LLC on behalf of Wickliffe R Spears* (Suarez, Hugo) (Entered: 04/26/2021) |
| | ◉3537<br><br>(34 pgs; 2 docs) | Freeman Mills PC's Response to Debtor's Sixth Omnibus Objection to Certain Proofs of Claim (Satisfied Claims) (related document(s):3297 |

| | | |
|---|---|---|
| 04/26/2021 | | Objection to Claim). (Attachments: # 1 Exhibits 1-4)(rcas) (Entered: 04/26/2021) |
| 04/26/2021 | 3538<br><br>(4 pgs) | Stipulation Extending the Deadline to Respond to Reorganized Debtors' Fifth Omnibus Objection to Certain Proofs of Claim (Cross-Debtor Duplicate Claims) Signed on 4/26/2021 (Related document(s):3514 Stipulation) (VrianaPortillo) (Entered: 04/26/2021) |
| 04/26/2021 | 3539<br><br>(5 pgs) | Stipulation and Agreed Order Regarding Proof of Claim No. 12862 Signed on 4/26/2021 (Related document(s):3533 Stipulation) (emiller) (Entered: 04/26/2021) |
| 04/26/2021 | 3540<br><br>(2 pgs) | Order Granting First and Final Fee Application of Shearman & Sterling LLP, Special Counsel for the Debtors and Debtors in Possession, for the Period from October 11, 2020 through and including January 16, 2021 (Related Doc # 3323) Signed on 4/26/2021. (emiller) (Entered: 04/26/2021) |
| 04/26/2021 | 3541<br><br>(2 pgs) | Order Granting Second Interim and Final Fee Application of Kirkland & Ellis LLP and Kirkland & Ellis International LLP, Attorneys for the Debtors and Debtors in Possession for (I) the Second Interim Fee Period from October 1, 2020 Through and Including January 16, 2021 and (II) the Fee Period from June 28, 2020 Through and Including January 16, 2021 (Related Doc # 3333) Signed on 4/26/2021. (emiller) (Entered: 04/26/2021) |
| 04/26/2021 | 3542<br><br>(180 pgs; 6 docs) | Response (related document(s):3296 Objection to Claim). (Attachments: # 1 Proposed Order # 2 Exhibit A # 3 Exhibit B # 4 Exhibit C # 5 Exhibit D)(JosephWells) (Entered: 04/26/2021) |
| 04/26/2021 | 3543<br><br>(17 pgs; 2 docs) | Objection to Claim Number by Claimant *Reorganized Debtors' Eleventh Omnibus Objection to Certain Proofs of Claim (Amended Claims)* Hearing scheduled for 6/2/2021 at 02:00 PM at telephone and video conference. (Attachments: # 1 Proposed Order)(Peguero, Kristhy) (Entered: 04/26/2021) |

| 04/26/2021 | 🔵 3544<br><br>(17 pgs; 2 docs) | Objection to Claim Number by Claimant *Reorganized Debtors' Twelfth Omnibus Objection to Certain Proofs of Claim (Duplicate Claims)* Hearing scheduled for 6/2/2021 at 02:00 PM at telephone and video conference. (Attachments: # 1 Proposed Order)(Peguero, Kristhy) (Entered: 04/26/2021) |
|---|---|---|
| 04/26/2021 | 🔵 3545<br><br>(26 pgs; 2 docs) | Objection to Claim Number by Claimant *Reorganized Debtors' Thirteenth Omnibus Objection to Certain Proofs of Claim (Cross-Debtor Duplicate Claims)* Hearing scheduled for 6/2/2021 at 02:00 PM at telephone and video conference. (Attachments: # 1 Proposed Order)(Peguero, Kristhy) (Entered: 04/26/2021) |
| 04/26/2021 | 🔵 3546<br><br>(25 pgs; 2 docs) | Objection to Claim Number by Claimant *Reorganized Debtors' Fourteenth Omnibus Objection to Certain Proofs of Claim (Reclassified Equity Claims)* Hearing scheduled for 6/2/2021 at 02:00 PM at telephone and video conference. (Attachments: # 1 Proposed Order)(Peguero, Kristhy) (Entered: 04/26/2021) |
| 04/26/2021 | 🔵 3547<br><br>(82 pgs; 2 docs) | Objection to Claim Number by Claimant *Reorganized Debtors' Fifteenth Omnibus Objection to Certain Proofs of Claim (Cross Debtor Duplicate Claims, Satisfied Claims, Equity Interest Claims, Beneficial Bondholder Duplicate Claims and Duplicate Claims)* Hearing scheduled for 6/2/2021 at 02:00 PM at telephone and video conference. (Attachments: # 1 Proposed Order)(Peguero, Kristhy) (Entered: 04/26/2021) |
| 04/27/2021 | 🔵 3548<br><br>(142 pgs; 17 docs) | Witness List, Exhibit List (Filed By Chesapeake Energy Corporation ).(Related document(s):3296 Objection to Claim, 3297 Objection to Claim, 3298 Objection to Claim, 3299 Objection to Claim, 3300 Objection to Claim, 3301 Objection to Claim) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16) (Peguero, Kristhy) (Entered: 04/27/2021) |

| | | |
|---|---|---|
| 04/27/2021 | ○ [3549](#)<br><br>(4 pgs; 2 docs) | Motion to Withdraw as Attorney. Objections/Request for Hearing Due in 21 days. Filed by Creditors Melissa Wood, Randy Wood (Attachments: # 1 Proposed Order Granting Motion to Withdraw as Attorney of Record) (Rubin, Howard) (Entered: 04/27/2021) |
| 04/27/2021 | ○ [3550](#)<br><br>(29 pgs; 4 docs) | Certificate of No Objection *Omnibus Certificate of No Objection* (Filed By Chesapeake Energy Corporation ).(Related document(s):3299 Objection to Claim, 3300 Objection to Claim, 3301 Objection to Claim) (Attachments: # 1 Proposed Order Eighth Omnibus Objection # 2 Proposed Order Ninth Omnibus Objection # 3 Proposed Order Tenth Omnibus Objection) (Cavenaugh, Matthew) (Entered: 04/27/2021) |
| 04/27/2021 | ○ [3551](#)<br><br>(6 pgs) | Response (related document(s):3296 Objection to Claim). (Gutierrez, Albert) (Entered: 04/27/2021) |
| 04/28/2021 | ○ [3552](#)<br><br>(690 pgs; 5 docs) | Certificate of No Objection *Omnibus Certificate of No Objection with Respect to the Fifth and Sixth Omnibus Objection to Certain Proofs of Claim* (Filed By Chesapeake Energy Corporation ).(Related document(s):3296 Objection to Claim, 3297 Objection to Claim) (Attachments: # 1 Proposed Order Fifth Omnibus Objection # 2 Redline - Fifth Omnibus Objection # 3 Proposed Order Sixth Omnibus Objection # 4 Redline - Sixth Omnibus Objection) (Peguero, Kristhy) (Entered: 04/28/2021) |
| 04/28/2021 | ○ [3553](#)<br><br>(29 pgs; 5 docs) | Certificate of No Objection *Amended Omnibus Certificate of No Objection with Respect to the Eighth, Ninth, and Tenth Omnibus Objection to Certain Proofs of Claim* (Filed By Chesapeake Energy Corporation ).(Related document(s):3299 Objection to Claim, 3300 Objection to Claim, 3301 Objection to Claim) (Attachments: # 1 Proposed Order Eighth Omnibus Objection # 2 Proposed Order Ninth Omnibus Objection # 3 Proposed Order Tenth Omnibus Objection # 4 Redline - Tenth Omnibus Objection) (Peguero, Kristhy) (Entered: 04/28/2021) |

| | | |
|---|---|---|
| 04/28/2021 | 🌑 3554<br><br>(4 pgs) | Agenda for Hearing on 4/29/2021 (Filed By Chesapeake Energy Corporation ). (Peguero, Kristhy) (Entered: 04/28/2021) |
| 04/28/2021 | 🌑 3555<br><br>(1 pg) | Order Granting Motion to Withdraw as Attorney of Record and Removal from Notice Lists (Related Doc # 3549) Signed on 4/28/2021. (VrianaPortillo) (Entered: 04/28/2021) |
| 04/28/2021 | 🌑 3556<br><br>(15 pgs) | Order Sustaining Reorganized Debtors' Eight Omnibus Objection to Certain Proofs of Claim (Beneficial Bondholder Duplicate Claims) Signed on 4/28/2021 (Related document(s):3299 Objection to Claim) (VrianaPortillo) (Entered: 04/28/2021) |
| 04/28/2021 | 🌑 3557<br><br>(86 pgs) | Order Signed on 4/28/2021 (Related document (s):3296 Objection to Claim) (aalo) (Entered: 04/28/2021) |
| 04/28/2021 | 🌑 3558<br><br>(228 pgs) | Order Signed on 4/28/2021 (Related document (s):3297 Objection to Claim) (aalo) (Entered: 04/28/2021) |
| 04/28/2021 | 🌑 3559<br><br>(5 pgs) | Order Signed on 4/28/2021 (Related document (s):3300 Objection to Claim) (aalo) (Entered: 04/28/2021) |
| 04/28/2021 | 🌑 3560<br><br>(4 pgs) | Order Signed on 4/28/2021 (Related document (s):3301 Objection to Claim) (aalo) (Entered: 04/28/2021) |
| 04/28/2021 | 🌑 | Certificate of Telephone Notice. Contacted Veronica Polnick. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):3299 Objection to Claim) **Hearing rescheduled for 6/2/2021 at 02:00 PM by telephone and video conference.** (aalo) (Entered: 04/28/2021) |
| 04/28/2021 | 🌑 3564<br><br>(1 pg) | Motion to Appear pro hac vice *Tyler S. Graden*. Filed by Creditors Gina M Suessenbach, James S Suessenbach, The Suessenbach Family Limited Partnership (than) (Entered: 04/29/2021) |
| | 🌑 | Certificate of Email Notice. Contacted Veronica |

| | | |
|---|---|---|
| 04/29/2021 | | Polnick. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):3296 Objection to Claim, 3297 Objection to Claim) **Hearing scheduled for 6/2/2021 at 02:00 PM by telephone and video conference.** (aalo) (Entered: 04/29/2021) |
| 04/29/2021 | 3561<br><br>(3 pgs) | Notice *of Reset Hearing*. (Related document (s):3296 Objection to Claim, 3297 Objection to Claim, Certificate of Notice) Filed by Chesapeake Energy Corporation (Peguero, Kristhy) (Entered: 04/29/2021) |
| 04/29/2021 | 3562<br><br>(2 pgs) | Agreed Motion to Withdraw Document (related document(s):3537 Response). Filed by Creditor Freeman Mills PC Hearing scheduled for 4/29/2021 at 01:00 PM. (Simms, Graham) (Entered: 04/29/2021) |
| 04/29/2021 | 3563<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew Cavenaugh. This is to order a transcript of 4/29/2021 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) Electronically forwarded to Access Transcripts, LLC on May 4, 2021. Estimated completion date: May 5, 2021. Modified on 5/4/2021 (ClaudiaGutierrez). (Entered: 04/29/2021) |
| 04/29/2021 | 3565<br><br>(1 pg) | PDF with attached Audio File. Court Date & Time [ 4/29/2021 1:00:03 PM ]. File Size [ 12176 KB ]. Run Time [ 00:25:22 ]. (In ref to doc no.3298. Hearing held April 29, 2021.). (admin). (Entered: 04/29/2021) |
| 04/29/2021 | 3566<br><br>(256 pgs; 2 docs) | Emergency Motion *Reorganized Debtors' Emergency Motion to Enforce Confirmation Order* Filed by Debtor Chesapeake Energy Corporation Hearing scheduled for 5/11/2021 at 03:30 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 04/29/2021) |
| | 3567 | Order Sustaining Reorganized Debtors' Seventh Omnibus Objection to Certain Proofs of Claim |

| | | |
|---|---|---|
| 04/29/2021 | (174 pgs) | (Equity Interests Claims) Signed on 4/29/2021 (Related document(s):3298 Objection to Claim) (VrianaPortillo) (Entered: 04/29/2021) |
| 04/29/2021 | 3568<br><br>(2 pgs) | Courtroom Minutes. Time Hearing Held: 1:00 PM. Appearances: SEE ATTACHED. Debtors exhibits 3548-3 admitted. The Court sustained the Debtors' seventh omnibus objection to certain proofs of claim 3298. Order to be entered. (VrianaPortillo) (Entered: 04/30/2021) |
| 04/29/2021 | 3577<br><br>(2 pgs) | Richard Wise; Claim #12367 Response to Objections Of Calim(related document(s):3148 Objection to Claim). (mmap) (Entered: 05/03/2021) |
| 04/30/2021 | 3569<br><br>(13 pgs) | BNC Certificate of Mailing. (Related document (s):3555 Order on Motion to Withdraw as Attorney) No. of Notices: 251. Notice Date 04/30/2021. (Admin.) (Entered: 04/30/2021) |
| 04/30/2021 | 3570<br><br>(27 pgs) | BNC Certificate of Mailing. (Related document (s):3556 Generic Order) No. of Notices: 251. Notice Date 04/30/2021. (Admin.) (Entered: 04/30/2021) |
| 04/30/2021 | 3571<br><br>(98 pgs) | BNC Certificate of Mailing. (Related document (s):3557 Generic Order) No. of Notices: 251. Notice Date 04/30/2021. (Admin.) (Entered: 04/30/2021) |
| 04/30/2021 | 3572<br><br>(240 pgs) | BNC Certificate of Mailing. (Related document (s):3558 Generic Order) No. of Notices: 251. Notice Date 04/30/2021. (Admin.) (Entered: 04/30/2021) |
| 04/30/2021 | 3573<br><br>(17 pgs) | BNC Certificate of Mailing. (Related document (s):3559 Generic Order) No. of Notices: 251. Notice Date 04/30/2021. (Admin.) (Entered: 04/30/2021) |
| 04/30/2021 | 3574<br><br>(16 pgs) | BNC Certificate of Mailing. (Related document (s):3560 Generic Order) No. of Notices: 251. Notice Date 04/30/2021. (Admin.) (Entered: 04/30/2021) |

| | | |
|---|---|---|
| 05/02/2021 | 🔵 3575<br><br>(186 pgs) | BNC Certificate of Mailing. (Related document (s):3567 Generic Order) No. of Notices: 252. Notice Date 05/02/2021. (Admin.) (Entered: 05/02/2021) |
| 05/03/2021 | 🔵 3576<br><br>(2 pgs) | Letter from Malinath Suralikal to Judge (mmap) (Entered: 05/03/2021) |
| 05/03/2021 | 🔵 3578<br><br>(5 pgs; 2 docs) | Certificate of No Objection (Filed By PMBG Parties ).(Related document(s):3394 Motion to Withdraw as Attorney) (Attachments: # 1 Proposed Order) (Heard, Mary) (Entered: 05/03/2021) |
| 05/03/2021 | 🔵 3579<br><br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Mary Elizabeth Heard Filed by on behalf of Encino Energy (Heard, Mary) (Entered: 05/03/2021) |
| 05/03/2021 | 🔵 3580<br><br>(1 pg) | Copy ORDER REASSIGNING CASE . Case 4:21CV1215 reassigned to Chief Judge Lee H Rosenthal for all further proceedings. Judge Keith P Ellison no longer assigned to the case. (Signed by Judge Keith P Ellison) (Related document(s):3480 Clerk's Notice of Filing of an Appeal) (hcar) (Entered: 05/04/2021) |
| 05/03/2021 | 🔵 3581<br><br>(1 pg) | Copy ORDER REASSIGNING CASE. Case reassigned to Chief Judge Lee H Rosenthal for all further proceedings. Judge Keith P Ellison no longer assigned to the case(Signed by Judge Keith P Ellison)(Related document(s):3481 Clerk's Notice of Filing of an Appeal) (hcar) (Entered: 05/04/2021) |
| 05/04/2021 | 🔵 3582<br><br>(13 pgs; 2 docs) | Motion to Seal *Settlement Motion* Filed by Debtor Chesapeake Energy Corporation (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 05/04/2021) |
| | 🔵 3583<br><br>(20 pgs; 2 docs) | Application to Compromise Controversy *Reorganized Debtors' Emergency Motion for Entry of an Order (I) Authorizing and Approving the Settlement Agreement, and (II) Granting Related Relief.* Objections/Request for Hearing |

| | | |
|---|---|---|
| 05/04/2021 | | Due in 21 days. Filed by Debtor Chesapeake Energy Corporation Hearing scheduled for 5/11/2021 at 03:30 PM at Houston, Courtroom 400 (DRJ). (Attachments: # 1 Proposed Order) (Cavenaugh, Matthew) (Entered: 05/04/2021) |
| 05/04/2021 | 3584 <br> (1 pg) | Order Granting Motion To Appear pro hac vice - Tyler S. Graden (Related Doc # 3564) Signed on 5/4/2021. (emiller) (Entered: 05/05/2021) |
| 05/05/2021 | 3585 | Receipt of Sealed Document retained in Clerk's office.re: 3583 (jdav) (Entered: 05/05/2021) |
| 05/05/2021 | 3586 <br> (24 pgs) | Transcript RE: Objection to Claim Number by Claimant Reorganized Debtors' Seventh Omnibus Objection to Certain Proofs of Claim (Equity Interest Claims) held on 04/29/21 before Judge David R. Jones. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 08/3/2021. (AccessTranscripts) (Entered: 05/05/2021) |
| 05/06/2021 | 3587 <br> (4 pgs) | Stipulation By Chesapeake Energy Corporation and Dennis R. Taylor, Cynthia A. Parks, Ladonna M. Riley, Brenda S. Simmons and Clinton L. Taylor. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 05/06/2021) |
| 05/06/2021 | 3588 <br> (1 pg) | Notice of Filing of Official Transcript as to 3586 Transcript. Parties notified (Related document (s):3586 Transcript) (jdav) (Entered: 05/06/2021) |
| 05/06/2021 | 3589 <br> (2 pgs) | Notice of Appearance and Request for Notice Filed by Charles M Rubio Filed by on behalf of CTF, Ltd. (Rubio, Charles) (Entered: 05/06/2021) |
| | 3590 <br> (1045 pgs; 22 docs) | Witness List, Exhibit List (Filed By Chesapeake Energy Corporation ).(Related document(s):3566 Emergency Motion (with hearing date), 3583 Application to Compromise Controversy) |

| | | |
|---|---|---|
| 05/07/2021 | | (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21) (Cavenaugh, Matthew) (Entered: 05/07/2021) |
| 05/07/2021 | 3591 | Receipt of Sealed Document retained in Clerk's office. (BrendaLacy) (Entered: 05/07/2021) |
| 05/07/2021 | 3592 (1 pg) | Motion to Appear pro hac vice *of Rex A. Sharp.* Filed by Creditor CTF, Ltd. (Rubio, Charles) (Entered: 05/07/2021) |
| 05/07/2021 | 3593 (5 pgs; 3 docs) | Motion to Withdraw as Attorney. Objections/Request for Hearing Due in 21 days. Filed by Creditor Francis R. Goddard (Attachments: # 1 Proposed Order # 2 Certificate of Service) (Shiner, Michael) (Entered: 05/07/2021) |
| 05/07/2021 | 3594 (5 pgs; 3 docs) | Motion to Withdraw as Attorney. Objections/Request for Hearing Due in 21 days. Filed by Creditor Michael West (Attachments: # 1 Proposed Order # 2 Certificate of Service) (Shiner, Michael) (Entered: 05/07/2021) |
| 05/07/2021 | 3595 (5 pgs; 3 docs) | Motion to Withdraw as Attorney. Objections/Request for Hearing Due in 21 days. Filed by Creditor Ronald Goddard (Attachments: # 1 Proposed Order # 2 Certificate of Service) (Shiner, Michael) (Entered: 05/07/2021) |
| 05/07/2021 | 3596 (626 pgs) | Affidavit Re: *Affidavit of Service of Settlement Notice of Angharad Bowdler* (Filed By Epiq Corporate Restructuring LLC ). (Garabato, Sid) (Entered: 05/07/2021) |
| 05/08/2021 | 3597 (14 pgs) | BNC Certificate of Mailing. (Related document (s):3588 Notice of Filing of Official Transcript (Form)) No. of Notices: 253. Notice Date 05/08/2021. (Admin.) (Entered: 05/08/2021) |
| | 3602 | Order Granting Motion To Appear pro hac vice - |

| | | |
|---|---|---|
| 05/09/2021 | (1 pg) | Rex A. Sharp (Related Doc # 3592) Signed on 5/9/2021. (emiller) (Entered: 05/10/2021) |
| 05/10/2021 | 3598<br><br>(4 pgs) | Stipulation and Agreed Order Regarding Proofs of Claim Nos. 540, 541, 542, 543, and 544 Signed on 5/10/2021 (Related document(s):3587 Stipulation) (VrianaPortillo) (Entered: 05/10/2021) |
| 05/10/2021 | 3599<br><br>(4 pgs) | Order Authorizing the Reorganized Debtors to File the Settlement Motion Under Seal (Related Doc # 3582) Signed on 5/10/2021. (VrianaPortillo) (Entered: 05/10/2021) |
| 05/10/2021 | 3600<br><br>(2 pgs) | Order Granting Unopposed Motion to Withdraw as Co-Counsel for Good Cause (Related Doc # 3394) Signed on 5/10/2021. (VrianaPortillo) (Entered: 05/10/2021) |
| 05/10/2021 | 3601<br><br>(692 pgs; 14 docs) | Exhibit List (Filed By CTF, Ltd. ).(Related document(s):3566 Emergency Motion (with hearing date)) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13) (Rubio, Charles) (Entered: 05/10/2021) |
| 05/10/2021 | 3603<br><br>(670 pgs; 11 docs) | Response *in Opposition to Reorganized Debtors' Emergency Motion to Enforce Confirmation Order* (related document(s):3566 Emergency Motion (with hearing date)). Filed by CTF, Ltd. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Proposed Order Proposed Order) (Rubio, Charles) (Entered: 05/10/2021) |
| | | Certificate of Telephone Notice. Due to the Courts schedule, the hearing time for the following motions has been moved up to 1:00 PM. Movant to notice all interested parties and file a certificate of service with the court (Related document(s):3566 Emergency Motion (with hearing date), 3583 Application to Compromise Controversy) **Hearing rescheduled for 5/11/2021 at 01:00 PM by** |

| | | |
|---|---|---|
| 05/10/2021 | | telephone and video conference. (aalo) (Entered: 05/10/2021) |
| 05/10/2021 | 🔘 3604<br><br>(3 pgs) | Notice *of Reset of Hearing*. (Related document (s):3566 Emergency Motion (with hearing date)) Filed by Chesapeake Energy Corporation (Peguero, Kristhy) (Entered: 05/10/2021) |
| 05/10/2021 | 🔘 3605<br><br>(1717 pgs; 4 docs) | Response (Filed By Encino Energy ).(Related document(s):3566 Emergency Motion (with hearing date)) (Attachments: # 1 Exhibit A PSA # 2 Exhibit B Indemnification Notice dated February 22, 2021 # 3 Exhibit C August 25, 2020 Hearing Transcript) (Heard, Mary) (Entered: 05/10/2021) |
| 05/10/2021 | 🔘 3606<br><br>(147 pgs; 4 docs) | Response (Filed By Encino Energy ).(Related document(s):3566 Emergency Motion (with hearing date)) (Attachments: # 1 Exhibit A PSA # 2 Exhibit B Indemnification Notice dated February 22, 2021 # 3 Exhibit C August 25, 2020 Hearing Transcript) (Heard, Mary) (Entered: 05/10/2021) |
| 05/10/2021 | 🔘 3607<br><br>(69 pgs) | Objection */ Reorganized Debtors' Objection to Motion for Allowance of Administrative Expense Claim Pursuant to 11 U.S.C § 503(B)(1)* (related document(s):3225 Application for Administrative Expenses). Filed by Chesapeake Energy Corporation (Schwarzman, Alexandra) (Entered: 05/10/2021) |
| 05/11/2021 | 🔘 3608<br><br>(137 pgs; 4 docs) | Witness List, Exhibit List (Filed By Encino Energy ).(Related document(s):3606 Response) (Attachments: # 1 Exhibit A Purchase and Sale Agreement # 2 Exhibit B Indemnification Notice dated February 22, 2021 # 3 Exhibit C August 25, 2020 Hearing Transcript) (Heard, Mary) (Entered: 05/11/2021) |
| 05/11/2021 | 🔘 3609<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Matthew Cavenaugh. This is to order a transcript of 5/11/2021 before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Chesapeake Energy Corporation ). (Cavenaugh, Matthew) (Entered: 05/11/2021) |

| | | |
|---|---|---|
| 05/11/2021 | 3610<br><br>(1 pg) | Courtroom Minutes. Time Hearing Held: 1:00 PM. Appearances: SEE ATTACHED. (Related document(s):3566 Emergency Motion (with hearing date), 3583 Application to Compromise Controversy) For the reasons stated on the record, the Court approved the Motion to Approve Settlement agreement 3583. Order to be entered. The Court denied the Debtors' Emergency Motion to Enforce Confirmation Order 3566 without prejudice to the filing of such other contested matter or adversary proceeding as the parties determine appropriate. (VrianaPortillo) (Entered: 05/11/2021) |
| 05/11/2021 | 3611<br><br>(1 pg) | PDF with attached Audio File. Court Date & Time [ 5/11/2021 1:00:01 PM ]. File Size [ 20230 KB ]. Run Time [ 00:42:09 ]. (In ref to doc nos. 3566 and 3583. Hearing held May 11, 2021.). (admin). (Entered: 05/11/2021) |
| 05/11/2021 | 3612<br><br>(1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Mary Elizabeth Heard. This is to order a transcript of 5/11/2021 Hearing before Judge David R. Jones. Court Reporter/Transcriber: Access Transcripts (Filed By Encino Energy ). (Heard, Mary) (Entered: 05/11/2021) |
| 05/11/2021 | 3613<br><br>(3 pgs) | Order (I) Authorizing and Approving the Settlement Agreement, and (II) Granting Related Relief (Related Doc # 3583) Signed on 5/11/2021. (VrianaPortillo) (Entered: 05/11/2021) |

**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | Case No. 20-33233 (DRJ) |
| Debtors. | (Jointly Administered) |

**FIFTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION**
**OF CHESAPEAKE ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752-4200
Facsimile:     (713) 752-4221
Email:     mcavenaugh@jw.com
             jwertz@jw.com
             kpeguero@jw.com
             vpolnick@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:     patrick.nash@kirkland.com
             marc.kieselstein@kirkland.com
             alexandra.schwarzman@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

Dated: January 12, 2021

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/chesapeake.  The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
          GOVERNING LAW ................................................................................................1
    A.    Defined Terms. ...............................................................................................1
    B.    Rules of Interpretation. ..................................................................................17
    C.    Computation of Time. ....................................................................................17
    D.    Governing Law. .............................................................................................18
    E.    Reference to Monetary Figures. .....................................................................18
    F.    Reference to the Debtors or the Reorganized Debtors. .................................18
    G.    Controlling Document. ..................................................................................18
    H.    Consultation, Information, Notice, and Consent Rights. ...............................18

ARTICLE II. ADMINISTRATIVE CLAIMS, DIP CLAIMS, AND PRIORITY CLAIMS ...................19
    A.    Administrative Claims. ..................................................................................19
    B.    DIP Claims. ...................................................................................................20
    C.    Priority Tax Claims. ......................................................................................21
    D.    Statutory Fees. ...............................................................................................21

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...................21
    A.    Classification of Claims and Interests. ..........................................................21
    B.    Treatment of Claims and Interests. ...............................................................22
    C.    Special Provision Governing Unimpaired Claims. ........................................25
    D.    Elimination of Vacant Classes. .....................................................................25
    E.    Voting Classes, Presumed Acceptance by Non-Voting Classes. ..................25
    F.    Intercompany Interests. ..................................................................................25
    G.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. .................26
    H.    Controversy Concerning Impairment. ...........................................................26
    I.    Subordinated Claims and Interests. ..............................................................26

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ...............................................26
    A.    General Settlement of Claims and Interests. .................................................26
    B.    Restructuring Transactions. ...........................................................................27
    C.    Midstream Savings Requirement. ..................................................................27
    D.    Reorganized Debtors. ....................................................................................27
    E.    Sources of Consideration for Plan Distributions. ..........................................28
    F.    Convenience Claim Distribution Reserve. ....................................................30
    G.    Corporate Existence. ......................................................................................30
    H.    Vesting of Assets in the Reorganized Debtors. .............................................30
    I.    Cancellation of Existing Securities and Agreements. ...................................31
    J.    Corporate Action. ..........................................................................................32
    K.    New Organizational Documents. ...................................................................32
    L.    Indemnification Obligations. .........................................................................33
    M.    Directors and Officers of the Reorganized Debtors. .....................................33
    N.    Effectuating Documents; Further Transactions. ............................................33
    O.    Section 1146 Exemption. ..............................................................................34
    P.    Director and Officer Liability Insurance. ......................................................34
    Q.    Management Incentive Plan. ..........................................................................34
    R.    Employee Benefits. ........................................................................................35
    S.    Preservation of Causes of Action. .................................................................35
    T.    Preservation of Royalty and Working Interests. ...........................................36
    U.    Resolution of Pending Litigation. .................................................................36
    V.    Payment of Certain Fees. ...............................................................................37

i

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................................37
   A.     Assumption and Rejection of Executory Contracts and Unexpired Leases. ...........37
   B.     Claims Based on Rejection of Executory Contracts or Unexpired Leases. .............38
   C.     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ..........38
   D.     Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases. ..........39
   E.     Insurance Policies. .............................................................................................39
   F.     Reservation of Rights. ........................................................................................40
   G.     Nonoccurrence of Effective Date. ......................................................................40
   H.     Contracts and Leases Entered Into After the Petition Date. ................................40

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ...........................................................40
   A.     Timing and Calculation of Amounts to Be Distributed. ......................................40
   B.     Delivery of Distributions and Undeliverable or Unclaimed Distributions. ..........41
   C.     Manner of Payment. ...........................................................................................42
   D.     Exemption from Securities Laws. .......................................................................42
   E.     Compliance with Tax Requirements. ...................................................................43
   F.     Allocations. .......................................................................................................43
   G.     No Postpetition or Default Interest on Claims. ...................................................43
   H.     Foreign Currency Exchange Rate. .......................................................................43
   I.     Setoffs and Recoupment. ...................................................................................43
   J.     No Double Payment of Claims. ..........................................................................44
   K.     Claims Paid or Payable by Third Parties. ............................................................44

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND
          DISPUTED CLAIMS .......................................................................................45
   A.     Allowance of Claims. .........................................................................................45
   B.     Claims Administration Responsibilities. .............................................................45
   C.     Estimation of Claims. .........................................................................................45
   D.     Adjustment to Claims or Interests without Objection. .........................................45
   E.     Time to File Objections to Claims. ......................................................................46
   F.     Reservation of Rights to Object to Claims. .........................................................46
   G.     Disputed and Contingent Claims Reserve. ..........................................................46
   H.     Disallowance of Claims or Interests. ...................................................................46
   I.     No Distributions Pending Allowance. .................................................................46
   J.     Distributions After Allowance. ...........................................................................46
   K.     No Interest on Disputed Claims. .........................................................................47

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ............................47
   A.     Discharge of Claims and Termination of Interests. ..............................................47
   **B.**     **Release of Liens.** .............................................................................................47
   **C.**     **Releases by the Debtors.** ................................................................................48
   **D.**     **Releases by Holders of Claims and Interests.** ...............................................49
   **E.**     **Exculpation.** .................................................................................................50
   **F.**     **Injunction.** ...................................................................................................50
   G.     Protections Against Discriminatory Treatment. ...................................................51
   H.     Recoupment. ......................................................................................................51
   I.     Document Retention. ..........................................................................................51
   J.     Reimbursement or Contribution. .........................................................................51

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ...................................51
   A.     Conditions Precedent to the Effective Date. ........................................................51
   B.     Waiver of Conditions. ........................................................................................53
   C.     Effect of Failure of Conditions. ..........................................................................53
   D.     Substantial Consummation ..................................................................................53

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ..................................... 53
    A.     Modification and Amendments. ............................................................................................... 53
    B.     Effect of Confirmation on Modifications. ............................................................................... 54
    C.     Revocation or Withdrawal of Plan. ......................................................................................... 54

ARTICLE XI. RETENTION OF JURISDICTION ....................................................................................... 54

ARTICLE XII. MISCELLANEOUS PROVISIONS ..................................................................................... 56
    A.     Immediate Binding Effect. ....................................................................................................... 56
    B.     Additional Documents. ............................................................................................................. 56
    C.     Payment of Statutory Fees. ...................................................................................................... 56
    D.     Statutory Committee and Cessation of Fee and Expense Payment. ......................................... 56
    E.     Reservation of Rights. .............................................................................................................. 56
    F.     Successors and Assigns. ........................................................................................................... 57
    G.     Notices. ..................................................................................................................................... 57
    H.     Term of Injunctions or Stays. .................................................................................................. 58
    I.     Entire Agreement. .................................................................................................................... 58
    J.     Plan Supplement. ..................................................................................................................... 58
    K.     Nonseverability of Plan Provisions. ........................................................................................ 58
    L.     Votes Solicited in Good Faith. ................................................................................................ 58
    M.     Closing of Chapter 11 Cases. .................................................................................................. 59
    N.     Waiver or Estoppel. ................................................................................................................. 59
    O.     Creditor Default. ...................................................................................................................... 59

## INTRODUCTION

Chesapeake Energy Corporation and the above-captioned debtors and debtors in possession (collectively, the "Debtors"), propose this joint chapter 11 plan of reorganization (as modified, amended, or supplemented from time to time, the "Plan") for the resolution of the outstanding claims against, and equity interests in, the Debtors. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor. Holders of Claims or Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, business, assets, results of operations, historical financial information, risk factors, a summary and analysis of this Plan, the Restructuring Transactions, and certain related matters. Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.     *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.     "*1145 Securities*" has the meaning set forth in Article IV.E.1 of the Plan.

2.     "*4(a)(2) Securities*" has the meaning set forth in Article IV.E.1 of the Plan.

3.     "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business; (b) Allowed Professional Claims; (c) DIP Claims; (d) Adequate Protection Super-Priority Claims (as defined in the Final DIP Order) (if any); (e) Royalty and Working Interests Administrative Claims; (f) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code; and (g) as approved by the Backstop Commitment Agreement Approval Order, including the priority and payment subordination provisions described in paragraph 7 thereof, the Put Option Premium.

4.     "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which shall be 30 days after the Effective Date; *provided*, *however*, that the deadline for Filing requests for payment of Royalty and Working Interests Administrative Claims shall be 120 days after the Effective Date.

5.     "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code. With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

6.     "*Agent*" means any administrative agent, collateral agent, collateral trustee, or similar Entity under the Exit Facilities, the DIP Facility, the Revolving Credit Facility, the Collateral Agreement, the Collateral Trust Agreement, and/or the FLLO Term Loan Facility.

7.     "*Allowed*" means, with respect to any Claim or Interest, except as otherwise provided herein: (a) a Claim or Interest in a liquidated amount as to which no objection has been Filed prior to the applicable claims objection deadline and that is evidenced by a Proof of Claim or Interest, as applicable, timely Filed by the applicable Bar Date or that is not required to be evidenced by a Filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, or a Final Order; (b) a Claim or Interest that is scheduled by the Debtors as neither Disputed, contingent, nor unliquidated, and for which no Proof of Claim or Interest, as applicable, has been timely Filed in an

1

unliquidated or a different amount; (c) a Claim or Interest that is upheld or otherwise Allowed (i) pursuant to the Plan; (ii) in any stipulation that is approved by the Bankruptcy Court; (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith; or (iv) by Final Order (including any such Claim to which the Debtors had objected or which the Bankruptcy Court had disallowed prior to such Final Order); *provided* that with respect to a Claim or Interest described in clauses (a) through (c) above, such Claim or Interest shall be considered Allowed only if and to the extent that with respect to such Claim or Interest no objection to the allowance thereof has been or, in the Debtors' or Reorganized Debtors' reasonable good faith judgment, may be interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim or Interest, as applicable, shall have been Allowed by a Final Order; *provided*, *further*, that no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or Disputed, and for which no Proof of Claim or Interest is or has been timely Filed, is not considered Allowed and shall be deemed expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. For the avoidance of doubt a Proof of Claim or Interest Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim. "Allow," "Allowing," and "Allowance" shall have correlative meanings.

8.      "*Alternative Securities Exchange*" means, excluding any National Securities Exchange, any other securities exchange or over-the-counter quotation system, including, without limitation, the NYSE MKT, the Nasdaq Capital Market, any quotation or other listing service provided by the OTC Markets Group or the Financial Industry Regulatory Authority, Inc., any "pink sheet" or other alternative listing service, or any successor or substantially equivalent service to any of the foregoing.

9.      "*Assumed Executory Contracts and Unexpired Leases Schedule*" means the schedule of Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, which shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

10.     "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

11.     "*Backstop*" means the several and not joint backstop in full of the Rights Offering by the Backstop Parties pursuant to the Backstop Commitment Agreement.

12.     "*Backstop Allocations*" has the meaning set forth in Article IV.E.1 of the Plan.

13.     "*Backstop Commitment Agreement*" means that certain Backstop Commitment Agreement, dated as of June 28, 2020, by and between Chesapeake and the Backstop Parties, as may be further amended, modified, or supplemented from time to time, in accordance with its terms.

14.     "*Backstop Commitment Agreement Approval Order*" means the *Order (I) Authorizing Entry into the Backstop Commitment Agreement, (II) Approving the Payment of Fees and Expenses Related Thereto, and (III) Granting Related Relief* entered by the Bankruptcy Court on August 21, 2020 at CM/ECF No. 899 in the Chapter 11 Cases.

15.     "*Backstop Parties*" means the members of the FLLO Ad Hoc Group and Franklin that are signatories to the Backstop Commitment Agreement.

16.     "*Backstop Party Rights*" means the non-certificated rights that will enable the holders thereof to purchase shares of New Common Stock at an aggregate purchase price of $150 million at a price per share to be determined based on a 35 percent discount to the equity value per share of New Common Stock, post new-money, as implied by a Plan total enterprise value of $3.25 billion.

17.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

18.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas.

19.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each, as amended from time to time.

20.     "*Bar Date*" means the date established by the Bankruptcy Court by which Proofs of Claim or Proofs of Interest must be Filed with respect to such Claims or Interests, other than Administrative Claims, Claims held by Governmental Units, or other Claims or Interests for which the Bankruptcy Court entered an order excluding the holders of such Claims or Interests from the requirement of Filing Proofs of Claim or Proofs of Interest.

21.     "*Business Day*" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the State of New York.

22.     "*Cash*" means cash in legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items.

23.     "*Cause of Action*" or "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

24.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

25.     "*Chesapeake*" means Chesapeake Energy Corporation or any successor or assign, by merger, consolidation, or otherwise, prior to the Effective Date.

26.     "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

27.     "*Claims and Balloting Agent*" means Epiq Corporate Restructuring, LLC, the notice, claims, and solicitation agent retained by the Debtors in the Chapter 11 Cases.

28.     "*Claims Register*" means the official register of Claims maintained by the Claims and Balloting Agent.

29.     "*Class*" means a class of Claims or Interests as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

30.     "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

31.     "*Collateral Agreement*" means that certain Collateral Agreement dated December 19, 2019 by and between MUFG Union Bank, N.A., as collateral trustee, Chesapeake, and certain of the other Debtors.

32.     "*Collateral Trust Agreement*" means that certain Collateral Trust Agreement dated December 19, 2019 by and between MUFG Union Bank, N.A., as collateral trustee and revolver agent, and GLAS USA LLC, as original term loan agent, and as acknowledged and agreed by certain of the Debtors (as from time to time amended and restated).

33.     "*Collateral Trust Documents*" means collectively, the Collateral Agreement, the Collateral Trust Agreement, and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents (including any amendments, restatements, supplements, or modifications of any of the foregoing), related to or executed in connection with the Collateral Agreement and the Collateral Trust Agreement.

34.     "*Collateral Trustee*" means MUFG Union Bank, N.A., in its capacity as collateral trustee under the Collateral Agreement and the Collateral Trust Agreement.

35.     "*Conditions Precedent to the Effective Date*" means the conditions precedent to the Effective Date set forth in Article IX.A of the Plan.

36.     "*Conditions Precedent to the Exit Facilities*" means the conditions precedent to the closing of the Exit Facilities identified on Exhibit D to the Exit Facilities Term Sheet.

37.     "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

38.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

39.     "*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court on confirmation of the Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

40.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

41.     "*Consenting DIP Lenders*" means those certain DIP Lenders that are or have become parties to the Restructuring Support Agreement.

42.     "*Consenting FLLO Term Loan Facility Lenders*" means those certain FLLO Term Loan Facility Lenders that are or have become parties to the Restructuring Support Agreement.

43.     "*Consenting Revolving Credit Facility Lenders*" means those certain Revolving Credit Facility Lenders that are or have become parties to the Restructuring Support Agreement.

44.     "*Consenting Second Lien Noteholders*" means Second Lien Noteholders, investment advisors thereto, sub-advisors thereto, or managers of discretionary accounts belonging to Second Lien Noteholders that are or have become parties to the Restructuring Support Agreement.

45.     "*Consenting Stakeholders*" means collectively, the Consenting DIP Lenders, the Consenting Revolving Credit Facility Lenders, the Consenting FLLO Term Loan Facility Lenders, and the Consenting Second Lien Noteholders.

46.     "*Consenting Unsecured Noteholders*" means Unsecured Noteholders, investment advisors thereto, sub-advisors thereto, or managers of discretionary accounts belonging to Unsecured Noteholders that are or have become parties to the Restructuring Support Agreement.

47.     "*Consummation*" means the occurrence of the Effective Date as to the applicable Debtor.

48.      "*Convenience Claim*" means any Allowed General Unsecured Claim (i) that is Allowed in an amount greater than $0 but less than or equal to $1,000,000.00; and (ii) for which the holder of such Claim irrevocably elects via a Convenience Claim Election Form to have such Claim treated as a Convenience Claim (upon Allowance) for the purposes of the Plan, in full and final satisfaction of such Claim; *provided* that a holder of a General Unsecured Claim in excess of $1,000,000.00 may irrevocably elect via a Convenience Claim Election Form to have such Claim irrevocably reduced to $1,000,000.00 and treated as a Convenience Claim (upon Allowance) for the purposes of the Plan, in full and final satisfaction of such Claim.

49.      "*Convenience Claim Election Form*" means the form to be distributed by the Claims and Balloting Agent to each holder of a General Unsecured Claim as soon as reasonably practicable after the Effective Date.

50.      "*Convenience Claim Distribution*" means each Convenience Claim's *Pro Rata* share of $10,000,000.00, which *Pro Rata* share shall not exceed 5 percent of such Convenience Claim.

51.      "*Convenience Claim Distribution Reserve*" means an interest bearing account funded by the Reorganized Debtors with Cash on the Effective Date in an amount equal to $10,000,000.00.

52.      "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon the Debtors' defaults on an Executory Contract or Unexpired Lease at the time such Executory Contract or Unexpired Lease is assumed by the Debtors pursuant to section 365 of the Bankruptcy Code, other than with respect to a default that is not required to be cured under section 365(b)(2) of the Bankruptcy Code.

53.      "*D&O Liability Insurance Policies*" means all insurance policies issued to or providing coverage at any time to any of the Debtors for directors', managers', and officers' liability existing as of the Petition Date (including any "tail policy") and all agreements, documents, or instruments relating thereto.

54.      "*Definitive Documents*" means, without limitation, the following documents:  (a) the Plan and its exhibits, ballots, and solicitation procedures; (b) the Confirmation Order; (c) the Disclosure Statement; (d) the Disclosure Statement Order; (e) the First Day Pleadings and all orders sought pursuant thereto; (f) the Plan Supplement; (g) the DIP Order, DIP Credit Agreement, and any and all other DIP Documents and related documentation; (h) the Backstop Commitment Agreement, Backstop Commitment Agreement Approval Order, Rights Offering Procedures, Registration Rights Agreement and any and all documentation required to implement, issue, and distribute the New Common Stock; (i) the New Warrants Agreements; (j) the Exit Facilities Documents and related documentation; (k) the Management Incentive Plan; (l) the New Organizational Documents and all other documents or agreements for the governance of Reorganized Chesapeake, including the list of directors of Reorganized Chesapeake and any certificates of incorporation and shareholders' agreements or supplements as may be reasonably necessary or advisable to implement the Restructuring Transactions; and (m) such other agreements and documentation reasonably desired or necessary to consummate and document the transactions contemplated by the Plan.

55.      "*DIP Agent*" means MUFG Union Bank, N.A., in its capacity as administrative agent and collateral agent under the DIP Credit Agreement.

56.      "*DIP Agent Fees and Expenses*" has the meaning ascribed to such term in the DIP Order.

57.      "*DIP Claims*" means all Claims derived from, based upon, or secured pursuant to the DIP Credit Agreement or DIP Order, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, professional fee reimbursements, transaction fees, Superpriority Hedge Claims, and other charges arising thereunder or related thereto, in each case, with respect to the DIP Facility; *provided* that any Adequate Protection Super-Priority Claims (as defined in the Final DIP Order), including such Claims granted in respect of the Revolving Credit Facility, FLLO Term Loan Facility, or Second Lien Notes authorized in the DIP Order, shall not be DIP Claims.

58. "*DIP Credit Agreement*" means that certain Senior Secured Super-Priority Debtor-In-Possession Credit Agreement dated July 1, 2020, between Chesapeake Energy Corporation, as borrower, the Debtor guarantors that are party thereto, the DIP Lenders, and the DIP Agent (as may be amended, supplemented, or otherwise modified from time to time).

59. "*DIP Documents*" means collectively, the DIP Credit Agreement and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents (including any amendments, restatements, supplements, or modifications of any of the foregoing), related to or executed in connection with the DIP Credit Agreement.

60. "*DIP Facility*" means that certain debtor-in-possession financing facility documented pursuant to the DIP Documents and DIP Order.

61. "*DIP Lenders*" means the lenders party to the DIP Credit Agreement.

62. "*DIP Order*" means collectively, the Interim DIP Order and the Final DIP Order.

63. "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto.

64. "*Disclosure Statement Order*" means an order of the Bankruptcy Court approving the Disclosure Statement, the Solicitation Materials, and the solicitation of the Plan.

65. "*Disputed*" means, as to a Claim or an Interest, any Claim or Interest: (a) that is not Allowed; (b) that is not disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable; (c) as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy law; (d) that is Filed in the Bankruptcy Court and not withdrawn, as to which a timely objection or request for estimation has been Filed; and (e) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

66. "*Distribution Record Date*" means, other than with respect to publicly held Securities, the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be on or before the Effective Date. For the avoidance of doubt, no distribution record date shall apply to holders of public Securities, including the Second Lien Notes and the Unsecured Notes.

67. "*DTC*" means the Depository Trust Company.

68. "*Effective Date*" means, as to the applicable Debtor, the date that is the first Business Day on which (a) no stay of the Confirmation Order is in effect and (b) all Conditions Precedent to the Effective Date have been satisfied or waived in accordance with Article IX.B of the Plan. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

69. "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

70. "*Estate*" means as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code upon the commencement of such Debtor's Chapter 11 Case.

71. "*Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*, as amended from time to time, and the rules and regulations promulgated thereunder.

72.     "*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) any official committees appointed in the Chapter 11 Cases and each of their respective members; (c) the DIP Lenders; (d) the Exit Facilities Lenders; (e) the Consenting Revolving Credit Facility Lenders; (f) the Consenting FLLO Term Loan Facility Lenders; (g) the Consenting Second Lien Noteholders; (h) the Consenting Unsecured Noteholders; (i) the Agents; (j) each Trustee; (k) the Backstop Parties; and (l) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders, subsidiaries, participants, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

73.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

74.     "*Existing Equity Interest*" means an Interest in Chesapeake Energy Corporation existing as of the Petition Date.

75.     "*Existing RBL Adequate Protection Payments*" has the meaning ascribed to such term in the DIP Order.

76.     "*Exit Facilities*" means collectively, the Exit RBL Facility and Exit FLLO Term Loan Facility.

77.     "*Exit Facilities Agent*" means MUFG Union Bank, N.A., in its capacity as administrative agent for the Exit Facilities.

78.     "*Exit Facilities Credit Agreements*" means those certain credit agreements that will govern the Exit Facilities (as each may be amended, supplemented, or otherwise modified from time to time), in each case which shall be consistent with the Exit Facilities Term Sheet.

79.     "*Exit Facilities Documents*" means, collectively, the Exit Facilities Credit Agreements, and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any amendments to existing loan or other finance documentation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, in each case if any, the form and substance of which shall be consistent with the Exit Facilities Term Sheet.

80.     "*Exit Facilities Lenders*" means the lenders party to the Exit Facilities Credit Agreements.

81.     "*Exit Facilities Loans*" means collectively, the Tranche A RBL Exit Facility Loans, the Tranche B RBL Exit Facility Loans, and the Exit FLLO Term Loans.

82.     "*Exit Facilities Term Sheet*" means the term sheet setting forth the material terms of the Exit Facilities, attached as <u>Exhibit 3</u> to the Restructuring Term Sheet.

83.     "*Exit FLLO Term Loan*" means term loans made under and on the terms set forth under the Exit FLLO Term Loan Facility.

84.     "*Exit FLLO Term Loan Facility*" means the term loan facility to be provided in accordance with the terms set forth in the Exit Facilities Term Sheet.

85.     "*Exit RBL Facility*" means the revolving credit facility to be provided in accordance with the terms set forth in the Exit Facilities Term Sheet.

86.     "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

87.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

88.      "*Final DIP Order*" means the *Final Order (I) Authorizing The Debtors To Obtain Postpetition Financing, (II) Authorizing The Debtors To Use Cash Collateral, (III) Granting Liens And Providing Claims With Superpriority Administrative Expense Status, (IV) Granting Adequate Protection To The Existing Secured Parties, (V) Modifying The Automatic Stay, And (VI) Granting Related Relief* entered by the Bankruptcy Court on July 31, 2020 at CM/ECF No. 597 in the Chapter 11 Cases.

89.      "*Final Order*" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter that has not been reversed, stayed, modified, or amended, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order will not preclude such order from being a Final Order.

90.      "*First Day Pleadings*" means the pleadings and related documentation requesting certain emergency relief, or supporting the request for such relief, Filed by the Debtors on or around the Petition Date and heard at the "first day" hearing.

91.      "*FLLO Ad Hoc Group*" means the ad hoc group of FLLO Term Loan Facility Lenders represented by Davis Polk & Wardwell LLP.

92.      "*FLLO Professionals*" means the FLLO Term Loan Facility Administrative Agent's professionals (including Arnold & Porter Kaye Scholer LLP and one local counsel in the relevant jurisdiction), the Collateral Trustee's professionals (including Paul Hastings LLP), and the FLLO Ad Hoc Group's professionals (including Davis Polk & Wardwell LLP, Vinson & Elkins LLP, one local counsel in each other relevant local jurisdiction, and Perella Weinberg Partners LP).

93.      "*FLLO Rights*" means the non-certificated rights that will enable the holders thereof to purchase shares of New Common Stock at an aggregate purchase price of $382.5 million at a price per share to be determined based on a 35 percent discount to the equity value per share of New Common Stock, post new-money, as implied by a Plan total enterprise value of $3.25 billion.

94.      "*FLLO Term Loan Facility*" means the facility outstanding under the FLLO Term Loan Facility Credit Agreement.

95.      "*FLLO Term Loan Facility Administrative Agent*" means GLAS USA LLC, in its capacity as administrative agent for the FLLO Term Loan Facility.

96.      "*FLLO Term Loan Facility Claim*" means any Claim on account of the FLLO Term Loan Facility.

97.      "*FLLO Term Loan Facility Credit Agreement*" means that certain Term Loan Agreement, dated as of December 19, 2019 ((i) as supplemented by that certain Class A Term Loan Supplement, dated as of December 19, 2019 (as amended, restated or otherwise modified from time to time), by and among Chesapeake, as borrower, the Debtor guarantors party thereto, the FLLO Term Loan Facility Administrative Agent, and the lender parties thereto, and (ii) as further amended, restated, or otherwise modified from time to time), by and among Chesapeake, as borrower, the Debtor guarantors party thereto, the FLLO Term Loan Facility Administrative Agent, and the lenders party thereto.

98.      "*FLLO Term Loan Facility Lenders*" means lenders party to the FLLO Term Loan Facility Credit Agreement.

99.    "*Franklin*" means Franklin Advisers, Inc., as investment manager on behalf of certain funds and accounts.

100.    "*General Unsecured Claim*" means any Claim against any Debtor that is not otherwise paid in full during the Chapter 11 Cases pursuant to an order of the Bankruptcy Court and is not an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, an Other Secured Claim, a Revolving Credit Facility Claim, a FLLO Term Loan Facility Claim, a Second Lien Notes Claim, an Unsecured Notes Claim, an Intercompany Claim, or a Section 510(b) Claim.

101.    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

102.    "*Impaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

103.    "*Insurance Policies*" means all insurance policies, including all D&O Liability Insurance Policies, that have been issued at any time or provide coverage, benefits or proceeds to any of the Debtors (or their predecessors) and all agreements, documents or instruments relating thereto.

104.    "*Insurer*" means any company or other Entity that issued or entered into an Insurance Policy, any third party administrator of or for any Insurance Policy, and any respective predecessors, successors and/or affiliates of any of the foregoing.

105.    "*Intercompany Claim*" means any Claim held by a Debtor or an Affiliate against a Debtor or an Affiliate of a Debtor.

106.    "*Intercompany Interest*" means an Interest in a Debtor held by a Debtor or an Affiliate of a Debtor.

107.    "*Intercreditor Agreement*" means that certain Intercreditor Agreement dated as of December 19, 2019 by and between MUFG Union Bank, N.A., as Priority Lien Agent, and the Second Lien Notes Trustee, and as acknowledged and agreed by certain of the Debtors (as from time to time amended and restated).

108.    "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable Securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

109.    "*Interim DIP Order*" means the *Interim Order (I) Authorizing The Debtors To Obtain Postpetition Financing, (II) Authorizing The Debtors To Use Cash Collateral, (III) Granting Liens And Providing Claims With Superpriority Administrative Expense Status, (IV) Granting Adequate Protection To The Existing Secured Parties, (V) Modifying The Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief* entered by the Bankruptcy Court on June 29, 2020 at CM/ECF No. 128 in the Chapter 11 Cases.

110.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time.

111.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

112.    "*Management Incentive Plan*" has the meaning set forth in Article IV.Q of the Plan.

113.    "*Minimum Liquidity Condition*" means the Condition Precedent to the Effective Date that provides that the Debtors shall have minimum liquidity, including unrestricted cash on hand and availability under the Exit RBL Facility, of at least $500 million.

114. "*National Securities Exchange*" means The New York Stock Exchange, The Nasdaq Global Select Market, or The Nasdaq Global Market.

115. "*New Board*" means the board of directors of Reorganized Chesapeake that shall be appointed in accordance with the terms of the governance term sheet attached as <u>Exhibit 6</u> to the Restructuring Term Sheet.  The identities of directors on the New Board shall be set forth in the Plan Supplement, to the extent known.

116. "*New Class A Warrants*" means warrants to purchase 10 percent of the New Common Stock (after giving effect to the Rights Offering, but subject to dilution by the Management Incentive Plan, the New Class B Warrants, and the New Class C Warrants), with a term of 5 years at an initial exercise price per share struck at the equity value of Reorganized Chesapeake, post new-money, implied by a total enterprise value of $4.0 billion.

117. "*New Class B Warrants*" means warrants to purchase 10 percent of the New Common Stock (after giving effect to the Rights Offering, but subject to dilution by the Management Incentive Plan and the New Class C Warrants), with a term of 5 years at an initial exercise price per share struck at the equity value of Reorganized Chesapeake, post new-money, implied by a total enterprise value of $4.5 billion.

118. "*New Class C Warrants*" means warrants to purchase 10 percent of the New Common Stock (after giving effect to the Rights Offering, but subject to dilution by the Management Incentive Plan), with a term of 5 years at an initial exercise price per share struck at the equity value of Reorganized Chesapeake, post new-money, implied by a total enterprise value of $5.0 billion.

119. "*New Common Stock*" means the single class of common stock to be issued by Reorganized Chesapeake on the Effective Date on terms acceptable to the Required Plan Sponsors.

120. "*New Organizational Documents*" means the amended and restated or new charters, bylaws, operating agreements, or other organizational documents of Reorganized Chesapeake and the other Reorganized Debtors, as applicable and in form and substance satisfactory to the Required Plan Sponsors.

121. "*New Warrants*" means collectively, the New Class A Warrants, the New Class B Warrants, and the New Class C Warrants.

122. "*New Warrants Agreements*" means the documents or agreements governing the New Warrants, Filed with the Plan Supplement, which will be consistent in all material respects with the terms of this Plan and shall at all times be in form and substance reasonably acceptable to the Required Plan Sponsors and the Consenting Second Lien Noteholders holding at least 66.67% of the aggregate outstanding principal amount of the Second Lien Notes Claims that are held by the Consenting Second Lien Noteholders.

123. "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

124. "*Other Secured Claim*" means any Secured Claim other than a DIP Claim, Revolving Credit Facility Claim, a FLLO Term Loan Facility Claim, or a Second Lien Notes Claim.

125. "*PDP PV-10 Ratio*" means the ratio of (a) the total present value of the future net revenues expected with respect to the oil and gas properties of the Debtors discounted at 10% per annum, calculated in accordance with the Exit Facilities Term Sheet to (b) consolidated indebtedness under the Exit Credit Facilities and any other secured debt of Chesapeake as of the closing date of the Exit Credit Facilities.

126. "*PDP PV-10 Test Ratio Condition*" means the Condition Precedent to the Effective Date that provides that the Debtors shall have a PDP PV-10 Ratio no less than 1.5x.

127. "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

128. "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

10

129.    "*Plan Securities*" has the meaning set forth in Article IV.E.1 of the Plan.

130.    "*Plan Supplement*" means the compilation of documents and forms of documents, term sheets, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed prior on or before November 23, 2020, and any additional documents Filed prior to the Effective Date as amendments to the Plan Supplement, including the following, as applicable:  (a) the New Organizational Documents; (b) to the extent known, the identities of the members of the New Board; (c) the Assumed Executory Contracts and Unexpired Leases Schedule; (d) the Rejected Executory Contracts and Unexpired Leases Schedule; (e) the Schedule of Retained Causes of Action; (f) a summary of the material terms of the Exit Facilities, which may include the Exit Facilities Term Sheet; (g) the definitive documentation related to the Management Incentive Plan; (h) the Restructuring Transactions Memorandum; (i) the New Warrants Agreements; and (j) the Registration Rights Agreement.

131.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

132.    "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class, unless otherwise indicated; *provided* that, as used in Article III.B.6 and III.B.7, "*Pro Rata*" means the proportion that an Allowed Unsecured Notes Claim or Allowed General Unsecured Claim, as appropriate, bears to the aggregate amount of Allowed Unsecured Notes Claims and Allowed General Unsecured Claims that are not Convenience Claims; *provided*, *further*, that for the purpose of calculating the aggregate Allowed Unsecured Notes Claims and aggregate Allowed General Unsecured Claims for purposes of determining each Allowed Unsecured Notes Claim's and Allowed General Unsecured Claim's *Pro Rata* distribution, each Allowed Unsecured Notes Claim and Allowed General Unsecured Claim shall be counted once, notwithstanding the number of Debtors against which such claim may be asserted; *provided*, *further*, that for the purpose of calculating the Convenience Claim Distribution pursuant to Article III.B.7 of the Plan, "*Pro Rata*" means the proportion that the amount of a Convenience Claim bears to the aggregate amount of Convenience Claims.

133.    "*Professional*" means an Entity:  (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

134.    "*Professional Claim*" means a Claim by a professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

135.    "*Professional Fee Amount*" means the aggregate amount of Professional Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors as set forth in Article II.A.2(c) of the Plan.

136.    "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Reorganized Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount.

137.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases by the Claims Bar Date or the applicable Administrative Claims Bar Date, as applicable.

138.    "*Proof of Interest*" means a proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

139.      "*Put Option Premium*" means a nonrefundable aggregate fee of $60 million, which represents 10 percent of the Rights Offering Amount, payable to the Backstop Parties in accordance with, and subject to the terms of, the Backstop Commitment Agreement based on their respective Backstop commitment percentages at the time such payment is made.

140.      "*Registration Rights Agreement*" means the registration rights agreement pursuant to which each Backstop Party shall be entitled to registration rights with respect to its shares of New Common Stock, its New Warrants, and its shares of New Common Stock underlying its New Warrants to be entered into as of the Effective Date.  The Registration Rights Agreement will provide (among other provisions) that, after the Effective Date, at any time Reorganized Chesapeake is not required to file public reports with the SEC, Reorganized Chesapeake shall continue to file such public reports on EDGAR as a voluntary filer, unless approved by the holders of a majority of the outstanding New Common Stock.

141.      "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall not be discharged hereunder and the holder's legal, equitable, and contractual rights on account of such Claim or Interest shall remain unaltered by Consummation in accordance with section 1124(1) of the Bankruptcy Code.

142.      "*Rejected Executory Contracts and Unexpired Leases Schedule*" means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, which schedule shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time; *provided* that such schedule shall be in form and substance acceptable to the Required Consenting Stakeholders.

143.      "*Released Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each of the Debtors' current and former directors and officers; (d) each DIP Lender; (e) each Agent; (f) each Trustee; (g) the Consenting Revolving Credit Facility Lenders; (h) the Consenting FLLO Term Loan Facility Lenders; (i) the Consenting Second Lien Noteholders; (j) the Consenting Unsecured Noteholders; (k) the Exit Facilities Lenders; (l) the Backstop Parties; (m) all holders of Interests; and (n) with respect to each of the foregoing (a) through (m), each of such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, participants, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided* that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.

144.      "*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each DIP Lender; (d) each Agent; (e) each Trustee; (f) the Consenting Revolving Credit Facility Lenders; (g) the Consenting FLLO Term Loan Facility Lenders; (h) the Consenting Second Lien Noteholders; (i) the Consenting Unsecured Noteholders; (j) the Exit Facilities Lenders; (k) the Backstop Parties; (l) all holders of Claims; (m) all holders of Interests; (n) with respect to each of the foregoing (a) through (m), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, participants, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case, solely in their respective capacities as such with respect to such Entity and solely to the extent such Entity has the authority to bind such Affiliate in such capacity; *provided* that in each case, an Entity shall not be a Releasing Party if it:  (x) elects to opt out of the releases contained in the Plan; or (y) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.

145.      "*Removal Deadline*" means the deadline by which the Debtors may remove actions pursuant to 28 U.S.C. § 1452 and Bankruptcy Rule 9027, as amended by the Removal Extension Order.

146. "*Removal Extension Order*" means the *Order (I) Extending the Time Within Which the Debtors May Remove Actions and (II) Granting Related Relief* entered by the Bankruptcy Court on September 25, 2020 at CM/ECF No. 1231 in the Chapter 11 Cases.

147. "*Reorganized Debtors*" means collectively, a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Effective Date, including any new entity established in connection with the implementation of the Restructuring Transactions.

148. "*Reorganized Chesapeake*" means the new entity which shall be incorporated in the State of Delaware and will be the successor or assign to Chesapeake, by merger, consolidation, or otherwise, on or after the Effective Date.

149. "*Required Consenting DIP Lenders*" means Consenting DIP Lenders holding at least 51% of the aggregate Revolving DIP Loan Commitments under the DIP Facility that are held by Consenting DIP Lenders.

150. "*Required Consenting Revolving Credit Facility Lenders*" means Consenting Revolving Credit Facility Lenders holding at least 51% of the aggregate outstanding principal amount of the Revolving Credit Facility Claims that are held by Consenting Revolving Credit Facility Lenders.

151. "*Required Consenting Stakeholders*" means the Required Consenting DIP Lenders, the Required Consenting Revolving Credit Facility Lenders, and the Required Plan Sponsors.

152. "*Required Plan Sponsors*" means the Backstop Parties holding FLLO Term Loan Facility Claims and commitments to Backstop the Rights Offering such that the Required Plan Sponsors Percentage exceeds 66 2/3 percent.

153. "*Required Plan Sponsors Percentage*" means a fraction, expressed as a percentage, (a) the numerator of which shall be the sum of (i) the aggregate outstanding principal amount of FLLO Term Loan Facility Claims that are held by the relevant Backstop Parties and (ii) the percentage of the Backstop ascribed to the relevant Backstop Parties (as set forth in the Backstop Commitment Agreement) multiplied by the Rights Offering Amount; and (b) the denominator of which shall be the sum of (i) the aggregate outstanding principal amount of FLLO Term Loan Facility Claims that are held by all of the Backstop Parties and (ii) the Rights Offering Amount.

154. "*Restructuring Expenses*" means any reasonable and documented unpaid fees and expenses incurred on or before the Effective Date by the FLLO Professionals and the Second Lien Professionals payable on the Effective Date, subject to the conditions set forth in Article IV.U of the Plan; *provided* that reimbursement of the Second Lien Notes Trustee's financial advisor's fees and expenses shall be limited to $250,000 in the aggregate, and no Person shall be entitled to increase or seek to increase this $250,000 limit or use a charging lien or seek payment for such financial advisor's or any financial advisor to the Second Lien Notes Trustee's fees and expenses from any other source.

155. "*Restructuring Support Agreement*" means that certain restructuring support agreement, dated as of June 28, 2020, by and among the Debtors and the Consenting Stakeholders, as may be further amended, modified, or supplemented from time to time, in accordance with its terms.

156. "*Restructuring Term Sheet*" means the term sheet setting forth the material terms of the Restructuring Transactions, attached as Exhibit B to the Restructuring Support Agreement.

157. "*Restructuring Transactions*" means the transactions described in Article IV.B of the Plan.

158. "*Restructuring Transactions Memorandum*" means a document, in form and substance acceptable to the Required Consenting Stakeholders, to be included in the Plan Supplement that will set forth the material components of the Restructuring Transactions.

159. "*Revolving Credit Facility*" means the facility outstanding under the Revolving Credit Facility Credit Agreement.

160. "*Revolving Credit Facility Administrative Agent*" means MUFG Union Bank, N.A., in its capacity as administrative agent for the Revolving Credit Facility.

161. "*Revolving Credit Facility Claim"* means any Claim on account of the Revolving Credit Facility, other than any Claims converted to Roll-Up Loans (as defined in the Final DIP Order).

162. "*Revolving Credit Facility Credit Agreement"* means that certain Amended and Restated Credit Agreement, dated as of September 12, 2018 (as amended, restated, or otherwise modified from time to time), by and among Chesapeake, as borrower, the Debtor guarantors party thereto, the Revolving Credit Facility Administrative Agent, and the other lender, issuer, and agent parties party thereto.

163. "*Revolving Credit Facility Lenders*" means the lenders party to the Revolving Credit Facility Credit Agreement.

164. "*Revolving DIP Loan Commitment*" means a commitment to provide revolving loans under the DIP Facility.

165. "*Rights*" means collectively, the FLLO Rights, the Second Lien Rights, and the Backstop Party Rights.

166. "*Rights Offering*" means the New Common Stock rights offering for the Rights Offering Amount to be consummated by the Debtors on the Effective Date in accordance with the Rights Offering Procedures.

167. "*Rights Offering Amount*" means a minimum of $600 million in aggregate amount of Rights.

168. "*Rights Offering Participants*" means (a) holders of FLLO Term Loan Facility Claims and Second Lien Notes Claims as of the Rights Offering Record Date and (b) the Backstop Parties.

169. "*Rights Offering Procedures*" means the procedures governing the Rights Offering attached as an exhibit to the Disclosure Statement Order.

170. "*Rights Offering Record Date*" means the record date set by the Rights Offering Procedures, as of which date an Entity must be a record holder of FLLO Term Loan Facility Claims or Second Lien Notes Claims in order to be eligible to be a Rights Offering Participant.

171. "*Royalty and Working Interests*" means the working interests involving the right to exploit oil, gas, and other minerals, as well as royalty and certain other mineral interests, including, but not limited to, landowner's royalty interests, overriding royalty interests, net profit interests, non-participating royalty interests, and unleased mineral interests.

172. "*Royalty and Working Interests Administrative Claims*" means any postpetition, pre-Effective Date rights to payment arising on account of Royalty and Working Interests.

173. "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time.

174. "*Schedules*" means the schedules of assets and liabilities, schedules of Executory Contracts or Unexpired Leases, and statement of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules.

175. "*SEC*" means the United States Securities and Exchange Commission.

176.  "*Second Lien Noteholders*" means holders of notes issued under the Second Lien Notes Indenture.

177.  "*Second Lien Notes*" means the 11.500% senior notes due 2025 issued by Chesapeake pursuant to the Second Lien Notes Indenture.

178.  "*Second Lien Notes Claim*" means any Claim on account of the Second Lien Notes.

179.  "*Second Lien Notes Indenture*" means that certain indenture dated as of December 19, 2019, by and among Chesapeake, as issuer, certain Debtors guarantors party thereto, and the Second Lien Notes Trustee, as may be amended, supplemented, or otherwise modified from time to time.

180.  "*Second Lien Notes Trustee*" means Deutsche Bank Trust Company Americas, in its capacity as trustee and collateral trustee for the Second Lien Notes Indenture.

181.  "*Second Lien Professionals*" means the Second Lien Collateral Trustee's professionals (including Morgan, Lewis & Bockius LLP, one local counsel in the relevant jurisdiction, and one financial advisor) and Franklin's professionals (including Akin Gump Strauss Hauer & Feld LLP, Moelis & Company LLC, one local counsel in each other relevant local jurisdiction, and FTI Consulting, Inc.).

182.  "*Second Lien Rights*" means the non-certificated rights that will enable the holders thereof to purchase shares of New Common Stock at an aggregate purchase price of $67.5 million at a price per share to be determined based on a 35 percent discount to the equity value per share of New Common Stock, post new-money, as implied by a Plan total enterprise value of $3.25 billion.

183.  "*Section 510(b) Claim*" means any Claim or Interest against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code, whether by operation of law or contract.

184.  "*Secured*" means, when referring to a Claim: (a) secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

185.  "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

186.  "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

187.  "*Solicitation Materials*" means the Disclosure Statement and related documentation to be distributed to holders of Claims entitled to vote on the Plan.

188.  "*Superpriority Hedge Claims*" means superpriority claims in respect of the Debtors' Superpriority Hedge Obligations.

189.  "*Superpriority Hedge Obligations*" means all hedging obligations with respect to commodity hedge transactions that are secured under the DIP Facility.

190.  "*Total Leverage*" means the ratio of (a) consolidated indebtedness net of unrestricted Cash and Cash equivalents held in a pledged account in an amount not to exceed $100 million to (b) consolidated EBITDAX calculated in accordance with the terms set forth in the Exit Facilities Term Sheet.

191.  "*Total Leverage Condition*" means the Condition Precedent to the Effective Date that provides that the Debtors shall have Total Leverage no greater than 2.25:1.00.

192.     "*Tranche A RBL Exit Facility Loans*" means fully revolving loans made under and on the terms set forth under the Exit RBL Facility which will be partially funded on the Effective Date, will have a scheduled maturity of 3 years from the Effective Date, and shall at all times be repaid prior to the repayment of Tranche B Exit RBL Facility Loans.

193.     "*Tranche B RBL Exit Facility Loans*" means term loans made under and on the terms set forth under the Exit RBL Facility which will be fully funded on the Effective Date, will have a scheduled maturity of 4 years from the Effective Date, will be repaid or prepaid only after there are no Tranche A RBL Exit Facility Loans outstanding, and once so prepaid or repaid, may not be reborrowed.

194.     "*Trustee*" means any indenture trustee, collateral trustee, or other trustee or similar entity under the Second Lien Notes or the Unsecured Notes.

195.     "*Turnover Provisions*" has the meaning set forth in Article IV.A of the Plan.

196.     "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

197.     "*Unimpaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

198.     "*United States Trustee*" means the United States Trustee for the jurisdiction in which the Chapter 11 Cases are commenced.

199.     "*Unsecured Claims Recovery*" means 12% of the New Common Stock (subject to dilution on account of the Management Incentive Plan, the Rights Offering, the Put Option Premium, and the New Warrants) and 50 percent of the New Class C Warrants.

200.     "*Unsecured Noteholders*" means holders of notes issued under the Unsecured Notes Indentures.

201.     "*Unsecured Notes*" means the 6.625% senior notes due 2020, the 6.875% senior notes due 2020, the 6.125% senior notes due 2021, the 5.375% senior notes due 2021, the 4.875% senior notes due 2022, the 5.750% senior notes due 2023, the 7.000% senior notes due 2024, the 8.000% senior notes due 2025, the 8.000% senior notes due 2026, the 7.500% senior notes due 2026, the 8.000% senior notes due 2027, the 5.500% convertible senior notes due 2026, and the 6.875% senior notes due 2025, all issued by certain Debtors pursuant to the Unsecured Notes Indentures.

202.     "*Unsecured Notes Claim*" means any Claim on account of the Unsecured Notes.

203.     "*Unsecured Notes Indentures*" means those certain indentures dated as of the following dates: August 2, 2010 (6.625% senior notes due 2020); November 8, 2005 (6.875% senior notes due 2020); February 11, 2011 (6.125% senior notes due 2021); April 1, 2013 (5.375% senior notes due 2021); April 24, 2014 (4.875% senior notes due 2022); April 1, 2013 (5.750% senior notes due 2023); September 27, 2018 (7.000% senior notes due 2024); December 20, 2016 (8.000% senior notes due 2025); April 3, 2019 (8.000% senior notes due 2026); September 27, 2018 (7.500% senior notes due 2026); June 6, 2017 (8.000% senior notes due 2027); October 5, 2016 (5.500% convertible senior notes due 2026); and February 1, 2017 (6.875% senior notes due 2025), each by and among certain of the Debtors and the Unsecured Notes Trustees, as may be amended, supplemented, or otherwise modified from time to time.

204.    "*Unsecured Notes Trustees*" means the following entities, each in its capacity as trustee for the Unsecured Notes Indentures:  The Bank of New York Trust Company, N.A. (6.625% senior notes due 2020); The Bank of New York Trust Company, N.A. (6.875% senior notes due 2020); The Bank of New York Trust Company, N.A. (6.125% senior notes due 2021); Wilmington Savings Fund Society, FSB (5.375% senior notes due 2021); Wilmington Savings Fund Society, FSB (4.875% senior notes due 2022); Wilmington Savings Fund Society, FSB (5.750% senior notes due 2023); Wilmington Savings Fund Society, FSB (7.000% senior notes due 2024); Wilmington Savings Fund Society, FSB (8.000% senior notes due 2025); Wilmington Savings Fund Society, FSB (8.000% senior notes due 2026); Wilmington Savings Fund Society, FSB (7.500% senior notes due 2026); Wilmington Savings Fund Society, FSB (8.000% senior notes due 2027); Wilmington Savings Fund Society, FSB (5.500% convertible senior notes due 2026); and U.S. Bank National Association (6.875% senior notes due 2025).

B.      *Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with the Plan or Confirmation Order, as applicable; (4) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (15)  references to "Proofs of Claims," "holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "holders of Interests," "Disputed Interests," and the like, as applicable; (16) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (17) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; *provided* that nothing in this clause (2) or clause (3) shall affect any parties' consent rights over any of the Definitive Documents or any amendments thereto, as provided for in the Restructuring Support Agreement.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.      *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or the Reorganized Debtors, as applicable.

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan or Plan Supplement, the Confirmation Order shall control.

H.      *Consultation, Information, Notice, and Consent Rights.*

Notwithstanding anything herein to the contrary, any and all consultation, information, notice, and consent rights of the parties to the Restructuring Support Agreement, as set forth in the Restructuring Support Agreement (including the exhibits thereto), with respect to the form and substance of this Plan, all exhibits to the Plan, the Plan Supplement, and all other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and fully enforceable as if stated in full herein.

Failure to reference the rights referred to in the immediately preceding paragraph as such rights relate to any document referenced in the Restructuring Support Agreement shall not impair such rights and obligations.

Further, any and all consultation, information, notice, and consent rights of the DIP Agent, DIP Lenders, Revolving Credit Facility Administrative Agent, Revolving Credit Facility Lenders, Exit Facilities Agent, and Exit Facilities Lenders as set forth in the DIP Documents, DIP Order, and Exit Facilities Documents, as applicable, relating to the form and substance of this Plan, all exhibits to the Plan, the Plan Supplement, all other Definitive Documents, and any consents, waivers, or other rights under or from any such documents, shall be incorporated herein by this reference and fully enforceable as if stated in full herein.  Failure to reference such rights in specific provisions of this Plan shall not impair such rights and obligations.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, DIP CLAIMS, AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims, DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.    *Administrative Claims.*

1.    General Administrative Claims.

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors (with the consent of the Required Consenting Stakeholders) or the Reorganized Debtors, as applicable, or otherwise provided for under the Plan, each holder of an Allowed Administrative Claim (other than holders of Professional Claims, DIP Claims, and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim treatment consistent with section 1129(a)(2) of the Bankruptcy Code in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Except as otherwise provided in this Article II.A of the Plan, and except with respect to Administrative Claims that are Professional Claims or DIP Claims, requests for payment of Administrative Claims must be Filed with the Bankruptcy Court and served on the Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the applicable Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be Filed with the Bankruptcy Court and served on the requesting party no later than 60 days after the applicable Administrative Claims Bar Date.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed.

The Debtors shall indefeasibly pay in Cash all Existing RBL Adequate Protection Payments that have accrued and are unpaid as of the Effective Date pursuant to the terms of the DIP Order, and none of the Revolving Credit Facility Administrative Agent, the Revolving Credit Facility Lenders, or the Collateral Trustee shall be required to File a request for payment of an Administrative Claim with the Bankruptcy Court on account of such Existing RBL Adequate Protection Payments.  The Debtors' obligation to pay the Existing RBL Adequate Protection Payments, to the extent not indefeasibly paid in full in Cash on the Effective Date, shall survive the Effective Date and shall not be released or discharged pursuant to this Plan or the Confirmation Order until indefeasibly paid in full in Cash.

2.    Professional Compensation.

(a)    Final Fee Applications and Payment of Professional Claims.

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 45 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court.  The Reorganized Debtors shall pay Professional Claims in Cash

19

in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date.

      (b)     Professional Fee Escrow Account.

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount, which shall be funded by the Reorganized Debtors. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Allowed Professional Claims shall be paid in Cash to the Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Claims are Allowed. When such Allowed Professional Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

      (c)     Professional Fee Amount.

Professionals shall reasonably estimate their unpaid Professional Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Cases. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

      (d)     Post-Confirmation Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

B.     *DIP Claims.*

For the avoidance of doubt, the DIP Claims are Allowed in full in accordance with the DIP Order. Except to the extent that a holder of an Allowed DIP Claim agrees to less favorable treatment, on the Effective Date, each holder of an Allowed DIP Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for such holder's Allowed DIP Claims, payment in full in Cash from, at the Debtors' option, (1) the proceeds of the Exit Facilities available as of the Effective Date and consistent with the Exit Facilities Term Sheet; (2) the proceeds of the Rights Offering; and (3) Cash on hand; *provided* that to the extent that such DIP Lender is also an Exit Facility Lender, such DIP Lender's Allowed DIP Claims will first be reduced dollar-for-dollar and satisfied by the amount of its Exit Facilities Loans provided by such DIP Lender as of the Effective Date; *provided further* that Allowed Superpriority Hedge Claims, if any, shall be converted to secured obligations under the Exit Facilities Documents to the extent permitted under the terms of the documentation evidencing the Superpriority Hedge Claims. For the avoidance of doubt, the Debtors shall indefeasibly pay in cash all DIP Agent Fees and Expenses and non-contingent indemnity obligations owed to the DIP Agent or DIP Lenders that have accrued and are unpaid as of the Effective Date pursuant to the terms of the DIP Order. The Debtors' obligation to pay the DIP Agent Fees and Expenses and non-contingent indemnity obligations owed to the DIP Agent or DIP Lenders, to the extent not indefeasibly paid in full in Cash on the Effective Date, shall survive the Effective Date and shall not be released or discharged pursuant to this Plan or the Confirmation Order until indefeasibly paid in full in Cash.

Upon the final and indefeasible payment or satisfaction of the Allowed DIP Claims in accordance with this 0, all Liens and security interests granted to secure the Allowed DIP Claims shall automatically be terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

C.      *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

D.      *Statutory Fees.*

All monthly reports shall be filed in a form reasonably acceptable to the U.S. Trustee, and all fees due and payable pursuant to section 1930 of Title 28 of the United States Code before the Effective Date with respect to the Debtors shall be paid by the Debtors.  On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the United States Trustee.  Each Debtor shall remain obligated to pay quarterly fees to the United States Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

A.      *Classification of Claims and Interests.*

This Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in Article II hereof, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest fits within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Revolving Credit Facility Claims | Impaired | Entitled to Vote |
| Class 4 | FLLO Term Loan Facility Claims | Impaired | Entitled to Vote |
| Class 5 | Second Lien Notes Claims | Impaired | Entitled to Vote |
| Class 6 | Unsecured Notes Claims | Impaired | Entitled to Vote |
| Class 7 | General Unsecured Claims | Impaired | Entitled to Vote |

21

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| Class 8 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept / Deemed to Reject) |
| Class 9 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept / Deemed to Reject) |
| Class 10 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**B.**       *Treatment of Claims and Interests.*

Each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Allowed Interest, except to the extent less favorable treatment is agreed to by the Reorganized Debtors and the holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

1.    Class 1 – Other Secured Claims.

(a)      *Classification*:  Class 1 consists of all Other Secured Claims.

(b)      *Treatment*: On the Effective Date, each holder of an Allowed Other Secured Claim shall receive, at the Debtors' option and in consultation with the Required Consenting Stakeholders:

(i)       payment in full in Cash;

(ii)      the collateral securing its Allowed Other Secured Claim;

(iii)     Reinstatement of its Allowed Other Secured Claim; or

(iv)     such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)      *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

2.    Class 2 – Other Priority Claims.

(a)      *Classification*:  Class 2 consists of all Other Priority Claims.

(b)      *Treatment*:  Each holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code.

(c)      *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

3. <u>Class 3 – Revolving Credit Facility Claims</u>.

    (a)    *Classification*: Class 3 consists of all Revolving Credit Facility Claims.

    (b)    *Treatment*: On the Effective Date, the Revolving Credit Facility Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the Revolving Credit Facility, including all principal, any accrued and unpaid interest at the non-default rate, and all accrued and unpaid fees, expenses, and non-contingent indemnity payable under the Revolving Credit Facility. On the Effective Date, except to the extent the holder of an Allowed Revolving Credit Facility Claim agrees to less favorable treatment, each holder of an Allowed Revolving Credit Facility Claim shall receive, in accordance with such holder's prior determined allocation, either (i) Tranche A RBL Exit Facility Loans or (ii) Tranche B RBL Exit Facility Loans, on a dollar-for-dollar basis; *provided* that any Claims on account of accrued but unpaid Existing RBL Adequate Protection Payments shall be paid in full as Cash as set forth in Section II.A.1 of the Plan.

    (c)    *Voting*: Class 3 is Impaired under the Plan. Holders of Revolving Credit Facility Claims are entitled to vote to accept or reject the Plan.

4. <u>Class 4 – FLLO Term Loan Facility Claims</u>.

    (a)    *Classification*: Class 4 consists of all FLLO Term Loan Facility Claims.

    (b)    *Treatment*: On the Effective Date, the FLLO Term Loan Facility Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the FLLO Term Loan Facility, including all principal, accrued and unpaid interest at the applicable default rate, the make whole amount, and all accrued and unpaid fees, expenses, and non-contingent indemnity payable under the FLLO Term Loan Facility. On the Effective Date, each holder of an Allowed FLLO Term Loan Facility Claim shall receive its *Pro Rata* share of (i) 76 percent of the New Common Stock (subject to dilution on account of the Management Incentive Plan, the Rights Offering, the Put Option Premium, and the New Warrants) and (ii) the FLLO Rights.

    (c)    *Voting*: Class 4 is Impaired under the Plan. Holders of FLLO Term Loan Facility Claims are entitled to vote to accept or reject the Plan.

5. <u>Class 5 – Second Lien Notes Claims</u>.

    (a)    *Classification*: Class 5 consists of all Second Lien Notes Claims.

    (b)    *Treatment*: On the Effective Date, the Second Lien Notes Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the Second Lien Notes Indenture, including the aggregate outstanding principal amount of Second Lien Notes, any premium (including the Make-Whole Premium (as defined in the Second Lien Notes Indenture)), and accrued and unpaid interest. Each holder of an Allowed Second Lien Notes Claim shall receive its *Pro Rata* share of (i) 12 percent of the New Common Stock (subject to dilution on account of the Management Incentive Plan, the Rights Offering, the Put Option Premium, and the New Warrants), (ii) the Second Lien Rights, (iii) the New Class A Warrants, (iv) the New Class B Warrants, and (v) 50 percent of the New Class C Warrants.

    (c)    *Voting*: Class 5 is Impaired under the Plan. Holders of Second Lien Notes Claims are entitled to vote to accept or reject the Plan.

6.  <u>Class 6 – Unsecured Notes Claims</u>.

    (a)    *Classification*:  Class 6 consists of all Unsecured Notes Claims.

    (b)    *Treatment*:  On the Effective Date, the Unsecured Notes Claims shall be deemed Allowed in full, and each holder of an Allowed Unsecured Notes Claim shall receive its *Pro Rata* share of  the Unsecured Claims Recovery.

    (c)    *Voting*:  Class 6 is Impaired under the Plan.  Holders of Unsecured Notes Claims are entitled to vote to accept or reject the Plan.

7.  <u>Class 7 – General Unsecured Claims</u>.

    (a)    *Classification*:  Class 7 consists of all General Unsecured Claims.

    (b)    *Treatment*:  On the Effective Date, each holder of an Allowed General Unsecured Claim shall receive its *Pro Rata* share of the Unsecured Claims Recovery; *provided* that to the extent such Allowed General Unsecured Claim is a Convenience Claim, such Holder shall receive the Convenience Claim Distribution.

    (c)    *Voting*:  Class 7 is Impaired under the Plan.  Holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

8.  <u>Class 8 – Intercompany Claims</u>.

    (a)    *Classification*:  Class 11 consists of all Intercompany Claims.

    (b)    *Treatment*:  On the Effective Date, unless otherwise provided for under the Restructuring Transactions Memorandum, each Allowed Intercompany Claim shall have its Claim:

        (i)    Reinstated; or

        (ii)    distributed, contributed, set off, settled, canceled and released, or otherwise addressed at the option of the Debtors with the consent of the Required Consenting Stakeholders; *provided* that no distribution shall be made on account of any such Intercompany Claims.

    (c)    *Voting*:  Class 8 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 8 is not entitled to vote to accept or reject the Plan.

9. <u>Class 9 – Intercompany Interests</u>.

    (a)    *Classification*:  Class 9 consists of all Intercompany Interests.

    (b)    *Treatment*:  On the Effective Date, each holder of Intercompany Interests shall have such Interest:

        (i)    Reinstated; or

        (ii)    canceled, released, and extinguished without any distribution at the Debtors' election with the consent of the Required Consenting Stakeholders.

    (c)    *Voting*:  Class 9 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 9 is not entitled to vote to accept or reject the Plan.

10. <u>Class 10 – Existing Equity Interests</u>.

    (a)    *Classification*:  Class 10 consists of all Existing Equity Interests.

    (b)    *Treatment*:  On the Effective Date, each holder of Existing Equity Interests shall have such Interest cancelled, released, and extinguished without any distribution.

    (c)    *Voting*:  Class 10 is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 14 is not entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including, all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

D.    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.    *Voting Classes, Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

F.    *Intercompany Interests*.

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure for the ultimate benefit of the holders of New Common Stock, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims.

G.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan.  The Debtors reserve the right, subject to the prior consent of the Required Consenting Stakeholders, which shall not be unreasonably withheld, to modify the Plan in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H.      *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.      *Subordinated Claims and Interests.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Any such contractual, legal, or equitable subordination rights shall be settled, compromised, and released pursuant to the Plan.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *General Settlement of Claims and Interests.*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including (1) any challenge to the amount, validity, perfection, enforceability, priority or extent of the DIP Claims, Revolving Credit Facility Claims, FLLO Term Loan Facility Claims, Second Lien Notes Claims, and Unsecured Notes Claims and (2) any claim to avoid, subordinate, or disallow any DIP Claims, Revolving Credit Facility Claims, FLLO Term Loan Facility Claims, Second Lien Notes Claims, and Unsecured Notes Claims, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise, including, without limitation, any claim of subordination or turnover of any payments arising under any provision of the Intercreditor Agreement, including, but not limited to, any turnover provisions in sections 3.05, 4.02(l), 6.01 and 7.03 thereof, or the Collateral Trust Agreement, including sections 5.05, 6.02(o), 8.01, and 9.03 thereof (the "Turnover Provisions").  In consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the FLLO Term Loan Facility Lenders and Revolving Credit Facility Lenders shall conclusively, absolutely, irrevocably and forever waive any rights they have to seek subordination or turnover of any payments arising under any provision of the Intercreditor Agreement, including, but not limited to, the Turnover Provisions.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

26

B.      *Restructuring Transactions.*

On or before the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into and shall take any actions as may be necessary or appropriate to effect the Restructuring Transactions, including as set forth in the Restructuring Transactions Memorandum.  The Restructuring Transactions Memorandum shall be reasonably acceptable to the Required Consenting Stakeholders.  The actions to implement the Restructuring Transactions may include:  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; (4) the execution and delivery of the New Organizational Documents; (5) the execution and delivery of the Exit Facilities Documents (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees to be paid by the Debtors or the Reorganized Debtors, as applicable), subject to any post-closing execution and delivery periods provided for in the Exit Facilities Documents; (6) execution and delivery of the Registration Rights Agreement; (7) pursuant to the Rights Offering Procedures and the Backstop Commitment Agreement, the implementation of the Rights Offering, the distribution of the Rights to the Rights Offering Participants as of the Rights Offering Record Date, and the issuance of New Common Stock in connection therewith; (8) the issuance of the New Common Stock and the New Warrants as set forth in the Plan; and (9) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan.  The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan.  On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors, as applicable, shall issue all Securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring Transactions.

C.      *Midstream Savings Requirement.*

In the event that sufficient savings with respect to the Debtors' midstream contracts (as determined by the Required Plan Sponsors) are not achieved, unless the Debtors and the Required Consenting Stakeholders agree otherwise (but subject to the reasonable written consent of the DIP Agent and the Required Consenting DIP Lenders), certain of the Debtors' assets will be separated from the Debtors' remaining assets to the extent not inconsistent with 28 U.S.C. § 959(b).  The Debtors' restructuring will then be consummated with respect to the remaining assets, and the separated assets will be wound down in a manner agreed to by the Debtors and the Required Consenting Stakeholders.

D.      *Reorganized Debtors.*

On the Effective Date, the New Board shall be established, and the Reorganized Debtors shall adopt their applicable New Organizational Documents.  The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.  Cash payments to be made pursuant to the Plan will be made by the Debtors or Reorganized Debtors.  The Debtors and Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or Reorganized Debtors, as applicable, to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date agreement, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing, subject to the New Organizational Documents and the Exit Facilities Documents, as the boards of directors of the applicable Reorganized Debtors deem appropriate.

E.      *Sources of Consideration for Plan Distributions.*

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with: (1) Cash on hand, including Cash from operations or asset dispositions; (2) Cash proceeds from the sale of New Common Stock pursuant to the Rights Offering; (3) the New Common Stock; (4) the New Warrants; and (5) the proceeds of the Exit Facilities, as applicable.  Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Plan, including the New Common Stock and the Rights will be exempt from SEC registration to the fullest extent permitted by law, as described more fully in Article VI.D below.

1.      Rights Offering.

The Debtors shall distribute the Rights to the Rights Offering Participants on behalf of the Reorganized Debtors as set forth in the Plan and the Rights Offering Procedures.  Pursuant to the Backstop Commitment Agreement and the Rights Offering Procedures, the Rights Offering shall be open to all Rights Offering Participants, and (a) Rights Offering Participants that are holders of Allowed FLLO Term Loan Facility Claims shall be entitled to participate in the Rights Offering up to a maximum amount of each holder's *Pro Rata* share of the FLLO Rights; (b) Rights Offering Participants that are holders of Allowed Second Lien Notes Claims shall be entitled to participate in the Rights Offering up to a maximum amount of each holder's *Pro Rata* share of the Second Lien Rights; and (c) Rights Offering Participants that are Backstop Parties (or have certain rights and obligations of Backstop Parties pursuant to agreement of the parties to the Backstop Commitment Agreement) shall be entitled to participate in the Rights Offering up to a maximum amount of each holder's Backstop Party Rights.  Rights Offering Participants shall have the right to purchase their allocated shares of New Common Stock at the per share price set forth in the Backstop Commitment Agreement and the Rights Offering Procedures.

Upon exercise of the Rights by the Rights Offering Participants pursuant to the terms of the Backstop Commitment Agreement and the Rights Offering Procedures, Reorganized Chesapeake shall be authorized to issue the New Common Stock issuable pursuant to such exercise.

In exchange for the Put Option Premium and in accordance with the Backstop Commitment Agreement, the Backstop Parties have committed to fully backstop, severally and not jointly, the Rights Offering Amount.  Pursuant to the Backstop Commitment Agreement and the allocations contained therein (subject to the transfer rights and restrictions contained in the Backstop Commitment Agreement, the "Backstop Allocations"), the Backstop Parties shall, severally and not jointly, backstop the Rights Offering Amount, purchase the New Common Stock not subscribed for purchase by the Rights Offering Participants at the per share purchase price set forth in the Backstop Commitment Agreement and exercise the Backstop Party Rights. The Put Option Premium shall be paid by Chesapeake or Reorganized Chesapeake in accordance with the Backstop Commitment Agreement and Backstop Commitment Agreement Approval Order.  For the avoidance of doubt, if the Put Option Premium is payable in Cash pursuant to the terms and conditions set forth in the Backstop Commitment Agreement and Backstop Commitment Agreement Approval Order, the Put Option Premium shall be a superpriority administrative expense with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113, and 1114 of the Bankruptcy Code, or otherwise and including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code except it shall be unsecured and (i) be subordinated in priority to (a) the DIP Claims and (b) any adequate protection granted on account of the Revolving Credit Facility Claims (and any Claims to which such Claims in (a) or (b) are subordinate); and (ii) payable only after all such Claims set forth in clause (i) have been paid in full in Cash or provided such other treatment as is agreed to by the  requisite parties, as set forth in section 3.1 of the Backstop Commitment Agreement.

All shares of the New Common Stock, the New Warrants (and any shares of the New Common Stock issuable upon the exercise thereof), the Rights (and any shares issuable upon the exercise thereof other than the unsubscribed shares of New Common Stock issued to the Backstop Parties pursuant to the Backstop Commitment Agreement), and the shares issuable as part of the Put Option Premium (collectively, the "1145 Securities") will be issued in reliance

upon section 1145 of the Bankruptcy Code to the extent permitted under applicable law.  The unsubscribed shares of New Common Stock issued to the Backstop Parties pursuant to the Backstop Commitment Agreement (collectively, the "4(a)(2) Securities" and together with the 1145 Securities and any other Securities issued under the Plan, the "Plan Securities") will be issued in reliance upon section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.  Entry of the Confirmation Order shall constitute Bankruptcy Court approval of the Rights Offering (including the transactions contemplated thereby, and all actions to be undertaken, undertakings to be made, and obligations to be incurred by Reorganized Chesapeake in connection therewith).  On the Effective Date, the rights and obligations of the Debtors under the Backstop Commitment Agreement shall vest in the Reorganized Debtors, as applicable.

The proceeds of the Rights Offering shall be used by the Debtors or Reorganized Debtors, as applicable, to fund payments under the Plan and for general corporate and strategic purposes as determined by management.

2.    Rights and New Common Stock.

Reorganized Chesapeake shall be authorized to issue the Rights and the New Common Stock to certain holders of Claims pursuant to Article III.B.  Such New Common Stock shall be issued to Rights Offering Participants and/or Backstop Parties pursuant to the Rights Offering, the Backstop Commitment Agreement, and the New Organizational Documents.  Reorganized Chesapeake shall issue all securities, instruments, certificates, and other documents required to be issued by it with respect to all such shares of New Common Stock.  All such Rights and shares of New Common Stock, and any other shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

Prior to the Effective Date, the Required Plan Sponsors shall determine whether Reorganized Chesapeake shall use commercially reasonable efforts to (i) cause the New Common Stock to be listed on a National Securities Exchange on the Effective Date or to (ii) cause the New Common Stock to be listed on an Alternative Securities Exchange on the Effective Date or as soon as reasonably practicable thereafter, to engage a market maker for the New Common Stock and to take other reasonable steps to establish that the New Common Stock is regularly traded on an established securities market for purposes of section 897 under the Code and Treasury regulations promulgated and proposed to be promulgated thereunder.

3.    New Warrants.

On the Effective Date, Reorganized Chesapeake will issue the New Warrants to certain holders of Claims pursuant to Article III.B this Plan.  Issuances of the New Warrants shall be governed by the terms and conditions set forth in this Plan and the New Warrant Agreements applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating each such issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance without the need for execution by any party thereto other than the applicable Reorganized Debtor(s).  The New Warrants issued pursuant to the Plan and the shares of New Common Stock that may be issued upon exercise of the New Warrants shall be duly authorized, validly issued, fully paid, and non-assessable, without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors, as applicable.

4.    Exit Facilities.

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities (the terms of which will be set forth in the Exit Facilities Documents).

To the extent applicable, Confirmation of the Plan shall be deemed (a) approval of the Exit Facilities (including the transactions and related agreements contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), to the extent not approved by the Bankruptcy Court previously, and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents and agreements necessary or appropriate to pursue or obtain the Exit Facilities, including the Exit Facilities Documents, and incur and pay any fees and expenses in

connection therewith, and (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, may deem to be necessary to consummate the Exit Facilities.

As of the Effective Date, upon the granting or continuation of Liens in accordance with the Plan and the Exit Facilities Documents, such Liens shall constitute valid, binding, enforceable, and automatically perfected Liens in the collateral specified in the Exit Facilities Documents. The Exit Facilities Agent or holder(s) of Liens under the Exit Facilities Documents are authorized to file with the appropriate authorities mortgages, financing statements, and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests. The guarantees, mortgages, pledges, Liens, and other security interests granted to secure the obligations arising under the Exit Facilities Documents have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy law, and the priorities of such Liens and security interests shall be as set forth in the Exit Facilities Documents. The Reorganized Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

F.      *Convenience Claim Distribution Reserve.*

On the Effective Date, the Reorganized Debtors shall establish and fund the Convenience Claim Distribution Reserve with Cash in an amount equal to $10,000,000.00. The Convenience Claim Distribution Reserve shall be maintained in trust solely for holders of Convenience Claims. Such funds shall not be considered property of the Debtors or the Reorganized Debtors; *provided* that any funds remaining in the Convenience Claim Distribution Reserve after all Convenience Claim Distributions have been made shall be distributed to and vest in the Reorganized Debtors. Convenience Claims shall be paid in accordance with Article V1.A of the Plan.

G.      *Corporate Existence.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended, amended and restated, or replaced under the Plan or otherwise, including pursuant to the New Organizational Documents, and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended, amended and restated, or replaced pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law). After the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of the Reorganized Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. After the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

H.      *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Confirmation Order, the Plan (including, for the avoidance of doubt, the Restructuring Transactions Memorandum), or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Plan or Plan Supplement, on the Effective Date, all property in each

Estate that constitutes property of the Estate under section 541 of the Bankruptcy Code, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

Nothing in the Plan or the Confirmation Order shall operate as a finding or determination that funds (1) held by the Debtors or subject to their control and (2) to which any holder of a Royalty and Working Interest has asserted or may assert a right of entitlement or ownership on account of such Royalty and Working Interest, constitute property of any of the Estates under section 541 of the Bankruptcy Code or otherwise. All parties' rights with respect to such issue remain unaffected by Confirmation of the Plan and entry of the Confirmation Order.

I.      *Cancellation of Existing Securities and Agreements.*

On the Effective Date, except as otherwise provided in this Plan, all notes, instruments, certificates, credit agreements, indentures, security agreements, collateral agreements, and other documents evidencing Claims or Interests shall be cancelled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect. Holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, Securities, and other documentation, or the cancellation thereof, except the rights provided for or preserved pursuant to this Plan or the Confirmation Order.

Notwithstanding anything to the contrary herein, to the extent cancelled pursuant to this Plan, the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured Notes Indentures shall continue in effect solely to the extent necessary to: (1) permit holders of Claims under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured Notes Indentures to receive their respective Plan distributions, if any; (2) permit the Debtors or the Reorganized Debtors to make Plan distributions on account of the Allowed Claims under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured Notes Indentures; (3) permit the Agents and Trustees to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of the DIP Order, the DIP Credit Agreement, this Plan, and the Confirmation Order, as applicable; (4) allow the Agents and Trustees to enforce their rights, claims, and interests against any party other than the Debtors; (5) preserve any rights of the Agents and Trustees to payment of fees, expenses, and indemnification obligations as against any money or property distributable to holders of Claims under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured Notes Indentures, respectively, including any rights to priority of payment and/or to exercise charging liens; (6) permit the Agents and Trustees to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or an appellate court, including to enforce any obligation owed to the Agents and Trustees or other holders of Claims under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured Notes Indentures, as applicable; (7) preserve the rights and obligations of the parties under the Exit Facilities Documents, as applicable; and (8) allow the Agents and Trustees to maintain any right of indemnification, contribution, or subrogation under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured Notes Indentures.

Except as provided in this Plan, on the Effective Date, the Agents and Trustees, and their respective agents, successors, and assigns, shall be automatically and fully discharged of all of their duties and obligations associated with the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured Notes Indentures, as applicable. To the extent cancelled in accordance with this Plan, the commitments and obligations (if any) of the holders under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured

Notes Indentures to extend any further or future credit or financial accommodations to any of the Debtors, any of the Debtors' respective subsidiaries, or any of the Debtors' respective successors or assigns under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured Notes Indentures, as applicable, shall fully terminate and be of no further force or effect on the Effective Date.

*J.*     *Corporate Action.*

        Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including: (1) implementation of the Restructuring Transactions, including the Rights Offering; (2) selection of the directors and officers for the Reorganized Debtors; (3) the issuance and distribution of the New Common Stock in accordance with the Plan, including all shares of New Common Stock issued by Reorganized Chesapeake to the Backstop Parties as part of the Put Option Premium and the unsubscribed shares of New Common Stock issued to Backstop Parties pursuant to the Backstop Commitment Agreement; (4) issuance and distribution of the Rights and subsequent issuance and distribution of New Common Stock issuable upon exercise of such Rights; (5) execution and delivery of the Registration Rights Agreement; (6) issuance and distribution of the New Warrants and entry into the New Warrants Agreements; (7) entry into the Exit Facilities Documents; (8) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (9) approval and adoption of the New Organizational Documents; (10) entry into the Management Incentive Plan; (11) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (12) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, members, directors, or officers of the Debtors or the Reorganized Debtors, as applicable.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Common Stock, Rights, the Registration Rights Agreement, the Management Incentive Plan, the New Warrants and the New Warrants Agreements, the New Organizational Documents, the Exit Facilities Documents, and any and all other agreements, documents, Securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by this Article IV.J shall be effective notwithstanding any requirements under non-bankruptcy law.

*K.*     *New Organizational Documents.*

        On or immediately prior to the Effective Date, the New Organizational Documents shall be automatically adopted by the applicable Reorganized Debtors.  To the extent required under the Plan or applicable non-bankruptcy law, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state if and to the extent required in accordance with the applicable laws of the respective state.  The New Organizational Documents will (i) prohibit the issuance of non-voting equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code; (ii) with respect to the New Organizational Documents of Reorganized Chesapeake, authorize the issuance of New Common Stock in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by this Plan (including as a result of the exercise of New Warrants); and (iii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate this Plan and the transactions contemplated herein. The New Organizational Documents shall also provide for the indemnification and exculpation of directors, officers and appropriate persons to the fullest extent permitted by applicable law.

        If requested by the Required Consenting Stakeholders before the Effective Date, the New Organizational Documents will include transfer restrictions designed to limit an ownership change for purposes of section 382 of the Code or otherwise the Debtors or Reorganized Debtors, as applicable, may adopt and implement a stockholder rights plan designed for such purpose, in each case effective upon the Effective Date.

The New Organizational Documents of Reorganized Chesapeake shall also provide that until such time as the New Common Stock is listed on a National Securities Exchange the Reorganized Debtors shall not, without the approval of the holders of the majority of outstanding New Common Stock: (i) issue shares of New Common Stock in excess of 5% of the fully-diluted number of shares of New Common Stock outstanding and authorized for issuance under the Plan on the Effective Date (including all shares contemplated under the claims recovery, the New Warrants, the Rights Offering, the Backstop Commitment Agreement and the Management Incentive Plan) or authorize or issue any shares of preferred stock; *provided* that this limitation shall not apply in connection with the adoption of a bona fide stockholder rights plan by Reorganized Chesapeake's board of directors; (ii) enter into any sales, transfers or licenses of any Reorganized Chesapeake subsidiary, division, operation, business, line of business, assets or property, in each case, held by Reorganized Chesapeake or any of its subsidiaries with any person other than Reorganized Chesapeake or one or more of its wholly-owned subsidiaries involving consideration in excess of $50,000,000 per transaction or series of related transactions; or (iii) make any acquisition, by merger, consolidation or stock or asset purchase or investment with respect to any business, assets, property or any corporation or other entity, involving consideration in excess of $50,000,000 per transaction or series of related transactions.

On or after the Effective Date, the Reorganized Debtors may amend, amend and restate or modify their respective New Organizational Documents in accordance with the terms thereof, and the Reorganized Debtors may file such amended, amended and restated or modified certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of their respective state of incorporation and the New Organizational Documents.

L.      *Indemnification Obligations.*

Consistent with applicable law, all indemnification provisions in place as of the Effective Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, the DIP Order, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, the DIP Agent, the DIP Lenders, the Revolving Credit Facility Agent, the Consenting Revolving Credit Facility Lenders, the Consenting FLLO Term Loan Facility Lenders, the Collateral Trustee, the Second Lien Notes Trustee, the Consenting Second Lien Noteholders, and the Consenting Unsecured Noteholders, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, the DIP Agent, the DIP Lenders, the Revolving Credit Facility Agent, the Consenting Revolving Credit Facility Lenders, the Consenting FLLO Term Loan Facility Lenders, the Collateral Trustee, the Second Lien Notes Trustee, the Consenting Second Lien Noteholders, and the Consenting Unsecured Noteholders, as applicable, than the indemnification provisions in place prior to the Effective Date.

M.      *Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, the terms of the current members of the board of directors of Chesapeake shall expire and the new directors and officers of the Reorganized Chesapeake shall be appointed. The identities of directors on the New Board shall be set forth in the Plan Supplement to the extent known at the time of Filing. Each member of the New Board will serve from and after the Effective Date pursuant to applicable law and the terms of the New Organizational Documents. The existing boards of directors and other governing bodies of the other Reorganized Debtors will be deemed to have resigned on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity.

Corporate governance for Reorganized Chesapeake, including charters, bylaws, operating agreements, or other organization documents, as applicable, shall be consistent with section 1123(a)(6) of the Bankruptcy Code and the New Organizational Documents.

N.      *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers (as applicable), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities,

instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, Exit Facilities entered into, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

O.       *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors, including the New Common Stock and the New Warrants (including the New Common Stock that may be issuable upon exercise of the New Warrants); (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for the Reorganized Debtors' obligations under and in connection with the Exit Facilities; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

P.       *Director and Officer Liability Insurance.*

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to sections 105 and 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the unexpired D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

Q.       *Management Incentive Plan.*

On the Plan Effective Date, the Reorganized Debtors shall adopt a management incentive plan (the "Management Incentive Plan"). All grants under the Management Incentive Plan shall be determined at the sole discretion of the New Board including, without limitation, with respect to the participants, allocation, timing, and the form and structure of the options, warrants, and/or equity compensation to be provided thereunder and taking into account market compensation levels and historical equity compensation structures.

R.      *Employee Benefits.*

Unless otherwise provided herein, and subject to Article V hereof, all wages, compensation, and benefits programs, including executive compensation programs and any motions in the Bankruptcy Court for the approval thereof, will be continued according to existing terms and practices.  On the Effective Date, the Debtors shall (1) assume all employment agreements, indemnification agreements, or other agreements entered into with current and former employees; or (2) enter into new agreements with such employees on terms and conditions acceptable to the Debtor and such employee.   Notwithstanding the foregoing, any employment agreements or other employment-related agreements that provide for any acceleration or enhancement of payments (including severance payments), vesting, benefits, or other rights in connection with a transaction that constitutes a change in control, change of control, or similar concept under such agreements, shall only be assumed if and to the extent that the Debtors, with the consent of the Required Plan Sponsors, obtain waivers specifying that the consummation of the Restructuring Transactions shall not trigger any such rights under such agreements.

For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

Notwithstanding the foregoing, on the Effective Date, the Debtors may enter into new arrangements with employees on terms and conditions acceptable to the Debtors, the Required Plan Sponsors, and such employee.

S.      *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than: (i) the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII hereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date; and (ii) all Causes of Action that arise under sections 544, 547, 548, and 549 of the Bankruptcy Code and state fraudulent conveyance law.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII hereof.  Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date.  Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor, without the need for any objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.**  The Reorganized Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court.  If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or Reorganized Debtors, as applicable, and the objection party for thirty (30) days, such objection shall be resolved by the Bankruptcy Court.  Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII hereof.  The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

T.      *Preservation of Royalty and Working Interests.*

Notwithstanding any other provision in the Plan, on and after the Effective Date, all Royalty and Working Interests shall remain in full force and effect in accordance with the terms of the granting instruments or other governing documents applicable to such Royalty and Working Interests.

Royalty and Working Interests shall not be modified, affected or impaired in any manner by any provision of the Plan or the Confirmation Order, including but not limited to any injunctive or stay relief, and the legal and equitable rights, interests, defenses, and obligations of holders of Royalty and Working Interests, with respect to such Royalty and Working Interests, shall not be modified, affected or impaired in any manner by the provisions of the Plan or the Confirmation Order; *provided* that, to the extent applicable, any Other Secured Claims, General Unsecured Claims, or Administrative Claims of holders of Royalty and Working Interests shall be treated in accordance with Articles II and III hereof.  Nor shall the Plan or the Confirmation Order modify, affect or impair the rights and defenses of the Debtors or the Reorganized Debtors with respect to the Royalty and Working Interests.  The Debtors' and the Reorganized Debtors' rights to dispute the amounts owing on account of Royalty and Working Interests and to assert that prepetition Claims for such amounts have been discharged by the Plan or the Confirmation Order are expressly preserved and reserved.  Nothing in this Plan or the Confirmation Order shall be deemed a finding or determination as to whether any such amount owed by the Debtors or the Reorganized Debtors on account of Royalty and Working Interests is a Claim or a specific type of Claim, if the amount has been discharged, or to what extent (if any) funds held by the Debtors or the Reorganized Debtors or subject to their control, with respect to which funds any holder of a Royalty and Working Interest has asserted or may assert a right of entitlement or ownership on account of such Royalty and Working Interest, constitute property of any of the Estates under section 541 of the Bankruptcy Code or otherwise; *provided*, *however*, that any determination with respect to the foregoing shall be made by the Bankruptcy Court.  All parties' rights are preserved and reserved with respect to such findings or determinations; *provided* that, to the extent applicable, any Administrative Claims, Other Secured Claims or General Unsecured Claims of holders of Royalty and Working Interests on account of Royalty and Working Interests shall be treated in accordance with Article II or III hereof, as appropriate.

Notwithstanding anything in the Plan or the Confirmation Order to the contrary, the Debtors or the Reorganized Debtors shall continue paying all undisputed amounts owing on account of Royalty and Working Interests, including with respect to suspense funds as and when reconciled, in the ordinary course of business and in accordance with all applicable agreements and laws.

Nothing in the Plan or the Confirmation Order shall affect the Debtors' or the Reorganized Debtors' obligations to comply with all federal, state and local laws, rules and regulations with respect to Royalty and Working Interests and holders thereof, including, without limitation, laws, rules and regulations regarding inspection of books and records and segregation or escrow of funds or production proceeds belonging and/or payable to holders of Royalty and Working Interests.

U.      *Resolution of Pending Litigation.*

The Debtors may remove to the Bankruptcy Court by the Removal Deadline any litigation pending as of the Petition Date that alleges claims or causes of action that, if successful, would not result in a Claim.  Notwithstanding the foregoing, (i) pending litigation alleging personal injury claims or causes of action, (ii) pending litigation for which the automatic stay has been lifted pursuant to section 362 of the Bankruptcy Code, and (iii) any litigation not removed

by the Removal Deadline shall proceed to final judgment in the jurisdiction in which such litigation was pending as of the Petition Date; *provided* that any Claim resulting from a final judgment in any such litigation shall be treated in accordance with the Plan.

V.      *Payment of Certain Fees.*

Without any further notice to or action, order, or approval of the Bankruptcy Court, the Debtors or the Reorganized Debtors, as applicable, shall pay on the Effective Date the Restructuring Expenses, subject to the conditions set forth in this Article IV.U of the Plan.  The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the Restructuring Support Agreement, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least five (5) Business Days before the anticipated Effective Date or such later time as required by the Debtors; *provided* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses.  On or as soon as practicable after the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.  In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay pre- and post-Effective Date Restructuring Expenses related to implementation, consummation, and defense of the Plan, whether incurred before, on, or after the Effective Date.  For the avoidance of doubt, nothing in this paragraph shall be deemed to impair, waive, discharge, or negatively impact or affect any rights of the FLLO Term Loan Facility Administrative Agent, the Collateral Trustee, and the Second Lien Notes Trustee to payment of fees, expenses, and indemnification obligations solely as against any money or property distributable to holders of Claims under the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, or the Second Lien Notes Indenture, as applicable, including any rights to priority of payment and/or to exercise charging liens.  Notwithstanding anything in the Plan, including Article IV.I hereof, reimbursement of the Second Lien Notes Trustee's financial advisor's fees and expenses shall be limited to $250,000 in the aggregate, and no Person shall be entitled to increase or seek to increase this $250,000 limit or use a charging lien or seek payment for such financial advisor's or any financial advisor to the Second Lien Notes Trustee's fees and expenses from any other source.

Without limiting the obligations of the Debtors or Reorganized Debtors to pay the DIP Agent Fees and Expenses and any fees, costs and expenses of the Exit Facilities Agent pursuant to the Exit Facilities Documents, the Reorganized Debtors shall pay all post-Effective Date expenses incurred by the DIP Agent and/or the Exit Facilities Agent related to implementation, consummation, and defense of the Plan, whether incurred on or after the Effective Date.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that are: (1) identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (2) previously expired or terminated pursuant to their own terms; (3) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (4) are the subject of a motion to reject that is pending on the Effective Date; or (5) have an ordered or requested effective date of rejection that is after the Effective Date.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumed Executory Contract and Unexpired Leases Schedule, or the Rejected Executory Contracts and Unexpired Leases Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy

37

Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right, with the consent of the Required Consenting Stakeholders, to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases Schedule and the Rejected Executory Contracts and Unexpired Leases Schedule at any time up to forty-five (45) days after the Effective Date, so long as such allocation, amendment, modification, or supplement is consistent with the Restructuring Support Agreement.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.**  All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.7 of this Plan.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

Any monetary defaults under each Assumed Executory Contract or Unexpired Lease shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, or as soon as reasonably practicable thereafter, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

Any objection by a contract or lease counterparty to a proposed assumption of an Executory Contract or Unexpired Lease or the related cure cost (including as set forth on the Assumed Executory Contracts and Unexpired Leases Schedule) must be Filed, served, and actually received by the Debtors in accordance with the Disclosure Statement Order or other applicable Final Order of the Bankruptcy Court.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have consented to such assumption or proposed cure amount.  For the avoidance of doubt, to the extent an Executory Contract or Unexpired Lease proposed to be assumed is not listed as having a related cure cost, any counterparty to such Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption will be deemed to

have consented to such assumption and deemed to release any Claim or Cause of Action for any monetary defaults under such Executory Contract or Unexpired Lease.

For the avoidance of doubt, the Debtors or the Reorganized Debtors, as applicable, with the consent of the Required Consenting Stakeholders, may add any Executory Contract or Unexpired Lease proposed to be assumed to the Rejected Executory Contracts and Unexpired Leases Schedule in accordance with the time limits provided by the Plan for any reason, including if the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable cure notice or the Plan, in which case such Executory Contract or Unexpired Lease is deemed rejected as the Effective Date.

Assumption of any Executory Contract or Unexpired Lease shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption.  Any Proofs of Claim Filed with respect to an Assumed Executory Contract or Unexpired Lease shall be deemed disallowed, without further notice to or action, order, or approval of the Bankruptcy Court.

D.     *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

E.     *Insurance Policies.*

Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, any Plan Supplement, the Confirmation Order, the Restructuring Support Agreement, the Restructuring Term Sheet, any Bar Date notice or Claim objection, any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction, discharge or release, or confers Bankruptcy Court jurisdiction or requires a party to opt out of any releases):

(1) on the Effective Date the Reorganized Debtors shall be deemed to have assumed all unexpired Insurance Policies in their entirety pursuant to sections 105 and 365 of the Bankruptcy Code; (2) all unexpired Insurance Policies shall re-vest in the Reorganized Debtors, unaltered, other than that on and after the Effective Date, the Reorganized Debtors shall be liable for all debts, obligations, and liabilities of the Debtors (and, after the Effective Date, of the Reorganized Debtors) under the Insurance Policies, regardless of when such debts, obligations, and liabilities arise, without the need or requirement for any Insurer to file a Proof of Claim, an Administrative Claim, a Cure Claim or to object to any cure amount, and thereafter the Reorganized Debtors may, subject to the terms of the Insurance Policies and applicable non-bankruptcy law, resolve any Claims covered by the Insurance Policies, resolve any Causes of Action, if any, in connection with the Insurance Policies, and collect any and all outstanding deposits, restricted cash, and letters of credit, if any, related thereto; (3) nothing shall alter, modify, amend, affect, impair or prejudice the legal, equitable or contractual rights, obligations, and defenses of the Insurers, the Debtors (or, after the Effective Date, the Reorganized Debtors), or any other individual or entity, as applicable, under any Insurance Policies; and (4) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article VIII of the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Bankruptcy Court, solely to permit:  (I) claimants with valid workers' compensation claims or direct action claims against an Insurer under applicable non-bankruptcy law to proceed with their claims; (II) the Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against any Insurer under applicable non-bankruptcy law, or an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (C) all costs in relation to each of the foregoing; and (III) the Insurers to cancel any Insurance Policies, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the Insurance Policies.

F.      *Reservation of Rights.*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

G.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

H.      *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors in the ordinary course of their business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim or Interest is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), each holder of an Allowed Claim or Allowed Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims and Allowed Interests in the applicable Class.

With respect to holders of Allowed Unsecured Notes Claims and Allowed General Unsecured Claims other than Convenience Claims, each such holder shall receive from the Unsecured Claims Recovery (1) an initial distribution on account of such holder's Allowed Unsecured Notes Claim or General Unsecured Claim on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter); and (2) upon completion of the Claims reconciliation process, its *Pro Rata* share of the remaining Unsecured Claims Recovery.

With respect to holders of Convenience Claims, each such holder shall receive from the Convenience Claim Distribution Reserve (1) an initial distribution on account of such holder's Convenience Claim on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter); and (2) upon completion of the Claims reconciliation process, its *Pro Rata* share of the remaining Convenience Claim Distribution Reserve; *provided* that no Convenience Claim shall recover in excess of 5 percent of such Convenience Claim; *provided*, *further*, that any funds remaining in the Convenience Claim Distribution Reserve after all Convenience Claim Distributions have been made shall be distributed to and vest in the Reorganized Debtors.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII of the Plan.

B.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.    <u>Record Date for Distribution</u>.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date.  If a Claim, other than one based on a publicly traded Security or FLLO Term Loan Facility Claim, is transferred twenty (20) or fewer days before the Distribution Record Date, distributions shall be made to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

2.    <u>Delivery of Distributions in General</u>.

Except as otherwise provided herein, the Reorganized Debtors shall make distributions to holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date at the address for each such holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors and, with respect to distributions on account of FLLO Term Loan Facility Claims, the Required Plan Sponsors.

3.    <u>No Fractional Distributions</u>.

No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded to the next lower whole number with no further payment therefor; *provided*, *however*, that fractional shares rounding determination with respect to the Rights Offering shall be subject to the Rights Offering Procedures.  The total number of authorized shares of New Common Stock to be distributed to holders of Allowed Claims hereunder shall be adjusted as necessary to account for the foregoing rounding.

4.    <u>Minimum Distributions</u>.

Notwithstanding any other provision of the Plan, holders of Allowed Claims entitled to distributions of $5 or less shall not receive distributions, and each Claim to which this limitation applies shall be discharged pursuant to Article VIII of this Plan, and its holder shall be forever barred from asserting that Claim against the Reorganized Debtors or their property.

5.    <u>Undeliverable Distributions and Unclaimed Property</u>.

In the event that any distribution to any holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such holder shall be made unless and until the Reorganized Debtors have determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred.

6.    <u>Surrender of Canceled Instruments or Securities</u>.

On the Effective Date or as soon as reasonably practicable thereafter, each holder of a certificate or instrument evidencing a Claim or an Interest that has been cancelled in accordance with Article IV.I hereof shall be deemed to have surrendered such certificate or instrument to the Debtors.  Such surrendered certificate or instrument shall be

cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the holder of a Claim or Interest, which shall continue in effect for purposes of allowing holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights.

      7.   <u>Delivery of Distributions on Second Lien Notes Claims and Unsecured Notes Claims</u>.

The Debtors shall make all distributions required under the Plan. Notwithstanding any provision of the Plan to the contrary, distributions to holders of Second Lien Notes Claims and Unsecured Notes Claims shall be made to or at the direction of each of the Trustees for distribution under the applicable indentures and bond agreements. The Trustees may transfer or direct the transfer of such distributions directly through the facilities of the applicable securities depository and clearing house and will be entitled to recognize and deal with, for all purposes under the Plan, holders of Second Lien Notes Claims and Unsecured Notes Claims, as applicable, as is consistent with the ordinary practices of the applicable depositories. Such distributions shall be subject to the right of each of the Trustees under the applicable indenture or bond agreements, including their rights to assert and exercise charging liens against such distributions.

*C.*      *Manner of Payment.*

Except as otherwise set forth herein, all distributions of Cash, the New Common Stock, the New Warrants, and the Rights, as applicable, to Holders of Allowed Claims under the Plan shall be made by the Debtors or the Reorganized Debtors, as applicable. At the option of the Reorganized Debtors (in consultation with and subject to the reasonable consent of the Required Consenting Stakeholders), any Cash payment to be made under the Plan, if any, may be made by check or wire transfer or as otherwise required or provided in the applicable agreements.

*D.*      *Exemption from Securities Laws.*

All 1145 Securities will be issued in reliance upon section 1145 of the Bankruptcy Code to the extent permitted under applicable law. All 4(a)(2) Securities will be issued in reliance upon section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

Pursuant to section 1145 of the Bankruptcy Code, the issuances of the 1145 Securities are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration before the offering, issuance, distribution, or sale of such securities, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act. Each of the 1145 Securities (1) is not a "restricted security" as defined in Rule 144(a)(3) under the Securities Act; and (2) is freely tradable and transferable by any initial recipient thereof that at the time of transfer or as a result thereof, is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act.

The 4(a)(2) Securities will be issued without registration under the Securities Act in reliance upon Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder. To the extent issued in reliance on Section 4(a)(2) of the Securities Act or Regulation D thereunder, the 4(a)(2) Securities will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable law.

Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Common Stock (including any shares issuable as part of the Put Option Premium or issuable upon exercise of the Rights other than the unsubscribed shares of New Common Stock issued to the Backstop Parties pursuant to the Backstop Commitment Agreement) or the New Warrants (and any Shares of the New Common Stock issuable upon the exercise of the New Warrants) through the facilities of DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to such treatment under applicable securities laws.

DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether any of the New Common Stock issuable upon exercise of the Rights, as applicable, are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock issuable upon exercise of the Rights, as applicable, are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Each Backstop Party that receives Plan Securities will be entitled to registration rights and sale support rights with respect to all such Securities to be documented in the Registration Rights Agreement in form and substance satisfactory to the Required Plan Sponsors.

E.       *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Debtors, the Reorganized Debtors, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Debtors and Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and similar spousal awards, Liens, and encumbrances.

F.       *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to the remainder of the Claims, including any Claims for accrued but unpaid interest.

G.       *No Postpetition or Default Interest on Claims.*

Notwithstanding any provision in the Plan, the Confirmation Order, or any documents that govern the Debtors' prepetition funded indebtedness or other Claims to the contrary, except as provided in the DIP Order, DIP Credit Agreement, and Articles II.B, III.B.3 and III.B.4 hereof, (a) postpetition and/or default interest shall not accrue or be paid on any Claims; and (b) no Holder of a Claim shall be entitled to (i) interest accruing on or after the Petition Date on any such Claim or (ii) interest at the contract default rate, as applicable.

H.       *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

I.       *Setoffs and Recoupment.*

Except as expressly provided in this Plan and the DIP Order, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and the holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the

allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable holder.  In no event shall any holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G hereof on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.  Notwithstanding anything to the contrary herein, the Allowed DIP Claims, the Allowed Revolving Credit Facility Claims, the Allowed FLLO Term Loan Facility Claims, the Allowed Second Lien Notes Claims, or the Allowed Unsecured Notes Claims and the Plan distributions to be made on account of such Claims shall not be subject to set off and/or recoupment by the Debtors or the Reorganized Debtors pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, and the Debtors and the Reorganized Debtors hereby waive any and all rights of set off or recoupment against such Claims.

*J.*        *No Double Payment of Claims.*

To the extent that a Claim is Allowed against more than one Debtor's Estate, there shall be only a single recovery on account of that Allowed Claim, but the holder of an Allowed Claim other than an Allowed Unsecured Notes Claim or Allowed General Unsecured Claim against more than one Debtor may recover distributions from all co-obligor Debtors' Estates until the holder has received payment in full on the Allowed Claims.  No Holder of an Allowed Claim shall be entitled to receive more than payment in full of its Allowed Claim, and each Claim shall be administered and treated in the manner provided by the Plan only until payment in full on that Allowed Claim.

*K.*        *Claims Paid or Payable by Third Parties.*

1.        Claims Paid by Third Parties.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

2.        Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Policies until the holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy. To the extent that one or more of the Debtors' Insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such Insurers' satisfaction of such Claim, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.        Applicability of Insurance Policies.

Except as otherwise provided in the Plan, payments to holders of Claims shall be in accordance with the provisions of any applicable Insurance Policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including Insurers under any Insurance Policies nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any rights or defenses, including coverage defenses, held by such Insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

A.      *Allowance of Claims.*

After the Effective Date, except as otherwise expressly set forth herein, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.  The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

B.      *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority:  (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.S of the Plan.

C.      *Estimation of Claims.*

Before, on, or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including, without limitation, pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection.  Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors or Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      *Adjustment to Claims or Interests without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Time to File Objections to Claims.*

Any objections to Claims shall be Filed on or before the later of (a) one-hundred-eighty (180) days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by a Final Order of the Bankruptcy Court for objecting to such claims.

F.      *Reservation of Rights to Object to Claims.*

The failure of the Debtors or the Reorganized Debtors, as applicable, to object to any Claim shall not be construed as an admission to the validity or amount of any such Claim, any portion thereof, or any other claim related thereto, whether or not such claim is asserted in any currently pending or subsequently initiated proceeding, and shall be without prejudice to the right of the Debtors or the Reorganized Debtors, as applicable, to contest, challenge the validity of, or otherwise defend against any such claim in the Bankruptcy Court or non-bankruptcy forum.

G.      *Disputed and Contingent Claims Reserve.*

On or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall establish one or more reserves (including the Convenience Claim Distribution Reserve) for Claims that are contingent or have not yet been Allowed, in an amount or amounts as reasonably determined by the Debtors or Reorganized Debtors, as applicable, consistent with the Proof of Claim Filed by the applicable holder of such Disputed Claim.  To the extent that a Disputed Claim may be entitled to receive New Common Stock pursuant to the Plan, such New Common Stock will remain authorized but unissued pending resolution of such Disputed Claim.

Any assets held in any such reserve shall be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9.  As such, such assets will be subject to entity-level taxation, and the Debtors and Reorganized Debtors, as applicable, shall be required to comply with the relevant rules.

H.      *Disallowance of Claims or Interests.*

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors.

**Except as otherwise provided herein or as agreed to by the Reorganized Debtors, any and all Proofs of Claim Filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order or otherwise allowed by order of the Bankruptcy Court**.

I.      *No Distributions Pending Allowance.*

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of the Disputed portion of such Claim or Interest unless and until such Disputed portion of the Claim or Interest is Allowed.

J.      *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Reorganized Debtors shall provide to the holder of such Claim

or Interest the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

K.      *No Interest on Disputed Claims.*

Interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

# ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Proof of Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan.   The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than the Reinstated Claims) and Interests (other than the Intercompany Interests that are Reinstated) subject to the occurrence of the Effective Date.

B.      **Release of Liens.**

**Except as otherwise provided in the Exit Facilities Documents, the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns; *provided* that no mortgage, deed of trust, Lien, pledge, or other security interest against any property of the Estates in favor of any Allowed Secured Claim shall be released prior to satisfaction and/or payment of such Allowed Secured Claim in full in accordance with the Plan; *provided*, *further*, that no Lien arising, whether arising by contract or statute, from an oil and gas lease shall be terminated, discharged, or released by the Plan. Any holder of such Secured Claim (and the applicable agents for such holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

To the extent that any holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such holder, has filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, then as soon as practicable on or after the Effective Date, such holder (or the agent for such holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or Exit Facilities Agent that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such holder's behalf.

C.   *Releases by the Debtors.*

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, or that any holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Revolving Credit Facility, the FLLO Term Loan Facility, the Collateral Trust Documents, the Second Lien Notes, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Disclosure Statement, the Backstop Commitment Agreement, the DIP Facility, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Backstop Commitment Agreement, the DIP Facility, the Plan, the Plan Supplement, or the Exit Facilities before or during the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, other than claims or liabilities that are not described in items 1 and 2 set forth in Article IV.A hereof arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facilities Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtors' release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtors' release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties, including,

without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtors' release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the debtors' release.

D.       *Releases by Holders of Claims and Interests.*

Except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Revolving Credit Facility, the FLLO Term Loan Facility, the Collateral Trust Documents, the Second Lien Notes, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, other than claims or liabilities that are not described in items 1 and 2 set forth in Article IV.A hereof arising out of or relating to any act or omission of a Released Party other than a Debtor that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facilities Credit Agreements, or any other financing document under and as defined therein) or (ii) any post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facilities Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the third-party releases, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the third party releases are:  (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of the Claims released by the third-party releases; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the third-party releases.

### E.      Exculpation.

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties and other parties set forth above have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

### F.      Injunction.

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Except as otherwise set forth in the Confirmation Order, each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F hereof.

G.        *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, no Governmental Unit shall discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

H.        *Recoupment.*

In no event shall any holder of Claims or Interests be entitled to recoup any Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Proof of Interest or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

I.        *Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

J.        *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent or (2) the relevant holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.        *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.        the Confirmation Order shall have become a Final Order and be in form and substance acceptable to the Required Consenting Stakeholders and shall:

(a)        authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

(b)        decree that the provisions in the Confirmation Order and the Plan are nonseverable and mutually dependent;

(c)        authorize the Debtors or the Reorganized Debtors, as applicable/necessary, to:  (a) implement the Restructuring Transactions, including the Rights Offering and Exit Facilities; (b) appoint the directors and officers for the Reorganized Debtors; (c) issue and distribute the New Common Stock in accordance with the Plan, including all shares of New Common Stock issued

by Reorganized Chesapeake to the Backstop Parties as part of the Put Option Premium and the unsubscribed shares of New Common Stock issued to Backstop Parties pursuant to the Backstop Commitment Agreement; (d) issue and distribute the Rights and subsequently issue and distribute New Common Stock issuable upon exercise of such; (e) execute and deliver the Registration Rights Agreement; (f) execute and deliver the New Warrants Agreements and issue and distribute the New Warrants; (g) enter into the Exit Facilities Documents; (h) take all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (i) approve and adopt the New Organizational Documents; (j) adopt the Management Incentive Plan; (k)  reject, assume, or assume and assign, as applicable, Executory Contracts and Unexpired Leases; and (l) complete all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).

(d) authorize the implementation of the Plan in accordance with its terms;

(e) provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax; and

(f) contain the release, injunction, and exculpation provisions contained in Article VIII herein; and

2. the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

3. the Plan and the applicable documents included in the Plan Supplement, including any schedules, documents, and exhibits contained therein, shall have been Filed and shall be in form and substance reasonably acceptable to the Debtors and the Required Consenting Stakeholders in accordance with the consent rights contained in the Restructuring Support Agreement;

4. the Restructuring Support Agreement shall remain in full force and effect;

5. the Final Order approving the DIP Facility shall remain in full force and effect and no event of default shall have occurred and be continuing thereunder;

6. the Backstop Commitment Agreement Approval Order and Backstop Commitment Agreement shall have been entered and remain in full force and effect;

7. all Allowed Professional Claims approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such Allowed Professional Claims after the Effective Date have been placed in the Professional Fee Escrow Account pending approval of the Professional Claims by the Bankruptcy Court, all fees and expenses payable pursuant to Article IV.U shall have been paid in full, and all fees and expenses of the DIP Agent, Revolving Credit Facility Administrative Agent, and the Collateral Trustee payable pursuant to the DIP Order shall have been paid in full;

8. the payments required to be made pursuant to the terms of Article IV.U of the Plan shall have been paid;

9. the New Organizational Documents with respect to the Reorganized Debtors shall be in full force and effect and be in form and substance reasonably acceptable to the Required Consenting Stakeholders;

10. the Exit Facilities Documents shall be in full force and effect (with the Conditions Precedent to the Exit Facilities having been met, satisfied, or waived) and, subject to any post-closing execution and

delivery requirements provided for in the Exit Facilities Documents, be in form and substance acceptable to the Required Consenting Stakeholders (such approval not to be withheld in bad faith; *provided* that the terms set forth in the Exit Facilities Term Sheet shall be deemed acceptable to the Required Consenting Stakeholders); and

11. The Minimum Liquidity Condition, the Total Leverage Condition, and the PDP PV-10 Test Ratio Condition shall have been met, satisfied, or waived.

For the avoidance of doubt, if the Minimum Liquidity Condition, the Total Leverage Condition, and/or the PDP PV-10 Test Ratio Condition would not otherwise be satisfied, the Required Plan Sponsors may agree, in their sole discretion, to increase the Rights Offering amount above $600 million on the same terms, including the Rights Offering Value and with an allocation consistent with the Backstop Allocations, in order to enable such conditions to be satisfied; *provided* that no Backstop Party's Backstop Commitment may be increased without its consent.

B.     *Waiver of Conditions.*

Any one or more of the conditions to Consummation (or component thereof) set forth in this Article IX may be waived by the Debtors with the prior written consent of the Required Consenting Stakeholders (with the exception of the condition precedent specified in Section IX.A.4, not to be withheld unreasonably), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

C.     *Effect of Failure of Conditions.*

If Consummation does not occur as to any Debtor, the Plan shall be null and void in all respects as to such Debtor and nothing contained in the Plan, the Disclosure Statement, or Restructuring Support Agreement as to such Debtor shall:  (1) constitute a waiver or release of any Claims by the Debtors, Claims, or Interests; (2) prejudice in any manner the rights of the Debtors, any holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders of Claims or Interests, or any other Entity.

D.     *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.     *Modification and Amendments.*

Except as otherwise specifically provided in this Plan, upon prior notice to and with the consent of the Required Consenting Stakeholders, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate and with the consent of the Required Consenting Stakeholders, not resolicit votes on such modified Plan.  Subject to those restrictions on modifications set forth in the Plan and the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.    *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.    *Revocation or Withdrawal of Plan.*

The Debtors reserve the right, upon prior notice to and with the consent of the Required Consenting Stakeholders, to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests, and including any settlement, waiver, or release of any rights of the Revolving Credit Facility Lenders under the Intercreditor Agreement or the Collateral Trust Documents), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.    decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.    resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.    ensure that distributions to holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of the Plan;

5.    adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.    adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

54

7.    enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with the Plan or the Disclosure Statement;

8.    enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.    resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.    issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12.    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.K hereof;

13.    enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.    determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement, including the Restructuring Support Agreement;

15.    enter an order concluding or closing the Chapter 11 Cases;

16.    adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.    consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.    determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.    hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.    hear and determine all disputes involving the obligations or terms of the Rights Offering and the Backstop Commitment Agreement;

22.    hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article VIII hereof;

23.    enforce all orders previously entered by the Bankruptcy Court; and

24.     hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article XI to the contrary, the New Organizational Documents and the Exit Facilities and any documents related thereto shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect.*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, any and all holders of Claims or Interests (irrespective of whether such holders of Claims or Interests have, or are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.     *Additional Documents.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms of the Plan.  The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.     *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors for each quarter (including any fraction thereof) until the earlier of entry of a final decree closing such Chapter 11 Cases or an order of dismissal or conversion, whichever comes first.

D.     *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Confirmation Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Confirmation Date.

E.     *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

F.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| Debtors | Counsel to the Debtors |
|---|---|
| Chesapeake Energy Corporation<br>6100 North Western Avenue<br>Oklahoma, Oklahoma 73118<br>Attention:  James R. Webb | Kirkland & Ellis LLP<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Attention:  Patrick J. Nash, Jr., P.C., Marc Kieselstein, P.C., and Alexandra Schwarzman<br><br>and<br><br>Jackson Walker LLP<br>1401 McKinney Street, Suite 1900<br>Houston, Texas 77010<br>Attention:  Matthew D. Cavenaugh, Jennifer F. Wertz, Kristhy M. Peguero, and Veronica A. Polnick |
| **United States Trustee** | **Counsel to the Consenting DIP Lenders** |
| Office of The United States Trustee<br>515 Rusk Street, Suite 3516<br>Houston, Texas 77002 | Sidley Austin LLP<br>555 West Fifth Street<br>Los Angeles, CA 90013<br>Attention:  Jennifer C. Hagle and Brian E. Minyard |
| **Counsel to the Consenting Revolving Credit Facility Lenders** | **Counsel to the FLLO Ad Hoc Group** |
| Sidley Austin LLP<br>555 West Fifth Street<br>Los Angeles, CA 90013<br>Attention:  Jennifer C. Hagle and Brian E. Minyard | Davis Polk & Wardwell LLP<br>450 Lexington Avenue<br>New York, New York 10017<br>Attention:  Damian S. Schaible, Darren S. Klein, and Aryeh Ethan Falk |
| **Counsel to Franklin** | |
| Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park<br>Bank of America Tower<br>New York, New York 10036<br>Attention:  Michael S. Stamer, Meredith A. Lahaie, and Stephen B. Kuhn | |

After the Effective Date, the Reorganized Debtors have the authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.      *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.      *Entire Agreement.*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.      *Plan Supplement.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://dm.epiq11.com/chesapeake or the Bankruptcy Court's website at www.txs.uscourts.gov/bankruptcy.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the Plan Supplement exhibit or document shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).

K.      *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable; and (3) nonseverable and mutually dependent.

L.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

M.      *Closing of Chapter 11 Cases.*

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases except for the Chapter 11 Case of Chesapeake, and all contested matters and adversary proceedings relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of Chesapeake; *provided* that for purposes of sections 546 and 550 of the Bankruptcy Code, the Chapter 11 Cases shall be deemed to remain open until the Chapter 11 Case of Chesapeake has been closed.

When all Disputed Claims have become Allowed or disallowed and all remaining Cash has been distributed in accordance with the Plan, the Reorganized Debtors shall seek authority from the Bankruptcy Court to close the Chapter 11 Case of Chesapeake in accordance with the Bankruptcy Code and the Bankruptcy Rules.

N.      *Waiver or Estoppel.*

Each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

O.      *Creditor Default.*

An act or omission by a holder of a Claim or an Interest in contravention of the provisions of this Plan shall be deemed an event of default under this Plan.  Upon an event of default, the Reorganized Debtors may seek to hold the defaulting party in contempt of the Confirmation Order and shall be entitled to reasonable attorneys' fees and costs of the Reorganized Debtors in remedying such default.  Upon the finding of such a default by a creditor, the Bankruptcy Court may:  (a) designate a party to appear, sign and/or accept the documents required under the Plan on behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (b) enforce the Plan by order of specific performance; (c) award judgment against such defaulting creditor in favor of the Reorganized debtor in an amount, including interest, to compensate the Reorganized Debtors for the damages caused by such default; and (d) make such other order as may be equitable that does not materially alter the terms of the Plan.

Dated:  January 12, 2021

CHESAPEAKE ENERGY CORPORATION

on behalf of itself and all other Debtors


*/s/  Domenic J. Dell'Osso, Jr.*
Domenic J. Dell'Osso, Jr.
Executive Vice President and Chief Financial Officer

**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 20-33233 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**~~FOUR~~IFTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION**
**OF CHESAPEAKE ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752-4200
Facsimile:      (713) 752-4221
Email:           mcavenaugh@jw.com
                      jwertz@jw.com
                      kpeguero@jw.com
                      vpolnick@jw.com


*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:           patrick.nash@kirkland.com
                      marc.kieselstein@kirkland.com
                      alexandra.schwarzman@kirkland.com


*Co-Counsel to the Debtors*
*and Debtors in Possession*

Dated:  ~~December 27, 2020~~January 12, 2021

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors'
proposed claims and noticing agent at https://dm.epiq11.com/chesapeake.  The location of Debtor Chesapeake
Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is
6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
       GOVERNING LAW ........................................................................................................1
    A.    Defined Terms. ...................................................................................................1
    B.    Rules of Interpretation. .....................................................................................17
    C.    Computation of Time. .......................................................................................17
    D.    Governing Law. ................................................................................................18
    E.    Reference to Monetary Figures. .......................................................................18
    F.    Reference to the Debtors or the Reorganized Debtors. .....................................18
    G.    Controlling Document. .....................................................................................18
    H.    Consultation, Information, Notice, and Consent Rights. ...................................18

ARTICLE II. ADMINISTRATIVE CLAIMS, DIP CLAIMS, AND PRIORITY CLAIMS ......................19
    A.    Administrative Claims. .....................................................................................19
    B.    DIP Claims. ......................................................................................................20
    C.    Priority Tax Claims. ..........................................................................................21
    D.    Statutory Fees. ..................................................................................................21

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS .......................21
    A.    Classification of Claims and Interests. .............................................................21
    B.    Treatment of Claims and Interests. ...................................................................22
    C.    Special Provision Governing Unimpaired Claims. ...........................................25
    D.    Elimination of Vacant Classes. .........................................................................25
    E.    Voting Classes, Presumed Acceptance by Non-Voting Classes. .......................25
    F.    Intercompany Interests. .....................................................................................25
    G.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. .................26
    H.    Controversy Concerning Impairment. ...............................................................26
    I.    Subordinated Claims and Interests. ...................................................................26

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ..............................................26
    A.    General Settlement of Claims and Interests. .....................................................26
    B.    Restructuring Transactions. ...............................................................................27
    C.    Midstream Savings Requirement. .....................................................................27
    D.    Reorganized Debtors. .......................................................................................27
    E.    Sources of Consideration for Plan Distributions. .............................................28
    F.    Convenience Claim Distribution Reserve. ........................................................30
    G.    Corporate Existence. .........................................................................................30
    H.    Vesting of Assets in the Reorganized Debtors. .................................................30
    I.    Cancellation of Existing Securities and Agreements. ........................................31
    J.    Corporate Action. .............................................................................................32
    K.    New Organizational Documents. ......................................................................32
    L.    Indemnification Obligations. ............................................................................33
    M.    Directors and Officers of the Reorganized Debtors. .........................................33
    N.    Effectuating Documents; Further Transactions. ................................................33
    O.    Section 1146 Exemption. ..................................................................................34
    P.    Director and Officer Liability Insurance. ..........................................................34
    Q.    Management Incentive Plan. .............................................................................34
    R.    Employee Benefits. ...........................................................................................35
    S.    Preservation of Causes of Action. ....................................................................35
    T.    Preservation of Royalty and Working Interests. ...............................................36
    U.    Resolution of Pending Litigation. .....................................................................36
    V.    Payment of Certain Fees. ..................................................................................37

i

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .................................37
    A.      Assumption and Rejection of Executory Contracts and Unexpired Leases. ..................37
    B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases. ....................38
    C.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. .................38
    D.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases. ..........39
    E.      Insurance Policies. ....................................................................................................39
    F.      Reservation of Rights. ..............................................................................................40
    G.      Nonoccurrence of Effective Date. .............................................................................40
    H.      Contracts and Leases Entered Into After the Petition Date. ........................................40

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS .................................................................40
    A.      Timing and Calculation of Amounts to Be Distributed. ..............................................40
    B.      Delivery of Distributions and Undeliverable or Unclaimed Distributions. ...................41
    C.      Manner of Payment. ..................................................................................................42
    D.      Exemption from Securities Laws. ..............................................................................42
    E.      Compliance with Tax Requirements. .........................................................................43
    F.      Allocations. ..............................................................................................................43
    G.      No Postpetition or Default Interest on Claims. ..........................................................43
    H.      Foreign Currency Exchange Rate. .............................................................................43
    I.      Setoffs and Recoupment. ..........................................................................................43
    J.      No Double Payment of Claims. .................................................................................44
    K.      Claims Paid or Payable by Third Parties. ...................................................................44

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND
                DISPUTED CLAIMS ..............................................................................................45
    A.      Allowance of Claims. ...............................................................................................45
    B.      Claims Administration Responsibilities. ....................................................................45
    C.      Estimation of Claims. ...............................................................................................45
    D.      Adjustment to Claims or Interests without Objection. ................................................45
    E.      Time to File Objections to Claims. .............................................................................46
    F.      Reservation of Rights to Object to Claims. .................................................................46
    G.      Disputed and Contingent Claims Reserve. .................................................................46
    H.      Disallowance of Claims or Interests. ..........................................................................46
    I.      No Distributions Pending Allowance. ........................................................................46
    J.      Distributions After Allowance. ..................................................................................46
    K.      No Interest on Disputed Claims. ................................................................................47

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS .............................47
    A.      Discharge of Claims and Termination of Interests. .....................................................47
    **B.**      **Release of Liens.** ......................................................................................................47
    **C.**      **Releases by the Debtors.** .........................................................................................48
    **D.**      **Releases by Holders of Claims and Interests.** ...........................................................49
    **E.**      **Exculpation.** ............................................................................................................50
    **F.**      **Injunction.** ...............................................................................................................50
    G.      Protections Against Discriminatory Treatment. ..........................................................51
    H.      Recoupment. ............................................................................................................51
    I.      Document Retention. .................................................................................................51
    J.      Reimbursement or Contribution. ...............................................................................51

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN .......................................51
    A.      Conditions Precedent to the Effective Date. ...............................................................51
    B.      Waiver of Conditions. ...............................................................................................53
    C.      Effect of Failure of Conditions. .................................................................................53
    D.      Substantial Consummation ........................................................................................53

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ........................................53
    A.     Modification and Amendments. ...........................................................................................53
    B.     Effect of Confirmation on Modifications. ..........................................................................54
    C.     Revocation or Withdrawal of Plan. ....................................................................................54

ARTICLE XI. RETENTION OF JURISDICTION .....................................................................................54

ARTICLE XII. MISCELLANEOUS PROVISIONS ...................................................................................56
    A.     Immediate Binding Effect. ..................................................................................................56
    B.     Additional Documents. ........................................................................................................56
    C.     Payment of Statutory Fees. .................................................................................................56
    D.     Statutory Committee and Cessation of Fee and Expense Payment. ...................................56
    E.     Reservation of Rights. .........................................................................................................56
    F.     Successors and Assigns. ......................................................................................................57
    G.     Notices. ................................................................................................................................57
    H.     Term of Injunctions or Stays. .............................................................................................58
    I.     Entire Agreement. ...............................................................................................................58
    J.     Plan Supplement. .................................................................................................................58
    K.     Nonseverability of Plan Provisions. ...................................................................................58
    L.     Votes Solicited in Good Faith. ...........................................................................................58
    M.     Closing of Chapter 11 Cases. .............................................................................................59
    N.     Waiver or Estoppel. ............................................................................................................59
    O.     Creditor Default. .................................................................................................................59

## **INTRODUCTION**

Chesapeake Energy Corporation and the above-captioned debtors and debtors in possession (collectively, the "Debtors"), propose this joint chapter 11 plan of reorganization (as modified, amended, or supplemented from time to time, the "Plan") for the resolution of the outstanding claims against, and equity interests in, the Debtors. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor.  Holders of Claims or Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, business, assets, results of operations, historical financial information, risk factors, a summary and analysis of this Plan, the Restructuring Transactions, and certain related matters.  Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## **ARTICLE I.**
## **DEFINED TERMS, RULES OF INTERPRETATION,**
## **COMPUTATION OF TIME, AND GOVERNING LAW**

A.      *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.      "*1145 Securities*" has the meaning set forth in Article IV.E.1 of the Plan.

2.      "*4(a)(2) Securities*" has the meaning set forth in Article IV.E.1 of the Plan.

3.      "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business; (b) Allowed Professional Claims; (c) DIP Claims; (d) Adequate Protection Super-Priority Claims (as defined in the Final DIP Order) (if any); (e) Royalty and Working Interests Administrative Claims; (f) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code; and (g) as approved by the Backstop Commitment Agreement Approval Order, including the priority and payment subordination provisions described in paragraph 7 thereof, the Put Option Premium.

4.      "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which shall be 30 days after the Effective Date; *provided*, *however*, that the deadline for Filing requests for payment of Royalty and Working Interests Administrative Claims shall be 120 days after the Effective Date.

5.      "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.  With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

6.      "*Agent*" means any administrative agent, collateral agent, collateral trustee, or similar Entity under the Exit Facilities, the DIP Facility, the Revolving Credit Facility, the Collateral Agreement, the Collateral Trust Agreement, and/or the FLLO Term Loan Facility.

7.      "*Allowed*" means, with respect to any Claim or Interest, except as otherwise provided herein:  (a) a Claim or Interest in a liquidated amount as to which no objection has been Filed prior to the applicable claims objection deadline and that is evidenced by a Proof of Claim or Interest, as applicable, timely Filed by the applicable Bar Date or that is not required to be evidenced by a Filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, or a Final Order; (b) a Claim or Interest that is scheduled by the Debtors as neither Disputed, contingent, nor unliquidated, and for which no Proof of Claim or Interest, as applicable, has been timely Filed in an

1

unliquidated or a different amount;  (c) a Claim or Interest that is upheld or otherwise Allowed (i) pursuant to the Plan; (ii) in any stipulation that is approved by the Bankruptcy Court; (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith; or (iv) by Final Order (including any such Claim to which the Debtors had objected or which the Bankruptcy Court had disallowed prior to such Final Order); *provided* that with respect to a Claim or Interest described in clauses (a) through (c) above, such Claim or Interest shall be considered Allowed only if and to the extent that with respect to such Claim or Interest no objection to the allowance thereof has been or, in the Debtors' or Reorganized Debtors' reasonable good faith judgment, may be interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim or Interest, as applicable, shall have been Allowed by a Final Order; *provided*, *further*, that no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or Disputed, and for which no Proof of Claim or Interest is or has been timely Filed, is not considered Allowed and shall be deemed expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  For the avoidance of doubt a Proof of Claim or Interest Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.  "Allow," "Allowing," and "Allowance" shall have correlative meanings.

8.      "*Alternative Securities Exchange*" means, excluding any National Securities Exchange, any other securities exchange or over-the-counter quotation system, including, without limitation, the NYSE MKT, the Nasdaq Capital Market, any quotation or other listing service provided by the OTC Markets Group or the Financial Industry Regulatory Authority, Inc., any "pink sheet" or other alternative listing service, or any successor or substantially equivalent service to any of the foregoing.

9.      "*Assumed Executory Contracts and Unexpired Leases Schedule*" means the schedule of Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, which shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

10.      "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

11.      "*Backstop*" means the several and not joint backstop in full of the Rights Offering by the Backstop Parties pursuant to the Backstop Commitment Agreement.

12.      "*Backstop Allocations*" has the meaning set forth in Article IV.E.1 of the Plan.

13.      "*Backstop Commitment Agreement*" means that certain Backstop Commitment Agreement, dated as of June 28, 2020, by and between Chesapeake and the Backstop Parties, as may be further amended, modified, or supplemented from time to time, in accordance with its terms.

14.      "*Backstop Commitment Agreement Approval Order*" means the *Order (I) Authorizing Entry into the Backstop Commitment Agreement, (II) Approving the Payment of Fees and Expenses Related Thereto, and (III) Granting Related Relief* entered by the Bankruptcy Court on August 21, 2020 at CM/ECF No. 899 in the Chapter 11 Cases.

15.      "*Backstop Parties*" means the members of the FLLO Ad Hoc Group and Franklin that are signatories to the Backstop Commitment Agreement.

16.      "*Backstop Party Rights*" means the non-certificated rights that will enable the holders thereof to purchase shares of New Common Stock at an aggregate purchase price of $150 million at a price per share to be determined based on a 35 percent discount to the equity value per share of New Common Stock, post new-money, as implied by a Plan total enterprise value of $3.25 billion.

17.　　"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

18.　　"*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas.

19.　　"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each, as amended from time to time.

20.　　"*Bar Date*" means the date established by the Bankruptcy Court by which Proofs of Claim or Proofs of Interest must be Filed with respect to such Claims or Interests, other than Administrative Claims, Claims held by Governmental Units, or other Claims or Interests for which the Bankruptcy Court entered an order excluding the holders of such Claims or Interests from the requirement of Filing Proofs of Claim or Proofs of Interest.

21.　　"*Business Day*" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the State of New York.

22.　　"*Cash*" means cash in legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items.

23.　　"*Cause of Action*" or "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

24.　　"*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

25.　　"*Chesapeake*" means Chesapeake Energy Corporation or any successor or assign, by merger, consolidation, or otherwise, prior to the Effective Date.

26.　　"*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

27.　　"*Claims and Balloting Agent*" means Epiq Corporate Restructuring, LLC, the notice, claims, and solicitation agent retained by the Debtors in the Chapter 11 Cases.

28.　　"*Claims Register*" means the official register of Claims maintained by the Claims and Balloting Agent.

29.　　"*Class*" means a class of Claims or Interests as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

30.　　"*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

31.　　"*Collateral Agreement*" means that certain Collateral Agreement dated December 19, 2019 by and between MUFG Union Bank, N.A., as collateral trustee, Chesapeake, and certain of the other Debtors.

3

32.     "*Collateral Trust Agreement*" means that certain Collateral Trust Agreement dated December 19, 2019 by and between MUFG Union Bank, N.A., as collateral trustee and revolver agent, and GLAS USA LLC, as original term loan agent, and as acknowledged and agreed by certain of the Debtors (as from time to time amended and restated).

33.     "*Collateral Trust Documents*" means collectively, the Collateral Agreement, the Collateral Trust Agreement, and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents (including any amendments, restatements, supplements, or modifications of any of the foregoing), related to or executed in connection with the Collateral Agreement and the Collateral Trust Agreement.

34.     "*Collateral Trustee*" means MUFG Union Bank, N.A., in its capacity as collateral trustee under the Collateral Agreement and the Collateral Trust Agreement.

35.     "*Conditions Precedent to the Effective Date*" means the conditions precedent to the Effective Date set forth in Article IX.A of the Plan.

36.     "*Conditions Precedent to the Exit Facilities*" means the conditions precedent to the closing of the Exit Facilities identified on Exhibit D to the Exit Facilities Term Sheet.

37.     "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

38.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

39.     "*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court on confirmation of the Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

40.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

41.     "*Consenting DIP Lenders*" means those certain DIP Lenders that are or have become parties to the Restructuring Support Agreement.

42.     "*Consenting FLLO Term Loan Facility Lenders*" means those certain FLLO Term Loan Facility Lenders that are or have become parties to the Restructuring Support Agreement.

43.     "*Consenting Revolving Credit Facility Lenders*" means those certain Revolving Credit Facility Lenders that are or have become parties to the Restructuring Support Agreement.

44.     "*Consenting Second Lien Noteholders*" means Second Lien Noteholders, investment advisors thereto, sub-advisors thereto, or managers of discretionary accounts belonging to Second Lien Noteholders that are or have become parties to the Restructuring Support Agreement.

45.     "*Consenting Stakeholders*" means collectively, the Consenting DIP Lenders, the Consenting Revolving Credit Facility Lenders, the Consenting FLLO Term Loan Facility Lenders, and the Consenting Second Lien Noteholders.

46.     "*Consenting Unsecured Noteholders*" means Unsecured Noteholders, investment advisors thereto, sub-advisors thereto, or managers of discretionary accounts belonging to Unsecured Noteholders that are or have become parties to the Restructuring Support Agreement.

47.     "*Consummation*" means the occurrence of the Effective Date as to the applicable Debtor.

4

48.     "*Convenience Claim*" means any Allowed General Unsecured Claim (i) that is Allowed in an amount greater than $0 but less than or equal to $1,000,000.00; and (ii) for which the holder of such Claim irrevocably elects via a Convenience Claim Election Form to have such Claim treated as a Convenience Claim (upon Allowance) for the purposes of the Plan, in full and final satisfaction of such Claim; *provided* that a holder of a General Unsecured Claim in excess of $1,000,000.00 may irrevocably elect via a Convenience Claim Election Form to have such Claim irrevocably reduced to $1,000,000.00 and treated as a Convenience Claim (upon Allowance) for the purposes of the Plan, in full and final satisfaction of such Claim.

49.     "*Convenience Claim Election Form*" means the form to be distributed by the Claims and Balloting Agent to each holder of a General Unsecured Claim as soon as reasonably practicable after the Effective Date.

50.     "*Convenience Claim Distribution*" means each Convenience Claim's *Pro Rata* share of $10,000,000.00, which *Pro Rata* share shall not exceed 5 percent of such Convenience Claim.

51.     "*Convenience Claim Distribution Reserve*" means an interest bearing account funded by the Reorganized Debtors with Cash on the Effective Date in an amount equal to $10,000,000.00.

52.     "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon the Debtors' defaults on an Executory Contract or Unexpired Lease at the time such Executory Contract or Unexpired Lease is assumed by the Debtors pursuant to section 365 of the Bankruptcy Code, other than with respect to a default that is not required to be cured under section 365(b)(2) of the Bankruptcy Code.

53.     "*D&O Liability Insurance Policies*" means all insurance policies issued to or providing coverage at any time to any of the Debtors for directors', managers', and officers' liability existing as of the Petition Date (including any "tail policy") and all agreements, documents, or instruments relating thereto.

54.     "*Definitive Documents*" means, without limitation, the following documents:  (a) the Plan and its exhibits, ballots, and solicitation procedures; (b) the Confirmation Order; (c) the Disclosure Statement; (d) the Disclosure Statement Order; (e) the First Day Pleadings and all orders sought pursuant thereto; (f) the Plan Supplement; (g) the DIP Order, DIP Credit Agreement, and any and all other DIP Documents and related documentation; (h) the Backstop Commitment Agreement, Backstop Commitment Agreement Approval Order, Rights Offering Procedures, Registration Rights Agreement and any and all documentation required to implement, issue, and distribute the New Common Stock; (i) the New Warrants Agreements; (j) the Exit Facilities Documents and related documentation; (k) the Management Incentive Plan; (l) the New Organizational Documents and all other documents or agreements for the governance of Reorganized Chesapeake, including the list of directors of Reorganized Chesapeake and any certificates of incorporation and shareholders' agreements or supplements as may be reasonably necessary or advisable to implement the Restructuring Transactions; and (m) such other agreements and documentation reasonably desired or necessary to consummate and document the transactions contemplated by the Plan.

55.     "*DIP Agent*" means MUFG Union Bank, N.A., in its capacity as administrative agent and collateral agent under the DIP Credit Agreement.

56.     "*DIP Agent Fees and Expenses*" has the meaning ascribed to such term in the DIP Order.

57.     "*DIP Claims*" means all Claims derived from, based upon, or secured pursuant to the DIP Credit Agreement or DIP Order, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, professional fee reimbursements, transaction fees, Superpriority Hedge Claims, and other charges arising thereunder or related thereto, in each case, with respect to the DIP Facility; *provided* that any Adequate Protection Super-Priority Claims (as defined in the Final DIP Order), including such Claims granted in respect of the Revolving Credit Facility, FLLO Term Loan Facility, or Second Lien Notes authorized in the DIP Order, shall not be DIP Claims.

58.     "*DIP Credit Agreement*" means that certain Senior Secured Super-Priority Debtor-In-Possession Credit Agreement dated July 1, 2020, between Chesapeake Energy Corporation, as borrower, the Debtor guarantors that are party thereto, the DIP Lenders, and the DIP Agent (as may be amended, supplemented, or otherwise modified from time to time).

59.     "*DIP Documents*" means collectively, the DIP Credit Agreement and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents (including any amendments, restatements, supplements, or modifications of any of the foregoing), related to or executed in connection with the DIP Credit Agreement.

60.     "*DIP Facility*" means that certain debtor-in-possession financing facility documented pursuant to the DIP Documents and DIP Order.

61.     "*DIP Lenders*" means the lenders party to the DIP Credit Agreement.

62.     "*DIP Order*" means collectively, the Interim DIP Order and the Final DIP Order.

63.     "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto.

64.     "*Disclosure Statement Order*" means an order of the Bankruptcy Court approving the Disclosure Statement, the Solicitation Materials, and the solicitation of the Plan.

65.     "*Disputed*" means, as to a Claim or an Interest, any Claim or Interest:  (a) that is not Allowed; (b) that is not disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable; (c) as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy law; (d) that is Filed in the Bankruptcy Court and not withdrawn, as to which a timely objection or request for estimation has been Filed; and (e) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

66.     "*Distribution Record Date*" means, other than with respect to publicly held Securities, the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be on or before the Effective Date.  For the avoidance of doubt, no distribution record date shall apply to holders of public Securities, including the Second Lien Notes and the Unsecured Notes.

67.     "*DTC*" means the Depository Trust Company.

68.     "*Effective Date*" means, as to the applicable Debtor, the date that is the first Business Day on which (a) no stay of the Confirmation Order is in effect and (b) all Conditions Precedent to the Effective Date have been satisfied or waived in accordance with Article IX.B of the Plan.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

69.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

70.     "*Estate*" means as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code upon the commencement of such Debtor's Chapter 11 Case.

71.     "*Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*, as amended from time to time, and the rules and regulations promulgated thereunder.

6

72.     "*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) any official committees appointed in the Chapter 11 Cases and each of their respective members; (c) the DIP Lenders; (d) the Exit Facilities Lenders; (e) the Consenting Revolving Credit Facility Lenders; (f) the Consenting FLLO Term Loan Facility Lenders; (g) the Consenting Second Lien Noteholders; (h) the Consenting Unsecured Noteholders; (i) the Agents; (j) each Trustee; (k) the Backstop Parties; and (l) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders, subsidiaries, participants, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

73.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

74.     "*Existing Equity Interest*" means an Interest in Chesapeake Energy Corporation existing as of the Petition Date.

75.     "*Existing RBL Adequate Protection Payments*" has the meaning ascribed to such term in the DIP Order.

76.     "*Exit Facilities*" means collectively, the Exit RBL Facility and Exit FLLO Term Loan Facility.

77.     "*Exit Facilities Agent*" means MUFG Union Bank, N.A., in its capacity as administrative agent for the Exit Facilities.

78.     "*Exit Facilities Credit Agreements*" means those certain credit agreements that will govern the Exit Facilities (as each may be amended, supplemented, or otherwise modified from time to time), in each case which shall be consistent with the Exit Facilities Term Sheet.

79.     "*Exit Facilities Documents*" means, collectively, the Exit Facilities Credit Agreements, and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any amendments to existing loan or other finance documentation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, in each case if any, the form and substance of which shall be consistent with the Exit Facilities Term Sheet.

80.     "*Exit Facilities Lenders*" means the lenders party to the Exit Facilities Credit Agreements.

81.     "*Exit Facilities Loans*" means collectively, the Tranche A RBL Exit Facility Loans, the Tranche B RBL Exit Facility Loans, and the Exit FLLO Term Loans.

82.     "*Exit Facilities Term Sheet*" means the term sheet setting forth the material terms of the Exit Facilities, attached as <u>Exhibit 3</u> to the Restructuring Term Sheet.

83.     "*Exit FLLO Term Loan*" means term loans made under and on the terms set forth under the Exit FLLO Term Loan Facility.

84.     "*Exit FLLO Term Loan Facility*" means the term loan facility to be provided in accordance with the terms set forth in the Exit Facilities Term Sheet.

85.     "*Exit RBL Facility*" means the revolving credit facility to be provided in accordance with the terms set forth in the Exit Facilities Term Sheet.

86.     "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

87.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

88.     "*Final DIP Order*" means the *Final Order (I) Authorizing The Debtors To Obtain Postpetition Financing, (II) Authorizing The Debtors To Use Cash Collateral, (III) Granting Liens And Providing Claims With Superpriority Administrative Expense Status, (IV) Granting Adequate Protection To The Existing Secured Parties, (V) Modifying The Automatic Stay, And (VI) Granting Related Relief* entered by the Bankruptcy Court on July 31, 2020 at CM/ECF No. 597 in the Chapter 11 Cases.

89.     "*Final Order*" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter that has not been reversed, stayed, modified, or amended, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order will not preclude such order from being a Final Order.

90.     "*First Day Pleadings*" means the pleadings and related documentation requesting certain emergency relief, or supporting the request for such relief, Filed by the Debtors on or around the Petition Date and heard at the "first day" hearing.

91.     "*FLLO Ad Hoc Group*" means the ad hoc group of FLLO Term Loan Facility Lenders represented by Davis Polk & Wardwell LLP.

92.     "*FLLO Professionals*" means the FLLO Term Loan Facility Administrative Agent's professionals (including Arnold & Porter Kaye Scholer LLP and one local counsel in the relevant jurisdiction), the Collateral Trustee's professionals (including Paul Hastings LLP), and the FLLO Ad Hoc Group's professionals (including Davis Polk & Wardwell LLP, Vinson & Elkins LLP, one local counsel in each other relevant local jurisdiction, and Perella Weinberg Partners LP).

93.     "*FLLO Rights*" means the non-certificated rights that will enable the holders thereof to purchase shares of New Common Stock at an aggregate purchase price of $382.5 million at a price per share to be determined based on a 35 percent discount to the equity value per share of New Common Stock, post new-money, as implied by a Plan total enterprise value of $3.25 billion.

94.     "*FLLO Term Loan Facility*" means the facility outstanding under the FLLO Term Loan Facility Credit Agreement.

95.     "*FLLO Term Loan Facility Administrative Agent*" means GLAS USA LLC, in its capacity as administrative agent for the FLLO Term Loan Facility.

96.     "*FLLO Term Loan Facility Claim*" means any Claim on account of the FLLO Term Loan Facility.

97.     "*FLLO Term Loan Facility Credit Agreement*" means that certain Term Loan Agreement, dated as of December 19, 2019 ((i) as supplemented by that certain Class A Term Loan Supplement, dated as of December 19, 2019 (as amended, restated or otherwise modified from time to time), by and among Chesapeake, as borrower, the Debtor guarantors party thereto, the FLLO Term Loan Facility Administrative Agent, and the lender parties thereto, and (ii) as further amended, restated, or otherwise modified from time to time), by and among Chesapeake, as borrower, the Debtor guarantors party thereto, the FLLO Term Loan Facility Administrative Agent, and the lenders party thereto.

98.     "*FLLO Term Loan Facility Lenders*" means lenders party to the FLLO Term Loan Facility Credit Agreement.

99.      "*Franklin*" means Franklin Advisers, Inc., as investment manager on behalf of certain funds and accounts.

100.      "*General Unsecured Claim*" means any Claim against any Debtor that is not otherwise paid in full during the Chapter 11 Cases pursuant to an order of the Bankruptcy Court and is not an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, an Other Secured Claim, a Revolving Credit Facility Claim, a FLLO Term Loan Facility Claim, a Second Lien Notes Claim, an Unsecured Notes Claim, an Intercompany Claim, or a Section 510(b) Claim.

101.      "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

102.      "*Impaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

103.      "*Insurance Policies*" means all insurance policies, including all D&O Liability Insurance Policies, that have been issued at any time or provide coverage, benefits or proceeds to any of the Debtors (or their predecessors) and all agreements, documents or instruments relating thereto.

104.      "*Insurer*" means any company or other Entity that issued or entered into an Insurance Policy, any third party administrator of or for any Insurance Policy, and any respective predecessors, successors and/or affiliates of any of the foregoing.

105.      "*Intercompany Claim*" means any Claim held by a Debtor or an Affiliate against a Debtor or an Affiliate of a Debtor.

106.      "*Intercompany Interest*" means an Interest in a Debtor held by a Debtor or an Affiliate of a Debtor.

107.      "*Intercreditor Agreement*" means that certain Intercreditor Agreement dated as of December 19, 2019 by and between MUFG Union Bank, N.A., as Priority Lien Agent, and the Second Lien Notes Trustee, and as acknowledged and agreed by certain of the Debtors (as from time to time amended and restated).

108.      "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable Securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

109.      "*Interim DIP Order*" means the *Interim Order (I) Authorizing The Debtors To Obtain Postpetition Financing, (II) Authorizing The Debtors To Use Cash Collateral, (III) Granting Liens And Providing Claims With Superpriority Administrative Expense Status, (IV) Granting Adequate Protection To The Existing Secured Parties, (V) Modifying The Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief* entered by the Bankruptcy Court on June 29, 2020 at CM/ECF No. 128 in the Chapter 11 Cases.

110.      "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time.

111.      "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

112.      "*Management Incentive Plan*" has the meaning set forth in Article IV.Q of the Plan.

113.      "*Minimum Liquidity Condition*" means the Condition Precedent to the Effective Date that provides that the Debtors shall have minimum liquidity, including unrestricted cash on hand and availability under the Exit RBL Facility, of at least $500 million.

9

114.     "*National Securities Exchange*" means The New York Stock Exchange, The Nasdaq Global Select Market, or The Nasdaq Global Market.

115.     "*New Board*" means the board of directors of Reorganized Chesapeake that shall be appointed in accordance with the terms of the governance term sheet attached as <u>Exhibit 6</u> to the Restructuring Term Sheet.  The identities of directors on the New Board shall be set forth in the Plan Supplement, to the extent known.

116.     "*New Class A Warrants*" means warrants to purchase 10 percent of the New Common Stock (after giving effect to the Rights Offering, but subject to dilution by the Management Incentive Plan, the New Class B Warrants, and the New Class C Warrants), with a term of 5 years at an initial exercise price per share struck at the equity value of Reorganized Chesapeake, post new-money, implied by a total enterprise value of $4.0 billion.

117.     "*New Class B Warrants*" means warrants to purchase 10 percent of the New Common Stock (after giving effect to the Rights Offering, but subject to dilution by the Management Incentive Plan and the New Class C Warrants), with a term of 5 years at an initial exercise price per share struck at the equity value of Reorganized Chesapeake, post new-money, implied by a total enterprise value of $4.5 billion.

118.     "*New Class C Warrants*" means warrants to purchase 10 percent of the New Common Stock (after giving effect to the Rights Offering, but subject to dilution by the Management Incentive Plan), with a term of 5 years at an initial exercise price per share struck at the equity value of Reorganized Chesapeake, post new-money, implied by a total enterprise value of $5.0 billion.

119.     "*New Common Stock*" means the single class of common stock to be issued by Reorganized Chesapeake on the Effective Date on terms acceptable to the Required Plan Sponsors.

120.     "*New Organizational Documents*" means the amended and restated or new charters, bylaws, operating agreements, or other organizational documents of Reorganized Chesapeake and the other Reorganized Debtors, as applicable and in form and substance satisfactory to the Required Plan Sponsors.

121.     "*New Warrants*" means collectively, the New Class A Warrants, the New Class B Warrants, and the New Class C Warrants.

122.     "*New Warrants Agreements*" means the documents or agreements governing the New Warrants, Filed with the Plan Supplement, which will be consistent in all material respects with the terms of this Plan and shall at all times be in form and substance reasonably acceptable to the Required Plan Sponsors and the Consenting Second Lien Noteholders holding at least 66.67% of the aggregate outstanding principal amount of the Second Lien Notes Claims that are held by the Consenting Second Lien Noteholders.

123.     "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

124.     "*Other Secured Claim*" means any Secured Claim other than a DIP Claim, Revolving Credit Facility Claim, a FLLO Term Loan Facility Claim, or a Second Lien Notes Claim.

125.     "*PDP PV-10 Ratio*" means the ratio of (a) the total present value of the future net revenues expected with respect to the oil and gas properties of the Debtors discounted at 10% per annum, calculated in accordance with the Exit Facilities Term Sheet to (b) consolidated indebtedness under the Exit Credit Facilities and any other secured debt of Chesapeake as of the closing date of the Exit Credit Facilities.

126.     "*PDP PV-10 Test Ratio Condition*" means the Condition Precedent to the Effective Date that provides that the Debtors shall have a PDP PV-10 Ratio no less than 1.5x.

127.     "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

128.     "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

129.     "*Plan Securities*" has the meaning set forth in Article IV.E.1 of the Plan.

130.     "*Plan Supplement*" means the compilation of documents and forms of documents, term sheets, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed prior on or before November 23, 2020, and any additional documents Filed prior to the Effective Date as amendments to the Plan Supplement, including the following, as applicable:  (a) the New Organizational Documents; (b) to the extent known, the identities of the members of the New Board; (c) the Assumed Executory Contracts and Unexpired Leases Schedule; (d) the Rejected Executory Contracts and Unexpired Leases Schedule; (e) the Schedule of Retained Causes of Action; (f) a summary of the material terms of the Exit Facilities, which may include the Exit Facilities Term Sheet; (g) the definitive documentation related to the Management Incentive Plan; (h) the Restructuring Transactions Memorandum; (i) the New Warrants Agreements; and (j) the Registration Rights Agreement.

131.     "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

132.     "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class, unless otherwise indicated; *provided* that, as used in Article III.B.6 and III.B.7, "*Pro Rata*" means the proportion that an Allowed Unsecured Notes Claim or Allowed General Unsecured Claim, as appropriate, bears to the aggregate amount of Allowed Unsecured Notes Claims and Allowed General Unsecured Claims that are not Convenience Claims; *provided*, *further*, that for the purpose of calculating the aggregate Allowed Unsecured Notes Claims and aggregate Allowed General Unsecured Claims for purposes of determining each Allowed Unsecured Notes Claim's and Allowed General Unsecured Claim's *Pro Rata* distribution, each Allowed Unsecured Notes Claim and Allowed General Unsecured Claim shall be counted once, notwithstanding the number of Debtors against which such claim may be asserted; *provided, further,* that for the purpose of calculating the Convenience Claim Distribution pursuant to Article III.B.7 of the Plan, "*Pro Rata*" means the proportion that the amount of a Convenience Claim bears to the aggregate amount of Convenience Claims.

133.     "*Professional*" means an Entity:  (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

134.     "*Professional Claim*" means a Claim by a professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

135.     "*Professional Fee Amount*" means the aggregate amount of Professional Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors as set forth in Article II.A.2(c) of the Plan.

136.     "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Reorganized Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount.

137.     "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases by the Claims Bar Date or the applicable Administrative Claims Bar Date, as applicable.

138.     "*Proof of Interest*" means a proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

139. "*Put Option Premium*" means a nonrefundable aggregate fee of $60 million, which represents 10 percent of the Rights Offering Amount, payable to the Backstop Parties in accordance with, and subject to the terms of, the Backstop Commitment Agreement based on their respective Backstop commitment percentages at the time such payment is made.

140. "*Registration Rights Agreement*" means the registration rights agreement pursuant to which each Backstop Party shall be entitled to registration rights with respect to its shares of New Common Stock, its New Warrants, and its shares of New Common Stock underlying its New Warrants to be entered into as of the Effective Date.  The Registration Rights Agreement will provide (among other provisions) that, after the Effective Date, at any time Reorganized Chesapeake is not required to file public reports with the SEC, Reorganized Chesapeake shall continue to file such public reports on EDGAR as a voluntary filer, unless approved by the holders of a majority of the outstanding New Common Stock.

141. "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall not be discharged hereunder and the holder's legal, equitable, and contractual rights on account of such Claim or Interest shall remain unaltered by Consummation in accordance with section 1124(1) of the Bankruptcy Code.

142. "*Rejected Executory Contracts and Unexpired Leases Schedule*" means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, which schedule shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time; *provided* that such schedule shall be in form and substance acceptable to the Required Consenting Stakeholders.

143. "*Released Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each of the Debtors' current and former directors and officers; (d) each DIP Lender; (e) each Agent; (f) each Trustee; (g) the Consenting Revolving Credit Facility Lenders; (h) the Consenting FLLO Term Loan Facility Lenders; (i) the Consenting Second Lien Noteholders; (j) the Consenting Unsecured Noteholders; (k) the Exit Facilities Lenders; (l) the Backstop Parties; (m) all holders of Interests; and (n) with respect to each of the foregoing (a) through (m), each of such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, participants, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided* that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.

144. "*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each DIP Lender; (d) each Agent; (e) each Trustee; (f) the Consenting Revolving Credit Facility Lenders; (g) the Consenting FLLO Term Loan Facility Lenders; (h) the Consenting Second Lien Noteholders; (i) the Consenting Unsecured Noteholders; (j) the Exit Facilities Lenders; (k) the Backstop Parties; (l) all holders of Claims; (m) all holders of Interests; (n) with respect to each of the foregoing (a) through (m), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, participants, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case, solely in their respective capacities as such with respect to such Entity and solely to the extent such Entity has the authority to bind such Affiliate in such capacity; *provided* that in each case, an Entity shall not be a Releasing Party if it:  (x) elects to opt out of the releases contained in the Plan; or (y) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.

145. "*Removal Deadline*" means the deadline by which the Debtors may remove actions pursuant to 28 U.S.C. § 1452 and Bankruptcy Rule 9027, as amended by the Removal Extension Order.

146.    "*Removal Extension Order*" means the *Order (I) Extending the Time Within Which the Debtors May Remove Actions and (II) Granting Related Relief* entered by the Bankruptcy Court on September 25, 2020 at CM/ECF No. 1231 in the Chapter 11 Cases.

147.    "*Reorganized Debtors*" means collectively, a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Effective Date, including any new entity established in connection with the implementation of the Restructuring Transactions.

148.    "*Reorganized Chesapeake*" means the new entity which shall be incorporated in the State of Delaware and will be the successor or assign to Chesapeake, by merger, consolidation, or otherwise, on or after the Effective Date.

149.    "*Required Consenting DIP Lenders*" means Consenting DIP Lenders holding at least 51% of the aggregate Revolving DIP Loan Commitments under the DIP Facility that are held by Consenting DIP Lenders.

150.    "*Required Consenting Revolving Credit Facility Lenders*" means Consenting Revolving Credit Facility Lenders holding at least 51% of the aggregate outstanding principal amount of the Revolving Credit Facility Claims that are held by Consenting Revolving Credit Facility Lenders.

151.    "*Required Consenting Stakeholders*" means the Required Consenting DIP Lenders, the Required Consenting Revolving Credit Facility Lenders, and the Required Plan Sponsors.

152.    "*Required Plan Sponsors*" means the Backstop Parties holding FLLO Term Loan Facility Claims and commitments to Backstop the Rights Offering such that the Required Plan Sponsors Percentage exceeds 66 2/3 percent.

153.    "*Required Plan Sponsors Percentage*" means a fraction, expressed as a percentage, (a) the numerator of which shall be the sum of (i) the aggregate outstanding principal amount of FLLO Term Loan Facility Claims that are held by the relevant Backstop Parties and (ii) the percentage of the Backstop ascribed to the relevant Backstop Parties (as set forth in the Backstop Commitment Agreement) multiplied by the Rights Offering Amount; and (b) the denominator of which shall be the sum of (i) the aggregate outstanding principal amount of FLLO Term Loan Facility Claims that are held by all of the Backstop Parties and (ii) the Rights Offering Amount.

154.    "*Restructuring Expenses*" means any reasonable and documented unpaid fees and expenses incurred on or before the Effective Date by the FLLO Professionals and the Second Lien Professionals payable on the Effective Date, subject to the conditions set forth in Article IV.U of the Plan; *provided* that reimbursement of the Second Lien Notes Trustee's financial advisor's fees and expenses shall be limited to $250,000 in the aggregate, and no Person shall be entitled to increase or seek to increase this $250,000 limit or use a charging lien or seek payment for such financial advisor's or any financial advisor to the Second Lien Notes Trustee's fees and expenses from any other source.

155.    "*Restructuring Support Agreement*" means that certain restructuring support agreement, dated as of June 28, 2020, by and among the Debtors and the Consenting Stakeholders, as may be further amended, modified, or supplemented from time to time, in accordance with its terms.

156.    "*Restructuring Term Sheet*" means the term sheet setting forth the material terms of the Restructuring Transactions, attached as Exhibit B to the Restructuring Support Agreement.

157.    "*Restructuring Transactions*" means the transactions described in Article IV.B of the Plan.

158.    "*Restructuring Transactions Memorandum*" means a document, in form and substance acceptable to the Required Consenting Stakeholders, to be included in the Plan Supplement that will set forth the material components of the Restructuring Transactions.

159.      "*Revolving Credit Facility*" means the facility outstanding under the Revolving Credit Facility Credit Agreement.

160.      "*Revolving Credit Facility Administrative Agent*" means MUFG Union Bank, N.A., in its capacity as administrative agent for the Revolving Credit Facility.

161.      "*Revolving Credit Facility Claim*" means any Claim on account of the Revolving Credit Facility, other than any Claims converted to Roll-Up Loans (as defined in the Final DIP Order).

162.      "*Revolving Credit Facility Credit Agreement*" means that certain Amended and Restated Credit Agreement, dated as of September 12, 2018 (as amended, restated, or otherwise modified from time to time), by and among Chesapeake, as borrower, the Debtor guarantors party thereto, the Revolving Credit Facility Administrative Agent, and the other lender, issuer, and agent parties party thereto.

163.      "*Revolving Credit Facility Lenders*" means the lenders party to the Revolving Credit Facility Credit Agreement.

164.      "*Revolving DIP Loan Commitment*" means a commitment to provide revolving loans under the DIP Facility.

165.      "*Rights*" means collectively, the FLLO Rights, the Second Lien Rights, and the Backstop Party Rights.

166.      "*Rights Offering*" means the New Common Stock rights offering for the Rights Offering Amount to be consummated by the Debtors on the Effective Date in accordance with the Rights Offering Procedures.

167.      "*Rights Offering Amount*" means a minimum of $600 million in aggregate amount of Rights.

168.      "*Rights Offering Participants*" means (a) holders of FLLO Term Loan Facility Claims and Second Lien Notes Claims as of the Rights Offering Record Date and (b) the Backstop Parties.

169.      "*Rights Offering Procedures*" means the procedures governing the Rights Offering attached as an exhibit to the Disclosure Statement Order.

170.      "*Rights Offering Record Date*" means the record date set by the Rights Offering Procedures, as of which date an Entity must be a record holder of FLLO Term Loan Facility Claims or Second Lien Notes Claims in order to be eligible to be a Rights Offering Participant.

171.      "*Royalty and Working Interests*" means the working interests involving the right to exploit oil, gas, and other minerals, as well as royalty and certain other mineral interests, including, but not limited to, landowner's royalty interests, overriding royalty interests, net profit interests, non-participating royalty interests, and unleased mineral interests.

172.      "*Royalty and Working Interests Administrative Claims*" means any postpetition, pre-Effective Date rights to payment arising on account of Royalty and Working Interests.

173.      "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time.

174.      "*Schedules*" means the schedules of assets and liabilities, schedules of Executory Contracts or Unexpired Leases, and statement of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules.

175.      "*SEC*" means the United States Securities and Exchange Commission.

14

176.     "*Second Lien Noteholders*" means holders of notes issued under the Second Lien Notes Indenture.

177.     "*Second Lien Notes*" means the 11.500% senior notes due 2025 issued by Chesapeake pursuant to the Second Lien Notes Indenture.

178.     "*Second Lien Notes Claim*" means any Claim on account of the Second Lien Notes.

179.     "*Second Lien Notes Indenture*" means that certain indenture dated as of December 19, 2019, by and among Chesapeake, as issuer, certain Debtors guarantors party thereto, and the Second Lien Notes Trustee, as may be amended, supplemented, or otherwise modified from time to time.

180.     "*Second Lien Notes Trustee*" means Deutsche Bank Trust Company Americas, in its capacity as trustee and collateral trustee for the Second Lien Notes Indenture.

181.     "*Second Lien Professionals*" means the Second Lien Collateral Trustee's professionals (including Morgan, Lewis & Bockius LLP, one local counsel in the relevant jurisdiction, and one financial advisor) and Franklin's professionals (including Akin Gump Strauss Hauer & Feld LLP, Moelis & Company LLC, one local counsel in each other relevant local jurisdiction, and FTI Consulting, Inc.).

182.     "*Second Lien Rights*" means the non-certificated rights that will enable the holders thereof to purchase shares of New Common Stock at an aggregate purchase price of $67.5 million at a price per share to be determined based on a 35 percent discount to the equity value per share of New Common Stock, post new-money, as implied by a Plan total enterprise value of $3.25 billion.

183.     "*Section 510(b) Claim*" means any Claim or Interest against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code, whether by operation of law or contract.

184.     "*Secured*" means, when referring to a Claim: (a) secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

185.     "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

186.     "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

187.     "*Solicitation Materials*" means the Disclosure Statement and related documentation to be distributed to holders of Claims entitled to vote on the Plan.

188.     "*Superpriority Hedge Claims*" means superpriority claims in respect of the Debtors' Superpriority Hedge Obligations.

189.     "*Superpriority Hedge Obligations*" means all hedging obligations with respect to commodity hedge transactions that are secured under the DIP Facility.

190.     "*Total Leverage*" means the ratio of (a) consolidated indebtedness net of unrestricted Cash and Cash equivalents held in a pledged account in an amount not to exceed $100 million to (b) consolidated EBITDAX calculated in accordance with the terms set forth in the Exit Facilities Term Sheet.

191.     "*Total Leverage Condition*" means the Condition Precedent to the Effective Date that provides that the Debtors shall have Total Leverage no greater than 2.25:1.00.

192.    "*Tranche A RBL Exit Facility Loans*" means fully revolving loans made under and on the terms set forth under the Exit RBL Facility which will be partially funded on the Effective Date, will have a scheduled maturity of 3 years from the Effective Date, and shall at all times be repaid prior to the repayment of Tranche B Exit RBL Facility Loans.

193.    "*Tranche B RBL Exit Facility Loans*" means term loans made under and on the terms set forth under the Exit RBL Facility which will be fully funded on the Effective Date, will have a scheduled maturity of 4 years from the Effective Date, will be repaid or prepaid only after there are no Tranche A RBL Exit Facility Loans outstanding, and once so prepaid or repaid, may not be reborrowed.

194.    "*Trustee*" means any indenture trustee, collateral trustee, or other trustee or similar entity under the Second Lien Notes or the Unsecured Notes.

195.    "*Turnover Provisions*" has the meaning set forth in Article IV.A of the Plan.

196.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

197.    "*Unimpaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

198.    "*United States Trustee*" means the United States Trustee for the jurisdiction in which the Chapter 11 Cases are commenced.

199.    "*Unsecured Claims Recovery*" means 12% of the New Common Stock (subject to dilution on account of the Management Incentive Plan, the Rights Offering, the Put Option Premium, and the New Warrants) and 50 percent of the New Class C Warrants.

200.    "*Unsecured Noteholders*" means holders of notes issued under the Unsecured Notes Indentures.

201.    "*Unsecured Notes*" means the 6.625% senior notes due 2020, the 6.875% senior notes due 2020, the 6.125% senior notes due 2021, the 5.375% senior notes due 2021, the 4.875% senior notes due 2022, the 5.750% senior notes due 2023, the 7.000% senior notes due 2024, the 8.000% senior notes due 2025, the 8.000% senior notes due 2026, the 7.500% senior notes due 2026, the 8.000% senior notes due 2027, the 5.500% convertible senior notes due 2026, and the 6.875% senior notes due 2025, all issued by certain Debtors pursuant to the Unsecured Notes Indentures.

202.    "*Unsecured Notes Claim*" means any Claim on account of the Unsecured Notes.

203.    "*Unsecured Notes Indentures*" means those certain indentures dated as of the following dates: August 2, 2010 (6.625% senior notes due 2020); November 8, 2005 (6.875% senior notes due 2020); February 11, 2011 (6.125% senior notes due 2021); April 1, 2013 (5.375% senior notes due 2021); April 24, 2014 (4.875% senior notes due 2022); April 1, 2013 (5.750% senior notes due 2023); September 27, 2018 (7.000% senior notes due 2024); December 20, 2016 (8.000% senior notes due 2025); April 3, 2019 (8.000% senior notes due 2026); September 27, 2018 (7.500% senior notes due 2026); June 6, 2017 (8.000% senior notes due 2027); October 5, 2016 (5.500% convertible senior notes due 2026); and February 1, 2017 (6.875% senior notes due 2025), each by and among certain of the Debtors and the Unsecured Notes Trustees, as may be amended, supplemented, or otherwise modified from time to time.

204.    "*Unsecured Notes Trustees*" means the following entities, each in its capacity as trustee for the Unsecured Notes Indentures:  The Bank of New York Trust Company, N.A. (6.625% senior notes due 2020); The Bank of New York Trust Company, N.A. (6.875% senior notes due 2020); The Bank of New York Trust Company, N.A. (6.125% senior notes due 2021); Wilmington Savings Fund Society, FSB (5.375% senior notes due 2021); Wilmington Savings Fund Society, FSB (4.875% senior notes due 2022); Wilmington Savings Fund Society, FSB (5.750% senior notes due 2023); Wilmington Savings Fund Society, FSB (7.000% senior notes due 2024); Wilmington Savings Fund Society, FSB (8.000% senior notes due 2025); Wilmington Savings Fund Society, FSB (8.000% senior notes due 2026); Wilmington Savings Fund Society, FSB (7.500% senior notes due 2026); Wilmington Savings Fund Society, FSB (8.000% senior notes due 2027); Wilmington Savings Fund Society, FSB (5.500% convertible senior notes due 2026); and U.S. Bank National Association (6.875% senior notes due 2025).

B.      *Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with the Plan or Confirmation Order, as applicable; (4) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (15)  references to "Proofs of Claim," "holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "holders of Interests," "Disputed Interests," and the like, as applicable; (16) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (17) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; *provided* that nothing in this clause (2) or clause (3) shall affect any parties' consent rights over any of the Definitive Documents or any amendments thereto, as provided for in the Restructuring Support Agreement.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.      *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or the Reorganized Debtors, as applicable.

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan or Plan Supplement, the Confirmation Order shall control.

H.      *Consultation, Information, Notice, and Consent Rights.*

Notwithstanding anything herein to the contrary, any and all consultation, information, notice, and consent rights of the parties to the Restructuring Support Agreement, as set forth in the Restructuring Support Agreement (including the exhibits thereto), with respect to the form and substance of this Plan, all exhibits to the Plan, the Plan Supplement, and all other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and fully enforceable as if stated in full herein.

Failure to reference the rights referred to in the immediately preceding paragraph as such rights relate to any document referenced in the Restructuring Support Agreement shall not impair such rights and obligations.

Further, any and all consultation, information, notice, and consent rights of the DIP Agent, DIP Lenders, Revolving Credit Facility Administrative Agent, Revolving Credit Facility Lenders, Exit Facilities Agent, and Exit Facilities Lenders as set forth in the DIP Documents, DIP Order, and Exit Facilities Documents, as applicable, relating to the form and substance of this Plan, all exhibits to the Plan, the Plan Supplement, all other Definitive Documents, and any consents, waivers, or other rights under or from any such documents, shall be incorporated herein by this reference and fully enforceable as if stated in full herein.  Failure to reference such rights in specific provisions of this Plan shall not impair such rights and obligations.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, DIP CLAIMS, AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims, DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.    *Administrative Claims.*

1.    General Administrative Claims.

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors (with the consent of the Required Consenting Stakeholders) or the Reorganized Debtors, as applicable, or otherwise provided for under the Plan, each holder of an Allowed Administrative Claim (other than holders of Professional Claims, DIP Claims, and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim treatment consistent with section 1129(a)(2) of the Bankruptcy Code in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Except as otherwise provided in this Article II.A of the Plan, and except with respect to Administrative Claims that are Professional Claims or DIP Claims, requests for payment of Administrative Claims must be Filed with the Bankruptcy Court and served on the Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the applicable Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be Filed with the Bankruptcy Court and served on the requesting party no later than 60 days after the applicable Administrative Claims Bar Date.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed.

The Debtors shall indefeasibly pay in Cash all Existing RBL Adequate Protection Payments that have accrued and are unpaid as of the Effective Date pursuant to the terms of the DIP Order, and none of the Revolving Credit Facility Administrative Agent, the Revolving Credit Facility Lenders, or the Collateral Trustee shall be required to File a request for payment of an Administrative Claim with the Bankruptcy Court on account of such Existing RBL Adequate Protection Payments.  The Debtors' obligation to pay the Existing RBL Adequate Protection Payments, to the extent not indefeasibly paid in full in Cash on the Effective Date, shall survive the Effective Date and shall not be released or discharged pursuant to this Plan or the Confirmation Order until indefeasibly paid in full in Cash.

2.    Professional Compensation.

(a)    Final Fee Applications and Payment of Professional Claims.

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 45 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court.  The Reorganized Debtors shall pay Professional Claims in Cash

19

in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date.

(b)  Professional Fee Escrow Account.

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount, which shall be funded by the Reorganized Debtors. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Allowed Professional Claims shall be paid in Cash to the Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Claims are Allowed. When such Allowed Professional Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

(c)  Professional Fee Amount.

Professionals shall reasonably estimate their unpaid Professional Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Cases. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

(d)  Post-Confirmation Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

B.  *DIP Claims.*

For the avoidance of doubt, the DIP Claims are Allowed in full in accordance with the DIP Order. Except to the extent that a holder of an Allowed DIP Claim agrees to less favorable treatment, on the Effective Date, each holder of an Allowed DIP Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for such holder's Allowed DIP Claims, payment in full in Cash from, at the Debtors' option, (1) the proceeds of the Exit Facilities available as of the Effective Date and consistent with the Exit Facilities Term Sheet; (2) the proceeds of the Rights Offering; and (3) Cash on hand; *provided* that to the extent that such DIP Lender is also an Exit Facility Lender, such DIP Lender's Allowed DIP Claims will first be reduced dollar-for-dollar and satisfied by the amount of its Exit Facilities Loans provided by such DIP Lender as of the Effective Date; *provided further* that Allowed Superpriority Hedge Claims, if any, shall be converted to secured obligations under the Exit Facilities Documents to the extent permitted under the terms of the documentation evidencing the Superpriority Hedge Claims. For the avoidance of doubt, the Debtors shall indefeasibly pay in cash all DIP Agent Fees and Expenses and non-contingent indemnity obligations owed to the DIP Agent or DIP Lenders that have accrued and are unpaid as of the Effective Date pursuant to the terms of the DIP Order. The Debtors' obligation to pay the DIP Agent Fees and Expenses and non-contingent indemnity obligations owed to the DIP Agent or DIP Lenders, to the extent not indefeasibly paid in full in Cash on the Effective Date, shall survive the Effective Date and shall not be released or discharged pursuant to this Plan or the Confirmation Order until indefeasibly paid in full in Cash.

Upon the final and indefeasible payment or satisfaction of the Allowed DIP Claims in accordance with this 0, all Liens and security interests granted to secure the Allowed DIP Claims shall automatically be terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

C.       *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

D.       *Statutory Fees.*

All monthly reports shall be filed in a form reasonably acceptable to the U.S. Trustee, and all fees due and payable pursuant to section 1930 of Title 28 of the United States Code before the Effective Date with respect to the Debtors shall be paid by the Debtors.  On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the United States Trustee.  Each Debtor shall remain obligated to pay quarterly fees to the United States Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.       *Classification of Claims and Interests.*

This Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in Article II hereof, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest fits within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Revolving Credit Facility Claims | Impaired | Entitled to Vote |
| Class 4 | FLLO Term Loan Facility Claims | Impaired | Entitled to Vote |
| Class 5 | Second Lien Notes Claims | Impaired | Entitled to Vote |
| Class 6 | Unsecured Notes Claims | Impaired | Entitled to Vote |
| Class 7 | General Unsecured Claims | Impaired | Entitled to Vote |

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 8 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept / Deemed to Reject) |
| Class 9 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept / Deemed to Reject) |
| Class 10 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.    *Treatment of Claims and Interests.*

Each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Allowed Interest, except to the extent less favorable treatment is agreed to by the Reorganized Debtors and the holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

1.   Class 1 – Other Secured Claims.

(a)    *Classification*:  Class 1 consists of all Other Secured Claims.

(b)    *Treatment*: On the Effective Date, each holder of an Allowed Other Secured Claim shall receive, at the Debtors' option and in consultation with the Required Consenting Stakeholders:

(i)    payment in full in Cash;

(ii)   the collateral securing its Allowed Other Secured Claim;

(iii)  Reinstatement of its Allowed Other Secured Claim; or

(iv)   such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)    *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

2.   Class 2 – Other Priority Claims.

(a)    *Classification*:  Class 2 consists of all Other Priority Claims.

(b)    *Treatment*:  Each holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code.

(c)    *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

3. Class 3 – Revolving Credit Facility Claims.

    (a)    *Classification*:  Class 3 consists of all Revolving Credit Facility Claims.

    (b)    *Treatment*:  On the Effective Date, the Revolving Credit Facility Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the Revolving Credit Facility, including all principal, any accrued and unpaid interest at the non-default rate, and all accrued and unpaid fees, expenses, and non-contingent indemnity payable under the Revolving Credit Facility.  On the Effective Date, except to the extent the holder of an Allowed Revolving Credit Facility Claim agrees to less favorable treatment, each holder of an Allowed Revolving Credit Facility Claim shall receive,  in accordance with such holder's prior predetermined allocation, either (i) Tranche A RBL Exit Facility Loans or (ii) Tranche B RBL Exit Facility Loans, on a dollar-for-dollar basis; *provided* that any Claims on account of accrued but unpaid Existing RBL Adequate Protection Payments shall be paid in full as Cash as set forth in Section II.A.1 of the Plan.

    (c)    *Voting*:  Class 3 is Impaired under the Plan.  Holders of Revolving Credit Facility Claims are entitled to vote to accept or reject the Plan.

4. Class 4 – FLLO Term Loan Facility Claims.

    (a)    *Classification*:  Class 4 consists of all FLLO Term Loan Facility Claims.

    (b)    *Treatment*:  On the Effective Date, the FLLO Term Loan Facility Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the FLLO Term Loan Facility, including all principal, accrued and unpaid interest at the applicable default rate, the make whole amount, and all accrued and unpaid fees, expenses, and non-contingent indemnity payable under the FLLO Term Loan Facility.  On the Effective Date, each holder of an Allowed FLLO Term Loan Facility Claim shall receive its *Pro Rata* share of (i) 76 percent of the New Common Stock (subject to dilution on account of the Management Incentive Plan, the Rights Offering, the Put Option Premium, and the New Warrants) and (ii) the FLLO Rights.

    (c)    *Voting*:  Class 4 is Impaired under the Plan.  Holders of FLLO Term Loan Facility Claims are entitled to vote to accept or reject the Plan.

5. Class 5 – Second Lien Notes Claims.

    (a)    *Classification*:  Class 5 consists of all Second Lien Notes Claims.

    (b)    *Treatment*:  On the Effective Date, the Second Lien Notes Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the Second Lien Notes Indenture, including the aggregate outstanding principal amount of Second Lien Notes, any premium (including the Make-Whole Premium (as defined in the Second Lien Notes Indenture)), and accrued and unpaid interest.  Each holder of an Allowed Second Lien Notes Claim shall receive its *Pro Rata* share of (i) 12 percent of the New Common Stock (subject to dilution on account of the Management Incentive Plan, the Rights Offering, the Put Option Premium, and the New Warrants), (ii) the Second Lien Rights, (iii) the New Class A Warrants, (iv) the New Class B Warrants, and (v) 50 percent of the New Class C Warrants.

    (c)    *Voting*:  Class 5 is Impaired under the Plan.  Holders of Second Lien Notes Claims are entitled to vote to accept or reject the Plan.

6. <u>Class 6 – Unsecured Notes Claims</u>.

    (a)    *Classification*:  Class 6 consists of all Unsecured Notes Claims.

    (b)    *Treatment*:  On the Effective Date, the Unsecured Notes Claims shall be deemed Allowed in full, and each holder of an Allowed Unsecured Notes Claim shall receive its *Pro Rata* share of  the Unsecured Claims Recovery.

    (c)    *Voting*:  Class 6 is Impaired under the Plan.  Holders of Unsecured Notes Claims are entitled to vote to accept or reject the Plan.

7. <u>Class 7 – General Unsecured Claims</u>.

    (a)    *Classification*:  Class 7 consists of all General Unsecured Claims.

    (b)    *Treatment*:  On the Effective Date, each holder of an Allowed General Unsecured Claim shall receive its *Pro Rata* share of the Unsecured Claims Recovery; *provided* that to the extent such Allowed General Unsecured Claim is a Convenience Claim, such Holder shall receive the Convenience Claim Distribution.

    (c)    *Voting*:  Class 7 is Impaired under the Plan.  Holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

8. <u>Class 8 – Intercompany Claims</u>.

    (a)    *Classification*:  Class 11 consists of all Intercompany Claims.

    (b)    *Treatment*:  On the Effective Date, unless otherwise provided for under the Restructuring Transactions Memorandum, each Allowed Intercompany Claim shall have its Claim:

        (i)    Reinstated; or

        (ii)    distributed, contributed, set off, settled, canceled and released, or otherwise addressed at the option of the Debtors with the consent of the Required Consenting Stakeholders; *provided* that no distribution shall be made on account of any such Intercompany Claims.

    (c)    *Voting*:   Class 8 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 8 is not entitled to vote to accept or reject the Plan.

9. <u>Class 9 – Intercompany Interests</u>.

    (a)    *Classification*:  Class 9 consists of all Intercompany Interests.

    (b)    *Treatment*:  On the Effective Date, each holder of Intercompany Interests shall have such Interest:

        (i)    Reinstated; or

        (ii)    canceled, released, and extinguished without any distribution at the Debtors' election with the consent of the Required Consenting Stakeholders.

    (c)    *Voting*:  Class 9 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 9 is not entitled to vote to accept or reject the Plan.

10. <u>Class 10 – Existing Equity Interests</u>.

    (a)    *Classification*:  Class 10 consists of all Existing Equity Interests.

    (b)    *Treatment*:  On the Effective Date, each holder of Existing Equity Interests shall have such Interest cancelled, released, and extinguished without any distribution.

    (c)    *Voting*:  Class 10 is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 14 is not entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including, all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

D.    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.    *Voting Classes, Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

F.    *Intercompany Interests*.

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure for the ultimate benefit of the holders of New Common Stock, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims.

G.       *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan. The Debtors reserve the right, subject to the prior consent of the Required Consenting Stakeholders, which shall not be unreasonably withheld, to modify the Plan in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H.       *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.       *Subordinated Claims and Interests.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Any such contractual, legal, or equitable subordination rights shall be settled, compromised, and released pursuant to the Plan.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.       *General Settlement of Claims and Interests.*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including (1) any challenge to the amount, validity, perfection, enforceability, priority or extent of the DIP Claims, Revolving Credit Facility Claims, FLLO Term Loan Facility Claims, Second Lien Notes Claims, and Unsecured Notes Claims and (2) any claim to avoid, subordinate, or disallow any DIP Claims, Revolving Credit Facility Claims, FLLO Term Loan Facility Claims, Second Lien Notes Claims, and Unsecured Notes Claims, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise, including, without limitation, any claim of subordination or turnover of any payments arising under any provision of the Intercreditor Agreement, including, but not limited to, any turnover provisions in sections 3.05, 4.02(l), 6.01 and 7.03 thereof, or the Collateral Trust Agreement, including sections 5.05, 6.02(o), 8.01, and 9.03 thereof (the "Turnover Provisions"). In consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the FLLO Term Loan Facility Lenders and Revolving Credit Facility Lenders shall conclusively, absolutely, irrevocably and forever waive any rights they have to seek subordination or turnover of any payments arising under any provision of the Intercreditor Agreement, including, but not limited to, the Turnover Provisions. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates. Subject to Article VI hereof, all distributions made to holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

B.      *Restructuring Transactions.*

On or before the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into and shall take any actions as may be necessary or appropriate to effect the Restructuring Transactions, including as set forth in the Restructuring Transactions Memorandum.  The Restructuring Transactions Memorandum shall be reasonably acceptable to the Required Consenting Stakeholders.  The actions to implement the Restructuring Transactions may include:  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; (4) the execution and delivery of the New Organizational Documents; (5) the execution and delivery of the Exit Facilities Documents (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees to be paid by the Debtors or the Reorganized Debtors, as applicable), subject to any post-closing execution and delivery periods provided for in the Exit Facilities Documents; (6) execution and delivery of the Registration Rights Agreement; (7) pursuant to the Rights Offering Procedures and the Backstop Commitment Agreement, the implementation of the Rights Offering, the distribution of the Rights to the Rights Offering Participants as of the Rights Offering Record Date, and the issuance of New Common Stock in connection therewith; (8) the issuance of the New Common Stock and the New Warrants as set forth in the Plan; and (9) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan.  The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan. On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors, as applicable, shall issue all Securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring Transactions.

C.      *Midstream Savings Requirement.*

In the event that sufficient savings with respect to the Debtors' midstream contracts (as determined by the Required Plan Sponsors) are not achieved, unless the Debtors and the Required Consenting Stakeholders agree otherwise (but subject to the reasonable written consent of the DIP Agent and the Required Consenting DIP Lenders), certain of the Debtors' assets will be separated from the Debtors' remaining assets to the extent not inconsistent with 28 U.S.C. § 959(b).  The Debtors' restructuring will then be consummated with respect to the remaining assets, and the separated assets will be wound down in a manner agreed to by the Debtors and the Required Consenting Stakeholders.

D.      *Reorganized Debtors.*

On the Effective Date, the New Board shall be established, and the Reorganized Debtors shall adopt their applicable New Organizational Documents.  The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.  Cash payments to be made pursuant to the Plan will be made by the Debtors or Reorganized Debtors.  The Debtors and Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or Reorganized Debtors, as applicable, to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date agreement, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing, subject to the New Organizational Documents and the Exit Facilities Documents, as the boards of directors of the applicable Reorganized Debtors deem appropriate.

27

E.      *Sources of Consideration for Plan Distributions.*

        The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with: (1) Cash on hand, including Cash from operations or asset dispositions; (2) Cash proceeds from the sale of New Common Stock pursuant to the Rights Offering; (3) the New Common Stock; (4) the New Warrants; and (5) the proceeds of the Exit Facilities, as applicable.  Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Plan, including the New Common Stock and the Rights will be exempt from SEC registration to the fullest extent permitted by law, as described more fully in Article VI.D below.

        1.      Rights Offering.

        The Debtors shall distribute the Rights to the Rights Offering Participants on behalf of the Reorganized Debtors as set forth in the Plan and the Rights Offering Procedures.  Pursuant to the Backstop Commitment Agreement and the Rights Offering Procedures, the Rights Offering shall be open to all Rights Offering Participants, and (a) Rights Offering Participants that are holders of Allowed FLLO Term Loan Facility Claims shall be entitled to participate in the Rights Offering up to a maximum amount of each holder's *Pro Rata* share of the FLLO Rights; (b) Rights Offering Participants that are holders of Allowed Second Lien Notes Claims shall be entitled to participate in the Rights Offering up to a maximum amount of each holder's *Pro Rata* share of the Second Lien Rights; and (c) Rights Offering Participants that are Backstop Parties (or have certain rights and obligations of Backstop Parties pursuant to agreement of the parties to the Backstop Commitment Agreement) shall be entitled to participate in the Rights Offering up to a maximum amount of each holder's Backstop Party Rights.  Rights Offering Participants shall have the right to purchase their allocated shares of New Common Stock at the per share price set forth in the Backstop Commitment Agreement and the Rights Offering Procedures.

        Upon exercise of the Rights by the Rights Offering Participants pursuant to the terms of the Backstop Commitment Agreement and the Rights Offering Procedures, Reorganized Chesapeake shall be authorized to issue the New Common Stock issuable pursuant to such exercise.

        In exchange for the Put Option Premium and in accordance with the Backstop Commitment Agreement, the Backstop Parties have committed to fully backstop, severally and not jointly, the Rights Offering Amount.  Pursuant to the Backstop Commitment Agreement and the allocations contained therein (subject to the transfer rights and restrictions contained in the Backstop Commitment Agreement, the "Backstop Allocations"), the Backstop Parties shall, severally and not jointly, backstop the Rights Offering Amount, purchase the New Common Stock not subscribed for purchase by the Rights Offering Participants at the per share purchase price set forth in the Backstop Commitment Agreement and exercise the Backstop Party Rights. The Put Option Premium shall be paid by Chesapeake or Reorganized Chesapeake in accordance with the Backstop Commitment Agreement and Backstop Commitment Agreement Approval Order.  For the avoidance of doubt, if the Put Option Premium is payable in Cash pursuant to the terms and conditions set forth in the Backstop Commitment Agreement and Backstop Commitment Agreement Approval Order, the Put Option Premium shall be a superpriority administrative expense with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113, and 1114 of the Bankruptcy Code, or otherwise and including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code except it shall be unsecured and (i) be subordinated in priority to (a) the DIP Claims and (b) any adequate protection granted on account of the Revolving Credit Facility Claims (and any Claims to which such Claims in (a) or (b) are subordinate); and (ii) payable only after all such Claims set forth in clause (i) have been paid in full in Cash or provided such other treatment as is agreed to by the  requisite parties, as set forth in section 3.1 of the Backstop Commitment Agreement.

        All shares of the New Common Stock, the New Warrants (and any shares of the New Common Stock issuable upon the exercise thereof), the Rights (and any shares issuable upon the exercise thereof other than the unsubscribed shares of New Common Stock issued to the Backstop Parties pursuant to the Backstop Commitment Agreement), and the shares issuable as part of the Put Option Premium (collectively, the "1145 Securities") will be issued in reliance

upon section 1145 of the Bankruptcy Code to the extent permitted under applicable law.  The unsubscribed shares of New Common Stock issued to the Backstop Parties pursuant to the Backstop Commitment Agreement (collectively, the "4(a)(2) Securities" and together with the 1145 Securities and any other Securities issued under the Plan, the "Plan Securities") will be issued in reliance upon section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.  Entry of the Confirmation Order shall constitute Bankruptcy Court approval of the Rights Offering (including the transactions contemplated thereby, and all actions to be undertaken, undertakings to be made, and obligations to be incurred by Reorganized Chesapeake in connection therewith).  On the Effective Date, the rights and obligations of the Debtors under the Backstop Commitment Agreement shall vest in the Reorganized Debtors, as applicable.

The proceeds of the Rights Offering shall be used by the Debtors or Reorganized Debtors, as applicable, to fund payments under the Plan and for general corporate and strategic purposes as determined by management.

2.   Rights and New Common Stock.

Reorganized Chesapeake shall be authorized to issue the Rights and the New Common Stock to certain holders of Claims pursuant to Article III.B.  Such New Common Stock shall be issued to Rights Offering Participants and/or Backstop Parties pursuant to the Rights Offering, the Backstop Commitment Agreement, and the New Organizational Documents.  Reorganized Chesapeake shall issue all securities, instruments, certificates, and other documents required to be issued by it with respect to all such shares of New Common Stock.  All such Rights and shares of New Common Stock, and any other shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

Prior to the Effective Date, the Required Plan Sponsors shall determine whether Reorganized Chesapeake shall use commercially reasonable efforts to (i) cause the New Common Stock to be listed on a National Securities Exchange on the Effective Date or to (ii) cause the New Common Stock to be listed on an Alternative Securities Exchange on the Effective Date or as soon as reasonably practicable thereafter, to engage a market maker for the New Common Stock and to take other reasonable steps to establish that the New Common Stock is regularly traded on an established securities market for purposes of section 897 under the Code and Treasury regulations promulgated and proposed to be promulgated thereunder.

3.   New Warrants.

On the Effective Date, Reorganized Chesapeake will issue the New Warrants to certain holders of Claims pursuant to Article III.B this Plan.  Issuances of the New Warrants shall be governed by the terms and conditions set forth in this Plan and the New Warrant Agreements applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating each such issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance without the need for execution by any party thereto other than the applicable Reorganized Debtor(s).  The New Warrants issued pursuant to the Plan and the shares of New Common Stock that may be issued upon exercise of the New Warrants shall be duly authorized, validly issued, fully paid, and non-assessable, without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors, as applicable.

4.   Exit Facilities.

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities (the terms of which will be set forth in the Exit Facilities Documents).

To the extent applicable, Confirmation of the Plan shall be deemed (a) approval of the Exit Facilities (including the transactions and related agreements contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), to the extent not approved by the Bankruptcy Court previously, and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents and agreements necessary or appropriate to pursue or obtain the Exit Facilities, including the Exit Facilities Documents, and incur and pay any fees and expenses in

29

connection therewith, and (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, may deem to be necessary to consummate the Exit Facilities.

As of the Effective Date, upon the granting or continuation of Liens in accordance with the Plan and the Exit Facilities Documents, such Liens shall constitute valid, binding, enforceable, and automatically perfected Liens in the collateral specified in the Exit Facilities Documents. The Exit Facilities Agent or holder(s) of Liens under the Exit Facilities Documents are authorized to file with the appropriate authorities mortgages, financing statements, and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests. The guarantees, mortgages, pledges, Liens, and other security interests granted to secure the obligations arising under the Exit Facilities Documents have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy law, and the priorities of such Liens and security interests shall be as set forth in the Exit Facilities Documents. The Reorganized Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

F.      *Convenience Claim Distribution Reserve.*

On the Effective Date, the Reorganized Debtors shall establish and fund the Convenience Claim Distribution Reserve with Cash in an amount equal to $10,000,000.00. The Convenience Claim Distribution Reserve shall be maintained in trust solely for holders of Convenience Claims. Such funds shall not be considered property of the Debtors or the Reorganized Debtors; *provided* that any funds remaining in the Convenience Claim Distribution Reserve after all Convenience Claim Distributions have been made shall be distributed to and vest in the Reorganized Debtors. Convenience Claims shall be paid in accordance with Article V1.A of the Plan.

G.      *Corporate Existence.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended, amended and restated, or replaced under the Plan or otherwise, including pursuant to the New Organizational Documents, and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended, amended and restated, or replaced pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law). After the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of the Reorganized Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. After the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

H.      *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Confirmation Order, the Plan (including, for the avoidance of doubt, the Restructuring Transactions Memorandum), or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Plan or Plan Supplement, on the Effective Date, all property in each

Estate that constitutes property of the Estate under section 541 of the Bankruptcy Code, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

Nothing in the Plan or the Confirmation Order shall operate as a finding or determination that funds (1) held by the Debtors or subject to their control and (2) to which any holder of a Royalty and Working Interest has asserted or may assert a right of entitlement or ownership on account of such Royalty and Working Interest, constitute property of any of the Estates under section 541 of the Bankruptcy Code or otherwise.  All parties' rights with respect to such issue remain unaffected by Confirmation of the Plan and entry of the Confirmation Order.

I.      *Cancellation of Existing Securities and Agreements.*

On the Effective Date, except as otherwise provided in this Plan, all notes, instruments, certificates, credit agreements, indentures, security agreements, collateral agreements, and other documents evidencing Claims or Interests shall be cancelled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect.  Holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, Securities, and other documentation, or the cancellation thereof, except the rights provided for or preserved pursuant to this Plan or the Confirmation Order.

Notwithstanding anything to the contrary herein, to the extent cancelled pursuant to this Plan, the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured Notes Indentures shall continue in effect solely to the extent necessary to:  (1) permit holders of Claims under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured Notes Indentures to receive their respective Plan distributions, if any; (2) permit the Debtors or the Reorganized Debtors to make Plan distributions on account of the Allowed Claims under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured Notes Indentures; (3) permit the Agents and Trustees to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of the DIP Order, the DIP Credit Agreement, this Plan, and the Confirmation Order, as applicable; (4) allow the Agents and Trustees to enforce their rights, claims, and interests against any party other than the Debtors; (5) preserve any rights of the Agents and Trustees to payment of fees, expenses, and indemnification obligations as against any money or property distributable to holders of Claims under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured Notes Indentures, respectively, including any rights to priority of payment and/or to exercise charging liens; (6) permit the Agents and Trustees to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or an appellate court, including to enforce any obligation owed to the Agents and Trustees or other holders of Claims under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured Notes Indentures, as applicable; (7) preserve the rights and obligations of the parties under the Exit Facilities Documents, as applicable; and (8) allow the Agents and Trustees to maintain any right of indemnification, contribution, or subrogation under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured Notes Indentures.

Except as provided in this Plan, on the Effective Date, the Agents and Trustees, and their respective agents, successors, and assigns, shall be automatically and fully discharged of all of their duties and obligations associated with the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured Notes Indentures, as applicable.  To the extent cancelled in accordance with this Plan, the commitments and obligations (if any) of the holders under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured

Notes Indentures to extend any further or future credit or financial accommodations to any of the Debtors, any of the Debtors' respective subsidiaries, or any of the Debtors' respective successors or assigns under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured Notes Indentures, as applicable, shall fully terminate and be of no further force or effect on the Effective Date.

J.     *Corporate Action.*

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including: (1) implementation of the Restructuring Transactions, including the Rights Offering; (2) selection of the directors and officers for the Reorganized Debtors; (3) the issuance and distribution of the New Common Stock in accordance with the Plan, including all shares of New Common Stock issued by Reorganized Chesapeake to the Backstop Parties as part of the Put Option Premium and the unsubscribed shares of New Common Stock issued to Backstop Parties pursuant to the Backstop Commitment Agreement; (4) issuance and distribution of the Rights and subsequent issuance and distribution of New Common Stock issuable upon exercise of such Rights; (5) execution and delivery of the Registration Rights Agreement; (6) issuance and distribution of the New Warrants and entry into the New Warrants Agreements; (7) entry into the Exit Facilities Documents; (8) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (9) approval and adoption of the New Organizational Documents; (10) entry into the Management Incentive Plan; (11) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (12) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).   All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, members, directors, or officers of the Debtors or the Reorganized Debtors, as applicable.   On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Common Stock, Rights, the Registration Rights Agreement, the Management Incentive Plan, the New Warrants and the New Warrants Agreements, the New Organizational Documents, the Exit Facilities Documents, and any and all other agreements, documents, Securities, and instruments relating to the foregoing.   The authorizations and approvals contemplated by this Article IV.J shall be effective notwithstanding any requirements under non-bankruptcy law.

K.     *New Organizational Documents.*

On or immediately prior to the Effective Date, the New Organizational Documents shall be automatically adopted by the applicable Reorganized Debtors.  To the extent required under the Plan or applicable non-bankruptcy law, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state if and to the extent required in accordance with the applicable laws of the respective state.  The New Organizational Documents will (i) prohibit the issuance of non-voting equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code; (ii) with respect to the New Organizational Documents of Reorganized Chesapeake, authorize the issuance of New Common Stock in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by this Plan (including as a result of the exercise of New Warrants); and (iii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate this Plan and the transactions contemplated herein. The New Organizational Documents shall also provide for the indemnification and exculpation of directors, officers and appropriate persons to the fullest extent permitted by applicable law.

If requested by the Required Consenting Stakeholders before the Effective Date, the New Organizational Documents will include transfer restrictions designed to limit an ownership change for purposes of section 382 of the Code or otherwise the Debtors or Reorganized Debtors, as applicable, may adopt and implement a stockholder rights plan designed for such purpose, in each case effective upon the Effective Date.

32

The New Organizational Documents of Reorganized Chesapeake shall also provide that until such time as the New Common Stock is listed on a National Securities Exchange the Reorganized Debtors shall not, without the approval of the holders of the majority of outstanding New Common Stock: (i) issue shares of New Common Stock in excess of 5% of the fully-diluted number of shares of New Common Stock outstanding and authorized for issuance under the Plan on the Effective Date (including all shares contemplated under the claims recovery, the New Warrants, the Rights Offering, the Backstop Commitment Agreement and the Management Incentive Plan) or authorize or issue any shares of preferred stock; *provided* that this limitation shall not apply in connection with the adoption of a bona fide stockholder rights plan by Reorganized Chesapeake's board of directors; (ii) enter into any sales, transfers or licenses of any Reorganized Chesapeake subsidiary, division, operation, business, line of business, assets or property, in each case, held by Reorganized Chesapeake or any of its subsidiaries with any person other than Reorganized Chesapeake or one or more of its wholly-owned subsidiaries involving consideration in excess of $50,000,000 per transaction or series of related transactions; or (iii) make any acquisition, by merger, consolidation or stock or asset purchase or investment with respect to any business, assets, property or any corporation or other entity, involving consideration in excess of $50,000,000 per transaction or series of related transactions.

On or after the Effective Date, the Reorganized Debtors may amend, amend and restate or modify their respective New Organizational Documents in accordance with the terms thereof, and the Reorganized Debtors may file such amended, amended and restated or modified certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of their respective state of incorporation and the New Organizational Documents.

L.      *Indemnification Obligations.*

Consistent with applicable law, all indemnification provisions in place as of the Effective Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, the DIP Order, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, the DIP Agent, the DIP Lenders, the Revolving Credit Facility Agent, the Consenting Revolving Credit Facility Lenders, the Consenting FLLO Term Loan Facility Lenders, the Collateral Trustee, the Second Lien Notes Trustee, the Consenting Second Lien Noteholders, and the Consenting Unsecured Noteholders, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, the DIP Agent, the DIP Lenders, the Revolving Credit Facility Agent, the Consenting Revolving Credit Facility Lenders, the Consenting FLLO Term Loan Facility Lenders, the Collateral Trustee, the Second Lien Notes Trustee, the Consenting Second Lien Noteholders, and the Consenting Unsecured Noteholders, as applicable, than the indemnification provisions in place prior to the Effective Date.

M.      *Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, the terms of the current members of the board of directors of Chesapeake shall expire and the new directors and officers of the Reorganized Chesapeake shall be appointed. The identities of directors on the New Board shall be set forth in the Plan Supplement to the extent known at the time of Filing. Each member of the New Board will serve from and after the Effective Date pursuant to applicable law and the terms of the New Organizational Documents. The existing boards of directors and other governing bodies of the other Reorganized Debtors will be deemed to have resigned on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity.

Corporate governance for Reorganized Chesapeake, including charters, bylaws, operating agreements, or other organization documents, as applicable, shall be consistent with section 1123(a)(6) of the Bankruptcy Code and the New Organizational Documents.

N.      *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers (as applicable), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities,

33

instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, Exit Facilities entered into, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

O.      *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors, including the New Common Stock and the New Warrants (including the New Common Stock that may be issuable upon exercise of the New Warrants); (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for the Reorganized Debtors' obligations under and in connection with the Exit Facilities; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

P.      *Director and Officer Liability Insurance.*

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to sections 105 and 365(a) of the Bankruptcy Code effective as of the Effective Date.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the unexpired D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

Q.      *Management Incentive Plan.*

On the Plan Effective Date, the Reorganized Debtors shall adopt a management incentive plan (the "Management Incentive Plan").  All grants under the Management Incentive Plan shall be determined at the sole discretion of the New Board including, without limitation, with respect to the participants, allocation, timing, and the form and structure of the options, warrants, and/or equity compensation to be provided thereunder and taking into account market compensation levels and historical equity compensation structures.

R.      *Employee Benefits.*

Unless otherwise provided herein, and subject to Article V hereof, all wages, compensation, and benefits programs, including executive compensation programs and any motions in the Bankruptcy Court for the approval thereof, will be continued according to existing terms and practices.  On the Effective Date, the Debtors shall (1) assume all employment agreements, indemnification agreements, or other agreements entered into with current and former employees; or (2) enter into new agreements with such employees on terms and conditions acceptable to the Debtor and such employee.   Notwithstanding the foregoing, any employment agreements or other employment-related agreements that provide for any acceleration or enhancement of payments (including severance payments), vesting, benefits, or other rights in connection with a transaction that constitutes a change in control, change of control, or similar concept under such agreements, shall only be assumed if and to the extent that the Debtors, with the consent of the Required Plan Sponsors, obtain waivers specifying that the consummation of the Restructuring Transactions shall not trigger any such rights under such agreements.

For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

Notwithstanding the foregoing, on the Effective Date, the Debtors may enter into new arrangements with employees on terms and conditions acceptable to the Debtors, the Required Plan Sponsors, and such employee.

S.      *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than: (i) the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII hereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date; and (ii) all Causes of Action that arise under sections 544, 547, 548, and 549 of the Bankruptcy Code and state fraudulent conveyance law.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII hereof.  Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date.  Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor, without the need for any objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.**  The Reorganized Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court.  If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or Reorganized Debtors, as applicable, and the objection party for thirty (30) days, such objection shall be resolved by the Bankruptcy Court.  Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII hereof.  The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

T.    *Preservation of Royalty and Working Interests.*

Notwithstanding any other provision in the Plan, on and after the Effective Date, all Royalty and Working Interests shall remain in full force and effect in accordance with the terms of the granting instruments or other governing documents applicable to such Royalty and Working Interests.

Royalty and Working Interests shall not be modified, affected or impaired in any manner by any provision of the Plan or the Confirmation Order, including but not limited to any injunctive or stay relief, and the legal and equitable rights, interests, defenses, and obligations of holders of Royalty and Working Interests, with respect to such Royalty and Working Interests, shall not be modified, affected or impaired in any manner by the provisions of the Plan or the Confirmation Order; *provided* that, to the extent applicable, any Other Secured Claims, General Unsecured Claims, or Administrative Claims of holders of Royalty and Working Interests shall be treated in accordance with Articles II and III hereof.  Nor shall the Plan or the Confirmation Order modify, affect or impair the rights and defenses of the Debtors or the Reorganized Debtors with respect to the Royalty and Working Interests.  The Debtors' and the Reorganized Debtors' rights to dispute the amounts owing on account of Royalty and Working Interests and to assert that prepetition Claims for such amounts have been discharged by the Plan or the Confirmation Order are expressly preserved and reserved.  Nothing in this Plan or the Confirmation Order shall be deemed a finding or determination as to whether any such amount owed by the Debtors or the Reorganized Debtors on account of Royalty and Working Interests is a Claim or a specific type of Claim, if the amount has been discharged, or to what extent (if any) funds held by the Debtors or the Reorganized Debtors or subject to their control, with respect to which funds any holder of a Royalty and Working Interest has asserted or may assert a right of entitlement or ownership on account of such Royalty and Working Interest, constitute property of any of the Estates under section 541 of the Bankruptcy Code or otherwise; *provided*, *however*, that any determination with respect to the foregoing shall be made by the Bankruptcy Court.  All parties' rights are preserved and reserved with respect to such findings or determinations; *provided* that, to the extent applicable, any Administrative Claims, Other Secured Claims or General Unsecured Claims of holders of Royalty and Working Interests on account of Royalty and Working Interests shall be treated in accordance with Article II or III hereof, as appropriate.

Notwithstanding anything in the Plan or the Confirmation Order to the contrary, the Debtors or the Reorganized Debtors shall continue paying all undisputed amounts owing on account of Royalty and Working Interests, including with respect to suspense funds as and when reconciled, in the ordinary course of business and in accordance with all applicable agreements and laws.

Nothing in the Plan or the Confirmation Order shall affect the Debtors' or the Reorganized Debtors' obligations to comply with all federal, state and local laws, rules and regulations with respect to Royalty and Working Interests and holders thereof, including, without limitation, laws, rules and regulations regarding inspection of books and records and segregation or escrow of funds or production proceeds belonging and/or payable to holders of Royalty and Working Interests.

U.    *Resolution of Pending Litigation.*

The Debtors may remove to the Bankruptcy Court by the Removal Deadline any litigation pending as of the Petition Date that alleges claims or causes of action that, if successful, would not result in a Claim.  Notwithstanding the foregoing, (i) pending litigation alleging personal injury claims or causes of action, (ii) pending litigation for which the automatic stay has been lifted pursuant to section 362 of the Bankruptcy Code, and (iii) any litigation not removed

by the Removal Deadline shall proceed to final judgment in the jurisdiction in which such litigation was pending as of the Petition Date; *provided* that any Claim resulting from a final judgment in any such litigation shall be treated in accordance with the Plan.

V.      *Payment of Certain Fees.*

Without any further notice to or action, order, or approval of the Bankruptcy Court, the Debtors or the Reorganized Debtors, as applicable, shall pay on the Effective Date the Restructuring Expenses, subject to the conditions set forth in this Article IV.U of the Plan.  The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the Restructuring Support Agreement, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least five (5) Business Days before the anticipated Effective Date or such later time as required by the Debtors; *provided* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses.  On or as soon as practicable after the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.  In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay pre- and post-Effective Date Restructuring Expenses related to implementation, consummation, and defense of the Plan, whether incurred before, on, or after the Effective Date.  For the avoidance of doubt, nothing in this paragraph shall be deemed to impair, waive, discharge, or negatively impact or affect any rights of the FLLO Term Loan Facility Administrative Agent, the Collateral Trustee, and the Second Lien Notes Trustee to payment of fees, expenses, and indemnification obligations solely as against any money or property distributable to holders of Claims under the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, or the Second Lien Notes Indenture, as applicable, including any rights to priority of payment and/or to exercise charging liens.  Notwithstanding anything in the Plan, including Article IV.I hereof, reimbursement of the Second Lien Notes Trustee's financial advisor's fees and expenses shall be limited to $250,000 in the aggregate, and no Person shall be entitled to increase or seek to increase this $250,000 limit or use a charging lien or seek payment for such financial advisor's or any financial advisor to the Second Lien Notes Trustee's fees and expenses from any other source.

Without limiting the obligations of the Debtors or Reorganized Debtors to pay the DIP Agent Fees and Expenses and any fees, costs and expenses of the Exit Facilities Agent pursuant to the Exit Facilities Documents, the Reorganized Debtors shall pay all post-Effective Date expenses incurred by the DIP Agent and/or the Exit Facilities Agent related to implementation, consummation, and defense of the Plan, whether incurred on or after the Effective Date.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that are: (1) identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (2) previously expired or terminated pursuant to their own terms; (3) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (4) are the subject of a motion to reject that is pending on the Effective Date; or (5) have an ordered or requested effective date of rejection that is after the Effective Date.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumed Executory Contract and Unexpired Leases Schedule, or the Rejected Executory Contracts and Unexpired Leases Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy

37

Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right, with the consent of the Required Consenting Stakeholders, to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases Schedule and the Rejected Executory Contracts and Unexpired Leases Schedule at any time up to forty-five (45) days after the Effective Date, so long as such allocation, amendment, modification, or supplement is consistent with the Restructuring Support Agreement.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.7 of this Plan.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

Any monetary defaults under each Assumed Executory Contract or Unexpired Lease shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, or as soon as reasonably practicable thereafter, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

Any objection by a contract or lease counterparty to a proposed assumption of an Executory Contract or Unexpired Lease or the related cure cost (including as set forth on the Assumed Executory Contracts and Unexpired Leases Schedule) must be Filed, served, and actually received by the Debtors in accordance with the Disclosure Statement Order or other applicable Final Order of the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have consented to such assumption or proposed cure amount. For the avoidance of doubt, to the extent an Executory Contract or Unexpired Lease proposed to be assumed is not listed as having a related cure cost, any counterparty to such Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption will be deemed to

have consented to such assumption and deemed to release any Claim or Cause of Action for any monetary defaults under such Executory Contract or Unexpired Lease.

For the avoidance of doubt, the Debtors or the Reorganized Debtors, as applicable, with the consent of the Required Consenting Stakeholders, may add any Executory Contract or Unexpired Lease proposed to be assumed to the Rejected Executory Contracts and Unexpired Leases Schedule in accordance with the time limits provided by the Plan for any reason, including if the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable cure notice or the Plan, in which case such Executory Contract or Unexpired Lease is deemed rejected as the Effective Date.

Assumption of any Executory Contract or Unexpired Lease shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption.  Any Proofs of Claim Filed with respect to an Assumed Executory Contract or Unexpired Lease shall be deemed disallowed, without further notice to or action, order, or approval of the Bankruptcy Court.

D.      *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

E.      *Insurance Policies.*

Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, any Plan Supplement, the Confirmation Order, the Restructuring Support Agreement, the Restructuring Term Sheet, any Bar Date notice or Claim objection, any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction, discharge or release, or confers Bankruptcy Court jurisdiction or requires a party to opt out of any releases):

(1) on the Effective Date the Reorganized Debtors shall be deemed to have assumed all unexpired Insurance Policies in their entirety pursuant to sections 105 and 365 of the Bankruptcy Code; (2) all unexpired Insurance Policies shall re-vest in the Reorganized Debtors, unaltered, other than that on and after the Effective Date, the Reorganized Debtors shall be liable for all debts, obligations, and liabilities of the Debtors (and, after the Effective Date, of the Reorganized Debtors) under the Insurance Policies, regardless of when such debts, obligations, and liabilities arise, without the need or requirement for any Insurer to file a Proof of Claim, an Administrative Claim, a Cure Claim or to object to any cure amount, and thereafter the Reorganized Debtors may, subject to the terms of the Insurance Policies and applicable non-bankruptcy law, resolve any Claims covered by the Insurance Policies, resolve any Causes of Action, if any, in connection with the Insurance Policies, and collect any and all outstanding deposits, restricted cash, and letters of credit, if any, related thereto; (3) nothing shall alter, modify, amend, affect, impair or prejudice the legal, equitable or contractual rights, obligations, and defenses of the Insurers, the Debtors (or, after the Effective Date, the Reorganized Debtors), or any other individual or entity, as applicable, under any Insurance Policies; and (4) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article VIII of the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Bankruptcy Court, solely to permit:  (I) claimants with valid workers' compensation claims or direct action claims against an Insurer under applicable non-bankruptcy law to proceed with their claims; (II) the Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against any Insurer under applicable non-bankruptcy law, or an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (C) all costs in relation to each of the foregoing; and (III) the Insurers to cancel any Insurance Policies, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the Insurance Policies.

F.      *Reservation of Rights.*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

G.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

H.      *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors in the ordinary course of their business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim or Interest is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), each holder of an Allowed Claim or Allowed Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims and Allowed Interests in the applicable Class.

With respect to holders of Allowed Unsecured Notes Claims and Allowed General Unsecured Claims other than Convenience Claims, each such holder shall receive from the Unsecured Claims Recovery (1) an initial distribution on account of such holder's Allowed Unsecured Notes Claim or General Unsecured Claim on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter); and (2) upon completion of the Claims reconciliation process, its *Pro Rata* share of the remaining Unsecured Claims Recovery.

With respect to holders of Convenience Claims, each such holder shall receive from the Convenience Claim Distribution Reserve (1) an initial distribution on account of such holder's Convenience Claim on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter); and (2) upon completion of the Claims reconciliation process, its *Pro Rata* share of the remaining Convenience Claim Distribution Reserve; *provided* that no Convenience Claim shall recover in excess of 5 percent of such Convenience Claim; *provided*, *further,* that any funds remaining in the Convenience Claim Distribution Reserve after all Convenience Claim Distributions have been made shall be distributed to and vest in the Reorganized Debtors.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII of the Plan.

B.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

    1.   Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date.  If a Claim, other than one based on a publicly traded Security or FLLO Term Loan Facility Claim, is transferred twenty (20) or fewer days before the Distribution Record Date, distributions shall be made to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

    2.   Delivery of Distributions in General.

Except as otherwise provided herein, the Reorganized Debtors shall make distributions to holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date at the address for each such holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors and, with respect to distributions on account of FLLO Term Loan Facility Claims, the Required Plan Sponsors.

    3.   No Fractional Distributions.

No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded to the next lower whole number with no further payment therefor; *provided*, *however*, that fractional shares rounding determination with respect to the Rights Offering shall be subject to the Rights Offering Procedures.  The total number of authorized shares of New Common Stock to be distributed to holders of Allowed Claims hereunder shall be adjusted as necessary to account for the foregoing rounding.

    4.   Minimum Distributions.

Notwithstanding any other provision of the Plan, holders of Allowed Claims entitled to distributions of $5 or less shall not receive distributions, and each Claim to which this limitation applies shall be discharged pursuant to Article VIII of this Plan, and its holder shall be forever barred from asserting that Claim against the Reorganized Debtors or their property.

    5.   Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such holder shall be made unless and until the Reorganized Debtors have determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred.

    6.   Surrender of Canceled Instruments or Securities.

On the Effective Date or as soon as reasonably practicable thereafter, each holder of a certificate or instrument evidencing a Claim or an Interest that has been cancelled in accordance with Article IV.I hereof shall be deemed to have surrendered such certificate or instrument to the Debtors.  Such surrendered certificate or instrument shall be

cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the holder of a Claim or Interest, which shall continue in effect for purposes of allowing holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights.

       7.   <u>Delivery of Distributions on Second Lien Notes Claims and Unsecured Notes Claims</u>.

The Debtors shall make all distributions required under the Plan.  Notwithstanding any provision of the Plan to the contrary, distributions to holders of Second Lien Notes Claims and Unsecured Notes Claims shall be made to or at the direction of each of the Trustees for distribution under the applicable indentures and bond agreements.  The Trustees may transfer or direct the transfer of such distributions directly through the facilities of the applicable securities depository and clearing house and will be entitled to recognize and deal with, for all purposes under the Plan, holders of Second Lien Notes Claims and Unsecured Notes Claims, as applicable, as is consistent with the ordinary practices of the applicable depositories. Such distributions shall be subject to the right of each of the Trustees under the applicable indenture or bond agreements, including their rights to assert and exercise charging liens against such distributions.

C.     *Manner of Payment*.

Except as otherwise set forth herein, all distributions of Cash, the New Common Stock, the New Warrants, and the Rights, as applicable, to Holders of Allowed Claims under the Plan shall be made by the Debtors or the Reorganized Debtors, as applicable.  At the option of the Reorganized Debtors (in consultation with and subject to the reasonable consent of the Required Consenting Stakeholders), any Cash payment to be made under the Plan, if any, may be made by check or wire transfer or as otherwise required or provided in the applicable agreements.

D.     *Exemption from Securities Laws*.

All 1145 Securities will be issued in reliance upon section 1145 of the Bankruptcy Code to the extent permitted under applicable law.  All 4(a)(2) Securities will be issued in reliance upon section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

Pursuant to section 1145 of the Bankruptcy Code, the issuances of the 1145 Securities are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration before the offering, issuance, distribution, or sale of such securities, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act.  Each of the 1145 Securities (1) is not a "restricted security" as defined in Rule 144(a)(3) under the Securities Act; and (2) is freely tradable and transferable by any initial recipient thereof that at the time of transfer or as a result thereof, is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act.

The 4(a)(2) Securities will be issued without registration under the Securities Act in reliance upon Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.  To the extent issued in reliance on Section 4(a)(2) of the Securities Act or Regulation D thereunder, the 4(a)(2) Securities will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable law.

Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Common Stock (including any shares issuable as part of the Put Option Premium or issuable upon exercise of the Rights other than the unsubscribed shares of New Common Stock issued to the Backstop Parties pursuant to the Backstop Commitment Agreement) or the New Warrants (and any Shares of the New Common Stock issuable upon the exercise of the New Warrants) through the facilities of DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to such treatment under applicable securities laws.

DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether any of the New Common Stock issuable upon exercise of the Rights, as applicable, are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock issuable upon exercise of the Rights, as applicable, are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Each Backstop Party that receives Plan Securities will be entitled to registration rights and sale support rights with respect to all such Securities to be documented in the Registration Rights Agreement in form and substance satisfactory to the Required Plan Sponsors.

E.      *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Debtors, the Reorganized Debtors, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Debtors and Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and similar spousal awards, Liens, and encumbrances.

F.      *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to the remainder of the Claims, including any Claims for accrued but unpaid interest.

G.      *No Postpetition or Default Interest on Claims.*

Notwithstanding any provision in the Plan, the Confirmation Order, or any documents that govern the Debtors' prepetition funded indebtedness or other Claims to the contrary, except as provided in the DIP Order, DIP Credit Agreement, and Articles II.B, III.B.3 and III.B.4 hereof, (a) postpetition and/or default interest shall not accrue or be paid on any Claims; and (b) no Holder of a Claim shall be entitled to (i) interest accruing on or after the Petition Date on any such Claim or (ii) interest at the contract default rate, as applicable.

H.      *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

I.      *Setoffs and Recoupment.*

Except as expressly provided in this Plan and the DIP Order, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and the holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the

allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable holder.  In no event shall any holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G hereof on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.  Notwithstanding anything to the contrary herein, the Allowed DIP Claims, the Allowed Revolving Credit Facility Claims, the Allowed FLLO Term Loan Facility Claims, the Allowed Second Lien Notes Claims, or the Allowed Unsecured Notes Claims and the Plan distributions to be made on account of such Claims shall not be subject to set off and/or recoupment by the Debtors or the Reorganized Debtors pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, and the Debtors and the Reorganized Debtors hereby waive any and all rights of set off or recoupment against such Claims.

J.      *No Double Payment of Claims*.

To the extent that a Claim is Allowed against more than one Debtor's Estate, there shall be only a single recovery on account of that Allowed Claim, but the holder of an Allowed Claim other than an Allowed Unsecured Notes Claim or Allowed General Unsecured Claim against more than one Debtor may recover distributions from all co-obligor Debtors' Estates until the holder has received payment in full on the Allowed Claims.  No Holder of an Allowed Claim shall be entitled to receive more than payment in full of its Allowed Claim, and each Claim shall be administered and treated in the manner provided by the Plan only until payment in full on that Allowed Claim.

K.      *Claims Paid or Payable by Third Parties*.

1.      Claims Paid by Third Parties.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

2.      Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Policies until the holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy. To the extent that one or more of the Debtors' Insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such Insurers' satisfaction of such Claim, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      Applicability of Insurance Policies.

Except as otherwise provided in the Plan, payments to holders of Claims shall be in accordance with the provisions of any applicable Insurance Policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including Insurers under any Insurance Policies nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any rights or defenses, including coverage defenses, held by such Insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

A.      *Allowance of Claims.*

After the Effective Date, except as otherwise expressly set forth herein, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.  The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

B.      *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority:  (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.S of the Plan.

C.      *Estimation of Claims.*

Before, on, or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including, without limitation, pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection.  Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors or Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      *Adjustment to Claims or Interests without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Time to File Objections to Claims.*

Any objections to Claims shall be Filed on or before the later of (a) one-hundred-eighty (180) days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by a Final Order of the Bankruptcy Court for objecting to such claims.

F.      *Reservation of Rights to Object to Claims.*

The failure of the Debtors or the Reorganized Debtors, as applicable, to object to any Claim shall not be construed as an admission to the validity or amount of any such Claim, any portion thereof, or any other claim related thereto, whether or not such claim is asserted in any currently pending or subsequently initiated proceeding, and shall be without prejudice to the right of the Debtors or the Reorganized Debtors, as applicable, to contest, challenge the validity of, or otherwise defend against any such claim in the Bankruptcy Court or non-bankruptcy forum.

G.      *Disputed and Contingent Claims Reserve.*

On or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall establish one or more reserves (including the Convenience Claim Distribution Reserve) for Claims that are contingent or have not yet been Allowed, in an amount or amounts as reasonably determined by the Debtors or Reorganized Debtors, as applicable, consistent with the Proof of Claim Filed by the applicable holder of such Disputed Claim.  To the extent that a Disputed Claim may be entitled to receive New Common Stock pursuant to the Plan, such New Common Stock will remain authorized but unissued pending resolution of such Disputed Claim.

Any assets held in any such reserve shall be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9.  As such, such assets will be subject to entity-level taxation, and the Debtors and Reorganized Debtors, as applicable, shall be required to comply with the relevant rules.

H.      *Disallowance of Claims or Interests.*

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors.

**Except as otherwise provided herein or as agreed to by the Reorganized Debtors, any and all Proofs of Claim Filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order or otherwise allowed by order of the Bankruptcy Court.**

I.      *No Distributions Pending Allowance.*

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of the Disputed portion of such Claim or Interest unless and until such Disputed portion of the Claim or Interest is Allowed.

J.      *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Reorganized Debtors shall provide to the holder of such Claim

or Interest the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

**K.**     *No Interest on Disputed Claims.*

Interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

**ARTICLE VIII.**
**SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**

**A.**     *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in the, Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Proof of Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than the Reinstated Claims) and Interests (other than the Intercompany Interests that are Reinstated) subject to the occurrence of the Effective Date.

**B.**     **Release of Liens.**

**Except as otherwise provided in the Exit Facilities Documents, the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns; *provided* that no mortgage, deed of trust, Lien, pledge, or other security interest against any property of the Estates in favor of any Allowed Secured Claim shall be released prior to satisfaction and/or payment of such Allowed Secured Claim in full in accordance with the Plan; *provided*, *further*, that no Lien arising, whether arising by contract or statute, from an oil and gas lease shall be terminated, discharged, or released by the Plan. Any holder of such Secured Claim (and the applicable agents for such holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

47

To the extent that any holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such holder, has filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, then as soon as practicable on or after the Effective Date, such holder (or the agent for such holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or Exit Facilities Agent that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such holder's behalf.

C.      *Releases by the Debtors.*

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, or that any holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Revolving Credit Facility, the FLLO Term Loan Facility, the Collateral Trust Documents, the Second Lien Notes, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Disclosure Statement, the Backstop Commitment Agreement, the DIP Facility, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Backstop Commitment Agreement, the DIP Facility, the Plan, the Plan Supplement, or the Exit Facilities before or during the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, other than claims or liabilities that are not described in items 1 and 2 set forth in Article IV.A hereof arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facilities Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtors' release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtors' release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including,

without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtors' release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the debtors' release.

D.      *Releases by Holders of Claims and Interests.*

Except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Revolving Credit Facility, the FLLO Term Loan Facility, the Collateral Trust Documents, the Second Lien Notes, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, other than claims or liabilities that are not described in items 1 and 2 set forth in Article IV.A hereof arising out of or relating to any act or omission of a Released Party other than a Debtor that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facilities Credit Agreements, or any other financing document under and as defined therein) or (ii) any post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facilities Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the third-party releases, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the third party releases are:  (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of the Claims released by the third-party releases; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the third-party releases.

E.      *Exculpation.*

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties and other parties set forth above have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

F.      *Injunction.*

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Except as otherwise set forth in the Confirmation Order, each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F hereof.

G.      *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, ~~all Entities, including~~no Governmental Units~~,~~ shall ~~not~~ discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

H.      *Recoupment.*

In no event shall any holder of Claims or Interests be entitled to recoup any Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Proof of Interest or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

I.      *Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

J.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent or (2) the relevant holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.      the Confirmation Order shall have become a Final Order and be in form and substance acceptable to the Required Consenting Stakeholders and shall:

   (a)   authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

   (b)   decree that the provisions in the Confirmation Order and the Plan are nonseverable and mutually dependent;

   (c)   authorize the Debtors or the Reorganized Debtors, as applicable/necessary, to:  (a) implement the Restructuring Transactions, including the Rights Offering and Exit Facilities; (b) appoint the directors and officers for the Reorganized Debtors; (c) issue and distribute the New

51

Common Stock in accordance with the Plan, including all shares of New Common Stock issued by Reorganized Chesapeake to the Backstop Parties as part of the Put Option Premium and the unsubscribed shares of New Common Stock issued to Backstop Parties pursuant to the Backstop Commitment Agreement; (d) issue and distribute the Rights and subsequently issue and distribute New Common Stock issuable upon exercise of such; (e) execute and deliver the Registration Rights Agreement; (f) execute and deliver the New Warrants Agreements and issue and distribute the New Warrants; (g) enter into the Exit Facilities Documents; (h) take all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (i) approve and adopt the New Organizational Documents; (j) adopt the Management Incentive Plan; (k) reject, assume, or assume and assign, as applicable, Executory Contracts and Unexpired Leases; and (l) complete all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).

(d)   authorize the implementation of the Plan in accordance with its terms;

(e)   provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax; and

(f)   contain the release, injunction, and exculpation provisions contained in Article VIII herein; and

2.   the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

3.   the Plan and the applicable documents included in the Plan Supplement, including any schedules, documents, and exhibits contained therein, shall have been Filed and shall be in form and substance reasonably acceptable to the Debtors and the Required Consenting Stakeholders in accordance with the consent rights contained in the Restructuring Support Agreement;

4.   the Restructuring Support Agreement shall remain in full force and effect;

5.   the Final Order approving the DIP Facility shall remain in full force and effect and no event of default shall have occurred and be continuing thereunder;

6.   the Backstop Commitment Agreement Approval Order and Backstop Commitment Agreement shall have been entered and remain in full force and effect;

7.   all Allowed Professional Claims approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such Allowed Professional Claims after the Effective Date have been placed in the Professional Fee Escrow Account pending approval of the Professional Claims by the Bankruptcy Court, all fees and expenses payable pursuant to Article IV.U shall have been paid in full,

and all fees and expenses of the DIP Agent, Revolving Credit Facility Administrative Agent, and the Collateral Trustee payable pursuant to the DIP Order shall have been paid in full;

8. the payments required to be made pursuant to the terms of Article IV.U of the Plan shall have been paid;

9. the New Organizational Documents with respect to the Reorganized Debtors shall be in full force and effect and be in form and substance reasonably acceptable to the Required Consenting Stakeholders;

10. the Exit Facilities Documents shall be in full force and effect (with the Conditions Precedent to the Exit Facilities having been met, satisfied, or waived) and, subject to any post-closing execution and delivery requirements provided for in the Exit Facilities Documents, be in form and substance acceptable to the Required Consenting Stakeholders (such approval not to be withheld in bad faith; *provided* that the terms set forth in the Exit Facilities Term Sheet shall be deemed acceptable to the Required Consenting Stakeholders); and

11. The Minimum Liquidity Condition, the Total Leverage Condition, and the PDP PV-10 Test Ratio Condition shall have been met, satisfied, or waived.

For the avoidance of doubt, if the Minimum Liquidity Condition, the Total Leverage Condition, and/or the PDP PV-10 Test Ratio Condition would not otherwise be satisfied, the Required Plan Sponsors may agree, in their sole discretion, to increase the Rights Offering amount above $600 million on the same terms, including the Rights Offering Value and with an allocation consistent with the Backstop Allocations, in order to enable such conditions to be satisfied; *provided* that no Backstop Party's Backstop Commitment may be increased without its consent.

B.      *Waiver of Conditions.*

Any one or more of the conditions to Consummation (or component thereof) set forth in this Article IX may be waived by the Debtors with the prior written consent of the Required Consenting Stakeholders (with the exception of the condition precedent specified in Section IX.A.4, not to be withheld unreasonably), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

C.      *Effect of Failure of Conditions.*

If Consummation does not occur as to any Debtor, the Plan shall be null and void in all respects as to such Debtor and nothing contained in the Plan, the Disclosure Statement, or Restructuring Support Agreement as to such Debtor shall:  (1) constitute a waiver or release of any Claims by the Debtors, Claims, or Interests; (2) prejudice in any manner the rights of the Debtors, any holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders of Claims or Interests, or any other Entity.

D.      *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments.*

Except as otherwise specifically provided in this Plan, upon prior notice to and with the consent of the Required Consenting Stakeholders, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate and with the consent of the Required Consenting Stakeholders, not resolicit votes on such modified Plan.  Subject to those

restrictions on modifications set forth in the Plan and the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.      *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan.*

The Debtors reserve the right, upon prior notice to and with the consent of the Required Consenting Stakeholders, to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests, and including any settlement, waiver, or release of any rights of the Revolving Credit Facility Lenders under the Intercreditor Agreement or the Collateral Trust Documents), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.  allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.  decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.  resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.     ensure that distributions to holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of the Plan;

5.     adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.     adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.     enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with the Plan or the Disclosure Statement;

8.     enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.    issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12.    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.K hereof;

13.    enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.    determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement, including the Restructuring Support Agreement;

15.    enter an order concluding or closing the Chapter 11 Cases;

16.    adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.    consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.    determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.    hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

55

21.    hear and determine all disputes involving the obligations or terms of the Rights Offering and the Backstop Commitment Agreement;

22.    hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article VIII hereof;

23.    enforce all orders previously entered by the Bankruptcy Court; and

24.    hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article XI to the contrary, the New Organizational Documents and the Exit Facilities and any documents related thereto shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect.*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, any and all holders of Claims or Interests (irrespective of whether such holders of Claims or Interests have, or are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.    *Additional Documents.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms of the Plan.  The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.    *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors for each quarter (including any fraction thereof) until the earlier of entry of a final decree closing such Chapter 11 Cases or an order of dismissal or conversion, whichever comes first.

D.    *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Confirmation Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Confirmation Date.

E.    *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does

not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

F.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| Debtors | Counsel to the Debtors |
|---|---|
| Chesapeake Energy Corporation<br>6100 North Western Avenue<br>Oklahoma, Oklahoma 73118<br>Attention:  James R. Webb | Kirkland & Ellis LLP<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Attention:  Patrick J. Nash, Jr., P.C., Marc Kieselstein, P.C., and Alexandra Schwarzman<br><br>and<br><br>Jackson Walker LLP<br>1401 McKinney Street, Suite 1900<br>Houston, Texas 77010<br>Attention:  Matthew D. Cavenaugh, Jennifer F. Wertz, Kristhy M. Peguero, and Veronica A. Polnick |
| **United States Trustee** | **Counsel to the Consenting DIP Lenders** |
| Office of The United States Trustee<br>515 Rusk Street, Suite 3516<br>Houston, Texas 77002 | Sidley Austin LLP<br>555 West Fifth Street<br>Los Angeles, CA 90013<br>Attention:  Jennifer C. Hagle and Brian E. Minyard |
| **Counsel to the Consenting Revolving Credit Facility Lenders** | **Counsel to the FLLO Ad Hoc Group** |
| Sidley Austin LLP<br>555 West Fifth Street<br>Los Angeles, CA 90013<br>Attention:  Jennifer C. Hagle and Brian E. Minyard | Davis Polk & Wardwell LLP<br>450 Lexington Avenue<br>New York, New York 10017<br>Attention:  Damian S. Schaible, Darren S. Klein, and Aryeh Ethan Falk |
| **Counsel to Franklin** | |
| Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park<br>Bank of America Tower<br>New York, New York 10036<br>Attention:  Michael S. Stamer, Meredith A. Lahaie, and Stephen B. Kuhn | |

After the Effective Date, the Reorganized Debtors have the authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.      *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.      *Entire Agreement.*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.      *Plan Supplement.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://dm.epiq11.com/chesapeake or the Bankruptcy Court's website at www.txs.uscourts.gov/bankruptcy. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the Plan Supplement exhibit or document shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).

K.      *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable; and (3) nonseverable and mutually dependent.

L.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

M.      *Closing of Chapter 11 Cases.*

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases except for the Chapter 11 Case of Chesapeake, and all contested matters and adversary proceedings relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of Chesapeake; *provided* that for purposes of sections 546 and 550 of the Bankruptcy Code, the Chapter 11 Cases shall be deemed to remain open until the Chapter 11 Case of Chesapeake has been closed.

When all Disputed Claims have become Allowed or disallowed and all remaining Cash has been distributed in accordance with the Plan, the Reorganized Debtors shall seek authority from the Bankruptcy Court to close the Chapter 11 Case of Chesapeake in accordance with the Bankruptcy Code and the Bankruptcy Rules.

N.      *Waiver or Estoppel.*

Each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

O.      *Creditor Default.*

An act or omission by a holder of a Claim or an Interest in contravention of the provisions of this Plan shall be deemed an event of default under this Plan.  Upon an event of default, the Reorganized Debtors may seek to hold the defaulting party in contempt of the Confirmation Order and shall be entitled to reasonable attorneys' fees and costs of the Reorganized Debtors in remedying such default.  Upon the finding of such a default by a creditor, the Bankruptcy Court may:  (a) designate a party to appear, sign and/or accept the documents required under the Plan on behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (b) enforce the Plan by order of specific performance; (c) award judgment against such defaulting creditor in favor of the Reorganized debtor in an amount, including interest, to compensate the Reorganized Debtors for the damages caused by such default; and (d) make such other order as may be equitable that does not materially alter the terms of the Plan.

Dated: ~~December 27, 2020~~January 12, 2021        CHESAPEAKE ENERGY CORPORATION

on behalf of itself and all other Debtors


/s/  Domenic J. Dell'Osso, Jr.
Domenic J. Dell'Osso, Jr.
Executive Vice President and Chief Financial Officer

```
                 UNITED STATES BANKRUPTCY COURT
                SOUTHERN DISTRICT OF TEXAS (HOUSTON)

                                 .    Case No. 20-33233 (DRJ)
IN RE:                           .    Chapter 11
                                 .    (Jointly Administered)
CHESAPEAKE ENERGY                .
CORPORATION,                     .    515 Rusk Street
                                 .    Houston, TX 77002
              Debtor.            .
                                 .    Wednesday, January 13, 2021
. . . . . . . . . . . . . . .    .    9:00 a.m.
```

TRANSCRIPT OF CONFIRMATION HEARING - DAY 13
**BEFORE THE HONORABLE DAVID R. JONES VIA VIDEOCONFERENCE
UNITED STATES BANKRUPTCY COURT JUDGE**

TELEPHONIC APPEARANCES:

```
For the Debtors:            Jackson Walker LLP
                            By:  MATTHEW CAVENAUGH, ESQ.
                                 KRISTHY M. PEGUERO, ESQ.
                            1401 McKinney Street, Suite 1900
                            Houston, TX 77010
                            (713) 752-4200

                            Kirkland & Ellis LLP
                            BY:  ALEXANDRA SCHWARZMAN, ESQ.
                                 PATRICK J. NASH, JR., ESQ.
                                 MARC KIESELSTEIN, ESQ.
                            300 North LaSalle
                            Chicago, IL 60654
                            (312) 862-2290

                            Kirkland & Ellis LLP
                            BY:  DANIEL T. DONOVAN, ESQ.
                                 JUDSON BROWN, ESQ.
                            1301 Pennsylvania Avenue, N.W.
                            Washington, D.C. 20004
                            (202) 389-5000


TELEPHONIC APPEARANCES CONTINUED.

Audio Operator:             Court ERO Personnel

Transcription Company:      Access Transcripts, LLC
                            10110 Youngwood Lane
                            Fishers, IN 46038
                            (855) 873-2223
                            www.accesstranscripts.com
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

TELEPHONIC APPEARANCES (Continued):                         2

For the Official            Forshey Prostok LLP
Committee of Royalty        By:  JEFF PROSTOK, ESQ.
Owners:                          DEIRDRE BROWN, ESQ.
                            1990 Post Oak Boulevard, Suite 2400
                            Houston, TX  77056
                            (832) 367-5722

For the United States       U.S. Department of Justice
(U.S. Department of         BY:  TIFFINEY FRANCES CARNEY, ESQ.
the Interior):              P.O. Box 875 Ben Franklin Station
                            Washington, DC 20044
                            (202) 353-7971

For the Ad Hoc Group        Davis Polk & Wardwell LLP
of FLLO Term Loan           BY:  ARYEH ETHAN FALK, ESQ.
Lenders:                         DARREN S. KLEIN, ESQ.
                                 DAMIAN S. SCHAIBLE, ESQ.
                                 BENJAMIN S. KAMINETZKY, ESQ.
                                 MARC J. TOBAK, ESQ.
                            450 Lexington Avenue
                            New York, NY 10017
                            (212) 450-4563

                            Paul Hastings LLP
                            BY:  JUSTIN RAWLINS, ESQ.
                            515 South Flower Street, 25th Floor
                            Los Angeles, CA 90071
                            (213) 683-6130

For Franklin Advisers,      Akin Gump Strauss Hauer & Feld LLP
Inc.:                       BY:  MICHAEL S. STAMER, ESQ.
                                 ABID QURESHI, ESQ.
                                 MEREDITH A. LAHAIE, ESQ.
                                 DAVID ZENSKY, ESQ.
                            One Bryant Park
                            Bank of America Tower
                            New York, NY 10036-6745
                            (212) 872-1025

For RLI Insurance           Krebs Farley & Dry PLLC
Company:                    BY:  JONATHAN ORD, ESQ.
                            400 Poydras Street, Suite 2500
                            New Orleans, LA 70130
                            (504) 299-3583

For Brandes Investment      Patterson Belknap Webb & Tyler
Partners, LP:               BY:  DANIEL LOWENTHAL, ESQ.
                            1133 Avenue of the Americas
                            New York NY, 10036
                            (212) 336-2318

TELEPHONIC APPEARANCES (Continued):                          3

| | |
|---|---|
| For Petty Business Enterprises, LP, Petty Energy LP, and their related entities: | Ross & Smith P.C.<br>BY:  JUDITH W. ROSS, ESQ.<br>       FRANCES SMITH, ESQ.<br>700 North Pearl Street, Suite 1610<br>Dallas, TX 75201<br>(214) 377-7879 |
| For the Official Committee of Unsecured Creditors: | Brown Rudnick LLP<br>BY:  ROBERT J. STARK, ESQ.<br>       BENNETT SILVERBERG, ESQ.<br>       SIGMUND S. WISSNER-GROSS, ESQ.<br>       KENNETH AULET, ESQ.<br>       MICHAEL WINOGRAD, ESQ.<br>       UCHECHI EGEONUIGWE, ESQ.<br>7 Times Square<br>New York, NY 10036<br>(212) 209-4862 |
| | Brown Rudnick LLP<br>BY:  JAMES W. STOLL, ESQ.<br>       JEFFREY L. JONAS, ESQ.<br>One Financial Center<br>Boston, MA 02111<br>(617) 856-8262 |
| | Norton Rose Fulbright US LLP<br>By:  LOUIS R. STRUBECK, JR., ESQ.<br>       KRISTIAN W. GLUCK, ESQ.<br>2200 Ross Avenue, Suite 3600<br>Dallas, TX 75201-2784<br>(214) 855-8210 |
| For Wilmington Savings Financial Society, as Indenture Trustee: | Foley & Lardner LLP<br>By:  MARK F. HEBBELN, ESQ.<br>321 North Clark Street, Suite 3000<br>Chicago, IL 60654-4762<br>(312) 832-4394 |
| For MUFG Union Bank, N.A., in its Capacity as Collateral Agent Under FLLO Collateral Trust Agreement: | Paul Hastings LLP<br>BY:  AVRAM EMMANUEL LUFT, ESQ.<br>200 Park Avenue<br>New York, NY 10166<br>(212) 318-6079 |
| | Paul Hastings LLP<br>BY:  BRENDAN M. GAGE, ESQ.<br>71 South Wacker Drive, 45th Floor<br> Chicago, IL 60606<br>(312) 499-6091 |

```
TELEPHONIC APPEARANCES (Continued):                           4

For the PMBG Client        Harrison Duncan PLLC
Parties:                   BY:  MARY ELIZABETH HEARD, ESQ.
                           8700 Crownhill, Suite 505
                           San Antonio, Texas 78209
                           (210) 821-5800

                           Lutrell & Carmody Law Group
                           BY:  LESLIE LUTTRELL, ESQ.
                           100 NE Loop 410, Suite 615
                           San Antonio, TX 78216-4713
                           (210) 426-3600

For Energy Transfer        Katten Muchin Rosenman LLP
Fuel, LP:                  BY:  KELLY HINE, ESQ.
                                JOHN E. MITCHELL, ESQ.
                           2121 North Pearl Street, Suite 1100
                           Dallas, TX 75201-2591
                           (214) 765-3641

                           Yetter Coleman LLP
                           BY:  KIMBERLY MCMULLAN, ESQ.
                                R. PAUL YETTER, ESQ.
                           811 Main Street, Suite 4100
                           Houston, TX 77002
                           (713) 632-8000

For MUFG Union Bank,       Sidley Austin LLP
N.A., in its Capacities    BY:  DUSTON K. MCFAUL, ESQ.
As DIP Agent and           1000 Louisiana Street, Suite 6000
RBL Agent:                 Houston, TX 77002
                           (713) 495-4500

                           Sidley Austin LLP
                           BY:  JENNIFER C. HAGLE, ESQ.
                           555 West Fifth Street
                           Los Angeles, CA 90013
                           (213) 896-6015

                           Sidley Austin LLP
                           BY:  BRIAN W. TOBIN, ESQ.
                                JAMES DUCAYET, ESQ.
                           One South Dearborn
                           Chicago, IL 60603
                           (312) 853-4578

For Four P Family          Whitaker Chalk Swindle & Schwartz PLLC
Holdings LP and Byrd       BY: PRICHARD BEVIS, ESQ.
Family Limited             301 Commerce Street, Suite 3500
Partnership:               Ft. Worth, TX 76102
                           (817) 878-0500
```

```
TELEPHONIC APPEARANCES (Continued):                          5

For the Commonwealth       Pennsylvania Office of the Attorney
of Pennsylvania:             General
                           BY:  JOSEPH STEPHEN BETSKO, ESQ.
                           15th Floor, Strawberry Square
                           Harrisburg, PA 17120
                           (717) 787-4530

                           Office of the Attorney General
                           BY:  CAROL E. MOMJIAN, ESQ.
                           1600 Arch Street, Suite 300
                           Philadelphia, PA 19107-3603
                           (215) 560-2128

For the Industrial         Weiner Weiss & Madison, APC
Development Board of the    BY:  PATRICK L. MCCUNE, ESQ.
Parish of Caddo, Inc.,     330 Marshall Street #1000
Caddo Parish, Paul M.      Shreveport, LA 71101
Davis, Paul M. Davis,      (318) 213-9246
Solely in his Capacity
as the Independent
Administrator of the
Succession of John P.
Davis, Jr., Coushatta
Bayou Land Company, LLC,
Caspiana Interests, LLC,
Bugg Desoto, LLC,
Kingwood Business
Center, LP, Charles
Steven Powers, Powers
Investments, LLC, and
Sonja Bott, on behalf
of the Succession of
Gregary Roy Bott:

For Multiple Texas         Texas Attorney General's Office
State Agencies:            BY: ABIGAIL RUSHING RYAN, ESQ.
                           300 West 15th Street, Floor 8
                           Austin, TX 78701
                           (512) 463-2173

For the Pennsylvania       Husch Blackwell LLP
Attorney General's         BY:  LYNN HAMILTON BUTLER, ESQ.
Office and Oklahoma        111 Congress Avenue, Suite 1400
State Treasurer:           Austin, TX 78701-4043
                           (512) 479-9758

For Tornado Venture        Law Office of William B. Kingman, P.C.
Quatro, LLC, Tornado       BY:  WILLIAM KINGMAN, ESQ.
Venture Cinco, LLC,        3511 Broadway
and Tornado Venture        San Antonio, TX 78209
Seis, LP:                  (210) 829-1199
```

```
TELEPHONIC APPEARANCES (Continued):                         6

For the PA Lessors and      Schnader Harrison Segal & Lewis LLP
Tyler/Mowry Lessors:        BY:  RICHARD A. BARKASY, ESQ.
                            1600 Market Street, Suite 3600
                            Philadelphia, PA 19103-7286
                            (215) 751-2526

For Aparicion Minerals,     Spence Desenberg & Lee, PLLC
LP, et al.:                 BY:  ROSS SPENCE, ESQ.
                            1770 St. James Place, Suite 625
                            Houston, TX 77056
                            (713) 275-8840

For Deutsche Bank Trust     Morgan Lewis & Bockius LLP
Company Americas, as        BY:  JOSHUA DORCHAK, ESQ.
Second Lien Trustee:             GLENN E. SIEGEL, ESQ.
                            101 Park Avenue
                            New York, NY 10178-0060

For the Texas               Office of The Attorney General of
Comptroller of Public       Texas
Accounts:                   BY: LAYLA MILLIGAN, ESQ.
                            JASON B. BINFORD, ESQ.
                            P.O. Box 12548
                            Houston, TX 78711
                            (512) 463-2173

For Gordy Gas:              Crady Jewett McCulley & Houren, LLP
                            BY:  SHELLEY MARMON, ESQ.
                            2727 Allen Parkway, Suite 1700
                            Houston, TX 77019-2125
                            (713) 739-7007

For CNOOC Energy            Andrews Myers, P.C.
U.S.A., LLC:                BY:  EDWARD RIPLEY, ESQ.
                            1885 Saint James Place, 15th Floor
                            Houston, TX 77056
                            (713) 850-4227

For The Bank of             Emmet, Marvin & Martin LLP
New York Mellon Trust       BY:  THOMAS PITTA, ESQ.
Company, N.A.:              120 Broadway, 32nd Floor
                            New York, NY 10271
                            (212) 238-3148

For Mary Wheeler Family     Branscomb Law PLLC
Limited Partnership:        BY:  PATRICK AUTRY, ESQ.
                            8023 Vantage Drive, Suite 560
                            San Antonio, TX 78230
                            (210) 598-5400
```

```
TELEPHONIC APPEARANCES (Continued):                          7

For FERC:                United States Attorney's Office
                         BY:  RICHARD KINCHELOE, ESQ.
                         1000 Louisiana Street, Suite 2300
                         Houston, TX 77002-5010
                         (713) 567-9422

For Kinder Morgan, Inc.: Bracewell LLP
                         BY:  JONATHAN LOZANO, ESQ.
                         111 Congress Avenue, Suite 2300
                         Austin, TX 78701-4061
                         (512) 494-3689

For GLAS USA LLC:        Cole Schotz P.C.
                         BY:  MICHAEL D. WARNER, ESQ.
                              BENJAMIN L. WALLEN, ESQ.
                         301 Commerce Street, Suite 1700
                         Fort Worth, TX 76102
                         (817) 810-5250

                         Cole Schotz P.C.
                         BY:  DANIEL F.X. GEOGHAN, ESQ.
                         1325 Avenue of the Americas
                         19th Floor
                         New York, NY 10019
                         (212) 752-8000

                         Arnold & Porter
                         BY:  JONATHAN I. LEVINE, ESQ.
                         250 West 55th Street
                         New York, NY 10019-9710
                         (212) 836-7010

For the Eagle Ford       O'ConnorWechsler PLLC
Royalty Owner            By:  ANNIE CATMULL, ESQ.
MDL Plaintiffs:          4400 Post Oak Parkway, Suite 2360
                         Houston, TX 77027
                         (281) 814-5977

Also Present:            MARK RULE, Director
                         AlixPartners LLP

                         JOSHUA AUSTIN
                         EJS Investment Holdings, LLC

                         R. ADAM MILLER
                         Intrepid Financial Partners

                         JON WINICK
                         Clark Street Capital
```

I N D E X
1/13/21

| | PAGE |
|---|---|
| CLOSING ARGUMENT BY MS. SCHWARZMAN | 13 |
| CLOSING ARGUMENT BY MR. ZENSKY | 74 |
| CLOSING ARGUMENT BY MR. SCHAIBLE | 112 |
| CLOSING ARGUMENT BY MS. HAGLE | 127 |
| CLOSING ARGUMENT BY MR. MITCHELL | 137 |
| CLOSING ARGUMENT BY MR. SIEGEL | 139 |
| CLOSING ARGUMENT BY MR. GEOGHAN | 141 |
| CLOSING ARGUMENT BY MR. BINFORD | 142 |
| CLOSING ARGUMENT BY MS. BROWN | 143 |
| CLOSING ARGUMENT BY MS. SMITH | 152 |
| CLOSING ARGUMENT BY MR. STARK | 153 |
| CLOSING ARGUMENT BY HEBBELN | 243 |
| CLOSING ARGUMENT BY MR. AUSTIN | 256 |
| CLOSING ARGUMENT BY MR. BARKASY | 262 |
| CLOSING ARGUMENT BY MR. MCCUNE | 270 |
| CLOSING ARGUMENT BY MR. PITTA | 272 |
| CLOSING ARGUMENT BY MR. WINICK | 287 |
| CLOSING ARGUMENT BY MR. KINCHLOE | 290 |
| CLOSING ARGUMENT BY MR. SPENCE | 301 |
| REBUTTAL ARGUMENT BY MS. SCHWARZMAN | 312 |
| REBUTTAL ARGUMENT BY MR. ZENSKY | 317 |
| REBUTTAL ARGUMENT BY MR. SCHAIBLE | 319 |
| REBUTTAL ARGUMENT BY MR. MITCHELL | 321 |

I N D E X
1/13/21
(Continued)

PAGE

CLOSING ARGUMENT BY MR. KINGMAN                    321

COURT RULING                                       324

1       (Proceedings commenced at 9:00 a.m.)

2           THE COURT:  Good morning, everyone.  Happy New Year.

3   This is Judge Jones.  The time is nine o'clock.  Today is

4   January the 13th, 2021.  This is the docket for Houston, Texas.

5   On this morning's docket we have closing arguments set in the

6   jointly administered cases under Case Number 20-33233,

7   Chesapeake Energy Corporation.

8           Just a couple of quick reminders.  Please don't

9   forget to record your electronic appearance today.  You do that

10  by making a quick trip to the website at any time prior to the

11  close of today's hearing.

12          First time that you speak, if you would, please state

13  your name and who you represent.  That will give us a good

14  voice print.

15          We are recording today using CourtSpeak, will again

16  -- will upload both that portion of the closing argument as

17  well as -- for transcript purposes -- as well as for

18  CourtSpeak, during our lunch break.

19          I have -- just because of the number of people on the

20  line, I have activated the "hand-raising" feature.  You can do

21  this at any time, but if you know you're going to be speaking,

22  especially early on, if you'd go ahead and hit "five star," so

23  that I can unmute you.  But again, you can do that at any time,

24  and hopefully we'll keep the sirens and other background noise

25  to a minimum as we go through today.

1          All right.  Mr. Nash.

2          MR. NASH:  Your Honor, can you hear me?

3          THE COURT:  Very well.  Thank you.

4          MR. NASH:  Good morning, Your Honor.  Pat Nash from

5 Kirkland & Ellis on behalf of the debtors.  Your Honor,

6 Ms. Schwarzman is going to be handling the closing argument

7 today for the debtors.  I rise to make Your Honor aware of a

8 development late last night -- although it's probably

9 charitable from the debtors' perspective to call it a

10 "development."  But if Your Honor permits, there is something

11 that I wish to bring to your attention.

12          THE COURT:  Certainly.

13          MR. NASH:  So, Your Honor, at 11:53 p.m. Central last

14 night, the debtors received -- and I want to be clear that it's

15 our understanding that the Committee is a recipient of this in

16 the same fashion that the debtors are.

17          THE COURT:  Okay.

18          MR. NASH:  So I don't think -- this didn't come from

19 the Committee.  But we received late last night for the first

20 time what purports to be a competing, you know, equity

21 proposal --

22          THE COURT:  I read it.

23          MR. NASH:  -- per its terms -- is there anything that

24 Your Honor wishes me to say about it?

25          THE COURT:  If there's anything that you'd like to

1  tell me, I'm certainly happy to hear it.  But I've read it.  I

2  understand it.  At this point, I have no questions.  I think

3  that would be up to the debtors.

4        MR. NASH:  Well, Your Honor, I'll just highlight.  It

5  purports to come from certain holders of unsecured notes and

6  certain third parties.  When we received it last night, it was

7  unsigned.

8        My understanding is that a few minutes ago there was

9  a two-page objection that was filed.  I haven't read that

10  objection yet, Your Honor.  I think it -- you know, literally

11  in the last few minutes.  I'm told that there now is something

12  that is signed.

13        I can also tell Your Honor clearly, though, that what

14  we received is subject to documentation and diligence.  It is

15  subject to unspecified modifications to the plan that would

16  need to be reasonably -- that would need to be acceptable to

17  the backstop parties.

18        It clearly, in our view, would require

19  resolicitation.  It would require cramming existing secured

20  lenders with equity.  It's our view, Your Honor, that -- you

21  know, it's a verbal preferred instrument with a scheduled

22  maturity date and a cash pay component and coupon.  We think it

23  would be treated as debt for GAP purposes.

24        You know, there are other contingencies and

25  infirmities.  These are the ones that from our perspective

13

1  we've identified at the outset.  We think it's a country mile

2  from actionable, and -- you know, with that, Your Honor, it's

3  not something that we think we can or should, you know, quote

4  unquote "do anything" with.

5       But I intended to make Your Honor aware of it.  Even

6  if an objection had not been filed -- although, like I said, my

7  understanding is that at Docket Number 2835 there is a short

8  objection.  But I will tell Your Honor I've not read that

9  objection.

10       THE COURT:  It all has to do with --

11       MR. NASH:  (Indiscernible.)

12       THE COURT:  -- "you should take mine instead of the

13  other."  I see it for what it is.

14       MR. NASH:  With that, Your Honor, I'm going to yield

15  the podium to my partner, Alexandra Schwarzman.

16       THE COURT:  All right.  Ms. Schwarzman, I do not see

17  you on video.  Oh, you're there.  I'm sorry.  My apologies.

18       MS. SCHWARZMAN:  (Indiscernible)  Good morning, Your

19  Honor.  Alexandra Schwarzman of Kirkland & Ellis for the

20  debtors.  Your Honor, if there's no other opening remarks, I

21  would just go ahead and get into it.

22       THE COURT:  Go ahead, please.

23       MS. SCHWARZMAN:  Great.  So it's been now a whole

24  month since we were in front of Your Honor for opening

25  arguments at the start of this trial.  And before I get into

1  it, I do just want to take a moment to thank you and your

2  staff, I think on behalf of all professionals and the company,

3  as well, for giving us so much of your time over the last few

4  weeks, particularly over the holidays.  We are incredibly

5  thankful and appreciative for that.

6           And I also want to thank the plan opponents, because

7  although they may be our adversaries, they are not our enemies.

8           And just on a personal note, I know Your Honor knows

9  how much work it takes to put on a trial such as the one that

10 we've -- you know, we're concluding today.  And I do just want

11 to extend my thanks to the entire team of professionals that

12 made it possible on our end, some of whom you've seen, but many

13 who you've not.  So just a really deep gratitude on my part for

14 all their work.

15          So with that, turning to the main event.  Your Honor,

16 this is Chesapeake, an important American company.  Provides

17 over 1,600 jobs, operates across five basins, and is run by a

18 management team that is focused on the safe and efficient

19 operation that will maximize value of these estates now and

20 into the future.

21          Your Honor, I would submit that the evidence has

22 overwhelming demonstrated that we comply with each and every

23 confirmation standard; and as a result, this plan should be

24 confirmed.

25          Your Honor, Mr. Nash stated at the opening of this

1  trial that the evidence would demonstrate the debtors'

2  compliance with confirmation standards.  And the weight of that

3  evidence, coupled with Your Honor's view of value, has

4  validated that statement, and they've left the Committee's

5  objection in tatters.

6          First and foremost, at the $5.129 billion valuation

7  set by Your Honor, unsecured creditors are unquestionably and

8  prodigiously out of the money.  That's true at the Committee's

9  $6 billion hurdle Mr. Stark alluded to in his opening but

10 notably is not in evidence, and it's true at the $7.3 billion

11 hurdle as Mr. Antinelli testified.  Unsecured creditors are

12 regrettably entitled to no recovery at all.  They are not the

13 fulcrum.

14         And so whether you're a noteholder in Class 6 with

15 dozens of worthless guaranty claims, or a trade creditor in

16 Class 7 with just one, the answer is no different.

17         That is the reality and it means that the Class --

18 Classes 6 and 7 have no cram-down objections.  The plan is by

19 definition fair and equitable with respect to that.  They have

20 no more to complain about than old equity.

21         And those massively underwater unsecured creditors,

22 Your Honor, they are receiving a package of consideration worth

23 $207 million at Your Honor's (indiscernible).  And if the

24 Committee believes its valuation and believes the testimony of

25 Dr. Shaked and Mr. Baggett, and perhaps the trading will prove

them right, then they must believe that that package of
consideration is worth (indiscernible) more, over 350 million
at their valuation.

So by any measure, 12 percent of the primary equity
plus one, "in the money" as we speak, it constitutes
off-the-charts consideration for a group of creditors that are
billions of dollars out of the money.

And so really that begs the question and leaves me
wondering why are we here?  What are we still fighting about?
What is left to fight about?  Well, apparently the Committee
prefers a plan that would revolve around litigation against our
plan sponsors, the one and a half liens and Franklin.

But the debtors have the benefit of exclusivity, and
we have chosen a different path, a path that deleverages the
balance sheet by over $7 million and gives the company its
$3 billion of exit capital, and importantly allows this
important American company to continue as a going concern to
provide jobs across the country.

And because the Committee may not at this juncture
propose a competing litigation plan, they must attack ours.
And specifically they do so by challenging the debtor releases
of the plan sponsors embodied in the plan, the releases the
very parties who are providing significant benefits, $3 billion
of exit capital, and very importantly equitization of claims,
some of which are oversecured and Your Honor (indiscernible).

1        They are providing the benefits necessary to make a

2   perpetuation of Chesapeake as a going concern possible.  The

3   releases are the quid to the quo.  And no one seriously

4   suggests that our plan could survive with those releases pulled

5   out.  No one seriously suggests that the new money and the

6   equitization would be there without those releases, that the

7   plan sponsors would fund litigation against themselves.

8        So the question then is really was this a proper

9   exercise of the debtors' business judgment to choose a path of

10  consensus, of peace and prosperity, in lieu of a path that

11  would require us to wage a holy war against our plan sponsors,

12  that would put the going concern at risk in the hopes of

13  securing more for a hopelessly out of the money group of

14  creditors.

15       The evidence provided (indiscernible) answer to this

16  question, and it fully vindicates the debtors' decision to

17  pursue that consensual path.

18       In the first instance, that's because the paramount

19  objective of Chapter 11 is reorganization, not liquidation.

20  And in the second instance, it's because the claims the

21  Committee seeks to preserve and pursue are terrible.  They are

22  meritless.  And I will walk through each of those claims and

23  their shortcomings in a moment, but even if those claims were

24  strong, and they could easily and cheaply be litigated -- and

25  they are decidedly none of those things -- would it really be

1 worth sacrificing or imperiling the going concern, the survival

2 of this important company and all the livelihoods dependent on

3 it, just to try to achieve a greater recovery for out of the

4 money creditors?  Obviously not.

5        The evidence showed that the plan sponsors' multi-

6 hundred-million-dollar DIP to unsecured creditors is not only

7 above the low end of the range of reasonableness, it could

8 actually be characterized as unbelievably high.  But that is

9 the deal that the plan sponsors agreed to, and they are going

10 to honor it.

11        And as to the Committee's good faith and best

12 interest objections, Your Honor, I'll return to those later in

13 the presentation, but suffice it to say the evidence has shown

14 that there is no "there" there.

15        So to guide our examination of the evidence, because

16 there is a lot of it, I would like to return to the opening

17 statements that Mr. Nash and Mr. Stark made to Your Honor and

18 their views of what the evidence would show with respect to

19 these claims.

20        So up on the screen, Your Honor -- oh, I apologize.

21 Can we give screen privileges to Mr. Schlaifer?

22        THE COURT:  Of course.  Give me just a second.

23        MS. SCHWARZMAN:  Okay.

24        THE COURT:  There we go.

25        MS. SCHWARZMAN:  Thank you.  So up on the screen,

1  Your Honor, we laid out for you what Mr. Nash and Mr. Stark

2  promised the evidence would show with respect to the estate

3  claims.  The factual and the counterfactual, as we call it.

4  And as you can see, they promised you two almost diametrically

5  opposing narratives on every single point.

6       Mr. Stark promised you smoky back-room deals, fraud,

7  untoward behavior.  Or, in the alternative, he promised you an

8  incompetent or oblivious company, unaware of its predicament

9  and incapable of (indiscernible).

10       In contrast, Mr. Nash promised you a steadfast

11  fiduciary, one that progressed through its restructuring

12  carefully and thoughtfully, at all times doing its best to

13  maximize the value of the enterprise.

14       And so let's see what the evidence bore out.  Turning

15  to the first point, Mr. Nash promised the evidence would

16  demonstrate the debtors had turned a new leaf under

17  Mr. Lawler's direction, and worked tirelessly since he took

18  over in 2013 to reduce outstanding liabilities and improve our

19  operational efficiency.

20       In contrast, Mr. Stark promised you a "grow at all

21  costs" debtor, a wild (indiscernible) on steroids, with no

22  financial discipline and no hope of survival.

23       So what did the evidence show?  Well, Mr. Lawler

24  testified that he before he joined the company he believed it

25  was, quote, "the greatest challenge in the entire oil and gas

1  industry."  And even with this view of the challenges that the

2  company faced, Mr. Lawler testified that the situation was

3  actually much worse once he got boots on the ground.

4         Mr. Lawler testified that when he joined the company

5  he evaluated various financial, operational, and efficiency

6  metrics to assess the company's performance versus its peers.

7  And what he found was that on an overwhelming majority of those

8  metrics, I think about two -- three quarters of those metrics,

9  the company was in the bottom quartile.  He found a company

10  that had some $40 billion of on and off balance sheet

11  liability, a company that had no formal budget process, no

12  corporate planning function, and was comprised of over 30

13  non-core businesses.

14         So what did he do?  Well, he testified, he put in

15  place a four-prong strategy: financial discipline; practical

16  and efficient growth, in company cash and resources; business

17  development; and exploration.  And his strategy, as Mr. Lawler

18  testified, it allowed Chesapeake to move from that bottom

19  quartile to the top quartile on a variety of the metrics that

20  he measured, all while commodity prices were falling.

21         So how did they do that?  Well, Mr. Dell'Osso

22  testified, testified to a number of liability management

23  transactions that were aimed at improving the balance sheet

24  that consist of refinancing, purchases, asset divestitures and

25  acquisitions.

1          And Mr. Lawler also testified to a number of

2    operational initiatives aimed at reducing G&A, decreasing off

3    balance sheet liabilities, and improving efficiencies.

4          And as you can see up on the screen, which is an

5    excerpt from Debtors' Exhibit 52, from 2013 to 2018,

6    Mr. Lawler's strategy resulted in significantly reduced

7    liability, an over $20 billion reduction over six years.  And

8    that evidence, Your Honor, it is uncontroverted.

9          And while we heard a lot about liability management

10   transactions generally, there are a few that the Committee

11   focused on significantly in its pleadings and that Your Honor

12   heard a lot about over the last few weeks, and one of those was

13   the WildHorse transaction.  And again there were contrasting

14   promises made to Your Honor on this point.

15         Mr. Nash promised the evidence would illuminate for

16   Your Honor the success in this transaction.  Mr. Stark promised

17   the evidence would show it was an abject failure.  Again,

18   Mr. Lawler, Mr. Dell'Osso, and also Mr. Martin all testified to

19   the rationale for the WildHorse acquisition, which included a

20   desire to add more oil to their portfolio, to generate higher

21   margins compared to the company's natural gas assets, a desire

22   to accelerate achievement of their strategic goals by acquiring

23   significant and competitive inventory, inventory that was in

24   basins that Chesapeake understood and that Chesapeake had

25   developed with its strong capital efficiency, scale, and

1 drilling technique, and a desire to improve cash flow by

2 acquiring assets (indiscernible) EBITDA.

3          In fact, I believe that Mr. Lawler testified that the

4 WildHorse assets were approximately 10 percent of the company's

5 portfolio but contributed to approximately 31 percent of its

6 EBITDA.

7          And you see the slide up on the screen, an excerpt

8 from Debtors' Exhibit 38, it demonstrates how that WildHorse

9 transaction aligned with the company's strategic goals.

10 Mr. Lawler and Mr. Dell'Osso both spoke to this presentation,

11 and they and Mr. Martin testified that the acquisition was a

12 success.

13          Mr. Lawler testified that WildHorse assets -- oh, I

14 mentioned that -- are 10 percent of the company's portfolio but

15 31 percent of EBITDA in 2019.  And Mr. Dell'Osso testified that

16 the company successfully integrated WildHorse's operations into

17 Chesapeake, and that it is exactly Chesapeake's ability to

18 integrate those assets, given its size and scale, that

19 interested NGP in doing the transaction in the first place, and

20 importantly in taking stock as consideration for it.

21          Mr. Martin testified that the board was very focused

22 on WildHorse's ability to increase cash flow, improve leverage

23 coverage ratios, increase the company's oil portfolio, and

24 provide other synergies.  And he testified that all of those

25 objections [sic] were met.

1          Mr. Lawler testified that by the second quarter of

2   2019, the company was anticipating that it would be on the high

3   side of its anticipated projected annual savings resulting from

4   the WildHorse acquisition, and that the company had already

5   driven down well costs, reduced cash costs, reduced asset down

6   time, and improved capital efficiencies around modeling and

7   well design.  And that's reflected in Debtors' Exhibit 59,

8   which is up on the screen.

9          Mr. Lawler testified that by the end of 2019, the

10  company had reduced cash costs by $336 million year over year,

11  and recognized the highest EBITDA per barrel of oil equivalent

12  since 2014, even though commodity prices at the end of 2019

13  were approximately half of what they were in 2014.  That is a

14  significant achievement, Your Honor, and significant progress

15  on the road to full financial health.  And again, importantly,

16  it is completely uncontroverted.

17         So the Committee's attempt to declare the WildHorse

18  transaction as a failure just because of a commodity price

19  drop, it is simply inaccurate, and it does nothing to detract

20  from the fact that by every metric within the company's

21  control, the transaction was a resounding success.

22         The second liability management transaction that the

23  Committee focuses on, and one that's at the heart of all the

24  conspiracy theories that we've heard about for the last few

25  weeks, and really for the whole case, is the December 2019

1  transactions, the RBL amendment, the one and a half lien term

2  loans, and the second lien uptier.

3         And really there are two main disputes with respect

4  to the 2019 transactions.  First, should they be viewed in

5  tandem, as we -- and until recently, the Committee -- believed?

6  And second, was there reasonably equivalent value?  Did the

7  transaction benefit all Chesapeake entities?

8         And Your Honor heard quite a bit of testimony on

9  these points, as well.  So starting with the first question,

10 should the transactions be viewed in tandem?  The Committee's

11 latest position relies heavily on statements around legal

12 conditionality, statements for example in the offering

13 memorandum in the second lien note that disclaimed formal

14 conditionality between the one and a half lien loans and the

15 uptier.  And that's up on the screen, UCC Exhibit 521.

16        Specifically, the Committee points to language in the

17 second lien offering memorandum that those exchange offers are

18 not conditioned upon completion of a concurrent transaction.

19 And it's true that these transactions may not have been legally

20 conditioned on one another.  But the testimony from the

21 business people, those involved in the transaction, both from

22 the company side and the participants in this transaction, the

23 creditors, they knew the transaction was interdependent.

24        Mr. Dell'Osso and Mr. Circle both testified on this

25 issue.  From the company's perspective, Mr. Dell'Osso explained

1  that the company planned to complete the transactions together

2  because they were integrated.  He also explained that it would

3  not be wise to tell the world that they were conditioned on one

4  another.  He testified that there are a lot of reasons, not

5  just commercial reasons, that when you're going to negotiate

6  something like an exchange, a highly negotiated transaction,

7  you don't want to lay out the conditionality, like you do this,

8  there's conditions on this.  It gives people leverage, and that

9  was a leverage that if you could structure around it, you

10 would, and that's what Chesapeake did.

11        He knew that the size of the second lien uptier would

12 be limited if they were not able to do the collapse at the same

13 time.  The company needed the incremental assets from the BVL

14 silo in the parent company credit chain to do the full size of

15 the uptier.  And he said, so while we didn't have formal

16 contingency, we certainly planned to do that together.  And

17 they were -- from an analytical standpoint, they were certainly

18 integrated.

19        Mr. Circle, representing Franklin, an anchor

20 participant in these transactions, similarly viewed them as,

21 quote, "undeniably linked."  Specifically, Mr. Circle testified

22 that Franklin was unwilling to do the uptier exchange without a

23 capital structure class, and the assurance that there would be

24 sufficient collateral to support the new 2L bonds.

25        It's worth noting that, given the size of Franklin's

1  holdings and the level of participation required to effectuate

2  the transactions, that it would have been unlikely if not

3  impossible to do the transactions without Franklin's

4  participation.  So if they wouldn't do them separately, they

5  could have only been done together.

6            So in assessing reasonably equivalent value, all the

7  steps for WildHorse refinancing and the uptier transactions

8  should be collapsed to reveal the underlying economics.  That's

9  what the case law tells us.  And I've noted a few cases up on

10 the screen that speak to this point.  I'm not going to read

11 them, but they're up there for Your Honor.  But again the

12 evidence overwhelmingly demonstrates that these transactions

13 were intended to be done together.  They were interdependent,

14 so they must be viewed together.

15           So with that, we now turn to whether the transaction

16 established reasonably equivalent value.  And in his opening,

17 Mr. Stark promised this Court, he assured this Court on

18 multiple occasions that there would be no evidence of any

19 benefit of the December 2019 transactions.  He said there are

20 some brief assertions, Your Honor, that there are indirect

21 benefits, that there is no evidence, and they won't give you

22 any evidence, they can't give you any evidence because there

23 were none.  And that, just stating it boldly, isn't sufficient

24 under the law.

25           Now, not only did the debtors provide evidence of the

27

1  transactions resulting in the exchange of reasonably equivalent
2  value, but the Committee did as well.  When Mr. Baggett, the
3  Committee's expert on the topic of reasonably equivalent value,
4  when he was asked whether his position was that the
5  transactions when weaved together did not provide reasonably
6  equivalent value, he testified that was not his position.

7       And with the interdependent nature of these
8  transactions established, the disagreement around whether these
9  transactions benefitted the Legacy Chesapeake and provided
10 reasonably equivalent value, it fades away.  The transactions
11 provided significant benefits to all entities, and we've listed
12 some of those up on the screen for Your Honor.  They expanded
13 and diversified the debtors' asset base by consolidating
14 capital structures.  They reduced Legacy Chesapeake debt by
15 approximately a billion.  Importantly, and I'll talk about this
16 in more detail in a minute, maintained the Chesapeake revolving
17 borrowing base, critically important to provide liquidity to
18 all entities.

19      It eliminating the technical going concern issue.  It
20 eliminated the threats of a near-term (indiscernible) coverage
21 ratio, and it provided a path to pay down junior Legacy
22 Chesapeake debt, among others.  They were a significant benefit
23 to all entities.

24      And that is true even if you look at reasonably
25 equivalent value only with respect to the one and a half lien

1  transactions and view that on its own in isolation.  So even if
2  we were wrong about the interdependent nature of these
3  transactions, and I do not believe that we're wrong, there is
4  still clear evidence and uncontroverted evidence of reasonably
5  equivalent value.

6           And because the Committee has essentially abandoned
7  its fraudulent transfer claims as they relate to the uptier
8  transactions, I'm only going to look at the benefits in the one
9  and a half liens.  Mr. Dell'Osso testified to this.  He said
10 that by collapsing the capital structure, the company was able
11 to pay off its BVL debt, which was clearly a direct benefit to
12 WildHorse, but also a direct benefit to Chesapeake.  As a
13 purely legal matter, Chesapeake Energy Corporation's ownership
14 of BVL means that what benefits BVL -- what benefits a
15 subsidiary benefits the parent.

16          But as a more practical matter, the collapse allowed
17 Chesapeake to pull assets from WildHorse into the parent
18 company credit chain.  And in doing that, Mr. Dell'Osso
19 testified that Chesapeake pulled both the collateral value as
20 well as the cash flow from those assets, so that they can now
21 contribute to the (indiscernible) calculations of the parent
22 company debt, a direct benefit.

23          And, Your Honor, this benefit cannot be overstated.
24 The Committee argues the collapse of -- the collapse had no
25 benefit to Chesapeake because Chesapeake Energy Corporation,

1 the parent, as equity owner of BVL, already got the benefit of
2 any residual value of BVL, and in fact value beyond its debt.
3 And while it may be true on paper, it was certainly not true
4 with respect to the RBL facility.  An unrestricted subsidiary,
5 the BVL entity did nothing to contribute to the covenant
6 calculations under Chesapeake's RBL.

7          Collapsing the capital structures was the only way to
8 take advantage of the significant value of those assets and to
9 enhance the collateral coverage and EBITDA considered by the
10 RBL lenders in calculating compliance with existing coverage at
11 ratios in determining the go-forward borrowing base.

12          In fact, it was that EBITDA and just the WildHorse
13 assets that allowed the company to stave off a borrowing base
14 redetermination and maintain that cash, that asset through
15 liquidity, critical to running the business, to maintain that
16 for all entities, including the Legacy Chesapeake entity.

17          Mr. Dell'Osso testified that's what they did.  He
18 said the $900 million debt reduction from the uptier exchange,
19 he said it was a huge benefit.  But in addition to that,
20 bringing the BVL assets into the parent company credit chain in
21 exchange for taking on a billion and a half of debt was a very
22 attractive element for everyone in that credit chain, not the
23 least of which was the parent company revolving credit facility
24 lender.

25          He said they no longer looked at the $3 billion

1  facility with Chesapeake in an environment that most E&P credit

2  facilities, certainly those below investment grade, were being

3  reduced.  They let us known through discussion that we should

4  expect that without some improvement to our situation, we could

5  expect a reduction coming in the spring of 2020.

6         And so when we discussed how this transaction would

7  unfold with the lenders, they certainly noted that if we

8  brought the BVL asset into the parent company, that there would

9  not be a need to reduce our availability under the Chesapeake

10 parent company's facility.  And maintaining that liquidity,

11 that extra liquidity that was $1.4 billion as of year-end 2019,

12 it was very, very important to us.  And to state the obvious,

13 it was important to every (indiscernible) Chesapeake entity

14 that tapped into that facility to fund its operations.

15        Mr. Martin testified to this very same benefit as

16 well.  He said that the 2019 transactions assured the company's

17 ability to have a revolving credit line sufficient to meet its

18 anticipated needs based on the 2020 business plan budgets that

19 were being generated at that point in time.  So this is

20 critical, the lifeblood of the company.  It is being

21 maintained.

22        Now, the Committee argued, well, it wasn't increased,

23 but that's not necessarily the litmus test.  As Mr. Nash

24 mentioned in the opening, you always have to be comparing what

25 you have to your alternative, not nirvana.  So the alternatives

1  that we had were maintain our borrowing base or have it

2  reduced.  And obviously maintaining that borrowing base, that

3  $1.4 billion of liquidity that Mr. Dell'Osso testified was

4  available at year-end, that was a significant and a direct

5  benefit solely from the one and a half liens and the

6  collateral.

7           And finally, Your Honor, you heard testimony on these

8  benefits from Mr. Circle.  He testified that his understanding

9  of the benefits of the transactions was in line with

10 management, that the transactions provided asset-based level

11 support to the Chesapeake revolving base credit facility, and

12 gave the benefit of the guaranties on all assets to the broader

13 enterprise.  So far from being no evidence of any benefit, like

14 Mr. Stark promised, the evidence of the benefits of the

15 transactions is overwhelming.

16          Now, with respect to the 2019 transactions, Mr. Stark

17 also promises the evidence would show that by late 2019, this

18 board knew the company was sunk and they did it anyway.  And he

19 also said there would be evidence that show that this was a

20 desperate act of a desperate entity to benefit an affiliated

21 company.  A desperate act of a desperate entity?  Pretty bold

22 statement, Your Honor.  And as it turns out, it's one that's

23 completely divorced from the evidence.

24          In fact, both Mr. Lawler and Mr. Martin testified

25 that they bought equity in Chesapeake in late 2019 as a result

1  of its belief in the company and its prospects.  Those are

2  hardly the actions of directors of a company that believe it's

3  sunk.

4         Now, the Committee, in support of its theory that the

5  company knew it was sunk, it latches on to certain comments

6  made by Mr. Dell'Osso as reflected in the December 2019 board

7  minutes introduced as Debtors' Exhibit 123, which is up on the

8  screen.  And specifically Mr. Dell'Osso noted in those minutes

9  that there were liquidity challenges remaining following the

10  December 2019 transactions.

11         On this point, Mr. Martin testified that the word

12  "challenges" is an important one.  He said, "Mr. Dell'Osso is

13  an in a thoughtful fashion, communicated with all lending

14  constituencies effectively, and it was also policies of the

15  board with respect to external circumstances that we were

16  facing as well as internal ones.  And as I've indicated,

17  $9 million to the debt fund, oil and gas activity in a volatile

18  market of its size, is the number too big, and it was the

19  intention of management and the board over time to get that

20  down or to grow out of it with acquisitions that would create

21  cash from a proven asset."

22         So in his view, in Mr. Martin's view, what

23  Mr. Dell'Osso was reporting to the board is that we've made a

24  step in the right direction.  We reduced a billion dollars of

25  debt, which would be less than nine at the end of the year, and

1   -- but that the same conditions that existed as of the fall of

2   2019 with respect to the capital markets, that they were going

3   to continue into 2020, and we would need to wait until there

4   was a recovery in oil or gas prices or both.  And so I think

5   that's a (indiscernible) discussion for him to share with us,"

6   he said.

7           So these comments -- this conversation that the board

8   was having is not an indication of a company that thought it

9   was sunk.  It's an indication of a diligent board and a

10  diligent management team.  In the Committee's retelling, Your

11  Honor, they say liquidity challenges is a terminal disease,

12  just as negative (indiscernible).  But these are not the basis

13  on which to determine a company was insolvent, not unless the

14  Committee's position is that this Court should find that

15  anytime a company faces a liquidity challenge, all is lost and

16  it's time to close up shop.  That is not a fair

17  (indiscernible).

18          In context of believing it was sunk in December 2019,

19  Your Honor, Mr. Lawler and Mr. Dell'Osso testified the company

20  was continuing to evaluate additional transactions all the way

21  up until the events of March 2020 flipped the markets upside

22  down.  And Debtors' Exhibit 88 sets out a few of these

23  transactions that were under consideration.

24          As Your Honor can see from this presentation, the

25  company had additional levers to pull after the December 2019

34

transactions, including debt and equity exchanges and asset
sales.  But of course the events of March 2020 intervened, and
the events of March 2020 are known to all, massive supply shock
from the Saudi-Russian price war and massive demand shock from
the COVID-19 pandemic.  No one seriously contests or asserts
these events happened or that they were remotely foreseeable.
Of course they were not.

Both Mr. Lawler and Mr. Dell'Osso, industry veterans
with a combined 50 years of experience in the oil and gas
industry, they testified these events and this stress, it was
unlike prior industry stress.  They were on another level.  As
the kids would say these days, they were extra.

When asked how the events of March 2020 compared to
previous challenges in the markets over the past seven to ten
years, Mr. Lawler testified that this disruption was much more
(indiscernible), much more significant.  He said it was a very,
very challenging market, unlike anything we'd ever seen.

Mr. Dell'Osso was asked a similar question, and he
testified that the events of March 2020 were more severe than
prior events.  Specifically, he testified that, "We've never
seen price classes of this nature that were viewed with such
uncertainty of future demands.  And when you marry that
uncertainty of how we're ever going to get supply reduced to a
level to meet that demand, it resulted in an investor sentiment
that was, you know, non-existent for the space."

1          He said, "You couldn't even really call it negative.

2     It didn't exist.  There was no interest in any sort of

3     investment, or even a long-term view of how to invest in oil

4     and gas at the time."

5          I'm going to come back to that in a little bit.

6     Mr. Martin, I believe, called the event a double black swan and

7     Mr. Antinelli similarly described it as volatility that none of

8     us had seen in our careers.  And it was the onslaught of these

9     unforeseen and these unprecedented events that forced the

10    company into bankruptcy, that forced the company to begin

11    exploring alternatives, nothing else.

12         Bankruptcy was not a foregone conclusion in December

13    2019.  It was not a foregone conclusion by any stretch of the

14    imagination or any stretch of the evidence by December 2019, or

15    really at any point in time up until March of 2020.  It wasn't

16    even on the radar.

17         Mr. Circle, one of, if not the largest creditor of

18    Chesapeake, he testified that he was not concerned about a

19    near-term bankruptcy in December of 2019.  He testified, "We

20    did not anticipate a near-term bankruptcy filing at the time of

21    the uptier exchange.  Because as we sat here in December 2019,

22    the company had a pretty substantial liquidity position."

23         He said ultimately that he believed the company had a

24    $3 billion RBL at the time that had over a billion dollars

25    drawn, but that there was sufficient liquidity from his

1  perspective.  He testified the company had minimal near-term
2  maturity runway as it related to the entirety of 2020 and 2021,
3  and that we had a really robust hedge book at the time.  And he
4  admitted there's always uncertainty in the commodity markets
5  about where the underlying commodity is going to go.  But
6  ultimately, his comfort in terms of (indiscernible) maturity
7  and liquidity profile, and the business profile of the company
8  did not leave him with a great deal of concern about a
9  near-term default.

10        (Indiscernible) that no bankruptcy was imminent or
11 even contemplated by Chesapeake or its creditors at the time,
12 it supported the fact that, as Mr. Circle testified, Franklin
13 had the ability -- it had the opportunity to uptier more of its
14 bonds and it elected not to do so.  Certainly, if this was a
15 transaction designed by Franklin, as the Committee alleges, or
16 designed for the benefit or with the intention or with the
17 knowledge that a near-term bankruptcy was imminent, certainly
18 Franklin, a sophisticated investor, one of the largest money
19 managers in the entire country, certainly they would have taken
20 full advantage of the opportunity to improve their position in
21 advance of the near-term bankruptcy.  But those are just not
22 our facts.

23        No.  These transactions, they were designed by a
24 thoughtful and diligent company that was focused on
25 deleveraging its balance sheet and ensuring financial health.

1              Mr. Dell'Osso was asked if he believed the company

2    was insolvent after this transaction.  He testified that he

3    believed it was solvent, and in support of this, he cited the

4    value of the company's proved reserves at the time and its

5    near-term liquidity.

6              Mr. Martin also testified his belief that the company

7    is solvent as of February 2020 when he authorized -- he and the

8    board authorized the dividends on the company's preferred

9    stock.  In fact, it had thought otherwise, he testified, would

10   mean that Chesapeake was acting in contravention of the law

11   (indiscernible) the Board.  So we at Chesapeake, we followed

12   the law.

13             Mr. Lawler also testified that bankruptcy was not a

14   consideration as of late February 2020.  He was asked, "As of

15   February 2020, did you believe Chesapeake was going to have to

16   file for bankruptcy?"  Answer:  "No, I did not."  Mr. Circle

17   testified to the same.  The company clearly did not believe it

18   was sunk, and neither did its creditors.

19             So while both parties put forward testimony on the

20   solvency of the company in December 2019, you know, solvency,

21   like water, it's a hard thing to pin down, Your Honor.  It is

22   nebulous at best.  Your Honor heard the testimony and you will

23   consider it, but I would submit that Your Honor does not need

24   to reach an answer on solvency as the evidence of reasonably

25   equivalent value is overwhelming.  And without proving each

1  element of Section 548, the Committee's fraudulent conveyance

2  theory must fail.

3        So, Your Honor, I want to pause here for a moment in

4  early March 2020, because what I just walked through, what was

5  just discussed is really the entire evidentiary record with

6  respect to TOUSA claims.  And with respect to the Committee's

7  (indiscernible) that the company was on the brink of bankruptcy

8  as either a Machiavellian or an oblivious soon-to-be debtor.

9  But the evidence is clear that the company was slowly but

10  surely moving towards greater financial health, sluggish

11  commodity prices notwithstanding.  The evidence shows that the

12  WildHorse transaction was a success, and that the 2019

13  transactions were interdependent and beneficial to all.

14        So despite Mr. Stark's views on the merits of his

15  TOUSA theory, the evidence just isn't there.  The UCC's claims

16  and theories with respect to these transactions are meritless.

17  The December 2019 transactions were not desperate acts, and

18  this was not a desperate entity.

19        Mr. Stark noted in his opening that our plan couldn't

20  possibly pass muster because to do so would require the Court

21  to ascribe little to no value to these claims.  And he

22  suggested it in exasperation.  He was in disbelief that that

23  could ever be the case.

24        So, Your Honor, I would submit that is the case.

25  There is no polite way to say that these claims have no merit,

1  and they merit no recompense.  They are based on a conspiracy

2  theory that is unsupported by the facts.  And with the <u>TOUSA</u>

3  theory, which I believe Mr. Stark -- I'm sorry, Mr. Nash

4  described as (indiscernible) meritless claim in the UCC'S

5  complaint out the window.

6          I want to turn to the events leading up to the

7  petition date, because these are the factual predicate to the

8  Committee's remaining claims, including breach of fiduciary

9  duty, aiding and abetting, equitable coordination, and what

10 we've dubbed (indiscernible) preferences.

11         So again Mr. Stark made a lot of promises to Your

12 Honor about what the evidence on this topic would show.  He

13 said that with respect to the breach of fiduciary duty, he said

14 there is some evidence that at this time the company decided to

15 back away to a monitoring or an observing role and allow the

16 one and a halves and Franklin to negotiate against -- amongst

17 themselves.  He said three days before the lapse of

18 preferences, the debtors had taken a back seat, were letting

19 the one and a halves and Franklin and figure it out for

20 themselves.

21         So now let's look at the evidence and let's see if

22 those promises hold up.  Well, first, Mr. Martin testified that

23 the company and the board were laser-focused on maximizing the

24 value of the enterprise consistent with their fiduciary duty.

25 Specifically, he testified that at that time the company and

1  its advisors' objectives were to develop strategies and options

2  for the Board to consider and for the company to consider that

3  would maximize the value of the enterprise in this

4  unprecedented and difficult time.

5        In terms of how to achieve that goal and how to

6  maximize the value of the company, Mr. Dell'Osso testified that

7  his focus in the first instance was on reducing the balance

8  sheet and securing sufficient capital to stay alive.  He

9  testified that once the company swallowed the tail and

10 recognized that they would have to go through this process, he

11 wanted to make sure that they had positioned themselves for a

12 reorganization and not a liquidation.  He felt that there was

13 too much value in this company to let a liquidation happen, and

14 I wholeheartedly agree with that, Your Honor.

15       And so management, Mr. Dell'Osso, was focused on

16 making sure that the company had a balance sheet that would

17 work on the other side so that they could have a business that

18 could create return and create value for all stakeholders.

19       So as a result, the two things he was focused on was

20 how do we get debt low enough to in light of projected cash

21 flow from projected drilling to support the business?  He

22 testified that was chief concern number one.  And so when we

23 engaged in discussions around that, it was how do we get there,

24 how do we get there in a way that we have a set of investors

25 that makes sense on the other side, that's logical, and that's

1  supportive.

2         Mr. Antinelli testified to the same thing.  He said

3  that we were very focused on positioning the company for

4  success on the other side.  I'm going to start to sound like a

5  broken record on this, Your Honor.  We wanted to make sure we

6  could get out.

7         Mr. Antinelli testified that in assessing the options

8  available to the company, he and the company's other advisors

9  were focused not just on DIP financing, but on DIP to exit

10  financing.  He went on to say that he felt like the DIP into

11  bankruptcy without a path out may not get us out given the

12  current macro and capital market's impairments.  And "may not

13  get us out" is a polite way of saying liquidate and lose the

14  going concern.

15         And you heard again, Your Honor, later in his

16  testimony that he had grave concerns in this environment, going

17  into bankruptcy with a small DIP with no plan or no strategy to

18  come out.  But it wasn't just debt capital that we were

19  seeking, Your Honor.  Mr. Antinelli also testified that the

20  company was looking for a large equity check basically from the

21  outset.  He testified that by April 21st, every single DIP

22  proposal we had received by that point in time, it required a

23  significant equity check or a junior check.

24         That's reflected in Debtor's Exhibit 185, which is up

25  on the screen, which is from our April 21st board deck.  So no

1    equity capital, no debt capital.  No debt capital, no going

2    concern.  That was the framework of the company, and that's how

3    we approached these prepetition negotiations.

4            Mr. Lawler echoed the sentiment.  He testified that

5    he knew at the time, in April of 2020, same time that this

6    presentation was being given, that it was absolutely imperative

7    for the company and the enterprise to secure new money and a

8    new equity investment in this company.  He said, it's very

9    important for me to note that just a few days prior to the

10   April '21 forecast, which was just up on the screen, he said

11   that is when we saw oil close in the negative $30 a barrel

12   range.  That impact and that low credit environment, combined

13   with a 30-million-barrel-per-day demand destruction that was

14   being recognized, it created significant pressure on the

15   company and the need for a new equity check.  And where could

16   we potentially source that check?  He testified there were a

17   limited number of places that we could source that new money.

18           Now, in terms of overall capital need, Your Honor,

19   you heard testimony from Mr. Dell'Osso that we originally

20   looked for a $1.3 billion DIP.  And we heard testimony from

21   Mr. Antinelli that we were originally looking for a

22   $750 million equity rights offering and a two and a half

23   billion dollar exit facility.  That's approximately four and a

24   half billion dollars of fresh capital that we were sourcing in

25   spring 2020.  Four and a half billion.  That is a huge lift in

43

1  any market, particularly one that was in shambles in the spring

2  of 2020.

3        So how did we go about doing it?  How did we end up

4  securing this kind of capital?  Well, two things happened.

5  First, on the debt side, the company was able to create a

6  competitive (indiscernible) and foster a competitive process.

7  Mr. Antinelli testified to this at length, both during these

8  proceedings and also at the interim and the final DIP hearings,

9  as reflected on the demonstrative up on the screen, and this is

10  pretty well-plowed ground, Your Honor, so I'm not going to

11  spend much time rehashing that process.

12        And then on the equity side, the company had what I

13  believe Mr. Circle dubbed a strategic asset of the estate, one

14  that had gotten a lot of air time during these proceedings.

15  And that is a potential (indiscernible).

16        Indeed, both Mr. Lawler and Mr. Martin testified that

17  the Board was aware of these potential preference claims.  When

18  asked if the Board was aware of the preference period for

19  certain liens granted in connection with the December 2019

20  transactions, that they may start to expire in mid-May,

21  Mr. Lawler testified that they were aware, as the Board had

22  discussed the capital structure and the timing of when those

23  liens were perfected.

24        He testified that the Board was advised by counsel of

25  these claims, that the management team had discussions with

1  counsel about the preference period and preference claims, and

2  that the Board had discussions with counsel about the

3  preference period and the preference claims.

4       Mr. Martin also testified to this.  He said the Board

5  discussed potential claims all the way back at the March 20,

6  2020 board meeting.  He testified the Board discussed the

7  probability of success of the preference claims and that the

8  Board was advised of potential defenses and merits of the

9  potential defenses in such claims.  And multiple witnesses --

10 Mr. Lawler, Mr. Dell'Osso, Mr. Antinelli -- they've all

11 testified that the company used these potential preference

12 claims as leverage.

13      Mr. Lawler testified that the company used the

14 specter of preference litigations to secure a better deal with

15 the secured lenders that they otherwise couldn't.

16      Mr. Dell'Osso testified similarly.  He said that the

17 potential preference actions were an important aspect of the

18 decision that the Board was going to need to make, and that the

19 company's advisors communicated to the plan sponsors that if

20 the company was going to file and not pursue a claim, that we

21 need to have an agreement that we felt would (indiscernible)

22 those claims and give consideration to the fact that they may

23 not exist anymore.

24      And finally Mr. Antinelli testified that we

25 (indiscernible) potentially file the company and pursue the

1  litigation to avoid the secured lender liens, unless we found a

2  more value maximizing alternative.

3          But you don't have to take our word for it, Your

4  Honor.  Mr. Circle, who was on the receiving end of that

5  leverage, he testified to the same.  When asked whether the

6  company used a threat of preference litigation in RSA

7  negotiations, he said, "They certainly did."  It was front and

8  center when he got restricted.  He testified that he remembered

9  vividly a gentleman from Intrepid referring to the perfection

10  of mortgages and the preference issue as the, quote, "strategic

11  asset of the estate."  That pressure would be applied and that

12  the company would not walk away from the strategic asset

13  without a clear plan with the support of as many parties as

14  possible.

15          And just as important, he testified that the company

16  was focused on a clear path to exit.  And he said, in his

17  words, "Because a plan without getting out of bankruptcy can

18  result in a lot of pain, needing to raise capital at the end of

19  the process.  And again that was our focus.  How do we get out?

20  Indeed, as this Court knows well, sometimes that exit capital

21  simply isn't there.  Not every chapter ends in a reorg -- not

22  every Chapter 11 ends in a reorganization or a going concern

23  sale, and that is certainly true in the oil and gas space.

24          And that leverage that we had, Your Honor, it may

25  have been of the mutually-assured destruction variety,

1  (indiscernible) predicated on massive litigation, <u>TOUSA</u> claims

2  and who knows what else.  But on a case that puts the

3  enterprise at risk, but that leverage, it clearly worked.

4          A little on the (indiscernible) group, they sent a

5  letter and presentation to the Board voicing their displeasure

6  they were being threatened with a lawsuit just mere months

7  after they had loaned the company a billion and a half dollars

8  of fresh capital.  They and Franklin ultimately agreed, thanks

9  to the efforts of the company and its advisors over the course

10  of approximately three weeks, they agreed to provide the

11  company with a $600 million fully backstopped equity rights

12  offering.  This was at a time that nobody was writing checks.

13  They didn't do this out of the kindness of their hearts, Your

14  Honor.  They did it because we had leverage and we used it.

15          And this goes directly to the dueling narratives that

16  we and the Committee have put forward in this case regarding

17  the rights offering.  The Committee has said that this rights

18  offering is a benefit -- it's always been a benefit to the

19  secured creditors as a way to steal value -- shield value from

20  unsecured creditors.

21          In contrast, we say it was a burden that we imposed

22  on secured creditors because, as multiple witnesses noted in

23  their testimony, the plan sponsors bore the risk that the world

24  would continue to deteriorate, that value would go down, and

25  they were still on the hook.

1          So despite the fact that the evidence clearly shows

2    that the company used every bit of leverage at its disposal,

3    and that the plan sponsors bore the risk that the world would

4    continue to deteriorate and value would continue to decline,

5    the Committee objects to the rights offering on the basis that

6    it was never marketed.  Never marketed.

7          Your Honor, there was no market.  Mr. Circle, who

8    works for one of the largest money managers in the country, he

9    testified that in the spring of 2020, the capital market could

10   be described as dead at best.  And Mr. Dell'Osso testified, as

11   I mentioned, that there wasn't even negative sentiment.  There

12   was no sentiment.

13         Mr. Circle said at that time he didn't think he'd

14   seen an issuance in the oil and gas space, let alone in the E&P

15   space, in multiple months, either on the debt or the equity

16   side of the ledger.  He testified that it was hard for him to

17   describe the market as anything other than dormant at the time.

18   Commodity prices had precipitously dropped.  He said one month

19   they even went negative in terms of the front-month contract.

20   And given the demand outlook, while we were all sheltering in

21   our basements when we were negotiating this, it was hard to put

22   a finger on exactly when demand was going to surface.

23         And so as a result of people's uncertainty as it

24   results -- related to supply and demand in a commodity, he

25   thought that there was very little appetite, in his

1   observation, in the marketplace, and as reflected by security

2   prices, not only Chesapeake but other companies across the

3   industry.

4          So again setting aside the uncontroverted evidence

5   that there was literally no market for oil and gas financings

6   in the spring of 2020, and setting aside the fact the debtors,

7   once we signed that RSA, we were bound, while of course

8   retaining our fiduciary out, the Committee nevertheless argued

9   that the rights offering failed under 203 and (indiscernible)

10  because we never market tested it.

11         But of course 203 (indiscernible) is inapposite.  203

12  (indiscernible) concerns (indiscernible) market test financing

13  provided by old equity in order to satisfy or (indiscernible)

14  the new value exception of the absolute priority rule.

15         And just like the Committee's misplaced tooth

16  analogy, this analogy similarly misses the mark.  Those are not

17  our facts.  The secured lenders are creditors, not equity.  And

18  as the evidence shows, they are not insiders.  They were not in

19  control of the company.  They were not in control of the

20  negotiations of this restructuring.  And of course there is no

21  absolute priority issue here.

22         So the evidence also shows that neither the company

23  nor its advisors until late last night received a single call,

24  a single email, a single inbound from any party, whether

25  involved in this case or not.  No one so much as inquired about

 1  an alternate rights offering, no one.  This argument holds no

 2  weight.

 3          So I want to turn back to the RSA negotiations.  And

 4  there Mr. Antinelli testified at length to the back and forth

 5  of these negotiations, which were moving at an incredibly rapid

 6  clip from the end of April, April 27 when we sent our strawman

 7  proposal, to mid-May.  Mr. Antinelli testified to that strawman

 8  proposal that was sent on April 27th, and in that strawman

 9  proposal we proposed a couple of different structures,

10  including one that had new money splits of 58.2 percent,

11  16.7 percent, and 25 percent to the one and a halves, the 2Ls,

12  and the unsecureds respectively.

13          Mr. Antinelli testified that the one and a half lien

14  ad hoc group got restricted on April 29th, and Franklin filed

15  suit on May 1st.  And he testified that this was an integral

16  turning point because now we had principals.  We had somebody

17  to talk to.  We had somebody to negotiate with.

18          He testified to multiple proposals exchanged between

19  April 27 and May 13, each of which modified various terms of

20  our proposal, including the terms of rights offering and the

21  equity splits, and those proposals are summarized on Debtors'

22  Exhibit 236 which is up on the screen.

23          Mr. Antinelli testified that by May 13th, I think he

24  said there was (indiscernible) we got a joint proposal from the

25  one and a half liens and Franklin.  But at that time he noted,

1 he testified, we the company, we had not signed on to that at

2 that time.  We still had issues, particularly around

3 conditionality.

4          He was very clear in his testimony the company was

5 not interested in signing on to a deal that had no certainty at

6 close.  And so we worked over the next few days to close out as

7 much uncertainty as we could and make this as airtight as we

8 could because as I've mentioned at least a half a dozen times,

9 we wanted a path out.  That was our number one focus.  That was

10 our number one goal.  We wanted to keep this going concern

11 alive.

12          With respect to the (indiscernible) negotiations,

13 Mr. Antinelli testified that we reached agreement in principle

14 with the one and a halves and Franklin on May 18th, and he

15 testified that that agreement in principle on May 18th, that

16 was ultimately the agreement in every material respect that was

17 documented in the RSA and we signed on June 28th.  And with the

18 exception of Class 6/7 treatment, it is the transaction that is

19 in front of Your Honor today under what is now the fifth

20 amended plan we filed on a slightly amended -- not in a

21 material way -- late last night.

22          And at a high level, Your Honor knows this

23 transaction includes a fully backstopped $600 million equity

24 rights offering, open for participation to the one and a halves

25 and the 2Ls, (indiscernible) money splits of 76 percent,

1 | 12 percent, and 12 percent across the one and a halves, 2Ls,

2 | the unsecureds respectively, (indiscernible) to the 2Ls and the

3 | unsecureds, and releases to the plan sponsors and certain other

4 | parties.

5 |       Importantly, and perhaps most importantly, Your

6 | Honor, Mr. Antinelli and Mr. Martin testified that the board

7 | was engaged and apprised at every step along the way.  That's

8 | reflected again in this demonstrative which we put up earlier.

9 | It's I believe Debtors' Demonstrative 6, and it was discussed

10 | at length by Mr. Antinelli and Mr. Martin.

11 |       In fact, Mr. Martin was asked, "Why did the Board

12 | meet so frequently during this time?"

13 |       And he testified that, "This was a company in crisis,

14 | and it was a time of crisis for the enterprise and the world.

15 | It was very important that the Board be diligent in

16 | understanding the circumstances of the company and the options

17 | that were available to the company to get through this period

18 | of time."

19 |       Now, Your Honor, those are not the words of a

20 | Chairman of the Board who's asleep at the switch or who

21 | abdicated his responsibility, as the Committee alleges.  The

22 | Board was engaged, the process was thoughtful and thorough, and

23 | it was a success.

24 |       And so in the face of this robust process, what does

25 | the Committee say?  Well, first the Committee alleges that the

1   company's process was essentially a sham because we abdicated

2   our role in the negotiations.  But that allegation, Your Honor,

3   like many of its others, it runs contrary to the evidence.

4           When asked whether he agreed with the Committee's

5   allegations that the Board of Directors abdicated its

6   responsibility in prepetition negotiations, Mr. Lawler

7   testified that he disagreed, and he disagreed in light of the

8   frequency of meetings, the discussions, and the process in

9   which they evaluated and discussed the alternatives and the

10  options for the company was quite extensive.

11          Similarly, when asked for his perspective as Chairman

12  of the Board, did he believe that the company abdicated its

13  role in negotiations, Mr. Martin testified that he did not

14  agree, the Board did not abdicate.

15          And finally, when he was asked how the company -- how

16  involved the company was in driving the deal, Mr. Antinelli

17  testified the negotiations were all consuming.

18          But again, Your Honor, you don't have to take our

19  word for it.  Our creditors saw it the same way.  When asked to

20  describe the debtors' role in the RSA negotiations, Mr. Circle

21  testified that it couldn't be described as anything other than

22  critical.  He said from his perspective it was certainly a

23  multi-party negotiation, but hard for him to describe the

24  company's role as anything but critical given the critical

25  nature of the ultimate outcome, how much money was going to be

1  raised from a rights offering, and ultimately he said the split

2  mattered greatly to the company.  And that was clear to him as

3  such as we moved to negotiations.

4          So again, in the face of this overwhelming evidence

5  of the company's involvement, the Committee points to the text

6  in the May 11th board presentation, which is up on the screen

7  for Your Honor.  Again Debtors' Exhibit 236.  And

8  (indiscernible) said the company had not inserted itself into

9  the dialogue as creditors constructively negotiate.  And the

10  Committee (indiscernible) is dispositive on the topic.  This is

11  all you need to know.

12          But of course, when asked about the meaning of this

13  language, Mr. Lawler testified that it did not refer or imply

14  that we were not actively talking to, negotiating, and

15  encouraging creditors to come to the conclusion that we could

16  go forward with.  The highlighted area simply noted that we

17  were not in the creditor-to-creditor discussions.

18          Mr. Antinelli also testified to the meaning of this

19  language, and he (indiscernible) that its meaning was that the

20  company did not demand that all conversations run through the

21  company.  But we allowed principal-to-principal discussion.

22  And in fact, on this point, Mr. Antinelli testified that he

23  believed it would have been counterproductive to require it all

24  to run through the company because of course we're negotiating

25  a very big transaction in a very short period of time.  If we

54

1  had to be in the room for every single negotiation, I do not

2  believe there was any chance the transaction would have gotten

3  negotiated in time.

4          And that's what we wanted to do.  We wanted a path of

5  consensus equal to achievement, we wanted to keep the going

6  concerns alive.

7          Mr. Antinelli testified that the proposals went back

8  and forth, the company was pushing both sides, and he testified

9  that the company was fighting for new money, it was engaged

10 with the principals, and we were fighting for unsecured

11 creditor recovery.  It's hardly an abdication, Your Honor.

12         So another variation in the Committee's argument that

13 we abdicated is that the company cowered in the face of a

14 letter from David Polk, and abandoned the preference claim as a

15 result.  I mean, this argument is sort of (indiscernible) Your

16 Honor, but, you know, we have as evidence exactly on point,

17 Mr. Martin and Mr. Lawler both testified that they did not view

18 this letter as a threat.  When asked why he didn't view it as a

19 threat, Mr. Lawler testified that he viewed it as a letter that

20 represented the views of creditors that David Polk represented.

21 He said there was nothing in the letter that he wasn't aware

22 of, or wasn't actively working on in the same email, and so he

23 didn't consider it a threat at all.  And importantly, Your

24 Honor, he testified the board did not change its plans, did not

25 give any different directions to its advisors based on this

1  letter.

2          Similarly, when asked whether he saw it as a threat,

3  Mr. Martin testified, he said, no, sir, I did not.  He said he

4  could only speak for himself, but he did not view it as a

5  threat.

6          And when Mr. Jonas asked Mr. Antinelli whether the

7  debtors abandoned the preferences in our May 6th term sheet, a

8  day after receiving the David Polk letter, Mr. Antinelli

9  testified that of course he didn't.  He testified that we were

10 a long way from giving up.  That was our leverage, and we were

11 continuing to wield it, and we were going to be prepared by the

12 14th to file the company without the benefits of a bargain

13 given the short timeline.  That's the end of that argument,

14 Your Honor.

15         So unless the Committee argues, well, even if the

16 process is thorough, and even if the debtors participated, the

17 process is nevertheless fatally flawed because unsecured

18 creditors were not a part of it.  Setting aside the

19 impossibility of having a creditors' committee that's not yet

20 appointed participate in prepetition negotiations, and setting

21 aside that no group of unsecured creditors ever organized

22 before the case or until last night, the evidence is clear that

23 the company was advocating for unsecured creditors, and

24 certainly, it cannot be the case that a process is fatally

25 flawed unless all constituents are at the table.

1          Mr. Dell'Osso testified to the fact that recovery for

2    unsecured creditors was an issue that was important to the

3    company during negotiations.  That the company fought for

4    recovery for unsecured creditors, and that the company did not

5    leave it to one-half Franklins as the Committee -- and

6    Franklin, as the Committee alleges that we did.  Mr. Antinelli

7    testified to the same.  When asked who was looking out for the

8    interests of unsecured creditors, he testified that the company

9    was, even though unsecured creditors were billions of dollars

10   out of the money.

11          And really important to this topic of who was looking

12   out for unsecured creditors, Your Honor, Mr. Antinelli

13   testified that certain of the secured creditors wanted us to

14   make unsecured recovery a deathtrap, and we, the company,

15   flatly rejected it.

16          So Your Honor, I want to pause, again, for a moment,

17   on the package of recovery that we got for unsecured creditors

18   under the plan.  Your Honor noted a few days ago that offering

19   a tip to out of the money creditors can unduly complicate the

20   process.  And perhaps you're wrong.  Perhaps this month long

21   trial is proof positive.  But I do want to take just a minute

22   to provide some perspective on what was going on in our minds

23   back in the spring of 2020 when we were negotiating.

24          You know, the primary job of the company is to

25   maximize value, maximize the value of the enterprise, and we

1  used our strategic asset, those potential preference claims, to

2  obtain massive equitization and massive amount of money in an

3  atmosphere of (indiscernible).  That was job number one, Your

4  Honor, and we were successful.  Had we left it at that, we

5  believe that the company would have fully discharged its

6  duties.  As we say on Passover, Your Honor, Dayenu.  That would

7  have been enough.

8          Had we left it at that, that would have been enough,

9  we would have satisfied our mandate.  But we felt strongly that

10 that was not enough, that we should do more.  That we should

11 obtain value for foregone and potential preference claims,

12 because while they would not result in a single additional

13 penny coming into the estate if pursued, they would potentially

14 be settlement negotiations and leverage for additional

15 recoveries to unsecured.

16         But if those preferences did not exist, if those

17 potential preference claims did not exist, there surely would

18 have been no basis to even ask for let obtain 12 percent of the

19 equity plus warrants for a party that is billions of dollars

20 out of the money even at Your Honor's valuation.  And that was

21 even more so the case in the spring of 2020.  But we felt that

22 as fiduciaries, saving the company and securing its future,

23 while paramount, was not all that we should obtain.  And so we

24 fought for recovery for unsecured, a recovery that under Your

25 Honor's TEV, is worth $207 million.

1          But Your Honor, we didn't stop there.  The evidence

2    shows that we refused to entertain that deathtrap, knowing full

3    well that it provided a risk free opportunity for unsecured

4    creditors to swing for the fences, and painful and expensive as

5    this has been, we believed then and we believe now that that

6    was the right and proper decision.

7          So where does the company -- or Committee go next?

8    In the face of (indiscernible) and deliberate process carried

9    out by a well-informed and diligent board, a process in which

10   the company did not abdicate its role, and fought for unsecured

11   creditors?  Well, now the Committee says that transactions in

12   the settlement reached as a result of this process must fail,

13   because the board did not commission an investigation of

14   potential estate claims and causes of action, before pursuing a

15   global deal that provided the company with $4 million of fresh

16   capital, significant equitization, meaningful credit recovery

17   to all creditors, and most importantly, I'll say it again, a

18   path to exit from bankruptcy.

19         While it is true, Your Honor, the board did not

20   commission such an investigation.  It also begs the question,

21   so what?  In the spring of 2020, the debtors, an E&C company in

22   the middle of the most volatile and capital scarce environment

23   of modern times, we were laser focused on finding the capital,

24   as the evidence showed clearly.  And as I already discussed,

25   the capital markets were closed.  Mr. Circle described them as

1  dead, Mr. Dell'Osso said there was no (indiscernible).  There

2  wasn't even a view of how to invest in the oil and gas base.

3  And as Mr. Nash said the other day, the company needed money

4  like humans need oxygen.  Without it, nothing else, including

5  an investigation, mattered.

6          Securing the capital was priority one.  But equally

7  important, you heard from Mr. Martin on issues of

8  investigation.  The Committee established on cross that

9  Mr. Martin was familiar with how to run an investigation, and

10 knows when one is appropriate or not.  And so when

11 Mr. Wissner-Gross asked Mr. Martin whether the board conducted

12 an investigation here, what did he say?  Mr. Martin said, I

13 didn't need an investigation.  I lived it.  Specifically, he

14 said, sir, I lived each of these issues extensively, day in and

15 day out over that period of time.  And maybe my recall isn't

16 perfect on occasion, but I understood what was going on with

17 the company during that period, and each of the decisions that

18 was being made.  So he didn't need an independent investigation

19 to understand how diligent this board was, and the decision

20 processes that they went through.

21          And that is so true, and it is so important, Your

22 Honor.  This is not the typical investigation case that we

23 often see.  A case of a sponsor owned entity, where the sponsor

24 is into equity and the debt and the (indiscernible) boards all

25 over the place.  There's a transaction that either takes money

1  off the table, or moves assets away from creditors.

2          In those cases, yes, we typically see independent

3  directors appointed, and an investigation undertaken with

4  respect to the transactions that happened before the

5  independent directors were on the board.  But those are simply

6  not our facts.  Chesapeake is a public company with a

7  completely independent board of outside directors, save for

8  Mr. Lawler.  You heard Mr. Martin testify to the bios of our

9  directors.  They are sophisticated and respected businesswomen

10 and men.  The transactions were public.  They moved valuable

11 assets closer to creditors, and as Your Honor heard at length

12 during this trial, they were consistent with the company's

13 march towards full financial health, and they were beneficial

14 to all entities.  These were not the machinations of a

15 Machiavellian or an oblivious debtor, as Mr. Stark promised the

16 evidence would show them to be.

17         So the Committee's arguments the board had a duty to

18 undertake an investigation of whatever fantastical theory the

19 Committee would divine in the future, is wrong on the facts and

20 as a matter of law.  No such duty exists.  And the evidence

21 clearly demonstrates that the duties that do exist, loyalty and

22 care, were carried out to their full.  Your Honor, this board,

23 and this management company, it rescued the company from raging

24 flood waters, and the Committee is here criticizing the Coast

25 Guard.

1    So again, I want to pause, because this process that

2  played out over approximately three months, it was thorough.

3  It was fast paced and it was deliberate, and it was aimed at

4  maximizing the value of an important enterprise, and obtaining

5  recovery for all creditors, and it was successful.  The

6  overwhelming and uncontroverted evidence flies in the face of

7  the Committee's breach of fiduciary duty theories, aiding and

8  abetting theories, ethical subordination theories, and what

9  we've done, the preference revival, preference resurrection

10 theories, and of course, once lapsed, a preference cannot be

11 brought back to life.  To do so would rank the 90-day statutory

12 lookback period out of the Code, and only Congress can do that.

13    Notably, Mr. Stark said no case in support of his

14 Buddhist notion that these preference claims could be

15 reincarnated in any form, fraudulent transfer, unjust

16 enrichment, or otherwise.  And it is true, Your Honor, the

17 debtors pursued this consensual transaction without an executed

18 RFA as of May 14th.  I believe Mr. Nash described it as a

19 calculated risk in his opening statement on the very first day

20 hearing in this case.  Mr. Martin testified that the board

21 understood the significance of the 14th, and the board was

22 supportive of the plan to pursue negotiations with secured

23 lenders and the DIP lenders, and the new capital providers for

24 consensual restructuring.

25    Mr. Antinelli agreed.  He testified that we took a

1  risk.  There was a risk associated with pursuing a consensual

2  deal, but we thought it was an appropriate risk to take,

3  particularly in light of the available alternative, an

4  alternative that Mr. Antinelli believed that -- he testified

5  that he believed would be a liquidation in the worst market

6  that anybody had ever seen.  And Your Honor, it is universally

7  recognized that reasonably calculated risk taking is entirely

8  appropriate for a board, whether it is healthy or distressed.

9  We know that from Quadrant.  Quadrant told us that the biggest

10 judgment rule protects the directors of solvent, fairly

11 solvent, and insolvent corporations, and that creditors of an

12 insolvent firm have no greater right to challenge a

13 distressed -- or I'm sorry, a disinterested good faith business

14 decision than the stockholders of a solvent firm.

15        And that's exactly what this was, Your Honor, a good

16 faith business decision.  It was made on an informed basis,

17 aware of the settlement leverage that we were giving up in the

18 potential preference claims, and a clear goal of what we were

19 trying to achieve; maximize the value of the enterprise, keep

20 the business intact, save jobs, and protect the going concern.

21 And it avoided what we didn't want; a value destructive

22 liquidation.

23        And it's important to note, Your Honor, that the deal

24 that was in front of the board and the deal the principals

25 agreed to in mid-May, that was documented on June 28th, in

63

1  every material respect is the deal in front of Your Honor

2  today, so whatever risk that was there, it did not materialize.

3  This was a good faith business decision.

4        With the Committee's claims and allegations

5  thoroughly discredited by the evidence, let's look for a moment

6  at whether any of their true confirmation objections stand up.

7  And Your Honor, it is our burden to demonstrate by a

8  preponderance of the evidence that the plan satisfied all

9  confirmation standards.

10       So I'd like to move quickly to the 1123(b)(3)

11  standards of settlement, and a couple 1129 standards objected

12  to by plan opponents, including good faith, best interests,

13  fair and equitable, and regulatory approval, and I'll touch

14  very briefly on subcon as I expect the Committee will raise it,

15  and of course there is no subcon here.  But if Your Honor would

16  like to hear argument on any other confirmation standards, I'm

17  happy to address those as well, but I wasn't planning on

18  raising them if they're not the source of a disagreement.

19       So turning to the settlement, Your Honor, various

20  parties including the Committee have objected to the

21  settlements embodied in this plan.  And the standard for

22  approving settlements under the plan is well known to Your

23  Honor, and requires an analysis of whether the settlement is

24  fair and equitable, and in the best interests of creditors.

25       The fair and equitable prong is not only interpreted

64

1  as compliance to absolute priority rules, clearly satisfied

2  here.  There are no classes junior to six and seven receiving a

3  recovery.  And the best interest prong is akin to the 9019

4  standard.  It considers the probability of success in

5  litigating the claims subject to the settlement, complexity and

6  likely duration of the litigation, and the attendant costs in

7  delay, and all other factors bearing out the wisdom of the

8  settlement, including creditor support, and the extent to which

9  the settlement is the product of an arm's length negotiation,

10 and not the product of fraud.  And we know that from Cajun

11 Electric, and In The Matter of Foster Mortgage Corporation.

12         But picking through those factors quickly, as I just

13 spoke about the claims at length, Your Honor, in terms of

14 likelihood of success, the evidence is clear that these claims

15 are meritless, and in terms of cost and time to litigate, the

16 claims undoubtedly would take a long time and cost a lot of

17 money to litigate.  I mean, this trial right here, it's been a

18 month, it's probably cost the estate tens of millions of

19 dollars, and we're only talking about colorability at this

20 stage.  Any contention by the Committee that this would result

21 in only a modest delay just does not square up with what we've

22 seen already, and I believe even Mr. MacGreevey testified that

23 this would not necessarily be a quick litigation.  And

24 moreover, the litigation would put the estate's exit and

25 backstop commitments at risk, if they went beyond a few more

1   weeks, and that, of course, would imperil the going concern.

2           In terms of the views and interests of creditors, you

3   know, despite a one month trial, there's actually significant

4   support for this plan, as evidenced by Debtors' Exhibits 406

5   and 435 before the voting reports.  The plan is unanimously

6   supported by Causes 3 and 4, almost unanimously supported by

7   Cause 5, and it enjoys a significant amount of support from

8   Cause 6 as well, I believe over 50 percent of claims by amount

9   voted in favor of this plan.  And finally, Your Honor, the

10  evidence is clear that (indiscernible) they were negotiated at

11  arm's length.

12          So the soundness of the settlement is clear, and it

13  is equally clear that a court may not undertake a

14  claim-by-claim (indiscernible) in making its determination, but

15  it should analyze the settlement on a holistic basis.  We know

16  this from Nellis v. Shurgrue, a case out of the Southern

17  District of New York, 165 B.R. 115 (1994).  That case was up on

18  appeal, and the objectors to a global settlement appealed, and

19  they argued that the settlement should be overruled, because it

20  did not contain sufficient detail of the claims being settled,

21  their likelihood of success, or the amounts in controversy.

22  Then-Judge Sotomayor, she disagreed.  She said the appellants

23  misperceive a bankruptcy court's obligations.  A bankruptcy

24  judge's sole and exclusive responsibility is to determine

25  whether a settlement is fair and in the best interests of the

1  estate.  Although a judge must consider the fairness of the

2  settlement to the estate and creditors, the judge is not

3  required to assess the minutiae of each and every claim.  The

4  bankruptcy judge does not have to decide the numerous questions

5  of law and fact raised by appellants.  The Court may only

6  (indiscernible) settlement to determine whether it is within

7  the acceptable range of reasonableness.  And I would submit

8  that the evidence has made clear that this settlement well

9  exceeds the lowest end of the range of reasonableness.

10         I believe the settlement is even more clear that

11 that's sustainable considering, as the Committee pointed out to

12 Mr. Antinelli on cross, that the settlement does not include

13 the preference claims, because of course they lacked, and

14 removing those from the equation, I would argue, lowers the

15 cost of settlement even further.  I would argue that in this

16 case, the low end of a range of reasonableness, Your Honor, it

17 is on the floor.  We could trip and stumble over that hurdle.

18 But we didn't do that.  We didn't barely clear the hurdle, we

19 didn't give them the bare minimum.  We extracted meaningful

20 value for unsecured creditors, as Mr. Antinelli testified.

21 Even at the time we sent the RSA, it was 150 million in our

22 valuation, 207 at Your Honor's, and I believe 350 at the

23 Committee's.

24         And if the Committee does truly have the courage of

25 its convictions, and it believes that this is worth

1  $350 million, then they can rest easy that the trade markets

2  will bear this out.  But also, if that's what they truly

3  believe, then their arguments and their contentions that

4  unsecured creditors are getting wiped out, that this plan is a

5  deed in lieu of foreclosure, as Mr. Stark characterized it in

6  his opening, that cannot stand.  It is obviously none of those

7  things.

8          So turning quickly to 1129, I'll start with

9  (indiscernible).  1129(a)(3), as Your Honor well knows,

10 requires that the proponent of a plan oppose the plan in good

11 faith, and not by any means prohibited by law.  And whether the

12 plan is proposed in good faith requires an analysis of whether

13 it was proposed with a legitimate and honest intention to

14 reorganize and have a reasonable hope of success and we know

15 that from In Re Sun Country from the Fifth Circuit.

16         Your Honor heard an overwhelming amount of testimony

17 on this point, and there is no serious contention that the plan

18 was not put forward to reorganize this company.  It deleverages

19 the company by over $7 billion.  It infuses the company with

20 $3 billion of fresh capital at exit, and on top of all that,

21 Your Honor, through this process and this plan, we've reduced

22 an additional $1.7 billion of outstanding midstream liability,

23 (indiscernible).

24         On best interests, 1129(a)(7) requires that with

25 respect to each impaired class of claims or interests, members

1  of such classes that have not accepted the plan will receive as

2  much or more under the plan than they would in a hypothetical

3  Chapter 7, and this test is generally satisfied through a

4  comparison of estimated recoveries under the plan, and a

5  liquidation analysis.  And we estimated our liquidation

6  analysis at Exhibit 439(a).  That's Mr. Stewart's best interest

7  analysis.  And he testified that under his analysis, all

8  creditors do better under the plan than they would in a

9  liquidation, and no one seriously contends that this plan

10  doesn't satisfy best interests.  In fact, nobody else actually

11  put forward an alternate liquidation model, a bottoms up

12  analysis, that looked at the assets, looked at the values,

13  looked at the plain facts, and said ours was wrong.  That's not

14  what they did.

15        Your Honor, the Committee, what they did is, they put

16  forward Mr. Brown, who testified that he adopted Mr. Stewart's

17  model, he took it wholesale, and then he would change a couple

18  assumptions, largely on the advice of counsel.  Another

19  assumption had to do of course with how value flowed, and every

20  single one of those assumptions was intended to (indiscernible)

21  value and deliver it directly to unsecured creditors.  And I'm

22  happy to walk through various of those assumptions and why they

23  apply, Your Honor, but your head shaking makes me think that

24  perhaps I'll just get back to my closing.  I have a lot to say.

25        I think it's important to say one thing on this

point, which is that one of Mr. Brown's instructions from
counsel was about the treatment of the roll up DIP claim, and
that they should not be applied against unencumbered assets.
They should be treated as second class DIP citizens.  And the
Committee argues obviously (audio interference) because to do
otherwise would be -- I think Mr. Stark's words were it would
slow the collateral entitlement of the one and a half if the
roll-up DIP claims were applied against unencumbered under the
marshaling provision under the DIP.

        But Your Honor, this is belied by the notion that
Mr. Jonas asked at least a half a dozen questions on cross that
indicated his view, or the Committee's view, that the roll up
DIP claims do soak up unencumbered value.  And I'll put those
up on the screen, it was at 573.  Here he has at least a half a
dozen times, Mr. Jonas says, you know, the DIP, it soaked up
the value (indiscernible).

        We know that's true.  First, that's what the DIP
order allowed, what the Code allows.  That's what the DIP order
said on -- and that's why the Committee fought the DIP order so
hard back in July.  If the roll up had no impact on unsecured
creditors that would not have been such a big issue.  But
again, in an attempt to roll that back, to roll back a
statement about how the roll up works, they argue that it
despoiled the collateral entitlement, and in doing so, they
tried a complaint, collateral entitlement, as of the petition

1  date with value of the collateral as of the petition date.  And
2  based on this sleight of hand, they go on to argue that because
3  the line that has it has only been entitled to a certain
4  portion of the value of their collateral as of the petition
5  date, before the roll up and before the value of the collateral
6  increased, that they should be allowed nothing further now.
7          And of course if true, that would mean a secured
8  lender's recovery could never increase over the course of the
9  plan, that they couldn't get the benefits of the rising value,
10 even though they maintained the risk that value would go down.
11 And Your Honor, there's a bunch of cases on this issue.  I'm
12 going to skip through them, unless Your Honor would like to
13 hear about it, but we submit that that's just not correct.
14         So moving towards fair and equitable, Your Honor, I
15 touched on it very briefly in the opening, but no class of
16 claims junior to six and seven is receiving a recovery under
17 the plan, and at Your Honor's valuation, there's no corollary
18 to be concerned about, either.  And I'm going to switch gears
19 just briefly to head off an objection I believe we're going to
20 hear from FERC's counsel about compliance with 1129(a)(6), and
21 on this part -- or point, Your Honor, I would submit that
22 1129(a)(6) is not applicable here.  No regulatory approval is
23 required to approve the plan.  As Your Honor is aware,
24 rejection of first jurisdictional contracts, they do not result
25 in a modification of the rate, and even if they did, even if

1  there was a rate modification, it is not a debtors' rate

2  modification, because of course the debtors are not subject to

3  court regulation.

4          So those standards and some others that are not in

5  dispute, those are the requirements of 1129, Your Honor, and I

6  would submit that we comply with all of them.  But I think

7  you're going to hear two other arguments from the Committee,

8  and so I want to touch on them briefly.

9          And of course, the first is sub-con, substantive

10  consolidation.  And that occurs when a court consolidates the

11  assets and liabilities of various legal entities, providing

12  different lenders with a common pool of recovery.  But the

13  hallmark of sub-con, importantly, is that, as we say

14  colloquially, somebody's ox gets gored.  There are different

15  collateral pools at different estates, lenders entitled to

16  different levels of recovery, and when those estates are

17  consolidated, somebody wins, somebody loses.  There's a

18  redistribution.

19          But of course that cannot be the case.  Six and seven

20  are out of the money, whether you have one claim or 30 claims,

21  as I mentioned at the outset, it does not change that.  Without

22  any redistribution, I don't believe sub-con is relevant to this

23  claim.

24          And the second argument that I think you might hear

25  from the Committee, it's a new one, it's one that's not found

1  anywhere on the Bankruptcy Code.  It's an argument that the

2  plan fails because it does not (indiscernible) for unsecured

3  creditors.  The value -- the going concern value of an

4  unencumbered asset, a going concern best interest, if you will.

5  And just a few notes on this, and I'm happy to talk about it

6  further either now or in rebuttal, in the event somebody brings

7  it up.

8          And my first point I make is there are no

9  unencumbered assets.  They were all pledged as security under

10 the DIP.  Second, even if there were unencumbered assets,

11 there's a waiver of marshaling the DIP order which is final and

12 not appealable.  Third, the only exception to that

13 anti-marshaling provision is for avoidance action proceeds.

14 Like here there are no avoidance action proceeds.  Even if

15 unencumbered assets had not been pledged to DIP lenders, which

16 they were, and if none of the previously unencumbered assets

17 were ever encumbered, not a single lien has been avoided during

18 these proceedings, so no avoidance, Your Honor, no avoidance

19 proceeds.

20         In fact, even if there were unencumbered assets, and

21 even if some of those, some or all of those had been considered

22 avoidance action proceeds, the claims of unsecured creditors

23 are still junior to those of administrative and priority

24 claims.  I would submit, Your Honor, that the Committee is

25 trying to fashion out of whole cloth the equivalent of a best

1 interest test on a reorganization context, and it simply does

2 not exist.  Even if it did, it is highly unlikely that

3 unsecured creditors would do better in that hypothetical going

4 concern than under the plan.

5         So coming back to our burden for confirmation, Your

6 Honor, we satisfied every one.  Every one.  And that brings me

7 back to the question I proposed at the beginning.  Why are we

8 here?  What are we fighting about?  Well, we know of two

9 things.  We're not here because our plan was flawed.  And we're

10 not here because our plan doesn't satisfy the confirmation

11 standards.  And we're not here because there was a breach of

12 fiduciary duty, or a fraudulent transfer.

13        We are here, Your Honor, because certain parties feel

14 entitled to more, despite having no legal basis for it.  As the

15 evidence shows, unsecured creditors are entitled to nothing,

16 but we got them over $200 million, a generous tip by any

17 measure.  But simply wanting more, Your Honor, is not a basis

18 to object to confirmation, to deny confirmation, and absent any

19 legitimate confirmation objection, Your Honor, the plan should

20 be confirmed.

21        That is all I have for Your Honor.  I would like to

22 reserve time to respond to any arguments raised by the

23 objectors, but unless Your Honor has any questions for me, I

24 would seek (indiscernible).

25        THE COURT:  Thank you, Ms. Schwarzman.  You

1 certainly will have rebuttal time, if required, and I don't

2 have any questions.  Thank you.

3          MS. SCHWARZMAN:  Thank you, Your Honor.

4          THE COURT:  All right.  Mr. Zensky, did you

5 anticipate going next?

6          MR. ZENSKY:  Yes, I think as agreed with the debtors

7 and other plans orders, we were to go next, Your Honor.

8          THE COURT:  Of course.  Whenever you're ready.

9          MR. ZENSKY:  Would it be okay if you gave my

10 colleague, Laura Warrick, sharing privileges?

11          THE COURT:  Of course.  Let me find her.  Did she go

12 last name first?  Yes, she did.  There she is.  All right.  She

13 should have --

14          MR. ZENSKY:  Thank you.

15          THE COURT:  -- control.  Yes, sir.

16          MR. ZENSKY:  Thank you, Your Honor.  For the record,

17 David Zensky, Akin Gump Strauss Hauer & Feld for Franklin

18 Advisors.

19          Let me start by echoing Ms. Schwarzman's thanks and

20 appreciation to the Court and staff for the conduct of the

21 trial, and let me also commend my friends at Brown Rudnick and

22 Kirkland on truly excellent lawyering over the course of the

23 case.  There hasn't been that much for us to do up until this

24 point, but I certainly enjoyed watching my friends go at it

25 before Your Honor, and it was a pleasure.

1          Your Honor, I'm going to limit my comments this

2     morning to the lack of merit of the proposed litigation claims

3     that are relevant to Franklin, and embraced by the Committee's

4     standing motion, and which are settled by the plan.  Please

5     stop me -- I know that you -- there's a lot of people you need

6     to hear from today, if I'm going into something that Your Honor

7     doesn't need argument on.  I will not be offended, and if I

8     don't pick up a head shake as Ms. Schwarzman did, please tell

9     me to move on.

10          Your Honor, we've got here a list of the claims that

11     were embraced by the Committee's standing motion which touch on

12     Franklin any way.  We've broken them into claims that allege or

13     seek standing to allege that Franklin itself did something

14     that's actionable, and then the larger group of claims which

15     concern the creditor body at large, and let me take the second

16     group first, just looking at our score card here, Your Honor.

17          The first line, of course, is the challenge to the

18     Legacy Chesapeake guarantee, and liens associated with the FLLO

19     facility that were probably the centerpiece of the Committee's

20     evidence during the course of the trial, and of course we

21     believe that the evidence showed that those claims are not

22     colorable.

23          Count 2, which related to the WildHorse guarantee,

24     the Committee withdrew that in the reply to the standing

25     motion, Footnote 9.  There wasn't really much discussion about

1 that at trial, but certainly our understanding is from the

2 express words of their brief that that claim is not part of the

3 standing motion.  Likewise, the constructive fraudulent

4 transfer claim regarding the up-tier exchange.  Mr. Stark

5 explained to you in his opening that the Committee was

6 withdrawing that, and the reasons for that.

7         Moving on from the constructive fraudulent transfer

8 claims, we then have the claims which seek to recharacterize

9 the last preference claims as something else, and you heard

10 Ms. Schwarzman talk about those briefly.  That's the preference

11 forfeiture and unjust enrichment, and I'll get into those as

12 well, and then finally, there were also intentional fraudulent

13 transfer claims, I skipped over that, and I don't intend to

14 discuss those in any length today, and I do not think there is

15 a need to, based on the evidence before you.

16         So as Ms. Schwarzman just went through, and as I will

17 touch on and come at from a different direction, I think the

18 second group of claims lack merit.  The debtors were entirely

19 justified in settling and not pursuing those claims.  Let me

20 turn now to the top box, which purported to target Franklin

21 specifically.  With all respect to my friends at Brown Rudnick,

22 Your Honor, these claims are a qualitatively different level of

23 speciousness.  They should have been withdrawn at the outset of

24 the trial.  If they weren't a dead letter on the face of the

25 proposed pleading, they certainly are a dead letter at this

1 stage.  I believe that the evidence at trial showed that

2 Franklin is a first rate, utterly honest institution, that did

3 nothing but help the case of unsecured creditors here,

4 participated in market transactions on the same basis as all

5 other creditors, and that everything in the trial -- that you

6 saw in the trial, bears out each and every fact that we set out

7 in our opposition to standing.

8          The Committee made no effort to highlight these

9 claims, to model these claims to convince you that it's in the

10 interest of the estate to pursue them, and unless they're

11 willing to tell you now they're withdrawing them, I'm going to

12 start my commentary with those claims first.

13          So as you can see on Slide 3, Your Honor, the

14 Committee told you in a standing motion -- excuse me -- yes, in

15 a standing motion, that they were going to show that Franklin

16 was able to coerce Chesapeake to take out its unsecured

17 WildHorse debt at above market -- above market at par, and

18 coerced it to borrow the FLLO facility in order to do so, and

19 Your Honor saw no evidence whatsoever to that effect.  That

20 Franklin used a close relationship with Chesapeake to obtain a

21 favored position with respect to the up tier transaction.  You

22 saw no evidence to that effect.  Franklin was treated the same

23 as all other creditors.

24          Further down, I believe in opening argument,

25 Mr. Stark said that they would show that Franklin found a way

1   to take somebody else's recovery, and keep it for itself.   I

2   certainly saw no evidence to that effect during the course of

3   the trial.   These are serious accusations that the Committee

4   has utterly failed to back up.

5          So let's turn to Slide 5, Your Honor, just as a

6   recap.   You've already from Ms. Schwarzman of quite a bit of

7   the testimony that Mr. Circle presented during the trial.   Just

8   to refresh on Franklin's position in the debtors' capital

9   structure at the various relevant times, Your Honor, heading

10  into the December, 2019 transactions, you can see that Franklin

11  held more than $2.4 billion of unsecured notes in the company.

12  Thirty-six percent of the then outstanding debt, and a smaller

13  percentage of the WildHorse unsecured notes, about 20 percent.

14  You heard testimony at length about Franklin's participation in

15  the 2019 transactions, and coming out of them, Franklin now had

16  a second lien position of 1.2 billion, and continued to hold

17  unsecured debt of 575 million, or 576, and subscribed for

18  $250 million of the new FLLO facility.   Certainly not a major

19  holder of the FLLO facility, or not a majority holder, rather,

20  and still a very significant unsecured creditor.

21         When we turn to the prepetition or petition time

22  frame, Franklin had sold down a large percentage of its FLLO

23  position, still held a very large 2L position, and now held a

24  larger unsecured position than it did at the time of the 2019

25  transactions.   Your Honor also may remember that Franklin held

1 equity at certain points in time, but all of that equity

2 position had been exited well before the negotiations of the

3 RSA.

4        Let me turn to the next page. So I'm going to start

5 with the Committee's proposed claims that Franklin be treated

6 as an insider, and be subject to a one-year lookback period, as

7 opposed to a 90-day lookback period. Your Honor, this is the

8 first of the Committee's three attempted workarounds to the

9 fact that there are no viable preference claims. As we just

10 discussed, of course, the liens at issue hardened well before

11 the petition date, and the Committee has tried three different

12 efforts to work around that. The first is to treat Franklin as

13 an insider, the second is to recharacterize that claim as a

14 fraudulent conveyance, and the third is to recharacterize it as

15 an unjust enrichment claim. I'll come to those later.

16        So in order to treat Franklin as a non-statutory

17 insider, the Committee would have to show, and this is the

18 middle bullet on this page, Your Honor, that it's the closeness

19 of the parties' relationship that was so great at the time of

20 the transaction, that it can be fairly determined that the

21 transaction was not conducted at arm's length, but rather on

22 the basis of the parties' affinity. And needless to say, we

23 don't see anything in the record to support a finding of that

24 nature or even a colorable claim of that nature, in respect to

25 the 2019 transactions.

1          And the flip side of that proposition, Your Honor, is

2     that a customary debtor/creditor relationship, even one where

3     the creditor can assert leverage, given the size or strategic

4     part -- the strategic nature of its interest in the cap

5     structure, that does not give rise to insider status, and never

6     has.

7          So if we start to look at some of the testimony, and

8     none of this is controverted, Your Honor, Franklin never had

9     any control over the company or its board.  In fact, Mr. Circle

10    testified he'd never even spoken to a member of the debtors'

11    board, with the exception of Mr. Lawler, who serves as CEO, and

12    participated in certain calls or briefings.  Franklin never

13    appointed directors, and Franklin never attempted to influence

14    the hiring of management or firing of management.  No

15    involvement in the operations of the company.

16         Similarly, when the 2019 transactions were laid on

17    the table after Franklin got restricted, Your Honor, Mr. Circle

18    testified, they had no input into formulating the debtors'

19    proposed liability management transactions, and Mr. Circle told

20    you unambiguously, quote, "We had no bearing on what they

21    proposed to us in the first --" and what he was referring to

22    was the first proposal, the slide deck that they got from

23    Mr. Dell'Osso.

24         Let's go to the next page.  Nothing would support an

25    inference that Franklin had any affinity with the company or

1 that the transactions were not at arm's length.  Every

2 transaction Franklin participated in, Your Honor, was on the

3 same basis as every other similarly situated creditor.  There

4 was no preferential treatment, whether in the 2019

5 transactions, or at any other date.  Let's go to the next page.

6          So again, despite extensive discovery, a three week

7 trial that included testimony from Mr. Circle, the full and

8 fair opportunity to cross-examine him, the full and fair

9 opportunity to show him and show Your Honor, any internal

10 emails or emails with the company, there's nothing here.  All

11 negotiations between Franklin and Chesapeake were at arm's

12 length.  And I think this is best described by taking Your

13 Honor back to what I'll call the Perry Mason moment of my

14 friend Mr. Aulet's examination of Mr. Circle.  And Mr. Aulet

15 actually elicited the admission that when Chesapeake came to

16 Franklin and said, we'd like to tender for your WildHorse bonds

17 at 95, Franklin said no, but we will sell that at par.

18          That was the highlight of the Committee's

19 interrogation of Mr. Circle, Your Honor, and indeed, Mr. Circle

20 went on to say that we were willing to sell or exchange at par,

21 but did not demand a make-whole as other creditors were doing.

22 So at the end of the day, I will give the Committee the props

23 that they did prove that Franklin negotiated on behalf of

24 Franklin, but certainly, telling the company that they were

25 only willing to tender or exchange their bonds at par, is

1   hardly the stuff that an insider status is made of.

2          So I'll move on from this claim and come back later

3   if need be, even if this claim had legs of any sort, it would

4   still be barred by 546(e), and by contemporaneous exchange.  I

5   don't think Your Honor will need to reach that, because it's

6   not colorable to suggest that Franklin was an insider.

7          Let me turn to equitable subordination.  This one is

8   no more proper than the alleged insider preference.  Your Honor

9   is fully aware of the standards for this sort of claim.  The

10  Committee, for reasons still unclear to us asked for permission

11  to allege that Franklin's claims should be equitably

12  subordinated.  They would have to show that Franklin engaged in

13  inequitable conduct that would constitute either fraud,

14  illegality, breach of fiduciary duty, or using the debtor as a

15  mere instrumentality, and that comes from the In Re Jack Kline

16  case out of this district, 440 B.R. 712, 743, and of course the

17  three prong test comes from In Re Mobile Steel.

18         In addition to proving those elements, it's clear, or

19  the need to prove that, the Committee would have to show that

20  some misconduct, that misconduct somehow resulted in an injury

21  to unsecured creditors, or conferred an unfair advantage and

22  none of that is the case here.  And finally, it's an

23  extraordinary remedy and should only be granted in limited

24  circumstances.

25         So looking briefly at the testimony, Your Honor,

1   you'll remember my partner, Mr. Qureshi, batting cleanup for

2   the debtors and asking the debtors' witnesses whether they had

3   any concern with the way Franklin had conducted itself in

4   negotiating either the 2019 transactions or the RSA terms with

5   the debtors, and the answer is uniformly no, that they behaved

6   exactly as you would expect a large creditor to behave, and

7   that they had no leverage over the company beyond their

8   holdings in the capital structure.  That is not the stuff that

9   equitable subordination is made of.  Let's go to the next page.

10         You heard Ms. Schwarzman mention the Davis Polk

11  letter, and why it was a non-issue for the board.  We agree

12  with that, but if it was an issue, the record is clear that

13  Franklin was never part of the FLLO group that sent the letter,

14  had no relationship to that letter or role, and in fact,

15  Mr. Circle had never seen it until it was put up on the screen

16  at some point during the trial for his testimony.  There's no

17  evidence that Franklin played any role in specifying the time

18  at which the debtors would file, and did not have any ability

19  to or attempt to coerce the debtors to agree to a term of the

20  RSA that the debtors were not otherwise prepared to agree to.

21         And in fact, Your Honor, as you'll recall from the

22  testimony and Ms. Schwarzman's comments, Franklin sought to

23  enhance unsecured creditor recoveries.  If we'd look at the

24  next slide, you saw this a short while ago in Ms. Schwarzman's

25  presentation, and we've blown up the column that shows the

1  first FLLO proposal, and the first Franklin proposal, and you

2  can see that in response to a proposal of 90 percent to FLLO's

3  4 percent to Second Lien and 6 percent of prime equity to

4  unsecured, Franklin came back with a proposal of 60 percent to

5  the FLLO group, 20 percent to the Second Liens, and full 20

6  percent of equity, pre-dilution, to the unsecured creditors.

7  So it is impossible to walk away from this trial with any

8  belief that Franklin engaged in any illegality or inequitable

9  behavior, or that it did anything other than negotiate in a way

10 that was beneficial to unsecured creditors.

11      Let me move on to the last Franklin conduct related

12 claim, and that is aiding and abetting breach of fiduciary

13 duty.  Ms. Schwarzman just took you through a tour de force on

14 the evidence, Your Honor, of how diligent this board was, and

15 how it fulfilled its fiduciary duties.  That's really the

16 beginning and end of whether there could be an aiding and

17 abetting claim, but beyond that, again, there is no basis to

18 show that Franklin, as a third-party creditor, improperly

19 influenced or induced a breach of duty by the board.  Again,

20 we've got testimony here that the centerpiece of this claim for

21 the Committee that somehow the creditors forced or induced the

22 company to delay filing.  Franklin had nothing to do with that.

23      Also relevant to this, Your Honor, as you know,

24 having seen the testimony of several of the board members and

25 officers, Chesapeake is a company run by sophisticated,

1   intelligent officers and directors.  They were counseled by

2   world class advisors, in the form of Kirkland, Wachtell, and

3   Rothschild, and to suggest that the board -- that this board

4   and this management breached fiduciary duties, and that

5   creditors induced it is a non-starter.  So unless Your Honor

6   has any questions, I'll move on to the second bucket of

7   claims --

8                  THE COURT:  I --

9                  MR. ZENSKY:  -- the ones directed to creditors at

10  large.

11                 THE COURT:  Got it.  I do not.  Thank you.

12                 MR. ZENSKY:  All right, thank you.  So first, we'll

13  talk about constructive fraudulent transfer claims, Your Honor.

14  You're familiar with the elements.  We've laid the three

15  elements out here, and more on the next page, Laura.

16                 And as you know in addition to establishing these

17  three elements, the parties agreed, and you've received

18  evidence on the applicability of the safe harbor, which I will

19  come to shortly.

20                 The Committee's main focus of course, was the TOUSA

21  claim.  That was the shiny object that the Committee has been

22  chasing here, and I believe Ms. Schwarzman's discussion,

23  particularly of the reasonably equivalent value, crushes that

24  claim, but I'm going to get into it in some detail as well.

25  And before we get into this, I'd like to take you back to

1  Mr. MacGreevey's testimony.  Mr. MacGreevey put up a slide on

2  his direct that purported to risk adjust the <u>TOUSA</u> claim and

3  the last preference claim.  Your Honor, you may remember it had

4  rows going across about what the recovery would be with a 25

5  percent chance of success, 50 percent, and so on.

6         And he admitted on cross that the bogey, effectively,

7  for the Committee here was that 25 percent line, because unless

8  the Committee had more than that chance of success, the plan

9  recoveries were superior.  Now, there were all kinds of other

10 problems with the assumptions he was asked to utilize, and the

11 debtors brought out those flaws in their cross.  What I'd like

12 to refresh Your Honor on from his testimony is that he agreed

13 that the right way to think about it is to multiply the

14 probabilities that the Committee could succeed on each

15 independent element of the <u>TOUSA</u> claim and the last preference,

16 so he conceded that if Your Honor believed, just for sake of

17 argument, the Committee had a 50/50 chance on proving

18 ultimately, insolvency, a 50/50 chance on reasonably equivalent

19 value, and a 50/50 chance on 546(e), you'd have to multiply .5

20 times 25 times 25, and what you'd end up with was a 12.5

21 percent chance of success, comparing that to what he admitted

22 was the Committee's bogey, the 25 percent threshold.

23        So let me turn first to the solvency prong.  The

24 Committee's only witness on solvency, Your Honor, was

25 Mr. Baggett, and we don't think that his opinion was of any use

1  to the Court, mostly because -- on solvency.  Mostly because he

2  made no effort to question the legitimacy of his conclusions

3  compared to what the market tells us about Chesapeake's value

4  at the time, and the only evidence before you is that there was

5  an active and informed market for both Chesapeake's equity and

6  debt security.

7          Now, evidence of market value is not always

8  dispositive, Your Honor, but in a case like this, it is

9  certainly reliable and highly relevant to think about both

10  solvency and reasonably equivalent value back at the time of

11  the 2019 transaction.  And I know Your Honor's familiar with

12  this.  I think it's a fascinating area of the law, but I think

13  Judge Peck's decision in Iridium is probably the godfather of

14  this line of thought, in which he determined that the public

15  trading market constitutes an impartial gauge of investor

16  confidence, and remains the best and most unbiased measure of

17  fair market value, and when available to the Court, is a

18  preferred standard of valuation.

19          And then we've also excerpted the Verizon case out of

20  the Northern District of Texas, which adopts the same approach.

21  And it's not hard to understand the thinking, Your Honor.  We

22  have investors who were making bets in real time with their own

23  economic resources, and making a judgment about the value of

24  Chesapeake's assets, and its prospects for the future in real

25  time, back in December, 2019, both before and after the

1  transactions, and that's an unbiased measure of value.  You

2  contrast that with the after the fact expert testimony of both

3  who were hired to promote an objective and don't have an

4  economic stake in the outcome of their testimonies, so the

5  market values are certainly relevant, and should be -- should

6  have caused Mr. Baggett to question his conclusions.

7         So let's look at the next slide, Your Honor, and the

8  next two slides, what we're showing you here are two columns on

9  the left that are taken from Mr. Baggett's own demonstratives,

10 in which we look at a base value of the company's debt, at the

11 two dates that Mr. Baggett suggested, or that he looked at,

12 rather, the first being December 3rd, and then on the right,

13 we've added a column that Mr. Baggett talked about in another

14 one of his demonstratives, but he never tried to reconcile the

15 third column with the first two.

16        So the column on the left, Your Honor, shows what the

17 base value was of the company's debt on December 3rd, and

18 that's a date cherry-picked by Mr. Baggett.  That was the nadir

19 of the company's value.  It was after the going concern

20 announcement, but before the curative transactions in December

21 were announced.  So he picked this date, and he showed you that

22 the total face value of the debt was $9.7 billion, and that the

23 market value of the debt and equity was only about $7.9

24 billion, and left it at that.

25        But if you look at the third column, his NAB, his

1  ground valuation for Chesapeake, Legacy Chesapeake, on

2  December 3rd, was $4.5 billion.  So what we have in the dotted

3  box here is an unexplained delta between Mr. Baggett's after

4  the fact valuation for Legacy Chesapeake, and what the market

5  told us, and he made no effort to reconcile the third column

6  with the second column.

7          Let's go to the next page, because the delta is even

8  more dramatic.  This is the second date that Mr. Baggett

9  included on his demonstrative, and this is January 6th.  And

10 you can see in the left-hand column, Your Honor, that the total

11 debt has gone down because of the billion dollar deleveraging

12 in the up-tier exchange, and you can see in the middle column

13 that the market value of the company's debt and equity had

14 increased by $1.8 billion to 9.7, showing a very substantial

15 equity cushion.

16         Now let must stop here, because the comparison

17 between the last line and this one should be the beginning and

18 end of any fraudulent conveyance claim.  How can it be that a

19 company that was defrauded by the December, 2019 transaction,

20 that were harmful to its creditors, and reduced the ability of

21 the company to pay its creditors back, jumped $1.8 billion by

22 market value between the pre-announcement date and the

23 consummation of the transactions?  There's never been a

24 fraudulent conveyance case that I'm aware of that was made out

25 on facts like that, and I don't believe the Committee can point

1  you to one.

2          But going back to the dissonance in Mr. Baggett's

3  expert testimony, he told you that Chesapeake was insolvent by

4  $4.9 million as of January 6th, Combined Chesapeake.  How can

5  you reconcile his after-the-fact opinion on the value of these

6  assets with the market value?  He says that value of the assets

7  is half what the market placed on them.  Now, there may be an

8  explanation for this, and if the Committee ever got standing,

9  although we certainly think Your Honor shouldn't grant it,

10  maybe there would be an explanation.  However, maybe

11  Mr. Baggett has one.  He certainly didn't offer it to you

12  during the course of the trial, and that's after we pointed out

13  in our papers that one needs to take these market values into

14  account.

15          And on Page 20, this is the totality of testimony

16  that Mr. Baggett offered to you on how to explain market value

17  versus his opinion.  And he said, well, we've all seen in all

18  the bankruptcies that we've been working on that that's not the

19  case, meaning that a positive equity market cap means the

20  company was solvent.  And then he pointed out, sometimes

21  companies have value even on the eve of filing.

22          Your Honor, I would submit this is the

23  (indiscernible) of all (indiscernible).  Okay?  This is the

24  opinion of an expert that, because I don't want to deal with

25  this issue, it's not a problem, okay.  I would suggest, Your

1  Honor, that his failure to even attempt to deal with it, is the

2  problem.

3          The last line I'll show you on this, Your Honor, I

4  think if there's still any questions.  What we're showing you

5  now is the percentage of the market equity capitalization at

6  the two dates we just talked about, that's December 3rd, 2019,

7  January 6th, and then the petition date itself, or the last

8  trading day before the petition.  Now these numbers all come

9  from Mr. Baggett's demonstrative, the two columns on the left,

10 where his demonstrative shows a billion and a quarter of equity

11 value on top of a $9.7 billion debt stack on December 3rd;

12 1.7 billion of market equity cap on January 6th, on top of 8.9,

13 and what we've done here is just run the leverage ratio, and

14 shown it at the top.  Then, the last trading day before the

15 petition, equity was worth $115 million, or 1.3 percent.

16 Mr. Baggett's testimony would like Your Honor to conclude that

17 all three of these things are the same, and I would submit to

18 Your Honor that one of these is not like the others, and that

19 the fact that parties speculate on stock on the moment before a

20 company files is no answer for the very robust market valuation

21 of the equity at the other relevant dates.

22          Finally, the last indicia of market behavior I would

23 point Your Honor to, and Ms. Schwarzman touched on this, she

24 reminded the Court of Mr. Circle's testimony that Franklin, who

25 remember was restricted, and would have had as visible access

1   into the company's financials as anyone, held back almost

2   $500 million of eligible debt from the up-tier exchange,

3   preferring to ride out the unsecured position because of the

4   upside associated with that.  But if you look at the box on the

5   right, Your Honor, Franklin wasn't the only market participant

6   that made that judgment.  These are numbers taken right from

7   Mr. Baggett's demonstrative, and you can see that we've

8   isolated the five issues that were eligible for the up-tier

9   exchange, and you can see that the total face amount that was

10  eligible was 4.5 billion, and that at the end of the

11  transaction, that there was still 1.3 billion, approximately,

12  left in these issues outstanding.

13          So Franklin accounts for part of that, Your Honor,

14  but not all of it.  So other market participants also made the

15  judgment that they would prefer to keep their equity position

16  rather than trade up.

17          So before moving on quickly to reasonably equivalent

18  value, Your Honor, there are other financial tests.  The

19  inadequate capital, and inability to pay debts.  I believe

20  Ms. Schwarzman covered -- the testimony covers those.  All of

21  the witnesses testified that they believe this company had

22  adequate capital moving forward, and were very comfortable with

23  where the company stood, albeit, with further work to do until

24  the double black swan event.  So I'll move on now to reasonably

25  equivalent value.

1           So Ms. Schwarzman covered this at length.  We adopt

2  her argument on that you should look at this as interconnected

3  transactions.  She took you through all the different aspects

4  of value to Legacy Chesapeake from the combination.  I want to

5  take you just to market implications of the transaction, again,

6  which speak as loud or louder than anything.

7           We know from ASARCO and the VFD case, which we cited

8  to Your Honor, that market values are relevant not just to

9  solvency, but also to the question of whether a debtor received

10 reasonably equivalent value for a transaction.

11          So this is Mr. Baggett's demonstrative, again, and

12 you'll remember Mr. Brown elicited testimony from him that

13 between the dates he picked on the pre-transaction side,

14 December 3rd, and the date he picked on the post-transaction

15 side, that all of the debt traded up.  What Mr. Brown did not

16 have time to do was actually to bring out the degree of that

17 increase.

18          And we've highlighted three of the issues here, Your

19 Honor, two of which were -- excuse me, one of which was

20 eligible for the exchange and two of which were not.  And you

21 can see that the 4.875 notes of Legacy Chesapeake due 2022,

22 which were not eligible, traded up from 66 pre-transaction to

23 8.144 post-transaction, a very material increase.

24          If you look at the next two lines, the 8 percent

25 senior notes due 2026 traded up from 4.875 to 6.013 between the

1    last date before the announcement and the closing of the

2    transactions.  These are not mere flips.  These are hundreds of

3    millions of dollars of value that people are bidding up the

4    prices of this debt in realtime.

5         And remember, post-transaction, Your Honor, this debt

6    was behind the revolving facility, the FILO, and the 2L debt,

7    and the prices were bid up following the transaction that the

8    Committee wants  to allege lacks reasonably equivalent value.

9    Again, it's impossible to square the market evidence with the

10   theories and allegations of the Committee.

11        The last thing I'll say here is that the sole

12   explanation or attempted explanation that you heard from

13   Mr. Baggett was, well, the values went back down later on after

14   the transaction closed.  And he's right.  But what he admitted

15   on cross was that that downturn coincided with a downturn in

16   the script and the spot pricing for the commodities.

17        And if there was any question, he fenced with me over

18   the materiality of that decline.  But if you look on page 24,

19   we've blown up a portion from Mr. Miller's report, which is in

20   evidence, and you can see on the left that the spot price at

21   Henry Hub trended nothing but down following the closing of the

22   transactions, and that the WTI spot price also traded

23   materially down in that window.  So to the extent the debt did

24   come back down, it's not because these transactions lacked fair

25   value.  It coincided with change in the prospects for the

1    company well after the transactions were closed.

2         All right.  Now I want to talk about TOUSA, Your

3    Honor.  Again, I called it the shiny object of the Committee in

4    this case.  The facts have been laid out by Ms. Schwarzman in

5    detail, and I think I've supplemented some of the relevant

6    facts.

7         Your Honor, my firm represented the Committee in

8    TOUSA.  I argued the standing motions in TOUSA, so I think I

9    know a little bit about the differences between TOUSA and

10   Chesapeake, and Chesapeake is not TOUSA, and TOUSA is not

11   Chesapeake.

12        TOUSA was an extremely egregious act of commercial

13   conduct by the debtor that has no analog in any case I've read

14   since, and certainly not this case.  And what the Court

15   determined there, there was no rule of law that when a

16   subsidiary assumes or issues a liability or assumes a guaranty

17   for debt that it was not previously responsible for, that that

18   is constructive fraudulent conveyance.

19        Rather, TOUSA was a fact-driven case.  And what the

20   Eleventh Circuit said in its review was, quote:

21             "It has long been established that whether fair

22             consideration has been given for a transfer is

23             largely a question of fact as to which considerable

24             latitude must be allowed to the trier of fact."

25             In other words, the Court needs to think about all of

1    the facts and circumstances that were presented to you

2    concerning these transactions.  The Eleventh Circuit reviewed

3    the factor of (indiscernible) and said that it was not left

4    with definite and firm conviction that the bankruptcy court had

5    clearly heard.  So these are factual issues.  There is no legal

6    rule, as much as the Committee would like it, that gives it a

7    constructive fraudulent conveyance claim on behalf of

8    (indiscernible).

9          So let's look at some of the most material

10   differences between the cases, Your Honor, because it is a

11   factor of an analysis.  Next page.

12         Okay.  So we've excerpted what I think are the

13   material facts at play in TOUSA, and we asked whether they're

14   present in Chesapeake.  So issue number one, did the

15   transaction at issue provide a material economic benefit to the

16   subsidiaries that guarantied the new debt?  In TOUSA the answer

17   was no.  The parent company simply caused the subsidiaries to

18   assume a new debt to pay off creditors that they were not

19   responsible for, and all that happened was it was able to keep

20   the parent company out of bankruptcy for a few months.

21         In Chesapeake, of course, the answer is yes, and

22   Ms. Schwarzman took you through all of the benefits of the

23   transaction for Legacy Chesapeake, and the market agrees that

24   there were benefits for Legacy Chesapeake.

25         Issue two, was the company on an inevitable path to

1  bankruptcy at the time of the transaction?  In <u>TOUSA</u>, the

2  answer was unequivocally yes.  External observers, insiders at

3  TOUSA recognized that the housing markets in which TOUSA

4  operated had begun their free fall long before the transaction

5  under attack, Your Honor.  In this case, the answer is no.  No

6  one thought the bankruptcy was near term for any considerations

7  in December.  Ms. Schwarzman again took you through that

8  testimony, and in fact you heard testimony that Mr. Waller and

9  Mr. Martin bought stock in the company at the time.  So the

10 cases couldn't be further apart on that issue.

11         Let's go to the next page.

12         The next issue which is closely related is whether

13 management believed in the wisdom of the transactions or

14 doubted them.  In <u>TOUSA</u>, management begged the controlling

15 stockholder not to force it to do the transaction.  Okay?  The

16 controlling stockholder said do the transaction because I want

17 to keep my equity check alive no matter how damaging and

18 dangerous it is.  There were dire predictions about the effects

19 of the transaction internally exchanged between the officers of

20 the company.  And you may remember that the CFO predicted in an

21 internal email that the transaction would likely end in a crash

22 and a very colorful word, which I will not use during today's

23 proceedings.

24         You weren't shown anything like that from the company

25 here.  What you were shown was a company that's diligently

1   worked, to the best of its ability, to put itself on an

2   appropriate path.  None of the officers of this company

3   questioned the wisdom of these transactions or that the company

4   would come out stronger and better.

5         The next issue, completely different status of the

6   housing market from the ENT market at the relevant time.  The

7   housing market was collapsing at the time TOUSA engaged in this

8   transaction.  Here, while you heard about the double black swan

9   event in March, back in November and December, the market was

10  stable.  Stock prices were stable and the script was stable.

11  No relation to TOUSA.

12        Finally, let's go to the next page, and I think this

13  is perhaps the most important distinction, Your Honor, and one

14  that I don't believe has been discussed yet.  In the structure

15  of the TOUSA transaction, remember, the parent was liable for

16  debt that had been assumed by a new joint venture called the

17  Transeastern Venture, and the parent caused the TOUSA

18  subsidiaries to issue guaranties to borrow money to pay off the

19  lenders who had funded that venture.

20        But that venture did not come along and guaranty the

21  new debt.  The venture, the entities that were formerly

22  responsible for that debt, pranced off into the sunset without

23  any help to the TOUSA subsidiaries in meeting the new debt.

24        In this case, that's not what happened.  The

25  WildHorse entities come into the fold as a result of the

ACCESS TRANSCRIPTS, LLC                     1-855-USE-ACCESS (873-2223)

collapse.  Mr. Baggett said that those assets were worth, by

his calculation, 1.4 billion, and I think we have a mistake

here; we said 1.3.  He said that WildHorse is worth 1.4.  So

it's not as if Legacy Chesapeake took on the responsibility for

what used to be the WildHorse debt at the RBL in bonds.

WildHorse itself remained responsible for that debt.  That

wasn't TOUSA.  And on that fact alone, the Court could easily

determine that TOUSA has no application here.

        And then, finally, I've already touched on this,

TOUSA had a board that was acting pursuant to the direction of

its controlling stockholder, and here Chesapeake had a

completely independent board that made the best judgment they

could in the interest of all its stakeholders.

        So unless Your Honor has any questions, I'll move

onto 546.

        THE COURT:  Yeah, I do not.  Thank you.

        MR. ZENSKY:  Okay.  Again, I don't think that the

Court will ever need to reach this.  We only reached the

(indiscernible) if the Committee has colorable fraudulent

conveyance for preference claims.  Those have no legs to begin

with, but if they did, there is a very strong safe harbor

defense here, Your Honor.  And what we'll show momentarily is

that the WildHorse transfer, that's the pay down of the

holders, pay down to the holders pursuant to the tender offer,

the PBL debt.  The FILO lien and the 2L liens, those were all

1  transfers that were made in connection with securities

2  contracts, and they were made to or for the benefit of

3  financial institutions.

4         Let's go to the next page.  I'm going to go quickly

5  through these, Your Honor, because these elements are not

6  contested by the Committee.

7         First, it's undoubted that we had transfers here.

8  Indeed, the Committee couldn't avoid or seek to avoid these

9  transactions unless there was a transfer.  So we're all agreed

10 that the payment to the holders of WildHorse debt, the issuance

11 of the FILO lien, and the issuance of the 2L lien all

12 constitute a transfer.

13        Next slide.

14        There's also no dispute that there were multiple

15 securities contracts at play here.  The first and most obvious,

16 Your Honor, is the WildHorse debt tender offer itself.  A

17 tender offer for debt or equity instrument is the

18 quintessential securities contact under the definition in the

19 Code of 101 -- excuse me -- 741(7)(A)(I), and that defines the

20 securities contract as a contract for the purchase, sale, or

21 loan of a security.  Excuse me.  So the Committee did not

22 dispute this in its papers.

23        Next, we also have the Uptier Exchange.  The Uptier

24 Exchange was effectively an offer or tender by the company for

25 holders of unsecured debt to send back their unsecured note and

1  receive instead the new 2L notes, and there was also cash pay

2  for accrued interest.  So this -- the Uptier Exchange in itself

3  constitutes a securities contract under 741(7)(A)(vii), which

4  says that a securities contract means, quote, "Any other

5  agreement or transaction that is similar to an agreement or

6  transaction referred to in this paragraph."  And I would

7  submit, of course, an exchange offer is similar to a tender or

8  purchase offer, and I don't believe there was any opposition to

9  that in the Committee's papers.

10          Where the Committee takes issue with the 546(e)

11  defense is whether these transfers were in connection with the

12  securities contracts that I just identified.  Now, the law is

13  clear, and Mr. Stark is right.  These cases are from the Second

14  Circuit, and the Second Circuit has had the opportunity to rule

15  on many 546(e) cases.  That doesn't mean that these cases are

16  not properly cited, and the Committee has not pointed you to

17  cases that take a contrary view.

18          So we've excerpted here three cases that address the

19  breadth of the "in connection with" requirement in 546(e), Your

20  Honor.  And you can see that in Boston Generating, the standard

21  that the Court set was that the in-connection requirement sets

22  a low bar between the securities contract and the transfers

23  sought to be avoided.  In Judge Peck's Lehman decision, he said

24  that the words "in connection with" are to be interpreted

25  liberally and should be interpreted to simply mean related to.

1 And then again we've cited the Second Circuit for the law-bar

2 standard.  So let's apply that standard to our arguments here.

3          So the first question is whether the FILO liens were

4 issued in connection with the securities contract.  So Your

5 Honor knows at this point that the FILO term loan was the way

6 the debtors funded the WildHorse debt tender offer.  Those two

7 transactions were inextricably intertwined, and while the

8 Committee changed its position on whether to collapse the

9 Uptier Exchange and the WildHorse tender in its reply, there is

10 no dispute about this.  The FILO loan and the debt tender offer

11 are two sides of the same coin.  That was the only financing

12 available to the company to buy back the WildHorse notes, and

13 the documents explicitly condition one on the other.

14          The debt tender offer says on its face that the

15 closing is conditioned -- that the closing of the loan is

16 conditioned on getting consents to do the tender offer.  And

17 then, on the face of the debt tender offer, it says explicitly

18 that it can be made, quote, "In connection with the concurrent

19 secured term loan financing."

20          Now, of course, that's not dispositive of applying

21 the statute, but that's the way the transaction is described.

22 The FILO term loan is in connection with the debt tender offer.

23 And if the debt tender offer doesn't go forward, the loan

24 doesn't go forward, and if the loan doesn't go forward, the

25 debt tender offer doesn't go forward.

1          So given that debt that was raised by the FILO

2  facility was necessary and inextricably intertwined with the

3  debt tender offer, we say that the liens at issue to secure

4  that debt are a transferring connection with the securities

5  contract.  That is the nub of the issue.  We say clearly in

6  connection with and the Committee disputes that.

7          Let me turn to the next page and discuss the

8  SunEdison case and its facts, because they are exactly on point

9  with what I just described, Your Honor.  And this is 620 B.R.

10  505.  In the SunEdison case, SunEdison contracted to buy

11  various equity interests in a separate, unaffiliated company

12  called First Wind and entered a purchase and sale agreement

13  back in 2014.

14          Now, to finance the purchase, it formed a special

15  purpose vehicle, a subsidiary called Seller Note, and Seller

16  Note in turn borrowed $350 million from the market in exchange

17  for exchangeable notes.  And then Seller Note transferred the

18  cash to Sun to buy the First Wind equity interest.  In order to

19  secure that financing, Sun transferred down to Seller Note, and

20  Seller Note transferred and posted as collateral equity

21  interest in various companies that Sun owned.

22          And that's the transfer that was being attacked in

23  this case, the pledge of stuff to the lenders that financed the

24  purchase and sale agreement transaction.  The analogs to our

25  case are on all fours.  The purchase and sale agreement is the

1    analog to the WildHorse debt tender offer, right?  It's the

2    securities contract and market transaction, and Judge Bernstein

3    said it was.

4            Then he went on citing that low-bar standard that the

5    pledge of the collateral that the company had to do to secure

6    that financing was a transfer in connection with the securities

7    contract.  So that's the analog for the finding of law, and he

8    said that that easily satisfies the "in connection with"

9    requirement.

10           And just to sum it all up, he wrote, quote:

11           "The January 15th transfer" -- that's the pledge of

12           the stock -- "related to and was associated with the

13           2014 purchase and sale agreement" -- that's the

14           securities transaction -- "because it was the means

15           of affecting the partial payment of the purchase

16           price under the 2014 PSA through the issuance of the

17           exchangeable notes secured by the pledged

18           collateral."

19           And we think that that is sound reasoning and applies

20   here, Your Honor.

21           We also cited the Boston Generating case.  I'll skip

22   over that in the interest of time.  We've explained it in our

23   brief and also applies an in-connection requirement in a

24   materially similar way.

25           So the Committee's argument is, well, the FILO

1  agreement itself in isolation is not a securities contract, and
2  they're right.  But that's not the test.  The test is whether
3  the FILO facility agreement and the lien at issue was entered
4  in connection with a securities contract, that being the debt
5  tender offer for the BBL notes, and I think we've just
6  established that that's the case.

7         Very briefly, the same argument holds true on the
8  Uptier Exchange.  We've already discussed how the Uptier
9  Exchange offer was a securities contract in its own right, and
10 the 2L lien which issued to secure the 2L notes was a transfer
11 in connection with that very securities contract and satisfies
12 the "in connection with" requirement.

13        The last prong, Your Honor, is whether these
14 transfers were made by (indiscernible) to the benefit of a
15 financial institution.  The FILO parties or the FILO group and
16 the 2L trustee have submitted briefing that all holders of this
17 debt are financial institutions by virtue of the agency
18 relationship with various banks.  Franklin adopted that
19 argument and I'll leave it to others to address that today.

20        Independent of that, Franklin itself is undoubtedly -
21 - or the Franklin entities that held the debt are financial
22 institutions.  You heard Mr. Circle's testimony that
23 100 percent of the BBL notes that were sold back in tender were
24 held by a 40 Act fund, 99 percent of the cash provided for the
25 FILO term loan came from Franklin funds that are 40 Act funds,

1  and 97 percent of the funds that hold second lien notes and

2  received  the second lien are 40 Act funds.

3          And, of course, the 40 Act fund is an explicit

4  financial institution under 101(22).  So whatever Your Honor

5  rules with respect to the rest of this discussion and the

6  creditors at whole, no fraudulent conveyance of preference

7  claim can be made out against the Franklin entities.

8          The last thing I want to say, and this relates to

9  Lehman Brothers, and that goes to the underlying debt claims

10 and guaranties, Your Honor.  This is a very interesting

11 question that Judge Peck addressed in Lehman, and you may

12 remember the fact patterns here that (indiscernible)

13 JPMorgan's, according to the estate, of coercion from Lehman to

14 post substantial new collateral and issue guaranties from

15 various affiliates on the eve of Lehman's bankruptcy filing.

16 And in a very well art -- or discussed decision, Judge Peck

17 determined that none of the constructive fraudulent conveyance

18 claims or preference claims to void those liens could go

19 forward because they were all (indiscernible) to work for the

20 benefit of JPMorgan, which is a financial institution.

21         And that was notwithstanding the Committee's

22 arguments in that case that the entities that issued those

23 guaranties got no value for the guaranties or for the lien

24 (indiscernible).

25         The question that's relevant here, and that Judge

1  Peck addressed, is what does that mean for the underlying debt

2  claims?  And here the Committee is seeking to avoid the claim

3  of Franklin for its FILO debt and its 2L debt in which Judge

4  Peck said and ruled and has never been disputed, reversed, or

5  questioned by any other Court, is that where the debtor or a

6  committee cannot avoid a lien, it cannot avoid the underlying

7  and connected debt claim.  Even though 546(e) on its face does

8  not speak to obligations, it only speaks to transfers, it's a

9  (indiscernible) victory to let a committee attack an underlying

10  debt claim if the lien stands.  And this goes to the very

11  purpose of the safe harbors, as well, to protect the very kind

12  of transactions that were conducted here.

13          And what Judge Peck said was that trying to avoid the

14  obligation is, quote:

15          "A dead-end for purposes of obtaining recovery, and

16          those obligations are resistant to successful

17          challenge because they connect so directly to

18          transfers that are exempt and beyond reach by virtue

19          of Section 546(e)."

20          Now, Your Honor doesn't have to rule on any of these

21  matters.  You're canvassing the issues, but the point here is

22  that there's an extraordinarily strong safe harbor defense that

23  has to be factored in to the settlement and the debtors'

24  refusal to bring the claims.

25          So the score card at the end of the day, Your Honor,

1  on the next page, is that every one of the preference claims

2  the Committee is asking for standing for or constructive

3  fraudulent conveyance claims have either been withdrawn or are

4  all subject to safe harbors, even assuming that there was a

5  colorable case on solvency for lack of reasonably equivalent

6  values.

7        I'm going to skip over intentional fraudulent

8  transfer.  We've briefed it.  I can't imagine on these facts

9  how one could argue that any of the badges of fraud are present

10 or that these debtors intended to defraud any of their

11 creditors.

12       The last thing I'll touch on very briefly is the

13 preference claim -- excuse me, the attempt to work around the

14 absence of a preference claim through calling it a constructive

15 fraudulent conveyance or calling it unjust enrichment.

16 Ms. Schwarzman talked about this.  Your Honor, the 90 days is

17 the 90 days, and if Congress wanted to allow for preference

18 claims against non-insiders after 90 days, it would be in the

19 Code.

20       There is no legal basis to say that a lapsed

21 preference claim can be reasserted as a constructive fraudulent

22 conveyance claim or as unjust enrichment, and that's really the

23 beginning and end of this discussion.  I've already touched on

24 the lack of evidence to Cole Franklin insider, but just if you

25 had any doubt about the cognizability of these claims, Your

Honor, we briefed the fact that the contemporaneous exchange

for value defense would have applied and would mean that the

preference claims would have no value even if you could

resurrect it as a constructive fraudulent conveyance claim or

as an unjust enrichment claim.

So Your Honor is familiar with that defense

effectively to preference claims and the inquiry about

contemporaneous exchange.  We've excerpted the (indiscernible)

Rivera case here, which has been cited in this district and

that is -- I believe by Judge Isgur actually -- that inquiry

should be focused on the risk of fraud, the intention of the

parties, the reason for the delay, and the nature of the

transaction.  And this defense is a flexible concept and

requires a case-by-case analysis.

You heard testimony from Mr. Circle about how

critical the issuance of the liens was through his willingness

to fund the FILO transaction, and you saw an email from

Mr. Circle to JPMorgan, in their capacity as the arrangers,

insisting that the debtors perfect the pledge of liens and

mortgages within 60 days.  That was the contemporaneous intent

of the parties to provide collateral for these loans, and there

was -- would be no FILO loan and no Uptier Exchange without the

issuance of the liens.

There's no fraud.  There's no rush to the courthouse

to dismember the debtor.  None of the policies underlying 547

110

itself are present here.  The only issue is the industry that
we're dealing in, and that you can't perfect thousands of
mortgages the day after the credit is issued.  And Mr. Circle
and the other lenders agreed that 60 days was an appropriate
period of time.  And why did they agree to this?  If you look
at Page 52, the industry standard is that it takes 60 to 90
days to perfect the lien granted by an E&P company.

          And we pointed here to admitted exhibits -- Franklin
Exhibits 10, 11, 12, and 13, with the ECF numbers, and these
are credit agreements by tier companies, all of which had 60-
or 90-day periods to perfect the pledge of collateral.  It was
perfectly reasonable for the creditors who were extending
credit or exchanging debt here to agree to a 60-day window, and
that should not be challenged after the fact as a lack of
substantially contemporaneous value.

          The only case the Committee really cites here is
Judge Isgur's Bison Building Holdings case, Your Honor, and I
think Your Honor knows that on the facts, it has no obligation
to a multi-billion-dollar E&P company borrowing money.  It
involved the sale of a number of products to the debtor, with
the vendor taking credit terms and getting paid back 45 days
routinely after the issuance of the invoice, and Judge Isgur
rightly said that we don't have an intent for contemporaneous
exchange here, and that was the end of that.

          So we don't think that that for a moment would

1  undercut a 547(c)(1) defense.  Any holding to the contrary,

2  Your Honor, would put lending practices at stake, and companies

3  would be very wary of extending secured credit to an E&P

4  company, particularly at the time it needed it most.

5         So to sum up, Your Honor, again I started with the

6  Franklin specific claims and that there's no -- nothing there.

7  We've now layered in the 547(c)(1) defense, and you can see

8  that -- next page, Laura -- all of the claims the Committee

9  would like to assert here and that the debtors have settled for

10  more than fair consideration are lacking in merit, they're safe

11  harbored, or they're barred by 547(c)(1) and had no value, even

12  if they could be resurrected.

13         Unless Your Honor has any questions, that's all I

14  have.

15         THE COURT:  All right. I do not.  Thank you,

16  Mr. Zensky.

17         MR. ZENSKY:  Your Honor, I have one housekeeping

18  measure before I cede the podium.

19         THE COURT:  Yes, sir.

20         MR. ZENSKY:  And we can deal with this at lunch.  We

21  had emailed Mr. Alonzo about an error in the transcript of

22  Mr. Circle's testimony that was actually material.  No one has

23  objected to the -- what we had said in our email to Mr. Alonzo,

24  the correct transcript would be, having listened to the audio.

25  I don't know how Your Honor wants to deal with that, but we

1  would like to correct the record at some point.

2          THE COURT:  So what I -- thank you for reminding me

3  about this.  I do not have the ability to unilaterally, without

4  a record, modify a transcript.  So what I would like for you to

5  do is, if you would file something, include a certification by

6  the person that went through and did it and let me sign an

7  order that becomes part of the public record.  I would ask that

8  you circulate it amongst the parties that participated and that

9  way, there is a clear and unambiguous, hey, we found a problem;

10 we brought it to everyone's attention, everyone was given an

11 opportunity to complain, and the Court signed an order with

12 full notice and opportunity to object by all concerned.  Can I

13 ask you to do that?

14         MR. ZENSKY:  Yes.  Of course, Your Honor.  Thank you

15 for that guidance.

16         THE COURT:  All right.  Thank you.

17         Mr. Schaible, are you next?

18         MR. SCHAIBLE:  I am, Your Honor.  Can you hear me

19 okay?

20         THE COURT:  I can hear you very well.  Before we get

21 started, do I need to give control to someone on your team or

22 to you?

23         MR. SCHAIBLE:  You do, Your Honor.  If you wouldn't

24 mind giving control actually to Mr. Schlaifer of Kirkland.

25         THE COURT:  All right.

113

1        MR. SCHAIBLE:  I'm capable of some things, but
2  running my own slides is not one of them.

3        THE COURT:  Yeah.

4        MR. SCHAIBLE:  Luckily, Mr. Schlafer was willing to
5  do it for me.

6        THE COURT:  We're going to keep working on that.
7  He -- Mr. Schlafer has control, Mr. Schaible.  Whenever you're
8  ready.

9        MR. SCHAIBLE:  Thank you, Your Honor.  Your Honor,
10 for the record, Damian Schaible with Davis Polk.  I'm here with
11 a number of my colleagues, and we are appearing on behalf of
12 the Ad Hoc Group of FLLO Term Loan Lenders.

13       First, Your Honor, as the other parties did, I'd like
14 to offer extreme thanks to the Court and to Your Honor for the
15 time and the diligence through this long process and this very
16 long trial.  Also, as others have done, I'd like to offer great
17 commendation to the excellent lawyers on all sides.  It's been
18 a pleasure to be a part of this trial, Your Honor.

19       Your Honor, just about one day and one month ago, we
20 rose to urge Your Honor to confirm the debtors' plan of
21 reorganization.  We told Your Honor that the plan before the
22 Court represents a monumental achievement, a hard-fought,
23 value-maximizing, equitable settlement of potential estate
24 causes of action.  We told Your Honor that the plan would
25 provide these debtors with a fresh start and with the certainty

1  and liquidity they need to emerge from bankruptcy in this

2  challenging, uncertain environment and thrive as a going

3  concern.  We told Your Honor we were confident that the

4  evidence we presented at trial would bear all that out, that

5  this plan not only satisfies the requirements of the Bankruptcy

6  Code, but frankly, it represents the very best of restructuring

7  practice.

8          Your Honor, the plan sponsors have satisfied their

9  burden, and we're proud to rise once more in support of the

10  confirmation.  Your Honor has heard a mountain of evidence in

11  these proceedings.  The debtors and counsel for Franklin have

12  ably summed up for you why this evidence more than suffices for

13  confirmation.  I see no reason to belabor the points they've

14  made, but I do want to just take a moment and spend some time

15  reviewing, from the perspective of the FLLO ad hoc group the

16  case for confirmation and why the Committee's objections just

17  do not pass muster.

18          We view the Committee's objections in this case, Your

19  Honor, as relating to two distinct moments in time:  the past,

20  which includes the events of April and May of 2020 and this

21  Court's entrance of orders on the DIP and the rights offering ,

22  both of which were entered and have become final, and then the

23  present.  I'm going to start with the past.

24          The Committee's challenge has been (indiscernible)

25  tell the story that we shared with Your Honor many times

1  before, the story about -- that has now been borne out at a

2  trial.  It's a story that begins with the world in the light of

3  March of 2020, a price war between Russia and Saudi Arabia

4  which sent unprecedented shocks through our oil and gas market,

5  and the pandemic, which is unfortunately still with us today as

6  we address Your Honor virtually, causing at the time and now

7  unimaginable harm around the world, and at the time, shuttering

8  much of the global economy.

9        Your Honor heard at trial that the extreme state of

10 the world simply derailed Chesapeake's otherwise -- at the

11 time -- successful and longstanding commitment to deleverage

12 its balance sheet and left the company in need of a near-term

13 emergency restructuring.

14       The Committee, of course, tells a different story, a

15 story of secured lenders that took advantage of the foundering

16 enterprise, bringing a company to heel while leaving unsecured

17 creditor and other constituents worse for the wear.  But the

18 facts will never fit that story.  Neither does the evidence.

19 That version of the story, to borrow a phrase oft repeated

20 during these (indiscernible) is at home only in fantasyland.

21       So what happened?  What actually happened?  What has

22 the evidence shown?  The evidence has made plain that these

23 debtors enjoyed a position of massive leverage over their

24 secured creditors.  Back in 2019, as Your Honor knows -- in

25 December of 2019, as Your Honor knows, the FLLO lenders

1  provided Chesapeake with a $1.5 billion new-money loan.  Then a

2  mere few months later, Chesapeake called them up and threatened

3  to file a (indiscernible) bankruptcy case specifically to avoid

4  the lien securing that recently provided loan unless the FLLO

5  lenders provided the debtors with a (indiscernible) value.

6           At this point, I believe we should be putting Slide

7  1.

8           This is leverage that the debtors used, I must admit,

9  very effectively.  They drove an extremely hard bargain.  And

10 the deal that we negotiated was a tough pill for a group of

11 secured lenders to swallow.  Full equitization.  Substantial

12 value for value to junior creditors, and the requirement to

13 provide a long-term and firm commitment to provide a

14 significant new money equity investment at a time of

15 nonexistent capital markets.

16          It's worth pausing here for a moment just on how

17 absurd the Committee's version of this story really is.  In the

18 Committee's telling, the FLLO ad hoc group overwhelmed the

19 Chesapeake board's independent business judgment as well as

20 that of Kirkland & Ellis and Wachtell Lipton and all of their

21 commitments, the fiduciary duty and professional responsibility

22 and (indiscernible) didn't take very much to do that.  Just one

23 letter in one slide deck.

24          We've known all along the Committee's story on this

25 score flew in the face of the truth.  Is it credible that a

1  letter and a few slides, even from me, could send ambient
2  restructuring professionals and a serious and independent
3  public company board of directors cowering for cover?  The
4  uncontrovuted -- uncontroverted -- excuse me -- evidence at
5  trial showed an engaged Chesapeake board and a management team
6  that did not in any way perceive the materials that we sent as
7  a threat.  Nor did the materials cause them to change their
8  course of action at all, and the slides that we're flipping
9  through now show excerpts from the transcript that show that
10 clearly.

11       Rather, Mr. (indiscernible) testified that the
12 letter, quote, "did nothing" except to confirm that there was a
13 interest in reality to continue to try and negotiate the debt
14 to -- in other words, a value mathematical transaction.

15       Ultimately, Chesapeake chose at the direction of its
16 board to negotiate and RSA with its senior creditors rather
17 than fight them in court.  They chose to settle potential
18 causes of action rather than pursue them with endless,
19 expensive, uncertain litigation.  They chose a certain path to
20 bankruptcy with committed exit financing and a bright future as
21 a going concern over a free fall and the liquidation that may
22 well have ensued.

23       The linchpin of those April and May negotiations,
24 Your Honor, as you know, were the rights offering.  Your Honor
25 has heard the debtors recount this morning the testimony of

1  Mr. Antinelli.  The rights offering, from the debtors'

2  perspective, was a critical component of their plan to emerge

3  from bankruptcy as a going concern.  Without that rights

4  offering, the debtors could have no certainty that they'd be

5  able to fund a Chapter 11 case and no clear path to exit from

6  Chapter 11 with sufficient liquidity to operate on the other

7  side.

8         But wishing for something doesn't make it so.  The

9  debtors weren't going to get this new money equity from just

10 anywhere, and as Your Honor heard from Mr. Antinelli and

11 Mr. Circle, capital markets at the time simply didn't exist.

12 The slides that we're putting up show that testimony.

13        In May 2020, there was simply no appetite to provide

14 an oil and gas company on the brink of bankruptcy $600 million

15 worth of equity.  Literally none.  And so the FLLO ad hoc group

16 and Franklin stepped up, in a time of unprecedented distress

17 and volatility, to provide the needed new money equity

18 investment.  Why?  Because the debtors successfully deployed

19 the substantial leverage (indiscernible).  They obtained a

20 rights offering that has allowed these debtors to shore up the

21 exit funding and liquidity (indiscernible) to remain

22 competitive into the future.

23        Your Honor, the Committee has tried, so far in vain,

24 to flip the new money equity commitment story on its head.  We

25 expect the Committee to expend significant time again today

1 challenging the rights offering.  Rather than a vital shot in

2 the arm, the Committee will describe the rights offering as an

3 impermissible value drag at unsecured creditor's expense.  Your

4 Honor should simply remain unpersuaded, and I'd like to take a

5 few minutes to explain why.

6          For starters, the Committee's arguments here are

7 simply too little, too late.  They've been asked and answered.

8 This Court has already approved the backstop commitment.  Your

9 Honor may not countenance the Committee's attempts to

10 relitigate the past.

11          But even putting that aside, the Committee's

12 arguments here are simply without merit.  As the evidence at

13 trial showed and as we've reminded Your Honor all day today,

14 the debtors wrestled a rights offering from their secured

15 creditors by successfully using the leverage at their disposal

16 in order to obtain $600 million equity investment in a dark --

17 indeed a dormant -- time for the oil and gas capital market.

18          But not only that, Your Honor.  (Indiscernible) from

19 the FLLO ad hoc group, this remains open over an incredibly

20 long time frame.  The debtors, mind you, have always had the

21 opportunity to walk away.  For two months from when the

22 commitment was publicly announced until when Your Honor

23 approved the commitment, they could have walked away for free.

24 Post-approval, they'd just have to pay a break fee.  And Your

25 Honor heard Mr. Antinelli's testimony on this point.  The

120

1  debtors would have been delighted to entertain a competing

2  rights offering.

3        We urge Your Honor to keep this in mind as the

4  Committee claims that this rights offering wasn't market

5  tested.  That's just wrong.  The terms of this rights offering

6  were completely public and have been for many, many months.  At

7  any point, an investor could have come along and proposed an

8  alternative -- a committed alternative, an actionable

9  alternative -- on more favorable terms.  And until this

10 morning's strategic and questionable half-proposal, no

11 proposal's even been received, let alone actionable

12 alternatives.

13        Your Honor, we deal with reality here, not the

14 hypothetical and not the fantastic, what our colleagues at

15 Kirkland & Ellis have repeatedly called the art of the

16 possible.  And this rights offering is the only committed,

17 enforceable, and actionable rights offering available to the

18 debtors today.  Nor is it the case that the FLLO ad hoc group

19 and Franklin pushed the debtors to use the total enterprise

20 value favorable to them.  To the contrary.  As the evidence

21 made clear, the $3.25 billion valuation came from the debtors.

22 We merely accepted it to be true.  In fact, the debtors made a

23 number of assumptions that we perhaps wouldn't have made to

24 ultimately increase that value to $3.25 billion.

25        Finally, we'd like the Court to consider the

1 practical implication of the Committee's continuing challenge

2 to the rights offering.  The participants of the rights

3 offering, as Your Honor knows -- the participants of the rights

4 offering, as Your Honor knows, the backstop party in

5 particular, had held upon its commitment to purchase $600

6 million worth of equity in a medium oil and gas company during

7 a global pandemic for many months.  Volatility has worked in

8 the debtors' favor recently and all the better.  But Your Honor

9 well knows the volatility could have worked against the debtors

10 as well.  If it had, had $600 million at a 35 percent to a

11 $3.25 billion valuation become an unattractive investment, Your

12 Honor can be certain that these debtors would have held our

13 feet to the fire.  These new money investors would not have

14 been allowed to walk away.  That's the very nature of the

15 investment.  Sometimes it goes up.  Sometimes it goes down.

16 And blowing up this rights offering simply because markets have

17 improved since last June (indiscernible) long-term commitments

18 (indiscernible)  one-way options.  Investors on the hook, no

19 matter what.  Debtors allowed to walk away at their leisure.

20         The Committee has also tried, again in vain, to

21 relitigate aspects of the DIP order that this Court entered

22 more than five months ago that happen to be harmful to its

23 confirmation objection.  We expect the Committee to spend

24 significant time today arguing that the roll-up DIP loans

25 should somehow be treated as they were never rolled up, as if

1  they were pre-petition RBL loans which should only be able to

2  be permitted to recover from pre-petition RBL collateral even

3  though the DIP loans were rolled up and there's deep additional

4  collateral post-petition.  And even though this Court approved

5  a surcharge waiver and a marshaling waiver.

6          We expect the Committee to argue for a reverse

7  marshaling of assets to ensure that secured creditor recoveries

8  are minimized while unsecured creditor recoveries are

9  maximized, even though the DIP order includes a marshaling

10 waiver.

11         Your Honor, I've enjoyed numerous long and multi-case

12 conversations with you on marshaling and we both understand one

13 thing:  that marshaling is a secured creditor remedy.  The

14 unsecured creditors simply have nothing to say about it.  But

15 also, again, the Committee's arguments here are too little, too

16 late.  This Court already approved the DIP order.  The

17 Committee did not appeal, and the Committee must now abide by

18 its terms.  Attempting to relitigate final orders entered many

19 months ago in support of a plan rejection should just not be

20 countenanced.

21         All of that brings us now, Your Honor, to now.

22 Fundamentally, before this Court is a settlement plan.  The

23 debtors have decided, in their sound business judgment that the

24 settlement embodied in this plan is fair and equitable and in

25 the best interest of the estate.  The evidence shows that the

1  debtors reached this conclusion after carefully laying the

2  benefits of the settlement against the likely rewards of

3  litigation.  The debtors have chosen the settlement rather than

4  litigation.  Reorganization rather than liquidation.  And we

5  think the evidence has shown that the debtors have chosen

6  wisely.

7          Your Honor, we've covered the benefits of this value

8  maximizing settlement at length.  It settles potential estate

9  causes of action in exchange for significant concessions from

10 the FLLO ad hoc group, including subsequent recoveries to out

11 of the money creditors and to review equity financing.  In

12 every respect, the settlement is fair, equitable, and

13 reasonable.  And it provides a certain path to Chesapeake's

14 emergence from bankruptcy, well positioning Chesapeake to

15 thrive as a going concern upon exit.

16         All along, Your Honor, the Committee's ignored these

17 benefits.  Instead, it would set the company on a different

18 path of endless litigation against major constituency

19 (indiscernible) that would very possibly result in a value

20 destructive liquidation of the company.  The Committee has

21 steadfastly ignored the drawbacks and hurdles of litigation.

22 Were this Court to grant the Committee's standing motions --

23 and it manifestly should not.  The Committee would face a

24 steep -- and we believe insurmountable -- uphill legal battle

25 that could leave the carcass of these debtors on the

1  battlefield.

2          If you could turn to the slide.

3          Your Honor, Mr. Zensky covered these claims, and I'm

4  not going to go through them in extreme detail, but each and

5  every one of these claims that the Committee's seeks to bring

6  and the Committee believes the debtor should litigate rather

7  than settle at best faces significant hurdles, and in our view,

8  is utterly meritless.  The obstacles explained in detail in our

9  papers and Mr. Zensky covered them and Ms. Schwarzman covered

10  them -- so there's no need for me to repeat them here.

11  However, I'm going to give to you what you've not heard after a

12  trial spanning nearly one month.  As we touched on earlier, you

13  have not heard any evidence that would support a claim that

14  FLLO ad hoc group aided or abetted breach to the fiduciary

15  duty.  To the contrary, the uncontroverted evidence

16  demonstrates that the debtors were not at all threatened by the

17  FLLO ad hoc group, that the debtors had the leverage in the

18  negotiations, and that the debtors board, management, and

19  advisors made a sound decision to use that leverage in pursuit

20  of a value-maximizing consensual deal.

21          The Committee's premise on the FLLO ad hoc groups

22  alleged bad acts aiding and abetting, unjust enrichment,

23  equitable subordination would just fail all the way.  There are

24  many and meaningful legal obstacles to this (indiscernible).

25          Your Honor, you've also heard (indiscernible) about

1   the Committee's revival of preference causes of action.

2   Revival is a misnomer.  This is a claim to imagine non pro tunc

3   if the debtors actually filed for bankruptcy before May 14th,

4   2020, and that they successfully prosecuted preference claims

5   that never came to be.  There's simply no legal support for

6   such a novel claim, and certainly nothing in the record

7   supports crafting such a claim out of pure equity.

8        Second, Your Honor, as set forth in detail in our

9   papers, the Committee's proposed avoidance actions, the

10  preference claims, all of their (indiscernible) -- their

11  preference claims, their constructive fraudulent transfer

12  claims, and any (indiscernible) fraudulent transfer claims are

13  all barred in our view by Section 546(e).  We could engage in a

14  lengthy and fascinating legal argument on the merits of Section

15  546(e), but it's really a straightforward application of the

16  statute.  Mr. Zensky did a good job of beating that horse, so

17  to speak.  While he focused mostly on the WildHorse

18  transactions, all of the Committee's proposed avoidance claims

19  fail for the same reason.

20       The point here is that we believe it's a complete

21  defense to these claims that can be established as a matter of

22  law and basic undisputed fact, and as Mr. Zensky explained, the

23  key legal obstacle to the Committee's proposed claims would be

24  full litigated and would, in our view, result in the claims

25  coming to a quick conclusion.  Any assessment of the value of

1  the Committee's claims and the reasonable and recommended

2  settlement must face the very really risk posed by the Section

3  546(e).

4         Third, Your Honor, the record demonstrates amply that

5  the TOUSA claims are utterly without merit, even if you set

6  aside 546(e).  Certainly, there's been no evidence that

7  Chesapeake sought to either delay or defraud creditors.  And as

8  the debtors and Franklin explained at length, the FLLO provided

9  numerous and meaningful benefit for Legacy Chesapeake.

10        Your Honor, the Committee's preferred path of

11 litigation is not just unlikely to return value to the estate.

12 It would be ruinously expensive, potentially hundreds of

13 millions of dollars in admin costs and professional fees and

14 enormously complicated.  The survey of recent fraudulent

15 transfer cases that we include in our confirmation brief makes

16 clear that the timeline would measure in years, not months, and

17 litigating the Committee's proposed complaints would undue all

18 of the certainty this settlement brings.  With settling comes

19 the sure path for reorganization and a bright future as a

20 viable going concern.  With litigation may well come

21 liquidation.  The debtors have more than reasonably avoided

22 that value-destructive path.  So too should Your Honor.  The

23 plan is satisfying the requirements of the Bankruptcy Code in

24 all respects, of course, but it does much more than that.  Two,

25 the plan maximizes value for these debtors and for all the

1 stakeholders, including Chesapeake's more than 1,000 dedicated

2 employees.  It provides these debtors with a fresh start, a

3 sure footing, and a chance to emerge from bankruptcy as a

4 thriving going concern, and it embodies the very best of the

5 restructuring process.

6            Your Honor, we respectfully submit the debtors and

7 the plan sponsors have more than satisfied their burden of

8 proof, and we ask that after considering the evidence

9 presented, Your Honor enter an order confirming the debtors'

10 plan of reorganization.

11            Unless you have any questions, Your Honor, I will

12 just preserve time further, and I thank Your Honor.

13            THE COURT:  Thank you, Mr. Schaible.  I do not have

14 any questions.

15            Let me ask are there -- I'm sorry.  Ms. Hagle?  Thank

16 you.  Good morning.

17            MS. HAGLE:  Good morning, Your Honor.  Can you hear

18 me all right?

19            THE COURT:  Perfectly.  Thank you.

20            MS. HAGLE:  Thank you, Your Honor.  I think I'm on

21 deck, if that's okay with Your Honor.

22            THE COURT:  Of course it is.  I'm sure someone's got

23 a list that I just didn't get, so I'm just -- whoever pops up

24 will go next, so whenever you're ready.

25            MS. HAGLE:  Okay.  Thank you very much, Your Honor.

1 Jennifer Hagle of Sidley Austin on behalf of MUFG Union Bank in

2 its capacity of administrative agent under the DIP facility,

3 the pre-certification senior revolving credit facility, and the

4 proposed exit facilities.

5          As you know, Your Honor, you have heard very little

6 from MUFG over the course of this trial.  There is a reason for

7 this.  Even though the Committee made reference to MUFG in

8 certain of its draft pleadings and its opening, it never

9 actually presented any evidence that would challenge MUFG's

10 rights under it's pre-petition documents, the DIP, or the plan.

11          According, at this point, MUFG's primary interest is

12 in the debtors' exit from bankruptcy in a time frame generally

13 consistent with the DIP facilities and the RSA milestones for

14 the benefit of all stakeholders, including the unsecured

15 creditors.  By all accounts, Your Honor, the bankruptcy process

16 has done in these cases what it was intended to do.  The

17 pre-petition settlement contemplated by the RSA has been

18 subjected to a vigorous, extended, and very transparent vetting

19 process.  In the end, the debtors have more than satisfied

20 their statutory burden to exit Chapter 11 with a strong

21 restructured balance sheet, adequately capitalized, and well

22 positioned to reclaim its competitive position as a leader in

23 the oil and gas market.

24          Your Honor, I will not attempt to rehash the closing

25 statements you've already heard.  Instead, I think it's

1 important to look at what you did not hear over the course of

2 the trial, especially as it affects MUFG.  In particular, I

3 want to focus on a lack of evidence from the Committee

4 regarding the need for a DIP and the need for an exit facility,

5 the lack of evidence to support the technical complaint

6 underlying the standing motion, and the lack of evidence

7 supporting the proposition that this company could somehow

8 survive as a going concern without confirmation of the debtors'

9 plan.

10 First, let's take the lack of evidence against the

11 DIP.  The Committee, in their opening, and in particular, in

12 the lead-up to trial, argued that the DIP was somehow improper.

13 On December 4th, you responded to these baseless accusations

14 from the Committee by saying it, quote, "may even cross over a

15 line", end quote, and if the Committee wished to attack the

16 integrity of counsel, it should do so quote, "based upon an

17 evidentiary record, not someone simply making statements in the

18 public record", end quote.  Despite Your Honor's warning, in

19 the end, we are left with nothing but Committee counsel's

20 assertions and arguments.  Indeed, there is no evidence in the

21 record after 12 days of testimony that the DIP was negotiated

22 in bad faith, nor any evidence that can lead to an inference

23 that the DIP was the product of anything but a hard-fought

24 arms-length negotiation among sophisticated commercial parties.

25 Mr. Dell'Osso testified that the debtors need access

1  to cash.  It should come as no surprise, and in fact, it came

2  as no surprise to Your Honor at the final DIP hearing that he

3  testified the debtors wanted more money and the DIP lenders

4  wanted to commit less.  And in the end, surprise, a number

5  somewhere in between was negotiated.  Again, it should not come

6  as a startling revelation to any seasoned restructuring

7  practitioner, let alone Your Honor.

8       Mr. Antinelli discussed the DIP negotiation process

9  in detail.  Reiterating his testimony from the DIP hearing, the

10 process was competitive, there was a specific competing DIP

11 proposal, and that MUFG and the DIP lenders ended up giving

12 significant concessions including delivery of a fully

13 negotiated exit financing package in an effort to reach

14 agreement on the final terms of the DIP.

15      The Committee introduced evidence showing that the

16 DIP borrowing ultimately ended up being lower than initially

17 forecast.  We don't dispute that fact.  That said, there is

18 simply nothing inappropriate, suspect, or even surprising about

19 that fact.  Experienced financial advisors routinely generate

20 conservative projections taking into account the unknown and

21 general volatility that accompanies a bankruptcy filing.  The

22 debtors' witnesses testified the commodity prices improved from

23 filing to today, improving the debtors' cash position.  And

24 finally, they also testified the Mid-Con sale further improved

25 the company's cash position by over $130 million that was not

1  initially taken into account in the debtors' initial DIP

2  budget.

3          The fact that the debtors obtained the benefit of a

4  number of unexpected positive financial developments should not

5  now serve as a basis to call into question the appropriateness

6  of the DIP terms as they were negotiated on the front end,

7  especially in the context of unprecedented uncertainty and

8  volatility in the oil and gas market.

9          The Committee offered no evidence in rebuttal.

10  Instead, they simply regurgitated their arguments from the

11  final DIP hearing.  The Committee lost those arguments in

12  August.  In the following months, they did not appeal.  They

13  did not file a motion to reconsider.  If their utter failure to

14  support their argument with evidence was not enough, their

15  five-month failure to comply with the proper procedural steps

16  to contest the final DIP order certainly must doom their

17  arguments against the DIP.

18          Next, the lack of evidentiary and legal support for

19  the technicals complaint involving MUFG.  The Committee said in

20  their opening -- while defending our attempt at relitigating

21  the settled DIP order -- that quote, "everything in the

22  technicals complaint is an avoidance action, and therefore the

23  DIP lenders can only look to those otherwise unencumbered

24  assets last".  That is, to say the least, Your Honor, an

25  interesting position.  In making the argument, Your Honor may

1   recall that the Committee's opening referred to the recent

2   Chapter 11 proceedings for Legacy Reserves.  In that case,

3   Judge Isgur was confronted with the very same need avoidance

4   argument.  His response, and I quote, "This does not apply to

5   anything that they're alleging is a defective lien, I don't

6   think, because I don't think those are Chapter 5 recovery.

7   They're simply not liens."

8          Now, the Committee tries to strain their argument

9   even further.  Avoidance action proceeds encompass not only

10  alleged defective liens, but also certain other assets that

11  everyone agrees and the debtors and secured creditors

12  stipulated were never encumbered in the first place.

13         Beyond the Committee's strained legal positions, the

14  Committee utterly failed to establish the value of the assets

15  referenced in the technical complaints that it argues are

16  unencumbered.  Indeed, the Committee's own expert testified

17  that he did not recall which counties had mortgages filed

18  inside the preference period on behalf of MUFG and which had

19  mortgages filed inside the preference period, only with respect

20  to the FLLOs and the 2Ls.

21         He further testified that if a mortgage was filed in

22  the preference period, he considered the asset subject to that

23  mortgage to be unencumbered in his analysis, regardless of

24  whether its essential prosecutions or the preference actions

25  would lead to avoidance of liens as to all three of the

1  pre-petition funded debt facilities or only the FLLO and second

2  lien.

3       In other words, if a probably was mortgaged by the

4  RBL lenders outside the preference period and then also

5  mortgaged by the FLLO and 2L lenders inside the preference

6  period, the Committee considered it unencumbered, even though

7  it is not even alleged that the RBL lien is avoidable.  Bottom

8  line, at the end of the day, it doesn't matter whether FLLO and

9  2L mortgages might be subject to a preference claim if the RBL

10 mortgages are not because in that case, those assets are

11 nevertheless encumbered.  As a result, Your Honor, this

12 fundamental mistaken assumption destroys the credibility of the

13 Committee's valuation of unencumbered assets, even if its

14 technical complaint were to be successfully prosecuted in all

15 of other respects.

16       The Committee also argued in their opening the DIP

17 lenders would not look first to assets that were unencumbered

18 pre-petition.  Each side's experts made a legal assumption with

19 the debtors' expert assuming, on advice of counsel, that DIP

20 lenders would first look to otherwise unencumbered assets, and

21 the Committee's expert, assuming on advice of counsel, the DIP

22 lenders would collect pro rata from otherwise unencumbered and

23 encumbered assets.

24       For the same reason the Committee's unencumbered

25 asset valuation falls apart, the Committee's assumption on

1  MUFG's enforcement of its DIP lien is simply not valid.  With

2  only minor changes due to trading activity, the DIP lenders and

3  the RBL lenders are virtually the same.  This is almost

4  axiomatic in Chapter 11 proceedings implementing DIP financing.

5  However, the Committee completely ignored that the liens

6  securing the RBL, FLLO, and second liens overlap.

7       Exhibit UCC-429, available at ACF2323-29, is in

8  evidence, Your Honor.  That document is the creditor agreement

9  between the secured creditors.  Section 2.04 of that agreement

10 provides, and I quote, "The parties hereto acknowledge and

11 agree that it is their intention that the priority lien

12 collateral, the second lien collateral, and the third lien

13 collateral be identical".  It then goes on to provide minor

14 enumerated exceptions.  The collateral trust agreement, also in

15 evidence, has similar language.

16       As pointed out by Ms. Schwarzman, it is simply

17 unreasonable to expect that a bank would weaken their own

18 collateral position when they have an alternative.  Why would a

19 bank want to risk recovering less on (indiscernible).  That is

20 precisely why MUFG negotiated so hard -- and believe me, Your

21 Honor, I was there -- to include the language addressing

22 marshaling in the DIP order, specifically, and I quote, "the

23 DIP agent may use commercially reasonable efforts to first

24 apply proceeds of the DIP collateral that is not existing

25 collateral to satisfy the DIP obligations before applying

1  proceeds of DIP collateral that is existing collateral to

2  satisfy the DIP obligations", end quote.

3       Third, the Committee has offered no evidence showing

4  that this company can survive indefinitely without the DIP

5  financing and without exit financing and the rights offering.

6  As Your Honor correctly pointed out during the direct of

7  Mr. Baggett, the Committee has offered no evidence that the

8  debtors have anything other than the two obvious options:

9  confirmation or liquidation.  There's no in between compromised

10  position.  Without imminent confirmation, the DIP financing

11  will inevitably go into default.

12       The DIP order provides that confirmation must occur

13  by 195 days from the petition date.  Your Honor, that date was

14  last Saturday, January 9th.  I will represent to the Court that

15  the DIP lenders have granted a short extension of that

16  deadline, but you can be sure any further extended delay will

17  most certainly put the DIP financing at risk of default and

18  termination.

19       An open-ended extension with no plan in place during

20  which time going concern value is somehow miraculously

21  preserved is simply not a reasonable assumption, and of course,

22  the Committee has offered no evidence to the contrary.

23       Your Honor knows this is a large and complex case.

24  Even with a highly negotiated pre-petition RSA, the tenure of

25  the bankruptcy has now spanned over seven months.  As

1  Mr. Schaible pointed out with respect to the rights offering,

2  the DIP and exit commitments have been in place for that entire

3  time, patiently waiting for confirmation, during a period of

4  unquestioned market uncertainty.  Without confirmation, the DIP

5  will go in default and could terminate.  The DIP in default,

6  the termination of that will also likely be triggered under the

7  RSA.  And the debtors will be left to wallow in a free fall

8  bankruptcy with no exit in sight, without access to capital, in

9  a price environment that remains volatile, compounded by

10 political unrest and a raging pandemic.

11        Your Honor, I'm not going to rehash the debtors'

12 arguments in support of the plan, but we certainly join in the

13 argument and submit that they have satisfied their burden.  The

14 Committee has simply failed to present the evidence to support

15 their objection and their standing motion, and we respectfully

16 the Court deny the Committee's standing motion and confirm the

17 plan.

18        Thank you, Your Honor.

19        THE COURT:  Thank you, Ms. Hagle.

20        Anyone else wish to make argument that supports

21 confirmation of the proposed plan?

22        Mr. Mitchell?  Mr. Mitchell?

23        MR. MITCHELL:  Your Honor, can you hear me okay?

24        THE COURT:  Very well.  You got a new headset.

25        MR. MITCHELL:  Thank you.  Well, I'm actually in the

1  office today, Your Honor, so I have a new background too, so --

2           THE COURT:  Ah, got it.

3           MR. MITCHELL:  Appreciate it.  Thank Your Honor.

4           And Your Honor, I don't need anybody to take control.

5  Just a couple of minutes from Energy Transfer, if you don't

6  mind.

7           THE COURT:  Certainly.

8           MR. MITCHELL:  Good morning, Your Honor.  Again, John

9  Mitchell for Energy Transfer.

10          Your Honor, about a month ago, when I gave opening

11  remarks on behalf of Energy Transfer, to start this

12  confirmation trial in opposition to the plan, I reminded the

13  Court of the long and substantial history between Energy and

14  Transfer and Chesapeake.  And even though Energy Transfer

15  likely was the largest single unsecured creditor and likely had

16  a longer relationship with Chesapeake than any other creditor

17  in these cases, it was not invited to participate in the

18  pre-petition restructuring discussions.  Instead, one of the

19  debtors' first steps in this case was to pursue litigation

20  against Energy Transfer and depending on how that litigation

21  would ultimately play out, Energy Transfer would hold unsecured

22  claims against these estates in the billions of dollars.

23          And due in large part to the proposed treatment of

24  those unsecured claims, including the unfair and disparate

25  treatment among unsecured creditors, Energy Transfer objected

1 to the plan.  But I rise today to express Energy Transfer's
2 support of the plan, and should the Court approve a compromise
3 that will be brought before you very soon, Energy Transfer and
4 Chesapeake will have laid the groundwork for commercial --
5 excuse me -- a continued robust commercial relationship that
6 hopefully will last for years to come.

7          Now, it's important for Your Honor to understand that
8 the agreement reached between Energy Transfer and the debtors
9 likely would not have occurred had the debtors not heeded this
10 Court's comments and amended their plan to provide parity and
11 treatment among classes 6 and 7.

12          Now, the Court will recall an interesting
13 cross-examination of Mr. Lawler, the debtors' CEO, when a
14 dialogue ensued between my co-counsel Mr. Yetter and Mr. Lawler
15 about whether or not there was or wasn't a commercial deal.
16 And while that isn't necessarily the purpose behind a
17 confirmation trial or even cross-examination for that matter,
18 it certainly led to a concerted effort by both parties over the
19 holidays, concurrently with the ongoing of this trial, to get
20 the deal done, and key to getting that deal done were the
21 modifications contained in the fourth amended plan and the
22 proposed treatment of the unsecured creditors contained
23 therein.

24          Now, Your Honor, the plan isn't perfect, and yes,
25 Ms. Schwarzman, Energy Transfer certainly would have wanted

1   more.  But it is a fair treatment of the unsecured creditors.

2   Energy Transfer would urge the Court to confirm the plan as

3   proposed.

4           Your Honor, if I might just reserve a couple minutes

5   for rebuttal, if necessary.

6           THE COURT:  Of course.

7           MR. MITCHELL:  Thank you.

8           THE COURT:  No.  Thank you for your statements,

9   Mr. Mitchell.

10          Let me -- Mr. Siegel, I think came on the same time

11  as mr. Mitchell, so let me take him next.

12          Mr. Siegel?

13          MR. SIEGEL:  Thank you, Your Honor.  First, I want to

14  join with everyone in thanking the Court and all of the court

15  officials and their patience and their availability in going

16  through this remarkable Zoom confirmation hearing.  I know this

17  is not Zoom but it's --

18          THE COURT:  Yeah.  This --

19          MR. SIEGEL:  -- we all call it Zoom.

20          THE COURT:  -- the folks at GoToMeeting would be very

21  upset with you.

22          MR. SIEGEL:  Yes.  And I will try to only call it

23  GoToMeeting going forward.

24          I also just want to say how I marvel at the skill of

25  all the lawyers who made their presentations during this

1  incredibly difficult trial and I think we should all be very

2  pleased that in this really difficult time, we've found a way

3  to do our jobs and try and allow this company (indiscernible).

4          THE COURT:  I agree.

5          MR. SIEGEL:  Having said that, Your Honor, I just

6  want -- I don't have much to say, but specifically, all we

7  really wanted to say is just really nothing has changed from

8  our opening.  At the end of the day, we do not believe that the

9  creditors' committee has done anything to overcome the debtors'

10  case to further the plan.  We think that they have not

11  demonstrated, absent the lawsuit, that they can meet the -- or

12  they can (indiscernible) the confirmation requirement.

13          And with respect to the lawsuit, we do not think

14  they have demonstrated that there's any justification for the

15  sale.  In particular, as it reflects our holders, we do want to

16  make the point that we don't believe that they've instituted

17  anything that overcomes the safe harbor protection that 2L

18  holders have.  And additionally, they have not demonstrated how

19  they can fashion a remedy that would not inevitably harm

20  innocent 2L investors who invested in this caper without

21  participating in any of the prior actions they suggest were

22  perpetrated on the company of the unsecured creditors.  And --

23  actually, that's really it.

24          Thank you very much, and I'm happy to cede

25  (indiscernible).

1          THE COURT:  Thank you, Mr. Siegel.

2          I think -- and I'm going to get this wrong.  And I do

3   apologize.  Is it Mr. Geoghan?  You -- I can see you talking to

4   me.  I cannot hear you.  Had you hit "five star" or do you have

5   yourself muted from your end?  So you hadn't hit "five star."

6   You have hit "five star."  But you don't have yourself muted

7   from your side.  Want to give me another try?  Oh, there you

8   go.  Oh, there you go.  646 number?

9          MR. GEOGHAN:  Yes, Your Honor.

10          THE COURT:  Got it.  All right.  My apologies.  And

11   tell me your name, and I apologize for getting it wrong.

12          MR. GEOGHAN:  No worries, Your Honor.  Dan Geoghan

13   from Cole Shotz.

14          THE COURT:  Geoghan.  Thank you.  My apologies, sir.

15   Geoghan.

16          MR. GEOGHAN:  No worries, Your Honor.  No worries.

17          Your Honor, Dan Geoghan from Cole Shotz here with

18   some of the members of our team and the Arnold & Porter team.

19   Your Honor, we represent G-L-A-S, GLAS LLC as the term agent

20   for the term loan.

21          Your Honor, we will be the briefest of all.  We rise

22   to join the arguments that were made by the debtors, the

23   lenders, and the other parties thus far.  We will not -- excuse

24   me -- in confirmation -- in support of confirmation of the

25   plan.  We're not going to provide a closing at this time, and

1  instead, we'll reserve any time for rebuttal if necessary.

2           THE COURT:  Thank you for your statement, sir.

3  And -- all right.

4           MR. GEOGHAN:  Thank you, Your Honor.

5           THE COURT:  Thank you.

6           Let's see.  I think -- Mr. Binford, I think you were

7  next.

8           MR. BINFORD:  Good afternoon, Your Honor.  Jason

9  Binford representing the Attorney General's Office on behalf of

10 the Texas Controller, Unclaimed Property Division.  We are

11 among the parties, which it looks like our turn to speak, which

12 objected to the plan but are no longer objecting to the plan

13 because we worked things out.  The language that we agreed to

14 is at paragraphs 178 through 181 of the confirmation order.  We

15 hope that those high numbers of paragraph doesn't take away

16 from how important we consider this issue.

17          And I am going to advise that -- put on the record

18 what I told debtors' counsel that I was going to do which is in

19 paragraph 181, it is a general reservation of rights for

20 important issues including pending matters, and by pending

21 matters, my understanding of that is that this does not resolve

22 the adversary proceeding that the Texas controller brought

23 regarding the declarations we are seeking from this Court.  So

24 we will -- we do intend to go forward with that adversary

25 proceeding.  It's just important that there's no

1  misunderstanding about that.

2          But we are pleased with the language that we have in

3  the confirmation order and do not oppose confirmation.

4          THE COURT:  Got it.  So Mr. Binford, I appreciate you

5  working through the issues.  I have had an opportunity to read

6  the redlines, and you know, all the interesting stuff is always

7  at the end in the high numbers.  So that's -- I had ample

8  opportunity to see it.  I appreciate you working through it,

9  and we'll deal with the other remaining pending matters in due

10 course.

11         MR. BINFORD:  Thank Your Honor.

12         THE COURT:  Thank you.

13         All right, Ms. Brown?

14         MS. BROWN:  Yes, Your Honor.  If I could have the

15 screen as well.

16         THE COURT:  Everyone's going to watch because

17 everyone's going to be amazed that you're going to do this

18 yourself.

19         MS. BROWN:  Now you just jinxed me.

20         THE COURT:  All right.  You should have it.

21         MS. BROWN:  Now, I never know if you can see it.  Do

22 you have it up there?

23         THE COURT:  So I will tell you when you can see it in

24 the little box that will come up on your screen, that's when we

25 all can see it.  So you can't see it because I can see it in

144

1  your glasses -- you can't see the little box yet, and neither

2  can we.

3          So if you share your screen, then you'll get the box

4  as to what you want to share, be it an application or a screen.

5          MS. BROWN:  Well, you know, I'm just going to do it

6  without it.  I don't understand why it's not coming up.

7          THE COURT:  I did not mean to jinx you.  The system

8  confirms that you have control.

9          So when you click on the bottom, on screen, what does

10 it do?

11         MS. BROWN:  Yes.  I clicked on that and my main

12 monitor, and it's not coming up.

13         THE COURT:  Well, no.  So it will -- it won't

14 necessarily come up on your main monitor.  There you go.

15         MS. BROWN:  All right.  There we go.  Okay.

16         Thank Your Honor for walking me through that.

17         So we'll just start with what's the big issue for us.

18 The largest stakeholder here at 237,000 royalty owners.  And we

19 heard some discussion during the opening about all parties and

20 wanting to make sure all parties were involved in the plan

21 process.  We are now, but we weren't prior, and that's been a

22 big issue in the case, and we don't want that to go unnoticed.

23 But we are here to support confirmation of the plan.

24         In that support of the confirmation of the plan, we

25 do want to make a couple comments just going forward because

there are some royalty owners that I believe are still

objecting. Almost all, I believe, have reached some type of

concession or agreement with the debtor, but there are some

outliers.

And just to kind of explain the process that royalty

went through, the royalty committee is constituted to represent

the small royalty owner interest. The royalty committee

members should be recognized and commended for their service.

They have been diligently following along in the process,

reading everything we send them, asking questions, and having

meetings. These aren't royalty owners that have a lot of legal

experience. Some have some oil and gas experience. One is a

farmer in Louisiana whose talking to you while he's building

his fence. There's others that were -- one is a former

legislator from Pennsylvania who lives in a small country town

as well whose husband actually handled all her royalty

interests and passed away recently. These are people who

understand the every day issues for royalty owners.

And as discussed in the testimony, it's been

uncertain times. We would like to thank the Court for all his

time and effort in this case. Last Wednesday was an

exceptional day, where the Court was dealing with a multitude

of issues and never missed a beat, and we really appreciate the

Court's savvy in dealing with the electronic issues that come

up in this new world and being able to keep the case going in

1  the way that it has.

2         The royalty committee's priorities have been to be

3  professional, pragmatic, and practical.  Have we heard

4  frustration from all the Committee members?  Yes.  Is there

5  anger at Chesapeake?  Yes.  But their role, as they see it, was

6  to be pragmatic and to move forward with the best treatment for

7  royalty owners generally.  The resources they wanted royalty

8  owners to have included somebody that they could ask questions

9  to, such as us.  We were told to answer every call that we had.

10  If there was a proof of claim question, whatever the question,

11  answer the call.  And when it came to the plan process, they

12  wanted that to be simplified for royalty owners, and we put

13  together a video so that royalty owners could understand that

14  process.

15         Here's some of the problem for the royalty committee.

16  They were dealing with diverse interests with people from

17  different states with different laws and different strengths to

18  their claims.  Pennsylvania, Oklahoma, Texas, Louisiana,

19  Wyoming, Ohio.  And as the Court well knows, there are

20  different rights that are assigned to all of those royalty

21  owners based on the law of those states.  In the original plan,

22  the debtors wanted to treat all royalty owners as unsecured

23  creditors.  We were able to get that change whittled away

24  pretty quickly, because they're not all unsecured creditors.

25  They all have different interests that they'll have to

1  preserve, reserve, and prosecute, at some point.  The plan

2  today says that secured claims are secured claims.  Unsecured

3  claims are unsecured claims, and you have the option of going

4  with a convenience class or the equity option.  And those that

5  are claims that it's not property of state are able to pursue

6  those claims.

7         And I need to make it known that yes, the royalty

8  committee did want funds segregated.  That was a big sticking

9  point for royalty committee members.  They wanted financial

10 control.  In some ways, we wanted to -- the royalty committee

11 members wanted to have added protections that may not have been

12 in the leases.  So from a legal perspective, while that was a

13 goal, there wasn't necessarily a lot of standing to make that a

14 reality without the consent of the royalty owners on those

15 leases as well as the debtors.  So they understood that as a

16 practical matter, but also wanted the pitch to be made that the

17 funds should be segregated as a good business practice, and

18 hopefully, the debtors will be doing that in the future -- the

19 reorganized debtors, I should say.

20        Nothing prohibits a royalty owner who has a claim

21 that property is not property from the estate from pursuing

22 those claims as I appreciate the plan and seeking a remedy at a

23 later point in time to segregate whatever that disputed amount

24 is, seek injunctive relief, or do whatever it is to protect

25 those rights.  The royalty committee could not protect the

1  rights of 237,000 parties on the specific fact that relate to

2  each of their claims, and so what it worked to do is to come up

3  with the most general language that is as protected as

4  possible.  And I think as the Court may agree, that language

5  became more and more protected as time went on, and I think

6  it's a much better position than we started with the first

7  plan.

8          Here's where we were at thee opening -- on a perilous

9  fence with alligators and crocodiles on one side or the other.

10  Here's where we are today.  We're on a more stable fence, but

11  still cautious, and a bit cloudy because there are some

12  interests that will have to be pursued post-confirmation.  But

13  as an administrative claim, a claim that's not property of the

14  estate, and all royalty owners need to know that, that it's not

15  final.  If you've got claims during that gap period, after the

16  petition was filed and before confirmation, there are still

17  rights to be pursued.  And I don't use a dog just because the

18  Court has made it known that he likes dogs, but because there's

19  a symbolism there, and I hope that Chesapeake sees that

20  symbolism and honors the loyalty of the royalty owners going

21  forward.

22          The royalty committee raised a series of objections:

23  increase the time to allow for admin claims, check.  That's

24  been done in the new plan, 120 days.  Modify the term language

25  in Article 4, check.  That's been done.  Adopt basic financial

1  controls.  We failed on that, but we did have an attestation

2  that they will follow the law and the rules and provide the

3  disclosures that are required under the law, and so that those

4  reading that order will know that they can go look to what

5  their state law is and the provisions that allow for open

6  access to their royalty information.  We asked for a simplified

7  claims management process, check.  That's been done.

8          So for the most part, the Committee's objections have

9  been resolved one way or another -- maybe not as we proposed or

10  that has -- as we would have liked, but it does make it better

11  for royalty owners going forward.

12          We told the Court during opening that the testimony

13  was so -- almost a wholesale lack of interest including royalty

14  in the plan discussions, and while we did a standstill with the

15  debtors after we came to an agreement, we actually had

16  testimony showing that that was exactly the case.  And that is

17  Mr. Lawler's testimony on the first day, where he acknowledged

18  that there was nothing in the plan process that dealt with

19  whether they were unsecured, secured, or how a royalty would be

20  treated.  And I'm not stating this to put any type of blame on

21  the debtors or to castigate the debtors in any way, but we

22  heard from debtors' counsel today that there was a proposal

23  that was submitted late last night to the unsecured creditors'

24  committee and the debtors, and that was filed early this

25  morning.  Those parties also seemed to wholesale reject the

1 importance of royalty owners in the company, because they
2 didn't think to reach out to the royalty as they made that
3 proposition.  And so going forward, I think all stakeholders in
4 the case, all stakeholders who own an interest in the debtor
5 going forward need to recognize the importance of royalty
6 owners.  And while this may be standing on a soap box a bit,
7 I'm going to do that.  I would encourage some of the suits to
8 go to Louisiana, go to Mansfield, meet with some of these
9 people, get a better appreciation for what you're dealing with
10 and not just looking at it in dollars and cents.

11        We heard some hyperbole as well, both in openings or
12 testimony and during argument throughout the trial.  Let's just
13 put the hyperbole aside and start a process that the debtors, I
14 believe, have started, to treating the debtors' business in a
15 better, more professional way, and treating royalty with the
16 respect that they deserve.

17        I missed my boat here.  It's not nirvana, as the
18 debtors said, but the royalty community does support
19 confirmation, and we do thank that the debtors, the UCC, their
20 counsel, and the Court for the time and energy put into this,
21 and we have the best of hopes that Chesapeake reorganizes and
22 does well in the future.

23        Thank you, Your Honor.

24        THE COURT:  Ms. Brown, thank you.  I want to take
25 just a moment because I don't want to forget this.  I

1  understand what you've undertaken, and I understand that

2  process that you've gone through.  I thank you and your firm

3  for what you've done.  You've listened.  You have been very

4  balanced and even-handed, and I very much appreciate that.

5  You've reduced what could have been a roar to a very

6  professional, easy-to-understand issue, and I know the debtor

7  hears you when you tell them, on behalf of 237,000 people or

8  entities, that they need to be good stewards.  I hear it.  I

9  know they heard it.  And I thank you for your involvement.

10         MS. BROWN:  Thank you, Your Honor.

11         THE COURT:  Anyone else that supports confirmation

12  that wishes to make any closing arguments?

13         All right.  Mr. Stark --

14         MS. SMITH:  Your Honor?

15         THE COURT:  Yeah.

16         MS. SMITH:  Frances Smith.

17         THE COURT:  I'm sorry, Ms. Smith.

18         MS. SMITH:  Can you hear me, Your Honor.

19         THE COURT:  I can hear you.  I can't see you.  I know

20  I saw you early this morning.

21         MS. SMITH:  (Audio interference) camera on active.

22         THE COURT:  Okay.  Then Ms. Smith, are there comments

23  that you wanted to make.  I wish you could be on video, but if

24  you can't, then we'll just do it by audio.

25         MS. SMITH:  Judge, it seems it's having a hard

1  time -- the software's having a hard time loading.

2          THE COURT:  Okay.

3          MS. SMITH:  Your Honor, Frances Smith of Ross and

4  Smith on behalf of the Petty Business Enterprise, LP and their

5  related entities.

6          THE COURT:  Yes, ma'am.

7          MS. SMITH:  Your Honor, the Petty entities support

8  plan confirmation today.  At the beginning of the case,

9  Ms. Ross advised this Court that the Petty entities wanted this

10 debtor to survive, and that is still Petty's desire, that this

11 company survive.  Petty has negotiated changes to the plan and

12 to the confirmation order that preserve its rights to continue

13 its attempts to get paid on its pre-petition claims and

14 preserve its rights going forward, but for purposes of today,

15 Petty is satisfied and would like the plan to be confirmed.

16         THE COURT:  All right.  Thank you, Ms. Smith.

17         Anyone else?

18         All right.  Then, Mr. Stark, my thought was is that I

19 give you the lunch break to sort of incorporate anything that

20 you heard into your closing or to sort of think through what

21 you heard and react to if you want to.  Also, if you don't need

22 it and you want to go ahead right now, we can -- I'm perfectly

23 happy unless someone's got an issue -- I'm perfectly to take a

24 10 or 15-minute break and then just let you get started.

25         MR. STARK:  Your Honor, can you hear me?

1              THE COURT:  Yes, sir.

2              MR. STARK:  Oh, thank you, Your Honor.  You know,

3    I've been listening very intently to what everybody has said.

4    I've made copious notes.  I've made them in my outline.  I

5    don't really believe I need a lot more time.

6              THE COURT:  Okay.

7              MR. STARK:  But we're going to spend some time

8    together, just little ole me versus the world, and we should

9    talk for awhile, so if Your Honor would like a lunch break, I'm

10   happy to accommodate whatever Your Honor wants.  But I'm

11   otherwise ready to go.

12             THE COURT:  Let's do this, just -- because I've --

13   we've got the entire day, and I haven't even given folks a --

14   of course, most people have turned their cameras off so they

15   can walk away when they want.  Let's do this.  It is 12:30.

16   Let's take a break until 1:15.  Would that work?

17             MR. STARK:  Certainly, whatever works for the Court.

18             THE COURT:  All right.  And so I will tell folks,

19   just because I'm looking at the number of people that are on

20   the video, don't terminate the meeting because you may not get

21   back on.  There have been in excess of -- there have been in

22   excess of 500 people that have tried to get on.  As you know,

23   the video is limited to 251, the audio to 400.  So what I'm

24   going to do is I'm just going to leave -- I'm going to mute

25   everything, but I'm not going to turn anything off, and I urge

1  you to do the same, just so we don't have problems when we come

2  back at 1:15.  All right?

3          MR. STARK:  Your Honor, before we break, Your Honor,

4  may I just ask one question, please?

5          THE COURT:  Of course.

6          MR. STARK:  We have a set of slides, and I wanted to

7  just to make sure Your Honor has them, and I just didn't -- I

8  know that's it's important sometimes to have a hard copy.

9  There we go.  All right.  So I don't need to send somebody over

10  there quick.

11          THE COURT:  Nope.  They walked in the courtroom as we

12  were talking and delivered the package.

13          MR. STARK:  Perfect.  Okay.  Thank you, Your Honor.

14  All right.  We'll see you shortly.

15          THE COURT:  All right.  Thank you.  We'll be

16  adjourned until 1:15, Central time.

17      (Recess taken at 12:27 p.m.)

18      (Proceedings resumed at 1:15 p.m.)

19          THE COURT:  Good afternoon, everyone.  This is Judge

20  Jones.  The time is 1:15.  Today is January the 13th, 2021.

21  It's the continued closing arguments in the confirmation

22  hearings in Case Number 20-33233, <u>Chesapeake Energy</u>

23  <u>Corporation</u>.

24          Mr. Stark, whenever you're ready.

25          MR. STARK:  Thank you, Your Honor.  First and

1  foremost, can Your Honor see me?

2            THE COURT:  Very well.

3            MR. STARK:  Am I coming through on my -- okay, good.

4  Thank you.

5            I can't help but start by saying throughout the

6  entirety of this case, I desperately wanted to be in the

7  courtroom, and no more than at this moment right now.  This has

8  been a very trying experience obviously for everybody.  We'll

9  talk about that in just a minute, but really to have a good,

10  thoughtful, analytical conversation about everything that's

11  going on really should be done in person, and I really sorely

12  miss that opportunity.

13            So forgive me, Your Honor, if at a point I become

14  colloquial.  I'll pretend that I'm in the courtroom with you,

15  and maybe I can even (indiscernible) you even to ask me

16  questions and we can engage on some of these very tough topics,

17  because they are tough.

18            But I do first want to express, as every -- as all of

19  the other professionals did, our thanks to the Court and the

20  staff, but more so in a little bit of a different way.

21  Fighting the deal in this kind of scenario where the company

22  controls the timing and the narrative, and as many different

23  wonderful law firms that we're against, you had many bleary-

24  eyed committee professionals in your courtroom who were

25  inelegant at various different points in time.  So we do very

1   much appreciate the patience in allowing us to get it in.

2   Sometimes it was a little bit more by sledgehammer than

3   otherwise intended, but I think it's there and I think we can

4   talk about what it all means now.

5          I also do want to congratulate all of my opposing

6   counsel.  Your Honor knows the respect and affection I have for

7   Ms. Schwarzman, Mr. Nash, and Mr. Schaible, but also

8   Mr. Zensky, who I've known for 20 years.  We've had a very

9   interesting trial with lots of very interesting issues, and now

10  it's time to actually unpack it.

11         As I said at an earlier hearing, I used a gloss of a

12  farm animal that somebody put lipstick on, but -- and that's

13  inappropriate.  But a lot of the narrative is surface and a lot

14  of it was not -- is more in the documents than it is in the

15  persona that presents on the stand.  And a lot of it is in the

16  engineering and the mathematics.  And so it's analysis.  It's

17  analysis that drives what we have to do slowly and

18  methodically, thoughtfully, about a very large case and what's

19  happening here, and that's what I'd like to do.

20         And even though I would love to have a debate with

21  you about two year versus five year and inflation adjustments

22  and NAV versus DCF and efficient market hypothesis versus

23  reverse behavioralism, Your Honor knows that I could talk for

24  days about that, and sometimes I even do, but I think, Your

25  Honor, hopefully you and I can debate that at a VALCON

1  presentation in the future because I'm not going to engage in

2  it today.

3         THE COURT:  That would be great.

4         MR. STARK:  Your Honor, we may not agree with 5.129,

5  but we respect the Court's judgment.  And even though Your

6  Honor called it a preliminary view, we know better than that.

7  At least, we know that Your Honor was thoughtful about it, and

8  so we're going to respect that.  Again, lodge our disagreement,

9  but today's presentation is not to revisit that number.  It is

10  to discuss the implications of that number, and that's what I'd

11  like to do if Your Honor will allow me.

12         THE COURT:  Sure.

13         MR. STARK:  First and foremost, I want to talk about

14  what that number means, and what it means in the scheme of this

15  case and the value allocation.  And then in particular I want

16  to talk about what it means in terms of the encumbered versus

17  unencumbered, what we call the technicals complaint, for lack

18  of a better phraseology.  Certainly we'll talk about the causes

19  of action, and (indiscernible) you've already heard an awful

20  lot about it, and we'll slowly and methodically unpack the

21  evidence.

22         We'll spend a little time on the collapsing of

23  Classes 6 and 7.  Not a lot of time, but I think we do need to

24  talk about it.  Then we have some final issues.  And at the end

25  of this presentation, this discussion that hopefully Your Honor

1   and I will have together, we'll talk about where we think or

2   respectfully propose this case goes from here.  Okay?  Does

3   that work for Your Honor?

4              THE COURT:  Sure.

5              MR. STARK:  Okay, good.  Let's -- if you wouldn't

6   mind, then can you move it, please, to Slide 4.

7              This is our plan schematic.  This is where the value

8   flows, but with a caveat.  This is where the equity value goes.

9   And it shows the pre-rights offering and then shows the after-

10  the-rights offering effect.  Okay.  You can see now in the row

11  that is just below the bottom row, unsecured notes and general

12  unsecured creditor claims are now merged into a consolidated

13  Class 6 and 7 for the 4 percent.

14             There is an increase now in the amount of claims

15  that's an updated number from the company that's been making

16  settlements with mid-streams, and so the numbers are

17  increasing.  So that's the latest number we have, but this is

18  the plan schematic, and this is what people are getting without

19  the warrants.

20             Next slide, please.

21             Mr. MacGreevey testified about his calculation of

22  warrant value, and his model is in evidence, or at least his

23  testimony about his model and the demonstrative laid out his

24  calculation of the warrant value.  All we did here is we

25  increased -- we plugged in the 5.129.  We used the same model.

1 We used 5.129 TEV and we increased the debt (audio

2 interference) number.  Okay.  And this is what the model spits

3 out.

4        If at any point Your Honor wants the natives of any

5 of this, we're perfectly happy to provide it, but --

6        THE COURT:  Okay.

7        MR. STARK:  -- this is a printout, and I'll make the

8 representation those are the only changes that have been made

9 about what otherwise has been presented to your Court.  Okay.

10        We can still do this as a Black-Scholes under the --

11 some of the warrants are (indiscernible) money at 5.129, but we

12 assume that people may hold that because there's extra option

13 value out of that, so we used that value instead.  Okay.

14        Slide 6 takes the first slide, the value allocation

15 is equity, and merges in the warrant value using the same

16 schematic in 5.129 and the updated claim amount.  We have for

17 exit financing 2.125 billion, but we assume that some portion

18 of that will be debt and the 600 million in equity, okay?  So

19 we just sort of take the 1.525, subtract that from the

20 enterprise value to get sort of a stock value, and then we

21 allocate accordingly.

22        And you'll notice in the box all the way to the

23 right, the recovery box, how people fair at this stage.  We're

24 not done yet.  This is just the first flood of value

25 allocation.  The FILOs get nearly 130 percent.  We'll come back

1    to that.

2              Next side, please.

3              Now, we're migrating a lot of value around because

4    what we do in the first (indiscernible) in terms of equity

5    allocations are then revisited by the rights offering, which

6    moves 67 percent of the stock around to different places.

7    Okay.  So you'll see up at the -- all the way up in the column

8    all the way on the right, you'll see what the allocations were

9    prior to the rights offering and then how it migrates as a

10   result of the rights offering.  This is just math, 5.129 minus

11   the debt following the equity allocations and the rights

12   offering.  Okay.

13             What's important to realize is that 25 percent of the

14   rights offering is reserved for the backstop parties.  It's not

15   an even spread of rights; 25 percent, 77 percent of that amount

16   goes to Mr. Schaible's clients, the ad hoc committee.  That's

17   worth about 447 million.  Twenty-three percent of that amount

18   goes to Franklin and that's worth about 134 million.  Together

19   that's 561 million.  63.75 percent of the rights go to the FILO

20   class generally.  That's on top of the backstop.  And

21   11.25 percent of rights goes to the second lien class.  So

22   that's the mapping of where the value flows.

23             Next slide, please.

24             Well, let's put a value on those rights.  We can do

25   that with 5.129.  Remember that the warrant is struck at a

discount at 3.25 billion TEV.  That's a 67 and a half percent
discount to enterprise value as Your Honor is judging it.
Okay.  And they don't just get to buy a little bit of it, they
get to buy 67 percent of that.  Okay.  So if you're a rights
offering participant, you can buy any kind of percentage.
Collectively the group gets $1.844 billion worth of stock for
$600 million.

And we'll state that in ways that an English major
like myself can understand.  If I put a dollar in, I get $3.07
of stock coming out based upon Your Honor's judgment.  Okay.
And here is the math for that.

Next slide please.

Now, let's exclude the backstop rights.  Let's only
talk about the 75 percent of the backstop that's allocated to
the different classes.  If you are a FILO creditor, but you're
not part of the backstop group, you don't get that extra
(indiscernible) of the backstop.  You're getting 108 percent
return on your claims in this case.  If you're a second lien
creditor, excluding Franklin, as a backstop participant, you're
getting 28 percent.  The unsecureds, earlier they were getting
around 7 percent.  Now they're getting 4.3 percent.  The 4.3
percent equates to two -- around $235 million.

So I think Ms. Schwarzman used a different number,
but their modeling tries to anticipate what our modeling would
come up, they said that it would be a little bit less than

1  that.  Our model shows a little bit more than the 200 and

2  change number, to around 235 million by our model.  Okay.

3        Now let's include the backstop rights.  If you give

4  the backstop -- if you allocate the value to the backstop

5  participants, here's what you find out.  If you are a member of

6  Mr. Schaible's group, the FILO ad hoc committee, you receive

7  133.4 percent return on your claims in this case.  If you are

8  not a member of his committee -- now, he has up to 85 percent

9  of the class represented.  If you're not a member of his

10 committee, so around that 15/16 percent, you get 108 percent.

11       On a blended basis, that is a little bit less than a

12 130 percent return on the class claims.  And if Your Honor

13 looks at the bottom line, subtotal after backstop allocation,

14 and you look at the column in the middle, total value received,

15 including rights offering, less new money costs, so we've

16 backed out the 600 million we had to pay for the stock, you're

17 getting $1.977.1 billion of value on the claim amount of

18 1.625 billion claim amount.  That's about 452 -- that's

19 $452.1 million over par that is going to the FILO class and the

20 backstop parties away from others.

21       If we flip the slide and we look at how does Franklin

22 fair, remember it too is a backstop party, we know from

23 Mr. Circle's testimony that Franklin holds a small amount of

24 the FILO, about 78 million, but a ton of the second lien paper.

25 The second liens don't get an awful lot of the rights offering,

1  but Franklin does.  So whereas other second lien creditors

2  receive 28 percent return on their claims, Franklin gets

3  41.3 percent on its claims.  Granted, some portion of that,

4  some very small portion is their FILO piece, most of that is

5  their second lien, raw disparity for Franklin.

6           Next slide, please.

7           Now we're going to talk about the technicals

8  complaint in a minute, but it is useful to think about, at this

9  moment, what would unsecured creditors be due from unencumbered

10 value away from the 2L deficiency claims?  The FILOs are being

11 paid off and then some.  The 2L deficiency claims.  How much

12 are the combined Classes 6 and 7 due because there's so much

13 unencumbered value?  We notice about 30 percent of the estate

14 is unencumbered value.  We have the unmortgaged oil and gas

15 assets, about 10.6 percent of TEV, and then we have those

16 cash-up mortgages, FILOs and the second liens.  Just as the

17 company was racing to prepare itself for bankruptcy, they filed

18 a whole bunch of catch-up mortgages, stuff that they admit, so

19 that's 17.6 percent of the enterprise value.

20          Using a 5.129 billion TEV, that's $1.445 billion of

21 unencumbered value.  This is the first of a couple of grave

22 errors that Ms. Schwarzman made in her presentation to you.

23 When she talks about unsecured creditors being out of the

24 money, she confused aspects of this trial.  Of course we've

25 been making the argument that the enterprise is larger than the

1  claim hurdle.  We were unsuccessful.  That doesn't end the

2  inquiry because a third of this company's value is unencumbered

3  value.

4          So even if we never crossed the hurdle, unsecured

5  creditors are due on just the O&G assets, 1.445.  Well, that's

6  not actually right because we have to back out the second lien

7  deficiency claims.  A big chunk of that has to go to the second

8  liens for their deficiencies.

9          What's the residual -- let's even do this a little

10  bit more slow.  There's another slide later I'm going to show

11  you, there's some additional unencumbered value that gets added

12  to the 1.445 to get to around 1.7.  That is a full basket of

13  unencumbered value.  It includes the headquarters and some

14  other miscellaneous assets with additional liens on them.  From

15  there we subtract the cost of exiting, administrative expenses,

16  including the $60 million breakup fee that needed to be for the

17  rights offering.  But that calculates around 200 million.

18          So there's about 1.5 billion in unencumbered value.

19  The second liens are entitled to a deficiency claim for that.

20  Okay.  That backs out about 600 million that goes to the second

21  liens, leaving 900 million of unencumbered value that all other

22  things being equal should go to the combined Class 6 and 7.  We

23  don't get $900 million.  We get $235 million.  We are short-

24  changed by $670 million.  That's just math.  That's how it

25  works.

```
 1              THE COURT:  You left --
 2              MR. STARK:  The formation --
 3              THE COURT:  I mean, Mr. Stark, in all fairness, you
 4   left out a couple of things, didn't you?
 5              MR. STARK:  I'm not sure.  What did I leave out?
 6              THE COURT:  Well, I'm going to listen to your
 7   argument.  I'm just telling -- go ahead.  It would be better if
 8   you --
 9              MR. STARK:  No.  I want to engage with you, Your
10   Honor.  If there's something that you think I'm not hitting,
11   I'd like to hit it.
12              THE COURT:  You know that you're not.  You know that
13   you're ignoring some things.  I'm not going to debate this with
14   you.  It would be much better if you would just be candid about
15   where the Committee stood.  You want to ignore those things you
16   don't like and that's not right, but go ahead.
17              MR. STARK:  Your Honor, I am candid.  I am honest.
18   I'm thoughtful.  If I missed something, it's an error.  It's
19   nothing more than that.  I just asked that our people run the
20   model straight through.  I understand the issue with respect to
21   the roll-up DIP.  If that's what Your Honor's talking about,
22   I'm going to address that in a minute.
23              THE COURT:  Okay.
24              MR. STARK:  But if there's something else I missed,
25   then I just don't know.
```

166

1          THE COURT:  Go ahead.  I'm listening.

2          MR. STARK:  Is that the issue?

3          THE COURT:  I'm listening, Mr. Stark.

4          MR. STARK:  Okay.  I'll continue.  The summation that

5    I have, it sounds like Your Honor gets it, is that there is an

6    overpayment of a substantial amount to the FILOs, and that's

7    where a lot of our value goes, the unencumbered value goes for

8    that.  Okay?  That's about $450 million.

9          The FILOs get a fair amount as well.  Maybe that's

10   the differential of 150.  It's hard to calculate, okay.  But

11   there is a massive shortfall, and that's what we want to talk

12   about.  Okay?

13         Your Honor heard a lot of argument today, or a lot of

14   framing of the way to think about this case, that there was a

15   deal in the spring and neither the natural consequences of the

16   company coming forward seven months later and the chips fall

17   where they may.  That may be principled in terms of the way in

18   which they presented the case, but that is not law.  The law

19   could not be clearer.  It's in the statute.  Valuation has to

20   be done today.  Creditors cannot be paid more than 100 percent

21   on the dollar, even if it's justified on a deal way back when.

22   That the law is clear as day.

23         Now, I'd like to -- if I'm intuiting correctly, Your

24   Honor, about I've missed out a couple of things, it's the roll-

25   up DIP.  Maybe I -- I may have missed other things, and if Your

1  Honor will -- I really did want to engage and address.  But my

2  next sets of slides talk about the roll-up DIP.

3          THE COURT:  Go ahead.

4          MR. STARK:  If we could move then, please, to

5  Slide 15.

6          This is sort of the same (audio interference) you had

7  before about $543 million of unmortgaged assets, 902 of the

8  catch-up mortgages.  Here you have delineated the headquarters

9  which is a stipulated value of 170 million.  There's non-core

10 assets of another 103, 208, and then there was some

11 unencumbered gathering assets of about 9 million.  That's where

12 we got the one-seven number from, and all of that's in

13 evidence.  Okay.  So that's the backing out of the residual

14 pieces of assets that weren't on the prior page.  Okay.

15         There are three justifications for the migration of

16 the value from what we perceive would be unencumbered value to

17 others.  The first one, and we didn't hear a lot of this today

18 other than the fact that it's history that must carry forward.

19 But again we have to look at it at today's valuation standards,

20 okay, and the company has increased in value.

21         The first point was the debtor said we need the

22 capital.  We must have 600 million to deal with structure so as

23 to enable the company to have equitization capital of

24 $600 million and the cost of capital are not market.  Okay.

25 Because of the company's improved performance over the course

1  of the case, the debtors only need, by their own books and

2  reference and assessments, as Mr. MacGreevey put that before

3  Your Honor, 185 million at most.

4           And as far as the proposed cost of capital, this is

5  excessive of market by a long shot.  You heard testimony that

6  59 percent discount to 4.1 billion was well beyond commercial

7  norms.  67.5 percent is facially absurd.  There is no support

8  for that in any even financial (audio interference) that I'm

9  aware of.  And yes, it's conceded it was never shopped.  It was

10 part of the deal.

11          So to the extent that this was financing that is

12 deemed necessary for a company that's dramatically improved in

13 value, I would propose to Your Honor that <u>LaSalle</u> is incredibly

14 fitting for this situation right now.  Okay.  And the fact

15 that -- and I take huge issue with Mr. Schaible's statement

16 about, well, it's all been shopped because the case is open.

17 Your Honor, there is no market test by a case that's pursuing

18 forward in a litigation posture.

19          The debtors have made very clear to anyone and

20 everyone, including this Court, that it cares about getting out

21 as soon as it possibly can.  It has its deal and it's fine with

22 it.  It doesn't care who its new owners are.  It just simply

23 wants out.  Okay.  You've heard me say it.  No one will

24 negotiate with us.  They like their deal too much.  And

25 everyone in the marketplace has heard that in open court.  That

1  is not a market test.

2         Even if litigation could ever be a market test, and

3  it certainly isn't, this case has always presented itself as

4  the fix is in, don't bother.  This is not a LaSalle process.

5         The next slide, Slide 17, Your Honor, is

6  Mr. MacGreevey's taking of the books and records, the source of

7  the (indiscernible) of the company has said that it needs for

8  exit financing, and it is adjusted for the 2.256, and now with

9  today, because there haven't been new money draws, no liquidity

10 draws on the debt, that's gone from 600 million to 185 million.

11 That is the evidence on the record.

12        The second justification as to why it is that the

13 migration of value from unsecured creditors to the secured

14 creditors is because they have defenses to the assertions that

15 that value is truly unencumbered.  They have the 546(e)

16 defense, and we'll talk about that in a minute, but I intend to

17 suggest that it would be uprooted from the entire statute if

18 not completely pioneering and no court has ever ruled on it in

19 any way shape or form that doing a catch-up mortgage filing for

20 bank debt is a 546(e) safe harbor security contract.

21        Mr. Zensky presented about the contemporaneous

22 exchange defense, and I didn't hear him accurately, but I may

23 not have heard him accurately, but I think he's confused about

24 the statutory requirements.  Okay.  There are two of them, and

25 that's what Bison Builders talks about.  That was the issue in

1  Exco (phonetic).  And Mr. Nash and Your Honor know so well that

2  the intent has to be reflected.  It's not by circumstantial

3  evidence, but by the document itself of a swap transaction of

4  actual contemporaneity.

5       It doesn't matter that the market standard is that we

6  lend the money on day one and 60 days later we deliver the

7  mortgages.  That may be the realities of the lending practice,

8  and it may be simply a pragmatic problem that lending in that

9  space has, but that is not a reflection of actual intent of a

10 swap transaction.  Sixty days is too far.

11      But even if it was somehow thought to be (audio

12 interference) a swap in the scheme of financing, catch-up

13 mortgages filed five, six months after the money flowed can

14 never be.  There's no cases that say that that's a

15 substantially contemporaneous exchange.  It just isn't.

16      So that takes us to the big argument, the DIP

17 soak-up.  Okay.  And I'm asking Your Honor to think really

18 deeply and engage with me about this because this is actually

19 really, really, really important.  It is simply too easy to

20 say, well it's a roll-up, they've got an admin claim, they get

21 all the unencumbered value.  And that, Your Honor, we submit is

22 very, very wrong as a matter of foundational bankruptcy law.

23      On top of that, just to frame the issue, and I've

24 been very clear about this since way back when.  For a very

25 long time, I said it.  I said it at a disclosure statement

1  hearing.  I said it at the opening here.  This issue itself I

2  believe is a fundamental violent wrong that's being done in

3  this case, and I want to talk about it because I really think

4  that this is something that fits within a category of

5  observation that scholars and others are looking around at our

6  bankruptcy process today and saying that it's a confidence

7  game.  They really are.

8          That there's a sleight of hand and it's being done in

9  the DIP, and it's being -- these roll-ups are being adorned to

10  something that's critical and necessary, and that is financing.

11  And it causes a massive reallocation of value in ways that

12  defies bankruptcy, defies what our historical precedent is

13  about lending requirements and norms and rights, violates

14  corporate finance principals, and is most of all inconsistent

15  with the deal that the lenders themselves cut pre-petition.

16  Okay.

17          THE COURT:  So, Mr. Stark, let me ask you --

18          MR. STARK:  The first --

19          THE COURT:  This is about the fifth or sixth time

20  that your firm has accused the debtors' lawyers and the

21  lenders' lawyers of committing a fraud on the Court.  I gave

22  you --

23          MR. STARK:  That's not what I'm doing.

24          THE COURT:  Mr. Stark, I didn't --

25          MR. STARK:  That's not --

1          THE COURT:  Mr. Stark, do not interrupt me again.  We

2  will cut your --

3          MR. STARK:  Apologies.

4          THE COURT:  We will cut your time short.  I don't

5  take that from anyone, despite the fact that you are my friend.

6  You will not do that to me.  Understood?

7          MR. STARK:  Understood.  I apologize.

8          THE COURT:  I'll start again.  This is about the

9  fifth or sixth time that you have accused the lawyers for the

10  debtor and the lawyers for the lender of committing fraud.

11  You've used that word in your comments to the Court.  And after

12  12 days, 13 days, you offered no basis for that allegation, yet

13  you continue to argue it here.  I would -- I warned you once

14  before.  I would genuinely like to understand why it is you

15  think that that's acceptable conduct.  You can now speak.

16          MR. STARK:  Well, Your Honor, and I jumped again.  I

17  apologize.  I'm really not trying to be.

18          Your Honor, I'm not accusing anybody of fraudulent

19  behavior.  I'm accusing the transaction of resulting in an

20  outcome that's inconsistent with law, and it is a strategy that

21  is being utilized in cases.  It's not fraudulent behavior.  It

22  is open expectations of parties.  Okay.  But by putting things

23  into a DIP loan that caused value migration, it's an open part

24  of the deal.  It's not accusing anybody of misleading the

25  Court.

173

1        But it is inconsistent with what we're trying -- what

2   I think bankruptcy law wants us to do here.  And it is

3   something that I think is a business wrong without causing --

4   calling people anything other than their advocates for their

5   clients trying to negotiate the best deal.  That doesn't mean

6   that it's the right deal.  It may not -- it may be a deal that

7   is inconsistent with bankruptcy principles, but they're being

8   good advocates.

9        Your Honor knows that I have wonderful relationships

10  with the lawyers in this case and I am not accusing them of

11  anything wrongful.  They're advocates for their clients doing

12  the best they can for their clients, but the transaction may

13  still be wrong.

14        I don't know if I satisfied Your Honor's response,

15  but that's honestly how I feel.  I believe that what's being

16  done here is a bankruptcy law wrong, and people are observing

17  it in a way that is creeping the way in which DIP loans are

18  presented to courts.  That is what I think is inconsistent with

19  bankruptcy principles and foundational principles of corporate

20  finance.  Okay.

21        THE COURT:  It may be how you feel; it's not what

22  you've said.

23        MR. STARK:  Well, that's what I intended, and if I

24  misspoke, then I will eat my words and I apologize.  That's not

25  my intent.  It is a sleight of hand in the sense that it has an

1    impact.  There's a strategy at play that is broader than just

2    financing a company to get through its bankruptcy process.  It

3    is intended to result in massive migrations of value relief

4    that's not consistent bankruptcy process.

5          It is the strategy that people are observing.  It is

6    the strategy which is becoming an accepted part of a

7    transactional bankruptcy practice, and it is inconsistent with

8    what I at least understand bankruptcy to mean and how it's

9    supposed to work.

10          And here are some points of observation, if I can

11   have Slide 20.

12          Okay.  We have 1.5 billion in value, unencumbered

13   value that I believe our model shows should go to unsecured

14   creditors.  It excludes the deficiency claims of the 2L.  And

15   it is deemed by the plan not to pay the DIP advances -- cash

16   advance -- post-petition cash advance like liquidity where

17   there aren't any or distributions from secured creditors, but

18   rather to pay the pre-petition rolled-up debt.  Okay.

19          The purpose of the plan structure is to relieve the

20   senior-most mortgage on the pre-petition collateral so that the

21   junior-most secured creditors are allowed to take more of a

22   collateral base.

23          THE COURT:  How do you know that?

24          MR. STARK:  Okay?  And --

25          THE COURT:  What's the evidence in the record?

1          MR. STARK:  Well, that's the entire -- that's the

2     entire structure of the deal.

3          THE COURT:  That's your belief.

4          MR. STARK:  Entire --

5          THE COURT:  Where's the record?

6          MR. STARK:  No, no, no.  It's effectively stipulated,

7     Your Honor, because what is -- what are they doing in the plan?

8     The plan says they're taking 1.5 billion of value, and they're

9     using it to pay off the DIP loan, and the final and the second

10    liens take all of the secured debt.  That is the structure of

11    the plan.  That's the architecture of the plan.  That's why we

12    don't get any value.

13         It's being deemed -- Ms. Schwarzman said it in her

14    representation of opening remarks.  It's being deemed to pay

15    off the RBL.  That's the entire structure -- that's the entire

16    architecture of the plan.  It's the only reason as to why it is

17    unsecured creditors don't get $1.5 billion.  That is how it

18    works.

19         And it's important to realize, Your Honor, that this

20    payoff doesn't arise in a DIP default and exercise of remedies,

21    a liquidation.  It's a plan that pays off the RBL lenders in

22    full.  Okay?  So the DIP protections that were given to the DIP

23    lenders are rendered moot.

24         I need to unpack for Your Honor why, because of that

25    and because of the way the architecture works, it is

1   inappropriate as a matter of law.  Okay?  Some backup if you

2   will, Your Honor, on Slide 21.

3            Ben, can you go to slide 21, please?  Okay.

4            So as of the petition date, we had about $2 billion

5   drawn on the RBL.  We had about 1.5 billion on the FLLO and

6   2.3 billion on the second lien debt.  Okay?

7            The contractual waterfall is, as it's been presented

8   to the Court, the RBL is first always.  The FLLO is junior to

9   the RBL.  The second lien is junior to the FLLO.  And they all

10  share collateral and in waterfall format.  The FLLO would have

11  to turn over any collateral proceeds to the RBL, and the second

12  liens have to turn over any collateral proceeds to the FLLO.

13           It also goes on to say in these agreements that if

14  the RBLs ever want to make a DIP loan, the FLLOs and the second

15  liens can't object in any way.  So they're -- so they're

16  silent.  That's normal.  And the FLLOs and the seconds waive

17  any sort of marshaling or other equitable responsibilities

18  vis-a-vis the RBLs' ability to take their collateral first.

19  That's the deal.  It's pretty normal, standard stuff.  Okay?

20           Next slide, please.

21           I believe counsel to the RBL DIP lenders confirmed

22  this, but the RBLs and the DIP lenders are the same.  There's a

23  subset of the RBL lenders who've made the DIP loan.  But what

24  happened is it was a cashless exchange.  It was a deemed

25  roll-up.  There was no money that changed hands.  1.25 billion

1    of the prepetition RBL was made by the order into the DIP loan.

2    Okay?

3            And they gave the RBL lenders for that rolled-up

4    portion protection, gave them adequate protection.  They now

5    got security not only on the shared collateral, the collateral

6    they share with the FLLOs and the second liens prepetition,

7    they also have liens now on unencumbered value, the 1.5 billion

8    that we're now talking about.

9            And they also got protected from an admin -- they

10   also got protected from cram-down, because they got an admin

11   claim, and 1129(a)(9) says you have to pay off the admin claim

12   in full.  Okay?  So they couldn't be crammed down.  So that was

13   the added protections the RBLs got.

14           But if you look at it from the perspective of the

15   FLLOs and the second liens, nothing really changed.  The

16   roll-up -- prior to the roll-up, the RBLs were first on the

17   shared collateral.  The FLLOs were second.  The second liens

18   were third.  After the roll-up, the RBLs remained first, the

19   FLLOs remained second and the -- and the second liens were

20   third.  Or sometimes (indiscernible) FLLOS one-and-a-half.

21           You can envision in your mind, if you will, Your

22   Honor, some collateral.  Let's just say it's a box that's worth

23   75-.  And the RBL lenders had 50-, and the FLLOS had 50-.

24   Well, prior to the roll-up, the RBLs were covered by their

25   first lien on that box at 75-.  Their 50- was covered by the

1 prepetition collateral.  The FLLOs were only 50 percent

2 covered, because the bottom 25- of the collateral value went to

3 them, but then they had 25 -- a 25 deficiency claim.  After the

4 roll-up, it remained exactly the same.

5          Today -- can we flip the slide, please?

6          Today, that's all that's left under the DIP.  The DIP

7 itself -- there haven't been -- there have been, I think,

8 incremental months -- monthly draws for short-term liquidity

9 needs.  But at the end of every month, there's just not been

10 any draws on the DIP.

11          So there's nothing outstanding besides the roll-up.

12 That's the nature of this entire dispute.  Okay?  And there's

13 no need for adequate protection, as Your Honor has ruled, we

14 started the case with a 3.25 billion TEV.  That got adjusted by

15 the debtors to 4.1 billion TEV.  And Your Honor's ruling at

16 5.129 billion suggests all O&G assets have increased in value.

17 And so here we are without any real argument on adequate

18 protection for the collateral value.  Okay?

19          So the FLLOs and the second liens on that box, maybe

20 their portion of the 25- with the 25- deficiency, maybe that

21 25- is now 35-, but there's still a deficiency there, because

22 they're still behind the RBLs.  Okay?

23          If you can go to 24, please.

24          The roll-up was intended to benefit the DIP lenders,

25 of course, but only the DIP lenders.  I have no quarrel with

1  anything that counsel for the DIP lenders said during her

2  presentation.  She's right.  Everything that was done in the

3  DIP order was to protect them and to make sure that they got

4  paid at the end of the case.

5          But the rights -- those rights only went to the DIP

6  lenders, including the roll-up piece.  Okay?  It made sure

7  that they had multiple different ways to get paid if we didn't

8  find ourselves at the end of the case with a plan that paid

9  them off.

10          No other party -- the debtors, the FLLOs, the second

11 liens, the Committee -- nobody has the ability to step into the

12 shoes and argue for any of the rights or benefits that were

13 afforded to the DIP lenders.  The order is about as clear as

14 day on that.  Okay?

15          The marshaling bars apply to everyone.  Nobody can

16 make any marshaling arguments, it seems, against anyone with

17 one exception, and that's the avoidance stuff.  And we'll come

18 back to that in a minute.  Okay?

19          And the roll-up came early on.  Again, I'm not saying

20 anybody did anything wrong, but the case facts had not yet been

21 developed.  We said at our objection, hey, you know, this feels

22 wrong; it feels like we're moving in a direction where this

23 case will have a bad outcome as a result of this.  Your Honor

24 overruled that objection.

25          And Your Honor's ruling was the roll-up was necessary

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

180

1  because it was adjoined -- adjoining to liquidity, and we

2  needed the liquidity.  Understandable.  Okay?  But there was no

3  finding at the time, and the order doesn't reflect it or the

4  transcript, nor could there have been, that any of the

5  protections in the DIP order were for the benefit of the FLLOs

6  or the second liens or to advantage the subordinated creditors

7  to the detriment of unsecured creditors.

8          The FLLOs and the second liens weren't providing any

9  liquidity to this company.  They were junior creditor -- junior

10 prepetition creditors.  They'll get at the end of the case

11 whatever it is they'll get.

12         So you could have blown me over with a feather when I

13 heard Mr. Schaible make the argument just a little while ago

14 that the junior creditors who didn't provide any capital have

15 the right under the DIP to channel and to allocate value as if

16 they were the DIP lender, because that's not what the rule was.

17         25, please.

18         The plan -- and, frankly, any plan in this case --

19 and there will be a plan in this case -- will pay off the RBLs

20 in full.  The value has rapidly increased in this company.

21 There's credit quality to take out the RBLs under any

22 circumstance here.  Okay?

23         But the DIP order, it -- you know, you have to think

24 about it this way.  Since there's no exercise of remedies, it's

25 true that the RBLs could have -- in a default scenario, in

exercise of remedies, in a liquidation, it was for the RBLs to decide as a roll-up -- the DIP lenders, I should say.  They could choose which collateral -- unencumbered prepetition collateral, whatever they wanted to.  They could look at any asset of the estate for repayment on their debt.  Okay?  But only in that context.

It says, specifically, in connection with any disposition or exercise of rights and remedies do they get the choice to allocate.  That's not our circumstance.  They're getting paid off.  There's no trigger for them to do an allocation themselves, and any right of allocation only arises in that trigger event.

Slide 26, please.

So that begs the question: if you don't have a DIP default, if the DIP's getting paid off, and there's no adequate protection entitlements for any of the junior creditors, okay, who pays for the roll-up?  It's not as easy and as quick as one may think.

Secured lenders come to bankruptcy courts with protections for the lien position that they had coming into the bankruptcy case.  Whatever it was coming in, they get adequate protection to make sure that, at the end of the case, they get that.  Using my hypothetical, again, of the $75,000 block where the RBL takes the first 50 million, the FLLO takes the next 50- but has a 50 million deficiency claim, the Radford rule, the

1   Supreme Court precedent, affords the FLLO only the $25 million.

2   The deficiency claim is its deficiency claim.  Okay?

3           The debtors assume that because the RBL also has an

4   admin claim that they have the right to pay off the entirety of

5   the RBL with unencumbered value.  That's an assumption.  There

6   is no case law authorizing that at all.  Okay?  That is, in

7   effect, allocating value even though allocation rights are only

8   given to the DIP lenders, not to the debtors and certainly not

9   to the FLLOs or the second liens.  And they only arise in the

10  context of a default scenario, exercise of remedies or

11  liquidation.

12          That's a usurpation of a DIP lender's protection for

13  strategic purposes for plan confirmation.  And the result is

14  this: you kind of magically get rid of the RBL.  The

15  prepetition debt that got rolled up, you get rid of it with

16  unencumbered value as if they had liens prepetition on that

17  unencumbered value.

18          What that does is it relieves the FLLOs and the

19  second liens of that $50 million senior lien that I mentioned

20  in my block before.  It goes away.  Now, the FLLOs and the

21  second liens then get to move up.  They get to assert the

22  entirety of the collateral rights on their prepetition

23  collateral as if they were providing that post-petition

24  liquidity and they got the benefit of the roll-up or they had

25  liens on that unencumbered value or that they were entitled to

183

1  adequate protection.  They don't have any of that.  Okay?

2          So what that does is that's where the explosion

3  happens.  It expands and explodes the FLLO and second liens'

4  lien entitlements as if they had liens on things that they

5  don't have.  It artificially relieves them of the -- of senior

6  collateral entitlement, and that's inconsistent with the

7  expectations of the parties.

8          And the one thing that Collier makes clear is that

9  the bankruptcy protections for lenders ensure only that the

10 secured creditor receives the value, essentially, what he

11 bargained for.  That would be the subordinated position that

12 the FLLOs and the second liens have on that collateral, not

13 that they get relieved of that by way of unencumbered value.

14 Okay?

15         Now, you can try to call it -- and I've heard it in

16 conversations away from this court.  Well, this is marshaling.

17 But you're not allowed to marshal.  The order says marshaling

18 is not allowed for anybody against anybody.  Okay?  Marshaling

19 is also disallowed under the collateral trust agreement, and

20 marshaling isn't allowed -- wasn't allowed on the first day of

21 the case, because it was sitting below -- before Your Honor

22 approved at the final DIP hearing to roll up, it was sitting

23 behind, and marshaling wasn't available.

24         And, by the way, marshaling is an inter-lender

25 argument.  It is one secured lender bringing an action against

1  another secured lender to marshal collateral as they see fit,

2  not estate representatives migrating value and marshaling

3  unsecured creditors that way.  Because, in the end -- and this

4  is the most important --

5        Ben, could you move to 27, please?

6        This is the most important bullet.  It's the third

7  bullet down.  Marshaling is, at its core, an equitable remedy.

8  It is not an equitable doctrine that a court of equity is

9  allowed to use -- the jurisprudence is about as clear as day on

10 this -- to give people value that they don't have liens on.

11 That is an inequitable result that is inconsistent with the

12 benefit of the bargain, that is excessive of the secured

13 lender's protections both under the Radford rule, Fifth

14 Amendment, and the Bankruptcy Code.  To do this is

15 overcompensating the secured lender in ways that they never

16 protected themselves with proper liens.

17        Next point, please.  Next slide, please.

18        Oh, and I should say, and this is on surcharge.  This

19 is important.  I heard somebody here this morning, this is --

20 well, this -- we're not -- we're surcharging their collateral.

21 That couldn't be farther from the truth.

22        Surcharging is taking administrative expenses of some

23 sort and saying the collateral has to be -- your collateral

24 return has to be deteriorated to offset for the admin expense.

25 That's not what we're doing at all.  Our model's always said,

1  you take that $200 million of admin expenses and charge it

2  against the unencumbered value, and we divvy it up from there.

3          What they're doing is they're taking somebody else's

4  value and saying I should get it on account of liens that

5  don't -- that I don't have.  That's the circuitous route that

6  is (indiscernible).

7          And here, Your Honor, after this big, long-winded

8  speech is where 506(a) comes in.  Okay?  Because 506(a) says we

9  are supposed to bifurcate the junior secured creditor's claim.

10 If the junior secured creditor has collateral and sits behind a

11 lien that is senior to it, and that creates a deficiency claim,

12 then we don't soak up other people's unencumbered value.  That

13 means they have an unsecured claim that goes into the unsecured

14 claim pot, the deficiency claim, and shares with other

15 unsecured creditors.

16         That's how 506 in the Bankruptcy Code works.  That is

17 what they're trying to avoid here.  Okay?

18         The question of bifurcation -- there's questions of

19 value, but we're sticking with 5.129-, and then we're just

20 doing the math off of that.  Okay?  So the real question on

21 bifurcation is when you're supposed to do it.  When is the

22 court supposed to do the bifurcation claims for the FLLOs and

23 the second liens, knowing that prepetition and post-petition

24 they sit behind the rolled-up RBL?  Well, the RBL and now it's

25 rolled-up RBL.  When are you supposed to do it?

1          The <u>Houston Sports Network</u> case says the court has
2     discretion and flexibility.  Well, that's consistent with the
3     statute.  It says it in the statute.  Okay?
4          But you're not supposed to ignore the fact that the
5     FLLOs and the second liens are junior subordinated lenders.
6     You're not supposed to do the bifurcation in ways that changes
7     that result.  Okay?  And so if the roll-up is charged to
8     unencumbered value, it's as if you've given the unencumbered
9     value to them.  Okay?
10          So let's talk a little bit further about the timing
11     of the bifurcation process, please.
12          Can we flip the slide, Ben?
13          Okay.  Now, Your Honor could have chosen or we could
14     have made a motion or some other contested matter could have
15     been presented to your Court to do the 506(a) bifurcation at
16     the beginning of the case.  At that time, enterprise value was
17     much lower.  The RBL was -- presumptively was covered.  I think
18     all of the evidence that came out at the DIP hearing was that
19     the -- that it was covered.  Okay?
20          But the FLLOs and the second liens' collateral on the
21     prepetition collateral, it would have been less.  Again, that's
22     increased over the course of the case.  But a bifurcation would
23     have yielded for them some portion that would have been covered
24     by collateral and some portion a deficiency claim that would
25     now share.

1    We didn't do that.  There was no bifurcation at the

2  beginning of the case.  We could go back and do that now, but

3  that would mean that the 1.5 billion wouldn't belong to them.

4  It wouldn't go to them.

5    We could do the bifurcation as of the final DIP

6  hearing date.  After Your Honor approved the final DIP hearing,

7  the roll-up happened.  The RBL lien position got a new name.

8  It was now a DIP.  It was a cash (indiscernible), but it still

9  sat at the top of the collateral stack.  The FLLO and  the

10  second liens were still behind it.  No change other than,

11  perhaps, there was some value -- collateral value accretion

12  between the beginning of the case and the final DIP hearing.

13    We could do it right now, Your Honor, right this very

14  second.  We could do a bifurcation by 506(a) of the collateral

15  entitlements of the FLLO.  And it's not hard to do.  The

16  evidence is there.  The 1.5 billion, they do not have a lien on

17  it.  That is not theirs to take.

18    So, therefore, they can have everything else.  Their

19  deficiency claim -- they don't have a deficiency claim, because

20  they're getting overcompensated.  But their deficiency claim

21  wouldn't share.  The second liens' deficiency does share.  And

22  so we go from 1.7- down a lot, because they get about 600-,

23  700 million of value.  I can't remember the exact figure.  But

24  they would get that for their unsecured deficiency claim.

25  Right?

1       We could do that now, but that's how that would come

2   out.   The 1.5 would still be available -- or the 680 million

3   would be available for class sixes and sevens.   Okay?

4       The only way in which it works, the only way in which

5   their structure meets with 506(a) is if you do the bifurcation

6   not at the petition date, not at the final DIP hearing, not at

7   the confirmation hearing but after the plan's effective date.

8   Because that's the time in which the money comes in.   The

9   600 million comes in.   The new draws come in on the exit lines

10  and pays off the RBL which, in turn, relieves the RBL of its

11  senior lien position, and the FLLO and the second lien can then

12  encroach upward.

13      It is the only time in which bifurcation actually can

14  work.   And I searched real hard, but I can't find a single case

15  that allows bifurcation of a -- the junior secured lender's

16  claim after confirmation, after the funding on the effective

17  date.   It doesn't exist.

18      If you can go to slide 30, please.

19      Now, roll-ups are disfavored lending structures.   We

20  cite the transcript from Judge Isgur.   I think Your Honor

21  probably knows he's not a fan of them.   And the Court's complex

22  case guidelines require close scrutiny and the same with other

23  sophisticated bankruptcy courts around the country who have

24  complex case guidelines:   Delaware and New York.

25      Roll-ups are almost invariably used with skepticism,

1  and it's a very rare day that you're supposed to do it.  Okay?

2  And when they're -- and when they are allowed, they're allowed

3  because there's a perception that -- rightfully, that they are

4  necessary components of liquidity that the company needs to run

5  through its Chapter 11 process.  It's a necessary evil.

6      And DIP roll-ups are approved to protect the DIP

7  lender and the DIP lender only.  So the quid pro quo for

8  providing the DIP loan is you get a little bit of extra

9  collateral, and you can be assured on a roll-up you don't get

10 crammed down for that debt.  But they're never, ever in any

11 court intended to create economic advantage for junior

12 creditors that do not provide any post-petition liquidity.

13 They don't get the benefit to tag along on the coattails of the

14 DIP lender and say I'd like the benefits by you channeling --

15 not the DIP lender channeling the default but the debtor

16 channeling unencumbered value paid off so that my prepetition

17 collateral entitlement can increase.  That is not what any

18 court, at least any court that I've ever been in front of, has

19 ever said or approved or an written opinion and said that's

20 what roll-ups are about.

21     And that's especially true where in a case the

22 roll-up happens early on, and we haven't yet figured out the

23 case implications of it, many cases, most cases, but also where

24 the DIP creditors agree in the DIP order, in the prepetition

25 credit agreement that they have no rights, that the RBL

1  lenders, as a prepetition lender or as a post-petition lender,

2  have.  They can't assert -- they can't tack on to those rights.

3  Okay?

4            If we can go to 31, please.

5            I think this accretion of collateral value is just so

6  bedrock violative of principle, but I do believe it's important

7  to think about what the implications of it are.  You could

8  conceive of a parade of horribles where there is wrongful

9  conduct in a case, okay?  There's liability claims.  The junior

10 lender seizes collateral, does something wrong like that.

11 Management takes something that it shouldn't take and cuts a

12 deal with the junior lender.  Okay?

13           There's unencumbered value that comes in for one

14 reason or another.  Call it tort claims or other claims or what

15 have you.  And the deal making can happen in the back room that

16 effectively says I'll -- we'll use it to pay off the DIP, and

17 I'll make it go away in the plan.

18           That's the gaming problem.  That's the opportunism

19 problem that I was talking about, about sleight of hand.

20 That's what people are observing about the confidence game of

21 the bankruptcy process itself.  Again, I'm not accusing

22 anybody.  It's just how we're creeping in that way.

23           But what it really does is, it writes 506(a) out of

24 the Bankruptcy Code.  It essentially says we'll never, ever

25 have a deficiency claim for a junior secured creditor, because

1  we'll channel all the unencumbered value strategically to pay

2  off the RBL, and we'll make you a fully secured creditor.  That

3  is gaming.

4          I have a fallback provision -- a fallback argument on

5  this.  To the extent that it's marshaling, that that's what's

6  going on here -- I don't think it is, because only secured

7  lenders can argue marshaling against each other.  But one of

8  the things that we argued in the court is that avoidance -- at

9  the final DIP hearing is that avoidance actions shouldn't be

10 included in this.  Avoidance theories should be left alone for

11 unsecured value.  And Your Honor ordered that there be a

12 carve-out for this very provision in the order so that they're

13 going to use commercially reasonable efforts to use DIP

14 collateral other than avoidance actions to repay the DIP

15 obligations.  Okay?

16         Let's go back to our split on the 30 percent.  We

17 have two different kinds.  We have the unmortgaged -- the 10.6

18 percent of unmortgaged assets.  Those assets, a security

19 interest and conveyance was done.  They just never perfected

20 it.  They never filed the mortgage.  So the estate's strong-arm

21 powers under 544 trump the unperfected security interest.

22 That's a Chapter 5 avoidance action.

23         But even if there's any ambiguity on that, the 17.6

24 percent, the 900 million of cash (indiscernible) preferences,

25 there's -- that is absolutely an avoidance action in

1 everybody's book.  And the order says that that will be set

2 aside for unsecured creditors and will not be used to repay DIP

3 collateral.

4        Your Honor, in summation on this point -- and I want

5 to be sure that I've addressed any questions Your Honor may

6 have -- we believe that (indiscernible) classes 6 and 7 are

7 short-changed here by $670 million.  That value can be tracked

8 into the rights offering.  It can be tracked over to an

9 overcompensation to the FLLO classes.  And we can't -- we at

10 least can do the 450-.  We can't calculate so readily how much

11 Franklin might be overcompensated.  Maybe not.  But that's

12 where most of that values goes.  It gets covered over and gets

13 explained away by this DIP roll-up construct which we believe

14 is utterly inconsistent with the Bankruptcy Code.  It is not

15 what the prepetition lending bargain was.  It would require

16 bifurcation late, or it would write bifurcation out of the

17 Code.

18        There's equitable considerations.  To the extent

19 marshaling and the plan's good faith confirmation requirement

20 are -- are principles of this Court's equity jurisprudence, we

21 would suggest, Your Honor, that this is not equity

22 jurisprudence.  This is not fair.  That's not right.  And,

23 again, we have the DIP carve-out that says that this value, at

24 least much of it, needs to be set aside for unsecured creditors

25 and not go to the other -- the junior secured creditors.

1        Your Honor, that's the final point that I wanted to

2  make on this particular section.  Do you have any questions or

3  comments for me about it?

4            THE COURT:  Not at this time.

5            MR. STARK:  Okay.  That takes us to the causes of

6  action.  We'll start with the <u>TOUSA</u> theory.  We have what I

7  call the squandering preference theories and then illegal

8  dividends.  I think we've made it clear we're not going to be

9  pressing, at least for purposes of closing, (indiscernible)

10  exchange with an intentional fraudulent transfer or the other

11  claims.  We're going to focus on the three that are at the top.

12  Okay?

13        And as Ms. Schwarzman conceded in her opening, the

14  plan doesn't provide us any value for these claims.  So it's

15  their burden of proof and persuasion under <u>TMT Trailers</u>, et

16  cetera, that that's the right answer, that these claims are

17  valueless; there's nothing to them.  Okay?  So let's analyze

18  them.

19        On 536 -- and I'll just do this as a throwaway.  In

20  constructing the plan, the testimony is the debtors didn't

21  actually investigate any of the claims that are asserted here.

22  Ms. Schwarzman said that.  It's conceded.

23        I've done a lot of big bankruptcy cases, a lot of big

24  bankruptcy cases where litigation and claim disputes are at

25  stake.  They're, in fact, in the center of the case.  I've

1   never seen zero record of an internal analysis along those

2   lines.  I think that's meaningful, but we can just put a point

3   in it and move on, and we'll come back to it in a little bit.

4          Let's talk about <u>TOUSA</u>, the black letter legal

5   principle right at the top.  It's an affiliated company,

6   transfers liens and guarantees that go to lenders of a second

7   affiliated company, a fraudulent transfer claim may arise.  You

8   have to establish the elements.  And the prima facie elements

9   are the value transferred to the FLLO guaranty on liens, by the

10  Legacy Chesapeake debtors, the non (indiscernible) entities.

11         The second element is reasonably equivalent value.

12  Was it received by Legacy Chesapeake in return?

13         The third element is solvency.  Was Legacy Chesapeake

14  insolvent at the time under the three tests?

15         And then there's the alternative test, which is

16  intentional fraudulent transfer.  Was there, in fact, intent to

17  hinder or delay Legacy Chesapeake creditors?

18         Now, the evidence -- of course, there was

19  cross-examination about the prima facie case, but there was no

20  rebuttal evidence submitted.  Okay?  There were affirmative

21  defenses in the good-faith lender defense.

22         And then we have Mr. Zensky's discussion on the

23  546(e) defense, and I'll come back to that.  But I couldn't

24  help but write a little note on this page when he was speaking,

25  drawing the distinction between <u>TOUSA</u> and Chesapeake, saying,

1  at the time of <u>TOUSA</u>, the housing market in Florida was

2  terrible.  But E&P has been fine.  I've been -- as Your Honor

3  knows, I've been spending a lot of time in Houston over the

4  last couple of years.  I don't think the E&P industry has been

5  fine in this country for quite a while.  Slide 39.

6          I don't think there's a dispute about the value

7  transfer.  If the liens and the guarantees that Legacy

8  Chesapeake debtors transferred to the FLLOs, which happened on

9  December 23rd of 2019, and those are the transfers that are at

10  stake in the Committee's complaint -- excuse me -- their

11  complaint.

12          So we go to the second element of the prima facie

13  case, was there reasonably equivalent value.  Well, let's talk

14  about the law and then we'll get into the facts.  Okay?  The

15  law says we look at reasonably equivalent value on a debtor by

16  debtor basis from the vantage point of the creditors of the

17  conveying debtor.

18          So, in my mind's eye, I think about somebody who's in

19  Pennsylvania who's doing trade business with Chesapeake

20  Appalachia.  Let's say they're providing sand or trucking

21  services, were stationary.  And they're providing it on credit

22  to Legacy -- to Chesapeake Appalachia and thinking about, I

23  know these people, I understand the credit risks associated

24  with them, I'm prepared to deal with them on unsecured credit

25  terms because I understand the credit quality of Chesapeake

1   Appalachia.  They told me; I understand it.  Okay.  That's

2   how -- that's the person that we have to walk a mile in their

3   shoes.

4          When they wake up one morning and find out the FLLOs

5   have gone ahead and put $1.5 billion of secured debt on top of

6   that creditor's unsecured claim, that creditor wakes up and

7   says, okay, well, can we get $1.5 billion of value at

8   Chesapeake Appalachia.  And the answer is, no, it went off to

9   benefit a far-off facility, a far-off affiliate in the Eagle

10  Ford area of Texas that you've never done business with.

11  That's the person that we have to think about reasonable

12  equivalent value issues.

13         The second legal point is we have to ask if there's

14  an affiliate conveying something here.  Here, we have

15  Chesapeake Appalachia conveying to the FLLOs.  We have to ask

16  what did Chesapeake Appalachia get in return.  It's a get-and-

17  give kind of a thing.  Okay?

18         On the next slide, please, if it doesn't lift off the

19  page, if you can't see it immediately, okay, you go to indirect

20  benefit.  And the doctrine in indirect benefits is pretty,

21  well, well-created in the jurisprudence.

22         Intangible unqualified indirect benefits don't work.

23  They have to come in a much more concrete format.  Or to use

24  the Smith court's phraseology, fairly concrete.  And the burden

25  of proof on indirect benefits is not the plaintiff.  It's not

on the defendant.  There's a burden shifting and all of the
cases say that.  It is not my burden to disprove indirect
benefit.  It's their burden to show that there were, in fact,
concrete, tangible indirect benefits.

So here is the evidence, in a nutshell.  And we'll
walk through it pretty quickly.  Okay.  The trial testimony,
and you can to back to 38, not a nickel of the money went to
Legacy Chesapeake.  It went to repay WildHorse creditors.  The
FLLO wasn't enough.  They needed -- Legacy Chesapeake needed to
draw another $194 million under its own RBL to help complete
the payoff of WildHorse creditors.  Okay.  This new debt load,
the increased RBL draws, plus the FLLO, increased Legacy
Chesapeake's capital costs by around 250 million on a present
value basis.  Okay.  That's all clear, clear and concrete
issues.

To prevail, the debtors have to show concrete
indirect benefits in a response that offset on a reasonable
basis all of that liability.  Okay.  So let's go through the
evidence.  Oh, I'm sorry.  And there are two -- 542 says there
are two indirect benefits of debtors who come forward.  And you
heard Ms. Schwarzman talk about that.  The first is that
WildHorse became obligee.  They agreed to become obligors on
Legacy Chesapeake debt, the RBL and the second lien.  Okay.  We
have to unpack that one.  And then Legacy Chesapeake got
commensurate value back in the up-tier exchange.  And we have

1  to talk about that.  But what -- with the evidence, when you

2  actually position it in law, and I know that the

3  cross-examination went quickly and we focused on other things.

4  So it may have gone so quick you didn't even realize how

5  important it was, the quick testimony or the summation.  But

6  these don't work.  Let me show you why.  Okay.

7  So WildHorse gave commensurate value back by assuming

8  Chesapeake's debt.  Okay.  Well, you heard Mr. Baggett.  He

9  testified that Legacy Chesapeake was worse off, by about

10  $550 million, even though WildHorse accepted certain debt,

11  guaranty obligations on Legacy debt.

12  And this breaks down to two different things.  Okay.

13  The first is you have to think about, let's just assume for the

14  sake of discussion, that WildHorse has value, has equity value.

15  Okay.  That evaluates the constants and the green in the

16  middle.  As a result of the transaction, Legacy Chesapeake's

17  debt goes up more than $200 million on the whole.  And the

18  present value of its interest is about an incremental 200 --

19  excuse me -- and it goes up -- excuse me.  The debt goes up

20  about 400 -- 40- to 50 million.  And then the incremental

21  interest on top of the interest, the earlier interest it was

22  paying, now it's paying higher interest payment.  You present

23  value that, you're about $300 million worse off if WildHorse

24  had equity value.  We'll go the next slide.

25  WildHorse was not solvent.  WildHorse was woefully

1  insolvent.  So, as a result, all of that debt that was trapped

2  in WildHorse did not leak out of because that debt was only --

3  there was no Legacy Chesapeake --

4      (Recorded voice indicates a conference extension code

5  needs to be entered)

6      MR. STARK:  -- goes for Legacy Chesapeake.

7  Mr. Baggett used the two-year with, the accelerator adjustment,

8  which is more upbeat in terms of value.  And that showed about

9  $250 million worth of leaking out value, leaking out losses, by

10 Legacy Chesapeake.  If you want to use Mr. Miller's more dour

11 five-year NYMEX pricing, that loss to Legacy Chesapeake goes

12 from 550, to about 850.  So there was no reasonably equivalent

13 value even though Legacy Chesapeake became a nominal obligor on

14 the debt.  It didn't do anything to help Legacy Chesapeake at

15 all.  This was expressed in demonstratives and we have those on

16 Slide 45.  So you can see the quantifications of it in a

17 separate way.  Okay.

18      So they go to their real argument, which is collapse.

19 Okay.  Chesapeake, the theory goes that they got -- if you

20 collapse the 2L exchange into the FLLO, there's benefit for

21 Legacy Chesapeake because the 2L exchange had a certain amount

22 of unsecured bonds that got converted into a lower quantum on a

23 principal basis of secured bonds.  Okay.  And they net those

24 two together.  Okay.  We're going to get into the law in just a

25 minute.

1        But I think it's very important, as I heard the
2   opening presentations today, he says if they were one and the
3   same transactions in people's minds, that people were motivated
4   to do this, as if subsumed within the WildHorse situation.
5   That's not true.  Creditors do up-tier exchanges all the time
6   with companies that are in distress.  That has nothing to do
7   with repurchasing of, you know, debt in a conglomerate.  It's
8   done because the company is failing, and they're looking to
9   up-tier to get liens so that they are in a better position than
10  their compatriot unsecured creditors.  And here, too -- here,
11  as well, the second lien up-tier exchange was only offered to a
12  select few.  It wasn't opened up to everybody.  So the purpose
13  of the up-tier exchange is very different than having anything
14  to do with the FLLO and the WildHorse transaction,
15  notwithstanding what you've heard in court.
16        But let's get even more granular, to what the law
17  says about collapsing.  It's a three-factor test.  All of the
18  cases, and there's many that are cited, have the same
19  three-factor test:  whether the parties involved had knowledge
20  of the multiple transactions; whether each transaction would
21  have occurred on its own; and, whether each transaction was
22  dependent or conditioned on the other.  Okay.  Those -- that's
23  the test.
24        The knowledge part really gets down to notice.  Did
25  the parties have notice of the -- how -- of the transaction

1    terms.  Did they know that they were -- as they were reflected

2    in the documents, that this was going to be an integrated deal,

3    or not.  Okay.  If the documents and notice facially reflect

4    that it was not an integrated transaction, collapsing's just

5    plain not allowed.  The law is as clear as day on this, without

6    exception.  The component parts are instead treated as "simply

7    different transactions towards the similar ends."  Every single

8    case says that over and over and over again.  If you didn't set

9    up the deal to be integrated, in a meaningful legal way, and if

10   everybody knew that to be the case, you cannot collapse for REB

11   purposes.  Okay.

12         That's where the testimony and the -- really, the

13   documents really hit home.  Because they say it over and over

14   and over again, that these deals were never intended to be

15   together.  They are not integrated, they're not conditioned.

16   They're thought to -- they're marketed separately and their

17   terms close separately.  Here is the up-tier exchange offering

18   memoranda.  Focus on the bottom line.  The offering -- the

19   exchange offers are not conditioned upon the completion of the

20   concurrent transactions.  Next slide.

21         Repeated (inaudible).  In addition, each exchange

22   offer is being made independently of each of the concurrent

23   transactions and is not conditioned upon the completion of any

24   of the concurrent transactions.  Go down to the left.

25         In addition, the exchange offers are not conditioned

1  upon the completion of the concurrent transactions.  Go to the

2  right.

3  　　　　In addition, the exchange offers are not conditioned

4  upon the completion of the concurrent transactions.  Next

5  slide.

6  　　　　On December 4th, 2019, the company met with

7  prospective FLLO lenders.  And it gave them a presentation

8  about the FLLO and the second lien.  And they said that the

9  FLLO is not -- excuse me -- the second lien is not conditioned

10  upon completion of the FLLO term loan.  This is in the

11  marketing of the deal.  Hasn't even happened yet.  Flip side.

12  　　　　You can try, in vain, to search the FLLO credit

13  agreement, conditions precedent or the rest, that has any sort

14  of notation about it being connected, tied, conditioned upon,

15  in any way, shape, or form, the 2L up-tier exchange which,

16  again, had a different purpose.  Next slide.

17  　　　　At trial, again, so quick you may have not even

18  noticed it.  Mr. Lawler confirmed that the filing of the second

19  lien up-tier exchanges were not conditioned on each other.

20  Next slide.

21  　　　　At trial, Mr. Dell'Osso confirmed that the FLLO term

22  on credit agreement did not contain any conditions precedent

23  based upon the effectiveness of the second lien up-tier

24  exchange.  Next slide.

25  　　　　Mr. Brendan Circle confirmed his understanding that

ACCESS TRANSCRIPTS, LLC　　　　　　　　1-855-USE-ACCESS (873-2223)

1  the FLLO was not conditioned upon the consummation of the

2  second lien up-tier exchanges or any minimum threshold related

3  to the up-tier exchanges.

4          The upshot of all of this, Your Honor, is that they

5  were two separate transactions that were not intended to be

6  connected.  They had different purposes, they were never

7  marketed as integrated, the contracts don't show that they were

8  integrated, they have no integration terms.  They are "simply

9  different transactions towards similar ends."  And there is no

10 law available to support the notion, other than some testimony

11 that, well, we thought that they were together because they

12 were around the same time, and it was how we thought about the

13 credit.  That is woefully insufficient under the law, period,

14 done.  These transactions cannot be collapsed for reasonably

15 equivalent value purposes.  That's why we stopped arguing it,

16 as soon as he started taking the depositions and we studied it

17 deeper.  Next slide, please.

18         The third element of the cause of action is that

19 there remained, when the Legacy Chesapeake debtors were

20 insolvent, it bears reminding this Court that there's, what,

21 $10 billion of debt on this company.  We had a big fight about

22 its value.  But it started at 3.25-, got to 4.1-.  And Your

23 Honor figured it was half the collateral value.  This company

24 has been insolvent for a long time.

25         The unrebutted testimony, they cross-examined but

204

1 didn't produce their own witnesses, even though they certainly

2 had them waiting, that Legacy Chesapeake was -- the evidence is

3 unrebutted that Legacy Chesapeake was insolvent under all three

4 tests in December of 2019, all three.  I only need to hear one,

5 but all three.  Next slide.

6          Before the transactions happened, on the balance

7 sheet test, you have -- Mr. Baggett testified.  He wasn't able

8 to value the PUDs or the possibles because the data wasn't

9 available.  But the gap to solvency was so incredibly big,

10 billions and billions of dollars, that there was no possible

11 way that the possibles and the PUDs could cover that

12 difference.  Next slide.

13          Before the transactions, unreasonably small capital

14 and inability to pay their debts due, this is important.  This

15 company issued a going concern qualification in November.  It

16 put the world on notice that it was really struggling.  You had

17 management's acknowledgment in documents that it expected a

18 covenant to fall by the third quarter of 2020.  You had

19 management's only projections showing that liquidity was

20 declining and capital spending was greater than the operating

21 cash flows.  You had debt trading levels that were reflecting

22 the debt was in distress plan.  All of that was in the public

23 domain before the transactions happened.  Every lender involved

24 knew that.  The debtor knew it.  Next slide.

25          Mr. Dell'Osso testified.  Again, sometimes our

1  cross-examinations go so fast you may not have even noticed it,

2  that, in December of 2019, the company was facing a de-listing,

3  a de-listing notice from NYMEX -- excuse me -- from the New

4  York Stock Exchange.  And it was facing liquidity challenges.

5  And the board knew it.  Next slide.

6          Let's look at it from after the transaction happened,

7  okay.  It was left insolvent on all three tests.  Two, balance

8  sheet, starting again.  Mr. Baggett couldn't -- didn't have the

9  data to do the possibles and the PUDs.  But the gap to solvency

10 was billions and billions of dollars.  There was no way this

11 company was solvent.  Liabilities exceeded assets by

12 $4.1 billion.  Next slide.

13         You have documents from the company showing that --

14 now, admittedly, this is a November document.  But it was

15 anticipating the closing of the FLLO and the second lien

16 up-tier exchanges at the level that actually consummated.  And

17 the company's own prognostication was, if you have a 2-to-3-

18 percent decline in commodity prices, this company was going to

19 hit a covenant pressure, 2 to 3 percent for a company as big as

20 Chesapeake.  And this is December of 2019.  They were going to

21 hit 2 to 3 percent.  That was certainly a foreseeable problem.

22 That is unreasonably small capital.  You can't weather that

23 kind of storm.  Next slide.

24         This may be Mr. Zensky's favorite slide because he

25 likes to talk about markets.  And I do too at times.  Okay.

1  Let's look at the price index throughout the entire time
2  period, before and after.  Okay.  Let's look at the bond
3  pricing.  Pick your day.  Before the transactions, they're
4  trading at 43 cents on the dollar, 47 cents on the dollar, 45
5  cents on the dollar, 59 cents on the dollar.  After the
6  transaction, they're trading at 52 cents on the dollar, 41
7  cents on the dollar, 52 cents on the dollar.  The market, the
8  bond market, did not show solvency, not by any stretch.
9         Mr. Zensky observed something that is kind of fun to
10 think about and talk about.  And I'd actually written on this a
11 little bit, which is stock market capitalization could be
12 outside of option value, while the debt value could be trading
13 at monstrous discounts to par, because the stock pickers may
14 have a different view of upside than the debt holders may have.
15 And we have some very weird conversations about the
16 admission -- efficient market hypothesis.  If one were to look
17 at massive debt discounts, right, you're looking at 9.7 billion
18 hard debt trading up to the transaction at a debt
19 capitalization of 7.12 billion.  Okay.  2.6 billion off of par.
20 And, after the transaction, you've got debt, 8.9 billion.  So
21 we lost that billion from the up-tier exchange, trading at
22 7.7 billion.  The debt markets did not like this company's
23 future.  Or at least it had a skeptical and (indiscernible)
24 view of what the company's future would be.
25         If you go to the next slide, at trial Mr. Lawler said

that Chesapeake never intended that the FLLO and second lien
transactions were "the end of the road" of its financial
problems.  Those problems preceded December 2019 and they
continued.  But what I do take tremendous exception with is the
notion that the black swan issues of spring of 2020, which were
true, COVID happened and the Saudi Russian deal happened, okay,
it wasn't like this company was doing great up until then.  And
that shockingly changed their entire dynamic.  This company had
been doing poorly for quite a while.  And it was working
through those issues.  But solvency does not rise or fall based
upon the black swan timeframe.  This company was insolvent for
a considerable period, before it had way too much debt for a
considerable period before.  Your Honor has more than enough
evidence to show insolvency at the time in question.

          That takes us to the alternative element.  This one's
a little bit harder because you had some very -- you had some
excellent executive witnesses.  And I'm sure they are excellent
executives.  I'm not suggesting that they're not.  Okay.

          Intentional fraudulent transfer theory, though,
doesn't anticipate that people are bad people.  The Elizabethan
deadbeat scenario is not our modern corporate world.  Today's
intentional fraudulent transfer theory follows what we call the
natural consequences doctrine, which says that those in control
have good intentions.  But, if it was natural, naturally
foreseeable, as a natural consequence, that if Legacy

1 Chesapeake provided the FLLO financing for the WildHorse debt,

2 that those creditors at Legacy Chesapeake would be hindered and

3 delayed in their ability to get repaid that.

4       Think back to our trade supplier in Pennsylvania

5 providing sand, Chesapeake Appalachia, who woke up one morning

6 and found that they're now sitting behind 1.5 billion of

7 secured FLLO debt, to pay off the debt of another affiliated

8 company.  Okay.  The natural consequences of what happened here

9 was that that sand provider is no longer -- would get paid.

10 And that was foreseeable and that's enough.

11       We do have badges of fraud.  I'll go through them

12 quickly.  And Mr. Baggett and Mr. Brown testified WildHorse and

13 Legacy Chesapeake were insolvent before and after the

14 transaction.  Here is the kind of interesting -- the second one

15 is kind of interesting, because the Elizabethan deadbeat

16 scenario is generally thought of in a context with the tax

17 man's a-coming.  And so you hand your sheep off to your brother

18 for a penny, but you get to keep the sheep.  Okay.  And when

19 the tax man comes, says you can have my penny, but I keep my

20 sheep.  Okay.

21       Here, you had an insider affiliate transaction like

22 an Elizabethan deadbeat.  You had Legacy Chesapeake providing

23 the value to keep WildHorse afloat, burdening up its value for

24 the benefit, as the tax man was a-coming to WildHorse.  Okay.

25 Third, WildHorse did not give Legacy Chesapeake reasonably

1  equivalent value because it was insolvent.  There was that

2  leakage of debt over to Legacy Chesapeake that it didn't know

3  (indiscernible) it was otherwise trapped down there.  Okay.

4         And the FLLO didn't resolve the conglomerate's

5  problems.  The company was in trouble before.  And, as

6  Mr. Lawler said, it wasn't ever intended to be the end of the

7  road to solving all those problems.  It was a step along the

8  way.  And, of course, we have those liquidity forecasts of the

9  company, at 2 to 3 percent liquidity shortfall would tough.

10         This is a good case, Your Honor.  This is not a

11  (indiscernible) case.  This is proven.  This is prima facie and

12  the evidence is there for it.

13         So they come with their defenses.  They start with

14  the good faith lender defense, 548(c).  Okay.  The good faith

15  lender defense is only available if you -- or it's not

16  available if you knew or should have known that the obligor

17  could be insolvent, that the guarantor could be insolvent, as a

18  result of its transaction.  Okay.  If you knew or should have

19  known of Legacy Chesapeake's potential insolvency, this defense

20  is unavailable.  The law is clear as day on that.  There was so

21  much public disclosure, discussion, information in the public

22  domain about it.  There's no way that -- and we put the

23  evidence out there, that a good faith lender defense could

24  hold.

25         So that takes us to the last ditch effort which is

1    546(e), the safe harbor.  That's it.  I mean, the case is a

2    good case.  The evidence is there for it.  And the defenses

3    don't work.  So it's only 546(e).  Now, the safe harbor is set

4    up.  And there is where I love to listen to Mr. Zensky because

5    he and I have, for years, have spent so much time talking about

6    546(e).  He's usually on the other side, saying 546(e) doesn't

7    ever apply.  And if I put (indiscernible) even right now, I'm

8    sure he'd tell him to tell me, in a pique of honesty, that he

9    doesn't think applies here too.  But I'll leave that aside.

10            The safe harbor was set up so that if a Wall Street

11   firm collapses, it doesn't create systemic risk and take down

12   the rest of our financial market.  That's the statutory

13   objectives.  And what's going here with a guaranty mortgage

14   fraudulent transfer case for bank debt, obviously, has nothing

15   to do with Wall Street.  But the language of 546(e) isn't

16   particularly clear.  And that's always been the problem with

17   it.  In the clause that they focus on we've kind of isolated

18   here.  The trustee may not avoid a transfer made to or for the

19   benefit of a financial institution in connection with a

20   securities contract except under Section 548(a)(1)(A) of this

21   title.  Well, that's the intentional fraudulent transfer

22   scenario.  So if Your Honor follows the evidence and the logic

23   and natural consequences (indiscernible) an intentional

24   fraudulent transfer claim would have a motion to dismiss would

25   be asserted here, then 546(e) doesn't apply, statutorily.

1           But, under constructive fraudulent transfer theory,

2    we've got two inquiries.  Okay.  The first is was the transfer

3    made to or for the benefit of a financial institution.  The

4    second is was the transfer made in connection with a securities

5    contract.  Okay.  And the defendant's theory, Franklin's

6    theory, as Mr. Zensky articulated, in a nutshell, Legacy

7    Chesapeake transferred liens to MUFG, the collateral agent.

8    Put asterisks on agent.  MUFG is the financial institution.

9    Alternatively, and this is sort of the statutory trick, the

10   workaround.  We'll talk about that in a minute.  MUFG, as

11   agent, renders all of the FLLO lenders, financial institutions

12   themselves, as a customer trick.  I got to talk to you about

13   that.  And then Franklin separately contends it's a financial

14   institution.

15          As far as in connection with a securities contract,

16   well, it's not the FLLO bank debt, because bank debt isn't a

17   security.  So the in connection with is a different contract

18   altogether.  It's a securities contract to repurchase the

19   WildHorse bond debt with the proceeds of the FLLO and the RBL,

20   incremental FLLO, RBL FLLO.  That's their theory, in a

21   nutshell.  Let's break it down.

22          The next slide, the pink, is the FLLO debt rate.

23   That's the actors in it, that's the participants in it, that's

24   the obligors on it.  The green is when you send the money over

25   there, and some different people, WildHorse, goes and tenders

1  for a debt.  Most of it went to WildHorse's bank debt.  Some of

2  it went to WildHorse bond holders.  And it's saying it's that

3  that bond, the tendering to bond holders, that overshadows

4  everything, subsumes the whole thing, and makes it 546(e) in

5  connection with the securities transaction.  Okay.  That's the

6  schematics.  Okay.  So let's break it down.  66, please.

7          Was the transfer made to or for the benefit of a

8  financial institution.  Mr. Zensky's wrong.  Our argument

9  doesn't start with in connection with.  We go there next.  But

10 MUFG was not a financial institution.  It was a conduit.  And

11 here you got to read the Supreme Court's Merit decision.  Okay.

12 In Merit, the Court held that financial intermediaries,

13 conduits, are not counted as financial institutions.  And this

14 makes intuitive sense.  The FLLO's rights as a secured lender

15 are held by those lenders, not MUFG.  FLLO lenders themselves

16 hold those rights.  They can buy and sell their debt at will.

17 They could novate their agreement with the company if they

18 chose, they could give waivers and forbearances, they could

19 recover value from this bankruptcy case.  Okay.  They were the

20 ones that negotiated the plan with the company.  MUFG didn't do

21 any of those things and can't do any of those things.

22         Because if you take a look at the agreements, MUFG

23 has no substantive agency authority or responsibility

24 whatsoever.  It's a repository, it's a bookkeeping, it's a mail

25 drop.  Okay.  As the agreement -- this is the collateral trust

1  agreement, Section 4.05.  And if you look, five lines up from

2  the bottom --

3          Can Your Honor hear me?  I just got a message.

4          THE COURT:  No, perfectly.

5          MR. STARK:  Okay, good.  Thanks.

6          If Your Honor will look, five lines up, in the

7  middle, the line that starts, the use of the term trustee --

8          Can Your Honor see that?  I meant to highlight it and

9  we just didn't get there in time.

10          THE COURT:  I'm with you.

11          MR. STARK:  Okay.  The use of the term trustee in

12  this agreement with reference to the collateral trustee is not

13  intended to connote any fiduciary or other implied or express

14  obligations arising under agency doctrine of any applicable

15  law.  Instead, such term is used merely as a matter of market

16  custom and is intended to create or reflect only an

17  administrative relationship between independent contracting

18  parties.  The trust agreement goes further, on the next slide.

19  Here, we did highlight it.

20      (Counsel confer)

21          MR. STARK:  MUFG acts only at the FLLO's specific

22  direction.  They have no discretion and no power to act unless

23  directed to do so.  They can't act prior to such direction, as

24  the bullet below says.  And, while there's shared collateral

25  with the RBLs, it can't do anything anyway.  Because the RBL

1    lender, the RBL agent, actually has all of the rights (audio
2    interference) collateral.  It is utterly powerless to do
3    anything.  It is the post office drop box.  Next slide, please.
4         Because of that, we didn't name them as a defendant
5    in the complaint.  The economic substance of the transactions
6    did not go to MUFG.  It went through MUFG.  And if we
7    successfully prosecuted TOUSA, MUFG bears no liability and can
8    do nothing.  It can provide no recovery on that litigation.
9    The FLLO lenders, not MUFG, receive that substance.  They were
10   the ones that get the benefit of the guarantees from the liens.
11   They're the ones that bear the economic impact.  MUFG is -- you
12   know, one way of thinking about it, some of the phraseology you
13   see in the case law, is that is MUFG on either side of the
14   transfer, as the Committee defined it.  It's not.  It's a
15   go-between conduit.  And Merit says you got to disregard it.
16        And on this point, in particular, I'll talk a little
17   bit more about it.  I'd urge Your Honor to read the Greektown
18   case.  Because the District Court in Greektown specifically
19   said that somebody occupying a role just like this, is a mere
20   conduit, and it doesn't matter, under Merit.  Okay.
21        This is the reason why we didn't name MUFG on the
22   TOUSA counts in the complaint.  We named the FLLO lenders
23   directly.  And that pleading decision has significance because,
24   according to Merit management, the only transfer that we're
25   supposed to look at is the transfer that the plaintiff seeks to

1  avoid, the flow through of MUFG.  Okay.  Next slide, please.

2        Now, there is a workaround to this rule.  Okay.  It

3  is incredibly controversial.  It's the Second Circuit's Tribune

4  decision.  It's the workaround to conduit rule.  Okay.  The

5  definition for financial institution has this weird clause in

6  it.  It says that it also includes any "entity," I added the

7  comma to make it easier, that's acting as an agent or custodian

8  for a customer in connection with a securities contract.  Then

9  it's that customer.  In other words, if somebody hires a agent

10 or custodian to do something for them, then the customer itself

11 can be a financial institution.  Tribune decision is weird.  It

12 says that the debtor, Tribune, hired an escrow agent as it was

13 doing its LBO.  That was the intermediary.  And, for Merit,

14 that intermediary would've been a conduit.  And so, under

15 Merit, the Tribune claim would be viable.

16        The Second Circuit didn't like that.  So it did the

17 workaround and said, well, no, the escrow agent's effectively

18 a -- acting as an agent for the customer, which is Tribune.  So

19 Tribune is the financial institution.  That's, like, weird and

20 shocking, and nobody academically thinks that makes any sense

21 at all.  But that's what Mr. Zensky is pressing we should do

22 here.  We should look to Tribune as persuasive authority, that

23 because MUFG is a conduit, we'll just skip it.  And we'll make

24 the -- we'll make the FLLO lenders themselves, who hired MUFG,

25 the financial institution.  And that doesn't work.  Doesn't

1   work for a couple of different reasons.

2          The first is that the FLLO loans -- it's not a

3   securities transaction.  And if you look at the -- if you parse

4   the words carefully on the definition, this workaround

5   definition, even if MUFG actually was an agent, which it's not,

6   (indiscernible) Greektown felt it should, okay, it's not an

7   agent for a customer in connection with a securities contract.

8   They got the wrong contract.  Right.  It's an agent for the

9   bank debt, not the agent for the WildHorse bond repurchase.  So

10  it doesn't work.

11         Also, as I said before, MUFG had no agency authority,

12  re: Greektown.  Okay.  The workaround is also very suspect.

13  Tribune, a cert petition was filed in Supreme Court.  The

14  Supreme Court asked the solicitor general as to whether or not

15  it was so violative of Merit the cert should be granted.

16  That's still pending right now.

17         They are a couple of cases out of the Second Circuit

18  that follow Tribune because they have to.  That's Sun Edison

19  and Boston Generating.  But it's not a good rule.  But, even

20  if it was, it's really distinguishable here because there, the

21  agent, the escrow transfer agent, was intermediary for a

22  securities contract specifically.  Transaction was a securities

23  transaction, facially.  Here, MUFG's agency relationship is

24  purportedly in connection with the FLLO bank debt which is, in

25  turn, in connection with a securities contract.  That's one in

1  connection with too many.  So the workaround doesn't work.

2  Okay.

3          So under Merit, 546(e) doesn't apply, nor should it

4  because it has nothing to do -- the avoidance of liens under a

5  TOUSA theory has nothing to do with a securities transaction.

6  And MUFG is a conduit.  Okay.  But now you're going for the --

7  the part which is what Mr. Zensky was talking about, which is

8  is it close enough.  Is the FLLO range close enough to be in

9  connection with the securities contract.  Okay.  And you got to

10 stretch from, the pink side of the page to the green side of

11 the page, to find that securities contract.

12         Remember, Legacy Chesapeake had no liability on the

13 WildHorse bond debt.  The WildHorse -- WildHorse came to

14 Chesapeake in early of 2020 -- excuse me -- early 2019 as an

15 acquisition that came at that debt pre-existing.  And none of

16 Legacy Chesapeake had anything to do with any of that debt's

17 issuance.  And, frankly, WildHorse, operating under Eagle Ford,

18 didn't really have much to do with any of their entities

19 either.  And so it's a fully standalone entity that would rise

20 and fall on its own.

21         And yet, so that creditor up in Pennsylvania, who's

22 dealing with Chesapeake Appalachia, if you were to say to that

23 person, oh, yeah, you're now behind FLLO debt because we had to

24 pay off the WildHorse bond debt in Texas, they'd scratch their

25 head and say, how am I involved in that, how -- there's no

1 securities that Legacy Chesapeake at issue here, there's

2 nothing going on that my debtor has anything to do, other than

3 the fact that we're now burdened up and paying for that

4 securities issue all the way down in another part of the

5 company, that has no distance operations with us at all.  It's

6 just too far removed.  And <u>Merit</u> requires closer scrutiny.

7          "The transfer that the trustee must -- that may not

8 avoid is specified to be a transfer that is either a settlement

9 payment or made in connection with a securities contract."  Not

10 a transfer that involves, not a transfer that comprises, but a

11 transfer that is a securities transaction covered under Section

12 546(e).  This is too attenuated.  Okay.  Back to <u>Sun Edison</u> and

13 <u>Boston Generating</u>, those were actual involvements in the

14 transaction.  Here, it is just sources and uses of money.

15 That's the only connectivities.

16          So, Your Honor, we do not -- next slide, please.

17          <u>TOUSA</u>, in sum.  We have a prima facie case here.

18 It's a good case.  There's been ample evidence to support

19 claims liability.  And remember, we're still at the (audio

20 interference) stage.  Okay.  The debtors did not introduce any

21 substantive rebuttal evidence.  All they did was cross-examine

22 ours.  Their contentions respecting indirect are they aren't

23 supported by the evidence.  WildHorse signing on to Legacy

24 Chesapeake that hurt Legacy Chesapeake, not the other way

25 around.  And collapsing doesn't work under the law as the

1  evidence we have.  And it's pretty clear on that point.

2           There's far too much information in the public domain

3  for a good faith lender defense.  And you got to really stretch

4  the facts and law under <u>Merit</u>.  Or Your Honor has to adopt the

5  Second Circuit's <u>Tribune</u> decision -- again, go read <u>Greektown</u>

6  and see what it says about <u>Tribune</u>.  You got to really stretch

7  that even further than <u>Boston Generating</u> and <u>Sun Edison</u> to sort

8  of say 546(e) has a bearing here.  These claims have value.

9  And we've gotten none of it.  That is wrongful, we think.  And

10 it violates 1129(a) and (b).

11          Does Your Honor have any questions for me on <u>TOUSA</u>?

12          THE COURT:  No, sir.

13          MR. STARK:  Okay.  Let's talk about the

14 (indiscernible) preferences.  Okay.  Let's have a little bit of

15 legal framework.  Chesapeake's an Oklahoma company.  We don't

16 have any Oklahoma precedent on point.  We're squandering, we're

17 lapsing $3.8 billion in preference claims.  That's a big thing.

18 But we don't have any law about that.

19          I made a second cite here.  It's sort of shameless,

20 self-indulgent.  Forgive me.  But I do some writing with

21 Professor Jared Ellias.  There's a book coming out that goes

22 through the history of American jurisprudence on fiduciary

23 duties in insolvency situations.  It's a white paper.  I

24 thought it was just the cleanest way of a lot of law for

25 hundreds of years, American corporate jurisprudence, used the

220

1  trust fund doctrine.  That lays all of that law out.

2  Eventually, it heeded the business judgment rule.  But there

3  were important stops along the way in Delaware, to the extent

4  that that was viewed by Oklahoma as a good precedent or a

5  persuasive precedent.  We have (indiscernible) and famous

6  footnote 55, the possibility of insolvency can do curious

7  things to incentives, exposing creditors to risk of

8  opportunistic behavior.

9        That launched a whole new wave of thinking about what

10 boards should do at the time in which a company becomes

11 insolvent.  It's sort of, I think, started its own of

12 insolvency and stuff like that.  Today, Delaware's

13 jurisprudence is really very thin.  You've got <u>Trenwick</u>,

14 <u>Gheewalla</u>, and <u>Quadrant</u>.  That's it.  13 years of change to

15 jurisprudence and you've got three cases.  Okay.

16       The rule has been tightened up a little bit.  At

17 least <u>Gheewalla</u> does it.  Do these follow traditional business

18 judgment principals.  And they're owed to the company itself,

19 not to any particular stakeholder.  Okay.  But it does not

20 authorize a swashbuckling attitude when it comes to a massive,

21 massive asset, like 3.8 billion in preference claims.  Okay.

22       Now, we don't have any case law at the state level,

23 Oklahoma, Delaware, and Texas, New York, with respect to

24 evaluating something as big and impressive as that.  We do have

25 two federal cases, the <u>Skorheim</u> (phonetic) case and <u>Exide</u>,

1  where in -- on the District Court and, in <u>Exide</u>, Judge Kerry

2  (phonetic), in Delaware, said that, if the company

3  intentionally lapses the preference claims, that can be a

4  breach of fiduciary duty.  In fact, <u>Exide</u> has a lot of

5  similarities.  The company cut a deal with the secured lenders

6  for a quick restructuring, for a program that gave all the

7  value to the secured lenders, the creditors committee.  And

8  they filed on the 91st day.  They allowed the mortgages to

9  harden.  The creditor's committee -- I wrote the complaint.

10 The creditor's committee lodged a breach of fiduciary,

11 fiduciary duty, and fraudulent transfer to the equitable

12 subordination complaint.  And Judge Kerry said those claims

13 survive a motion to dismiss.

14          Next page.  Now, the law also tells us that when

15 you're in distress, purchasing officers need to really, really

16 study the situation.  Judge Rakoff's decision that came down

17 just a few weeks ago in the <u>Nine West</u> case is really

18 instructive.  There was an (indiscernible) that was done, and

19 the allegation from the complaint was they didn't study the

20 implication decision that they were making, and Judge Rakoff

21 said that's a claim.  You don't get the benefits of business

22 judgment if you didn't really look at it.  From here, I go back

23 to Mr. Lawler's testimony: I don't need to study it; I live it.

24          Next bullet.  At some point, squandering assets

25 lasting values can be so great because even if you studied it,

222

1  it's corporate waste.

2          Next slide, please.  There is Judge Chapman's

3  decision (indiscernible), and I believe that one, too.  Judge

4  Chapman dismissed the fiduciary duty and avoidance theories

5  from the failed merger of Forest and Sabine.  I don't think an

6  awful lot of this opinion, and I'd love to talk about it, but

7  it's not necessary.

8          To the extent Judge Chapman quickly draws a

9  distinction between decision making and avoidance theories that

10 bring value into the company, recovering payments made, for

11 example, versus value allocation, she doesn't rest her opinion

12 on it.  She rests her opinion on the Creditors' Committee's

13 inability to put forward evidence that if you prosecuted this

14 claim, it actually would end up yielding value to unsecured

15 creditors.  That's not what -- we've done that here.  The

16 Creditors' Committee in Sabine did not do that.  That's why

17 those claims were dismissed.  But if anybody wants to read

18 Sabine as seeing a distinction, and I gather the debtors do,

19 between avoidance actions that bring in money versus those that

20 allocate, I don't find that in the statute, or in corporate --

21 in (indiscernible) corporate law anyway.  I think if that's the

22 reading, then Sabine (indiscernible) your opinion, and I don't,

23 I just don't think it's right because if you avoid nearly

24 $4 billion of liens, that's good for a company.  That's a good

25 thing.

1        And of course, there's claim, even if you can't go
2   after the D&Os for the business judgment, that side will tell
3   you, as to other authorities, that you still can go after the
4   lenders who received the benefit of the last preferences.  I'm
5   not recreating something; that still can be a theory that
6   works.  Enterprise proved positive, they filed on the 91st day
7   and they -- and that was a joint deal between the lenders and
8   the company, and an equitable subordination claim alive and
9   unjust enrichment was always available in an equitable
10  circumstance.

11        So let's go to the next slide because the debtors'
12  case narrative, they aggressively used the preference thread to
13  secure a badly-needed rights offering, and you couldn't get it
14  any other way.  Chesapeake FLLOs and Franklin breached that
15  deal around before May 14th, and they got those concessions by
16  the threat of the preference litigation.

17        You have their argument that the company fought
18  really hard in these negotiations to obtain these great
19  recoveries from secured creditors and that they could not have
20  risked the freefall because they didn't have financing in place
21  in that scenario.  Okay?  And again, I don't -- I'm not
22  faulting the executives.  Life is hard.  But I don't think
23  that's an accurate narrative.

24        What you'll see from the evidence, and we'll go
25  through it, is that the FLLOs did threaten, not people

224

1  intentionally, I don't -- I think they're probably honest when

2  they tell you, oh, I wasn't really worried of a lawsuit against

3  me.  But they threatened a litigious and hostile Chapter 11

4  case, which we know quite well, that this company really just

5  wanted to get in and out of bankruptcy as soon as it could.

6  And having to file those in a litigious posture was something

7  that scared them, so they folded.  They didn't get any sort of

8  tolling agreement, no forbearance; they simply let them go.

9  And when they -- and by doing that, they relieve the FLLOs and

10 the second liens of litigation risk.  There's no real evidence

11 that they spent it.

12         The DIP financing was available, and actually, there

13 was potentially less expensive equity financing.  Okay?  One of

14 the FLLOs relieved of the lien avoidance risk, they went off on

15 their own, and they structured the deal, and they told the

16 company what the deal would be.  Okay?  And the debtor signed

17 on after the fact.  And ever since that day, it's been a hard

18 push.  They don't want to talk to me; they don't want to

19 negotiate with me.  A hard push to push that deal forward, the

20 one that they (indiscernible).  Okay?

21         So now let's look at the actual evidence.  Okay?  77,

22 please.  There was -- Ms. Schwarzman, as Mr. Nash did in his

23 opening, go back to 2013.  I don't care about 2013.  I don't

24 care about anything until just before the bankruptcy case.  May

25 14th was the stipulated date.  That was the date.  If you filed

1  by May 14th, then most of the FLLO and second lien mortgages

2  would have been avoidable under a preference theory and a

3  pretty darn good one.  Okay?

4         Let's go back only a few weeks before that time.  The

5  Board was told of the FLLO second lien preference risk.  They

6  were given an analysis that was done by the companies'

7  professionals that showed that there was big preference risk,

8  and that they were prepared to discern how much unsecured

9  creditors should get in the case.  Based upon this analysis, it

10  was the company's perspective that the negotiating offer should

11  be for FLLOs and the Franklin 25 percent of new equity goes to

12  unsecured creditors, even if that would reduce enterprise

13  value.  Okay?

14         Next slide, please.  Two days later, on April 30th,

15  the Ad Hoc Group responded by threatening -- yeah, they

16  threatened them individually, and everybody shrugged their

17  shoulders, but they threatened the hostile and litigious

18  bankruptcy process and that they should not and could not file

19  during the case if that's what they were looking at.

20         In the same presentation, the FLLO lenders said, we

21  know that Kirkland is telling the Board that you both have a

22  fiduciary duty to preserve those certain alleged preference

23  claims, and then they launched into why it is they should just

24  disregard them.

25         Now we go to 79.  This is Mr. Nelly's (phonetic)

1  testimony about May 5th.  Okay?  The Ad Hoc -- the FLLO Ad Hoc

2  Group delivers a restructuring proposal, and it has a weird

3  term.  I've been doing this for a long time, and I've never --

4  I've negotiated a lot of deals, but I've seen a term like this

5  in a term sheet.  No bankruptcy filing before June 30th.  It

6  was a deal point made at this point that if you want to

7  negotiate with us, you better not file on the 14th.

8          The same day, the Board votes to pay themselves, to

9  pay the executives 19 million in bonus payments.  I'm not

10  attacking the decision that they did that, but it's clear that

11  they did that because they knew that bankruptcy was going to

12  happen, and like most debtors nowadays, they might do it

13  beforehand to avoid the 503(c) scrutiny.  So this is evidence

14  that they were thinking hard to prepare for the bankruptcy with

15  no problem, at least when it came to their bonuses.

16          Next slide.  On the next day, as Mr. Antinelli

17  testified, the FLLO groups sent another letter reiterating,

18  we're going to have ourselves (indiscernible), which is a

19  bankruptcy case, if you file on time.  A few hours later, after

20  the company receives that letter, the second letter in, like,

21  three days, two days, the company then sends back a term sheet

22  to the FLLO term lender group saying, okay, we're going to do

23  -- we'll change the term sheet, and we'll get rid of unsecured

24  creditor fixed amount; we'll leave that as TBD.

25          Next slide.  Remember that?  That's -- so now we go

1  five days later.  We have this presentation on May 11th.  Okay?

2  This is the document.  You've heard Mr. Antinelli and others

3  say, well, this really isn't a good reflection of what truly

4  happened.  But it says the company has not inserted itself in

5  the dialogue as creditors have constructively negotiated.

6          I'm sure that there's truth to both assertions.  I'm

7  sure that Franklin and the FLLOs were all talking among

8  themselves about what a deal should look like.  And I'm sure

9  that the company said, have those conversations, keep us

10  informed, let us know how it turns out, see if we can be

11  helpful.  That's how assertion works.  But the notion that they

12  were leaving it, that the (indiscernible) bankruptcy practice

13  as I know it, is far more likely that, in fact, those guys were

14  meeting separately to talk amongst themselves, in part because

15  if you see here, Franklin was offering an exit -- a backstop

16  rights offering that was substantially cheaper than what the

17  FLLOs were offering.  They were prepared to do it.  Okay?  So

18  they went off to talk amongst themselves about that.

19          Mr. Lawler testified to the extent that if there's

20  any ambiguity on the point of who was leading who, Mr. Lawler

21  testified that it was not Chesapeake, but the FLLOs and

22  Franklin who determined for themselves what unsecured creditors

23  would get in this case.  And that's despite the analysis they

24  got a week earlier about the substantial unencumbered value

25  that should go to the unsecured creditors.

1        Next slide.  We've had a lot of discovery in this

2   case, but we haven't seen a single document on or prior to May

3   14th where the Board received any other analysis about the

4   3.8 billion in preference claims.  What could it be done?  What

5   kind of financing could come in here?  What kind of deal could

6   be achieved?  There's no records at all about anything else.

7   Even though we have analyses, we don't have any that look like

8   that.  Okay?

9        There's -- and then as far as the Board decision, all

10  we have is on May 10th there was an information session.

11  Nothing was decided.  Okay?  There's no vote.  No votes were

12  taken.  No records exist to corroborate that the information

13  session actually involved a deliberative process to determine

14  not to file.  There are no minutes to that extent.

15       Now we get into the 14th, where it's time zero.  On

16  this date, as both Mr. Lawler and Mr. Antinelli testified,

17  there was no restructuring deal.  There wasn't even a deal in

18  principle yet.  They were still talking.  The decision was then

19  made to lapse the preferences.

20       Next slide.  The Board didn't -- Mr. (indiscernible)

21  said the Board decided not to file, but we don't know when that

22  decision was made.  There weren't even any Board meetings on

23  May 13th or 14th; it just kind of sort of happened.  So the

24  debtors got nothing.  The testimony is, there was no legally

25  binding deal, the creditor groups -- they were talking, and

1  they may have been intimating what they might want to do, but

2  they could walk at any time, they could demand the deal be

3  changed.  The leverage was allowed to dissipate, and the RSA

4  didn't come together until later.

5          Next slide.  But we know this is a designated

6  deposition testimony.  MUFG was prepared to provide the DIP for

7  filing on May 14th.  They had committed financing.  They may

8  not have had the equity committee commitment that

9  Ms. Schwarzman talked about before, but this company could have

10  filed.  It was -- it had the commitment to get the financing

11  done, it just didn't want to execute on that.

12          Next slide.  And the FLLO/Franklin rights offering

13  was not the only option.  Franklin was willing to backstop its

14  equity rights offering at the lower price reflected on Slide

15  80.  What happened?  Why didn't that come to be, Mr. Circle

16  said, because the debtors never asked.

17          Next slide.  Franklin also never believed this

18  company was worth 3.25 billion.  It was a sham.  Mr. Circle

19  testified that the Chesapeake was worth, in his mind, far in

20  excess of the RBL and the FLLOs.  And here we go back to a

21  quote that I had back in the first day -- at the beginning of

22  this, my opening slide, the Warren Buffett quote, quote, "The

23  best thing that happens to us is when a great company gets into

24  temporary trouble.  We want to buy them when they're on the

25  operating table."  Okay?  That's -- this company was on the

1  operating table, and Franklin was a buyer, and so was the

2  FLLOs, and they figured out a price point that would be a

3  really, really inexpensive buy for them.

4        I'll just pause for a moment.  Mr. Zensky made a

5  point about, you know, that everybody saw before this period of

6  time the equity upside because bondholders didn't go into the

7  second lien exchange.  And it kind of, you know, made me think

8  about this particular slide because people do what they do for

9  the economic reasons they have at the time.  Unsecured

10 bondholders may have been offered the opportunity to go to the

11 second lien exchange.  They may not have wanted to do it

12 because they'd have to sign an intercreditor agreement; they

13 lose all optionality.  People don't go into second liens all

14 the time if they're in a subordinated lien position because the

15 senior lienholders tell them what they can and cannot do with

16 the collateral.

17        Here you have exactly what Franklin wanted to be.

18 They're in a position to be a buyer, and they can -- and

19 they're not hampered by what the senior lenders tell them what

20 they want to do, what they should do.

21        Next slide.  Again, the debtors always knew that

22 there was significant value -- a significant unencumbered value

23 and they let Franklin and the FLLOs construct their deal on

24 their own to take it.  They knew about the 10.6 percent, that's

25 in here, okay, but they deferred to those negotiations, and

1 what came out of those negotiations, rather than the 25 percent

2 that was initially asked, was what later became 17 percent.

3      The FLLOs and Franklin decided to give the unsecureds

4 12 percent, close enough, I guess to the 17, but then they took

5 it back.  They did the 3.25 rights offering and took eight

6 percentage points and reallocated back to themselves.

7      Now they find themselves having to back up.  Now that

8 the company has actually grown in value, and exposes how that

9 kind of came together, they're backing into this RBL roll up

10 way of trying to get done because at the time deal was done, it

11 may have been okay as the TEV was there then, but it is not

12 okay as the TEV is today.

13      Last slide in this section.

14      RECORDING:  Our system will end this conference in

15 five minutes.  To extend this -- (phone buttons pushed) -- your

16 contract has been extended for 60 minutes.

17      MR. STARK:  -- in our complaint.  That was basically

18 lying that that was in our complaint.  They didn't have

19 analyses; they didn't look at them; they didn't evaluate them.

20 Once Franklin and the FLLOs did their deal and told them what

21 the unsecureds were going to get, they signed on, when is the

22 bankruptcy, and we've been marching like soldiers ever since.

23      Summation, Your Honor, on 93.  It is a very big deal

24 under the law to last 3.8 billion in known and viable

25 preference claims.  That is a very, very big deal.  There is no

1   case law that says, oh, yeah, you've got business judgment

2   rights, you can just dispense with that.  Okay?  There is no

3   decision like that.  Not out of Delaware, not anybody else.

4   There is case law saying that if you do this, you do run the

5   risk of breach of fiduciary duty; you better study it hard.

6            Second point.  Lien avoidance is good.  Lien

7   avoidance is not bad.  The FLLOs may not have liked the fact

8   that they went into a bankruptcy and they couldn't control the

9   other side of it, and the debtors may have preferred,

10  literally, they preferred, that they wanted a bankruptcy that

11  was more of a transaction that they knew the outcome.  Okay?

12           The lien avoidance is an acceptable way to go ahead

13  and reorganize the company.  It's the traditional way to

14  reorganize the company.  But if you're going to let them

15  (indiscernible), you better work awfully hard.  The Chesapeake

16  (indiscernible) without having made any preparations for

17  bankruptcy.  They've had the opportunity to have the DIP

18  financing by May 14th, and they didn't secure it.  They didn't

19  tie it down.  There's no documentary evidence, again, that they

20  really studied the issue, except Mr. Lawler says he know -- he

21  lived it and that was good enough.  Okay?  And they didn't

22  secure any deal.  They let their leverage dissipate before the

23  deal, and there's no evidence they even convened a board

24  meeting to face these things, they just let it go.

25           And it is not true that Chesapeake aggressively

1  mandated the deal.  They didn't lead the discussion.  As

2  Mr. Lawler testified, the FLLOs and Franklin dictated the terms

3  of what unsecured creditors and others would get and then they

4  gave it to the company, and we've been marching like soldiers

5  ever since.  This is the (indiscernible) case outcome, Your

6  Honor, I don't -- I know that I'm marching against, you know,

7  bankruptcy practice and great professionals, and everybody is

8  working really hard, but 3.8 billion squandered, the people who

9  are the target of the suit, walk away with the company, for

10  convenience sake.  Okay?  And now we're going to be

11  overcompensated when the company itself knew all the way back

12  here that unsecured creditors should be due is a terrible case

13  outcome.  It should not be exonerated under 1129(a) or (b).

14        Your Honor has been very patient with me and I'm

15  trying not to belabor.  I have a few more sections.  Does your

16  Honor have any questions for me about that?

17             THE COURT:  No, sir.

18             MR. STARK:  Okay.  There's sort of a low hanging

19  fruit claim, legal dividends.  An Oklahoma company that pays

20  self dividends when it's insolvent violates Section 41 and 52

21  of the Oklahoma General Corporations Act.  Section 53 of the

22  Act makes the directors liable for that.  $22 million has been

23  paid per quarter in dividends to preferred stockholders.

24  There's no collectability issue.  The company's got ample D&O,

25  and there's no insurance along with the Committee that's going

1  to stand and prosecute it.  Okay?

2         We know that the 22 million equity dividend was done

3  in December of 2019, and we have evidence of solvency.  We know

4  how 22 million was done as (indiscernible) on board and was

5  valuating you know, preference risks, things like that.  That

6  is low hanging fruit, the 44 million, and there may even be

7  more if we go back to earlier quarters, depending upon whether

8  they were paid systemically and whether insolvency can be

9  proven back there.  Those are released as well for no

10 consideration.  That doesn't make sense to us either.

11        Again, I don't want to -- on Slide 98, we learned

12 from reading Sabine that Creditors' Committees that bring

13 litigation claims have to produce to the judge evidence that

14 actually prosecuting would be beneficial to the unsecured

15 creditors their constituency, so we provided those litigation

16 models.

17        People can differ as to whether or not the model

18 assumptions are right or wrong, but if you were to avoid the

19 liens and the guarantees issued in connection with the FLLO, if

20 you were to have a remedy provided for the lasting of the

21 preferences, if you were to provide -- if those illegal

22 dividend claims are prosecuted successfully, that is

23 unencumbered value.  That renders or delivers unencumbered

24 value of significant quantums and that evidence has been

25 presented to Your Honor.

1        If you will, Your Honor, on Slide 101 and 102, the

2  collapsing of Classes 6 and 7.  The thing that I've been trying

3  to do from the beginning of this case to this very moment --

4  and if Your Honor will allow me and I'm going to be intense --

5  it begins with a fair outcome.  I haven't been trying to, you

6  know, stick it for people.  I haven't been trying to avoid

7  negotiations.  I've been making proposals and trying to get

8  anybody to negotiate to avoid this day as much as possible.

9  And just nobody calls me back.  Okay?

10        Collapsing a 6 and 7 as done in the middle of a

11  trial, I didn't play for time; I said, okay, we'll study it,

12  and we'll see what the implications are.  But it's not

13  particularly fair.  And consistent with our entire theory of

14  fairness, we said, well, what is fair, right.

15        So when we looked at the company, and we said, there

16  are some entities in the company that are asset rich, and there

17  are some entities in the company that are asset poor, like any

18  other large conglomerate.  If you have a claim at an asset-rich

19  entity, generally speaking, you've done your credit risk

20  profile, and you've made your commercial decision about

21  providing credit one way or other about that entity, you should

22  get the benefit of your bargain.

23        Some other creditor who chose to contract with a less

24  rich entity should not get the benefit of that bargain. That is

25  ETC's problem.  That is why Mr. Mitchell was fighting, you

ACCESS TRANSCRIPTS, LLC           ⚖           1-855-USE-ACCESS (873-2223)

1  know, the separation between the bond and the trade.  He made a

2  very component argument, it's true, that doing holistic across

3  the board, separation of bonds and trade isn't sensible.

4  That's not fair.

5         But in order to substantive consolidation, because

6  Energy Transfer and, frankly, a whole lot of other creditors

7  don't have claims at very asset-rich entities, they have them

8  at certain entities that have value and some that don't have

9  value.  And so that's now glomming onto a solution, he created

10  -- he identified the problem persuasively.  The solution

11  creates problems for everybody else.  And that's not fair.

12         The slides here sort of show that.  It sort of shows

13  that if you do, this is Mr. MacGreevey's analysis, and we can

14  just use the books and records (indiscernible).  Okay?  And if

15  you combine it so that everybody -- and this is the combined

16  full distributions, everybody gets 2.6 percent recovery.

17         If you go company by company, and people who have got

18  claims of asset-rich entities get their allocation based upon

19  the asset pool, it's different.  If you do it with intercompany

20  claims, but the companies do migrate values between themselves

21  to intercompany claims, a lender -- a debtor-by-debtor analysis

22  gets 3.8 percent for Class 6 and .5 percent for Class 7.

23         If you do it without the intercompanies, if you sort

24  of just write those off as equity contributions and dividends

25  as opposed to intercompany debt, it's a little bit different;

1  it's 3.7 and .8.  We just want the fair outcome, Your Honor.

2  And the fair outcome should be people should get paid based

3  upon what their legal entitlements are, not for convenience

4  sake.  So that's what we would suggest.

5          Miscellaneous issues, and then I'll wrap up, on slide

6  106.  The confirmation order provides at paragraph 242 that the

7  Committee goes away immediately.  There are no signs of the

8  confirmation order, there's no more committee anymore.

9          THE COURT:  It's 276 now.

10          MR. STARK:  Okay.  Apologies.  That's not consistent

11  with bankruptcy practice or appropriate, in our view.

12          THE COURT:  I agree.

13          MR. STARK:  There is a -- the waiver, the 14-day

14  stay, obviously, we're bringing substantial issues here.  If

15  Your Honor were to overrule our issues, I'd have to talk to the

16  Committee about our appeal options.  So this is intended to

17  prevent that from happening.  I'm not suggesting that we

18  wouldn't come and talk to the Court about it or the other

19  parties, but to -- before we even have an opportunity to hear

20  your ruling and to think about it, it's being taken away.

21          There's the opportunity to modify the plan, which was

22  carte blanche, and we don't think that's right either.

23          The last issue is that there's value being given in

24  the form of equity and warrants to various bonds creditors

25  here.  We have indenture trustees, they've been very active.

1  They've been very constructive members of the Committee.  If

2  they have to go and sell all of the stock on the market to

3  satisfy their charging lien, that's not -- that's going to

4  really hurt people.  The normal convention is to pay their fees

5  in cash, and so we're supporting -- we're asking that that be

6  done here to conform with other cases.

7          I promised I would conclude, Your Honor, by offering

8  an alternative view about how to proceed.  It is not a

9  different way to proceed than any of the other times have been

10  before Your Honor, in a sense.  This case, proceeding with

11  soldiers marching, and that's just not good bankruptcy process.

12  These are substantial issues, and we should sit and talk about

13  them.

14          You asked Mr. Baggett did the Committee prefer

15  liquidating his company, and the answer is an unreserved no.

16  That's never been what we're about.  We have always been

17  willing, ready, and able to negotiate a fully professional

18  deal.  Your Honor knows me.  That's how I practice.  I want to

19  get to a win-win for everybody, but you have to engage with us

20  if we're meaningful in the case.

21          THE COURT:  Mr. Stark, here's the problem.  And I've

22  hinted at this all along.  You can't stand up and accuse

23  someone of malfeasance and then expect them to sit down and

24  negotiate a resolution.  And you did it from day --

25          MR. STARK:  Well --

239

1          THE COURT:  -- one.  I'll get Mr. Schaible, and I'll

2   get Kirkland on here, and I have every belief they'll tell you

3   that they were offended and insulted at some of the things

4   you've said that they engaged in.  I heard it.  But you can't

5   expect people to say, okay, I'm going to put that aside, and

6   I'm going to sit down and negotiate with you when I don't think

7   you're entitled to something and you've impugned my reputation,

8   which is all that lawyers have.

9          MR. STARK:  Well, Your Honor, as far as impugning a

10   reputation, again, there's only so many times I can apologize

11   and say I'm sorry, and I think everybody in this deal and this

12   Court knows me.

13          THE COURT:  Actually, this first --

14          MR. STARK:  Your Honor, I have --

15          THE COURT:  This is the first time you've actually

16   said that you would apologize.  Every other time, you said you

17   didn't do it.

18          MR. STARK:  Well, I'm sorry, Your Honor.  I thought I

19   apologized many times at the beginning of the case.  If I --

20   again, I'm tired.  I don't think that I've impugned anybody,

21   but if I have, and if I've offended, I'm certainly apologetic.

22   Your Honor knows that I have all respect in the world for those

23   professionals.  I work with them all the time on lots of

24   different cases.  I have great affection for them and call them

25   my friends.

1          THE COURT:  Well, I've --

2          MR. STARK:  They've been doing this job --

3          THE COURT:  -- been very surprised at some of the

4   things that you have said.  I've been very surprised,

5   especially when I've got nothing in the record.

6          MR. STARK:  Your Honor, again, the theory of this

7   case is that a deal was struck for the purposes of economic

8   improvement of the people that were bargaining.  There's

9   nothing wrong with that.  That's commerce.  That's America.

10          THE COURT:  I agree.  That would be the only way I

11   would understand.

12          MR. STARK:  The lawyers and the bankers hate the

13   situation that they have, but they negotiate for their clients

14   to the best of their ability.  That's what they did.  That

15   doesn't mean the deal is right.  That doesn't mean that a

16   faulty transfer and other claims don't arise because of the

17   structuring of that deal, that aggrandized the people who are

18   allowed to negotiate it.

19          THE COURT:  I totally agree.  But that's not what we

20   were talking about, was it?

21          MR. STARK:  I --

22          THE COURT:  You have complained.  You have

23   complained, hearing after hearing after hearing, that no one

24   would talk to you.  Now, in all candor, I don't care.  But you

25   cannot expect someone to want to sit down and negotiate with

1  you when you position this the way you did.  That's what we're

2  talking about.

3          MR. STARK:  Well --

4          THE COURT:  And so I just don't think it can be that

5  big of a surprise.

6          MR. STARK:  Your Honor, we started this case being

7  told you're out of the money, you get nothing; and you're going

8  to have to litigate your way to get something; you've got three

9  months to figure out a standing motion.

10         We handed everything to the other side and said we

11 don't wish to file any of this.  We don't wish to litigate.  We

12 wish to sit down with you and negotiate.  We're prepared to go

13 to judicial mediation.  We were told that's not available to

14 you, we would prefer that you go ahead and file this and start

15 your litigation, we like our deal too much.

16         I said, okay, what am I supposed to do?  I'm an

17 advocate for a client.  It -- I think -- I believe -- I

18 personally believe that what happened here is a gross migration

19 of value that belongs to unsecured creditors to those who were

20 allowed in the room and it is wrongful.

21         THE COURT:  I --

22         MR. STARK:  I don't know how to say that in a way

23 that people that negotiated or participated in the deal -- if

24 they want to put on their hats as a commercial party and say,

25 okay, if you've got leverage, we'll negotiate; if the Court

1 thinks you've got no leverage, we won't.

2          If there are multiple -- if they feel that they're

3 maligned because I said to them I think the deal you cut is

4 wrongful, and I think the way that you -- if you put it into

5 the DIP loan, as a means to kind of make sure that it was

6 impossible for us to be able to actually litigate this, because

7 we've seen that trick before.

8          I don't know what to say.  I've got a job to do.  But

9 I did not shoot first.  I've been trying.

10          If they don't want to talk to me because they don't

11 like me, and they don't like my rhetoric, they don't like the

12 way I smell, they don't like the way that I present myself,

13 okay.

14          THE COURT:  Mr. Stark.  That's --

15          MR. STARK:  This is a big case.  This is a hard --

16          THE COURT:  Mr. Stark.  That's enough.  You're ending

17 exactly where you started.  Thank you, sir.

18          All right.  Anyone else have closing argument that

19 they wish to make that opposes the plan?

20          MR. HEBBELN:  Your Honor, this is Mark Hebbeln on

21 behalf of Wilmington Savings Fund Society.  Can you hear me?

22          THE COURT:  Mr. Hebbeln, I can.  I cannot see you.

23 Should I be able to?

24          MR. HEBBELN:  I've been having trouble with my camera

25 all day, Your Honor.

243

```
 1              THE COURT:  Okay.
 2              MR. HEBBELN:  It doesn't seem to be working for me.
 3    I can't see anybody.  If it's okay with you, as long as you can
 4    hear me, and see our slides, I'm willing to proceed if that
 5    works for you.
 6              THE COURT:  So let me -- that's -- that'll be a good
 7    question.  Are you actually on GoToMeeting?
 8              MR. HEBBELN:  Yes.
 9              THE COURT:  All right.  And who did you -- what's the
10    login name?
11              MR. HEBBELN:  For sharing the slides, Your Honor?
12              THE COURT:  Yes, sir.
13              MR. HEBBELN:  Jennifer Huckleberry, please.
14              THE COURT:  Jennifer Huckleberry.  Ah, there she is.
15    She went last name, first.  Got it.  Okay.  She should have
16    control and I can hear you just fine.
17              MR. HEBBELN:  Okay.  My camera actually looks like it
18    may be working so I may hop in there in a second, Judge.
19              THE COURT:  Terrific.
20              MR. HEBBELN:  Thank you, Your Honor.  Again, Mark
21    Hebbeln, Foley & Lardner, on behalf of Wilmington Savings Fund
22    Society, FSB, as indenture trustee.
23              And Your Honor, just as a little background, I think,
24    as Your Honor knows, Wilmington Savings Fund Society is the
25    indenture trustee for nine sets of the debtors' unsecured
```

1 notes.  And the total outstanding principal amount is
2 approximately 2.9 billion, which is the vast majority of the
3 3.4 billion of unsecured notes in these case -- cases, that
4 were issued by Chesapeake Energy Corporation and guaranteed by
5 29 of the debtors.

6    Your Honor, what I'd like to talk about is the issue
7 that Mr. Stark -- one of the issues Mr. Stark ended on, which
8 is the combining of Classes 6 and 7 in the fourth amended plan.
9 And I know it's a relatively narrow issue in the grand scheme
10 of this case, but one that is important to our constituency.
11 And I'd like to walk Your Honor through why we believe that it
12 shouldn't be done in the way proposed by the fifth amended
13 plan.

14    And, Your Honor, I expected Mr. Stark would steal
15 some of my thunder on this issue and, in fact, he did, but --
16 which is fine.  But of course, we have a slightly different way
17 of looking at a couple of different points.  But if I become
18 repetitive of what Mr. Stark said, please let me know and I'll
19 move along as quickly as I can.

20    THE COURT:  Just fine.

21    MR. HEBBELN:  So just -- thank you, Judge.  So just a
22 preview of our argument.

23    Your Honor, we start with the third amended plan,
24 which provided for separate distributions to Class 6 and 7.  As
25 you know, Class 6, unsecured notes, got new common stock and

1 warrants, and it was a relatively modest recovery.  2, 3, 4

2 percent was the estimate.  One thing it did allow -- and I'll

3 come back to this in a minute -- is it allowed for a single

4 distribution to the noteholders, on or shortly after the

5 effective date, because all of the noteholder claims are

6 allowed under the plan, and they weren't sharing their

7 distribution with any creditors whose claims were not allowed.

8        Class 7 obviously had the $10 million cash and we'll

9 talk about this a little bit too.  Distribution to those

10 creditors were to be done on a debtor-by-debtor basis and they

11 respected multiple claims that creditors had against the

12 various debtors.  And as I think Your Honor recognized, it was

13 a disproportionately low recovery to those unsecured creditors.

14 And what the disclosure statement basically said, noteholders

15 have guarantees, the trades don't, so the noteholders get a

16 greater recovery.  And you know, reading between the lines a

17 little bit, we think the third amended plan basically attempted

18 a sort of rough justice to account for the presence of the

19 noteholder guarantees.

20        Then the debtors filed the fourth amended plan and

21 now they filed a fifth amended plan.  And those plans have

22 Classes 6 and 7 sharing in the new common stock and warrants

23 that were previously going only to Class 6.  And they created a

24 new convenience class.  We think this resulted in some issues,

25 Your Honor.

246

1        First of all, it substantially diluted the

2  distribution of unsecured noteholders rather than just

3  increasing the distribution to the general unsecured creditors,

4  which would have been an option.  It turned a single

5  distribution to noteholders, that I referenced on the last

6  slide, into multiple distributions, potentially requiring

7  significant OPEX, reflecting the unliquidated general unsecured

8  claims.

9        And then, contrary to the fact that it's not a

10  substantive consolidation plan, it didn't -- it does not

11  contemplate debtor-by-debtor allocations and it wipes out the

12  multiple -- the claims that multiple -- the creditors may have

13  against multiple debtors.  And that includes not only the

14  noteholders, but trade creditors who might have multiple claims

15  against debtors.  And it ignores that most of the unsecured

16  note obligations are obligations of 30 debtors holding most of

17  the oil and gas assets, while the general unsecured claims are

18  primarily against a few of the entities holding less of the gas

19  assets.

20        And so we think -- we don't think this cured the

21  rough justice problem of the third amended plan.  In fact, we

22  think it just bent it in a different form of rough justice on

23  the unsecured noteholders because it completely disregarded

24  their guaranteed claims against multiple debtors.  And the

25  beneficiaries of that rough justice were the trade creditors

1  because they were now receiving distributions of value that is

2  allocable to debtors against which they may not have claims.

3  So in essence, in the fourth amended plan, the rough justice

4  pendulum merely swung from one end to the other.

5          And our argument implicates, you know, substantive

6  consolidation, new potential unfair discrimination issues, new

7  potential DIP lien issues, and as I referenced the distribution

8  mechanics and holdbacks that made the list, delay

9  distributions.  So, Your Honor, our view is that rough justice

10  be -- not be visited on either group.

11          THE COURT:  Okay.

12          MR. HEBBELN:  In response to Your Honor's -- I'm

13  sorry?

14          THE COURT:  No, no, no.  I was following you.  I just

15  said, okay.

16          MR. HEBBELN:  Oh.  Oh, sorry.  Sorry, Judge.  in

17  response to Your Honor's concerns about the recoveries for

18  Class 7 under the third amended plan, we obviously would have

19  preferred to see the plan proponents just increase the

20  distribution of Class 7, but they didn't go that way.  Instead,

21  they lumped the bonds and the trades together, so now they're

22  both getting the same percentage recovery.  And this seems, at

23  first blush, Your Honor, as fair.  After all, unsecured

24  creditors are getting the same percentage recovery.  But we

25  would submit that it raises more problems than it solves

248

1  including the ones I've already discussed.

2          THE COURT:  So is the right -- I'm sorry.

3          MR. HEBBELN:  No, go ahead.  I'm sorry, Your Honor.

4          THE COURT:  I mean, is the right answer -- is it just

5  that 6 and 7 get nothing?

6          MR. HEBBELN:  No, Your Honor.  We think that the

7  right answer is that 6 and 7 get the current gross distribution

8  they're supposed to get, but that the distribution is recognize

9  multiple claims that the creditors may have against debtors.

10  And that includes not only the noteholder claims, which they

11  have about, you know, one is short, one plan against the short

12  and 29 claims against guarantors, but also trade creditors.

13  Some trade creditors undoubtedly have multiple claims against

14  debtors, and we think those should be, you know, honored also.

15          And in fact, the third amended plan -- I was just

16  going to go to the next slide on this, if I may, Your Honor.

17          THE COURT:  Sure.

18          MR. HEBBELN:  To point out some language -- I'm sorry

19  -- that just shows that -- I'm sorry.  That slide just shows

20  that it's not a sub-con plan, and nobody thinks it is.

21  Ms. Schwarzman confirmed that in her closing.

22          THE COURT:  Right.

23          MR. HEBBELN:  This slide, Your Honor, this shows, if

24  you look at Class 7 treatments, and if you look at the

25  highlighted language, the -- those creditors received their

249

1  full share of the general unsecured claim recovery amount

2  allocable to the debtor for which such claim is asserted.  So

3  that plan actually contemplated allocating the $10 million

4  among various debtors and then having creditors assert their

5  claims.  It could be one claim, it could be two, it could be

6  three against those debtors and getting their share of that

7  recovery.

8       And the next slide, Your Honor, is just Article 6(j)

9  of that plan, which just kind of drives that point home that

10 the holder of an allowed claim against more than one debtor may

11 recover distributions from all co-obligor debtors until it's

12 paid in full.

13      The next slide, Your Honor, is this is what I -- this

14 is from the disclosure statement.  And it just says, you know,

15 that highlighted language, as a result, the distribution to

16 such holders -- we're talking about the general unsecured

17 creditors under the third amended plan will depend on the

18 allocation of value between the debtors.

19      So -- and the next slide, Judge, is a chart that we

20 included in the disclosure statement.  It kind of set out what

21 the -- where the claim against the debtor -- those debtors,

22 resided with general unsecured creditors, and the recovery that

23 you could have against each of those debtors.  If you had a

24 claim against more than one debtor, you got more than one

25 recovery, so the debtor-by-debtor analysis.  So it's clear the

1  debtors could do that if they wanted to.

2          On the next slide, Your Honor, I'm going to segue to

3  the fourth amended plan, but first I want to just hit -- this

4  is the -- back one slide, please, Jennifer.

5          This is the discussion of the treatments and

6  basically of the Class 6 and 7 claims and it gives as a

7  justification the guarantees for the disparate treatment

8  between those creditors.

9          THE COURT:  Okay.

10         MR. HEBBELN:  And I think Your Honor notices this is

11 a particularly rough justice for the bondholders who were

12 projected to get a 2-to-4-percent recovery and trade was

13 getting just above zero.

14         So they filed the fourth amended plan, and again, I

15 put the treatment up on this next slide just to show that --

16 the thing I'll note here, Your Honor, is that distributions are

17 not being allocated on a debtor-by-debtor basis anymore.  That

18 concept which was in the third amended plan for Class 7, has

19 disappeared from the plan altogether.

20         THE COURT:  Okay.

21         MR. HEBBELN:  And that's just confirmed on the next

22 slide.  The definition of pro-rata was changed to make that

23 clear also.  And on the next slide, Your Honor, interestingly,

24 Article (j) --

25         THE COURT:  Can we go back and I'm sorry, you just

1  went faster than I.  Can you go back one?

2  MR. HEBBELN:  Yep.  So that's just shows Your Honor,

3  that one did change -- that's in the fourth amended plan that

4  shows that basically you pool all the --

5  THE COURT:  Got it.

6  MR. HEBBELN:  -- noteholder claims, and general

7  unsecured claims, and you get your pro-rata share of whatever

8  that denominator is.

9  THE COURT:  I got it.

10  MR. HEBBELN:  But only on the claims once.  And

11  there's a further clarification of that in the fifth amended

12  plan that I'll hit in a second.

13  THE COURT:  Okay.  Thank you.  I'm sorry.  I just

14  wasn't able to keep up.

15  MR. HEBBELN:  No problem.  Sorry if I was going too

16  fast.

17  Next slide, please, Jennifer.

18  So interestingly, Your Honor, Article 6(j) was still

19  in the fourth amended plan despite the last couple of slides

20  that we looked at, that seemed to pool the claims of the

21  general unsecured creditors and the bond holders, so that each

22  only had one claim.  This still allowed -- seemed to allow

23  creditors to assert claims against various co-obligor debtors'

24  estates.  So at this point, Your Honor, the fourth amended plan

25  seemed a little self-contradictory since it wiped out the

1  multiple claims the Class 6 or 7 creditors had while at the

2  same time, seemingly preserving them.

3         So what happened next, Your Honor, last night, the

4  debtors filed their fifth amended plan and they, I think,

5  noticed -- must have noticed the ambiguity created by Article

6  6(j) and made it clear in this provision, this 6(j) and the

7  highlighted language, that you only get one allowed claim.

8         Sorry, Your Honor, I'm just reading to make sure

9  that --

10        THE COURT:  Yeah, read that --

11        MR. HEBBELN:  I've got my --

12        THE COURT:  Read that again.  I'm not sure just your

13  highlighted language, that the holder of an --

14        MR. HEBBELN:  Your Honor, I --

15        THE COURT:  Sorry, go ahead.

16        MR. HEBBELN:  No, I'm sorry, Judge.  I think that

17  might be the wrong -- we were scrambling a little bit this

18  morning to get this in, because it was filed last night.  But

19  let me check 6(j).  I think that might be the wrong reference.

20        MR. HEBBELN:  Judge, I --

21        THE COURT:  So it would be 2833, right?

22        MR. HEBBELN:  Yes.

23        THE COURT:  Okay.  6(j).

24        MR. HEBBELN:  Oh, I'm sorry, Your Honor.  Yeah, I

25  think -- Your Honor, the language that was added to 6(j) carves

253

1  out allowed unsecured note claims and allows general unsecured

2  claims from the operation of Article 6(j).

3           THE COURT:  Okay.  Let' see.  I am on -- let me get

4  to 6(j).  I want to read this.  All right.  I have it.  It's on

5  Page 48 of 64, if anyone's following along.

6           MR. HEBBELN:  Yes.  And I think it's actually -- now

7  that I'm looking closer at it, Judge, it's on this slide.  It

8  says -- that section starts:

9           "But the holder of an allowed claim other than an

10          allowed, unsecured notes claim, or allowed general

11          unsecured claim against more than one debtor, may

12          recover distributions from all co-obligor debtors'

13          estates."

14          THE COURT:  Got it.

15          MR. HEBBELN:  Yeah.  Sorry for the confusion there,

16 Judge.

17          So that was just making it patently clear that the

18 unsecured creditors basically have one recovery.  And, Your

19 Honor, on the next slide, they did something to the definition

20 of "pro-rata" last night, which basically, in my view, did the

21 same thing.  It made it clear that (indiscernible) second-from-

22 the-bottom line, says, "shall be counted once."  So it's just

23 driving home the point that you don't have multiple claims

24 anymore.  You have one claim.

25          Okay.  So, Your Honor, this is just 1129(b).  I think

1   what this does is it just raises the specter of unfair

2   discrimination.  And you know, given that, Your Honor, that the

3   fourth amended plan was filed after the start of the

4   confirmation hearing, we obviously didn't have a chance to

5   brief the issue.  And if Your Honor thinks that would be

6   helpful, we'd be happy to do it.

7            The next slide is actually a slide that Mr. Stark

8   just looked at also, so I won't belabor it.  We realize that --

9   I don't want to make more of it than it is.  I understand

10  Mr. MacGreevey made certain assumptions that people disagree

11  with.  I understand these numbers aren't necessarily solid

12  gold, but we think directionally this shows that there is some

13  discrimination against the unsecured noteholders who are having

14  their guaranteed claims essentially wiped out.  And it would do

15  -- this does more damage to unsecured noteholders who have 30

16  claims than it does to, say, unsecured trade creditors who have

17  one, two, or three claims in the proposed pooling of this

18  recovery.

19           So, Your Honor, in a nutshell, this is not a

20  substantive consolidation plan.  We understand why the third

21  amended plan was problematic in how it treated general

22  unsecured creditors, but the fourth amended plan is equally

23  problematic in not recognizing those guaranteed claims.  But we

24  don't have to have a plan that's problematic on this score.

25  With a few word changes to the treatment of Class 6 and 7 the

1 definition of "pro rata," I'll bet we can do it in fewer than

2 20 words.  And the deletion of this new language and the fifth

3 amended plan, I think we could cure these problems pretty

4 easily.  And we would, in our view, avoid implicating chief --

5 implicating issues of unfair discrimination and gifting, which

6 is kind of lurking in the background here.

7          So again, Your Honor, if you think that briefing on

8 this issue would be necessary or helpful, we're happy to do it.

9 But more importantly, if those amendments are made to the plan

10 to recognize the separateness of the debtors and the claims

11 against each of them, I think those issues become moot.  And

12 the rough justice pendulum will swing back to the middle, which

13 is probably where it should be.

14          And Your Honor, the only reason we can think of not

15 to do this is administrative convenience.  But we would submit

16 that mere administrative convenience is an insufficient reason

17 to substantively affect substantive rights.

18          And no matter what happens here, Your Honor, if the

19 Court confirms the Chapter 11 plan, we will work closely with

20 Kirkland and Ms. Sullivan from Epiq and the debtors' other

21 professionals like we do in many other cases to get the largest

22 distribution out to the unsecured noteholders as possible, as

23 quickly as possible.  Because that is an issue that we want to

24 let Your Honor know is kind of lurking out there, and we're

25 trying to -- we've raised it with Kirkland, and we're going o

1  work together to try to get the best solution we can, get as

2  much of the distribution out to the unsecured noteholders as

3  possible.

4             THE COURT:  Thank you.

5             MR. HEBBELN:  And that is all I have.

6             THE COURT:  I thank you -- don't go anywhere, just

7  if you would.

8             MR. HEBBELN:  Okay.

9             THE COURT:  Stay on the line.  When I -- I want to

10  hear the rest of sort of these one-off objections and then I'm

11  going to come back and hear from Ms. Schwarzman, and I have a

12  belief that she'll at least have thoughts about some or all of

13  these.  Okay?

14             MR. HEBBELN:  Of course.  Thank you, Judge.

15             THE COURT:  All right.  Thank you.

16             Mr. Austin?

17             MR. AUSTIN:  Good afternoon, Your Honor.  Can you

18  hear me now?

19             THE COURT:  Yes, sir.  Thank you.

20             MR. AUSTIN:  Yes, sir.  Thank you.

21             MR. AUSTIN:  May it please the Court, Your Honor.

22  Good afternoon.  I'm Joshua Austin on behalf of EJS Investment

23  Holdings, LLC, a creditor in this case.

24             Your Honor, EJS Investments continues to object to

25  the rights offering.  Mr. Stark went through a lot of that

1 problematic math and, as a foreign affairs major, I'm not much

2 better at it so I'll try not to -- oops.

3          THE COURT:  You still there?

4          MR. AUSTIN:  Apologies, Your Honor.  My dog just

5 started barking at a neighbor.

6          THE COURT:  That's quite all right.  Puppies are most

7 important.

8          MR. AUSTIN:  I'm going to try and bribe her with a

9 treat really quick.  See if that works.

10          THE COURT:  It often -- it works on me if that's any

11 consolation.

12          MR. AUSTIN:  Yes, Your Honor.

13          Under the company's unamended total enterprise

14 valuation, the discount is inappropriate and it was fully

15 briefed in our objection.  However, in light of Your Honor's

16 indication that the company's TEV is more like 5.129 billion,

17 that discount dilution is even more draconian.  At a

18 5.2 billion enterprise value with current net debt of about

19 1.79 billion, that would bring the value of the equity to

20 $3.4 billion.

21          THE COURT:  Right.

22          MR. AUSTIN:  The backstop fee of the rights offering

23 is either 60 million in cash, or 60 million in stock at the

24 949 million equity valuation, which could work out to

25 approximately $200 million in value as of the updated TEV Your

1  Honor has indicated.  There's also a holdback amount of

2  150 million at that 949 million valuation for backstopped

3  parties, which would be approximately $540 million of value for

4  150 million of cash.

5           THE COURT:  Right.

6           MR. AUSTIN:  This would make the total of the current

7  backstop and holdback approximately 590 million which may be --

8  and like I said, I'm not a math major, but I believe that would

9  probably be closer to 550- to 570- with the warrants, of the

10 dissolution.

11          THE COURT:  Right.  So let me --

12          MR. AUSTIN:  Now, in our opening, your --

13          THE COURT:  Sorry.  Let me --

14          MR. AUSTIN:  Sorry, Your Honor.

15          THE COURT:  -- just from a practical perspective, if

16 it turns out and just make this assumption.  If it turns out

17 that I made a mistake and I never should have approved it, what

18 am I supposed to do at this point, in your mind?

19          MR. AUSTIN:  Your Honor, I think that we could either

20 get a more equitable deal related to the current rights

21 offering, maybe a movement on the TEV value or the discount

22 rate or something like that, and keep the current rights

23 offering in place.  Or, the next point I was going to get to,

24 we did file with the Court this morning that there is a fully

25 backstopped alternative, a fully financed proposal that

1   Jefferies and Jones Day are backing.

2           THE COURT:  I read that this morning.

3           MR. AUSTIN:  Yes, Your Honor.

4           THE COURT:  And you understand the war that that

5   precipitates, right?

6           MR. AUSTIN:  Yes, Your Honor, we understand that

7   there could be problems with that.  But we also believe that

8   it's something that would get the FLLO folks to par.  It would

9   provide additional benefit to the 2L group and the unsecureds

10  and the GUPS (phonetic) would also have an increased recovery.

11  And it would also allow participation across all classes.

12          THE COURT:  And --

13          MR. AUSTIN:  It's a bit more democratic.

14          THE COURT:  So don't I just avoid the whole rights

15  issue by converting the case to a Chapter 7?  That way, I don't

16  have to worry about if I got it right.

17          MR. AUSTIN:  Well, I think we've had plenty of

18  testimony the last few weeks, now that converting this to a

19  Chapter 7 would create a whole lot of waste with potential --

20          THE COURT:  Well, you --

21          MR. AUSTIN:  -- capital and --

22          THE COURT:  Yeah, but you know you hear that.

23  Everyone says, no, I don't want it.  But the argument -- but

24  the lawyers all argue that that's exactly what they want to

25  have happen.

1          And I get that it's all a threat, but I mean, I'm

2    looking genuinely for help.  I mean, everyone is sitting here

3    suggesting that, well, if you just threaten them enough,

4    they're going to come around.  That's -- you know, the game of

5    chicken was played and it was lost.

6          And maybe I shouldn't have approved that rights

7    offering.  I did -- I made the best decision I could at the

8    time.  Maybe I was wrong.  But having done it, you know, the

9    Court process doesn't meant much if I can simply change my mind

10   because I learned something later, right?

11         MR. AUSTIN:  Well, Your Honor, there is a fiduciary

12   out that the debtors have and we feel really confident that if

13   we had even just three days, four days, to work with Jefferies

14   Advisors, and those folks with the company, I understood --

15         THE COURT:  So --

16         MR. AUSTIN:  -- this morning that --

17         THE COURT:  Now, let me ask you something.  So you'll

18   never convince me that my determination of value precipitated

19   anything.  There is no investment banker at Jefferies that

20   cares two iotas about what Judge Jones thinks a TEV is except

21   for purposes of confirmation.  They care about the market and

22   they know far more about the market than Judge Jones does.

23         I mean, how long has this been sitting out there?

24   Why did I just get this at 8:30 this morning?

25         MR. AUSTIN:  Your Honor, I've been -- we've been

trying to find someone.  In our opening, we mentioned about EJS

specifically was trying to talk to people about bringing up

some sort of unsecured note-backed rights offering.  And I can

tell you this all just -- Friday afternoon, it was gas on the

fire.

          THE COURT:  Okay.

          MR. AUSTIN:  That was the first I got involved in

this was over the weekend.

          THE COURT:  I got it.

          MR. AUSTIN:  And people have been working around the

clock.

          THE COURT:  Okay.  I interrupted you and I apologize.

Go ahead, please.

          MR. AUSTIN:  No, Your Honor.  I believe the

discussion we've had is probably sufficient for most of what I

noted.  I would just note that if you were to look at this

alternative, it is more democratic.  It would dilute everyone

far less and it wild still allow for the FLLO to be essentially

made whole related to the issue that Mr. Stark has with the

discount and the value that's actually being transferred to the

FLLO and the 2Ls.

          We're just trying to be a solution to a problem, Your

Honor.  And the market listens.  The market sees things.  And

we're in a better position today than we were in that nadir and

I think Kirkland did their best at that time, and did what they

1 could there.  But, you know, as we've heard lots of times here

2 throughout the past month that there's no market.  We didn't

3 test it because there was no one out there.

4        People are out here with real money, real backing.

5 Jones Day and Jefferies are real financial institutions.  This

6 is fully-backed stock.  They're offering 500 million but

7 they'll go up to 750 million, which the company said they'd

8 actually like more money.  And it would be at a far less

9 dilution.

10        So Your Honor, we think the rights offering as

11 currently formed here is inappropriate and the discount is just

12 far too draconian, setting aside any other alternative measure,

13 but it is just another thing we wanted to make Your Honor aware

14 of that could be a potential tool in your toolbox.  That's all.

15        THE COURT:  All right.  Got it.  Thank you very much.

16        Mr. --

17        MR. AUSTIN:  Thank you, Your Honor.

18        THE COURT:  Is it Mr. Barkasy?  So Mr. Barkasy, if

19 I'm getting that right, I can see you talking to me.  Had you

20 hit "five star"?

21        Ah, there we go.  How about now?

22        MR. BARKASY:  Yes, Your Honor.  Can you hear me?

23        THE COURT:  Very well.  Thank you, sir.

24        MR. BARKASY:  Thank you, Your Honor.  My name is Rich

25 Barkasy.  I'm from the Schnader Harrison Segal & Lewis firm,

263

1  and we represent several Pennsylvania oil and gas lessors,

2  royalty owners.  Objections were filed for these parties at

3  Docket Numbers 2122 and 2128, and there was a joinder filed by

4  several lessors at Docket Number 2142.

5       I -- we're heartened that, as Ms. Brown described

6  during her presentation that there have been improvements to

7  Article 14 of the plan as it applies to royalty owners, Your

8  Honor.  As to our specific Pennsylvania royalty owner parties,

9  we are looking for some further clarifications with regard to

10  their rights, and we've supplied some language to the debtors

11  in that regard for the confirmation order, and hopefully, we're

12  able to resolve that language.  I just wanted to mention those

13  for the record.

14       Our objection was filed before the modifications to

15  the plan, and for example, in our objection, we contend that

16  our clients' interim claims for termination of the debtors'

17  interests in oil and gas leases would not be subject to the

18  discharge, because they're interim claims, not in personam

19  claims.  Now, with the modifications to Article 14, we're just

20  seeking a clarification that our clients' rights with regards

21  to those interim claims are preserved.  We -- and the same is

22  also true of the claims made with regard to the issues

23  concerning whether unpaid or underpaid or wrongfully deducted

24  royalties are property of the estate.

25       THE COURT:  So --

264

1          MR. BARKASY:  It --

2          THE COURT:  I'm sorry.

3          MR. BARKASY:  We had a -- and we're just looking,

4   like I said, we're referencing the confirmation order,

5   reserving our positions and the debtors' positions in that

6   regard.  We just -- what we understand the basic idea of

7   Section 14 to be.

8          With regard to the -- another one of our objections,

9   we believe that the post effective date royalties are not

10  subject to the discharge. If the reorganized debtor doesn't pay

11  royalties due from the effective date on, that the bankruptcy

12  discharge and the plan can't bar or preclude those claims.

13  We're asking for some clarification in that regard, and a

14  clarification that parties, if post-effective-date royalties

15  are not paid by the reorganized debtors, will not have to come

16  to this Court and seek stay relief or discharge injunction

17  relief in order to be able to proceed with claims for post

18  effective dates and royalty claims against the reorganized

19  debtors.

20          The last item, Your Honor, relates to the automatic

21  stay.  That Article 14 describes certain things that the

22  bankruptcy court will decide, like issues relating to the

23  discharge.  We think that that language does not preclude

24  requests for relief from the stay, to -- so one of them better

25  were to liquidate or determine the amount of unpaid or

1 underpaid royalties, or to determine interim rights under oil

2 and gas leases under Pennsylvania law.  However, we were

3 seeking a clarification in that regard.

4           Finally, we're seeking clarification as to our

5 clients, to the extent that their secured claims are allowed,

6 they will be paid in full in accordance with the other secured

7 claims provisions of the plan.  And we've provided language

8 proposed to the debtor -- the debtors, and hopefully we'll be

9 able to include those things in the confirmation order, but I

10 wanted to state those objections for the record, just in case

11 there was an issue that arises.

12           THE COURT:  Fair enough, and I tried to take good

13 notes, and quite honestly, as I was trying to think and write,

14 you went faster than I could write and process, and so let me

15 -- there were some things in there that puzzled me, so like for

16 instance, plan goes effective -- I don't understand why there's

17 an issue of the automatic stay anymore.  It's a discharge

18 injunction issue, not an automatic stay.  The stay's going to

19 terminate.

20           MR. BARKASY:  I -- so I -- I agree with you, Your

21 Honor.

22           THE COURT:  Okay.

23           MR. BARKASY:  I agree with that.  There would be an

24 issue if, post-effective date, royalties were not paid as to

25 the discharge injunction and clarification in advance that we

266

1  wouldn't have to come back to Your Honor and first file a

2  motion for relief from the discharge injunctions to proceed

3  with that kind of a claim might be helpful to the extent that

4  those claims may arise post-effective date.

5              THE COURT:  So -- and again, I hate to venture down

6  this path, because I don't know the factual scenario, and I

7  don't know what conversations that you've had with counsel.  A

8  claim that arises after the effective date?  I struggle to see

9  how that could be implicated by the plan.  Now, if there was a

10 claim that arose post-confirmation, pre-effective date,

11 different issue, and obviously, pre-confirmation, same issue.

12 So I don't really have a good sense of what you're talking

13 about.

14             But I will just tell you, just as a general notion,

15 and again, you know, I've read the plan a couple of times, but

16 as you know, it's a long, complicated document, and unless

17 you're reading with a specific question in mind, you don't

18 obviously absorb everything.  You know, if a claim truly arises

19 post effective date, I can't imagine how it's implicated by the

20 bankruptcy plan.  Now, if it -- you know, if it arose

21 pre-effective date, but you want to bring it post effective

22 date, then yes, I think there are issues there, and I just

23 don't know.  And so I don't really know what you're searching

24 for from me.

25             It sounds like to me, you understand all the issues,

1    and I'm not even sure they're confirmation issues.  They are --

2    they may be plan interpretation issues, or this set of

3    circumstances has arisen and so we need to know what we can do

4    and what we can't do, or we think the plan says this, and we

5    want to go do something different, and we just want to make

6    sure that nothing -- you know, that no one says we did

7    something wrong.  I don't know -- I'm -- again, I hate to

8    venture down a path that I don't fully understand, and I'm just

9    trying to give you my reaction.

10           MR. BARKASY:  Your Honor, I don't disagree with

11   really anything that you're saying.  To put it in a factual

12   context, we have a number of clients who allege that over a

13   period of several years, the debtors have wrongfully deducted

14   sums from royalty payments.  There's some expectation that that

15   could possibly continue after the effective date with royalties

16   that would come due from the day after the effective date in

17   the future, and --

18           THE COURT:  So --

19           MR. BARKASY:  -- I guess instead of creating an --

20   you know, it would just eliminate an issue if we understood

21   that those claims could be pursued as if there had -- they were

22   unaffected by the plan.  It's not anything tricky or sneaky, we

23   just, you know, the need for these claims to be filed somewhere

24   post-confirmation, and then post effective date, may be

25   required, and that's all.  There's nothing -- it's not a -- I

268

1   can assure you, not some kind of major strategic item that

2   we're trying to push.  It's just the idea that it would

3   eliminate and provide some comfort in the event that those

4   actions are necessary.  I agree with you with regard to

5   pre-effective date royalties that obviously are either impacted

6   by the bankruptcy stay, and as I read the plan, the parties

7   wouldn't be precluded from moving for relief from the stay to

8   arbitrate those claims under the lease provisions requiring

9   arbitration and the like.

10          But -- and Your Honor may or may not grant that, and

11   then Your Honor may decide those issues.  But I understand

12   that's how issues that would arise post-petition, pre-effective

13   date, would be handled.

14          THE COURT:  Got it.  And so let me just give you a

15   reaction, so try -- so it gives you some context, and again, I

16   will be the first --

17       (Recording interrupts)

18          THE COURT:  Sorry about that.  So let me give you

19   just a reaction, and let me be the first to profess, I don't

20   understand Pennsylvania oil and gas law.  So start with that

21   presumption.  So what I'm going to give you is a Texas answer,

22   because I do have a pretty good sense of Texas oil and gas law.

23          So if there were a claim pre-effective date for

24   underpayment of royalty due to an improper deduction of some

25   sort, let's say.  And I'm trying to define something very

generic.  It is my view that that is a legal claim that would

get liquidated, and then it would be paid pursuant to the plan.

Let's say that the plan went effective March 1st, and then

beginning -- let me pick something that can't possibly anyone

quibble with -- let's assume that on June 1, there was then a

new alleged improper deduction going forward.  I'm just

creating a gap in time for purposes of example.

        I think, at that point, the plan is irrelevant, and I

think that you could then go do whatever Pennsylvania law says

you can do, and again, that's just Jones' reaction.  Obviously,

that's not put to me, and you know the rule.  There's a good

reason why they tell judges not to make advisory opinions, but

I think I just gave you one.  And so -- but I -- just to try to

draw an example for you of, you know, what I think is effective

and what's not.  Okay?

        MR. BARKASY:  Thank you, Your Honor.

        THE COURT:  Thank you.  All right.  I think,

Mr. McCune, I think you were next?

        MR. MCCUNE:  Can you hear me, Your Honor?

        THE COURT:  Very well, thank you, sir.

        MR. MCCUNE:  Excellent.  I don't intend to be long.

Your Honor, this is Patrick McCune.  For the record, I

represent Caddo Parish, Louisiana, and several of the persons

and entities listed in the objection to debtors' Second Amended

Plan, found at D.E. 2134.  I apologize that I'm rising out of

270

1   order here, but I was waiting for an amended proposed order for

2   confirmation the plan to be filed by the debtors before

3   speaking, to note we have resolved our objection.

4           THE COURT:  So --

5           MR. MCCUNE:  And since one has now been -- sorry,

6   Your Honor.

7           THE COURT:  No, no, no.  So the -- is there now a

8   further revised order?

9           MR. MCCUNE:  Yes.  2847.

10          THE COURT:  Ah.  I looked at 2845.  Thank you.  I

11  don't even know --

12          MR. MCCUNE:  No problem.

13          THE COURT:  I don't even know that there is a 2847, I

14  haven't refreshed my docket.

15          MR. MCCUNE:  Well, since one has now been filed, Your

16  Honor, can I make a brief statement regarding that order as it

17  concerns my clients?

18          THE COURT:  Of course.  Do you want me to follow

19  something along, or do you just want to make a statement for

20  the record?

21          MR. MCCUNE:  I just want to make a quick statement

22  for the record.

23          THE COURT:  Then please go ahead.

24          MR. MCCUNE:  Thank you.  Your Honor, as you may

25  recall, we filed an objection at D.E. 2134 and offered

1  extensive arguments on the same during the opening arguments in
2  this hearing.  Similar to the sentiments of Ms. Deidre Brown
3  expressed earlier, while we are not fond of several components
4  to the plan, we've elected to resolve that objection through
5  inclusion of certain language in the order confirming the plan.
6  At present, that language appears in Paragraphs 260 through 270
7  of D.E. 2847, the Amended Order for Confirmation of the Plan,
8  addressing the Caddo DeSoto owners.  In part, we have
9  incorporated and reiterated therein much of the language from
10 the current Article 4, Section T of the plan, which was
11 recrafted with the input of the hardworking royalty committee,
12 in line with the goals Ms. Deidre Brown so eloquently expressed
13 earlier to reserve and preserve rights regarding current and
14 future disputes.

15         I want to thank debtors' counsel, in particular
16 Tricia Swaler (phonetic) and Annie Drysback (phonetic) for
17 working with us late into the evening to complete work on the
18 insert, and I thank you for allowing me to make this brief
19 statement.  And one more thing:  I'd just like to express my
20 sincere admiration of the Court's management of this online
21 trial, and to offer my congratulations to the attorneys who
22 have managed the bulk of the presentations during the same.  I
23 think everyone acquitted themselves exceptionally well.  That's
24 all I have, Your Honor.

25         THE COURT:  Thank you, Mr. McCune.

272

1          Mr. Pitta, and I hope you didn't put the puppy in the

2   closet.  I hope --

3          MR. PITTA:  No, no.  She's just heading elsewhere.

4          THE COURT:  All right.

5          MR. PITTA:  I'll miss her, though.  Thank you, Your

6   Honor.  Thomas Pitta from Emmett, Marvin and Martin.  We

7   represent the Bank of New York Mellon Trust Company, which is

8   the indenture trustee for about $425 million of the debtors'

9   unsecured bonds, and a member of the Creditors' Committee.

10         Your Honor, I won't be long.  You know, I would adopt

11  the arguments made by the Committee, and earlier by Mr. Hebbeln

12  on behalf of WSFS, who is the, you know, the indenture trustee

13  for a substantially larger portion of the unsecured bonds.

14         I would agree, though, with what Mr. Hebbeln said.

15  It appears that what's happened twice now is that following

16  comments by Your Honor, and arguments made by certain trade

17  creditors, the debtors have tried, in what appears to be a

18  couple of clumsy ways, to fix a problem that Your Honor pointed

19  out.  You know, and, you know, when the fourth amended plan was

20  filed, you know, the debtor reacted to statements that the, you

21  know, the distributions to Class 7s were relatively negligible,

22  and much lower than Class 6, and instead of increasing those

23  distributions to Class 7s, they reached into Class 6's pocket

24  and transferred some value to them.  You know, and as

25  Mr. Hebbeln pointed out, we think that ignores the relative

1  value of the claims of the holders in Class 6, and creditors in

2  Class 7.

3          You know, and then the fifth amended plan, it kind of

4  just looks like a couple of Band-Aids put over the wounds

5  created by the fourth amended plan.  It -- you know, the

6  debtors have said that this is not a substantive and

7  consolidated plan, Ms. Schwarzman argued that specifically this

8  morning and said it's not a substantive and consolidated plan.

9          But with respect to Classes 6 and 7, particularly

10 with this language that's been added to the fifth amended plan,

11 this is a substantively consolidated plan.  It says,

12 notwithstanding what claims you may have as different entities,

13 you're only getting one distribution, you know, and that is

14 substantive consolidation, and not only did the debtors not

15 make a case for substantive consolidation, but one, they've

16 argued that they're not substantively consolidating, and two, I

17 think they actually made a pretty confident case that these

18 estates should not be substantively consolidated, that they do

19 track the books and records on an individual basis of these

20 debtors, and so, substantive consolidation is inappropriate

21 here.

22         And to go back to 6, you know, I think this is a

23 couple of clumsy fixes to a problem that Your Honor pointed

24 out, and, you know, the third amended plan, for all the

25 deficiencies that we think that it did have, I think

1  Mr. Hebbeln described it well.  It did a kind of a rough

2  justice between Classes 6 and 7s, and it actually attempted --

3  and even the disclosure statement was very specific about the

4  fact that it attempted to weigh the value of the relative

5  claims of the parties in those classes.  And the fix that they

6  came up with, rather than actually just putting some more value

7  into the plan to address the claims in Class 7, was just to

8  take money out of the pocket of Class 6 and transfer it to

9  Class 7, and doing it in a way that looks and smells like

10  substantive consolidation, but we're being told it's not.

11           THE COURT:  Sure.  So let me --

12           MR. PITTA:  And so, you know, absent a -- go ahead.

13           THE COURT:  No, no, because I -- this is actually

14  very helpful to me.  So when I posed my -- when I posed the

15  problem, I had no idea what the ultimate valuation -- what

16  conclusion I was going to come to regarding the valuation.

17  What I could -- the assumption that I made was that there would

18  be value that would flow down on this -- in those classes, and

19  so that -- that disparate treatment issue was problematic for

20  me.  And not asking you to agree or disagree with the

21  valuation, but the valuation that I've now made, does it

22  matter?  I mean, wouldn't we be --

23           MR. PITTA:  Well, I think --

24           THE COURT:  -- if we really --

25           MR. PITTA: -- it's --

ACCESS TRANSCRIPTS, LLC                1-855-USE-ACCESS (873-2223)

1          THE COURT:  -- if I really wanted to make this plan

2     work, I'd just say, you know, value is what value is.  There's

3     no value that goes to those classes, they voted no, so it

4     doesn't change anything.

5          MR. PITTA:  Well, I think, Your Honor, that obviously

6     your finding on value is relevant.  It does matter.

7          THE COURT:  Okay.

8          MR. PITTA:  But I don't know that it's the end of the

9     discussion.

10          THE COURT:  Okay.

11          MR. PITTA:  You know, I think the Committee has made

12     a substantial case that valuation is not the only issue --

13          THE COURT:  Agreed.

14          MR. PITTA:  -- that goes to whether unsecured

15     creditors are entitled to a recovery here.  You know --

16          THE COURT:  So let me ask you this, as a member

17     sitting on the -- as a member of the Committee, if that

18     language changed so that -- because I don't like predetermining

19     things.  I like for the process to work itself through.  If it

20     just said -- if it just talked about allowed claim, but didn't

21     reach the conclusion as to what an allowed claim was, would

22     that solve your concern?

23          MR. PITTA:  Your Honor, I guess the question I would

24     ask to clarify that is, are you intentionally saying we go back

25     to the fourth amended plan language?

1           THE COURT:  No.  Because that predetermined the other

2    way.

3           MR. PITTA:  Well, Judge, I just want to make sure

4    that you're -- real quick, the fourth amended was the one that

5    we had as of yesterday, where -- I mean, I believe everybody's

6    interpretation of that plan, notwithstanding what I think was

7    just some legacy language that was left in Paragraph 6-J, I

8    believe everybody's understanding of that was that the changes

9    made last night were to clean up language, but not to change

10   what's supposed to happen here.

11          THE COURT:  Right.  So -- but the whole problem with

12   both what I'm just -- what I'm going to call three and four,

13   and hopefully that's clear enough.  The whole problem with

14   three and four is that it was determinative of an issue in

15   different directions.  And I actually don't think that plans

16   are the place where you determine what -- you know, who's got

17   what claim?  I think plans are where you determine, once you

18   figure out what the body of allowed claims is, then that's how

19   they get treated.

20          The disclosure statement is supposed to give you some

21   idea of what the range of the claims could be, but, you know,

22   my view of a plan is it's for treatment purposes, and so if we

23   just went back to a definition of allowed claim, and we made

24   it, and, you know, we can effectively track the code, why does

25   -- and I don't know whether your issue is, you know, the right

1  issue or not.  I'm not going one way or the other, but

2  obviously, I've had two people bring that up, and it just seems

3  to me, in order to stop people trying to push it to the left or

4  to the right, if the goal is to really get it in the center, we

5  just go back to a very simple, you know, just the holder of an

6  allowed claim.  And the holder of an allowed claim is what it

7  is.  Doesn't that fix the problem?

8         MR. PITTA:  So theoretically it does, Your Honor, but

9  I think that it begs the question, what is the treatment under

10 the plan?

11        THE COURT:  Well, the treatment is whatever --

12        MR. PITTA:  And is the treatment under the plan --

13        THE COURT:  If you have five allowed claims --

14        MR. PITTA:  Is the treatment under the plan -- sorry,

15 go ahead.

16        THE COURT:  No, no, no.  This is so hard on video.

17        MR. PITTA:  All right?

18        THE COURT:  Yeah, go ahead.

19        MR. PITTA:  So we may have allowed claims, we may

20 wind up having allowed claims as 30 (ph) debtors, and I believe

21 that's actually -- that's baked into the plan, and nobody

22 disputes it.  The unsecured noteholders have claims against the

23 issuer, Chesapeake, and 29 guarantors.

24        THE COURT:  Right.

25        MR. PITTA:  So we'll wind up with claims at 30

1  entities.  But it begs the question, does the plan that you're

2  envisioning allow for treatment by 30 entities?  So are 30

3  entities distributing stock that makes up 12 percent of the

4  common stock of the new reorganized debtors?

5           THE COURT:  So --

6           MR. PITTA:  And I don't know how we -- I mean, I

7  think we could do that, but I don't think that either of the

8  plans that have been filed, any of the plans that have been

9  filed really contemplates doing that, and that's part of the

10 problem, is that, you know, from the beginning, while this is

11 not a substantively consolidated plan, this has been

12 effectively a substantively consolidate plan.  The third

13 amended plan talked about the noteholders getting one

14 distribution of 12 percent of the common stock in this

15 reorganized entity.  The fourth amended plan still talked about

16 one distribution to the noteholders, but in this case, it's

17 just being diluted further by the claims in Class 7.

18          THE COURT:  Right.

19          MR. PITTA:  And so I agree with you that if we had 30

20 allowed claims, we would be taking a step in the right

21 direction, but the treatment provisions of the plan stop us

22 short of actually achieving the proper solution.

23          THE COURT:  Well, so you want to go back to the

24 debtor-by-debtor issue, and here's the -- and it's not that

25 that's a bad result.  If there were truly value down in each of

1  those entities, then that is probably an exercise that we would

2  need to do, and maybe that is ultimately what we do need to do.

3  I'm just trying to figure out what it is you're really asking

4  for, because this has a practical implication to it, and I like

5  practicality, I like realism.

6         MR. PITTA:  It does, Your Honor, and, you know, part

7  of the problem here is that this is a problem that was created

8  halfway through a trial.

9         THE COURT:  Uh-huh.

10         MR. PITTA:  You know, and so, it didn't lend itself

11  to nuanced solutions in the time that it came up, and so I, you

12  know, your statement that maybe that's what we have to do, I

13  think is theoretically correct, but, you know, I have listened

14  to Your Honor, I hear where you're at, and I don't think that's

15  where we're going --

16         THE COURT:  Okay.

17         MR. PITTA:  -- and so I think, you know, what --

18         THE COURT:  If you were writing the order --

19         MR. PITTA:  -- the solution to this problem is --

20         THE COURT:  If you were writing the order, what would

21  you write?  I have a basket of goods with, you know, a certain

22  percentage of the new common equity and some warrants to tag on

23  to that.  If you were writing the provision, and I'll just --

24  you know, if you make the assumption that everybody's going to

25  get treated equally, and I mean, equally by having the same

1 opportunity.  If somebody's got a -- you know, somebody

2 provided bottled water, and has a guarantee from six entities,

3 then theoretically, it could file six proofs of claim.  If a

4 bondholder has a guarantee from 32 entities, then

5 theoretically, it could have 32 claims.  If you were writing

6 the language, what would you say?

7          MR. PITTA:  Well, Your Honor, I think part of the

8 problem here is that this isn't really a thing that should be

9 fixed in an order, it should be fixed in a plan, and, you

10 know --

11          THE COURT:  Well, we're going to fix it --

12          MR. PITTA: -- if you're calling balls or strikes, and

13 I think the answer is to call a strike here, but I think that

14 the practical solution is to tell the parties, if this is your

15 inclination, I'm inclined to confirm this plan, but this

16 problem needs to be fixed, and then I think that a commercial

17 solution could be reached, but I think that that commercial

18 solution is to say, if you're inclined to say that yes, the

19 unsecured creditors can only get 12 percent, because that's

20 what this plan says, and I'm inclined to confirm this plan, I

21 think the solution is to say, it's 12 percent, but parties

22 should receive a -- it's not a perfect solution, because these

23 entities do not have equal value, but to the extent that

24 parties have claims against multiple debtors, they should --

25 the definition of pro rata for unsecured creditors should --

1  and I'm going to not do math on the fly here, or even write

2  math on the fly here, but the definition of pro rata should

3  incorporate the number of claims that you have relative to the

4  number of claims that other unsecured creditors have.

5         THE COURT:  So why should the language -- as opposed

6  to putting numbers in there, why should the language not be

7  that in order to figure out what each person is entitled to

8  receive, you take the sum total of the claims held by that

9  person or entity, divided by the total number of claims

10  asserted?  By everyone?  Why isn't that the right --

11         MR. PITTA:  At each entity?

12         THE COURT:  Well, I just -- globally, I mean --

13  because if you do that --

14         MR. PITTA:  Well --

15         THE COURT:  -- because, I mean, how do you allocate

16  the equity between entities?

17         MR. PITTA:  I think I actually just figured out what

18  you were suggesting.  So your suggestion being, if we have a

19  claim against the issuer in 29 guarantors and we have a

20  $425 million, our claim would be 425- times 30.  425 million

21  times 30, and then, we would share in an unsecured creditors

22  pool, pro rata, based on everybody else's claim, times the

23  number of debtors they have claims against.

24         THE COURT:  Yeah.  And I wasn't trying to say that --

25  you know, I mean, because I can see -- let me draw up a really

1  weird scenario where you're owed something by Entity 1, and

2  Entity 2 has a 50 percent guarantee, and another entity has a

3  50 percent guarantee.

4         So obviously it wouldn't be the claims times three.

5  It would be the claim -- I mean, you get my point.  I was

6  trying not to be limiting.  And I don't know -- I mean, that's

7  potentially right.  So both the numerator and the denominator

8  will be reflective of what the ultimate disposition is, and I

9  don't know what it is.  I mean, I'm not trying to -- I'm

10  certainly not trying to resolve that today.

11         MR. PITTA:  No, I appreciate that, Your Honor.  You

12  know, it brings me to, you know, one of the other --

13  "injustices" may be the wrong word, but one of the other

14  injustices that the forth in the fifth amended plan have

15  visited upon the noteholders here, which is that under the

16  third amended plan, on the effective date, 12 percent of the

17  stock was going to be distributed through the DTC to the

18  holders of the unsecured notes, and they would be on their

19  merry way.

20         THE COURT:  Uh-huh.

21         MR. PITTA:  Under the fourth and fifth amended

22  plans --

23         THE COURT:  Doesn't happen.

24         MR. PITTA:  -- you know, there are substantial

25  rejection damage claims that have to be liquidated here, other

1 unsecured claims that need to be liquidated, and we're looking

2 at -- we don't know what magnitude of distribution is going to

3 be available.

4          Now, to the extent that we have to then -- or the

5 debtor has to engage in a process where it's figuring out the

6 best pro rata share, you know, that probably exacerbates that

7 problem from the noteholders' perspective, and leaves them in

8 limbo for even longer.

9          THE COURT:  Sure.  But it's fair.

10          MR. PITTA:  You know -- and I don't -- I don't

11 necessarily disagree with you on that at all, Your Honor.  You

12 know, but again, it feels like Your Honor raised an issue with

13 a provision of the plan and the -- what looked like a neat

14 solution is actually fairly clumsy and creates a lot more

15 problems.

16          And you know, I -- you know, this is the -- I've

17 heard you say this in multiple cases.  You are not the -- you

18 know, you're not the kind of judge who says go in the hall and

19 fix this.  But I think there is some value here to say you have

20 a problem that you've created in this plan, and this is a

21 problem that's created by the circumstances of this trial.

22 This was a solution to a problem that was dropped into the

23 middle of trial, and I think if the parties had more

24 opportunity to have worked through this ahead of this trial,

25 you know, there would have been and there could have been a

1  more neat solution to this that was a little more fair, and

2  also logistically worked better.

3          But I think that there's some value to say whatever

4  you're going to say in this trial -- and I can read tea leaves,

5  but I, you know, whatever you're going to say at the end of

6  this trial, I think it can be accompanied by -- and it sounds

7  like Your Honor understands the issues that this creates and

8  has some issues with it, at least, an instruction to the

9  parties that you need to think about what you've done here.

10         And I encourage you to take some time -- and it's not

11  -- I don't think this needs a lot of time -- but take some time

12  and go find a solution to this that gets us back to rough

13  justice for the noteholders while also providing a -- you know,

14  a modicum of justice to the other creditors, including

15  creditors who were in Class 7 but actually have multiple-debtor

16  claims.

17             THE COURT:  Right.

18             MR. PITTA:  You know?  This is not just a noteholder

19  issue.  But I think -- I think that's what makes the most sense

20  here, rather than you and I trying to fix this on the fly over

21  a Zoom.

22             THE COURT:  Sure.  So --

23             MR. PITTA:  Or a GoToMeeting.

24             THE COURT:  No, no, no.  So the way -- and just -- I

25  mean, I've been thinking about this a lot.  And you know, the

285

1 problem is -- and I know you appreciate this -- is the debtor

2 has nothing to offer.  The debtor doesn't care who its

3 shareholders are.  Or it shouldn't.  And so this is a -- you

4 know, this is a Tom Pitta versus Damian Schaible discussion,

5 best I can tell.

6      MR. PITTA:  Your Honor, I think that's a discussion

7 that Tom Pitta and Damian and Mr. Stark and Mr. Zersky (sic)

8 you know, can engage in.  And Mr. Hebbeln, you know, can engage

9 in.  And I really think, you know, all the members of the

10 Committee have an interest in this.  You know, and to be frank,

11 Your Honor, I think that having your ruling may be --

12      THE COURT:  Helps.  I got it.

13      MR. PITTA:  -- helpful, you know, to reaching a

14 solution on this.  But I think -- I think it does warrant a

15 neater solution.  And I see Ms. Schwarzman has jumped back on,

16 and I just wanted to address one other thing, which is that --

17 you know, even to the extent that one would argue that this is

18 a gift, I don't believe that much in the munificence of the

19 banks in Mr. Schaible's group, or Franklin, for that matter.

20 And this gift is given on account of some belief that there is

21 at least, you know, a holdup value here.

22      And, you know, I don't think they just decided they

23 want to give a few hundred million dollars of value away.  And

24 so I don't think it's as simple as saying this is a gift, you

25 don't have to care about where it goes --

1          THE COURT:  Yeah.  I got it.  You and I both --

2          MR. PITTA:  -- because I don't think that's really

3    how it works.

4          THE COURT:  You and I both know this was done to try

5    and entice Class 6 to vote for the plan, and it didn't work.

6    That's why --

7          MR. PITTA:  Yeah.

8          THE COURT:  That's why it was done.

9          I've got -- don't go away.  If you would, just hang

10   on the line.  Let me --

11          MR. PITTA:  I'll be here.

12          THE COURT:  Let me finish the circle.

13          Mr. Kincheloe, I know you're there.

14          There's one thing -- Mr. Alonzo got an email from an

15   individual by the name of Jon Winick.  And, Mr. Winick, I saw

16   you on earlier.  Are you still with us?

17          MR. WINICK:  I am, Your Honor.

18          THE COURT:  Is it possible -- I really like to see

19   people.  Is it possible for you to turn your camera back on?

20          MR. WINICK:  Yes.  And I'm going to apologize.  I

21   couldn't get into the meeting before.  So I didn't think I

22   could be on video, so I didn't dress appropriately, so --

23          THE COURT:  That's quite all right.

24          MR. WINICK:  -- I apologize for that.

25          THE COURT:  So I -- number --

1        MR. WINICK:  I just want to just --

2        THE COURT:  Go ahead.  I'm sorry.

3        MR. WINICK:  That's okay.  No, go ahead.  Sorry, Your

4  Honor.

5        THE COURT:  No, the podium is -- I was just going to

6  say the podium is all yours.

7        MR. WINICK:  Thank you, Your Honor.  My name is Jon

8  Winick, CEO of Clark Street Capital.  I'm a holder personally

9  of the bonds, and sort of informally represent a group of us.

10  I'm not an attorney.  You know, this whole process has been an

11  education.

12        You know, first off, Your Honor, I really appreciate

13  the time you've spent on this case, the thoughtfulness.  And I

14  mean, the fact that you came up with your own valuation, which

15  we will respectfully disagree with, but, you know, certainly

16  not something a typical judge does.  So, you know, I appreciate

17  your engagement in this process.

18        You know, my background is in the world of banking

19  and, you know, one thing that sort of struck me as being odd

20  about the U.S. bankruptcy process is, you know, at least in the

21  banking world, no regulator would ever let a management team

22  who kind of drove a financial institution into the bus retake

23  the keys.  You know, to give you an example, Wells Fargo had a

24  scandal a couple of years ago.  They had about $10 million in

25  damages, and they essentially required the firm to fire two

1  CEOs and replace the entire board of directors.

2           THE COURT:  I remember.

3           MR. WINICK:  This particular -- this particular

4  management team at Chesapeake has presided over a catastrophic

5  loss of value in American history.  You know, part of the flaw

6  of the banking process is we're presuming that this group is

7  qualified here to get the most value.  I disagree.  I think the

8  Court should consider hiring an examiner and see if we've got

9  the right management team to pull off this Chapter 11 plan.

10          The other thing that's bothersome is this company's

11  been filing -- has been thinking about this for years.  To

12  paraphrase Michael Corleone, this company's been filing the

13  same bankruptcy for years.  Seems like they've been looking for

14  the perfect time to file in order to essentially walk over

15  billions of dollars of unsecured creditors.

16          To me, this looks like this company took a dive --

17  you know, you want to call it a "flop," but they basically

18  waited for the perfect time to burn through billions of dollars

19  in value.  And you know, this plan, based on their made as

20  instructed $4.1 billion valuation basically implies that the

21  current management team has burned through -- what is that,

22  $8 billion in cash.  And now we're being asked to trust them

23  again, and I think it's amazing that anyone would seriously

24  believe that the stakeholders are best served by this

25  management team.

1         If you confirm this plan, you would send a message to

2    any public company, be a reckless steward of your shareholders'

3    money, collude with your favorite lenders against the interest

4    of the stockholders and other stakeholders, and put together a

5    slick bankruptcy plan, hire great counsel, and go from there.

6         I was encouraged by the first day of the process,

7    where you seemed to want the two parties, Brown Rudnick and

8    Kirkland, to get together and work on an solution.  I think

9    it's disappointing that the debtors' counsel has refused to

10   negotiate with anybody.  And you made these comments regarding

11   -- Your Honor made these comments regarding the trade

12   creditors, and their solution was to collapse 6 and 7.  You

13   know, we have guarantees from 26 entities.  They may have a

14   contract with one subsidiary.  So believe it's totally unfair

15   to treat 6 and 7 essentially the same.

16        Your Honor, I hope you'll do what is right here and

17   reject this plan.  You've rejected their valuation, and I urge

18   you humbly to reject this plan.  I also urge you to allow us to

19   prosecute our claims.

20        THE COURT:  Thank you.

21        MR. WINICK:  With that, I appreciate the time to

22   speak, and hope we move forward, reject this plan, and start

23   over.

24        THE COURT:  Thank you, Mr. Winick.

25        Mr. Kincheloe.

290

1          MR. KINCHELOE:  Good afternoon, almost evening, Your

2     Honor.  My client's objection has three issues.  The first,

3     which I think is probably the -- both easiest and most

4     difficult in different ways, the jurisdictional issue.  The

5     plan contains what has been in a lot of cases, it's a retention

6     of jurisdiction.  And I don't remember who said this -- it was

7     sometime this morning that it was talking about the preference

8     actions and how the 90 days couldn't be extended because

9     Congress was the only one that could extend it.  It makes total

10    sense.  Valuation and all that's not my issue.

11         But it does kind of carry over here that only

12    Congress can expand jurisdiction.  And that's been the subject

13    of a lot of litigation.  I know we have Stern v. Marshall, but

14    when it comes down to subject matter jurisdiction, that's

15    defined by Congress.

16         THE COURT:  Yeah.  Marshall was actually

17    constitutional authority, not jurisdiction.

18         MR. KINCHELOE:  Sorry.  I may have misspoke.  That's

19    what I was trying to say, was Stern v. Marshall talks about

20    constitutional authority and the statutory jurisdiction has to

21    fit within that.  But the basic concept of subject matter

22    jurisdiction is statutory.  And that, like 547 and the 90 days,

23    is set by Congress.  This plan expands what 1334 provides.

24    1334 gives the Court exclusive jurisdiction over the case, and

25    then 1334(b) says that the Court has non-exclusive jurisdiction

1   over matters arising under, arising in, or related to.

2          Now, "arising in" isn't in Article XI of the plan,

3   but "arising out of, or related to" are.  And it says that the

4   Court's going to retain exclusive jurisdiction over those two

5   categories.  That's beyond what 1334 provides.

6          And I know I've made a similar argument to Your Honor

7   before, and the Court suggested that we say okay, the Court

8   retains jurisdiction to the maximum extent permitted by law.

9   In a normal contested matter, that probably is okay.  The

10  problem that might client's concerned with in this case is the

11  Supreme Court's decision in Espinosa.  And at least as I read

12  Espinosa, it says to the extent a confirmed plan conflicts with

13  the statute, the plan controls.

14          THE COURT:  Right.

15          MR. KINCHELOE:  Okay.  Well, I mean, I could come up

16  with arguments why that case probably shouldn't apply to

17  jurisdiction.  I don't want to have to make them, and my client

18  doesn't want to have to make them, and so I'd rather just

19  object here.

20          Right now, the plan expands -- would expand the

21  Court's jurisdiction, and I don't want to risk either me or my

22  client with some other counsel having to argue whether Espinosa

23  applies later.

24          THE COURT:  Can you take me --

25          MR. KINCHELOE:  And so --

292

1          THE COURT:  I'm sorry, Mr. Kincheloe.  Can you take

2   me to the specific language in the plan that you're talking

3   about?

4          MR. KINCHELOE:  So there's one spot in the plan and

5   two spots in the confirmation order.  It's -- I'm looking at

6   Document 2833.  And the page number at the top, it's Page 58 of

7   64.  If you're looking at the page numbers on the bottom, it's

8   actually Page 54 of the plan.

9          THE COURT:  Yeah.  Hold on.  Oh, I had 2833 up.

10  Sorry.

11         Okay.  I'm sorry.  I have 28 -- and it's what of 64?

12         MR. KINCHELOE:  It's Page 58 of 64.

13         THE COURT:  58 of 64.  Okay.  So retention -- so --

14         MR. KINCHELOE:  And it says, you know, dot dot dot,

15  "shall retain exclusive jurisdiction over all matters arising

16  out of, or relating to."  And I mean, there is plenty of case

17  law -- those are terms of art that have been interpreted by the

18  courts, and this comes straight out of 1334(b).

19         THE COURT:  Yeah.  I'm not going to do anything more

20  than add the language "to the maximum extent provided by law."

21  Because I don't think I can change that.  And I don't think --

22  number one, parties can't agree to it.  I have what I have.

23  And as the Supreme Court has taught us, we determine that on a

24  case-by-case basis.  So I'll add that, but nothing more.

25         MR. KINCHELOE:  Well, Your Honor, I would ask for one

293

1  thing.  If the Court wants to overrule me, I'll take that

2  and --

3           THE COURT:  Understood.

4           MR. KINCHELOE:  -- advise my client.  There was a

5  paragraph that was added last night to the confirmation order,

6  that's Paragraph 258.

7           THE COURT:  Okay.  Hold on.  Let me get there.  Is it

8  -- can you give me the reference to the brand new one, 2847?

9           MR. KINCHELOE:  If the Court gives me a second, I

10 can.

11          THE COURT:  Sure.

12          MR. KINCHELOE:  I had the one last night open.  So

13 it's Document 2845.  And it looks like it's Page -- well, no,

14 Your Honor.  I'm sorry, the -- oh, here it is.  It's now

15 Number 256.  It's Page 133 of 211.

16          THE COURT:  Okay.  I'm sorry, one what?  I just

17 couldn't hear you.

18          MR. KINCHELOE:  133 of 211.

19          THE COURT:  Okay.  And it's 250 -- it's what page?

20          MR. KINCHELOE:  It's -- sorry, it's Page 133.

21          THE COURT:  I'm sorry, paragraph.

22          MR. KINCHELOE:  Paragraph 256.

23          THE COURT:  256.

24          MR. KINCHELOE:  And I heard Chesapeake's counsel on

25 opening argue that they're not subject to FERC's jurisdiction.

294

1  I'll get to that in a second.  But if they're not --

2            THE COURT:  That's not what they said.

3            MR. KINCHELOE:  Okay.  Either way, Your Honor, I'd

4  ask that this paragraph be deleted.  I mean, there's just no

5  reason --

6            THE COURT:  We can't be on the same -- because

7  Paragraph 256 is a settlement with Stone Well Service.

8            MR. KINCHELOE:  Okay.  I'm looking at Document 2845.

9            THE COURT:  Right.

10           MR. KINCHELOE:  Am I looking at the wrong one, Your

11 Honor?

12           THE COURT:  The current confirmation order is 2847.

13           MR. KINCHELOE:  If the Court will give me a second,

14 I'll try to find it.

15           THE COURT:  Sure.  What am I looking for?  And I'll

16 do the same --

17           MR. KINCHELOE:  There's -- the subheading is "FERC

18 Jurisdiction."

19           THE COURT:  Ah, okay.  I can search for that.  It's

20 255.

21           MR. KINCHELOE:  Whatever my client's jurisdiction is,

22 it is -- it's the Court saying it's retaining jurisdiction to

23 the maximum extent permitted by law.  Okay.  My client and I

24 can talk about it after the hearing.  But a paragraph trying to

25 modify my client's jurisdiction in any way is just -- I

295

1  can't --

2         THE COURT:  So let me say this.  So I've read 255.

3  I don't think that 255 has anything to do with FERC.  I would

4  just suggest we delete the header "EEEE, period, provision

5  regarding FERC jurisdiction," because 255 has nothing to do

6  with FERC jurisdiction specifically.  It may have tangentially,

7  but it ends by, you know, the "Bankruptcy Court shall not

8  retain jurisdiction beyond the maximum extent allowed by law

9  under the applicable circumstances."  I mean, that's all we've

10 said.

11        I'm not going to do anything less.  And I'm certainly

12 not going to do anything more.  I do think the header comes

13 out, if that was creating confusion, because I don't think it

14 serves any purpose.  And to the extent that it's meant to mean

15 something, it shouldn't.

16        So we're going to delete "EEEE, period, Provision

17 Regarding FERC Jurisdiction, period." As -- 255 is just going

18 to say what it says.

19        MR. KINCHELOE:  I understand, Your Honor.

20        THE COURT:  Understood.  What's next?

21        MR. KINCHELOE:  The next -- it's the 1129(a)(6)

22 issue.  Now, the Court has heard me say this before.  My client

23 doesn't like Mirant.  The Court has also heard me say Your

24 Honor is bound by Mirant.  My client is where it is.  It may

25 one day ask the Fifth Circuit to overturn Mirant, but for

296

1  today, the objection was merely to ensure that we're complying

2  with it.

3        To the extent we're saying the rejections are just

4  breach, okay.  My client just wants to make sure that nobody is

5  taking the position that rejection equals more than breach,

6  like maybe rejection means the contracts no longer exist.

7        THE COURT:  So first --

8        MR. KINCHELOE:  So that's --

9        THE COURT:  First of all, I mean, 1129(a)(6) only

10 pertains to the plan.  And there is nothing I saw in the plan

11 that comes anywhere close to what you're worried about.  If I

12 missed it, please point me to it.

13       MR. KINCHELOE:  The concern is this would be the

14 discussion about the treatment of executory contracts.

15       THE COURT:  I got it.

16       MR. KINCHELOE:  And that that somehow incorporates by

17 reference.  And again, if Your Honor's ruling is to overrule

18 that objection, I'll advise my client.

19       THE COURT:  Understood.  I'm going to overrule that

20 objection.

21       MR. KINCHELOE:  Thank you.  The third objection --

22 and this got a little more -- this got a little more weight

23 with my client in the last 24 hours.  We understand that ETC

24 Tiger and Chesapeake are going to present Your Honor with a

25 settlement at some point.  And you know, we're going to have

297

1   issues with that when it comes up, mainly because we haven't

2   seen it.

3           THE COURT:  Sure.

4           MR. KINCHELOE:  But as I understand the settlement,

5   it's going to result in ETC Tiger and Chesapeake presenting a

6   new proposed rate to FERC.  And as we read the injunction, the

7   injunction provision of the plan talks about it enjoins any

8   actions in connection with, or with respect to the discharged

9   claim, which is slightly broader than 524.  524 only enjoins an

10  action to collect or recover a discharged debt.

11          And so what my client's worried about is that they

12  could arguably be violating the injunction provision in the

13  plan by adjudicating that request to approve a new filed rate.

14          And I know as I'm saying it, probably odds are nobody

15  is going to make that argument, but I don't want to risk having

16  my client leave today and not having raised the issue with the

17  Court.

18          THE COURT:  You've raised it and I won't -- well,

19  I'll remember you said something.  Bring that up at the

20  compromise hearing.  I can't imagine that the parties would

21  submit a compromise to me and then say that to the extent that

22  FERC has to approve a rate change, if there is a rate change,

23  that they can't do it.  I can't imagine that argument being

24  made.  But remind me of today, and remind me at the hearing on

25  that motion to compromise.

298

1    I would be shocked if that were an issue, but if it

2  is, we'll deal with it.  And just as protective as I am of

3  bankruptcy court jurisdiction, and you know what I think of the

4  contract rejection argument, I am equally protective of what I

5  believe to be FERC's legitimate purpose and rights and duties.

6    MR. KINCHELOE:  Thank you, Your Honor.  The one last

7  thing -- I've heard Your Honor.  My client representative is on

8  the line.  He has heard Your Honor.  We will talk after the

9  hearing and we will decide what to do.  I don't know what we're

10 going to do.

11   THE COURT:  Sure.

12   MR. KINCHELOE:  But I also don't want to be the cause

13 of any delay.  So if the Court does overrule the objection

14 today, I would just appreciate, so I can remove the delay, an

15 opportunity to move for a stay pending an appeal orally.  And

16 if the Court denies it, just so we can move on with life.

17   THE COURT:  Well, you're going to file a motion, and

18 I'm going to set it for a hearing.

19   MR. KINCHELOE:  Okay.  That's fine, Your Honor.

20   THE COURT:  All right.  Anything else, Mr. Kincheloe?

21   MR. KINCHELOE:  That's all.  Thank you.

22   THE COURT:  And I don't think I've seen you.  Happy

23 New Year.

24   MR. KINCHELOE:  Happy New Year, Your Honor.

25    (Court attends to unrelated matter/caller at 4:58 p.m.)

299

1    (Proceedings resume at 5:04 p.m.)

2         THE COURT:  All right.  Let me make one more pass.

3    Anyone else wish to make comments that opposes the plan?

4         All right.  Ms. Schwarzman, do you want to respond to

5    some of the issues that you have heard?

6         MS. SCHWARZMAN:  Sure.  Well, I was actually going to

7    start by asking Your Honor if there's any sort of issues that

8    were raised that you would like to hear response.  And I'm

9    prepared to respond to many things, but you know, Your Honor

10   sat through the trial with us.  You have an excellent grasp of

11   the evidence.  And so I'll defer to you, if there's anything

12   particular you wanted to hear on.

13        THE COURT:  So -- and I will listen to anything that

14   you want to respond to, but in particular I do want you to

15   address Mr. Pitta's concerns about 6 and 7.  I hadn't really

16   focused on the language.  I said once before, you know, I made

17   certain assumptions which have turned out not to be true.  And

18   I was always worried that I was creating, you know, multiple

19   problems when I was trying to solve what I thought was an easy

20   one at the time.

21        Let me give you my reaction, and then I'll have you

22   respond however you want.  My goal always was -- and Mr. Pitta,

23   and probably rightly so, referenced this as sort of Texas rough

24   justice.  And I get that.  I appreciate it.  I apply it all the

25   time.  But I wanted it to be even.  And I haven't really

300

1  thought about whether or not it's currently even.

2        I don't like the concept of -- that one particular

3  type of creditor can file multiple claims based upon a

4  guarantee or a co-obligor type thing, and another one can't.

5  I think it all needs to be one way or the other.

6        I don't particularly have a preference.  My goal is

7  that, you know, if there isn't -- if there isn't an

8  agreement -- and I'm perfectly happy to give you the evening or

9  a day or -- not too long, but I'm happy to give you an

10 opportunity to try and craft some language that may be

11 reconciliatory in some form or fashion.

12       But at the end of the day, you know, if you can't

13 reach an accord, then, you know, what I want is I want

14 something -- if people are going to be -- if people are going

15 to feel like they've been unfairly treated, I want everybody to

16 feel that way to an equal degree.

17       And I'm not making light of that.  It's genuinely

18 what I want.  I want everybody to be treated exactly the same

19 way.  But I don't -- I don't like the thought of approving some

20 language where if you are a green creditor that you can do one

21 thing, but if you're a blue creditor you cannot.  I want

22 blue/green to exist the same way, either way, and I don't

23 really care.

24       That's obviously, you know, Mr. Mitchell has popped

25 in.  He's going to weigh in on this.  And maybe you don't want

301

1   to have a discussion.

2          But I do want to hear your thoughts about that issue.

3   And then obviously I'm happy to hear any other responses that

4   you want to make with respect to any of the arguments that

5   you've heard, and including, obviously, the Committee's and

6   Mr. Stark's.

7          And let me do this before I do that.  It says Henry

8   Knight, but I know it's not Henry Knight, because I know the

9   lawyer.

10         MR. SPENCE:  Yes, Your Honor.  Ross Spence of -- I

11  was raising my hand and it told me "hand raised" from my desk,

12  but for some reason you couldn't see it or -- so I moved to my

13  associate's office, and hopefully can hear me.

14         THE COURT:  Very well.  And I'm sorry I didn't see

15  you.

16         MR. SPENCE:  No problem.  I represent some royalty

17  owners.  I have a very practical issue.

18         THE COURT:  I read your objection.

19         MR. SPENCE:  Okay.  No, we resolved a lot of things

20  in the plan language.  We, and the Committee, and others.  But

21  the practical issue I have is that you pointed out during trial

22  third day that an unpaid royalty is a property interest, but a

23  claim -- a claim for a disputed royalty is more of a legal

24  claim.

25         But the question is -- so once it gets decided, what

302

1  happens?  And in the <u>Extraction</u> bankruptcy case, recently,

2  Judge Sontchi ruled that -- exactly what you did, that royalty

3  payments are not property of (audio interference) but claims

4  for disputed royalties are just that, legal claims.  But when

5  they're decided -- once they become decided, then those

6  disputed -- now undisputed royalties are property of the

7  royalty owners, not the estate.

8           THE COURT:  Yeah.  So let me be -- and I've read

9  Judge Sontchi's decision.  I've actually talked to him about

10  it.  And I'm not sure that it came out exactly how he was

11  thinking about it.  But again, we're -- that's his decision.

12  I've read it.  I understand it.

13           And let me -- the answer to your question is it's

14  going to depend.  And it depends on a lot of things.  And you

15  know, for instance, you know, let's assume -- let me make

16  something up.  And I want to try to draw the example that won't

17  offend anybody.

18           Let's say that in 1967 your client was underpaid a

19  royalty of a dollar.  And today there is a lawsuit for that

20  royalty and there is no cash in the bank.  Well, obviously, you

21  know, any claims that you can make that, you know, based upon

22  tracing or the -- I mean, I know all the theories and I've

23  tried to pick something that wouldn't -- that you couldn't say,

24  well, what about this?

25           Let's assume that there was zero in the bank account.

303

1  Well, at that point, you have a claim.  You have an unsecured

2  claim.  And it would just get paid, you know, however the plan

3  treatment for general unsecured claims is.

4          Now, I know that that will never be the case.  And so

5  if you're -- I think what I said -- and I'm sure you've looked

6  at the transcript, and I'm sure my memory is bad, is that these

7  things aren't absolute, but --

8          ELECTRONIC VOICE:  Our system will end this

9  conference in five minutes.

10         THE COURT:  Hold on.

11         ELECTRONIC VOICE:  Your conference has been extended

12  for 60 minutes.

13         THE COURT:  I think what I said was in general,

14  claims arising out of the underpayment of royalty are exactly

15  that, legal claims.  Because I know all of the -- you know,

16  there are additional damages that go with that.  There are fees

17  and costs that go with that.

18         And so, again, you know, the answer is we're going to

19  have to get further down the path of where your particular

20  claims are and what they are.  And I will tell you I read so

21  much -- and I read your objection.  I know what it's about.  I

22  don't remember what jurisdiction it is.  Obviously, I'm much

23  more comfortable talking about Texas, because I've litigated

24  that issue as a lawyer and I just -- I'm very comfortable with

25  it.

304

1    With the lawyer that was making the comments from

2  Pennsylvania, you know, the only time I've ever been to

3  Pennsylvania was to fly into Philadelphia to take the train

4  down to Delaware.  I mean, that's -- I mean, that's the sum

5  total of my exposure.  So I -- it's going to depend on an awful

6  lot.

7    MR. SPENCE:  Could I say then that the -- I'm aware

8  of -- you know, a <u>SandRidge</u> problem where the money got swept.

9  So, sorry, you're out of luck.  But there's language that's now

10  been added to the confirmation order.  I had it in my other

11  computer, but it's Page 94 of the redline of the current

12  confirmation order, so the "dash 1" version.

13    THE COURT:  Okay.  Hold on.  And was this language

14  that Ms. Brown negotiated?

15    MR. SPENCE:  No.  It was language that the Perry

16  (sic) royalty owners negotiated, but strictly for themselves.

17    THE COURT:  Okay.  Hold on.

18    MR. SPENCE:  Not general --

19    THE COURT:  So hold on.  Let me get to the order.

20    (Pause)

21    THE COURT:  All right.  I'm going to look.  I'm going

22  to pull up -- if it would stop.  I'm going to pull up --

23  actually, I didn't pull up the redline.  Can you give me the

24  number that it's in?  And I'm looking at 2845.

25    MR. SPENCE:  It should be 2845-1.  It was filed at

305

1  the same --
2           THE COURT:  No, it was.  It's just -- it takes me a
3  moment to get there.  I was trying not to do it, but hold on.
4           MR. SPENCE:  (Audio interference)
5           THE COURT:  That's just fine.  The computer --
6           MR. SPENCE:  The one I was --
7           THE COURT:  -- gets tired at the end of the day.
8           MR. SPENCE:  What I'm hoping to prevent is that --
9  it's fine to say okay, do you have a secured claim, do you not?
10  We fight over that later.  That's been preserved.
11          THE COURT:  Sure.  Can you --
12          MR. SPENCE:  But if we fight over that --
13          THE COURT:  Can you get me to -- I'm sorry,
14  Mr. Spence.  Can you get me to the paragraph that we're talking
15  about?
16          MR. SPENCE:  It was Page 94 of the redline,
17  continuing to Page 95.  I don't remember the paragraph number.
18          THE COURT:  Okay.  So this is the --
19          MS. SCHWARZMAN:  Your Honor, it should be Paragraph
20  190, I believe.
21          THE COURT:  Okay.  Mr. Spence --
22          MS. SCHWARZMAN:  It's included in 2847.
23          THE COURT:  Okay.  I have it, Mr. Spence.
24          MR. SPENCE:  And so there they preserved the idea
25  that if you just -- if you have adjudication of your claim and

306

1  it becomes an allowed secured claim, well, then it will be

2  classified as an other secured claim.  To me, that should mean

3  you get paid.

4         But what I hear you saying and what I'm concerned

5  about, after SandRidge, is that, well, you may be an other

6  secured claim, but unless there's money sitting in the royalty

7  account that you can claim your security interest against,

8  well, then, you're out of luck.

9         THE COURT:  Well, then you're not a secured claim,

10  right?  If you have --

11         MR. SPENCE:  Right.

12         THE COURT:  If you have no collateral, you can't be a

13  secured claim.

14         MR. SPENCE:  Right.  And so to me, the SandRidge

15  royalty owners did not object at the plan stage.  Here, we have

16  obeyed that objection, and we just think that there either --

17  you can by plan fiat dictate that an other secured claim will

18  get paid regardless of whether the debtor swept the monies so

19  that they can earn some interest.

20         THE COURT:  So you're --

21         MR. SPENCE:  Or --

22         THE COURT:  Are you complaining about the fact that

23  the debtors entered into a settlement with the Pettys?

24         MR. SPENCE:  No, I am not.

25         THE COURT:  Okay.

307

 1          MR. SPENCE:  No.

 2          THE COURT:  Then I'm not appreciating the objection.

 3          MR. SPENCE:  Okay.  Well, to solve the problem that

 4    the money may not be there at the time that your claim gets

 5    adjudicated --

 6          UNIDENTIFIED:  Escrow.

 7          MR. SPENCE:  -- then what I was saying is you can

 8    have -- you can either, just like -- you can just state that it

 9    will be treated as an other secured claim, whether the money is

10    still there due to sweeping or not.  Or you can escrow.  Going

11    forward, these debtors can escrow all the disputed royalties,

12    and then we won't have a problem.

13          THE COURT:  So your problem is an ongoing problem?

14          MR. SPENCE:  Well, no.  Our claim was fixed in time,

15    but we just want to make sure that it will get paid.  If it

16    truly is our property or it is a secured claim, we'd like to

17    get paid as such, not -- otherwise, we're going to be in the

18    unsecured pool no matter what.

19          THE COURT:  So here's my -- Mr. Spence, and I don't

20    think that this is a plan issue.  I'm surprised that I haven't

21    seen something else filed, if that's where you are.  But I

22    don't think it's a plan issue.

23          Again -- and I said this before.  And part of it was

24    because of -- when I read your objection, when I said it to the

25    other -- or I said it to Mr. -- I can't remember who I said it

308

1  to.  But I said plans shouldn't be about -- I did say it to

2  Mr. Pitta, that plans shouldn't be about dictating, you know,

3  who has what.  It's -- plans should be about dictating if you

4  have this, then here is your treatment.

5        Now, granted, 1123 specifically permits the

6  embodiment of settlements within confirmation orders and plans.

7  But just as a general -- as a general statement, I don't

8  believe that the purpose of plans is to dictate who has what.

9  It's to set forth here's how claims will be treated, and then

10 we use the claims adjudication process to figure out what it is

11 you have.

12        If you believe that your position is changing to the

13 negative, then you should file something and tell me there's a

14 problem and let me deal with it.  But I just don't think it's a

15 confirmation issue.

16        MR. SPENCE:  Well, all I can say in that regard is

17 that each day, apparently, they're sweeping those funds, which

18 we don't even think they own.  And so, yes, it is an ongoing

19 problem in that sense.

20        THE COURT:  But is the underpayment, if you will --

21 if your theory of the world is correct, is the underpayment

22 ongoing?

23        MR. SPENCE:  It is in the sense that, yes, until we

24 resolve our issues with them, they are treating our royalty in

25 a certain way, which we disagree with.

309

1  THE COURT:  Then you need to file something and tell

2  me that, and give me the ability to grant relief.

3  MR. SPENCE:  Okay.  The other thing that was done in

4  those Paragraphs 190 and following was they preserved their

5  right to argue about cure amounts under surface cases.  And we

6  had asked for that, that we never got that.

7  THE COURT:  So has your lease -- is your lease being

8  assumed under the plan?

9  MR. SPENCE:  We have -- yes, we have surface leases

10  that they're assuming at zero.  And we tried to get them to

11  agree, let's put off that fight over the cure amount, to

12  another day, and just preserve that.

13  THE COURT:  So do you have a good faith basis, as we

14  stand here today, for disputing the amount of the cure?

15  MR. SPENCE:  My clients feel that it's not zero, but

16  I don't have any -- I don't have the facts in front of me to

17  tell Your Honor here's why.

18  THE COURT:  And again, I just don't remember.  What

19  was the process for asserting an objection to the cure amount?

20  MR. SPENCE:  I do not recall it, Your Honor.

21  THE COURT:  Ms. Schwarzman, could you remind me?

22  MS. SCHWARZMAN:  Yes, Your Honor.  Objections to cure

23  were due at the same time as objections to confirmation

24  generally.

25  THE COURT:  Right.  And how long did folks have to do

310

1  that?

2           MS. SCHWARZMAN:  Objections were due on December

3  10th, I believe, and the DS was approved on October 30th.

4           THE COURT:  And so here we are, what, three months

5  later, Mr. Spence, and you still don't know?

6           MR. SPENCE:  I don't know the cure amounts.  I did --

7  I did discuss this whole surface contract issue, and just that

8  the issue should be preserved for future.

9           THE COURT:  I got it.  That objection is going to be

10 overruled.  What else?

11          MR. SPENCE:  We had asked to preserve all lease

12 rights.  There is sort of general language preserving the lease

13 as unimpaired -- the mineral leases.

14          THE COURT:  So I don't understand what that means.

15 If you're -- if the lease is being assumed --

16          MR. SPENCE:  No, no.  I mean the mineral lease.

17          THE COURT:  Oh, the mineral -- I'm sorry.  Sorry,

18 sorry, sorry.  Okay.  And so what is it that you're looking

19 for?

20          MR. SPENCE:  (Audio interference) so we've asked for

21 specific reservation of audit rights, consent rights, and lease

22 termination rights, as part of the bundle of rights that's

23 being preserved.  We just were unable to get that language

24 included.

25          THE COURT:  And what does the confirmation order say?

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

311

1          MR. SPENCE:  Generally that -- in Paragraph T --

2   well, I'm thinking of the plan --

3          THE COURT:  Okay.

4          MR. SPENCE:  -- but that the leases will be

5   unimpaired --

6          THE COURT:  Yeah.  I think the bundle of rights --

7   I'm not going to go through, because I'm worried that if I say

8   anything -- because no two leases are ever the same.  Whatever

9   the lease rights are, they are.  And I think that a statement

10  is that those will continue unimpaired is exactly the right

11  statement to make, because then I don't have to look at, you

12  know, 27,000 leases in 15 different states, only one of which

13  I'm probably marginally qualified to look at.

14         MR. SPENCE:  Okay.  Thank you.  And Your Honor asked

15  what state, and it's all Texas that I'm talking about.

16         THE COURT:  Okay.  Well, then -- well, I'm at least

17  more comfortable.

18         MR. SPENCE:  And that really -- that's it, Your

19  Honor.

20         THE COURT:  Okay.  Thank you, Mr. Spence.

21         So, Mr. Mitchell, before I come back to you, I want

22  to hear what Ms. Schwarzman has to say.  I would think that you

23  would, as well.

24         All right.  Ms. Schwarzman.

25         MS. SCHWARZMAN:  Thank you, Your Honor.

312

1      THE COURT:  And my apologies for interrupting with

2  the gentleman from J.C. Penney.

3      MS. SCHWARZMAN:  No problem.

4      THE COURT:  I hope --

5      MS. SCHWARZMAN:  He was very lovely to us.

6      THE COURT:  I hope he hasn't been waiting since nine

7  o'clock.  That would be a long day.

8      Go ahead, please.  I'm sorry.

9      MS. SCHWARZMAN:  So --

10      MR. SPENCE:  (Indiscernible.)

11      THE COURT:  Mr. Spence, could you mute me, please?

12      Go ahead, please.

13      MS. SCHWARZMAN:  Thank you, Your Honor.  So I

14  believe, you know, Your Honor, was saying that you want the

15  treatment to be fair, and you want it to be fair for everyone.

16  And you know, green creditors don't get different treatment

17  than blue creditors.  And I believe that what we've done,

18  although people say it's complicated -- I believe that it's

19  fair.  Everybody gets (indiscernible) recovery and not

20  misconstruing what the plan says.

21      But we heard Your Honor loud and clear.  Your

22  assumptions, when you gave us that hint, was correct, and that

23  unsecureds are "out of the money."  And you know, we think zero

24  times 30 results in the same as zero times one or times two.

25  And so we do think it's fair.  And so I do think we would -- we

313

1  would ask the plan be confirmed as is.

2          THE COURT:  So let me ask you this.  Because the way,

3  at least my memory, of 30 minutes ago, was that it was only one

4  claim as to a lease -- or, I'm sorry, as to a noteholder.  But

5  another by just a general unsecured could perhaps do that.  Is

6  that -- that's just not correct?

7          MS. SCHWARZMAN:  No.  Whatever Your Honor's

8  expression was, "one riot, one ranger."  It's the same for

9  everybody.

10          THE COURT:  Got it.  And can you -- and I have now

11  2845 up on my screen.  Can you walk me through where that is?

12  Oh, it's actually going to be --

13          MS. SCHWARZMAN:  I'm looking at 2847.  It's actually

14  in the plan, which would be 2833.

15          THE COURT:  Got it.

16          MS. SCHWARZMAN:  And I'm looking at 2833-1, looking

17  at the redline.

18          THE COURT:  33-1.  Okay.

19          MS. SCHWARZMAN:  So the first page I would go to,

20  Your Honor, is Page 15 of 64.  And it's the pro rata language.

21          THE COURT:  Hold on just one second.  I'm lagging

22  behind you.

23          MS. SCHWARZMAN:  Sure.  Okay.

24          THE COURT:  All right.  I now have the plan.  You

25  said 15 of 64?

1      MS. SCHWARZMAN:  Yes, Your Honor.

2      THE COURT:  Okay.

3      MS. SCHWARZMAN:  So the pro rata language should

4  describe how we get to numerator and the denominator, and most

5  importantly it says about halfway through that redline

6  language, "Each allowed unsecured notes claim and each allowed

7  general unsecured claim shall be counted ounce, notwithstanding

8  the number of debtors against which such claim may be

9  asserted."

10      THE COURT:  I misread that.  You're right.

11      MS. SCHWARZMAN:  And then we did clean up the section

12  -- I believe it was VI-J on Page 48, to clarify the confusion

13  there, as well.  Just to say that holders in allowed claims

14  other than an allowed unsecured notes claim or allowed general

15  unsecured claim cannot recover against more than debtor just

16  once.

17      And I believe somebody -- Mr. Silverberg from the

18  Committee asked me earlier to clarify if that applies to the

19  convenience claims, too.  And the answer is yes, that's the

20  intention: one claim, one recovery.

21      THE COURT: Okay.  So -- got it.  Okay.  So you treat

22  everybody the same.  Got it.  Okay.

23      MS. SCHWARZMAN:  And then with respect to rebuttal of

24  the other things we've heard.  I'd just quickly -- on

25  Mr. Kincheloe's objection.  No issue changing the heading of

ACCESS TRANSCRIPTS, LLC            1-855-USE-ACCESS (873-2223)

1   that FERC section.  You're right.  It is a misnomer.  But if we

2   could change it to just "Retention of Jurisdiction."

3               THE COURT:  That's fine.

4               MS. SCHWARZMAN:  Otherwise, it looks like it stays in

5   that ETC section.  So that would be the request there.

6               And you know, Your Honor, Mr. Stark said a lot.  I'm

7   very happy to go through and explain why I disagree with the

8   numbers that he put up in a slide when he was trying to put in

9   what he thought the value of unencumbered collateral is.

10              If Your Honor is not persuaded by theory, I don't

11  feel the need to take the time to respond to either the theory

12  or the numbers.  But I'll take direction from Your Honor.

13              THE COURT:  Yeah.  First, let's deal with

14  Mr. Kincheloe.

15              Mr. Kincheloe, any issue if we just -- as opposed to

16  the language that dealt with FERC, we just give it a title?

17  Because I agree.  It means -- that it looks like it's in

18  another section.  If we just call it "Retention of

19  Jurisdiction"?

20              MR. KINCHELOE:  There is a problem, Your Honor.

21  Section I has the same subheading.  It's Paragraph 112 on Page

22  52.

23              THE COURT:  So hold on.  Hold on.  Hold on.  So one

24  at a time.

25              So, with respect to the question that I asked you,

316

1  any issue in just changing that to "Retention of Jurisdiction"?

2           MR. KINCHELOE:  Well, yes, Your Honor, because there

3  is already the exact same subheading elsewhere, and I think

4  it's confusing to have that in two separate places.

5           THE COURT:  Okay.  So then why can't we just move the

6  paragraph?

7           MR. KINCHELOE:  We can, Your Honor.

8           THE COURT:  Okay.  Can you do that, Ms. Schwarzman?

9           MS. SCHWARZMAN:  Yeah.  Your Honor, I think we can

10 actually just delete the second time it shows up.  I'll have to

11 double-check, but I think (indiscernible).  We can definitely

12 make that change.

13          THE COURT:  Could you just confirm to Mr. Kincheloe,

14 once you have a chance to catch your breath, that you're either

15 going to put them both together or you're going to delete one?

16          MS. SCHWARZMAN:  Yes.  Absolutely, we will.

17          THE COURT:  Thank you.

18          MR. KINCHELOE:  Thank you, Your Honor.

19          THE COURT:  Thank you, Mr. Kincheloe.

20          Ms. Schwarzman, I want to hear whatever comments that

21 you want to make.  I told you I would give you rebuttal.  I

22 don't want to dictate what you say, what you don't say.  I'll

23 leave it at that.

24          MS. SCHWARZMAN:  Your Honor, I don't really feel like

25 I need to respond.  You know, at a high level, I don't think

317

1  the numbers that Mr. Stark gave you were consistent with the

2  evidence or at a minimum had misconstrued the evidence.  But

3  Your Honor, at this time, unless there's any questions

4  troubling you, I would reiterate our request to confirm the

5  plan.

6          THE COURT:  All right.  Thank you.

7          Anyone else that I promised rebuttal to want to take

8  me up on that?  Mr. Zensky.

9          MR. ZENSKY:  Can you hear me, Your Honor?

10          THE COURT:  Yes, sir.

11          MR. ZENSKY:  Okay.  Thank you.  I'll be very brief.

12  I just wanted to respond to a few of my friend, Mr. Stark's,

13  comments.

14          On 546(e) and the questions of a qualifying financial

15  institution, Mr. Stark discussed at length the argument about

16  MUFG's relationship to the lenders and the 2L trustee.  He did

17  not respond at all to Franklin's independent status as a

18  financial institution.  And as Your Honor knows, from argument

19  and from the papers, that's not all dependent on whether Your

20  Honor agrees with the second and more encompassing argument

21  that is based on the Commune case.  So you've heard nothing to

22  suggest that our argument is wrong as to the Franklin funds

23  themselves.

24          With respect to the "in connection with" requirement,

25  which I spent some time on, Mr. Stark showed you a chart which

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

318

1  he called a "schematic," and used it to try to argue that the

2  FILO loans and the debt tender for the WildHorse notes really

3  have nothing to do with each other, or certainly shouldn't be

4  considered as related.

5           He did that have very pretty arrow going across the

6  page from one side to the other, which belies the point.  But

7  he's really twisting himself into a knot trying to avoid the

8  "in connection with" argument, because the whole theory of the

9  Committee's fraudulent conveyance case is that you have to

10  collapse the FILO loans with the debt tender offer, and that's

11  what makes it a constructive fraudulent conveyance.

12           In other words, the lenders did give Chesapeake

13  $1.5 billion, and the argument that it becomes constructively

14  fraudulent is if you collapse it with the next step of the

15  transaction, because the money goes out the door to buy the

16  bonds.

17           So you can't have it both ways.  You can't argue that

18  the loan and the lien are not in connection with the debt

19  tender offer, but at the same time argue that the debt tender

20  offer makes it constructively fraudulent.

21           There's a similar problem that comes up with the

22  Committee's intentional fraudulent transfer argument.  And

23  Mr. Stark tried to argue that there's a badge of fraud here

24  that the debtors retained the property at the same time it was

25  dispossessed from the Legacy Chesapeake entities.  And again,

319

1 that's intentioned with the argument that what makes it

2 fraudulent is that the money was borrowed by the Legacy

3 Chesapeake entities and sent out the door to pay off the BVL

4 bondholders.  So that doesn't work.

5      Mr. Stark cited the _Sentinel_ case to you, and I would

6 say that Sentinel on the standard of intent has never been

7 followed by any court, and has been criticized, in fact, in

8 particular in the _Lyondell_ case at 554 B.R. 635.  If the

9 _Sentinel_ formulation of intent -- sufficient to trigger intent

10 -- intentional fraudulent transfer was right, every

11 constructive case would become an intentional case, because the

12 natural consequences of engaging in a transaction without

13 alleged reasonably equivalent value when you're insolvent is

14 that creditors will be harmed.

15      So the _Sentinel_ formulation is not remotely

16 approximate to what 548(a)(1)(A) requires.  And that's all I

17 wanted to say, Your Honor, unless you have any questions.

18      THE COURT:  No, I do not.  Thank you.

19      And Mr. Schaible, I think I gave you the opportunity

20 as well.

21      MR. SCHAIBLE:  Thank you, Your Honor.  Thank you,

22 Your Honor.  Can you hear me?

23      THE COURT:  Yes, sir.

24      MR. SCHAIBLE:  Your Honor, I'll try to be even

25 briefer than Mr. Zensky.  Suffice it to say, Your Honor, we

320

1  disagree with Mr. Stark's first set of arguments about the

2  FILOs being more than (indiscernible).  I could walk you

3  through the math, but I don't think I need to.

4         He overstates -- understates the claims by ignoring

5  postpetition interest (indiscernible) and he overstates the

6  recovery by using the backstop economic (indiscernible) as if

7  it's part of the recovery on a claim, which of course it's not.

8         And Your Honor, we agree with the debtors with

9  respect to -- significantly overstating over -- unencumbered

10 value (indiscernible) numbers for the oil and gas leases and

11 leave a bunch of other (indiscernible) including taking value

12 that is encumbered by the RBL under all circumstances and

13 counting it as unencumbered.

14        Lastly, Your Honor, again, (indiscernible) Mr. Zensky

15 sort of left it, we do believe very strongly that MUFG is a

16 financial institution, and we could walk you through how the

17 merit case works.  But I would just leave it at that for the

18 record.  Thank you, Your Honor.

19        THE COURT:  All right.  Thank you.  Anyone else?

20        All right.  Then we'll -- Mr. Mitchell, I'm sorry.  I

21 did tell you that you could comment.  I'm assuming --

22        MR. MITCHELL:  Your Honor --

23        THE COURT:  I just assumed you had none, given what

24 Ms. Schwarzman said.

25        MR. MITCHELL:  That's correct, Your Honor.  Can you

1  hear me?

2           THE COURT:  I can.

3           MR. MITCHELL:  I'm sorry.  I was just going to join

4  in what Ms. Schwarzman said, and ask the Court to please

5  confirm the plan, and Energy Transfer would urge confirmation

6  as proposed.  Thank you.

7           THE COURT:  All right.  Thank you.

8           MR. KINGMAN:  Your Honor?

9           THE COURT:  Yes, sir.

10          MR. KINGMAN:  This is Bill Kingman.  I represent

11 three entities, and I'm not opposing a plan.  I just want to

12 make one comment before we go offline here.

13          THE COURT:  Yes, sir.

14          MR. KINGMAN:  I did originally file objection to the

15 plan, similar to Mr. McCune's client, but we have reached a

16 resolution on all of those.  Unfortunately, we have not papered

17 the -- or finalized the settlement of one of the claims.  There

18 is currently in Docket Number 2847-1 -- it addresses the

19 settlement between two of my clients, which is Tornado Venture

20 Quattro, LLC and Tornado Venture Seis, LLC [sic].  We are a

21 surface use agreement counterparty.  We've reached a

22 resolution.  I'm looking for the provision in 2847-1 if I can't

23 get my hands on it quickly, but the terms of that settlement's

24 address, and as a result of that settlement, we'll be

25 withdrawing our objection to the claim -- excuse me, to the

1  plan.

2          The third entity is a royalty interest holder,

3  Tornado Venture Seis, LP.  We have reached the terms of an

4  agreement similar to the stipulations that have been previously

5  approved by the Court.  They could be part of the plan

6  confirmation pursuant to Section 1123, but I believe the

7  debtors would prefer to have a separate stipulation or a Rule

8  9019 motion.  It contemplates the payment of my client of

9  $575,000 for (indiscernible) prepetition claim and the

10 withdrawal of our assertion that the underlying lease was

11 terminated on a prepetition basis.  There was pending state

12 court litigation.  That will be resolved as to the prepetition

13 portion of the claim.  But again, as a result of the settlement

14 that we have reached, and assuming it's ultimately approved by

15 the Court, and in fact, we'll be withdrawing our objection to

16 the plan.  However, (indiscernible) that if it's not -- if it

17 does not get approved by the Court, then, in fact, we will then

18 have our rights under the plan, assuming the plan is

19 confirming, asserting that the lease was, in fact, terminated,

20 that we have a secured claim, have the ability to liquidate the

21 claim.  But again, I do anticipate getting the ultimate

22 settlement approved by the Court.

23          So if Ms. Schwarzman wants to confirm that, I

24 appreciate your time today and your patience with everybody,

25 and I hope you have a good evening.

323

1    THE COURT:  So, Mr. Kingman, always good to hear from
2  you.  Happy New Year.  I haven't seen you yet this year.  I
3  don't know how --
4    MR. KINGMAN:  No, I --
5    THE COURT:  I don't know how I'm going to put you
6  back to trial if I can't get you to get a camera.
7    MR. KINGMAN:  I've got a camera.  I apologize for not
8  turning it on.
9    THE COURT:  I am just having fun with you.
10   Ms. Schwarzman, can you give Mr. Kingman some comfort
11  there.
12   MS. SCHWARZMAN:  Yes, Your Honor.  I can confirm.  My
13  apologies, Mr. Kingman.  I did tell him I'd put that on the
14  record, and it just got lost in the shuffle.  But that's all
15  true, and we'll be filing that as shortly as possible.
16  (Indiscernible) other non-debtor parties to it, and that's why
17  we're doing separate stipulations, but that is all correct.
18   THE COURT:  I got it.
19   And, Mr. Kingman, if you want to do a stipulation and
20  agreed order with a memorandum of lease status and have me
21  approve it so you've got something you can put on record at the
22  county courthouse, I'm happy to do it.
23   MR. KINGMAN:  I sure appreciate that, Your Honor.  I
24  will -- Ms. Schwarzman and I and her colleagues will work on a
25  settlement agreement.  I appreciate that very much.

324

1    THE COURT:  All right.  Thank you, Mr. Kingman.

2    Anyone else?

3    MR. KINGMAN:  Have a great day.

4    THE COURT:  You, too.

5    All right.  Then, with that, I'll consider the

6  arguments closed.  Let me first start and echo the comments.

7    In 32 years, I don't think that I've ever seen,

8  participated in, or adjudicated over a confirmation hearing

9  that has been handled the way that this one has been handled.

10  It was just -- it was just immaculately done.  The lawyering

11  was great.  The preparation was great.  Obviously, I didn't

12  agree with every assumption, but I think that's my prerogative,

13  and what I look to the professionals to do, what I look to the

14  parties to do is to make me better and hopefully make a better

15  decision, and that's what I've tried to do.

16    With respect to the valuation, I've listened to

17  everything.  I've reread all of the arguments in favor of

18  different valuations.  I've looked back at the testimony.  I am

19  not so arrogant to say that the value is $5,129,000.  What I am

20  willing to do, and I believe that I've done all the work that

21  anyone could ask, is my opinion that a fair representation of

22  value is $5,129,000, and that is my finding for purposes of

23  confirmation.

24    Let me -- I want to deal with both the Committee's

25  motion for standing, as well as the settlement that was

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1  embodied within the plan.  I want to deal with those kind of

2  together.  We spent a lot of time talking about the claims and

3  the defenses, and while I appreciate all that argument, it's

4  not really all of that -- it's not really all that persuasive

5  to me at all.  Colorability is a really low standard.  It

6  doesn't take a lot to get over the colorability standard.  And

7  I do find that the claims asserted by the Committee meet that.

8  I mean, there is -- you know, there are plenty of lawyers who

9  would put their name pursuant to Rule 11 on a complaint that

10 sets forth those claims, and if that's not exactly the

11 colorability argument or standard, it's awfully close.  And so

12 I just don't think it takes a lot to get over that hurdle, and

13 I think that given the diligence and the effort and the thought

14 that went into that complaint, it meets that standard.

15        The second portion of the <u>Louisiana World</u> standard or

16 evaluation or analysis, however you want to phrase it, is

17 whether or not there's been an unjustified refusal or inability

18 to bring the identified claims.  And that brings into play the

19 compromise.  I just outright reject all of the hyperbole and

20 all of the assertions that people just threw caution to the

21 wind and didn't care, weren't thoughtful, violated their

22 fiduciary duties.  It really bothers me, if it wasn't obvious,

23 when those terms get thrown around when there is simply zero in

24 the record to support those comments.

25        I think that debtors' management was faced with an

1  incredibly difficult problem in an unprecedented time.  It went

2  -- not only did they have to deal with problem A, they had to

3  deal with problem B and then problem C, and then problem A got

4  worse.  I can't imagine sitting on a board or being management

5  through the events that have taken place over the past three

6  years in the energy industry.  Just I don't know how those

7  folks get it right, but they do.

8         And I'm not suggesting that every decision that they

9  made was the right one, but that's not what the governing

10 precedence tells me that I'm supposed to do, and I'm

11 specifically referencing Foster Mortgage, which is 68 F.3d 914,

12 Jackson Brewing, which 624 F.2d 599, In re Aweco, 725 F.2d 293,

13 Cajun Electric, 119 F.3d 349, all governing precedent in this

14 circuit, all which derive out of the Supreme Court's decision

15 in TNT Trailer (ph), 390 U.S. 414.

16        Management made a decision that it thought was right

17 under the circumstances, and to suggest that the analysis

18 wasn't thoughtful, that it wasn't designed to achieve a good

19 outcome is to ignore the record.  Again, I'm not suggesting

20 that everything that management did was right, but it

21 absolutely was thoughtful.  It was designed with the interest

22 of the company put first, and that is all that you can ask of

23 management or a director, though I do find that the debtors

24 prudently exercised their business judgment under the most

25 difficult of circumstances.  And not only should they not be

1  criticized and not only should they not be accused of violating

2  their fiduciary duty, and they should be complimenting [sic]

3  for staying the course and not running and trying to deal with

4  problems that they were faced that no one has ever seen, at

5  least in my 32 years of dealing with these issues.

6          With respect to the compromise that is contained with

7  the plan, I do find that it represents the prudent exercise of

8  business judgment.  It is in the best interest of the estate,

9  and I will approve that compromise.

10          I also want to deal with the rights offering.  And I

11 get the complaints.  You know, I would always make better

12 decisions with the benefit of hindsight.  But there is a

13 bankruptcy process which demands finality.  People make

14 decisions based upon the orders that I enter, and they need to

15 be able to rely on their orders.  And there's been no showing

16 that there was any bad behavior.  There's been no concrete

17 evidence of any fraud on the court.  I hear terms like "slight

18 of hand" and all those types of things, which again are

19 offensive to me.  You either are transparent with me or you're

20 not.  There is no middle ground, and I don't -- again, I might

21 have made a different decision if I had the benefit of

22 hindsight, and maybe I should have delayed ruling, but the fact

23 of the matter is I didn't.  I was told there was a need.  I

24 believed it.  That's what the record said.  I evaluated the

25 applicable law, and I made the decision that I thought was

1    right under the circumstances, and that order stands.  Turns

2    out that the folks who agreed to backstop it made a great

3    business decision, but that happens every single day.

4           With respect to the plan itself, I am required to

5    ensure that the plan satisfies the mandatory requirements of

6    Section 1123(a) of the Code, and I make that finding.  I have

7    considered all of the arguments that have been made, that the

8    plan violates other provisions of the Bankruptcy Code, that it

9    lacks fundamental fairness.  All of those arguments, I reject

10   them all.  I think the plan -- I will find that the plan does

11   not violate any of the permissive requirements of 1123(b) or

12   any other section of the Bankruptcy Code.

13          With respect to Section 1129, I am required to

14   conduct an independent analysis of each of the requirements of

15   1129(a).  And based upon the record that I have before me, I

16   will find that the plan satisfies the requirements of

17   1129(a)(1), (a)(2), (a)(3), (a)(4), (a)(5), (a)(6).  I will

18   stop and pause at (a)(6) to specifically note that I have

19   overruled FERC's objection with respect to the challenge to

20   1129(a)(6).

21          With respect to 1129(a)(7), I will find that the plan

22   satisfies the requirements of 1129(a)(7) with the changes that

23   have been made and again recognizing where value flows, the

24   unique circumstances of the case.  Everybody in 6 and 7 are

25   equally unhappy, and that's just he way it should be.

329

1      I will further find that the requirements of

2  1129(a)(9), (a)(10), (a)(11), (a)(12), and (a)(13) have been

3  satisfied.  I will find that the requirements of 1129(a)(14),

4  (a)(15), and (a)(16) are not applicable to this case.

5      Having found that the plan satisfies all of the

6  requirements of 1129(a) or those provisions identified are not

7  applicable other than 1129(a)(8), I will move to 1129(b) and I

8  will find that the plan does not discriminate unfairly and is

9  fair and equitable with respect to each class of claims or

10  interest that is impaired under and has not accepted the plan.

11      There's only one plan before me for confirmation.  I

12  will find that the requirements of 1129(c) are not implicated

13  and have been satisfied and I'll further find that the primary

14  purpose of the plan is not the avoidance of taxes or the

15  avoidance of the application of Section 5 of the 1933

16  Securities Act.

17      I'll find that Section -- that the requirements of

18  1129(e) are not applicable to this case.

19      With those findings and with the changes that have

20  been announced, I will confirm the debtors' fifth amended plan.

21  That is the plan that is filed at Docket Number 2833.

22      Having made those findings and conclusions and

23  confirmed the plan, I'd like Mr. Lawler to appear on the video

24  if that's possible, please.

25      MS. SCHWARZMAN:  Your Honor, we're just confirming

330

1 that Mr. Lawler has the video capabilities right now.

2            THE COURT:  Understood.

3            MS. SCHWARZMAN:  (Indiscernible).

4            THE COURT:  While we're waiting for Mr. Lawler, let

5 me confirm for those who are listening who are individual

6 retail investors and/or stockholders, I got a large number of

7 correspondence.  Consistent with my practice, I read every

8 single one of them.  I know how bad this hurts.  I wish I had

9 the ability to do more.  I wish I had a magic wand and I could

10 generate value.  I simply don't, but I have considered your

11 comments.  I have spent a lot of time, a lot of sleepless

12 nights thinking about this.

13            UNIDENTIFIED:  (Indiscernible).

14            THE COURT:  I just wanted all those folks to know

15 that I appreciate the time that you took to write me.  I did

16 read it, every -- I read every single scrap of paper, and I

17 thought about everything in trying to work my way through the

18 problem.

19            Do we have Mr. Lawler now?

20            MS. SCHWARZMAN:  We're back (indiscernible).  I know

21 video's a process.  The video isn't working.  I know he's on by

22 phone.

23            THE COURT:  Got it.

24            Mr. Lawler -- ah, here we go.

25            There's Mr. Dell'Osso.

1        MR. LAWLER:  Sorry, Your Honor.  It's Doug.  I'm --

2  my camera (indiscernible) work so I came to Nick's office.

3        THE COURT:  No, got it.  I now --

4        MR. LAWLER:  Sorry for the delay.

5        THE COURT:  -- I now see your picture.  I appreciate

6  you getting online.  There are a couple things, after thinking

7  about it, that I really just wanted to convey to you, and I

8  want to be very measured in what I say.

9        The history of Chesapeake, let's just be candid, is

10 not that great.  It has treated a lot of people very poorly.  I

11 am hoping that, going forward, we can change that policy.  And

12 let's be honest and I want to focus for a second on the royalty

13 holders.  The majority of those folks are underequipped to deal

14 with an entity like Chesapeake, and that gives you an

15 incredible amount of power.  And with power comes

16 responsibility, and I want you to instill in your corporate

17 culture that -- I want you to consider every royalty holder to

18 be like your parent.  They may not like the answer, but you

19 treat them with respect, you treat them with honesty, and you

20 treat them with transparency.  Can I ask you to do that?

21        MR. LAWLER:  Yes, sir, without question.  It is my

22 full commitment to you, to the court, to the royalty interest

23 holders of the company, and all the stakeholders of the company

24 and is a culture that, Your Honor, it's very easily for me to

25 say that I agree with.  It is something that I personally work

1   very hard on, and I'm fully committed to further improve.

2           THE COURT:  Good.  So in a couple minutes -- right

3   now, I have all the power in the world.  I control the destiny

4   of Chesapeake Energy.  In a couple moments, I'm going to

5   transfer that power to you.  And I want you to remember --

6   Chesapeake is a really big and important company.  It's an

7   important company to our country's infrastructure.  It makes --

8   it helps make everything work.  And that's not lost on me.

9           But we live right now in a very, very difficult time,

10  and you have the ability to be a leader and to make a

11  difference, to remember we only have one planet and we are all

12  one race.  That's the human race.  So I ask you as a good

13  corporate citizen and to remember that a lot of people have

14  suffered a lot of pain for Chesapeake to have a second chance,

15  and I ask that you not forget that going forward and remember

16  there is decision-making and then there is responsible

17  decision-making.  Decision-making is the cold, analytical

18  running the numbers, "Can I?"  Responsible decision-making is

19  after you run that analysis, you ask yourself the question,

20  "Now that I've concluded I can, should I?"

21          And I have -- there's nothing under the Code that

22  gives me this authority, but I simply ask, as one human to

23  another, that you not forget that.

24          MR. LAWLER:  Yes, sir.  I will not forget that.  And

25  I will very earnestly commit to you and demonstrate the

333

1  leadership, the culture, and commitment such that in a way when

2  you follow up on this company in one year's time or five years'

3  time that you'll see a track record of dedication and

4  commitment to what you just described, Your Honor.

5          THE COURT:  Then, that serves honor to the process,

6  and that's all I could ask.  So thank you for getting on.  I

7  know you weren't expecting that, but thank you for popping on

8  the camera.

9          Let met take your other outstanding objections that I

10 didn't specifically address.  To the extent that there isn't

11 language that has been added or agreements that have been made,

12 those objections are overruled.

13         Ms. Schwarzman, do you need to do a final run-

14 through, make sure you've got all the tweaks, run -- just sort

15 of make sure you've got a perfect form of order, or you think

16 that's being uploaded as we talk?

17         MS. SCHWARZMAN:  The only change is the deletion of

18 the duplicative retention of jurisdiction paragraph, so if Your

19 Honor wanted to pull it up -- and I think you have it -- we

20 could just delete it in realtime or we can get one loaded up.

21 I don't know if it's --

22         THE COURT:  (Indiscernible) --

23         MS. SCHWARZMAN:  -- currently already happened.

24         THE COURT:  My guess is -- so there were a couple of

25 other things.  Mr. Stark raised some issues about termination

334

1  of the Committee.  I agree, termination of the Committee should

2  be the effective date, not the confirmation date.  The request

3  for a 14-day stay -- I'm sorry, the request for -- to overrule

4  the request that it go -- or that there be a -- that the 14-day

5  stay not be waived, that request is denied.  I think there's

6  more than adequate basis.  This needs to be done yesterday.

7          And, Mr. Stark, there was a third thing that was in

8  your miscellaneous category, and I've just forgotten what the

9  third one was.

10          MR. STARK:  Your Honor, can you hear me?

11          THE COURT:  Yes, sir.

12          MR. STARK:  I believe it was with respect to the

13  indenture trustee fees.

14          THE COURT:  So I didn't --

15          MR. STARK:  Let me research.

16          THE COURT:  So I didn't understand that, Ms.

17  Schwarzman.  Do you have a reaction to that?  I wrote myself a

18  note.  I just forgot to ask you.

19          MS. SCHWARZMAN:  Your Honor, I believe there were --

20  you know, usually when we end up and agree with a settlement

21  with the Committee, one of the things we do is we agree to pay

22  the Committee members' fees, and that way, they don't have to

23  assert their charging liens.  Obviously, we never got to an

24  agreement here, and so there's currently no agreement to pay

25  Committee members' fees.

1   THE COURT:  So why don't you --

2   MS. SCHWARZMAN:  (Indiscernible).

3   THE COURT:  Why don't we do this?  Why don't you take

4   the rest of the evening and -- until, let's say, noon tomorrow

5   to talk to Mr. Pitta, anyone else, see if there are any other

6   tweaks that you want to make to the proposed order, and then

7   just let Mr. Alonzo know around noon that the final form of

8   order has been uploaded.  I will take a look at it then, and

9   then I will sign it.  Fair enough?

10   MS. SCHWARZMAN:  Yes, Your Honor.  We'll do that.

11   THE COURT:  All right.  Again, thank you, everyone.

12   I know it's been late.  My view, the process has worked the way

13   it's supposed to.  I always appreciate good advocates, and this

14   is why you don't try things by declaration.  This is why you

15   get to look in people's eyes and you get to test the models and

16   you get to hear not only what people say but how they say it.

17   I think it just makes the process better.

18   Anyway, go home, be safe, and we'll be adjourned.

19   Thank you.

20   MS. SCHWARZMAN:  Thank you, Your Honor.

21   UNIDENTIFIED:  Thanks, Your Honor.

22   (Proceedings concluded at 5:59 p.m.)

23   * * * * *

24

25

336

# **C E R T I F I C A T I O N**

We, Alicia Jarrett, Ilene Watson, and Lisa Luciano, court-approved transcribers, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.


ALICIA JARRETT, AAERT NO. 428      DATE:  January 14, 2021
ACCESS TRANSCRIPTS, LLC


ILENE WATSON, AAERT NO. 447      DATE:  January 14, 2021
ACCESS TRANSCRIPTS, LLC


LISA LUCIANO, AAERT NO. 327      DATE:  January 14, 2021
ACCESS TRANSCRIPTS, LLC

ENTERED
01/16/2021

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,1 | § | Case No. 20-33233 (DRJ) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

## ORDER CONFIRMING FIFTH
## AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
## CHESAPEAKE ENERGY CORPORATION AND ITS DEBTOR AFFILIATES

The above-captioned debtors and debtors in possession (collectively, the "Debtors"),

having:[2]

a.      entered into that certain restructuring support agreement, dated as of June 28, 2020, (as may be amended from time to time in accordance with its terms, the "Restructuring Support Agreement");

b.      entered into that certain backstop commitment agreement, dated as of June 28, 2020 (the "Backstop Commitment Agreement"), between the Company and the Backstop Parties (each as defined therein);

c.      commenced, on June 28, 2020 (the "Petition Date"), these chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code");

d.      filed, on the Petition Date, the *Declaration of Domenic J. Dell'Osso, Jr., Executive Vice President and Chief Financial Officer of Chesapeake Energy Corporation in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 37];

---

1       A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/chesapeake.  The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

2       Capitalized terms used but not otherwise defined in this order (this "Confirmation Order") shall have the meaning ascribed to them in the *Fifth Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates*, attached hereto as **Exhibit A** (as may be amended, supplemented, or otherwise modified from time to time, and including all exhibits and supplements thereto, the "Plan").  The rules of interpretation set forth in Article I.B of the Plan apply to this Confirmation Order.

e. continued to operate their businesses and manage their properties as debtors in possession in accordance with sections 1107(a) and 1108 of the Bankruptcy Code;

f. filed, on September 11, 2020, (i) the *Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates* [Docket No. 1150]; and (ii) the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates* (as amended, supplemented, or modified from time to time, the "Disclosure Statement") [Docket No. 1151];

g. filed, on October 8, 2020, the *Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates* [Docket No. 1330] and a revised Disclosure Statement [Docket No. 1331];

h. filed, on October 29, 2020, the *Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates* [Docket No. 1599];

i. filed, on October 30, 2020, a further revised Disclosure Statement [Docket No. 1622];

j. filed, on October 30, 2020, a further revised Disclosure Statement [Docket No. 1645];

k. obtained, on October 30, 2020, entry of the *Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation Procedures with Respect to Confirmation of the Debtors' Proposed Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Approving the Rights Offering Procedures and Related Materials, (V) Scheduling Certain Dates with Respect Thereto, and (VI) Granting Related Relief* [Docket No. 1633] (the "Disclosure Statement Order") approving the Disclosure Statement, solicitation procedures (the "Solicitation Procedures"), the related notices, forms, and ballots (collectively, the "Solicitation Packages"), and the rights offering procedures and related materials;

l. caused, on or about November 4, 2020, notice of the Confirmation Hearing (the "Confirmation Hearing Notice") to be published in the *New York Times*, the *Oklahoman*, the *Houston Chronicle*, the *Billings Gazette*, the *Casper Star-Tribune*, the *Philadelphia Inquirer*, and *The Advocate*, as evidenced by the *Affidavits of Publication* [Docket Nos. 1779–85] (the "Publication Affidavits");

m. caused, beginning on or about November 6, 2020 (the "Solicitation Date"), Solicitation Packages and deadline for objecting to confirmation of the Plan to be distributed in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Disclosure Statement Order, and the Solicitation Procedures, as evidenced by, among other things, the *Affidavit of Service* [Docket No. 1909] (the "Solicitation Affidavit");

n.  filed, on November 23, 2020, the *Plan Supplement for the Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates* [Docket No. 1907] (the "Plan Supplement");

o.  filed, on November 25, 2020, *Notice of Corrected Exhibit C to Plan Supplement* [Docket No. 1931];

p.  filed, on December 11, 2020, the *Declaration of Jane Sullivan of Epiq Corporate Restructuring, LLC Regarding Voting and Tabulation of Certain Ballots Cast on the Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates*, including the voting report with respect to Classes 3, 4, 5 and 7 [Docket No. 2272] (the "Initial Voting Report");

q.  filed, on December 12, 2020, the *Amended Plan Supplement for the Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates* [Docket No. 2312] (the "Amended Plan Supplement");

r.  filed, on December 13, 2020, the *Third Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates* [Docket No. 2336];

s.  filed, on December 13, 2020, the *Debtors' Memorandum of Law In Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates* [Docket No. 2354] (the "Confirmation Brief");

t.  filed, on December 14, 2020, the *Supplemental Voting Declaration of Jane Sullivan of Epiq Corporate Restructuring, LLC Regarding Voting and Tabulation of Certain Ballots Cast on the Second Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates*, including the voting report with respect to Class 6 [Docket No. 2453] (the "Supplemental Voting Report," and together with the Initial Voting Report, the "Voting Reports");

u.  filed, on December 15, 2020, the *Second Amended Plan Supplement for the Third Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates* [Docket No. 2457] (the "Second Amended Plan Supplement");

v.  filed, on December 27, 2020, the *Fourth Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates* [Docket No. 2630];

w.  filed, on January 7, 2021, the *Third Amended Plan Supplement for the Fourth Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy*

*Corporation and Its Debtor Affiliates* [Docket No. 2782] (the "Third Amended Plan Supplement"); and

x.    filed, on January 12, 2021, the *Fifth Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates* [Docket No. 2833].

This Bankruptcy Court having:

a.    entered the Disclosure Statement Order on October 30, 2020;

b.    set December 7, 2020, at 5:00 p.m. (prevailing Central Time) as the deadline for filing objections in opposition to the Plan;[3]

c.    set December 7, 2020, at 11:59 p.m. (prevailing Central Time) as the deadline for voting on the Plan;[4]

d.    set December 15, 2020, at 12:00 p.m. (prevailing Central Time) as the date and time for the commencement of the Confirmation Hearing in accordance with Bankruptcy Rules 3017 and 3018 and sections 1126, 1128, and 1129 of the Bankruptcy Code;

e.    reviewed the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Brief, the Voting Reports, and all pleadings, exhibits, declarations, affidavits, statements, responses, and comments regarding Confirmation, including all objections, statements, and reservations of rights filed by parties in interest on the docket of the Chapter 11 Cases;

f.    held the Confirmation Hearing;

g.    heard the statements and arguments made by counsel in respect of Confirmation;

h.    considered all oral representations, live testimony, written direct testimony, designated deposition testimony, exhibits, documents, filings, and other evidence presented at the Confirmation Hearing;

i.    made rulings on the record at the Confirmation Hearing (the "Confirmation Ruling");

j.    overruled any and all objections to the Plan and to Confirmation, except as otherwise stated or indicated on the record, and all statements and reservations of rights not consensually resolved or withdrawn unless otherwise indicated; and

---

[3]    The deadline to file an objection in opposition to the Plan for the Committee and its members was extended by agreement of parties to December 10, 2020 at 12:00 p.m. (prevailing Central Time).

[4]    The deadline to vote on the Plan for holders of Class 6 Unsecured Notes Claims was extended by agreement of parties to December 11, 2020 at 5:00 p.m. (prevailing Central Time).

KE 71402552

k.      taken judicial notice of all papers and pleadings filed in the Chapter 11 Cases.

NOW, THEREFORE, the Bankruptcy Court having found that notice of the Confirmation Hearing and the opportunity for any party in interest to object to Confirmation have been adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated thereby; and the record of the Chapter 11 Cases and the legal and factual bases set forth in the documents filed in support of Confirmation and presented at the Confirmation Hearing, including, without limitation, the declarations in support, establish just cause for the relief granted in this Confirmation Order; and after due deliberation thereon and good cause appearing therefor, the Bankruptcy Court hereby makes and issues the following findings of fact, conclusions of law, and order:

## I.  FINDINGS OF FACT AND CONCLUSIONS OF LAW

IT IS HEREBY DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT:

**A.    Findings and Conclusions.**

1.      The findings and conclusions set forth herein and in the record of the Confirmation Hearing constitute the Bankruptcy Court's findings of fact and conclusions of law under rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014.  To the extent any of the following conclusions constitute findings of fact, or vice versa, they are adopted as such.

**B.    Jurisdiction and Venue.**

2.      The Bankruptcy Court has subject matter jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334.  The Bankruptcy Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed and to enter a final order with respect thereto.  The Debtors confirm their consent, pursuant to rule

7008 of the Bankruptcy Rules, to the entry of a final order by the Bankruptcy Court in connection with this motion to the extent that it is later determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue in this Bankruptcy Court was proper as of the Petition Date and continues to be proper under 28 U.S.C. §§ 1408 and 1409.  Confirmation of the Plan is a core proceeding under 28 U.S.C. § 157(b)(2).

**C.      Eligibility for Relief.**

3.      The Debtors were and continue to be entities eligible for relief under section 109 of the Bankruptcy Code.

**D.      Commencement and Joint Administration of the Chapter 11 Cases.**

4.      On the Petition Date, the Debtors commenced the Chapter 11 Cases.  On June 28, 2020, the Bankruptcy Court entered an order [Docket No. 91] authorizing the joint administration of the Chapter 11 Cases in accordance with Bankruptcy Rule 1015(b).  The Debtors have operated their business and managed their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases.

**E.      Appointment of Committees.**

5.      On July 9, 2020, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") to represent the interests of the unsecured creditors of the Debtors in the Chapter 11 Cases [Docket No. 301].  On July 24, 2020, a committee of royalty owners (the "Royalty Committee") was appointed in these Chapter 11 Cases [Docket No. 488]. The Royalty Committee was reconstituted on August 8, 2020 [Docket No. 1040].

**F.      Plan Supplement.**

6.      On November 23, 2020, the Debtors filed the Plan Supplement [Docket No. 1907]. On November 25, 2020, the Debtors filed the corrected Plan Supplement [Docket No. 1931]. On December 12, 2020, the Debtors filed an amended Plan Supplement [Docket No. 2312]. The Plan Supplement (as may be amended, supplemented, or otherwise modified from time to time according to the Plan) complies with the Bankruptcy Code and the terms of the Plan, and the Debtors provided good and proper notice of the filing in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Disclosure Statement Order, and the facts and circumstances of the Chapter 11 Cases.  No other or further notice is or will be required with respect to the Plan Supplement or any of the documents contained therein or related thereto.  No other or further notice is or will be required with respect to the Plan Supplement or any of the documents contained therein or related thereto.  Subject to the terms of the Plan, the Debtors are authorized to modify the Plan Supplement in accordance with the time limits set forth in the Plan.

**G.      Modifications to the Plan.**

7.      Pursuant to section 1127 of the Bankruptcy Code, the modifications to the Plan since the Debtors began the solicitation of votes as described or set forth in this Confirmation Order constitute technical changes, changes with respect to particular Claims by agreement with holders of such Claims, or modifications that do not otherwise materially and adversely affect or change the treatment of any other Claim or Interest.  These modifications are consistent with the disclosures previously made pursuant to the Disclosure Statement and solicitation materials served pursuant to the Disclosure Statement Order, and notice of these modifications was adequate and appropriate under the facts and circumstances of the Chapter 11 Cases.

8.      In accordance with Bankruptcy Rule 3019, these modifications do not require additional disclosures under section 1125 of the Bankruptcy Code or the resolicitation of votes

under section 1126 of the Bankruptcy Code, and they do not require that holders of Claims and Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan. Accordingly, the Plan, as modified, is properly before this Bankruptcy Court and all votes cast with respect to the Plan prior to such modifications shall be binding and shall apply with respect to the Plan.

**H.    Objections Overruled.**

9.    Any resolution or disposition of objections to Confirmation of the Plan explained or otherwise ruled upon by the Bankruptcy Court on the record at the Confirmation Hearing is hereby incorporated by reference.  All unresolved objections, statements, informal objections, and reservations of rights with respect to Confirmation are hereby overruled on the merits.

**I.    Disclosure Statement Order.**

10.    On October 30, 2020, the Bankruptcy Court entered the Disclosure Statement Order [Docket No. 1633].  The Disclosure Statement Order, among other things, fixed December 7, 2020 at 5:00 p.m. (prevailing Central Time) as the deadline for objecting to the Plan (the "Plan Objection Deadline") and December 7, 2020, at 11:59 p.m. (prevailing Central Time) as the deadline for voting to accept or reject the Plan (the "Voting Deadline").  The Plan Objection Deadline for the Committee was extended to December 10, 2020, at 12:00 p.m. (prevailing Central Time).  The Voting Deadline to vote on the Plan for holders of Class 6 Unsecured Notes Claims was extended by agreement of parties to December 11, 2020 at 5:00 p.m. (prevailing Central Time).

**J.    Transmittal and Mailing of Materials; Notice.**

11.    As evidenced by the Solicitation Affidavit and the Publication Affidavits, the Debtors provided due, adequate, and sufficient notice of the Plan, Disclosure Statement, Disclosure Statement Order, Solicitation Packages, the Confirmation Hearing Notice, the Plan

Supplement, and all the other materials distributed by the Debtors in connection with the Confirmation of the Plan in compliance with the Bankruptcy Rules, including Bankruptcy Rules 2002, 3017, 3019, and 3020(b), the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Local Rules"), and the procedures set forth in the Disclosure Statement Order.  The Debtors provided due, adequate, and sufficient notice of the Voting Deadline and Plan Objection Deadline, the Confirmation Hearing, and any applicable hearings described in the Disclosure Statement Order in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and the Disclosure Statement Order.  No other or further notice is or shall be required.

**K.     Solicitation.**

12.     The Debtors solicited votes for acceptance and rejection of the Plan in good faith, and such solicitation complied with sections 1125, 1126, and all other applicable sections of the Bankruptcy Code, Bankruptcy Rules 2002, 3017, 3018, and 3019, the Disclosure Statement Order, the Bankruptcy Local Rules, and all other applicable rules, laws, and regulations.  The Solicitation Packages provided the opportunity for voting creditors to opt out of the releases.

**L.     Voting Reports.**

13.     Before the Confirmation Hearing, the Debtors filed the Voting Reports. The Voting Reports were admitted into evidence during the Confirmation Hearing without objection.  The procedures used to tabulate ballots were fair and conducted in accordance with the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and all other applicable rules, laws, and regulations.

14.     As set forth in the Plan and Disclosure Statement, holders of Claims in Classes 3, 4, 5, 6, and 7 of the Plan (collectively, the "Voting Classes") were eligible to vote to accept or reject the Plan in accordance with the Solicitation Procedures.  Holders of Claims and Interests in

Classes 1 and 2 of the Plan (collectively, the "Deemed Accepting Classes") are Unimpaired and conclusively presumed to accept the Plan and, therefore, did not vote to accept or reject the Plan. Holders of Claims or Interests in Class 10 of the Plan (collectively, the "Deemed Rejecting Class") are Impaired and are entitled to no recovery under the Plan, and are therefore deemed to have rejected the Plan.   Holders of Intercompany Claims in Class 8 of the Plan and holders of Intercompany Interests in Class 9 of the Plan are Unimpaired and conclusively presumed to have accepted the Plan, or are Impaired and deemed to reject the Plan, and, in either event, are not entitled to vote to accept or reject the Plan.

15.     As evidenced by the Voting Reports, Classes 3, 4, and 5 voted to accept the Plan at each Debtor, and Classes 6 and 7 voted to reject the Plan at nearly every Debtor (together with the Deemed Rejecting Class, the "Rejecting Classes").

**M.     Bankruptcy Rule 3016.**

16.     The Plan is dated and identifies the Entities submitting it, thereby satisfying Bankruptcy Rule 3016(a).  The Debtors appropriately filed the Disclosure Statement and Plan with the Bankruptcy Court, thereby satisfying Bankruptcy Rule 3016(b).  The injunction, release, and exculpation provisions in the Plan, as described in the Disclosure Statement, describe, in bold font and with specific and conspicuous language, all acts to be enjoined and identify the Entities that will be subject to the injunction, thereby satisfying Bankruptcy Rule 3016(c).

**N.     Burden of Proof.**

17.     The Debtors, as proponents of the Plan, have met their burden of proving the elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, the applicable evidentiary standard for Confirmation.  Further, the Debtors have surpassed that standard and have proven the elements of sections 1129(a) and 1129(b) by clear and convincing evidence.  Each witness who testified on behalf of the Debtors in connection with the

Confirmation Hearing was credible, reliable, and qualified to testify as to the topics addressed in his or her testimony.

**O.     Compliance with the Requirements of Section 1129 of the Bankruptcy Code.**

18.     The Plan complies with all applicable provisions of section 1129 of the Bankruptcy Code as follows:

**a.     Section 1129(a)(1)—Compliance of the Plan with Applicable Provisions of the Bankruptcy Code.**

19.     The Plan complies with all applicable provisions of the Bankruptcy Code, including sections 1122 and 1123, as required by section 1129(a)(1) of the Bankruptcy Code.

**i.     Sections 1122 and 1123(a)(1)—Proper Classification.**

20.     The classification of Claims and Interests under the Plan is proper under the Bankruptcy Code.  In accordance with sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article III of the Plan provides for the separate classification of Claims and Interests into ten different Classes, based on differences in the legal nature or priority of such Claims and Interests (other than Administrative Claims, Professional Claims, Priority Tax Claims, DIP Claims, and payment of United States Trustee statutory fees, which are each addressed in Article II of the Plan and are required not to be designated as separate Classes pursuant to section 1123(a)(1) of the Bankruptcy Code).  Valid business, factual, and legal reasons exist for the classification of the various Classes of Claims and Interests created under the Plan; the classifications were not implemented for any improper purpose, and the creation of such Classes does not unfairly discriminate between or among holders of Claims and Interests.

21.     In accordance with section 1122(a) of the Bankruptcy Code, each Class of Claims or Interests contains only Claims or Interests substantially similar to the other Claims or Interests

within that Class. Accordingly, the Plan satisfies the requirements of sections 1122(a), 1122(b), and 1123(a)(1) of the Bankruptcy Code.

**ii.      Sections 1123(a)(2)—Specification of Unimpaired Classes.**

22.     Article III of the Plan specifies that Claims in the Deemed Accepting Classes are Unimpaired under the Plan. In addition, Article II of the Plan specifies that Administrative Claims, Professional Claims, Priority Tax Claims, and DIP Claims with respect to the Plan are Unimpaired, although the Plan does not classify these Claims. Accordingly, the Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

**iii.     Sections 1123(a)(3)—Specification of Treatment of Impaired Classes.**

23.     Article III of the Plan specifies the treatment of each Impaired Class under the Plan. Accordingly, the Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

**iv.     Sections 1123(a)(4)—No Discrimination.**

24.     Article III of the Plan provides the same treatment to each Claim or Interest in any particular Class, as the case may be, unless the holder of a particular Claim or Interest has agreed to a less favorable treatment with respect to such Claim or Interest. Accordingly, the Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code.

**v.      Section 1123(a)(5)—Adequate Means for Plan Implementation.**

25.     The Plan and the various documents included in the Plan Supplement provide adequate and proper means for the Plan's execution and implementation, including: (a) implementation of the Restructuring Transactions, including the Rights Offering; (b) selection of the directors and officers for the Reorganized Debtors; (c) the issuance and distribution of the New Common Stock in accordance with the Plan, including all shares of New Common Stock issued by Reorganized Chesapeake to the Backstop Parties as part of the Put Option Premium and the unsubscribed shares of New Common Stock issued to Backstop Parties pursuant to the

Backstop Commitment Agreement; (d) issuance and distribution of the Rights and subsequent issuance and distribution of New Common Stock issuable upon exercise of such Rights; (e) execution and delivery of the Registration Rights Agreement; (f) issuance and distribution of the New Warrants and entry into the New Warrants Agreements; (g) entry into the Exit Facilities Documents; (h) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (i) approval and adoption of the New Organizational Documents; (j) entry into the Management Incentive Plan; (k) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (l) the cancellation of existing Interests, existing indebtedness and related agreements; (m) the vesting of Estate assets in the Reorganized Debtors; and (n) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  Accordingly, the Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.

### vi.      Section 1123(a)(6)—Non-Voting Equity Securities.

26.      The New Organizational Documents for the Debtors prohibit the issuance of non-voting equity securities.      Accordingly, the Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code.

### vii.      Section 1123(a)(7)—Directors, Officers, and Trustees.

27.      The selection of the members of the New Board of Reorganized Chesapeake is set forth in the Plan Supplement.      Accordingly, the Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

### b.      Section 1123(b)—Permissive Contents of the Plan.

28.      The Plan contains various discretionary provisions that are permitted by section 1123(b) of the Bankruptcy Code.  Any such provision complies with section 1123(b) of

the Bankruptcy Code and is not inconsistent with the applicable provisions of the Bankruptcy Code.  Thus, the Plan satisfies section 1123(b) of the Bankruptcy Code.

> ### i.      Impairment/Unimpairment of Any Class of Claims or Interests.

29.     Pursuant to the Plan, Article III of the Plan impairs or leaves unimpaired, as the case may be, each Class of Claims and Interests, as contemplated by section 1123(b)(1) of the Bankruptcy Code.

> ### ii.      Assumption and Rejection of Executory Contracts and Unexpired Leases.

30.     Article V of the Plan provides for the assumption of the Debtors' Executory Contracts and Unexpired Leases as of the Effective Date of the Plan, unless such Executory Contracts or Unexpired Leases:  (a) are identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (b) previously expired or terminated pursuant to their own terms; (c) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (d) are the subject of a motion to reject that is pending on the Effective Date; or (e) have an ordered or requested effective date of rejection that is after the Effective Date.

> ### iii.      Compromise and Settlement.

31.     In accordance with section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The Plan (as expressly modified by this Confirmation Order) incorporates a settlement (the "Settlement"), of numerous claims and Causes of Action, issues, and disputes designed to achieve a beneficial and efficient resolution of the

Chapter 11 Cases for all parties in interest.  The Settlement includes, without limitation, all claims and causes of action that are the subject of (1) the *Emergency Motion of the Official Committee of Unsecured Creditors for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of the Debtors' Estates and (II) Exclusive Settlement Authority* [Docket No. 1682] and (2) *Emergency Motion of the Official Committee of Unsecured Creditors for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of the Debtors' Estates and (II) Exclusive Settlement Authority* [Docket No. 1807] (together, the "Standing Motions").

32.     Accordingly, in consideration for the distributions and other benefits provided under the Plan, this Confirmation Order shall constitute the Bankruptcy Court's approval of the Settlement as well as a finding by the Bankruptcy Court that such Settlement is in the best interests of the Debtors, their Estates, and the holders of Claims and Interests and is fair, equitable, and reasonable.

33.     Based upon the representations and arguments of counsel to the Debtors and all other testimony either actually given or proffered and other evidence introduced at the Confirmation Hearing and the full record of the Chapter 11 Cases, this Confirmation Order constitutes the Bankruptcy Court's approval of the Settlement incorporated in the Plan and this Confirmation Order, because, among other things:  (a) the Settlement reflects a reasonable balance between the possible success of litigation with respect to each of the settled claims and disputes, on the one hand, and the benefits of fully and finally resolving such claims and disputes and allowing the Debtors to expeditiously exit chapter 11, on the other hand; (b) absent the Settlement, there is a likelihood of complex and protracted litigation involving, among other things, the Settlement, with the attendant expense, inconvenience, and delay that have a possibility to derail

the Debtors' reorganization efforts; (c) each of the parties supporting the Settlement, including the Debtors and the Consenting Stakeholders, are represented by counsel that is recognized as being knowledgeable, competent, and experienced; (d) the Settlement is the product of arm's-length bargaining and good faith negotiations between sophisticated parties; and (e) the Settlement is fair, equitable, and reasonable and in the best interests of the Debtors, Reorganized Debtors, their respective Estates and property, creditors, and other parties in interest, will maximize the value of the Estates by preserving and protecting the ability of the Reorganized Debtors to continue operating outside of bankruptcy protection and in the ordinary course of business, and is essential to the successful implementation of the Plan.  Based on the foregoing, the Settlement satisfies the requirements of applicable Fifth Circuit law for approval of settlements and compromises pursuant to Bankruptcy Rule 9019.

### iv.     Debtors' Release.

34.     The releases of claims and Causes of Action by the Debtors described in Article VIII.C of the Plan and incorporated into this Confirmation Order in accordance with section 1123(b)(3)(A) of the Bankruptcy Code represent a valid exercise of the Debtors' business judgment under Bankruptcy Rule 9019 (the "Debtors' Release").  The Debtors' or the Reorganized Debtors' pursuit of any such claims against the Released Parties is not in the best interest of the Estates' various constituencies because the costs involved would likely outweigh any potential benefit from pursuing such claims.  The Debtors' Release is fair and equitable.

35.     The Debtors' Release is furthermore an integral part of the Plan and the Settlement embodied therein and in this Confirmation Order, and is in the best interests of the Debtors' Estates as a component of the comprehensive Settlement implemented under the Plan.  The probability of success in litigation with respect to the released Causes of Action supports the Debtors' Release. In negotiations between the Debtors and the Consenting Stakeholders, the parties identified various

16

potential claims and Causes of Action held by the Debtors. With respect to each of these potential claims and Causes of Action, parties could assert colorable defenses, and the probability of success is highly uncertain and appropriately reflected in the recoveries provided under the Plan.

36. Creditors have overwhelmingly voted in favor of the Plan, including the Debtors' Release. The Plan, including the Debtors' Release contained therein, was negotiated in good faith by sophisticated parties represented by able counsel and financial advisors, including the Consenting Stakeholders. The Debtors' Release is therefore the result of an arm's-length negotiation process.

37. The Debtors' Release appropriately offers protection to parties that provided consideration to the Debtors and that participated in the Debtors' restructuring process. Specifically, the Released Parties under the Plan, including: (a) each Debtor; (b) each Reorganized Debtor; (c) each of the Debtors' current and former directors and officers; (d) each DIP Lender; (e) each Agent; (f) each Trustee; (g) the Consenting Revolving Credit Facility Lenders; (h) the Consenting FLLO Term Loan Facility Lenders; (i) the Consenting Second Lien Noteholders; (j) the Consenting Unsecured Noteholders; (k) the Exit Facilities Lenders; (l) the Backstop Parties; (m) all holders of Interests; and (n) with respect to each of the foregoing (a) through (m), each of such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, participants, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such, made significant

concessions and contributions to the Chapter 11 Cases, including, as applicable, entering into the Settlement and actively supporting the Plan and the Chapter 11 Cases.  In particular, the RBL Lenders consented to the use of their cash collateral and consented to be primed by the DIP Facility, both of which provided the liquidity and financing necessary to fund the administration of these cases, and agreed to accept debt issued by the Reorganized Debtors on account of their Claims instead of cash in accordance with the terms set forth in the Restructuring Support Agreement.  The DIP Lenders provided a $925 million new money debtor-in-possession facility to finance these Chapter 11 Cases and agreed to accept debt issued by the Reorganized Debtors on account of a portion of their Claims instead of cash.  The Exit Facility Lenders and the Exit Facility Agent agreed to provide the approximately $2.5 billion Exit Facilities, which will provide the Debtors with liquidity to fund distributions under the Plan and their go-forward business.  The consenting FLLO Term Loan Facility Lenders and consenting Second Lien Noteholders agreed to equitize their claims in order to significantly deleverage Chesapeake's prepetition capital structure.  Certain of the consenting FLLO Term Loan Facility Lenders and consenting Second Lien Noteholders also agreed to fully backstop a $600 million equity rights offering and allocate value to junior creditors beyond what they would receive in a strict priority waterfall scenario.  The Debtors' Release for the Debtors' directors and officers is appropriate because the Debtors' directors and officers share an identity of interest with the Debtors, supported the Plan and the Chapter 11 Cases, actively participated in meetings, negotiations, and implementation during the Chapter 11 Cases, and have provided other valuable consideration to the Debtors to facilitate the Debtors' reorganization.

38.     As such, the releases are:  (a) in exchange for the good and valuable consideration provided by or on behalf of the Released Parties; (b) a good faith settlement and compromise of

the claims or Causes of Action released herein; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the releases described herein.  In light of the foregoing, the Debtors' Release is approved.

v.        **Release by Holders of Claims and Interests.**

39.      The release by the Releasing Parties set forth in Article VIII.D of the Plan and incorporated into this Confirmation Order (the "Third-Party Release") is an essential provision of the Plan.  The Third-Party Release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of such claims or Causes of Action; (e) in the best interests of the Debtors, their Estates, holders of Claims and Interests, and all other parties in interest; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the releases described herein.

40.      The Third-Party Release is an integral part of the Plan.  Similar to the Debtors' Release, the Third-Party Release was integral to the formulation of the Plan, including the Settlement embodied therein and in this Confirmation Order.  The Third-Party Release was critical in incentivizing the Released Parties to support the Plan and the Settlement and preventing potentially significant and time-consuming litigation.  The Third-Party Release appropriately offers certain protections to parties who constructively participated in the Debtors' restructuring process by supporting the Plan through the Settlement.  Furthermore, the Third-Party Release is consensual, as the Releasing Parties in interest were provided notice of the chapter 11 proceedings, the Plan, and the deadline to object to confirmation of the Plan.  Additionally, voting creditors and

non-voting parties were given the opportunity to opt out of the Third-Party Release, and the release provisions of the Plan were conspicuous and emphasized with boldface type in the Plan, the Disclosure Statement, and the applicable ballots or opt-out form.

41.     The scope of the Third-Party Release is appropriately tailored under the facts and circumstances of the Chapter 11 Cases, and parties received due and adequate notice of the Third-Party Release.  Among other things, the Plan provides appropriate and specific disclosure with respect to the claims and Causes of Action that are subject to the Third-Party Release, and no other disclosure is necessary.  The Debtors, as evidenced by the Solicitation Affidavit, provided sufficient notice of the Third-Party Release, and no further or other notice is necessary.  The Third-Party Release is consistent with established practice in this jurisdiction and others.  The Third-Party Release is specific in language, integral to the Plan, a condition of the Settlement, and given for substantial consideration.

### vi.     Exculpation.

42.     The exculpation provision set forth in Article VIII.E of the Plan and incorporated into this Confirmation Order is essential to the Plan.  The record in the Chapter 11 Cases supports the exculpation provision set forth in Article VIII.E of the Plan, which is appropriately tailored to protect the Exculpated Parties from unnecessary litigation.  The exculpation, including the carveout for actual fraud, gross negligence, or willful misconduct, is consistent with established practice in this jurisdiction and others.  The Exculpated Parties subject to the exculpation provision have, and upon entry of this Confirmation Order will be deemed to have, participated in good faith and in compliance with all applicable laws with regard to the distribution of recoveries under the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation or such distributions made pursuant to the Plan.

20

### vii.  Injunction.

43.     The injunction provision set forth in Article VIII.F of the Plan is essential to the Plan and is necessary to implement the Plan and to preserve and enforce the discharge, the Debtors' Release, the Third-Party Release, and the exculpation provision in Article VIII.E of the Plan.  The injunction provision is fair and reasonable and is appropriately tailored to achieve those purposes.

### viii.  Preservation of Claims and Causes of Action.

44.     Article IV.S of the Plan, as well as the Plan Supplement, appropriately provide for the preservation by the Debtors or the Reorganized Debtors of certain Causes of Action in accordance with section 1123(b)(3)(B) of the Bankruptcy Code.  Causes of Action not released by the Debtors or exculpated under the Plan or this Confirmation Order will be retained by the Reorganized Debtors as provided by the Plan.  The Plan is specific and unequivocal with respect to the Causes of Action to be retained by the Reorganized Debtors, and the Plan and the Plan Supplement provide meaningful disclosure with respect to the potential Causes of Action that the Reorganized Debtors may retain, and all parties in interest received adequate notice with respect to such Causes of Action.  The provisions regarding Causes of Action in the Plan, and as set forth in the Plan Supplement, are appropriate and in the best interests of the Debtors, their respective Estates, and holders of Claims and Interests.  For the avoidance of any doubt, Causes of Action released or exculpated under the Plan will not be retained by the Reorganized Debtors.

### ix.  Lien Releases.

45.     The release and discharge of certain mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors' Estates set forth in Article VIII.B of the Plan and (the "Lien Releases") are necessary to implement the Plan.  The provisions of the Lien Releases are appropriate, fair, equitable, and reasonable and in the best interests of the Debtors, their Estates, and holders of Claims and Interests.

### x.     Additional Plan Provisions.

46.     The other discretionary provisions of the Plan, including the Plan Supplement, are appropriate and consistent with the applicable provisions of the Bankruptcy Code, including, without limitation, provisions for the allowance of certain Claims, treatment of indemnification obligations, and the retention of court jurisdiction.  Thus, the Plan satisfies section 1123(b)(6) of the Bankruptcy Code.

### c.     Section 1123(d)—Cure of Defaults.

47.     Article V.C of the Plan provides for the satisfaction of Cure Claims associated with each Executory Contract and Unexpired Lease to be assumed in accordance with section 365(b)(1) of the Bankruptcy Code.  Any monetary defaults under each Assumed Executory Contract or Unexpired Lease shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, or as soon as reasonably practicable thereafter, subject to the limitations described in Article V.C of the Plan, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  Except as expressly provided in this Confirmation Order, any disputed Cure Claims will be determined in accordance with the procedures set forth in Article V.C of the Plan or this Confirmation Order and applicable bankruptcy and nonbankruptcy law.  As such, the Plan provides that the Debtors will cure, or provide adequate assurance that the Debtors will promptly cure, defaults with respect to assumed Executory Contracts and Unexpired Leases in accordance with section 365(b)(1) of the Bankruptcy Code.  Assumption of any Executory Contract or Unexpired Lease shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Executory Contract or Unexpired

Lease at any time before the effective date of assumption. Thus, the Plan complies with section 1123(d) of the Bankruptcy Code.

### d. Section 1129(a)(2)—Compliance of the Debtors and Others with the Applicable Provisions of the Bankruptcy Code.

48. The Debtors, as proponents of the Plan, have complied with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, 1126, 1128, and 1129 and Bankruptcy Rules 2002, 3017, 3018, and 3019.

49. The Debtors and their agents solicited votes to accept or reject the Plan after the Bankruptcy Court approved the adequacy of the Disclosure Statement, pursuant to section 1125(a) of the Bankruptcy Code and the Disclosure Statement Order.

50. The Debtors and their agents solicited and tabulated votes on the Plan and participated in the activities described in section 1125 of the Bankruptcy Code fairly, in good faith within the meaning of section 1125(e), and in a manner consistent with the applicable provisions of the Disclosure Statement Order, the Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation provision set forth in Article VIII.E of the Plan. The Debtors and their agents and Affiliates participated in good faith and in compliance with applicable provisions of the Bankruptcy Code in the offer, issuance, sale, or purchase of the New Common Stock, and the Debtors, the Reorganized Debtors, and their respective agents and Affiliates shall not be held liable on account of such participation for violation of any applicable law, rule, or regulation governing the offer, issuance, sale, or purchase of such securities.

51.     The Debtors and their agents participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the offering, issuance, and distribution of recoveries under the Plan and therefore are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or distributions made pursuant to the Plan, so long as such distributions are made consistent with and pursuant to the Plan.

**e.     Section 1129(a)(3)—Proposal of Plan in Good Faith.**

52.     The Debtors have proposed the Plan (and all documents necessary to effectuate the Plan) in good faith, with the legitimate and honest purpose of maximizing the value of the Debtors' Estates for the benefit of their stakeholders, and not by any means forbidden by law.   In determining that the Plan was proposed in good faith, the Bankruptcy Court examined the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the Plan, and the process leading to its formulation.  The Debtors' good faith is evident from the facts and record of the Chapter 11 Cases, the Disclosure Statement, the hearing on the Disclosure Statement, and the record of the Confirmation Hearing and other proceedings held in the Chapter 11 Cases.

53.     The Plan and the contracts, instruments, releases, agreements and other documents necessary and related to implementing, effectuating and consummating the Plan, including the Settlement and the Exit Facility Documents, are the product of good faith, arm's-length negotiations by and among the Debtors and the Consenting Stakeholders, and their respective representatives and professionals.  The Plan's classification, indemnification, release, injunction, and exculpation provisions have been negotiated in good faith and at arm's length, are consistent with sections 105, 1122, 1123(b)(3)(A), 1123(b)(6), 1129 and 1142 of the Bankruptcy Code and applicable law in this Circuit and are each necessary for the Debtors' successful reorganization. The Plan itself and the process leading to its formulation provides evidence of the Debtors' and

KE 71402552

such other parties' good faith, serves the public interest, and assures fair treatment of holders of Claims and Interests.  Consistent with the overriding purpose of chapter 11, the Debtors filed the Chapter 11 Cases with the belief that the Debtors were in need of reorganization, and the Plan was negotiated and proposed with the intention of accomplishing a successful reorganization and maximizing stakeholder value and for no ulterior purpose.  Accordingly, the requirements of section 1129(a)(3) of the Bankruptcy Code are satisfied.

54.     The Debtors or the Reorganized Debtors, as appropriate, the Consenting Stakeholders, the Exit Facilities Agent and the Exit Facilities Lenders have been, are, and will continue acting in good faith if they proceed to:  (a) consummate the Plan, the Restructuring Transactions, the Rights Offering, the Exit Facilities, and the agreements, settlements, transactions, and transfers contemplated thereby; and (b) take the actions authorized and directed or contemplated by this Confirmation Order.  Therefore, the Plan has been proposed in good faith to achieve a result consistent with the objectives and purposes of the Bankruptcy Code.

**f.     Section 1129(a)(4)—Court Approval of Certain Payments as Reasonable.**

55.     Except as otherwise provided or permitted by the Plan or other orders of the Bankruptcy Court, any payment made or to be made by the Debtors, or by a person issuing securities or acquiring property under the Plan, for services or costs and expenses in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, in each case incurred prior to the Effective Date, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.  Accordingly, the Plan satisfies the requirements of section 1129(a)(4).

g.      **Section 1129(a)(5)—Disclosure of Directors and Officers Are Consistent with the Interests of Creditors and Public Policy.**

56.     The Reorganized Debtors' directors and officers are qualified and were selected in a manner consistent with the interests of holders of Claims and Interests and with public policy. Their identities were, to the extent reasonably practicable and known to the Debtors, disclosed in the Plan Supplement.

57.     Accordingly, the Debtors satisfied the requirements of section 1129(a)(5) of the Bankruptcy Code.

h.      **Section 1129(a)(6)—Rate Changes.**

58.     The Plan does not contain any rate changes subject to the jurisdiction of any governmental regulatory commission and therefore will not require governmental regulatory approval.  Therefore, section 1129(a)(6) of the Bankruptcy Code does not apply to the Plan.

i.      **Section 1129(a)(7)—Best Interests of Holders of Claims and Interests.**

59.     The evidence in support of the Plan that was proffered or adduced at the Confirmation Hearing, and the facts and circumstances of the Chapter 11 Cases, establishes that each holder of Allowed Claims or Interests in each Class will recover as much or more value under the Plan on account of such Claim or Interest, as of the Effective Date of the Plan, than the amount such holder would receive if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code.  As a result, the Debtors have demonstrated that the Plan is in the best interest of their creditors and equity holders, and the requirements of section 1129(a)(7) of the Bankruptcy Code are satisfied.

KE 71402552

**j.      Section 1129(a)(8)—Conclusive Presumption of Acceptance by Unimpaired Classes; Acceptance of the Plan by Certain Impaired Classes; Fairness of Plan with Respect to Rejecting Classes.**

60.      The Deemed Accepting Classes are Unimpaired under the Plan and are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Classes 3, 4, and 5 are Impaired under the Plan and have accepted the Plan.  Nevertheless, because the Plan has not been accepted by the Rejecting Classes, the Debtors seek Confirmation, solely with respect to the Rejecting Classes, under section 1129(b) of the Bankruptcy Code, rather than section 1129(a)(8) of the Bankruptcy Code.  Although section 1129(a)(8) has not been satisfied with respect to the Rejecting Classes, the Plan is confirmable because the Plan does not discriminate unfairly and is fair and equitable with respect to the Rejecting Classes, and thus satisfies section 1129(b) of the Bankruptcy Code with respect to such Classes as described further below.  As a result, the requirements of section 1129(b) of the Bankruptcy Code are satisfied.

**k.      Section 1129(a)(9)—Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code.**

61.      The treatment of Administrative Claims, Professional Claims, Priority Tax Claims, DIP Claims, and payment of United States Trustee statutory fees under Article II of the Plan satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.

**l.      Section 1129(a)(10)—Acceptance by at Least One Impaired Class.**

62.      As set forth in the Voting Reports, multiple Impaired Classes that were entitled to vote on the Plan, including Classes 3, 4, and 5, voted to accept the Plan.  As such, there is at least one Class of Claims that is Impaired under the Plan and has accepted the Plan, determined without including any acceptance of the Plan by any insider (as defined by the Bankruptcy Code).

KE 71402552

Accordingly, the requirements of section 1129(a)(10) of the Bankruptcy Code are satisfied with respect to the Plan.

**m.      Section 1129(a)(11)—Feasibility of the Plan.**

63.      The Plan satisfies section 1129(a)(11) of the Bankruptcy Code.  The evidence supporting the Plan proffered or adduced by the Debtors at or before the Confirmation Hearing: (a) is reasonable, persuasive, credible, and accurate as of the dates such evidence was prepared, presented, or proffered; (b) has not been controverted by other persuasive evidence; (c) establishes that the Plan is feasible and Confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization; (d) establishes that the Debtors will have sufficient funds available to meet their obligations under the Plan; and (e) establishes that the Debtors or the Reorganized Debtors, as applicable, will have the financial wherewithal to pay any Claims that accrue, become payable, or are allowed by Final Order following the Effective Date.

64.      Accordingly, the Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.

**n.      Section 1129(a)(12)—Payment of Statutory Fees.**

65.      Article XII.C of the Plan provides that all fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at the Confirmation Hearing in accordance with section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors for each quarter (including any fraction thereof) until the earlier of entry of a final decree closing such Reorganized Debtor's Chapter 11 Case or an order of dismissal or conversion, whichever comes first.  Accordingly, the Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

**o.      Section 1129(a)(13)—Retiree Benefits.**

66.     Pursuant to section 1129(a)(13) of the Bankruptcy Code, and as provided in Article IV.R of the Plan, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.  As a result, the requirements of section 1129(a)(13) of the Bankruptcy Code are satisfied.

**p.      Section 1129(a)(14), (15), and (16)—Domestic Support Obligations, Individuals, and Nonprofit Corporations.**

67.     The Debtors do not owe any domestic support obligations, are not individuals, and are not nonprofit corporations.  Therefore, sections 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code do not apply to the Chapter 11 Cases.

**q.      Section 1129(b)—Confirmation of the Plan Over Nonacceptance of Impaired Classes.**

68.     Notwithstanding the fact that the Rejecting Classes have not accepted the Plan, the Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code because:  (a) at least one Impaired Class voted to accept the Plan; and (b) the Plan does not discriminate unfairly and is fair and equitable with respect to the Claims and Interests in the Rejecting Classes.  As a result, the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code.  Thus, the Plan may be confirmed even though section 1129(a)(8) of the Bankruptcy Code is not satisfied with respect to the Rejecting Classes.  After entry of this Confirmation Order and upon the occurrence of the Effective Date, the Plan shall be binding upon all holders of Claims and Interests, including the members of the Rejecting Classes.

r.      **Section 1129(c)—Only One Plan.**

69.     Other than the Plan with respect to the Debtors, no other plan has been confirmed in the Chapter 11 Cases.  Accordingly, the requirements of section 1129(c) of the Bankruptcy Code are satisfied.

s.      **Section 1129(d)—Principal Purpose of the Plan Is Not Avoidance of Taxes or Section 5 of the Securities Act.**

70.     No Governmental Unit has requested that the Bankruptcy Court refuse to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.  As evidenced by its terms, the principal purpose of the Plan is not the avoidance of the taxes or the application of section 5 of the Securities Act.  Accordingly, the requirements of section 1129(d) of the Bankruptcy Code have been satisfied.

t.      **Section 1129(e)—Not Small Business Cases.**

71.     The Chapter 11 Cases are not small business cases, and, accordingly, section 1129(e) of the Bankruptcy Code does not apply to the Chapter 11 Cases.

u.      **Satisfaction of Confirmation Requirements.**

72.     Based upon the foregoing and all other pleadings and evidence proffered or adduced at or prior to the Confirmation Hearing, the Plan and the Debtors, as applicable, satisfy all the requirements for plan confirmation set forth in section 1129 of the Bankruptcy Code.

v.      **Conditions to Effective Date.**

73.     The Plan shall not become effective unless and until the conditions set forth in Article IX.A of the Plan have been satisfied or waived pursuant to Article IX.B of the Plan.

**w.**     **Implementation.**

74.     All documents and agreements necessary to implement transactions contemplated by the Plan, including those contained or summarized in the Plan Supplement, the Exit Facilities Documents, the Registration Rights Agreement and Warrant Agreement, the Backstop Commitment Agreement, the New Organizational Documents for the Reorganized Debtors, and all other relevant and necessary documents have been negotiated in good faith and at arm's-length, are essential elements of the Plan, are in the best interests of the Debtors, their Estates, and the holders of Claims and Interests, and shall, upon completion of documentation and execution, be valid, binding, and enforceable documents and agreements not in conflict with any federal, state, or local law.  The Debtors are authorized to take any action reasonably necessary or appropriate to consummate such agreements and the transactions contemplated thereby.

**x.**     **Corporate Action.**

75.     Upon the Effective Date, all actions contemplated by and set forth in the Plan shall be deemed authorized and approved.  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with implementation of the Plan shall be deemed to have occurred and shall be in effect upon the Effective Date, without any requirement of further action by the security holders or directors of any Debtor or any Reorganized Debtor or by any other stakeholder.

**y.**     **Vesting of Assets.**

76.     Except as otherwise provided herein, in the Plan (including, without limitation, Article IV.H of the Plan), or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Plan or Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors

31

pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

z.      **Treatment of Executory Contracts and Unexpired Leases.**

77.     Pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code, upon the occurrence of the Effective Date, the Plan and Plan Supplement provides for the assumption or rejection of certain Executory Contracts and Unexpired Leases.  The Debtors' determinations regarding the assumption or rejection of Executory Contracts and Unexpired Leases are based on and within the sound business judgment of the Debtors, are necessary to the implementation of the Plan, and are in the best interests of the Debtors, their Estates, holders of Claims and other parties in interest in the Chapter 11 Cases.

aa.      **Exit Facilities.**

78.     The Exit Facilities are an essential element of the Plan, are necessary for confirmation and consummation of the Plan, and are critical to the overall success and feasibility of the Plan.  Entry into the Exit Facilities and the Exit Facilities Documents on the same or better terms as set forth in the Plan Supplement is in the best interest of the Debtors, their Estates, and all holders of Claims or Interests.  The Debtors have exercised reasonable business judgment in determining to enter into the Exit Facilities Documents and have provided sufficient and adequate notice of the material terms of each such exit facility, which material terms were filed as part of the Plan, Plan Supplement, and related pleadings.  The terms and conditions are fair and reasonable, and were negotiated in good faith and at arm's-length, and any credit extended, letters

of credit issued, and loans made pursuant to the Exit Facilities shall be deemed to have been extended, assumed and assigned, issued, or made in good faith.  All fees due and payable under the Exit Facilities are hereby approved (and to the extent such fees were approved by prior order of the Bankruptcy Court, such approval is hereby ratified) and the Debtors are authorized and directed to pay such fees in accordance with, and to the extent they become payable, under the terms of the fee letters respect the Exit Facilities and the Exit Facilities Documents.  The Debtors are authorized without further approval of the Bankruptcy Court or any other party to execute and deliver all agreements, guarantees, instruments, mortgages, control agreements, certificates, and other documents and to perform their obligations thereunder, including, without limitation, the payment or reimbursement of any fees, expenses, losses, damages, or indemnities.

**bb.** **Issuance of New Common Stock and Warrants.**

79.     The issuance of the New Common Stock and the New Warrants is an essential element of the Plan and is in the best interests of the Debtors, the Estates and holders of Claims and Interests.

**cc.** **Approval of the Registration Rights Agreement and the New Warrants Agreements.**

80.     The Registration Rights Agreement and the New Warrants Agreements are essential elements of the Plan.  The terms of the Registration Rights Agreement and the New Warrants Agreements are reasonable, and the Debtors have provided adequate notice of the material terms thereof.  The Debtors and the Reorganized Debtors are authorized, without further approval of this Bankruptcy Court, to execute and deliver all agreements, documents, instruments and certificates relating to the Registration Rights Agreement and the New Warrants Agreements and to perform their obligations thereunder in accordance with, and subject to, the terms of those agreements.

**dd.      Rights Offering.**

81.      The Debtors solicited subscriptions to the Rights Offering in good faith pursuant to the Rights Offering Procedures set forth in the Disclosure Statement Order, applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules and any applicable non-bankruptcy laws, rules or regulations, and the Rights Offering Procedures are fair, equitable, and reasonable and provide for the Rights Offering to be conducted in a manner that is in the best interests of the Debtors, the Estates and holders of Claims and Interests.

## II. <u>ORDER</u>

**BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:**

82.      This Confirmation Order confirms the Plan in its entirety, as expressly modified herein.

83.      This Confirmation Order approves the Plan Supplement, including the documents contained therein that may be amended in accordance with and as permitted by the Plan and this Confirmation Order.  The terms of the Plan, the Plan Supplement, and the exhibits thereto are incorporated herein by reference and are an integral part of this Confirmation Order; *provided*, *however*, that if there is any direct conflict between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order shall control solely to the extent of such conflict.

84.      All holders of Claims that voted to accept the Plan are conclusively presumed to have accepted the Plan.

85.      The terms of the Plan, the Plan Supplement, all exhibits thereto, and this Confirmation Order shall be effective and binding as of the Effective Date on all parties in interest,

including, but not limited to:  (a) the Debtors; (b) the Consenting Stakeholders; and (c) all holders of Claims and Interests against the Debtors.

## A.  Objections.

86.  To the extent that any objections (including any reservations of rights contained therein) to Confirmation have not been withdrawn, waived, or settled before entry of this Confirmation Order, are not cured by the relief granted in this Confirmation Order, or have not been otherwise resolved as stated on the record of the Confirmation Hearing, all such objections (including any reservation of rights contained therein) are hereby overruled in their entirety and on their merits.

## B.  Findings of Fact and Conclusions of Law.

87.  The findings of fact and the conclusions of law set forth in this Confirmation Order constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052, made applicable to this proceeding by Bankruptcy Rule 9014.  All findings of fact and conclusions of law announced by the Bankruptcy Court at the Confirmation Hearing in relation to Confirmation, including the Confirmation Ruling, are hereby incorporated into this Confirmation Order.  To the extent that any of the following constitutes findings of fact or conclusions of law, they are adopted as such.  To the extent any finding of fact or conclusion of law set forth in this Confirmation Order (including any findings of fact or conclusions of law announced by the Bankruptcy Court at the Confirmation Hearing and incorporated herein) constitutes an order of this Bankruptcy Court, it is adopted as such.

## C.  Incorporation by Reference.

88.  The terms and provisions of the Plan and the Plan Supplement are an integral part of this Confirmation Order and are incorporated by reference herein as if set forth herein. The terms of the Plan, the Plan Supplement, all exhibits thereto, this Confirmation Order, and all

other relevant and necessary documents shall, on and after the Effective Date, be binding in all respects upon, and shall inure to the benefit of, the Debtors and Reorganized Debtors, their Estates and their creditors, and their respective successors and assigns, any affected third parties, all holders of Claims and Interests, whether known or unknown, against the Debtors, including, but not limited to any trustees, examiners, administrators, responsible state officers, estate representatives, or similar entities for the Debtors, if any, subsequently appointed in any of the Chapter 11 Cases or upon a conversion to chapter 7 under the Bankruptcy Code of any of the Chapter 11 Cases, and each of their respective affiliates, successors, and assigns.  The failure to include or refer to any particular article, section, or provision of the Plan, the Plan Supplement, any related document, agreement, or exhibit does not impair the effectiveness of that article, section, or provision; it being the intent of the Bankruptcy Court that the Plan, the Plan Supplement, and any related document, agreement, or exhibit are approved in their entirety.

**D.      General Settlement of Claims and Interests.**

89.      Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including (1) any challenge to the amount, validity, perfection, enforceability, priority or extent of the DIP Claims, Revolving Credit Facility Claims, FLLO Term Loan Facility Claims, Second Lien Notes Claims, and Unsecured Notes Claims and (2) any claim to avoid, subordinate, or disallow any DIP Claims, Revolving Credit Facility Claims, FLLO Term Loan Facility Claims, Second Lien Notes Claims, and Unsecured Notes Claims, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise, including, without limitation, any claim of

subordination or turnover of any payments arising under any provision of the Intercreditor Agreement, including, but not limited to, any turnover provisions in sections 3.05, 4.02(l), 6.01 and 7.03 thereof, or the Collateral Trust Agreement, including sections 5.05, 6.02(o), 8.01, and 9.03 thereof (the "Turnover Provisions"). In consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the FLLO Term Loan Facility Lenders and Revolving Credit Facility Lenders shall conclusively, absolutely, irrevocably and forever waive any rights they have to seek subordination or turnover of any payments arising under any provision of the Intercreditor Agreement, including, but not limited to, the Turnover Provisions. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of this Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates. Subject to Article VI of the Plan, all distributions made to holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

**E.     The Releases, Injunction, Exculpation, and Related Provisions Under the Plan.**

90.     The following releases, injunctions, exculpations, discharges, and related provisions set forth in Article VIII of the Plan are incorporated and expressly modified herein, are hereby approved and authorized in all respects, are so ordered, and shall be immediately effective on the Effective Date without further order or action on the part of this Bankruptcy Court or any other party:

KE 71402552

## 1. Discharge of Claims and Termination of Interests.

91.     Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, this Confirmation Order, or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Proof of Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan.  This Confirmation Order shall be a judicial determination of the discharge of all Claims (other than the Reinstated Claims) and Interests (other than the Intercompany Interests that are Reinstated) subject to the occurrence of the Effective Date.

**2.      Releases of Liens.**

92.      **Except as otherwise provided in the Exit Facilities Documents, the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns; *provided* that no mortgage, deed of trust, Lien, pledge, or other security interest against any property of the Estates in favor of any Allowed Secured Claim shall be released prior to satisfaction and/or payment of such Allowed Secured Claim in full in accordance with the Plan; *provided*, *further*, that no Lien arising, whether arising by contract or statute, from an oil and gas lease shall be terminated, discharged, or released by the Plan.  Any holder of such Secured Claim (and the applicable agents for such holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of this Confirmation Order to or with any federal, state,**

provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

93.     To the extent that any holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such holder, has filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, then as soon as practicable on or after the Effective Date, such holder (or the agent for such holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or Exit Facilities Agent that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings; *provided* that the Reorganized Debtors shall be entitled to make any such filings or recordings on such holder's behalf.

**3.     Releases by the Debtors.**

94.     Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own

right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, or that any holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Revolving Credit Facility, the FLLO Term Loan Facility, the Collateral Trust Documents, the Second Lien Notes, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Disclosure Statement, the Backstop Commitment Agreement, the DIP Facility, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or this Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Backstop Commitment Agreement, the DIP Facility, the Plan, the Plan Supplement, or the Exit Facilities before or during the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and

41

implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, other than claims or liabilities that are not described in items 1 and 2 set forth in Article IV.A of the Plan arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post Effective Date obligations of any party or Entity under the Plan, this Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facilities Documents, or any Claim or obligation arising under the Plan.

95.     Entry of this Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtors' release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtors' release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtors' release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors,

KE 71402552

or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtors' release.

4.      **Releases by Holders of Claims and Interests.**

96.     **Except as otherwise expressly set forth in the Plan or this Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Revolving Credit Facility, the FLLO Term Loan Facility, the Collateral Trust Documents, the Second Lien Notes, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested**

43

by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or this Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, other than claims or liabilities that are not described in items 1 and 2 set forth in Article IV.A of the Plan arising out of or relating to any act or omission of a Released Party other than a Debtor that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facilities Credit Agreements, or any other financing document under and as defined therein) or (ii) any post Effective Date obligations of any party or Entity under the Plan, this Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facilities Documents, or any Claim or obligation arising under the Plan.

97.     **Entry of this Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Releases, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Releases are: (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of the Claims released by the Third-Party Releases; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Releases.**

 **5. Exculpation.**

98.     **Except as otherwise specifically provided in the Plan or this Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or this Confirmation Order in lieu of such legal opinion) created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the**

Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

99.     The Exculpated Parties and other parties set forth above have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

6.     Injunction.

100.     Except as otherwise expressly provided in the Plan or this Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or this Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on

46

account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

101.    Upon entry of this Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Except as otherwise set forth in this Confirmation Order, each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article VIII.F of the Plan.

KE 71402552

**F.      Preservation of Causes of Action.**

102.    In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than:   (i) the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date; and (ii) all Causes of Action that arise under sections 544, 547, 548, and 549 of the Bankruptcy Code and state fraudulent conveyance law.

103.    The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.  Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date.  Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor, without the need

for any objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.  The Reorganized Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court.  If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or Reorganized Debtors, as applicable, and the objection party for thirty (30) days, such objection shall be resolved by the Bankruptcy Court.  Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

104.    The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.  The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent

or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**G.      Professional Compensation and Administrative Claims Bar Date.**

105.    All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court.  The Reorganized Debtors shall pay Professional Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date.

106.    On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount, which shall be funded by the Reorganized Debtors.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.  Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors.  The amount of Allowed Professional Claims shall be paid in Cash to the Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Claims are Allowed.  When such Allowed Professional Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

107.    Professionals shall reasonably estimate their unpaid Professional Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five (5) days before the

Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Cases.  If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

108.    Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

109.    Except as otherwise provided in Article II.A of the Plan, and except with respect to Administrative Claims that are Professional Claims, or DIP Claims, requests for payment of Administrative Claims must be Filed and served on the Debtors no later than the Administrative Claims Bar Date, which shall be the first Business Day that is thirty (30) days following the Effective Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be Filed with the Bankruptcy Court and served on the requesting party no later than sixty (60) days after the Administrative Claims Bar Date.

KE 71402552

110.     The Debtors shall indefeasibly pay in Cash all Existing RBL Adequate Protection Payments that have accrued and are unpaid as of the Effective Date pursuant to the terms of the DIP Order, and none of the Revolving Credit Facility Administrative Agent, the Revolving Credit Facility Lenders, or the Agent under the Collateral Trust Agreement shall be required to File a request for payment of an Administrative Claim with the Bankruptcy Court on account of such Existing RBL Adequate Protection Payments.  The Debtors' obligation to pay the Existing RBL Adequate Protection Payments, to the extent not indefeasibly paid in full in Cash on the Effective Date, shall survive the Effective Date and shall not be released or discharged pursuant to the Plan or this Confirmation Order until indefeasibly paid in full in Cash.

**H.     Notice of Subsequent Pleadings.**

111.     Except as otherwise provided in the Plan or in this Confirmation Order, notice of all subsequent pleadings in the Chapter 11 Cases after the Effective Date will be limited to the following parties:  (a) the United States Trustee; (b) the Reorganized Debtors and their counsel; and (c) any party known to be directly affected by the relief sought by such pleadings.

**I.     Retention of Jurisdiction.**

112.     Notwithstanding the entry of this Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, this Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including the matters set forth in Article XI of the Plan; *provided* that the New Organizational Documents and the Exit Facilities and any documents related thereto shall be governed by the jurisdictional provisions therein, and this Bankruptcy Court shall not retain jurisdiction beyond the maximum extent allowed by law under the applicable circumstances.

**J.      Reports.**

113.    After the Effective Date of the Plan, the Debtors have no obligation to file with the Bankruptcy Court or serve on any parties reports that the Debtors were obligated to file under the Bankruptcy Code or a Court order, including monthly operating reports (even for those periods for which a monthly operating report was not filed before such Effective Date), ordinary course professional reports, and monthly or quarterly reports for Professionals; *provided, however,* that the Debtors will comply with the United States Trustee's quarterly reporting requirements.  From Confirmation through the Effective Date of the Plan, the Debtors will file such reports as are required under the Bankruptcy Local Rules.  For the avoidance of doubt, nothing in this paragraph shall affect the Reorganized Debtors' reporting obligations under the Exit Facilities Documents.

**K.      Effectiveness of All Actions.**

114.    Except as set forth in the Plan, all actions authorized to be taken pursuant to the Plan shall be effective on, before, or after the Effective Date of the Plan, and pursuant to this Confirmation Order, without further application to, or order of the Bankruptcy Court, or further action by the Debtors and/or the Reorganized Debtors and their respective directors, officers, members, or stockholders, and with the effect that such actions had been taken by unanimous action of such officers, directors, managers, members, or stockholders.

**L.      Approval of Consents and Authorization to Take Acts Necessary to Implement the Plan.**

115.    This Confirmation Order shall constitute all authority, approvals, and consents required, if any, by the laws, rules, and regulations of any states, federal, and any other governmental authority with respect to the implementation or consummation of the Plan and any certifications, mortgages, documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts and transactions referred to in or contemplated by the

KE 71402552

Plan, the Plan Supplement, the Disclosure Statement, the Exit Facilities Documents, and any certifications, mortgages, documents, instruments, securities, or agreements, and any amendments or modifications thereto.

**M.     Plan Implementation Authorization.**

116.     The Debtors or the Reorganized Debtors, as the case may be, and their respective directors, officers, members, agents, and attorneys, financial advisors, restructuring advisors, and investment bankers are authorized and empowered from and after the date hereof to negotiate, execute, issue, deliver, implement, file, or record any contract, instrument, mortgage, release, assumption and assignment, or other agreement or document related to the Plan, as the same may be modified, amended, and supplemented, and to take any action necessary or appropriate to implement, effectuate, consummate, or further evidence the Plan in accordance with their terms, or take any or all corporate actions authorized to be taken pursuant to the Plan, whether or not specifically referred to in the Plan or any exhibit thereto, without further order of the Bankruptcy Court.  To the extent applicable, any or all such documents shall be accepted upon presentment by each of the respective state filing offices and recorded in accordance with applicable state law and shall become effective in accordance with their terms and the provisions of state law.  Pursuant to section 10.301 of the Business Organizations Code of the State of Texas, section 18-1118 of the Oklahoma General Corporation Act, and any comparable provision of the business corporation laws of any other state, as applicable, no action of the respective directors or equity holders of the Debtors or the Reorganized Debtors, as applicable, will be required to authorize the Debtors or Reorganized Debtors, as applicable, to enter into, execute, deliver, file, adopt, amend, restate, consummate, or effectuate, as the case may be, the Plan, the restructuring, and any such contract, certificate, instrument, mortgage, release, assumption and assignment, or other agreement or document related to the Plan, and following the Effective Date, each of the

documents for the Plan will be a legal, valid, and binding obligation of the Debtors or Reorganized

Debtors, as applicable, enforceable against the Debtors and the Reorganized Debtors in accordance

with the respective terms thereof.

**N.     Distributions.**

117.    The procedures governing distributions contained in Article VI of the Plan are

approved in their entirety.

**O.     Restructuring Transactions.**

118.    On or before the Effective Date, the applicable Debtors or the Reorganized Debtors

shall enter into and shall take any actions as may be necessary or appropriate to effect the

Restructuring Transactions, including as set forth in the Restructuring Transactions Memorandum.

The Restructuring Transactions Memorandum shall be reasonably acceptable to the Required

Consenting Stakeholders.  The actions to implement the Restructuring Transactions may include:

(1) the execution and delivery of appropriate agreements or other documents of merger,

amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement,

continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with

the terms of the Plan and that satisfy the applicable requirements of applicable law and any other

terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate

instruments of transfer, assignment, assumption, or delegation of any asset, property, right,

liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms

for which the applicable parties agree; (3) the filing of appropriate certificates or articles of

incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation,

arrangement, continuance, or dissolution pursuant to applicable state or provincial law; (4) the

execution and delivery of the New Organizational Documents; (5) the execution and delivery of

the Exit Facilities Documents (including all actions to be taken, undertakings to be made, and

obligations to be incurred and fees to be paid by the Debtors or the Reorganized Debtors, as applicable), subject to any post-closing execution and delivery periods provided for in the Exit Facilities Documents; (6) execution and delivery of the Registration Rights Agreement; (7) pursuant to the Rights Offering Procedures and the Backstop Commitment Agreement, the implementation of the Rights Offering, including the distribution of the Rights to the Rights Offering Participants as of the Rights Offering Record Date and the issuance of New Common Stock in connection therewith; (8) the issuance of the New Common Stock and the New Warrants as set forth in the Plan; and (9) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan.  This Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan.  On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors, as applicable, shall issue all Securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring Transactions.

119.    This Confirmation Order shall and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

**P.      Approval of Rights Offering.**

120.    On and after the Effective Date, all documents necessary to effectuate the Rights Offering shall constitute legal, valid, and binding obligations of the Reorganized Debtors and be enforceable in accordance with their respective terms.  All of the New Common Stock to be granted in accordance with the terms of the Rights Offering shall (a) be duly authorized, validly

issued, fully paid, and non-assessable consistent with the terms of the New Organizational Documents and (b) not be subject to avoidance or recharacterization for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable nonbankruptcy law.

**Q.      Approval of Exit Facilities.**

121.      On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities (on the same or better terms as set forth in the Exit Facilities Documents).  The terms of the Exit Facilities are fair and reasonable, and the Exit Facilities were negotiated in good faith and at arm's-length by the Debtors and the Agent under the Exit Facilities.  This Confirmation Order constitutes approval of the Exit Facilities (including the transactions and related agreements contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or the Reorganized Debtors in connection therewith), to the extent not approved by this Bankruptcy Court previously, and the Debtors or the Reorganized Debtors, as applicable, are hereby authorized to (i) execute and deliver the documents necessary or appropriate to obtain the Exit Facilities, including the Exit Facilities Documents and any and all other documents required to enter into the Exit Facilities and all collateral documents related thereto, without further notice to or order of the Bankruptcy Court, (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, may deem to be necessary to consummate entry into the Exit Facilities.  All fees due and payable under the Exit Facilities are hereby approved (and to the extent such fees were approved by prior order of the Bankruptcy Court, such approval is hereby ratified) and the Debtors are authorized and directed to pay such fees in accordance with, and to the extent they become payable, under the terms of the fee letters respect the Exit Facilities and the Exit Facilities Documents.

122.    As of the Effective Date, upon the granting or continuation of Liens in accordance with the Plan and the Exit Facilities Documents, such Liens shall constitute valid, binding, enforceable, and automatically perfected Liens in the collateral specified in the Exit Facilities Documents.  The Exit Facilities Agent or holder(s) of Liens under the Exit Facilities Documents are hereby authorized to file with the appropriate authorities mortgages, financing statements, and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests.  The guarantees, mortgages, pledges, Liens, and other securities interests granted to secure the obligations arising under the Exit Facilities Documents have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer and shall not be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy law, and the priorities of such Liens and security interests shall be as set forth in the Exit Facilities Documents.  The Reorganized Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and this Confirmation Order (*provided* that perfection shall occur automatically by virtue of the entry of this Confirmation Order), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

R.     **New Organizational Documents and New Warrants Agreements.**

123.     The terms of any New Organizational Documents and New Warrants Agreements as set forth in the Plan Supplement are approved in all respects.   To the extent any New Organization Document is not attached to the Plan Supplement as of the entry of this Confirmation Order, such New Organizational Document shall be filed with the Bankruptcy Court prior to the Effective Date, and such New Organizational Document is approved to the extent it is consistent with this Confirmation Order, the Plan, the Plan Supplement, and the Restructuring Support Agreement (including any applicable consent rights therein).   The obligations of the applicable Reorganized Debtors related thereto, will, upon execution, constitute legal, valid, binding, and authorized obligations of each of the Debtors or Reorganized Debtors, as applicable, enforceable in accordance with their terms and not in contravention of any state or federal law. On the Effective Date, without any further action by the Bankruptcy Court or the directors, officers, or equity holders of any of the Reorganized Debtors, each Reorganized Debtor, as applicable, will be and is authorized to enter into the New Organizational Documents, the New Warrants Agreements, and all related documents, to which such Reorganized Debtor is contemplated to be a party on the Effective Date.   In addition, on the Effective Date, without any further action by the Bankruptcy Court or the directors, officers or equity holders of any of the Reorganized Debtors, each applicable Reorganized Debtor will be and is authorized to: (a) execute, deliver, file, and record any other contracts, assignments, certificates, instruments, agreements, guaranties, or other documents executed or delivered in connection with the New Organizational Documents and the New Warrants Agreements; (b) issue the New Common Stock and the New Warrants (including the New Common Stock that may be issuable upon exercise of the New Warrants); (c) perform all of its obligations under the New Organizational Documents and the New Warrants Agreements; and (d) take all such other actions as any of the responsible officers of such Reorganized Debtor

may determine are necessary, appropriate or desirable in connection with the consummation of the transactions contemplated by the New Organizational Documents and the New Warrants Agreements.  Notwithstanding anything to the contrary in this Confirmation Order or the Plan, after the Effective Date, any disputes arising under the New Organizational Documents and the New Warrants Agreements will be governed by the jurisdictional provisions therein.

**S.      Binding Effect.**

124.    Except as otherwise set forth in this Confirmation Order, subject to Article IX.A of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests have, or are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

**T.      Convenience Claim Distribution Reserve.**

125.    On the Effective Date, the Reorganized Debtors shall establish and fund the Convenience Claim Distribution Reserve with Cash in an amount equal to $10,000,000.00.  The Convenience Claim Distribution Reserve shall be maintained in trust solely for holders of Convenience Claims.  Such funds shall not be considered property of the Debtors or the Reorganized Debtors; *provided* that any funds remaining in the Convenience Claim Distribution Reserve after all Convenience Claim Distributions have been made shall be distributed to and vest

in the Reorganized Debtors.  Convenience Claims shall be paid in accordance with Article VI.A of the Plan.

**U.      Continued Corporate Existence**

126.    Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended, amended and restated, or replaced under the Plan or otherwise, including pursuant to the New Organizational Documents, and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended, amended and restated, or replaced pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

127.    After the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of the Reorganized Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  After the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

KE 71402552

## V.      Vesting of Assets in the Reorganized Debtors.

128.    Except as otherwise provided in this Confirmation Order, the Plan (including, for the avoidance of doubt, the Restructuring Transactions Memorandum), or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Plan or Plan Supplement, on the Effective Date, all property in each Estate that constitutes property of the Estate under section 541 of the Bankruptcy Code, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

129.    Nothing in the Plan or this Confirmation Order shall operate as a finding or determination that funds (1) held by the Debtors or subject to their control and (2) to which any holder of a Royalty and Working Interest has asserted or may assert a right of entitlement or ownership on account of such Royalty and Working Interest, constitute property of any of the Estates under section 541 of the Bankruptcy Code or otherwise.  All parties' rights with respect to such issue remain unaffected by Confirmation of the Plan and entry of this Confirmation Order.

## W.      Directors and Officers of Reorganized Debtors.

130.    Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors have, to the extent known at the time of Filing, disclosed the identities of directors on the New Board.  Each member of the New Board will serve from and after the Effective Date pursuant to applicable law and the terms of the New Organizational Documents.  The existing boards of directors and other governing bodies of the other Reorganized Debtors will be deemed to have resigned on and as of

the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity.

## X.      Employee Obligations.

131.      Except as otherwise provided in the Plan and subject to Article V thereof, all wages, compensation, and benefits programs, including executive compensation programs and any motions in the Bankruptcy Court for the approval thereof, will be continued according to existing terms and practices.   On the Effective Date, the Debtors shall (a) assume all employment agreements, indemnification agreements, or other agreements entered into with current and former employees or (b) enter into new agreements with such employees on terms and conditions acceptable to the Debtor and such employee.   Notwithstanding the foregoing, any employment agreements or other employment-related agreements that provide for any acceleration or enhancement of payments (including severance payments), vesting, benefits, or other rights in connection with a transaction that constitutes a change in control, change of control, or similar concept under such agreements, shall only be assumed if and to the extent that the Debtors, with the consent of the Required Plan Sponsors, obtain waivers specifying that the consummation of the Restructuring Transactions shall not trigger any such rights under such agreements.

## Y.      Ownership and Control.

132.      The consummation of the Plan shall not constitute a change in ownership or change in control, as such terms are used in any statute, regulation, contract, or agreement, including, but not limited to, any assumption, assumption and assignment, insurance agreement, mortgage, letter of credit, or hedging arrangement, in effect on the Effective Date and to which any Debtor is a party or under any applicable law of any unit of government.

**Z.      Indemnification Obligations.**

133.    Consistent with applicable law, all indemnification provisions in place as of the Effective Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, the DIP Order, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, the DIP Agent, the DIP Lenders, the Revolving Credit Facility Agent, the Consenting Revolving Credit Facility Lenders, the FLLO Term Loan Facility Administrative Agent, the Consenting FLLO Term Loan Facility Lenders, the Collateral Trustee, the Second Lien Notes Trustee, the Consenting Second Lien Noteholders, and the Consenting Unsecured Noteholders, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, the DIP Agent, the DIP Lenders, the Revolving Credit Facility Agent, the Consenting Revolving Credit Facility Lenders, the FLLO Term Loan Facility Administrative Agent, the Consenting FLLO Term Loan Facility Lenders, the Collateral Trustee, the Second Lien Notes Trustee, the Consenting Second Lien Noteholders, and the Consenting Unsecured Noteholders, as applicable, than the indemnification provisions in place prior to the Effective Date.

**AA.   Disputed and Contingent Claims Reserves.**

134.    If any portion of a Claim is a Disputed Claim, including an objection to a Claim or portion thereof is filed as set forth in Article VII.F of the Plan, no payment or distribution provided under the Plan shall be made on account of such Disputed Claim or a portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

135.    On or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall establish one or more reserves (including the Convenience Claim Distribution Reserve) for Claims that are contingent or have not yet been Allowed, in an amount or amounts as reasonably determined by the Debtors or Reorganized Debtors, as applicable, consistent with the Proof of Claim Filed by the applicable holder of such Disputed Claim.  To the extent that a Disputed Claim may be entitled to receive New Common Stock pursuant to the Plan, such New Common Stock will remain authorized but unissued pending resolution of such Disputed Claim.

136.    Any assets held in any such reserve shall be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. § 1.468B–9.  As such, such assets will be subject to entity-level taxation, and the Debtors and Reorganized Debtors, as applicable, shall be required to comply with the relevant rules.

**BB.    Claims Reconciliation Process.**

137.    Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority:  (a) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (b) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.S of the Plan.

**CC.     Injunctions and Automatic Stay.**

138.     Unless otherwise provided in the Plan or this Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or this Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or this Confirmation Order shall remain in full force and effect in accordance with their terms.

**DD.     Cancellation of Existing Securities and Agreements.**

139.     On the Effective Date, except as otherwise provided in the Plan or this Confirmation Order, all notes, instruments, certificates, credit agreements, indentures, security agreements, collateral agreements, and other documents evidencing Claims or Interests shall be cancelled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect.  Holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, Securities, and other documentation, or the cancellation thereof, except the rights provided for or preserved pursuant to the Plan or this Confirmation Order.

140.     Notwithstanding anything to the contrary in the Plan, to the extent cancelled pursuant to the Plan, the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured Notes Indentures shall continue in effect solely to the extent necessary to:  (1) permit holders of Claims under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured Notes Indentures to receive their respective Plan distributions, if any; (2) permit the Debtors or the Reorganized Debtors to make

Plan distributions on account of the Allowed Claims under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured Notes Indentures; (3) permit the Agents and Trustees to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of the DIP Order, the DIP Credit Agreement, the Plan, and this Confirmation Order, as applicable; (4) allow the Agents and Trustees to enforce their rights, claims, and interests against any party other than the Debtors; (5) preserve any rights of the Agents and Trustees to payment of fees, expenses, and indemnification obligations as against any money or property distributable to holders of Claims under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured Notes Indentures, respectively, including any rights to priority of payment and/or to exercise charging liens; (6) permit the Agents and Trustees to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or an appellate court, including to enforce any obligation owed to the Agents and Trustees or other holders of Claims under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured Notes Indentures, as applicable; (7) preserve the rights and obligations of the parties under the Exit Facilities Documents, as applicable; and (8) allow the Agents and Trustees to maintain any right of indemnification, contribution, or subrogation under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured Notes Indentures.

141.    Except as provided in the Plan, on the Effective Date, the Agents and Trustees, and their respective agents, successors, and assigns, shall be automatically and fully discharged of all of their duties and obligations associated with the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured Notes Indentures, as applicable. To the extent cancelled in accordance with the Plan, the commitments and obligations (if any) of the holders under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured Notes Indentures to extend any further or future credit or financial accommodations to any of the Debtors, any of the Debtors' respective subsidiaries, or any of the Debtors' respective successors or assigns under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured Notes Indentures, as applicable, shall fully terminate and be of no further force or effect on the Effective Date.

**EE.    Securities Law Exemption.**

142.    All 1145 Securities will be offered, issued, and distributed in reliance upon section 1145 of the Bankruptcy Code to the extent permitted under applicable law.  All 4(a)(2) Securities will be offered, issued, and distributed in reliance upon section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, will be considered "restricted securities" as defined in Rule 144(a)(3) under the Securities Act and may not be transferred except pursuant to an effective registration statement or under the Securities Act or an available exemption therefrom.

143.    Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of each of the 1145 Securities under the Plan is exempt from, among other things, the

registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration before the offering, issuance, distribution, or sale of such securities. Pursuant to section 1145 of the Bankruptcy Code, each of the 1145 Securities under the Plan (1) is not a "restricted security" as defined in Rule 144(a)(3) under the Securities Act; and (2) is freely tradable and transferable by any holder thereof that at the time of transfer or as a result thereof, is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act. Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the 1145 Securities, including any New Common Stock or New Warrants, through the facilities of DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or this Confirmation Order with respect to the treatment of such New Common Stock or New Warrants under applicable securities laws.

144.    The 4(a)(2) Securities will be offered, issued, and distributed in reliance upon Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder and not pursuant to an effective registration statement under the Securities Act.  To the extent issued in reliance on Section 4(a)(2) of the Securities Act or Regulation D thereunder, the 4(a)(2) Securities will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to an effective registration statement under the Securities Act or an available exemption therefrom and other applicable law.   Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the 4(a)(2) Securities through the facilities of DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or this Confirmation Order with respect to the treatment of the 4(a)(2) Securities under applicable securities laws.

KE 71402552

145.    Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Common Stock (including any shares issuable as part of the Put Option Premium, issuable upon exercise of the Rights, or the unsubscribed shares of New Common Stock issued to the Backstop Parties pursuant to the Backstop Commitment Agreement) or the New Warrants (and any shares of the New Common Stock issuable upon the exercise of the New Warrants) through the facilities of DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or this Confirmation Order with respect to such treatment under applicable securities laws.

146.    DTC shall be required to accept and conclusively rely upon the Plan and this Confirmation Order in lieu of a legal opinion regarding whether any of the New Common Stock or New Warrants issuable pursuant to the Plan, including issuable pursuant to the Backstop Commitment Agreement, are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

147.    Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock issuable upon exercise of the Rights or any of the other 1145 Securities or 4(a)(2) Securities, as applicable, are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

148.    Each Backstop Party that receives Plan Securities will be entitled to registration rights and sale support rights with respect to all such Securities to be documented in the Registration Rights Agreement in form and substance satisfactory to the Required Plan Sponsors.

KE 71402552

**FF.    Section 1146 Exemption.**

149.    To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to:  (a) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors, including the New Common Stock and the New Warrants (including the New Common Stock that may be issuable upon exercise of the New Warrants); (b) the Restructuring Transactions; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; (c) the grant of collateral as security for the Reorganized Debtors' obligations under and in connection with the Exit Facilities; or (f) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of this Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the

collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## GG.    Payment of Certain Fees.

150.    Without any further notice to or action, order, or approval of the Bankruptcy Court, the Debtors or the Reorganized Debtors, as applicable, shall pay on the Effective Date the Restructuring Expenses, subject to the conditions set forth in Article IV.V of the Plan.   The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the Restructuring Support Agreement, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Court review or approval.   All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least five (5) Business Days before the anticipated Effective Date or such later time as required by the Debtors; *provided* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses.   On or as soon as practicable after the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.   In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay pre- and post-Effective Date Restructuring Expenses related to implementation, consummation, and defense of the Plan, whether incurred before, on, or after the Effective Date.   For the avoidance of doubt, nothing in this paragraph shall be deemed to impair, waive, discharge, or negatively impact or affect any rights of the FLLO Term Loan Facility Administrative Agent, the Collateral Trustee, and the Second Lien Notes Trustee to

payment of fees, expenses, and indemnification obligations solely as against any money or property distributable to holders of Claims under the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, or the Second Lien Notes Indenture, as applicable, including any rights to priority of payment and/or to exercise charging liens.  Notwithstanding anything in the Plan, including Article IV.I thereof, reimbursement of the Second Lien Notes Trustee's financial advisor's fees and expenses shall be limited to $250,000 in the aggregate, and no Person shall be entitled to increase or seek to increase this $250,000 limit or use a charging lien or seek payment for such financial advisor's or any financial advisor to the Second Lien Notes Trustee's fees and expenses from any other source.

151.    Without limiting the obligations of the Debtors or Reorganized Debtors to pay the DIP Agent Fees and Expenses and any fees, costs and expenses of the Exit Facilities Agent pursuant to the Exit Facilities Documents, the Reorganized Debtors shall pay all post-Effective Date expenses incurred by the DIP Agent and/or the Exit Facilities Agent related to implementation, consummation, and defense of the Plan, whether incurred on or after the Effective Date.

152.    Provided the Committee has not filed an appeal of the Confirmation Order, on or as soon as reasonably practicable after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall pay in Cash the reasonable and documented unpaid fees and expenses (including the fees and expenses of their counsel) of the Unsecured Notes Trustees (the "Unsecured Notes Trustee Fees") incurred through the Effective Date, without any requirement to file a fee application with the Bankruptcy Court, and without any requirement for Bankruptcy Court review or approval.  All Unsecured Notes Trustee Fees to be paid on or as soon as reasonably practicable after the Effective Date shall be estimated prior to and as of the Effective Date and such estimates

shall be delivered to the Debtors at least five (5) Business Days before the anticipated Effective Date or such later time as required by the Debtors; *provided* that such estimates shall not be considered an admission or limitation with respect to such Unsecured Notes Trustee Fees. In addition, the Debtors and the Reorganized Debtors, as applicable, shall continue to pay pre- and post-Effective Date Unsecured Notes Trustee Fees related to implementation and consummation of the Plan, whether incurred before, on, or after the Effective Date.  For the avoidance of doubt, nothing in this paragraph shall be deemed to impair, waive, discharge, or negatively impact or affect any rights of the Unsecured Notes Trustees to payment of fees, expenses, and indemnification obligations solely as against any money or property distributable to holders of Claims under the Unsecured Notes Indentures, as applicable, including any rights to priority of payment and/or to exercise charging liens.

**HH.     Nonseverability of Plan Provisions upon Confirmation.**

153.     Each term and provision of each of the Plan as it heretofore may have been altered or interpreted by the Bankruptcy Court in accordance with the Plan and as modified by this Confirmation Order is:  (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable; and (c) nonseverable and mutually dependent.

**II.     Waiver or Estoppel.**

154.     Each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement is not addressed in this Confirmation Order or was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

KE 71402552

**JJ.    Authorization to Consummate.**

155.    The Debtors and the Reorganized Debtors, as applicable, are authorized to consummate the Plan, including the transactions contemplated by the Rights Offering and Exit Facilities, and any other contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan at any time after the entry of this Confirmation Order, subject to satisfaction or waiver (by the Required Consenting Stakeholders) of the conditions precedent to Consummation set forth in Article IX of the Plan.  The substantial consummation of the Plan, within the meaning of sections 1101(2) and 1127 of the Bankruptcy Code, is deemed to occur on the Effective Date.

**KK.    Assumption and Cure of Executory Contracts.**

156.    The provisions governing the treatment of Executory Contracts and Unexpired Leases set forth in Article V of the Plan (including the procedures regarding the resolution of any and all disputes concerning the assumption or rejection, as applicable, of such Executory Contracts and Unexpired Leases) shall be, and hereby are, approved in their entirety.  For the avoidance of doubt, on the Effective Date, except as otherwise provided in the Plan or this Confirmation Order, any Executory Contract or Unexpired Lease of the Debtors will be deemed to be an Assumed Executory Contract or Unexpired Lease in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that are:  (a) identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (b) previously expired or terminated pursuant to their own terms; (c) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (d) are the subject of a motion to reject that is pending on the Effective Date; or (e) have an ordered or requested effective date of rejection that is after the Effective Date.

KE 71402552

157.    Except as otherwise set forth herein, this Confirmation Order constitutes approval of such assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumed Executory Contract and Unexpired Leases Schedule, or the Rejected Executory Contracts and Unexpired Leases Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

158.    To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right, with the consent of the Required

Consenting Stakeholders, to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases Schedule and the Rejected Executory Contracts and Unexpired Leases Schedule at any time up to forty-five (45) days after the Effective Date, so long as such allocation, amendment, modification, or supplement is consistent with the Restructuring Support Agreement and is not otherwise inconsistent with the terms of this Confirmation Order.

159.    Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or this Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including this Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date.  Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.  All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.7 of the Plan.

160.    Except as provided in this Confirmation Order, any disputed cure costs shall be determined in accordance with the procedures set forth in Article V.C of the Plan, and applicable bankruptcy and nonbankruptcy law.

KE 71402552

**LL.     Preservation of Royalty and Working Interests.**

161.     Notwithstanding any other provision in the Plan, on and after the Effective Date, all Royalty and Working Interests shall remain in full force and effect in accordance with the terms of the granting instruments or other governing documents applicable to such Royalty and Working Interests.  Royalty and Working Interests shall not be modified, affected or impaired in any manner by any provision of the Plan or this Confirmation Order, including but not limited to any injunctive or stay relief, and the legal and equitable rights, interests, defenses, and obligations of holders of Royalty and Working Interests, with respect to such Royalty and Working Interests, shall not be modified, affected or impaired in any manner by the provisions of the Plan or this Confirmation Order; *provided* that, to the extent applicable, any Other Secured Claims, General Unsecured Claims, or Administrative Claims of holders of Royalty and Working Interests shall be treated in accordance with Articles II and III of the Plan.  Nor shall the Plan or this Confirmation Order modify, affect or impair the rights and defenses of the Debtors or the Reorganized Debtors with respect to the Royalty and Working Interests.  The Debtors' and the Reorganized Debtors' rights to dispute the amounts owing on account of Royalty and Working Interests and to assert that prepetition Claims for such amounts have been discharged by the Plan or this Confirmation Order are expressly preserved and reserved.  Nothing in the Plan or this Confirmation Order shall be deemed a finding or determination as to whether any such amount owed by the Debtors or the Reorganized Debtors on account of Royalty and Working Interests is a Claim or a specific type of Claim, if the amount has been discharged, or to what extent (if any) funds held by the Debtors or the Reorganized Debtors or subject to their control, with respect to which funds any holder of a Royalty and Working Interest has asserted or may assert a right of entitlement or ownership on account of such Royalty and Working Interest, constitute property of any of the Estates under section 541 of the Bankruptcy Code or otherwise; *provided, however*, that any determination with

KE 71402552

respect to the foregoing shall be made by the Bankruptcy Court. All parties' rights are preserved and reserved with respect to such findings or determinations; *provided* that, to the extent applicable, any Administrative Claims, Other Secured Claims or General Unsecured Claims of holders of Royalty and Working Interests on account of Royalty and Working Interests shall be treated in accordance with Article II or III of the Plan, as appropriate.

162.    Notwithstanding anything in the Plan or this Confirmation Order to the contrary, the Debtors or the Reorganized Debtors shall continue paying all undisputed amounts owing on account of Royalty and Working Interests, including with respect to suspense funds as and when reconciled, in the ordinary course of business and in accordance with all applicable agreements and laws.

163.    Nothing in the Plan or this Confirmation Order shall affect the Debtors' or the Reorganized Debtors' obligations to comply with all federal, state and local laws, rules and regulations with respect to Royalty and Working Interests and holders thereof, including, without limitation, laws, rules and regulations regarding inspection of books and records and segregation or escrow of funds or production proceeds belonging and/or payable to holders of Royalty and Working Interests.

**MM. Provisions Regarding Certain Governmental Unit Liabilities.**

164.    Nothing in this Confirmation Order or the Plan discharges, releases, precludes, or enjoins: (i) any liability to any Governmental Unit that is not a Claim; (ii) any Claim of a Governmental Unit arising on or after the Confirmation Date; (iii) any police or regulatory liability to a Governmental Unit that any Entity would be subject to as the owner or operator of property after the Confirmation Date; or (iv) any liability to a Governmental Unit on the part of any non-Debtor. For the avoidance of doubt, all Claims under police or regulatory law for penalties for days of violations prior to the Effective Date, or for off-site waste disposal prior to the

Effective Date shall be subject to Article II and III of the Plan and treated in accordance with the Plan in all respects.  Nor shall anything in this Confirmation Order or the Plan enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside this Bankruptcy Court, any liability described in the preceding sentence; *provided* that the Bankruptcy Court retains jurisdiction to determine whether police or regulatory liabilities asserted by any Governmental Unit or other entity are discharged or otherwise barred by this Confirmation Order, the Plan, or the Bankruptcy Code.  Nothing in this Confirmation Order or the Plan divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Confirmation Order or the Plan to adjudicate any defense asserted relating to the liabilities and/or Claims set forth in this paragraph. Nothing in this Confirmation Order or the Plan shall authorize the transfer or assignment of any Governmental Unit (i) license, (ii) permit, (iii) registration, (iv) authorization, (v) certification, or (vi) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable nonbankruptcy legal requirements under police or regulatory law.

165.    Notwithstanding anything to the contrary in the Plan, Plan Supplement, or this Confirmation Order, the Debtors must meet the requirements of 11 U.S.C. § 365, to the extent applicable, before assuming (or assuming and assigning) any interests in contracts, leases, covenants, operating rights agreements, rights-of-use and easements, rights-of-way or other agreements: (a) with the federal government; (b) involving (i) federal land or minerals or (ii) lands or minerals held in trust for federally-recognized Indian tribes or Indian individuals (together, "Indian Landowners"); or (c) held by such Indian Landowners in fee with federal restriction on alienation (collectively, the "Federal Leases").  Further, no sale, assignment, and/or transfer of Federal Lease may take place pursuant to this Confirmation Order, the Plan, or the Plan Supplement absent the consent of the U.S. Department of the Interior ("DOI"), including any of

its components, and any applicable Indian Landowner as provided for in applicable non-bankruptcy laws and regulations; *provided, further,* that Debtors also must meet the requirements of 11 U.S.C. § 365, to the extent applicable, before any such sale, assignment, and/or transfer of any Federal Lease.

166.    For the avoidance of doubt and without limiting the foregoing, any assignment and/or transfer of any interests in the Federal Leases will be ineffective absent the consent of the DOI to the extent required by the Federal Leases.  Nothing in the Plan or Plan Supplement shall be interpreted to set cure amounts or require the United States to novate, approve or consent to the sale, assignment and/or transfer of any interests in the Federal Leases except pursuant to existing regulatory requirements and applicable law.

167.    Notwithstanding anything to the contrary in the Plan, Plan Supplement, or this Confirmation Order, the Debtors, Reorganized Debtors, and/or any assignee(s) or transferee(s) agree to comply with all applicable bankruptcy and non-bankruptcy law with respect to the Federal Leases, and nothing in this Confirmation Order shall otherwise affect the decommissioning and financial assurance obligations of the Debtors, Reorganized Debtors, and/or the assignee(s) or transferee(s), as applicable, under the Federal Leases and non-bankruptcy law.

168.    Notwithstanding anything to the contrary in the Plan, Plan Supplement, or this Confirmation Order, the United States will retain and have the right to audit and/or perform any compliance review and, if appropriate, collect from the Debtor(s), Reorganized Debtor(s), and/or the transferee(s) or assignee(s), as applicable, in full any additional monies owed by the Debtor prior to the assumption and/or assignment of the Federal Leases without those rights being adversely affected by these bankruptcy proceedings.  Such rights shall be preserved in full as if this bankruptcy had not occurred.  The Debtors, Reorganized Debtors, and/or the transferee(s) or

assignee(s), as applicable, will retain all defenses and/or rights, other than defenses and/or rights arising from these bankruptcy proceedings, to challenge any such determination: *provided, however*, that any such challenge, including any challenge associated with these bankruptcy cases, must be raised in the United States' administrative review process leading to a final agency determination by DOI.  The audit and/or compliance review period shall remain open for the full statute of limitations period established by the Federal Oil and Gas Royalty Simplification and Fairness Act of 1996, 30 U.S.C. § 1702, et seq.

169.    Notwithstanding anything to the contrary in the Plan, Plan Supplement, or this Confirmation Order, nothing shall affect a Governmental Unit's setoff and recoupment rights or Debtors', Reorganized Debtors', and/or any assignee(s)' or transferee(s)' defenses thereto; *provided* that all rights and defenses of the Debtors and Reorganized Debtors under applicable nonbankruptcy laws, regulations, and rules concerning any Governmental Unit's setoff or recoupment rights are expressly reserved and preserved.

**NN.    Provisions Regarding SEC.**

170.    Notwithstanding any provision herein to the contrary, no provision of the Plan, or any order confirming the Plan, (i) releases any non-Debtor Person or Entity (including any Released Party) from any Claim or Cause of Action of the United States Securities and Exchange Commission (the "<u>SEC</u>") or (ii) enjoins, limits, impairs, or delays the SEC from commencing or continuing any Claims, Causes of Action, proceedings, or investigations against any non-Debtor Person or Entity (including any Released Party) in any forum.

**OO.    Provisions Regarding the United States Department of Justice.**

171.    Notwithstanding anything to the contrary in this Confirmation Order, the applicable Reorganized Debtors named as defendants in the following consent decrees and agreements shall continue to be bound by their terms:

82

a.     the Consent Decree between the United States of America, on behalf of the United States Environmental Protection Agency, and the State of West Virginia, on behalf of the West Virginia Department of Environmental Protection, as plaintiffs, and Chesapeake Appalachia, LLC, as defendant, entered by the United States District Court for the Northern District of West Virginia on March 11, 2014, Civ. Action No. 5:13-cv-170 (N.D. W. Va.);

b.     the Consent Decree and Environmental Settlement Agreement (as may be amended, modified, or supplemented from time to time) executed by Chesapeake Energy Corporation, Chesapeake Exploration, L.L.C., and Chesapeake Appalachia, LLC (collectively "Chesapeake") on December 1, 2020, between the United States of America, on behalf of the United States Environmental Protection Agency, and Chesapeake relating to alleged Clean Air Act (CAA) claims at 159 oil and natural gas production facilities in Ohio following both execution by the United States of America, on behalf of the United States Environmental Protection Agency and Bankruptcy Court approval; and

c.     the Consent Decree (as may be amended, modified, or supplemented from time to time) executed by Chesapeake Appalachia LLC ("CALLC") on December 30, 2020, between the United States of America, on behalf of the United States Environmental Protection Agency, and the Commonwealth of Pennsylvania Department of Environmental Protection, as plaintiffs, and CALLC, as defendant, resolving alleged violations by CALLC of Sections 301(a) and 404 of the Clean Water Act, 33 U.S.C. §§ 1311(a) & 1344, and alleged violations of The Clean Streams Law, Act of June 22, 1937, as amended, 35 P.S. §§ 691.1-691.1001; the Dam Safety and Encroachments Act, Act of November 26, 1978, P.L. 1375, as amended, 32 P.S. §§ 693.1-693.28; the 2012 Oil and Gas Act, Act of February 14, 2012 P.L. 87 No. 13, 58 Pa C.S. §§ 3201-3274; Section 1917-A of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, as amended, 71 P.S. § 510-17; and the rules and regulations promulgated thereunder following execution by all parties, Bankruptcy Court approval of Debtors' entry into the Consent Decree, and District Court approval of the Consent Decree.

**PP.     Provisions Regarding Certain Texas Taxing Authorities.**

172.     Notwithstanding anything to the contrary in the Plan or this Confirmation Order, with respect to the Claims of the Texas Taxing Authorities[5] under the Texas Tax Code (the "Texas

---

[5]     For purposes of this Confirmation Order, the term "Texas Taxing Authorities" shall mean Angelina County, Atascosa County, Bastrop County, Bexar County, Brazos County, Burleson County Tax Office, Cherokee County, Cherokee County Appraisal District, Cotulla ISD, Crosby Independent School District, Culberson County-Allamoore ISD, Cypress - Fairbanks ISD, DeWitt County, Dilley ISD, Dimmit County, Ellis County, Fayette County Appraisal District Tax Office, Fort Bend County, Franklin ISD, Frio Hospital District, Gainesville

Taxing Authority Claims"), (a) to the extent the Texas Tax Code provides for interest and/or penalties with respect to any portion of the Texas Taxing Authority Claims, such interest and/or penalties shall be included in the Texas Taxing Authority Claims, (b) the liens, if any, securing the Texas Taxing Authority Claims shall be retained until the applicable Texas Taxing Authority Claims are paid in full, and (c) the Debtors or the Reorganized Debtors, as applicable, shall pay Allowed Texas Taxing Authority Claims on the later of (i) the date the Texas Taxing Authority Claims become due pursuant to the Texas Tax Code and in the ordinary course of business (subject to any applicable extensions, grace periods, or similar rights under the Texas Tax Code) and (ii) the Effective Date (or as soon as reasonably practicable thereafter).

173.    All rights and defenses of the Debtors and the Reorganized Debtors under non-bankruptcy law are reserved and preserved with respect to such Texas Taxing Authority Claims.  The Texas Taxing Authorities' lien priority, if any, shall not be primed or subordinated by the Exit Facilities if approved by the Bankruptcy Court in conjunction with the Confirmation of the Plan or otherwise.  In the event of a default in the payment of the Texas Taxing Authority Claims as provided herein, the Texas Taxing Authorities shall provide notice to counsel for the Reorganized Debtors who shall have twenty (20) days from the date of such notice to cure the default.  If the default is not cured, the Texas Taxing Authorities shall be entitled to pursue collection of all amounts owed pursuant to state law outside the Bankruptcy Court.  Failure to pay

---

ISD, Galveston County, Gause Independent School District c/o Milam County Tax Office, Goliad County, Grayson County, Grey County Tax Office, Gregg County, Hansford County Tax Office, Harris County, Harrison Central Appraisal District, Harrison County, Hood CAD, Houston CAD, Houston County Tax Office, Irion County, Jasper County, Jim Wells CAD, Karnes City ISD, Karnes County Tax Office, LaSalle County, Lee County, Liberty County, Madison County, Matagorda County, McMullen County, Midland Central Appraisal District, Midland County, Milam County, Montgomery County, Morris CAD, Nacogdoches County, Nueces County, Orange County, Panola County, Parker CAD, Pearsall ISD, Polk County, Red River CAD, Red River County, Reeves County Tax District, Reeves County, Robertson County, Rusk County, Sabine County, San Augustine County, Shelby County, Sheldon Independent School District, Smith County, Tarrant County, Tom Green CAD, Tyler County, Upshur County, Washington County, Webb CISD, Wood County, Zapata County, Zavala CAD.

KE 71402552

the 2020 ad valorem taxes prior to the state law delinquency date shall constitute an event of default only as to the relevant Texas Taxing Authority.  Notwithstanding any provision in the Plan or this Confirmation Order to the contrary, to the extent the Proofs of Claims relating to the Texas Taxing Authority Claims have not already been amended the Texas Taxing Authorities may amend their respective Proofs of Claims once the current year's ad valorem taxes are actually assessed without further agreement with the Debtors or Reorganized Debtors (as applicable) or leave of the Bankruptcy Court for approval to amend their Proofs of Claims; *provided* that no such Proofs of Claim may be amended or supplemented after January 30, 2021 at 5:00 p.m. prevailing Central Time. The Debtors' and the Reorganized Debtors' (as applicable) rights and defenses under applicable law and the Bankruptcy Code with respect to the foregoing, including their right to dispute or object to the Texas Taxing Authority Claims and liens, are fully preserved.

**QQ.    Provisions Regarding Certain Texas State Agencies.**

174.    Nothing in this Confirmation Order, Plan, or any Plan Supplement releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to the Texas Commission on Environmental Quality or the Railroad Commission of Texas arising from or related to the enforcement of any applicable police or regulatory law or regulation to which any entity would be subject to as the owner or operator of property from and after the Effective Date of the Plan. Nothing in this Confirmation Order, Plan, or Plan Supplement authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police and regulatory law.

175.    Nothing in the Plan or in this Confirmation Order shall be deemed to be a finding that fees payable by the Debtors or the Reorganized Debtors to the Texas Commission on Environmental Quality or the Railroad Commission of Texas, or royalty payments payable by the

Debtors or the Reorganized Debtors to the Texas General Land Office are, or will be, considered taxes under applicable non-bankruptcy law.  Moreover, such fees or royalty payments shall not be classified as taxes under the terms of the Plan or for any other purpose.

**RR.  Provisions Regarding Surety Bond Obligations.**

176.     Notwithstanding any other provisions of the Plan, this Confirmation Order, or any other order of the Bankruptcy Court, on the Effective Date, all rights and obligations of any party related to (i) the Debtors' current surety bonds (each, a "Surety," and collectively, the "Surety Bonds") maintained in the ordinary course of business; (ii) any surety payment and indemnity agreements, setting forth the Surety's rights against the Debtors, and the Debtors' obligations, among other things, to pay and indemnify the Surety from any loss, cost, or expense that the Surety may incur, in each case, on account of the issuance of any surety bonds on behalf of the Debtors; (iii) any Surety collateral; (iv) Surety collateral agreements governing collateral, if any, in connection with the Debtors' Surety Bonds; and/or (v) ordinary course premium payments to the Surety for the Debtors' Surety Bonds (collectively, the "Surety Bond Program" and the Debtors' obligations arising therefrom, the "Surety Bond Obligations") shall be reaffirmed and ratified by the applicable Reorganized Debtors and continue in full force and effect and are not discharged, released or precluded by the Plan in any way.  For the avoidance of doubt, Debtors' Surety Bond Obligations are reaffirmed and will continue without regard to any stated cure amount.  On the Effective Date, all liens, security interests and claims, if any, arising under or granted pursuant to or in connection with the Surety Bond Program shall be valid, binding, perfected, enforceable liens and security interests with the priorities established in respect thereof under applicable non-bankruptcy law and the common law of suretyship, and shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination or similar encumbrance under any applicable law, the Plan, or this Confirmation Order.  Nothing in this

KE 71402552

Confirmation Order or the Plan or otherwise shall be deemed to limit any Surety's right to draw on any collateral.  It shall not be necessary for any Surety to "opt out" of any release provisions required under the Plan to receive any rights granted under this paragraph.  The Surety Bond Program and all Surety Bond Obligations related thereto shall be treated by the Reorganized Debtors and the Surety in the ordinary course of business as if the Chapter 11 Cases had not been commenced; and in furtherance thereof, in the event that any of the Surety Bond Obligations cease to be in effect upon the Effective Date for reasons other than their expiration or termination in accordance with the terms of the applicable agreements, the Reorganized Debtors and the applicable Surety shall execute the documents that are necessary to reinstitute such Surety Bond Obligations, including, without limitation, the indemnity obligations thereunder, as such Surety Bond Obligations were in effect immediately prior to the Effective Date; *provided, however*, that nothing in the foregoing shall be deemed to alter, limit, modify or expand any such Surety Bond Obligations.  For the avoidance of any doubt, with a reservation of rights to all parties, and only to the extent applicable, any agreements related to the Surety Bond Program are assumed by the Debtors and the Reorganized Debtors pursuant to section 365 of the Bankruptcy Code upon the Effective Date. Nothing in the Plan or this paragraph shall affect in any way the Surety's rights against any non-Debtor, or any non-Debtor's rights against the Surety, including under the Surety Bond Program or with regard to the Surety Bond Obligations.

**SS.**   **Provisions Regarding the Commonwealth of Pennsylvania, Department of Revenue and the Texas Comptroller of Public Accounts.**

177.    Notwithstanding any provision to the contrary in the Plan, this Confirmation Order, and the Plan Supplement, nothing shall:  (a) require the Commonwealth of Pennsylvania, Department of Revenue ("Department") or the Texas Comptroller of Public Accounts ("Texas Comptroller") to file an Administrative Claim in order to receive payment for any liability

described in 11 U.S.C. §§ 503(b)(1)(B) and 503(b)(1)(C); (b) affect the rights of the Department or the Texas Comptroller to assert setoff and recoupment under section 553 of the Bankruptcy Code or the Debtors' or Reorganized Debtors' defenses thereto and such rights are expressly preserved and shall not be altered or impaired; (c) affect the ability of the Department or the Texas Comptroller to pursue any non-Debtors to the extent allowed by non-bankruptcy law for any liabilities that may be related to any state tax liabilities owed to the Department or the Texas Comptroller by the Debtors and the Reorganized Debtors; and (d) affect the imposition of the Department realty transfer tax against all transfers made prior to the confirmation of the Plan as provided for under 11 U.S.C. § 1146(a); and (e) allow the Debtors and the Reorganized Debtors to estimate the Department's or the Texas Comptroller's claims beyond what is provided and allowed for in 11 U.S.C. § 502(c).

178.    Further, notwithstanding any provision to the contrary in the Plan, this Confirmation Order, and Plan Supplement, (a) any Allowed Secured Claim of the Department shall be paid as provided for in 11 U.S.C. § 1129(a)(9)(D) and the Department shall retain its tax lien(s) and be paid the present value of its claim (including interest) as provided for in 11 U.S.C. § 1129(b)(2); (b) any Allowed Unsecured Priority Claim of the Department or the Texas Comptroller shall be paid in cash of its total value (including interest) as provided for in 11 U.S.C. § 1129(a)(9)(C); (c) the Bankruptcy Court shall retain exclusive jurisdiction regarding the Department's or the Texas Comptroller's Claims to the extent permissible under applicable federal law; and (d) as required under 11 U.S.C. § 1123(a)(5)(G), upon the Debtors or the Reorganized Debtors failure to comply with any provision in the Plan or this Confirmation Order regarding their tax obligations, the Department, the Texas Comptroller, and other government entities, with written notice and following an opportunity by the Debtors or Reorganized Debtors,

as applicable, to cure such default within thirty (30) days of such notice, may exercise any and all rights and remedies under state law, including but not limited to usual state tax collection procedures, or under federal law.

179.    The following provisions of this Confirmation Order will govern the treatment of the Texas Comptroller concerning the duties and responsibilities of the Debtors and the Reorganized Debtors relating to all unclaimed property presumed abandoned (the "Texas Unclaimed Property") under Texas Property Code, Title 6, Chapters 72-76 and other applicable Texas laws (the "Texas Unclaimed Property Laws"):

180.    The Debtors and the Reorganized Debtors remain subject to the continuing reporting and remitting requirements of the Texas Unclaimed Property Laws for the Texas Unclaimed Property.  On or within thirty (30) days after the Effective Date, the Debtors shall review their books and records and turn over to the Texas Comptroller all known Texas Unclaimed Property presumed abandoned before the Petition Date and reflected in property reports delivered by the Debtors to the Texas Comptroller under the Texas Unclaimed Property Laws (the "Reported Texas Unclaimed Property").  With respect to such Reported Texas Unclaimed Property, the Texas Comptroller will not seek payment of any interest or penalty by the Debtors or the Reorganized Debtors.  Nothing in the Plan or this Confirmation Order shall convert the Texas Unclaimed Property to property of the Debtors' estates or vest such property in the Reorganized Debtors and the Texas Unclaimed Property shall continue to be held by the Debtors or Reorganized Debtors until such time it is presumed abandoned, at which time the Texas Unclaimed Property shall be reported and remitted to the Texas Comptroller in accordance with the Texas Unclaimed Property Laws.

KE 71402552

181.     Notwithstanding section 362 of the Bankruptcy Code and the injunction in Article VIII.F of the Plan, after the Effective Date, the Texas Comptroller and its agents may commence an audit of the Debtors or the Reorganized Debtors, as applicable, in accordance with the Texas Unclaimed Property Laws (the "Texas Unclaimed Property Audit") and pursue recovery of any unremitted Texas Unclaimed Property identified pursuant to the Texas Unclaimed Property Audit.  To the extent reasonably practicable, the Debtors and the Reorganized Debtors shall fully cooperate with the Auditors to enable them to accurately and timely perform the Texas Unclaimed Property Audit by making the entities' employees, professionals, books, and records reasonably available during normal business hours.  Upon completion of the Texas Unclaimed Property Audit, the Texas Comptroller will promptly inform the Debtors or the Reorganized Debtors, as applicable, that such audit is complete.  The Debtors and Reorganized Debtors shall continue to comply with Texas Unclaimed Property Laws regarding retention of records.

182.     The Debtors', Reorganized Debtors' and Texas Comptroller's rights and defenses with respect to any allegations, pending matters, and/or claims asserted against the Debtors or Reorganized Debtors, as applicable, arising from or relating to the Texas Unclaimed Property Audit are hereby reserved and preserved, and Article IV.T of the Plan shall not apply to the Texas Comptroller or any Texas Unclaimed Property; *provided, however*, that upon agreement between the Debtors or the Reorganized Debtors and the Texas Comptroller or a final nonappealable determination by a court or other tribunal with jurisdiction as to the amount of unremitted Texas Unclaimed Property, if any, that is due in connection with the Texas Unclaimed Property Audit, the Debtors or the Reorganized Debtors shall turn over such unremitted Texas Unclaimed Property to the Texas Comptroller.

183.     The Texas Comptroller may amend any Proofs of Claim in these Chapter 11 Cases following the Effective Date as a result of the filing of any property reports or in the ordinary course of the Texas Unclaimed Property Audit.

184.     Nothing herein precludes Debtors and Reorganized Debtors from compliance with continued obligations pursuant to Texas Unclaimed Property Laws.

**TT.    Provisions Regarding the Commonwealth of Pennsylvania, Department of Environmental Protection.**

185.     On the Effective Date, the applicable Reorganized Debtors that are signatories to the following Consent Orders and Agreements ("COA") between Debtors and the Commonwealth of Pennsylvania, Department of Environmental Protection ("PA DEP") shall continue to be bound by their terms:

  a.     the COA executed on May 16, 2011, between PA DEP and Debtor CALLC relating to the Paradise Road, Sugar Run, and Vargson gas migration areas;

  b.     the COA executed on June 21, 2011, between PA DEP and Debtor CALLC relating to the Fitzsimmons wetland mitigation site;

  c.     the COA executed on December 12, 2016, between PA DEP and Debtor CALLC relating to the Lambert Farms 2H gas well (Permit Number 113-20016);

  d.     the COA executed on August 28, 2019, between PA DEP and Debtor CALLC relating to the Rexford 2H well (Permit Number 015-20871) and the Rexford 5H well (Permit Number 015-20865);

  e.     the COA executed on September 20, 2019 between PA DEP and Debtor CALLC relating to the Heartwood 1 well (Permit Number 083-53842), the Heartwood 2 well (Permit Number 083-53843), and the Heartwood 3H well (Permit Number 083-55327); and

  f.     the COA executed on December 7, 2020 between PA DEP and CALLC, relating to the Hess 1 well (015-20111) in Bradford County, the Arch Pot 5H well (105-21804) in Potter County, and the DGSM 5H well (015-21559) in Bradford County.

186.     On the Effective Date, the applicable Reorganized Debtors shall be bound by the obligations, if any, under the proceeding initiated by the Compliance Order issued by PA DEP on September 25, 2020, and appealed on October 23, 2020, relating to the DBC well pad in Beaver County.

187.     On the Effective Date, the applicable Reorganized Debtors shall be bound by the obligations, if any, under the proceeding initiated by the Administrative Order issued by PA DEP on May 22, 2020, amended on June 12, 2020, and appealed on June 17, 2020, directing Chesapeake Energy Corporation and CALLC, in part, to (a) submit and identify certain information pertaining to the well sites where there are potential permit and regulatory violations; (b) submit a Corrective Action Plan to correct all violations described in the Administrative Order; (c) implement the approved Corrective Action Plan; and (d) inspect and take return to compliance actions with regard to post construction stormwater management at the well sites.

## UU.     Provisions Regarding the Commonwealth of Pennsylvania, Department of Conservation and Natural Resources.

188.     The Debtors and certain of their affiliates are parties to two (2) oil and gas leases (collectively, the "PA DCNR Leases"), to which the Commonwealth of Pennsylvania Department of Conservation and Natural Resources ("PA DCNR") is a party.  The terms of this paragraph shall apply only to PA DCNR and the PA DCNR Leases.  Notwithstanding anything to the contrary in the Plan, Plan Supplement, or this Confirmation Order, this Confirmation Order shall not be, and shall not be construed as, a determination of the cure amount, if any, required to satisfy the provisions of sections 365(b)(1)(A) and 365(b)(1)(B) of the Bankruptcy Code for the assumption of the PA DCNR Leases.  The Debtors or Reorganized Debtors, as applicable, and PA DCNR shall endeavor in good faith to reach agreement as to any defaults of amounts owed under the PA DCNR Leases, including as set forth in Claim No. 4617, within one hundred and eighty (180) days

following the Effective Date. If the Debtors or Reorganized Debtors, as applicable, and PA DCNR fail to reach such agreement, either the Debtors or Reorganized Debtors, as applicable, or PA DCNR may, upon notice to the Debtors or Reorganized Debtors or PA DCNR, as applicable, request a hearing before the Bankruptcy Court for the determination thereof.  Otherwise, the Debtors or Reorganized Debtors, as applicable, and PA DCNR expressly reserve their respective rights regarding any contracts, leases, covenants, operating rights agreements or other interests or agreements between the Debtors or Reorganized Debtors, as applicable, and the PA DCNR, including but not limited to the PA DCNR Leases, which shall be paid, treated, determined, and administered in the ordinary course of business following the Effective Date in accordance with applicable bankruptcy and nonbankruptcy law.  Nothing in this Confirmation Order shall otherwise affect the financial assurance obligations of the Debtors, Reorganized Debtors, and/or the assignee(s) or transferee(s), as applicable, under the PA DCNR Leases and non-bankruptcy law. Notwithstanding anything to the contrary in the Plan, Plan Supplement, or this Confirmation Order, the PA DCNR will retain and have the right as provided in the PA DCNR Leases to audit/and or perform any compliance review of the PA DCNR Leases without those rights being adversely affected by these bankruptcy proceedings.

189.    Nothing in this Confirmation Order or the Plan discharges, releases, precludes, or enjoins: (i) any liability to the PA DCNR that is not a Claim; (ii) any Claim of the PA DCNR arising on or after the Confirmation Date; or (iii) any liability to PA DCNR on the part of any non-Debtor.

**VV.    Provisions Regarding Chubb.**

190.    Notwithstanding anything to the contrary in this Confirmation Order, the Disclosure Statement, the Plan, any Plan Supplement, the Restructuring Support Agreement, the Restructuring Term Sheet, any bar date notice or claim objection, any other document related to

any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction, discharge or release, confers Court jurisdiction or requires a party to opt out of any releases):

    a.    on the Effective Date the Reorganized Debtors shall be deemed to have assumed all expired and unexpired Insurance Policies that have been issued or entered into at any time by ACE American Insurance Company, Federal Insurance Company, ESIS, Inc., and/or each of their U.S.-based affiliates and successors (collectively, the "Chubb Companies") in their entirety pursuant to sections 105 and 365 of the Bankruptcy Code (the "Chubb Insurance Policies");

    b.    all Chubb Insurance Policies shall re-vest in the Reorganized Debtors, unaltered, other than that on and after the Effective Date, the Reorganized Debtors shall be liable for all debts, obligations, and liabilities of the Debtors (and, after the Effective Date, of the Reorganized Debtors) under the Chubb Insurance Policies, regardless of when such debts, obligations, and liabilities arise, without the need or requirement for any Chubb Company to file a Proof of Claim, an Administrative Claim, a Cure Claim or to object to any cure amount, and thereafter the Reorganized Debtors may, subject to the terms of the Chubb Insurance Policies and applicable non-bankruptcy law, resolve any Claims covered by the Chubb Insurance Policies, resolve any Causes of Action, if any, in connection with the Chubb Insurance Policies, and collect any and all outstanding deposits, restricted cash, and letters of credit, if any, related thereto;

    c.    nothing shall alter, modify, amend, affect, impair or prejudice the legal, equitable or contractual rights, obligations, and defenses of the Chubb Companies, the Debtors (or, after the Effective Date, the Reorganized Debtors), or any other individual or entity, as applicable, under any Chubb Insurance Policies; and

    d.    the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article VIII of the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Bankruptcy Court, solely to permit:  (I) claimants with valid workers' compensation claims or direct action claims against a Chubb Company under applicable non-bankruptcy law to proceed with their claims; (II) the Chubb Companies to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against any Chubb Company under applicable non-bankruptcy law, or an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (C) all costs in relation to each of the foregoing; and (III) the Insurers to cancel any Chubb Insurance

Policies, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the Chubb Insurance Policies.

## WW.   Provisions Regarding the Petty Entities.

191.    Notwithstanding any language to the contrary contained in the Plan, the Disclosure Statement, or this Confirmation Order, the postpetition royalty, revenue interests, and other obligations owing to the Petty Entities[6] in the leases between PBE as lessor and Chesapeake Exploration L.L.C. as lessee as well as any operating agreement between Chesapeake Exploration L.L.C. and/or Chesapeake Operating L.L.C. as operator and Petty Energy L.P. (the "Subject Oil and Gas Leases"), along with all liens, rights and other interests of the Petty Entities in and related thereto, will survive confirmation of the Plan, with the stipulation that the procedures established in paragraphs 192 through 194 of this Confirmation Order will govern the quantum and secured status of the prepetition claim of the Petty Entities.

192.    The Petty Entities' prepetition claims against the Debtors under the Subject Oil and Gas Leases will be determined both as to quantum and as to secured status by this Bankruptcy Court in the Adversary Proceeding entitled *Petty Business Enterprises, L.P. v. Chesapeake Exploration, L.L.C. (In re Chesapeake Energy Corporation),* pending in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Adversary"), along

---

[6]    Petty Business Enterprises, L.P. ("PBE"), Petty Energy L.P., Petty Grandchildren's 2007 Trust, Susan Petty Arnim 2009 Trust, Scott James Petty 2009 Trust, Joan L. Petty 2009 Trust, Scott James Petty, Joan L. Petty, Susan Petty Arnim, Petty Group LLP, Ferncliff Investments, L.P., Scott Petty, Jr. and Eleanor O. Petty, Susan and Thomas Arnim, Eleanor O. Petty, and The Petty Family Limited Partnership, LLP, Baptist Foundation of Texas, Reagan Tucker, III, Mary Tucker and Rodney Huff, Chad Huff, Heather Huff Boyle, Noel Petty Minerals, Ltd., Petty O&G Management, LLC, Dabney Noel Petty Trust, Laney Fuhrmann, individually and as Executrix of the Estate of Carl Fuhrmann, Jr, Charles Fuhrmann, Debra G. Newmann Fuhrmann, Richard Fuhrmann, F.G. Brown and Joan H. Brown Revocable Trust, F.G. Brown and Joan H. Brown, Co-Trustees, Nelta K. Hill, David Law, Gerry Law, Jr., and Olivia Kornelis are defined as the "Petty Entities," (each, a "Petty Entity") for purposes of this Confirmation Order.

with the Petty claims under the Subject Oil and Gas Leases against the non-Debtor defendants, which is scheduled for trial some time in February of 2021.

193.    Notwithstanding any language to the contrary contained in the Plan, the Disclosure Statement, or this Confirmation Order, in the event that this Bankruptcy Court rules in the Adversary (whether through settlement or through litigation) that any such prepetition claim of the Petty Entities or any individual Petty Entity against the Debtors is secured ("Allowed Secured Claim"), then such Allowed Secured Claim of such Petty Entity shall be treated as a Class 1 "Other Secured Claim" entitled to payment in full.  Such payment shall be satisfied *first*, with funds held in escrow for the benefit of the Petty Entities (the "Escrow Funds") and *second*, from the Debtors' or Reorganized Debtors' consolidated cash accounts, including but not limited to that certain Master Funding Account ending in account number 1568 with JP Morgan Chase Bank, N.A., of Chesapeake Energy Corporation.  Further, notwithstanding any language to the contrary contained in the Plan, the Disclosure Statement or this Confirmation Order, the Petty Entities do not release any or all of the non-Debtor defendants in the Adversary.

194.    On the Effective Date, the Debtors shall assume the executory contracts relating to the Petty Entities, including those executory contracts listed on Exhibit A of *Petty's Reservation of Rights and Limited Objection to the Debtors' Notice of Assumed Contracts, the Schedule in the Debtors' Plan Supplement, and Associated Cure Amounts* [Docket No. 2114] (the "Petty Contracts").  Notwithstanding anything in the Plan, Plan Supplement, or Confirmation Order to the contrary, the Plan and Confirmation Order shall not be, and shall not be construed as or deemed to be, a determination of the cure amount or compensation, if any required to satisfy the provisions of sections 365(b)(1)(A) and 365(b)(1)(B) of the Bankruptcy Code (the "Petty Cure Amount") for the assumption of the Petty Contracts.  To the extent that any amounts owed relating to the Petty

Contracts are not paid in the ordinary course of business, the Debtors or Reorganized Debtors, as applicable, and the Petty Entities shall endeavor in good faith to reach agreement as to the Petty Cure Amount within one hundred and eighty (180) days following the Effective Date and if such agreement is reached may, but need not, file a stipulation with the Bankruptcy Court setting forth the agreed Petty Cure Amount.  If the Reorganized Debtors and the Petty Entities fail to reach an agreement as to the Petty Cure Amount within such one hundred and eighty (180) day period, either the Reorganized Debtors or the Petty Entities may, upon notice to the Reorganized Debtors or the Petty Entities as applicable, request a hearing before the Bankruptcy Court for the determination of the Petty Cure Amount.  For purposes of determining the Petty Cure Amount, the effective date of assumption shall be the Effective Date. Nothing herein shall prejudice the Petty Entities' right to oppose assumption and/or assignment of any Executory Contracts between the Debtors and the Petty Entities, or the Debtors' or the Reorganized Debtors' right to add any Petty Contract to the list of rejected executory contracts if the Bankruptcy Court determines that the Petty Cure Amount is greater than the amount set forth in any applicable cure notice.  Nothing herein shall prejudice (a) the Petty Entities' right to assert an Administrative Claim for any postpetition obligation owed to the Petty Entities in accordance with applicable law, or (b) the Debtors' or the Reorganized Debtors' right to dispute such Claim.  To the extent that any Petty Contract is assumed, such assumption shall result in the release and satisfaction of only those Claims that are based on an actual default existing as of the Petition Date with respect to such assumed Petty Contract.  Otherwise, each of the Petty Entities, the Debtors, and the Reorganized Debtors expressly retain all of their rights and obligations under the Petty Contracts.

## XX.    Provisions Regarding Mitsui E&P USA LLC.

195.    Notwithstanding anything in this Confirmation Order or Article V.A of the Plan to the contrary, in connection with the assumption of contracts to which Mitsui E&P USA LLC or its

affiliates (collectively, "Mitsui") are a party, including, without limitation, any gas imbalance agreements or any other gas balancing arrangements under operating agreements between Mitsui and Chesapeake Appalachia LLC, all of the parties' rights relating to gas imbalances (including pursuant to which Mitsui might be an underproducing party) that have arisen or may arise under such agreements, including prior to the Petition Date, shall be preserved following the Effective Date.

**YY.    Provisions Regarding Chevron U.S.A. Inc.**

196.    Notwithstanding anything to the contrary in the Plan, this Confirmation Order, or any other order entered in these Chapter 11 Cases, the Debtors' agreements with Chevron U.S.A. Inc., its subsidiaries and/or its affiliates ("Chevron," and all the Debtors' agreements with Chevron, collectively, the "Chevron Agreements") shall be deemed assumed and affirmed upon the occurrence of the Effective Date.  The Debtors and Reorganized Debtors shall continue to have and perform the obligations, if any, under the Chevron Agreements in accordance with their terms.  Subject to Section 365(e) of the Bankruptcy Code in connection with these Chapter 11 Cases, all rights and claims of the parties under the Chevron Agreements are expressly preserved and nothing in, about or related to these Chapter 11 Cases (including but not limited to the Confirmation of the Plan and the entry of this Confirmation Order) shall prevent the parties from maintaining, asserting or pursuing any right, claim or defense against the other party arising under the Chevron Agreements (including but not limited to audit rights or claims arising from any audit).  Further, the Debtors may have obligations to Chevron for payment of royalty interests and payments of revenues related to various shared working interests.  All such obligations, if any, are unaffected and not impaired by the Plan, this Confirmation Order or any other order entered in these Chapter 11 Cases.  Notwithstanding anything to the contrary in the Plan, this Confirmation Order, or any other order entered in these Chapter 11 Cases, nothing in, about or related to these

Chapter 11 Cases (including, but not limited to, the confirmation of the Plan and entry of this Confirmation Order) releases any entity from any claim, defense or Cause of Action of Chevron. For the avoidance of doubt, Chevron is deemed to have opted out of the releases set forth in Article VIII.D of the Plan, and Chevron shall not be a "Released Party" or otherwise receive any benefits of the releases.

**ZZ.    Provisions Regarding Archrock Partners Operating LLC.**

197.    Notwithstanding anything contained in the Plan, the Plan Supplement, or this Confirmation Order to the contrary, the Archrock Contracts (as defined below) are assumed under the Plan, and the Debtors and Reorganized Debtors, as applicable, shall pay Archrock Partners Operating LLC ("Archrock") all postpetition and post-Effective Date amounts owed to Archrock in the ordinary course of business, pursuant to the following contracts, and further provide that if there is any dispute regarding such postpetition or post-Effective Date payments to Archrock, Archrock may file a proof of Administrative Claim with the Bankruptcy Court, and the rights of Archrock and the Debtors with respect to such proof of Administrative Claim and payments related thereto are reserved and preserved:

a.    *Master Compression Services Agreement* dated January 1, 2008, between Archrock (as successor in interest to Exterran, Inc., and Exterran Energy Solutions, L.P.) and Chesapeake Energy Company;

b.    *Amendment No. 1 to Master Compression Services Agreement* dated July 23, 2015, between Chesapeake Energy Company, properly known as Chesapeake Energy Corporation and Archrock, successor in interest to EXLP Operating LLC, as assignee of Exterran Energy Solutions, L.P.;

c.    *Novation and Amendment of the Master Compression Services Agreement* dated September 29, 2018, between Chesapeake Operating, L.L.C. and Archrock;

d.    *Scope of Work* agreement (Contract No. CW2254551) dated effective December 3, 2018, between Chesapeake Operating, L.L.C. and Archrock; and

e.      Seventy Seven (77) *Schedule "A"* pursuant to which Archrock provides compression services at 77 service locations (and together with "A" through "E", collectively, the "Archrock Contracts"). The seventy-seven (77) *Schedule "A"* are further detailed in Exhibit "A" to Archrock's limited objection filed at ECF No. 2097.

**AAA.  Provisions Regarding Liberty Mutual Insurance Company.**

198.    For the avoidance of doubt, all Insurance Policies issued by Liberty Mutual Insurance Company and any and all of its affiliates for the benefit of the Debtors will be deemed unexpired Insurance Policies as described in Article V.E of the Plan and shall be treated as such in accordance with Article V.E thereunder.

**BBB.  Provisions Regarding Madison Hendrix, Traci Hendrix, Norma Lyn Maldonado, Erika Beddingfield, Linda Milanovich, Justin Cobb, and Kristine Cobb (collectively, the "Plaintiffs").**

199.    Plaintiffs are parties to the lawsuits styled as follows: (i) *Madison Hendrix, Individually, and as the Personal Representative of the Estate of Brad Hendrix v. Chesapeake Energy Corporation, CC Forbes, LLC, Forbes Energy Services, L.L.C., Eagle PCO LLC, Wildhorse Resources Management Company, LLC*, Cause No. DC-20-06798; (ii) *Traci Hendrix, Individually and as Next of Kin to the Estate of Bradley Hendrix, Deceased v. Chesapeake Energy Corporation, Chesapeake Operating LLC, Forbes Energy Services Delaware LLC, C.C. Forbes, LLC, Forbes Energy Services Ltd., A&L Hot Oil Service, Inc., and SDS Petroleum Consultants, LLC,* Cause No. DC-20-06937;  (iii) *Norma Lyn Maldonado, Individually and As Representative of the Estate of Brian Amador Maldonado, Deceased v. Chesapeake Operating, L.L.C., Chesapeake Energy Corporation, SDS Petroleum Consultants, L.L.C., A&L Hot Oil Service, Inc., Eagle PCO, L.L.C., Forbes Energy Services, Ltd., C.C. Forbes, L.L.C.,* Cause No. DC-20-06809; (iv) *Erika Beddingfield, Individually and As Next Friend of M.B., a Minor, and As Representative of the Estate of Windell Beddingfield, Deceased, v. Chesapeake Energy Corporation, Chesapeake Operating, L.L.C., Forbes Energy Services, Ltd., C.C. Forbes, L.L.C., Forbes Services, LLC, A&L*

*Hot Oil Service, Inc., and SDS Petroleum Consultants, LLC,* Cause No. DC-20-07024; and

(v) *Linda Milanovich, Justin Cobb, Individually and as Next Friend of M.C. and R.C., Minors, and Kristine Cobb, Individually and as Next Friend of K.C. and M.C.*, *Minors v. Chesapeake Energy Corporation, et al.*, Cause No. DC-20-06977 (collectively, the "Pending Claims").

200.    Notwithstanding anything to the contrary in either the Plan, the Plan Supplement, this Confirmation Order, or any other order of the Bankruptcy Court, beginning January 4, 2021, nothing shall stay, enjoin, modify or impair Plaintiffs' respective rights to pursue the MDL Proceeding (defined below) and the Pending Claims to final judgment, including any appeals and to collect from the proceeds of any available insurance policies on any judgment rendered; *provided, however*, that any recovery on the Pending Claims will be enforceable only (i) against proceeds of any applicable insurance policies and, if necessary, Plaintiffs may take legal action against the insurance companies which have issued the policies to obtain the policy proceeds and/or enforce the rights of the Debtors against the insurance companies issuing the policies; or (ii) as an unsecured prepetition claim against the Debtors subject the provisions of the Plan. Plaintiffs' respective Proofs of Claim shall be allowed in an amount equal to the amount of any final, non-appealable judgment in the above-referenced cases or settlement resolving the claims, less the amount of proceeds of the policies received by the Plaintiffs on account of such judgment or settlement, if any.  Plaintiffs are each hereby granted relief from the automatic stay imposed under section 362 by the Bankruptcy Code to pursue the claims and causes of action described in this paragraph as well as to pursue the joint motion filed by Plaintiffs and Chesapeake Energy Corporation, Chesapeake Operating, LLC to transfer the Texas actions, along with certain other actions, to a single pretrial court for coordinated pretrial proceedings in the action styled as styled In re Wendland Well Cases, pending with the Supreme Court of Texas Judicial Panel on

Multidistrict Litigation No. 20-0286 (the "MDL Proceeding").  Each of the Plaintiffs hereby opts out of the Third-Party Release provided under Section VII.D of the Plan.

201.    For the avoidance of doubt, nothing in the Plan, the Plan Supplement, or this Confirmation Order, including specifically section VI.K.2 of the Plan, shall, with respect to the Pending Claims, give any insurance carrier any defense as to coverage that does not otherwise exist under applicable non-bankruptcy law, and no such carrier may rely on the Plan, Plan Supplement, or this Confirmation Order to assert any defense or avoidance of any coverage of the Pending Claims.

**CCC.  Provisions Regarding Repsol Oil & Gas USA, LLC**

202.    Notwithstanding anything to the contrary in the Plan, this Confirmation Order, any other order of the Bankruptcy Court entered on or before the Effective Date or any other applicable law, the following provisions shall apply to the Debtors' relations with Repsol Oil & Gas USA, LLC and its affiliates  (collectively, "Repsol"):

a.    The Debtors and Repsol are co-tenants and/or parties to certain joint operating agreements and other related agreements with respect to certain natural resources operations  (collectively, the "Repsol Agreements").  The terms of this paragraph shall apply only to Repsol and the Repsol Agreements.  Within thirty (30) days of the entry of this Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, agree to provide Repsol with an accounting (the "Repsol Accounting") for unpaid royalties or other amounts, if any, due under the Repsol Agreements, which accounting shall, *inter alia*, provide Repsol with sufficient information in order to determine the appropriate balance, if any, of any Claim or Administrative Claim Filed by Repsol.  Repsol shall have thirty (30) days following the receipt of the Repsol Accounting to amend any Claims and to file Administrative Claims in relation to the Repsol Agreements. The Debtors agree that the assumption of the Repsol Agreements in accordance with the Plan or other order of this Bankruptcy Court shall be subject to the requirement that Debtors' or the Reorganized Debtors', as applicable, provide the Repsol Accounting.  The Plan, this Confirmation Order or any related order shall not be, and shall not be construed as, a determination of the cure amount, if any, required to satisfy section 365(b)(1) of the Bankruptcy Code for the assumption of any Repsol Agreements and all parties reserve all rights with respect to the calculation

of any cure amount(s) owed to Repsol with respect to the Repsol Agreements. The parties agree the cure amount with respect to any of the assumed Repsol Agreements shall be as agreed to by the parties or pursuant to further Order of Court if no agreement can be reached. To the extent the Repsol Accounting is not provided on an timely basis as set forth above, Repsol shall be entitled to seek an extension of any deadline for amending any timely filed Proofs of Claims or filing or amending any Administrative Claims and such extension of time can be pursuant to an agreement between Repsol and any of the Debtors or Reorganized Debtors without the need for further approval by the Bankruptcy Court.

b.   Subject to Section 365(e) of the Bankruptcy Code in connection with these Chapter 11 Cases, all rights, claims, interests, and defenses of the parties under the Repsol Agreements are expressly reserved and nothing in, about or related to these Chapter 11 Cases (including but not limited to the Confirmation of the Plan and the entry of this Confirmation Order) shall prevent the parties from maintaining, asserting or pursuing any right, claim, interest, or defense against the other party arising under the Repsol Agreements, including any disputes over title ownership to property related to the Repsol Agreements.

**DDD.  Provisions Regarding the Graves Peeler Heirs.**

203.   Notwithstanding anything in the Plan to the contrary, the Plan does not dispose of the following interpleader proceeding initiated by Chesapeake Operating, L.L.C. and Chesapeake Exploration, L.L.C., which is now pending in the 343rd Judicial District Court, McMullen County, Texas:   *Chesapeake Operating, L.L.C. et al. v. 7PL Minerals Ltd., et al.*, Cause No. M-17-008-CV-C  (the "Interpleader Action").[7]   The rights of the parties to the Interpleader Action with regard to ownership, division, and allocation of the registry proceeds at issue in the Interpleader Action are reserved, and such registry proceeds will be distributed in accordance with a final, non-appealable order issued in the Interpleader Action or a final settlement agreement signed by all parties to the Interpleader Action.  The Debtors and twenty-one royalty owners (the "Graves Peeler Heirs") party to the Interpleader Action agree that (a) (i) any claims

---

[7]   Consolidated with *Armadillo E&P, Inc. et al. v. Shannon Dylan Pearcy, Trustee of the Shannon Family Trust, et al.*, Cause No. M-17-0034-CV-B in the 156th Judicial District Court, McMullen County, Texas.

filed in these cases by the Graves Peeler Heirs[8] will be satisfied solely from funds deposited in the Bankruptcy Court registry, (ii) the Graves Peeler Heirs will not seek to recover any other or additional amounts from the Debtors or the Reorganized Debtors, as applicable, and (iii) any Proofs of Claims filed by the Graves Peeler Heirs shall be deemed disallowed and expunged from the claims registrar upon entry of this Confirmation Order; and (b) the Debtors will not seek to recover for their estates the registry proceeds at issue in the Interpleader Action in a manner inconsistent with a final, non-appealable order issued in the Interpleader Action or a final settlement agreement signed by all parties to the Interpleader Action.

**EEE.  Provisions Regarding Targa Pipeline Mid-Continent WestOK LLC.**

204.    The Debtors and certain of their affiliates are parties to certain executory contracts (collectively, the "Targa Agreements"), to which the Targa Pipeline Mid-Continent WestOK LLC ("Targa") is a party.  Nothing in this Confirmation Order, the Plan, or the Plan Supplement shall prejudice or impact the rights of Targa to seek indemnification from Debtors for any postpetition claim for which Debtors may be obligated to provide indemnification pursuant to any Targa Agreements that the Debtors assume (the "Targa Indemnification Rights").  All rights, interests, claims, defenses, objections, and remedies of the Debtors and Targa in relation to the Targa Indemnification Rights are reserved.

**FFF.  Provisions Regarding Credit Agricole.**

205.    All letters of credit issued by Credit Agricole Corporate and Investment Bank ("Credit Agricole") pursuant to the Revolving Credit Facility Credit Agreement that are outstanding and not cash collateralized prior to the Effective Date shall be (i) replaced by new letters of credit issued on the Effective Date under the Exit RBL Facility, (ii) backstopped with

---

[8]    The following Proofs of Claim have been filed in the chapter 11 case of Chesapeake Exploration, L.L.C.:  Claim Nos. 12692, 12695, 12697, 12698, 12700 – 12706, 12708 – 12711, 12713 – 12718.

another letter of credit issued on the Effective Date under the RBL Exit Facility, or (iii) cash collateralized on the Effective Date pursuant to, with respect to clauses (ii) and (iii), customary, bilateral arrangements and documentation entered into by the applicable Debtors and acceptable to the issuer of such letters of credit.

**GGG. Provisions Regarding Marathon Oil Company.**

206.     The Debtors and certain of their affiliates are parties to certain executory contracts (collectively, the "Marathon Agreements"), to which Marathon Oil Company (together with any affiliates, "Marathon") is a party.  Notwithstanding anything in the Plan, the Plan Supplement, or this Confirmation Order to the contrary, the Plan and this Confirmation Order shall not be, and shall not be construed as or deemed to be, a determination of the cure amount, if any, required to satisfy the provisions of sections 365(b)(1)(A) and 365(b)(1)(B) of the Bankruptcy Code with respect to the assumption of the Marathon Agreements (the "Marathon Cure Amount").  The Debtors or Reorganized Debtors, as applicable, and Marathon shall endeavor in good faith to reach agreement as to the Marathon Cure Amount within one hundred and eighty (180) days following the Effective Date. If the Debtors or Reorganized Debtors, as applicable, and Marathon fail to reach an agreement as to the Marathon Cure Amount within such one hundred and eighty (180) day period, either the Debtors or Reorganized Debtors, as applicable, or Marathon may, upon notice to the Debtors or Reorganized Debtors or Marathon, as applicable, request a hearing before the Bankruptcy Court for the determination of the Marathon Cure Amount.

207.     For purposes of determining the Marathon Cure Amount, the effective date of assumption shall be the Effective Date. Nothing herein shall prejudice Marathon's right to oppose assumption and/or assignment of any Executory Contracts between the Debtors and Marathon, or the Debtors' or the Reorganized Debtors' right to add any Marathon Agreements to the Rejected Executory Contracts and Unexpired Leases Schedule if the Bankruptcy Court determines that the

Marathon Cure Amount is greater than the amount set forth in the Plan Supplement.  Nothing herein shall prejudice (a) Marathon's right to assert an Administrative Claim for, *inter alia*, any postpetition obligation owed to Marathon in accordance with applicable law, or (b) the Debtors' or the Reorganized Debtors' right dispute such Claim.  To the extent that any Marathon Agreement is assumed, such assumption shall result in the release and satisfaction of all prepetition Claims arising under the Marathon Agreement.  Otherwise, Marathon expressly retains all of its rights under the Marathon Agreements.

208.    Notwithstanding anything in the Plan, the Plan Supplement, or this Confirmation Order to the contrary, the Plan and this Confirmation Order shall not alter (a) the character of Marathon's mineral interests or proceeds related thereto under applicable nonbankruptcy law, or (b) any of Marathon's statutory liens, consensual liens, defenses, rights of setoff or recoupment to the extent such rights exist under the Marathon Agreements or applicable law.  Marathon shall be deemed to opt-out of the Third-Party Release.

**HHH. Provisions Regarding EOG Resources, Inc.**

209.    The Debtors and certain of their affiliates are parties to certain executory contracts (collectively, the "EOG Agreements"), to which EOG Resources, Inc. (together with any affiliates, "EOG") is a party.  Notwithstanding anything in the Plan, the Plan Supplement, or this Confirmation Order to the contrary, the Plan and this Confirmation Order shall not be, and shall not be construed as or deemed to be, a determination of the cure amount, if any, required to satisfy the provisions of sections 365(b)(1)(A) and 365(b)(1)(B) of the Bankruptcy Code with respect to the assumption of the EOG Agreements (the "EOG Cure Amount").  The Debtors or Reorganized Debtors, as applicable, and EOG shall endeavor in good faith to reach agreement as to the EOG Cure Amount within one hundred and eighty (180) days following the Effective Date. If the Debtors or Reorganized Debtors, as applicable, and EOG fail to reach an agreement as to the EOG

Cure Amount within such one hundred and eighty (180) day period, either the Debtors or Reorganized Debtors, as applicable, or EOG may, upon notice to the Debtors or Reorganized Debtors or EOG, as applicable, request a hearing before the Bankruptcy Court for the determination of the EOG Cure Amount.

210.    For purposes of determining the EOG Cure Amount, the effective date of assumption shall be the Effective Date. Nothing herein shall prejudice EOG's right to oppose assumption and/or assignment of any Executory Contracts between the Debtors and EOG, or the Debtors' or the Reorganized Debtors' right to add any EOG Agreements to the Rejected Executory Contracts and Unexpired Leases Schedule if the Bankruptcy Court determines that the EOG Cure Amount is greater than the amount set forth in the Plan Supplement.  Nothing herein shall prejudice (a) EOG's right to assert an Administrative Claim for, *inter alia*, any postpetition obligation owed to EOG in accordance with applicable law, or (b) the Debtors' or the Reorganized Debtors' right dispute such Claim.  To the extent that any EOG Agreement is assumed, such assumption shall result in the release and satisfaction of all prepetition Claims arising under the EOG Agreement. Otherwise, EOG expressly retains all of its rights under the EOG Agreements.

211.    Notwithstanding anything in the Plan, the Plan Supplement, or this Confirmation Order to the contrary, the Plan and this Confirmation Order shall not alter (a) the character of EOG's mineral interests or proceeds related thereto under applicable nonbankruptcy law, or (b) any of EOG's statutory liens, consensual liens, defenses, rights of setoff or recoupment to the extent such rights exist under the EOG Agreements or applicable law.  EOG shall be deemed to opt-out of the Third-Party Release.

## III.    Provisions Regarding Eric Petroleum Corporation and Eric Petroleum Utica, LLC.

212.    Notwithstanding anything to the contrary in the Plan or this Confirmation Order, confirmation of the Plan shall not operate as an injunction or stay with respect to the non-monetary

relief sought by Eric Petroleum Corporation and Eric Petroleum Utica, LLC in the lawsuit that is pending in the Court of Common Pleas of Columbiana County, Ohio, docketed as Case No. 2019-CV-536 (the "Ohio Litigation"), or in any related proceeding or appeal involving the Asset Sale Agreement that is the subject of the Ohio Litigation, including Case No. 2020 CO 0020 currently pending before the Court of Appeals of Ohio, Seventh Appellate District.  Furthermore, nothing in the Plan or this Confirmation Order shall operate as a stay or injunction to prevent Eric Petroleum Corporation and Eric Petroleum Utica, LLC from pursuing any and all relief to which they may be entitled in the Ohio Litigation against all non-Debtor parties.  For the avoidance of doubt, to the extent that Eric Petroleum Corporation and Eric Petroleum Utica, LLC have monetary claims against the Debtors, including those asserted in the Ohio Litigation, those will remain subject to the Plan and will be resolved as part of the Claims resolution process.

**JJJ.    Provisions Regarding BPX Operating Company.**

213.    Notwithstanding anything in the Plan to the contrary, the Plan does not dispose of the following concursus proceedings initiated by BPX Operating Company and its affiliates, which are now pending in the State of Louisiana:

    a.    *BHP Billiton Petroleum Properties (N.A.), L.P., et al. v. Rives Plantation, LLC, et al.*, No. 583940-A, First Judicial District Court, Caddo Parish, LA;

    b.    *BHP Billiton Petroleum Properties (N.A.), L.P., et al. v. Small Fry, LLC, et al.*, No. 585984-C, First Judicial District Court, Caddo Parish, LA;

    c.    *BHP Billiton Petroleum Properties (N.A.), L.P., et al. v. Hassell Investments, LLC, et al.*, No. 148,080-A, 26th Judicial District Court, Bossier Parish, LA;

    d.    *BHP Billiton Petroleum Properties (N.A), L.P., et al. v. Hosier Properties, LLC, et al.*, No. 587,839-A, First Judicial District Court, Caddo Parish, LA;

    e.    *BHP Billiton Petroleum Properties (N.A.), L.P., et al. v. Caspiana Minerals, LLC, et al.*, No. 156336, 26th Judicial District Court, Bossier Parish, LA; and

       f.     *BPX Properties (N.A.), L.P., et al. v. Moss and Magnolia, LLC, et al.*, No. 161900, 26th Judicial District Court, Bossier Parish, LA (the "<u>BPX Concursus Cases</u>").

214.    The rights of the Reorganized Debtors, Debtors, and other parties in the BPX Concursus Cases with regard to ownership, division and allocation of the registry proceeds at issue in the BPX Concursus Cases are reserved, pending the resolution and disposition of those cases.  Debtors consent to the withdrawal of the following Proofs of Claim filed by various parties (the "<u>BPX Registry Claimants</u>") regarding the registry proceeds in the BPX Concursus Cases: Proofs of Claim nos. 26, 28, 29, 30 and 31 in the bankruptcy case of Chesapeake Louisiana, LP (No. 20-33242), and Proofs of Claim Nos. 99, 101, 102, 105 and 106 in the bankruptcy case of Chesapeake Operating, LLC (No. 20-33249).  To the extent said Proofs of Claim are not withdrawn prior to confirmation, they shall be disallowed as moot and expunged from the claims registrar upon entry of this Confirmation Order.  Any rights asserted by the BPX Registry Claimants as to the registry proceeds in the BPX Concursus Cases are referred to said cases, subject to resolution and disposition therein.

**KKK. Provisions Regarding Atomic et al. Objectors.**

215.    Notwithstanding anything to the contrary in the Plan or this Confirmation Order, neither the Plan nor this Confirmation Order shall modify the rights or remedies of Atomic Capital Minerals, LLC, ACM Fund II, LLC, 2005 Seminar Complex LP, Robert Aiello, Linton Road Company, LLC, or West Shreve Land Co., LLC (collectively, the "<u>Atomic et al. Objectors</u>") under their respective mineral leases as against Chesapeake Operating, L.L.C., Chesapeake Louisiana, LP or any third parties, including any audit, termination, escrow rights or rights to seek royalty payment; *provided* that any prepetition amounts to payment arising from the applicable mineral leases shall be treated as Claims in accordance with the Plan and postpetition, pre-Effective Date rights to payment arising on account of such mineral leases due, or that will become due shall be

treated as Administrative Claims. The Atomic et al. Objectors will be deemed to opt out of the releases set forth in the Plan, and shall not be Releasing Parties thereunder.

**LLL.   Provisions Regarding Cactus Wellhead, LLC.**

216.   Notwithstanding anything to the contrary in the Plan, the Plan Supplement, or this Confirmation Order, any amounts due and owing by the Debtors to Cactus Wellhead, LLC ("Cactus") for services provided after the Petition Date shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, and Cactus reserves all rights to assert an Administrative Claim related thereto.

**MMM.        Provision Regarding CoVal-BRP.**

217.   Notwithstanding anything to the contrary in the Plan or this Confirmation Order, the Plan shall not operate as an injunction with respect to the non-monetary relief sought by Coval Leasing Co. L.L.C. ("CoVal"), BRP, LLC (together with CoVal, "CoVal-BRP"), or the Debtors in the pending state court litigation styled *Coval Leasing Company L.L.C. et al. v. Chesapeake Louisiana, LP, Chesapeake Operating, L.L.C., Empress Louisiana Properties, LP, and EMLP, L.L.C.*, Cause No. 81354-A, 42nd Judicial District Court, DeSoto Parish, Louisiana (the "LA State Court Litigation"). Monetary claims or awards in favor of the CoVal-BRP for prepetition amounts are waived. Monetary claims or awards in favor of the CoVal-BRP arising from the LA State Court Litigation for postpetition but pre-Effective Date amounts, if any, shall be subject to the procedures set forth in the Plan for Administrative Claims. The Debtors reserve all rights to remove the LA State Court Litigation to federal court, and CoVal-BRP reserve all arguments regarding removal and remand.

**NNN.   Provision Regarding USA Compression Partners, LLC.**

218.   Notwithstanding anything to the contrary in the Plan or this Confirmation Order, the Debtors shall perform their postpetition obligations under all contracts (the "USAC Contracts")

110

with USA Compression Partners, LLC and its affiliates (collectively, "USAC") in the ordinary course of business; *provided* that the Debtors and USAC reserve their respective rights and defenses regarding the USAC Contracts and such rights and defenses are unaffected by the Plan.

**OOO.  Provision Regarding PMBG Client Group.**

219.    Notwithstanding anything contained in this Confirmation Order or the Plan to the contrary, the terms, conditions, provisions, rights, and privileges set forth in the oil and gas leases between any PMBG Client Group[9] member and any Debtor, inclusive of any predecessor in interest thereto, (the "PMBG Leases"), together with all applicable statutory authorities, shall be unaffected by any provision of the Plan, except as it relates to the payment, release, and discharge of the Claims (if any) of any member of the PMBG Client Group.  Specifically, the extent, validity, and priority of the Allowed Claim, if any, of each member of the PMBG Client Group shall be determined either by the agreement of the applicable PMBG Client Group member and the applicable Debtor or by final non-appealable order of the Bankruptcy Court.  All Allowed Claims of the PMBG Client Group determined to be Secured shall be paid in full in Cash within seven

---

[9]     (i) Kelly Vesper, individually, and as Trustee of the Kelly Vesper Heritage Trust, and as Executrix of the Estate of John B. Vesper, Deceased and as Executrix of the Estate of Leslie T. Vesper, Deceased; (ii) Gates Mineral Company, Ltd., Gates Production Company EF, LLC, Donald G. Elliott, Jannifer M. Elliott, David B. Elliott, Richard J. Gates, Linda A. Pederson, Louise G. Davis, Thomas A. Gates, Terri S. Gates, and Kevin Kennedy, Guardian of the Estate and Person of Laura I. Gates; (iii) Leojua Ltd.; (iv) Blackstone Dilworth, Frances Diane Dilworth Gates, Joya Minerals, LP, Anthony Aguilar, Horacio Saenz, David Ortiz, Paul Dirks, Executor of the Estate of Frances Dilworth, deceased, Joseph Blackstone Dilworth, III, Thomas A. Gates, Jr., Louise Dilworth Davis, Trustee of the Louise Dilworth Davis 2006 Trust, Frost Bank, Trustee for the J.C. Dilworth, III, Generation Skipping Trust for the benefit of Eric Davis, Frost Bank, Trustee for the J.C. Dilworth, III, Generation Skipping Trust for the benefit of Daniel Davis, Frost Bank, Trustee for the J.C. Dilworth, III, Generation Skipping Trust for the benefit of Serena Davis, Frost Bank, Trustee for the J.C. Dilworth, III, Generation Skipping Trust for the benefit of Michelle Davis; (v) MBF Holdings La Salle LP, formerly MBF Partnership; (vi) Dan W. Kinsel III, individually, and as Trustee of the 2009 Dan and Leslie Kinsel Children's Trust, Leslie Kinsel, individually, and Karl Gene Kinsel, Individually, and as Trustee of the 2009 Karl Gene Kinsel Child's Trust; (vii) Leighton Arthur Wier, Ronald Hargis Wier, Vicki Grace Gilbert, Max Harris Wier III, Sims Family Limited Partnership, Elizabeth Sims Hufft, Terry Lewis as Executor of the Estate of Diana Rose Sims Lewis, deceased, and James Edward Sheldon individually and as Executor of the Estate of Kay L. Sheldon (a.k.a. Catherine Lilley Sheldon), deceased; (viii) Gabriela N. Gallagher, Robert A. Haynes, Ralph A. Wright, Maria Del Rosario Hickle, James Adrian Jones, Thomas R. Sheppard, Jr., Todd Whalen, Tracy J. Power, Peter R. Villarreal, Jr., Trustees of the Haynes Mineral Trust; (ix) Talbert Operations, LLC; and (x) TB Harris Minerals, LP; and their successors or assigns.

KE 71402552

business days of entry of a final non-appealable order allowing the Claim.[10]  All funds escrowed

prepetition in favor of any PMBG Client Group member shall remain escrowed for the benefit of

such PMBG Client Group member and shall be used to satisfy such Allowed Claim, whether

Secured or unsecured, prior to the reversion of such funds, if any, to the applicable Debtor.  Except

for those PMBG Client Group members whose Allowed Claims will first be satisfied with

prepetition escrows, all unsatisfied Claims of the PMBG Client Group determined to be

"unsecured" shall be treated as General Unsecured Claims and be paid their *pro rata* share of the

Unsecured Claims Recovery in accordance with the Plan.  For the avoidance of doubt, the

discharge set forth in the Plan and this Confirmation Order shall not limit the PMBG Client

Group's right to recover on behalf of their Allowed Claims, if any, in accordance with the Plan as

modified by the terms of this paragraph.

220.    All Claims of the PMBG Client Group for non-monetary relief, including depth and

acreage releases under the terms of the PMBG Leases, whether arising prepetition or post-petition

but pre-Effective Date, shall be treated in accordance with the terms of the applicable PMBG Lease

and Texas law in the ordinary course of business.  The resolution of any dispute regarding

performance (including depth and acreage releases) under the terms of the PMBG Leases between

any PMBG Client Group member and any Chesapeake Debtor (whether as direct counterparty or

assignee) shall be resolved in accordance with the terms and conditions of the applicable PMBG

Lease in the venue provided for in the applicable PMBG Lease or, as appropriate, applicable Texas

law. Notwithstanding anything to the contrary in this Confirmation Order or the Plan, the Debtors,

---

[10]    The payment of the Allowed Secured Claim of a PMBG Client Group member shall be from whatever source within the Debtors and Reorganized Debtors' funds including, but not limited to the consolidated Cash accounts of the Debtors and Reorganized Debtors.

the Reorganized Debtors, and the PMBG Client Group each reserve all claims, rights, and defenses with respect to the PMBG Leases and all ancillary documents, except as provided herein.

221.    The PMBG Client Group shall be deemed to have opted out of the Third-Party Release contained in Article VIII.D of the Plan and expressly reserves the right to pursue the enforcement of their rights under the PMBG Leases against such third parties.

**PPP.    Provision Regarding Core Laboratories LP.**

222.    Notwithstanding anything in any Plan, Disclosure Statement, Plan Supplement, Schedule of Assumed Executory Contracts and Unexpired Leases, Schedule of Rejected Executory Contracts and Unexpired Leases, this Confirmation Order or otherwise, and in resolution of the objection to confirmation [Docket No. 2413] (the "Core Lab Objection") filed by Core Laboratories LP ("Core Lab"): (i) to the extent the Data License Agreement dated June 14, 2019, as well as any and all supplements, supplemental agreements, addenda, product schedules, purchase orders, amendments, and related agreements connected therewith (the "Core Lab Agreement") are deemed rejected by the Debtors pursuant to the Plan as of the Effective Date thereof, the rights of the Debtors or Reorganized Debtors, as applicable, and Core Lab regarding the rejection of the Core Lab Agreement with respect to any confidentiality provisions and retention or the return, destruction and redaction of the data provided thereunder are fully preserved; and (ii) Core Lab is not a "Releasing Party" as defined by the Plan and is not bound by such releases.

**QQQ.    Provision Regarding Louisiana Department of Revenue.**

223.    Notwithstanding any provision of the Plan or this Confirmation Order: (a) the Louisiana Department of Revenue (the "LDR") shall not be required to file any request for payment of an Administrative Claim with respect to liabilities described in 11 U.S.C. §§ 503(b)(1)(B) and 503(b)(1)(C) as a condition for payment as an administrative expense

pursuant to § 503(b)(1)(D) of the Bankruptcy Code; (b) the LDR shall be deemed to have opted out of Third-Party Releases in the Plan and shall not be a "Releasing Party" pursuant to the Plan; (c) any Allowed Unsecured Priority Claim of the LDR shall be paid in cash of its total value as provided for in 11 U.S.C. § 1129(a)(9)(C), including interest, if any, at the rate required by 11 U.S.C. § 511; (d) to the extent Allowed Unsecured Priority Claim of the LDR, if any, are not paid in full in cash on the Effective Date, such Allowed Unsecured Priority Tax Claims shall, at minimum, be paid by regular, quarterly installment payments (to commence on the first day of the first calendar quarter following the Effective Date) in cash (including applicable interest) over a period not to exceed five years from the Petition Date, and for the avoidance of doubt, Article VI.G of the Plan shall not apply to the LDR; (e) in no event shall timely filed claim of the LDR be disallowed and/or expunged except in accordance with a properly filed and noticed objection to such claims with an opportunity to respond and be heard on such objection, and for the avoidance of doubt, Article VII.D of the Plan shall not apply to the LDR; (f) the rights of the LDR, if any, to exercise any right of setoff or recoupment permitted under Louisiana law and the Bankruptcy Code remains unaffected by the Plan, and the Debtors' or Reorganized Debtors' defenses thereto are expressly preserved; (g) nothing in the Plan or this Confirmation Order shall excuse the Debtors or Reorganized Debtors, as applicable, from any obligation under applicable Louisiana state law to timely submit returns (including, for the avoidance of doubt, any delinquent returns) which returns shall be filed by the later of, unless otherwise agreed by LDR in writing (email being sufficient), (i) 120 days after the Effective Date or (ii) the applicable due date under Louisiana law and remit payment of taxes in the ordinary course of business; (h) for the avoidance of doubt, Article VI.B.4 of the Plan shall not apply to the LDR; and (i) to the extent the Debtors or Reorganized Debtors have any Retained Causes of Action as provided in Exhibit 5 to the Plan

Supplement related to the LDR, nothing in this Confirmation Order or the Plan shall restrict, abridge, or otherwise limit the LDR's rights or defenses in connection with such Retained Cause of Action.

**RRR.  Provision Regarding Murphy Exploration & Production Company-USA.**

224.    Notwithstanding anything in the Plan, Plan Supplement, or this Confirmation Order to the contrary, the Plan and this Confirmation Order shall not be, and shall not be construed as or deemed to be, a determination of the cure amount or compensation or adequate protection (collectively, the "Murphy Cure Amount"), if any, required to satisfy the provisions of sections 365(b)(1)(A)–(C) of the Bankruptcy Code for the assumption of any executory contract (collectively, the "Murphy Contracts") relating to Murphy Exploration & Production Company-USA (together with any affiliates, collectively, "Murphy").  If the Debtors elect to assume certain Murphy Contracts, the Debtors or Reorganized Debtors, as applicable, shall remain responsible for all obligations and liabilities of the Debtors arising under such assumed Murphy Contracts, including but not limited to all obligations pertaining to joint account(s) under any joint operating agreement(s).  No such obligation or liability arising under such assumed Murphy Contracts shall be limited, diminished, or discharged by the Plan and/or this Confirmation Order.  Furthermore, notwithstanding anything in the Plan, Plan Supplement, or this Confirmation Order to the contrary, the Plan and this Confirmation Order shall not alter (a) the character of Murphy's mineral interests or proceeds related thereto under applicable nonbankruptcy law, or (b) any of Murphy's liens, rights of setoff or recoupment to the extent such rights secure an assumed Murphy Contract.

**SSS.   Provision Regarding CNOOC Energy U.S.A. LLC f/k/a OOGC America LLC.**

225.    All the Debtors' current executory contracts with CNOOC Energy U.S.A. LLC f/k/a OOGC America LLC ("CEU") (collectively, the "CEU Agreements") shall be deemed

assumed and affirmed upon the occurrence of the Effective Date, and the Debtors and Reorganized Debtors, as applicable, shall continue to have and perform the obligations, if any, under the CEU Agreements in accordance with their terms.  Nothing in the Plan, Plan Supplement, this Confirmation Order, or any other order entered in these Chapter 11 Cases, the Plan and Confirmation Order determines the cure amount or compensation, if any, required to satisfy the provisions of sections 365(b)(1)(A) and 365(b)(1)(B) of the Bankruptcy Code (the "CEU Cure Amount") for the assumption of the CEU Agreements (the "Assumed CEU Agreements"). CEU, the Debtors, and Reorganized Debtors, as applicable, expressly retain any right, claim or defense against the other party arising under the Assumed CEU Agreements (including but not limited to audit rights or claims arising from any audit).  The Debtors' identification of any agreement with CEU in its Assumed Executory Contracts and Unexpired Schedule is not binding upon CEU and CEU fully preserves its rights to contest or object that any agreement identified by the Debtors is not executory, no longer in existence or binding on the parties, and the Debtors reserve their rights to contest otherwise, if applicable.

**TTT.   Provisions Regarding Karnes Electric Cooperative.**

226.    Certain of the Debtors and Karnes Electric Cooperative ("Karnes") are parties to certain utility contracts ("Karnes Agreements"), to which Crédit Agricole Corporate and Investment Bank issued an irrevocable transferable standby letter of credit (the "Existing Letter of Credit") for the benefit of Karnes to secure Karnes' provision of utility services.  Debtors sought to replace the Existing Letter of Credit with a new letter of credit (the "Replacement Letter of Credit") to be issued by one of the Debtors' DIP Lenders, and with an agreed upon augmentation of the amount of the adequate protection account for Karnes under the *Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, of Discontinuing Services, (III) Approving the Debtors'*

*Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief* [Docket No. 143].

227.     Notwithstanding anything to the contrary in the Plan, the Plan Supplement, or this Confirmation Order, the Replacement Letter of Credit to be issued in favor of Karnes and (a) the obligations of the Debtors and of the issuer of the Replacement Letter of Credit, as applicable, arising from the Replacement Letter of Credit and any documentation related thereto and (b) the rights of the Debtors and Karnes, as applicable, pursuant to the Replacement Letter of Credit and any documentation related thereto, and the rights of Karnes with respect to the augmented adequate protection account and with respect to the security deposits previously deposited by Debtor(s), will not be released or impaired by or under the Plan, any amendment or supplement to the Plan, or any other provision of this Confirmation Order.

**UUU.  Provisions Regarding Seismic Licensors.**

228.     Nothing in the Plan, this Confirmation Order, any Plan Supplement, any Cure Notice, or corresponding documents shall or shall be construed to: (i) modify or nullify any provision of any master license agreement and/or supplemental or other agreement (collectively, the "Seismic Agreements") related to seismic, geological or geophysical data, derivatives, or interpretations thereof, or intellectual property (the "Materials") between Seitel,[11] the WesternGeco Entities,[12] CGG,[13] GPI,[14] or Fairfield[15] (collectively, "Seismic Objectors") and any Debtor; and (ii) authorize or permit the assumption and/or assignment of any Seismic Agreements

---

[11] "Seitel" means collectively Seitel Data, Ltd., Seitel Data Corp., Seitel Offshore Corp., joint venture and other affiliates.

[12] The "WesternGeco Entities" means collectively WesternGeco LLC and Vector Seismic Data Processing Inc.

[13] "CGG" means collectively CGG Land (U.S.) Inc. and all of its predecessors in interest.

[14] "GPI" means Geophysical Pursuit, Inc.

[15] "Fairfield" means Fairfield Industries Incorporated d/b/a Fairfield Geotechnologies f/k/a Fairfield Nodal.

KE 71402552

between the Seismic Objectors and any Debtor.  However, the Reorganized Debtors are authorized to continue operating under Seismic Agreements and use the Materials in the ordinary course of business without the payment of any relicensing, transfer or similar fee unless and until any further order of the Bankruptcy Court rejecting assumption thereof, determining that such fees are owed, or approving any agreement between the Reorganized Debtors and any of the Seismic Objectors resolving any of their objections that contemplates the payment of any such fees.  Notwithstanding anything in the Plan, any Plan Supplement, or this Confirmation Order to the contrary, the Plan and this Confirmation Order shall not be, and shall not be construed as or deemed to be, a determination of the cure amount or compensation, if any required to satisfy the provisions of sections 365(b)(1)(A) and 365(b)(1)(B) of the Bankruptcy Code for the assumption and/or assignment of any Seismic Agreement.  It is hereby provided further that all rights and defenses of the Debtors, the Reorganized Debtors and the Seismic Objectors under bankruptcy and non-bankruptcy law, and all objections of the Seismic Objectors, and the Debtors' and Reorganized Debtors' rights and defenses with respect thereto, regarding the assumption and/or assignment of the Seismic Agreements, are reserved and preserved with respect to such Seismic Agreements.  Debtors acknowledge and agree that each of the Seismic Objectors has opted out of the releases as set forth in the Plan.

229.    All issues pertaining to the assumption and/or assignment of the Seismic Agreements shall be set for hearing on January 22, 2021 at 9:00 a.m. (prevailing Central Time) in the Bankruptcy Court pursuant to all Local Rules.[16]

**VVV.  Provision Regarding the Commonwealth of Pennsylvania.**

---

[16] The deadline for filing a reply to the assumption and/or assignment of the Seismic Agreements shall be set for January 15, 2021 at 5:00 p.m. (prevailing Central Time).

KE 71402552

230.     Nothing in this Confirmation Order, Plan, or any Plan Supplement releases, nullifies, precludes or enjoins the enforcement of any police or regulatory action by the Commonwealth of Pennsylvania or the Pennsylvania Office of Attorney General arising from or related to the enforcement of any applicable police or regulatory law or regulation to which any entity would be subject to as the owner or operator of property from and after the Effective Date of the Plan.  Nothing in this Confirmation Order, Plan, or Plan Supplement authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police and regulatory law.  Nothing in this Confirmation Order or the Plan will prevent the Commonwealth of Pennsylvania from asserting that any Claim it has is nondischargeable pursuant to Bankruptcy Code.

231.     In addition to Article IV.T of the Plan, the following provisions of this Confirmation Order will govern the treatment of the Commonwealth of Pennsylvania ("Pennsylvania") concerning Pennsylvania's enforcement of police and regulatory powers and the duties and responsibilities of the Debtors and the Reorganized Debtors relating to all unclaimed property presumed abandoned (the "Pennsylvania Unclaimed Property") under the Disposition of Abandoned and Unclaimed Property Act, 72 P.S. § 1301.1, *et seq.*, and other applicable Pennsylvania laws (the "Pennsylvania Unclaimed Property Laws"):

232.     The Debtors and the Reorganized Debtors remain subject to the continuing reporting and remitting requirements of the Pennsylvania Unclaimed Property Laws for the Pennsylvania Unclaimed Property.  On or within thirty (30) days after the Effective Date, the Debtors shall review their books and records and turn over to the custodial care of the Commonwealth, State Treasurer, all known Pennsylvania Unclaimed Property presumed

119

abandoned before the Effective Date and reflected in property reports delivered by the Debtors to Pennsylvania under the Pennsylvania Unclaimed Property Laws (the "Reported Pennsylvania Unclaimed Property").  With respect to such Reported Pennsylvania Unclaimed Property, Pennsylvania will not seek payment of any interest or penalty by the Debtors or the Reorganized Debtors.  Nothing in the Plan or this Confirmation Order shall convert the Pennsylvania Unclaimed Property to property of the Debtors estates or vest such property in the Reorganized Debtors and the Pennsylvania Unclaimed Property shall continue to be held by the Debtors or Reorganized Debtors until such time it is presumed abandoned, at which time the Pennsylvania Unclaimed Property shall be reported and remitted to the custodial care of the Commonwealth, State Treasurer, in accordance with the Pennsylvania Unclaimed Property Laws.

233.   Notwithstanding section 362 of the Bankruptcy Code and any injunction in Article VIII.F of the Plan, after the Effective Date, Pennsylvania, acting through its State Treasurer and its agents may commence an audit of the Debtors in accordance with the Pennsylvania Unclaimed Property Laws (the "Pennsylvania Unclaimed Property Audit") and pursue recovery of any unremitted Pennsylvania Unclaimed Property identified pursuant to the Pennsylvania Unclaimed Property Audit.  To the extent reasonably practicable, the Debtors and the Reorganized Debtors shall fully cooperate with the Auditors to enable them to accurately and timely perform the Pennsylvania Unclaimed Property Audit by making the entities' employees, professionals, books, and records available at reasonable times and upon reasonable notice for review by the State Treasurer.  Upon completion of the Pennsylvania Unclaimed Property Audit, Pennsylvania will promptly inform the Debtors or the Reorganized Debtors, as applicable, that such audit is complete, alleviating the Debtors and the Reorganized Debtors of the requirement to retain records related to the Pennsylvania Unclaimed Property.

234.     The Debtors', Reorganized Debtors', and Pennsylvania's rights and defenses with respect to any allegations and claims asserted against the Debtors or Reorganized Debtors, as applicable, arising from or relating to the Pennsylvania Unclaimed Property Audit are hereby reserved; *provided, however*, that upon agreement between the Debtors or the Reorganized Debtors and Pennsylvania or a final nonappealable determination by a court or other tribunal with jurisdiction as to the amount of unremitted Pennsylvania Unclaimed Property, if any, that is due in connection with the Pennsylvania Unclaimed Property Audit, the Debtors or the Reorganized Debtors shall turn over such unremitted Pennsylvania Unclaimed Property to the custodial care of the Commonwealth, State Treasurer.

235.     Pennsylvania may file or amend any Proofs of Claim in these Chapter 11 Cases following the Effective Date as a result of the filing of any property reports or in the ordinary course of the Pennsylvania Unclaimed Property Audit.

236.     Nothing herein precludes Debtors and Reorganized Debtors from compliance with continued obligations pursuant to Pennsylvania Unclaimed Property Laws.

**WWW.          Provisions Regarding the TGS Entities.**

237.     Notwithstanding anything to the contrary in the Plan, the Plan Supplement, any Schedule of Rejected Executory Contracts and Unexpired Leases, any Schedule of Assumed Executory Contracts and Unexpired Leases, this Confirmation Order, or otherwise, on the Effective Date, the applicable Debtor will assume all geophysical, geological, well data, petroleum data, and other license agreements, as well as supplemental and related agreements (the "TGS License Agreements") between any of the Debtors and TGS-NOPEC Geophysical Company ASA and/or its subsidiaries or affiliates, including but not limited to TGS-NOPEC Geophysical Company, A2D Technologies d/b/a TGS Geological Products & Services, TGS Canada Corp. and TGS AP Investments AS (collectively, the "TGS Entities"), as well as the following agreements

between the applicable Debtor and TGS Canada Corp.: (1) Seismic Processing Proposal; Powder River Basin 3D Merge dated April 25, 2018, as addended via Addendum 1 dated July 18, 2019 and Addendum 2 dated August 2, 2019 (the "PRB Agreement"); and (2) Seismic Processing Proposal; East Yegua Creek 3D Merge dated July 16, 2020 (the "East Yegua Agreement"; which, along with the PRB Agreement are collectively referred to as the "TGS Processing Agreements"; and which along with the TGS License Agreements are referred to hereinafter as the "TGS Agreements") under section 365 of the Bankruptcy Code.  As a condition for such assumption, and in resolution of *TGS Canada Corp.'s Limited Objection to Assumption or Assumption and Assignment of its Processing Agreements With the Debtors, Notice of Opt-Out Regarding and Objection to Plan Releases, and Reservation Of Rights* [Docket No. 2090], the applicable Debtors and Reorganized Debtors agree and shall be obligated, on and after the Effective Date and as adequate assurance of future performance, to timely comply with all of the monetary and non-monetary terms and conditions of the TGS Agreements, including but not limited to any and all provisions and restrictions regarding use, disclosure, transfer, assignment, change of ownership or control, and termination thereof; *provided* that the TGS Entities agree that confirmation of the Plan and assumption of the TGS License Agreements shall not trigger any change of ownership or control or termination provisions contained therein.  Further, it is agreed that none of the TGS Entities are a "Releasing Party" as defined by the Plan and that they are not bound by such releases.  The Bankruptcy Court hereby approves the assumption of the TGS Agreements pursuant to and in accordance with the terms set forth above.

**XXX.  Provisions Regarding the Oklahoma Treasurer.**

238.    In addition to Article IV.T of the Plan, the following provisions of this Confirmation Order will govern the treatment of the Oklahoma Office of State Treasurer (the "Oklahoma Treasurer") concerning the duties and responsibilities of the Debtors and the

Reorganized Debtors relating to all unclaimed property presumed abandoned (the "Oklahoma Unclaimed Property") under the Oklahoma Uniform Unclaimed Property Act, 60 O.S. § 651, et seq., and other applicable Oklahoma laws (the "Oklahoma Unclaimed Property Laws"):

239.    The Debtors and the Reorganized Debtors remain subject to the continuing reporting and remitting requirements of the Oklahoma Unclaimed Property Laws for the Oklahoma Unclaimed Property.  On or within thirty (30) days after the Effective Date, the Debtors shall review their books and records and turn over to the Oklahoma Treasurer all known Oklahoma Unclaimed Property presumed abandoned before the Effective Date and reflected in property reports delivered by the Debtors to the Oklahoma Treasurer under the Oklahoma Unclaimed Property Laws (the "Reported Oklahoma Unclaimed Property").  With respect to such Reported Oklahoma Unclaimed Property, the Oklahoma Treasurer will not seek payment of any interest or penalty by the Debtors or the Reorganized Debtors.  Nothing in the Plan or this Confirmation Order shall convert the Oklahoma Unclaimed Property to property of the Debtors' estates or vest such property in the Reorganized Debtors and the Oklahoma Unclaimed Property shall continue to be held by the Debtors or Reorganized Debtors until such time it is presumed abandoned, at which time the Oklahoma Unclaimed Property shall be reported and remitted to the Oklahoma Treasurer in accordance with the Oklahoma Unclaimed Property Laws.

240.    Notwithstanding section 362 of the Bankruptcy Code and any injunction in Article VIII.F of the Plan, after the Effective Date, the Oklahoma Treasurer and its agents may commence an audit of the Debtors in accordance with the Oklahoma Unclaimed Property Laws (the "Oklahoma Unclaimed Property Audit") and pursue recovery of any unremitted Oklahoma Unclaimed Property identified pursuant to the Oklahoma Unclaimed Property Audit.  To the extent reasonably practicable, the Debtors and the Reorganized Debtors shall fully cooperate with the

KE 71402552

Auditors to enable them to accurately and timely perform the Oklahoma Unclaimed Property Audit by making the entities' employees, professionals, books, and records reasonably available during normal business hours.  Upon completion of the Oklahoma Unclaimed Property Audit, the Oklahoma Treasurer will promptly inform the Debtors or the Reorganized Debtors, as applicable, that such audit is complete, alleviating the Debtors and the Reorganized Debtors of the requirement to retain records related to the Oklahoma Unclaimed Property.

241.    The Debtors', Reorganized Debtors', and Oklahoma Treasurer's rights and defenses with respect to any allegations and claims asserted against the Debtors or Reorganized Debtors, as applicable, arising from or relating to the Oklahoma Unclaimed Property Audit are hereby reserved; *provided, however*, that upon agreement between the Debtors or the Reorganized Debtors and the Oklahoma Treasurer or a final nonappealable determination by a court or other tribunal with jurisdiction as to the amount of unremitted Oklahoma Unclaimed Property, if any, that is due in connection with the Oklahoma Unclaimed Property Audit, the Debtors or the Reorganized Debtors shall turn over such unremitted Oklahoma Unclaimed Property to the Oklahoma Treasurer.

242.    The Oklahoma Treasurer may file or amend any Proofs of Claim in these Chapter 11 Cases following the Effective Date as a result of the filing of any property reports or in the ordinary course of the Oklahoma Unclaimed Property Audit.

243.    Nothing herein precludes Debtors and Reorganized Debtors from compliance with continued obligations pursuant to Oklahoma Unclaimed Property Laws.

**YYY. Provisions Regarding Enterprise Products Operating LLC, Enterprise Gathering LLC and Enterprise Texas Pipeline LLC.**

244.    Notwithstanding anything in the Plan, Plan Supplement, or Confirmation Order to the contrary, the Plan and Confirmation Order: (i) shall not be, and shall not be construed as or

deemed to be, a determination of the cure amount or compensation, if any required to satisfy the provisions of sections 365(b)(1)(A) and 365(b)(1)(B) of the Bankruptcy Code (the "Enterprise Cure Amount") for the assumption of any executory contract (the "Assumed Enterprise Contracts") relating to Enterprise Products Operating LLC, Enterprise Gathering LLC and Enterprise Texas Pipeline LLC  (collectively, "Enterprise"); (ii) shall not impair or impact Enterprise's rights to setoff and/or recoupment, if any; (iii) shall not release, reduce, discharge or otherwise adversely affect any Liens, if any, of Enterprise.  To the extent that any amounts owed relating to the Assumed Enterprise Contracts are not paid in the ordinary course of business, the Debtors or Reorganized Debtors, as applicable, and Enterprise shall endeavor in good faith to reach agreement as to the Enterprise Cure Amount within thirty (30) days following the later of (i) January 4, 2021, or (ii) entry of this Confirmation Order (the "30 Day Deadline").  If such agreement is reached, the Debtors or Reorganized Debtors, as applicable, and Enterprise may, but need not, file a stipulation with the Court setting forth the agreed Enterprise Cure Amount.  If the Debtors or Reorganized Debtors, as applicable, and Enterprise fail to reach an agreement as to the Enterprise Cure Amount within the 30 Day Deadline, either the Reorganized Debtors or Enterprise may, upon notice to the Reorganized Debtors or Enterprise, as applicable, request a hearing before the Court for the determination of the Enterprise Cure Amount prior to expiration of the 30 Day Deadline.  For purposes of determining the Enterprise Cure Amount, the effective date of assumption shall be the Effective Date. Nothing herein shall prejudice Enterprise's right to oppose assumption and/or assignment of any Executory Contracts between the Debtors and Enterprise, or the Debtors' or the Reorganized Debtors' right to add any Assumed Enterprise Contract to the list of rejected executory contracts prior to the expiration of the 30 Day Deadline.  For the avoidance of doubt, rejection of the applicable Enterprise Contract must occur prior to the 30 Day Deadline,

otherwise the applicable Assumed Enterprise Contract will be deemed assumed by the Reorganized Debtors. Nothing herein shall prejudice (a) Enterprise's right to assert an Administrative Claim for any postpetition obligation owed to Enterprise in accordance with applicable law, or (b) the Debtors' or the Reorganized Debtors' right dispute such Claim. To the extent that any Assumed Enterprise Contract is assumed, upon payment of the applicable cure amount by the Reorganized Debtors, such assumption shall result in the release and satisfaction of all prepetition Claims arising under the Assumed Enterprise Contract. Otherwise, each of Enterprise, the Debtors, and the Reorganized Debtors expressly retain all of their rights under the Assumed Enterprise Contracts. Enterprise shall not be deemed to be a Releasing Party under the Plan and Enterprise has effectively opted out of the Third-Party Releases contained in the Plan. Notwithstanding anything herein, to the extent that Plan or this Confirmation Order provides a shorter deadline to assume or reject unexpired executory contracts than the 30 Day Deadline, the shorter deadline shall apply to the Assumed Enterprise Contracts.

**ZZZ.  Provisions Regarding the Cecil Blount Farms, LLC Royalty Assignees.**

245.    Notwithstanding anything to the contrary in the Plan or this Confirmation Order, the Plan and this Confirmation Order shall not impair or prejudice the rights of the Cecil Blount Farms, LLC, Dorothy Peek, Morning Glory Ranch, LLC, Betty Kyson, Thomas Cecil Blount, Jr., Lachute Company, LLC, Michael Blount, Janis Blount, Brandi Lynn Blount and Carrie Lea Blount (collectively, the "CBF Royalty Assignees") to assert that the rights, if any, that they may have in any escrowed or suspended funds are not property of the estate and are subject to their property interest. The Debtors and the Reorganized Debtors, as applicable, reserve all rights and defenses regarding the same.

**AAAA.**          **Provisions Regarding Certain Dallas/Fort Worth Parties.**

246.     For the avoidance of doubt, Dallas/Fort Worth International Airport Board, the City of Dallas, and the City of Fort Worth (collectively, the "DFW Parties") have opted out of the releases in the Plan. Notwithstanding any other provision in the Plan or Confirmation Order, nothing in the Plan or Confirmation Order shall release, affect or alter the claims and rights of the DFW Parties against TOTAL E&P USA, Inc., TOTAL E&P USA Barnett, LLC and any of their affiliates ("TOTAL") under (i) that certain Compromise Settlement and High-Low Agreement by and between the DFW Parties and Chesapeake Exploration, L.L.C., and TOTAL ("High-Low Settlement Agreement"), the underlying Oil and Gas Lease entered into in 2006 as referenced in the High-Low Settlement Agreement, including all amendments, supplements, modifications and/or ratifications thereto ("DFW Lease"), and any related agreements (collectively, the "DFW Agreements") and (ii) the orders and judgments entered in any litigation involving or related to the DFW Agreements.

247.     Further, the rejection of the High-Low Settlement Agreement by the Debtors does not terminate the High-Low Settlement Agreement with respect to any non-Debtor party thereunder or affect any rights and/or obligations of such parties.  Within thirty (30) days of the Effective Date, the Debtors shall move to dismiss with prejudice their appeal from the summary judgment entered in favor of the DFW Parties in that certain lawsuit styled *Dallas/Fort Worth International Airport Board, City of Fort Worth and City of Dallas v. Chesapeake Exploration, L.L.C., and TOTAL E&P USA, INC.*, that was initially filed as Cause No. 236-286059-16 in the 236 Judicial District Court, Tarrant County, Texas, and later transferred to the 67th Judicial District Court as Cause No. 067-286059-16, currently pending in the Court of Appeals for the Second Appellate District of Texas at Fort Worth, Case No. 02-20-00054.  The dismissal of the aforementioned appeal by the Debtors shall be effective as of immediately before Petition Date for

purposes of rejection of High-Low Settlement Agreement such that all appeals of the declaratory judgment claims of the Debtors will be deemed to have been exhausted pursuant to Section IV.A.7.c of the High-Low Settlement Agreement as of the time of rejection; *provided* that the Debtors' rejection of the High-Low Settlement Agreement is not a release of any payment obligation of the Debtors to the DFW Parties under Section IV.A.7.c. of the High-Low Settlement Agreement, all such rights of the DFW Parties are expressly reserved and preserved hereby; *provided, further*, that any such payment obligation shall be treated as an unsecured claim pursuant to the Bankruptcy Code and shall receive the treatment for such type of claim under the terms of the Plan as confirmed by the Court and the terms of this Confirmation Order.

### BBBB. Provisions Regarding Jamestown Resources, LLC, Larchmont Resources, LLC and Pelican Energy, LLC.

248.    Notwithstanding anything in the Plan, Plan Supplement, or this Confirmation Order to the contrary, the Plan and this Confirmation Order shall not be, and shall not be construed as or deemed to be, a determination of the cure amount or compensation, if any required to satisfy the provisions of sections 365(b)(1)(A) and 365(b)(1)(B) of the Bankruptcy Code (the "JLP Cure Amount") for the assumption of any executory contract (the "Assumed JLP Contracts") relating to Jamestown Resources, LLC, Larchmont Resources, LLC and Pelican Energy, LLC (together with any affiliates, collectively, "JLP").  To the extent that any amounts owed relating to the Assumed JLP Contracts are not paid in the ordinary course of business, the Debtors or Reorganized Debtors, as applicable, and JLP shall endeavor in good faith to reach agreement as to the JLP Cure Amount within ninety (90) days following the Effective Date (the "Cure Negotiation Period") and if such agreement is reached may, but need not, file a stipulation with the Court setting forth the agreed JLP Cure Amount.  If the Reorganized Debtors and JLP fail to reach an agreement as to the JLP Cure Amount within the Cure Negotiation Period, either the Reorganized Debtors or JLP

may, before the expiration of thirty (30) days after the Cure Negotiation Period, upon notice to the Reorganized Debtors or JLP, as applicable, file a pleading with the Court seeking approval of the asserted JLP Cure Amount and request a hearing before the Court for the determination of the JLP Cure Amount.  For purposes of determining the JLP Cure Amount, the effective date of assumption shall be the Effective Date. Nothing herein shall prejudice JLP's right to oppose assumption and/or assignment of any Executory Contracts between the Debtors and JLP, or the Debtors' or the Reorganized Debtors' right to add any Assumed JLP Contract to the list of rejected executory contracts if the Court determines that the JLP Cure Amount is greater than the amount set forth in any applicable cure notice.   Nothing herein shall prejudice (a) JLP's right to assert an Administrative Claim for any postpetition obligation owed to JLP in accordance with applicable law, or (b) the Debtors' or the Reorganized Debtors' right to dispute such Claim.  To the extent that any Assumed JLP Contract is assumed, such assumption shall result in the release and satisfaction of only those Claims that are based on an actual default existing as of the Effective Date with respect to such Assumed JLP Contract.  Otherwise, JLP, the Debtors, and the Reorganized Debtors expressly retain all of its rights under the Assumed JLP Contracts.

249.    Notwithstanding anything in the Plan, Plan Supplement, or this Confirmation Order to the contrary, the Plan and this Confirmation Order shall not be, and shall not be construed as or deemed to be, a determination that those certain Supplemental Joint Operating Services Agreements by and between JLP and Chesapeake Energy Corporation, dated November 30, 2016 (the "SJOSA"), is integrated with any other Assumed JLP Contract, including, without limitation, any of the joint operating agreements by and between JLP and Chesapeake Energy Corporation (each, a "JOA").  The Debtors or Reorganized Debtors, as applicable, and JLP shall endeavor in good faith to reach agreement as to the integration of the SJOSA within ninety (90) days following

the Effective Date.  If the Reorganized Debtors and JLP fail to reach an agreement regarding whether the JSOSA is an integrated contract with any Assumed JLP Contract within such ninety (90) day period, either the Reorganized Debtors or JLP may, upon notice to the Reorganized Debtors or JLP, as applicable, request a hearing before the Court to determinate whether the JSOSA is integrated into such Assumed JLP Contract.

250.    Notwithstanding anything in the Plan, Plan Supplement, or this Confirmation Order to the contrary, the Plan and this Confirmation Order shall not alter (a) the character of JLP's mineral interests or proceeds related thereto under applicable nonbankruptcy law, or (b) any of JLP's statutory liens, consensual liens, defenses, rights of setoff or recoupment to the extent such rights exist under the Assumed JLP Contracts, executory contracts rejected pursuant to the Plan, or applicable law.  JLP shall not be a Releasing Party.

**CCCC.        Provisions Regarding Certain Kinder Morgan Entities.**

251.    Notwithstanding anything to the contrary in the Assumed Executory Contracts and Unexpired Leases Schedule (as amended from time to time, the "Assumption Schedule"), the aggregate cure amount required to satisfy the provisions of sections 365(b)(1)(A) and 365(b)(1)(B) of the Bankruptcy Code (the "TGP Cure Amount") for the assumption of the executory contracts (each, an "Assumed TGP Contract," and together, the "Assumed TGP Contracts") by and between (i) any Debtor entity and (ii) Tennessee Gas Pipeline Company or Tennessee Gas Pipeline Company, L.L.C. (together, "TGP") shall be $6,468,391.  Notwithstanding the deadline to object to cure amounts described in the Disclosure Statement Order and Article V.C. of the Plan, in the event any Assumed TGP Contract is subsequently removed from the Assumption Schedule, the Debtors or Reorganized Debtors, as applicable, and TGP shall endeavor in good faith to reach agreement as to the TGP Cure Amount for each individual Assumed TGP Contract remaining on the Assumption Schedule within one hundred and eighty (180) days following the Effective Date

and if such agreement is reached may, but need not, file a stipulation with the Court setting forth the agreed TGP Cure Amount.  If the Reorganized Debtors and TGP fail to reach an agreement as to such TGP Cure Amount within such one hundred and eighty (180) day period, either the Reorganized Debtors or TGP may, upon notice to the Reorganized Debtors or TGP, as applicable, request a hearing before the Court for the determination of the TGP Cure Amount.

252.    Notwithstanding any other provision in this Confirmation Order or the Plan to the contrary, nothing in this Confirmation Order or the Plan (and neither the confirmation nor consummation of the Plan) shall eliminate, alter or impair, or otherwise prevent Kinder Morgan Texas Pipeline LLC, Kinder Morgan Tejas Pipeline LLC, Eagle Ford Gathering LLC, Kinderhawk Field Services, LLC, Scissortail Energy, LLC, El Paso Marketing Company, L.L.C., Camino Real Gas Gathering Company, LLC, Tennessee Gas Pipeline Company, L.L.C., Wyoming Interstate Company, L.L.C., Midcontinent Express Pipeline LLC, Independent Trading & Transportation Company LLC, Hiland Crude, LLC or Kinder Morgan, Inc. (collectively, "Kinder Morgan" and each such entity, a "KM Counterparty") from asserting any or all of such KM Counterparty's defenses, arguments or appellate rights relating to any proposed rejection of any Executory Contract or Unexpired Lease with such KM Counterparty or real property interests of such KM Counterparty (including rights, defenses, or arguments that such agreements or interests, as applicable, constitute covenants running with the land or equitable servitudes not subject to rejection, do not constitute Executory Contracts or Unexpired Leases under the Bankruptcy Code and the terms of the Plan, or are not otherwise subject to rejection); *provided* that each KM Counterparty shall be required to assert such rights, defenses, or arguments in a written objection filed with this Bankruptcy Court on or prior to the KM Contract Objection Deadline (as defined below).

253.     Except as agreed upon by the applicable KM Counterparty and the Reorganized Debtors, and notwithstanding any other provision of this Confirmation Order or the Plan, from the period commencing on the Effective Date through the date of the entry of an order of this Bankruptcy Court resolving any and all disputes raised in an objection filed by the KM Contract Objection Deadline by one or more applicable KM Counterparties relating to the proposed rejection of any agreement(s), all rights of the Debtors and the applicable KM Counterparty are reserved, including with respect to whether (i) such agreement(s) shall continue as in effect immediately prior to the Effective Date, (ii) the terms of such agreement(s) shall continue to apply to the applicable Reorganized Debtor and KM Counterparty in accordance with otherwise applicable law, without alteration or modification, including without limitation the obligation to pay all amounts due thereunder as and when due, and (iii) the relative obligations of the applicable Reorganized Debtor and KM Counterparty arising under such agreement(s) during such time shall not be excused, relieved or otherwise impaired by the proposed rejection of such agreements.

254.     For any Executory Contract or Unexpired Lease related to Kinder Morgan removed from the Assumed Executory Contracts and Unexpired Leases Schedule or added to the Rejected Executory Contracts and Unexpired Leases Schedule on or after the date of this Confirmation Order, the applicable KM Counterparty shall have twenty-one (21) days after the date of such removal or addition to file with the Court a written objection to the proposed treatment of such contract or lease (the "KM Contract Objection Deadline").

**DDDD.     Provision Regarding Energy Transfer.**

255.     Notwithstanding anything in the Plan, Plan Supplement, or Confirmation Order to the contrary, the Plan and Confirmation Order shall not: (i) adjudicate the assumption or rejection

of executory contracts between Energy Transfer[17] and the Debtors, including determining cure or rejection amounts owing under section 365 of the Bankruptcy Code; (ii) modify or impair Energy Transfer's rights to setoff and/or recoupment, if any; (iii) release, reduce, discharge, enjoin, or otherwise adversely affect any Liens or Claims held by Energy Transfer, each of (i) through (iii) being the subject of a separate settlement agreement between Energy Transfer and the Debtors embodied in a Settlement Term Sheet dated as of January 5, 2021.  The Debtors and Energy Transfer shall use their best efforts to gain Bankruptcy Court approval of the settlement on an expedited basis.  In the event the Debtors and Energy Transfer are unable to obtain Bankruptcy Court approval of the settlement, the parties will meet in good faith to determine what issues remain to be adjudicated between them and will thereafter schedule a status conference with the Bankruptcy Court for discussion and scheduling of any remaining, open matters and disputes for determination.

**EEEE.**         **Provision Regarding Stone Well Service LLC.**

256.    Notwithstanding anything in the Plan, Plan Supplement, or Confirmation Order to the contrary, the Plan and Confirmation Order shall not be, and shall not be construed as or deemed to be, a determination of the cure amount or compensation, if any required to satisfy the provisions of sections 365(b)(1)(A) and 365(b)(1)(B) of the Bankruptcy Code (the "Stone Well Service LLC Cure Amount") for the assumption of any executory contract (the "Assumed Stone Well Service LLC Contracts") relating to Stone Well Service LLC (together with any affiliates, collectively, "Stone Well Service LLC").  To the extent that any amounts owed relating to the Assumed Stone

---

[17]   For the purposes of this Confirmation Order, "Energy Transfer" shall mean, collectively, ETC Texas Pipeline, Ltd., ETC Tiger Pipeline, LLC, ETC Marketing, Ltd., Houston Pipe Line Company LP, Energy Transfer Fuel, LP, Oasis Pipeline, LP, ETC Katy Pipeline, LLC, Regency Intrastate Gas LP, Regency Marcellus Gas Gathering LLC, Sunoco Partners Marketing & Terminals L.P., Fayetteville Express Pipeline LLC, Regency NEPA Gas Gathering LLC, Trade Star, LLC, Transwestern Pipeline Company, LLC, Trunkline Gas Company, LLC, and Panhandle Eastern Pipe Line Company, LP.

Well Service LLC Contracts are not paid in the ordinary course of business, the Debtors or Reorganized Debtors, as applicable, and Stone Well Service LLC shall endeavor in good faith to reach agreement as to the Stone Well Service LLC Cure Amount within one hundred and eighty (180) days following the Effective Date and if such agreement is reached may, but need not, file a stipulation with the Court setting forth the agreed Stone Well Service LLC Cure Amount. If the Reorganized Debtors and Stone Well Service LLC fail to reach an agreement as to the Stone Well Service LLC Cure Amount within such one hundred and eighty (180) day period, either the Reorganized Debtors or Stone Well Service LLC may, upon notice to the Reorganized Debtors or Stone Well Service LLC, as applicable, request a hearing before the Court for the determination of the Stone Well Service LLC Cure Amount. For purposes of determining the Stone Well Service LLC Cure Amount, the effective date of assumption shall be the Effective Date. Nothing herein shall prejudice Stone Well Service LLC's right to oppose assumption and/or assignment of any Executory Contracts between the Debtors and Stone Well Service LLC, or the Debtors' or the Reorganized Debtors' right to add any Assumed Stone Well Service LLC Contract to the list of rejected executory contracts if the Court determines that the Stone Well Service LLC Cure Amount is greater than the amount set forth in any applicable cure notice. Nothing herein shall prejudice (a) Stone Well Service LLC's right to assert an administrative claim for, inter alia, any postpetition obligation owed to Stone Well Service LLC in accordance with applicable law, or (b) the Debtors' or the Reorganized Debtors' right dispute such claim. To the extent that any Stone Well Service LLC Assumed Contract is assumed, such assumption shall result in the release and satisfaction of only those claims that are based on an actual default existing as of the Effective Date with respect to such assumed Stone Well Service LLC Assumed Contract, but only to the extent the Stone Well Service LLC Cure Amount agreed upon by the parties or ordered by the Court is actually paid by

the Debtors. Otherwise, each of Stone Well Service LLC, the Debtors, and the Reorganized

Debtors expressly retain all of their rights under the Stone Well Service LLC Assumed Contracts.

**FFFF. Provision Regarding the Eagle Ford Royalty Interest Owner MDL Plaintiffs.**

257.    Notwithstanding anything to the contrary in this Confirmation Order, the Plan, or

the Plan Supplement:

a.    This Confirmation Order is not, and shall not be construed as, (a) an adjudication or disposition of (i) the proofs of claims filed by any of the Eagle Ford Royalty Interest Owner MDL Plaintiffs (for the removal of doubt, including, but not limited to, (A) any assertions within such proofs of claim that the proofs of claim are secured and (B) any assertions within such proofs of claim that mineral leases or acreage have terminated pre- or postpetition), (ii) the adversary proceedings numbered 20-03491, 20-03467 or 20-03490 pending before this Bankruptcy Court, or (iii) any timely filed application for the approval and payment of an Administrative Claim ((i)-(iii) hereinafter collectively referred to as the "EF Litigation"), or (b) an adjudication or disposition of any issue or issues in any of the EF Litigation.

b.    Neither the Plan nor the Plan Supplement (nor, for the removal of doubt, any §365 assumption or rejection contemplated within any of the aforementioned) is (a) an adjudication or disposition of any of the EF Litigation, or (b) an adjudication or disposition of any issue or issues in any of the EF Litigation.

c.    The respective ownership interests of the Eagle Ford Royalty Interest Owner MDL Plaintiffs in the leases that are the subjects of the EF Litigation shall not be, in any manner, impaired, diminished, or prejudiced by this Confirmation Order, the Plan, or the Plan Supplement.

d.    The Eagle Ford Royalty Interest Owner MDL Plaintiffs shall continue to enjoy the rights and protections, if any, of the language at paragraph 47 of the DIP Order.

**GGGG.    Provision Regarding the Louisiana Department of Natural Resources.**

258.    Notwithstanding anything in the Plan, Plan Supplement, or Confirmation Order to

the contrary, the Plan and Confirmation Order shall not be, and shall not be construed as or deemed

to be, a determination of the cure amount or compensation, if any, required to satisfy the provisions

of sections 365(b)(1)(A) and 365(b)(1)(B) of the Bankruptcy Code (the "Louisiana Cure Amount")

for the assumption of any executory contract (the "Assumed Louisiana Contracts") relating to the Louisiana Department of Natural Resources (together with any affiliates, collectively, "LDNR"). To the extent that any amounts owed relating to the Assumed Louisiana Contracts are not paid in the ordinary course of business, the Debtors or Reorganized Debtors, as applicable, and LDNR shall endeavor in good faith to reach agreement as to the Louisiana Cure Amount within one hundred and eighty (180) days following the Effective Date and if such agreement is reached may, but need not, file a stipulation with the Court setting forth the agreed Louisiana Cure Amount. If the Reorganized Debtors and LDNR fail to reach an agreement as to the Louisiana Cure Amount within such one hundred and eighty (180) day period, either the Reorganized Debtors or LDNR may, upon notice to the Reorganized Debtors or LDNR, as applicable, request a hearing before the Court for the determination of the Louisiana Cure Amount. For purposes of determining the Louisiana Cure Amount, the effective date of assumption shall be the Effective Date. Nothing herein shall prejudice LDNR's right to oppose assumption and/or assignment of any Executory Contracts between the Debtors and LDNR, or the Debtors' or the Reorganized Debtors' right to add any Assumed Louisiana Contract to the list of rejected executory contracts if the Court determines that the Louisiana Cure Amount is greater than the amount set forth in any applicable cure notice. Nothing herein shall prejudice (a) LDNR's right to assert an administrative claim for, inter alia, any postpetition obligation owed to LDNR in accordance with applicable law, or (b) the Debtors' or the Reorganized Debtors' right to dispute such claim. To the extent that any Louisiana Assumed Contract is assumed, such assumption shall result in the release and satisfaction of only those claims that are based on an actual default existing as of the Effective Date with respect to such assumed Louisiana Assumed Contract. Otherwise, each of LDNR, the Debtors, and the Reorganized Debtors expressly retain all of their rights under the Louisiana Assumed Contracts.

259.    Nothing contained in the Plan represents any waiver by the State of Louisiana of any rights that it may have against actual non-debtor state mineral lessees for which the Debtors are merely payors to the State.  Any such rights to enforce those leases, including, but not limited to, the ability to demand payment from such actual non-debtor lessees are here by expressly reserved unto the State of Louisiana.

**HHHH.        Provision Regarding the CaddoDesoto Owners.**

260.    Notwithstanding anything to the contrary in either the Plan, the Plan Supplement, this Confirmation Order, or any implementing Plan documents (collectively "Plan Documents" for purposes of paragraphs 260 through 270 of this Confirmation Order, the "CaddoDeSoto Owners Section"), the Industrial Development Board of the Parish of Caddo, Inc., Caddo Parish, Paul M. Davis, Paul M. Davis, solely in his capacity as the independent administrator of the Succession of John P. Davis, Jr. (the "Succession of John P. Davis Jr."), Coushatta Bayou Land Company, L.L.C., Caspiana Interests, LLC; Bugg DeSoto, LLC; Kingwood Business Center Ltd. Partnership, Charles Steven Powers, Powers Investments, L.L.C., and Sonja Bott, on behalf of the Succession of Gregary Roy Bott (each of the foregoing, a "CaddoDeSoto Owner," and collectively, the "CaddoDeSoto Owners") shall be treated in accordance with this CaddoDeSoto Owners Section.

261.    The CaddoDeSoto Owners have each filed proofs of claim against one or more Debtors, and assert therein certain rights including rights in Royalty and Working Interests in mineral properties located in Louisiana, including without limitation unleased minerals and Louisiana mineral leases.  The CaddoDeSoto Owners have asserted among other things a right of entitlement or ownership of any amount owed by the Debtors/Reorganized Debtors on account of their Royalty and Working Interests, *see e.g.*, Docket No. 2134. The CaddoDeSoto Owners'

Royalty and Working Interests shall be treated in accordance with the Plan provisions regarding such interests including, but not limited to, Article IV.H and Article IV.T.

262.    Without any admission as to the legal character/nature of their rights to any alleged amounts owed, and reserving all rights reserved and or preserved on their account under Article IV.T of the Plan, any of the CaddoDeSoto Owners may file Royalty and Working Interests Administrative Claims for amounts owed to them on account of their Royalty and Working Interests postpetition, but pre-Effective Date, on or before 120 days after the Effective Date, pursuant to the Plan, including, but not limited to, Articles I.A.4 and I.A.172, and Article II.A.1.

263.    For the avoidance of doubt, the Bankruptcy Court shall have exclusive jurisdiction to resolve any dispute between any CaddoDeSoto Owner and any Debtor or Reorganized Debtor, as applicable, as to: (i) the amounts owed prepetition by any Debtor to any CaddoDeSoto Owner on account of Royalty and Working Interests, (ii) the amounts owed postpetition through and until the Effective Date by any Debtor to any CaddoDeSoto Owner on account of a Royalty and Working Interests, (iii) whether any such amounts owed have been discharged under the Plan or the Confirmation Order, (iv) whether any such amount owed is a prepetition Claim or a specific type of prepetition Claim under the Plan, or, as relevant, an Administrative Claim or a Royalty and Working Interests Administrative Claim, and/or (v) to what extent (if any) funds held by the Debtors or the Reorganized Debtors, as applicable, or subject to their control, with respect to which funds any CaddoDeSoto Owner holder of a Royalty and Working Interest has asserted or may assert a right of entitlement or ownership on account of such Royalty and Working Interest, constitute property of any of the Estates under section 541 of the Bankruptcy Code or otherwise. All rights of the CaddoDeSoto Owners and the Debtors or Reorganized Debtors are preserved and reserved with respect to findings or determinations on the foregoing points, and nothing in the Plan

138

or the Confirmation Order shall be deemed a finding or determination as to these issues.  To the extent applicable, any Administrative Claims, Other Secured Claims, or General Unsecured Claims of the CaddoDeSoto Owners on account of Royalty and Working Interests shall be treated in accordance with Article II or III of the Plan, as appropriate.

264.    The prepetition lawsuit *Bugg Desoto, LLC, v. Chesapeake Operating, LLC*, Civil Action No. 19-cv-1049 (W.D. La.) ("Bugg Desoto Suit"), shall be stayed in the United States District Court for the Western District of Louisiana pending either: (a) entry of a final, non-appealable order in regard to the Memorandum Ruling and corresponding Order entered on March 21, 2019, in *Allen Johnson, et al. v. Chesapeake Louisiana, LP*, Civil Action No. 16-1543 (W.D. La.) (D.E. 54-55 therein), by the Honorable Maurice Hicks, Jr., concerning post-production costs, or (b) final disposition of that matter through other means, such as settlement (collectively "Final Disposition").  If the United States District Court for the Western District of Louisiana does not enter an order affecting the stay described above within thirty days of the entry of this Confirmation Order, then the relevant Debtors or Reorganized Debtors, as applicable, will consent to a request for the transfer of venue of the Bugg Desoto Suit to the United States District Court for the Southern District of Texas, and to thereafter request referral of that case from that District Court to the Bankruptcy Court (collectively "Transfer and Referral"), where it shall be stayed in accord with the foregoing.  Upon Final Disposition, the Transfer and Referral shall occur at that time if it has not occurred previously, and the Bankruptcy Court shall then proceed to adjudicate the matters in the Bugg Desoto Suit in accord with paragraph 263 of this CaddoDeSoto Owners Section.

265.    Within thirty (30) days of the Effective Date, the relevant Debtors or Reorganized Debtors, as applicable, will consent to a request for the transfer of venue of the lawsuit *Caspiana*

*Interests, LLC, et al. v. Chesapeake Louisiana*, LP, et al., Civil Action No. 19-cv-489 (W.D. La.) ("Caspiana Suit"), to the United States District Court for the Southern District of Texas, and to thereafter request referral of that case from that District Court to the Bankruptcy Court, and the Bankruptcy Court shall then proceed to adjudicate the matters in the Caspiana Suit in accord with paragraph 263 of this CaddoDeSoto Owners Section.

266.     Notwithstanding anything to the contrary in the Plan Documents, including but not limited to Article V of the Plan, any CaddoDeSoto Owner may file and have adjudicated an objection with the Bankruptcy Court to a proposed assumption of an Executory Contract or Unexpired Lease or the related cure cost, if such CaddoDeSoto Owner is a contract or lease counterparty to the subject Executory Contract or Unexpired Lease, within thirty (30) days of the receipt of written notice by such CaddoDeSoto Owner and its counsel from any Debtor or Reorganized Debtor, as applicable, informing the CaddoDeSoto Owner that it is a counterparty to that Executory Contract or Unexpired Lease, that the Debtors or Reorganized Debtors, as applicable, wish to assume the same, and stating the proposed cure costs for the assumption.

267.     Notwithstanding anything to the contrary in the Plan Documents, including but not limited to, Article V of the Plan, any CaddoDeSoto Owner may file a proof of claim for a Claim arising from rejection of an Executory Contract or Unexpired Lease, if such CaddoDeSoto Owner is a counterparty to the same, within thirty (30) days of the receipt of written notice by such CaddoDeSoto Owner and its counsel from any Debtor or Reorganized Debtor, as applicable, informing the CaddoDeSoto Owner that it is a counterparty to the relevant Executory Contract or Unexpired Lease that has been rejected pursuant to the entry of an order of the Bankruptcy Court.

268.     The CaddoDeSoto Owners shall not be considered "Releasing Parties" under the Plan, as defined therein in Article I.A.144, and discussed in Article VIII.

269.     In an effort to avoid unnecessary litigation, the Debtors or the Reorganized Debtors, as applicable, agree to provide counsel for the CaddoDeSoto Owners the following within forty-five (45) days of the Effective Date: an accounting of the amounts owed as well as the amounts paid to each of the CaddoDeSoto Owners on account of their respective Royalty and Working Interests, per the books and records of the Debtors: (i) prior to the Petition Date and (ii) after the Petition Date through the Effective Date. This shall include documentation and information regarding any costs deductions from gross production revenue for these periods. Further, as to unleased mineral interests, this shall include, but is not limited to (i) the status of well payout for each well in which any CaddoDeSoto Owner has an interest and (ii) reports on costs and or revenue due under La. R.S. 30:103.1 for all periods prior to the Petition Date, and for periods postpetition through the Effective Date. This production of data is without prejudice to any further requests for information or documentation by any of the CaddoDeSoto Owners to any Debtor or Reorganized Debtor under any relevant law and or rule, and without prejudice to any and all other reporting requirements under relevant law, both currently and on a going forward basis.

270.     Consistent with Article IV.T of the Plan, Debtors and Reorganized Debtors, as applicable, shall continue paying the CaddoDeSoto Owners all undisputed amounts owing on account of their respective Royalty and Working Interests, including funds held or booked or deemed to be held in suspense, as and when reconciled, in the ordinary course of business, and in accordance with all applicable agreements and laws, without any further action on the part of any of the CaddoDeSoto Owners.  Moreover, the Reorganized Debtors shall give notice to counsel for the CaddoDeSoto Owners of any amounts held, or booked or deemed to be held, in suspense on

KE 71402552

account of the Royalty and Working Interests of any of the CaddoDeSoto Owners within ten (10) days after the Effective Date.

**IIII.    Provisions Regarding Tornado Venture Quatro, LLC and Tornado Venture Cinco, LLC.**

271.    Notwithstanding anything in the Plan, Plan Supplement, or Confirmation Order to the contrary, the Plan and Confirmation Order shall not be, and shall not be construed as or deemed to be, a determination of the cure amount or compensation, if any required to satisfy the provisions of sections 365(b)(1)(A) and 365(b)(1)(B) of the Bankruptcy Code (the "Tornado Cure Amount") for the assumption of any executory contract (the "Assumed Tornado Contracts") relating to Tornado Venture Quatro, LLC and Tornado Venture Cinco, LLC (together with any affiliates, collectively, "Tornado").  To the extent that any amounts owed relating to the Assumed Tornado Contracts are not paid in the ordinary course of business, the Debtors or Reorganized Debtors, as applicable, and Tornado shall endeavor in good faith to reach agreement as to the Tornado Cure Amount within sixty (60) days following the Effective Date and if such agreement is reached may, but need not, file a stipulation with the Court setting forth the agreed Tornado Cure Amount.  If the Reorganized Debtors and Tornado fail to reach an agreement as to the Tornado Cure Amount within such sixty (60) day period, either the Reorganized Debtors or Tornado may, upon notice to the Reorganized Debtors or Tornado, as applicable, request a hearing before the Court for the determination of the Tornado Cure Amount, with such hearing date to occur no later than one hundred and fifty (150) days after the Effective date, subject to the Court's availability. For purposes of determining the Tornado Cure Amount, the effective date of assumption shall be the Effective Date.  Nothing herein or in the Plan shall prejudice (a) Tornado's right to assert (on or before the date of a hearing on the determination of the Tornado Cure Amount) an Administrative Claim that arose prior to the Effective Date for, inter alia, any postpetition obligation owed to

Tornado in accordance with applicable law, or (b) the Debtors' or the Reorganized Debtors' right dispute such claim.  The assumption of each Tornado Assumed Contract shall result in the release and satisfaction of only those claims that are based on damages or defaults existing as of the Petition Date with respect to such assumed Tornado Assumed Contract.  Otherwise, each of Tornado, the Debtors, and the Reorganized Debtors expressly retain all of their rights under the Tornado Assumed Contracts.  Furthermore, prior to and after the Tornado Cure Amount is paid, Tornado and the Debtors or Reorganized Debtors, as applicable, shall comply with the provisions of the Tornado Assumed Contracts.

272.    Each Assumed Tornado Contract shall not be assigned to a third party before or after the Effective Date without the consent of Tornado, which consent cannot be unreasonably withheld.  Upon the Effective Date, each Assumed Tornado Contract shall re-vest in and be fully enforceable against the applicable contracting Reorganized Debtor in accordance with its terms.

**JJJJ.        Investigation Termination Date and Dismissal of the Standing Motions.**

273.    Pursuant to the Final DIP Order, the Investigation Termination Date (as defined in the Final DIP Order) occurred on October 26, 2020, and the stipulations, admissions, findings, relief, releases and other provisions of contained in the Final DIP Order shall be binding on the Debtors' estates and all parties in interest.  The Committee's Standing Motions are hereby dismissed with prejudice.

274.    Moreover, there is no evidence to support that Franklin Resources, Inc.,[18] Franklin Advisers, Inc. or any of the funds and accounts for which Franklin Advisers, Inc. serves as

---

[18]    Franklin Resources, Inc. is the parent company of Franklin Advisers, Inc.  Franklin Resources, Inc. took no part in any of the relevant transactions and at no time has held any economic stake in the Debtors, but was inappropriately listed as a party in the Proposed Complaint attached to the Affirmative Claims Standing Motion. Franklin Advisers, Inc. is also inappropriately listed as a party in the Proposed Complaint since any economic stake in the Debtors is and was held only by certain funds and accounts advised by Franklin Advisers, Inc. rather than Franklin Advisers, Inc. itself.

KE 71402552

investment manager (collectively "<u>Franklin</u>") engaged in any of the wrongdoing or inequitable conduct alleged by the Committee in the Committee's Standing Motions or the draft complaints attached thereto.  Among other things, there is no evidence that Franklin colluded with the Debtors and/or manipulated the Debtors' conduct in any way.  *Emergency Motion of the Official Committee of Unsecured Creditors for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of the Debtors' Estates and (II) Exclusive Settlement Authority* [Docket No. 1682] (the "<u>Affirmative Claims Standing Motion</u>") at ¶ 68.  There is no evidence that Franklin participated in the Director Defendant's[19] alleged squandering of the Non-Insider Preference Claims.  *Id.* at ¶ 88.  There is no evidence that Franklin coerced Chesapeake to take out its Unsecured Wildhorse Debt or obtain a favored position with respect to the Uptier Transaction.  *Id.* at ¶ 114.  There is no evidence that Franklin is or was an "insider" of the Debtors.  Furthermore, there is no legal or factual support for any of the counts alleged against the FLLO Term Loan Facility Lenders or Franklin in the Proposed Complaint, including, without limitation, intentional fraudulent transfer, aiding and abetting breach of fiduciary duty, unjust enrichment, equitable subordination, and insider preference.

**KKKK.**     **Dissolution of the Committees.**

275.     On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.  The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date.

---

[19]     Capitalized terms used but not otherwise defined in this paragraph shall have the meaning ascribed to them in the Affirmative Claims Standing Motion.

KE 71402552

**LLLL.         Effect of Non-Occurrence of Conditions to the Effective Date.**

276.     Notwithstanding the entry of this Confirmation Order, if Consummation does not occur as to any Debtor, the Plan shall be null and void in all respects as to such Debtor and nothing contained in the Plan, the Disclosure Statement, or Restructuring Support Agreement as to such Debtor shall:  (a) constitute a waiver or release of any Claims by the Debtors, Claims, or Interests; (b) prejudice in any manner the rights of the Debtors, any holders of Claims or Interests, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders of Claims or Interests, or any other Entity.

**MMMM.      Applicable Nonbankruptcy Law**

277.     The provisions of this Confirmation Order, the Plan and related documents, or any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

**NNNN.        Waiver of 14-Day Stay.**

278.     Notwithstanding Bankruptcy Rule 3020(e), and to the extent applicable, Bankruptcy Rules 6004(h), 7062, and 9014, this Confirmation Order is effective and enforceable immediately upon its entry and not subject to any stay.

**OOOO.       Post-Confirmation Modification of the Plan.**

279.     Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan, the Debtors are hereby authorized to alter, amend, or modify materially the Plan, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or this Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

**PPPP.**      **Effect of Conflict.**

280.    This Confirmation Order supersedes any Court order issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order, solely to the extent of any such inconsistency.  If there is any inconsistency between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order govern and control.

**QQQQ.**      **Final Order.**

281.    This Confirmation Order is a final order and the period in which an appeal must be filed will commence upon entry of this Confirmation Order.

**Signed:  January 15, 2021.**

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

146

**<u>Exhibit A</u>**

**The Plan**

**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 20-33233 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

---

**FIFTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION**
**OF CHESAPEAKE ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**

---

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:    (713) 752-4200
Facsimile:    (713) 752-4221
Email:    mcavenaugh@jw.com
         jwertz@jw.com
         kpeguero@jw.com
         vpolnick@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

Dated:  January 12, 2021

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    patrick.nash@kirkland.com
         marc.kieselstein@kirkland.com
         alexandra.schwarzman@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/chesapeake.  The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
        GOVERNING LAW .................................................................................................................1
    A.     Defined Terms. .......................................................................................................................1
    B.     Rules of Interpretation. ........................................................................................................17
    C.     Computation of Time. ..........................................................................................................17
    D.     Governing Law. ...................................................................................................................18
    E.     Reference to Monetary Figures. ..........................................................................................18
    F.     Reference to the Debtors or the Reorganized Debtors. .......................................................18
    G.     Controlling Document. .........................................................................................................18
    H.     Consultation, Information, Notice, and Consent Rights. .....................................................18

ARTICLE II. ADMINISTRATIVE CLAIMS, DIP CLAIMS, AND PRIORITY CLAIMS .....................................19
    A.     Administrative Claims. ........................................................................................................19
    B.     DIP Claims. ..........................................................................................................................20
    C.     Priority Tax Claims. .............................................................................................................21
    D.     Statutory Fees. .....................................................................................................................21

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ....................................21
    A.     Classification of Claims and Interests. ................................................................................21
    B.     Treatment of Claims and Interests. .....................................................................................22
    C.     Special Provision Governing Unimpaired Claims. ..............................................................25
    D.     Elimination of Vacant Classes. ...........................................................................................25
    E.     Voting Classes, Presumed Acceptance by Non-Voting Classes. .........................................25
    F.     Intercompany Interests. ........................................................................................................25
    G.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. .................26
    H.     Controversy Concerning Impairment. ..................................................................................26
    I.     Subordinated Claims and Interests. .....................................................................................26

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ...................................................................26
    A.     General Settlement of Claims and Interests. ........................................................................26
    B.     Restructuring Transactions. ..................................................................................................27
    C.     Midstream Savings Requirement. ........................................................................................27
    D.     Reorganized Debtors. ..........................................................................................................27
    E.     Sources of Consideration for Plan Distributions. ................................................................28
    F.     Convenience Claim Distribution Reserve. ..........................................................................30
    G.     Corporate Existence. ............................................................................................................30
    H.     Vesting of Assets in the Reorganized Debtors. ...................................................................30
    I.     Cancellation of Existing Securities and Agreements. ..........................................................31
    J.     Corporate Action. ................................................................................................................32
    K.     New Organizational Documents. .........................................................................................32
    L.     Indemnification Obligations. ...............................................................................................33
    M.     Directors and Officers of the Reorganized Debtors. ...........................................................33
    N.     Effectuating Documents; Further Transactions. ..................................................................33
    O.     Section 1146 Exemption. .....................................................................................................34
    P.     Director and Officer Liability Insurance. .............................................................................34
    Q.     Management Incentive Plan. ................................................................................................34
    R.     Employee Benefits. ..............................................................................................................35
    S.     Preservation of Causes of Action. .......................................................................................35
    T.     Preservation of Royalty and Working Interests. ..................................................................36
    U.     Resolution of Pending Litigation. ........................................................................................36
    V.     Payment of Certain Fees. .....................................................................................................37

i

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................... 37
    A.      Assumption and Rejection of Executory Contracts and Unexpired Leases. ................ 37
    B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases. .................... 38
    C.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ................ 38
    D.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases. .......... 39
    E.      Insurance Policies. ................................................................................................ 39
    F.      Reservation of Rights. ........................................................................................... 40
    G.      Nonoccurrence of Effective Date. ........................................................................ 40
    H.      Contracts and Leases Entered Into After the Petition Date. ................................. 40

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS .......................................................... 40
    A.      Timing and Calculation of Amounts to Be Distributed. ....................................... 40
    B.      Delivery of Distributions and Undeliverable or Unclaimed Distributions. ............ 41
    C.      Manner of Payment. .............................................................................................. 42
    D.      Exemption from Securities Laws. ......................................................................... 42
    E.      Compliance with Tax Requirements. .................................................................... 43
    F.      Allocations. ........................................................................................................... 43
    G.      No Postpetition or Default Interest on Claims. ..................................................... 43
    H.      Foreign Currency Exchange Rate. ........................................................................ 43
    I.      Setoffs and Recoupment. ...................................................................................... 43
    J.      No Double Payment of Claims. ............................................................................ 44
    K.      Claims Paid or Payable by Third Parties. ............................................................. 44

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND
               DISPUTED CLAIMS ............................................................................................. 45
    A.      Allowance of Claims. ............................................................................................ 45
    B.      Claims Administration Responsibilities. ............................................................... 45
    C.      Estimation of Claims. ............................................................................................ 45
    D.      Adjustment to Claims or Interests without Objection. .......................................... 45
    E.      Time to File Objections to Claims. ....................................................................... 46
    F.      Reservation of Rights to Object to Claims. ........................................................... 46
    G.      Disputed and Contingent Claims Reserve. ........................................................... 46
    H.      Disallowance of Claims or Interests. .................................................................... 46
    I.      No Distributions Pending Allowance. ................................................................... 46
    J.      Distributions After Allowance. ............................................................................. 46
    K.      No Interest on Disputed Claims. ........................................................................... 47

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ........................... 47
    A.      Discharge of Claims and Termination of Interests. ............................................... 47
    **B.**      **Release of Liens.** ............................................................................................... 47
    **C.**      **Releases by the Debtors.** ................................................................................ 48
    **D.**      **Releases by Holders of Claims and Interests.** ............................................... 49
    **E.**      **Exculpation.** .................................................................................................... 50
    **F.**      **Injunction.** ...................................................................................................... 50
    G.      Protections Against Discriminatory Treatment. .................................................... 51
    H.      Recoupment. .......................................................................................................... 51
    I.      Document Retention. ............................................................................................. 51
    J.      Reimbursement or Contribution. .......................................................................... 51

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ............................... 51
    A.      Conditions Precedent to the Effective Date. ......................................................... 51
    B.      Waiver of Conditions. ........................................................................................... 53
    C.      Effect of Failure of Conditions. ........................................................................... 53
    D.      Substantial Consummation ................................................................................... 53

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ......................................53

    A.      Modification and Amendments.........................................................................................53
    B.      Effect of Confirmation on Modifications.........................................................................54
    C.      Revocation or Withdrawal of Plan. .................................................................................54

ARTICLE XI. RETENTION OF JURISDICTION ..........................................................................................54

ARTICLE XII. MISCELLANEOUS PROVISIONS .......................................................................................56

    A.      Immediate Binding Effect. ..............................................................................................56
    B.      Additional Documents. ...................................................................................................56
    C.      Payment of Statutory Fees. .............................................................................................56
    D.      Statutory Committee and Cessation of Fee and Expense Payment. .................................56
    E.      Reservation of Rights......................................................................................................56
    F.      Successors and Assigns....................................................................................................57
    G.      Notices. ...........................................................................................................................57
    H.      Term of Injunctions or Stays. .........................................................................................58
    I.      Entire Agreement. ...........................................................................................................58
    J.      Plan Supplement. ............................................................................................................58
    K.      Nonseverability of Plan Provisions. ...............................................................................58
    L.      Votes Solicited in Good Faith. ........................................................................................58
    M.      Closing of Chapter 11 Cases. ..........................................................................................59
    N.      Waiver or Estoppel. ........................................................................................................59
    O.      Creditor Default. .............................................................................................................59

**INTRODUCTION**

Chesapeake Energy Corporation and the above-captioned debtors and debtors in possession (collectively, the "Debtors"), propose this joint chapter 11 plan of reorganization (as modified, amended, or supplemented from time to time, the "Plan") for the resolution of the outstanding claims against, and equity interests in, the Debtors. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor. Holders of Claims or Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, business, assets, results of operations, historical financial information, risk factors, a summary and analysis of this Plan, the Restructuring Transactions, and certain related matters. Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.     *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.     "*1145 Securities*" has the meaning set forth in Article IV.E.1 of the Plan.

2.     "*4(a)(2) Securities*" has the meaning set forth in Article IV.E.1 of the Plan.

3.     "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business; (b) Allowed Professional Claims; (c) DIP Claims; (d) Adequate Protection Super-Priority Claims (as defined in the Final DIP Order) (if any); (e) Royalty and Working Interests Administrative Claims; (f) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code; and (g) as approved by the Backstop Commitment Agreement Approval Order, including the priority and payment subordination provisions described in paragraph 7 thereof, the Put Option Premium.

4.     "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which shall be 30 days after the Effective Date; *provided*, *however*, that the deadline for Filing requests for payment of Royalty and Working Interests Administrative Claims shall be 120 days after the Effective Date.

5.     "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code. With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

6.     "*Agent*" means any administrative agent, collateral agent, collateral trustee, or similar Entity under the Exit Facilities, the DIP Facility, the Revolving Credit Facility, the Collateral Agreement, the Collateral Trust Agreement, and/or the FLLO Term Loan Facility.

7.     "*Allowed*" means, with respect to any Claim or Interest, except as otherwise provided herein: (a) a Claim or Interest in a liquidated amount as to which no objection has been Filed prior to the applicable claims objection deadline and that is evidenced by a Proof of Claim or Interest, as applicable, timely Filed by the applicable Bar Date or that is not required to be evidenced by a Filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, or a Final Order; (b) a Claim or Interest that is scheduled by the Debtors as neither Disputed, contingent, nor unliquidated, and for which no Proof of Claim or Interest, as applicable, has been timely Filed in an

unliquidated or a different amount; (c) a Claim or Interest that is upheld or otherwise Allowed (i) pursuant to the Plan; (ii) in any stipulation that is approved by the Bankruptcy Court; (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith; or (iv) by Final Order (including any such Claim to which the Debtors had objected or which the Bankruptcy Court had disallowed prior to such Final Order); *provided* that with respect to a Claim or Interest described in clauses (a) through (c) above, such Claim or Interest shall be considered Allowed only if and to the extent that with respect to such Claim or Interest no objection to the allowance thereof has been or, in the Debtors' or Reorganized Debtors' reasonable good faith judgment, may be interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim or Interest, as applicable, shall have been Allowed by a Final Order; *provided*, *further*, that no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or Disputed, and for which no Proof of Claim or Interest is or has been timely Filed, is not considered Allowed and shall be deemed expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. For the avoidance of doubt a Proof of Claim or Interest Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim. "Allow," "Allowing," and "Allowance" shall have correlative meanings.

8. "*Alternative Securities Exchange*" means, excluding any National Securities Exchange, any other securities exchange or over-the-counter quotation system, including, without limitation, the NYSE MKT, the Nasdaq Capital Market, any quotation or other listing service provided by the OTC Markets Group or the Financial Industry Regulatory Authority, Inc., any "pink sheet" or other alternative listing service, or any successor or substantially equivalent service to any of the foregoing.

9. "*Assumed Executory Contracts and Unexpired Leases Schedule*" means the schedule of Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, which shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

10. "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

11. "*Backstop*" means the several and not joint backstop in full of the Rights Offering by the Backstop Parties pursuant to the Backstop Commitment Agreement.

12. "*Backstop Allocations*" has the meaning set forth in Article IV.E.1 of the Plan.

13. "*Backstop Commitment Agreement*" means that certain Backstop Commitment Agreement, dated as of June 28, 2020, by and between Chesapeake and the Backstop Parties, as may be further amended, modified, or supplemented from time to time, in accordance with its terms.

14. "*Backstop Commitment Agreement Approval Order*" means the *Order (I) Authorizing Entry into the Backstop Commitment Agreement, (II) Approving the Payment of Fees and Expenses Related Thereto, and (III) Granting Related Relief* entered by the Bankruptcy Court on August 21, 2020 at CM/ECF No. 899 in the Chapter 11 Cases.

15. "*Backstop Parties*" means the members of the FLLO Ad Hoc Group and Franklin that are signatories to the Backstop Commitment Agreement.

16. "*Backstop Party Rights*" means the non-certificated rights that will enable the holders thereof to purchase shares of New Common Stock at an aggregate purchase price of $150 million at a price per share to be determined based on a 35 percent discount to the equity value per share of New Common Stock, post new-money, as implied by a Plan total enterprise value of $3.25 billion.

17.　　"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

18.　　"*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas.

19.　　"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each, as amended from time to time.

20.　　"*Bar Date*" means the date established by the Bankruptcy Court by which Proofs of Claim or Proofs of Interest must be Filed with respect to such Claims or Interests, other than Administrative Claims, Claims held by Governmental Units, or other Claims or Interests for which the Bankruptcy Court entered an order excluding the holders of such Claims or Interests from the requirement of Filing Proofs of Claim or Proofs of Interest.

21.　　"*Business Day*" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the State of New York.

22.　　"*Cash*" means cash in legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items.

23.　　"*Cause of Action*" or "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

24.　　"*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

25.　　"*Chesapeake*" means Chesapeake Energy Corporation or any successor or assign, by merger, consolidation, or otherwise, prior to the Effective Date.

26.　　"*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

27.　　"*Claims and Balloting Agent*" means Epiq Corporate Restructuring, LLC, the notice, claims, and solicitation agent retained by the Debtors in the Chapter 11 Cases.

28.　　"*Claims Register*" means the official register of Claims maintained by the Claims and Balloting Agent.

29.　　"*Class*" means a class of Claims or Interests as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

30.　　"*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

31.　　"*Collateral Agreement*" means that certain Collateral Agreement dated December 19, 2019 by and between MUFG Union Bank, N.A., as collateral trustee, Chesapeake, and certain of the other Debtors.

32.      "*Collateral Trust Agreement*" means that certain Collateral Trust Agreement dated December 19, 2019 by and between MUFG Union Bank, N.A., as collateral trustee and revolver agent, and GLAS USA LLC, as original term loan agent, and as acknowledged and agreed by certain of the Debtors (as from time to time amended and restated).

33.      "*Collateral Trust Documents*" means collectively, the Collateral Agreement, the Collateral Trust Agreement, and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents (including any amendments, restatements, supplements, or modifications of any of the foregoing), related to or executed in connection with the Collateral Agreement and the Collateral Trust Agreement.

34.      "*Collateral Trustee*" means MUFG Union Bank, N.A., in its capacity as collateral trustee under the Collateral Agreement and the Collateral Trust Agreement.

35.      "*Conditions Precedent to the Effective Date*" means the conditions precedent to the Effective Date set forth in Article IX.A of the Plan.

36.      "*Conditions Precedent to the Exit Facilities*" means the conditions precedent to the closing of the Exit Facilities identified on Exhibit D to the Exit Facilities Term Sheet.

37.      "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

38.      "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

39.      "*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court on confirmation of the Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

40.      "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

41.      "*Consenting DIP Lenders*" means those certain DIP Lenders that are or have become parties to the Restructuring Support Agreement.

42.      "*Consenting FLLO Term Loan Facility Lenders*" means those certain FLLO Term Loan Facility Lenders that are or have become parties to the Restructuring Support Agreement.

43.      "*Consenting Revolving Credit Facility Lenders*" means those certain Revolving Credit Facility Lenders that are or have become parties to the Restructuring Support Agreement.

44.      "*Consenting Second Lien Noteholders*" means Second Lien Noteholders, investment advisors thereto, sub-advisors thereto, or managers of discretionary accounts belonging to Second Lien Noteholders that are or have become parties to the Restructuring Support Agreement.

45.      "*Consenting Stakeholders*" means collectively, the Consenting DIP Lenders, the Consenting Revolving Credit Facility Lenders, the Consenting FLLO Term Loan Facility Lenders, and the Consenting Second Lien Noteholders.

46.      "*Consenting Unsecured Noteholders*" means Unsecured Noteholders, investment advisors thereto, sub-advisors thereto, or managers of discretionary accounts belonging to Unsecured Noteholders that are or have become parties to the Restructuring Support Agreement.

47.      "*Consummation*" means the occurrence of the Effective Date as to the applicable Debtor.

48.     "*Convenience Claim*" means any Allowed General Unsecured Claim (i) that is Allowed in an amount greater than $0 but less than or equal to $1,000,000.00; and (ii) for which the holder of such Claim irrevocably elects via a Convenience Claim Election Form to have such Claim treated as a Convenience Claim (upon Allowance) for the purposes of the Plan, in full and final satisfaction of such Claim; *provided* that a holder of a General Unsecured Claim in excess of $1,000,000.00 may irrevocably elect via a Convenience Claim Election Form to have such Claim irrevocably reduced to $1,000,000.00 and treated as a Convenience Claim (upon Allowance) for the purposes of the Plan, in full and final satisfaction of such Claim.

49.     "*Convenience Claim Election Form*" means the form to be distributed by the Claims and Balloting Agent to each holder of a General Unsecured Claim as soon as reasonably practicable after the Effective Date.

50.     "*Convenience Claim Distribution*" means each Convenience Claim's *Pro Rata* share of $10,000,000.00, which *Pro Rata* share shall not exceed 5 percent of such Convenience Claim.

51.     "*Convenience Claim Distribution Reserve*" means an interest bearing account funded by the Reorganized Debtors with Cash on the Effective Date in an amount equal to $10,000,000.00.

52.     "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon the Debtors' defaults on an Executory Contract or Unexpired Lease at the time such Executory Contract or Unexpired Lease is assumed by the Debtors pursuant to section 365 of the Bankruptcy Code, other than with respect to a default that is not required to be cured under section 365(b)(2) of the Bankruptcy Code.

53.     "*D&O Liability Insurance Policies*" means all insurance policies issued to or providing coverage at any time to any of the Debtors for directors', managers', and officers' liability existing as of the Petition Date (including any "tail policy") and all agreements, documents, or instruments relating thereto.

54.     "*Definitive Documents*" means, without limitation, the following documents:  (a) the Plan and its exhibits, ballots, and solicitation procedures; (b) the Confirmation Order; (c) the Disclosure Statement; (d) the Disclosure Statement Order; (e) the First Day Pleadings and all orders sought pursuant thereto; (f) the Plan Supplement; (g) the DIP Order, DIP Credit Agreement, and any and all other DIP Documents and related documentation; (h) the Backstop Commitment Agreement, Backstop Commitment Agreement Approval Order, Rights Offering Procedures, Registration Rights Agreement and any and all documentation required to implement, issue, and distribute the New Common Stock; (i) the New Warrants Agreements; (j) the Exit Facilities Documents and related documentation; (k) the Management Incentive Plan; (l) the New Organizational Documents and all other documents or agreements for the governance of Reorganized Chesapeake, including the list of directors of Reorganized Chesapeake and any certificates of incorporation and shareholders' agreements or supplements as may be reasonably necessary or advisable to implement the Restructuring Transactions; and (m) such other agreements and documentation reasonably desired or necessary to consummate and document the transactions contemplated by the Plan.

55.     "*DIP Agent*" means MUFG Union Bank, N.A., in its capacity as administrative agent and collateral agent under the DIP Credit Agreement.

56.     "*DIP Agent Fees and Expenses*" has the meaning ascribed to such term in the DIP Order.

57.     "*DIP Claims*" means all Claims derived from, based upon, or secured pursuant to the DIP Credit Agreement or DIP Order, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, professional fee reimbursements, transaction fees, Superpriority Hedge Claims, and other charges arising thereunder or related thereto, in each case, with respect to the DIP Facility; *provided* that any Adequate Protection Super-Priority Claims (as defined in the Final DIP Order), including such Claims granted in respect of the Revolving Credit Facility, FLLO Term Loan Facility, or Second Lien Notes authorized in the DIP Order, shall not be DIP Claims.

58.     "*DIP Credit Agreement*" means that certain Senior Secured Super-Priority Debtor-In-Possession Credit Agreement dated July 1, 2020, between Chesapeake Energy Corporation, as borrower, the Debtor guarantors that are party thereto, the DIP Lenders, and the DIP Agent (as may be amended, supplemented, or otherwise modified from time to time).

59.     "*DIP Documents*" means collectively, the DIP Credit Agreement and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents (including any amendments, restatements, supplements, or modifications of any of the foregoing), related to or executed in connection with the DIP Credit Agreement.

60.     "*DIP Facility*" means that certain debtor-in-possession financing facility documented pursuant to the DIP Documents and DIP Order.

61.     "*DIP Lenders*" means the lenders party to the DIP Credit Agreement.

62.     "*DIP Order*" means collectively, the Interim DIP Order and the Final DIP Order.

63.     "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto.

64.     "*Disclosure Statement Order*" means an order of the Bankruptcy Court approving the Disclosure Statement, the Solicitation Materials, and the solicitation of the Plan.

65.     "*Disputed*" means, as to a Claim or an Interest, any Claim or Interest:  (a) that is not Allowed; (b) that is not disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable; (c) as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy law; (d) that is Filed in the Bankruptcy Court and not withdrawn, as to which a timely objection or request for estimation has been Filed; and (e) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

66.     "*Distribution Record Date*" means, other than with respect to publicly held Securities, the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be on or before the Effective Date.  For the avoidance of doubt, no distribution record date shall apply to holders of public Securities, including the Second Lien Notes and the Unsecured Notes.

67.     "*DTC*" means the Depository Trust Company.

68.     "*Effective Date*" means, as to the applicable Debtor, the date that is the first Business Day on which (a) no stay of the Confirmation Order is in effect and (b) all Conditions Precedent to the Effective Date have been satisfied or waived in accordance with Article IX.B of the Plan.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

69.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

70.     "*Estate*" means as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code upon the commencement of such Debtor's Chapter 11 Case.

71.     "*Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*, as amended from time to time, and the rules and regulations promulgated thereunder.

72.     "*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) any official committees appointed in the Chapter 11 Cases and each of their respective members; (c) the DIP Lenders; (d) the Exit Facilities Lenders; (e) the Consenting Revolving Credit Facility Lenders; (f) the Consenting FLLO Term Loan Facility Lenders; (g) the Consenting Second Lien Noteholders; (h) the Consenting Unsecured Noteholders; (i) the Agents; (j) each Trustee; (k) the Backstop Parties; and (l) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders, subsidiaries, participants, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

73.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

74.     "*Existing Equity Interest*" means an Interest in Chesapeake Energy Corporation existing as of the Petition Date.

75.     "*Existing RBL Adequate Protection Payments*" has the meaning ascribed to such term in the DIP Order.

76.     "*Exit Facilities*" means collectively, the Exit RBL Facility and Exit FLLO Term Loan Facility.

77.     "*Exit Facilities Agent*" means MUFG Union Bank, N.A., in its capacity as administrative agent for the Exit Facilities.

78.     "*Exit Facilities Credit Agreements*" means those certain credit agreements that will govern the Exit Facilities (as each may be amended, supplemented, or otherwise modified from time to time), in each case which shall be consistent with the Exit Facilities Term Sheet.

79.     "*Exit Facilities Documents*" means, collectively, the Exit Facilities Credit Agreements, and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any amendments to existing loan or other finance documentation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, in each case if any, the form and substance of which shall be consistent with the Exit Facilities Term Sheet.

80.     "*Exit Facilities Lenders*" means the lenders party to the Exit Facilities Credit Agreements.

81.     "*Exit Facilities Loans*" means collectively, the Tranche A RBL Exit Facility Loans, the Tranche B RBL Exit Facility Loans, and the Exit FLLO Term Loans.

82.     "*Exit Facilities Term Sheet*" means the term sheet setting forth the material terms of the Exit Facilities, attached as <u>Exhibit 3</u> to the Restructuring Term Sheet.

83.     "*Exit FLLO Term Loan*" means term loans made under and on the terms set forth under the Exit FLLO Term Loan Facility.

84.     "*Exit FLLO Term Loan Facility*" means the term loan facility to be provided in accordance with the terms set forth in the Exit Facilities Term Sheet.

85.     "*Exit RBL Facility*" means the revolving credit facility to be provided in accordance with the terms set forth in the Exit Facilities Term Sheet.

86.     "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

87.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

88. "*Final DIP Order*" means the *Final Order (I) Authorizing The Debtors To Obtain Postpetition Financing, (II) Authorizing The Debtors To Use Cash Collateral, (III) Granting Liens And Providing Claims With Superpriority Administrative Expense Status, (IV) Granting Adequate Protection To The Existing Secured Parties, (V) Modifying The Automatic Stay, And (VI) Granting Related Relief* entered by the Bankruptcy Court on July 31, 2020 at CM/ECF No. 597 in the Chapter 11 Cases.

89. "*Final Order*" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter that has not been reversed, stayed, modified, or amended, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order will not preclude such order from being a Final Order.

90. "*First Day Pleadings*" means the pleadings and related documentation requesting certain emergency relief, or supporting the request for such relief, Filed by the Debtors on or around the Petition Date and heard at the "first day" hearing.

91. "*FLLO Ad Hoc Group*" means the ad hoc group of FLLO Term Loan Facility Lenders represented by Davis Polk & Wardwell LLP.

92. "*FLLO Professionals*" means the FLLO Term Loan Facility Administrative Agent's professionals (including Arnold & Porter Kaye Scholer LLP and one local counsel in the relevant jurisdiction), the Collateral Trustee's professionals (including Paul Hastings LLP), and the FLLO Ad Hoc Group's professionals (including Davis Polk & Wardwell LLP, Vinson & Elkins LLP, one local counsel in each other relevant local jurisdiction, and Perella Weinberg Partners LP).

93. "*FLLO Rights*" means the non-certificated rights that will enable the holders thereof to purchase shares of New Common Stock at an aggregate purchase price of $382.5 million at a price per share to be determined based on a 35 percent discount to the equity value per share of New Common Stock, post new-money, as implied by a Plan total enterprise value of $3.25 billion.

94. "*FLLO Term Loan Facility*" means the facility outstanding under the FLLO Term Loan Facility Credit Agreement.

95. "*FLLO Term Loan Facility Administrative Agent*" means GLAS USA LLC, in its capacity as administrative agent for the FLLO Term Loan Facility.

96. "*FLLO Term Loan Facility Claim*" means any Claim on account of the FLLO Term Loan Facility.

97. "*FLLO Term Loan Facility Credit Agreement*" means that certain Term Loan Agreement, dated as of December 19, 2019 ((i) as supplemented by that certain Class A Term Loan Supplement, dated as of December 19, 2019 (as amended, restated or otherwise modified from time to time), by and among Chesapeake, as borrower, the Debtor guarantors party thereto, the FLLO Term Loan Facility Administrative Agent, and the lender parties thereto, and (ii) as further amended, restated, or otherwise modified from time to time), by and among Chesapeake, as borrower, the Debtor guarantors party thereto, the FLLO Term Loan Facility Administrative Agent, and the lenders party thereto.

98. "*FLLO Term Loan Facility Lenders*" means lenders party to the FLLO Term Loan Facility Credit Agreement.

99.  "*Franklin*" means Franklin Advisers, Inc., as investment manager on behalf of certain funds and accounts.

100.  "*General Unsecured Claim*" means any Claim against any Debtor that is not otherwise paid in full during the Chapter 11 Cases pursuant to an order of the Bankruptcy Court and is not an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, an Other Secured Claim, a Revolving Credit Facility Claim, a FLLO Term Loan Facility Claim, a Second Lien Notes Claim, an Unsecured Notes Claim, an Intercompany Claim, or a Section 510(b) Claim.

101.  "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

102.  "*Impaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

103.  "*Insurance Policies*" means all insurance policies, including all D&O Liability Insurance Policies, that have been issued at any time or provide coverage, benefits or proceeds to any of the Debtors (or their predecessors) and all agreements, documents or instruments relating thereto.

104.  "*Insurer*" means any company or other Entity that issued or entered into an Insurance Policy, any third party administrator of or for any Insurance Policy, and any respective predecessors, successors and/or affiliates of any of the foregoing.

105.  "*Intercompany Claim*" means any Claim held by a Debtor or an Affiliate against a Debtor or an Affiliate of a Debtor.

106.  "*Intercompany Interest*" means an Interest in a Debtor held by a Debtor or an Affiliate of a Debtor.

107.  "*Intercreditor Agreement*" means that certain Intercreditor Agreement dated as of December 19, 2019 by and between MUFG Union Bank, N.A., as Priority Lien Agent, and the Second Lien Notes Trustee, and as acknowledged and agreed by certain of the Debtors (as from time to time amended and restated).

108.  "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable Securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

109.  "*Interim DIP Order*" means the *Interim Order (I) Authorizing The Debtors To Obtain Postpetition Financing, (II) Authorizing The Debtors To Use Cash Collateral, (III) Granting Liens And Providing Claims With Superpriority Administrative Expense Status, (IV) Granting Adequate Protection To The Existing Secured Parties, (V) Modifying The Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief* entered by the Bankruptcy Court on June 29, 2020 at CM/ECF No. 128 in the Chapter 11 Cases.

110.  "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time.

111.  "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

112.  "*Management Incentive Plan*" has the meaning set forth in Article IV.Q of the Plan.

113.  "*Minimum Liquidity Condition*" means the Condition Precedent to the Effective Date that provides that the Debtors shall have minimum liquidity, including unrestricted cash on hand and availability under the Exit RBL Facility, of at least $500 million.

114.    "*National Securities Exchange*" means The New York Stock Exchange, The Nasdaq Global Select Market, or The Nasdaq Global Market.

115.    "*New Board*" means the board of directors of Reorganized Chesapeake that shall be appointed in accordance with the terms of the governance term sheet attached as <u>Exhibit 6</u> to the Restructuring Term Sheet.  The identities of directors on the New Board shall be set forth in the Plan Supplement, to the extent known.

116.    "*New Class A Warrants*" means warrants to purchase 10 percent of the New Common Stock (after giving effect to the Rights Offering, but subject to dilution by the Management Incentive Plan, the New Class B Warrants, and the New Class C Warrants), with a term of 5 years at an initial exercise price per share struck at the equity value of Reorganized Chesapeake, post new-money, implied by a total enterprise value of $4.0 billion.

117.    "*New Class B Warrants*" means warrants to purchase 10 percent of the New Common Stock (after giving effect to the Rights Offering, but subject to dilution by the Management Incentive Plan and the New Class C Warrants), with a term of 5 years at an initial exercise price per share struck at the equity value of Reorganized Chesapeake, post new-money, implied by a total enterprise value of $4.5 billion.

118.    "*New Class C Warrants*" means warrants to purchase 10 percent of the New Common Stock (after giving effect to the Rights Offering, but subject to dilution by the Management Incentive Plan), with a term of 5 years at an initial exercise price per share struck at the equity value of Reorganized Chesapeake, post new-money, implied by a total enterprise value of $5.0 billion.

119.    "*New Common Stock*" means the single class of common stock to be issued by Reorganized Chesapeake on the Effective Date on terms acceptable to the Required Plan Sponsors.

120.    "*New Organizational Documents*" means the amended and restated or new charters, bylaws, operating agreements, or other organizational documents of Reorganized Chesapeake and the other Reorganized Debtors, as applicable and in form and substance satisfactory to the Required Plan Sponsors.

121.    "*New Warrants*" means collectively, the New Class A Warrants, the New Class B Warrants, and the New Class C Warrants.

122.    "*New Warrants Agreements*" means the documents or agreements governing the New Warrants, Filed with the Plan Supplement, which will be consistent in all material respects with the terms of this Plan and shall at all times be in form and substance reasonably acceptable to the Required Plan Sponsors and the Consenting Second Lien Noteholders holding at least 66.67% of the aggregate outstanding principal amount of the Second Lien Notes Claims that are held by the Consenting Second Lien Noteholders.

123.    "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

124.    "*Other Secured Claim*" means any Secured Claim other than a DIP Claim, Revolving Credit Facility Claim, a FLLO Term Loan Facility Claim, or a Second Lien Notes Claim.

125.    "*PDP PV-10 Ratio*" means the ratio of (a) the total present value of the future net revenues expected with respect to the oil and gas properties of the Debtors discounted at 10% per annum, calculated in accordance with the Exit Facilities Term Sheet to (b) consolidated indebtedness under the Exit Credit Facilities and any other secured debt of Chesapeake as of the closing date of the Exit Credit Facilities.

126.    "*PDP PV-10 Test Ratio Condition*" means the Condition Precedent to the Effective Date that provides that the Debtors shall have a PDP PV-10 Ratio no less than 1.5x.

127.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

128.    "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

129. "*Plan Securities*" has the meaning set forth in Article IV.E.1 of the Plan.

130. "*Plan Supplement*" means the compilation of documents and forms of documents, term sheets, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed prior on or before November 23, 2020, and any additional documents Filed prior to the Effective Date as amendments to the Plan Supplement, including the following, as applicable: (a) the New Organizational Documents; (b) to the extent known, the identities of the members of the New Board; (c) the Assumed Executory Contracts and Unexpired Leases Schedule; (d) the Rejected Executory Contracts and Unexpired Leases Schedule; (e) the Schedule of Retained Causes of Action; (f) a summary of the material terms of the Exit Facilities, which may include the Exit Facilities Term Sheet; (g) the definitive documentation related to the Management Incentive Plan; (h) the Restructuring Transactions Memorandum; (i) the New Warrants Agreements; and (j) the Registration Rights Agreement.

131. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

132. "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class, unless otherwise indicated; *provided* that, as used in Article III.B.6 and III.B.7, "*Pro Rata*" means the proportion that an Allowed Unsecured Notes Claim or Allowed General Unsecured Claim, as appropriate, bears to the aggregate amount of Allowed Unsecured Notes Claims and Allowed General Unsecured Claims that are not Convenience Claims; *provided, further,* that for the purpose of calculating the aggregate Allowed Unsecured Notes Claims and aggregate Allowed General Unsecured Claims for purposes of determining each Allowed Unsecured Notes Claim's and Allowed General Unsecured Claim's *Pro Rata* distribution, each Allowed Unsecured Notes Claim and Allowed General Unsecured Claim shall be counted once, notwithstanding the number of Debtors against which such claim may be asserted; *provided, further,* that for the purpose of calculating the Convenience Claim Distribution pursuant to Article III.B.7 of the Plan, "*Pro Rata*" means the proportion that the amount of a Convenience Claim bears to the aggregate amount of Convenience Claims.

133. "*Professional*" means an Entity: (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

134. "*Professional Claim*" means a Claim by a professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

135. "*Professional Fee Amount*" means the aggregate amount of Professional Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors as set forth in Article II.A.2(c) of the Plan.

136. "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Reorganized Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount.

137. "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases by the Claims Bar Date or the applicable Administrative Claims Bar Date, as applicable.

138. "*Proof of Interest*" means a proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

139.     "*Put Option Premium*" means a nonrefundable aggregate fee of $60 million, which represents 10 percent of the Rights Offering Amount, payable to the Backstop Parties in accordance with, and subject to the terms of, the Backstop Commitment Agreement based on their respective Backstop commitment percentages at the time such payment is made.

140.     "*Registration Rights Agreement*" means the registration rights agreement pursuant to which each Backstop Party shall be entitled to registration rights with respect to its shares of New Common Stock, its New Warrants, and its shares of New Common Stock underlying its New Warrants to be entered into as of the Effective Date.  The Registration Rights Agreement will provide (among other provisions) that, after the Effective Date, at any time Reorganized Chesapeake is not required to file public reports with the SEC, Reorganized Chesapeake shall continue to file such public reports on EDGAR as a voluntary filer, unless approved by the holders of a majority of the outstanding New Common Stock.

141.     "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall not be discharged hereunder and the holder's legal, equitable, and contractual rights on account of such Claim or Interest shall remain unaltered by Consummation in accordance with section 1124(1) of the Bankruptcy Code.

142.     "*Rejected Executory Contracts and Unexpired Leases Schedule*" means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, which schedule shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time; *provided* that such schedule shall be in form and substance acceptable to the Required Consenting Stakeholders.

143.     "*Released Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each of the Debtors' current and former directors and officers; (d) each DIP Lender; (e) each Agent; (f) each Trustee; (g) the Consenting Revolving Credit Facility Lenders; (h) the Consenting FLLO Term Loan Facility Lenders; (i) the Consenting Second Lien Noteholders; (j) the Consenting Unsecured Noteholders; (k) the Exit Facilities Lenders; (l) the Backstop Parties; (m) all holders of Interests; and (n) with respect to each of the foregoing (a) through (m), each of such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, participants, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided* that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.

144.     "*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each DIP Lender; (d) each Agent; (e) each Trustee; (f) the Consenting Revolving Credit Facility Lenders; (g) the Consenting FLLO Term Loan Facility Lenders; (h) the Consenting Second Lien Noteholders; (i) the Consenting Unsecured Noteholders; (j) the Exit Facilities Lenders; (k) the Backstop Parties; (l) all holders of Claims; (m) all holders of Interests; (n) with respect to each of the foregoing (a) through (m), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, participants, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case, solely in their respective capacities as such with respect to such Entity and solely to the extent such Entity has the authority to bind such Affiliate in such capacity; *provided* that in each case, an Entity shall not be a Releasing Party if it:  (x) elects to opt out of the releases contained in the Plan; or (y) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation.

145.     "*Removal Deadline*" means the deadline by which the Debtors may remove actions pursuant to 28 U.S.C. § 1452 and Bankruptcy Rule 9027, as amended by the Removal Extension Order.

146.     "*Removal Extension Order*" means the *Order (I) Extending the Time Within Which the Debtors May Remove Actions and (II) Granting Related Relief* entered by the Bankruptcy Court on September 25, 2020 at CM/ECF No. 1231 in the Chapter 11 Cases.

147.     "*Reorganized Debtors*" means collectively, a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Effective Date, including any new entity established in connection with the implementation of the Restructuring Transactions.

148.     "*Reorganized Chesapeake*" means the new entity which shall be incorporated in the State of Delaware and will be the successor or assign to Chesapeake, by merger, consolidation, or otherwise, on or after the Effective Date.

149.     "*Required Consenting DIP Lenders*" means Consenting DIP Lenders holding at least 51% of the aggregate Revolving DIP Loan Commitments under the DIP Facility that are held by Consenting DIP Lenders.

150.     "*Required Consenting Revolving Credit Facility Lenders*" means Consenting Revolving Credit Facility Lenders holding at least 51% of the aggregate outstanding principal amount of the Revolving Credit Facility Claims that are held by Consenting Revolving Credit Facility Lenders.

151.     "*Required Consenting Stakeholders*" means the Required Consenting DIP Lenders, the Required Consenting Revolving Credit Facility Lenders, and the Required Plan Sponsors.

152.     "*Required Plan Sponsors*" means the Backstop Parties holding FLLO Term Loan Facility Claims and commitments to Backstop the Rights Offering such that the Required Plan Sponsors Percentage exceeds 66 2/3 percent.

153.     "*Required Plan Sponsors Percentage*" means a fraction, expressed as a percentage, (a) the numerator of which shall be the sum of (i) the aggregate outstanding principal amount of FLLO Term Loan Facility Claims that are held by the relevant Backstop Parties and (ii) the percentage of the Backstop ascribed to the relevant Backstop Parties (as set forth in the Backstop Commitment Agreement) multiplied by the Rights Offering Amount; and (b) the denominator of which shall be the sum of (i) the aggregate outstanding principal amount of FLLO Term Loan Facility Claims that are held by all of the Backstop Parties and (ii) the Rights Offering Amount.

154.     "*Restructuring Expenses*" means any reasonable and documented unpaid fees and expenses incurred on or before the Effective Date by the FLLO Professionals and the Second Lien Professionals payable on the Effective Date, subject to the conditions set forth in Article IV.U of the Plan; *provided* that reimbursement of the Second Lien Notes Trustee's financial advisor's fees and expenses shall be limited to $250,000 in the aggregate, and no Person shall be entitled to increase or seek to increase this $250,000 limit or use a charging lien or seek payment for such financial advisor's or any financial advisor to the Second Lien Notes Trustee's fees and expenses from any other source.

155.     "*Restructuring Support Agreement*" means that certain restructuring support agreement, dated as of June 28, 2020, by and among the Debtors and the Consenting Stakeholders, as may be further amended, modified, or supplemented from time to time, in accordance with its terms.

156.     "*Restructuring Term Sheet*" means the term sheet setting forth the material terms of the Restructuring Transactions, attached as Exhibit B to the Restructuring Support Agreement.

157.     "*Restructuring Transactions*" means the transactions described in Article IV.B of the Plan.

158.     "*Restructuring Transactions Memorandum*" means a document, in form and substance acceptable to the Required Consenting Stakeholders, to be included in the Plan Supplement that will set forth the material components of the Restructuring Transactions.

159.     "*Revolving Credit Facility*" means the facility outstanding under the Revolving Credit Facility Credit Agreement.

160.     "*Revolving Credit Facility Administrative Agent*" means MUFG Union Bank, N.A., in its capacity as administrative agent for the Revolving Credit Facility.

161.     "*Revolving Credit Facility Claim*" means any Claim on account of the Revolving Credit Facility, other than any Claims converted to Roll-Up Loans (as defined in the Final DIP Order).

162.     "*Revolving Credit Facility Credit Agreement*" means that certain Amended and Restated Credit Agreement, dated as of September 12, 2018 (as amended, restated, or otherwise modified from time to time), by and among Chesapeake, as borrower, the Debtor guarantors party thereto, the Revolving Credit Facility Administrative Agent, and the other lender, issuer, and agent parties party thereto.

163.     "*Revolving Credit Facility Lenders*" means the lenders party to the Revolving Credit Facility Credit Agreement.

164.     "*Revolving DIP Loan Commitment*" means a commitment to provide revolving loans under the DIP Facility.

165.     "*Rights*" means collectively, the FLLO Rights, the Second Lien Rights, and the Backstop Party Rights.

166.     "*Rights Offering*" means the New Common Stock rights offering for the Rights Offering Amount to be consummated by the Debtors on the Effective Date in accordance with the Rights Offering Procedures.

167.     "*Rights Offering Amount*" means a minimum of $600 million in aggregate amount of Rights.

168.     "*Rights Offering Participants*" means (a) holders of FLLO Term Loan Facility Claims and Second Lien Notes Claims as of the Rights Offering Record Date and (b) the Backstop Parties.

169.     "*Rights Offering Procedures*" means the procedures governing the Rights Offering attached as an exhibit to the Disclosure Statement Order.

170.     "*Rights Offering Record Date*" means the record date set by the Rights Offering Procedures, as of which date an Entity must be a record holder of FLLO Term Loan Facility Claims or Second Lien Notes Claims in order to be eligible to be a Rights Offering Participant.

171.     "*Royalty and Working Interests*" means the working interests involving the right to exploit oil, gas, and other minerals, as well as royalty and certain other mineral interests, including, but not limited to, landowner's royalty interests, overriding royalty interests, net profit interests, non-participating royalty interests, and unleased mineral interests.

172.     "*Royalty and Working Interests Administrative Claims*" means any postpetition, pre-Effective Date rights to payment arising on account of Royalty and Working Interests.

173.     "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time.

174.     "*Schedules*" means the schedules of assets and liabilities, schedules of Executory Contracts or Unexpired Leases, and statement of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules.

175.     "*SEC*" means the United States Securities and Exchange Commission.

176.     "*Second Lien Noteholders*" means holders of notes issued under the Second Lien Notes Indenture.

177.     "*Second Lien Notes*" means the 11.500% senior notes due 2025 issued by Chesapeake pursuant to the Second Lien Notes Indenture.

178.     "*Second Lien Notes Claim*" means any Claim on account of the Second Lien Notes.

179.     "*Second Lien Notes Indenture*" means that certain indenture dated as of December 19, 2019, by and among Chesapeake, as issuer, certain Debtors guarantors party thereto, and the Second Lien Notes Trustee, as may be amended, supplemented, or otherwise modified from time to time.

180.     "*Second Lien Notes Trustee*" means Deutsche Bank Trust Company Americas, in its capacity as trustee and collateral trustee for the Second Lien Notes Indenture.

181.     "*Second Lien Professionals*" means the Second Lien Collateral Trustee's professionals (including Morgan, Lewis & Bockius LLP, one local counsel in the relevant jurisdiction, and one financial advisor) and Franklin's professionals (including Akin Gump Strauss Hauer & Feld LLP, Moelis & Company LLC, one local counsel in each other relevant local jurisdiction, and FTI Consulting, Inc.).

182.     "*Second Lien Rights*" means the non-certificated rights that will enable the holders thereof to purchase shares of New Common Stock at an aggregate purchase price of $67.5 million at a price per share to be determined based on a 35 percent discount to the equity value per share of New Common Stock, post new-money, as implied by a Plan total enterprise value of $3.25 billion.

183.     "*Section 510(b) Claim*" means any Claim or Interest against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code, whether by operation of law or contract.

184.     "*Secured*" means, when referring to a Claim: (a) secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

185.     "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

186.     "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

187.     "*Solicitation Materials*" means the Disclosure Statement and related documentation to be distributed to holders of Claims entitled to vote on the Plan.

188.     "*Superpriority Hedge Claims*" means superpriority claims in respect of the Debtors' Superpriority Hedge Obligations.

189.     "*Superpriority Hedge Obligations*" means all hedging obligations with respect to commodity hedge transactions that are secured under the DIP Facility.

190.     "*Total Leverage*" means the ratio of (a) consolidated indebtedness net of unrestricted Cash and Cash equivalents held in a pledged account in an amount not to exceed $100 million to (b) consolidated EBITDAX calculated in accordance with the terms set forth in the Exit Facilities Term Sheet.

191.     "*Total Leverage Condition*" means the Condition Precedent to the Effective Date that provides that the Debtors shall have Total Leverage no greater than 2.25:1.00.

192.     "*Tranche A RBL Exit Facility Loans*" means fully revolving loans made under and on the terms set forth under the Exit RBL Facility which will be partially funded on the Effective Date, will have a scheduled maturity of 3 years from the Effective Date, and shall at all times be repaid prior to the repayment of Tranche B Exit RBL Facility Loans.

193.     "*Tranche B RBL Exit Facility Loans*" means term loans made under and on the terms set forth under the Exit RBL Facility which will be fully funded on the Effective Date, will have a scheduled maturity of 4 years from the Effective Date, will be repaid or prepaid only after there are no Tranche A RBL Exit Facility Loans outstanding, and once so prepaid or repaid, may not be reborrowed.

194.     "*Trustee*" means any indenture trustee, collateral trustee, or other trustee or similar entity under the Second Lien Notes or the Unsecured Notes.

195.     "*Turnover Provisions*" has the meaning set forth in Article IV.A of the Plan.

196.     "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

197.     "*Unimpaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

198.     "*United States Trustee*" means the United States Trustee for the jurisdiction in which the Chapter 11 Cases are commenced.

199.     "*Unsecured Claims Recovery*" means 12% of the New Common Stock (subject to dilution on account of the Management Incentive Plan, the Rights Offering, the Put Option Premium, and the New Warrants) and 50 percent of the New Class C Warrants.

200.     "*Unsecured Noteholders*" means holders of notes issued under the Unsecured Notes Indentures.

201.     "*Unsecured Notes*" means the 6.625% senior notes due 2020, the 6.875% senior notes due 2020, the 6.125% senior notes due 2021, the 5.375% senior notes due 2021, the 4.875% senior notes due 2022, the 5.750% senior notes due 2023, the 7.000% senior notes due 2024, the 8.000% senior notes due 2025, the 8.000% senior notes due 2026, the 7.500% senior notes due 2026, the 8.000% senior notes due 2027, the 5.500% convertible senior notes due 2026, and the 6.875% senior notes due 2025, all issued by certain Debtors pursuant to the Unsecured Notes Indentures.

202.     "*Unsecured Notes Claim*" means any Claim on account of the Unsecured Notes.

203.     "*Unsecured Notes Indentures*" means those certain indentures dated as of the following dates: August 2, 2010 (6.625% senior notes due 2020); November 8, 2005 (6.875% senior notes due 2020); February 11, 2011 (6.125% senior notes due 2021); April 1, 2013 (5.375% senior notes due 2021); April 24, 2014 (4.875% senior notes due 2022); April 1, 2013 (5.750% senior notes due 2023); September 27, 2018 (7.000% senior notes due 2024); December 20, 2016 (8.000% senior notes due 2025); April 3, 2019 (8.000% senior notes due 2026); September 27, 2018 (7.500% senior notes due 2026); June 6, 2017 (8.000% senior notes due 2027); October 5, 2016 (5.500% convertible senior notes due 2026); and February 1, 2017 (6.875% senior notes due 2025), each by and among certain of the Debtors and the Unsecured Notes Trustees, as may be amended, supplemented, or otherwise modified from time to time.

204.    "*Unsecured Notes Trustees*" means the following entities, each in its capacity as trustee for the Unsecured Notes Indentures:  The Bank of New York Trust Company, N.A. (6.625% senior notes due 2020); The Bank of New York Trust Company, N.A. (6.875% senior notes due 2020); The Bank of New York Trust Company, N.A. (6.125% senior notes due 2021); Wilmington Savings Fund Society, FSB (5.375% senior notes due 2021); Wilmington Savings Fund Society, FSB (4.875% senior notes due 2022); Wilmington Savings Fund Society, FSB (5.750% senior notes due 2023); Wilmington Savings Fund Society, FSB (7.000% senior notes due 2024); Wilmington Savings Fund Society, FSB (8.000% senior notes due 2025); Wilmington Savings Fund Society, FSB (8.000% senior notes due 2026); Wilmington Savings Fund Society, FSB (7.500% senior notes due 2026); Wilmington Savings Fund Society, FSB (8.000% senior notes due 2027); Wilmington Savings Fund Society, FSB (5.500% convertible senior notes due 2026); and U.S. Bank National Association (6.875% senior notes due 2025).

B.    *Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with the Plan or Confirmation Order, as applicable; (4) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (15)  references to "Proofs of Claims," "holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "holders of Interests," "Disputed Interests," and the like, as applicable; (16) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (17) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; *provided* that nothing in this clause (2) or clause (3) shall affect any parties' consent rights over any of the Definitive Documents or any amendments thereto, as provided for in the Restructuring Support Agreement.

C.    *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.      *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or the Reorganized Debtors, as applicable.

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan or Plan Supplement, the Confirmation Order shall control.

H.      *Consultation, Information, Notice, and Consent Rights.*

Notwithstanding anything herein to the contrary, any and all consultation, information, notice, and consent rights of the parties to the Restructuring Support Agreement, as set forth in the Restructuring Support Agreement (including the exhibits thereto), with respect to the form and substance of this Plan, all exhibits to the Plan, the Plan Supplement, and all other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and fully enforceable as if stated in full herein.

Failure to reference the rights referred to in the immediately preceding paragraph as such rights relate to any document referenced in the Restructuring Support Agreement shall not impair such rights and obligations.

Further, any and all consultation, information, notice, and consent rights of the DIP Agent, DIP Lenders, Revolving Credit Facility Administrative Agent, Revolving Credit Facility Lenders, Exit Facilities Agent, and Exit Facilities Lenders as set forth in the DIP Documents, DIP Order, and Exit Facilities Documents, as applicable, relating to the form and substance of this Plan, all exhibits to the Plan, the Plan Supplement, all other Definitive Documents, and any consents, waivers, or other rights under or from any such documents, shall be incorporated herein by this reference and fully enforceable as if stated in full herein.  Failure to reference such rights in specific provisions of this Plan shall not impair such rights and obligations.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, DIP CLAIMS, AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims, DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.      *Administrative Claims.*

1.      General Administrative Claims.

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors (with the consent of the Required Consenting Stakeholders) or the Reorganized Debtors, as applicable, or otherwise provided for under the Plan, each holder of an Allowed Administrative Claim (other than holders of Professional Claims, DIP Claims, and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim treatment consistent with section 1129(a)(2) of the Bankruptcy Code in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Except as otherwise provided in this Article II.A of the Plan, and except with respect to Administrative Claims that are Professional Claims or DIP Claims, requests for payment of Administrative Claims must be Filed with the Bankruptcy Court and served on the Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the applicable Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be Filed with the Bankruptcy Court and served on the requesting party no later than 60 days after the applicable Administrative Claims Bar Date.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed.

The Debtors shall indefeasibly pay in Cash all Existing RBL Adequate Protection Payments that have accrued and are unpaid as of the Effective Date pursuant to the terms of the DIP Order, and none of the Revolving Credit Facility Administrative Agent, the Revolving Credit Facility Lenders, or the Collateral Trustee shall be required to File a request for payment of an Administrative Claim with the Bankruptcy Court on account of such Existing RBL Adequate Protection Payments.  The Debtors' obligation to pay the Existing RBL Adequate Protection Payments, to the extent not indefeasibly paid in full in Cash on the Effective Date, shall survive the Effective Date and shall not be released or discharged pursuant to this Plan or the Confirmation Order until indefeasibly paid in full in Cash.

2.      Professional Compensation.

(a)      Final Fee Applications and Payment of Professional Claims.

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 45 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court.  The Reorganized Debtors shall pay Professional Claims in Cash

in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date.

      (b)      Professional Fee Escrow Account.

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount, which shall be funded by the Reorganized Debtors. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Allowed Professional Claims shall be paid in Cash to the Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Claims are Allowed. When such Allowed Professional Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

      (c)      Professional Fee Amount.

Professionals shall reasonably estimate their unpaid Professional Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Cases. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

      (d)      Post-Confirmation Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

B.      *DIP Claims.*

For the avoidance of doubt, the DIP Claims are Allowed in full in accordance with the DIP Order. Except to the extent that a holder of an Allowed DIP Claim agrees to less favorable treatment, on the Effective Date, each holder of an Allowed DIP Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for such holder's Allowed DIP Claims, payment in full in Cash from, at the Debtors' option, (1) the proceeds of the Exit Facilities available as of the Effective Date and consistent with the Exit Facilities Term Sheet; (2) the proceeds of the Rights Offering; and (3) Cash on hand; *provided* that to the extent that such DIP Lender is also an Exit Facility Lender, such DIP Lender's Allowed DIP Claims will first be reduced dollar-for-dollar and satisfied by the amount of its Exit Facilities Loans provided by such DIP Lender as of the Effective Date; *provided further* that Allowed Superpriority Hedge Claims, if any, shall be converted to secured obligations under the Exit Facilities Documents to the extent permitted under the terms of the documentation evidencing the Superpriority Hedge Claims. For the avoidance of doubt, the Debtors shall indefeasibly pay in cash all DIP Agent Fees and Expenses and non-contingent indemnity obligations owed to the DIP Agent or DIP Lenders that have accrued and are unpaid as of the Effective Date pursuant to the terms of the DIP Order. The Debtors' obligation to pay the DIP Agent Fees and Expenses and non-contingent indemnity obligations owed to the DIP Agent or DIP Lenders, to the extent not indefeasibly paid in full in Cash on the Effective Date, shall survive the Effective Date and shall not be released or discharged pursuant to this Plan or the Confirmation Order until indefeasibly paid in full in Cash.

Upon the final and indefeasible payment or satisfaction of the Allowed DIP Claims in accordance with this 0, all Liens and security interests granted to secure the Allowed DIP Claims shall automatically be terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

C.      *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

D.      *Statutory Fees.*

All monthly reports shall be filed in a form reasonably acceptable to the U.S. Trustee, and all fees due and payable pursuant to section 1930 of Title 28 of the United States Code before the Effective Date with respect to the Debtors shall be paid by the Debtors.  On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the United States Trustee.  Each Debtor shall remain obligated to pay quarterly fees to the United States Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

# ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests.*

This Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in Article II hereof, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest fits within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Revolving Credit Facility Claims | Impaired | Entitled to Vote |
| Class 4 | FLLO Term Loan Facility Claims | Impaired | Entitled to Vote |
| Class 5 | Second Lien Notes Claims | Impaired | Entitled to Vote |
| Class 6 | Unsecured Notes Claims | Impaired | Entitled to Vote |
| Class 7 | General Unsecured Claims | Impaired | Entitled to Vote |

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 8 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept / Deemed to Reject) |
| Class 9 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept / Deemed to Reject) |
| Class 10 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**B.**    *Treatment of Claims and Interests.*

Each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Allowed Interest, except to the extent less favorable treatment is agreed to by the Reorganized Debtors and the holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

1.    Class 1 – Other Secured Claims.

(a)    *Classification*:  Class 1 consists of all Other Secured Claims.

(b)    *Treatment*: On the Effective Date, each holder of an Allowed Other Secured Claim shall receive, at the Debtors' option and in consultation with the Required Consenting Stakeholders:

(i)    payment in full in Cash;

(ii)    the collateral securing its Allowed Other Secured Claim;

(iii)    Reinstatement of its Allowed Other Secured Claim; or

(iv)    such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)    *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

2.    Class 2 – Other Priority Claims.

(a)    *Classification*:  Class 2 consists of all Other Priority Claims.

(b)    *Treatment*:  Each holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code.

(c)    *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

3. <u>Class 3 – Revolving Credit Facility Claims</u>.

    (a)    *Classification*:  Class 3 consists of all Revolving Credit Facility Claims.

    (b)    *Treatment*:  On the Effective Date, the Revolving Credit Facility Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the Revolving Credit Facility, including all principal, any accrued and unpaid interest at the non-default rate, and all accrued and unpaid fees, expenses, and non-contingent indemnity payable under the Revolving Credit Facility.  On the Effective Date, except to the extent the holder of an Allowed Revolving Credit Facility Claim agrees to less favorable treatment, each holder of an Allowed Revolving Credit Facility Claim shall receive,  in accordance with such holder's prior predetermined allocation, either (i) Tranche A RBL Exit Facility Loans or (ii) Tranche B RBL Exit Facility Loans, on a dollar-for-dollar basis; *provided* that any Claims on account of accrued but unpaid Existing RBL Adequate Protection Payments shall be paid in full as Cash as set forth in Section II.A.1 of the Plan.

    (c)    *Voting*:  Class 3 is Impaired under the Plan.  Holders of Revolving Credit Facility Claims are entitled to vote to accept or reject the Plan.

4. <u>Class 4 – FLLO Term Loan Facility Claims</u>.

    (a)    *Classification*:  Class 4 consists of all FLLO Term Loan Facility Claims.

    (b)    *Treatment*:  On the Effective Date, the FLLO Term Loan Facility Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the FLLO Term Loan Facility, including all principal, accrued and unpaid interest at the applicable default rate, the make whole amount, and all accrued and unpaid fees, expenses, and non-contingent indemnity payable under the FLLO Term Loan Facility.  On the Effective Date, each holder of an Allowed FLLO Term Loan Facility Claim shall receive its *Pro Rata* share of (i) 76 percent of the New Common Stock (subject to dilution on account of the Management Incentive Plan, the Rights Offering, the Put Option Premium, and the New Warrants) and (ii) the FLLO Rights.

    (c)    *Voting*:  Class 4 is Impaired under the Plan.  Holders of FLLO Term Loan Facility Claims are entitled to vote to accept or reject the Plan.

5. <u>Class 5 – Second Lien Notes Claims</u>.

    (a)    *Classification*:  Class 5 consists of all Second Lien Notes Claims.

    (b)    *Treatment*:  On the Effective Date, the Second Lien Notes Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the Second Lien Notes Indenture, including the aggregate outstanding principal amount of Second Lien Notes, any premium (including the Make-Whole Premium (as defined in the Second Lien Notes Indenture)), and accrued and unpaid interest.  Each holder of an Allowed Second Lien Notes Claim shall receive its *Pro Rata* share of (i) 12 percent of the New Common Stock (subject to dilution on account of the Management Incentive Plan, the Rights Offering, the Put Option Premium, and the New Warrants), (ii) the Second Lien Rights, (iii) the New Class A Warrants, (iv) the New Class B Warrants, and (v) 50 percent of the New Class C Warrants.

    (c)    *Voting*:  Class 5 is Impaired under the Plan.  Holders of Second Lien Notes Claims are entitled to vote to accept or reject the Plan.

6. <u>Class 6 – Unsecured Notes Claims</u>.

    (a)    *Classification*:  Class 6 consists of all Unsecured Notes Claims.

    (b)    *Treatment*:  On the Effective Date, the Unsecured Notes Claims shall be deemed Allowed in full, and each holder of an Allowed Unsecured Notes Claim shall receive its *Pro Rata* share of  the Unsecured Claims Recovery.

    (c)    *Voting*:  Class 6 is Impaired under the Plan.  Holders of Unsecured Notes Claims are entitled to vote to accept or reject the Plan.

7. <u>Class 7 – General Unsecured Claims</u>.

    (a)    *Classification*:  Class 7 consists of all General Unsecured Claims.

    (b)    *Treatment*:  On the Effective Date, each holder of an Allowed General Unsecured Claim shall receive its *Pro Rata* share of the Unsecured Claims Recovery; *provided* that to the extent such Allowed General Unsecured Claim is a Convenience Claim, such Holder shall receive the Convenience Claim Distribution.

    (c)    *Voting*:  Class 7 is Impaired under the Plan.  Holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

8. <u>Class 8 – Intercompany Claims</u>.

    (a)    *Classification*:  Class 11 consists of all Intercompany Claims.

    (b)    *Treatment*:  On the Effective Date, unless otherwise provided for under the Restructuring Transactions Memorandum, each Allowed Intercompany Claim shall have its Claim:

        (i)    Reinstated; or

        (ii)    distributed, contributed, set off, settled, canceled and released, or otherwise addressed at the option of the Debtors with the consent of the Required Consenting Stakeholders; *provided* that no distribution shall be made on account of any such Intercompany Claims.

    (c)    *Voting*:   Class 8 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 8 is not entitled to vote to accept or reject the Plan.

9. <u>Class 9 – Intercompany Interests</u>.

    (a)    *Classification*:  Class 9 consists of all Intercompany Interests.

    (b)    *Treatment*:  On the Effective Date, each holder of Intercompany Interests shall have such Interest:

        (i)    Reinstated; or

        (ii)    canceled, released, and extinguished without any distribution at the Debtors' election with the consent of the Required Consenting Stakeholders.

    (c)    *Voting*:  Class 9 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 9 is not entitled to vote to accept or reject the Plan.

10. <u>Class 10 – Existing Equity Interests</u>.

    (a)    *Classification*:  Class 10 consists of all Existing Equity Interests.

    (b)    *Treatment*:  On the Effective Date, each holder of Existing Equity Interests shall have such Interest cancelled, released, and extinguished without any distribution.

    (c)    *Voting*:  Class 10 is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 14 is not entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including, all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

D.    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.    *Voting Classes, Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

F.    *Intercompany Interests.*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure for the ultimate benefit of the holders of New Common Stock, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims.

G.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan. The Debtors reserve the right, subject to the prior consent of the Required Consenting Stakeholders, which shall not be unreasonably withheld, to modify the Plan in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H.      *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.      *Subordinated Claims and Interests.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Any such contractual, legal, or equitable subordination rights shall be settled, compromised, and released pursuant to the Plan.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

A.      *General Settlement of Claims and Interests.*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including (1) any challenge to the amount, validity, perfection, enforceability, priority or extent of the DIP Claims, Revolving Credit Facility Claims, FLLO Term Loan Facility Claims, Second Lien Notes Claims, and Unsecured Notes Claims and (2) any claim to avoid, subordinate, or disallow any DIP Claims, Revolving Credit Facility Claims, FLLO Term Loan Facility Claims, Second Lien Notes Claims, and Unsecured Notes Claims, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise, including, without limitation, any claim of subordination or turnover of any payments arising under any provision of the Intercreditor Agreement, including, but not limited to, any turnover provisions in sections 3.05, 4.02(l), 6.01 and 7.03 thereof, or the Collateral Trust Agreement, including sections 5.05, 6.02(o), 8.01, and 9.03 thereof (the "Turnover Provisions"). In consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the FLLO Term Loan Facility Lenders and Revolving Credit Facility Lenders shall conclusively, absolutely, irrevocably and forever waive any rights they have to seek subordination or turnover of any payments arising under any provision of the Intercreditor Agreement, including, but not limited to, the Turnover Provisions. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates. Subject to Article VI hereof, all distributions made to holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

*B.        Restructuring Transactions.*

On or before the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into and shall take any actions as may be necessary or appropriate to effect the Restructuring Transactions, including as set forth in the Restructuring Transactions Memorandum.  The Restructuring Transactions Memorandum shall be reasonably acceptable to the Required Consenting Stakeholders.  The actions to implement the Restructuring Transactions may include:  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; (4) the execution and delivery of the New Organizational Documents; (5) the execution and delivery of the Exit Facilities Documents (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees to be paid by the Debtors or the Reorganized Debtors, as applicable), subject to any post-closing execution and delivery periods provided for in the Exit Facilities Documents; (6) execution and delivery of the Registration Rights Agreement; (7) pursuant to the Rights Offering Procedures and the Backstop Commitment Agreement, the implementation of the Rights Offering, the distribution of the Rights to the Rights Offering Participants as of the Rights Offering Record Date, and the issuance of New Common Stock in connection therewith; (8) the issuance of the New Common Stock and the New Warrants as set forth in the Plan; and (9) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan.  The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan.  On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors, as applicable, shall issue all Securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring Transactions.

*C.        Midstream Savings Requirement.*

In the event that sufficient savings with respect to the Debtors' midstream contracts (as determined by the Required Plan Sponsors) are not achieved, unless the Debtors and the Required Consenting Stakeholders agree otherwise (but subject to the reasonable written consent of the DIP Agent and the Required Consenting DIP Lenders), certain of the Debtors' assets will be separated from the Debtors' remaining assets to the extent not inconsistent with 28 U.S.C. § 959(b).  The Debtors' restructuring will then be consummated with respect to the remaining assets, and the separated assets will be wound down in a manner agreed to by the Debtors and the Required Consenting Stakeholders.

*D.        Reorganized Debtors.*

On the Effective Date, the New Board shall be established, and the Reorganized Debtors shall adopt their applicable New Organizational Documents.  The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.  Cash payments to be made pursuant to the Plan will be made by the Debtors or Reorganized Debtors.  The Debtors and Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or Reorganized Debtors, as applicable, to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date agreement, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing, subject to the New Organizational Documents and the Exit Facilities Documents, as the boards of directors of the applicable Reorganized Debtors deem appropriate.

E.       *Sources of Consideration for Plan Distributions.*

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with: (1) Cash on hand, including Cash from operations or asset dispositions; (2) Cash proceeds from the sale of New Common Stock pursuant to the Rights Offering; (3) the New Common Stock; (4) the New Warrants; and (5) the proceeds of the Exit Facilities, as applicable.  Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Plan, including the New Common Stock and the Rights will be exempt from SEC registration to the fullest extent permitted by law, as described more fully in Article VI.D below.

1.       Rights Offering.

The Debtors shall distribute the Rights to the Rights Offering Participants on behalf of the Reorganized Debtors as set forth in the Plan and the Rights Offering Procedures.  Pursuant to the Backstop Commitment Agreement and the Rights Offering Procedures, the Rights Offering shall be open to all Rights Offering Participants, and (a) Rights Offering Participants that are holders of Allowed FLLO Term Loan Facility Claims shall be entitled to participate in the Rights Offering up to a maximum amount of each holder's *Pro Rata* share of the FLLO Rights; (b) Rights Offering Participants that are holders of Allowed Second Lien Notes Claims shall be entitled to participate in the Rights Offering up to a maximum amount of each holder's *Pro Rata* share of the Second Lien Rights; and (c) Rights Offering Participants that are Backstop Parties (or have certain rights and obligations of Backstop Parties pursuant to agreement of the parties to the Backstop Commitment Agreement) shall be entitled to participate in the Rights Offering up to a maximum amount of each holder's Backstop Party Rights.  Rights Offering Participants shall have the right to purchase their allocated shares of New Common Stock at the per share price set forth in the Backstop Commitment Agreement and the Rights Offering Procedures.

Upon exercise of the Rights by the Rights Offering Participants pursuant to the terms of the Backstop Commitment Agreement and the Rights Offering Procedures, Reorganized Chesapeake shall be authorized to issue the New Common Stock issuable pursuant to such exercise.

In exchange for the Put Option Premium and in accordance with the Backstop Commitment Agreement, the Backstop Parties have committed to fully backstop, severally and not jointly, the Rights Offering Amount.  Pursuant to the Backstop Commitment Agreement and the allocations contained therein (subject to the transfer rights and restrictions contained in the Backstop Commitment Agreement, the "Backstop Allocations"), the Backstop Parties shall, severally and not jointly, backstop the Rights Offering Amount, purchase the New Common Stock not subscribed for purchase by the Rights Offering Participants at the per share purchase price set forth in the Backstop Commitment Agreement and exercise the Backstop Party Rights. The Put Option Premium shall be paid by Chesapeake or Reorganized Chesapeake in accordance with the Backstop Commitment Agreement and Backstop Commitment Agreement Approval Order.  For the avoidance of doubt, if the Put Option Premium is payable in Cash pursuant to the terms and conditions set forth in the Backstop Commitment Agreement and Backstop Commitment Agreement Approval Order, the Put Option Premium shall be a superpriority administrative expense with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113, and 1114 of the Bankruptcy Code, or otherwise and including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code except it shall be unsecured and (i) be subordinated in priority to (a) the DIP Claims and (b) any adequate protection granted on account of the Revolving Credit Facility Claims (and any Claims to which such Claims in (a) or (b) are subordinate); and (ii) payable only after all such Claims set forth in clause (i) have been paid in full in Cash or provided such other treatment as is agreed to by the  requisite parties, as set forth in section 3.1 of the Backstop Commitment Agreement.

All shares of the New Common Stock, the New Warrants (and any shares of the New Common Stock issuable upon the exercise thereof), the Rights (and any shares issuable upon the exercise thereof other than the unsubscribed shares of New Common Stock issued to the Backstop Parties pursuant to the Backstop Commitment Agreement), and the shares issuable as part of the Put Option Premium (collectively, the "1145 Securities") will be issued in reliance

upon section 1145 of the Bankruptcy Code to the extent permitted under applicable law.  The unsubscribed shares of New Common Stock issued to the Backstop Parties pursuant to the Backstop Commitment Agreement (collectively, the "4(a)(2) Securities" and together with the 1145 Securities and any other Securities issued under the Plan, the "Plan Securities") will be issued in reliance upon section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.  Entry of the Confirmation Order shall constitute Bankruptcy Court approval of the Rights Offering (including the transactions contemplated thereby, and all actions to be undertaken, undertakings to be made, and obligations to be incurred by Reorganized Chesapeake in connection therewith).  On the Effective Date, the rights and obligations of the Debtors under the Backstop Commitment Agreement shall vest in the Reorganized Debtors, as applicable.

The proceeds of the Rights Offering shall be used by the Debtors or Reorganized Debtors, as applicable, to fund payments under the Plan and for general corporate and strategic purposes as determined by management.

2.    Rights and New Common Stock.

Reorganized Chesapeake shall be authorized to issue the Rights and the New Common Stock to certain holders of Claims pursuant to Article III.B.  Such New Common Stock shall be issued to Rights Offering Participants and/or Backstop Parties pursuant to the Rights Offering, the Backstop Commitment Agreement, and the New Organizational Documents.  Reorganized Chesapeake shall issue all securities, instruments, certificates, and other documents required to be issued by it with respect to all such shares of New Common Stock.  All such Rights and shares of New Common Stock, and any other shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

Prior to the Effective Date, the Required Plan Sponsors shall determine whether Reorganized Chesapeake shall use commercially reasonable efforts to (i) cause the New Common Stock to be listed on a National Securities Exchange on the Effective Date or to (ii) cause the New Common Stock to be listed on an Alternative Securities Exchange on the Effective Date or as soon as reasonably practicable thereafter, to engage a market maker for the New Common Stock and to take other reasonable steps to establish that the New Common Stock is regularly traded on an established securities market for purposes of section 897 under the Code and Treasury regulations promulgated and proposed to be promulgated thereunder.

3.    New Warrants.

On the Effective Date, Reorganized Chesapeake will issue the New Warrants to certain holders of Claims pursuant to Article III.B this Plan.  Issuances of the New Warrants shall be governed by the terms and conditions set forth in this Plan and the New Warrant Agreements applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating each such issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance without the need for execution by any party thereto other than the applicable Reorganized Debtor(s).  The New Warrants issued pursuant to the Plan and the shares of New Common Stock that may be issued upon exercise of the New Warrants shall be duly authorized, validly issued, fully paid, and non-assessable, without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors, as applicable.

4.    Exit Facilities.

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities (the terms of which will be set forth in the Exit Facilities Documents).

To the extent applicable, Confirmation of the Plan shall be deemed (a) approval of the Exit Facilities (including the transactions and related agreements contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), to the extent not approved by the Bankruptcy Court previously, and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents and agreements necessary or appropriate to pursue or obtain the Exit Facilities, including the Exit Facilities Documents, and incur and pay any fees and expenses in

connection therewith, and (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, may deem to be necessary to consummate the Exit Facilities.

As of the Effective Date, upon the granting or continuation of Liens in accordance with the Plan and the Exit Facilities Documents, such Liens shall constitute valid, binding, enforceable, and automatically perfected Liens in the collateral specified in the Exit Facilities Documents.  The Exit Facilities Agent or holder(s) of Liens under the Exit Facilities Documents are authorized to file with the appropriate authorities mortgages, financing statements, and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests. The guarantees, mortgages, pledges, Liens, and other security interests granted to secure the obligations arising under the Exit Facilities Documents have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy law, and the priorities of such Liens and security interests shall be as set forth in the Exit Facilities Documents.  The Reorganized Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

F.      *Convenience Claim Distribution Reserve.*

On the Effective Date, the Reorganized Debtors shall establish and fund the Convenience Claim Distribution Reserve with Cash in an amount equal to $10,000,000.00.  The Convenience Claim Distribution Reserve shall be maintained in trust solely for holders of Convenience Claims.  Such funds shall not be considered property of the Debtors or the Reorganized Debtors; *provided* that any funds remaining in the Convenience Claim Distribution Reserve after all Convenience Claim Distributions have been made shall be distributed to and vest in the Reorganized Debtors.  Convenience Claims shall be paid in accordance with Article V1.A of the Plan.

G.      *Corporate Existence.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended, amended and restated, or replaced under the Plan or otherwise, including pursuant to the New Organizational Documents, and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended, amended and restated, or replaced pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).  After the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of the Reorganized Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  After the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

H.      *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Confirmation Order, the Plan (including, for the avoidance of doubt, the Restructuring Transactions Memorandum), or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Plan or Plan Supplement, on the Effective Date, all property in each

Estate that constitutes property of the Estate under section 541 of the Bankruptcy Code, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

Nothing in the Plan or the Confirmation Order shall operate as a finding or determination that funds (1) held by the Debtors or subject to their control and (2) to which any holder of a Royalty and Working Interest has asserted or may assert a right of entitlement or ownership on account of such Royalty and Working Interest, constitute property of any of the Estates under section 541 of the Bankruptcy Code or otherwise.  All parties' rights with respect to such issue remain unaffected by Confirmation of the Plan and entry of the Confirmation Order.

I.      *Cancellation of Existing Securities and Agreements.*

On the Effective Date, except as otherwise provided in this Plan, all notes, instruments, certificates, credit agreements, indentures, security agreements, collateral agreements, and other documents evidencing Claims or Interests shall be cancelled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect.  Holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, Securities, and other documentation, or the cancellation thereof, except the rights provided for or preserved pursuant to this Plan or the Confirmation Order.

Notwithstanding anything to the contrary herein, to the extent cancelled pursuant to this Plan, the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured Notes Indentures shall continue in effect solely to the extent necessary to:  (1) permit holders of Claims under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured Notes Indentures to receive their respective Plan distributions, if any; (2) permit the Debtors or the Reorganized Debtors to make Plan distributions on account of the Allowed Claims under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured Notes Indentures; (3) permit the Agents and Trustees to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of the DIP Order, the DIP Credit Agreement, this Plan, and the Confirmation Order, as applicable; (4) allow the Agents and Trustees to enforce their rights, claims, and interests against any party other than the Debtors; (5) preserve any rights of the Agents and Trustees to payment of fees, expenses, and indemnification obligations as against any money or property distributable to holders of Claims under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured Notes Indentures, respectively, including any rights to priority of payment and/or to exercise charging liens; (6) permit the Agents and Trustees to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or an appellate court, including to enforce any obligation owed to the Agents and Trustees or other holders of Claims under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured Notes Indentures, as applicable; (7) preserve the rights and obligations of the parties under the Exit Facilities Documents, as applicable; and (8) allow the Agents and Trustees to maintain any right of indemnification, contribution, or subrogation under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured Notes Indentures.

Except as provided in this Plan, on the Effective Date, the Agents and Trustees, and their respective agents, successors, and assigns, shall be automatically and fully discharged of all of their duties and obligations associated with the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured Notes Indentures, as applicable.  To the extent cancelled in accordance with this Plan, the commitments and obligations (if any) of the holders under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured

Notes Indentures to extend any further or future credit or financial accommodations to any of the Debtors, any of the Debtors' respective subsidiaries, or any of the Debtors' respective successors or assigns under the DIP Credit Agreement, the Revolving Credit Facility Credit Agreement, the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, the Second Lien Notes Indenture, and the Unsecured Notes Indentures, as applicable, shall fully terminate and be of no further force or effect on the Effective Date.

J.      *Corporate Action.*

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including: (1) implementation of the Restructuring Transactions, including the Rights Offering; (2) selection of the directors and officers for the Reorganized Debtors; (3) the issuance and distribution of the New Common Stock in accordance with the Plan, including all shares of New Common Stock issued by Reorganized Chesapeake to the Backstop Parties as part of the Put Option Premium and the unsubscribed shares of New Common Stock issued to Backstop Parties pursuant to the Backstop Commitment Agreement; (4) issuance and distribution of the Rights and subsequent issuance and distribution of New Common Stock issuable upon exercise of such Rights; (5) execution and delivery of the Registration Rights Agreement; (6) issuance and distribution of the New Warrants and entry into the New Warrants Agreements; (7) entry into the Exit Facilities Documents; (8) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (9) approval and adoption of the New Organizational Documents; (10) entry into the Management Incentive Plan; (11) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (12) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, members, directors, or officers of the Debtors or the Reorganized Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Common Stock, Rights, the Registration Rights Agreement, the Management Incentive Plan, the New Warrants and the New Warrants Agreements, the New Organizational Documents, the Exit Facilities Documents, and any and all other agreements, documents, Securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.J shall be effective notwithstanding any requirements under non-bankruptcy law.

K.      *New Organizational Documents.*

On or immediately prior to the Effective Date, the New Organizational Documents shall be automatically adopted by the applicable Reorganized Debtors. To the extent required under the Plan or applicable non-bankruptcy law, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state if and to the extent required in accordance with the applicable laws of the respective state. The New Organizational Documents will (i) prohibit the issuance of non-voting equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code; (ii) with respect to the New Organizational Documents of Reorganized Chesapeake, authorize the issuance of New Common Stock in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by this Plan (including as a result of the exercise of New Warrants); and (iii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate this Plan and the transactions contemplated herein. The New Organizational Documents shall also provide for the indemnification and exculpation of directors, officers and appropriate persons to the fullest extent permitted by applicable law.

If requested by the Required Consenting Stakeholders before the Effective Date, the New Organizational Documents will include transfer restrictions designed to limit an ownership change for purposes of section 382 of the Code or otherwise the Debtors or Reorganized Debtors, as applicable, may adopt and implement a stockholder rights plan designed for such purpose, in each case effective upon the Effective Date.

The New Organizational Documents of Reorganized Chesapeake shall also provide that until such time as the New Common Stock is listed on a National Securities Exchange the Reorganized Debtors shall not, without the approval of the holders of the majority of outstanding New Common Stock: (i) issue shares of New Common Stock in excess of 5% of the fully-diluted number of shares of New Common Stock outstanding and authorized for issuance under the Plan on the Effective Date (including all shares contemplated under the claims recovery, the New Warrants, the Rights Offering, the Backstop Commitment Agreement and the Management Incentive Plan) or authorize or issue any shares of preferred stock; *provided* that this limitation shall not apply in connection with the adoption of a bona fide stockholder rights plan by Reorganized Chesapeake's board of directors; (ii) enter into any sales, transfers or licenses of any Reorganized Chesapeake subsidiary, division, operation, business, line of business, assets or property, in each case, held by Reorganized Chesapeake or any of its subsidiaries with any person other than Reorganized Chesapeake or one or more of its wholly-owned subsidiaries involving consideration in excess of $50,000,000 per transaction or series of related transactions; or (iii) make any acquisition, by merger, consolidation or stock or asset purchase or investment with respect to any business, assets, property or any corporation or other entity, involving consideration in excess of $50,000,000 per transaction or series of related transactions.

On or after the Effective Date, the Reorganized Debtors may amend, amend and restate or modify their respective New Organizational Documents in accordance with the terms thereof, and the Reorganized Debtors may file such amended, amended and restated or modified certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of their respective state of incorporation and the New Organizational Documents.

L.      *Indemnification Obligations.*

Consistent with applicable law, all indemnification provisions in place as of the Effective Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, the DIP Order, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, the DIP Agent, the DIP Lenders, the Revolving Credit Facility Agent, the Consenting Revolving Credit Facility Lenders, the Consenting FLLO Term Loan Facility Lenders, the Collateral Trustee, the Second Lien Notes Trustee, the Consenting Second Lien Noteholders, and the Consenting Unsecured Noteholders, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, the DIP Agent, the DIP Lenders, the Revolving Credit Facility Agent, the Consenting Revolving Credit Facility Lenders, the Consenting FLLO Term Loan Facility Lenders, the Collateral Trustee, the Second Lien Notes Trustee, the Consenting Second Lien Noteholders, and the Consenting Unsecured Noteholders, as applicable, than the indemnification provisions in place prior to the Effective Date.

M.      *Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, the terms of the current members of the board of directors of Chesapeake shall expire and the new directors and officers of the Reorganized Chesapeake shall be appointed.  The identities of directors on the New Board shall be set forth in the Plan Supplement to the extent known at the time of Filing.  Each member of the New Board will serve from and after the Effective Date pursuant to applicable law and the terms of the New Organizational Documents.  The existing boards of directors and other governing bodies of the other Reorganized Debtors will be deemed to have resigned on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity.

Corporate governance for Reorganized Chesapeake, including charters, bylaws, operating agreements, or other organization documents, as applicable, shall be consistent with section 1123(a)(6) of the Bankruptcy Code and the New Organizational Documents.

N.      *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers (as applicable), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities,

instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, Exit Facilities entered into, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

O.     *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors, including the New Common Stock and the New Warrants (including the New Common Stock that may be issuable upon exercise of the New Warrants); (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for the Reorganized Debtors' obligations under and in connection with the Exit Facilities; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

P.     *Director and Officer Liability Insurance.*

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to sections 105 and 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the unexpired D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

Q.     *Management Incentive Plan.*

On the Plan Effective Date, the Reorganized Debtors shall adopt a management incentive plan (the "Management Incentive Plan"). All grants under the Management Incentive Plan shall be determined at the sole discretion of the New Board including, without limitation, with respect to the participants, allocation, timing, and the form and structure of the options, warrants, and/or equity compensation to be provided thereunder and taking into account market compensation levels and historical equity compensation structures.

R.      *Employee Benefits.*

Unless otherwise provided herein, and subject to Article V hereof, all wages, compensation, and benefits programs, including executive compensation programs and any motions in the Bankruptcy Court for the approval thereof, will be continued according to existing terms and practices.  On the Effective Date, the Debtors shall (1) assume all employment agreements, indemnification agreements, or other agreements entered into with current and former employees; or (2) enter into new agreements with such employees on terms and conditions acceptable to the Debtor and such employee.   Notwithstanding the foregoing, any employment agreements or other employment-related agreements that provide for any acceleration or enhancement of payments (including severance payments), vesting, benefits, or other rights in connection with a transaction that constitutes a change in control, change of control, or similar concept under such agreements, shall only be assumed if and to the extent that the Debtors, with the consent of the Required Plan Sponsors, obtain waivers specifying that the consummation of the Restructuring Transactions shall not trigger any such rights under such agreements.

For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

Notwithstanding the foregoing, on the Effective Date, the Debtors may enter into new arrangements with employees on terms and conditions acceptable to the Debtors, the Required Plan Sponsors, and such employee.

S.      *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than: (i) the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII hereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date; and (ii) all Causes of Action that arise under sections 544, 547, 548, and 549 of the Bankruptcy Code and state fraudulent conveyance law.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII hereof.  Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date.  Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor, without the need for any objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.**  The Reorganized Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court.  If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or Reorganized Debtors, as applicable, and the objection party for thirty (30) days, such objection shall be resolved by the Bankruptcy Court.  Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII hereof.  The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

T.     *Preservation of Royalty and Working Interests.*

Notwithstanding any other provision in the Plan, on and after the Effective Date, all Royalty and Working Interests shall remain in full force and effect in accordance with the terms of the granting instruments or other governing documents applicable to such Royalty and Working Interests.

Royalty and Working Interests shall not be modified, affected or impaired in any manner by any provision of the Plan or the Confirmation Order, including but not limited to any injunctive or stay relief, and the legal and equitable rights, interests, defenses, and obligations of holders of Royalty and Working Interests, with respect to such Royalty and Working Interests, shall not be modified, affected or impaired in any manner by the provisions of the Plan or the Confirmation Order; *provided* that, to the extent applicable, any Other Secured Claims, General Unsecured Claims, or Administrative Claims of holders of Royalty and Working Interests shall be treated in accordance with Articles II and III hereof.  Nor shall the Plan or the Confirmation Order modify, affect or impair the rights and defenses of the Debtors or the Reorganized Debtors with respect to the Royalty and Working Interests.  The Debtors' and the Reorganized Debtors' rights to dispute the amounts owing on account of Royalty and Working Interests and to assert that prepetition Claims for such amounts have been discharged by the Plan or the Confirmation Order are expressly preserved and reserved.  Nothing in this Plan or the Confirmation Order shall be deemed a finding or determination as to whether any such amount owed by the Debtors or the Reorganized Debtors on account of Royalty and Working Interests is a Claim or a specific type of Claim, if the amount has been discharged, or to what extent (if any) funds held by the Debtors or the Reorganized Debtors or subject to their control, with respect to which funds any holder of a Royalty and Working Interest has asserted or may assert a right of entitlement or ownership on account of such Royalty and Working Interest, constitute property of any of the Estates under section 541 of the Bankruptcy Code or otherwise; *provided*, *however*, that any determination with respect to the foregoing shall be made by the Bankruptcy Court.  All parties' rights are preserved and reserved with respect to such findings or determinations; *provided* that, to the extent applicable, any Administrative Claims, Other Secured Claims or General Unsecured Claims of holders of Royalty and Working Interests on account of Royalty and Working Interests shall be treated in accordance with Article II or III hereof, as appropriate.

Notwithstanding anything in the Plan or the Confirmation Order to the contrary, the Debtors or the Reorganized Debtors shall continue paying all undisputed amounts owing on account of Royalty and Working Interests, including with respect to suspense funds as and when reconciled, in the ordinary course of business and in accordance with all applicable agreements and laws.

Nothing in the Plan or the Confirmation Order shall affect the Debtors' or the Reorganized Debtors' obligations to comply with all federal, state and local laws, rules and regulations with respect to Royalty and Working Interests and holders thereof, including, without limitation, laws, rules and regulations regarding inspection of books and records and segregation or escrow of funds or production proceeds belonging and/or payable to holders of Royalty and Working Interests.

U.     *Resolution of Pending Litigation.*

The Debtors may remove to the Bankruptcy Court by the Removal Deadline any litigation pending as of the Petition Date that alleges claims or causes of action that, if successful, would not result in a Claim.  Notwithstanding the foregoing, (i) pending litigation alleging personal injury claims or causes of action, (ii) pending litigation for which the automatic stay has been lifted pursuant to section 362 of the Bankruptcy Code, and (iii) any litigation not removed

36

by the Removal Deadline shall proceed to final judgment in the jurisdiction in which such litigation was pending as of the Petition Date; *provided* that any Claim resulting from a final judgment in any such litigation shall be treated in accordance with the Plan.

V.      *Payment of Certain Fees.*

Without any further notice to or action, order, or approval of the Bankruptcy Court, the Debtors or the Reorganized Debtors, as applicable, shall pay on the Effective Date the Restructuring Expenses, subject to the conditions set forth in this Article IV.U of the Plan.  The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the Restructuring Support Agreement, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least five (5) Business Days before the anticipated Effective Date or such later time as required by the Debtors; *provided* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses.  On or as soon as practicable after the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.  In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay pre- and post-Effective Date Restructuring Expenses related to implementation, consummation, and defense of the Plan, whether incurred before, on, or after the Effective Date.  For the avoidance of doubt, nothing in this paragraph shall be deemed to impair, waive, discharge, or negatively impact or affect any rights of the FLLO Term Loan Facility Administrative Agent, the Collateral Trustee, and the Second Lien Notes Trustee to payment of fees, expenses, and indemnification obligations solely as against any money or property distributable to holders of Claims under the FLLO Term Loan Facility Credit Agreement, the Collateral Trust Documents, or the Second Lien Notes Indenture, as applicable, including any rights to priority of payment and/or to exercise charging liens.  Notwithstanding anything in the Plan, including Article IV.I hereof, reimbursement of the Second Lien Notes Trustee's financial advisor's fees and expenses shall be limited to $250,000 in the aggregate, and no Person shall be entitled to increase or seek to increase this $250,000 limit or use a charging lien or seek payment for such financial advisor's or any financial advisor to the Second Lien Notes Trustee's fees and expenses from any other source.

Without limiting the obligations of the Debtors or Reorganized Debtors to pay the DIP Agent Fees and Expenses and any fees, costs and expenses of the Exit Facilities Agent pursuant to the Exit Facilities Documents, the Reorganized Debtors shall pay all post-Effective Date expenses incurred by the DIP Agent and/or the Exit Facilities Agent related to implementation, consummation, and defense of the Plan, whether incurred on or after the Effective Date.

# ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that are: (1) identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (2) previously expired or terminated pursuant to their own terms; (3) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (4) are the subject of a motion to reject that is pending on the Effective Date; or (5) have an ordered or requested effective date of rejection that is after the Effective Date.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumed Executory Contract and Unexpired Leases Schedule, or the Rejected Executory Contracts and Unexpired Leases Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy

Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right, with the consent of the Required Consenting Stakeholders, to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases Schedule and the Rejected Executory Contracts and Unexpired Leases Schedule at any time up to forty-five (45) days after the Effective Date, so long as such allocation, amendment, modification, or supplement is consistent with the Restructuring Support Agreement.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.**  All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.7 of this Plan.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

Any monetary defaults under each Assumed Executory Contract or Unexpired Lease shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, or as soon as reasonably practicable thereafter, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

Any objection by a contract or lease counterparty to a proposed assumption of an Executory Contract or Unexpired Lease or the related cure cost (including as set forth on the Assumed Executory Contracts and Unexpired Leases Schedule) must be Filed, served, and actually received by the Debtors in accordance with the Disclosure Statement Order or other applicable Final Order of the Bankruptcy Court.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have consented to such assumption or proposed cure amount.  For the avoidance of doubt, to the extent an Executory Contract or Unexpired Lease proposed to be assumed is not listed as having a related cure cost, any counterparty to such Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption will be deemed to

have consented to such assumption and deemed to release any Claim or Cause of Action for any monetary defaults under such Executory Contract or Unexpired Lease.

For the avoidance of doubt, the Debtors or the Reorganized Debtors, as applicable, with the consent of the Required Consenting Stakeholders, may add any Executory Contract or Unexpired Lease proposed to be assumed to the Rejected Executory Contracts and Unexpired Leases Schedule in accordance with the time limits provided by the Plan for any reason, including if the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable cure notice or the Plan, in which case such Executory Contract or Unexpired Lease is deemed rejected as the Effective Date.

Assumption of any Executory Contract or Unexpired Lease shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption.  Any Proofs of Claim Filed with respect to an Assumed Executory Contract or Unexpired Lease shall be deemed disallowed, without further notice to or action, order, or approval of the Bankruptcy Court.

D.      *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

E.      *Insurance Policies.*

Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, any Plan Supplement, the Confirmation Order, the Restructuring Support Agreement, the Restructuring Term Sheet, any Bar Date notice or Claim objection, any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction, discharge or release, or confers Bankruptcy Court jurisdiction or requires a party to opt out of any releases):

(1) on the Effective Date the Reorganized Debtors shall be deemed to have assumed all unexpired Insurance Policies in their entirety pursuant to sections 105 and 365 of the Bankruptcy Code; (2) all unexpired Insurance Policies shall re-vest in the Reorganized Debtors, unaltered, other than that on and after the Effective Date, the Reorganized Debtors shall be liable for all debts, obligations, and liabilities of the Debtors (and, after the Effective Date, of the Reorganized Debtors) under the Insurance Policies, regardless of when such debts, obligations, and liabilities arise, without the need or requirement for any Insurer to file a Proof of Claim, an Administrative Claim, a Cure Claim or to object to any cure amount, and thereafter the Reorganized Debtors may, subject to the terms of the Insurance Policies and applicable non-bankruptcy law, resolve any Claims covered by the Insurance Policies, resolve any Causes of Action, if any, in connection with the Insurance Policies, and collect any and all outstanding deposits, restricted cash, and letters of credit, if any, related thereto; (3) nothing shall alter, modify, amend, affect, impair or prejudice the legal, equitable or contractual rights, obligations, and defenses of the Insurers, the Debtors (or, after the Effective Date, the Reorganized Debtors), or any other individual or entity, as applicable, under any Insurance Policies; and (4) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article VIII of the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Bankruptcy Court, solely to permit:  (I) claimants with valid workers' compensation claims or direct action claims against an Insurer under applicable non-bankruptcy law to proceed with their claims; (II) the Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against any Insurer under applicable non-bankruptcy law, or an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (C) all costs in relation to each of the foregoing; and (III) the Insurers to cancel any Insurance Policies, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the Insurance Policies.

F.       *Reservation of Rights.*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

G.       *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

H.       *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors in the ordinary course of their business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.       *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim or Interest is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), each holder of an Allowed Claim or Allowed Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims and Allowed Interests in the applicable Class.

With respect to holders of Allowed Unsecured Notes Claims and Allowed General Unsecured Claims other than Convenience Claims, each such holder shall receive from the Unsecured Claims Recovery (1) an initial distribution on account of such holder's Allowed Unsecured Notes Claim or General Unsecured Claim on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter); and (2) upon completion of the Claims reconciliation process, its *Pro Rata* share of the remaining Unsecured Claims Recovery.

With respect to holders of Convenience Claims, each such holder shall receive from the Convenience Claim Distribution Reserve (1) an initial distribution on account of such holder's Convenience Claim on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter); and (2) upon completion of the Claims reconciliation process, its *Pro Rata* share of the remaining Convenience Claim Distribution Reserve; *provided* that no Convenience Claim shall recover in excess of 5 percent of such Convenience Claim; *provided, further,* that any funds remaining in the Convenience Claim Distribution Reserve after all Convenience Claim Distributions have been made shall be distributed to and vest in the Reorganized Debtors.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII of the Plan.

B.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

    1.   <u>Record Date for Distribution</u>.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date.  If a Claim, other than one based on a publicly traded Security or FLLO Term Loan Facility Claim, is transferred twenty (20) or fewer days before the Distribution Record Date, distributions shall be made to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

    2.   <u>Delivery of Distributions in General</u>.

Except as otherwise provided herein, the Reorganized Debtors shall make distributions to holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date at the address for each such holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors and, with respect to distributions on account of FLLO Term Loan Facility Claims, the Required Plan Sponsors.

    3.   <u>No Fractional Distributions</u>.

No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded to the next lower whole number with no further payment therefor; *provided*, *however*, that fractional shares rounding determination with respect to the Rights Offering shall be subject to the Rights Offering Procedures.  The total number of authorized shares of New Common Stock to be distributed to holders of Allowed Claims hereunder shall be adjusted as necessary to account for the foregoing rounding.

    4.   <u>Minimum Distributions</u>.

Notwithstanding any other provision of the Plan, holders of Allowed Claims entitled to distributions of $5 or less shall not receive distributions, and each Claim to which this limitation applies shall be discharged pursuant to Article VIII of this Plan, and its holder shall be forever barred from asserting that Claim against the Reorganized Debtors or their property.

    5.   <u>Undeliverable Distributions and Unclaimed Property</u>.

In the event that any distribution to any holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such holder shall be made unless and until the Reorganized Debtors have determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred.

    6.   <u>Surrender of Canceled Instruments or Securities</u>.

On the Effective Date or as soon as reasonably practicable thereafter, each holder of a certificate or instrument evidencing a Claim or an Interest that has been cancelled in accordance with Article IV.I hereof shall be deemed to have surrendered such certificate or instrument to the Debtors.  Such surrendered certificate or instrument shall be

cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the holder of a Claim or Interest, which shall continue in effect for purposes of allowing holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights.

7.   Delivery of Distributions on Second Lien Notes Claims and Unsecured Notes Claims.

The Debtors shall make all distributions required under the Plan.  Notwithstanding any provision of the Plan to the contrary, distributions to holders of Second Lien Notes Claims and Unsecured Notes Claims shall be made to or at the direction of each of the Trustees for distribution under the applicable indentures and bond agreements.  The Trustees may transfer or direct the transfer of such distributions directly through the facilities of the applicable securities depository and clearing house and will be entitled to recognize and deal with, for all purposes under the Plan, holders of Second Lien Notes Claims and Unsecured Notes Claims, as applicable, as is consistent with the ordinary practices of the applicable depositories.  Such distributions shall be subject to the right of each of the Trustees under the applicable indenture or bond agreements, including their rights to assert and exercise charging liens against such distributions.

C.     Manner of Payment.

Except as otherwise set forth herein, all distributions of Cash, the New Common Stock, the New Warrants, and the Rights, as applicable, to Holders of Allowed Claims under the Plan shall be made by the Debtors or the Reorganized Debtors, as applicable.  At the option of the Reorganized Debtors (in consultation with and subject to the reasonable consent of the Required Consenting Stakeholders), any Cash payment to be made under the Plan, if any, may be made by check or wire transfer or as otherwise required or provided in the applicable agreements.

D.     Exemption from Securities Laws.

All 1145 Securities will be issued in reliance upon section 1145 of the Bankruptcy Code to the extent permitted under applicable law.  All 4(a)(2) Securities will be issued in reliance upon section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

Pursuant to section 1145 of the Bankruptcy Code, the issuances of the 1145 Securities are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration before the offering, issuance, distribution, or sale of such securities, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act.  Each of the 1145 Securities (1) is not a "restricted security" as defined in Rule 144(a)(3) under the Securities Act; and (2) is freely tradable and transferable by any initial recipient thereof that at the time of transfer or as a result thereof, is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act.

The 4(a)(2) Securities will be issued without registration under the Securities Act in reliance upon Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.  To the extent issued in reliance on Section 4(a)(2) of the Securities Act or Regulation D thereunder, the 4(a)(2) Securities will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable law.

Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Common Stock (including any shares issuable as part of the Put Option Premium or issuable upon exercise of the Rights other than the unsubscribed shares of New Common Stock issued to the Backstop Parties pursuant to the Backstop Commitment Agreement) or the New Warrants (and any Shares of the New Common Stock issuable upon the exercise of the New Warrants) through the facilities of DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to such treatment under applicable securities laws.

DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether any of the New Common Stock issuable upon exercise of the Rights, as applicable, are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock issuable upon exercise of the Rights, as applicable, are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Each Backstop Party that receives Plan Securities will be entitled to registration rights and sale support rights with respect to all such Securities to be documented in the Registration Rights Agreement in form and substance satisfactory to the Required Plan Sponsors.

E.      *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Debtors, the Reorganized Debtors, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Debtors and Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and similar spousal awards, Liens, and encumbrances.

F.      *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to the remainder of the Claims, including any Claims for accrued but unpaid interest.

G.      *No Postpetition or Default Interest on Claims.*

Notwithstanding any provision in the Plan, the Confirmation Order, or any documents that govern the Debtors' prepetition funded indebtedness or other Claims to the contrary, except as provided in the DIP Order, DIP Credit Agreement, and Articles II.B, III.B.3 and III.B.4 hereof, (a) postpetition and/or default interest shall not accrue or be paid on any Claims; and (b) no Holder of a Claim shall be entitled to (i) interest accruing on or after the Petition Date on any such Claim or (ii) interest at the contract default rate, as applicable.

H.      *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

I.      *Setoffs and Recoupment.*

Except as expressly provided in this Plan and the DIP Order, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and the holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the

allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable holder.  In no event shall any holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G hereof on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.  Notwithstanding anything to the contrary herein, the Allowed DIP Claims, the Allowed Revolving Credit Facility Claims, the Allowed FLLO Term Loan Facility Claims, the Allowed Second Lien Notes Claims, or the Allowed Unsecured Notes Claims and the Plan distributions to be made on account of such Claims shall not be subject to set off and/or recoupment by the Debtors or the Reorganized Debtors pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, and the Debtors and the Reorganized Debtors hereby waive any and all rights of set off or recoupment against such Claims.

J.     *No Double Payment of Claims.*

To the extent that a Claim is Allowed against more than one Debtor's Estate, there shall be only a single recovery on account of that Allowed Claim, but the holder of an Allowed Claim other than an Allowed Unsecured Notes Claim or Allowed General Unsecured Claim against more than one Debtor may recover distributions from all co-obligor Debtors' Estates until the holder has received payment in full on the Allowed Claims.  No Holder of an Allowed Claim shall be entitled to receive more than payment in full of its Allowed Claim, and each Claim shall be administered and treated in the manner provided by the Plan only until payment in full on that Allowed Claim.

K.     *Claims Paid or Payable by Third Parties.*

1.     Claims Paid by Third Parties.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

2.     Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Policies until the holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy. To the extent that one or more of the Debtors' Insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such Insurers' satisfaction of such Claim, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.     Applicability of Insurance Policies.

Except as otherwise provided in the Plan, payments to holders of Claims shall be in accordance with the provisions of any applicable Insurance Policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including Insurers under any Insurance Policies nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any rights or defenses, including coverage defenses, held by such Insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT,
## UNLIQUIDATED, AND DISPUTED CLAIMS

A.      *Allowance of Claims.*

After the Effective Date, except as otherwise expressly set forth herein, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.  The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

B.      *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority:  (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.S of the Plan.

C.      *Estimation of Claims.*

Before, on, or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including, without limitation, pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection.  Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors or Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      *Adjustment to Claims or Interests without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Time to File Objections to Claims.*

Any objections to Claims shall be Filed on or before the later of (a) one-hundred-eighty (180) days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by a Final Order of the Bankruptcy Court for objecting to such claims.

F.      *Reservation of Rights to Object to Claims.*

The failure of the Debtors or the Reorganized Debtors, as applicable, to object to any Claim shall not be construed as an admission to the validity or amount of any such Claim, any portion thereof, or any other claim related thereto, whether or not such claim is asserted in any currently pending or subsequently initiated proceeding, and shall be without prejudice to the right of the Debtors or the Reorganized Debtors, as applicable, to contest, challenge the validity of, or otherwise defend against any such claim in the Bankruptcy Court or non-bankruptcy forum.

G.      *Disputed and Contingent Claims Reserve.*

On or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall establish one or more reserves (including the Convenience Claim Distribution Reserve) for Claims that are contingent or have not yet been Allowed, in an amount or amounts as reasonably determined by the Debtors or Reorganized Debtors, as applicable, consistent with the Proof of Claim Filed by the applicable holder of such Disputed Claim.  To the extent that a Disputed Claim may be entitled to receive New Common Stock pursuant to the Plan, such New Common Stock will remain authorized but unissued pending resolution of such Disputed Claim.

Any assets held in any such reserve shall be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9.  As such, such assets will be subject to entity-level taxation, and the Debtors and Reorganized Debtors, as applicable, shall be required to comply with the relevant rules.

H.      *Disallowance of Claims or Interests.*

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors.

**Except as otherwise provided herein or as agreed to by the Reorganized Debtors, any and all Proofs of Claim Filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order or otherwise allowed by order of the Bankruptcy Court.**

I.      *No Distributions Pending Allowance.*

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of the Disputed portion of such Claim or Interest unless and until such Disputed portion of the Claim or Interest is Allowed.

J.      *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Reorganized Debtors shall provide to the holder of such Claim

or Interest the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

K.      *No Interest on Disputed Claims.*

Interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Proof of Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan.   The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than the Reinstated Claims) and Interests (other than the Intercompany Interests that are Reinstated) subject to the occurrence of the Effective Date.

B.      **Release of Liens.**

**Except as otherwise provided in the Exit Facilities Documents, the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns; *provided* that no mortgage, deed of trust, Lien, pledge, or other security interest against any property of the Estates in favor of any Allowed Secured Claim shall be released prior to satisfaction and/or payment of such Allowed Secured Claim in full in accordance with the Plan; *provided, further,* that no Lien arising, whether arising by contract or statute, from an oil and gas lease shall be terminated, discharged, or released by the Plan. Any holder of such Secured Claim (and the applicable agents for such holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

To the extent that any holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such holder, has filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, then as soon as practicable on or after the Effective Date, such holder (or the agent for such holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or Exit Facilities Agent that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such holder's behalf.

C.     *Releases by the Debtors.*

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, or that any holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Revolving Credit Facility, the FLLO Term Loan Facility, the Collateral Trust Documents, the Second Lien Notes, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Disclosure Statement, the Backstop Commitment Agreement, the DIP Facility, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Backstop Commitment Agreement, the DIP Facility, the Plan, the Plan Supplement, or the Exit Facilities before or during the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, other than claims or liabilities that are not described in items 1 and 2 set forth in Article IV.A hereof arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facilities Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtors' release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtors' release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties, including,

without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtors' release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the debtors' release.

D.      *Releases by Holders of Claims and Interests.*

Except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Revolving Credit Facility, the FLLO Term Loan Facility, the Collateral Trust Documents, the Second Lien Notes, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Exit Facilities, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, other than claims or liabilities that are not described in items 1 and 2 set forth in Article IV.A hereof arising out of or relating to any act or omission of a Released Party other than a Debtor that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facilities Credit Agreements, or any other financing document under and as defined therein) or (ii) any post Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facilities Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the third-party releases, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the third party releases are:  (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of the Claims released by the third-party releases; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the third-party releases.

E.      *Exculpation.*

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties and other parties set forth above have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

F.      *Injunction.*

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Except as otherwise set forth in the Confirmation Order, each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F hereof.

G.       *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, no Governmental Unit shall discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

H.       *Recoupment.*

In no event shall any holder of Claims or Interests be entitled to recoup any Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Proof of Interest or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

I.       *Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

J.       *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent or (2) the relevant holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.       *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.       the Confirmation Order shall have become a Final Order and be in form and substance acceptable to the Required Consenting Stakeholders and shall:

(a)       authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

(b)       decree that the provisions in the Confirmation Order and the Plan are nonseverable and mutually dependent;

(c)       authorize the Debtors or the Reorganized Debtors, as applicable/necessary, to:  (a) implement the Restructuring Transactions, including the Rights Offering and Exit Facilities; (b) appoint the directors and officers for the Reorganized Debtors; (c) issue and distribute the New Common Stock in accordance with the Plan, including all shares of New Common Stock issued

by Reorganized Chesapeake to the Backstop Parties as part of the Put Option Premium and the unsubscribed shares of New Common Stock issued to Backstop Parties pursuant to the Backstop Commitment Agreement; (d) issue and distribute the Rights and subsequently issue and distribute New Common Stock issuable upon exercise of such; (e) execute and deliver the Registration Rights Agreement; (f) execute and deliver the New Warrants Agreements and issue and distribute the New Warrants; (g) enter into the Exit Facilities Documents; (h) take all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (i) approve and adopt the New Organizational Documents; (j) adopt the Management Incentive Plan; (k)  reject, assume, or assume and assign, as applicable, Executory Contracts and Unexpired Leases; and (l) complete all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).

(d)   authorize the implementation of the Plan in accordance with its terms;

(e)   provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax; and

(f)   contain the release, injunction, and exculpation provisions contained in Article VIII herein; and

2.   the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

3.   the Plan and the applicable documents included in the Plan Supplement, including any schedules, documents, and exhibits contained therein, shall have been Filed and shall be in form and substance reasonably acceptable to the Debtors and the Required Consenting Stakeholders in accordance with the consent rights contained in the Restructuring Support Agreement;

4.   the Restructuring Support Agreement shall remain in full force and effect;

5.   the Final Order approving the DIP Facility shall remain in full force and effect and no event of default shall have occurred and be continuing thereunder;

6.   the Backstop Commitment Agreement Approval Order and Backstop Commitment Agreement shall have been entered and remain in full force and effect;

7.   all Allowed Professional Claims approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such Allowed Professional Claims after the Effective Date have been placed in the Professional Fee Escrow Account pending approval of the Professional Claims by the Bankruptcy Court, all fees and expenses payable pursuant to Article IV.U shall have been paid in full, and all fees and expenses of the DIP Agent, Revolving Credit Facility Administrative Agent, and the Collateral Trustee payable pursuant to the DIP Order shall have been paid in full;

8.   the payments required to be made pursuant to the terms of Article IV.U of the Plan shall have been paid;

9.   the New Organizational Documents with respect to the Reorganized Debtors shall be in full force and effect and be in form and substance reasonably acceptable to the Required Consenting Stakeholders;

10.   the Exit Facilities Documents shall be in full force and effect (with the Conditions Precedent to the Exit Facilities having been met, satisfied, or waived) and, subject to any post-closing execution and

delivery requirements provided for in the Exit Facilities Documents, be in form and substance acceptable to the Required Consenting Stakeholders (such approval not to be withheld in bad faith; *provided* that the terms set forth in the Exit Facilities Term Sheet shall be deemed acceptable to the Required Consenting Stakeholders); and

11.    The Minimum Liquidity Condition, the Total Leverage Condition, and the PDP PV-10 Test Ratio Condition shall have been met, satisfied, or waived.

For the avoidance of doubt, if the Minimum Liquidity Condition, the Total Leverage Condition, and/or the PDP PV-10 Test Ratio Condition would not otherwise be satisfied, the Required Plan Sponsors may agree, in their sole discretion, to increase the Rights Offering amount above $600 million on the same terms, including the Rights Offering Value and with an allocation consistent with the Backstop Allocations, in order to enable such conditions to be satisfied; *provided* that no Backstop Party's Backstop Commitment may be increased without its consent.

B.    *Waiver of Conditions.*

Any one or more of the conditions to Consummation (or component thereof) set forth in this Article IX may be waived by the Debtors with the prior written consent of the Required Consenting Stakeholders (with the exception of the condition precedent specified in Section IX.A.4, not to be withheld unreasonably), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

C.    *Effect of Failure of Conditions.*

If Consummation does not occur as to any Debtor, the Plan shall be null and void in all respects as to such Debtor and nothing contained in the Plan, the Disclosure Statement, or Restructuring Support Agreement as to such Debtor shall:  (1) constitute a waiver or release of any Claims by the Debtors, Claims, or Interests; (2) prejudice in any manner the rights of the Debtors, any holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders of Claims or Interests, or any other Entity.

D.    *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

### ARTICLE X.
### MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.    *Modification and Amendments.*

Except as otherwise specifically provided in this Plan, upon prior notice to and with the consent of the Required Consenting Stakeholders, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate and with the consent of the Required Consenting Stakeholders, not resolicit votes on such modified Plan.  Subject to those restrictions on modifications set forth in the Plan and the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.      *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan.*

The Debtors reserve the right, upon prior notice to and with the consent of the Required Consenting Stakeholders, to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests, and including any settlement, waiver, or release of any rights of the Revolving Credit Facility Lenders under the Intercreditor Agreement or the Collateral Trust Documents), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7. enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with the Plan or the Disclosure Statement;

8. enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9. resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10. issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

11. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.K hereof;

13. enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14. determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement, including the Restructuring Support Agreement;

15. enter an order concluding or closing the Chapter 11 Cases;

16. adjudicate any and all disputes arising from or relating to distributions under the Plan;

17. consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18. determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19. hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21. hear and determine all disputes involving the obligations or terms of the Rights Offering and the Backstop Commitment Agreement;

22. hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article VIII hereof;

23. enforce all orders previously entered by the Bankruptcy Court; and

24.    hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article XI to the contrary, the New Organizational Documents and the Exit Facilities and any documents related thereto shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect.*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, any and all holders of Claims or Interests (irrespective of whether such holders of Claims or Interests have, or are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.    *Additional Documents.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms of the Plan.  The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.    *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors for each quarter (including any fraction thereof) until the earlier of entry of a final decree closing such Chapter 11 Cases or an order of dismissal or conversion, whichever comes first.

D.    *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Confirmation Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Confirmation Date.

E.    *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

F.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| Debtors | Counsel to the Debtors |
|---|---|
| Chesapeake Energy Corporation<br>6100 North Western Avenue<br>Oklahoma, Oklahoma 73118<br>Attention:  James R. Webb | Kirkland & Ellis LLP<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Attention:  Patrick J. Nash, Jr., P.C., Marc Kieselstein, P.C., and Alexandra Schwarzman<br><br>and<br><br>Jackson Walker LLP<br>1401 McKinney Street, Suite 1900<br>Houston, Texas 77010<br>Attention:  Matthew D. Cavenaugh, Jennifer F. Wertz, Kristhy M. Peguero, and Veronica A. Polnick |
| **United States Trustee** | **Counsel to the Consenting DIP Lenders** |
| Office of The United States Trustee<br>515 Rusk Street, Suite 3516<br>Houston, Texas 77002 | Sidley Austin LLP<br>555 West Fifth Street<br>Los Angeles, CA 90013<br>Attention:  Jennifer C. Hagle and Brian E. Minyard |
| **Counsel to the Consenting Revolving Credit Facility Lenders** | **Counsel to the FLLO Ad Hoc Group** |
| Sidley Austin LLP<br>555 West Fifth Street<br>Los Angeles, CA 90013<br>Attention:  Jennifer C. Hagle and Brian E. Minyard | Davis Polk & Wardwell LLP<br>450 Lexington Avenue<br>New York, New York 10017<br>Attention:  Damian S. Schaible, Darren S. Klein, and Aryeh Ethan Falk |
| **Counsel to Franklin** | |
| Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park<br>Bank of America Tower<br>New York, New York 10036<br>Attention:  Michael S. Stamer, Meredith A. Lahaie, and Stephen B. Kuhn | |

After the Effective Date, the Reorganized Debtors have the authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.      *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.      *Entire Agreement.*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.      *Plan Supplement.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://dm.epiq11.com/chesapeake or the Bankruptcy Court's website at www.txs.uscourts.gov/bankruptcy.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the Plan Supplement exhibit or document shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).

K.      *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable; and (3) nonseverable and mutually dependent.

L.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

M.      *Closing of Chapter 11 Cases.*

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases except for the Chapter 11 Case of Chesapeake, and all contested matters and adversary proceedings relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of Chesapeake; *provided* that for purposes of sections 546 and 550 of the Bankruptcy Code, the Chapter 11 Cases shall be deemed to remain open until the Chapter 11 Case of Chesapeake has been closed.

When all Disputed Claims have become Allowed or disallowed and all remaining Cash has been distributed in accordance with the Plan, the Reorganized Debtors shall seek authority from the Bankruptcy Court to close the Chapter 11 Case of Chesapeake in accordance with the Bankruptcy Code and the Bankruptcy Rules.

N.      *Waiver or Estoppel.*

Each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

O.      *Creditor Default.*

An act or omission by a holder of a Claim or an Interest in contravention of the provisions of this Plan shall be deemed an event of default under this Plan.  Upon an event of default, the Reorganized Debtors may seek to hold the defaulting party in contempt of the Confirmation Order and shall be entitled to reasonable attorneys' fees and costs of the Reorganized Debtors in remedying such default.  Upon the finding of such a default by a creditor, the Bankruptcy Court may:  (a) designate a party to appear, sign and/or accept the documents required under the Plan on behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (b) enforce the Plan by order of specific performance; (c) award judgment against such defaulting creditor in favor of the Reorganized debtor in an amount, including interest, to compensate the Reorganized Debtors for the damages caused by such default; and (d) make such other order as may be equitable that does not materially alter the terms of the Plan.

Dated:  January 12, 2021

CHESAPEAKE ENERGY CORPORATION

on behalf of itself and all other Debtors

*/s/  Domenic J. Dell'Osso, Jr.*

Domenic J. Dell'Osso, Jr.
Executive Vice President and Chief Financial Officer

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | § | Case No. 20-33233 (DRJ) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**NOTICE OF ENTRY OF ORDER CONFIRMING THE FIFTH**
**AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**CHESAPEAKE ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**

**TO ALL CREDITORS, INTEREST HOLDERS, AND OTHER PARTIES IN INTEREST:**

    **PLEASE TAKE NOTICE** that on January 16, 2021 the Honorable David R. Jones, United States Chief Bankruptcy Judge of the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), entered the *Order Confirming Fifth Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation And Its Debtor Affiliates* [Docket No. 2915] (the "Confirmation Order"), confirming, as modified therein, the *Fifth Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates* [Docket No. 2833] (the "Plan").[2]

    **PLEASE TAKE FURTHER NOTICE** that copies of the Confirmation Order, the Plan, and all documents filed in these chapter 11 cases are available free of charge by visiting http://dm.epiq11.com/chesapeake or by calling (646) 282-2400.  You may also obtain copies of any pleadings by visiting the Bankruptcy Court's website at https://ecf.txsb.uscourts.gov in accordance with the procedures and fees set forth therein.

    **PLEASE TAKE FURTHER NOTICE** that the Effective Date of the Plan occurred on February 9, 2021.

    **PLEASE TAKE FURTHER NOTICE** that, unless otherwise provided by the Plan, the Confirmation Order, any other applicable order of the Bankruptcy Court, or agreed to by the holder of an Allowed Administrative Claim and the Debtors, all requests for payment of Administrative Claims, other than Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code, which were required to be filed by the Claims Bar Date, must be filed and served on the Debtors

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

[2]    Unless otherwise defined in this notice, capitalized terms used in this notice shall have the meanings ascribed to them in the Plan and the Confirmation Order, as applicable.

no later than:  (1) with respect to General Administrative Claims other than those that were accrued in the ordinary course of business, **March 11, 2021, 5:00 p.m. prevailing Central Time**; (2) with respect to Professional Claims, **March 26, 2021, 5:00 p.m. prevailing Central Time**; or (3) with respect to Royalty and Working Interests Administrative Claims, **June 9, 2021, 5:00 p.m. prevailing Central Time**.  Holders of Administrative Claims that are required to file and serve a request for payment of such Administrative Claims that do not file and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.

**PLEASE TAKE FURTHER NOTICE** that, unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based upon the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan and the Confirmation Order must be filed within thirty (30) days after the later of:  (1) the entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; and (2) the effective date of such rejection.

**PLEASE TAKE FURTHER NOTICE** that the Plan and its provisions are binding on the Debtors, the Reorganized Debtors, any holder of a Claim against, or interest in, the Debtors and such holder's respective successors and assigns, notwithstanding whether or not such holder (1) will receive any property or interest in property under the Plan, or (2) has filed a Proof of Claim or interest in the Chapter 11 Cases, or (3) failed to vote to accept or reject the Plan or affirmatively voted to reject the Plan.

[*Remainder of page intentionally left blank*]

Houston, Texas
February 9, 2021

/s/ *Matthew D. Cavenaugh*

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:          mcavenaugh@jw.com
                jwertz@jw.com
                kpeguero@jw.com
                vpolnick@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Patrick J. Nash, Jr., P.C. (admitted *pro hac vice* )
Marc Kieselstein, P.C. (admitted *pro hac vice* )
Alexandra Schwarzman (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          patrick.nash@kirkland.com
                marc.kieselstein@kirkland.com
                alexandra.schwarzman@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

## **Certificate of Service**

I certify that on February 9, 2021, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | § | Case No. 20-33233 (DRJ) |
| | § | |
| Reorganized Debtors. | § | (Jointly Administered) |
| | § | |

## REORGANIZED DEBTORS' MOTION FOR
## ENTRY OF ORDERS (I) AUTHORIZING AND APPROVING
## (A) THE PA AG SETTLEMENT, (B) THE MEC SETTLEMENT, AND
## (C) THE NON-MEC SETTLEMENT, AND (II) GRANTING RELATED RELIEF

---

**This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the Court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

---

The above-captioned reorganized debtors (collectively, the "<u>Reorganized Debtors</u>" or

"<u>Chesapeake</u>")[2] respectfully state the following in support of this motion:

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

[2]   A detailed description of the Debtors and their businesses, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Domenic J. Dell'Osso, Jr., Executive Vice President and Chief Financial Officer of Chesapeake Energy Corporation in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 37] (the "<u>First Day Declaration</u>"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), on June 28, 2020 (the "<u>Petition Date</u>").

**Preliminary Statement**

1.      The PA AG Settlement, the MEC Settlement, and the Non-MEC Settlement represent global resolution of royalty-related litigation and disputes in Pennsylvania.   The Settlement Agreements resolve three interconnected lawsuits— the *Demchak* class action (referred to as the "MEC" Action), the *Brown-Suessenbach* class action (referred to as the "Non-MEC" Action) and the related state-court action initiated by the Commonwealth of Pennsylvania (referred to as the "AG" Action)—concerning alleged royalty underpayments to Pennsylvania oil and gas lessors.   The Settlement Agreements will reset Chesapeake's relationship with its Pennsylvania lessors by providing Chesapeake royalty owners in Pennsylvania the ability (a) to select the method by which their royalties are calculated and (b) to realize an immediate benefit from the settlement payments under the Settlement Agreements.   Of course, the Settlement Agreements will also avoid protracted and costly litigation and position the newly-emerged Reorganized Debtors and Pennsylvania lessors for continued growth and long-term mutual success.

2.      The Reorganized Debtors seek two primary approvals.   *First*, the Reorganized Debtors request final approval of the PA AG Settlement, which addresses the state-court action initiated by the Commonwealth of Pennsylvania.   *Second*, the Reorganized Debtors request that the Court apply Bankruptcy Rule 7023, and, by incorporation, Civil Rule 23, with respect to the MEC Settlement and the Non-MEC Settlement, which address the *Demchak* and *Brown-Suessenbach* class action lawsuits.   The Reorganized Debtors seek to implement the MEC Settlement and the Non-MEC Settlement on a class-wide basis—despite the fact that no class proofs of claim were filed and regardless of whether an individual lessor filed a proof of claim— in order to provide all Pennsylvania lessors with the opportunity to participate in the settlements and, importantly, to choose their go-forward royalty calculation method, thus resolving the root cause of the royalty disputes.   To assure due process, Chesapeake seeks evaluation and final

approval of the MEC Settlement and the Non-MEC Settlement through two stages, consistent with the notice requirements of Civil Rule 23. *Initially*, the Court would preliminarily approve the MEC Settlement and the Non-MEC Settlement and approve the form and manner of notice to be provided to the respective Settlement Class under each agreement (each, a "Settlement Notice"). The Settlement Administrator would in turn serve the Settlement Notice, which would apprise the respective Settlement Class Members of their ability to object to, or opt out of, the terms of the MEC Settlement or the Non-MEC Settlement at the settlement fairness hearing. Chesapeake also requests that the Court schedule a settlement fairness hearing, at which any respective Settlement Class Members who objected to either the MEC Settlement or the Non-MEC Settlement may appear and present any such objections. *Later*, the Court would hold the final settlement fairness hearing and, following such hearing, enter orders finally approving the MEC Settlement and the Non-MEC Settlement and granting other related relief.

3.     Chesapeake believes that the Settlement Agreements are in the best interests of the Reorganized Debtors' estates, the Commonwealth, all respective Settlement Class Members, and all other parties in interest. Accordingly, the Court should finally approve the PA AG Settlement and approve the Preliminary Approval Orders and, following the settlement fairness hearing, the Final Approval Orders granting the relief requested in this motion.

## Relief Requested

4.     The Reorganized Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit 1** (the "PA AG Settlement Order"):  (a) authorizing and approving on a final basis, the settlement agreement by and among Chesapeake Energy Corporation, Chesapeake Appalachia, L.L.C., Chesapeake Operating, L.L.C., and Chesapeake Energy Marketing, L.L.C. and the Commonwealth of Pennsylvania (the "Commonwealth"), through the Pennsylvania Office

of Attorney General (the "PA AG"), attached hereto as **Exhibit 2** (the "PA AG Settlement"), and

(b) granting related relief.

5.     The Reorganized Debtors also seek entry of orders, substantially in the forms set

forth in the MEC Settlement and the Non-MEC Settlement (collectively, the "Preliminary

Approval Orders"):

     a.     authorizing and approving:

- on a preliminary basis, the settlement agreement by and among Chesapeake Appalachia, L.L.C. and the named plaintiffs and plaintiffs-intervenors in *Demchak Partners Limited Partnership, et. al. v. Chesapeake Appalachia, L.L.C.*, No. 3:13-cv-2289 ("*Demchak*"), on behalf of themselves and as putative class representatives, attached hereto as **Exhibit 3** (the "MEC Settlement"); and

- on a preliminary basis, the settlement agreement by and among Chesapeake Energy Corporation and the named plaintiffs in *Brown v. Access Midstream Partners, LP.*, No. 3: 1 4-cv-00591-MEM (M.D. Pa.) ("*Brown*") and in *Suessenbach Family Limited Partnership v. Access Midstream Partners, L. P.*, No. 3: 14-cv- 01197 (M.D. Pa.) ("*Suessenbach*," and together with *Demchak* and *Brown*, the "Class Royalty Litigation"), on behalf of themselves and as putative class representatives, attached hereto as **Exhibit 4** (the "Non-MEC Settlement," and together with the PA AG Settlement and the MEC Settlement, the "Settlement Agreements");

     b.     approving the form of Settlement Notice as set forth in each of the MEC Settlement and the Non-MEC Settlement;

     c.     setting the settlement fairness hearing; and

     d.     granting related relief.

6.     Finally, the Reorganized Debtors seek entry of orders, substantially in the forms set

forth in the Non-MEC Settlement and the MEC Settlement (the "Final Approval Orders"):

(a) authorizing and approving the MEC Settlement and the Non-MEC Settlement on a final basis;

and (b) granting related relief.  The Reorganized Debtors seek entry of the Final Approval Orders after the settlement fairness hearing.[3]

## **Jurisdiction and Venue**

7.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Reorganized Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The bases for the relief requested herein are sections 105(a) and 363(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 7023, and 9019, and rule 23 of the Federal Rules of Civil Procedure ("Civil Rule 23").

---

[3]   The Reorganized Debtors reserve the right to submit additional briefing in support of the Final Approval Orders.

Chesapeake and plaintiffs' counsel have signed the MEC and Non-MEC Private Settlement agreements.  Counsel expects additional signatures from certain royalty owners will be added to those settlements in the future.

## Background

10.     As the Court knows from prior briefing and oral arguments, private Pennsylvania landowners initiated several lawsuits against Chesapeake alleging that Chesapeake underpaid royalties due to them under various oil and gas leases.  These lawsuits are the MEC and Non-MEC lawsuits.  The Attorney General of Pennsylvania also filed a lawsuit seeking substantially similar relief from Chesapeake for Pennsylvania landowners.  Below is a summary of the actions used previously at oral argument before the Court.



## I.     The Class Royalty Litigation.

11.     As the Court knows from prior briefings and arguments, in 2013 and 2014, private Pennsylvania landowners initiated several lawsuits against Chesapeake alleging that Chesapeake underpaid royalties due to them under various oil and gas leases.

12.     **Demchak.**  The *Demchak* plaintiffs, as lessors, and Chesapeake Appalachia, L.L.C., as lessee, are parties to oil and gas leases governing leaseholds in Pennsylvania.[4]  On August 30, 2013, the *Demchak* plaintiffs initiated a lawsuit on behalf of a putative class of oil and gas lessors in Pennsylvania, alleging that Chesapeake, among other things, underpaid royalties by improperly deducting post-production costs.  Chesapeake denies those claims and further denies that its royalty payment practices are or were improper.  Chesapeake believes it paid royalties consistent with the leases and Pennsylvania law.

13.     **Brown-Suessenbach.**    The *Brown-Suessenbach* plaintiffs, as lessors, and Chesapeake Appalachia, L.L.C., as lessee, are parties to oil and gas leases governing leaseholds in Pennsylvania.[5]  On March 28, 2014, the *Brown* plaintiffs initiated a lawsuit on behalf of a putative class of oil and gas lessors in Pennsylvania, and on June 20, 2014, the *Suessenbach* plaintiffs initiated a similar lawsuit.  Both *Brown* and *Suessenbach* allege that Chesapeake, among other things, underpaid royalties by improperly deducting inflated post-production costs and engaged in a purported scheme with Access Midstream Partners, L.P. to charge landowners artificially inflated and supra-competitive rates for certain post-production services.  Chesapeake denies the plaintiffs' claims that the post-production costs are or were inflated and further denies that its royalty payment practices are or were improper.  Chesapeake believes it paid royalties consistent with the leases and Pennsylvania law.

---

[4]   The leases implicated in the MEC Settlement contain Market Enhancement Clauses and Ready for Sale or Use Clauses.

[5]   The leases implicated in the Non-MEC Settlement do not contain Market Enhancement Clauses or Ready for Sale or Use Clauses.

## II.      The PA AG Litigation.

14.      On December 9, 2015, the Commonwealth, through the PA AG, initiated its own state-court lawsuit styled *Commonwealth of Pennsylvania v. Chesapeake Energy Corporation*, No. 2015IR0069 (the "PA AG Litigation"), in the Bradford County, Pennsylvania Court of Common Pleas against Chesapeake Energy Corporation, Chesapeake Appalachia, L.L.C., Chesapeake Operating, L.L.C., and Chesapeake Energy Marketing, L.L.C., seeking substantially similar relief for the same Pennsylvania lessors that are plaintiffs in the Class Royalty Litigation. The PA AG filed a Second Amended Complaint on May 3, 2016, alleging that Chesapeake violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law and Pennsylvania antitrust common law through unfair and/or deceptive acts or practices concerning inflated midstream prices, leasing practices at the formation and post-formation stages, improper deductions from royalty payments, and an undisclosed market allocation agreement in the Marcellus Shale.  Chesapeake denies the Commonwealth's allegations as a factual matter and denies that the Commonwealth's allegations are cognizable as a legal matter.

## III.     The Chapter 11 Cases.

15.      On June 28, 2020, the Debtors filed for relief under chapter 11 of the Bankruptcy Code.

16.      On December 28, 2020, the PA AG filed Claim Nos. 4672, 4673, 4675, and 4683 related to the PA AG Litigation.

17.      Although no class proofs of claim were filed on behalf of the putative classes involved in the Class Royalty Litigation, approximately 161 proofs of claim were filed by individual Pennsylvania lessors related to the conduct alleged in the Class Royalty Litigation.

18.      On January 13, 2021, the Court confirmed the Debtors' plan of reorganization (the "Plan"), memorializing that decision in an order filed on January 16, 2021 (the "Confirmation

Order"). *Order Confirming Fifth Am. Joint Ch. 11 Plan of Reorganization of Chesapeake Energy Corp. & Its Debtor Affiliates* [Docket No. 2915].

19.     The Debtors substantially consummated the Plan on February 9, 2021 (the "Effective Date"). *Notice of Entry of Order Confirming the Fifth Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates* [Docket No. 3058].

20.     On February 9, 2021, after good-faith and arms' length negotiations, the Reorganized Debtors and the PA AG entered into the PA AG Settlement.

21.     On March 4, 2021, after good-faith and arms' length negotiations, the Reorganized Debtors and the *Demchak* plaintiffs finalized the MEC Settlement.

22.     On March 4, 2021, after good-faith and arms' length negotiations the Reorganized Debtors and the *Brown* and *Suessenbach* plaintiffs finalized the Non-MEC Settlement.

23.     All capitalized terms used in this motion but not otherwise defined herein have the meanings ascribed to such terms in the PA AG Settlement, the MEC Settlement, and the Non-MEC Settlement, as applicable.

## The Settlement Agreements

24.     Collectively, the Settlement Agreements resolve all royalty-related litigation and disputes in Pennsylvania, resulting in a fundamental reset of Chesapeake's relationship with its Pennsylvania lessors.

## IV.     The PA AG Settlement.

25.     Under the terms of the PA AG Settlement:[6]

a.      Chesapeake shall not use the Market Enhancement Clause or Ready for Sale or Use Clause in future leases.

b.      Chesapeake shall offer Pennsylvania Landowners with Market Enhancement Clauses or Ready for Sale or Use Clauses the opportunity to have their Gas Royalties paid at the higher of the In-Basin Price without Post-Production Deductions or the Netback Price.

c.      Chesapeake shall offer Pennsylvania Landowners with Non-MEC leases the opportunity to have their Gas Royalties paid at the In-Basin Price without Post-Production Deductions or the Netback Price.

d.      Chesapeake has certain leases which expressly prohibit Post-Production Deductions (which are not contained in the MEC or RFSU Lease categories).  Chesapeake believes it is not taking any prohibited Post-Production Deductions from such leases.  If Chesapeake discovers it is taking prohibited Post-Production Deductions from such leases, it will discontinue doing so.

e.      Chesapeake shall pay $5,300,000 to the Commonwealth, which shall be distributed to Pennsylvania Lessors.

f.      Chesapeake shall pay $350,000 to the PA AG towards reimbursement of costs related to the PA AG Litigation.

g.      Chesapeake shall comply with certain reporting requirements as set forth in the PA AG Settlement, including semi-annually publishing the monthly In-Basin Price on its royalty owner website.

h.      Chesapeake shall, jointly with the PA AG, appoint an Ombudsman to assist in resolution of any issues, questions or complaints raised by Pennsylvania Landowners and assist the PA AG with ensuring compliance with the settlement's terms.

i.      The Commonwealth shall release Chesapeake for all claims and actions that were brought or that could have been brought based on the allegations contained in the PA AG Litigation, except for any criminal, tax and environmental claims.

---

[6]    The following summary is provided for illustrative purposes only and is qualified in its entirety by reference to the PA AG Settlement.  In the event of any inconsistency between this summary and the PA AG Settlement, the PA AG Settlement controls in all respects.  Further, this summary shall not be used to construe or interpret the terms of the PA AG Settlement or intent of the parties thereto.

j.  Chesapeake and the PA AG agree that any claims (as defined by section 101(5) of the Bankruptcy Code) against Chesapeake held by the Commonwealth, except for any criminal, tax and environmental claims, shall be deemed satisfied and released and any Settled Claims filed in the Chapter 11 cases shall be discharged and expunged from the claims registrar without any further order of the Bankruptcy Court.

## V.   The MEC Settlement.

26.   Under the terms of the MEC Settlement:[7]

a.  Within fifteen (15) days after the Court's entry of the Preliminary Approval Order or a date otherwise established by the Court, the Settlement Administrator shall provide the Settlement Notice to the Settlement Class in the manner approved by the Court, which Settlement Notice shall include mailing the Settlement Notice by first-class mail, postage pre-paid, to individuals and entities who are in the Settlement Class and for whom Chesapeake has addresses available from its business records. In addition, Chesapeake shall send a timely and proper notice(s) of this Settlement to all appropriate federal and state officials as required by the Class Action Fairness Act of 2005 ("CAFA"), including under 28 U.S.C. §1715, if necessary.

b.  Chesapeake shall pay $5,000,000 in Settlement Funds, to be distributed to the Settlement Class in accordance with the Final Approval Order.

c.  Chesapeake shall pay all Settlement Administrative Costs.

d.  Chesapeake shall have no obligation whatsoever to pay any Attorneys' Fees of Plaintiffs, Class Counsel, or Settlement Class Members, or any Incentive Award Payments to Plaintiffs.

e.  Each Settlement Class Member shall be provided the opportunity to make an election concerning how Chesapeake (and its affiliates, successors, and assigns) will calculate and pay Gas Royalties to such Settlement Class Member and its successors and assigns after the Settlement Effective Date occurs, pursuant to such Settlement Class Member's Pennsylvania Leases in which Chesapeake currently owns an interest.

f.  Each Plaintiff and Settlement Class Member hereby releases the Settled Claims and any and all claims that Chesapeake is obligated to pay them royalties under their Pennsylvania Leases in any manner other than the

---

[7]   The following summary is provided for illustrative purposes only and is qualified in its entirety by reference to the MEC Settlement. In the event of any inconsistency between this summary and the MEC Settlement, the MEC Settlement controls in all respects. Further, this summary shall not be used to construe or interpret the terms of the MEC Settlement or intent of the parties thereto.

Election under Paragraph 6 of the MEC Settlement (including, but not limited to, the Settled Claims). Plaintiffs and the Settlement Class Members further agree that they fully and forever release and discharge all working interest owners on whose behalf Chesapeake has paid or will pay Royalties pursuant to Pennsylvania Leases from any and all of the Settled Claims, but do so only to the limited extent of Chesapeake's payments of Gas Royalties on behalf of such working interest owners.

g.  Each of the Plaintiffs and the Settlement Class Members agree that any claims (as defined by section 101(5) of the Bankruptcy Code) against Chesapeake held by such Plaintiffs or Settlement Class Members shall be deemed satisfied and released and any Settled Claims filed in the Bankruptcy Cases shall be discharged and expunged from the claims registrar without any further order of the Bankruptcy Court.

## VI.   The Non-MEC Settlement.

27.  Under the terms of the Non-MEC Settlement:[8]

a.  Within fifteen (15) days after the Court's entry of the Preliminary Approval Order or a date otherwise established by the Court, the Settlement Administrator shall provide the Settlement Notice to the Settlement Class in the manner approved by the Court, which Settlement Notice shall include mailing the Settlement Notice by first-class mail, postage pre-paid, to individuals and entities who are in the Settlement Class and for whom Chesapeake has addresses available from its business records. In addition, Chesapeake shall send a timely and proper notice(s) of this Settlement to all appropriate federal and state officials as required by CAFA, including under 28 U.S.C. §1715, if necessary.

b.  Chesapeake shall pay $1,250,000 in Settlement Funds, to be distributed to the Settlement Class in accordance with the Final Approval Order.

c.  Chesapeake shall pay all Settlement Administrative Costs.

d.  Chesapeake shall have no obligation whatsoever to pay any Attorneys' Fees of Plaintiffs, Class Counsel, or Settlement Class Members, or any Incentive Award Payments to Plaintiffs.

e.  Each Settlement Class Member shall be provided the opportunity to make an election concerning how Chesapeake (and its affiliates, successors, and assigns) will calculate and pay Gas Royalties to such Settlement Class

---

[8]  The following summary is provided for illustrative purposes only and is qualified in its entirety by reference to the Non-MEC Settlement. In the event of any inconsistency between this summary and the Non-MEC Settlement, the Non-MEC Settlement controls in all respects. Further, this summary shall not be used to construe or interpret the terms of the Non-MEC Settlement or intent of the parties thereto.

Member and its successors and assigns after the Settlement Effective Date occurs, pursuant to such Settlement Class Member's Pennsylvania Leases in which Chesapeake currently owns an interest.

f. Each Plaintiff and Settlement Class Member hereby releases the Settled Claims and any and all claims that Chesapeake is obligated to pay them royalties under their Pennsylvania Leases in any manner other than the Election under Paragraph 6 of the Non-MEC Settlement (including, but not limited to, the Settled Claims). Plaintiffs and the Settlement Class Members further agree that they fully and forever release and discharge all working interest owners on whose behalf Chesapeake has paid or will pay Royalties pursuant to Pennsylvania Leases from any and all of the Settled Claims, but do so only to the limited extent of Chesapeake's payments of Gas Royalties on behalf of such working interest owners.

g. Each of the Plaintiffs and the Settlement Class Members agree that any claims (as defined by section 101(5) of the Bankruptcy Code) against Chesapeake held by such Plaintiffs or Settlement Class Members shall be deemed satisfied and released and any Settled Claims filed in the Bankruptcy Cases shall be discharged and expunged from the claims registrar without any further order of the Bankruptcy Court.

28. The Reorganized Debtors believe the Settlement Agreements are in the best interests of the Reorganized Debtors and their estates. Specifically, the Settlement Agreements address the root cause of the PA AG Litigation and the Class Royalty Litigation by allowing all putative class members to elect how their royalties are calculated on a go-forward basis. As a result, the Reorganized Debtors believe the settlements will reduce the likelihood and attendant cost and distraction of future royalty related litigation. In addition, the PA AG Settlement resolves any dispute regarding the dischargeability of the PA AG Litigation—wherein the PA AG sought to require Chesapeake to forfeit its right to engage in certain business activities until the company paid all alleged restitution, costs and civil penalties—thus preserving Chesapeake's ability to continue operating in the Commonwealth. Accordingly, to finally resolve Chesapeake's disputes with the Commonwealth and Pennsylvania lessors, the Reorganized Debtors seek authorization and approval of the Settlement Agreements.

## Basis for Relief

I.    **Settlements Are Favored in Bankruptcy, and the Debtors' Business Judgment Is Given Significant Deference.**

29.    Bankruptcy Rule 9019(a) provides, in relevant part:

> On motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement.  Notice shall be given to creditors, the United States trustee . . . and indenture trustee as provided in Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019(a).

30.    "To minimize litigation and expedite the administration of a bankruptcy estate, compromises are favored in bankruptcy."  *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (internal quotations omitted) (citing 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)).  Settlements are considered a "normal part of the process of reorganization" and a "desirable and wise method[] of bringing to a close proceedings otherwise lengthy, complicated, and costly."  *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980) (citations omitted) (decided under the Bankruptcy Act).

31.    Pursuant to Bankruptcy Rule 9019(a), a bankruptcy court may, after appropriate notice and a hearing, approve a compromise or settlement so long as the proposed settlement is fair, reasonable, and in the best interest of the estate.  *See In re Age Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015).  Ultimately, approval of a compromise is within the "sound discretion" of the bankruptcy court.  *United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 298 (5th Cir. 1984); *see also Jackson Brewing Co.*, 624 F.2d at 602–03 (same).

32.    Generally, the role of the bankruptcy court is not to decide the issues in dispute when evaluating a settlement.  *Watts v. Williams*, 154 B.R. 56, 59 (S.D. Tex. 1993).  Instead, the

court should determine whether the settlement as a whole is fair and equitable.  *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).[9]

33.    "Great judicial deference is given to the [debtor's] exercise of business judgment." *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Grp., Ltd.)*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005) (citation omitted).  "As long as [the decision] appears to enhance a debtor's estate, court approval of a debtor-in-possession's decision . . . should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code." *Richmond Leasing Co.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (citation omitted).

## II.    The Settlement Agreements Satisfy the Three-Factor Test Courts in the Fifth Circuit Employ to Analyze Proposed Settlements.

34.    The Fifth Circuit has established a three-factor balancing test under which bankruptcy courts are to analyze proposed settlements.  The factors a court must consider in determining whether a compromise is "fair, equitable, and in the best interest of the estate" are: "(1) [t]he probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law; (2) [t]he complexity and likely duration of litigation and any attendant expense, inconvenience, and delay; and (3) [a]ll other factors bearing on the wisdom of the compromise." *In re Roqumore*, 393 B.R. 474, 479 (Bankr. S.D. Tex. 2008) (citing the factors set forth by the court in *Jackson Brewing*); s*ee also Age Ref. Inc.*, 801 F.3d at 540 (same).

---

[9]    Further, under section 105(a) of the Bankruptcy Code, the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  Authorizing the Reorganized Debtors to proceed with the Settlement Agreements falls squarely within the spirit of Bankruptcy Rule 9019, if not the letter, as well as the Bankruptcy Code's predilection for compromise.  Thus, to the extent necessary, section 105(a) relief is appropriate in this instance and would best harmonize the settlement processes contemplated by the Bankruptcy Code.

35.     Under the rubric of the third factor referenced above, the Fifth Circuit has specified two additional factors that bear on the decision to approve a proposed settlement.  ***First***, the court should consider "the paramount interest of creditors with proper deference to their reasonable views."  *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (Matter of Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995); *see also Age Ref. Inc.*, 801 F.3d at 540 (noting the *Foster Mortgage* factors).  "While the desires of the creditors are not binding, a court 'should carefully consider the wishes of the majority of the creditors.'"  *Foster Mortg. Corp.*, 68 F.3d at 917 (quoting *In re Transcon. Energy Corp.*, 764 F.2d 1296, 1299 (9th Cir. 1985)).  ***Second***, the court should consider the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion."  *Age Ref. Inc.*, 801 F.3d at 540; *Foster Mortg. Corp.*, 68 F.3d at 918 (citations omitted).

### A.     The Reorganized Debtors Face Exposure in Excess of the Settlement Payments.

36.     Although the Reorganized Debtors believe that the claims related to the PA AG Litigation were discharged on the Effective Date pursuant to the Plan and the Confirmation Order, the PA AG Settlement resolves any dispute regarding the dischargeablity of the PA AG Litigation. While the Reorganized Debtors believe there is a high probability of success in litigation related to the dischargeabilty, as well as the merits, of the PA AG Litigation, resolution of these matters would rest in a court's discretion.  Moreover, should Chesapeake not succeed in the litigation, the Reorganized Debtors may be required to pay more in restitution, costs, and civil penalties—and jeopardize their ability to conduct business in the Commonwealth—than the approximately $5,650,000 in settlement payments contemplated under the PA AG Settlement.

37.     Similarly, the claims related to Class Royalty Litigation were discharged on the Effective Date pursuant to the Plan and the Confirmation Order.  However, the MEC Settlement

and the Non-MEC Settlement reduce the likelihood of future royalty related litigation by allowing all putative class members to elect how their royalties are calculated on a go-forward basis. The Reorganized Debtors, in their reasonable business judgment, believe that the approximately $5,000,000 settlement payment contemplated under the MEC Settlement and the approximately $1,250,000 settlement payment contemplated under the Non-MEC Settlement are likely less than the attendant cost and possible liability of potential future royalty related litigation, including potential class action litigation.

**B. Ongoing and Potential Future Litigation Would Be Complex and Result in Delay and Distraction.**

38.     With respect to "the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay," further claims litigation and potential future royalty related litigation in Pennsylvania likely would be costly and time consuming, involving drafting and filing motions and preparing for trial. Specifically, absent the PA AG Settlement, the Reorganized Debtors face continued litigation with the PA AG regarding the dischargeability—and, if nondischargebale, the merits—of the PA AG Litigation. Absent the MEC Settlement and the Non-MEC Settlement, the Reorganized Debtors face claims litigation with individual Pennsylvania lessors, as well as future potential class litigation related to the calculation of royalties. All such litigation would distract from the Reorganized Debtors' business operations and claims administration process, as well as threaten the relationship between Chesapeake and its Pennsylvania lessors.

**C. The Settlement Agreements Are in the Best Interests of Creditors.**

39.     The Settlement Agreements will provide all stakeholders with certainty regarding the resolution of the disputes between Chesapeake and the Commonwealth and the Class Royalty Litigation plaintiffs and putative class members. The Settlement Agreements constitute a

fundamental reset of Chesapeake's relationship with its Pennsylvania lessors, obviating the need for further claims litigation and future potential class action litigation and preserving the Reorganized Debtors' interests in the Pennsylvania leases.  The PA AG Settlement additionally preserves the Reorganized Debtors' ability to continue conducting business in the Commonwealth. Further, the Settlement Agreements arise out of arm's-length bargaining between the Reorganized Debtors and the Commonwealth and the Class Royalty Litigation plaintiffs.

40.     Based on the foregoing considerations, the Settlement Agreements represent fair and reasonable compromises that are in the best interest of the Reorganized Debtors' estates. Accordingly, the Court should authorize and approve the PA AG Settlement on a final basis, and the MEC Settlement and the Non-MEC Settlement (a) on a preliminary basis as set forth in the Preliminary Approval Orders and (b) following the settlement fairness hearing, on a final basis as set forth in the Final Approval Orders.

## III.   The MEC Settlement and the Non-MEC Settlement Satisfy the Requirements of Civil Rule 23.

41.     Civil Rule 23(e) provides that "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e).  Final approval of a settlement pursuant to Civil Rule 23(e) turns on whether the settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977); *In re Shell Oil Refinery*, 155 F.R.D. 552, 555 (E.D. La. 1993); *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 285–86 (W.D. Tex. 2007).   "The general rule applicable to the court's exercise of its discretion in deciding the fairness of a proposed [settlement of a] class action is that the court must ensure that the settlement is in the interest of the class, does not unfairly impinge on the rights and interests of dissenters, and does not merely mantle oppression."  *DeHoyos*, 240 F.R.D. at 286 (internal citations omitted) (quoting *Garza v. Sporting*

*Goods Properties, Inc.*, No. CIV. A. SA-93-CA-108, 1996 WL 56247, at \*11 (W.D. Tex. Feb. 6, 1996)).  "[T]here is a strong presumption in favor of finding the settlement fair."  *Id*.  Furthermore, "the proposed settlement is not required to achieve some hypothetical standard constructed by imagining every benefit that might someday be obtained in a contested matter," but instead the "[c]ourt may rely on the judgement of experienced counsel for the parties."  *Id*.

42.     The Fifth Circuit has held that the following six factors are relevant in determining whether a proposed class settlement is fair, reasonable, and adequate:  "(1) the existence of fraud or collusion behind the settlement; (2) the probability of plaintiffs' success on the merits;  (3) the range of possible recovery; (4)  the complexity, expense and likely duration of the litigation; (5) the stage of the proceedings and the amount of discovery completed; and (6) the opinions of the class counsel, class representatives, and absent class members."  *Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983) (citing *Parker v. Anderson*, 667 F.2d 1205, 1209 (5th Cir. 1982)); *In re Katrina Canal Breaches Litigation*, 628 F.3d 185, 194-95 (5th Cir. 2010) (citing *Newby v. Enron Corp.*, 394 F.3d 296, 301 (5th Cir. 2004)); *cf. In re TD Banknorth*, 938 A.2d 654, 658 (Del. Ch. 2007) ("an evaluation of whether a settlement is fair and reasonable" "requires balancing the strengths of the claims being compromised against the benefits the settlement provides to the class members.").  The *Reed* factors strongly support approval of the MEC Settlement and the Non-MEC Settlement.

43.     ***First***, as noted herein, both the MEC Settlement and the Non-MEC Settlement arise out of serious, informed, arms'-length bargaining between Chesapeake and the Class Royalty Litigation plaintiffs.  There is no evidence that either the MEC Settlement or the Non-MEC Settlement is collusive or fraudulent.

44.    **Second** and **third**, although the claims related to the Class Royalty Litigation were discharged on the Effective Date pursuant to the Plan and the Confirmation Order and no class proofs of claim were filed, the MEC Settlement and the Non-MEC Settlement nevertheless provide the Class Royalty Litigation plaintiffs and putative class members with closure regarding past royalty disputes; the Reorganized Debtors believe this is an important step towards resetting Chesapeake's relationship with its Pennsylvania lessors.  The MEC Settlement and the Non-MEC Settlement provide all Pennsylvania lessors with the opportunity to participate in the settlements and, importantly, to choose their go-forward royalty calculation method.  Absent the MEC Settlement and the Non-MEC Settlement, the Reorganized Debtors face claims litigation with individual Pennsylvania lessors, as well as future potential class action litigation related to the calculation of royalties.  In light of these circumstances, the MEC Settlement and the Non-MEC Settlement are fair and reasonable.

45.    **Fourth** and **fifth**, the complexity, expense and likely duration of related litigation all point in favor of approving the MEC Settlement and the Non-MEC Settlement.  Absent approval of the MEC Settlement and the Non-MEC Settlement, the Reorganized Debtors will have to litigate over 100 claims filed by individual Pennsylvania lessors.  Such litigation would likely entail significant expense and delay for all parties involved.  Further, the MEC Settlement and the Non-MEC Settlement allow all putative class members to elect how their royalties are calculated on a go-forward basis.  As a result, the Reorganized Debtors believe the settlements will reduce the likelihood and attendant cost and delay of future potential royalty related litigation, including potential class action litigation.

46.    **Sixth**, the MEC Settlement and the Non-MEC Settlement enjoy the support of the *Demchak*, *Brown*, and *Suessenbach* plaintiffs and respective Class Counsel, who engaged in

negotiations with Chesapeake throughout these chapter 11 cases to secure each settlement's respective terms.  All respective Settlement Class Members will be afforded the opportunity to opt-out of the applicable settlement agreement and object to any of the respective settlement agreement's terms at the settlement fairness hearing.  At that time, if significant objections manifest, the Court, the Reorganized Debtors, and the Class Royalty Litigation plaintiffs may address them as appropriate.

47.     For all of the foregoing reasons, the Court should enter the PA AG Settlement Order, the Preliminary Approval Orders and, after the settlement fairness hearing, the Final Approval Orders.

## **Reservation of Rights**

48.     Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as:  (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Reorganized Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested by this motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Reorganized Debtors' estates; (g) a waiver or limitation of the Reorganized Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Reorganized Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief

requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.

### Notice

49.     The Reorganized Debtors will provide notice of this motion to:  (a) the United States Trustee for the Southern District of Texas; (b) the parties to the Settlement Agreements; and (c) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Reorganized Debtors respectfully request that the Court enter the orders, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
March 5, 2021

*/s/  Matthew D. Cavenaugh*

| | |
|---|---|
| **JACKSON WALKER LLP** | **KIRKLAND & ELLIS LLP** |
| Matthew D. Cavenaugh (TX Bar No. 24062656) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Kristhy M. Peguero (TX Bar No. 24102776) | Patrick J. Nash, Jr., P.C. (admitted *pro hac vice* ) |
| 1401 McKinney Street, Suite 1900 | Alexandra Schwarzman (admitted *pro hac vice*) |
| Houston, Texas 77010 | 300 North LaSalle Street |
| Telephone:  (713) 752-4200 | Chicago, Illinois 60654 |
| Facsimile:  (713) 752-4221 | Telephone:  (312) 862-2000 |
| Email:  mcavenaugh@jw.com | Facsimile:  (312) 862-2200 |
|   kpeguero@jw.com | Email:  patrick.nash@kirkland.com |
| | alexandra.schwarzman@kirkland.com |
| | |
| *Co-Counsel to the Reorganized Debtors* | *Co-Counsel to the Reorganized Debtors* |

## **<u>Certificate of Service</u>**

I certify that on March 5, 2021, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | § | Case No. 20-33233 (DRJ) |
|  | § |  |
| Reorganized Debtors. | § | (Jointly Administered) |
|  | § |  |

## ORDER (I) AUTHORIZING AND APPROVING THE PA AG
## SETTLEMENT ON A FINAL BASIS, AND
## (II) GRANTING RELATED RELIEF

Upon the motion (the "<u>Motion</u>")[2] of the above-captioned reorganized debtors (collectively, the "<u>Reorganized Debtors</u>") for entry of an order (this "<u>PA AG Settlement Order</u>"), (a) authorizing and approving the PA AG Settlement on a final basis and (b) granting related relief, all as more fully set forth in the Motion; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Reorganized Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Reorganized Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the

---

[1]  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at <u>https://dm.epiq11.com/chesapeake</u>.  The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

[2]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The PA AG Settlement is approved on a final basis.

2.      The Reorganized Debtors hereby are authorized to take all actions necessary to implement the PA AG Settlement as set forth in Exhibit 2 to the Motion.

3.      Upon the Reorganized Debtors' entry into the PA AG Settlement, it shall be binding on them, their estates, all creditors and parties-in-interest, and on any trustee appointed in these cases.

4.      Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

5.      The Reorganized Debtors are authorized to take all actions necessary to effectuate the relief granted in this PA AG Settlement Order in accordance with the Motion.

6.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this PA AG Settlement Order.


Dated: _____, 2021                 _____
                                          DAVID R. JONES
                                          UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT 2

## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 11** |
| **CHESAPEAKE ENERGY** | § | |
| **CORPORATION**, *et al.*[1], | § | **Case No. 20-33233 (DRJ)** |
| | § | |
| **Debtors.** | § | **(Jointly Administered)** |

## SETTLEMENT AGREEMENT

This SETTLEMENT AGREEMENT ("Settlement Agreement") is entered into by, between, and among, Chesapeake Energy Corporation, Chesapeake Appalachia, L.L.C., Chesapeake Operating, L.L.C., and Chesapeake Energy Marketing, L.L.C. (collectively, "Chesapeake" or "Chesapeake Defendants") and the Commonwealth of Pennsylvania (the "Commonwealth"), through the Pennsylvania Office of Attorney General (the "Office of Attorney General"). This Settlement Agreement is entered into to effect a full and final settlement and dismissal with prejudice of all Settled Claims on the terms set forth below. The date of this Settlement Agreement is February 9, 2021.

## RECITALS

A.      The Commonwealth, through the Office of Attorney General, filed its Second Amended Complaint in *Commonwealth of Pennsylvania v. Chesapeake Energy Corporation, et al.*, Case No. 2015IR0069 (Ct. of Common Pleas, Bradford Cty., Pa.) (the "Lawsuit") on May 3, 2016, alleging that Chesapeake had violated Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1 et seq. ("UTPCPL"), and Pennsylvania's common law of antitrust involving the Marcellus Shale gas play. Specifically, the Commonwealth alleged that the Defendants had violated the UTPCPL through, inter alia, unfair and/or deceptive acts or practices concerning inflated midstream prices, leasing practices at the formation and post-formation stages, improper deductions from royalty payments, and an undisclosed market allocation agreement.

B.      The Commonwealth also alleged a violation of Pennsylvania's common-law proscription against unreasonable restraint of trade for the agreement between competitors, in particular the alleged allocation of certain counties amongst competitors for the acquisition of oil and gas leases. The Commonwealth alleged that there was an unlawful agreement that had the effect of fixing, stabilizing and lowering royalty rates and signing bonuses paid to Pennsylvania

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

Confidential Pursuant to F.R.E. 408 and Pa. R.E. 408

landowners for oil and gas leases and that suppressed competition for the acquisition of oil and gas leases in the affected counties.

C.      Chesapeake denies the Commonwealth's allegations as a factual matter and denies that the Commonwealth's allegations are cognizable as a legal matter.

D.      The parties, by their respective attorneys, have consented to this Settlement Agreement without trial or adjudication of any issue of fact or law, and without this Settlement Agreement constituting any evidence against, or any admission by, any party regarding any such issue of fact or law.

## AGREEMENT FOR SETTLEMENT PURPOSES ONLY

This Settlement Agreement is for settlement purposes only.  The fact of this Settlement Agreement or any provision herein, the negotiations or proceedings related hereto, and any actions taken hereunder shall <u>not</u> constitute or be construed as (a) any admission of the validity of any claim or any fact alleged by the Commonwealth in the Lawsuit; (b) any admission of any wrongdoing, fault, violation of law, breach of contract, or liability of any kind on the part of Chesapeake; (c) any admission as to any claim or allegation made in any demand of, action against, or proceeding against Chesapeake; and/or (d) a waiver of any applicable defense, including, without limitation, any applicable statute of limitations.  This Settlement Agreement and its exhibits shall not be offered or admissible in evidence against any party in any action or proceeding in any forum for any purpose whatsoever, except any action or proceeding brought to enforce its terms.

## 1.  <u>JURISDICTION</u>

**1.1**    This Court has jurisdiction over the parties and subject matter of this action pursuant to 28 U.S.C. § 1334.

## 2.  <u>DEFINITIONS</u>

As used in this Agreement:

**2.1**    **"**Chesapeake" means Chesapeake Energy Corporation, Chesapeake Appalachia, LLC, Chesapeake Operating, LLC, and Chesapeake Energy Marketing, LLC and their respective subsidiaries, members, affiliates, predecessors in interest, successors in interest, current or former officers and directors, attorneys, and agents.

**2.2**    "Final" means that (a) the final judgment approving this Settlement Agreement is a final, appealable order ("Final Judgment"); and (b) either (i) no appeal has been taken from the Final Judgment as of the date on which all times to appeal therefrom have expired, or (ii) an appeal or other review proceeding of the Final Judgment having been commenced, such appeal or other review is finally concluded and no longer is subject to review by any court, whether by appeal, petitions for rehearing or argument, petitions for rehearing en banc, petitions for writ of certiorari, or otherwise, and such appeal or other review has been finally resolved in such manner that affirms the Final Judgment in all material respects.

Confidential Pursuant to F.R.E. 408 and Pa. R.E. 408

**2.3**     "Gas" means natural gas, other than gas that is processed to separate natural gas liquids ("NGLs") from the gas stream in a processing (or similar) plant.  Gas is not processed solely because it is passed through a mechanical separator for the removal of liquid hydrocarbons at or near a well.

**2.4**     "In-Basin Price" means MMBtu price that is the weighted average price of (a) 50% of the Leidy Hub monthly (first of the month) index price ($/MMBtu) as reported in *Inside FERC's Gas Market Report* (published by Platts), and (b) 50% of the TGP Zone 4-300 Leg monthly (first of the month) index price ($/MMBtu) as reported in *Inside FERC's Gas Market Report* (published by Platts).  If either the Leidy Hub or TGP Zone 4-300 Leg ceases to be published, the Office of Attorney General and Chesapeake will agree on a replacement index.  If a new hub or sales point is developed in the Marcellus Region and a corresponding index price for it is published by Platts, the Office of Attorney General and Chesapeake will determine whether to revise the In-Basin Price to also include the new index.  To the extent the parties are unable to reach agreement under this paragraph, the dispute resolution mechanism set forth in paragraph 5.4 shall apply.

**2.5**     "Leidy Hub" means the "Leidy Hub" trading location as defined in the July 2020 "Methodology and Specifications Guide/US and Canada Natural Gas" published by S&P Global Platts.

**2.6**     "Marcellus Region" refers to the area encompassing the following Pennsylvania counties:

- Bradford County
- Lycoming County
- Sullivan County
- Susquehanna County
- Tioga County
- Wyoming County
- Potter County
- McKean County
- Wayne County

**2.7**     "Market Enhancement Clause" means Royalty payment clauses or provisions in an oil and gas lease that preclude the lessee from deducting Post-Production Costs incurred to transform leasehold gas into marketable form, but permit the lessee to deduct a pro-rata share of Post-Production Costs incurred after the gas is marketable if they enhance the value of the marketable gas.  Such clauses are usually identified, entitled or referred to as "Market Enhancement Clauses" or "MECs."

**2.8**     "Parties" means the Commonwealth of Pennsylvania and Chesapeake.

**2.9**     "Pennsylvania" means the Commonwealth of Pennsylvania.

**2.10**     "Pennsylvania Landowners" means owners of interests in minerals located within the Commonwealth of Pennsylvania.

Confidential Pursuant to F.R.E. 408 and Pa. R.E. 408

**2.11**   "Pennsylvania Leases" means each and every oil and gas lease that (a) covers a leasehold located in Pennsylvania, and (b) is or has been owned, in whole or in part, by a Chesapeake entity as a lessee, according to the business records maintained by Chesapeake.

**2.12**   "Pennsylvania Lessors" means Pennsylvania Landowners who have entered into oil and gas leases with Chesapeake or whose leases have been assigned to Chesapeake.

**2.13**   "Post-Production Costs" means costs for gathering, compressing, treating, dehydrating, processing, transporting, or transmitting Gas.

**2.14**   "Ready for Sale or Use Clause" means Royalty payment clauses or provisions in an oil and gas lease that preclude the lessee from deducting Post-Production Costs to make such gas ready for sale or use but permit the lessee to deduct a pro-rata share of Post-Production Costs incurred after the gas is ready for sale or use.  Such clauses are often entitled or referred to as "Ready for Sale or Use Clauses" or RFSU.

**2.15**   "Royalty" means lessor royalty interests and does not include overriding royalty interests.

**2.16**   "Settlement Administrator" means Epiq Corporate Restructuring L.L.C.

**2.17**   "Settlement Agreement" or "Agreement" means this Settlement Agreement, including all exhibits hereto.

**2.18**   "Settled Claims" means any and all claims and causes of action related to the Lawsuit and that are released as further set forth in paragraph 6.1.

**2.19**   "Settlement Effective Date" or "Effective Date" shall be the date when the Settlement Agreement has been fully executed by all the Parties and their counsel, the Court approves this Settlement Agreement and this Settlement Agreement is Final.

**2.20**   "TGP Zone 4 – 300 Leg" means the "Tennessee, Zone 4 – 300 leg" trading location as defined in the July 2020 "Methodology and Specifications Guide/US and Canada Natural Gas" published by S&P Global Platts.

### 3.   **TERMS**

**3.1   Future Acquisition of Leases**.  To the extent Chesapeake enters into new oil and gas leases with Pennsylvania Landowners, it agrees not to use the Market Enhancement Clause or Ready for Sale or Use Clause for any such new leases.

**3.2   Royalty Methodology Going Forward for MEC and RFSU Leases.**  Within sixty (60) days of the Effective Date, for MEC and RFSU Leases only, Chesapeake shall offer Pennsylvania Landowners with MEC or RFSU Leases the opportunity to have their Gas Royalties

4

Confidential Pursuant to F.R.E. 408 and Pa. R.E. 408

paid the at the higher of the "In-Basin Price Without Post-Production Deductions" (paragraph 3.2.1) or the "Netback Price" (paragraph 3.2.2).  Chesapeake may implement this notice and election process through the *Demchak* class action settlement, which shall contain a separate section, jointly agreed to by the Attorney General and Chesapeake, explaining the terms of this Settlement Agreement

**3.2.1   In-Basin Price Without Post-Production Deductions.** The In-Basin Price Without Post-Production Deductions refers to the calculation of Gas Royalties based on the In-Basin Price without deduction of any Post-Production Costs and without deduction of any other items, costs, or fees.  When calculating and remitting royalty payments to Pennsylvania Lessors under this scenario, Chesapeake may, if it is permitted by Pennsylvania law to do so, deduct any applicable and properly-calculated state severance taxes from the royalty payments and remit such deducted taxes to the appropriate governmental authority.

**3.2.2   Netback Price**.  The Netback Price refers to the calculation of Gas Royalties based on the weighted average sales price a Chesapeake entity received for its production month sales to third parties minus a proportionate share (net revenue interest share) of the Post-Production Costs that Chesapeake incurred and any applicable and properly-calculated state severance taxes.  It is agreed, however, that Gas Royalties calculated under this scenario for any given month and any given well shall never be in an amount that is less than zero.

**3.3      Royalty Methodology Going Forward for Non-MEC Leases.**  Within sixty (60) days of the Effective Date, for Non-MEC Lessors (that is, Pennsylvania Landowners with leases that do not include Market Enhancement Clauses or Ready for Sale or Use Clauses), Chesapeake shall provide Pennsylvania Landowners with Non-MEC Leases the opportunity to make a one-time election concerning how Chesapeake will calculate and pay Gas Royalties in the future pursuant to Pennsylvania Leases in which Chesapeake currently owns an interest.  Pennsylvania Landowners with Non-MEC Leases will be given the choice to have their Gas Royalties pursuant to Non-MEC Leases calculated and paid based either on the "In-Basin Price Without Post-Production Deductions" methodology detailed above (paragraph 3.2.1) or the "Netback Price" methodology detailed above (paragraph 3.2.2).  Chesapeake may implement this notice and election process through the *Brown/Suessenbach* class action settlement**,** which shall contain a separate section, jointly agreed to by the Attorney General and Chesapeake, explaining the terms of this Settlement Agreement

**3.4      Leases That Prohibit Deductions.**  Chesapeake has certain leases which expressly prohibit Post-Production Deductions (which are not contained in the MEC or RFSU Lease categories).  Chesapeake believes it is not taking any prohibited Post-Production Deductions from such leases.  If Chesapeake discovers it is taking prohibited Post-Production Deductions from such leases, it will discontinue doing so.

**3.5      Payments**.

**3.5.1**   Payments to Pennsylvania Lessors.  Within sixty (60) days of the Effective Date,

5

Confidential Pursuant to F.R.E. 408 and Pa. R.E. 408

Chesapeake shall pay $5,300,000.00 to the Commonwealth of Pennsylvania which shall be allocated and distributed by the Office of Attorney General to Pennsylvania Lessors with notice to Chesapeake.

**3.5.2**   Payments to the Office of Attorney General.  Within sixty (60) days of the Effective Date, Chesapeake shall pay $350,000.00 to the "Commonwealth of Pennsylvania, Office of Attorney General" towards reimbursement of the Office of Attorney General's costs incurred to conduct its investigation and litigation, which payment shall be allocated to the Public Protection Division within the Office of Attorney General and used for future Public Protection Division purposes.

## 4.   COMMUNICATIONS WITH PENNSYLVANIA LANDOWNERS

**4.1**   Attached as Exhibit A is an exemplar of the royalty payment check stub that Pennsylvania Lessors currently receive from Chesapeake for payment of natural gas royalties. Chesapeake shall continue to provide the categories of information applicable to the royalty owner presently furnished on the check stub through June 2025.

**4.2**   Chesapeake shall semi-annually publish the monthly In-Basin Price on its royalty owner website.

**4.3**   Chesapeake shall maintain on its website a link to the Pennsylvania Department of Environmental Protection's webpage which contains information for monthly natural gas production by well.

**4.4**   Chesapeake shall maintain on its website an address where additional information pertaining to the owner's interest in production may be obtained and questions answered.  If a request for information is submitted by certified mail by a Chesapeake royalty owner, Chesapeake shall use good faith efforts to provide an answer by certified mail (or electronic communication) within thirty (30) days of the receipt of the request.

**4.5**   Chesapeake agrees annually, through June 2025, to provide the Commonwealth with call and email metrics from Chesapeake's call centers (e.g., call volume, wait times, etc.) to the extent those communications involve Pennsylvania Lessors.

## 5.   COMPLIANCE AND ENFORCEMENT

**5.1**   **Complaint Procedure**

**5.1.1**   Any person who wishes to report a possible violation of this Agreement shall send a written description of the alleged violation to the Chief Deputy Attorney General, Antitrust Section, Office of Attorney General, 14th Floor, Strawberry Square, Harrisburg, Pennsylvania 17120.  The Office of Attorney General shall transmit the full complaint to the Ombudsman and Chesapeake.

Confidential Pursuant to F.R.E. 408 and Pa. R.E. 408

**5.1.2**   Chesapeake shall respond in writing to the complainant and to the Ombudsman within ninety (90) days from the receipt of any complaint.

**5.1.3**   If the complaint is still unresolved, the Ombudsman will attempt to negotiate a satisfactory resolution.  Chesapeake will provide reasonable cooperation with the Ombudsman to attempt to resolve the complaint.

**5.1.4**   If Chesapeake believes a complaint to be frivolous, they may so advise the Ombudsman and the Office of Attorney General and their obligations under this paragraph will be satisfied unless they are otherwise advised by the Ombudsman to respond more fully to the complaint.

**5.2**   **Compliance Inspection**.  To confirm compliance with this Agreement, any duly authorized representative of the Office of Attorney General, with reasonable notice, may request information contained in non-privileged books, ledgers, accounts, correspondence, memoranda, other records and documents, regarding Pennsylvania Lessors in the possession of Chesapeake, relating to any matters contained in this Agreement, and Chesapeake agrees to provide copies of such non-privileged documents relating to any matters contained in this Agreement.

**5.3**   **Ombudsman.**  Within sixty (60) days of the Effective Date, the Office of Attorney General and Chesapeake, shall jointly appoint an Ombudsman to assist in the resolution of any issues, questions or complaints raised by Pennsylvania Landowners related to the calculation of royalties and the deduction, if any, of Post-Production Costs or related to Pennsylvania Landowners' relationships with Chesapeake.

**5.3.1**   If the Ombudsman determines material deficiencies in Chesapeake's compliance with the terms of the Agreement, the Ombudsman shall contact the Attorney General and Chesapeake or prepare a written report of the claimed material deficiencies that is provided to the Attorney General and Chesapeake.  Chesapeake shall have 90 days from the date of the Ombudsman's report to respond to any claimed material deficiencies.

**5.3.2**   If the claimed material deficiency or violation is not refuted or substantially cured by Chesapeake, the Office of Attorney General may initiate dispute resolution including, but not limited to, an arbitration proceeding pursuant to paragraph 5.4.  No party shall be bound by any findings or conclusions of the Ombudsman and they shall not be admissible in any arbitration or court proceeding.  Neither shall any party's burden of proof be affected in any proceeding by the Ombudsman's findings or conclusions.

**5.3.3**   The Ombudsman's services shall be detailed in a written agreement, on terms and conditions, including terms and conditions governing confidentiality requirements and conflict-of-interest certifications that are approved by the Office of Attorney General and Chesapeake.

**5.3.4**   Chesapeake's compensation of the Ombudsman must be on reasonable and customary terms commensurate with the individual's experience and responsibilities.

Confidential Pursuant to F.R.E. 408 and Pa. R.E. 408

Compensation, costs and expenses for the Ombudsman (and any replacement Ombudsman) shall be reasonable and shall not exceed $125,000.00 per year.

**5.3.5**     The Ombudsman must account to the Office of Attorney General and Chesapeake for all costs and expenses incurred.

**5.3.6**     If the Office of Attorney General or Chesapeake determines that the Ombudsman is not acting diligently or in a reasonably cost-effective manner, the Office of Attorney General and Chesapeake shall jointly appoint a substitute.

**5.3.7**     The Ombudsman shall be appointed for a term of five (5) years to run from the Effective Date.  If the Ombudsman is dismissed or leaves the position for any reason before the end of the term, the Office of Attorney General and Chesapeake shall jointly appoint another Ombudsman to serve the remainder of the term.

**5.3.8**     The Ombudsman shall make a good faith effort to perform his or her duties in a manner designed to cause minimal disruption to Chesapeake.  In this regard, Chesapeake shall designate a primary point of contact for the Ombudsman.

**5.3.9**     Chesapeake agrees to reasonably cooperate with the Ombudsman's efforts to monitor Chesapeake's compliance with its obligations under this Agreement.  For the avoidance of doubt, reasonable cooperation is limited to reasonable requests for information or documents. Chesapeake's reasonable cooperation with the Ombudsman does not require Chesapeake to accept or agree to any factual or legal positions taken by the Ombudsman or the Commonwealth.

**5.3.10**     To the extent the Ombudsman or the Office of Attorney General, in executing the provisions of this Agreement, receive access to Chesapeake's confidential business information, the Ombudsman and Office of Attorney General hereby agree to keep such information confidential and use such information solely for the purposes specifically set forth in this Agreement and for no other purpose whatsoever.

**5.4**     **Dispute Resolution.**  Any controversy or claim arising under this Agreement, or the breach thereof, may be resolved by petitioning this Court, or, at the petitioning Party's election, be settled by an arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules.  The AAA's Expedited Procedures shall apply to this dispute.  Each party will bear one-half of the expenses of the arbitration.

**5.5**     **Reporting.**  Within 60 days of the closing of each calendar year, through June 2025, Chesapeake shall submit to the Office of Attorney General, with simultaneous copies to the Ombudsman: 1) an Annual Report on compliance with the provisions of this Agreement setting forth in detail the manner and form in which they intend to comply, are complying and have complied with this Agreement; and 2) a Calendar Year Production and Sales Report that details for each calendar year the number of active leases and wells in Pennsylvania, the total production of natural gas from the wells, the total amount of revenue received for sales of the production, and the total amount of deductions taken.

Confidential Pursuant to F.R.E. 408 and Pa. R.E. 408

# 6.  <u>MISCELLANEOUS TERMS</u>

**6.1     Release.**  As of the Effective Date and at all times thereafter, the Commonwealth hereby releases Chesapeake for all claims and actions that were brought or that could have been brought based on the allegations contained in the Lawsuit, except for any criminal, tax and environmental claims.  Further, the Parties agree that any claims (as defined by section 101(5) of the Bankruptcy Code) against Chesapeake held by the Commonwealth, except for any criminal, tax and environmental claims, shall be deemed satisfied and released and any Settled Claims filed in the Chapter 11 cases shall be discharged and expunged from the claims registrar without any further order of the Bankruptcy Court.  Nothing in this Agreement shall prevent the Office of Attorney General from investigating and prosecuting Chesapeake for any other alleged violations of the Unfair Trade Practices and Consumer Protection Law and Federal and State antitrust laws that do not relate to the subject matter of the Lawsuit and/or this Agreement.  There is no release of any claims of vicarious liability against an unrelated, non-debtor person that is not identified above.

**6.2     Legal Exposure.**  No provision of this Agreement shall be interpreted or construed to require Chesapeake to take any action, or to prohibit Chesapeake from taking any action, if that requirement or prohibition would expose Chesapeake to liability for negligence.  Further, this Agreement or any reports required hereunder shall not be introduced as evidence and cannot be used for any purpose or in any proceeding by a third party.

**6.3     Enforcement.**  Solely for purposes of effectuating this Settlement Agreement, the Commonwealth and Chesapeake hereby stipulate that intentional breach of any of its terms or of any Agreement or Judgment accompanying it shall be sufficient cause for the Commonwealth, by its Attorney General, or Chesapeake to seek enforcement of this Agreement.

**6.4     Notices.**  All notices required by this Agreement shall be sent by certified or registered mail, return receipt requested, postage prepaid or by hand delivery to:

**If to the Office of Attorney General:**

Chief Deputy Attorney General
Antitrust Section
Office of Attorney General
14th Floor, Strawberry Square
Harrisburg, PA 17120

**If to Chesapeake:**

Fred Gipson
Chesapeake Energy Corporation
6100 North Western Avenue
Oklahoma City, OK 73118

9

Confidential Pursuant to F.R.E. 408 and Pa. R.E. 408

**Copy to:**

| Daniel T. Donovan, P.C. | Daniel Brier |
|---|---|
| Kirkland & Ellis LLP | Myers, Brier & Kelly, LLP |
| 1301 Pennsylvania Avenue, NW | 425 Spruce Street, Suite 200 |
| Washington, D.C. 20004 | Scranton, PA 18503 |

**6.5    Averment of Truth.**  Chesapeake avers that, to the best of their knowledge, the information it has provided to the Office of Attorney General in connection with this Agreement is true.  The Office of Attorney General avers that, to the best of its knowledge, the information it has provided to Chesapeake in connection with this Agreement is true.

**6.6    Modification.**  If the Parties agree on a modification of this Agreement, they shall jointly petition the Court to modify the Agreement.  If the Parties cannot agree on a modification, the party seeking modification may petition the Court or arbitration panel for modification and shall bear the burden of persuasion that the requested modification is in the public interest.

**6.7    No Admission of Liability.**  The Commonwealth, Office of Attorney General, and Chesapeake, desiring to settle their differences without trial or adjudication of any issue of fact or law, have consented to entry of this Agreement, which is not an admission of liability by Chesapeake to any issue of fact or law and may not be offered or received into evidence in any action, whether arising before or after the Effective Date.

**6.8    Condition Precedent.**  This Agreement shall become null and void if not approved in full by the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

**6.9    Deadlines.**  Any obligations of the Parties to collaborate pursuant to this Agreement, not given an express deadline herein, shall cease as of January 31, 2026.

**6.10    Counterparts.**  This Agreement may be executed in counterparts.

Confidential Pursuant to F.R.E. 408 and Pa. R.E. 408

/s/

Daniel T. Donovan
Ragan Naresh
Kirkland & Ellis LLP
1301 Pennsylvania Ave., N.W.
Washington DC 20004

Daniel T. Brier
Myers Brier & Kelly, LLP
425 Spruce Street, Ste. 200
Scranton, PA 18503

/s/

Lynn Hamilton Butler
Husch Blackwell LLP
111 Congress Avenue, Suite 1400
Austin, Texas 78701

Tracy W. Wertz
Chief Deputy Attorney General
Antitrust Section
Pennsylvania Office of Attorney General
14th Floor Strawberry Square
Harrisburg, PA 17120

Joseph S. Betsko
Senior Deputy Attorney General
Antitrust Section
Pennsylvania Office of Attorney General
14th Floor Strawberry Square
Harrisburg, PA 17120

/s/

James R. Webb
Executive Vice President – General
Counsel, Chesapeake Energy Corp.

/s/

Office of Attorney General
on behalf of the Commonwealth of
Pennsylvania

11

Confidential Pursuant to F.R.E. 408 and Pa. R.E. 408

/s/
_____

Daniel T. Donovan
Ragan Naresh
Kirkland & Ellis LLP
1301 Pennsylvania Ave., N.W.
Washington DC 20004

Daniel T. Brier
Myers Brier & Kelly, LLP
425 Spruce Street, Ste. 200
Scranton, PA 18503

/s/
_____

Lynn Hamilton Butler
Husch Blackwell LLP
111 Congress Avenue, Suite 1400
Austin, Texas 78701

Tracy W. Wertz
Chief Deputy Attorney General
Antitrust Section
Pennsylvania Office of Attorney General
14th Floor Strawberry Square
Harrisburg, PA 17120

Joseph S. Betsko
Senior Deputy Attorney General
Antitrust Section
Pennsylvania Office of Attorney General
14th Floor Strawberry Square
Harrisburg, PA 17120

/s/
_____

James R. Webb
Executive Vice President – General
Counsel, Chesapeake Energy Corp.

/s/
_____

Office of Attorney General
on behalf of the Commonwealth of
Pennsylvania

11

Confidential Pursuant to F.R.E. 408 and Pa. R.E. 408

/s/
Daniel T. Donovan
Ragan Naresh
Kirkland & Ellis LLP
1301 Pennsylvania Ave., N.W.
Washington DC 20004

Daniel T. Brier
Myers Brier & Kelly, LLP
425 Spruce Street, Ste. 200
Scranton, PA 18503

/s/
Lynn Hamilton Butler
Husch Blackwell LLP
111 Congress Avenue, Suite 1400
Austin, Texas 78701

Tracy W. Wertz
Chief Deputy Attorney General
Antitrust Section
Pennsylvania Office of Attorney General
14th Floor Strawberry Square
Harrisburg, PA 17120

Joseph S. Betsko
Senior Deputy Attorney General
Antitrust Section
Pennsylvania Office of Attorney General
14th Floor Strawberry Square
Harrisburg, PA 17120

/s/
James R. Webb
Executive Vice President – General
Counsel, Chesapeake Energy Corp.

/s/
Office of Attorney General
on behalf of the Commonwealth of
Pennsylvania

11

# EXHIBIT 3

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## BANKRUPTCY COURT

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 20-33233 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## MEC CLASS ACTION SETTLEMENT AGREEMENT

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

This CLASS ACTION SETTLEMENT AGREEMENT ("Settlement Agreement") is entered into by, between, and among, Chesapeake Appalachia, L.L.C., and the named plaintiffs and plaintiffs-intervenors (collectively, "Plaintiffs") in *Demchak Partners Limited Partnership, et. al. v. Chesapeake Appalachia, L.L.C.*, No. 3:13-cv-2289, on behalf of themselves and as the putative class representatives for the Settlement Class defined below.

This Settlement Agreement is entered into to effect a full and final settlement and dismissal with prejudice of all Settled Claims on the terms set forth below, subject to the approval of the Court.

## RECITALS

A.     Plaintiffs, as lessors, and Chesapeake Appalachia, L.L.C. as lessee, are parties to oil and gas leases governing leaseholds in the Commonwealth of Pennsylvania.  The leases implicated in this Settlement contain Market Enhancement Clauses and Ready for Sale or Use Clauses.

B.     Plaintiffs allege in *Demchak* that Chesapeake, among other allegations, underpaid Royalties by deducting Post-Production Costs from Royalties.  Chesapeake denies those claims and further denies that its Royalty payment practices are or were improper.  Chesapeake believes it paid Royalties consistent with the leases and Pennsylvania law.

C.     Class Counsel and counsel for Chesapeake engaged in arm's-length negotiations in the interest of resolving this dispute.  They have met at length and have mediated this dispute with the assistance of third-party mediators, including Judge Edward N. Cahn (ret.) and John W. Perry, Jr.

D.     Chesapeake enters into this Settlement Agreement as part of its broader effort to achieve global resolution across the Commonwealth of Pennsylvania as to any royalty-related litigation or disputes.

E.     While Chesapeake believes this Settlement Agreement can and should be approved to avoid the time, expense, and uncertainty of litigation, in the event the Settlement Agreement does not receive final approval from the Court or is terminated according to its terms, Chesapeake expressly reserves any and all available defenses, including the right to challenge class certification and to insist on individual arbitration or litigation of each Plaintiff's dispute and each Settlement Class Member's dispute.  Plaintiffs likewise reserve their right to proceed with all claims if the Settlement Agreement is not approved.

F.     In light of the investigations undertaken and conclusions reached by the Parties and discussed above, the Parties agree, subject to approval by the Court, to fully and finally compromise, settle, extinguish and resolve the Settled Claims and to dismiss with prejudice *Demchak* under the terms and conditions set forth in this Settlement Agreement.

## AGREEMENT FOR SETTLEMENT PURPOSES ONLY

This Settlement Agreement is for settlement purposes only. The fact of this Settlement Agreement or any provision herein, the negotiations or proceedings related hereto, and any actions taken hereunder shall <u>not</u> constitute or be construed as (a) any admission of the validity of any claim or any fact alleged by Plaintiffs in *Demchak*; (b) any admission of any wrongdoing, fault, violation of law, breach of contract, or liability of any kind on the part of Chesapeake; (c) any admission as to any claim or allegation made in any demand of, action against, or proceeding against Chesapeake; and/or (d) a waiver of any applicable defense, including, without limitation, any applicable statute of limitations. This Settlement Agreement and its exhibits shall not be offered or admissible in evidence against Plaintiffs, Chesapeake, or the Settlement Class Members in any action or proceeding in any forum for any purpose whatsoever, except any action or proceeding brought to enforce its terms.

## AGREEMENT

In consideration of the mutual promises and covenants set forth herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Plaintiffs, on behalf of themselves and as the class representatives of the Settlement Class, and Chesapeake hereby contract, covenant, and agree that the Settled Claims are fully resolved, settled, compromised, extinguished and dismissed on the merits and with prejudice, subject to the approval of the Court, on the following terms and conditions:

## JURISDICTION

This Court has jurisdiction over the parties and subject matter of this action pursuant to 28 U.S.C. § 1334.

## DEFINITIONS

1.      <u>Definitions</u>.   When used in this Settlement Agreement, unless otherwise specifically indicated, the following terms shall have the respective meanings assigned to them in this paragraph 1:

1.1      "Attorneys' Fees" refers to any award of attorneys' fees requested by Class Counsel and awarded by the Court.

1.2      "Bonus" means the monetary payment that a lessee or its affiliate(s) paid to a lessor as consideration for signing an oil and gas lease.

1.3      "*Burkett*" means the arbitration proceeding initiated by Russell E. Burkett and Gayle Burkett against Chesapeake Appalachia, L.L.C.

1.4      "Chapter 11 Cases" means the procedurally consolidated chapter 11 cases of Chesapeake Energy Corporation and its debtor affiliates (Case No. 20-33233) pending in the Court.

1.5   "Chapter 11 Plan" means the joint chapter 11 plan of reorganization approved in the Chapter 11 Cases.

1.6   "Chesapeake" means Chesapeake Energy Corporation, Chesapeake Appalachia, L.L.C., Chesapeake Operating, L.L.C., and Chesapeake Energy Marketing, L.L.C. and their respective subsidiaries, members, affiliates, predecessors in interest, successors in interest, current or former officers and directors, attorneys, and agents.

1.7   "Class Counsel" is defined as follows:

Larry D. Moffett
Law Office of Larry D. Moffett,
PLLCP.O. Box 1418
Oxford, MS 38655

John W. ("Don") Barrett
Barrett Law Group
Post Office Drawer 927
Lexington, MS39095

Daniel E. Seltz
Lieff, Cabraser, Heimann &
Bernstein, LLP
250 Hudson St., 8th Floor
New York, NY 10013

Michelle R. O'Brien
The O'Brien Law Group LLC
2800 Stafford Ave., Box 3034
Scranton, PA 18505

Charles J. LaDuca
Cuneo Gilbert & LaDuca, LLP
8120 Woodmont Avenue
Suite 810
Bethesda, MD 20814

Charles E. Schaffer
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106

Jonathan Cuneo
Cuneo Gilbert & LaDuca LLP
507 C Street NE
Washington, DC 20002

1.8   "Court" means the United States Bankruptcy Court for the Southern District of Texas.

1.9   "Chesapeake's Counsel" means the following attorneys:

Daniel T. Donovan, P.C.
Ragan Naresh, P.C.
Kirkland & Ellis LLP
1301 Pennsylvania Ave., N.W.
Washington DC 20004
Tel: 202-389-5000
Fax: 202-389-5200

1.10    "*Demchak*" means the civil action styled *Demchak Partners Limited Partnership, et al. v. Chesapeake Appalachia, L.L.C.*, No. 3:13-cv-2289 on the docket of the United States District Court for the Middle District of Pennsylvania.

1.11    "Excluded Member" means any person or entity who falls within the Settlement Class definition but who elects to be excluded from the Settlement Class and submits a valid Request for Exclusion.

1.12    "Final" means that (a) the Final Judgment is a final, appealable order; and (b) either (i) no appeal has been taken from the Final Judgment as of the date on which all times to appeal therefrom have expired, or (ii) an appeal or other review proceeding of the Final Judgment having been commenced, such appeal or other review is finally concluded and no longer is subject to review by any court, whether by appeal, petitions for rehearing or argument, petitions for rehearing en banc, petitions for writ of certiorari, or otherwise, and such appeal or other review has been finally resolved in such manner that affirms the Final Judgment in all material respects.

1.13    "Final Judgment" means the Final Judgment and Order of Dismissal to be entered by the Court substantially in the form set forth in Exhibit A upon final approval of the Settlement, as provided in paragraph 8 of this Settlement Agreement.

1.14    "Gas" means natural gas, other than gas that is processed to separate natural gas liquids ("NGLs") from the gas stream in a processing (or similar) plant.  Gas is not processed solely because it is passed through a mechanical separator for the removal of liquid hydrocarbons at or near a well.

1.15    "In-basin Index Price" means a per MMBtu price that is the weighted average price of (a) 50% of the Leidy Hub monthly (first of the month) index price ($/MMBtu) as reported in *Inside FERC's Gas Market Report* (published by Platts), and (b) 50% of the TGP Zone 4-300 Leg monthly (first of the month) index price ($/MMBtu) as reported in *Inside FERC's Gas Market Report* (published by Platts). If either the Leidy Hub or TGP Zone 4-300 Leg ceases to be published, Chesapeake will identify a replacement index.  If a new hub or sales point is developed in the Marcellus Region and a corresponding index price for it is published by Platts, the Parties shall confer whether to revise the In-Basin Price to also include the new index.

1.16    "Incentive Award Payments" means the amount of any class representative incentive awards granted by the Court and paid pursuant to paragraph 18.7.1.

1.17    "Including" and "include(s)" mean "including or include(s), without limitation."

1.18    "Litigation Expenses" means expenses incurred by Plaintiffs or Class Counsel in pursuing Demchak and/or Burkett, and/or negotiating, preparing or presenting to the Court the Settlement Agreement, including expert witness fees, consultant fees, investigation expenses, deposition expenses, copying charges, long distance telephone calls, expenses for meeting with and communicating with clients, fax charges, computer research charges, travel expenses, court costs, arbitrators' fees, and mediator fees.

1.19   "Marcellus Region" refers to the area encompassing the following Pennsylvania counties: Bradford; Lycoming; Sullivan; Susquehanna; Tioga; Wyoming; Potter; McKean; Wayne.

1.20   "Market Enhancement Clause" means Royalty payment clauses or provisions in an oil and gas lease that preclude the lessee from deducting Post-Production Costs incurred to transform leasehold gas into marketable form, but permit the lessee to deduct a pro-rata share of Post-Production Costs incurred after the gas is marketable if they enhance the value of the marketable gas. Such clauses are usually identified, entitled or referred to as "Market Enhancement Clauses" or "MECs."

1.21   "Parties" means Plaintiffs and Chesapeake.

1.22   "Pennsylvania" means the Commonwealth of Pennsylvania.

1.23   "Pennsylvania Leases" means each and every oil and gas lease that (a) covers a leasehold located in Pennsylvania except for the portions of Southwestern Pennsylvania covered by the Gas Gathering Contract Cost of Service - South Marcellus, (b) contains a Market Enhancement Clause or Ready for Sale or Use Clause, and (c) is or has been owned, in whole or in part, by Chesapeake Appalachia, L.L.C. as a lessee, according to the business records maintained by Chesapeake.   Chesapeake represents that upon reasonable investigation, the only Pennsylvania Leases that are in production are located in the Marcellus Region.

1.24   "Plaintiffs" means both (1) the named plaintiffs in *Demchak*, including Demchak Partners Limited Partnership, James P. Burger, Jr., Barbara H. Burger, William A. Burke, II, Clara Burke, William A. Burke, III, Edward J. Burke, Donald G. Fuller, Karen M. Fuller, Randy K. Hemerly, Lamar R. King, Linda J. Schlick, and Janet C. Young; and (2) the plaintiffs-intervenors in *Demchak*, including Russell E. Burkett and Gayle Burkett.

1.25   "Plan of Allocation" means the allocation of the Settlement Funds among the Settlement Class Members based on the Plan of Allocation attached as Exhibit B.  To the extent a Settlement Class Member opts out of this Agreement, Settlement Funds shall be reduced on a pro rata basis.

1.26   "Post-Production Costs" means costs for gathering, compressing, treating, dehydrating, processing, transporting, or transmitting Gas.

1.27   "Preliminary Approval Order" means the order entered by the Court pursuant to paragraph 3 below and in the form set forth in Exhibit C preliminarily approving the Settlement, approving the form and manner of the Settlement Notice, and setting a date certain for the settlement fairness hearing.

1.28   "Ready for Sale or Use Clause" means Royalty payment clauses or provisions in an oil and gas lease that preclude the lessee from deducting Post-Production Costs to make such gas ready for sale or use but permit the lessee to deduct a pro-rata share of Post-

Production Costs incurred after the gas is ready for sale or use. Such clauses are often entitled or referred to as "Ready for Sale or Use Clauses" or RFSU.

   1.29 "Request for Exclusion" means a timely and properly submitted written request to be excluded from the Settlement Class. A request for exclusion is not timely and properly submitted unless it is in writing, is signed by the person or entity requesting exclusion, is mailed in a postage-paid envelope to the Settlement Administrator, postmarked no later than the due date established by the Court in the Preliminary Approval Order, and otherwise complies with the instructions contained in the Settlement Notice. The request for exclusion must be personally signed by any natural person requesting exclusion; it cannot be signed by that person's lawyer or other agent, unless the person is incapacitated. Requests for exclusion may not be made on a class or representative basis. If the entity requesting exclusion is a corporation, partnership, or other legal entity, the request must be personally signed by a duly-authorized officer, partner, or managing agent. A request for exclusion is also not properly submitted or valid if it requests a qualified or partial exclusion or any other qualification.

   1.30 "Royalty" means lessor royalty interests, and does not include overriding royalty interests.

   1.31 "Settled Claims" means any and all claims and causes of action related to Chesapeake's interest in the Pennsylvania Leases of Settlement Class Members, including, but not limited to: (a) any and all claims related to the calculation, amount, payment, and/or reporting of Royalty or Bonus payments made by Chesapeake, either on its own working interest share or on behalf of other working interests, on Gas produced pursuant to a Pennsylvania Lease; (b) any and all claims and causes of action that were alleged or could have been alleged in *Demchak* or in *Burkett* related to the calculation, amount, payment, and/or reporting of such Royalty or Bonus payments; (c) claims for breach of contract, fraud, conspiracy, breach of implied duties and covenants, unjust enrichment, accounting, declaratory or injunctive relief, unfair or deceptive trade practices under federal or state law; (d) challenges to the manner in which sales are made to an affiliated entity, if any; (e) claims that formation, sale, or disposition of assets or equity interests by Chesapeake impacted Royalty payments; and (f) any other challenges to Chesapeake's pricing, sales, or Royalty payment practices. The Settled Claims do not include claims for royalties in suspense, claims for the failure to pay royalties due at all, claims based on errors in determining ownership interests, claims for mathematical or calculation errors in determining volumes, prices, values, or decimal interests. The Settled Claims also do not include claims and causes of action for the breach of this Agreement, including, but not limited to, claims that Chesapeake has not properly calculated Gas Royalties pursuant to paragraph 6 of this Agreement, nor any other future claims and causes of action related to Chesapeake's interests in and obligations under the Pennsylvania Leases. The Settled Claims also do not include any claims or causes of action that Plaintiffs and the Settlement Class Members have or may have against persons and entities other than Chesapeake, except that the Settled Claims do include any claims or causes of action that Plaintiffs and the Settlement Class Members have or may have against Williams Partners, L.P. and/or any of its predecessors or successors in interest, including Access Midstream Partners, L.P.

   1.32 "Settlement" means the settlement embodied in this Settlement Agreement and the Final Judgment.

1.33    "Settlement Administrative Costs" means expenses incurred in carrying out the terms of the Settlement Agreement, including fees and expenses of any notice experts or claims administrators who may present affidavits or testimony at the preliminary approval hearing and/or final fairness hearing; and fees and expenses of the Settlement Administrator in administering and carrying out the terms of the Settlement Agreement, including expenses for printing and mailing of the Settlement Notice, post office box rental costs, responding to inquiries by persons receiving or reading the Settlement Notice, and implementing the Plan of Allocation. Settlement Administrative Costs shall not include litigation expenses or Attorneys' Fees or costs associated with calculating or distributing funds for litigation expenses or Attorneys' Fees.

1.34    "Settlement Administrator" means Epiq Corporate Restructuring LLC, in its capacity as administrator of the Settlement in accordance with the provisions of this Agreement.

1.35    "Settlement Agreement" or "Agreement" means this Settlement Agreement, including all exhibits hereto.

1.36    "Settlement Class" means all individuals and entities, including their predecessors and successors-in-interest, who, according to the business records maintained by Chesapeake, are or have been lessor parties to one or more Pennsylvania Leases, to the extent of their interests in such Pennsylvania Leases.  The Settlement Class excludes (a) Chesapeake; (b) any person or entity who owns a working interest in or operates a gas well in Pennsylvania; (c) any person or entity who receives royalty in kind pursuant to a Pennsylvania Lease; (d) any person or entity who has previously released Chesapeake from liability concerning or encompassing any or all Settled Claims; (e) the federal government; (f) legally-recognized Indian Tribes; and (g) any person who serves as a judge in this civil action and his/her spouse.  Any person or entity who falls within the Settlement Class definition but who is party to a Pennsylvania Lease that has not started producing Gas as of the Settlement Effective Date shall not be entitled to a share of the Settlement Funds as to such Lease, but shall be entitled to make an election under paragraph 6 of this Settlement Agreement as to such Lease.

1.37    "Settlement Class Member" means every member of the Settlement Class who does not submit a valid Request for Exclusion.

1.38    "Settlement Effective Date" shall be the date when each and all of the following conditions have occurred:

1.38.1    The Settlement Agreement has been fully executed by all the Parties and their counsel;

1.38.2    The Preliminary Approval Order has been entered by the Court certifying a Settlement Class, granting preliminary approval of this Settlement Agreement, and approving the Settlement Notice;

1.38.3   The Court-approved Settlement Notice has been mailed as ordered by the Court;

1.38.4    The Court has approved and entered the Final Judgment, thereby approving this Settlement Agreement and dismissing the Settled Claims with prejudice; and

1.38.5    The Final Judgment becomes Final as defined in paragraph 1.12, above.

1.39    "Settlement Funds" means $5,000,000.00 in available funds to the Settlement Class pursuant to the Plan of Allocation.

1.40    "Settlement Notice" means the notice substantially in the form set forth in Exhibit D, or such other comparable notice(s) approved by the Court, which is to be given to the Settlement Class as provided in paragraph 4 below.  The Settlement Notice as determined to be appropriate and approved by the Court and meeting the criteria in paragraph 4, below, shall be regarded as and is the best notice practicable under the circumstances.

2.    <u>Best Efforts to Garner Settlement's Approval</u>.  The Parties and Class Counsel agree to recommend that the Court approve the Settlement Agreement and further agree to undertake their best efforts, including all steps and efforts contemplated by this Settlement Agreement and any other reasonable steps and efforts that may be necessary or appropriate to implement the terms of this Settlement Agreement and to garner Final Approval.  The Parties agree that they will not take any steps to suggest or recommend that members of the Settlement Class should opt out of or elect to be excluded from this Settlement Agreement.

3.    <u>Motion for Preliminary Approval</u>.  Chesapeake, the Debtors in the Chapter 11 Plan, shall submit to the Court a motion for preliminary approval of the Settlement Agreement, which shall include a request for entry of the Preliminary Approval Order in the form set forth in Exhibit C.  It is expressly understood that by entering into this Settlement Agreement, Chesapeake does so for settlement purposes only.  Chesapeake expressly reserves the right to oppose certification of a litigation class or filing of a class proof of claim in the event the Court denies the Motion for Preliminary Approval.  The motion for preliminary approval also shall include the proposed Settlement Notice in the form set forth in Exhibit D.

4.    <u>Class Notice</u>.  Within fifteen (15) days after the Court's entry of the Preliminary Approval Order or a date otherwise established by the Court, the Settlement Administrator shall provide the Settlement Notice to the Settlement Class in the manner approved by the Court, which Settlement Notice shall include mailing the Settlement Notice by first-class mail, postage pre-paid, to individuals and entities who are in the Settlement Class and for whom Chesapeake has addresses available from its business records.  The Parties reserve the right to extend and otherwise amend this timeframe as set forth in this Settlement Agreement.  To the extent that any Settlement Notices are returned because an individual or entity who is in the Settlement Class does not reside at the address provided, the Settlement Administrator shall take reasonable steps to obtain a valid address and re-mail the Settlement Notice.  Chesapeake shall send a timely and proper notice(s) or update(s) of this Settlement to all appropriate federal and state officials consistent with the Class Action Fairness Act of 2005 ("CAFA"), including under 28 U.S.C. §1715, if necessary.

5. <u>Settlement Funds and Settlement Administrative Costs</u>.

5.1 <u>Settlement Funds</u>.  The Settlement Funds shall be distributed pursuant to the Final Approval Order.

5.2 <u>Provision of Information</u>.  Chesapeake shall provide such records and information, including electronic data, in its possession, custody, or control, as may be reasonably necessary for the Settlement Administrator to prepare a list of the members of the Settlement Class, mail the Settlement Notice to the members of the Settlement Class, and otherwise properly administer the Settlement.

5.3. <u>Settlement Administrative Costs</u>.  In addition to the Settlement Funds, Chesapeake shall be obligated to pay all Settlement Administrative Costs.  This provision shall survive any termination of this Settlement Agreement and is binding and effective even in the absence of a Settlement Effective Date.

5.4 <u>No Further Payment Obligations</u>.  Upon the Court's approval of the Settlement Agreement and the distribution of funds pursuant to the Chapter 11 Plan, Chesapeake shall have no further settlement payment obligations to the Settlement Class Members, Class Counsel, or any other person whatsoever under this Settlement Agreement.

5.5 <u>No Obligations for Fees</u>.  Chesapeake shall have no obligation whatsoever to pay any Attorneys' Fees of Plaintiffs, Class Counsel, or Settlement Class Members, or any Incentive Award Payments to Plaintiffs.  Plaintiffs shall look exclusively to the Settlement Funds to recover any Attorneys' Fees or Incentive Award Payments or, subject to the Court's approval, from the economic benefits realized by the Future Royalty Calculations described in paragraph 6.

6. <u>Future Royalty Calculations</u>.  In exchange for the consideration set forth in this Agreement, including but not limited to the Release, the Settlement Class Members shall be provided the opportunity to make an election concerning how Chesapeake (and its affiliates, successors, and assigns) will calculate and pay Gas Royalties to the Settlement Class Members and their successors and assigns after the Settlement Effective Date occurs, pursuant to the Settlement Class Members' Pennsylvania Leases in which Chesapeake currently owns an interest.  This paragraph applies to Pennsylvania Leases in which Chesapeake currently owns an interest and applies to Chesapeake (and its affiliates, successors, and assigns) as well as the Settlement Class Members and their successors and assigns.  The prices set forth in paragraphs 6.1 and 6.2 of this Agreement do not apply to Pennsylvania Leases in which Chesapeake does not own any interest as of the date of this Agreement.  Therefore, the Parties agree that the Final Judgment shall specify that the following provisions apply to the Settlement Class Members' Pennsylvania Leases in which Chesapeake owns an interest as of the date of this Agreement.

6.1 <u>In-Basin Index Price Without Post-Production Deductions</u>.  The In-Basin Index Price Without Post-Production Deductions refers to the calculation of Gas Royalties based on the In-Basin Price without deduction of any Post-Production Costs and without deduction of any other items, costs, or fees. When calculating and remitting royalty payments to Pennsylvania Lessors under this scenario, Chesapeake may, if it is permitted by Pennsylvania law to do so,

- 10 -

deduct any applicable and properly-calculated state severance taxes from the royalty payments and remit such deducted taxes to the appropriate governmental authority.

6.2     Netback Price.   The Netback Price refers to the calculation of Gas Royalties based on the weighted average sales price a Chesapeake entity received for its production month sales to third parties minus a proportionate share (net revenue interest share) of the Post-Production Costs that Chesapeake incurred and any applicable and properly-calculated state severance taxes.  It is agreed, however, that Gas Royalties calculated under this scenario for any given month and any given well shall never be in an amount that is less than zero.  For clarity, the Netback Price as described in this paragraph is how Gas Royalties have been calculated and paid by Chesapeake in Pennsylvania pursuant to MEC Leases prior to the date of this Agreement.

6.3     Notice and Election of Options.   No later than sixty days after the Settlement Effective Date of this Agreement, the Settlement Administrator shall provide written notice ("Election Notice") to each of the Settlement Class Members advising them of their right to elect either (1) the higher of the In-Basin Index Price Without Post-Production Deductions and the Netback Price; (2) the In-Basin Index Price Without Post-Production Deductions; or (3) the Netback Price, each as defined in paragraphs 6.1 and 6.2.  The Election Notice shall provide the Settlement Class Members with an election period ("Election Period") of at least ninety (90) days from the date of the Election Notice within which to send their written election ("Election"), if any, to the Settlement Administrator.  To the extent no Election by a Settlement Class Member is received by the Settlement Administrator within five (5) business days after the expiration of the Election Period, such Settlement Class Member will be deemed to have elected Option (1) (*i.e.*, the higher of the In-Basin Index Price Without Post-Production Deductions and the Netback Price). The Settlement Administrator shall, as soon as possible, and no later than ten (10) business days after the expiration of the Election Period, provide Chesapeake with a copy of all Elections received by the Settlement Administrator and a spreadsheet (in Microsoft Excel or such other format as may be specified by Chesapeake's Counsel) listing each Settlement Class Member and identifying the election made by the Settlement Class Member.  The Elections made pursuant to this Agreement shall be final, and are not subject to change by the Settlement Class Member after the expiration of the Election Period.

6.4     The Elections chosen by the Settlement Class Members will be effective and utilized by Chesapeake in calculating Gas Royalties beginning with royalties no later than the first production month immediately following the month in which the Election Period expired.

6.5     The Election chosen by each Settlement Class Member will be deemed to be an amendment of their Pennsylvania Lease, shall run with the land, and shall be binding on the Settlement Class Member and Chesapeake and their respective successors and assigns. Chesapeake will file the Final Judgment incorporating the terms of this Agreement with the Clerk and Recorder of each county covered by the Pennsylvania Leases that are subject to paragraph 6, and the future royalty calculation provisions of paragraph 6 of this Agreement shall burden the Settlement Class Members' interests and Chesapeake's interests in the Pennsylvania Leases. In the event of a contemplated transfer or assignment of its interests under any Pennsylvania Lease that is subject to paragraph 6, Chesapeake shall provide written notification

- 11 -

to its proposed successor or assign of the applicability of this Agreement and the Election made by the Settlement Class Member(s) covered by the Lease, and shall procure the written agreement of the successor and assign to calculate and pay Gas Royalties in accordance with the Election made by the Settlement Class Member(s).

6.6     It is acknowledged that some volumes of Gas produced by Chesapeake under the Pennsylvania Leases may be used as fuel, lost, or otherwise unaccounted for by a provider of post-production operations or services ("FLU Volumes").   Regardless of a Settlement Class Member's Election, Chesapeake shall not deduct any FLU volumes when calculating its Gas Royalty payments but shall, instead, pay Gas Royalties on one hundred percent (100%) of the FLU Volumes, except as otherwise permitted by a Settlement Class Member's Pennsylvania Lease.

6.7     If post-production operations or services are provided by a third party, then the Post-Production Costs subject to deduction under the Netback Price shall be the Post-Production Costs actually charged by the third party to Chesapeake and/or its affiliate and paid by Chesapeake and/or its affiliate to the third party on an arm's length basis. If post-production operations or services are provided by Chesapeake and/or its affiliates, then the Post-Production Costs for such operations or services subject to deduction under the Netback Price shall include only Chesapeake's and/or its affiliate's actual and reasonable cost for such operations or services. In addition, in taking deductions pursuant to the Netback Price, Chesapeake shall not deduct or reflect as deductions, directly or indirectly, except as expressly allowed by a lease: (a) any marketing fees, (b) any costs for production facilities, or (c) any costs for field separators, flow lines, or the facilities or operations located between the wellhead and the point at which Gas enters a gathering system; nor shall any such deductions be taken pursuant to the Netback Price.

6.8     The Final Judgment shall modify only how Chesapeake (and its affiliates, successors and assigns) calculates and pays Royalties on Chesapeake's share of Gas production and how Chesapeake (and its affiliates, successors and assigns) pays Gas Royalties on behalf of any other person or entity holding a lessee/working interest under a Pennsylvania Lease.  The Final Judgment shall not modify how any other entity calculates and/or pays Royalties pursuant to the Pennsylvania Leases.

6.9     Except as specified herein and in the Final Judgment, paragraph 6 of this Settlement Agreement shall not affect any other provisions of a Pennsylvania Lease.  The Parties expressly agree that paragraph 6 of this Settlement Agreement applies notwithstanding any current or future law, statute, judicial decision, or rule regulating the payment of Royalties in Pennsylvania.

7.     Walk-Away Rights. In the event that there are Excluded Members who, when combined, would be allocated twenty percent (20%) or more of the Settlement Fund, Chesapeake shall have the right, in its sole and absolute discretion, within twenty (20) calendar days after the opt-out deadline set by the Court, to notify Class Counsel in writing that Chesapeake has elected to dissolve this Settlement Agreement and withdraw from the Settlement.   In the event Chesapeake provides such notification and thereby exercises its walk-away rights hereunder, the Parties shall have no further obligations under this Settlement Agreement whatsoever.

8.      <u>Order, Final Judgment, and Dismissal</u>.  If the Court provides final approval of this Settlement Agreement, then the Parties jointly and promptly shall seek entry of the Final Judgment in the form set forth in Exhibit A.  The Parties intend that the language in the Final Judgment shall conform to the language in this Settlement Agreement, and the Parties will modify Exhibit A if necessary to ensure such conformity.

9.      *Burkett* Arbitration.

9.1.      Defendant and the *Burkett* Plaintiffs-Intervenors agree to vacatur of the January 28, 2014 and September 11, 2014 orders issued by the arbitration Panel in the *Burkett* Arbitration.  Within five days of the Settlement Effective Date (or if the fifth day falls on a weekend or a federal holiday, then on the next business day thereafter), Defendant and the *Burkett* Plaintiffs-Intervenors shall jointly submit a mutually-agreed upon form of vacatur to the arbitration Panel.  Consistent with paragraph 9.4, the *Burkett* Plaintiff-Intervenors and Defendant agree to reinstate the orders if the Settlement Agreement does not become Final.

9.2.      The *Burkett* Plaintiffs-Intervenors further agree that within five days of the Settlement Effective Date (or if the fifth day falls on a weekend or a federal holiday, then on the next business day thereafter), the *Burkett* Plaintiffs-Intervenors shall voluntarily dismiss the *Burkett* Arbitration, with prejudice.  In the interim, to the extent the arbitration Panel orders briefing or other action in the *Burkett* Arbitration, Defendant and the *Burkett* Plaintiffs-Intervenors agree to stay and shall make their best efforts to stay the *Burkett* Arbitration pending this Settlement Agreement becoming Final.

9.3.      Defendant further agrees that within five days of the Settlement Effective Date (or if the fifth day falls on a weekend or a federal holiday, then on the next business day thereafter), Defendant shall voluntarily dismiss the *Burkett* Arbitration and any appeals related thereto.  In the interim, to the extent a court orders briefing or other action in the *Burkett* Arbitration, and any appeals related thereto, Defendant and the *Burkett* Plaintiffs-Intervenors shall make their best efforts to stay the *Burkett* Arbitration pending this Settlement Agreement becoming Final.

9.4.      In the event this Settlement Agreement does not become Final, nothing in paragraph 9 and its sub-sections shall preclude either Defendant or the *Burkett* Plaintiffs-Intervenors from seeking to re-initiate the *Burkett* Arbitration or the *Burkett* Arbitration, or any appeals related thereto, following termination of the automatic stay in the Chapter 11 Cases.

10.      <u>Conditions Precedent to Agreement's Effect</u>.  This Settlement Agreement shall become final, binding and effective upon the Settlement Effective Date, and not before then.

11.      <u>Modifications</u>.  Any modification to this Settlement Agreement or its exhibits, whether modified by the Parties or any court, must be approved in writing signed by the Parties or their authorized representatives to be binding.

12.      <u>Release</u>.

12.1.1. As of the Settlement Effective Date and at all times thereafter, each Plaintiff and Settlement Class Member hereby releases the Settled Claims and any and all claims

that Chesapeake is obligated to pay them royalties under their Pennsylvania Leases in any manner other than the Election under paragraph 6 of this Agreement (including, but not limited to, the Settled Claims). Plaintiffs and the Settlement Class Members hereby further agree that they fully and forever release and discharge all working interest owners on whose behalf Chesapeake has paid or will pay Royalties pursuant to Pennsylvania Leases from any and all of the Settled Claims, but do so only to the limited extent of Chesapeake's payments of Gas Royalties on behalf of such working interest owners. Further, each of the Plaintiffs and the Settlement Class Members agree that any claims (as defined by section 101(5) of the Bankruptcy Code) against Chesapeake held by such Plaintiffs or Settlement Class Members shall be deemed satisfied and released and any Settled Claims filed in the Bankruptcy Cases shall be discharged and expunged from the claims registrar without any further order of the Bankruptcy Court. To the extent any of the Plaintiffs or Settlement Class Members vote on the Chapter 11 Plan, they shall vote in favor of the Plan and not opt out of the third party releases contained in the Chapter 11 Plan.

12.1.2   The Parties acknowledge and agree that the relief afforded under this Settlement Agreement fully and completely compromises the Settlement Class Members' claims for relief in *Demchak* and *Burkett*.

12.1.3  This Release also covers, without limitation, any and all claims for Attorneys' Fees, Incentive Award Payments, catalyst fees, costs, or disbursements incurred by Class Counsel or any other counsel representing Plaintiffs or Settlement Class Members or by Plaintiffs or the Settlement Class Members, or any of them, in connection with or related in any manner to *Demchak* and *Burkett*, the settlement of *Demchak* and *Burkett*, the administration of this Settlement, the implementation of this Settlement, and/or the Settled Claims except to the extent otherwise specified in the Settlement Agreement.

12.2   No Release of Non-Parties. Nothing herein shall operate or be construed to release any claims the Parties and Settlement Class Members may have against any person or entity who is not a Party hereto except as provided for in sub-paragraph 12.1.1, above. Moreover, to the extent a Pennsylvania Lease provides an audit or accounting right, this Agreement does not preclude the exercise of such audit or accounting right regarding Royalty payments made after the Settlement Effective Date pursuant to the lessor's election for future royalty calculations under paragraph 6 of this Settlement Agreement.

13.   Authority and Capacity to Execute. Each person signing this Settlement Agreement on behalf of a Party represents that such signatory has the full and complete power, authority and capacity to execute and deliver this Settlement Agreement and any documents to be executed pursuant hereto, that all formalities necessary to authorize execution of this Settlement Agreement so as to bind the principal, limited liability company, trust, partnership or corporation have been undertaken, and that upon the occurrence of the Settlement Effective Date, this Settlement Agreement will constitute the valid and legally binding obligation of each such Party hereto, enforceable by and against that Party in accordance with its terms.

14.   Successors and Assigns. This Settlement Agreement is binding upon and will inure to the benefit of each of the Parties hereto and their respective agents, officers, directors,

- 14 -

shareholders, employees, consultants, heirs, devisees, legal representatives, attorneys, successors and assigns.

15.     Construction.  The language of all parts of this Settlement Agreement and its exhibits will in all cases be construed as a whole, according to its fair meaning, and not strictly for or against any Party.  All Parties have participated in the preparation of this Settlement Agreement and its exhibits and no presumptions or rules of interpretation based upon the identity of the Party preparing or drafting this Settlement Agreement or its exhibits, or any part thereof, shall be applied or invoked.

16.     Disputed Claims.  It is understood that this Settlement Agreement constitutes a compromise of highly disputed claims, and that neither (a) the consideration provided for herein, (b) the entry into the Settlement Agreement or stipulation to the Final Judgment, nor (c) any recital contained herein, will be construed, interpreted, or admissible as an admission of liability by or on behalf of any Party hereto, all such liability being expressly denied, regardless of whether this Settlement Agreement becomes Final.  In the event that the Settlement Agreement does not become Final, then this Settlement Agreement shall be of no force or effect, and the Settlement Agreement and any and all negotiations, documents, and discussions associated with it shall be without prejudice to the rights of any Party, shall not be deemed or construed to be an admission or evidence of any liability or wrongdoing by Chesapeake or of the truth of any of the claims or allegations contained in the complaint or any other pleading, and evidence thereof shall not be discoverable or used directly or indirectly, in any way, whether in *Demchak*, *Burkett*, or in any other action or proceeding.  The Parties expressly reserve all of their respective rights, claims and defenses if this Settlement Agreement does not become Final.

The Parties agree that the Settlement Class will be certified for settlement purposes only, that this Settlement shall not be construed to represent either an assertion or concession that such a class would be manageable or appropriately certified for litigation, arbitration, trial, or a class proof of claim in the Chapter 11 Cases, and in the event this Settlement Agreement is not given final approval or this Settlement is not finalized for any reason whatsoever, the Parties acknowledge and agree that Chesapeake remains free to challenge whether this proposed class or any other proposed classes are properly certifiable in this litigation, in the Chapter 11 Cases, or anywhere else, and Plaintiff shall not argue that anything in this Settlement Agreement limits Chesapeake's right to do so.

The Parties further agree that by entering into this Settlement Agreement and seeking Preliminary Approval and/or Final Approval, no Party waives or in any way diminishes its right to demand that any disputes arising from the Pennsylvania Leases be decided in individual, binding arbitration pursuant to the arbitration clause, if any, in any given lease or by litigation. Moreover, neither the fact of this Settlement Agreement nor the fact that the Parties are seeking court approval of this Settlement should be construed that the Parties or the Pennsylvania Leases have agreed to or contemplated that disputes as to royalty payments may be resolved on a class-wide basis in arbitration or otherwise.

17.     Survival of Covenants and Representations.  All covenants and representations contained in this Settlement Agreement are contractual in nature, are not mere recitals, and will survive the execution of this Settlement Agreement.

18.    <u>Miscellaneous</u>.

18.1    <u>Governing Law</u>.  This Settlement Agreement is and will be governed by the laws of the Commonwealth of Pennsylvania.

18.2    <u>Severability</u>.  In the event that a court of competent jurisdiction enters a final judgment or decision holding invalid any nonmaterial provision of this Settlement Agreement, the remainder of this Settlement Agreement will be fully enforceable.  If a court of competent jurisdiction holds invalid or materially modifies any material provision of this Settlement Agreement, including but not limited to the provisions set forth in paragraph 6, either Party shall be entitled to dissolve this Settlement Agreement and withdraw from the Settlement.

18.3    <u>Counterparts</u>.  This Settlement Agreement may be executed by facsimile or electronic signatures and in counterparts, all of which will have full force and effect between the Parties, subject to all conditions precedent and subsequent set forth herein.

18.4    <u>Integration</u>.  This Settlement Agreement and its exhibits constitute the entire agreement of the Parties and a complete merger of all prior negotiations and agreements.

18.5    <u>Headings</u>.  The headings of the paragraphs and subparagraphs herein are intended solely for convenience or reference and will not control or influence the meaning or interpretation of any of the provisions of this Settlement Agreement.

18.6    <u>Gender and Number</u>.  Whenever applicable, the pronouns designating the feminine, masculine and neuter will equally apply to the feminine, masculine and neuter genders; the singular will include the plural and the plural will include the singular.

18.7    <u>Fees and Costs</u>.  Chesapeake shall bear its own costs, expenses, and attorneys' fees incurred in connection with *Demchak, Burkett*, this Settlement, and performance of the obligations imposed hereunder.  Chesapeake shall have no obligation to pay the Attorneys' Fees or Incentive Award Payments of Plaintiffs, any Settlement Class Member, Class Counsel, or any other counsel or representative.

18.7.1  Class Counsel may request Court approval for the payment from the Settlement Funds of Incentive Award Payments to Plaintiffs.

18.7.2  Class Counsel will request reimbursement of Litigation Expenses to be paid from the Settlement Funds. Class Counsel will also request an award of Attorneys' Fees to be paid from the Settlement Funds and/or from future economic benefits realized under the Future Royalty Calculation Method. Chesapeake will take no position on the amount of any requests for reimbursement of Litigation Expenses or Attorneys' Fees to Class Counsel or Incentive Award Payments to Plaintiffs.

18.8     Extensions of Time.  The Parties reserve the right, subject to the Court's approval, to mutually agree to any reasonable extension of time that might be necessary to carry out any of the provisions of this Settlement Agreement.

18.9     Notice.  All notices called for by this Settlement Agreement shall be sent to Class Counsel on behalf of Plaintiffs and all Settlement Class Members; and to Chesapeake's Counsel on behalf of Chesapeake.  Such notice shall become effective when placed in the United States mail, prepaid first-class postage affixed, addressed to the addresses listed in paragraph 1 above.  It is the responsibility of each Party to notify all other Parties of any change in any of these addresses.  The Party giving notice shall make reasonable efforts also to provide copies of any notices by electronic mail or telephonic facsimile at the same time notice is placed in the mail.

18.9.1   Class Counsel, or any person acting on behalf of Class Counsel, shall not publish any form of written notice except as provided for herein without prior written approval of the content of such notice by Chesapeake, other than any information provided to any Court in furtherance of this Settlement Agreement.

18.9.2   It shall be the responsibility of Class Counsel, or its designees, to respond to all inquiries from members of the Settlement Class.

18.9.3   Plaintiffs agree that they shall not elect or seek to opt out of or exclude themselves from the Settlement Class.

18.9.4   Plaintiffs, Class Counsel, and Chesapeake hereby agree not to initiate, nor respond to, any communications with the media or press, on the Internet, or in any public forum, orally or in writing, that relate to this Settlement, *Demchak*, or *Burkett* that could be viewed to cast Plaintiffs, Class Counsel, or Chesapeake in an unfavorable light or otherwise be inconsistent with the Settlement Notice, the Settlement Agreement, and Court papers filed by the Parties in connection with the Settlement Agreement.

AGREED TO AND DATED AS OF THE *3rd* DAY OF MARCH, 2021.

**APPROVED BY CLASS COUNSEL
AND COUNSEL FOR THE
*DEMCHAK* PLAINTIFFS:**

**_DEMCHAK_ PLAINTIFFS, FOR
THEMSELVES AND ON BEHALF OF
THE SETTLEMENT CLASS:**

_Larry D. Moffett_

Larry D. Moffett
Law Office of Larry D. Moffett, PLLC
P.O. Box 1418
Oxford, MS 38655

**FOR DEMCHAK PARTNERS LIMITED
PARTNERSHIP**

_Charles Schaffer / som_

Charles E. Schaffer
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Ste 500
Philadelphia, PA 19106

**FOR JAMES P. BURGER, JR. & BARBARA
H. BURGER**

_Charles LaDuca / som_

Charles J. LaDuca
Cuneo Gilbert & LaDuca, LLP
8120 Woodmont Avenue
Suite 810
Bethesda, MD 20814

**FOR WILLIAM A. BURKE, II & CLARA
BURKE**

**FOR WILLIAM A. BURKE, III**

_Don Barrett / som_

John W. ("Don") Barrett
Barrett Law Group
Post Office Drawer 927
Lexington, MS 39095

**FOR EDWARD J. BURKE**

**FOR DONALD G. FULLER & KAREN M.
FULLER**

**FOR RANDY K. HEMERLY**

Daniel E. Seltz
Lieff, Cabraser, Heimann & Bernstein,
LLP
250 Hudson St., 8th Floor
New York, NY 10013

**FOR LAMAR R. KING**

**FOR LINDA J. SCHLICK**

Michelle R. O'Brien
The O'Brien Law Group LLC
2800 Stafford Ave., Box 3034
Scranton, PA 18505

**FOR JANET C. YOUNG**

AGREED TO AND DATED AS OF THE _____ DAY OF MARCH, 2021.

**APPROVED BY CLASS COUNSEL**
**AND COUNSEL FOR THE**
***DEMCHAK* PLAINTIFFS:**

***DEMCHAK* PLAINTIFFS, FOR**
**THEMSELVES AND ON BEHALF OF**
**THE SETTLEMENT CLASS:**

_____

Larry D. Moffett
Law Office of Larry D. Moffett, PLLC
P.O. Box 1418
Oxford, MS 38655

_____
**FOR DEMCHAK PARTNERS LIMITED**
**PARTNERSHIP**

_____

Charles E. Schaffer
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Ste 500
Philadelphia, PA 19106

_____
**FOR JAMES P. BURGER, JR. & BARBARA**
**H. BURGER**

_____

Charles J. LaDuca
Cuneo Gilbert & LaDuca, LLP
8120 Woodmont Avenue
Suite 810
Bethesda, MD 20814

_____
**FOR WILLIAM A. BURKE, II & CLARA**
**BURKE**

_____
**FOR WILLIAM A. BURKE, III**

_____

John W. ("Don") Barrett
Barrett Law Group
Post Office Drawer 927
Lexington, MS 39095

_____
**FOR EDWARD J. BURKE**

_____
**FOR DONALD G. FULLER & KAREN M.**
**FULLER**

_____

Daniel E. Seltz
Lieff, Cabraser, Heimann & Bernstein,
LLP
250 Hudson St., 8th Floor
New York, NY 10013

_____
**FOR RANDY K. HEMERLY**

_____
**FOR LAMAR R. KING**

_____
**FOR LINDA J. SCHLICK**

_____

Michelle R. O'Brien
The O'Brien Law Group LLC
2800 Stafford Ave., Box 3034
Scranton, PA 18505

_____
**FOR JANET C. YOUNG**

AGREED TO AND DATED AS OF THE _____ DAY OF MARCH, 2021.

**APPROVED BY CLASS COUNSEL AND COUNSEL FOR THE *DEMCHAK* PLAINTIFFS:**

**_DEMCHAK_ PLAINTIFFS, FOR THEMSELVES AND ON BEHALF OF THE SETTLEMENT CLASS:**

_____
Larry D. Moffett
Law Office of Larry D. Moffett, PLLC
P.O. Box 1418
Oxford, MS 38655

_____
Charles E. Schaffer
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Ste 500
Philadelphia, PA 19106

_____
Charles J. LaDuca
Cuneo Gilbert & LaDuca, LLP
8120 Woodmont Avenue
Suite 810
Bethesda, MD 20814

_____
John W. ("Don") Barrett
Barrett Law Group
Post Office Drawer 927
Lexington, MS 39095

_____
Daniel E. Seltz
Lieff, Cabraser, Heimann & Bernstein, LLP
250 Hudson St., 8th Floor
New York, NY 10013

_____
Michelle R. O'Brien
The O'Brien Law Group LLC
2800 Stafford Ave., Box 3034
Scranton, PA 18505

_____
**FOR DEMCHAK PARTNERS LIMITED PARTNERSHIP**

_____
**FOR JAMES P. BURGER, JR. & BARBARA H. BURGER**

_____
**FOR WILLIAM A. BURKE, II & CLARA BURKE**

_____
**FOR WILLIAM A. BURKE, III**

_____
**FOR EDWARD J. BURKE**

_____
**FOR DONALD G. FULLER & KAREN M. FULLER**

_____
**FOR RANDY K. HEMERLY**

_____
**FOR LAMAR R. KING**

_____
**FOR LINDA J. SCHLICK**

_____
**FOR JANET C. YOUNG**

AGREED TO AND DATED AS OF THE ____ DAY OF MARCH, 2021.

**APPROVED BY CLASS COUNSEL AND COUNSEL FOR THE *DEMCHAK* PLAINTIFFS:**

*DEMCHAK* **PLAINTIFFS, FOR THEMSELVES AND ON BEHALF OF THE SETTLEMENT CLASS:**

_____
Larry D. Moffett
Law Office of Larry D. Moffett, PLLC
P.O. Box 1418
Oxford, MS 38655

**FOR DEMCHAK PARTNERS LIMITED PARTNERSHIP**

_____
**FOR JAMES P. BURGER, JR. & BARBARA H. BURGER**

_____
Charles E. Schaffer
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Ste 500
Philadelphia, PA 19106

_____
Charles J. LaDuca
Cuneo Gilbert & LaDuca, LLP
8120 Woodmont Avenue
Suite 810
Bethesda, MD 20814

**FOR WILLIAM A. BURKE, II & CLARA BURKE**

_____
**FOR WILLIAM A. BURKE, III**

_____
**FOR EDWARD J. BURKE**

_____
John W. ("Don") Barrett
Barrett Law Group
Post Office Drawer 927
Lexington, MS 39095

**FOR DONALD G. FULLER & KAREN M. FULLER**

_____
**FOR RANDY K. HEMERLY**

_____
Daniel E. Seltz
Lieff, Cabraser, Heimann & Bernstein, LLP
250 Hudson St., 8th Floor
New York, NY 10013

**FOR LAMAR R. KING**

_____
**FOR LINDA J. SCHLICK**

_____
Michelle R. O'Brien
The O'Brien Law Group LLC
3738 Birney Avenue
Moosic, PA 18507

**FOR JANET C. YOUNG**

- 18 -

AGREED TO AND DATED AS OF THE ____ DAY OF MARCH, 2021.

**APPROVED BY CLASS COUNSEL**
**AND COUNSEL FOR THE**
***DEMCHAK* PLAINTIFFS:**

***DEMCHAK* PLAINTIFFS, FOR**
**THEMSELVES AND ON BEHALF OF**
**THE SETTLEMENT CLASS:**

_____
Larry D. Moffett
Law Office of Larry D. Moffett, PLLC
P.O. Box 1418
Oxford, MS 38655

**FOR DEMCHAK PARTNERS LIMITED**
**PARTNERSHIP**

_____
Charles E. Schaffer
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Ste 500
Philadelphia, PA 19106

**FOR JAMES P. BURGER, JR. & BARBARA**
**H. BURGER**

_____
Charles J. LaDuca
Cuneo Gilbert & LaDuca, LLP
8120 Woodmont Avenue
Suite 810
Bethesda, MD 20814

**FOR WILLIAM A. BURKE, II & CLARA**
**BURKE**

**FOR WILLIAM A. BURKE, III**

_____
John W. ("Don") Barrett
Barrett Law Group
Post Office Drawer 927
Lexington, MS 39095

**FOR EDWARD J. BURKE**

**FOR DONALD G. FULLER & KAREN M.**
**FULLER**

_____
Daniel E. Seltz
Lieff, Cabraser, Heimann & Bernstein,
LLP
250 Hudson St., 8th Floor
New York, NY 10013

**FOR RANDY K. HEMERLY**

**FOR LAMAR R. KING**

**FOR LINDA J. SCHLICK**

_____
Michelle R. O'Brien
The O'Brien Law Group LLC
3738 Birney Avenue
Moosic, PA 18507

**FOR JANET C. YOUNG**

AGREED TO AND DATED AS OF THE _____ DAY OF MARCH, 2021.

**APPROVED BY CLASS COUNSEL AND COUNSEL FOR THE *DEMCHAK* PLAINTIFFS:**

*DEMCHAK* **PLAINTIFFS, FOR THEMSELVES AND ON BEHALF OF THE SETTLEMENT CLASS:**

_____
Larry D. Moffett
Law Office of Larry D. Moffett, PLLC
P.O. Box 1418
Oxford, MS 38655

**FOR DEMCHAK PARTNERS LIMITED PARTNERSHIP**

_____
Charles E. Schaffer
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Ste 500
Philadelphia, PA 19106

**FOR JAMES P. BURGER, JR. & BARBARA H. BURGER**

_____
Charles J. LaDuca
Cuneo Gilbert & LaDuca, LLP
8120 Woodmont Avenue
Suite 810
Bethesda, MD 20814

**FOR WILLIAM A. BURKE, II & CLARA BURKE**

**FOR WILLIAM A. BURKE, III**

_____
John W. ("Don") Barrett
Barrett Law Group
Post Office Drawer 927
Lexington, MS 39095

**FOR EDWARD J. BURKE**

**FOR DONALD G. FULLER & KAREN M. FULLER**

**FOR RANDY K. HEMERLY**

_____
Daniel E. Seltz
Lieff, Cabraser, Heimann & Bernstein, LLP
250 Hudson St., 8th Floor
New York, NY 10013

**FOR LAMAR R. KING**

**FOR LINDA J. SCHLICK**

_____
Michelle R. O'Brien
The O'Brien Law Group LLC
3738 Birney Avenue
Moosic, PA 18507

**FOR JANET C. YOUNG**

- 18 -

AGREED TO AND DATED AS OF THE ____ DAY OF MARCH, 2021.

**APPROVED BY CLASS COUNSEL AND COUNSEL FOR THE *DEMCHAK* PLAINTIFFS:**

**_DEMCHAK_ PLAINTIFFS, FOR THEMSELVES AND ON BEHALF OF THE SETTLEMENT CLASS:**

_____
Larry D. Moffett
Law Office of Larry D. Moffett, PLLC
P.O. Box 1418
Oxford, MS 38655

**FOR DEMCHAK PARTNERS LIMITED PARTNERSHIP**

_____
Charles E. Schaffer
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Ste 500
Philadelphia, PA 19106

**FOR JAMES P. BURGER, JR. & BARBARA H. BURGER**

_____
Charles J. LaDuca
Cuneo Gilbert & LaDuca, LLP
8120 Woodmont Avenue
Suite 810
Bethesda, MD 20814

**FOR WILLIAM A. BURKE, II & CLARA BURKE**

**FOR WILLIAM A. BURKE, III**

_____
John W. ("Don") Barrett
Barrett Law Group
Post Office Drawer 927
Lexington, MS 39095

**FOR EDWARD J. BURKE**

**FOR DONALD G. FULLER & KAREN M. FULLER**

_____
Daniel E. Seltz
Lieff, Cabraser, Heimann & Bernstein, LLP
250 Hudson St., 8th Floor
New York, NY 10013

**FOR RANDY K. HEMERLY**

**FOR LAMAR R. KING**

*Amanda L. Schlick*
**FOR LINDA J. SCHLICK**

_____
Michelle R. O'Brien
The O'Brien Law Group LLC
3738 Birney Avenue
Moosic, PA 18507

**FOR JANET C. YOUNG**

- 18 -

AGREED TO AND DATED AS OF THE _____ DAY OF MARCH, 2021.

**APPROVED BY CLASS COUNSEL AND COUNSEL FOR THE *DEMCHAK* PLAINTIFFS:**

**_DEMCHAK_ PLAINTIFFS, FOR THEMSELVES AND ON BEHALF OF THE SETTLEMENT CLASS:**

_____
Larry D. Moffett
Law Office of Larry D. Moffett, PLLC
P.O. Box 1418
Oxford, MS 38655

**FOR DEMCHAK PARTNERS LIMITED PARTNERSHIP**

_____
Charles E. Schaffer
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Ste 500
Philadelphia, PA 19106

**FOR JAMES P. BURGER, JR. & BARBARA H. BURGER**

_____
Charles J. LaDuca
Cuneo Gilbert & LaDuca, LLP
8120 Woodmont Avenue
Suite 810
Bethesda, MD 20814

**FOR WILLIAM A. BURKE, II & CLARA BURKE**

**FOR WILLIAM A. BURKE, III**

_____
John W. ("Don") Barrett
Barrett Law Group
Post Office Drawer 927
Lexington, MS 39095

**FOR EDWARD J. BURKE**

**FOR DONALD G. FULLER & KAREN M. FULLER**

_____
Daniel E. Seltz
Lieff, Cabraser, Heimann & Bernstein, LLP
250 Hudson St., 8th Floor
New York, NY 10013

**FOR RANDY K. HEMERLY**

**FOR LAMAR R. KING**

**FOR LINDA J. SCHLICK**

_____
Michelle R. O'Brien
The O'Brien Law Group LLC
3738 Birney Avenue
Moosic, PA 18507

*Janet C. Young*
**FOR JANET C. YOUNG**

**APPROVED BY COUNSEL FOR THE *BURKETT* PLAINTIFFS-INTERVENORS:**

*BURKETT* **PLAINTIFFS-INTERVENORS, FOR THEMSELVES:**

Douglas A. Clark
The Clark Law Firm
1563 Main Street
Peckville, PA 18452

**RUSSELL E. BURKETT**

**GAYLE BURKETT**

Francis P. Karam
Francis P. Karam, Esq. P.C.
12 Debrosses Street
New York, NY 10013

Gerard M. Karam
Mazzoni, Karam Petorek & Valvano
321 Spruce Street #201
Scranton, PA 18503

Rachel Schulman
Rachel Schulman, Esq. P.C.
14 Bond Street, Suite 143
Great Neck, NY 11021

---

## FOR JANET C. YOUNG

**APPROVED BY COUNSEL FOR THE *BURKETT* PLAINTIFFS-INTERVENORS:**

*BURKETT* **PLAINTIFFS-INTERVENORS, FOR THEMSELVES:**

---

Douglas A. Clark
The Clark Law Firm
1563 Main Street
Peckville, PA 18452

**RUSSELL E. BURKETT**

**GAYLE BURKETT**

---

Francis P. Karam
Francis P. Karam, Esq. P.C.
12 Debrosses Street
New York, NY 10013

---

Gerard M. Karam
Mazzoni, Karam Petorek & Valvano
321 Spruce Street #201
Scranton, PA 18503

---

Rachel Schulman
Rachel Schulman, Esq. P.C.
14 Bond Street, Suite 143
Great Neck, NY 11021

**APPROVED BY COUNSEL FOR THE DEFENDANT:**

**CHESAPEAKE APPALACHIA, L.L.C.**

---

Daniel T. Donovan
Ragan Naresh
Kirkland & Ellis LLP
1301 Pennsylvania Ave., N.W.
Washington DC 20004

Daniel T. Brier
Myers Brier & Kelly, LLP
425 Spruce Street, Ste. 200

---

James R. Webb
Executive Vice President – General Counsel,
Chesapeake Energy Corp.

AGREED TO AND DATED AS OF THE _____ DAY OF MARCH, 2021

**APPROVED BY CLASS COUNSEL AND COUNSEL FOR THE *DEMCHAK* PLAINTIFFS:**

_____

Larry D. Moffett
Law Office of Larry D. Moffett, PLLC
P.O. Box 1418
Oxford, MS 38655

_____

Charles E. Schaffer
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Ste 500
Philadelphia, PA 19106

_____

Charles J. LaDuca
Cuneo Gilbert & LaDuca, LLP
8120 Woodmont Avenue
Suite 810
Bethesda, MD 20814

_____

John W. ("Don") Barrett
Barrett Law Group
Post Office Drawer 927
Lexington, MS 39095

_____

Daniel E. Seltz
Lieff, Cabraser, Heimann & Bernstein, LLP
250 Hudson St., 8th Floor
New York, NY 10013

_____

Michelle R. O'Brien
The O'Brien Law Group LLC
2800 Stafford Ave., Box 3034
Scranton, PA 18505

**_DEMCHAK_ PLAINTIFFS, FOR THEMSELVES AND ON BEHALF OF THE SETTLEMENT CLASS:**

_____

**FOR DEMCHAK PARTNERS LIMITED PARTNERSHIP**

_____

**FOR JAMES P. BURGER, JR. & BARBARA H. BURGER**

_____

**FOR WILLIAM A. BURKE, II & CLARA BURKE**

_____

**FOR WILLIAM A. BURKE, III**

_____

**FOR EDWARD J. BURKE**

_____

**FOR DONALD G. FULLER & KAREN M. FULLER**

_____

**FOR RANDY K. HEMERLY**

_____

**FOR LAMAR R. KING**

_____

**FOR LINDA J. SCHLICK**

_____

**FOR JANET C. YOUNG**

APPROVED BY COUNSEL FOR
THE DEFENDANT:

CHESAPEAKE APPALACHIA, L.L.C.


Daniel T. Donovan
Ragan Naresh
Kirkland & Ellis LLP
1301 Pennsylvania Ave., N.W.
Washington DC 20004

Daniel T. Brier
Myers Brier & Kelly, LLP
425 Spruce Street, Ste. 200
Scranton, PA 18503

James R. Webb
Executive Vice President – General Counsel,
Chesapeake Energy Corp.

- 20 -

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## BANKRUPTCY COURT

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 20-33233 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## [PROPOSED] ORDER (I) DIRECTING THE APPLICATION OF RULES 9014, 9019, AND 7023, (II) CERTIFYING THE SETTLEMENT CLASS FOR SETTLEMENT PURPOSES ONLY, (III) FINALLY APPROVING THE SETTLEMENT AGREEMENT, AND (IV) GRANTING RELATED RELIEF

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

Upon the motion (the "Motion") of Chesapeake Energy Corporation ("Chesapeake") and Plaintiffs for entry of an order (this "Order"): (i) directing the application of Rules 9014, 9019, and 7023 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and, by incorporation, Rule 23 of the Federal Rules of Civil Procedure (the "Federal Rules"), (ii) certifying the Settlement Class, as defined in the Settlement Agreement, for settlement purposes only, and (iii) finally approving the Settlement Agreement attached as Exhibit 3 to the Motion, and (iv) granting related relief as more fully set forth in the Motion and the Settlement Agreement, and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a preliminary order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having found that the Notice of Settlement and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having found that each putative member of the Settlement Class was afforded a reasonable opportunity to opt out of or object to the Settlement; and this Court having found Debtors to have complied with 28 U.S.C. § 1715; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Settlement Fairness Hearing"); and this Court having considered each of the factors listed in

Civil Rule 23; and this Court having determined that the legal and factual bases set forth in the

Motion and at the Settlement Fairness Hearing establish just cause for the relief granted herein;

and this Court having entered an order preliminarily approving the Settlement Agreement,

among other things Docket No. [] (the "Preliminary Approval Order"); and this Court having

found that the Settlement Administrator complied with the Preliminary Approval Order; and this

Court having found that the Settlement is fair, reasonable, and adequate; and this Court having

found that the Plan of Allocation and Distribution is fair and reasonable to the Settlement Class;

and upon all of the proceedings had before this Court; and after due deliberation and sufficient

cause appearing therefor, it is HEREBY ORDERED THAT:

1. Pursuant to, and in accordance with, Bankruptcy Rules 7023, 9014, and 9019, and Civil

Rule 23, the Settlement Agreement is hereby approved on a final basis.

2. The Settlement Class shall include:

> [A]ll individuals and entities, including their predecessors and
> successors-in-interest, who, according to the business records
> maintained by Chesapeake, are or have been lessor parties to one
> or more Pennsylvania Leases, to the extent of their interests in such
> Pennsylvania Leases.   The Settlement Class excludes (a)
> Chesapeake; (b) any person or entity who owns a working interest
> in or operates a gas well in Pennsylvania; (c) any person or entity
> who receives royalty in kind pursuant to a Pennsylvania Lease; (d)
> any person or entity who has previously released Chesapeake from
> liability concerning or encompassing any or all Settled Claims; (e)
> the federal government; (f) legally-recognized Indian Tribes; and
> (g) any person who serves as a judge in this civil action and his/her
> spouse.

3. Pennsylvania Leases means each and every oil and gas lease that (a) covers a leasehold

located in Pennsylvania except for the portions of Southwestern Pennsylvania covered by the

Gas Gathering Contract Cost of Service - South Marcellus, (b) contains a Market Enhancement

Clause or Ready for Sale or Use Clause, and (c) is or has been owned, in whole or in part, by

Chesapeake Appalachia, L.L.C. as a lessee, according to the business records maintained by Chesapeake.

4.   The Settlement Class is certified for settlement purposes only pursuant to Bankruptcy Rules 7023, 9014, 9019, and Civil Rule 23.

5.   Upon Defendant's transfer of the Settlement Funds the Defendant shall have no further liability for payment of any additional amount under the Settlement Agreement.

6.   The putative members of the Settlement Class listed on Exhibit [] to this Judgment elected to opt-out of the Settlement Class and are not entitled to receive any Settlement Funds.

7.   All Settlement Class Members who did not exercise the right to opt-out of the Settlement Class are bound by this Judgment and the terms of the Settlement Agreement.

8.   Each Settlement Class Member and the heirs, devisees, successors, assigns, agents and/or representatives of each Settlement Class Member, and each Defendant and Affiliate of each Defendant and their successors shall be barred from asserting any and all Released Claims against the Released Parties.

9.   Each Settlement Class Member and the heirs, devisees, successors, assigns, agents and/or representatives of each Settlement Class Member, and each Defendant and Affiliate of each Defendant and their successors shall be conclusively deemed to have released any and all Released Claims against the Released Parties.

10. Distribution of the Settlement Funds and election of future royalty payment methodologies shall be made in accordance with the Settlement Agreement.

11. No Settlement Class Member filed an objection to the Settlement. Hence, no Settlement Class Member has standing to appeal entry of this Judgment. Nonetheless, any Settlement Class

Member that wishes to appeal this Judgment or the Fees and Expenses Order must file a notice of appeal within (14) days of entry of this Judgment pursuant to Bankruptcy Rule 8002.

12. Neither the Preliminary Approval Order, this Judgment, the Settlement Agreement, the negotiations leading to the Settlement Agreement, nor the carrying out of the Settlement Agreement may ever be used by any person or entity as proof of the viability of any claim, cause of action, or in any other proceeding.

13. This Court retains jurisdiction to construe, interpret, enforce, and implement the Settlement Agreement and this Judgment.

SO ORDERED this ____ day of _____, 2021.

_____
HON. DAVID R. JONES

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**BANKRUPTCY COURT**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CHESAPEAKE ENERGY CORPORATION, *et al.,*[1] | ) | Case No. 20-33233 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## PLAN OF ALLOCATION AND DISTRIBUTION

1.     Plan of Allocation

(a)     The aggregate amount of funds available for distribution to the Settlement Class Members ("Distribution Funds") will be determined by subtracting from the Settlement Funds any award of Attorneys' Fees, Litigation Expenses, and/or Incentive Payments that the Court may grant to Plaintiffs, Class Members, or Class Counsel.

(b)     Each Settlement Class Member's allocated share of the Distribution Funds will be calculated in a two-step process.  First, each class member's percentage share of the total amount of Royalty deductions for Post-Production Costs that Chesapeake has taken from the Settlement Class under Pennsylvania Leases up to December 31, 2020.  Second, the Class Member's percentage share of the total Royalty deductions will be used as the Class Member's percentage of the Distribution Funds.

(c)     Calculation of each Settlement Class Member's allocated share of the Distribution Funds shall be based upon Chesapeake's accounting records that identify the lessors to whom royalties were paid up to the December 31, 2020.  Claims between or among Settlement Class Members as to their respective entitlements to Distribution Funds under a given Pennsylvania Lease shall be resolved by and among such Settlement Class Members.  Chesapeake shall have no obligation or responsibility to address or resolve any such disputes, and no payment obligation beyond the distribution required by paragraph 1.b of this Plan of Allocation and Distribution.

(d)     Chesapeake will be entitled to any portion of the Distribution Funds that is attributable to those lessors who have opted out of the Settlement Class.  Any other unclaimed portion of the Distribution Funds that remains after payment has been made to the Settlement Class Members shall be distributed as ordered by the Court, to the extent permissible under applicable law.

(e)     The Settlement affects only Chesapeake and/or its Affiliates and does not affect how any other entity calculates and/or pays Royalties.

2.     Heirship Notification Form. Some persons included in the Settlement Class definition may now be deceased ("Deceased Class Members").  In order to assist the Settlement Administrator in the allocation and

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

distribution of funds attributable to the interests of Deceased Class Members, the Settlement Notice mailed to Settlement Class Members will be accompanied by an Heirship/Beneficiary Information Form ("Heirship Form"), which will be substantially in the form of the document attached hereto as Attachment 1. If a Settlement Class Member believes that he or she is entitled to receive all, or some portion, of the settlement funds allocable to a Deceased Class Member under the Plan of Allocation, then the Settlement Class Member will be requested, but not required, to mail to the Settlement Administrator a completed Heirship Form containing the information and documents requested therein.

The provision of an Heirship Form will be requested as an aid to the Settlement Administrator in the distribution of the Settlement Funds, but shall not constitute a required proof of claim form, nor be a condition precedent to the allocation and distribution of settlement monies attributable to a Deceased Class Member's interests.  In the absence of an Heirship Form, the Settlement Administrator may, but will not be required to, review records in Defendant's possession, including division orders, transfer orders, probate records, payment records, and like documents, and reasonably attempt to allocate and distribute Settlement Funds attributable to a Deceased Class Member's interest to the person, or persons, who received royalty payments from the Producers as a successor-in-interest to the Deceased Class Member in the ordinary course of business.  The Settlement Administrator may also allocate and distribute Settlement Funds attributable to a Deceased Class Member's interests to the estate of the Deceased Class Member, with any such payment to be sent to such mailing address as may be readily ascertainable by the Settlement Administrator.

To the extent a Settlement Class Member is an entity, such as a family limited partnership, that is no longer in existence, such a Settlement Class Member's share of the Distribution Funds shall be distributed to the successor(s) in interest to that entity based on Chesapeake's records.

3.    <u>Distribution of Settlement Proceeds</u>

(a)    Within sixty (60) days after the Effective Date, the Settlement Administrator shall make a determination as to the amounts owed to each Settlement Class Member and shall issue checks to each Settlement Class Member to whom a payment is owed.  Chesapeake shall provide data pertaining to Settlement Class Members' historic Royalty deductions for Post-Production Costs within thirty (30) days of the Effective Date.

(b)    The amount of money to be disbursed to each Settlement Class Member will be the Settlement Class Member's allocated share of the Settlement Funds as calculated in accordance with the Plan of Allocation, including any interest earned thereon, reduced by his or her proportionate share of Court-approved Litigation Expenses, Administrative Costs, and Attorneys' Fees, Incentive Award Payments, and any interest earned thereon.

(c)    The Settlement Administrator shall, not less than one year after the Effective Date, determine for the Court the total dollar amount of the distribution checks which were payable to Settlement Class Members but which were not negotiated by the Settlement Class Members for any reason, for example, because a Settlement Class Member could not be located or a Settlement Class Member failed or refused to negotiate his distribution check. All such unclaimed monies shall be transferred to a charitable organization agreed to by Plaintiffs, Plaintiffs-Intervenors, and Defendant.

4.    <u>Disputed Claims.</u>  Any dispute between persons who are, or who purport to be, Settlement Class Members concerning the distribution of a portion of the Distribution Funds shall be resolved by and among such Settlement Class Members.  Chesapeake shall have no obligation or responsibility to address or resolve any such disputes, and no payment obligation beyond the distribution required by paragraph 1.b of this Plan of Allocation and Distribution.  Such dispute shall not in any way affect, delay, or interfere with, the approval of the settlement or

any distribution to any persons not involved in the dispute, including any distribution to other Settlement Class Members or Class Counsel.

5.    <u>Claims Based Upon Distributions.</u>  No Settlement Class Member shall have any claim against the Class Representatives, Class Counsel, the Settlement Administrator, or Defendant based upon distributions made substantially in accordance with the Settlement Agreement, the Plan of Allocation and Distribution, or orders of the Court, or in good faith reliance on any public records or records provided by Defendant or any other person or entity.

6.    <u>Final Report of Distribution by Settlement Administrator.</u>  Within sixty (60) days after completing full distribution of the Settlement Funds, unless otherwise ordered by the Court, the Settlement Administrator shall file with the Court a Final Report (together with a proposed order approving such report and discharging the Settlement Administrator) indicating that the Settlement Funds have been distributed in accordance with the terms of the Settlement Agreement and the Court's prior orders.

7.    <u>Settlement Administrator.</u>  As used herein and in the exhibits hereto, the term "Settlement Administrator" means any person approved by Lead Class Counsel to administer the Settlement in accordance with the Settlement Agreement, Final Judgment, and this Plan of Allocation and Distribution.

8.    <u>Definitions.</u>  All terms defined in the Settlement Agreement shall have the same meaning when used in this Plan of Allocation and Distribution except as otherwise specified herein.

**ATTACHMENT 1**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## BANKRUPTCY COURT

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **CHESAPEAKE ENERGY CORPORATION,** *et al.*,1 | ) | Case No. 20-33233 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## CLASS ACTION SETTLEMENT HEIRSHIP/BENEFICIARY INFORMATION FORM

The information in this form is solicited to assist the Settlement Administrator in the allocation and distribution of monies attributable to the interests of persons included in the Settlement Class definition who are now deceased ("Deceased Class Members"). If you are an heir or beneficiary of a Deceased Class Member and thereby believe you are entitled to receive all, or some portion, of the Distribution Funds allocable to a Deceased Class Member under the Settlement Agreement's Plan of Allocation and Distribution, then you are requested to provide the information set forth below. Please sign, notarize and mail the completed form in a postage-prepaid envelope, to the Settlement Administrator listed below, postmarked no later than _____, **2021**.

**You should send your completed form to:**

**Administrator Address**

If you have any questions about this form, please write the Settlement Administrator at the address above, email the Settlement Administrator at email address, or call the Settlement Administrator at N-NNN-NNN-NNNN. Additional blank forms are available for download at settlement website.          -

---

1 A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

The Heirship Form is requested as an aid to the Settlement Administrator in the distribution of the Distribution Funds, but shall not constitute a required proof of claim form.  In the absence of an Heirship Form, the Settlement Administrator may, but is not required to review records in Chesapeake's possession, including division orders, transfer orders, probate records, payment records, and like documents, in an attempt to reasonably allocate and distribute Distribution Funds attributable to a Deceased Class Member's interests, to the person, or persons, who received Royalty payments from Chesapeake as a successor-in-interest to the Deceased Class Member in the ordinary course of business.  The Settlement Administrator may also allocate and distribute Distribution Funds attributable to a Deceased Class Member's interests to the estate of the Deceased Class Member, with any such payment to be made payable to the estate of the Deceased Class Member and sent to such mailing address for the estate as may be readily ascertainable by the Settlement Administrator.

**Requested Information**

A.      Provide the following information about the person submitting this form:

1.      Current Name:_____

2.      Any different name under which you may have received gas royalty payments from Chesapeake:

_____

3.      Current Address
              Address 1:

_____

              Address 2:

_____

City:          State:  Zip:   _____

4.      Current Telephone Number   (_____)_____-____

B.      Provide the following information about the Deceased Class Member to whom this Heirship Form pertains:

1.  Name:_____

2.  The approximate date of the Deceased Class Member's death:__/_____/ _____

3. Identify each oil and gas lease number under which the Deceased Class Member received royalty payments on gas produced by Chesapeake (if you know).

Lease: Lease: _____   Lease: Lease: _____   Lease: Lease: _____   Lease: Lease: _____

C.      List the name and address of each person and/or entity who is an heir or beneficiary of the Deceased Class Member and succeeded to the Deceased Class Member's mineral or royalty interests and specify the fractional share (e.g., 1/2, 1/3, etc.) of the Deceased Class Member's interests to which each such person or entity succeeded:
Name: _____ Percentage: _____
Name: _____ Percentage: _____
Name: _____ Percentage: _____
Name: _____ Percentage: _____

D.      Attach copies of documentation, such as probate documents, transfer orders, division orders, and like documents, which evidence that the undersigned and the persons identified in paragraph C, above, succeeded to the Deceased Class Member's interests.

Your signature on this Heirship Form constitutes a representation that the information contained in this form and the documents provided with the form, are true and correct, to the best of your knowledge, information, or belief.

_____

State of                   County of _____

On _____,      \_\_\_\_\_, before me, a Notary Public in and for said County, personally appeared_____ , who acknowledged that he/she/they did sign the foregoing document and that it is their act and deed.

My commission expires

Signature / Notary Public      Name / Notary Public

# EXHIBIT C

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# BANKRUPTCY COURT

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 20-33233 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**[PROPOSED] ORDER (I) DIRECTING THE APPLICATION OF RULES 9014, 9019, AND 7023, (II) GRANTING PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT, (III) PRELIMINARILY CERTIFYING A CLASS FOR SETTLEMENT PURPOSES, (IV) APPROVING FORM AND MANNER OF CLASS NOTICE, AND (V) SETTING  DATE FOR FINAL APPROVAL HEARING ON FINAL APPROVAL OF <u>SETTLEMENT</u>**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

Upon the motion (the "Motion") of Chesapeake Energy Corporation ("Chesapeake") for entry of an order (this "Order"): (i) directing the application of Rules 9014, 9019, and 7023 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and, by incorporation, Rule 23 of the Federal Rules of Civil Procedure (the "Federal Rules"),   (ii) granting preliminary approval of the class action settlement attached as Exhibit 3 to the Motion (the "Settlement Agreement"); (iii) preliminarily certifying a class for settlement purposes, (iv) approving the form and manner of Class Notice to members of the Settlement Agreement, and (v) setting date for final approval hearing on final approval of the settlement, and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a preliminary order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is permissible pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Motion is granted to the extent set forth herein.

2.   The Settlement Agreement attached as Exhibit 3 to the Motion is hereby preliminarily approved.  The Court preliminarily finds that the Settlement Agreement complies with Federal Rule of Civil Procedure 23 and the Class Action Fairness Act of 2005 ("CAFA") (28 U.S.C. §1715).

3.   The form of the notice to be sent to the Class Members (the "Class Notice") attached to the Settlement Agreement as Exhibit D and the service of the Class Notice by the Epiq Corporate Restructuring LLC (the "Settlement Administrator") to each class Member, at the last known address of each Class Member according to the Debtors' books and records (or as updated by Class Counsel's searches for current addresses or as may otherwise be determined by the Parties) comports with all applicable law and is hereby approved.

4.   The Class Notice shall be mailed by first-class mail, postage prepaid, by the Notice Administrator within 15 business days following the entry of this Order.

5.   The parties shall file motions and memoranda in support of final approval of the Settlement Agreement and Class Counsel shall file their request for attorneys' fees and expense reimbursements on or before _____.

6.   Any member of the Class who wishes to object to or comment on the proposed settlement, or to object to Class Counsel's request for attorney's fees and expense reimbursements, must postmark and mail such objections or comments on or before _____. In accordance with the procedures set forth in the Settlement Notice, any such objections or comments must be mailed to Class Counsel, Chesapeake's counsel, and the Court.

7.   Any member of the Class who wishes to exclude himself or herself from the Class Settlement must postmark and mail the exclusion request to Class Counsel and Chesapeake's counsel no later than _____.

8.   Any class member who wishes to appear and be heard at the final approval hearing must postmark and mail notice of such intention on or before _____.  Notice of such intention must be mailed to Class Counsel, Chesapeake's counsel, and the Court.

9.   On or before _____, Class Counsel and Chesapeake may file a response to any Class Member's objections or comments.

10.  The Court shall conduct the Fairness Hearing on [_____], 2021 at [___].m. to consider final approval of the Settlement Agreement and Class Counsel's request for attorneys' fees and expense reimbursements.  The Court may adjourn the Fairness Hearing without further notice of any kind.

11. This Court retains jurisdiction to construe, interpret, enforce, and implement the Settlement Agreement and this Order.

SO ORDERED this ____ day of _____, 2021.


_____
HON. DAVID R. JONES

# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**BANKRUPTCY COURT**

There are Proposed Settlements of lawsuits brought on behalf of the Commonwealth of Pennsylvania ("PA AG Action") and Pennsylvania Royalty Owners against Chesapeake Appalachia, L.L.C., Chesapeake Energy Corporation and other defendants.

If you have received royalty payments from Chesapeake or you have an existing unexpired lease with Chesapeake, you may be able to obtain benefits through these Settlements.

***This is a court-authorized Notice.  This is NOT a solicitation from a lawyer.***

Chesapeake Energy and its affiliates have reached settlements with the Pennsylvania Attorney General's Office and in class actions brought on behalf of oil and gas lessors in Pennsylvania.  Each of the lawsuits asserts claims that Chesapeake or its affiliates failed to pay gas royalties consistent with the oil and gas leases and related claims.  Chesapeake denies these claims, but settled the lawsuits in order to resolve the claims and to establish a new relationship with its Pennsylvania royalty owners.

| 1. Why did I receive this Notice? |
| --- |

Records show that you (or someone in your family) have received and/or currently receive royalty payments from Chesapeake from a natural gas well(s) in Pennsylvania, or that you have an unexpired lease with Chesapeake that is not currently producing hydrocarbons.

This Court sent you this notice to inform you of three settlement agreements in the following cases:

- The PA AG Action.  This refers to the action brought by the Commonwealth of Pennsylvania in *Commonwealth of Pennsylvania v. Chesapeake Energy Corporation*, et al., originally brought as Case No. 2015IR0069 (Ct. of Common Pleas, Bradford Cty., Pa.).

- The MEC Action.  This refers to the class action styled *Demchak Partners Limited Partnership, et al. v. Chesapeake Appalachia, L.L.C.*, originally brought as Case No. 3:13-cv-2289 on the docket of the United States District Court for the Middle District of Pennsylvania.

- The Non-MEC Action.  This refers to the class actions styled *Brown v. Access Midstream Partners, L.P., et al.*, Case No. 3:14-cv-00591-MEM, and *The Suessenbach Family Limited Partnership v. Access Midstream Partners, L.P.*, Case No. 3:14-cv-01197-MEM, both originally on the docket of the United States District Court for the Middle District of Pennsylvania.

This notice refers to the PA AG Action, the MEC Action, and the Non-MEC Action together as the "Lawsuits," and it refers to the MEC and Non-MEC Action together as the "Settlement Class Actions."

The Lawsuits were initially filed in Pennsylvania, but because of Chesapeake's Bankruptcy Filing the settlements are being reviewed by the United States District Court for the Southern District of Texas, Bankruptcy Court.  Judge David R. Jones of the United States District Court for the Southern District of Texas Bankruptcy Court is overseeing these settlements.

## 2.  What are these Lawsuits about?

The Lawsuits claim that Chesapeake underpaid royalties relating to gas produced from wells located in Pennsylvania pursuant to certain provisions of oil and gas leases.  All of the Lawsuits allege that Chesapeake inappropriately deducted certain costs from royalty payments due under oil and gas leases.  Chesapeake denies all allegations but has agreed to settle them based on the time and expense of continuing litigation and in the interest of furthering its relationship with its Pennsylvania lessors.

## 3.  How do I know if I am part of the Settlement?

**PA AG Action Settlement**

You are part of the PA AG Action Settlement if you have or have had an oil and gas lease with Chesapeake in Pennsylvania.

**MEC Action Settlement**

You are a part of the settlement in the MEC Action if you are or have been a lessor to one or more Pennsylvania Lease(s) that (a) covers a leasehold located in Pennsylvania except for the portions of Southwestern Pennsylvania covered by the Gas Gathering Contract Cost of Service - South Marcellus, (b) contains a Market Enhancement Clause or Ready for Sale or Use Clause, and (c) is or has been owned, in whole or in part, by Chesapeake Appalachia, L.L.C. as a lessee, according to the business records maintained by Chesapeake.

A Market Enhancement Clause ("MEC") is a provision in an oil and gas lease that precludes the lessee (such as Chesapeake) from deducting Post-Production Costs incurred to transform leasehold gas into marketable form, but permits the lessee to deduct a pro-rata share of Post-Production Costs incurred after the gas is marketable if they enhance the value of the marketable gas.

A "Ready for Sale or Use Clause" ("RFSU") is a provision in an oil and gas lease that precludes the lessee from deducting Post-Production Costs to make such gas ready for sale or use but permits the lessee to deduct a pro-rata share of Post-Production Costs incurred after the gas is ready for sale or use.

Excluded from the MEC Settlement Class are: (a) Chesapeake; (b) any person or entity who owns a working interest in or operates a gas well in Pennsylvania; (c) any person or entity who receives royalty in kind pursuant to a Pennsylvania Lease; (d) any person or entity who has previously released Chesapeake from liability concerning or encompassing any or all Settled Claims; (e)

the federal government; (f) legally recognized Indian Tribes; and (g) any person who serves as a judge in these Lawsuits and his/her spouse.

## Non-MEC Action Settlement

You are a part of the settlement in the Non-MEC Action if you are or have been a lessor to one or more Pennsylvania Lease(s) that (a) covers a leasehold located in Pennsylvania except for the portions of Southwestern Pennsylvania covered by the Gas Gathering Contract Cost of Service - South Marcellus, (b) does not contain a Market Enhancement Clause or Ready for Sale or Use Clause, and (c) is or has been owned, in whole or in part, by Chesapeake Appalachia, L.L.C. as a lessee, according to the business records maintained by Chesapeake.

The following individuals, groups, and entities are excluded from the Non-MEC Settlement Class: (a) Defendants; (b) any person or entity who owns a working interest in or operates a gas well in Pennsylvania; (c) any person or entity who receives royalty in kind pursuant to a Pennsylvania Lease; (d) any person or entity who has previously released Chesapeake from liability concerning or encompassing any or all claims that are the subject of the Lawsuit; (e) the federal government; (f) legally-recognized Indian Tribes; (g) the Commonwealth of Pennsylvania and its agencies, in their individual capacities only; and (h) any person who serves as a judge in these Lawsuits and his/her spouse.

## Deceased Class Members

Some persons who are part of the MEC and/or Non-MEC settlements may be deceased ("Deceased Class Members").  To assist the Settlement Administrator in allocating and distributing monies attributable to the interests of Deceased Settlement Class Members, this Notice is accompanied by an Heirship/Beneficiary Information Form ("Heirship Form").  If you believe that you are entitled to all or some portion of the Settlement funds allocable to a Deceased Settlement Class Member, then please mail to the Settlement Administrator a completed Heirship Form.

Some corporations, partnerships, or other entities included in the Class definition may now be dissolved. If you have succeeded to the interest of such a dissolved corporation, partnership, or other entity, you should immediately contact the Settlement Administrator, whose contact information is attached to this Notice.

**If you are a Settlement Class Member and the Judge approves the Proposed Settlement, you will be bound by all orders and judgments of the Court and by the Court's final resolution of the Settlement Class claims in the Lawsuits. See Question 10 for information about your right to comment on or object to the Proposed Settlement.**

| 4.  What do the Settlements provide? |
| --- |

Chesapeake has historically calculated its royalty payments to Pennsylvania landowners based on the "Netback Method."  Under the Netback Method, Chesapeake pays royalties based on the weighted average sales price Chesapeake receives for its production month sales to third parties minus a proportionate share of all the post-production costs Chesapeake incurs, including costs for gathering, compression and transportation.

The PA AG Action Settlement and the Class Action Settlements provide Pennsylvania lessors the right to make an election as to how their royalties will be calculated by Chesapeake in the future.  This election does not apply to leases no longer owned by Chesapeake, nor does it apply to the interests owned by any other working interest owner in the lease.

Under the PA AG Action Settlement:

> If you have a lease with a MEC or RFSU clause, you will have the one-time opportunity to select having your future royalties paid at (1) the **higher** of the In-Basin Index Price (50% Leidy Hub and 50% TGP Zone 4) Without Post-Production Deductions or the Netback Price with deductions, whichever price is higher for the production month; or 2) continue to be paid the Netback Price with deductions.

> If you have a lease with a Non-MEC clause, you will have the one time opportunity to select having your future royalties paid at (1) the In-Basin Price (50% Leidy Hub and 50% TGP Zone 4) Without Post-Production Deductions; or 2) continue to be paid the Netback Price with deductions.

> If you have a lease that expressly prohibits deductions, and Chesapeake discovers it has been taking deductions, Chesapeake will discontinue doing so.

Under the Class Action Settlements, if you have a lease with a MEC or RFSU clause, you will have the one-time opportunity to select having your royalties paid at (1) the *higher* of the In-Basin Index Price Without Post-Production Deductions, or the Netback Price; (2) the In-Basin Index Price Without Post-Production Deductions; or (3) the Netback Price, each as defined in the Settlement Agreement(s). To the extent no Election by a Settlement Class Member is received by the Settlement Administrator within five (5) business days after the expiration of the Election Period, such Settlement Class Member will be deemed to have elected Option (1) (i.e., the higher of the In-Basin Index Price Without Post-Production Deductions and the Netback Price).

If your lease does not have a MEC or RFSU clause, you will have the one-time opportunity to elect to select having Chesapeake pay royalties to you based solely on an In-Basin Price without deductions of any costs, or you may elect to have Chesapeake pay royalties to you based solely on the Netback Method.

You will receive a separate mailing explaining how to make your election between the options discussed above after certain specific events occur, including final approval of the Proposed Settlements.

In addition to this right to an election, all three settlements—the PA AG Action Settlement, the MEC Action Settlement, and the Non-MEC Action Settlement—include a cash payment by Chesapeake for distribution to Pennsylvania royalty owners and/or Class Members.  The total cash amount to be distributed among the royalty owners and/or Class Members (as applicable) is $5,300,000 for the PA AG Settlement, $5,000,000 for the MEC Settlement Class, and $1,250,000 for the Non-MEC Settlement Class. The amounts distributed to royalty owners under the PA AG Action Settlement will be distributed by the Settlement Administrator in fixed amounts based on lease type, as determined by the Pennsylvania Attorney General's Office.  The

amounts distributed to the MEC Settlement Class and Non-MEC Settlement Class will be distributed among the Class Members on a pro rata basis, net of any attorneys' fees and costs awarded by the Court to Class Counsel in the Non-MEC Action.

- You will be eligible for a portion of the payment from PA AG Action Settlement no matter what action you take in response to this notice.

- You will only be eligible for a share of the cash payment being made in the MEC Action and the Non-MEC Action if you (a) qualify as a member of those settlements (see Question 3 above) and (b) you do you not exclude yourself from those settlements (see Question 7, below). The payments and the manner in which the funds will be distributed is set forth in greater detail in the Settlement Agreements.

**5. Can I participate in the PA AG Action Settlement without participating in the Class Action Settlements?**

The PA AG Action Settlement and Class Action Settlements are independent settlements. You can participate in the PA AG Action Settlement without participating in the Class Action Settlements.

If you choose, however, to opt out of the Class Action Settlements (see Question 7 below), you will not be entitled to receive any of the Class Settlement funds that will be distributed to class members under the Class Action Settlements

**6. What do I need to do to remain the Settlement Class Member in the MEC or Non-MEC Action?**

If you are a member of the settlement classes in the MEC and/or Non-MEC Actions and you want to remain a Settlement Class Member, **you do not need to take any action whatsoever.** Class Counsel in the respective actions will represent your interests as a member of the Settlement Class.

**7. Can I get out of the Settlement Class in the MEC or Non-MEC Action?**

If you do not want to be in a Settlement Class in the MEC or Non-MEC Action and you want to keep the right to sue Chesapeake on your own, you must take steps to get out of the Settlement Class. This is called excluding yourself from or "opting out of" the Settlement Class.

Chesapeake filed for Chapter 11 bankruptcy on June 28, 2020, and emerged from bankruptcy on February 9, 2021. As a result, all claims (as defined in the Bankruptcy Code) against Chesapeake arising before February 9, 2021 have been discharged by the bankruptcy court.

To exclude yourself from ("opt out of") the Settlement Class in the MEC or Non-MEC Action, you must send a letter personally signed by you that includes all of the following: (1) Your name, address, and telephone number; (2) Your Chesapeake owner number (if you know it); (3) The following Civil Action Number: 20-33233; and (4) A statement that you want to be excluded from the

Settlement Class, specifying which Settlement Class (MEC Settlement Class or Non-MEC Settlement Class or both) you wish to opt out of.

Your request for exclusion letter must be mailed first class, postage pre-paid, **received on or before** _____, 2021 to the Settlement Administrator, whose contact information is attached to this Notice.

You cannot exclude yourself from only part of the Proposed Settlement or Settlement Class. Also, please remember that you cannot exclude yourself by phone or by sending an email.

## 8.   Do I have lawyers representing my interests in the case?

The Court has appointed the law firms identified in the attachment to this Notice to represent each Settlement Class.  The lawyers representing the Settlement Classes in the MEC and Non-MEC Action are called "Class Counsel."  You do not have to directly pay Class Counsel.  If you want your own lawyer, and to have that lawyer appear in court, you may hire one at your own expense. If you want your own lawyer to speak for you or to appear in Court, you or your lawyer must file a Notice of Appearance.  (See Question 10 to find out how to submit a Notice of Appearance). Class Counsel in each action will request that the Court award them reimbursement of their litigation expenses plus attorneys' fees based on a percentage (not exceeding 33.33%) of the total economic benefit realized by the class members under the settlement agreements.

## 9.   Who are the Class Representatives and how are they compensated?

The Court has appointed Plaintiffs James L. Brown, Alice R. Brown, The Suessenbach Family Limited Partnership, James S. Suessenbach, and Gina M. Suessenbach as Class Representatives for the Non-MEC Settlement Class.  The Court has appointed certain of the Plaintiffs in Demchak as Class Representatives for the MEC Settlement Class.

The Settlement Class Representatives work with Class Counsel on behalf of all Settlement Class Members to present the views of typical Settlement Class Members to Class Counsel and the Court. The Settlement Class Representatives may be entitled to an Incentive Payment Award of no more than $5,000 each.

## 10.  Can I object to or comment on the Proposed Settlement?

If you have comments about, or disagree with, any aspect of the Proposed Settlements, including the Class Action Settlements requested attorneys' fees, you may express your views to the Court through a written response.  Only Class Action Settlement Members who have not opted out can object or comment.  The written comment or objection should include your name, address, telephone number, and Chesapeake owner number(s) (if known).  In addition, any objection must include (a) a written statement of your objection, (b) a written statement of the grounds or reasons for your objection, and (c) copies of any papers, briefs, or other documents supporting your objection.  The document must be signed to ensure the Court's review.  In order to be considered by the Court, your comment or objection must be **received** on or before _____**, 2021** and mailed to:

Clerk of the Court
United States District Court, Southern District of Texas
515 Rusk Street
Houston, TX 77002

Your comment or objection must clearly state that it relates to the following civil action number: 20-33233, and must state what specific settlement you are objecting to.

The comment or objection must also be mailed to counsel for Chesapeake, as well as either Larry D. Moffett (if you are a member of and objecting to the MEC Action Class) or Michael D. Donovan (if you are a member of and objecting to the Non-MEC Action Class).  Contact information for all is attached to this Notice.

| 11. Will there be a Hearing on the Proposed Settlements? |
|---|

The Court will hold a Final Approval Hearing on _____, to consider whether the Proposed Settlements are fair, reasonable, and adequate. The Hearing will be at the United States Courthouse, at _____.  At the Hearing, the Court will decide whether to approve the Proposed Settlements and the Class Action Settlements' motions for attorneys' fees and expenses.  If comments or objections have been received, the Court will consider them at this time.

Attendance is not required, even if you properly mailed a written objection or comment.  If you filed an objection to the Settlement, as long as the objection was received before the deadline, the Court will consider it, regardless of whether you or your privately-retained attorney appear at the Hearing.

If you want to speak or have your own lawyer speak at the Final Approval Hearing, you must give the Court a paper that is called a "Notice of Appearance."  The Notice of Appearance must refer to *In re Chesapeake Energy Corp.*, Case No. 20-33233-DRJ, United States District Court for the Southern District of Texas*,* and state that you or your lawyer wish to enter an appearance at the Final Approval Hearing.  It must also include your name, address, telephone number, and signature.  Your "Notice of Appearance" must be received no later than _____.  You cannot speak at the Hearing if you asked to be excluded from the Proposed Settlement Class in the MEC or Non-MEC Action.

The Notice of Appearance must be filed with the Court at the address provided under after Question 10 above and also mailed to the attorneys listed in Question 10 above.

In addition, your document must clearly state that it relates to the following Civil Action Number: 20-33233.

| 12. How do I get more information about the Proposed Settlement? |
|---|

If you have additional questions about the Class Action Settlements you may contact the Settlement Administrator.

QUESTIONS? CALL 1-800-____-_____

If you have questions about the PA AG Action Settlement you may contact the Pennsylvania Attorney General's Office at 717-787-4530 or landowners@attorneygeneral.gov.  You can also visit the PA Attorney General Office's website at www.attorneygeneral.gov/public-protection-division/natural-gas-royalty-lawsuit.

All court records, including the Settlement Agreements and other documents for the Lawsuit, may be examined in person and copied at the United States Courthouse, Southern District of Texas, Bankruptcy Division, 515 Rusk Street, Houston, TX 77002.

**Please do not telephone the Court, the Clerk of the Court, or Chesapeake.**

QUESTIONS? CALL **1-800-_____-_____**

## Contact Information
## MEC Action Class Counsel

Larry D. Moffett
Law Office of Larry D. Moffett, PLLC
P.O. Box 1418
Oxford, MS 38655
larry@larrymoffett.com

Daniel E. Seltz
Lieff, Cabraser, Heimann & Bernstein, LLP
250 Hudson St., 8th Floor
New York, NY 10013

Charles J. LaDuca
Cuneo Gilbert & LaDuca, LLP
8120 Woodmont Avenue
Suite 810
Bethesda, MD 20814

Jonathan Cuneo
Cuneo Gilbert & LaDuca LLP
507 C Street NE
Washington, DC 20002

John W. ("Don") Barrett
Barrett Law Group
Post Office Drawer 927
Lexington, MS 39095

Michelle R. O'Brien
The O'Brien Law Group LLC
2800 Stafford Ave., Box 3034
Scranton, PA 18505

Charles E. Schaffer
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 50
Philadelphia, PA 19106

## Non-MEC Action Class Counsel

Noah Axler
Axler Goldich, LLC
1520 Locust St., Suite 301
Philadelphia, PA 19102

Michael D. Donovan
Donovan Litigation Group, LLC
1885 Swedesford Road
Malvern, PA 19355
mdonovan@donovanlitigationgroup.com

Robert E. McCann
McCann & Wall, LLC
Two Penn Center Plaza
1500 JFK Blvd., Ste. 1110
Philadelphia, PA 19102

Joseph H. Meltzer
Tyler S. Graden
Kessler Topaz Meltzer & Check, LLP
280 King of Prussia Rd.
Radnor, PA 19807

Robert D. Schaub
Rosenn, Jenkings & Greenwald, LLP
15 South Franklin St.
Wilkes-Barre, PA 18711

## Settlement Administrator

Epiq Corporate Restructuring, LLC
777 Third Avenue, 12th Floor
New York NY 10017
Attn: Robert A. Hopen

## Counsel for Chesapeake

Daniel T. Donovan
Ragan Naresh
Kirkland & Ellis LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C., 20004
Daniel.donovan@kirkland.com
ragan.naresh@kirkland.com

Daniel T. Brier
Myers, Brier & Kelly LLP
425 Spruce Street, Suite 200
Scranton, PA 18503
570-342-6100
dbrier@mbklaw.com

## Pennsylvania Attorney General

Chief Deputy Attorney General
Antitrust Section
Pennsylvania Office of Attorney General
14th Floor, Strawberry Square
Harrisburg, PA 17120-1410
(717) 787-4530
landowners@attorneygeneral.gov

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**BANKRUPTCY COURT**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 20-33233 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NON-MEC CLASS ACTION SETTLEMENT AGREEMENT**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

This CLASS ACTION SETTLEMENT AGREEMENT ("Settlement Agreement") is entered into by, between, and among, Chesapeake Energy Corporation, and the named plaintiffs in *Brown v. Access Midstream Partners, L.P.*, No. 3:14-cv-00591-MEM (M.D. Pa.) ("*Brown*") and in *Suessenbach Family Limited Partnership v. Access Midstream Partners, L.P.*, No. 3:14-cv-01197 (M.D. Pa.) ("*Suessenbach*"), on behalf of themselves and as the putative class representatives for the Settlement Class defined below.

This Settlement Agreement is entered into to effect a full and final settlement and dismissal with prejudice of all Settled Claims on the terms set forth below, subject to the approval of the Court.

## RECITALS

A.     Plaintiffs, as lessors, and Chesapeake Appalachia, L.L.C., as lessee, are parties to oil and gas leases governing leaseholds in the Commonwealth of Pennsylvania. The leases implicated in this Settlement do not contain Market Enhancement Clauses or Ready for Sale or Use Clauses.

B.     Plaintiffs allege in *Brown* and *Suessenbach* that Chesapeake underpaid Royalties by deducting inflated Post-Production Costs from royalties. Plaintiffs allege that Chesapeake and Access Midstream Partners, L.P. engaged in a purported scheme to charge landowners artificially inflated and supra-competitive rates for certain post-production services, among other allegations. Chesapeake denies Plaintiffs' claims that the Post-Production Costs are or were inflated and further denies that its Royalty payment practices are or were improper. Chesapeake believes it paid Royalties consistent with the leases and Pennsylvania law.

C.     Class Counsel and counsel for Chesapeake engaged in arm's-length negotiations in the interest of resolving this dispute. They have met at length and have mediated this dispute with the assistance of third-party mediators, including Judge Edward N. Cahn (ret.) and John W. Perry, Jr.

D.     Chesapeake enters into this Settlement Agreement as part of its broader effort to achieve global resolution across the Commonwealth of Pennsylvania as to any royalty-related litigation or disputes, including claims raised by the Pennsylvania Office of the Attorney General.

E.     While Chesapeake believes this Settlement Agreement can and should be approved, to avoid the time, expense, and uncertainty of litigation, in the event the Settlement Agreement does not receive final approval from the Court or is terminated according to its terms, Chesapeake expressly reserves any and all available defenses, including the right to challenge class certification and to insist on individual arbitration or litigation of each Plaintiffs dispute and each Settlement Class Member's dispute. Plaintiffs likewise reserve their right to proceed with all claims if the Settlement is not approved.

F.     In light of the investigations undertaken and conclusions reached by the Parties and discussed above, the Parties agree, subject to approval by the Court, to fully and finally compromise, settle, extinguish and resolve the Settled Claims and to dismiss with prejudice *Brown* and *Suessenbach* under the terms and conditions set forth in this Settlement Agreement.

## AGREEMENT FOR SETTLEMENT PURPOSES ONLY

This Settlement Agreement is for settlement purposes only. The fact of this Settlement Agreement or any provision herein, the negotiations or proceedings related hereto, and any actions taken hereunder shall not constitute or be construed as (a) any admission of the validity of any claim or any fact alleged by Plaintiffs in *Brown* or in *Suessenbach*; (b) any admission of any wrongdoing, fault, violation of law, breach of contract, or liability of any kind on the part of Chesapeake; (c) any admission as to any claim or allegation made in any demand of, action against, or proceeding against Chesapeake; and/or (d) a waiver of any applicable defense, including, without limitation, any applicable statute of limitations. This Settlement Agreement and its exhibits shall not be offered or admissible in evidence against Plaintiffs, Chesapeake, or the Settlement Class Members in any action or proceeding in any forum for any purpose whatsoever, except any action or proceeding brought to enforce its terms.

## AGREEMENT

In consideration of the mutual promises and covenants set forth herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Plaintiffs, on behalf of themselves and as the class representatives of the Settlement Class, and Chesapeake hereby contract, covenant, and agree that the Settled Claims are fully resolved, settled, compromised, extinguished and dismissed on the merits and with prejudice, subject to the approval of the Court, on the following terms and conditions:

## JURISDICTION

This Court has jurisdiction over the parties and subject matter of this action pursuant to 28 U.S.C. § 1334.

## DEFINITIONS

1.   <u>Definitions</u>.   When used in this Settlement Agreement, unless otherwise specifically indicated, the following terms shall have the respective meanings assigned to them in this paragraph 1:

1.1   "Attorneys' Fees" refers to any award of attorneys' fees requested by Class Counsel and awarded by the Court pursuant to paragraph 17.7.2.

1.2   "Bonus" means the monetary payment that a lessee or its affiliate(s) paid to a lessor as consideration for signing an oil and gas lease.

1.3   "*Brown*" means the civil action styled *Brown v. Access Midstream Partners, L.P.*, No. 3:14-cv-00591-MEM, on the docket of the United States District Court for the Middle District of Pennsylvania, as well as the arbitration proceeding initiated by James L. Brown against Chesapeake Appalachia, LLC before the American Arbitration Association on or about March 28, 2014, and the related declaratory judgment action captioned *Chesapeake Appalachia, L.L.C. v. Brown*, No. 3:14-cv-00833-MEM, on the docket of the United States District Court for the Middle District of Pennsylvania.

1.4     "Chapter 11 Cases" means the procedurally consolidated chapter 11 cases of Chesapeake Energy Corporation and its debtor affiliates (Case No. 20-33233) pending in the Court.

1.5     "Chapter 11 Plan" means the joint chapter 11 plan of reorganization approved in the Chapter 11 Cases.

1.6     "Chesapeake" means Chesapeake Energy Corporation and its current and former subsidiaries and affiliates, predecessors in interest, successors in interest, and current or former officers, including, for the avoidance of doubt, Domenic J. Dell'Osso, Jr.

1.7     "Class Counsel" is defined as follows:

Noah Axler
Axler Goldich, LLC
1520 Locust St., Suite 301
Philadelphia, PA 19102

Joseph H. Meltzer
Tyler S. Graden
Kessler Topaz Meltzer & Check, LLP
280 King of Prussia Rd
Radnor, PA 19807

Michael D. Donovan
Donovan Litigation Group, LLC
1885 Swedesford Road
Malvern, PA 19355

Robert D. Schaub
Rosenn, Jenkings & Greenwald, LLP
15 South Franklin St.
Wilkes-Barre, PA 18711

Robert E. McCann
McCann & Wall, LLC
Two Penn Center Plaza
1500 JFK Blvd., Ste. 1110
Philadelphia, PA 19102

1.8     "Court" means the United States Bankruptcy Court for the Southern District of Texas.

1.9     "Chesapeake's Counsel" means the following attorneys:

Daniel T. Donovan, P.C.
Ragan Naresh, P.C.
Kirkland & Ellis LLP
1301 Pennsylvania Ave., N.W.
Washington DC 20004

1.10    "Defendant Releasees'' means Chesapeake Energy Corporation,  Domenic J. Dell'Osso, Jr., and Williams Partners, and each of their respective parents, present and former affiliates and subsidiaries, and their respective predecessors, heirs, successors, assigns, present, former, and future officers, directors, employees, agents, insurers, and any third party payment processors, independent contractors, successors, assigns, attorneys and legal representatives working on their behalf. Defendant Releasees do not include Anadarko Petroleum Corporation, Mitsui, Statoil ASA or any of their parents, present and former affiliates, and subsidiaries, and

- 4 -

their respective predecessors, successors, assigns, present, former, and future officers, directors, employees, agents, or any third party payment processors, independent contractors, successors, assigns, attorneys and legal representatives working on their behalf.

1.11     "Effective Date" shall be the date when each and all of the following conditions have occurred:

1.11.1 The Settlement Agreement has been fully executed by all the parties and their counsel;

1.11.2 The Preliminary Approval Order has been entered by the Court certifying a Settlement Class, granting preliminary approval of this Settlement Agreement, and approving the Settlement Notice;

1.11.3 The Court-approved Settlement Notice has been mailed as ordered by the Court;

1.11.4 The Court has approved and entered the Final Judgment, thereby approving this Settlement Agreement and dismissing the Settled Claims with prejudice; and

1.11.5 The Final Judgment becomes Final as defined in paragraph 1.15, below.

1.12     "Excluded Member" means any person or entity who falls within the Settlement Class definition but who elects to be excluded from the Settlement Class and submits a valid Request for Exclusion.

1.13     "Final" means that (a) the Final Judgment is a final, appealable order; and (b) either (i) no appeal has been taken from the Final Judgment as of the date on which all times to appeal therefrom have expired, or (ii) an appeal or other review proceeding of the Final Judgment having been commenced, such appeal or other review is finally concluded and no longer is subject to review by any court, whether by appeal, petitions for rehearing or argument, petitions for rehearing en banc, petitions for writ of certiorari, or otherwise, and such appeal or other review has been finally resolved in such manner that affirms the Final Judgment in all material respects.

1.14     "Final Judgment" means the Final Judgment and Order of Dismissal to be entered by the Court substantially in the form attached hereto as Exhibit A upon final approval of the Settlement, as provided in paragraph 8 of this Settlement Agreement.

1.15     "Gas" means natural gas, other than gas that is processed to separate natural gas liquids ("NGLs") from the gas stream in a processing (or similar) plant.  Gas is not processed solely because it is passed through a mechanical separator for the removal of liquid hydrocarbons at or near a well.

1.16     "In-basin Index Price" means a per MMBtu price that is the weighted average price of (a) 50% of the Leidy Hub monthly (first of the month) index price ($/MMBtu) as reported in *Inside FERC's Gas Market Report* (published by Platts), and (b) 50% of the TGP Zone

4-300 Leg monthly (first of the month) index price ($/MMBtu) as reported in *Inside FERC's Gas Market Report* (published by Platts). If either the Leidy Hub or TGP Zone 4-300 Leg ceases to be published, Chesapeake will identify a replacement index.  If a new hub or sales point is developed in the Marcellus Region and a corresponding index price for it is published by Platts, the Parties shall confer whether to revise the In-Basin Price to also include the new index.

      1.17    "Incentive Award Payments" means the amount of any class representative incentive awards granted by the Court and paid pursuant to paragraph 17.7.1.

      1.18    "Including" and "include(s)" mean "including or include(s), without limitation."

      1.19    "Leidy Hub" means the "Leidy Hub" trading location as defined in the July 2020 "Methodology and Specifications Guide/US and Canada Natural Gas" published by S&P Global Platts.

      1.20    "Litigation Expenses" means expenses incurred by Plaintiffs or Class Counsel in pursuing *Brown, Suessenbach*, and/or negotiating, preparing or presenting to the Court the Settlement Agreement, including expert witness fees, consultant fees, investigation expenses, deposition expenses, copying charges, long distance telephone calls, expenses for meeting with and communicating with clients, fax charges, computer research charges, travel expenses, court costs, arbitrators' fees, and mediator fees and awarded by the Court pursuant to paragraph 17.7.2.

      1.21    "Marcellus Region" refers to the area encompassing the following Pennsylvania counties: Bradford; Lycoming; Sullivan; Susquehanna; Tioga; Wyoming; Potter; McKean; Wayne.

      1.22    "Market Enhancement Clause" means Royalty payment clauses or provisions in an oil and gas lease that preclude the lessee from deducting Post-Production Costs incurred to transform leasehold gas into marketable form, but permit the lessee to deduct a pro-rata share of Post-Production Costs incurred after the gas is marketable if they enhance the value of the marketable gas. Such clauses are usually identified, entitled or referred to as "Market Enhancement Clauses" or "MECs."

      1.23    "Parties" means Plaintiffs and Chesapeake.

      1.24    "Pennsylvania" means the Commonwealth of Pennsylvania.

      1.25    "Pennsylvania Leases" means each and every oil and gas lease that (a) covers a leasehold located in Pennsylvania except for the portions of Southwestern Pennsylvania covered by the Gas Gathering Contract Cost of Service - South Marcellus, (b) does not contain a Market Enhancement Clause or Ready for Sale or Use Clause, and (c) is or has been owned, in whole or in part, by Chesapeake Appalachia, L.L.C. as a lessee, according to the business records maintained by Chesapeake. Pennsylvania Leases does not include any lease Chesapeake Appalachia, L.L.C. owned in whole or in part as a lessee, but in which Chesapeake Appalachia, L.L.C. is not a lessee as of the date the Preliminary Approval Order and for which no Gas was produced during the time that Chesapeake Appalachia, L.L.C. was a lessee.

1.26     "Plaintiffs" means the named plaintiffs in *Brown* and *Suessenbach*.

1.27     "Plan of Allocation" means the Plan of Allocation and Distribution as set forth in Exhibit B hereto, describing the specific procedures and processes for the administration, allocation, and distribution of the Settlement Funds.

1.28     "Post-Production Costs" means costs for gathering, compressing, treating, dehydrating, processing, transporting, or transmitting Gas.

1.29     "Preliminary Approval Order" means the order entered by the Court pursuant to paragraph 3 below and in the form attached as Exhibit C, preliminarily approving the Settlement, approving the form and manner of the Settlement Notice, and setting a date certain for the settlement fairness hearing.

1.30     "Ready for Sale or Use Clause" means Royalty payment clauses or provisions in an oil and gas lease that preclude the lessee from deducting Post-Production Costs to make such gas ready for sale or use but permit the lessee to deduct a pro-rata share of Post-Production Costs incurred after the gas is ready for sale or use. Such clauses are often entitled or referred to as "Ready for Sale or Use Clauses" or RFSU.

1.31     "Request for Exclusion" means a timely and properly submitted written request to be excluded from the Settlement Class. A request for exclusion is not timely and properly submitted unless it is in writing, is signed by the person or entity requesting exclusion, is mailed in a postage-paid envelope to the Settlement Administrator, postmarked no later than the due date established by the Court in the Preliminary Approval Order, and otherwise complies with the instructions contained in the Settlement Notice. The request for exclusion must be personally signed by any natural person requesting exclusion; it cannot be signed by that person's lawyer or other agent, unless the person is incapacitated. Requests for exclusion may not be made on a class or representative basis. If the entity requesting exclusion is a corporation, partnership, or other legal entity, the request must be personally signed by a duly-authorized officer, partner, or managing agent. A request for exclusion is also not properly submitted or valid if it requests a qualified or partial exclusion or any other qualification.

1.32     "Royalty" means lessor royalty interests, and does not include overriding royalty interests.

1.33     "Settled Claims" means any and all claims and causes of action related to Chesapeake's interest in the Pennsylvania Leases of Settlement Class Members that were alleged or could have been alleged in *Brown* or in *Suessenbach*, including, but not limited to: (a) any and all claims related to the calculation, amount, payment, and/or reporting of Royalty or Bonus payments made by Chesapeake, either on its own working interest share or on behalf of other working interests, on Gas produced pursuant to a Pennsylvania Lease; (b) any and all claims and causes of action, related to the calculation, amount, payment, and/or reporting of such Royalty or Bonus payments; (c) claims for breach of contract, fraud, conspiracy, breach of implied duties and covenants, unjust enrichment, accounting, declaratory or injunctive relief, unfair or deceptive trade practices under federal or state law, and/or anticompetitive conduct under federal or state antitrust law; (d) challenges to the manner in which sales are made to an

affiliated entity, if any; (e) claims that formation, sale, or disposition of assets or equity interests by Chesapeake impacted Royalty payments; and (f) any other challenges to Chesapeake's pricing, sales, or Royalty payment practices. The Settled Claims do not include claims for royalties in suspense, claims for the failure to pay royalties due at all, claims based on errors in determining ownership interests, claims for mathematical or calculation errors in determining volumes, prices, values, or decimal interests. The Settled Claims also do not include claims and causes of action for the breach of this Agreement, including, but not limited to, claims that Chesapeake has not properly calculated Gas Royalties pursuant to paragraph 6 of this Agreement, nor any other future claims and causes of action related to Chesapeake's interests in and obligations under the Pennsylvania Leases. The Settled Claims also do not include any claims or causes of action that Plaintiffs and the Settlement Class Members have or may have against persons and entities other than Chesapeake, except that the Settled Claims do include any claims or causes of action that Plaintiffs and the Settlement Class Members have or may have against Williams Partners, L.P. and/or any of its predecessors or successors in interest, including Access Midstream Partners, L.P.

1.34    "Settlement" means the settlement embodied in this Settlement Agreement and the Final Judgment.

1.35    "Settlement Administrative Costs" means expenses incurred in carrying out the terms of the Settlement Agreement, including fees and expenses of any notice experts or claims administrators who may present affidavits or testimony at the preliminary approval hearing and/or final fairness hearing; and fees and expenses of the Settlement Administrator in administering and carrying out the terms of the Settlement Agreement, including expenses for printing and mailing of the Settlement Notice, post office box rental costs, responding to inquiries by persons receiving or reading the Settlement Notice, and implementing the Plan of Allocation. Settlement Administrative Costs shall not include Litigation Expenses or Attorneys' Fees or costs associated with calculating or distributing funds for Litigation Expenses or Attorneys' Fees.

1.36    "Settlement Administrator" means Epiq Corporate Restructuring LLC, in its capacity as administrator of the Settlement in accordance with the provisions of this Agreement.

1.37    "Settlement Agreement" or "Agreement" means this Settlement Agreement, including all exhibits hereto.

1.40    "Settlement Class" means all individuals and entities, including their predecessors and successors-in-interest, who are or have been lessor parties to one or more Pennsylvania Leases, to the extent of their interests in such Pennsylvania Leases. The Settlement Class excludes (a) Chesapeake; (b) Williams Partners; (c) any person or entity who owns a working interest in or operates a gas well in Pennsylvania; (d) any person or entity who receives royalty in kind pursuant to a Pennsylvania Lease; (e) any person or entity who has previously released Chesapeake from liability concerning or encompassing any or all Settled Claims; (f) the federal government; (g) legally-recognized Indian Tribes; (h) the Commonwealth of Pennsylvania and its agencies, in their individual capacities only; and (i) any person who serves as a judge in these civil actions and his/her spouse. Any person or entity who is a party to a Pennsylvania Lease that has not started producing Gas as of the Effective Date shall not be entitled to receive a pro rata share

of the Settlement Payment, but shall be entitled to make an election under paragraph 6 of this Settlement Agreement.

       1.41   "Settlement Class Member" means every member of the Settlement Class who does not submit a valid Request for Exclusion.

       1.42   "Settlement Effective Date" shall be the date when each and all of the following conditions have occurred:

       1.42.1  The Settlement Agreement has been fully executed by all the Parties and their counsel;

       1.42.2   The Preliminary Approval Order has been entered by the Court certifying a Settlement Class, granting preliminary approval of this Settlement Agreement, and approving the Settlement Notice;

       1.42.3  The Court-approved Settlement Notice has been mailed as ordered by the Court;

       1.42.4   The Court has approved and entered the Final Judgment, thereby approving this Settlement Agreement and dismissing the Settled Claims with prejudice; and

       1.42.5   The Final Judgment becomes Final as defined in paragraph 1.12, above.

       1.43   "Settlement Funds" means $1,250,000.00 in available funds to the Settlement Class pursuant to the Plan of Allocation.

       1.44   "Settlement Notice" means the notice substantially in the form attached as Exhibit D, or such other comparable notice(s) approved by the Court, which is to be given to the Settlement Class as provided in paragraph 4 below. The Settlement Notice as determined to be appropriate and approved by the Court and meeting the criteria in paragraph 4, below, shall be regarded as and is the best notice practicable under the circumstances.

       1.45   "*Suessenbach*" means the civil action styled *Suessenbach Family Limited Partnership v. Access Midstream Partners, L.P.*, No.3:14-cv-01197-MEM, on the docket of the United States District Court for the Middle District of Pennsylvania.

       1.46   "*Suessenbach* Plaintiffs" refers to Suessenbach Family Limited Partnership, James S. Suessenbach, and Gina M. Suessenbach.

       1.47   "Transmission Pipeline" means a large-diameter natural gas transmission or transportation pipeline (interstate or intrastate).  The term "Transmission Pipeline" does not include field facilities or field gathering pipelines or systems. An example of an interstate Transmission Pipeline is the interstate pipeline owned by Tennessee Gas Pipeline Company, and an example of an intrastate Transmission Pipeline is the intrastate pipeline owned and operated by Regency Energy Partners NEPA Gas Gathering, L.L.C., commonly referred to as the Wyoming Pipeline.

1.48    "Transmission Pipeline" means a large-diameter natural gas transmission or transportation pipeline (interstate or intrastate).   The term "Transmission Pipeline" does not include field facilities or field gathering pipelines or systems. An example of an interstate Transmission Pipeline is the interstate pipeline owned by Tennessee Gas Pipeline Company, and an example of an intrastate Transmission Pipeline is the intrastate pipeline owned and operated by Regency Energy Partners NEPA Gas Gathering, L.L.C., commonly referred to as the Wyoming Pipeline.

1.49    "Williams Partners" means Williams Partners, L.P.  (formerly known as Access Midstream Partners, L.P.), and its parents, current and former subsidiaries and affiliates, predecessors in interest, successors in interest, and current or former officers.

2.    <u>Best Efforts to Garner Settlement's Approval</u>.  The Parties and Class Counsel agree to recommend that the Court approve the Settlement Agreement and further agree to undertake their best efforts, including all steps and efforts contemplated by this Settlement Agreement and any other reasonable steps and efforts that may be necessary or appropriate to implement the terms of this Settlement Agreement and to garner Final Approval.  The Parties agree that they will not take any steps to suggest or recommend that members of the Settlement Class should opt out of or elect to be excluded from this Settlement Agreement.

3.    <u>Motion for Preliminary Approval</u>.  Chesapeake, the Debtors in the Chapter 11 Plan, shall submit to the Court a motion for preliminary approval of the Settlement Agreement, which shall include a request for entry of the Preliminary Approval Order in the form attached hereto as Exhibit C.  It is expressly understood that by entering into this Settlement Agreement, Chesapeake does so for settlement purposes only.   Chesapeake expressly reserves the right to oppose certification of a litigation class or filing of a class proof of claim in the event the Court denies the Motion for Preliminary Approval.  The motion for preliminary approval also shall include the proposed Settlement Notice in the form attached hereto as Exhibit D.

4.    <u>Class Notice</u>.  Within fifteen (15) days after the Court's entry of the Preliminary Approval Order or a date otherwise established by the Court, the Settlement Administrator shall provide the Settlement Notice to the Settlement Class in the manner approved by the Court, which Settlement Notice shall include mailing the Settlement Notice by first-class mail, postage pre-paid, to individuals and entities who are in the Settlement Class and for whom Chesapeake has addresses available from its business records.  The Parties reserve the right to extend or otherwise amend this timeframe as set forth in this Settlement Agreement.  To the extent that any Settlement Notices are returned because an individual or entity who is in the Settlement Class does not reside at the address provided, the Settlement Administrator shall take reasonable steps to obtain a valid address and re-mail the Settlement Notice.  Chesapeake shall send a timely and proper notice(s) of this Settlement to all appropriate federal and state officials as required by the Class Action Fairness Act of 2005 ("CAFA"), including under 28 U.S.C. §1715, if necessary.

5.    <u>Settlement Funds and Settlement Administrative Costs</u>.

5.1    <u>Settlement Funds</u>.  The Settlement Funds shall be distributed pursuant to the Final Approval Order.

5.2     Provision of Information.  Chesapeake shall provide such records and information, including electronic data, in its possession, custody, or control, as may be reasonably necessary for the Settlement Administrator to prepare a list of the members of the Settlement Class, mail the Settlement Notice to the members of the Settlement Class, and otherwise properly administer the Settlement.

5.3.    Settlement Administrative Costs.   In addition to the Settlement Funds, Chesapeake shall be obligated to pay all Settlement Administrative Costs.  This provision shall survive any termination of this Settlement Agreement and is binding and effective even in the absence of a Settlement Effective Date.

5.4     No Further Payment Obligations.   Upon the Court's approval of the Settlement Agreement and the distribution of funds pursuant to the Chapter 11 Plan, Chesapeake shall have no further settlement payment obligations to the Settlement Class Members, Class Counsel, or any other person whatsoever under this Settlement Agreement.

5.5     No Obligations for Fees.  Chesapeake shall have no obligation whatsoever to pay any Attorneys' Fees and Litigation Expenses of Plaintiffs, Class Counsel, or Settlement Class Members, or any Incentive Award Payments to Plaintiffs.  Plaintiffs shall look exclusively to the Settlement Funds to recover any Attorneys' Fees, Litigation Expenses or Incentive Award Payments or, subject to the Court's approval, from the economic benefits realized by the Future Royalty Calculations described in paragraph 6.

6.      Future Royalty Calculations.   In exchange for the consideration set forth in this Agreement, including but not limited to the Release, the Settlement Class Members shall be provided the opportunity to make an election concerning how Chesapeake (and its affiliates, successors, and assigns) will calculate and pay Gas Royalties to the Settlement Class Members and their successors and assigns after the Settlement Effective Date occurs, pursuant to the Settlement Class Members' Pennsylvania Leases in which Chesapeake currently owns an interest. This paragraph applies to Pennsylvania Leases in which Chesapeake currently owns an interest and applies to Chesapeake (and its affiliates, successors, and assigns) as well as the Settlement Class Members and their successors and assigns.  The prices set forth in paragraphs 6.1 and 6.2 of this Agreement do not apply to Pennsylvania Leases in which Chesapeake does not own any interest as of the date of this Agreement.  Therefore, the Parties agree that the Final Judgment shall specify that the following provisions apply to the Settlement Class Members' Pennsylvania Leases in which Chesapeake owns an interest as of the date of this Agreement.

6.1. In-basin Index Price Without Post-Production Deductions.  The In-Basin Price Without Post-Production Deductions refers to the calculation of Gas Royalties based on the In-Basin Price without deduction of any Post-Production Costs and without deduction of any other items, costs, or fees. When calculating and remitting royalty payments to Pennsylvania Lessors under this scenario, Chesapeake may, if it is permitted by Pennsylvania law to do so, deduct any applicable and properly-calculated state severance taxes from the royalty payments and remit such deducted taxes to the appropriate governmental authority.

6.2     Netback Price .  The Netback Price refers to the calculation of Gas Royalties based on the weighted average sales price a Chesapeake entity received for its production month

- 11 -

sales to third parties minus a proportionate share (net revenue interest share) of the Post-Production Costs that Chesapeake incurred and any applicable and properly-calculated state severance taxes. It is agreed, however, that Gas Royalties calculated under this scenario for any given month and any given well shall never be in an amount that is less than zero.  For clarity, the Netback Price as described in this paragraph is how Gas Royalties have been calculated and paid by Chesapeake in Pennsylvania pursuant to Pennsylvania Leases prior to the date of this Agreement.

6.3     Notice and Election of Options.  No later than sixty days after the Settlement Effective Date of this Agreement, the Settlement Administrator shall provide written notice ("Election Notice") to each of the Settlement Class Members advising them of their right to elect either (1) the In-basin Index Price Without Post-Production Deductions; or (2) the Netback Price, each as defined in paragraphs 6.1 and 6.2, above.  The Election Notice shall provide the Settlement Class Members with an election period ("Election Period") of at least ninety (90) days from the date of the Election Notice within which to send their written election ("Election"), if any, to the Settlement Administrator.  To the extent no Election by a Settlement Class Member is received by the Settlement Administrator within five (5) business days after the expiration of the Election Period, such Settlement Class Member will be deemed to have elected Option (2) (*i.e.*, the Netback Price). The Settlement Administrator shall, as soon as possible, and no later than ten (10) business days after the expiration of the Election Period, provide Chesapeake with a copy of all Elections received by the Settlement Administrator and a spreadsheet (in Microsoft Excel or such other format as may be specified by Chesapeake's Counsel) listing each Settlement Class Member and identifying the election made by the Settlement Class Member.  The Elections made pursuant to this Agreement shall be final, and are not subject to change by the Settlement Class Member after the expiration of the Election Period.

6.4     The Elections chosen by the Settlement Class Members will be effective and utilized by Chesapeake in calculating Gas Royalties beginning with royalties for the first production month immediately following the month in which the Election Period expired.

6.5     The Election chosen by each Settlement Class Member will be deemed to be an amendment of their Pennsylvania Lease, shall run with the land, and shall be binding on the Settlement Class Member and Chesapeake and their respective successors and assigns. Chesapeake will file the Final Judgment incorporating the terms of this Agreement with the Clerk and Recorder of each county covered by the Pennsylvania Leases that are subject to paragraph 6, and the future royalty calculation provisions of paragraph 6 of this Agreement shall burden the Settlement Class Members' interests and Chesapeake's interests in the Pennsylvania Leases. In the event of a contemplated transfer or assignment of its interests under any Pennsylvania Lease that is subject to this paragraph 6, Chesapeake shall provide written notification to its proposed successor or assign of the applicability of this Agreement and the Election made by the Settlement Class Member(s) covered by the Lease, and shall procure the written agreement of the successor and assign to calculate and pay Gas Royalties in accordance with the Election made by the Settlement Class Member(s).

6.6     It is acknowledged that some volumes of Gas produced by Chesapeake under the Pennsylvania Leases may be used as fuel, lost, or otherwise unaccounted for by a provider of post-production operations or services ("FLU Volumes"). Regardless of a Settlement Class Member's Election, Chesapeake shall not deduct any FLU volumes  when calculating its

Gas Royalty payments but shall, instead, pay Gas Royalties on one hundred percent (100%) of the FLU Volumes, except as otherwise permitted by a Settlement Class Member's Pennsylvania Lease.

6.7     If post-production operations or services are provided by a third party, then the Post-Production Costs subject to deduction under the Netback Price shall be the Post-Production Costs actually charged by the third party to Chesapeake and/or its affiliate and paid by Chesapeake and/or its affiliate to the third party on an arm's length basis. If post-production operations or services are provided by Chesapeake and/or its affiliates, then the Post-Production Costs for such operations or services subject to deduction under the Netback Price shall include only Chesapeake's and/or its affiliate's actual and reasonable cost for such operations or services. In addition, in taking deductions pursuant to the Netback Price, Chesapeake shall not deduct or reflect as deductions, directly or indirectly, except as expressly allowed by a lease: (a) any marketing fees, (b) any costs for production facilities, or (c) any costs for field separators, flow lines, or the facilities or operations located between the wellhead and the point at which Gas enters a gathering system; nor shall any such deductions be taken pursuant to the Netback Price.

6.8     The Final Judgment shall modify only how Chesapeake (and its affiliates, successors and assigns) calculates and pays Royalties on Chesapeake's share of Gas production and how Chesapeake (and its affiliates, successors and assigns) pays Gas Royalties on behalf of any other person or entity holding a lessee/working interest under a Pennsylvania Lease.  The Final Judgment shall not modify how any other entity calculates and/or pays Royalties pursuant to the Pennsylvania Leases.

6.9     Except as specified herein and in the Final Judgment, paragraph 6 of this Settlement Agreement shall not affect any other provisions of a Pennsylvania Lease.  The Parties expressly agree that paragraph 6 of this Settlement Agreement applies notwithstanding any current or future law, statute, judicial decision, or rule regulating the payment of Royalties in Pennsylvania.

7.     <u>Walk-Away Rights.</u> In the event that there are Excluded Members who, when combined, would be allocated twenty percent (20%) or more of the Settlement Fund, Chesapeake shall have the right, in its sole and absolute discretion, within twenty (20) calendar days after the opt-out deadline set by the Court, to notify Class Counsel in writing that Chesapeake has elected to dissolve this Settlement Agreement and withdraw from the Settlement.  In the event Chesapeake provides such notification and thereby exercises its walk-away rights hereunder, the Parties shall have no further obligations under this Settlement Agreement whatsoever.

7.1 In the event Chesapeake exercises its walk-away rights in Section 7, Chesapeake shall continue to be responsible for the payment of any settlement administration costs incurred. Additionally, in the event that the settlement in the action brought by the Commonwealth of Pennsylvania in Commonwealth of Pennsylvania v. Chesapeake Energy Corporation, et al., originally brought as Case No. 2015IR0069 (Ct. of Common Pleas, Bradford Cty., Pa.) ("PA AG Action") is not filed on or around this Settlement is filed or the settlement in the class action styled Demchak Partners Limited Partnership, et al. v. Chesapeake Appalachia, L.L.C., originally brought as Case No. 3:13-cv-2289 on the docket of the United States District Court for the Middle District of Pennsylvania ("MEC Action") is not submitted contemporaneously with this Settlement

Agreement for approval, Class Counsel shall have the right, in their sole and absolute discretion, within three (3) calendar days after the submission of this Settlement Agreement to the Court, to notify Chesapeake's counsel in writing that Class Counsel and Plaintiffs have elected to dissolve this Settlement Agreement and withdraw from the Settlement.  In the event Class Counsel provides such notification and thereby exercise Plaintiffs' walk-away rights hereunder, the Parties shall have no further obligations under this Settlement Agreement whatsoever.

8.      <u>Order, Final Judgment, and Dismissal</u>.  If the Court provides final approval of this Settlement Agreement, then the Parties jointly and promptly shall seek entry of the Final Judgment in the form attached hereto as Exhibit A.  The Parties intend that the language in the Final Judgment shall conform to the language in this Settlement Agreement, and the Parties will modify Exhibit A if necessary to ensure such conformity.

9.      <u>Conditions Precedent to Agreement's Effect</u>.  This Settlement Agreement shall become final, binding and effective upon the Settlement Effective Date, and not before then.

10.     <u>Modifications</u>.  Any modification to this Settlement Agreement or its exhibits, whether modified by the Parties or any court, must be approved in writing signed by the Parties or their authorized representatives to be binding.

11.     <u>Release</u>.

11.1.1  As of the Settlement Effective Date and at all times thereafter, each Plaintiff and Settlement Class Member hereby releases the Settled Claims and any and all claims that Chesapeake is obligated to pay them royalties under their Pennsylvania Leases in any manner other than the Election under Paragraph 6 of this Agreement (including, but not limited to, the Settled Claims).  Plaintiffs and the Settlement Class Members hereby further agree that they fully and forever release and discharge all working interest owners on whose behalf Chesapeake has paid or will pay Royalties pursuant to Pennsylvania Leases from any and all of the Settled Claims, but do so only to the limited extent of Chesapeake's payments of Gas Royalties on behalf of such working interest owners.  Further, each of the Plaintiffs and the Settlement Class Members agree that any claims (as defined by section 101(5) of the Bankruptcy Code) against Chesapeake held by such Plaintiffs or Settlement Class Members shall be deemed satisfied and released and any Settled Claims filed in the Bankruptcy Cases shall be discharged and expunged from the claims registrar without any further order of the Bankruptcy Court.

11.1.2   The Parties acknowledge and agree that the relief afforded under this Settlement Agreement fully and completely compromises the Settlement Class Members' claims for relief in *Brown* and in *Suessenbach*.

11.1.3  This Release also covers, without limitation, any and all claims for Attorneys' Fees, Litigation Expenses, Incentive Award Payments, catalyst fees, costs, or disbursements incurred by Class Counsel or any other counsel representing Plaintiffs or Settlement Class Members or by Plaintiffs or the Settlement Class Members, or any of them, in connection with or related in any manner to *Brown* and *Suessenbach*, the settlement of *Brown* and *Suessenbach*, the administration of this Settlement, the implementation of this Settlement, and/or the Settled Claims except to the extent otherwise specified in the Settlement Agreement.

11.2    No Release of Non-Parties.  Nothing herein shall operate or be construed to release any claims the Parties and Settlement Class Members may have against any person or entity who is not a Party hereto except as provided for in sub-paragraph 11.1.1, above.  Moreover, to the extent a Pennsylvania Lease provides an audit or accounting right, this Agreement does not preclude the exercise of such audit or accounting right regarding Royalty payments made after the Settlement Effective Date pursuant to the lessor's election for future royalty calculations under paragraph 6 of this Settlement Agreement.

12.    Authority and Capacity to Execute.  Each person signing this Settlement Agreement on behalf of a Party represents that such signatory has the full and complete power, authority and capacity to execute and deliver this Settlement Agreement and any documents to be executed pursuant hereto, that all formalities necessary to authorize execution of this Settlement Agreement so as to bind the principal, limited liability company, trust, partnership or corporation have been undertaken, and that upon the occurrence of the Settlement Effective Date, this Settlement Agreement will constitute the valid and legally binding obligation of each such Party hereto, enforceable by and against that Party in accordance with its terms.

13.    Successors and Assigns.  This Settlement Agreement is binding upon and will inure to the benefit of each of the Parties hereto and their respective agents, officers, directors, shareholders, employees, consultants, heirs, devisees, legal representatives, attorneys, successors and assigns.

14.    Construction.  The language of all parts of this Settlement Agreement and its exhibits will in all cases be construed as a whole, according to its fair meaning, and not strictly for or against any Party.  All Parties have participated in the preparation of this Settlement Agreement and its exhibits and no presumptions or rules of interpretation based upon the identity of the Party preparing or drafting this Settlement Agreement or its exhibits, or any part thereof, shall be applied or invoked.

15.    Disputed Claims.  It is understood that this Settlement Agreement constitutes a compromise of highly disputed claims, and that neither (a) the consideration provided for herein, (b) the entry into the Settlement Agreement or stipulation to the Final Judgment, nor (c) any recital contained herein, will be construed, interpreted, or admissible as an admission of liability by or on behalf of any Party hereto, all such liability being expressly denied, regardless of whether this Settlement Agreement becomes Final.  In the event that the Settlement Agreement does not become Final, then this Settlement Agreement shall be of no force or effect, and the Settlement Agreement and any and all negotiations, documents, and discussions associated with it shall be without prejudice to the rights of any Party, shall not be deemed or construed to be an admission or evidence of any liability or wrongdoing by Chesapeake or of the truth of any of the claims or allegations contained in the complaint or any other pleading, and evidence thereof shall not be discoverable or used directly or indirectly, in any way, whether in *Brown*, *Suessenbach*, or in any other action or proceeding.  The Parties expressly reserve all of their respective rights, claims and defenses if this Settlement Agreement does not become Final.

The Parties agree that the Settlement Class will be certified for settlement purposes only, that this Settlement shall not be construed to represent either an assertion or concession that such a class would be manageable or appropriately certified for litigation, arbitration, trial, or a class proof of claim in the Chapter 11 Cases, and in the event this Settlement Agreement is not given

- 15 -

final approval or this Settlement is not finalized for any reason whatsoever, the Parties acknowledge and agree that Chesapeake remains free to challenge whether this proposed class or any other proposed classes are properly certifiable in this litigation, in the Chapter 11 Cases, or anywhere else, and Plaintiff shall not argue that anything in this Settlement Agreement limits Chesapeake's right to do so.

The Parties further agree that by entering into this Settlement Agreement and seeking Preliminary Approval and/or Final Approval, no Party waives or in any way diminishes its right to demand that any disputes arising from the Pennsylvania Leases be decided in individual, binding arbitration pursuant to the arbitration clause, if any, in any given lease or by litigation.  Moreover, neither the fact of this Settlement Agreement nor the fact that the Parties are seeking court approval of this Settlement should be construed that the Parties or the Pennsylvania Leases have agreed to or contemplated that disputes as to royalty payments may be resolved on a class-wide basis in arbitration or otherwise.

16.    <u>Survival of Covenants and Representations</u>.  All covenants and representations contained in this Settlement Agreement are contractual in nature, are not mere recitals, and will survive the execution of this Settlement Agreement.

17.    <u>Miscellaneous</u>.

17.1    <u>Governing Law</u>.  This Settlement Agreement is and will be governed by the laws of the Commonwealth of Pennsylvania.

17.2    <u>Severability</u>.  In the event that a court of competent jurisdiction enters a final judgment or decision holding invalid any nonmaterial provision of this Settlement Agreement, the remainder of this Settlement Agreement will be fully enforceable.  If a court of competent jurisdiction holds invalid or materially modifies any material provision of this Settlement Agreement, including but not limited to the provisions set forth in paragraph 6, either Party shall be entitled to dissolve this Settlement Agreement and withdraw from the Settlement.

17.3    <u>Counterparts</u>.  This Settlement Agreement may be executed by facsimile or electronic signatures and in counterparts, all of which will have full force and effect between the Parties, subject to all conditions precedent and subsequent set forth herein.

17.4    <u>Integration</u>.  This Settlement Agreement and its exhibits constitute the entire agreement of the Parties and a complete merger of all prior negotiations and agreements.

17.5    <u>Headings</u>.  The headings of the paragraphs and subparagraphs herein are intended solely for convenience or reference and will not control or influence the meaning or interpretation of any of the provisions of this Settlement Agreement.

17.6    <u>Gender and Number</u>.  Whenever applicable, the pronouns designating the feminine, masculine and neuter will equally apply to the feminine, masculine and neuter genders; the singular will include the plural and the plural will include the singular.

17.7    <u>Fees and Costs</u>.  Chesapeake shall bear its own costs, expenses, and attorneys' fees incurred in connection with *Brown*, *Suessenbach*, this Settlement, and performance

of the obligations imposed hereunder.  Chesapeake shall have no obligation to pay the Attorneys' Fees, Litigation Expenses or Incentive Award Payments of Plaintiffs, any Settlement Class Member, Class Counsel, or any other counsel or representative.

17.7.1  Class Counsel may request Court approval for the payment from the Settlement Funds of Incentive Award Payments to Plaintiffs.

17.7.2  Class Counsel will request Court approval for an award of Litigation Expenses and Attorneys' Fees to be paid from the Settlement Funds.

17.8  Extensions of Time.  The Parties reserve the right, subject to the Court's approval, to mutually agree to any reasonable extension of time that might be necessary to carry out any of the provisions of this Settlement Agreement.

17.9  Notice.  All notices called for by this Settlement Agreement shall be sent to Class Counsel on behalf of Plaintiffs and all Settlement Class Members; and to Chesapeake's Counsel on behalf of Chesapeake.  Such notice shall become effective when placed in the United States mail, prepaid first-class postage affixed, addressed to the addresses listed in paragraph 1 above.  It is the responsibility of each Party to notify all other Parties of any change in any of these addresses.  The Party giving notice shall make reasonable efforts also to provide copies of any notices by electronic mail or telephonic facsimile at the same time notice is placed in the mail.

17.9.1  Class Counsel, or any person acting on behalf of Class Counsel, shall not publish any form of written notice except as provided for herein without prior written approval of the content of such notice by Chesapeake, other than any information provided to any Court in furtherance of this Settlement Agreement.

17.9.2  It shall be the responsibility of Class Counsel, or its designees, to respond to all inquiries from members of the Settlement Class.

17.9.3  Plaintiffs agree that they shall not elect or seek to opt out of or exclude themselves from the Settlement Class.

17.9.4  Plaintiffs, Class Counsel, and Chesapeake hereby agree not to initiate, nor respond to, any communications with the media or press, on the Internet, or in any public forum, orally or in writing, that relate to this Settlement, *Brown*, or *Suessenbach* that could be viewed to cast Plaintiffs, Class Counsel, or Chesapeake in an unfavorable light or otherwise be inconsistent with the Settlement Notice, the Settlement Agreement, and Court papers filed by the Parties in connection with the Settlement Agreement.

AGREED TO AND DATED AS OF THE _____ DAY OF MARCH, 2021.

| | |
|---|---|
| **APPROVED BY CLASS COUNSEL AND COUNSEL FOR THE *BROWN* PLAINTIFFS:** | ***BROWN* PLAINTIFFS, FOR THEMSELVES AND ON BEHALF OF THE SETTLEMENT CLASS:** |

_____

Noah Axler
Axler Goldich, LLC
1520 Locust St., Suite 301
Philadelphia, PA 19102

_____

**FOR JAMES L. BROWN**

_____

Michael D. Donovan
Donovan Litigation Group, LLC
1885 Swedesford Road
Malvern, PA 19355

_____

**FOR ALICE R. BROWN**

_____

Robert E. McCann
MCCANN & WALL, LLC
Two Penn Center Plaza
1500 JFK Blvd., Ste. 1110
Philadelphia, PA 19102

_____

***SUESSENBACH* PLAINTIFFS, FOR THEMSELVES:**

*Class Counsel and Counsel for Brown Plaintiffs*

**APPROVED BY CLASS COUNSEL AND COUNSEL FOR THE *SUESSENBACH* PLAINTIFFS:**

_____

**SUESSENBACH FAMILY LIMITED PARTNERSHIP:**

_____

Joseph H. Meltzer
Tyler S. Graden
KESSLER TOPAZ MELTZER & CHECK, LLP
280 King of Prussia Rd.
Radnor, PA 19807

_____

**JAMES S. SUESSENBACH**

_____

Robert D. Schaub
ROSENN, JENKINS & GREENWALD, LLP
15 South Franklin St.
Wilkes-Barre, PA 18711

_____

**GINA M. SUESSENBACH**

*Class Counsel and Counsel for Suessenbach Plaintiffs*

- 18 -

AGREED TO AND DATED AS OF THE _____ DAY OF MARCH, 2021.

**APPROVED BY CLASS COUNSEL AND COUNSEL FOR THE *BROWN* PLAINTIFFS:**

*Noah Axler*
_____
Noah Axler
Axler Goldich, LLC
1520 Locust St., Suite 301
Philadelphia, PA 19102

_____
Michael D. Donovan
Donovan Litigation Group, LLC
1885 Swedesford Road
Malvern, PA 19355

_____
Robert E. McCann
McCann & Wall, LLC
Two Penn Center Plaza
1500 JFK Blvd., Ste. 1110
Philadelphia, PA 19102

*Class Counsel and Counsel for Brown Plaintiffs*

**APPROVED BY CLASS COUNSEL AND COUNSEL FOR THE *SUESSENBACH* PLAINTIFFS:**

_____
Joseph H. Meltzer
Tyler S. Graden
Kessler Topaz Meltzer & Check, LLP
280 King of Prussia Rd.
Radnor, PA 19807

_____
Robert D. Schaub
Rosenn, Jenkins & Greenwald, LLP
15 South Franklin St.
Wilkes-Barre, PA 18711

*Class Counsel and Counsel for Suessenbach Plaintiffs*

***BROWN* PLAINTIFFS, FOR THEMSELVES AND ON BEHALF OF THE SETTLEMENT CLASS:**

_____
**FOR JAMES L. BROWN**

_____
**FOR ALICE R. BROWN**

***SUESSENBACH* PLAINTIFFS, FOR THEMSELVES:**

_____
**SUESSENBACH FAMILY LIMITED PARTNERSHIP:**

_____
**JAMES S. SUESSENBACH**

_____
**GINA M. SUESSENBACH**

- 18 -

AGREED TO AND DATED AS OF THE _____ DAY OF MARCH, 2021.

**APPROVED BY CLASS COUNSEL AND COUNSEL FOR THE *BROWN* PLAINTIFFS:**

_____
Noah Axler
Axler Goldich, LLC
1520 Locust St., Suite 301
Philadelphia, PA 19102


_____
Michael D. Donovan
Donovan Litigation Group, LLC
1885 Swedesford Road
Malvern, PA 19355

_____
Robert E. McCann
MCCANN & WALL, LLC
Two Penn Center Plaza
1500 JFK Blvd., Ste. 1110
Philadelphia, PA 19102

*Class Counsel and Counsel for Brown Plaintiffs*

**APPROVED BY CLASS COUNSEL AND COUNSEL FOR THE *SUESSENBACH* PLAINTIFFS:**

_____
Joseph H. Meltzer
Tyler S. Graden
KESSLER TOPAZ MELTZER & CHECK, LLP
280 King of Prussia Rd.
Radnor, PA 19807

_____
Robert D. Schaub
ROSENN, JENKINS & GREENWALD, LLP
15 South Franklin St.
Wilkes-Barre, PA 18711

*Class Counsel and Counsel for Suessenbach Plaintiffs*

***BROWN* PLAINTIFFS, FOR THEMSELVES AND ON BEHALF OF THE SETTLEMENT CLASS:**

_____
FOR JAMES L. BROWN

_____
**FOR ALICE R. BROWN**

***SUESSENBACH* PLAINTIFFS, FOR THEMSELVES:**

_____
**SUESSENBACH FAMILY LIMITED PARTNERSHIP:**

_____
**JAMES S. SUESSENBACH**

_____
**GINA M. SUESSENBACH**

- 18 -

AGREED TO AND DATED AS OF THE 4 DAY OF MARCH, 2021.

**APPROVED BY CLASS COUNSEL AND COUNSEL FOR THE *BROWN* PLAINTIFFS:**

**_BROWN_ PLAINTIFFS, FOR THEMSELVES AND ON BEHALF OF THE SETTLEMENT CLASS:**

Noah Axler
Axler Goldich, LLC
1520 Locust St., Suite 301
Philadelphia, PA 19102

**FOR JAMES L. BROWN**

Michael D. Donovan
Donovan Litigation Group, LLC
1885 Swedesford Road
Malvern, PA 19355

**FOR ALICE R. BROWN**

Robert E. McCann
MCCANN & WALL, LLC
Two Penn Center Plaza
1500 JFK Blvd., Ste. 1110
Philadelphia, PA 19102

**_SUESSENBACH_ PLAINTIFFS, FOR THEMSELVES:**

*Class Counsel and Counsel for Brown Plaintiffs*

**APPROVED BY CLASS COUNSEL AND COUNSEL FOR THE *SUESSENBACH* PLAINTIFFS:**

**SUESSENBACH FAMILY LIMITED PARTNERSHIP:**

Joseph H. Meltzer
Tyler S. Graden
KESSLER TOPAZ MELTZER & CHECK, LLP
280 King of Prussia Rd.
Radnor, PA 19807

**JAMES S. SUESSENBACH**

Robert D. Schaub
ROSENN, JENKINS & GREENWALD, LLP
15 South Franklin St.
Wilkes-Barre, PA 18711

**GINA M. SUESSENBACH**

*Class Counsel and Counsel for Suessenbach Plaintiffs*

- 18 -

AGREED TO AND DATED AS OF THE _____ DAY OF MARCH, 2021.

**APPROVED BY CLASS COUNSEL AND COUNSEL FOR THE *BROWN* PLAINTIFFS:**

*BROWN* **PLAINTIFFS, FOR THEMSELVES AND ON BEHALF OF THE SETTLEMENT CLASS:**

---
Noah Axler
Axler Goldich, LLC
1520 Locust St., Suite 301
Philadelphia, PA 19102

---
**FOR JAMES L. BROWN**

---
Michael D. Donovan
Donovan Litigation Group, LLC
1885 Swedesford Road
Malvern, PA 19355

---
**FOR ALICE R. BROWN**

---
Robert E. McCann
McCann & Wall, LLC
Two Penn Center Plaza
1500 JFK Blvd., Ste. 1110
Philadelphia, PA 19102

*Class Counsel and Counsel for Brown Plaintiffs*

*SUESSENBACH* **PLAINTIFFS, FOR THEMSELVES:**

**APPROVED BY CLASS COUNSEL AND COUNSEL FOR THE *SUESSENBACH* PLAINTIFFS:**

---
**SUESSENBACH FAMILY LIMITED PARTNERSHIP:**

---
Joseph H. Meltzer
Tyler S. Graden
Kessler Topaz Meltzer & Check, LLP
280 King of Prussia Rd.
Radnor, PA 19807

---
**JAMES S. SUESSENBACH**

---
Robert D. Schaub
Rosenn, Jenkins & Greenwald, LLP
15 South Franklin St.
Wilkes-Barre, PA 18711

*Class Counsel and Counsel for Suessenbach Plaintiffs*

---
**GINA M. SUESSENBACH**

**APPROVED BY COUNSEL FOR
CHESAPEAKE:**

**CHESAPEAKE:**

Daniel T. Donovan
Ragan Naresh
Kirkland & Ellis LLP
1301 Pennsylvania Ave., N.W.
Washington DC 20004

James R. Webb
Executive Vice President – General Counsel,
Chesapeake Energy Corp.

Daniel T. Brier
Myers Brier & Kelly, LLP
425 Spruce Street, Ste. 200
Scranton, PA 18503

# EXHIBIT A

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# BANKRUPTCY COURT

| | | |
|---|---|---|
| ' | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CHESAPEAKE ENERGY CORPORATION, | ) | Case No. 20-33233 (DRJ) |
| *et al.,*[1] | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**[PROPOSED] ORDER (I) DIRECTING THE APPLICATION OF RULES 9014, 9019, AND 7023, (II) CERTIFYING THE SETTLEMENT CLASS FOR SETTLEMENT PURPOSES ONLY, (III) FINALLY APPROVING THE SETTLEMENT AGREEMENT, AND (IV) GRANTING RELATED RELIEF**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

1

Upon the motion (the "Motion") of Chesapeake Energy Corporation ("Chesapeake") and Plaintiffs for entry of an order (this "Order"): (i) directing the application of Rules 9014, 9019, and 7023 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and, by incorporation, Rule 23 of the Federal Rules of Civil Procedure (the "Federal Rules"), (ii) certifying the Settlement Class, as defined in the Settlement Agreement, for settlement purposes only, and (iii) finally approving the Settlement Agreement attached as Exhibit 4 to the Motion, and (iv) granting related relief as more fully set forth in the Motion and the Settlement Agreement, and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a preliminary order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is permissible pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having found that the Notice of Settlement and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having found that each putative member of the Settlement Class was afforded a reasonable opportunity to opt out of or object to the Settlement; and this Court having found Debtors to have complied with 28 U.S.C. § 1715; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Settlement Fairness Hearing"); and this Court having considered

each of the factors listed in Civil Rule 23; and this Court having determined that the legal and

factual bases set forth in the Motion and at the Settlement Fairness Hearing establish just cause for

the relief granted herein; and this Court having entered an order preliminarily approving the

Settlement Agreement, among other things Docket No. [] (the "Preliminary Approval Order"); and

this Court having found that the Settlement Administrator complied with the Preliminary Approval

Order; and this Court having found that the Settlement is fair, reasonable, and adequate; and this

Court having found that the Plan of Allocation and Distribution is fair and reasonable to the

Settlement Class; and upon all of the proceedings had before this Court; and after due deliberation

and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.   Pursuant to, and in accordance with, Bankruptcy Rules 7023, 9014, and 9019, and Civil

Rule 23, the Settlement Agreement is hereby approved on a final basis.

2.   The Settlement Class shall include, as the terms are defined in the Settlement Agreement:

> [A]ll individuals and entities, including their predecessors and successors-
> in-interest, who are or have been lessor parties to one or more
> Pennsylvania Leases, to the extent of their interests in such Pennsylvania
> Leases. The Settlement Class excludes (a) Chesapeake; (b) Williams
> Partners; (c) any person or entity who owns a working interest in or
> operates a gas well in Pennsylvania; (d) any person or entity who receives
> royalty in kind pursuant to a Pennsylvania Lease; (e) the McNamara and
> McDonald Lessors; (f) any person or entity who has previously released
> Chesapeake from liability concerning or encompassing any or all Settled
> Claims; (g) the federal government; (h) legally-recognized Indian Tribes;
> (i) the Commonwealth of Pennsylvania and its agencies, in their individual
> capacities only; and (j) any person who serves as a judge in these civil
> actions and his/her spouse.

3.   "Pennsylvania Leases" means each and every oil and gas lease that (a) covers a leasehold

located in Pennsylvania except for the portions of Southwestern Pennsylvania covered by the Gas

Gathering Contract Cost of Service - South Marcellus, (b) does not contain a Market Enhancement

3

Clause or Ready for Sale or Use Clause, and (c) is or has been owned, in whole or in part, by Chesapeake Appalachia, L.L.C. as a lessee, according to the business records maintained by Chesapeake. Pennsylvania Leases does not include any lease Chesapeake Appalachia, L.L.C. owned in whole or in part as a lessee, but in which Chesapeake Appalachia, L.L.C. is not a lessee as of the date the Preliminary Approval Order and for which no Gas was produced during the time that Chesapeake Appalachia, L.L.C. was a lessee.

4.   The Settlement Class is certified for settlement purposes only pursuant to Bankruptcy Rules 7023, 9014, 9019, and Civil Rule 23.

5.   Upon Defendant's transfer of the Settlement Funds the Defendant shall have no further liability for payment of any additional amount under the Settlement Agreement.

6.   The putative members of the Settlement Class listed on Exhibit [] to this Judgment elected to opt-out of the Settlement Class and are not entitled to receive any Settlement Funds.

7.   All Settlement Class Members who did not exercise the right to opt-out of the Settlement Class are bound by this Judgment and the terms of the Settlement Agreement.

8.   Each Settlement Class Member and the heirs, devisees, successors, assigns, agents and/or representatives of each Settlement Class Member, and each Defendant and Affiliate of each Defendant and their successors shall be barred from asserting any and all Released Claims against the Released Parties.

9.   Each Settlement Class Member and the heirs, devisees, successors, assigns, agents and/or representatives of each Settlement Class Member, and each Defendant and Affiliate of each Defendant and their successors shall be conclusively deemed to have released any and all Released Claims against the Released Parties.

4

10. Distribution of the Settlement Funds and election of future royalty payment methodologies shall be made in accordance with the Plan of Allocation.

11. Chesapeake shall provide notice to Settlement Class Members of their option to modify the manner in which their royalties are calculated pursuant to Paragraph 6 of the Settlement Agreement within 60 days of the Effective Date.

12. To the extent a Settlement Class Member elects to receive royalties that are calculated based upon an identified index price going forward pursuant to Paragraph 6.1 of the Settlement Agreement, such an election and this Judgment shall modify how Chesapeake calculates and pays Royalties on Chesapeake's share of production and how Chesapeake pays Royalties on behalf of any other person or entity holding a lessee/working interest under a Pennsylvania Lease, but will not modify how any other entity calculates and/or pays Royalties pursuant to the Pennsylvania Leases.  Such an election will take effect no more than 180 days after the Effective Date of the Settlement Agreement.

13. The Court has reviewed and finds to be reasonable the Plan of Administration attached as Exhibit B to the Settlement Agreement.  The Settlement Administrator shall calculate and disburse Distribution Funds in accordance with the Plan of Administration.

14. Chesapeake shall deposit the Settlement Funds with the Settlement Administrator within ten (10) business days of this Order and shall be obligated to pay all Settlement Administrative Costs.

15. The Settlement Administrator shall maintain the Settlement Funds in accordance with the requirements set forth in the Settlement Agreement, including those terms set forth in the Plan of Administration.

16. The application of Class Counsel for an award of attorneys' fees in the amount of one-third (33%) of the Settlement Funds and expenses in the amount of $_____ is hereby approved. The application of Class Counsel for Incentive Award Payments to each of the representative Plaintiffs in the amount of $_____ is hereby approved. These awards shall be paid by the Settlement Administrator from the Settlement Funds upon the Settlement Effective Date.

17. No Settlement Class Member filed an objection to the Settlement. Hence, no Settlement Class Member has standing to appeal entry of this Judgment. Nonetheless, any Settlement Class Member that wishes to appeal this Judgment or the Fees and Expenses Order must file a notice of appeal within (14) days of entry of this Judgment pursuant to Bankruptcy Rule 8002.

18. Neither the Preliminary Approval Order, this Judgment, the Settlement Agreement, the negotiations leading to the Settlement Agreement, nor the carrying out of the Settlement Agreement may ever be used by any person or entity as proof of the viability of any claim, cause of action, or in any other proceeding.

19. This Court retains jurisdiction to construe, interpret, enforce, and implement the Settlement Agreement and this Judgment.

20. Without further approval from the Court, the parties are hereby authorized to agree and to adopt such amendments or modifications of the Settlement Agreement or any exhibits attached thereto to effectuate the Settlement that:  (i) are not materially inconsistent with this Order and Judgment; and (ii) do not materially limit the rights of Settlement Class Members in connection with the Settlement.  Without further order of the Court, the Settling Parties may agree to reasonable extensions of time to carry out any of the provisions of the Settlement Agreement.

SO ORDERED THIS ____DAY OF _____, 2021

_____

HON. DAVID R. JONES

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## BANKRUPTCY COURT

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CHESAPEAKE ENERGY | ) | Case No. 20-33233 (DRJ) |
| CORPORATION, *et al.*,[1] | ) |  |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## PLAN OF ALLOCATION AND DISTRIBUTION

1.   <u>Plan of Allocation</u>

(a)   The aggregate amount of funds available for distribution to the Settlement Class Members ("Distribution Funds") will be determined by subtracting from the Settlement Funds any award of Attorneys' Fees, Litigation Expenses, and/or Incentive Payments that the Court may grant to Plaintiffs, Class Members, or Class Counsel.

(b)   Each Settlement Class Member's allocated share of the Distribution Funds will be calculated in a two-step process.  First, each class member's percentage share of the total amount of Royalty deductions for Post-Production Costs that Chesapeake has taken from the Settlement Class under Pennsylvania Leases up to December 31, 2020.  Second, the Class Member's percentage share of the total Royalty deductions will be used as the Class Member's percentage of the Distribution Funds.

(c)   Calculation of each Settlement Class Member's allocated share of the Distribution Funds shall be based upon Chesapeake's accounting records that identify the lessors to whom royalties were paid up to the December 31, 2020.  Claims between or among Settlement Class Members as to their respective entitlements to Distribution Funds under a given Pennsylvania Lease shall be resolved by and among such Settlement Class Members.  Chesapeake shall have no obligation or responsibility to address or resolve any such disputes, and no payment obligation beyond the distribution required by paragraph 1.b of this Plan of Allocation and Distribution.

(d)   Chesapeake will be entitled to any portion of the Distribution Funds that is attributable to those lessors who have opted out of the Settlement Class.  Any other unclaimed portion of the Distribution Funds that remains after payment has been made to the Settlement Class Members shall be distributed as ordered by the Court, to the extent permissible under applicable law.

(e)   The Settlement affects only Chesapeake and/or its Affiliates and does not affect how any other entity calculates and/or pays Royalties.

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

2.     Heirship Notification Form. Some persons included in the Settlement Class definition may now be deceased ("Deceased Class Members").  In order to assist the Settlement Administrator in the allocation and distribution of funds attributable to the interests of Deceased Class Members, the Settlement Notice mailed to Settlement Class Members will be accompanied by an Heirship/Beneficiary Information Form ("Heirship Form"), which will be substantially in the form of the document attached hereto as Attachment 1.  If a Settlement Class Member believes that he or she is entitled to receive all, or some portion, of the settlement funds allocable to a Deceased Class Member under the Plan of Allocation, then the Settlement Class Member will be requested, but not required, to mail to the Settlement Administrator a completed Heirship Form containing the information and documents requested therein.

The provision of an Heirship Form will be requested as an aid to the Settlement Administrator in the distribution of the Settlement Funds, but shall not constitute a required proof of claim form, nor be a condition precedent to the allocation and distribution of settlement monies attributable to a Deceased Class Member's interests. In the absence of an Heirship Form, the Settlement Administrator may, but will not be required to, review records in Defendant's possession, including division orders, transfer orders, probate records, payment records, and like documents, and reasonably attempt to allocate and distribute Settlement Funds attributable to a Deceased Class Member's interest to the person, or persons, who received royalty payments from the Producers as a successor-in-interest to the Deceased Class Member in the ordinary course of business.  The Settlement Administrator may also allocate and distribute Settlement Funds attributable to a Deceased Class Member's interests to the estate of the Deceased Class Member, with any such payment to be sent to such mailing address as may be readily ascertainable by the Settlement Administrator.

To the extent a Settlement Class Member is an entity, such as a family limited partnership, that is no longer in existence, such a Settlement Class Member's share of the Distribution Funds shall be distributed to the successor(s) in interest to that entity based on Chesapeake's records.

3.     Distribution of Settlement Proceeds

(a)     Within sixty (60) days after the Effective Date, the Settlement Administrator shall make a determination as to the amounts owed to each Settlement Class Member and shall issue checks to each Settlement Class Member to whom a payment is owed.  Chesapeake shall provide data pertaining to Settlement Class Members' historic Royalty deductions for Post-Production Costs within thirty (30) days of the Effective Date.

(b)     The amount of money to be disbursed to each Settlement Class Member will be the Settlement Class Member's allocated share of the Settlement Funds as calculated in accordance with the Plan of Allocation, including any interest earned thereon, reduced by his or her proportionate share of Court-approved Litigation Expenses, Administrative Costs, and Attorneys' Fees, Incentive Award Payments, and any interest earned thereon.

(c)     The Settlement Administrator shall, not less than one year after the Effective Date, determine for the Court the total dollar amount of the distribution checks which were payable to Settlement Class Members but which were not negotiated by the Settlement Class Members for any reason, for example, because a Settlement Class Member could not be located or a Settlement Class Member failed or refused to negotiate his distribution check. All such unclaimed monies shall be transferred to a charitable organization agreed to by Plaintiffs, Plaintiffs-Intervenors, and Defendant.

4.     Disputed Claims.  Any dispute between persons who are, or who purport to be, Settlement Class Members concerning the distribution of a portion of the Distribution Funds shall be resolved by and among such Settlement Class Members.  Chesapeake shall have no obligation or responsibility to address or resolve any such disputes, and no payment obligation beyond the distribution required by paragraph 1.b of this Plan of Allocation

and Distribution. Such dispute shall not in any way affect, delay, or interfere with, the approval of the settlement or any distribution to any persons not involved in the dispute, including any distribution to other Settlement Class Members or Class Counsel.

5.  <u>Claims Based Upon Distributions.</u>  No Settlement Class Member shall have any claim against the Class Representatives, Class Counsel, the Settlement Administrator, or Defendant based upon distributions made substantially in accordance with the Settlement Agreement, the Plan of Allocation and Distribution, or orders of the Court, or in good faith reliance on any public records or records provided by Defendant or any other person or entity.

6.  <u>Final Report of Distribution by Settlement Administrator.</u>  Within sixty (60) days after completing full distribution of the Settlement Funds, unless otherwise ordered by the Court, the Settlement Administrator shall file with the Court a Final Report (together with a proposed order approving such report and discharging the Settlement Administrator) indicating that the Settlement Funds have been distributed in accordance with the terms of the Settlement Agreement and the Court's prior orders.

7.  <u>Settlement Administrator.</u> As used herein and in the exhibits hereto, the term "Settlement Administrator" means any person approved by Lead Class Counsel to administer the Settlement in accordance with the Settlement Agreement, Final Judgment, and this Plan of Allocation and Distribution.

8.  <u>Definitions.</u>  All terms defined in the Settlement Agreement shall have the same meaning when used in this Plan of Allocation and Distribution except as otherwise specified herein.

**ATTACHMENT 1**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## BANKRUPTCY COURT

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **CHESAPEAKE ENERGY** | ) | Case No. 20-33233 (DRJ) |
| **CORPORATION,** *et al.,*1 | | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### CLASS ACTION SETTLEMENT HEIRSHIP/BENEFICIARY INFORMATION FORM

The information in this form is solicited to assist the Settlement Administrator in the allocation and distribution of monies attributable to the interests of persons included in the Settlement Class definition who are now deceased ("Deceased Class Members"). If you are an heir or beneficiary of a Deceased Class Member and thereby believe you are entitled to receive all, or some portion, of the Distribution Funds allocable to a Deceased Class Member under the Settlement Agreement's Plan of Allocation and Distribution, then you are requested to provide the information set forth below. Please sign, notarize and mail the completed form in a postage-prepaid envelope, to the Settlement Administrator listed below, postmarked no later than _____, **2021**.

**You should send your completed form to:**

**Administrator Address**

If you have any questions about this form, please write the Settlement Administrator at the address above, email the Settlement Administrator at email address, or call the Settlement Administrator at N-NNN-NNN-NNNN. Additional blank forms are available for download at settlement website.                              -

---

1 A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

The Heirship Form is requested as an aid to the Settlement Administrator in the distribution of the Distribution Funds, but shall not constitute a required proof of claim form.  In the absence of an Heirship Form, the Settlement Administrator may, but is not required to review records in Chesapeake's possession, including division orders, transfer orders, probate records, payment records, and like documents, in an attempt to reasonably allocate and distribute Distribution Funds attributable to a Deceased Class Member's interests, to the person, or persons, who received Royalty payments from Chesapeake as a successor-in-interest to the Deceased Class Member in the ordinary course of business.  The Settlement Administrator may also allocate and distribute Distribution Funds attributable to a Deceased Class Member's interests to the estate of the Deceased Class Member, with any such payment to be made payable to the estate of the Deceased Class Member and sent to such mailing address for the estate as may be readily ascertainable by the Settlement Administrator.

**Requested Information**

A.  Provide the following information about the person submitting this form:

1.  Current Name:_____

2.  Any different name under which you may have received gas royalty payments from Chesapeake:

    _____

3.  Current Address
    Address 1:

    _____

    Address 2:

    _____

City:          State:  Zip:  _____

4.  Current Telephone Number   (_____)_____-____

B.  Provide the following information about the Deceased Class Member to whom this Heirship Form pertains:

1. Name:_____

2. The approximate date of the Deceased Class Member's death:__/_____/ _____

3. Identify each oil and gas lease number under which the Deceased Class Member received royalty payments on gas produced by Chesapeake (if you know).

Lease:_____Lease: _____ Lease:_____Lease:_____Lease:_____ ___

C.  List the name and address of each person and/or entity who is an heir or beneficiary of the Deceased Class Member and succeeded to the Deceased Class Member's mineral or royalty interests and specify the fractional share (e.g., 1/2, 1/3, etc.) of the Deceased Class Member's interests to which each such person or entity succeeded:

Name: _____ Percentage:  _____
Name: _____ Percentage:  _____
Name: _____ Percentage:  _____
Name: _____ Percentage:  _____

D.    Attach copies of documentation, such as probate documents, transfer orders, division orders, and like documents, which evidence that the undersigned and the persons identified in paragraph C, above, succeeded to the Deceased Class Member's interests.

Your signature on this Heirship Form constitutes a representation that the information contained in this form and the documents provided with the form, are true and correct, to the best of your knowledge, information, or belief.

_____        _____

State of _____                County of _____

On _____, _____, before me, a Notary Public in and for said County, personally appeared_____ , who acknowledged that he/she/they did sign the foregoing document and that it is their act and deed.

My commission expires \_\_\_\_

Signature / Notary Public \_\_\_ Name / Notary Public _____

7

# EXHIBIT C

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## BANKRUPTCY COURT

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | ) Case No. 20-33233 (DRJ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## [PROPOSED] ORDER (I) DIRECTING THE APPLICATION OF RULES 9014, 9019, AND 7023, (II) GRANTING PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT, (III) PRELIMINARILY CERTIFYING A CLASS FOR SETTLEMENT PURPOSES, (IV) APPROVING FORM AND MANNER OF CLASS NOTICE, AND (V) <u>SETTING  DATE FOR FINAL APPROVAL HEARING ON FINAL APPROVAL OF SETTLEMENT</u>

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

Upon the motion (the "Motion") of Chesapeake Energy Corporation ("Chesapeake") for entry of an order (this "Order"): (i) directing the application of Rules 9014, 9019, and 7023 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and, by incorporation, Rule 23 of the Federal Rules of Civil Procedure (the "Federal Rules"),  (ii) granting preliminary approval of the class action settlement attached as Exhibit 4 to the Motion (the "Settlement Agreement"); (iii) preliminarily certifying a class for settlement purposes, (iv) approving the form and manner of Class Notice to members of the Settlement Agreement, and (v) setting date for final approval hearing on final approval of the settlement, and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a preliminary order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is permissible pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.  The  Motion is granted to the extent set forth herein.

2.   The Settlement Agreement attached as Exhibit 4 to the Motion is hereby preliminarily approved.  The Court preliminarily finds that the Settlement Agreement complies with Federal Rule of Civil Procedure 23 and the Class Action Fairness Act of 2005 ("CAFA") (28 U.S.C. §1715).

3.   The Plan of Allocation attached as Exhibit B to the Settlement Agreement is hereby preliminarily approved.

4.   The form of the notice to be sent to the Class Members (the "Class Notice") attached to the Settlement Agreement as Exhibit D and the service of the Class Notice by the Epiq Corporate Restructuring LLC (the "Settlement Administrator") to each class Member, at the last known address of each Class Member according to the Debtors' books and records (or as updated by Class Counsel's searches for current addresses or as may otherwise be determined by the Parties) comports with all applicable law and is hereby approved.

5.   The Class Notice shall be mailed by first-class mail, postage prepaid, by the Notice Administrator within 15 business days following the entry of this Order.

6.   The parties shall file motions and memoranda in support of final approval of the Settlement Agreement and Class Counsel shall file their request for attorneys' fees and expense reimbursements on or before _____.

7.   Any member of the Class who wishes to object to or comment on the proposed settlement, or to object to Class Counsel's request for attorney's fees and expense reimbursements, must postmark and mail such objections or comments on or before _____. In accordance with the procedures set forth in the Settlement Notice, any such objections or comments must be mailed to Class Counsel, Chesapeake's counsel, and the Court.

8.   Any member of the Class who wishes to exclude himself or herself from the Class Settlement must postmark and mail the exclusion request to Class Counsel and Chesapeake's counsel no later than _____.

9.   Any class member who wishes to appear and be heard at the final approval hearing must postmark and mail notice of such intention on or before _____.  Notice of such intention must be mailed to Class Counsel, Chesapeake's counsel, and the Court.

10. On or before _____, Class Counsel and Chesapeake may file a response to any Class Member's objections or comments.

11.  The Court shall conduct the Fairness Hearing on [_____], 2021 at [___]   .m. to consider final approval of the Settlement Agreement and Class Counsel's request for attorneys' fees and expense reimbursements.  The Court may adjourn the Fairness Hearing without further notice of any kind.

12. This Court retains jurisdiction to construe, interpret, enforce, and implement the Settlement Agreement and this Order.

SO ORDERED this ____ day of _____, 2021.


_____
HON. DAVID R. JONES

# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**BANKRUPTCY COURT**

There are Proposed Settlements of lawsuits brought on behalf of the Commonwealth of Pennsylvania ("PA AG Action") and Pennsylvania Royalty Owners against Chesapeake Appalachia, L.L.C., Chesapeake Energy Corporation and other defendants.

If you have received royalty payments from Chesapeake or you have an existing unexpired lease with Chesapeake, you may be able to obtain benefits through these Settlements.

***This is a court-authorized Notice.  This is NOT a solicitation from a lawyer.***

Chesapeake Energy and its affiliates have reached settlements with the Pennsylvania Attorney General's Office and in class actions brought on behalf of oil and gas lessors in Pennsylvania.  Each of the lawsuits asserts claims that Chesapeake or its affiliates failed to pay gas royalties consistent with the oil and gas leases and related claims.  Chesapeake denies these claims, but settled the lawsuits in order to resolve the claims and to establish a new relationship with its Pennsylvania royalty owners.

| 1.  Why did I receive this Notice? |
| --- |

Records show that you (or someone in your family) have received and/or currently receive royalty payments from Chesapeake from a natural gas well(s) in Pennsylvania, or that you have an unexpired lease with Chesapeake that is not currently producing hydrocarbons.

This Court sent you this notice to inform you of three settlement agreements in the following cases:

- The PA AG Action.  This refers to the action brought by the Commonwealth of Pennsylvania in *Commonwealth of Pennsylvania v. Chesapeake Energy Corporation*, et al., originally brought as Case No. 2015IR0069 (Ct. of Common Pleas, Bradford Cty., Pa.).

- The MEC Action.  This refers to the class action styled *Demchak Partners Limited Partnership, et al. v. Chesapeake Appalachia, L.L.C.*, originally brought as Case No. 3:13-cv-2289 on the docket of the United States District Court for the Middle District of Pennsylvania.

- The Non-MEC Action.  This refers to the class actions styled *Brown v. Access Midstream Partners, L.P., et al.*, Case No. 3:14-cv-00591-MEM, and *The Suessenbach Family Limited Partnership v. Access Midstream Partners, L.P.*, Case No. 3:14-cv-01197-MEM, both originally on the docket of the United States District Court for the Middle District of Pennsylvania.

This notice refers to the PA AG Action, the MEC Action, and the Non-MEC Action together as the "Lawsuits," and it refers to the MEC and Non-MEC Action together as the "Settlement Class Actions."

The Lawsuits were initially filed in Pennsylvania, but because of Chesapeake's Bankruptcy Filing the settlements are being reviewed by the United States District Court for the Southern District of Texas, Bankruptcy Court.  Judge David R. Jones of the United States District Court for the Southern District of Texas Bankruptcy Court is overseeing these settlements.

## 2.  What are these Lawsuits about?

The Lawsuits claim that Chesapeake underpaid royalties relating to gas produced from wells located in Pennsylvania pursuant to certain provisions of oil and gas leases.  All of the Lawsuits allege that Chesapeake inappropriately deducted certain costs from royalty payments due under oil and gas leases.  Chesapeake denies all allegations but has agreed to settle them based on the time and expense of continuing litigation and in the interest of furthering its relationship with its Pennsylvania lessors.

## 3.  How do I know if I am part of the Settlement?

### PA AG Action Settlement

You are part of the PA AG Action Settlement if you have or have had an oil and gas lease with Chesapeake in Pennsylvania.

### MEC Action Settlement

You are a part of the settlement in the MEC Action if you are or have been a lessor to one or more Pennsylvania Lease(s) that (a) covers a leasehold located in Pennsylvania except for the portions of Southwestern Pennsylvania covered by the Gas Gathering Contract Cost of Service - South Marcellus, (b) contains a Market Enhancement Clause or Ready for Sale or Use Clause, and (c) is or has been owned, in whole or in part, by Chesapeake Appalachia, L.L.C. as a lessee, according to the business records maintained by Chesapeake.

A Market Enhancement Clause ("MEC") is a provision in an oil and gas lease that precludes the lessee (such as Chesapeake) from deducting Post-Production Costs incurred to transform leasehold gas into marketable form, but permits the lessee to deduct a pro-rata share of Post-Production Costs incurred after the gas is marketable if they enhance the value of the marketable gas.

A "Ready for Sale or Use Clause" ("RFSU") is a provision in an oil and gas lease that precludes the lessee from deducting Post-Production Costs to make such gas ready for sale or use but permits the lessee to deduct a pro-rata share of Post-Production Costs incurred after the gas is ready for sale or use.

Excluded from the MEC Settlement Class are: (a) Chesapeake; (b) any person or entity who owns a working interest in or operates a gas well in Pennsylvania; (c) any person or entity who receives royalty in kind pursuant to a Pennsylvania Lease; (d) any person or entity who has previously released Chesapeake from liability concerning or encompassing any or all Settled Claims; (e)

the federal government; (f) legally recognized Indian Tribes; and (g) any person who serves as a judge in these Lawsuits and his/her spouse.

## Non-MEC Action Settlement

You are a part of the settlement in the Non-MEC Action if you are or have been a lessor to one or more Pennsylvania Lease(s) that (a) covers a leasehold located in Pennsylvania except for the portions of Southwestern Pennsylvania covered by the Gas Gathering Contract Cost of Service - South Marcellus, (b) does not contain a Market Enhancement Clause or Ready for Sale or Use Clause, and (c) is or has been owned, in whole or in part, by Chesapeake Appalachia, L.L.C. as a lessee, according to the business records maintained by Chesapeake.

The following individuals, groups, and entities are excluded from the Non-MEC Settlement Class: (a) Defendants; (b) any person or entity who owns a working interest in or operates a gas well in Pennsylvania; (c) any person or entity who receives royalty in kind pursuant to a Pennsylvania Lease; (d) any person or entity who has previously released Chesapeake from liability concerning or encompassing any or all claims that are the subject of the Lawsuit; (e) the federal government; (f) legally-recognized Indian Tribes; (g) the Commonwealth of Pennsylvania and its agencies, in their individual capacities only; and (h) any person who serves as a judge in these Lawsuits and his/her spouse.

## Deceased Class Members

Some persons who are part of the MEC and/or Non-MEC settlements may be deceased ("Deceased Class Members"). To assist the Settlement Administrator in allocating and distributing monies attributable to the interests of Deceased Settlement Class Members, this Notice is accompanied by an Heirship/Beneficiary Information Form ("Heirship Form"). If you believe that you are entitled to all or some portion of the Settlement funds allocable to a Deceased Settlement Class Member, then please mail to the Settlement Administrator a completed Heirship Form.

Some corporations, partnerships, or other entities included in the Class definition may now be dissolved. If you have succeeded to the interest of such a dissolved corporation, partnership, or other entity, you should immediately contact the Settlement Administrator, whose contact information is attached to this Notice.

**If you are a Settlement Class Member and the Judge approves the Proposed Settlement, you will be bound by all orders and judgments of the Court and by the Court's final resolution of the Settlement Class claims in the Lawsuits. See Question 10 for information about your right to comment on or object to the Proposed Settlement.**

| 4. What do the Settlements provide? |
| --- |

Chesapeake has historically calculated its royalty payments to Pennsylvania landowners based on the "Netback Method." Under the Netback Method, Chesapeake pays royalties based on the weighted average sales price Chesapeake receives for its production month sales to third parties minus a proportionate share of all the post-production costs Chesapeake incurs, including costs for gathering, compression and transportation.

QUESTIONS? CALL **1-800-____-_____**

The PA AG Action Settlement and the Class Action Settlements provide Pennsylvania lessors the right to make an election as to how their royalties will be calculated by Chesapeake in the future.  This election does not apply to leases no longer owned by Chesapeake, nor does it apply to the interests owned by any other working interest owner in the lease.

Under the PA AG Action Settlement:

> If you have a lease with a MEC or RFSU clause, you will have the one-time opportunity to select having your future royalties paid at (1) the **higher** of the In-Basin Index Price (50% Leidy Hub and 50% TGP Zone 4) Without Post-Production Deductions or the Netback Price with deductions, whichever price is higher for the production month; or 2) continue to be paid the Netback Price with deductions.

> If you have a lease with a Non-MEC clause, you will have the one time opportunity to select having your future royalties paid at (1) the In-Basin Price (50% Leidy Hub and 50% TGP Zone 4) Without Post-Production Deductions; or 2) continue to be paid the Netback Price with deductions.

> If you have a lease that expressly prohibits deductions, and Chesapeake discovers it has been taking deductions, Chesapeake will discontinue doing so.

Under the Class Action Settlements, if you have a lease with a MEC or RFSU clause, you will have the one-time opportunity to select having your royalties paid at (1) the *higher* of the In-Basin Index Price Without Post-Production Deductions, or the Netback Price; (2) the In-Basin Index Price Without Post-Production Deductions; or (3) the Netback Price, each as defined in the Settlement Agreement(s). To the extent no Election by a Settlement Class Member is received by the Settlement Administrator within five (5) business days after the expiration of the Election Period, such Settlement Class Member will be deemed to have elected Option (1) (i.e., the higher of the In-Basin Index Price Without Post-Production Deductions and the Netback Price).

If your lease does not have a MEC or RFSU clause, you will have the one-time opportunity to elect to select having Chesapeake pay royalties to you based solely on an In-Basin Price without deductions of any costs, or you may elect to have Chesapeake pay royalties to you based solely on the Netback Method.

You will receive a separate mailing explaining how to make your election between the options discussed above after certain specific events occur, including final approval of the Proposed Settlements.

In addition to this right to an election, all three settlements—the PA AG Action Settlement, the MEC Action Settlement, and the Non-MEC Action Settlement—include a cash payment by Chesapeake for distribution to Pennsylvania royalty owners and/or Class Members.  The <u>total</u> cash amount to be distributed among the royalty owners and/or Class Members (as applicable) is $5,300,000 for the PA AG Settlement, $5,000,000 for the MEC Settlement Class, and $1,250,000 for the Non-MEC Settlement Class. The amounts distributed to royalty owners under the PA AG Action Settlement will be distributed by the Settlement Administrator in fixed amounts based on lease type, as determined by the Pennsylvania Attorney General's Office.  The

amounts distributed to the MEC Settlement Class and Non-MEC Settlement Class will be distributed among the Class Members on a pro rata basis, net of any attorneys' fees and costs awarded by the Court to Class Counsel in the Non-MEC Action.

- You will be eligible for a portion of the payment from PA AG Action Settlement no matter what action you take in response to this notice.

- You will only be eligible for a share of the cash payment being made in the MEC Action and the Non-MEC Action if you (a) qualify as a member of those settlements (see Question 3 above) and (b) you do you not exclude yourself from those settlements (see Question 7, below).  The payments and the manner in which the funds will be distributed is set forth in greater detail in the Settlement Agreements.

### 5.   Can I participate in the PA AG Action Settlement without participating in the Class Action Settlements?

The PA AG Action Settlement and Class Action Settlements are independent settlements. You can participate in the PA AG Action Settlement without participating in the Class Action Settlements.

If you choose, however, to opt out of the Class Action Settlements (see Question 7 below), you will not be entitled to receive any of the Class Settlement funds that will be distributed to class members under the Class Action Settlements

### 6.   What do I need to do to remain the Settlement Class Member in the MEC or Non-MEC Action?

If you are a member of the settlement classes in the MEC and/or Non-MEC Actions and you want to remain a Settlement Class Member, **you do not need to take any action whatsoever.** Class Counsel in the respective actions will represent your interests as a member of the Settlement Class.

### 7.   Can I get out of the Settlement Class in the MEC or Non-MEC Action?

If you do not want to be in a Settlement Class in the MEC or Non-MEC Action and you want to keep the right to sue Chesapeake on your own, you must take steps to get out of the Settlement Class.  This is called excluding yourself from or "opting out of" the Settlement Class.

Chesapeake filed for Chapter 11 bankruptcy on June 28, 2020, and emerged from bankruptcy on February 9, 2021.  As a result, all claims (as defined in the Bankruptcy Code) against Chesapeake arising before February 9, 2021 have been discharged by the bankruptcy court.

To exclude yourself from ("opt out of") the Settlement Class in the MEC or Non-MEC Action, you must send a letter personally signed by you that includes all of the following: (1) Your name, address, and telephone number; (2) Your Chesapeake owner number (if you know it); (3) The following Civil Action Number: 20-33233; and (4) A statement that you want to be excluded from the

Settlement Class, specifying which Settlement Class (MEC Settlement Class or Non-MEC Settlement Class or both) you wish to opt out of.

Your request for exclusion letter must be mailed first class, postage pre-paid, **received on or before** _____, 2021 to the Settlement Administrator, whose contact information is attached to this Notice.

You cannot exclude yourself from only part of the Proposed Settlement or Settlement Class. Also, please remember that you cannot exclude yourself by phone or by sending an email.

## 8.   Do I have lawyers representing my interests in the case?

The Court has appointed the law firms identified in the attachment to this Notice to represent each Settlement Class.  The lawyers representing the Settlement Classes in the MEC and Non-MEC Action are called "Class Counsel."  You do not have to directly pay Class Counsel.  If you want your own lawyer, and to have that lawyer appear in court, you may hire one at your own expense. If you want your own lawyer to speak for you or to appear in Court, you or your lawyer must file a Notice of Appearance.  (See Question 10 to find out how to submit a Notice of Appearance). Class Counsel in each action will request that the Court award them reimbursement of their litigation expenses plus attorneys' fees based on a percentage (not exceeding 33.33%) of the total economic benefit realized by the class members under the settlement agreements.

## 9.   Who are the Class Representatives and how are they compensated?

The Court has appointed Plaintiffs James L. Brown, Alice R. Brown, The Suessenbach Family Limited Partnership, James S. Suessenbach, and Gina M. Suessenbach as Class Representatives for the Non-MEC Settlement Class.  The Court has appointed certain of the Plaintiffs in Demchak as Class Representatives for the MEC Settlement Class.

The Settlement Class Representatives work with Class Counsel on behalf of all Settlement Class Members to present the views of typical Settlement Class Members to Class Counsel and the Court. The Settlement Class Representatives may be entitled to an Incentive Payment Award of no more than $5,000 each.

## 10.  Can I object to or comment on the Proposed Settlement?

If you have comments about, or disagree with, any aspect of the Proposed Settlements, including the Class Action Settlements requested attorneys' fees, you may express your views to the Court through a written response.  Only Class Action Settlement Members who have not opted out can object or comment.  The written comment or objection should include your name, address, telephone number, and Chesapeake owner number(s) (if known).  In addition, any objection must include (a) a written statement of your objection, (b) a written statement of the grounds or reasons for your objection, and (c) copies of any papers, briefs, or other documents supporting your objection.  The document must be signed to ensure the Court's review.  In order to be considered by the Court, your comment or objection must be **received** on or before _____, **2021** and mailed to:

Clerk of the Court
United States District Court, Southern District of Texas
515 Rusk Street
Houston, TX 77002

Your comment or objection must clearly state that it relates to the following civil action number: 20-33233, and must state what specific settlement you are objecting to.

The comment or objection must also be mailed to counsel for Chesapeake, as well as either Larry D. Moffett (if you are a member of and objecting to the MEC Action Class) or Michael D. Donovan (if you are a member of and objecting to the Non-MEC Action Class). Contact information for all is attached to this Notice.

| 11. | Will there be a Hearing on the Proposed Settlements? |
|---|---|

The Court will hold a Final Approval Hearing on _____, to consider whether the Proposed Settlements are fair, reasonable, and adequate. The Hearing will be at the United States Courthouse, at _____. At the Hearing, the Court will decide whether to approve the Proposed Settlements and the Class Action Settlements' motions for attorneys' fees and expenses. If comments or objections have been received, the Court will consider them at this time.

Attendance is not required, even if you properly mailed a written objection or comment. If you filed an objection to the Settlement, as long as the objection was received before the deadline, the Court will consider it, regardless of whether you or your privately-retained attorney appear at the Hearing.

If you want to speak or have your own lawyer speak at the Final Approval Hearing, you must give the Court a paper that is called a "Notice of Appearance." The Notice of Appearance must refer to *In re Chesapeake Energy Corp.*, Case No. 20-33233-DRJ, United States District Court for the Southern District of Texas, and state that you or your lawyer wish to enter an appearance at the Final Approval Hearing. It must also include your name, address, telephone number, and signature. Your "Notice of Appearance" must be received no later than _____. You cannot speak at the Hearing if you asked to be excluded from the Proposed Settlement Class in the MEC or Non-MEC Action.

The Notice of Appearance must be filed with the Court at the address provided under after Question 10 above and also mailed to the attorneys listed in Question 10 above.

In addition, your document must clearly state that it relates to the following Civil Action Number: 20-33233.

| 12. | How do I get more information about the Proposed Settlement? |
|---|---|

If you have additional questions about the Class Action Settlements you may contact the Settlement Administrator.

QUESTIONS? CALL 1-800-____-_____

If you have questions about the PA AG Action Settlement you may contact the Pennsylvania Attorney General's Office at 717-787-4530 or landowners@attorneygeneral.gov.  You can also visit the PA Attorney General Office's website at www.attorneygeneral.gov/public-protection-division/natural-gas-royalty-lawsuit.

All court records, including the Settlement Agreements and other documents for the Lawsuit, may be examined in person and copied at the United States Courthouse, Southern District of Texas, Bankruptcy Division, 515 Rusk Street, Houston, TX 77002.

**Please do not telephone the Court, the Clerk of the Court, or Chesapeake.**

## <u>Contact Information</u>
## MEC Action Class Counsel

Larry D. Moffett
Law Office of Larry D. Moffett, PLLC
P.O. Box 1418
Oxford, MS 38655
larry@larrymoffett.com

Daniel E. Seltz
Lieff, Cabraser, Heimann & Bernstein, LLP
250 Hudson St., 8th Floor
New York, NY 10013

Charles J. LaDuca
Cuneo Gilbert & LaDuca, LLP
8120 Woodmont Avenue
Suite 810
Bethesda, MD 20814

Jonathan Cuneo
Cuneo Gilbert & LaDuca LLP
507 C Street NE
Washington, DC 20002

John W. ("Don") Barrett
Barrett Law Group
Post Office Drawer 927
Lexington, MS 39095

Michelle R. O'Brien
The O'Brien Law Group LLC
2800 Stafford Ave., Box 3034
Scranton, PA 18505

Charles E. Schaffer
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 50
Philadelphia, PA 19106

## Non-MEC Action Class Counsel

Noah Axler
Axler Goldich, LLC
1520 Locust St., Suite 301
Philadelphia, PA 19102

Michael D. Donovan
Donovan Litigation Group, LLC
1885 Swedesford Road
Malvern, PA 19355
mdonovan@donovanlitigationgroup.com

Robert E. McCann
McCann & Wall, LLC
Two Penn Center Plaza
1500 JFK Blvd., Ste. 1110
Philadelphia, PA 19102

Joseph H. Meltzer
Tyler S. Graden
Kessler Topaz Meltzer & Check, LLP
280 King of Prussia Rd.
Radnor, PA 19807

Robert D. Schaub
Rosenn, Jenkings & Greenwald, LLP
15 South Franklin St.
Wilkes-Barre, PA 18711

### Settlement Administrator

Epiq Corporate Restructuring, LLC
777 Third Avenue, 12th Floor
New York NY 10017
Attn: Robert A. Hopen

### Counsel for Chesapeake

Daniel T. Donovan
Ragan Naresh
Kirkland & Ellis LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C., 20004
Daniel.donovan@kirkland.com
ragan.naresh@kirkland.com

Daniel T. Brier
Myers, Brier & Kelly LLP
425 Spruce Street, Suite 200
Scranton, PA 18503
570-342-6100
dbrier@mbklaw.com

### Pennsylvania Attorney General

Chief Deputy Attorney General
Antitrust Section
Pennsylvania Office of Attorney General
14th Floor, Strawberry Square
Harrisburg, PA 17120-1410
(717) 787-4530
landowners@attorneygeneral.gov

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| CHESAPEAKE ENERGY | ) | |
| CORPORATION, *et al.,* | ) | Case No. 20-33233 (DRJ) |
| | ) | |
| Debtors. | ) | Jointly Administered |

**PENNSYLVANIA PROOF OF CLAIM LESSORS' JOINT OBJECTION TO
REORGANIZED DEBTORS' MOTION FOR ENTRY OF ORDERS AUTHORIZING
AND APPROVING CLASS SETTLEMENTS AND GRANTING RELATED RELIEF**

This joint objection to the Reorganized Debtors' ("Debtors") Motion for Entry of Orders

(I) Authorizing and Approving (A) the PA AG Settlement, (B) the MEC Settlement, and (C) the

Non-MEC Settlement,[1] and (II) Granting Related Relief is filed by 58 Pennsylvania oil and gas

lessors listed on the attached Exhibit A, each of whom have filed proofs of claim in these

proceedings ("Pennsylvania Proof of Claim Lessors"), and who by and through their undersigned

counsel hereby state:

**INTRODUCTION**

1.    The Debtors seek approval of class settlements that would rewrite the leases of all

Pennsylvania lessors. The Debtors assert that the two class settlements will "reset" the

relationship with Pennsylvania lessors to both resolve existing proofs of claim in the bankruptcy

proceedings and obviate potential future royalty litigation for the Reorganized Debtors. Debtors'

Mot. ¶¶ 1, 2 (ECF No. 3175).

---

[1] This opposition brief will refer to the MEC Settlement and Non-MEC settlement collectively as
the "Class Settlements."

2.      However, while the Debtors suggest that they want to resolve pending proofs of claim, they have gone about it in an odd way by not talking to the creditors whose proofs of claim they are trying to resolve.

3.      Moreover, Debtors have failed to establish a record that would allow the Court to determine that it has or should exercise jurisdiction over the proposed class settlements, which largely concern themselves with post-Effective Date matters.   Rather, the critical inquiries related to the fairness of the proposed settlements to the putative class members should be left to the United States District Court for the Middle District of Pennsylvania, which has already been involved in supervising matters relating to class settlement approval.

4.      If the Court were to determine that it has or should exercise jurisdiction over the proposed class settlements, it still cannot grant the relief that the Debtors seek in this motion (*i.e.*, preliminarily approving the two settlements and directing notice to the classes).   The record before the Court is insufficient to allow the Court, which is required to act as a fiduciary to absent class members, to determine whether the proposed Class Settlements are fair, reasonable, and adequate for absent class members.   Rule 23 of the Federal Rules of Civil Procedure, as incorporated into Bankruptcy Rule 7023, requires a record with evidence sufficient for the Court to make the factual findings necessary to support both class certification and a conclusion that notice is justified.

5.      Bankruptcy Rule 7023 incorporates Federal Rule of Civil Procedure 23 in its entirety.   Debtors concede this and ask this Court to apply Rule 23 to approve the Class Settlements.  *See* Debtors' Mot. ¶ 2.

6.      Under Rule 23(e), a federal court asked to approve notice of a proposed settlement to absent class members acts as a fiduciary, ensuring that a proposed class settlement

is likely to receive final approval as fair, reasonable, and adequate to the absent class members. *See Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 842–43 (E.D. La. 2007) (observing the reviewing court "must be exacting and thorough in analyzing whether the settlement is in the best interests of class members"); *Moore v. Halliburton Co.*, No. 3:02-CV-1152, 2004 U.S. Dist. LEXIS 18187, at *15 (N.D. Tex. Sept. 9, 2004); *Neff v. Via Metro. Transit Auth.*, 179 F.R.D. 185, 208 (W.D. Tex. 1998).

7.     Further, under Rule 23(e), as amended December 1, 2018, a federal court may not preliminarily approve a class settlement and direct notice to absent class members until it carefully analyzes the record evidence offered by the proponent of the settlement and makes findings that it is likely to be able to certify a class and grant final approval to the proposed settlement in consideration of the factors spelled out in Rule 23(e)(2). *See* Fed. R. Civ. P. 23(e)(1)(A).

8.     Under the current version of Rule 23, at this stage of the proceedings, the *setting class representatives* must provide the Court with all evidence they expect to rely on for final settlement approval. *See* Fed. R. Civ. P. 23(e)(1)(A); 2018 Advisory Committee Note to Rule 23(e)(1). But there is no such record. Indeed, there is no filing at all from the proposed class representatives.

9.     In an unusual turn of events, only the Debtors have moved to approve the class settlements. Debtors *offer no evidence whatsoever* that would permit the Court to fulfill its fiduciary duty to absent class members. The Debtors have created no evidentiary record to allow the Court to conduct the careful analysis a federal court must undertake under Federal Rule of Civil Procedure 23(e)(1), as amended December 1, 2018, *before* granting preliminary approval and sending notice to absent class members. *See, e.g.*, *Hays v. Eaton Grp. Attorneys, LLC*, Civ.

A. No. 17-88, 2019 U.S. Dist. LEXIS 17029, *9–10 (M.D. La. Feb. 4, 2019) (explaining that "the decision to give notice of a proposed settlement . . . *should be based on a solid record* supporting the conclusion that the proposed settlement will likely earn final approval after notice and an opportunity to object") (emphasis added).

10.    There are other facial infirmities in Debtors' motion.

a.    First, Debtors say that no class proof of claim was filed that covers the claims in the so-called MEC Settlement, but that is not true.  On October 30, 2020, the Tyler/Mowry Lessors[2] filed proofs of claim, attached here as Exhibit B.  The Tyler/Mowry proofs of claim incorporate their class action complaint, which is attached to the proof of claim and reserves the right to have the proof of claim liquidated on a class basis.

b.    Second, while Debtors say that the proposed Class Settlements are in furtherance of resolving proofs of claim filed by Pennsylvania lessors, that does not appear to be the case.

i.    The motion does not show that any of the named plaintiffs in the Class Settlements, in contrast to the Pennsylvania Proof of Claim Lessors, filed a proof of claim that the Class Settlements would resolve.  Nor does the motion, which does not seek an extension of the Bar Date for the named plaintiffs, explain why the Bar Date is not an impediment to the named plaintiffs proceeding either individually or on a class basis.  *See In re DDi Corp.*, No. 03-15261, 304 B.R. 626, 629 (Bankr. S.D.N.Y. 2004) (explaining unfairness resulting from late class claims, which arises in part

---

[2] A subset of the Pennsylvania Proof of Claim Lessors, the Tyler/Mowry Lessors are Tim & Terri Tyler Family LP; Tyler 5 FLP; Timothy & Terri Tyler; and Rodney & Dianna Mowry.

because "the class member who purposely ignored the bar date without good reason would get a second chance, while the similarly situated individual creditor would not"); *In re Jamesway Corp.*, No. 95 B 44821, 1997 WL 327105, at *9–10 (Bankr. S.D.N.Y. June 12, 1997) (explaining that the bar date order is akin to a statute of limitations that must be "strictly observed," that late claims may be filed on a showing of excusable neglect, and that allowing a post-bar date request for class certification of a class that received notice of the bar date would improperly extend the bar date for absent class members who did not file proofs of claims before the bar date, possibly violating the due process rights of those who did).

ii. The Class Settlements would divide cash payments for pre-effective date claims not just with class members who did file proofs of claims but with others who did not, making no distinction about how the funds would be allocated between those groups. *See* Plan of Allocation & Distribution ¶¶ 1, 3 (ECF Nos. 3175-3, 3175-4). The motion does not explain why it is beneficial or fair to putative class members who filed proofs of claim to share the total of $6.25 million made available through the two Class Settlements equally with others who chose not to file proofs of claims by the Bar Date.

iii. The Class Settlements concern themselves with post-effective date claims that will arise in the future, unrelated to the bankruptcy proceedings, and do so by *requiring* class members to amend their bargained leases,

5

providing a financial benefit to the post-Effective Date Reorganized Debtors without any evidence provided to the Court showing that amending all Pennsylvania leases would financially benefit all potential class members regardless of lease form in general and the Pennsylvania Proof of Claim Lessors in particular.  The motion does not explain why it is fair to potential class members who have filed proofs of claim to have to agree to amend their leases after the Effective Date in order to obtain a share of the $6.25 million in total that the Debtors apparently have available to resolve proofs of claim.  It appears from Debtors' motion, in fact, that the principal motivation for the settlement is to obtain post-Effective Date lease amendments for the sole benefit of the post-Effective Date Reorganized Debtors.  *See* Debtors' Mot. ¶ 38.

c.  Third, the Debtors have also not shown, and have offered no evidence, that the Court may certify settlement classes under Rule 23(a) and (b), as required by Rule 23(e)(1)(A)(ii).  *See Hayes*, 2019 U.S. Dist. LEXIS 17029, at *10–11.

    i.  For example, there is no analysis of lease language to demonstrate that the named plaintiffs in the Class Settlements have leases and claims typical of those of absent class members.  In addition, there is no analysis of lease language or financial projections that show whether the going-forward relief in the Class Settlements is  a benefit to the class members or how the benefits vary depending on specific lease language.

    ii.  There is no analysis of lease language, description of the prominent categories of leases, or explanation to show how every Pennsylvania

lessor's lease falls within the MEC or Non-MEC class.  Nor is there any explanation whether there are additional variations of language and, if so, whether a particular lease variation is considered to fall in the MEC or non-MEC category.

    iii. For example, there are Pennsylvania lessors apparently included in the MEC class who have lease language that requires the lessee to pay royalties based on the downstream price a marketing affiliate receives for the gas without deductions for post-production costs when gas is sold in the ordinary course of business.  The motion wholly fails to explain how the MEC Settlement, by amending their leases to change the valuation point for the royalties to the wellhead instead of the point of sale to unaffiliated third parties, would benefit these lessors.

    iv. There is no evidentiary explanation why the named plaintiffs did not pursue class (or individual) proofs of claims.  If that omission was the result of an agreement with the Debtors, Rule 23 requires the agreement to be disclosed before notice may issue to the class.  *See* Fed. R. Civ. P. 23(e)(1)(B) (i) & (e)(2)(C)(4).

d. Fourth, there is no evidence that would allow the Court to determine what the best possible recovery for the settlement classes would be over the long term range of the post-Effective Date lease amendments, which precludes any finding that the amounts of the Class Settlements—including the values of going-forward relief that rewrites all absent class members' leases—fall within a range of

reasonableness and represent a fair, reasonable, and adequate compromise of class claims to allow the Court to preliminarily approve the settlements.

11.     For all these reasons, the Court should exercise its discretion under Bankruptcy Rule 9014(c), decline to direct Bankruptcy Rule 7023 and Rule 23 to apply to the Class Settlements, and allow the Middle District of Pennsylvania to complete the class settlement proceedings pending there, which a federal district judge is actively overseeing.  *See In re TWL Corp.*, 712 F.3d 886, 892–93 (5th Cir. 2013) (explaining bankruptcy courts' discretion to apply Rule 7023 and Rule 23 in contested proceedings).  In the alternative, if the Court decides to apply Bankruptcy Rule 7023 and Rule 23, then the Court should deny Debtors' motion, which does not satisfy the standards for preliminary approval and notice to the class, let alone the class certification requirements of Rule 23(e).  Either of these options would allow for an opportunity for Debtors, in this proceeding, to work to resolve the proofs of claim that have in fact been filed in this proceeding by the Pennsylvania Proof of Claim Lessors, and to address post-Effective date matters in another forum.

## FACTUAL BACKGROUND

12.     On June 28, 2020 (the "Petition Date"), the Debtors, including Chesapeake Appalachia, L.L.C. ("Chesapeake") filed petitions for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code").

**The Pennsylvania Proof of Claim Lessors**

13.     The 58 Pennsylvania Proof of Claim Lessors are parties to oil and gas leases with Chesapeake for parcels of real property located in Pennsylvania (the "Leased Premises").[3]

---

[3] Copies of the Pennsylvania Lessors' Leases are attached to the Pennsylvania Lessors' Proofs of Claim.

14.     Chesapeake breached the Leases through: (a) its underpayment of royalties, which were underpaid or not paid as a result of Chesapeake's unauthorized deduction of post-production costs; and (b) for certain lessors, its failure to provide production data and otherwise comply with its obligations under the audit clauses in certain leases.

15.     Of the Pennsylvania Proof of Claim Lessors, at least 26 hold group-negotiated leases in a form known as the Wyoming County Landowners Group Lease ("WCLG Lease").

16.     The WCLG Leases provide that the lessee must pay royalties as a percentage of the gross proceeds (as broadly defined in the Leases) received by a marketing affiliate without deductions for post-production services incurred getting the gas to the downstream point of sale to unaffiliated third parties.  *See* Ex. C, ¶ 4(b)(ii).[4]  Because Debtors describe the two class settlements as covering all Pennsylvania leases, these WCLG Leases are apparently included in the MEC Settlement Class.

17.     Each of the Pennsylvania Proof of Claim Lessors filed a proof of claim.  Those proofs of claim included addenda particularly describing each claim.

18.     Pennsylvania Proof of Claim Lessors with WCLG Leases stated that Chesapeake breached their leases by, among other things, failing to pay Claimants' royalties calculated upon the entire gross proceeds of gas, computed at the point of sale, as required under the Leases.  *See, e.g.*, Addendum to Placewood Resource Management, LLC, *et al.*, Proof of Claim ¶ 8.

19.     Pennsylvania Proof of Claim Lessors with WCLG Leases also stated that Chesapeake breached their leases by refusing to provide them with production data and by failing to establish production unit sizes required by the terms of the WCLG Leases.  *See, e.g.*, *id.* ¶ 10.

---

[4] A copy of a WCLG Lease is attached as Exhibit C.

20.     Several Pennsylvania Proof of Claim Lessors, including the Places, Ruarks, Wilsons, and Steeles, were actively engaged in AAA arbitration actions against Chesapeake concerning Chesapeake's breaches of their leases at the time the bankruptcy was filed.  *See, e.g.*, *id.* ¶ 15.

21.     Pennsylvania Proof of Claim Lessors with WCLG Leases also explained that they are secured creditors because their interests are secured by liens arising from the WCLG Leases' terms.  *See id.* ¶ 19.

22.     Pennsylvania Proof of Claim Lessors with WCLG Leases further explained that they are entitled to seek termination of the leases as a result of Chesapeake's breaches of their leases.  *See id.* ¶ 23.

23.     On March 15, 2016, Tyler/Mowry Lessors filed a class action complaint in the U.S. District Court for the Middle District of Pennsylvania, Case No. 3:16-cv-00456-MEM, against Chesapeake asserting claims for breach of contract, tortious interference with contract, unjust enrichment, and breach of various covenants implied in oil and gas leases, seeking injunctive and declaratory relief and an accounting (the "Pennsylvania Action").  A copy of the class complaint in the Pennsylvania Action is attached to the Tyler/Mowry Lessors' Proofs of Claim.

24.     In these bankruptcy proceedings, the Tyler/Mowry Lessors timely filed conditional class proofs of claim[5] on behalf of themselves and all those similarly situated.  Those are Claim Nos. 12945 and 12964 (the "Class Proofs of Claim").

---

[5] This district recognizes that creditors may file conditional class proofs of claim.  *See In re Vanguard Natural Resources, LLC*, No. 17-30560, 2017 Bankr. LEXIS 3978, *10–11 (S.D. Tex. Bankr. Nov. 20, 2017).

PHDATA 7707723_2

25.     The Tyler/Mowry Lessors discussed the Pennsylvania Action and their Class Proofs of Claim in their Objection to Debtors' Plan of Reorganization.  *See* Tyler/Mowry Lessors' Objection ¶¶ 8, 9.[6]

26.     The Tyler/Mowry Lessors' Pennsylvania Action alleges Chesapeake breached their leases and implied covenants by impermissibly taking deductions for post-production costs and wasting their gas by selling it at prices that yielded no royalty payments following Chesapeake's improper deductions of post-production costs.   Pennsylvania Action Compl. ¶¶ 48–80, 93–106.  They further alleged claims for tortious interference with contract and unjust enrichment.   *Id*. ¶¶ 107–15.   They sought declaratory and injunctive relief, including an accounting. *Id*. ¶¶ 121–40.

27.     Judge Mannion stayed the Pennsylvania Action while Chesapeake pursued settlement mediation with the parties and the Office of the Pennsylvania Attorney General— including the Tylers and Mowrys—in the *Demchak* litigation (M.D. Pa. Civ. A. No. 3:13-cv-02289).  *See Tyler* ECF No. 43.  The case had returned to the active docket after the Tylers and Mowrys reported that mediation had been unsuccessful, and Chesapeake's motion to dismiss was fully briefed and pending at the time Debtors instituted these bankruptcy proceedings, which subjected the Pennsylvania Action to the automatic stay.  *Tyler* ECF No. 51.

28.     In *Demchak* in 2015, the Middle District of Pennsylvania granted preliminary approval of a proposed settlement between Chesapeake and Pennsylvania lessors with MEC clauses in their leases.  *See Demchak* ECF No. 91.

29.     Judge Mannion has been supervising the class cases before him, requesting quarterly monthly status reports in the *Demchak* litigation, ordering the parties to mediation of

---

[6] The Other Pennsylvania Proof of Claim Lessors who are parties to this objection also filed objections to plain confirmation or joined other objections that were filed.

issues raised by the class settlement proposed there, and requiring reports about mediation progress.  *See Demchak* ECF Nos. 145, 161, 173, & 193.

## The Proposed Class Settlements

30.     On March 5, 2021, Debtors filed their motion seeking, *inter alia*, entry of orders preliminarily approving the Class Settlements and directing notice of the Class Settlements to absent class members.  *See* Debtors' Mot. ¶ 5.

31.     The Debtors also seek this Court's approval of a settlement with the Pennsylvania Attorney General's Office under Bankruptcy Rule 9019.  *Id*. ¶ 4.

32.     As explained in *Kilmer v. Elexco Land Services*, 990 A.2d 1147 (Pa. 2010), oil and gas leases have different methods of determining royalties.  One prominent method measures the royalties based on the price of gas at the wellhead via a method called the "netback" method. Because there is no market for gas at the wellhead, the netback method estimates a wellhead price by deducting the cost of post-production services incurred in moving the gas to a downstream point of sale.  *Id*. at 424, 428–29.  Another prominent method determines royalties as a percentage of actual proceeds received at the downstream point of valuation (*i.e.*, the point of sale to unaffiliated third parties).  *Id*. at 419.

33.     The chief features of the MEC Settlement include a payment by Chesapeake of $5 million and rewriting class members' leases to make them all "at the wellhead" leases that require royalties be calculated and paid based on an "in-basin index price" or a netback price (*i.e.*, a downstream price with deductions taken for post-production services), irrespective of whether the lease specifies another point of royalty valuation.  *Id*. ¶ 26; MEC Settlement ¶¶ 6, 6.1, & 6.2.

PHDATA 7707723_2

34.     The MEC Settlement will rewrite *all* class members' leases in perpetuity irrespective of whether the class members affirmatively choose that result: "To the extent no Election by a Settlement Class Member is received by the Settlement Administrator within five (5) business days after the election Period, such Settlement Class Member will be deemed to have elected Option (1) (i.e., the high of the In-Basin Index Price Without Post-Production Deductions and the Netback Price)." MEC Settlement ¶ 6.3.

35.     This so-called "Election" will "be deemed to be an amendment of [the class member's] Pennsylvania Lease, shall run with the land, shall be binding on the Settlement Class Member and Chesapeake and their respective successors and assigns." *Id.* ¶ 6.5.

36.      The Non-MEC Settlement includes a $1.25 million payment and similarly results in material lease amendments on all class members in perpetuity that value royalties at the wellhead irrespective of whether the class members' leases specify a different point of royalty valuation.  *See* Non-MEC Settlement ¶¶ 1.43, 6, 6.1, 6.2, 6.3, & 6.5 (ECF No. 3175-4).

37.     The Class Settlements make no distinction among class members who filed proofs of claim and those who did not.  All class members are paid from the same fund paid by Chesapeake for each Class Settlement (*i.e.*, from the $5 million payment in the MEC Settlement and the $1.25 million payment in the Non-MEC Settlement).

## ARGUMENT

## I.     THE BANKRUPTCY COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION OVER THE ASPECTS OF THE CLASS SETTLEMENTS THAT INVOLVE THE MODIFICATION OF PENNSYLVANIA LEASES IN PERPETUITY FOR THE BENEFIT OF THE REORGANIZED DEBTORS.

38.     No court may consider approval of a class action settlement unless it has subject matter jurisdiction.  *See Zink v. First Niagara Bank, N.A.*, 155 F. Supp. 3d 297, 305 (W.D.N.Y. 2016).

39.    Under the Debtors' Fifth Amended Joint Chapter 11 Plan of Reorganization (the "Plan") [Docket No. 2833], all of the Pennsylvania Leases rode through the bankruptcy unimpaired.  The Plan provides that "all Royalty and Working Interests shall remain in full force and effect in accordance with the terms of the granting instruments or other governing documents applicable to such Royalty and Working Interests."  Plan, Article IV. T.

40.    The Plan further states that "Royalty and Working Interests shall not be modified, affected or impaired in any manner by any provision of the Plan or the Confirmation Order, including but not limited to any injunctive or stay relief, and the legal and equitable rights, interests, defenses, and obligations of holders of Royalty and Working Interests, with respect to such Royalty and Working Interests, shall not be modified, affected or impaired in any manner by the provisions of the Plan or the Confirmation Order."  *Id.*

41.    The Plan became effective on February 9, 2021 (the "Effective Date").

42.    The motion seeks approval of the rewriting of the Pennsylvania leases, which became passed through to the Reorganized Debtors as of the Effective Date.

43.    Upon confirmation of a reorganization plan, "the debtor in possession disappears."  *In re Rickel & Assocs., Inc.*, 272 B.R. 74, 98 (Bankr. S.D.N.Y. 2002). "Confirmation of the plan marks the beginning of the reorganized debtor's new financial life."  *In re Good*, 428 B.R. 235, 243 (Bankr. E.D. Tex. 2010), quoting *In re Valley Park Group, Inc.*, 96 B.R. 16, 24 (Bankr. N.D.N.Y. 1989). Once a bankruptcy plan is effectuated, all indications from the Code would incline us to treat the reorganized entity as we would any other company."  *In re T&A Holdings, LLC*, 2016 WL 7105903, at *7 (Bankr. N.D. Ill. Nov. 2, 2016) (quoting *In re Jartran, Inc.*, 886 F.2d 859, 870 (7th Cir. 1989)).  "[B]ankruptcy courts have always viewed

confirmation as an event that severs the once close ties between the former debtor and the bankruptcy court." *In re In Play Membership Golf, Inc.*, 576 B.R. 15, 21 (Bankr. D. Colo. 2017).

44.    Consequently, "[v]irtually all courts that have considered the question have concluded that, after confirmation, the 'related to' jurisdiction of the bankruptcy courts shrinks." *In re In Play Membership Golf, Inc.*, 576 B.R. at 21.

45.    "After a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan." *In re Craig's Stores of Texas, Inc.*, 266 F.3d 388, 390 (5th Cir. 2001).[7]

46.    The planned, forced post-Effective Date amendments to the Pennsylvania leases will not have any effect on the Debtors' bankruptcy estates,[8] but rather will benefit the post-confirmation Reorganized Debtors only.

47.    The proposed settlements are touted as providing significant benefits to the Debtors in their post-Effective Date operations in Pennsylvania:

- The proposed settlements "constitute a fundamental reset of Chesapeake's relationship with its Pennsylvania lessors."

- The proposed settlements will preserve "the Reorganized Debtors' interests in the Pennsylvania leases."

---

[7]    The Fifth Circuit standard for post-confirmation jurisdiction pursuant to *Craig's Stores* is narrower than the 'close nexus" test adopted by many other courts. *In re In Play Membership Golf, Inc.*, 576 B.R. at 22.

[8]    Any argument by the Reorganized Debtors that their post-Effective Date success will benefit the unsecured creditors by potentially increasing the value of the stock to be distributed under the Plan is irrelevant. *See In re Gen. Media, Inc.*, 335 B.R. 66, 75 (Bankr. S.D.N.Y. 2005) ("Plans frequently call for future payments to creditors funded through future operations. A bankruptcy court cannot hear a post-confirmation dispute simply because it might conceivably increase the recovery to creditors, because the rationale could 'endlessly stretch a bankruptcy court's jurisdiction.'") (citation omitted).

PHDATA 7707723_2

- The PA AG Settlement "preserves the Reorganized Debtors' ability to conduct business in the Commonwealth."

- The proposed settlements will allegedly eliminate "future potential class litigation related to the calculation of royalties" which would "distract from the Reorganized Debtors' business operations."

- The settlements proposed settlements "will reduce the likelihood and attendant cost and distraction of future royalty related litigation."

Debtors' Mot. ¶¶ 13, 17, & 18.

48. However, the Bankruptcy Court has no jurisdiction over matters involving the Reorganized Debtors' post-Effective Date operations and business relationships. *See In re Park Ave. Radiologists, P.C.*, 450 B.R. 461, 470 (Bankr. S.D.N.Y. 2011) ("Bankruptcy court jurisdiction does not exist to protect a debtor following reorganization.").

49. Since the Pennsylvania lease modifications do not pertain to the execution of implementation of the Plan, the Bankruptcy Court does not have jurisdiction to consider approval of the proposed permanent modification of the Pennsylvania leases.

## II. THE BANKRUPTCY COURT SHOULD ABSTAIN AND DEFER TO THE U.S. DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA TO DETERMINE WHETHER THE SETTLEMENTS SHOULD BE APPROVED.

50. Although this Court may determine whether the proposed settlements pass muster under Bankruptcy Rule 9019, it should abstain from considering whether the settlements should be approved under Federal Rule of Civil Procedure 23 and allow the U.S. District Court for the Middle District of Pennsylvania, where *all* of the class actions involving Pennsylvania oil and gas leases (including the Tyler/Mowry Lessors' class action) have been pending before the Honorable Malachy E. Mannion for years, make that determination.

51. "Under the 'permissive abstention' doctrine, 28 U.S.C. § 1334(c)(1), courts have broad discretion to abstain from hearing state law claims whenever appropriate 'in the interest of

justice, or in the interest of comity with State courts or respect for State law.'" *Gober v. Terra+Corp. (In re Gober)*, 100 F.3d 1195, 1206 (5th Cir. 1996) (quoting 28 U.S.C. § 1334(c)(1)).

52.     "The proposition that bankruptcy courts have broad discretion on whether to abstain comes from both the plain language of the statute and the Fifth Circuit's decision in *Wood v. Wood*." *In re Houston Reg'l Sports Network*, 514 B.R. 211, 218 (Bankr. S.D. Tex. 2014) (citing *Wood v. Wood (In re Wood)*, 825 F.2d 90, 93 (5th Cir. 1987)).

53.     In deciding whether to permissively abstain from hearing a proceeding, bankruptcy courts weigh the following factors:

(1)     Effect or lack thereof on the efficient administration of the estate if the court recommends abstention;

(2)     Extent to which state law issues predominate over bankruptcy issues;

(3)     Difficult or unsettled nature of applicable law;

(4)     Presence of related proceeding commenced in state court or other non-bankruptcy proceeding;

(5)     Jurisdictional basis, if any, other than § 1334;

(6)     Degree of relatedness or remoteness of proceeding to main bankruptcy case;

(7)     The substance rather than the form of an asserted core proceeding;

(8)     The feasibility of severing state law claims from core bankruptcy matters to allow judgment to be entered in state court with enforcement left to the bankruptcy court;

(9)     The burden of the bankruptcy court's docket;

(10)     The likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties;

PHDATA 7707723_2

(11)    The existence of a right to a jury trial;

(12)    The presence in the proceeding of non-debtor parties;

(13)    Comity; and

(14)    Possibility of prejudice to other parties in the action.

*In re Houston Reg'l Sports Network, L.P.*, 514 B.R. at 215.

54.    "The evaluation of these factors is not merely a mathematical exercise." *DHP Holdings II Corp. v. Peter Skop Indus., Inc. (In re DHP Holdings II Corp.)*, 435 B.R. 220, 224 (Bankr. D. Del. 2010) (internal quotation omitted). Not every factor "must be satisfied nor all factors weigh in favor of abstention for its exercise to be appropriate," and "the importance of various factors will vary with the circumstances of each case, and no one factor is determinative." *In re Nagel*, 2020 WL 1182664 at *5 (Bankr. E.D. Ky. 2020) (quoting *PRN Pharm. Servs. v. Brownsburg Healthcare LLC (In re Kentuckiana Healthcare, LLC)*, 2014 WL 906121, at *5 (W.D. Ky. 2014)).

55.    Here the factors overwhelmingly weigh in favor of this Court exercising its broad discretion to abstain from hearing the non-bankruptcy issues relevant to this matter. *See In re Motors Liquidation Co.*, 2013 WL 620281, at *10–12 (Bankr. S.D.N.Y. 2013) (abstaining from hearing class action claims after determining bankruptcy issues involving interpretation of sale order).

56.    First and foremost, the determination of the fairness of the proposed class action settlements involves complicated questions of non-bankruptcy Pennsylvania law, with which the federal court in Pennsylvania will be far more familiar. *In re TitleMax Holdings, LLC*, 447 B.R. 896, 903 (Bankr. S.D. Ga. 2010) (abstaining "because the fairness of the terms of a class

settlement depend solely upon application of South Carolina law, it is self-evident that South Carolina courts should have a primary role in concluding this matter").

57.     The complexities of the state law issues present here further weigh in favor of abstention.  *See In re Cashco, Inc.*, 2019 WL 4307544, at *8 (Bankr. D.N.M. 2019) (abstaining where "the Class Action Adversary Proceeding is complex"); *In re DHP Holdings II Corp.*, 435 B.R. at 227 (noting that presence of unsettled or difficult state law issues favors abstention).  As the Pennsylvania Supreme Court has observed, Pennsylvania oil and gas leases are "far from the simplest of property concepts."  *T.W. Phillips Gas & Oil Co. v. Jedlicka*, 42 A.3d 261, 267 (Pa. 2012).

58.     Abstention is also mandated because there is, at a minimum, a substantial question as to whether this Court has jurisdiction of the most significant aspect of the settlement, the substantial modification of the Pennsylvania leases, that under the plan passed through the bankruptcy.  *See In re Motors Liquidation Co.*, 2013 WL 620281, at *11 ("The fact that in all probability, any subject matter jurisdiction to decide the underlying [class action] claims would exist only in the Michigan district court tilts in favor of abstaining in favor of that court").

59.     Additionally, the Debtors will not suffer any harm by litigating the Rule 23 issues in federal court in Pennsylvania because the dispute can be resolved economically, conveniently, and quickly in the pending actions, where the underlying class action cases have been litigated for years and Judge Mannion already possesses substantial knowledge and information regarding the salient issues.  At the same time, the Debtors will be free to pursue resolution of the proofs of claim that have been filed in this proceedings with the funds apparently available.

60.     For these reasons, the Bankruptcy Court should abstain from hearing the Rule 23 settlement approval issues.

PHDATA 7707723_2

III.   **IF THE COURT EXERCISES ITS DISCRETION TO DIRECT APPLICATION OF BANKRUPTCY RULE 7023, IT SHOULD DENY DEBTORS' MOTION FOR FAILURE TO SATISFY THE CLASS CERTIFICATION REQUIREMENTS OF FEDERAL RULE OF CIVIL PROCEDURE 23(A) AND (B) AND FOR FAILURE TO SHOW THAT THE CLASS SETTLEMENTS ARE LIKELY TO RECEIVE FINAL APPROVAL UNDER RULE 23(E), AS AMENDED DECEMBER 1, 2018, AS FAIR, REASONABLE, AND ADEQUATE TO THE CLASS MEMBERS.**

61.     The Debtors have offered no record evidence in support of their motion for preliminary approval of the Class Settlements.  Thus, the Court cannot make the findings required to support a decision concerning class certification or perform its fiduciary duty to ensure the Class Settlements are fair, reasonable, and adequate with regard to the interests of absent class members.

62.     "If the court decides to apply Rule 23, it then must determine whether the Rule's requirements for class certification have been satisfied."  *In re TWL Corp.*, 712 F.3d at 892–93. A court must also conclude that a class may likely be certified under Rule 23(a) and (b) before it may grant preliminary approval and direct notice of a proposed settlement to absent class members.  Fed. R. Civ. P. 23(e)(1)(B)(ii); *see also Hays*, 2019 U.S. Dist. LEXIS 17029, at *9–11 (observing that the "court must determine whether it can certify the [proposed settlement] class under the Standards of Rule 23(a) and (b) for purposes of judgment based on the propos[ed settlement]").

63.     This class certification inquiry requires the court to analyze the record evidence submitted by the settlement proponent and to make specific factual and legal findings.  *See In re TWL Corp.*, 712 F.3d at 893.  The proponent of the settlement has the burden to show through evidence that class certification is likely proper before the court may order notice to the class. *Hays*, 2019 U.S. Dist. LEXIS 17029, at *10–11.  Thus, under amended Rule 23(e), the proponent of the class settlement must submit substantial record evidence in support of its request for

preliminary approval of the settlement, including evidence showing class certification is likely possible. *Id*. at *9–10.

64.    The 2018 Advisory Committee Note to Rule 23(e)(1) explains that the record supporting a request for preliminary approval and order directing notice to the class must be robust:

> The decision to give notice of a proposed settlement to the class is an important event.   It should be *based on a solid record* supporting the conclusion that the proposed settlement will likely earn final approval after notice and an opportunity to object.  *The parties must provide the court with information sufficient to determine whether notice should be sent.*   At the time they seek notice to the class, *the proponents of the settlement should ordinarily provide the court with all available materials they intend to submit to support approval under Rule 23(e)(2)* and that they intend to make available to class members.
>
>                                    . . .
>
> [I]f a class has not [yet] been certified, the parties must ensure that the court has a basis for concluding that it likely will be able, after the final hearing, to certify the class.  Although the standards for certification differ for settlement and litigation purposes, *the court cannot make the decision regarding the prospects for certification without a suitable basis in the record.*
>
>                                    . . .
>
> The court should not direct notice to the class until the parties' submissions show it is likely that the court will be able to approve the proposal after notice to the class and a final approval hearing.

2018 Advisory Committee Note to Rule 23(e)(1) (emphasis added).

65.    The Debtors ignore these requirements of Rule 23 as amended in 2018 in their motion that requests the Court enter orders preliminarily approving the Settlement and directing notice to absent class members.  Their failure to create any record in support of their motion or

perform any class certification analysis fatal to their request to preliminarily approve the Class Settlements and direct notice to the proposed class.

66.     Whether a settlement is fair to a debtor is not the same as whether a settlement is fair to creditors or absent class members.  There are different inquiries under Bankruptcy Rule 9019(a) and Rule 23(e), which requires that a court consider specific factors designed to guide its analysis that the settlement is likely to be approved as fair, reasonable, and adequate *to the absent class members* before it directs notice of the settlement to the class.  *See* Fed. R. Civ. P. 23(e)(1)(B)(i).

67.     It is usually a representative plaintiff that shows the court that the requirements of Rule 23 are satisfied with regard to a proposed class settlement.  *See, e.g.*, *Moore v. Halliburton Co.*, No. 3:02-CV-1152, 2004 U.S. Dist. LEXIS 18187, *15–17 (N.D. Tex. Sept. 9, 2004) (noting that the burden to show that a class settlement satisfies Rule 23's requirements for approval "should be placed on the parties, especially the class representative . . . ," who "owes a fiduciary duty to the class.").

68.     Here, however, there is no class representative plaintiff moving the court for preliminary approval and notice.  Only the Debtors—defendants in the cases underlying the Class Settlements—are here.

69.     Unsurprisingly, the Debtors focus primarily on whether the AG Settlement and Class Settlements may be approved under Bankruptcy Rule 9019(a) as fair to Debtors.  *See, e.g.*, Debtors' Mot. ¶¶ 29–40.

70.     But the Debtors' interest in having a settlement that is fair to them is not aligned with the inquiry that Rule 23(e) demands, and the significant divide between the two inquiries becomes apparent in the Debtors' motion.

PHDATA 7707723_2

71.     For example, the Debtors say they have an interest in resolving the proofs of claim that Pennsylvania lessors have filed.  Debtors' Mot. ¶ 44.  However, the Debtors have not addressed the issues with the lessors/creditors who actually filed proofs of claim, including the Tyler/Mowry class claims.  Instead, they negotiated the Class Settlements with lessors who apparently did not file proofs of claim, let alone class proofs of claim, to reach agreements that divert funds from the estate to pay class members who did not file claims.

72.     Because there is no class proof of claim or individual proofs of claim identified for the purported class representatives in the Class Settlements, there is no basis for any determination of whether these proposed class representatives have any claims that they asserted in these proceedings.  There is also no basis to determine whether the proposed class representatives identified and pursued the issues that the Pennsylvania Proof of Claim Lessors have raised, including issues relating to secured claims under certain leases, issues relating to lease termination, and issues relating to the characterization of mineral leases under Pennsylvania law.  *See*, *supra*, ¶¶ 14–26; *see also T.W. Phillips Gas & Oil Co.*, 42 A.3d at 267 (explaining that Pennsylvania gas leases are "far from the simplest of property concepts").

73.     Moreover, there is no request to extend the Bar Date or explain why the Bar Date should not apply to the Class Settlements.  This raises concerns that the Class Settlements will unfairly allow class members who did not file proofs of claim to receive better treatment than they should at the expense of class members who did timely file proofs of claim.

74.     Nothing in Debtors' motion explains how payment to absent class members that did not file proofs of claim benefits Debtors' creditors who did, let alone how it is fair to those who filed proofs of claim to have their claims liquidated on the exact same terms as those who

PHDATA 7707723_2

did not.  This creates significant issues that show the Court should not grant preliminary approval or direct notice to the classes defined in the Class Settlements.

      **A.**     **Debtors Fail to Analyze and Explain Critical Issues or Offer Evidence That Would Allow the Court to Conduct the Required  Rule 23(e)(1) Inquiry to Determine Whether the Proposed Classes Are Likely to Be Certified for Purposes of Judgment.**

75.    Ultimately, the Debtors devote a total of *only six paragraphs* of their motion to their argument that the Class Settlements satisfy Rule 23's requirements.  *See id.* ¶¶ 41–46.

76.    The Debtors' six paragraphs addressing Rule 23's requirements say *nothing at all* about whether the proposed settlement classes satisfy the certification requirements of Rule 23(a) and (b).  *See id.*  But a court must be able to determine it will likely be able to certify the proposed classes for purposes of judgment before directing notice to the classes.   Rule 23(e)(1)(B)(ii).

77.    For that reason alone, the Court must deny the Debtors' motion: There is no record to support a conclusion that the proposed classes likely can be certified for purposes of final judgment.  *See In re TWL Corp.*, 712 F.3d at 893–94; *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 212 (5th Cir. 1981); *In re Vanguard Natural Resources, LLC*, 2017 Bankr. 3978, at *9 ("[I]f the Court decides to apply Rule 23 to the proceeding, it must determine whether that Rule's requirements for class certification are satisfied."); *see also Hays*, 2019 U.S. Dist. LEXIS 17029, at *9–11 (noting the certification requirements of Rule 23 apply to certification for settlement purposes and, under the 2018 amendments, must be evaluated before a court may grant preliminary approval and direct notice to the class); *cf.* 2018 Advisory Committee Note to Rule 23(e)(1).

78.    The evidence and analysis supporting a motion for preliminary approval and notice must accompany the motion; it cannot be offered later.  *Richard v. Hoechst Celanese*

*Chem. Grp.*, 208 F.R.D. 575, 583–84 (E.D. Tex. 2002) (ruling it is not sufficient for a plaintiff seeking preliminary class certification in connection with a class settlement to offer to provide the court later with the information the court needs to conduct the required "substantial inquiry relating to certification").

79.     Further, absent class members have a right to have the necessary information available to them to make an informed decision whether to remain in a class, object, or opt out. *See* 2018 Advisory Committee Note to Rule 23(e)(1).  That cannot happen if the information does not appear until a final fairness hearing.  Accordingly, the Debtors' failure to provide that information with their motion is fatal.

80.     The Debtors' six paragraphs about Rule 23 say *nothing at all* about whether the proposed settlement classes satisfy the certification requirements of Rule 23(a) and (b).  *See id.* For that reason alone, the Court must deny the Debtors' motion because there is no basis in the record to make the required pre-notice conclusion that the proposed classes likely can be certified for purposes of final judgment.  *See In re TWL Corp.*, 712 F.3d at 893–94; *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 212 (5th Cir. 1981); *Richard v. Hoechst Celanese Chem. Grp.*, 208 F.R.D. 575, 583–84 (E.D. Tex. 2002) (ruling it is not sufficient for a plaintiff seeking preliminary class certification in connection with a class settlement to offer to provide the court later with the information the court needs to conduct the required "substantial inquiry relating to certification"); *In re Vanguard Natural Resources, LLC*, 2017 Bankr. 3978, at *9 ("[I]f the Court decides to apply Rule 23 to the proceeding, it must determine whether that Rule's requirements for class certification are satisfied."); *see also Hays*, 2019 U.S. Dist. LEXIS 17029, at *9–11 (noting the certification requirements of Rule 23 apply to certification for settlement purposes and, under the 2018 amendments, must be evaluated before a court may

grant preliminary approval and direct notice to the class); *cf.* 2018 Advisory Committee Note to Rule 23(e)(1).

81.     In addition, the plans of allocation and distribution of the settlement funds, which make no distinctions in whether a putative class member filed a proof of claim by the Bar Date or did not and no distinctions based on lease forms, as well as the post-bankruptcy going forward relief that rewrites all Pennsylvania leases regardless of whether the lessors filed proofs of claim, also set up potential intraclass conflicts of interest among members of the classes that Debtors' motion does not address.

82.     Most strikingly, creditors with WCLG Leases who filed proofs of claim, such as the 26 lessors joining this objection, receive no benefit whatsoever from having their favorable royalty payment terms rewritten as wellhead terms, whether on an in-basin or netback basis.  To the contrary, their interests are actively harmed by the MEC Settlement's going forward relief, converting their gross proceeds leases that expressly calculate royalties at a downstream point of sale to wellhead leases.  In this regard, the MEC Settlement creates impermissible intraclass conflicts of interest among different segments of the settlement classes defined in the Class Settlements that prevent certification.  *See, e.g.*, *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 315–16 (5th Cir. 2007).

83.     And there is no financial analysis or evidence in Debtors' motion that shows the going forward relief would create a financial benefit for any other Pennsylvania Proof of Claim Lessor.

84.     Rule 23(a) requires, in part, that "(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will

fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(3) & (4). These inquiries often overlap. *See Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982).

85. The Fifth Circuit instructs that the adequacy requirement "adequacy requirement mandates an inquiry into [1] the zeal and competence of the representative[s'] counsel and . . . [2] the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of absentees." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir. 2001). To show they will fairly and adequately protect the interests of the class, proposed class representatives must demonstrate that they "possess a sufficient level of knowledge and understanding to be capable of controlling or prosecuting the litigation." *Id.* at 482–83. To do this, "class representatives must show themselves sufficiently informed about the litigation to manage the litigation effort." *Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005).

86. There is nothing in the record to show that the named plaintiffs in the Class Settlements filed proofs of claim, and what issues, if any, they pursued that address the matters raised in the Pennsylvania Proof of Claim Lessors' proofs of claim.

87. In addition, the "adequacy inquiry also serves to uncover conflicts of interest between the named plaintiffs and the class they seek to represent." *Berger*, 257 F.3d at 479–80 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)) (internal quotations omitted); *see also Langbecker*, 476 F.3d at 314–15 (noting problems of intraclass conflicts of interest undermine a proposed representative's adequacy).

88. As shown above, there are intraclass conflicts between class members who did not file proofs of claim and class members who did based on the settlement terms, including in how settlement fund are to be allocated.

89.     Further, the Debtors offer no analysis of lease language or legal claims to show that the leases and claims of the named plaintiffs in the Class Settlements are typical and consistent with of those of the absent class members they seek to bind by those settlements, including those of lessors with WCLG Leases who filed proofs of claim.

90.     An analysis of the lease language and how the proposed relief relates to the lease language is important in order to gauge whether the Settlement Agreements are fair, reasonable and adequate.  For example, the royalty payment clause of the WCLG Lease unambiguously requires the lessee to determine royalties as a percentage of its marketing affiliate's gross proceeds received for the sale of gas calculated at the downstream point of sale to unaffiliated third parties. *See* Ex. C, ¶ 4(b)(ii).

91.     One Pennsylvania family with a Wyoming County Lease, Richard and Denise Kuffa (the "Kuffas"), filed a AAA arbitration demand against Equinor USA Onshore Properties, Inc. ("EOP"), an assignee of part of Chesapeake's lease interest, for breaching their lease and improperly calculating determination of royalties based on an index price instead of actual gross proceeds received by EOP's marketing affiliate.

92.     The arbitrator issued an award in the Kuffas' favor and ruled that use of an "in basin" index price to pay royalties breaches WCLG Leases and that the Lease prohibits the lessee from deducting post-production costs incurred to move the gas to the downstream point of sale when such sales are in the usual course of business and no post-production services beyond those typically required to get the gas to the downstream point of sale are involved.  *See* Kuffa Award & Order No. 4 at ¶ 9.[9]

---

[9] A copy of the Kuffas' Judicially Confirmed Arbitration Award is attached as Exhibit __.

PHDATA 7707723_2

93.     None of the named plaintiffs in the Class Settlements has a Wyoming County Lease.  However, Wyoming County Leases apparently are within the proposed MEC Settlement class, and the proposed Class Settlements seek to rewrite the leases to force Wyoming County Lease owners to choose between receiving an index price—something the Kuffa arbitrator ruled impermissible under the Wyoming County Lease—and a wellhead netback price (*i.e.*, a downstream sales price net of post-production costs) that changes the bargained for point of royalty valuation

94.     Consequently, there is no competent record evidence on which the Court can make findings (or perform the required reasoned analysis) that the requirements of Rule 23(a) are met here.

**B.      The Debtors Have not Shown—and Cannot Show—That the Class Settlements Are Likely to Be Approved as Fair, Reasonable, and Adequate in Consideration of the Factors Courts Must Evaluate Under Rule 23(e)(2) and Fifth Circuit Jurisprudence.**

95.     When a party seeks preliminary approval of a class settlement and an order directing notice to absent class members, it must show that the settlement will likely obtain the court's final approval as fair, reasonable, and adequate in light of the factors stated in Rule 23(e)(2).  Fed. R. Civ. P. 23(e)(1)(B)(i).  Those factors include whether:

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
>> (i) the costs, risks, and delay of trial and appeal;
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

PHDATA 7707723_2

> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
> (iv) any agreement required to be identified under Rule 23(e)(3); and
>
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2)(A)–(D). These considerations are in addition to, and do not displace, the factors the Fifth Circuit directed lower courts to consider prior to the 2018 amendments to Rule 23, known as the *Reed* factors. *See Hays*, 2019 U.S. Dist. LEXIS 17029, at *22–23. The *Reed* factors are:

> (1) whether the settlement was a product of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and amount of discovery completed; (4) the factual and legal obstacles [to] prevailing on the merits; (5) the possible range of recovery and the certainty of damages; and (6) the respective opinions of the participants, including class counsel, class representative, and the absent class members.

*Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983).[10]

96.     As mentioned above, the Debtors do not acknowledge the specific elements a court must consider under amended Rule 23(e)(2) before granting preliminary approval and ordering notice to absent class members. Instead, they cite only the *Reed* factors and cases decided before the 2018 amendments to Rule 23(e). Debtors' Mot. ¶ 42. For this reason alone, Debtors' motion must be denied.

97.     Without any evidentiary record or analysis offered by the Debtors, the Court cannot perform its fiduciary duty to the absent class members, let alone the required analysis under Rule 23(e)(1)(B)(i).

---

[10] While there is some overlap between the provisions of Rule 23(e)(2) and the *Reed* factors, the *Reed* factors do not encompass all the considerations required under Rule 23(e)(2).

PHDATA 7707723_2

98.    For example, the Court cannot perform the required reasoned analysis to determine whether the forms of relief provided in the Class Settlements are a fair, reasonable, and adequate compromise of class claims when there is no evidence of what the best possible recoveries would be for the class members, including over the post-Effective Date time period where class members' leases will be amended  *See* Fed. R. Civ. P. 23(e)(2); *see, e.g.*, *Neff*, 179 F.R.D. at 185 (explaining the court must "determine the value of the settlement in light of the potential for recovery," which "requires the Court to establish the range of possible damages that could be recovered at trial, and, then, by evaluating the likelihood of prevailing at trial and other relevant factors, determine whether the settlement is pegged at a point in the range that is fair to the plaintiff settlors") (internal citation and quotations omitted).

99.    As described above, the Debtors claim it is in their interest to rewrite all Pennsylvania lessors' leases to change the point of valuation to the wellhead (*i.e.*, computing royalties based on in-basin or netback prices) in perpetuity.  The Debtors claim this will be a substantial benefit to them (*see* Debtors' Mot. ¶ 28), but they provide no analysis that shows any financial benefit to class members.

100.    Where the Debtors offer no analysis of any lease language and no explanation of the likely monetary consequences to class members of changing the royalty payment provisions, the Court cannot determine whether the mandatory post-Effective Date amendment of all class members' leases provides any value to class members compared to the benefit the Debtors would receive from the release of claims class members would provide.

101.    An evidentiary record that establishes an actual benefit to class members for amending their leases is particularly important in the context of the MEC Settlement, where a previous settlement agreement was placed before Judge Mannion for approval in *Demchak*.  In

that earlier version, the going forward relief provided for a limited reduction in the amounts of post-production costs to be charged to MEC class members going forward.   Assessing the fairness here of the newly proposed going-forward relief requires evidence that the financial benefit, if any, to MEC class members from the mandatory lease amendments here is an improvement on the previous proposed going-forward relief.[11]

102.   The fact is that the lack of any evidentiary record or analysis of the Class Settlement by proposed class counsel prevents the Court from performing its fiduciary duty to conduct the review that the Fifth Circuit has described as the lower court's "most important function in reviewing compromises of class actions."   *In re Corrugated Container Antitrust Litig.*, 643 F.2d at 212.   There is no basis in the record for the Court to assess proposed class counsel's judgments and gauge the adequacy of their representation.

103.   In sum, the Debtors have explained how the Class Settlements benefit the post-Effective Date Reorganized Debtors.   However, they have not shown that the proposed classes can be certified under the requirements of Rule 23(a) and (b) or that they are likely to be approved as fair, reasonable, and adequate taking into consideration the interests of the class members.

## **RESERVATION OF RIGHTS**

104.   The Pennsylvania Proof of Claim Lessors reserve the right to respond to any attempt of Debtors or non-parties to supplement Debtors' motion with new evidence.   The Pennsylvania Proof of Claim Lessors further reserve the right to make additional objections if the Court grants the Debtors' motion and enters an order granting preliminary approval and directing

---

[11] The Class Settlements contain "walk-away rights" if too many class members opt out.  Class Settlements ¶ 7.  If too many class members opt out, the Debtors cannot accomplish their stated goal of "resetting the relationship" with Pennsylvania lessors generally.

notice to the proposed classes.  The Pennsylvania Proof of Claim Lessors also reserve their rights to obtain discovery of, at a minimum, documents and information the Debtors provided to the settling parties.

## **CONCLUSION**

105.    For the foregoing reasons, the Court should deny the Debtors' motion as it relates to the Proposed Settlements.

Dated:  March 26, 2021                      SCHNADER HARRISON SEGAL & LEWIS LLP


By:   /s/ Ira N. Richards
Ira N. Richards
Richard A. Barkasy
Arleigh P. Helfer III
Schnader Harrison Segal & Lewis LLP
1600 Market Street
Suite 3600
Philadelphia, PA 19103-7286
Telephone: (215) 751-2000
Facsimile: (215) 751-2205
irichards@schnader.com
rbarkasy@schnader.com
ahelfer@schnader.com

Aaron D. Hovan
Law Office of Aaron Hovan
154 Warren St.
Tunkhannock, PA 18657
Telephone: (570) 836-3121
aaron@hovanlaw.com

*Attorneys for Tyler/Mowry Lessors*

PHDATA 7707723_2

| Client Last | Client First | Lease Form | Secured Claim Amount | Claims Filed* | Claim # Operat | Claim # Ap |
|---|---|---|---|---|---|---|
| Baker | Roberta | Wyco | 118,373.00 | 2 | 12919 | 12930 |
| Barna | Kimberely | | | 1 | | 13235 |
| Beebe's Farm FLP | | MEC | | 2 | 13096 | 13118 |
| Bethel | Kyle | | | 1 | | |
| Booth | Elizabeth | Wyco | 69,299.00 | 1 | | 13242 |
| Boyanowski FLP | | MEC | | 2 | 13136 | 13147 |
| Buckingham | Jeff & Melinda | | | 1 | 13073 | |
| Cecil Family LLC | | Wyco | 291,787.00 | 2 | 12979 | 13025 |
| Clark | Rick & Mary | Wyco | 104,360.00 | 2 | 13052 | 13102 |
| Clark | John & Vilma | Wyco | 131,218.00 | 2 | 13033 | 13135 |
| Clark | Mike & Shellene | Wyco | 41,728.00 | 2 | 13069 | 13088 |
| Dunlap | Robert | | | 1 | 13231 | |
| Endless Mountain Water Co | | Wyco | 338,891.00 | 2 | 13011 | |
| Hatokey LLC | | Wyco | | 1 | 13237 | |
| Henning | Stephen | MEC | | 1 | | |
| Jennings Partners LP | | Wyco | 355,121.00 | 2 | 12858 | 12866 |
| Kuffa | Richard & Denise | Wyco | 21,194.00 | 2 | 12978 | 13076 |
| Kuffa | Charles & Carol | Wyco | 40,121.00 | 2 | 12998 | |
| Lake Carey Investments LLC | | Wyco | 4,562.00 | 2 | 13034 | 13090 |
| Lockburner | Dwayne | MEC | | 1 | 12338 | |
| Lyman Walters FLP | | MEC | | 1 | 13224 | 13226 |
| Marbaker | Carol | MEC | | | 13148 | 13168 |
| Marbaker | Alan | MEC | | | | |
| Marbaker | Alan & Carol | MEC | | 2 | | |
| McGavin | Marty | MEC | | 2 | 13170 | 13183 |
| McGavin | Paul & Tracie | MEC | | 2 | 13172 | 13195 |
| McIntyre | Gail | MEC | | 2 | 13194 | 13205 |
| Miller | Donald | | | 1 | | |
| Mills PTR LP | | Wyco | 355,121.00 | 2 | 12899 | 12904 |
| Montague Partners LP | | Wyco | 24,722.00 | 1 | 13233 | |
| Mostek Family LP | | Wyco | 882,872.00 | 2 | 12080 | 13063 |
| Mowry | Rodney & Diana | Tyler | | 2 | 12957 | 12985 |
| Neumane | James & Sharon | | | 1 | 13044 | |
| Neumane | James & Sharon | | | | | |
| Noone | Sam & Deborah | MEC | | 2 | 13121 | 13145 |
| Pensworth | Christina | Wyco | 118,373.00 | 2 | 12944 | 12960 |
| Pensworth | Leslie | Wyco | 118,373.00 | 2 | 12931 | 12950 |
| Petlock | Adam & Erin | MEC | | 2 | 13137 | 13155 |
| Phillips | John & Megan | Wyco | 118566 | 1 | 13238 | |
| Pickering Sisters LP | | MEC | | 1 | | 13234 |
| Poepperling Partners LP | | Wyco | 246,615.00 | 2 | 13193 | 13199 |
| Prevost | John | MEC | | 1 | 13057 | |
| Prevost | Russell | MEC | | 1 | | 13236 |
| Prizzi | Alessio | | | 1 | | 13241 |
| RDNJ Trowbridge | | | | 1 | | |
| Roman | Paul & Deborah | Wyco | 181,463.00 | 1 | 13239 | |
| S & C Henning FLP | | MEC | | 2 | 13220 | 13222 |
| Stark Family LP | Marilyn | Wyco | 578,488.00 | 1 | 13240 | |
| Teetsel Family Trust | | MEC | | 2 | 13184 | 13200 |
| Tyler Family | | No Deducts | | 2 | 12945 | 12964 |
| Vaskas | Chris & Lisa | | | 1 | 13153 | 13182 |
| Wintermute | Stephen | | | 1 | | |
| Yanchick | Andrew | Wyco | 83,887.00 | 2 | 13203 | 13209 |

* If 2, claims were filed for both CHK Appalachia and CHK Operating.

| | | | | | | |
|---|---|---|---|---|---|---|
| Place | Richard | | | | | 12977 |
| Ruark | William | | | | | 12396 |
| Steele | Herbert | | | | | 12951 |
| Wilson | Raynold | | | | | 12965 |

| United States Bankruptcy Court for the Southern District of Texas | For Court Use Only |
|---|---|
| **Name of Debtor:** Chesapeake Operating, L.L.C. | Claim Number:   0000012957 |
| **Case Number:**   20-33249 | File Date:   10/30/2020 13:55:49 |

# Proof of Claim (Official Form 410)

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case.  With the exception of 503(b)(9), do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**
**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.
A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.  18 U.S.C. §§ 152, 157, and 3571.
**Fill in all the information about the claim as of the date the case was filed.  That date is on the notice of bankruptcy** (Form 309) **that you received.**

**04/19**

---

| Part 1: | Identify the Claim |
|---|---|

**1.   Who is the current creditor?**
Name of the current creditor (the person or entity to be paid for this claim):   Rodney & Dianna Mowry

Other names the creditor used with the debtor: _____

**2.   Has this claim been acquired from someone else?**   ☑ No   ☐ Yes.   From whom? _____

**3.   Where should notices and payments to the creditor be sent?** Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| Name   Rodney & Dianna Mowry | Name   _____ |
| Address   c/o Aaron D. Hovan | Address   _____ |
| 154 Warren St. | _____ |
| | _____ |
| City   Tunkhannock | City   _____ |
| State   PA   ZIP Code  18657 | State   _____  ZIP Code  _____ |
| Country (if International): _____ | Country (if International): _____ |
| Phone:   570-836-3121 | Phone:   _____ |
| Email:   Aaron@hovanlaw.com | Email:   _____ |

| **4. Does this claim amend one already filed?** | **5. Do you know if anyone else has filed a proof of claim for this claim?** |
|---|---|
| ☑ No | ☑ No |
| ☐ Yes. | ☐ Yes. |
| Claim number on court claims register (if known) _____ | Who made the earlier filing? |
| Filed on _____<br>        MM / DD / YYYY | _____ |

**6. Do you have any number you use to identify the debtor?**

☒ No

☐ Yes.
Last 4 digits of the debtor's account or any number you use to identify the debtor:

____ ____ ____ ____

**7. How much is the claim?**

$ 73,928.91

**Does this amount include interest or other charges?**

☒ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). Limit disclosing information that is entitled to privacy, such as health care information.

Royalty Payments

**9. Is all or part of the claim secured?**

☒ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe:

_____

**Basis for perfection:**

_____

Attach redacted copies of documents, if any, that show evidence of perfection of security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:                  $_____

Amount of the claim that is secured:   $_____

Amount of the claim that is unsecured: $_____
(The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any
default as of the date of the petition:  $_____

**Annual Interest Rate** (when case was filed) _____%
☐ Fixed  ☐ Variable

**10. Is this claim based on a lease?**

☐ No

☒ Yes. **Amount necessary to cure any default as of the date of petition.**

$ 73,928.91

**11. Is this claim subject to a right of setoff?**

☒ No

☐ Yes. Identify the property:

_____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

☒ No

☐ Yes. *Check one:*

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).

☐ Other. Specify subsection of 11 U.S.C. § 507 (a) (_____) that applies.

* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

**Amount entitled to priority**

$_____

$_____

$_____

$_____

$_____

$_____

**13. Does this claim qualify as an Administrative Expense under 11 U.S.C. § 503(b)(9)?**

☐ No

☒ Yes. **Amount that qualifies as an Administrative Expense under 11 U.S.C. § 503(b)(9):** $ 4,204.57

**Part 3:** **Sign Below**

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other co-debtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

*Aaron D. Hovan*                                    10/30/2020 13:55:49

Signature                                           Date

**Provide the name and contact information of the person completing and signing this claim:**

Name      Aaron D. Hovan

Address   154 Warren St.

City      Tunkhannock

State     PA                         Zip   18657

Country (in international)

Phone     570-836-3121

Email     aaron@hovanlaw.com

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CHESAPEAKE ENERGY | ) | Case No. 20-33233 (DRJ) |
| CORPORATION, *et al.*, | ) |  |
|  | ) | Jointly Administered |
| Debtors. | ) |  |

**ADDENDUM TO TYLER/MOWRY PROOF OF CLAIM**

1.       The undersigned, counsel for Tim & Terri Tyler Family LP, Tyler 5 FLP,

Timothy & Terri Tyler, and Rodney & Dianna Mowry, on behalf of themselves and all those

similarly situated ("Claimants"), is authorized to file this Proof of Claim on behalf of Claimants.

2.       The mailing address for this Proof of Claim for all purposes is: Tyler et. al., c/o

Aaron D. Hovan, 154 Warren St., Tunkhannock, Pennsylvania 18657.

3.       On June 28, 2020 (the "Petition Date"), the Debtors, including Chesapeake

Appalachia, L.L.C., Chesapeake Energy Corporation and Chesapeake Energy Marketing, L.L.C.

("Chesapeake") filed petitions for relief under Chapter 11 of the United States Bankruptcy Code

(11 U.S.C. § 101, *et seq*.).

4.       On April 11, 2008, Claimants entered into the following four leases with Debtor

Chesapeake Appalachia LLC (the "Leases"):

a)  Chesapeake Lease No. 233002b-00163 (30 acres);

b)   Chesapeake Lease No. 233002b-00161 ( 362.87 acres),;

c) Chesapeake Lease No. 233002b-00162 (50 acres); and

d) Chesapeake Lease No. 1-349406-000, 33.88 acres.

5. All of these Leases are identical except for the property description. These four oil and gas Leases with Chesapeake burden multiple parcels of real property located in Wyoming County, Pennsylvania (the "Leased Premises"). A copy of one of these Leases is attached as Exhibit A.

6. Pursuant to the terms of the Leases, Claimants are permitted to conduct audits to determine whether Chesapeake has paid to Claimants all sums due and owing under the Leases.

7. Claimants arranged for an examination of Chesapeake's operations under the Leases for the period from January 2012 through December 31, 2013 (the "Examination").

8. The Examination revealed that Chesapeake underpaid royalties due and owing to Claimants under the Leases. For example, Chesapeake has failed to pay Claimants royalties calculated upon the revenue realized from the sale of gas without deductions of post-production costs as required by the Leases, and were underreporting gas volumes and prices, among other things.

9. Chesapeake refused to respond to the audit exception reports prepared on behalf of the Claimants and other similarly situated lessors.

10. By way of example, as the Examination report reflects, Chesapeake underpaid royalties due and owing to Claimants for the Examination period of January, 2012 through December 31, 2013 in an amount of at least:

a) $37,104.58 (Timothy Tyler)

b) $335,744.24 (T&T FLP)

c) $353,047.04 (Tyler 5 FLP)

11.     Chesapeake breached the Leases through: (a) its underpayment of royalties, which were underpaid or not paid by Chesapeake's unauthorized deduction of post-production costs; and (b) its failure to provide production data to Claimant and otherwise comply with its obligations under the Leases' audit clauses.

12.     Chesapeake's underpayment of royalties continued after the period of the Examination and is ongoing.

13.     On March 15, 2016, Claimants filed a class action complaint (the "Complaint") in the U.S. District Court for the Middle District of Pennsylvania, Case No. 3:16-cv-00456-MEM, against Chesapeake asserting claims for breach of contract, tortious interference with contract, unjust enrichment, breach of various covenants implied in oil and gas leases, injunctive and declaratory relief, and for an accounting.  A copy of the Complaint is attached as Exhibit B and is incorporated herein in its entirety by reference.  Claimants submit this claim on behalf of themselves and on behalf of those similarly situated as alleged in Exhibit B.  The total amount of the class claim requires additional information, including from a full accounting, and Claimants reserve their right to amend this claim to reflect the full class amount.

14.     As of the Petition Date, a total of $1,194,017.43 was due and owing under the Leases,[1] based on Chesapeake's unauthorized deduction of post-production costs for Gathering

---

[1] $76,457.14 (Timothy & Terri Tyler), $507,364.55 (T&T FLP), $536,266.83 (Tyler 5 FLP), $73,928.91 (Rodney & Dianna Mowry)

and Transportation from Claimants' royalty payments.  Of this amount, $357,075.76[2] in improper deductions of post-production costs were taken prior to 2014 and $836,990.24[3] was taken from 2014 until the petition date.  Claimants are unable to determine the full amount of the royalty underpayments and other charges due under the Leases because Chesapeake has failed and refused to provide necessary information in response to Claimants' requests.

15.     Claimants also possess an administrative claim under 11 U.S.C. § 507(a)(5) for all unpaid amounts due under the Leases from the Petition Date through the Effective Date of any plan of reorganization confirmed in the Debtors' cases.  This amount is $78,600.52[4] as of October 22, 2020, and will continue to grow for so long as Debtors continue to withhold post-production charges from monthly royalties in violation of the Leases.

16.     Further, as a result of Chesapeake's breaches of the Lease, any right, title and interest held by Chesapeake under the Lease of the Leased Premises reverted to Claimants.  Claimants reserves the right to seek through a class judgment in a court of appropriate jurisdiction a declaration that Chesapeake does not possess any right, title or interest in the Leases or the Leased Premises.

---

[2]  $17,565.55 (Timothy & Terri Tyler), $151,518.73 (T&T FLP), $158,905.59 (Tyler 5 FLP), $29,085.89 (Rodney & Dianna Mowry)

[3] $58,891.59 (Timothy & Terri Tyler), $355,845.82 (T&T FLP), $377,361.24 (Tyler 5 FLP), $44,843.02 (Rodney & Dianna Mowry)

[4] $6,956.46 (Timothy & Terri Tyler), $36,077.76 (T&T FLP), $38,282.19 (Tyler 5 FLP), $4,204.57 (Rodney & Dianna Mowry)

17.     Claimants reserves all of his rights under the Leases.  The filing of this proof of claim shall not be deemed a waiver of any claims or rights against any person, entity or property, or as an election of remedy.

18.     The filing of this Proof of Claim is not and shall not be deemed or construed as: (i) a waiver, release, or limitation of its right against any person, entity, or property (including, without limitation, the Debtors or any other person or entity that is or may become a debtor in a case pending in this Court); (ii) a consent by Claimants to the jurisdiction or venue of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimants; (iii) a waiver, release, or limitation of the right of  Claimants to trial by jury in this Court or any other court in any proceeding as to any and all matters so triable herein, whether or not the same be designated legal or private rights or in any case, controversy, or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether or not such jury trial right is pursuant to statute or the U.S. Constitution; (iv) a consent by Claimants to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy, or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (v) a waiver, release, or limitation of the right of Claimants to have any and all final orders in any and all non-core matters or proceedings entered only after *de novo* review by a U.S. District Court Judge; (vi) a consent to this Court hearing or deciding any matter or proceeding, to the extent this Court lacks the constitutional authority to do so under *Stern v. Marshall*, or otherwise; (vii) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Proof of Claim, any objection thereto or other proceeding which may be commenced in this

case against or otherwise involving Claimants; (viii) an election of remedies; or (ix) a consent to the final determination or adjudication of any claim or right pursuant to 28 U.S.C. § 157(c).

19.     Each of the claims described above, including the claims described in the Complaint, are brought by Claimants on their behalf and a class of similarly situated lessors.

20.     Claimants reserve their right to amend and/or supplement this Proof of Claim for all purposes.

Dated:  October  **30** , 2020                          By: Aaron D. Hovan
                                                        **Aaron D. Hovan**
                                                        154 Warren Street
                                                        Tunkhannock, PA 18657
                                                        570-836-3121

                                                        Ira N. Richards
                                                        SCHNADER HARRISON SEGAL & LEWIS LLP
                                                        1600 Market Street, Suite 3600
                                                        Philadelphia, PA 19103-7286
                                                        Telephone: (215) 751-2000
                                                        Facsimile: (215) 751-2205
                                                        irichards@schnader.com

# EXHIBIT A



MARY F. EVANS
Register of Wills - Recorder of Deeds
Clerk of Orphans' Court Division
Court of Common Pleas of Susquehanna County
PO BOX 218
MONTROSE, PA 18801-0218

(570) 278-4600

*SUSQUEHANNA COUNTY COURT HOUSE
MONTROSE, PENNSYLVANIA*

Instrument Number - 200800996
Recorded On 1/25/2008 At 12:08:55 PM
* Instrument Type - OIL LEASE
  Invoice Number - 47102
* Grantor - TYLER, NANCY W
* Grantee - ELEXCO LAND SERVICES INC
* Customer - ELEXCO LAND SERVICES INC
* FEES

| | |
|---|---|
| STATE WRIT TAX | $0.50 |
| RECORDING FEES – | $13.00 |
| RECORDER OF DEEDS | |
| COUNTY IMPROVEMENT FEE | $2.00 |
| RECORDER IMPROVEMENT FEE | $3.00 |
| TOTAL PAID | $18.50 |

* Total Pages - 4

---

**This is a certification page**

# DO NOT DETACH

**This page is now part
of this legal document.**

---

RETURN DOCUMENT TO:
ELEXCO LAND SERVICES INC
505 W HENLEY ST
OLEAN, NY 14760
ATTN: AMY

I hereby CERTIFY that this document is recorded in the
Recorder's Office of Susquehanna County, Pennsylvania.

  

MARY F. EVANS
RECORDER OF DEEDS

* - Information denoted by an asterisk may change during
  the verification process and may not be reflected on this page.

000TTY

a33002 0161

# MEMORANDUM OF LEASE

THIS MEMORANDUM OF LEASE dated the __02__ day of __January__, 2008

Original Lease
Will Not Be Recorded

BETWEEN:

Nancy W. Tyler, Widow,

RR2 Box 198
Meshoppen, Pa. 18630

-and-

(hereinafter called the "Lessor")
OF THE FIRST PART

Elexco Land Services, Inc., P.O. Box 383, Olean, New York 14760

(hereinafter called the "Lessee")
OF THE SECOND PART

WHEREAS:

The Lessor and the Lessee have entered into an Oil and Gas Lease dated __January 02__, __2008__, and made effective __January 02__, __2008__, for a primary term of __Ten (10)__ years, on those premises described as all those certain tracts of land situate in the Township of __Auburn__, County of __Susquehanna__, Commonwealth of __Pennsylvania__, and bounded as follows:

On the North by: _____;

On the East by: _____;

On the South by: _____;

On the West by: _____;

Tax ID# _____
See Exhibit "A" - Additional Leaseholds - Attached

Consisting of __362.87__ acres, more or less.

NOW THEREFORE: in consideration of the mutual covenants and agreements contained in this Agreement, the Lessor and the Lessee agree as follows:

1.      This Memorandum of Lease has been executed for the purpose of indicating the existence of the aforesaid Lease and shall not be considered in any way a modification or alteration of the Lease Agreement.

2.      The Lease further provides that the lease continues beyond its primary term for so long thereafter as the leased substances are produced from the said lands or any portion thereof is pooled, unitized or consolidated with other lands in accordance with the lease terms.

IN WITNESS WHEREOF, Lessor hereunto sets hand and seal.

LESSOR:

_____ (Seal)

_____ (Seal)

_____
Nancy W. Tyler

_____

LESSEE:
Elexco Land Services, Inc.

Per: _____
John L. Norman, Vice-President

2330080-00161

# EXHIBIT "A" - ADDITIONAL LEASEHOLDS

*between*
**Nancy W. Tyler**, *as Lessor*
*and*
**Elexco Land Services, Inc.**, *as Lessee*
dated the __02__ day of __January__ _____, 20_08_

*Original Lease Will Not Be Recorded*

The Leasehold is located, all or in part, in the Township of Auburn

in the County of Susquehanna, in the State of Pennsylvania,

and is bounded substantially formerly or currently as follows:

| | |
|---|---|
| On the North by lands of | Cooley Hill Road; |
| On the East by lands of | Mowry Road; |
| On the South by lands of | Denise McCarty, 232.00-1,022.00; |
| On the West by lands of | Theodore and Rebecca Place, 232.00-1,032.00; |
| Tax ID# | 232.00-1,025.00 |

Deed or other instrument by which the Lessor acquired title _____

The Leasehold is located, all or in part, in the Township of Auburn

in the County of Susquehanna, in the State of Pennsylvania,

and is bounded substantially formerly or currently as follows:

| | |
|---|---|
| On the North by lands of | Alfred and Barbara Place, 232.00-1,005.00; |
| On the East by lands of | George and Patricia Mowry, 233.00-1,061.00; |
| On the South by lands of | Cooley Hill Road; |
| On the West by lands of | Thomas and Susan Beitel, 232.00-1,039.00; |
| Tax ID# | 232.00-1,028.00 |

Deed or other instrument by which the Lessor acquired title _____

The Leasehold is located, all or in part, in the Township of Auburn

in the County of Susquehanna, in the State of Pennsylvania,

and is bounded substantially formerly or currently as follows:

| | |
|---|---|
| On the North by lands of | Nancy Tyler, 232.00-1,028.00; |
| On the East by lands of | State Highway 3005; |
| On the South by lands of | Nancy Tyler, 232.00-1,025.00; |
| On the West by lands of | Theodore and Rebecca Place, 232.00-1,027.00; |
| Tax ID# | 232.00-1,045.00 |

Deed or other instrument by which the Lessor acquired title _____

The Leasehold is located, all or in part, in the Township of Auburn

in the County of Susquehanna, in the State of Pennsylvania,

and is bounded substantially formerly or currently as follows:

| | |
|---|---|
| On the North by lands of | Burton and Kathleen Smith, 251.00-1,007.00; |
| On the East by lands of | Timothy and Terri Tyler, 251.00-1,014.03; |
| On the South by lands of | Michael Tyler, 251.00-1,013.00; |
| On the West by lands of | State Highway 3005; |
| Tax ID# | 251.00-1,009.00 |

Deed or other instrument by which the Lessor acquired title _____

233002b-00161

*Original Lease Will Not Be Recorded*

## ACKNOWLEDGEMENT

Commonwealth of Pennsylvania )
)
County of *SUSQUEHANNA* )          ss.:

On this, the _2_ day of *JANUARY*_____, in the year 20_08_, before me *PETER N. STRINEKA*, the undersigned officer, personally appeared **Nancy W. Tyler**, satisfactorily proven to me to be the person(s) whose name(s) is/are subscribed to the within document, and acknowledged that he/she/they executed the same for the purpose therein contained.

   **In Witness Whereof,** I have hereunto set my hand and official seal.

My Commission Expires: *AUG 17, 2011*

```
COMMONWEALTH OF PENNSYLVANIA
         Notarial Seal
   Peter N. Strineka, Notary Public
   Plum Boro, Allegheny County
   My Commission Expires Aug. 17, 2011
Member, Pennsylvania Association of Notaries
```

## ACKNOWLEDGEMENT

State of New York )
)
County of *Cattaraugus* )          ss.:

On the _24_ day of_____ *November* _____ in the year 20_08_ before me, the undersigned, a Notary Public in and for said State, personally appeared John L. Norman, **Elexco Land Services, Inc.** personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

My commission expires

```
Suzanne L. Williams # 6166383
Notary Public, State of New York
Qualified in Cattaraugus
My Commission Expires May 21, 20__
```
Commission Number

Signature: *Suzanne L Williams*

Office: *Notary Public*

\* The term "person" means any corporation, joint stock company, estate, general partnership (including any registered limited liability partnership or foreign limited liability partnership), limited liability company (including a professional service limited liability company), foreign limited liability company (including a foreign professional service limited liability company), joint venture, limited partnership, natural person, attorney in fact, real estate investment trust, business trust or other trust, custodian, nominee or any other individual or entity in its own or any representative capacity.

This document prepared by: ELEXCO LAND SERVICES, INC., P.O. Box 383, Olean, NY 14760-0383
When recorded return to: ELEXCO LAND SERVICES, INC., P.O. Box 383, Olean, NY 14760-0383

Acknowledgement Page to Memorandum of Oil and Gas Lease dated the _02_ day of _January_____, 2008 between Nancy W. Tyler and Elexco Land Services, Inc.

233002 00161

PROD 88 - Pennsylvania

## PAID UP OIL AND GAS LEASE

THIS LEASE AGREEMENT is made as of the <u>02</u> day of <u>January , 2008</u> between <u>Nancy W. Tyler</u> , <u>Widow</u> of <u>RR 2 Box 198, Meshoppen, Pennsylvania 18630</u> as Lessor (whether one or more), and <u>Elexco Land Services, Inc.</u> of P.O. Box 383, Olean, NY 14760, as Lessee. All printed portions of this lease are prepared by the party hereinabove named as Lessee, but all other provisions (including the completion of blank spaces) were prepared jointly by Lessor and Lessee.

**1. Grant of Leased Premises.** In consideration of one ($1.00) dollar in hand paid and the covenants herein contained, Lessor hereby grants, leases and lets exclusively to Lessee the following described land, hereinafter called leased premises (use Exhibit "A" for long description):

Tax Map No(s): <u>See Exhibit "A" - Additional Leaseholds - Attached</u> and is bounded substantially by lands now or formerly owned as follows:

On the North By: \_\_\_\_\_;
On the East By: \_\_\_\_\_;
On the South By: \_\_\_\_\_;
On the West By: \_\_\_\_\_;

in the township(s) of <u>Auburn</u>, in the County of <u>Susquehanna</u>, Commonwealth of Pennsylvania, containing <u>362.87</u> gross acres, more or less (including any interests therein which Lessor may hereafter acquire by reversion, prescription or otherwise), for the purpose of exploring for, developing, producing and marketing oil and gas, along with all hydrocarbon and nonhydrocarbon substances produced in association therewith (collectively, the "Oil and Gas Substances"). The term "gas" as used herein includes helium, carbon dioxide, gaseous sulfur compounds, methane produced from coal formations (including coalbed methane gas, gob gas, occluded natural gas in any formation or any other naturally occurring gases contained in or associated with any coal seam and all communicating zones) and other commercial gases, as well as normal hydrocarbon gases. In addition to the above-described land, this lease and the term "leased premises" also covers accretions and any small strips or parcels of land now or hereafter owned by Lessor which are contiguous or adjacent to the above-described land, and, in consideration of the aforementioned cash bonus, Lessor agrees to execute at Lessee's request any additional or supplemental instruments for a more complete or accurate description of the land so covered. For the purpose of determining the amount of any payments based on acreage hereunder, the number of gross acres above specified shall be deemed correct, whether actually more or less.

The rights granted to Lessee hereunder shall include the right of ingress and egress on the leased premises or lands pooled or unitized therewith, along with such rights as may be reasonably necessary to conduct operations for exploring, developing, producing, storing and marketing Oil and Gas Substances, including, but not limited to, geophysical operations, the drilling of wells, and the construction and use of roads, pipelines, tanks, water wells, disposal wells, injection wells, pits, electric and telephone lines, fiber optics and other communications facilities, power stations, and other facilities deemed necessary by Lessee to explore, discover, produce, store, (including storage in subsurface strata), treat and/or transport Oil and Gas Substances and water produced from the leased premises or other lands that share central facilities and are jointly operated with the leased premises for gathering, treating, compression and water disposal. Lessee may use in such operations, free of cost, any oil, gas, water and/or other substances produced from the leased premises, except water from Lessor's wells or ponds. In exploring, developing, producing or marketing from the leased premises or lands pooled or unitized therewith, the rights granted herein shall apply (a) to the entire leased premises, notwithstanding any partial release or other partial termination of this lease; and (b) to any other lands in which Lessor now or hereafter has authority to grant such rights in the vicinity of the leased premises or lands pooled or unitized therewith. When requested by Lessor in writing, Lessee shall bury its pipelines below ordinary plow depth on cultivated lands. No well shall be located less than 200 feet from any house or barn now on the leased premises or other lands of Lessor used by Lessee hereunder, without Lessor's consent, and Lessee shall pay for damage caused by its operations to buildings and other improvements now on the leased premises or such other lands, and to commercial timber and growing crops thereon. Lessee shall have the right at any time to remove its fixtures, equipment and materials, including well casing, from the leased premises or such other lands during the term of this lease or within a reasonable time thereafter.

**2. Term of Lease.** This lease shall be in force for a primary term of <u>Ten</u> (<u>10</u>) years from the date hereof, and for as long thereafter as oil or gas or other substances covered hereby are produced in paying quantities from the leased premises or from lands pooled or unitized therewith or this lease is otherwise maintained in effect pursuant to the provisions hereof. This lease is a "Paid-Up Oil and Gas Lease", all rental payments having been paid in advance. No rental payments are necessary in order to maintain this lease in full force and effect during the primary term.

**3. Royalty Payment.** For all Oil and Gas Substances that are produced and sold from the leased premises, Lessor shall receive as its royalty one eighth (1/8th) of the sales proceeds actually received by Lessee from the sale of such production, less this same percentage share of all Post Production Costs, as defined below, and this same percentage share of all production, severance and ad valorem taxes. As used in this provision, Post Production Costs shall mean (i) all losses of produced volumes (whether by use as fuel, line loss, flaring, venting or otherwise) and (ii) all costs actually incurred by Lessee from and after the wellhead to the point of sale, including, without limitation, all gathering, dehydration, compression, treatment, processing, marketing and transportation costs incurred in connection with the sale of such production. For royalty calculation purposes, Lessee shall never be required to adjust the sales proceeds to account for the purchaser's costs or charges downstream of the point of sale.

Lessee or its affiliate shall have the right to construct, maintain and operate any facilities providing some or all of the services identified as Post Production Costs. If this occurs, the rates charged by Lessee for such services shall not exceed the prevailing rates in the area for services of similar quality.

If Lessee uses the Oil and Gas Substances (other than as fuel in connection with the production and sale thereof) in lieu of receiving sale proceeds, the price to be used under this provision shall be based upon arm's-length sale(s) to unaffiliated parties for the applicable month that are obtainable, comparable in terms of quality and quantity, and in closest proximity to the leased premises. Such comparable arm's-length sales price shall be less any Post Production Costs applicable to the specific arms-length transaction that is utilized.

**4.   Shut-in Royalty.** If after the primary term one or more wells on the leased premises, or lands pooled or unitized therewith are capable of producing Oil and Gas Substances in paying quantities, but such well or wells are either shut in or production therefrom is not being sold by Lessee, such well or wells shall nevertheless be deemed to be producing in paying quantities for the purpose of maintaining this lease. If for a period of 90 consecutive days such well or wells are shut in or production therefrom is not sold by Lessee, then Lessee shall pay an aggregate shut-in royalty of five ($5.00) dollars per acre then covered by this lease. The payment shall be made to Lessor on or before the first anniversary date of the lease following the end of the 90-day period and thereafter on or before each anniversary while the well or wells are shut in or production therefrom is not being sold by Lessee; provided that if this lease is otherwise being maintained by operations under this lease, or if production is being sold by Lessee from another well or wells on the leased premises or lands pooled or unitized therewith, no shut-in royalty shall be due until the first anniversary date of the lease following the end of the 90-day period next following the cessation of such operations or production, as the case may be. Lessee's failure to properly pay shut-in royalty shall render Lessee liable for the amount due, but shall not operate to terminate this lease.

**5.   Operations.** If Lessee drills a well on the leased premises, or lands pooled or unitized therewith, that is incapable of producing in paying quantities (hereinafter called "dry hole"), or if all production (whether or not in paying quantities) permanently ceases from any cause, including a revision of unit boundaries pursuant to the provisions of this lease or the action of any governmental authority, then in the event this lease is not otherwise being maintained in force it shall nevertheless remain in force if Lessee commences further operations for reworking an existing well or for drilling an additional well or for otherwise obtaining or restoring production on the leased premises or lands pooled or unitized therewith within 90 days after completion of operations on such dry hole or within 90 days after such cessation of all production. If after the primary term this lease is not otherwise being maintained in force, but Lessee is then engaged in Operations, as defined below, this lease shall remain in force so long as any one or more of such Operations are prosecuted with no interruption of more than 90 consecutive days, and if any such Operations result in the production of Oil and Gas Substances, as long thereafter as there is production in paying quantities from the leased premises or lands pooled or unitized therewith. As used herein, the term Operations shall mean any activity conducted on or off the leased premises that is reasonably calculated to obtain or restore production, including without limitation, (i) drilling or any act preparatory to drilling (such as obtaining permits, surveying a drill site, staking a drill site, building roads, clearing a drill site, or hauling equipment or supplies); (ii) reworking, plugging back, deepening, treating, stimulating, refitting, installing any artificial lift or production-enhancement equipment or technique; (iii) constructing facilities related to the production, treatment, transportation and marketing of substances produced from the lease premises; and (iv) construction of water disposal facilities and the physical movement of water produced from the leased premises.

**6.   Pooling.** Lessee shall have the right, but not the obligation, to pool all or any part of the leased premises or any interest therein with any other lands or interests, as to any or all depths or zones, and as to any or all substances covered by this lease, either before or after the commencement of drilling or production, whenever Lessee deems it necessary or proper to do so in order to prudently develop or operate the leased premises, whether or not similar pooling authority exists with respect to such other lands or interests. The creation of a unit by such pooling shall be based on the following criteria (hereinafter called "pooling criteria"): A unit for an oil well (other than a horizontal completion) shall not exceed 40 acres plus a maximum acreage tolerance of 10%, and for a gas well or a horizontal completion shall not exceed 640 acres plus a maximum acreage tolerance of 10%; provided that a larger unit may be formed for an oil well or gas well or horizontal completion to conform to any well spacing or density pattern that may be prescribed or permitted by any governmental authority having jurisdiction over such matters. In exercising its pooling rights hereunder, Lessee shall file of record at the County Recorder's Office a written declaration describing the unit and stating the effective date of pooling. Production, drilling or reworking operations anywhere on a unit which includes all or any part of the leased premises shall be treated as if it were production, drilling or reworking operations on the leased premises, except that the production on which Lessor's royalty is calculated shall be that proportion of the total unit production which the net acreage covered by this lease and included in the unit bears to the total acreage in the unit, but only to the extent such proportion of unit production is sold by Lessee. In the event a unit is formed hereunder before the unit well is drilled and completed, so that the applicable pooling criteria are not yet known, the unit shall be based on the pooling criteria Lessee expects in good faith to apply upon completion of the well; provided that within a reasonable time after completion of the well, the unit shall be revised if necessary to conform to the pooling criteria that actually exist. Pooling in one or more instances shall not exhaust Lessee's pooling rights hereunder, and Lessee shall have the recurring right, but not the obligation, to revise any unit formed hereunder by expansion or contraction or both, either before or after commencement of production, in order to conform to the well spacing or density pattern prescribed or permitted by the governmental authority having jurisdiction, or to conform to any productive acreage determination made by such governmental authority. To revise a unit hereunder, Lessee shall file of record at the County Recorder's Office a written declaration describing the revised unit and stating the effective date of revision. To the extent any portion of the leased premises is included in or excluded from the unit by virtue of such revision, the proportion of unit production on which royalties are payable hereunder shall thereafter be adjusted accordingly.

**7.   Unitization.** Lessee shall have the right, but not the obligation, to commit all or any part of the leased premises or any interest therein to one or more unit plans or agreements for the cooperative development or operation of one or more oil and/or gas reservoirs or portions thereof, if in lessee's judgment such plan or agreement will prevent waste and protect correlative rights, and if such plan or agreement is approved by the federal, commonwealth or local governmental authority having jurisdiction. When such a commitment is made, this lease shall be subject to the terms and conditions of the unit plan or agreement, including any formula prescribed therein for the allocation of production from a unit. Upon permanent cessation thereof, Lessee may terminate the unit by filing of record at the County Recorder's Office a written declaration describing the unit and stating the date of termination. Pooling hereunder shall not constitute a cross-conveyance of interests.

**8.   Payment Reductions.** If Lessor owns less than the full Oil and Gas/Mineral estate in all or any part of the leased premises, payment of royalties and shut-in royalties hereunder shall be reduced as follows: royalties and shut-in royalties for any well on any part of the leased premises or lands pooled therewith shall be reduced to the proportion that Lessor's interest in such part of the leased premises bears to the full Oil and Gas/Mineral estate in such part of the leased premises. To the extent any royalty or other payment attributable to the Oil and Gas/Mineral estate covered by this lease is payable to someone other than Lessor, such royalty or other payment shall be deducted from the corresponding amount otherwise payable to Lessor hereunder.

**9. Ownership Changes.** The interest of either Lessor or Lessee hereunder may be assigned, devised or otherwise transferred in whole or in part, by area and/or by depth or zone, and the rights and obligations of the parties hereunder shall extend to their respective heirs, devisees, executors, administrators, successors and assigns. No change in Lessor's ownership shall have the effect of reducing the rights or enlarging the obligations of Lessee hereunder, and no change in ownership shall be binding on Lessee until 60 days after Lessee has been furnished the original or duly authenticated copies of the recorded documents establishing such change of ownership to the satisfaction of Lessee or until Lessor has satisfied the notification requirements contained in Lessee's usual form of division order. In the event of the death of any person entitled to shut-in royalties hereunder, Lessee may pay or tender such shut-in royalties to the credit of decedent or decedent's estate. If at any time two or more persons are entitled to shut-in royalties hereunder, Lessee may pay or tender such shut-in royalties to such persons either jointly or separately in proportion to the interest which each owns. If Lessee transfers its interest hereunder, in whole or in part, Lessee shall be relieved of all obligations thereafter arising with respect to the transferred interest, and failure of the transferee to satisfy such obligations with respect to the transferred interest shall not affect the rights of Lessee with respect to any interest not so transferred. If Lessee transfers a full or undivided interest in all or any portion of the area covered by this lease, the obligation to pay or tender shut-in royalties hereunder shall be divided between Lessee and the transferee in proportion to the net acreage interest in this lease then held by each.

**10. Release of Lease.** Lessee may, at any time and from time to time, deliver to Lessor or file of record at the County Recorder's Office a written release of this lease as to a full or undivided interest in all or any portion of the area covered by this lease or any depths or zones thereunder, and shall thereupon be relieved of all obligations thereafter arising with respect to the interest so released. If Lessee releases less than all of the interest or area covered hereby, Lessee's obligation to pay or tender shut-in royalties shall be proportionately reduced in accordance with the net acreage interest retained hereunder.

**11. Regulation and Delay.** Lessee's obligations under this lease, whether express or implied, shall be subject to all applicable laws, rules, regulations and orders of any governmental authority having jurisdiction, including restrictions on the drilling and production of wells, and regulation of the price or transportation of oil, gas and other substances covered hereby. When drilling, reworking, production or other operations are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this lease shall not terminate because of such prevention or delay, and, at Lessee's option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable for breach of any provisions or implied covenants of this lease when drilling, production or other operations are so prevented or delayed.

**12. Breach or Default.** No litigation shall be initiated by Lessor for damages, forfeiture or cancellation with respect to any breach or default by Lessee hereunder, for a period of at least 90 days after Lessor has given Lessee written notice fully describing the breach or default, and then only if Lessee fails to remedy the breach or default within such period. In the event the matter is litigated and there is a final judicial determination that a breach or default has occurred, this lease shall not be forfeited or cancelled, in whole or in part, unless Lessee is given a reasonable time after said judicial determination to remedy the breach or default and Lessee fails to do so.

**13. Warranty of Title.** Lessor hereby warrants and agrees to defend title to the leased premises conveyed to Lessee hereunder. Lessor also agrees that Lessee may, at Lessee's option, pay and discharge any taxes, mortgages or liens existing, levied or assessed on or against the leased premises. If Lessee exercises such option, Lessee shall be subrogated to the rights of the party to whom payment is made, and, in addition to its other rights, may reimburse itself out of any royalties or shut-in royalties otherwise payable to Lessor hereunder. In the event Lessee is made aware of any claim inconsistent with Lessor's title, Lessee may suspend the payment of royalties and shut-in royalties hereunder, without interest, until Lessee has been furnished satisfactory evidence that such claim has been resolved.

**14. Indemnity.** Lessee will indemnify and hold Lessor, harmless from any and all claims, demands, suits, losses, damages, and costs (including, without limitation, any attorney fees) incurred by the Lessor which may be asserted against the Lessor by reason of or which may arise out of or which may be related to Lessee's activities on the leased premises.

**~~15.~~ Extension of Primary Term.** Lessee is hereby given the exclusive option and right to extend the primary term of this lease as to all or any part of the leased premises, for an additional five (5) years, commencing with the expiration of the original primary term described in paragraph 2 above. This option may be exercised by Lessee at any time during the original primary term by paying to Lessor the sum of $1.00 and other good and valuable consideration per net mineral acre for each net mineral acre hereunder that is being extended by Lessee and is not otherwise being maintained by other provisions hereof (the "Extension Payment"). The Extension Payment may be made by check or draft mailed, tendered or delivered to Lessor at any time during the original primary term hereof. If, at the time the Extension Payment is made, multiple parties are entitled to specific amounts according to Lessee's records, the Extension Payment may be divided between said parties and paid in the same proportions. Lessee shall have the right to record a notice of extension of the primary term of this lease describing the portion of the leased premises covered by such extension; provided, however, the failure of Lessee to record such entire notice shall not affect the validity of the extension.

**SEE ADDENDUM ATTACHED HERETO AND MADE A PART HEREOF**

**IN WITNESS WHEREOF**, this lease is executed to be effective as of the date first written above, but upon execution shall be binding on the signatory and the signatory's heirs, devisees, executors, administrators, successors and assigns, whether or not this lease has been executed by all parties hereinabove named as Lessor.

WITNESSES AND/OR ATTESTATIONS:

LESSOR (WHETHER ONE OR MORE)

_____

_____   *Nancy W. Tyler*

_____   Nancy W. Tyler

23300-2100-00161

# EXHIBIT "A" - ADDITIONAL LEASEHOLDS

*between*
**Nancy W. Tyler**, *as Lessor*
*and*
**Elexco Land Services, Inc.**, *as Lessee*
dated the _____02_____ day of ___January_____, 2008

The Leasehold is located, all or in part, in the Township of Auburn

in the County of Susquehanna, in the State of Pennsylvania,

and is bounded substantially formerly or currently as follows:

| | |
|---|---|
| On the North by lands of | Cooley Hill Road; |
| On the East by lands of | Mowry Road; |
| On the South by lands of | Denise McCarty, 232.00-1,022.00; |
| On the West by lands of | Theodore and Rebecca Place, 232.00-1,032.00; |

Tax ID#   232.00-1,025.00

Deed or other instrument by which the Lessor acquired title _____N.W.T._____

The Leasehold is located, all or in part, in the Township of Auburn

in the County of Susquehanna, in the State of Pennsylvania,

and is bounded substantially formerly or currently as follows:

| | |
|---|---|
| On the North by lands of | Alfred and Barbara Place, 232.00-1,005.00; |
| On the East by lands of | George and Patricia Mowry, 233.00-1,061.00; |
| On the South by lands of | Cooley Hill Road; |
| On the West by lands of | Thomas and Susan Beitel, 232.00-1,039.00; |

Tax ID#   232.00-1,028.00

Deed or other instrument by which the Lessor acquired title _____N.W.T._____

The Leasehold is located, all or in part, in the Township of Auburn

in the County of Susquehanna, in the State of Pennsylvania,

and is bounded substantially formerly or currently as follows:

| | |
|---|---|
| On the North by lands of | Nancy Tyler, 232.00-1,028.00; |
| On the East by lands of | State Highway 3005; |
| On the South by lands of | Nancy Tyler, 232.00-1,025.00; |
| On the West by lands of | Theodore and Rebecca Place, 232.00-1,027.00; |

Tax ID#   232.00-1,045.00

Deed or other instrument by which the Lessor acquired title _____N.W.T._____

The Leasehold is located, all or in part, in the Township of Auburn

in the County of Susquehanna, in the State of Pennsylvania,

and is bounded substantially formerly or currently as follows:

| | |
|---|---|
| On the North by lands of | Burton and Kathleen Smith, 251.00-1,007.00; |
| On the East by lands of | Timothy and Terri Tyler, 251.00-1,014.03; |
| On the South by lands of | Michael Tyler, 251.00-1,013.00; |
| On the West by lands of | State Highway 3005; |

Tax ID#   251.00-1,009.00

Deed or other instrument by which the Lessor acquired title _____N.W.T._____

# ADDENDUM

1. **General**

This Addendum is attached to and forms part of the Lease dated _____JAN 2_____, 2008
      1. from _NANCY W TYLER_
      Lessor, to Elexco Land Services, Inc., Lessee.

(a) In the event of a conflict between a provision contained in this Addendum and a provision contained in the Lease, the provision contained in this Addendum prevails.

(b) Unless expressly indicated otherwise, all capitalized words used in this Addendum have the same meaning attributed to them in the Lease.

(c) The Lease continues in full force and effect and is amended only to the extent necessary to give force and effect to this Addendum and the Lease is ratified, approved and confirmed as so amended. The Lease may be further amended only by a subsequent writing executed by both Lessor and Lessee.

The following additional terms are added to the Lease:

2. The Lessor reserves the right to approve the location of all well sites, access roads, pipelines and related appliances constructed or installed on leased premises. Said approval shall not be unreasonably withheld and shall be granted in a timely manner.

3. The Lessee's operations on the leased premises shall be in accordance with regulations set forth by the Pennsylvania Department of Environment Protection.

4. The Lessee shall test the Lessor's domestic water supply (as to the quality and quantity) prior to the commencement of and following drilling operations. In the event it is determined that said operations have adversely affected said water supply, then the Lessee, at its own expense, shall take all steps necessary to return said water supply to pre-drilling conditions.

5. The Lessee shall construct or install all well sites, access roads and pipe line right-of-way in a manner which would minimize any related soil erosion. Further, any related surface reclamation shall be done in a manner which restores said land as nearly too original contours as reasonably possible.

6. The Lessee shall promptly replace any fences temporarily removed by the Lessee during its operations on the leased premises accept as to any portion thereof permanently removed for a well production site, and further shall construct gates on all access roads built by the Lessee crossing existing fences on the leased premises upon written request of the Lessor.

7. The Lessee agrees to hold the Lessor harmless from any claims which may arise as a result of the lessee's operations on the said lands.

8. Notwithstanding anything to the contrary contained in the Lease, the Lessee is not granted any right what so ever to use the leased premises or any portion thereof, for gas storage purposes.

9. The Lessee agrees that no well shall be located within four hundred feet (400') of existing building located on the leased premises without the prior written consent from the Lessor.

10. The Lessee agrees that upon completion of seismic work on the leased premises that all shot holes will be filled and the land will be returned to as close to original contours as reasonably possible within a reasonable amount of time.

11. The Lessee shall pay for damages caused by the Lessee's operations to growing crops on the leased premises.

233002 040600161

.../2

— 2 —

12.  The Lessee and Lessor agree that prior to the removal of any and all marketable timber resulting from the Lessee's operations under the terms of this lease, an appraisal shall be conducted by a qualified third party forester and the Lessee shall pay the Lessor the said appraised value.

13.  The Lessee acknowledges that this lease does not give the Lessee the right to construct a pipe line on the leased premises unless a well that is capable of producing leased substances is located on the leased premises or lands pooled or unitized with the leased premises.

14.  The Lessee agrees that all permanent pipe lines shall be buried at least 36 inches deep if requested by the Lessor in writing prior to installation of the pipeline.

15.  Notwithstanding anything to the contrary herein, this agreement shall convey no rights to lessee, the exercise of which would conflict with the eligibility of the premises for the valuation for general property tax purposes established by the Farmland and Forest Land Assessment Act of 1974, Title 72, Act 319, Sections 5490.1 et. seq. as amended, commonly referred to as the "Clean and Green Program" unless and until the exercise of such rights shall be determined by competent legal authority not to impair such eligibility, but if such eligibility is impaired, lessee shall reimburse lessor for the resulting increase in tax liability, if any

16.  The Lessee agrees that if a well is drilled on the leased premises that the Lessee shall pay the Lessor an annual payment of $2,000.00 for as long as the well is located on the leased premises.

17.  Royalties shall be paid without deductions for the costs of producing, gathering, storing, separating, treating, dehydrating, compressing, transporting, or otherwise making the oil and/or gas produced from the lease premises ready for sale or use.  All oil and/or gas royalty shall be delivered free of cost into the tank or pipeline (for oil) and into the pipeline (for gas), with the exception of Lessor's prorated share of taxes, measured by volume, on the oil and/or gas royalty.

18.  The Lessee acknowledges that any lands acquired by the Lessor after the effective date of this lease would require a separate lease agreement.

This Addendum executed as of the Lease date.


WITNESS:

_____
Witness


WITNESS:

_____
Witness


LESSOR: _____


LESSOR:

_____


LESSEE:

Elexco Land Services, Inc.

By:

_____

23300209-00161

## ACKNOWLEDGEMENTS

**COMMONWEALTH OF PENNSYLVANIA** )
)  SS.
County of _____SUSQUEHANNA_____ )

On this _2_ day of ___JANUARY___, 20_08_, before me, the undersigned Notary Public in and for said county and state, personally appeared **Nancy W. Tyler** known to me to be the person or persons whose names are subscribed to the foregoing instrument, and acknowledged that the same was executed and delivered as their free and voluntary act for the purposes therein set forth. In witness whereof I hereunto set my hand and official seal as of the date hereinabove stated.

My Commission Expires ___AUG 17, 2011___

_____
Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Peter N. Strineka, Notary Public
Plum Boro, Allegheny County
My Commission Expires Aug. 17, 2011
Member, Pennsylvania Association of Notaries

**INDIVIDUAL**
**(For use in all states)**

State / Commonwealth of _____ )
)  SS.
County of _____ )

On this _____ day of _____, 20____, before me, the undersigned Notary Public in and for said county and state, personally appeared **Nancy W. Tyler** known to me to be the person or persons whose names are subscribed to the foregoing instrument, and acknowledged that the same was executed and delivered as their free and voluntary act for the purposes therein set forth. In witness whereof I hereunto set my hand and official seal as of the date hereinabove stated.

My Commission Expires _____

_____
Notary Public

## RECORDING INFORMATION

**COMMONWEALTH OF PENNSYLVANIA** )
)  SS.
County of _____ )

This instrument was filed for record on the _____ day of _____, 20____, at _____ o'clock ____M., and duly recorded in Book _____ , Page _____, of the _____ records of this office.

By_____
Clerk (or Deputy)

This document prepared by: ELEXCO LAND SERVICES, INC., P.O. Box 383, Olean, NY 14760-0383
When recorded return to: ELEXCO LAND SERVICES, INC., P.O. Box 383, Olean, NY 14760-0383

Acknowledgement Page to Oil and Gas Lease dated the 02 day of January, 2008 between **Nancy W. Tyler** and Elexco Land Services, Inc.

ELEXCO LAND SERVICES, INC.

ORDER OF PAYMENT

DATE: __January 02__, 2008

On approval of the agreement associated herewith and on approval of terms and subject to verification of title to same, Elexco Land Services, Inc. will make payment as indicated herein by check within 60 days of the signing of this Order Of Payment by the Lessor as indicated below. No default shall be declared for failure to make payment until 60 days after receipt of written notice from payee of intention to declare such default.

PAY TO          Nancy W. Tyler

the amount of
Address                                                   Dollars ($108,861.00     )
                RR 2 Box 198
                Meshoppen, Pennsylvania 18630

| Payee Social Security No. | State | Town(ship) | County |
|---|---|---|---|
| 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 Nancy | PA | Auburn | Susquehanna |
| - | | | |
| - | | | |
| - | | | |

| Prospect Name | Area # | Gross Acres |
|---|---|---|
| Auburn | 002b | 362.87 |

Lease Number _____     New - yes     Renewal - no

This payment is for Bonus Consideration and rental period __January 02__, 2008 to __January 01__,
2018 covering 362.87 gross acres which covers property described in the Oil and Gas Lease executed this day.

| Tax Map ID # 232.00-1,025.00 | Gross Acres 118.47 | Mineral Ownership 100 | % |
|---|---|---|---|
| Tax Map ID # 232.00-1,028.00 | Gross Acres 187 | Mineral Ownership 100 | % |
| Tax Map ID # 232.00-1,045.00 | Gross Acres 47.1 | Mineral Ownership 100 | % |
| Tax Map ID # 251.00-1,009.00 | Gross Acres 10.3 | Mineral Ownership 100 | % |

First year bonus/rental payment on a _Ten (10)_ year Primary Term Oil and Gas Lease.

Lessor's Signatures:

Nancy W. Tyler

Lessor's date of signature: _____

Completed by: sms

Approved by _____     Date _____     Method _____

1 copy to lessor
1 copy to office

Tyler N - O of P[1]

**ELEXCO LAND SERVICES, INC.**

**ORDER OF PAYMENT**

DATE: __January 02__, 2008

On approval of the agreement associated herewith and on approval of terms and subject to verification of title to same, Elexco Land Services, Inc. will make payment as indicated herein by check within 60 days of the signing of this Order Of Payment by the Lessor as indicated below.  No default shall be declared for failure to make payment until 60 days after receipt of written notice from payee of intention to declare such default.

PAY TO          Nancy W. Tyler

the amount of                                                    Dollars ($108,861.00        )
Address        RR 2 Box 198
               Meshoppen, Pennsylvania 18630

| Payee Social Security No. | State | Town(ship) | County |
|---|---|---|---|
| 2b/28-3055 - Nancy | PA | Auburn | Susquehanna |
| - | | | |
| - | | | |
| - | | | |

| Prospect Name | Area # | Gross Acres |
|---|---|---|
| Auburn | 002b | 362.87 |
| Lease Number _____ | New - yes | Renewal - no |

This payment is for Bonus Consideration and rental period __January 02__, 2008 to __January 01__,
2018 covering 362.87 gross acres which covers property described in the Oil and Gas Lease executed this day.

| Tax Map ID # 232.00-1,025.00 | Gross Acres 118.47 | Mineral Ownership 100 | % |
|---|---|---|---|
| Tax Map ID # 232.00-1,028.00 | Gross Acres 187 | Mineral Ownership 100 | % |
| Tax Map ID # 232.00-1,045.00 | Gross Acres 47.1 | Mineral Ownership 100 | % |
| Tax Map ID # 251.00-1,009.00 | Gross Acres 10.3 | Mineral Ownership 100 | % |

First year bonus/rental payment on a **Ten (10)** year Primary Term Oil and Gas Lease.

Lessor's Signatures:

_Nancy W. Tyler_

Nancy W. Tyler

__1-2-08__
Lessor's date of signature:

Completed by:  sms

Approved by _____       Date _____       Method _____

1 copy to lessor
1 copy to office

# EXHIBIT B

Case 4:21-cv-01215-Document 8  Filed on 05/12/21 in TXSD  Page 1478 of 1639
Case 9:02-at-06000  Document 290  Filed 03/15/16  Page 1 of 35
1473

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| TIMOTHY TYLER; TERRI TYLER; TIM & TERRI FAMILY LP; TYLER 5 FAMILY LP; RODNEY MOWRY; and DIANNA MOWRY | : : : : : | Civil Action No.<br><br>Class Action Complaint |
| Plaintiffs, | : : : |  |
| v. | : : |  |
| CHESAPEAKE APPALACHIA, L.L.C.; CHESAPEAKE ENERGY CORPORATION; and CHESAPEAKE ENERGY MARKETING, L.L.C. | : : : : : | |
| Defendants. | : : : : : |  |

Plaintiffs Timothy Tyler; Terri Tyler; Tim & Terri Family LP; Tyler 5 Family LP; Rodney Mowry; and Dianna Mowry (collectively "Plaintiffs") bring this claim against Chesapeake Appalachia, L.L.C., Chesapeake Energy Corporation, and Chesapeake Energy Marketing, L.L.C. (collectively the "Chesapeake Defendants" or "Defendants") on behalf of themselves and all those similarly situated.

## NATURE OF THE SUIT

1.     This is a class action seeking damages for the Chesapeake Defendants' illegal conduct.  As Plaintiffs allege more fully below, the Chesapeake Defendants exploit Plaintiffs and other Pennsylvania landowners to generate revenue and profits for themselves while cutting Plaintiffs and others situated similarly to Plaintiffs out of money they are entitled to under terms of oil and gas leases.

Case 4:21-cv-01215 Document 8 Filed on 05/12/23 in TXSD Page 1474 of 1639
Case 3:02-at-06000 Document 290 Filed 03/15/16 Page 2 of 35
1474

2.      Plaintiffs, and others similarly situated, hold interests in standard form oil and gas leases entered with the expectation that the lessee's production of their gas would generate royalty payments. Thus, Plaintiffs would share in the revenues that energy companies generated from the sale of Plaintiffs' natural gas. Consistent with that expectation, the leases contain uniform language prohibiting the lessee from taking deductions for post-production costs.

3.      There is no commercial market at the wellhead for gas extracted from Plaintiffs' properties. Before the gas can be sold, post-production services such as compression, dehydration, gathering, and transportation of the natural gas are necessary to render it ready for sale. The gas is generally moved further along the interstate pipeline for sale in higher priced end-user markets.

4.      Ignoring the fact that the Plaintiffs' leases prohibit deductions from royalty payments for post-production services, the Chesapeake Defendants generated a ploy to enrich themselves at the expense of Plaintiffs and all members of the Deductions Class as defined herein.

5.      In this scheme, Chesapeake Appalachia, L.L.C. ("CHK Appalachia"), the subsidiary that holds the leases and produces gas from leased properties, transfers title to the gas to an affiliated company, Chesapeake Energy Marketing, L.L.C. ("CEML"). CEML then markets and sells the gas to third parties in the interstate pipeline system. Despite the fact that the gas is sold downstream of the wellhead, and despite the fact that the leases prohibit deductions for post-production costs, CHK Appalachia takes deductions against the royalties payable to Plaintiffs and members of the Deductions Class, charging for post-production services as though its transfer to its sister company, which like CHK Appalachia, is a wholly owned

PHDATA 5628181_1

Case 4:21-cv-81215-Document 8 Filed on 05/12/23 in TXSD Page 1475 of 1639
Case 9:02-at-06000 Document 290 Filed 03/15/16 Page 3 of 35
1475

subsidiary of Chesapeake Energy Corporation ("CHK"), is a "sale" for purposes of calculating royalties.

6.      CHK, the ultimate parent of CHK Appalachia and CEML, unjustly benefits from these improper deductions because it uses its subsidiaries to depress or eliminate royalty payments to Plaintiffs and those similarly situated while generating revenues and profits for itself from the sale of the natural gas extracted from their properties and sold to third parties in the interstate pipeline system.[1]  Thus, CHK makes money at the expense of Plaintiffs and those similarly situated by minimizing—and in some cases entirely eliminating—royalty payments to Plaintiffs, which are swallowed up by the deductions for purported post-production services.

7.      In fact, under CHK's scheme, there are times the deductions are so extensive that Plaintiffs *would actually owe money to CHK above the amount of their royalties* for post-production services.[2]  Put differently, CHK claims that despite the language of the lease

---

[1] As explained more fully below, CHK treats its production and sales operations as an integrated, unitary business.

[2] This is a potential future liability to landowners under CHK's current accounting practices. CHK's accounting for a named Plaintiff's deductions is instructive in this regard.  CHK initially paid royalties to named Plaintiff without deductions.  *See* December 21, 2011 Statement showing no deductions for first four months, attached hereto as Exhibit A.  CHK proceeded to deduct post-production costs retroactively by simply taking those costs from future royalties, informing Plaintiff of this retroactive taking via letter stating "We will also recoup the [post-production] costs that have been suspended back to the date of the *Kilmer* decision."  February 21, 2012 Letter from Mobley to Tyler, attached hereto as Exhibit B.  Although CHK has at present "zeroed out" Plaintiffs' royalty payments, without this Court's intervention there is nothing to prevent CHK from retroactively deducting the purported liability it has created from future royalties.

Case 4:21-cv-01215- Document 8 Filed on 05/12/21 in TXSD Page 1476 of 1639
Case 3:02-at-06000 Document 290 Filed 03/15/16 Page 4 of 35
1476

prohibiting deductions, it is free to produce Plaintiffs' gas without paying them royalties if post-production costs exceed the price of the gas.

8. In perpetrating this scheme, CHK profits by using its subsidiary companies to deprive Plaintiffs and others of the benefit of the royalties they expected when they signed the leases. To be sure, no one would sign an oil and gas lease promising the payment of royalties if that promise was so meaningless that it could be turned on its head and result in the lessee ***taking the lessor's gas and demanding payment for it***.

9. This lawsuit seeks legal and equitable relief to recover the funds due to Plaintiffs and those similarly situated that the Chesapeake Defendants have wrongfully appropriated to themselves through this scheme and to prevent them from exploiting landowners through the continuation of this scheme in the future.

10. At a minimum, Plaintiffs seek to enjoin the Chesapeake Defendants' most egregious misconduct. That is, Plaintiffs seek to enjoin the Chesapeake Defendants from producing Plaintiffs' gas when Plaintiffs will receive no benefit from that production (*i.e.*, when the Chesapeake Defendants assess negative royalties due to, *inter alia*, improper post-production charges).

11. In addition, the Tylers are members of a group of approximately 100 lessors whose leases are pooled in sixteen separate gas wells, all of whom joined together to review and audit the Chesapeake Defendants' records to ensure that their royalty payments were being calculated correctly (the "Audit Group"). The Audit Group engaged an accountant knowledgeable about the energy industry and royalty payments to perform the audit, which revealed that the Chesapeake Defendants were miscalculating royalties even assuming that their

Case 4:21-cv-01215 Document 8 Filed on 05/12/21 in TXSD Page 1437 of 1639
Case 3:02-at-06000 Document 290 Filed 03/15/16 Pages 5 of 35
1477

position that they are permitted to take deductions for post-production costs is correct, which it is

not. The miscalculations are attributable to the Chesapeake Defendants' underreporting of

volumes and prices. The Chesapeake Defendants have refused to correct the problems identified

by the Audit Group.

## THE PARTIES

12.     Plaintiffs Timothy and Terri Tyler reside at 2262 SR 3001 Meshoppen,

Pennsylvania 18630. They are citizens of Pennsylvania.

13.     Plaintiff Tim & Terri Family LP is a Pennsylvania limited partnership with a

principal place of business at 2262 SR 3001, Meshoppen, Pennsylvania 18630. Timothy and

Terri Tyler are the general partners and the limited partners of Tim & Terri Family LP.

14.     Plaintiff Tyler 5 Family LP is a Pennsylvania limited partnership with a principal

place of business at 540 SR 3005, Meshoppen, Pennsylvania 18630. Brian and Teresa Tyler are

the general partners and the limited partners of Tyler 5 Family LP. They reside at 540 SR 3005

Meshoppen, Pennsylvania 18630. They are citizens of Pennsylvania.

15.     Plaintiffs Rodney Mowry and Dianna Mowry reside at 233 Mowry Road,

Meshoppen, Pennsylvania 18630. They are citizens of Pennsylvania.

16.     Defendant Chesapeake Appalachia, L.L.C. is a subsidiary of Chesapeake Energy

Corporation. It is an Oklahoma limited liability company with a principal business address of

6100 North Western Avenue, Oklahoma City Oklahoma 73118, and registered agent at 1833

South Morgan Road, Oklahoma City, Oklahoma 73128.

PHDATA 5628181_1

Case 4:21-cv-01215 Document 8 Filed on 05/12/21 in TXSD Page 1478 of 1639
Case 3:02-at-06000 Document 290 Filed 03/15/16 Page 6 of 35
1478

17.     Defendant Chesapeake Energy Corporation is an Oklahoma corporation with a principal business address of 6100 North Western Avenue, Oklahoma City Oklahoma 73118, and registered agent at 1833 South Morgan Road, Oklahoma City, Oklahoma 73128.

18.     Defendant Chesapeake Energy Marketing, L.L.C. is an Oklahoma limited liability company with a principal business address of 6100 North Western Avenue, Oklahoma City Oklahoma 73118, and registered agent at 1833 South Morgan Road, Oklahoma City, Oklahoma 73128.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.  In the alternative, this Court has jurisdiction under the Class Action Fairness Act because, on information and belief, the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and because this is a class action in which a member of the class is a citizen of a state different from the defendant Chesapeake entities.  *See* 28 U.S.C. § 1332(d)(2)(A).

20.     Venue is proper pursuant to 28 U.S.C. § 1391(b) and (c)(2) because Defendants do business in this District and are subject to personal jurisdiction in this District, and because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTS

### THE MARCELLUS REGION AND THE LEASES

21.     The underlying claims involve oil and gas leases entered into by landowners in the Marcellus region, an area comprising numerous counties in Pennsylvania.

Case 4:21-cv-01215 Document 8 Filed on 05/12/23 in TXSD Page 1479 of 1639
Case 3:02-at-06000 Document 290 Filed 03/15/16 Page 7 of 38
1479

22.     The natural gas rich Marcellus Shale formation spans approximately 95,000 square miles from northern Pennsylvania to central West Virginia.  *See* http://www.chk.com/operations#/pennsylvania.

23.     CHK reports that it "has approximately 9 trillion cubic feet of net recoverable resources in the Marcellus shale, with a 55% rate of return on reinvested capital."  *Id.*

24.     In 2008, CHK was the largest leasehold owner in the Marcellus Shale play.  *See, e.g.*, CHK 2008 Annual Report at 14 (available for viewing and downloading at http://www.chk.com/investors/financial-information).  On information and belief, CHK is still the largest leaseholder in the Marcellus Shale play.

25.     The Marcellus shale region has attracted a great deal of energy industry attention because it can generate large profits for energy companies.  According to CHK, the proximity of the Marcellus shale formation to major East Coast natural gas markets "offers producers the best profit margins in the nation."  *Id.*  These profit margins depend on many factors, including the price of gas and the share of revenues paid to royalty owners.

26.     Plaintiffs Tim and Terri Tyler, Tim & Terri Family LP, and Tyler 5 Family LP own interests in Paid Up Oil and Gas Leases originally entered on January 2, 2008, with Elexco Land Services, Inc. ("Elexco").  True and correct copies of the leases are attached as Exhibit C.

27.     On January 24, 2008, plaintiffs Rodney and Dianna Mowry entered into a Paid Up Oil and Gas Lease with Elexco.  A true and correct copy of the lease is attached as Exhibit D.

28.     The Plaintiffs' Elexco leases are form leases.  In all material respects, their terms are identical.  They contain uniform provisions relating to the calculation of royalties that apply

Case 4:21-cv-01215 Document 8 Filed on 05/12/21 in TXSD Page 1486 of 1639
Case 9:02-at-06000 Document 290 Filed 03/15/16 Page 8 of 35

1480

to all lessors who are parties to leases with identical terms and specify the share of revenues to be paid to royalty owners.

29.     Each of the leases contains the following language concerning payment of royalties for any oil and gas substances produced from the properties covered by the leases:

> For all Oil and Gas Substances that are produced and sold from the leased premises, Lessor shall receive as its royalty one eighth (1/8th) of the sales proceeds actually received by Lessee from the sale of such production, less this same percentage share of all Post Production Costs, as defined below, and this same percentage share of all production, severance and ad valorem taxes. As used in this provision, Post Production Costs shall mean (i) all loses of produced volumes (whether by use as fuel, line loss, flaring, venting or otherwise) and (ii) all costs actually incurred by Lessee from and after the wellhead to the point of sale, including, without limitation, all gathering, dehydration, compression, treatment, processing, marketing and transportation costs incurred in connection with the sale of such production. For royalty calculation purposes, Lessee shall never be required to adjust the sales proceeds to account for the purchaser's costs or charges downstream of the point of sale.

30.     All the leases contain, in an addendum, a clause at paragraph 17 that overrides and modifies the royalty term above (the "Addendum Clause"). The Addendum Clause provides:

> Royalties shall be paid **without deductions for the costs of producing, gathering, storing, separating, treating, dehydrating, compressing, transporting, or otherwise making the oil and/or gas produced from the lease premises ready for sale or use**. All oil and/or gas royalty **shall be delivered free of cost** into the tank or pipeline (for oil) and **into the pipeline** (for gas) with the exception of Lessor's prorated share of taxes, measured by volume, on the oil and/or gas royalty.

(Ex. A, Addendum ¶ 17; Ex. B., Addendum ¶ 17 (emphasis added).)

PHDATA 5628181_1

Case 4:21-cv-01215-Document 8 Filed on 05/12/21 in TXSD Page 1481 of 1639
Case 3:02-at-06000 Document 290 Filed 03/15/16 Page 9 of 35
1481

31.     In connection with the execution of these leases, the Elexco representatives, and specifically Pete Strineka, attended a meeting prior to signing the leases at issue. The purpose of the meeting was to have Mr. Strineka explain the meaning of each clause in the lease to Tim, Brian, Theresa, and Nancy Tyler. At this meeting, Mr. Strineka told Tim, Brian, Theresa, and Nancy Tyler that the Tylers were extremely lucky to have the Addendum Clause in their leases. Mr. Strineka told the Tylers that the Addendum Clause explicitly prohibited the lessee from deducting any post-production costs from their royalty payment and that the Tylers would receive royalties based on 100% of the revenue from the sale of their gas.

32.     Mr. Strineka made substantially identical—and therefore apparently scripted—representations to the Mowrys about the meaning and significance of the Addendum Clause in connection with the execution of their lease.

33.     Each of the leases is assignable and states in pertinent part:

> The interest of either Lessor or Lessee hereunder may be assigned, devised or otherwise transferred in whole or in part, by area and/or by depth or zone, and the rights and obligations of the parties hereunder shall extend to their respective heirs, devisees, executors, administrators, successors and assigns.

34.     On information and belief, CHK Appalachia was assigned or otherwise acquired the Plaintiffs' leases from Elexco.

35.     Under Pennsylvania law, an oil and gas lessee is subject both to an implied duty of fair dealing and an implied covenant to develop and operate the leasehold for the mutual benefit of the lessor and lessee.

Case 4:21-cv-00215-Document 8 Filed on 05/12/21 in TXSD Page 1483 of 1639
Case 3:02-at-06000 Document 280 Filed 03/15/16 Page 10 of 35
1482

36.     The leases recognize that such implied covenants exist and are applicable to the lessee.  *See, e.g.*, Ex. A at ¶ 11 ("***Lessee's obligations*** under this lease, whether express or ***implied***, shall be subject to all applicable laws, rules, regulations and orders of any governmental authority having jurisdiction . . . .  Lessee shall not be liable for breach of any provisions or implied covenant of this lease when drilling, production or other operations are . . . prevented or delayed [by enumerated causes].").

37.     Accordingly, the leases require CHK Appalachia to act in good faith and for the mutual benefit of the lessor and lessee, taking the lessors' interests into consideration.  The Chesapeake Defendants have flouted these obligations by improperly charging deductions for post-production costs and appropriating benefits to themselves at the expense of Plaintiffs and all members of the Class.

### CHESAPEAKE'S OPERATIONAL STRUCTURE AND IMPROPER DEDUCTIONS OF POST-PRODUCTION COSTS FROM ROYALTIES UNDER THE LEASES

38.     CHK, through its wholly-owned subsidiary CHK Appalachia, owns interests in leases covering tens of thousands of acres in the Marcellus region and, through its wholly owned subsidiary CEML, markets gas it produces from the lands it has under lease.  Among other things, CHK represents in filings with the Securities and Exchange Commission that it owns or controls businesses that allow it to extract gas from the Marcellus shale and, ultimately, sell the gas into lucrative citygate markets at the end of interstate pipelines.  *See, e.g.*, CHK 2014 Report on Form 10-K at 1, 11-12 (available for viewing and downloading at http://www.chk.com/investors/financial-information).

39.     CHK has stated repeatedly that it sells Marcellus gas into lucrative citygate markets by virtue of owning firm interstate pipeline capacity contracts.

PHDATA 5628181_1

Case 4:21-cv-00215 Document 8 Filed on 05/12/21 in TXSD Page 1483 of 1639
Case 3:02-at-06000 Document 230 Filed 03/15/16 Page 11 of 35
1483

40.   CHK controls its gas production and sales operations as an integrated business entity, reporting revenues from the subsidiary companies' operations in the Marcellus region as CHK's in CHK's annual report. *See, e.g.*, *id.*; CHK 2014 Annual Report (available for viewing and downloading at http://www.chk.com/investors/financial-information).  CHK's consolidated financial statements include entities and subsidiaries in which it has a controlling financial interest or in which it directly or indirectly holds more than 50% of the stock. *See id.* at 79.  On information and belief, CHK Appalachia's and CEML's revenues are included in CHK's consolidated financial statements.

41.   CHK Appalachia holds CHK's leasehold interests in the Marcellus region.

42.   CHK Appalachia produces the gas from Plaintiffs' properties.  Following extraction, the gas is treated, gathered, and delivered into an interstate pipeline, where it is ready to be delivered to third parties for eventual sale.

43.   CHK Appalachia's affiliated company, CEML, another CHK subsidiary, purportedly handles the marketing of the gas to third parties, selling the gas to them at an interstate pipeline connection or further downstream.  In addition, on information and belief, CEML holds firm contracts for use of gathering system and pipeline transportation capacity.  For example, CEML's pipeline capacity contract on Tennessee Gas Pipeline's 300 line allows CHK to transport gas to NYC citygate. *See, e.g.*, Federal Energy Regulatory Commission: Order Issuing Certificate and Approving Abandonment, issued May 29, 2012 re: Tennessee Gas Pipeline Company LLC at 4 ¶ 6, 5¶ 8, 11 ¶¶ 27, 28, and 13 ¶ 32 (available for viewing and downloading at http://www.ferc.gov/EventCalendar/Files/20120529165448-CP11-161-000.pdf).

PHDATA 5628181_1

Case 4:21-cv-00215  Document 8  Filed on 05/12/21 in TXSD  Page 1484 of 1639
Case 3:02-at-06000  Document 280  Filed 03/15/16  Page 12 of 35
1484

44.     CEML generates an increasingly large percentage of CHK's revenues and, on information and belief, profits.  CEML's revenues have increased from approximately $3 billion to approximately $12 billion between 2010 and 2014.  See CHK 2014 Annual Report (available for viewing and downloading at http://www.chk.com/investors/annual-report/financial-review). This increase comes despite the fact that CHK sold substantially all of its gas gathering assets in a series of transactions between June 8, 2012 and December 11, 2012.  Thus, even as CHK divested its gas gathering systems, its revenues generated from gathering, marketing, and compression increased.

45.     CHK Appalachia pays royalties to Plaintiffs and those similarly situated starting from an alleged weighted average sales price ("WASP") that is purportedly calculated from sales to third parties at downstream locations served by the interstate pipeline.

46.     However, the royalty statements provided by CHK Appalachia to Plaintiffs reflect that CHK takes deductions for various purported post-production services notwithstanding the lease and addendum terms, and the landmen's statements about the meaning of those terms, as though the sale of gas to unaffiliated third parties occurs at the wellhead, before it is delivered into the gathering system that later feeds into the interstate pipeline where CEML sells the gas to third parties.  These deductions have been and, unless enjoined, will be unjustly charged against the royalty payments due to Plaintiffs and the members of the Class.

47.     These deductions are improper because they are expressly disallowed by the leases.  Pursuant to the Addendum Clause, CHK Appalachia is obligated to deliver gas for sale free of cost to the Plaintiffs.

PHDATA 5628181_1

Case 4:21-cv-00215 Document 8 Filed on 05/12/21 in TXSD Page 1485 of 1639
Case 3:02-at-06000 Document 280 Filed 03/15/16 Page 13 of 35
1485

48.     The Plaintiffs' lease forms, like those of other similarly situated lessors, contain specific, standard language governing the calculation of royalties.  The standard form leases require the lessee to calculate royalties based on the sales proceeds it receives.

49.     The leases contain standard language contemplating downstream sales to third parties, obligating the lessee to pay royalties based on "the sales proceeds actually received by Lessee."  The leases do not permit CHK Appalachia to limit royalties artificially by using the expedient of transferring gas to an affiliate such as CEML or otherwise calculating royalties on any basis other than the actual gross sale proceeds received upon sale of the gas to a third party in an arm's length transaction at the point of such sale.

50.     Moreover, when read in conjunction with the royalty provisions, the Addendum Clauses in the leases preclude Chesapeake from deducting any post-production costs.

51.     Expressly altering and superseding the post-production deduction language in the royalty provision,[3] the Addendum Clause provides that the royalties "shall be paid **_without deductions_** for the costs of producing, gathering, storing, separating, treating, dehydrating, compressing, transporting, or otherwise making the . . . gas produced from the lease premises ready for sale or use."  (Ex. A, Addendum ¶ 17 (emphasis added).)

---

[3] The lease addendum provides that "[i]n the event of a conflict between a provision contained in this Addendum and a provision contained in the Lease, the provision contained in this addendum prevails."  Ex. A. at ¶ 1(a).

PHDATA 5628181_1

Case 4:21-cv-00215 Document 8 Filed on 05/12/21 in TXSD Page 14 of 35
Case 3:02-at-06000 Document 280 Filed 03/15/16 Page 14 of 35
1486

52. Further, the Addendum Clause provides that the "gas royalty shall be delivered *free of cost into the . . . pipeline* (for gas), with the exception of Lessor's prorated share of taxes, measured by volume, on the . . . gas royalty." *Id*. (emphasis added).

53. Thus, by the express terms of the leases, CHK Appalachia may not take any deductions for post-production services.

54. On information and belief, CHK Appalachia transfers title to the gas from Plaintiffs' properties to its affiliated marketing company CEML before it is sold in an arm's length transaction at the interstate pipeline (or further downstream).

55. CHK Appalachia tells lessors that it transfers title to the gas to CEML at the wellhead; however, upon information and belief—and as the Pennsylvania Attorney General has alleged in a recently-filed Unfair Trade Practices enforcement action[4] against CHK and related companies—internal Chesapeake documents and contracts show that the transfer of title actually takes place in the interstate pipeline, where CEML sells the gas (generally at or near a citygate). A copy of a typical letter in which Chesapeake makes this misrepresentation to lessors is attached hereto as Exhibit E.

---

[4] The Attorney General's lawsuit against the Chesapeake companies, filed December 9, 2015, is styled *Commonwealth v. Chesapeake Energy Corp*., No. 2015IR0069 (Bradford Co. Ct. Common Pleas).

PHDATA 5628181_1

Case 4:21-cv-00215 Document 8 Filed on 05/13/21 in TXSD Page 1487 of 1639
Case 3:02-at-06000 Document 280 Filed 03/15/16 Page 15 of 35
1487

56.     Moreover, as the letter and Chesapeake's own conduct reflects, there is no commercial market at the wellhead.  Rather, the first commercial market exists in the interstate pipeline system.

57.     Accordingly, for purposes of the lease's royalty provision and Addendum Clause, the gas is not sold at the wellhead.  It is sold in the interstate pipeline system.

58.     Despite these facts, CHK Appalachia has deducted purported post-production costs for gathering, compression, and transportation against the royalty payments to Plaintiffs and the members of the Class.

59.     By letter dated September 16, 2015, counsel for the Tylers and their partnerships wrote to CHK Appalachia to challenge the improper deductions, which, as of May 2015, were approximately $500,000.  *See* September 16, 2015 Memorandum from Aaron Hovan to Chesapeake, attached hereto as Exhibit F.

60.     CHK Appalachia refused to correct its breach of the lease.  Instead, CHK Appalachia claims that it is permitted to take the deductions notwithstanding the Addendum Clause because, it claims, the gas is marketable at the wellhead.  It then claims that any costs incurred between the wellhead and the ultimate point of sale are post-production costs permitted by the Addendum Clause because the gas is purportedly ready for sale at the wellhead.  *See* October 16, 2015 letter from CHK counsel Gregory Miller to Aaron Hovan, a copy of which is attached hereto as Exhibit G.

61.     However, CHK Appalachia's reading of the lease renders the Addendum Clause meaningless.  It also reads the language stating that the lessee must deliver the gas to the pipeline free of cost out of the Addendum Clause by claiming that the "pipeline" is the "gathering

PHDATA 5628181_1

Case 4:21-cv-00215 Document 8 Filed on 05/13/21 in TXSD Page 1488 of 1639
Case 3:02-at-06000 Document 280 Filed 03/15/16 Page 16 of 35
1488

pipeline," not the interstate transmission pipeline where the gas is actually sold to third parties.
(*See* Ex. F at 2 ¶ 3.)  The interpretation offered by CHK, under which CHK generates revenue
for itself and its subsidiaries at the expense of the landowners, cannot be, and is not, what the
landowners intended when signing leases including the Addendum Clause guaranteeing that they
would receive royalties without deductions for gas produced from their properties and sold to
third parties.

62.     Contrary to CHK Appalachia's claims, there is no readily available commercial
market for gas at the wellhead.  To the contrary, Chesapeake's business—and the business of its
subsidiaries CHK Appalachia and CEML—is predicated on producing gas at the wellhead and
then selling the gas downstream of the wellhead to unaffiliated third parties at the highest
possible price.

63.     Accordingly, CHK Appalachia breached the lease terms expressly requiring that it
pay royalties free from deductions.

**CHESAPEAKE'S SCHEME RESULTS IN NEGATIVE ROYALTY PAYMENTS TO PLAINTIFFS AT A
HIGH POINT IN THE DECLINE CURVE**

64.     CHK Appalachia's royalty statements demonstrate that Chesapeake is
manipulating the Addendum Clause to benefit itself at the expense of Plaintiffs and the members
of the Class.

65.     For example, the Mowrys' December 31, 2015 royalty statement reflects
transactions for which ***the post-production deductions taken by Chesapeake exceed the
Mowrys' royalties in their entirety***, resulting in negative royalties that Chesapeake "zeroes out"

PHDATA 5628181_1

Case 4:21-cv-00215 Document 8 Filed on 05/13/21 in TXSD Page 1489 of 1639
Case 3:02-at-06000 Document 280 Filed 03/15/16 Page 17 of 35
1489

or offsets against the Mowrys' royalties on other transactions. A copy of the Mowrys' December 31, 2015 royalty statement is attached hereto as Exhibit H.

66.    For the "Angie 5H" well, the statement reflects a net payment of $2.45 to the Mowrys. There were sales of 48297.62 Mcf of gas produced from the well in October 2015 (production date 1015), of which 28.37 Mcf were attributable to the Mowrys' interest, at a price of $1.211 per Mcf, for a gross value of $34.35. The deductions for transportation ($23.36), gathering ($10.94 + $2.06), and compression ($1.02 + $0.67) total $38.05, eclipsed the gross value of the gas and resulted in zero royalties for the Mowrys for that month of production.

67.    Similarly, the royalty statement for Tyler 5 Family LP reflects transactions for which the post-production deductions taken by Chesapeake exceed the royalty entirely, resulting in negative royalties that Chesapeake offsets against the Tyler Family 5 LP royalties on other transactions. A copy of the Tyler 5 Family LP December 31, 2015 royalty statement is attached hereto as Exhibit I.

68.    For the "Angie 5H" well, the Tyler 5 Family LP December 31, 2015 statement reflects a credit for fuel attributable to October 2012 production (production date 1012) of $71.82. All values for October 2015 production (production date 1015) were "zeroed" out by CHK Appalachia in light of deductions taken for post-production processing. Therefore, despite producing and selling significant volumes of gas from the property, CHK Appalachia only paid the Tyler 5 Family LP $71.82 attributable to a fuel charge from October 2012. There were no royalties paid on the October 2015 production. If CHK Appalachia had not "graciously" zeroed out the net deduction charges, the net royalty to the Tyler 5 Family LP would have been

PHDATA 5628181_1

Case 4:21-cv-00215 Document 8 Filed on 05/13/21 in TXSD Page 1490 of 1639
Case 3:02-at-06000 Document 280 Filed 03/15/16 Page 18 of 35
1490

negative, effectively calling for the lessor to pay the lessee for extracting and selling gas from the property.

69.     Similarly, for the Tim & Terri Family LP, the December 31, 2015 statement reflects a payment of $71.81 for production from the "Angie 5H" well for October 2015 production (production date 1015).  That $71.81 is a credit for fuel attributable to the October 2012 production from the well (production date 1012).  All values for October 2015 production (production date 1015) are "zeroed" out by CHK Appalachia in light of deductions taken for post-production processing.  Therefore, despite producing and selling significant volumes of gas from the property, CHK Appalachia only paid the Tim & Terri Family LP $71.81 attributable to a fuel charge from October 2012.  There were no royalties paid on the October 2015 production. If CHK Appalachia had not zeroed out the net deduction charges, the net royalty to the Tim & Terri Family LP would have been negative.  A copy of the Tim & Terri Family LP December 31, 2015 royalty statement is attached hereto as Exhibit J.

70.     The timing of these negative payments is particularly damaging in light of the declining nature of gas well production.  A typical Marcellus shale well produces progressively less over its lifetime.  The rate at which production drops over the life of the well is called the "decline curve."  The fact that the negative royalties are being paid in the Plaintiffs' wells' initial years is significant, as those years are the most significant producing years of any shale well. According to Rusty Braziel, a "steep rate of decline is simply the modus operandi of shale

Case 4:21-cv-00215 Document 8 Filed on 05/12/21 in TXSD Page 1491 of 1639
Case 3:02-at-06000 Document 280 Filed 03/15/16 Page 19 of 35

1491

development and can be expected to be somewhere in the 50-90% range in the first year"[5] and

continuing thereafter. *See* Rusty Braziel "The Domino Effect" at 156.[6] Steep decline curves of

Marcellus shale wells mean that paying negative royalties in the beginning years of a well's

production is much more damaging than in its later years, when production is dramatically lower.

71.    The Tylers are in their third year of production on their wells.

72.    Thus, it is not fair to say that one month in the thirty-year life of a well is like any

other month.  Although each well is different, negative or low price production in the first three

years of a well's life is generally much more damaging than negative or low price production

near the end of a well's life.

73.    An example of negative royalties follows.  The prices and deductions on the Tyler

5 Family LP interest for October 2015 demonstrate that the deductions for purported post-

production services exceed the value of the gas at the stated $1.211 per Mcf stated by CHK

Appalachia:

---

[5] The Chesapeake Defendants have "paid" negative royalties to many lessors who are in the first
or second year of their production profile in 2015, including lessors in at least the Franclaire
East, Franclaire West, Roundwood, Lasher East, Lasher West, Lasher Southwest, Lasher
Southeast, Lasher South, McGavin East, McGavin West, O'Dowd South, and Rosiemar pooled
units.

[6] *See also* http://extension.psu.edu/natural-resources/natural-gas/webinars/pennsylvania-royalty-
calculations-and-decline-curves/pennsylvania-royalty-calculations-and-decline-curves-
powerpoint-april-17-2014.

PHDATA 5628181_1

Case 4:21-cv-00215 Document 8 Filed on 05/12/21 in TXSD Page 1492 of 1639
Case 3:02-at-06000 Document 280 Filed 03/15/16 Page 20 of 35

1492

| Owner Number | Lease Name | Deduction | Owner Volume (Mcf) | Owner Gross | Owner Deduction | Owner Net | Price per Mcf | |
|---|---|---|---|---|---|---|---|---|
| 60197 | ANGIE 5H | Fuel | 985.77 | 1,193.82 | -33.88 | 1,227.70 | **1.34** | Costs per Mcf |
| 60197 | ANGIE 5H | Gathering | 0.00 | 0.00 | 379.95 | -379.95 | 0.39 | |
| 60197 | ANGIE 5H | Compression | 0.00 | 0.00 | 23.12 | -23.12 | 0.02 | |
| 60197 | ANGIE 5H | Compression | 0.00 | 0.00 | 35.63 | -35.63 | 0.04 | |
| 60197 | ANGIE 5H | Gathering | 0.00 | 0.00 | 71.52 | -71.52 | 0.07 | |
| 60197 | ANGIE 5H | Transportation | 0.00 | 0.00 | 811.89 | -811.89 | 0.82[7] | |
| | | | | | | | **-0.13** | Net price per Mcf |
| 60197 | CLAUDE 6H | Fuel | 1,018.66 | 1,235.36 | -10.56 | 1,245.92 | **1.32** | Costs per Mcf |
| 60197 | CLAUDE 6H | Gathering | 0.00 | 0.00 | 385.58 | -385.58 | 0.38 | |
| 60197 | CLAUDE 6H | Compression | 0.00 | 0.00 | 23.46 | -23.46 | 0.02 | |
| 60197 | CLAUDE 6H | Compression | 0.00 | 0.00 | 36.16 | -36.16 | 0.04 | |
| 60197 | CLAUDE 6H | Gathering | 0.00 | 0.00 | 72.59 | -72.59 | 0.07 | |
| 60197 | CLAUDE 6H | Transportation | 0.00 | 0.00 | 823.95 | -823.95 | 0.81 | |
| | | | | | | | **-0.10** | Net price per Mcf |
| 60197 | TYLER SUS 4H | Fuel | 188.80 | 228.36 | -1.34 | 229.70 | **1.31** | Costs per Mcf |
| 60197 | TYLER SUS 4H | Gathering | 0.00 | 0.00 | 71.11 | -71.11 | 0.38 | |
| 60197 | TYLER SUS 4H | Compression | 0.00 | 0.00 | 4.33 | -4.33 | 0.02 | |
| 60197 | TYLER SUS 4H | Compression | 0.00 | 0.00 | 6.67 | -6.67 | 0.04 | |
| 60197 | TYLER SUS 4H | Gathering | 0.00 | 0.00 | 13.38 | -13.38 | 0.07 | |
| 60197 | TYLER SUS 4H | Transportation | 0.00 | 0.00 | 151.91 | -151.91 | 0.80 | |

[7] It is notable that transportation charges assessed to landowners are $0.82/Mcf. An Mcf is roughly equivalent to a Dth. Since CHK pays .4450 per Dth to get to citygate, it is unclear how charging almost double that amount is fair or reasonable. *See, e.g*., Federal Energy Regulatory Commission: Order Issuing Certificate and Approving Abandonment, issued May 29, 2012 re: Tennessee Gas Pipeline Company LLC at 4 ¶ 6, 5¶ 8, 11 ¶¶ 27, 28, and 13 ¶ 32 (available for viewing and downloading at http://www.ferc.gov/EventCalendar/Files/20120529165448-CP11-161-000.pdf).

PHDATA 5628181_1

Case 4:21-cv-00215 Document 8 Filed on 05/13/21 in TXSD Page 1493 of 1639
Case 3:02-at-06000 Document 280 Filed 03/15/16 Page 21 of 35
1493

| Owner Number | Lease Name | Deduction | Owner Volume (Mcf) | Owner Gross | Owner Deduction | Owner Net | Price per Mcf | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | -0.10 | Net price per Mcf |

74.     CHK charges these claimed expenses for post-production services out of landowners' royalties despite the lease terms, thereby generating revenue for the Chesapeake Defendants at the expense of the landowners.

75.     The resulting situation, in which CHK generates revenue for itself and its subsidiaries at the expense of the landowners, is contrary to the lease terms. Moreover, it cannot be, and is not, what the parties intended when signing leases including the Addendum Clause at issue. This clause guarantees, as landmen like Mr. Strineka plainly and repeatedly stated, that lessors would receive royalties without cost for gas produced from their properties and sold to third parties.

### THE CHESAPEAKE DEFENDANTS SUDDENLY CEASE COOPERATING WITH THE AUDIT GROUP AFTER THE AUDIT REVEALS THAT THEY HAD MISCALCULATED ROYALTIES

76.     After reviewing the relevant corporate records, the Audit Group's auditor, Mary Ellen Denomy, prepared an audit letter exception report dated March 22, 2015, and a corrected audit letter exception report dated May 13, 2015, that demonstrated that the Chesapeake Defendants had miscalculated royalty payments to the Tylers and those similarly situated. These royalty payments are incorrect even if one assumes that the Chesapeake Defendants' position with regard to deductions of post-production costs from royalty payments were correct, which it is not.

Case 4:21-cv-00215-Document 8 Filed on 05/13/21 in TXSD Page 1494 of 1639
Case 3:02-at-06000   Document 280   Filed 03/15/16   Page 22 of 35
1494

77.     The audit exception letter identified that the Chesapeake Defendants were underreporting gas volumes and prices, among other things.

78.     The Chesapeake Defendants' miscalculations resulted in underpayment of royalties to the members of the Audit Group.

79.     When the Audit Group sought a response to the audit letter exception reports, the Chesapeake Defendants refused.  In a letter dated January 25, 2016, CHK took the position that, in light of the Attorney General's lawsuit against the Chesapeake Defendants, referenced *supra* at ¶ 55, it would no longer cooperate and would not respond to the audit letter exception reports prepared on behalf of the Tylers and those similarly situated.  *See* January 25, 2016 letter from Steve Armstrong to M.E. Denomy, attached hereto as Exhibit K.

80.     Accordingly, the Chesapeake Defendants have not corrected the underpayment of royalties exposed by the Audit Group and Ms. Denomy's exception reports and refuse to do so.

## CLASS DEFINITIONS AND CLASS ALLEGATIONS

81.     Plaintiffs bring Counts I through VII of this action pursuant to Federal Rule of Civil Procedure 23(b)(3) on behalf of themselves and on behalf of other lessors who entered into any lease in the Marcellus Region in which the Chesapeake Defendants have an interest or have acquired an interest that states: "Royalties shall be paid without deductions for the costs of producing, gathering, storing, separating, treating, dehydrating, compressing, transporting, or otherwise making the oil and/or gas produced from the lease premises ready for sale or use.  All oil and/or gas royalty shall be delivered free of cost into the tank or pipeline (for oil) and into the pipeline (for gas) with the exception of Lessor's prorated share of taxes, measured by volume, on the oil and/or gas royalty."  This is the "Deductions Class."

PHDATA 5628181_1

Case 4:21-cv-00215 Document 8 Filed on 05/12/21 in TXSD Page 1495 of 1639
Case 3:02-at-06000 Document 280 Filed 03/15/16 Page 23 of 35
1495

82.     In addition, Plaintiffs bring Count VIII of this action pursuant to Federal Rule of Civil Procedure 23(b)(2) for declaratory and injunctive relief on behalf of themselves and all other lessors who hold an interest in a lease in which the Chesapeake Defendants have an interest or have acquired an interest in the Marcellus Region.  This is the "Negative Royalty Class."

83.     Further, Plaintiffs bring Count IX of this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3) for declaratory relief on behalf of themselves and all other lessors who are members of the Audit Group.  This is the "Audit Group Class."

84.     Each such Class is so numerous that joinder of separate claims on behalf of all members is impracticable.  The Chesapeake Defendants' conduct affects hundreds of lessors with leases in which the Chesapeake Defendants have or have acquired an interest.

85.     There are questions of law or fact common to each class.  The Chesapeake Defendants' course of conduct affects Plaintiffs and other situated lessors similarly, and whether that conduct violates and breaches the requirements of the leases is a question common to the class.

86.     With respect to Counts I through VII and Count IX, common questions predominate over any individual issues, since CHK Appalachia is subject to standard lease terms that apply equally to all members of the Class.  These predominating questions include, without limitation, whether CHK Appalachia has complied with its obligations to pay royalties based on the terms of the leases, whether it has engaged in a scheme with affiliate companies that depresses Class members' royalty payments, and whether Class members have been damaged by its conduct.

PHDATA 5628181_1

Case 4:21-cv-00215-Document 8 Filed on 05/13/21 in TXSD Page 1496 of 1639
Case 3:02-at-06000 Document 280 Filed 03/15/16 Page 24 of 35
1496

87.     The claims or defenses of the representative parties are typical of the claims or defenses of the Class.  Plaintiffs are not subject to any unique defenses that would render their claims atypical of those of other Class members.

88.     The Plaintiffs will adequately protect the interests of the Classes.

89.     Plaintiffs' counsel has significant class action experience and will fairly and adequately protect the interests of the Classes.

90.     With regard to the Deductions Class, each Class member has a lease agreement containing an Addendum Clause that is substantially similar to that signed by the Plaintiffs.

91.     With respect to Count VIII, Count IX, and Count X each Class member has a lease agreement in which the Chesapeake Defendants have or have acquired an interest.  The Chesapeake Defendants have acted or refused to act on grounds identical to all Class members, thus making classwide injunctive and declaratory relief appropriate.

92.     Plaintiffs anticipate that there will be no difficulties in managing this case as a class action.  Class members can be ascertained from the Chesapeake Defendants' records and damages can be calculated based on those records.

### CAUSES OF ACTION

### COUNT I—BREACH OF CONTRACT – CHK APPALACHIA
### (ON BEHALF OF THE DEDUCTIONS CLASS)

93.     Plaintiffs incorporate the allegations of paragraphs 1-92 above as if fully set forth herein.

PHDATA 5628181_1

Case 4:21-cv-00215-Document 8  Filed on 05/12/21 in TXSD  Page 1497 of 1639
Case 3:02-at-06000  Document 280  Filed 03/15/16  Page 25 of 35
1497

94.     Plaintiffs and Class members own interests in leases, which are contracts pursuant to which CHK Appalachia owed and owes royalties for the production and sale of Plaintiffs' and Class members' natural gas.

95.     In breach of the lease terms, CHK Appalachia improperly took deductions for purported post-production services in contravention of the express terms of the leases.

96.     Plaintiffs and Class members have been damaged as a result of CHK Appalachia's breach of the lease agreements and are entitled to judgment against it in the amount of their actual damages, statutory or other interest at the maximum allowable rate, attorneys' fees, costs of suit, and any further relief the Court deems appropriate.

### COUNT II – BREACH OF 1) IMPLIED DUTIES OF GOOD FAITH AND FAIR DEALING AND 2) IMPLIED COVENANT TO DEVELOP AND OPERATE LEASEHOLD FOR THE MUTUAL BENEFIT OF THE LESSOR AND LESSEE – CHK APPALACHIA (ON BEHALF OF THE DEDUCTIONS CLASS)

97.     Plaintiffs incorporate the allegations of paragraphs 1-96 above as if fully set forth herein.

98.     At all times, CHK Appalachia owed Plaintiffs and other Class members an implied duty of good faith and fair dealing.

99.     At all times, CHK Appalachia owed Plaintiffs and other Class members an implied duty to operate the leasehold for the mutual benefit of lessors and lessees, including Plaintiffs and other Class members.

100.    CHK Appalachia's conduct taking improper deductions and using affiliate companies to enhance CHK's profits and revenues at the expense of Plaintiffs and those similarly situated breached the duty of good faith and fair dealing and the duty to operate the

PHDATA 5628181_1

Case 4:21-cv-00215 Document 8 Filed on 05/12/21 in TXSD Page 1498 of 1639
Case 3:02-at-06000   Document 280   Filed 03/15/16   Page 26 of 35
1498

leases for the mutual benefit of Plaintiffs that CHK Appalachia owed Plaintiffs and Class

members as a matter of law.

101.     CHK Appalachia's reported sales of gas that yielded negative royalties to

Plaintiffs demonstrate that it is not operating the leased premises for the mutual benefit of the

Plaintiffs. In doing so, CHK Appalachia is producing and selling gas from Plaintiffs' properties

in a manner that benefits the Chesapeake Defendants giving the Plaintiffs no benefit whatsoever.

102.     Accordingly, Plaintiffs and Class members are entitled to their actual damages,

statutory or other interest at the maximum allowable rate, attorneys' fees, costs of suit, and any

further relief the Court deems appropriate.

### COUNT III – BREACH OF THE PENNSYLVANIA OIL AND GAS LEASE ACT – CHK APPALACHIA (ON BEHALF OF THE DEDUCTIONS CLASS)

103.     Plaintiffs incorporate the allegations of paragraphs 1-102 above as if fully set

forth herein.

104.     CHK Appalachia's conduct violates the Pennsylvania Oil and Gas Lease Act, 58

P.S. § 33 ("OGLA"), to the extent that it has resulted in Plaintiffs receiving less than the

minimum 12.5% royalty guaranteed by law.  This is particularly evident where deductions taken

against royalties meet or exceed the price used to calculate royalty payments.  Put differently, no

law, statute, or dictionary definition can reasonably be construed to reconcile "guaranteed

minimum royalty" with the zero royalty paid by CHK.  "Guaranteed Minimum" is simply

mathematically incompatible with zero or a negative figure.

105.     In addition, because deductions of post-production costs are prohibited by the

leases, CHK initially violated the OGLA in every instance in which it assessed deductions

Case 4:21-cv-00215 Document 8 Filed on 05/13/21 in TXSD Page 27 of 1639
Case 3:02-at-06000 Document 280 Filed 03/15/16 Page 27 of 35
1499

against royalty payments and paid less than a 12.5% royalty on the gross sale proceeds. CHK further violated the OGLA in all instances in which it later offset a "negative royalty" from one month against a subsequent royalty payment. In such situations, each offset constitutes an additional violation of the OGLA to the extent it results in the royalty payment against which it is charged to fall below the 12.5% guaranteed minimum royalty.

106. Accordingly, Plaintiffs and Class members are entitled to their actual damages, statutory or other interest at the maximum allowable rate, attorneys' fees, costs of suit, and any further relief the Court deems appropriate.

### COUNT IV – TORTIOUS INTERFERENCE WITH EXISTING CONTRACT – CHK AND CEML (ON BEHALF OF THE DEDUCTIONS CLASS)

107. Plaintiffs incorporate the allegations of paragraphs 1-106 above as if fully set forth herein.

108. Plaintiffs' leases represent contracts with CHK Appalachia.

109. Without privilege or justification, CHK and CEML have acted purposefully to harm this contractual relationship by requiring CHK Appalachia to deduct purported post-production costs from royalty payments to Plaintiffs, thereby causing CHK Appalachia to breach the contracts, resulting in monetary damages and depriving Plaintiffs of the benefit of the bargains represented by the leases while improperly benefitting CHK and CEML.

110. CHK Appalachia breached the existing contract as a result of interference by CHK and CEML.

PHDATA 5628181_1

Case 4:21-cv-00215 Document 8 Filed on 05/13/21 in TXSD Page 1500 of 1639
Case 3:02-at-06000 Document 280 Filed 03/15/16 Page 28 of 35
1500

111.     Accordingly, Plaintiffs and Class members are entitled to their actual damages, statutory or other interest at the maximum allowable rate, attorneys' fees, costs of suit, and any further relief the Court deems appropriate.

### COUNT V – UNJUST ENRICHMENT – CHK AND CEML
### (ON BEHALF OF THE DEDUCTIONS CLASS)

112.     Plaintiffs incorporate the allegations of paragraphs 1-111 above as if fully set forth herein.

113.     CHK and CEML have received benefits from Plaintiffs by accepting and realizing revenues from the sale of gas on which CHK Appalachia improperly charged post-production costs against the royalties due to Plaintiffs and members of the Class.

114.     Under the circumstances, it would be unjust to permit CHK and CEML to retain such benefits without payment of value to Plaintiffs and all Class members.

115.     Accordingly, Plaintiffs and all Class members are entitled to their actual damages, statutory or other interest at the maximum allowable rate, attorneys' fees, costs of suit, and any further relief the Court deems appropriate.

### COUNT VI – MONEY HAD AND RECEIVED – ALL DEFENDANTS
### (ON BEHALF OF THE DEDUCTIONS CLASS)

116.     Plaintiffs incorporate the allegations of paragraphs 1-115 above as if fully set forth herein.

117.     Chesapeake has compelled Plaintiffs and members of the Class to pay money for purported post-production services by deducting that money from their royalties on natural gas extracted and sold from their properties.

PHDATA 5628181_1

Case 4:21-cv-00215-DC Document 8 Filed on 05/13/21 in TXSD Page 1501 of 1639
Case 3:02-at-06000   Document 280   Filed 03/15/16   Page 29 of 35
1501

118.     Chesapeake has appropriated the benefit of these payments and the natural gas under circumstances in which the Defendants know that they are not entitled to such benefits, particularly in light of the Addendum Clause in the leases of Plaintiffs and members of the Class.

119.     Chesapeake has given insufficient consideration for the benefits it received from Plaintiffs and members of the Class, most particularly observable when the purported post-production services resulted in negative royalties to them.

120.     Accordingly, Plaintiffs and all Class members are entitled to return of the money deducted by CHK Appalachia, statutory or other interest at the maximum allowable rate, attorneys' fees, costs of suit, and any further relief the Court deems appropriate

### COUNT VII – INJUNCTIVE RELIEF – ALL DEFENDANTS
### (ON BEHALF OF THE DEDUCTIONS CLASS)

121.     Plaintiffs incorporate the allegations of paragraphs 1-120 above as if fully set forth herein.

122.     The Chesapeake Defendants continues to violate their obligations to Plaintiffs and those similarly situated under their leases.

123.     Unless the Chesapeake Defendants are ordered to desist from their practice of benefitting CHK by improperly taking deductions of purported post-production expenses, the Chesapeake Defendants will continue to cause harm to Plaintiffs and Class members.

124.     The Chesapeake Defendants will suffer less harm if they are ordered to desist from the practice of improperly taking deductions for purported post-production expenses against the royalties owed to Plaintiffs and Class members under the express terms of the leases than Plaintiffs and Class members will suffer if such improper practices are not enjoined.

PHDATA 5628181_1

Case 4:21-cv-00215-O Document 8 Filed on 05/12/21 in TXSD Page 1502 of 1639
Case 3:02-at-06000 Document 280 Filed 03/15/16 Page 30 of 35
1502

125.     Enjoining the Chesapeake Defendants from continuing their practice of taking improper deductions against Plaintiffs' and Class members' royalty payments will not harm the public interest.  To the contrary, it will advance the public interest by ensuring that the Chesapeake Defendants comply with their legal obligations.

126.     Plaintiffs and the Class members have no adequate remedy at law to prevent the Chesapeake Defendants from continuing their practice of taking improper deductions for purported post-production costs against their royalty payments.

### COUNT VIII – DECLARATORY AND INJUNCTIVE RELIEF – ALL DEFENDANTS
### (ON BEHALF OF THE NEGATIVE ROYALTY CLASS)

127.     Plaintiffs incorporate the allegations of paragraphs 1-126 above as if fully set forth herein.

128.     With regard to gas production, the Chesapeake Defendants' lawyer represented that, in accordance with the reasonable operator standard, "[m]any producers, including Chesapeake, are curtailing or shutting-in production because of lower natural gas prices."  Ex. E. However, the Chesapeake Defendants have blatantly disregarded and violated this principle.

129.     In any transaction in which the Chesapeake Defendants' costs meet or exceed the price achieved for the gas, resulting in zero royalties or negative royalties for Plaintiffs and the members of the Class, the Chesapeake Defendants are, by definition, violating their duty to Plaintiffs and other Class members to conduct "prudent operations" and to act as a "prudent operator" in the manner the Chesapeake Defendants' lawyer represented by shutting in wells or in any other way ceasing production when the costs of producing and selling gas meet or exceed the obtainable sales price.

Case 4:21-cv-00215 Document 8 Filed on 05/12/21 in TXSD Page 1508 of 1639
Case 3:02-at-06000 Document 280 Filed 03/15/16 Page 31 of 35
1503

130.    Plaintiffs and members of the Class are entitled to a declaration pursuant to 28 U.S.C. § 2201 that the Chesapeake Defendants' practice of extracting gas and selling gas from Plaintiffs' and the Class members' properties in transactions in which their costs meet or exceed the sales prices achieved violates the prudent operator duty and results in waste.

131.    Unless the Chesapeake Defendants are ordered to desist from their practice of violating the prudent operator duty by extracting gas from the properties of Plaintiffs and those similarly situated and selling that gas in transactions in which their costs exceed the sales prices, the Chesapeake Defendants will continue to cause harm to Plaintiffs and Class members by selling gas from their properties without any compensation to Plaintiffs and Class members.

132.    The Chesapeake Defendants will suffer less harm than Plaintiffs and Class members if they are ordered to desist from their practice of violating the prudent operator duty and committing waste by extracting gas from the properties of Plaintiffs and those similarly situated and selling that gas in transactions in which their costs exceed the sales prices achieved.

133.    Enjoining the Chesapeake Defendants from continuing their practice of violating the prudent operator duty and committing waste by extracting gas from Plaintiffs' and the Class members' properties for sale in transactions in which their costs exceed the sales prices achieved will not harm the public interest.  To the contrary, it will advance the public interest by ensuring that the Chesapeake Defendants comply with their legal obligations.

134.    Plaintiffs and the Class members have no adequate remedy at law to prevent the Chesapeake Defendants from continuing their practice of violating the prudent operator duty and committing waste by extracting gas from their properties and selling that gas in transactions in which their costs exceed the sales prices achieved.

PHDATA 5628181_1

Case 4:21-cv-00215 Document 8 Filed on 05/13/21 in TXSD Page 1504 of 1639
Case 3:02-at-06000 Document 280 Filed 03/15/16 Page 32 of 35
1504

## COUNT IX – DECLARATORY RELIEF – ALL DEFENDANTS
### (ON BEHALF OF AUDIT GROUP CLASS)

135.     Plaintiffs incorporate the allegations of paragraphs 1-134 above as if fully set forth herein.

136.     The audit of the Chesapeake Defendants' corporate records performed on behalf of the Audit Group demonstrated that the Chesapeake Defendants' miscalculated royalty payments they did pay to Plaintiffs and those similarly situated by, among other things, underreporting gas volumes and prices, resulting in underpayment of royalties to the members of the Audit Group.

137.     Plaintiffs and the Class are entitled to a declaration pursuant to 28 U.S.C. § 2201 that the Chesapeake Defendants have miscalculated and underpaid royalties to the members of the Audit Group in breach of their leases as documented in the audit letter exception reports prepared on behalf of the Audit Group.

138.     Plaintiffs and the Class are further entitled to a declaration that the Chesapeake Defendants owe Plaintiffs and the Class money damages as a consequence of their miscalculation and underpayment of royalties as documented in the audit letter exception reports prepared on behalf of the Audit Group.

## COUNT X – ACCOUNTING – ALL DEFENDANTS
### (ON BEHALF OF ALL CLASSES)

139.     Plaintiffs incorporate the allegations of paragraphs 1-138 above as if fully set forth herein.

140.     In light of the Chesapeake Defendants' inequitable conduct, including unjustly enriching themselves at Plaintiffs' expense, Plaintiffs and the members of the Classes are entitled

PHDATA 5628181_1

to an accounting of all sales of gas, post-production charges, royalty payments, and revenues derived from the sales of gas from their properties.

## JURY DEMAND

Plaintiffs demand trial by jury on all counts for which a jury trial is permitted.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and members of the Classes, pray for the following relief:

a. An order certifying a Class of lessors who entered into any lease in the Marcellus Region in which the Chesapeake Defendants have an interest or have acquired an interest that states, in substance: "Royalties shall be paid without deductions for the costs of producing, gathering, storing, separating, treating, dehydrating, compressing, transporting, or otherwise making the oil and/or gas produced from the lease premises ready for sale or use. All oil and/or gas royalty shall be delivered free of cost into the tank or pipeline (for oil) and into the pipeline (for gas) with the exception of Lessor's prorated share of taxes, measured by volume, on the oil and/or gas royalty";

b. An order certifying a Rule 23(b)(2) Class of lessors who hold an interest in a lease in the Marcellus Region in which Chesapeake has or has acquired an interest;

c. An order certifying a Rule 23(b)(2) and/or Rule 23(b)(3) Class of lessors who are members of the Audit Group;

PHDATA 5628181_1

Case 4:21-cv-00215 Document 8 Filed on 05/13/21 in TXSD Page 1506 of 1639
Case 3:02-at-06000 Document 280 Filed 03/15/16 Page 34 of 35

1506

d.  A judgment awarding Plaintiffs and the Class their actual damages, punitive damages on Counts II and IV, statutory or other interest at the maximum allowable rate, attorneys' fees, and costs of suit;

e.  An order enjoining the Chesapeake Defendants from engaging in further wrongful conduct regarding improper assessment of post-production costs;

f.  With regard to the Negative Royalty Class, a declaratory judgment pursuant to 28 U.S.C. § 2201 that the Chesapeake Defendants' practice of extracting gas from Class members' properties for sale in transactions in which costs exceed price violates the prudent operator standard and constitutes waste;

g.  With regard to the Negative Royalty Class, an order enjoining the Chesapeake Defendants from engaging in violations of the prudent operator standard or committing waste by extracting or selling gas from Class members' properties for sale in transactions in which costs exceed price;

h.  With regard to the Audit Group Class, a declaratory judgment pursuant to 28 U.S.C. § 2201 that the Chesapeake Defendants have miscalculated and underpaid royalties to the members of the Class;

i.  With regard to the Audit Group Class, a declaratory judgment pursuant to 28 U.S.C. § 2201 that the Chesapeake Defendants owe Plaintiffs and the Class money damages as a consequence of their miscalculation and underpayment of royalties to members of the Class;

j.  An order requiring an accounting; and

PHDATA 5628181_1

Case 4:21-cv-00215 Document 8 Filed on 05/13/21 in TXSD Page 1507 of 1639
Case 3:02-at-06000 Document 280 Filed 03/15/16 Page 35 of 35

1507

k. Any further relief the Court deems appropriate.

      /s/ Ira Neil Richards         

Ira Neil Richards (PA 50879)
Kenneth I. Trujillo (PA 46520)
Arleigh P. Helfer III (PA 84427)
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
Voice: (215) 751-2000
Fax: (215) 751-2205
irichards@schnader.com

Aaron D. Hovan (PA 308412)
154 Warren Street
Tunkhannock, PA 18657
(570) 836-3121

Richard L. Huffsmith (PA 78895)
28 East Tioga Street
Tunkhannock, PA 18657
(570) 240-4400

Richard D. Greenfield (PA 9669)
Greenfield & Goodman LLC
250 Hudson Street, 8th Floor
New York, NY 10013
(917) 495-4446
whitehatrdg@earthlink.net

*Counsel for Plaintiffs
   and the Classes*

PHDATA 5628181_1

## OIL AND GAS LEASE

THIS OIL AND GAS LEASE (the "Lease") made this **24th** day of September, 2009, between Richard L. Kuffa and **Denise D Kuffa**, his wife, hereinafter called Lessor (whether one or more), whose address is: **1054 SR 29 N, TUNKHANNOCK, PA 18657**, hereinafter "Lessor" and **CHESAPEAKE APPALACHIA, L.L.C.**, an Oklahoma limited liability company, 6100 N. Western Ave.,Oklahoma City, OK 73118, hereinafter "Lessee".

WITNESSETH:

1.     **Construction of Lease.** Lessor, in consideration of a cash bonus in hand paid, of the royalties herein provided and of the covenants and agreements of Lessee hereinafter contained, does hereby lease and let unto Lessee the land covered hereby for the purposes of exploring and with the exclusive right of drilling, and operating for, and producing oil, gas, and other liquid or gaseous hydrocarbons produced in association with oil or gas through the well borehole from the land covered hereby or lands pooled therewith. Lessee agrees to act as a reasonably prudent operator assuming the obligation to exercise due diligence and act competently and in good faith taking into consideration the legitimate interests of the Lessor. Lessee and Lessor agree to a signing bonus of Five Thousand Seven Hundred and Fifty and No/100 dollars ($5,750.00) for each acre, One Thousand and No/100 dollars ($1,000.00) per acre of which is non refundable paid at the time of signing Lessee's Lease Commitment Agreement, with the remainder payable pursuant to Order of Payment on the date Lessor's title is confirmed. This lease shall become effective on the date of receipt by Lessor of the final signing bonus payment. Lessee and Lessor agree that all rental and bonus payments made by Lessee for this Lease are non-refundable. The total paid up amount shall be based on Five Thousand Seven Hundred and Fifty and No/100 dollars ($5,750.00), for each acre leased hereunder, for a total of $87,832.40. Lessee acknowledges receipt of One Thousand dollars ($1,000.00) per acre for $15,275.20 paid by Lessee upon the execution of Lessee's Lease Commitment Agreement dated September 24, 2009. The balance of Four Thousand Seven Hundred and Fifty and No/100 dollars ($4,750.00) per acre for a total of $72,557.20 to be paid in full upon the execution hereof, provided however, title shall be confirmed or title defect(s) shall be documented, payment shall be received by Lessor, in hand, not later than December 31, 2009. For the purposes of this paragraph (1), an unsubordinated mortgage will not be considered a title defect. The lands covered hereby, herein called the "leased premises," is located in the County of WYOMING, Commonwealth of Pennsylvania, and are described as follows:

### See Exhibit 'A' attached hereto and made a part hereof.

For the purpose of determining the amount of any bonus, delay rental or other payment hereunder, the leased premises shall be deemed to contain 15.2752 acres, whether actually containing more or less, and the above recital of acreage in any tract shall be deemed to be the true acreage thereof unless either party provides conclusive evidence to the contrary.

2.     **Term.**

(a)     Except as expressly provided below and unless sooner terminated under other provisions herein, the lease shall remain in full force and effect for a period of five (5) years from the date set forth above (hereinafter referred to as "Primary Term"). The Lease may be extended beyond the Primary Term under the following terms and conditions: (i) the Lease will continue for so long as Lessor receives royalty or other prescribed payments as provided for herein; or (ii) in the event a well is being drilled, completed, reworked, recompleted, deepened, plugged back or repaired upon the leased premises or lands pooled therewith and the Primary Term expires prior to the completion of said well, Lessee shall be granted a one hundred eighty (180) day extension to complete the well and place it into production.

(b)     Lessee is hereby given the option to extend the primary term of this lease for one (1) additional five (5) year period. This option may be exercised by Lessee at any time on or before the expiration of the original primary term by notifying Lessor of its intent to exercise its option to extend the term and simultaneously therewith paying a lease bonus to Lessor in an amount equal to the original signing bonus, Five Thousand Seven Hundred and Fifty and No/100 dollars ($5,750.00), per acre paid to Lessor by Lessee; this payment shall be based upon the number of net acres then covered by this Lease and not at such time being maintained by other provisions hereof. If, at the time this payment is made, various parties are entitled to specific amounts according to Lessee's records, this payment may be divided between said parties and paid in proportion to each party's rightful ownership in the leased premises. Should this option be exercised as herein provided, it shall be considered for all purposes as though this Lease originally provided for a primary term of ten (10) years.

3.    **Reservations.**  Lessor reserves all rights not specifically provided for in paragraph 1, including but not limited to those listed in this paragraph 3.

(a)      Lessee shall have the right to conduct seismic operations on the leased premises and to contract with third parties to conduct seismic operations, for Lessee's own account and use. If Lessee contracts with an independent contractor third party to perform seismic operations on Lessee's behalf, Lessor shall nevertheless be entitled to deal only with a representative of Lessee in connection with such operations, and shall not be required to contract or negotiate with such independent contractor.  Lessor shall have the right to conduct seismic operations on the leased premises, and to grant permits to third parties for the conduct of such operations, and Lessor shall be entitled to all consideration paid by any third party for such right, and Lessee shall have no interest in or right to such seismic information.

(b)      Lessor reserves the right to construct any structure or other improvements, at any location selected by Lessor, anywhere on the leased premises. If, prior to Lessee coordinating site location (paragraph 17(a)), Lessor commences construction of a structure or other improvement on the leased premises, Lessee will not locate any equipment, nor conduct any operations within 300 feet of the proposed structure or improvement (within 500 feet if a habitable structure) without Lessor's written permission.

(c)      Lessor reserves the right to raise livestock and grow all types of crops including timber on the leased premises except in those areas covered in paragraph 20(b). If Lessor is currently using or elects in the future to use all or any part of the leased premises to raise livestock, Lessee will construct the necessary fence, gates and cattleguards in accordance with paragraph 20(c), and otherwise accommodate Lessor's use of the leased premises for raising livestock.

(d)      Lessor reserves the right to initiate or continue irrigation and agricultural activities on the leased premises.  If Lessor decides to conduct agricultural activities on the leased premises, to include irrigation and recognized soil conservation practices, Lessee will accommodate Lessor's agricultural use of the leased premises.

(e)      This Lease does not include and there is hereby excepted and reserved unto Lessor all of the sulphur, coal, lignite, uranium and other fissionable materials, geothermal energy, base and precious metals, rock, stone, gravel, and any other mineral substances (excepting oil, condensate, distillate, gas and natural gas liquids, including any hydrocarbon or non-hydrocarbon minerals or products that may be associated with oil or gas produced therewith) presently owned by Lessor in, under or upon the leased premises, together with rights of ingress and egress and use of the leased premises by Lessor and its agents, and or mineral lessees, for purposes of exploration for and production and marketing of the materials and minerals reserved herein to Lessor.

(f)      Lessor retains the right to negotiate, lease, explore for and develop wind energy and receive any and all benefits therefrom.  Lessee agrees that it shall cooperate in good faith with Lessor and any wind lessee, not unreasonably impede such activities and not unreasonably interfere with installation and maintenance of wind turbines, substations, transmission lines, anemometers or other related equipment.

(g)      All of the rights retained by Lessor and the rights granted the Lessee herein shall be exercised in such manner that neither shall unreasonably interfere with the operations of the other upon the leased premises.

4.    **Royalty.**

(a)      The royalties payable to the Lessor under this Lease shall be on a well by well basis.  As to each and every well completed as a producer of oil and/or gas on the leased premises or on lands pooled therewith, the royalties paid to Lessor shall be twenty percent (20%) of all the oil, gas and casinghead gas removed or recovered from the leased premises or,  at Lessor's option (which shall be presumed to be exercised unless Lessor advises Lessee to the contrary prior to any applicable production month) the Gross Proceeds (as hereinafter defined in paragraph 4(d)) of the total gross production attributable to the applicable well.

(b)      Lessee covenants and agrees:

(i)      To sell and execute division orders for the sale of all oil, condensate and liquid hydrocarbons produced and saved by Lessee from the leased premises, including Lessor's share with Lessee's share and shall pay Lessor royalty (in accordance with paragraph (a) above), where applicable, based on the Gross Proceeds paid to Lessee or any Affiliate (as hereafter defined in paragraph 4 (c)) of Lessee from the sale.  From time to time, at the option of Lessor, to deliver or cause to be delivered to the credit of Lessor, in the pipeline or tanks to which Lessee may connect its wells, percentages (in accordance with paragraph (a) above) of all oil, condensate and liquid hydrocarbons produced and saved from the leased premises;

(ii)      To pay Lessor on gas and casinghead gas produced from the leased premises, percentages of proceeds (in accordance with paragraph (a) above) based on:

(1)     the Gross Proceeds paid to Lessee from the sale of such gas and casinghead gas when sold by Lessee in an arms-length sale to an unaffiliated third party, or

(2)     the Gross Proceeds, paid to an Affiliate of Lessee, computed at the point of sale, for gas sold by lessee to an Affiliate of Lessee, and

(3)     the market value at the point of use, when used by Lessee.

(iii)     To pay Lessor on all other byproducts and/or constituents marketed or utilized by Lessee from the leased premises, in accordance with paragraph (a), the percentages of the Gross Proceeds paid at the point of sale.

(c)     For purposes of this Lease, an "Affiliate of Lessee" is any corporation, firm or other entity in which Lessee, or any parent company, subsidiary or affiliate of Lessee, owns an interest of more than ten percent (10%), whether by stock ownership or otherwise, or over which Lessee or any parent company or Affiliate of Lessee exercises any degree of control, directly or indirectly, by ownership, interlocking directorate, or in any other manner; and any corporation, firm or other entity which owns any interest in Lessee, whether by stock ownership or otherwise, or which exercises any degree of control, directly or indirectly, over Lessee, by stock ownership, interlocking directorate, or in any other manner.

(d)     For purposes of this Lease, "Gross Proceeds" means the total consideration paid for oil, gas, associated hydrocarbons, and marketable by-products, produced from the leased premises or consideration for relinquishing any rights relating to this Lease whether in the form of payments, bonuses, premiums, pre-payments for future production or delivery of production at a future time, or sums paid to compromise claims relating to payment obligations with the following exceptions:

(i)     If gas produced from the leased premises is processed for the recovery of liquefiable hydrocarbon products prior to sale, and if such processing plant is not owned by Lessee or any Affiliate of Lessee, Lessor's royalty shall be calculated based upon the consideration paid to Lessee (or any Affiliate of Lessee) from Lessee's (or Lessee's Affiliate's) sale of such liquefiable hydrocarbons and residue gas.

(ii)     If gas produced from the leased premises is processed for the recovery of liquefiable hydrocarbon products prior to sale, and if such processing plant is owned by Lessee or an Affiliate of Lessee, Lessor's royalty shall be calculated based on (a) the gross proceeds (without deduction for costs of processing) paid to Lessee (or any Affiliate of Lessee) from the sale of all products extracted from such gas, plus (b) the total consideration paid to Lessee (or any Affiliate of Lessee) from the sale of all residue gas.

(iii)     If oil or gas production from the leased premises is processed in a plant for the extraction of gasoline, hydrocarbons or other products, the value of the Gross Production shall, for purposes of determining royalty due, never be less than if such gas had not been processed.

(iv)     Lessee shall pay to the Lessor royalty at the applicable royalty rate (paragraph a) on any monetary settlement received by Lessee from any breach of contract by Lessee's purchaser relating to the marketing, pricing, or taking of oil or gas production from the leased premises.

(e)     Lessee shall place oil and gas produced from the leased premises in marketable condition and shall market same as agent for Lessor, at no cost to Lessor. Except as expressly provided in (d) above, Lessor's royalty shall not be charged directly or indirectly with any expense required to make gas marketable, including but not limited to the following: expenses of production, gathering, dehydration, compression, manufacturing, processing, treating, transporting or marketing of gas, oil, or any liquefiable hydrocarbons extracted therefrom; provided however, that reasonable, actual costs paid to nonaffiliated third parties for gathering, compression and transportation necessary to enhance the value of otherwise marketable gas may be deducted from Lessor's royalty proportionately to Lessor's royalty percentage. However, those costs shall never cause the royalty due to Lessor to be less than what the royalty would have been if enhancements and the associated costs had never been made. The burden of proving marketability and enhanced value shall be upon the Lessee.

(f)     All royalties that may become due hereunder shall commence to be paid on the first well completed on the leased premises within one hundred-twenty (120) days after the first day of the month following the month during which any well is completed and commences production into a pipeline for sale of such production. On each subsequent well, royalty payments must commence within ninety (90) days after the first day of the month following the month during which any well is completed and commences production into a pipeline for sale of such production. Thereafter, all royalties on oil shall be paid to Lessor on or before the last day of the second month following the month of production, and all royalties on gas shall be paid to Lessor on or before the last day of the third month following the month of production. Royalties not paid when due shall bear interest at the prime rate, plus five percent (5%).

Kuffa 00312

(g)    If royalty is not paid by the date due, Lessor may give Lessee written notice of nonpayment of royalty, by certified mail, return receipt requested, and if Lessor's royalty is not paid on or before expiration of thirty (30) days from Lessee's receipt of such notice, interest shall commence accruing on the due date and be payable by Lessee to Lessor on the delinquent balance at the rate of five percent (5%) above prime interest rate. However, Lessee may avoid any interest obligation if prior to the expiration of such thirty (30) days Lessor is furnished an attorney's written opinion citing a bona fide dispute or a good faith question of royalty entitlement (either as to ownership or as to amount), Lessee pays to Lessor the undisputed portion and Lessee pays the disputed royalty to an escrow account to be administered by, a trustee agreed to by both parties or by the American Arbitration Association, if such trustee cannot be found. If practical, such escrow funds shall be invested in interest-bearing accounts pending resolution of the entitlement issue, with the interest to follow the distribution of escrow.

(h)    Lessee and any purchaser of oil or gas produced from the leased premises hereby waive any legal provisions which entitle a payer of royalties to require a signed division order as a condition to payment. If Lessor agrees to accept payment of royalties from a purchaser of oil or gas produced from the leased premises, or from another party designated to distribute royalties other than Lessee, Lessor's acceptance of such payments shall not relieve Lessee of its obligation to pay royalty hereunder except to the extent of payments actually received by Lessor from such third party, and if such third party fails to pay any sums due as royalty under this Lease, Lessee shall remain fully liable therefore, whether or not Lessee has received payment for production from such purchaser or third party. Lessee may defer payment of any royalty sum due Lessor, or to any payee hereunder, until the total amount of such royalty due shall equal One Hundred Dollars ($100.00), whereupon payment shall promptly be made.

(i)    Lessee further grants to Lessor or Lessor's designee the right at Lessor's expense, to examine, audit, copy or inspect books, records, and accounts of Lessee pertinent to the purpose of verifying the accuracy of the reports and statements furnished to Lessor, and for checking the amount of payments lawfully due the Lessor under the terms of this agreement; however, such audit rights shall be limited to not more than three (3) audits during any six (6) year period and shall not extend to any periods which are more than thirty-six (36) months prior to the date of such audit notice. In exercising this right, Lessor shall give reasonable notice to Lessee of its intended audit and such audit shall be conducted during normal business hours at the office of Lessee at the sole cost and expense of Lessor. However, if the amount of exceptions or deficiencies in royalty payments revealed by the audit equal or exceed 125% of the cost and expense of the audit, then the Lessee shall bear the cost and expense of the audit and all monies due (audit exceptions, costs, and expenses) shall be payable within 30 days of the final determination of the amounts due.

(j)    Lessor hereby retains a security interest in (a) all of the oil and gas produced and saved from the leased premises or lands pooled therewith, under and pursuant to this Lease, and (b) all proceeds of sale of such oil and gas and all accounts arising therefrom (the "Collateral"), to secure Lessee's payment of royalties and compliance with the other terms and provisions of this Lease. In addition to any other remedies provided in this Lease, Lessor, as a secured party, may in event of Lessee's default in any obligation of Lessee under this Lease proceed under the Pennsylvania Uniform Commercial Code (the "Code") as to the Collateral, in any manner permitted by the Code. In the event of default by Lessee, Lessor shall have the right to take possession of the Collateral, and to receive the proceeds attributable thereto and to hold same as security for Lessee's obligations or to apply it on the amounts owing to Lessor hereunder. The Collateral includes oil, condensate, distillate, gas and natural gas liquids, including any hydrocarbon or non-hydrocarbon minerals or products that may be associated with oil or gas to be financed at the wellhead of the wells and accounts from the sale thereof. This Lease, or memorandum thereof, (which shall contain the provisions of this paragraph) when filed in the real property records where the leased premises are located, shall constitute a financing statement under the Code. Additionally, Lessee agrees to cooperate with any UCC-1 filing requested by the Lessor.

(k)    If, by reason of assignments of undivided interests in Lessee's interest in this Lease, more than one party becomes entitled to a portion of Lessee's share of gas produced from any well on the leased premises, and if any or all of such co-owners elect to take their share of gas in kind, resulting in split-stream deliveries of gas to different purchasers, Lessor shall be entitled, at Lessor's election, to require the operator of the leased premises to pay and account to Lessor for all royalties due on gas production from the well or wells from which split-stream deliveries are being made, so that Lessor shall not be required to receive royalties from more than one (1) purchaser or party on the same gas stream. If Lessor exercises such election, the operator of the leased premises (or of that portion of the leased premises upon which the split-stream production is located) shall pay to Lessor all royalties due on such gas production and shall provide production statements from all purchasers of such gas showing the amounts sold and the price paid therefor, with any applicable adjustments. Such election, if made, shall not relieve any party otherwise liable for payment of royalties from such liability, and all parties owning an undivided interest in all or any portion of the leased premises shall be and remain jointly and severally liable for the payment of all royalties due on production therefrom.

Kuffa 00313

5.  **Delay Rental.** The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof.

6.  **Operations.** The term "operations" as used in this Lease shall mean only (a) the production of oil, gas or other liquid hydrocarbons in paying quantities subsequent to drilling or (b) the actual drilling, completing, reworking, recompleting, deepening, plugging back or repairing of a well in search for or in an endeavor to obtain production of oil or gas, conducted in good faith and with due diligence. In the event a well that had been placed into production, requires reworking, recompleting, deepening, plugging back or repairing and such operation is in search of or in an endeavor to obtain production of oil or gas, and is being conducted in good faith and with due diligence, the Primary Term, and any extensions thereof pursuant to Paragraph 2 herein shall be extended to allow completion of said operation, provided however, that in no event shall Lessee cease said operation for more than ninety (90) consecutive days. Cessation of said operational activity for more than ninety (90) consecutive days terminates the lease term.

7.  **Shut-In and Minimum Royalties.**

a)   If there shall be a well on the leased premises capable of producing gas or gas and condensate in paying quantities, but from which neither gas nor condensate is sold or used off the leased premises for lack of a satisfactory market (which well is herein sometimes called a "shut-in" gas well), Lessee may pay or tender to Lessor, as shut-in gas well royalty, for each shut-in well, a yearly sum equal to twenty and No/100 Dollars ($20.00), indexed to the Consumer Price Index (CPI) as published for January 01, 2010, and recalculated every five (5) years thereafter, multiplied by the number of acres subject to this Lease at the time such payment is made.  The first such payment of shut-in gas well royalty is to be made on or before sixty (60) days after the day on which (a) such well was shut in, or (b) this Lease ceases to be in force by any other provision hereof, whichever is later. Succeeding payments may be made annually thereafter on or before the anniversary of the due date of such payment; and if such shut-in gas well royalty shall be paid or tendered as above provided, it shall be considered for purposes of this Lease that such well is producing gas in paying quantities for a period of one (1) year from the due date of such payment, and for like annual periods thereafter; provided, however, that the payment of shut-in gas well royalty shall not prevent the termination of this Lease as to portions of acreage covered hereby, in accordance with the provisions of paragraph 8 hereof. Notwithstanding the making of such shut-in gas well royalty payments, Lessee shall be and remain under the continuing obligation to (a) use all reasonable efforts to find a market for said gas and to commence or resume marketing same when a market is available, (b) reasonably develop the lands then subject to this Lease, and (c) drill all such wells on the lands then subject to this Lease as may be reasonably necessary to protect same from drainage by wells on adjoining or adjacent lands. All payments or tenders provided for in this paragraph shall be made to Lessor personally or to the depository bank provided for elsewhere in this Lease.

b)   After expiration of the primary term, the portion of the leased premises being held by the Lessee solely by the payment of shut-in royalty, shall be released after a period of thirty-six (36) consecutive months or a cumulative total of sixty (60) months, unless given written consent by the Lessor to continue to be shut-in.

8.  **Well Pad and Production Units.**

a)   If the Lessee plans to drill two (2) or more horizontal wells from a single well pad or in a single production unit, then the Lessee may designate a "Multi-Well Production Unit" at the end of the primary term or any extensions of the primary term (as per paragraph 2(b)), the "Multi-Well Production Unit" shall reflect the actual acreage of the production units covered thereby, based on the formula set forth in paragraph 8(b) (iii) below.  However, if the Lessee is drilling a well in the Multi-Well Production Unit at the end of the primary term (or extended term), the Lease shall not terminate for any acreage in the planned production/pooled unit for the Multi-Well Production Unit, until ninety (90) days after the cessation of all drilling and completion operations. Alternatively, Lessee may delay further development of a Multi-Well Production Unit beyond the primary term (or extended term) by tendering to Lessor on or before the expiration of the primary term (or extended term), a minimum royalty payment equal to $20.00 multiplied by the number of acres in the Multi-Well Production Unit not theretofore designated to horizontal wells under the formula set forth in paragraph 8(b) (iii) below.  Like payments may be made each anniversary following the expiration of the primary term (or extended term) to extend full development of a Multi-Well Production Unit for a total of three (3) years beyond the expiration of the primary term (or extended term) at the rate of $20.00 multiplied by the number of acres not then designated to horizontal wells on the date payment is due. A Multi-Well Production Unit may not exceed 1,280 acres, without written consent of Lessor.

b)   Except as provided in 8(a) above, the production of oil or gas under the terms of this Lease will maintain this Lease beyond its primary term including any extensions thereto only as to that portion of the leased premises actually included within a production unit or units created and designated around wells then producing in paying quantities or capable of producing in paying quantities.  In the absence of well spacing units, a spacing order or other density

**Kuffa 00314**

requirements issued by the Bureau of Oil and Gas Management (or other government entity with jurisdiction) for a particular well; Lessee shall designate a "production unit" which for the purpose of this Lease, shall contain only the acreage overlaying that portion of the target formation or pool under a well that a prudent operator would deem capable of being most efficiently drained by that well while utilizing the best production technology in common use at the time of drilling. Notwithstanding any density rules applicable to any well, however, no production unit assigned to any well shall exceed the following sizes:

(i)      If the well is classified as a vertical oil well, the maximum size of the production unit shall be 80 acres if the well is producing only from formations in or above the Onondaga Horizon, and 160 acres if the well is producing from formations below the Onondaga Horizon.  The well shall be located in the center of the production unit to the extent practical.

(ii)      If the well is classified as a vertical gas well, the maximum size of the production unit shall be 100 acres if the well is producing only from formations in or above the Onondaga Horizon, and 320 acres if the well is producing from formations below the Onondaga Horizon.  The well shall be located in the center of the production unit to the extent practical.

(iii)      If the well is classified as a horizontal well (horizontal component of the drainhole in the target formation greater than the vertical component in the target formation, whether oil or gas) then the maximum size of the production unit shall be determined by the following formula: 100 acres + .02755 x A, where A = the length (number of feet) of the horizontal lateral component of the drainhole of the well. (i.e. – 100 acres + .02755 x 3,000' = 182.65 acres) The production unit shall to the extent practical parallel and be centered on the horizontal.  It being the intent that the total acres comprising a Multi-Well Production unit shall be the sum total of all the acres attributable to all wellbores within said Multi-Well Production unit, based on the aforementioned acreage calculation for each wellbore.

If at the time Lessee must designate production units in accordance with this paragraph there is a well or wells on the leased premises producing or capable of producing from a field for which no spacing units have yet been adopted, then Lessee shall designate a production unit complying with the size requirements delineated in this paragraph, as applicable; and Lessee shall proceed with diligence to apply for spacing units for such field.  When spacing units or a spacing order are adopted by the Bureau of Oil and Gas Management (or other government entity with jurisdiction), if Bureau requirements provide for units smaller or greater than the maximum production unit sizes provided for above, Lessee shall designate a production unit for such well complying with Bureau requirements. Lessee shall release the lands no longer included in the production unit for such well or wells; provided, however, that Lessee may maintain this Lease as to such excluded lands to the end of the five (5) year primary term, and thereafter by either, (a) paying in accordance with paragraph 2(b) for each acre the Lessee desires to retain, or (b) if Lessee commences operations for the drilling on such lands within ninety (90) days from the end of the primary term plus extensions, and continues such operations with no cessation of more than ninety (90) consecutive days until production is established, in which event Lessee shall designate production units and this Lease shall remain in force as to the units so designated as provided in this paragraph.

(c)      Insofar as possible, taking into consideration the productive limits of the producing interval and the unit configuration for the leased premises, the lands included within the production unit for a well shall be in the form of a square or rectangle. Every effort shall be made in designating production units to avoid releasing small or irregularly shaped portions of the leased premises, or portions not contiguous with other released portions.  Acreage assigned to wells producing from different zones may overlap, and shall overlap when necessary to comply with the requirements of this section.  If a well is producing from more than one formation, its production unit's size and configuration shall conform to the Bureau of Oil and Gas Management (or other government entity with jurisdiction) rules applicable to the well which provides the largest production unit (subject to the size limitations stated above).  If all or a portion of the leased premises is included in a pooled unit, then for purposes of this paragraph all the lands within the pooled unit shall be considered a part of the leased premises, and the size and configuration of the production unit(s) must conform to the requirements of this paragraph for a production unit.

(d)      As to any acreage which is not included within any production unit at the expiration of the primary term, including any extension in accordance with paragraph 2(b) or 8(a), Lessee may maintain this Lease as to such excluded acreage beyond the primary term only by conducting operations for the drilling thereon with no cessation of more than ninety (90) consecutive days; and at such time as such operations cease, Lessee shall designate any additional production units resulting from such operations, and this Lease shall automatically terminate and be of no further force or effect as to any acreage not within such designated units.

(e)        In addition, at the end of the primary term, or, extension thereof, or (if at the end of the primary term Lessee is conducting operations for the drilling on the leased premises) upon cessation of such operations for more than ninety (90) consecutive days, whichever is later, this Lease shall terminate as to all depths and horizons under each production unit below two hundred feet (200') below the stratigraphic equivalent of the base (bottom) of the deepest formation from which production of oil or gas in paying quantities is being maintained (or, in the case of a shut-in gas well, can be maintained) in the well on such production unit.  However, the Lessee at the time of such termination, shall have the first right of refusal to match any subsequent Lease offers for the depths and horizons released in accordance with this paragraph 8(e).

(f)        As to acreage which is included within a production unit, this Lease may be held in force after the termination of the primary term, including any extension in accordance with paragraph 2(b) or 8(a) only by production from, or operations conducted (as provided in this Lease) on, such unit; and production from, or operations conducted on, one unit will not maintain this Lease in force as to any other acreage included within any other unit, but such production or operations will maintain this Lease only as to the acreage within the unit or units upon which such production or operations are being maintained or conducted.

(g)        Upon termination of this Lease as to any portion of the leased premises, Lessee shall promptly deliver to Lessor a plat showing the designated production units around each well and a partial release containing a satisfactory description of the acreage and depths not retained, suitable for recording.  In addition, Lessee shall peaceably surrender the released Premises to Lessor and remove any and all facilities, equipment and machinery from the site within ninety (90) days, weather permitting, at Lessee's expense. Further the affected grounds shall be reclaimed as in paragraph 20.

9.   **Partial Releases.**  Lessee shall have the right at any time and from time to time during the term of this Lease to release from the lands covered hereby any lands subject to this Lease and thereby be relieved of all obligations thereafter accruing as to the acreage so released, provided that (a) Lessee may not release any portion of this Lease included in a pooled unit as long as operations are being conducted on such unit, and (b) any such partial release must release all depths in and under the lands so released.

10.   **Holding Over.**  If Lessee continues in possession of the leased premises after termination or expiration of this Lease (whether such termination occurs by the lapse of production, default or otherwise), other than for the purpose of plugging abandoned wells, removing equipment, and restoring the leased premises as required by this Lease, Lessee shall be considered a tenant at will.  The terms of this Lease shall continue to apply to Lessee's continued possession, provided that (a) Lessor shall have the right to evict and remove Lessee and Lessee's property from the leased premises at any time; and (b) Lessee shall be liable to Lessor for any and all damages suffered by Lessor as a result of Lessee's continued possession of the leased premises.

11.   **Pooled Units.**

(a)        Subject to any limitations provided below, Lessee is hereby granted the right, at its option, to pool or unitize any land covered by this Lease with any other contiguous or noncontiguous lands covered by this Lease, and/or with any other contiguous land; Lease; or Leases; as to any or all horizons or gas, oil, liquid hydrocarbons, or minerals dissolved or suspended therein; so as to establish pooled units.

(b)        Lessee shall exercise said option as to each desired pooled unit by executing an instrument identifying such pooled unit and filing it for record in the public office in which this Lease is recorded, and furnishing a copy to Lessor. Each of said options may be exercised by Lessee at any time and from time to time while this Lease is in force, and whether before or after production has been established either on the leased premises, or on the portion of the leased premises included in the pooled unit, or on other land unitized therewith.  A pooled unit established hereunder shall be valid and effective for all purposes of this Lease even though there may be gas, oil, liquid hydrocarbons, or minerals dissolved or suspended therein; royalty, or leasehold interests in lands within the pooled unit which are not effectively pooled or unitized. Any operations conducted on any part of such unitized land shall be considered, for all purposes, except the payment of royalty, operations conducted upon that portion of the leased premises included in the pooled unit.

(c)        There shall be allocated to the land covered by this Lease within each such pooled unit (or to each separate tract within the pooled unit if this Lease covers separate tracts within the pooled unit) that proportion of the total production of pooled or unitized oil, gas or minerals dissolved or suspended therein from the pooled unit which the number of surface acres in such land (or in each such separate tract) covered by this Lease within the pooled unit bears to the total number of surface acres in the pooled unit, and the production so allocated shall be considered for all purposes, including

Kuffa 00316

payment or delivery of royalty under this Lease, to be the entire production of unitized oil, gas, liquid or gaseous hydrocarbons, their constituents and byproducts from the land to which allocated in the same manner as though produced therefrom under the terms of this Lease. The formation of any pooled unit hereunder which includes land not covered by this Lease shall not have the effect of exchanging or transferring any interest under this Lease (including, without limitation, any shut-in royalty which may become payable under this Lease) between parties owning interests in land covered by this Lease and parties owning interests in land not covered by this Lease. Neither shall it impair the right of Lessee to release as provided in paragraph 9 hereof, except that Lessee may not so release as to lands within a pooled unit while there are operations thereon for pooled or unitized oil, gas, liquid or gaseous hydrocarbons or their byproducts or constituents. At any time while this Lease is in force Lessee may dissolve any pooled unit established hereunder by filing for record in the public office where this Lease is recorded a declaration to that effect with a copy to Lessor, if at that time there is no well located on the pooled unit which is producing or capable of producing oil or gas in paying quantities.

(d)     If this Lease now or hereafter covers separate tracts, no pooling or unitization of royalty interests as between any such separate tracts is intended or shall be implied or result merely from the inclusion of such separate tracts within this Lease but Lessee shall nevertheless have the right to pool or unitize as provided in this paragraph 11 with consequent allocation of production as herein provided. As used in this paragraph 11, the words "separate tract" mean any tract with royalty ownership differing, now or hereafter, either as to parties or amounts, from that as to any other part of the leased premises.

(e)     Pooled units created hereunder shall not exceed the size limitations set forth in paragraph 8(b) for production units.

(f)     If a well is producing from formations only in or above the Onondaga Horizon, Lessee shall have no right to pool the leased premises with other lands for the production of oil or gas unless either (a) at least ten (10) acres of the leased property, or (b) if the leased property, or the portion of the leased property not previously pooled or unitized is less than ten (10) acres, all of the leased acreage is included within the pooled unit thereby created. If a well is producing from below the Onondaga Horizon, all the leased acreage shall be included within the pooled unit thereby created. This sub-paragraph shall be inapplicable, if state spacing laws are enacted which conflict with this requirement or if in conflict with other rule, law or regulatory agency having jurisdiction.

(g)     If there are royalty interests in oil and gas in the leased premises now owned by parties other than Lessor, Lessor makes no warranty or representation that this Lease grants Lessee the power or authority to pool such royalty interests, but in the event of pooling hereunder Lessor's royalty on production from the pooled unit shall be calculated and paid as if Lessee had the power, and had exercised the power, to pool such royalty interests, whether or not Lessee in fact has such authority.

(h)     In the event a portion or portions of the land herein leased is pooled or unitized with other land so as to form a pooled unit or units, operations on, completion of a well upon, or production from such pooled unit will not maintain this Lease in force as to the land not included in such pooled unit or units. This Lease may be maintained in force as to any land covered hereby and not included in such pooled unit or units in any manner provided for herein.

12.     **Assignment.** The rights and estate of any party hereto may be assigned from time to time in whole or in part and as to any horizon subject to the written consent of the Lessor. Lessor's consent shall not be unreasonably withheld. Provided, however, that consent from the Lessor shall not be required in the event of an assignment by Lessee: to an affiliate, subsidiary, or internal partners, joint venture partners or in consequence of a merger or amalgamation. All of the covenants, obligations, and considerations of this Lease shall extend to and be binding upon the parties hereto, their heirs, successors, assigns, and successive assigns. No assignment by Lessee (or any assignee of Lessee) of all or any portion of or interest in this Lease shall relieve Lessee (or any assignee of Lessee) of any liability for breach of any covenant, warranty or other obligation of Lessee hereunder, whether theretofore or thereafter accrued. Each assignee of all or any portion of the rights of Lessee hereunder agrees to be bound by the provisions of this Lease to the same extent as if such assignee were an original party to this Lease. Notwithstanding any assignment by Lessee of a segregated portion of this Lease, default by Lessee or any assignee or subassignee of Lessee in any covenant or condition in this Lease shall constitute default as to the entire Lease. Lessee shall prior to the assignment of this Lease or any part thereof notify Lessor of such assignment and furnish Lessor a true copy of any assignment. All notices to Lessee hereunder may be given to the Lessee named herein, despite the assignment of part or all of this Lease. No change or division in the ownership of the leased premises, royalties, or other moneys, or any part thereof, howsoever affected, shall increase the obligations or diminish the rights of Lessee, including, but not limited to, the location and drilling of wells and the measurement of production. Notwithstanding any other actual or constructive knowledge or notice thereof to Lessee, its successors or assigns, no change or division in the ownership of the leased premises or of the royalties or other moneys, or the right to receive the same, howsoever effected, shall be binding

Kuffa 00317

upon the then record owner of this Lease until thirty (30) days after there has been furnished to such record owner at his or its principal place of business by Lessor or Lessor's heirs, successors, or assigns, notice of such change or division, supported by either originals or copies of the instruments which have been properly filed for record and which evidence such change or division, and of such court records and proceedings, transcripts, or other documents as shall be necessary in the opinion of such record owner to establish the validity of such change or division. If any such change in ownership occurs by reason of the death of the Lessor, Lessee may nevertheless pay or tender such royalties or other moneys, or part thereof, to Lessor.

13. **Proportionate Reduction.** This Lease is made without warranty of title, express, implied or statutory. Lessor's rights and interests hereunder shall be charged primarily with any mortgages, taxes or other liens, or interest and other charges on the leased premises, but Lessor agrees that Lessee may pay and discharge any past due taxes, mortgages, judgments, or other liens and encumbrances on or against any land or interest included in the Leasehold if such obligations jeopardize its ability to perform under the Lease; and Lessee shall be entitled to recover from the debtor, with reasonable legal interest and costs, by deduction from any future payments to Lessor or by any other lawful means. In the event Lessor herein does not have title to the lands hereinbefore described but claims a retained interest in the oil and gas situate therein, any moneys due and owing as a result of this Lease shall be paid into escrow with a mutually agreeable escrow agent pending a determination of entitlement. In the event Lessor has title to the lands but not clear title to the oil and gas situate thereon, Lessee shall pay any moneys due and owing as a result of this Lease directly to Lessor provided Lessor agrees to defend, indemnify and hold harmless Lessee from and against any and all claims, demands and causes of action or damage arising therefrom. Lessor agrees and acknowledges that an unsubordinated pre-existing mortgage on the leased premises that covers Lessor's oil and gas rights constitutes a title defect, and if the well or well bore is on or directly under the leased premises, the defect must be cured by Lessor obtaining a subordination of that mortgage before Lessor is entitled to be paid Royalties under this Lease. Providing, however, that all royalties attributed to the net oil and gas acreage of this Lease shall be deposited in an interest bearing escrow account that may be used to pay or discharge past due obligations only in accordance with this paragraph. All royalties and interest in the escrow account when the satisfaction of or subordination of that mortgage occurs, shall be paid to the Lessor within thirty (30) days of Lessee's receipt of written confirmation of such satisfaction or subordination.

14. **Tax Assessment.**

(a) If the leased premises experiences any increase in the amount of the real property taxes assessed and/or other municipal assessments as a result of Lessee's activities on the leased premises, or any property taxes are levied against Lessor or any property of Lessor (including the leased premises) due to the loss of Lessor's Clean and Green deferred status under Act 319 resulting substantially from Lessee's activities hereunder, then in either case, Lessee shall annually pay or reimburse Lessor an amount equal to the new or increased property taxes no later than thirty (30) days prior to the date each year on which the applicable real estate taxes are due to be paid. Furthermore, Lessee shall pay any and all rollback tax including interest and costs related thereto that results from violation of the enrollment criteria of Act 319 of the Clean and Green Tax Preferential Assessment Program.

(b) If any penalty, refund of payments, rollback or re-capture of tax abatements created or imposed under any governmental program, such as, but not limited to CREP or CRP that is levied on Lessor as a result of Lessee's operations on leased premises, Lessee will reimburse Lessor within thirty (30) days of written request.

(c) In the event there is a change in federal, state or local tax code that provides for implementation or increase in severance or production tax attributed to or resulting from, the assessment of oil and gas due to oil and/or gas production from the leased premises, Lessee shall abide by such tax laws and pay accordingly. Should the tax be assessed on oil and/or gas prior to production, Lessor and Lessee shall be proportionately (according to royalty allocation) responsible for paying the tax and Lessee is authorized to deduct Lessor's share of such taxes from Lessor's royalty payments and remit same to the taxing authority in accordance with paragraph 13.

15. **Force Majeure.** Should Lessee be prevented from complying with any express or implied covenant of this Lease (except payment of money), from conducting drilling or reworking operations thereon or from producing oil or gas therefrom by reason of inability to obtain or to use equipment or material, or by operation of force majeure, any Federal or state law or any order, rule or regulation of governmental authority ("force majeure event"), then while so prevented, Lessee's obligation to comply with such covenant shall be suspended, and Lessee shall not be liable in damages for failure to comply therewith; and this Lease shall be extended while and so long as Lessee is prevented by any such force majeure event from conducting drilling or reworking operations on or from producing oil or gas from the leased premises.

Kuffa 00318

16. **Indemnity.** Lessee agrees to defend, indemnify and hold harmless Lessor and Lessor's heirs, successors, representatives, agents and assigns ("Indemnitees"), from and against any and all claims, demands and causes of action for injury (including death) or damage to persons or property arising out of, incidental to or resulting from the operations of or for Lessee or Lessee's servants, agents, employees, guests, licenses, invitees or independent contractors, and from and against all costs and expenses incurred by Indemnitees by reason of any such claim or claims, including attorneys' fees; and each assignee of this Lease, or an interest therein, agrees to indemnify and hold harmless Indemnitees in the same manner provided above. Such indemnity shall apply to any claim arising out of operations conducted under or pursuant to this Lease, howsoever caused. LESSEE'S OBLIGATION TO DEFEND AND INDEMNIFY INDEMNITEES SHALL APPLY WHETHER OR NOT INDEMNITEES MAY BE GUILTY OF ANY NEGLIGENT ACT OR OMISSION WHICH RESULTED IN OR CONTRIBUTED TO THE COST, EXPENSE OR LIABILITY AGAINST WHICH LESSEE IS OBLIGATED TO INDEMNIFY INDEMNITEES HEREUNDER, AND WHETHER OR NOT INDEMNITEES MAY BE SUBJECT TO SUCH LIABILITY BY STATUTE OR BY APPLICATION OF PRINCIPLES OF STRICT LIABILITY. The provisions of this paragraph shall survive the termination of this Lease.

17. **Communications and Access to Information.**

   (a) **Coordination with Lessor.** Before commencing surface disturbing operations on the Leased Premises, Lessee and Lessor shall mutually agree in writing on the location of all wells, roads, pipelines, gates, tank batteries and other equipment so as to minimize disruption of Lessor's use of the leased premises. Lessor's consent shall not be unreasonably withheld. Without a separate written agreement, no, pump stations, compressors, dryers or separators shall be located on the leased premises unless they are for the sole purpose of treating gas from the leased premises or lands pooled or unitized therewith, and those shall not be located nearer than, and no well shall be drilled nearer than, five hundred feet (500') from any house or three hundred feet (300') from any barn now on the leased premises without Lessor's written consent. Lessee shall provide Lessor up to date name, address, and telephone number of the responsible officer or employee who can be contacted by Lessor at all times for the purpose of reporting any damages or breaches of this agreement.

   (b) **Notice to Drill.** Lessee agrees to provide a five (5) day written notice to Lessor of Lessee's entry upon the leased premises to drill.

   (c) **Filings Reports and Contracts.** Upon Lessor's written request, Lessee shall furnish Lessor, copies of all title opinions covering the leased premises and promptly upon receipt by Lessee, notify Lessor of any judicial proceeding brought to the attention of Lessee affecting its possession under the Lease or the interest of Lessor in the leased premises as well as copies of all filings, statements, and reports made by Lessee with the Pennsylvania Bureau of Oil and Gas Management or other government agency pertinent to drilling, completing and equipping wells. Upon Lessor's written request, Lessee shall provide to the Lessor in the routine course of Lessee's daily business, full information as to the production, use, transfer, disposal and sales from wells on the leased premises or lands pooled or unitized therewith. Such production information shall be strictly confidential and Lessor agrees not provide any such information to any party without written consent of Lessee. Lessor shall have the right to inspect, audit (paragraph 4(i)) and copy all records of Lessee pertaining to the production and sale of oil and gas from the leased premises and the calculation and payment of Lessor's royalty hereunder. A single written request for the information referred to in this paragraph will cause the information to be supplied on continuing basis until such time as Lessee receives a written request from the Lessor to stop providing such information.

   (d) **Delivery Methods.** Notices, consents, or other documents required or permitted by this Lease must be given by personal delivery, telecopier, delivered by Federal Express or other reputable overnight courier, or sent by registered or certified mail, return receipt requested, and postage prepaid.

18. **Reasonable Development.** If oil or gas is discovered on the leased premises, Lessee shall develop the leased premises as a reasonable and prudent operator and exercise due diligence in drilling such additional well or wells as may be necessary to fully develop the leased premises. Lessee shall protect the oil and gas in and under the leased premises from drainage by wells on adjoining or adjacent tracts or leases, including those held by the Lessee or any Affiliate of Lessee (paragraph 4 c). If oil or gas should be produced in paying quantities from a well draining any acreage of the leased premises that is not pooled or unitized with that well, Lessee shall within one hundred twenty (120) days after the earlier to occur of notice from the Lessor of such producing well or Lessee's knowledge of such well having been drilled, begin in good faith and pursue diligently operations leading to the drilling of a well/offset well and such well shall be drilled to such depth as may be necessary to prevent drainage of the leased premises, and Lessee shall use all means necessary in a good faith effort to make such well produce oil or gas in paying quantities. Any well with a borehole passing within three hundred (300) feet of the leased premises shall be presumed to be draining the leased premises. Lessee may rebut this presumption only with evidence acceptable to Lessor. The requirements of this paragraph shall be subject to the rules and regulations of the

Pennsylvania Bureau of Oil and Gas Management or other regulatory agency having jurisdiction over the spacing and permitting of wells, and such agencies' determination as to well spacing and drainage shall be final and conclusive. Payment of the bonus, deferred drilling fees, royalties paid or to be paid, shut-in royalty, minimum royalty, or other amounts due hereunder shall not relieve Lessee from its obligations under this paragraph 18. If Lessee makes a claim or files for such drainage or damage, Lessee will notify Lessor and will represent Lessor in such claim or cause of action without cost to Lessor unless Lessor notifies Lessee in writing to the contrary. If Lessee recovers damages as a result of such claim, either by settlement or judgment, Lessor shall be entitled to share in such recovery pro rata in accordance with Lessor's interest in production from the leased premises whether or not Lessor is a party to such settlement or judgment.

19.   **Ratification.** Neither the acceptance of royalties, shut-in royalties or other payments by Lessor (regardless of any notation thereon or instrument accompanying same), nor Lessor's execution of any division order or transfer order or similar instrument, shall ever constitute or be deemed to effect (a) a ratification, renewal or amendment of this Lease or of any pooled unit designation filed by Lessee purporting to exercise the pooling rights granted to Lessee in this Lease, or (b) a waiver of the rights granted to Lessor, or the obligations imposed upon Lessee, express or implied, by the terms of this Lease, or remedies for Lessee's breach thereof, or (c) an estoppel against Lessor preventing Lessor from enforcing Lessor's rights or Lessee's obligations hereunder, express or implied, or from seeking damages for Lessee's breach thereof. Lessor's agreement to accept royalties from any purchaser shall not affect Lessee's obligation to pay royalties pursuant to this Lease. No instrument executed by Lessor shall be effective to constitute a ratification, renewal, extension or amendment of this Lease unless the instrument is clearly titled to indicate its purpose and intent. Furthermore, the failure of either party to enforce or exercise any provision of this Lease shall not constitute or be considered a ratification of change or waiver of the provision in the future unless the same is expressed in writing and signed by the respective parties.

20.   **Surface Provisions.**

(a)   **Care in Operations.**

(i)      Lessee shall be responsible for all acts whether they be reasonably foreseen or unforeseen. All operations conducted by Lessee, its agents, contractors, or assigns relative to this Lease shall comply with federal, state and local law, statute, regulation and/or order. Lessee's failure to comply with any federal, state, local law or any regulation or order of any enforcement agency having jurisdiction over Lessee's operation shall be a default of this Lease.

(ii)     Lessee shall at all times use the highest degree of care and all reasonable safeguards to prevent its operations from (a) causing or contributing to soil erosion, or to the injury of terraces, grades, or other soil-conserving structures on the leased premises; (b) polluting or contaminating any environmental medium including the surface or subterranean soils and/or waters and ambient atmosphere in, on, under or about the leased premises and surrounding properties; (c) decreasing the fertility of the soil; (d) damaging crops, native or cultivated grasses, fruit or nut trees, timber, or pastures, consistent with the purpose of the Lease; (e) harming or in anyway injuring the animals, poultry, fish or livestock owned by the Lessor or by his tenants and kept or pastured on the leased premises; including the erection and maintenance of fences, gates, and cattle guards where necessary for such purposes; or (f) damaging buildings, roads, structures, ensilage pits, improvements, farm implements, or fences. Lessee shall dispose of salt water and waste oil in accordance with the rules and regulations of the Pennsylvania Department of Environmental Protection, Bureau of Oil and Gas Management or other governmental authority. Lessee shall clean up, remove, remedy, and repair any soil or ground water contamination and damage caused by its presence or release of any contaminant in, on, under or about the leased premises, whether or not caused by the negligence of Lessee, its agents, employees, licensees or independent contractors. Lessee shall pay to the person beneficially interested in the harmed object all damages caused by its operations.

(iii)    Lessee shall not use land application for the disposal of any drill cuttings or residual waste.

(iv)    Lessee shall not use, dispose or release on the leased premises or permit to exist or be used, disposed of or released on the leased premises as a result of its operations, any substances (other than those Lessee has been licensed or permitted to use on the leased premises) which is defined as a "hazardous material", "toxic substance", or "solid waste" in applicable federal, state or local laws, statutes or ordinances.

(v)     Prior to any surface excavation, Lessee shall set topsoil aside for the express purpose of recovering any areas to be graded at conclusion of activities requiring excavation. Within ninety (90) days of the conclusion of such activities, weather permitting, Lessee shall grade all areas as nearly as practicable to the original contours following applicable state regulations and spread set aside topsoil evenly to its original depth. Lessee shall purchase and plant graded areas with the desired seeds meeting Department of Environmental Protection (DEP) and Department of Conservation and Natural Resources (DCNR) regulations.

(vi)  Lessee shall notify Lessor prior to the removal of any standing timber in a sufficiently timely manner so as to allow Lessor to obtain an appraisal of such timber by a qualified forester. Lessor shall have the option to take payment from Lessee for said timber prior to its removal or to take possession of said timber after its removal by Lessee. If Lessor opts to take possession, Lessee shall cut and set aside logs so as to be accessible, exercising due care in cutting and handling said timber so as to preserve its market value. Lessee shall remove any uprooted stumps from the leased premises at Lessor's request.

(vii)  Lessee shall plan surface operations in a manner that will reduce or minimize the intrusion to crop fields. In the event that such intrusion can not be avoided, Lessee shall compensate Lessor for the damage at current market value for the projected yield at full maturity.

(viii)  Should any "pollutant", "hazardous material", "toxic substance", or "contaminated waste" be accidentally released on the leased premises requiring the notification of the DEP or other governmental entity, Lessee shall notify Lessor immediately after notifying the governmental body using the same means of communication.

(b)  **Surface Damages.** Lessee agrees to pay Lessor or any tenants of Lessor, if and as applicable, reasonable compensation for all use of or damage to the surface estate (or any incident of the surface estate) owned by them, which use is made or which damages are incurred in the exercise of the rights granted to Lessee by this Lease. Lessee's obligation to compensate Lessor for such use or damage shall exist whether or not such use or damage is due to the negligence of Lessee, its agents, employees, invitees or independent contractors. Furthermore, Lessee shall pay Lessor damages for lands that are restricted as to their use by setback restrictions around wells, pipelines, tanks, structures, and facilities whether required by the Lessee, the Bureau of Oil or Gas Management, or other governmental body. Damages, if they occur, shall be paid when they occur or when they are discovered.

(c)  **Fences and Gates.** At Lessor's request, Lessee will install and diligently maintain fences, gates and locks or cattle guards above pipelines and on all access roads, Christmas trees, pumping units, tanks, sump holes, pits, machinery, other excavations, or other areas of operations so as to maintain the integrity of preexisting fences and to the extent required to safeguard livestock and prevent access by any unauthorized persons. Lessor shall be given a key to these gates and allowed free use thereof. Gates or cattle guards will become Lessor's property on termination of this Lease. Lessee will keep all gates locked when not in use.

(d)  **Roads.** Lessee agrees to locate (paragraph 17(a)) and grade not more than one (1) road to each location and to confine travel to such road. Lessee agrees to improve, construct and maintain all roads used by it in good repair utilizing shale, gravel, or crushed stone and sluice pipes where necessary to provide a smooth rut free all weather surface suitable for use by automobiles, and when such roads are no longer being used, if Lessee has laid stone or any other topping, Lessee agrees upon Lessor's request, to remove such topping and restore the surface as nearly as possible to its former condition. Lessee shall not use shale, gravel or crushed stone from the leased premises without the written consent of the Lessor. During the construction phase the graded width shall not exceed forty (40) feet and width shall revert to not more than thirty (30) foot travel corridor once construction is complete. Lessee shall control dust from traffic to the extent practical, utilizing water when necessary. Lessee shall prevent its employees, agents and contractors from operating vehicles in a negligent manner or at speeds in excess of 25 miles per hour while on the leased premises.

(e)  **Pipelines and Utilities.** Upon payment of reasonable damages therefor, Lessee shall have the right to construct pipelines and shall bury any and all necessary phone, electric, and data collection lines on the leased premises in connection with the production from the leased premises, but such right may not be assigned to a utility company, pipeline company or anyone else who owns no interest in the leased premises or not otherwise contracted or affiliated with Lessee for the purpose of carrying out the rights and obligations under this lease. The right to use said pipelines terminates when production from the leased premises permanently ceases and all wells associated therewith plugged and abandoned. Lessee agrees all pipelines, wires, and cables shall be buried to a depth not less than that required to allow unrestricted access to and crossing of the same by equipment typically utilized in local agricultural and timbering activities, including but not limited to tractors, plows, combines, log skidders, harvesters, forwarders, loaded trucks and loaded trailers. Lessee shall "double ditch" all underground lines so that all topsoil will be replaced on the surface. The width of the graded underground line corridor shall not exceed thirty (30) feet.

(f) **Firewalling and Maintenance of Production Equipment.** Dikes, firewalls or other methods of secondary containment must be constructed and maintained at all times around all tanks, separators and other receptacles so as to contain a volume of liquid equal to at least 1.25 times the total volume of such tanks, separators and other receptacles located within the boundaries of the firewall. Lessee shall keep all tanks and other equipment at each well location painted, and shall keep the well site and all roads leading thereto free of all noxious weeds and debris.

(g) **Pits.** Lessee shall have no right to dig any pits on the leased premises except with Lessor's written consent; provided, however, that Lessee may dig and use pits for drilling operations if (a) such pits conform to DEP requirements, (b) the pit is planned to be deep enough to allow at least thirty-six (36) inches of backfill over the liner after grading to the surrounding pre-drill contours, and (c) promptly after completion of operations paragraph 6(b) pits are drained, prepared for burial, backfilled, graded and planted within ninety (90) days (weather permitting), in accordance with paragraph 20(a) (v). Lessee shall immediately notify Lessor and the DEP if any pit lining is torn, punctured, or otherwise breached, allowing any fluid contained in a pit or designated to be contained in a pit to seep, leak or overflow through or around the liner.

(h) **Water.**

(i) Lessee shall not have any right to use water from Lessor's springs, ponds, wells, creeks, streams or facilities for any operations hereunder without Lessor's written consent. Any water well drilled by Lessee upon the leased premises with Lessor's written consent shall be left intact and become the property of Lessor upon the termination of this Lease as to that portion of the leased premises upon which such water well is located. Lessee may not use any fresh water from the leased premises for any waterflood, pressure maintenance or other secondary recovery operations.

(ii) Lessee shall maintain the quality and quantity of Lessor's domestic water supply by testing the supply prior to and at the completion of operations and as deemed necessary by Lessor due to changes in flow or quality, including but not limited to, color, smell or taste. Should the water supply be polluted or reduced, Lessee shall take any and all steps to restore water quality and quantity to its pre-existing condition. During the period of remediation, Lessee shall supply Lessor with an adequate supply of potable water consistent with Lessor's use of the damaged water supply prior to Lessee's operation. Any pollution or reduction of any water supply will be presumed to be the result of Lessee's operation unless Lessee can affirmatively otherwise prove.

(i) **Hunting and Fishing.** Lessee agrees that its employees, agents and independent contractors shall have no right to and are prohibited from firing any firearms, hunting and fishing on the leased premises. Any person found to have violated this provision may be denied further access to the leased premises for any purpose. Furthermore, Lessor retains the right for Lessor its successors, assigns and invitees to fish and hunt anywhere on the leased premises and this Lease grants written permission to hunt within safety zones in accordance with Pennsylvania Game Commission laws and regulations.

21. **Insurance.**

(a) A company licensed by the Pennsylvania Department of Insurance to do business in the state shall underwrite all policies required by this paragraph 21. Provided however, such insurance requirements may be met by a combination of self-insurance, primary and excess insurance policies.

(b) Lessee shall assure that Lessee and any person acting on Lessee's behalf under this Lease carry the following insurance with one or more insurance carriers at any and all times such party or person is on or about the leased premises or acting pursuant to this Lease, in such amounts as from time to time reasonably required by Lessor, indexed for inflation as per paragraph 22(c):

(i) Workers Compensation and Employer's Liability Insurance;

(ii) Commercial General Liability and Umbrella Liability Insurance; ($5,000,000.00 Minimum coverage)

(iii) Business auto and Umbrella Liability Insurance; ($5,000,000.00 Minimum coverage)

The Lessee shall cause Certificates of Insurance evidencing the above coverage to be provided promptly upon request to Lessor, or to such other representative of Lessor as Lessor may from time to time designate. The insurance policies required under 21(b) (ii) and (b) (iii) above, shall cover the Lessor as additional insureds with regard to the leased premises; and shall reflect that the insurer has waived any right of subrogation against the Lessor. Lessee may satisfy its obligation to maintain insurance as specified in this section by means of self insurance, provided that Lessee notifies Lessor of its intent to self-insure and meets the financial requirements set forth in paragraph 22(a) as they pertain to net worth, audits and public company annual reports, auditor opinions, and debt rating. Failure to comply with this clause (paragraph 21) shall be basis of default and all operation on the leased premises shall cease immediately.

Kuffa 00322

22. **Bonding.**

(a)    If this Lease is assigned, sold, or transferred in any other way, Lessee shall continue to be liable for well plugging; removal of all equipment, structures and other facilities; and rehabilitation of the affected leased premises unless prior to such assignment, sale or other transfer, the assignee, buyer or transferee provides "Affected Lessor", (defined for this paragraph (22) as Lessor whose leased premises have, heretofore, suffered surface use by Lessee, its contractors, agents or assigns), bonds meeting the requirements of paragraph 22 (b & c). Additionally, Lessee shall annually have an audit performed by a Certified Public Accountant to verify Lessee's net worth if Lessee is not a publically traded company and provide Affected Lessor a copy of the results of that audit. Should the net worth of Lessee fall below one hundred million dollars ($100,000,000.00), as documented and certified by the audit of Lessee's books, or if a publically traded company, Lessee's audit and financial statements, or if auditor expresses a going concern opinion, or if Lessee is publicly traded and Lessee's senior secured debt rating falls below investment grade as rated by Finch Ratings, S&P, or Moody's, Lessee must provide Affected Lessor bonds meeting the requirements of the following in paragraph 22 (b) and (c).

(b)    Prior to entering the leased premises, Lessee agrees to give the Lessor a surety bond or performance bond from an issuer with a Best Rating not less than AA in the principal amount of Twenty-Five Thousand Dollars ($25,000.00) with a judgment clause in a form acceptable to Lessor conditioned on the faithful performance of the covenants of this Lease. The bond shall be further conditioned that in the event Lessee shall fail to remove its equipment and machinery and properly abandon any well(s) upon partial or total termination of all or any portion of this Lease, then within six (6) months from such termination, Lessor can execute upon the bond to pay for cost of removal of the equipment and machinery and proper abandonment of the well or wells. In addition, the bond shall be conditioned in favor of the Lessor for all damages that may arise as a result of fires, accidents, or any other causes brought about by Lessee or Lessee's agents occupying the leased premises and in the use of all lands of the leased premises.

(c)    Prior to drilling any well on the leased premises, Lessee shall provide the Lessor with a surety or collateral well plugging bond, in form acceptable to both parties (i.e. surety bond, irrevocable letter of credit or bank certificate of deposit) in an amount equal to or exceeding the reasonable expected estimated total cost of plugging and abandonment of the well one year after its predicted completion as a producer or shut-in well, said bond to remain in effect until the plugging and abandonment of the well has been completed in compliance with applicable state law, and the well site has been restored and revegetated to the satisfaction of the Lessor. The minimum well plugging bond coverage per well acceptable will be determined by the Lessee's estimated total cost to plug each said well based upon its known depth. This estimated total cost must include, at a minimum, expected labor rates, equipment rental/contracting rates, and a listing of all materials and their affiliated costs per unit required to plug each well. Should the Lessor not approve in writing the Lessee's estimates or should the Lessee not provide an estimated well plugging total cost per well, the following set bond rates shall apply:

| Well Depth | Minimum Bond Amount |
| --- | --- |
| Less than 2500' | $5,000 |
| 2500' to 5000' | $10,000 |
| 5000' to 8500' | $20,000 |
| 8500' and deeper | $40,000 |

Within six (6) months of the five (5) year anniversary date of this Lease and each subsequent fifth (5th) anniversary, Lessor may request in writing and Lessee shall agree to institute new bond and insurance amounts based on the original bond and insurance amounts set forth in paragraphs 21(b) and 22(b) and (c) indexed to the Producers Price Index for All Commodities, issued for the anniversary month by the U.S. Department of Labor, Bureau of Labor Statistics. Should such index be discontinued and/or replaced, a conversion to a substitute or replacement index shall be accomplished using normally accepted conversion factors. Such adjusted amounts shall be rounded off to the nearest Thousand Dollar ($1,000) amount. Failure of Lessor to request an adjustment for any five (5) year period shall not preclude a full adjustment at a subsequent five (5) year anniversary if requested.

23.    **Future Mortgages.** Lessor may at any time mortgage all or any part of the leased premises as Lessor deems necessary and appropriate, provided that mortgage is subordinated to this Lease.

Kuffa 00323

24.   **Condemnation.**  Any and all payments made by a Condemnor on account of a taking by eminent domain shall be the property of Lessor.

25.   **Arbitration.**

(a)   Any controversy or claim arising out of or relating to this Lease, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules including the Optional Rules for Emergency Measures of Protection, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

(b)   Arbitration shall take place within One hundred (100) miles of the leased premises and this agreement shall be governed by and interpreted in accordance with the laws of the State of Pennsylvania. The parties acknowledge that this agreement evidences a transaction involving interstate commerce. The United States Arbitration Act shall govern the interpretation, enforcement, and proceedings pursuant to the arbitration clause in this agreement.

(c)   Either party may apply to the arbitrator seeking injunctive relief until the arbitration award is rendered or the controversy is otherwise resolved. Either party also may, without waiving any remedy under this agreement seek from any court having jurisdiction any interim or provisional relief that is necessary to protect its rights or property of that party, pending the establishment of the arbitral tribunal (or Pending the arbitral tribunal's determination of the merits of the controversy).

26.   **Payments.**  All royalties not paid in kind at the election of Lessor, and any and all sums due hereunder from Lessee to Lessor shall be paid at the option of Lessor, by check tendered directly from Lessee to Lessor or by depositing the same to the credit of Lessor in _____ Bank, _____, Pennsylvania (which bank and its successors are Lessor's agent and shall continue as depository for all sums payable hereunder, regardless of changes in ownership of said land or the rentals, either by dissolution, by conveyance or by the death or incapacity of Lessor, its successors or assigns). If any named depository bank (or any successor bank) is named to receive payment, and if such bank should fail, liquidate, or be succeeded by another bank, or for any reason fail or refuse to accept any payment or rental, Lessee shall not be held in default for failure to make such payment or tender of rental until thirty (30) days after Lessor shall deliver to Lessee a proper recordable instrument, naming another bank as agent or another person or entity to receive such payment or tender. No depository bank shall have authority to accept payments not timely made or payments not in the correct amounts as required by this Lease, and said bank's acceptance of payments not timely made or not in the correct amount shall not constitute a waiver by Lessor of any rights or remedies of Lessor under this Lease. A payment submitted electronically shall be considered timely paid if such payment is successfully transmitted to the Lessor's account on or before the due date. A payment not submitted electronically shall be considered timely paid if delivered to the Lessor on or before the applicable due date or if deposited in a postpaid, properly addressed wrapper with a post office or official depository under the care and custody of, and postmarked by, the United States Postal Service before the applicable due date.

27.   **Default.**

(a)   In addition to any incidents of default described throughout this agreement, the occurrence of any of the following constitutes a default hereunder:

(i)    if any creditor of Lessee, its agents, and/or assigns shall take any action to execute on, garnish, or attach the assets of Lessee, or

(ii)   if a request or a petition for liquidation, reorganization, adjustment of debts, arrangement, or similar relief under the bankruptcy, insolvency, or similar laws of the United States or any state or territory thereof or any foreign jurisdiction shall be filed by or against Lessee or any formal or informal proceeding for the reorganization, dissolution or liquidation of settlement of claims against, or winding up of affairs of the Lessee; or the garnishment, attachment, or taking by governmental authority of any collateral or other property of Lessee.

(b)   Upon the occurrence of any event of default, as defined in paragraph 21(b) or 27(a) (i) and (ii) the Lease shall be terminated immediately and the Lessee shall become a tenant at will to operate in accordance with paragraph (10). If evicted, Lessee agrees to surrender possession of the leased premises, or of the portion of leased premises included in such termination. Lessee agrees to execute and deliver to Lessor appropriate instruments sufficient to clear the title of the leased premises, or any portion, from this Lease and all liens and encumbrances created suffered by Lessee. If Lessee fails to deliver such instruments to Lessor within sixty (60) days after termination, Lessor may institute proceedings necessary to

clear title, and in that event, in addition to all other relief that may be granted to Lessor, Lessor shall be entitled to recover against Lessee, all attorney fees, investigation charges, court costs and other sums that Lessor has expended in clearing its title.

(c)     Upon default by Lessee, Lessor shall be entitled to exercise any and all remedies available at law, in equity or otherwise, each such remedy being considered cumulative.  No single exercise of any remedy set forth herein shall be deemed an election to forego any other remedy and any failure to pursue a remedy shall not prevent, restrict or otherwise modify its exercise subsequently.

28.     **Notice of Breach.**  In the event Lessor considers that Lessee has not complied with all its obligations hereunder, both express and implied, excepting the non-payment of royalty as addressed in paragraph 4 (g), Lessor shall notify Lessee in writing, setting out specifically in what respects Lessee has breached this contract.  Lessee shall then have thirty (30) days after receipt of said notice within which to meet or commence to meet all or any part of the breaches alleged by Lessor.  The service of said notice shall be precedent to the bringing of any action by Lessor on said Lease for any cause, and no such action shall be brought until the lapse of thirty (30) days after service of such notice on Lessee.  Neither the service of said notice nor the doing of any acts by Lessee aimed to meet all or any of the alleged breaches shall be deemed an admission or presumption that Lessee has failed to perform all its obligations hereunder.

29.     **Place of Performance.**  All obligations of Lessee other than arbitration and the payment of money shall be performable in the county or counties in which the leased premises are situated.  All obligations of Lessee for the payment of money shall be performable in the county of residence of each Lessor.  Venue for any action to enforce Lessee's obligations hereunder shall lie in the county in which the leased premises are situated.

30.     **Authorship.**  For the purpose of construction, interpretation, arbitration or adjudication, it shall be deemed that Lessee and Lessor contributed equally to the drafting of this instrument.

31.     **Severability.**  If any provision of this Lease is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect.  Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals.

Richard L. Kuffa                                  Witness: Roberta K. Harvey

Denise D. Kuffa                                   Witness: Roberta K. Harvey

Document prepared by: Chesapeake Appalachia, L.L.C., 6100 N. Western Ave., Oklahoma City, OK 73118

Kuffa 00325

## EXHIBIT "A"

This Exhibit "A" is attached to and made part of that certain Oil and Gas Lease dated 9/24/2009, by and between Richard L. Kuffa and Denise D Kuffa, his wife of 1054 SR 29 N TUNKHANNOCK, PA 18657, as Lessor, and CHESAPEAKE APPALACHIA, L.L.C., 6100 N. Western Ave., Oklahoma City, OK 73118, as Lessee, and is made a part of said lease as if incorporated therein.

Lands located in:

### LEMON TOWNSHIP

Property Tax Parcel Identification Number: 10-082.0-001-00-00-00

and is bounded formerly or currently as follows:

| | |
|---|---|
| On the North by lands now or formerly of | Russell W. Shaw |
| On the East by lands now or formerly of | Charles S. Kuffa |
| On the South by lands now or formerly of | Steven Kuffa |
| On the West by lands now or formerly of | Ernest H. Burleson |

including lands acquired from Mary Kuffa, widow, by virtue of deed dated July 16, 2001, and recorded in/at Book 428, Page 467, and described for the purposes of this agreement as containing a total of 1.976 Leasehold acres

Property Tax Parcel Identification Number: 10-082.0-001-01-00-00

and is bounded formerly or currently as follows:

| | |
|---|---|
| On the North by lands now or formerly of | Carmine Alticri, Jr. |
| On the East by lands now or formerly of | Charles S. Kuffa |
| On the South by lands now or formerly of | Charles S. Kuffa |
| On the West by lands now or formerly of | Charles S. Kuffa & Matthew Kuffa |

including lands acquired from Andrew R. Kuffa et ux Mary Kuffa, by virtue of deed dated October 1, 1984, and recorded in/at Book 233, Page 627, and described for the purposes of this agreement as containing a total of 13.6 Leasehold acres

### SIGNED FOR IDENTIFICATION ONLY:

Richard L. Kuffa

Witness:

Denise D. Kuffa

Witness:

**LESSEE:**

**CHESAPEAKE APPALACHIA, L.L.C.**

By:

Roger C. Nelson

Its:   Landman

Witness _____ (Seal)

**Kuffa 00326**

Ira Neil Richards
Arleigh P. Helfer III
irichards@schnader.com
ahelfer@schnader.com
ID Nos. 50879, 84427
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
(215)751-2503; 2430



Filed and Attested by the
Office of Judicial Records
31 JAN 2020 10:58 am
M. RUSSO

Attorneys for Petitioners

| | | |
|---|---|---|
| RICHARD L. KUFFA and DENISE D. KUFFA, as husband and wife, | : : : | PHILADELPHIA COUNTY COURT OF COMMON PLEAS TRIAL DIVISION |
| Petitioners, | : : | |
| v. | : : | December Term, 2019 Case No. 2572 |
| EQUINOR USA ONSHORE PROPERTIES, INC. f/k/a STATOIL USA ONSHORE PROPERTIES, INC., | : : : : | |
| Respondent. | : : | |

### PRAECIPE TO ENTER JUDGMENT

TO THE CLERK:

     Kindly enter judgment in favor of Richard L. Kuffa and Denise D. Kuffa pursuant to Pa.

R. Civ. P. 237.4 and the January 23, 2020 Order attached hereto as Exhibit A.  The judicially

confirmed award to be entered as judgment is attached as Exhibit B.


     s/Arleigh P. Helfer III
     Ira Neil Richards (PA I.D. 50879)
     Arleigh P. Helfer III (PA I.D. 84427)
     SCHNADER HARRISON SEGAL & LEWIS LLP
     1600 Market Street, Suite 3600
     Philadelphia, PA 19103
     (215) 751-2000

Aaron D. Hovan (PA I.D. 308412)
154 Warren Street
Tunkhannock, PA 18657
(570) 836-3121

Richard L. Huffsmith (PA I.D. 78895)
26 East Tioga Street
Tunkhannock, PA 18657
(570) 240-4400

*Attorneys for Petitioner*

PHDATA 7172109_1

Case ID: 191202572

*Filed and Attested by the
Office of Judicial Records
31 JAN 2020 10:58 am
M. RUSSO*

RICHARD L. KUFFA and DENISE D.
KUFFA, as husband and wife,
1054 SR 29 N,
Tunkhannock, PA 18657

               Petitioners,

    v.

EQUINOR USA ONSHORE PROPERTIES,
INC. f/k/a STATOIL USA
ONSHORE PROPERTIES, INC.,
2103 City West Boulevard, Suite 800
Houston, TX 77042

             Respondent.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

PHILADELPHIA COUNTY
COURT OF COMMON PLEAS

TRIAL DIVISION

December Term, 2019

Case No. 02572

## ORDER

AND NOW, this 23rd day of January, 2020, upon consideration of the Petition to Confirm Arbitration Award, it is hereby ORDERED and DECREED that the Arbitration Award in the amount of $3,611.74, plus statutory and contract interest, and granting equitable and declaratory relief, entered on November 8, 2019, in favor of Petitioners, Richard and Denise Kuffa, and against Respondent, Equinor USA Onshore Properties, Inc. (f/k/a Statoil USA Onshore Properties, Inc.) is confirmed, and that judgment be entered by the Office of Judicial Records upon Praecipe filed by Petitioners.

BY THE COURT:

_____
                              J.

Kuffa Etal Vs Equinor U-ORDRF

19120257200009

AMERICAN ARBITRATION ASSOCIATION
COMMERCIAL ARBITRATION TRIBUNAL

*Filed and Attested by the
Office of Judicial Records
31 JAN 2020 10:58 am
M. RUSSO*

| | | |
|---|---|---|
| RICHARD L. KUFFA AND DENISE D. KUFFA, | § § § | |
| *Claimants,* | § § | |
| | § | Case No. 01-17-0005-6012 |
| v. | § § | |
| STATOIL USA ONSHORE PROPERTIES § INC. f/k/a STATOILHYDRO USA ONSHORE PROPERTIES, INC. | § § | |
| *Respondent.* | § § | |

## AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the Lease Agreement entered into between the above-named parties on September 24, 2009 ("Agreement"), and having been duly sworn, and having duly heard the proofs and allegations of Ira Richards, Esq., on behalf of Claimants, and Robert Theriot, Esq., on behalf of Respondent, in a two-day evidentiary hearing and having considered the pre-hearing and post-hearing submissions, and Claimants having made a motion to amend their claim and the Arbitrator having considered same, hereby AWARD, as follows:

1.    In Order No. 4, I found that Respondent breached the lease agreement by paying royalties based upon a methodology different than the "gross proceeds" required by the Agreement.  The calculation of damages was reserved for proof at hearings.  Order No. 4 is incorporated by reference herein.

2.    On Count III, alleging breach of contract, I find in favor of Claimants and against Respondent and award damages in the amount of $3,611.74 based upon the "Achieved Price" calculations of Claimants' expert.  Having given notice under Paragraph 4(g) of the

Case ID: 191202572
Control No.: 19122301

Agreement, Claimants are also entitled to penalty interest at the rate provided in the Agreement, (Prime Rate +5%) plus legal interest at the statutory rate of 6% computed from the date of notice June 12, 2018.

3.      On Count I, alleging breach of fiduciary duty, I find in favor of Respondent and against Claimants.

4.      On Count II, alleging breach of express duties of good faith and fair dealing, I find in favor of Respondent and against Claimants.

5.      On Counts IV and V, seeking declaratory and injunctive relief, I find in favor of Claimants and against Respondent for the reasons set forth above.

6.      Claimants' claim for punitive damages is denied.

7.      Accordingly, Respondent shall pay to Claimants, within thirty days of the date of this Award, the sum of $3,611.74, plus penalty interest of prime plus 5%  and legal interest at the rate of 6% computed from June 12, 2018.

8.      The administrative fees totaling $1,550.00 shall be paid as incurred and the compensation of the arbitrator totaling $33,700.00 shall be borne equally and has been paid.

9.      This Award fully and finally adjudicates claims of Claimants and Respondent submitted for decision by the Arbitrator.

_____
B. Christopher Lee, Esq. Arbitrator          Date: November **8**, 2019


I, B. Christopher Lee, Esq., do hereby affirm upon my oath as an Arbitrator that I am the individual described in and who executed this instrument, which is my Final Award.

_____
                                             Date: November 8, 2019

Case ID: 191202572
Control No.: 19122301

AMERICAN ARBITRATION ASSOCIATION
SCRANTON, PENNSYLVANIA

| | | |
|---|---|---|
| **RICHARD L. KUFFA AND DENISE D. KUFFA,** | § § § | |
| *Claimants,* | § § | **Case No. 01-17-0005-6012** |
| **v.** | § § | |
| **STATOIL USA ONSHORE PROPERTIES INC. f/k/a STATOILHYDRO USA ONSHORE PROPERTIES, INC.** | § § § § | |
| *Respondent.* | § | |

**ORDER NO. 4**

By email dated November 11, 2018, the parties agreed to the following procedure for resolution of the issue of interpretation of the Lease:

> Claimants' motion will address what they believe to be the threshold lease construction issue under paragraph 4 of the Lease that they contend entitles them to a finding that Respondent is in breach of its obligation to calculate and pay royalties as required by the Lease.  Respondent reserves its right to dispute how Claimants frame the issue in their dispositive motion and to otherwise make any arguments that it believes show that Claimants are not entitled to judgment as a matter of law on their breach of contract claim.  The parties have agreed that while they may as they deem necessary for their positions on the dispositive motion make arguments about whether matters relating to the marketability of gas are material to the arbitrator's determination of the dispositive motion neither side will seek factual determinations through dispositive motion on issues of whether the gas is in fact marketable at the wellhead.  Also, the dispositive motion will not address Claimants' causes of action for breach of the duty of good faith and fair dealing or breach of fiduciary duty, although Claimants and Respondents each reserve their rights to cite any language in the Lease in support of their arguments about the royalty provision.

Upon consideration of extensive briefing, the undersigned Arbitrator finds as follows:

1. The parties entered into a Joint Stipulation of Fact dated September 28, 2018 in

   which Equinor USA Onshore Properties, Inc. (f/k/a Statoil USA Onshore Properties,

   Inc. (SOP") admits that:

Case ID: 191202572
Control No.: 19122301

    a.   Its only marketing effort was to deliver the gas to its affiliate, Equinor Natural Gas (f/k/a Statoil Natural Gas ("SNG");

    b.   It did not seek a different purchaser;

    c.   It paid Claimants based on index prices, not based on the gross proceeds received by SNG for gas sold to unaffiliated third parties.

2.   Paragraph 4(a) of the Lease provides

> T] he royalties paid to Lessor shall be twenty percent (20%) of all the . . . gas and casinghead gas removed or recovered from the leased premises or, at Lessor's option . . . the Gross Proceeds . . . of the total gross production attributable to the applicable well.

3.   If  SOP elects to hand off gas at the wellhead  to an affiliate for sale downstream in the interstate pipeline, the Lease dictates that royalties paid  to Claimants "shall be" twenty percent of the Gross Proceeds, paid to an Affiliate of Lessee, computed at the  point of sale, for gas sold by lessee [sic] to an affiliate of Lessee[.]

4.   Paragraph 4(d) of the lease defines Gross Proceeds as:

> total consideration paid for oil, gas, associated hydrocarbons, and  marketable by-products, produced from the leased premises or  consideration for relinquishing any rights relating to this Lease  whether in the form of payments, bonuses, pre-payments for future  production or delivery of production at a future time, or sums paid  to compromise claims. . ..

5.   SOP admitted in the Stipulation that it paid claimants based upon an index price and not based upon gross proceeds referenced in the Lease.  Nowhere in the Lease is there any mention of payment based upon index prices. Accordingly, SOP has admitted that it breached the Lease Agreement, but the parties disagree upon the

Case ID: 191202572
Control No.: 19122301

how the Lease should be interpreted to determine the proper

calculation of royalty payments.

6. Paragraph 4(e), about which the parties disagree, provides:

> Lessee shall place oil and gas produced from the leased premises in marketable condition and shall market same as agent for Lessor, at no cost to Lessor. Except as expressly provided in (d) above, Lessor's royalty shall not be charged directly or indirectly with any expense required to make the gas marketable, including but not limited to the following: expenses of production, gathering, dehydration, compression, manufacturing, processing, treating, transporting or marketing of gas, oil, or any liquefiable hydrocarbons extracted therefrom; provided however, that reasonable, actual costs paid to nonaffiliated third parties for gathering, compression and transportation necessary to enhance the value of otherwise marketable gas may be deducted from Lessor's royalty proportionately to Lessor's royalty percentage. However, those costs shall never cause the royalty due to Lessor to be less than what the royalty would have been if enhancements and associated costs had never been made. The burden of proving marketability and enhanced value shall be upon the Lessee.

7. The following phrase in paragraph 4(e) established the default for payment of

royalties:

> Except as expressly provided in (d) above, Lessor's royalty shall not be charged directly or indirectly with any expense required to make the gas marketable, including but not limited to the following: expenses of production, gathering, dehydration, compression, manufacturing, processing, treating, transporting or marketing of gas, oil, or any liquefiable hydrocarbons extracted therefrom;

The parties have not asserted that any of the exceptions set forth in

paragraph 4(d) are applicable. Therefore, the Lease provides that,

absent any other exception, there would be no deduction for the

3

Case ID: 191202572
Control No.: 19122301

costs incurred by Statoil or its affiliate for activities leading up to

the sale of the gas to a third party.

8. In addition to the exceptions in paragraph 4(d), the Lease includes one additional

exception to the default that no costs shall be deducted from the twenty percent

(20%) royalty.  That section immediately follows the default and states:

> provided however, that  reasonable, actual costs paid to non-affiliated third
> parties for gathering, compression and transportation necessary to enhance the
> value of otherwise marketable gas may be deducted from Lessor's  royalty
> proportionately to Lessor's royalty percentage.

9. Particularly because the added exception immediately follows the default language,

the added exception applies only to situations where there is additional payment to

third parties for "gathering, compression and transportation <u>necessary to enhance</u>

<u>the value of otherwise marketable gas...</u>"   The fact that the terms "gathering,

compression and transportation" are also included in the default provision can only

mean that deduction for such costs is allowed when there is some out of the ordinary

process to "enhance" the value of the gas, in addition to gathering, compressing and

transporting the gas.  This interpretation is confirmed by the phrase that puts the

burden on Statoil to prove "marketability" and "enhanced value".

10. As set forth in paragraph 1 herein, the parties have agreed that the "neither side will

seek factual determinations through dispositive motion on issues of whether the gas

is in fact marketable at the wellhead."

11. Based upon the foregoing, Partial Summary Judgment is granted in favor of Claimant

on contractual liability as Respondent has admitted that it breached Lease

4

Agreement in computing the royalty payments based upon an index.

12. This Order is limited to resolution of liability for Count III of Claimant's demand (Breach of Contract) and does not address the computation of damages which shall be decided upon presentation of evidence at hearing.

13. This Order also does not address any other claims asserted by Claimant, including those asserted in Counts I, II and IV of Claimant's Demand.

14. The AAA Case Manager shall promptly arrange a conference call to discuss a pre-hearing schedule and hearing date to address Claimant's remaining claims and damages.


 B. Christopher Lee 
B. Christopher Lee, Arbitrator


Dated:  April 12, 2019

Case ID: 191202572
Control No.: 19122301

## PROOF OF SERVICE

I, Arleigh P. Helfer III, hereby certify that I caused the foregoing Praecipe for Writ of

Judgment to be served on respondent Equinor USA Onshore Properties, Inc. today, January 31,

2020, by mailing a copy via U.S. Mail addressed as follows:

> Equinor USA Onshore Properties, Inc.
> 2103 City West Boulevard, Suite 800
> Houston, TX 77042

> *s/Arleigh P. Helfer III*

Filed and Attested by the
Office of Judicial Records
31 JAN 2020 10:58 am
M. RUSSO

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS (HOUSTON)

|  |  |  |
|---|---|---|
| IN RE: | . | Case No. 20-33233 |
|  | . | Chapter 11 |
|  | . | (Jointly Administered) |
|  | . |  |
| CHESAPEAKE ENERGY CORPORATION, | . | 515 Rusk Street |
|  | . | Houston, TX 77002 |
| Debtor. | . |  |
|  | . | Wednesday, March 31, 2021 |
| . . . . . . . . . . . . . . . . | . | 9:00 a.m. |

TRANSCRIPT OF SETTLEMENT CONFERENCE
**BEFORE THE HONORABLE DAVID R. JONES VIA VIDEOCONFERENCE**
**UNITED STATES BANKRUPTCY COURT JUDGE**

TELEPHONIC APPEARANCES:

For Reorganized Debtors:  Kirkland & Ellis LLP
                          BY:  DANIEL T. DONOVAN, ESQ.
                          1301 Pennsylvania Avenue, N.W.
                          Washington, D.C. 20004
                          (202) 389-5174

For Demchak Plaintiffs:   Law Office of Larry D. Moffett, PLLC
                          By:  LARRY MOFFETT, ESQ.
                          2086 Old Taylor Road, Suite 1012
                          Oxford, MS  38655
                          (662) 298-4435

                          Lief Cabraser Helmann & Bernstein LLP
                          By:  DANIEL SELTZ, ESQ.
                          250 Hudson Sreet, 8th Floor
                          New York, NY 10013
                          (212) 355-9500

TELEPHONIC APPEARANCES CONTINUED.


Audio Operator:           Courtroom ECRO Personnel

Transcription Company:    Access Transcripts, LLC
                          10110 Youngwood Lane
                          Fishers, IN 46038
                          (855) 873-2223
                          www.accesstranscripts.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
TELEPHONIC APPEARANCES (Continued):                        2

For James. L. Brown &      Donovan Litigation Group, LLC
Alice R. Brown &           By:  MICHAEL DONOVAN, ESQ.
Non-MEC Class (PA)         1885 Swedesford Road
Creditors:                 Malvern, PA  19355
                           (610) 647-6067


For the Objectors:         Schnader Harrison Segal & Lewis LLP
                           By:  IRA NEIL RICHARDS, ESQ.
                           1600 Market Street, Suite 3600
                           Philadelphia, PA 19103
                           (215) 751-2503


For Commonwealth of        Office of the Attorney General
of Pennsylvania:           By: JOSEPH S. BETSKO, ESQ.
                           Strawberry Square, 14th Floor
                           Harrisburg, PA 17120
                           (717) 787-4530


                           Husch Blackwell LLP
                           By:  LYNN HAMILTON BUTLER, Esq.
                           111 Congress Avenue, Suite 1400
                           Austin, TX 78701-4043
                           (512) 479-9758


Also Present:              WILL THOMAS, Trial Technology Director
                           Kirkland & Ellis
```

1    (Proceedings commence at 9:00 a.m.)

2        THE COURT:  All right.  Good morning, everyone.  This

3  is Judge Jones.  The time is nine o'clock Central.  Today is

4  March the 31st, 2021.  This is the docket for Houston, Texas.

5  Next on this morning's docket, we have the jointly administered

6  cases under Case Number 20-33233, <u>Chesapeake Energy</u>

7  <u>Corporation</u>.

8        Folks, I will remind you, don't forget to record your

9  electronic appearance.  You do this by making very quick trip

10 to my website, two clicks.  It will take you less than 20

11 seconds.  You can do that at any time prior to the conclusion

12 of the hearing.

13       First time that you speak this morning, if you would,

14 please state your name and who you represent.  It really,

15 really helps the court reporters do their job.

16       And we are recording using CourtSpeak this morning.

17 Since I am by myself and I have no staff, it will probably be

18 late this afternoon, perhaps even tomorrow, before I get the

19 audio up on the docket.  I apologize for that delay, but it's

20 just -- there are a couple of technical steps that the clerk

21 chose not to give me the authority to do in my log-in ID.

22       I have activated the "hand-raising" feature, just

23 because it seems like there were a number of conversations

24 going on.  If you know you're going to be speaking this

25 morning, if you would, please go ahead and hit "five star" so

1  we won't have any further delay and we can get started.  And

2  that would be on your phone.

3            All right.  I think that's everyone.

4            Mr. Donovan, are you starting us off this morning?

5            MR. DANIEL DONOVAN:  I am, Your Honor.

6            THE COURT:  All right.

7            MR. DANIEL DONOVAN:  I just noticed -- I'm not sure

8  if it's intentional -- I noticed your camera, I think, is off

9  today.

10           THE COURT:  It's -- I'm going Darth Vader on you.

11 Sorry.  See, when I don't have somebody in the courtroom with

12 me -- I thought I'd covered everything.  I need a checklist,

13 like a plane.

14           MR. DANIEL DONOVAN:  Well, good morning.  Daniel

15 Donovan, Kirkland & Ellis, for Chesapeake.  Here to -- and I'll

16 get into details -- seek approval of certain settlements

17 related to Pennsylvania royalty owners.

18           And let me start, Judge.  I think we've spent a lot

19 of time.  Today is a good news story, in my view.  It's a good

20 news story of counsel.  Many are here that I'll introduce.  But

21 they worked hard, cooperatively, to resolve what I think can

22 fairly be called hotly-contested issues over the years.  And

23 these settlements took many years to achieve.  The settlements

24 we're here about today are literally the result of years of

25 work by a lot of the counsel you see here, but also your

5

1  supervision, Judge, during the bankruptcy, Judge Mannion of the

2  Middle District of Pennsylvania, Retired Chief Judge Cahn, who

3  was the chief mediator over many years; and frankly, the work

4  by lawyers in the Pennsylvania Attorney General's office and

5  class counsel here; and many other interested parties, to be

6  fair.

7         Our goal for Chesapeake was to globally resolve the

8  existing disputes and reset -- as I've told you before, Judge,

9  it's to reset this relationship.  It had issues, and we believe

10 we've positioned it for a productive and prosperous future

11 through these.

12        To do that, the parties mediated.  We certainly

13 litigated over the years.  And we finally settled the existing

14 disputes and set a path forward that I'll describe in a moment.

15 All the parties entered into these settlements at arm's length

16 and in good faith.  And these settlements, I'd submit, are in

17 the best interest of the Commonwealth of Pennsylvania, the

18 royalty owners, and Chesapeake Energy and its creditors.

19        Accordingly, at the close, we moved, but I'm going to

20 seek approval of all three.  And I'll talk about them.  First

21 is the Attorney General's settlement with Pennsylvania, of

22 which I don't believe there's any objections.  And then the two

23 class settlements, of which there's one objection that I'll

24 address.

25        So before proceeding, I'd like to spend a couple

6

1  minutes introducing counsel, Judge, who have -- who are also

2  going to speak, but I think are part of this.  First, you know

3  Mr. Lynn Butler, but also Joe Betsko of the Pennsylvania

4  Attorney General's office.  They join me today to seek approval

5  of the settlement.  They'll confirm that Chesapeake acted in

6  good faith in finalizing the settlement.  They're also

7  available to answer the Court's questions.

8          THE COURT:  Thank you.  Good morning to all.

9         MR. DANIEL DONOVAN:  On a personal note -- on a

10  personal note, Judge, after many years being on opposite sides

11  of Mr. Betsko of the AG's office, and Mr. Butler recently, I

12  enjoy today being on the same side with them, a little bit

13  more.  So that's who's representing the Attorney General.

14          THE COURT:  Of course.

15         MR. DANIEL DONOVAN:  So next, Judge, there are two

16  gentlemen, Larry Moffett and Daniel Seltz.  I see Daniel's on

17  the video, Larry was.  They appear on behalf of the Demchak or

18  the market enhancement -- call it the "MEC" -- class.

19         THE COURT:  Got it.

20         MR. DANIEL DONOVAN:  They're both nationally

21  recognized oil and gas lawyers, especially in the class action

22  context.  As I'll talk about in a moment, they were the first

23  lawyers to bring these claims.  They've been lawyers for over

24  seven years for their clients on these, and they're here to

25  answer questions and explain kind of their view of the MEC

1  settlement.

2            THE COURT:  Thank you.  Good morning, Mr. Seltz.

3            MR. SELTZ:  Good morning.

4            MR. DANIEL DONOVAN:  Moving to the non-MEC, the

5  non-MEC class, is Mike Donovan.  No relation.  We often get

6  that in court.  But Mike Donovan is a well-recognized lawyer,

7  especially in the class context.  He's a fierce advocate, and a

8  proud citizen of Pennsylvania, and he's here also to answer any

9  questions on the non-MEC class.

10            THE COURT:  Thank you.  Good morning, Mr. Donovan.

11            MR. MICHAEL DONOVAN:  Good morning.

12            MR. DANIEL DONOVAN:  And finally, I'd introduce Ira

13  Richards, Judge.  He's counsel for the objectors.  He's been

14  involved in much of the mediation over the years.  And although

15  we disagree on the legal arguments, I respect him as a fellow

16  lawyer.  We had a good discussion yesterday that I think

17  clarified at least a few issues --

18            THE COURT:  Very good.

19            MR. DANIEL DONOVAN:  -- on the settlement, so --

20            THE COURT:  Good morning, Mr. Richards.

21            MR. RICHARDS:  Good morning, Judge.

22            MR. DANIEL DONOVAN:  So with the lineup, set, Judge,

23  I now want to turn to our grounds for approval of the

24  settlements, and I know you're familiar -- you've had these

25  cases for a wile -- of that, and the numerous motions, the

8

1    arguments, the filings.  I have three issues I want to do this
2    morning.
3             First, I just want to briefly summarize the disputes
4    which sets the context for the settlements.  And finally, I'll
5    address the single objection.  And as always, most importantly,
6    I'm here to answer any questions that you have, Judge.
7             THE COURT:  Okay.
8             MR. DANIEL DONOVAN:  As I transition, if my
9    colleague, Will Thomas, can have sharing privileges, we have a
10   few slides to guide my discussions.
11            THE COURT:  Of course.  All right.  He should have
12   control.
13            MR. DANIEL DONOVAN:  Thanks.
14            Will, if we can go to Slide 2, please.
15            So, Judge, I'd start where I've started several
16   times, which is, you know, what is the layout here.  These are
17   the Pennsylvania leases.  There's more than 14,000 that
18   Chesapeake has in production in Pennsylvania.  And in general,
19   they can be categorized into two buckets:  one, the MEC, market
20   enhancement clause, leases, which are -- for obvious reasons,
21   leases with a market enhancement clause.  That also includes
22   something you may see in the documents, some additional leases,
23   ready for sale or use, as they're called.  We have categorized
24   them in that bucket.
25            And then the other bucket is non-MEC leases, which

1 are primarily leases that expressly permit post-production

2 deductions.  But not all of them.  But that's the category we

3 put.

4          So what were the disputes?  At the highest level,

5 royalty owners claim that Chesapeake didn't pay them all the

6 royalties due.  Chesapeake disagreed.  But there's been

7 litigation over the years, and I want to start, first, when did

8 this start?

9          And if we can go to Slide 3, Will.

10          This started, Judge, if you could believe it, in

11 2013, when Mr. Moffett, who was MEC counsel, and I've been on

12 the other side of him in cases, called me to raise issues for

13 his clients (indiscernible) Chesapeake in Pennsylvania.

14          After those initial calls, we had numerous meetings,

15 both in Oklahoma City, with Chief Judge Cahn, in mediation

16 sessions, and Mr. Seltz.  And those early claims and those

17 early discussions we resolved sometimes.  Some, we ended up

18 into this settlement agreement, that was filed in front of

19 Judge Mannion in the Middle District of Pennsylvania on behalf

20 of the market enhancement clause class.

21          As soon as we filed, there was collateral private

22 party litigation brought by other counsel, which took a little

23 time to resolve.  It was resolved.  And that ended, Judge, in

24 the amended MEC settlement, which I show here, and it was

25 preliminarily approved by Judge Mannion.  And it's still

1  preliminarily approved.  There's still a settlement class in

2  effect today.  I know the case was stayed during the

3  bankruptcy, but that order has never been vacated.  So it's

4  still in effect until hopefully today when we get the new

5  order.  That's the MEC class action.

6            In the interim, before preliminary approval, Mike

7  Donovan and his colleagues brought what we've currently called

8  the non-MEC class action.  That was focused on claims that were

9  primarily not necessarily that you couldn't take deductions,

10 but they were too high.  They were unreasonably high.  And

11 because there already was the MEC class action, those cases

12 kind of got focused on the remaining leases, that is the

13 non-MEC class actions.

14           We had a settlement reached there in August of 2018.

15 We then subsequently updated it.  That was filed before Judge

16 Mannion, but was not approved.  Not because he didn't approve

17 it.  It just never got ripe, for the reasons I'll get to in a

18 moment.

19           So then a third bucket, Judge.  I know you've heard

20 from me and Mr. Butler before, but in 2015 the Attorney General

21 objected to the MEC class action brought -- at that time her,

22 and subsequent him -- their own action in state court in

23 Pennsylvania, seeking recovery on behalf of Pennsylvania

24 royalty owners.  And they brought that under the Pennsylvania

25 Consumer Protection Law.

1    Those are the three cases.  And in this litigation,

2 Judge, you know there's been numerous filings and hearings,

3 primarily by the Attorney General.  But there's over 200

4 royalty claims from Pennsylvania royalty owners still pending,

5 Judge, on the register.

6    In addition, there was a Royalty Committee, as you

7 know, in this case.  They raised issue with us.  And from the

8 start, we've done our best to keep the Court apprised of our

9 settlement efforts, of which we're here today in the

10 culmination.

11    So that's the background, Judge, and now I want to

12 turn to Number 2, which is the agreements.

13    And Will, if we could go to Slide 4.

14    There are three agreements.  And they really all work

15 together, and that's part of what took the most time, Judge, is

16 to make sure they did.  At the highest level, the settlements

17 resolved all royalty claims in Pennsylvania by Pennsylvania

18 lessors, of course subject to anybody that opts out later.

19    The settlements provide funds for all claims for

20 royalty underpayments.  And in total, Chesapeake will pay

21 approximately $11.5 million, in what I'd call (indiscernible)

22 dollars.  And if you look under the AG settlement, we have

23 agreed to provide the Attorney General $5.3 million to

24 distribute to royalty owners as they see fit, $5 million for

25 the MEC settlement, and $1.25 million in the non-MEC

12

1 settlement.

2          So those are the different numbers.  Since they work
3 together, again, the AG is for all royalty owners.  And then
4 the other two, the distributions will kind of cut across all
5 those classes.

6          In addition, Chesapeake is providing through these
7 settlements royalty owners the opportunity to choose the
8 royalty formula going forward.  And to me, from my work in this
9 area, this is the real groundbreaking part.  If you have an MEC
10 lease under both the AG and the MEC settlement, you are
11 entitled to choose -- which I think most will -- the higher of.
12 That is, each month you will get the higher of a calculated
13 index price or the netback.

14          So, as Mr. Moffett can address, I think this is both
15 good for royalty owners and it's good for Chesapeake.  They
16 want to move forward and have a kind of productive and non-
17 adversarial -- so they think, although this is going to cost
18 money for the company, it's worth it.

19          The same thing under the non-MEC.  They will have the
20 opportunity -- the difference is under those leases, which we
21 view differently, it's a one-time election.  So as opposed to
22 getting the higher of, the non-MEC lessor is entitled to choose
23 I want to get the in-basin index every month with no
24 deductions, which will tend to be a little bit more consistent,
25 we think, over time.  Or I want the netback, which is probably

1    lumpy; but like in recent times, when it was really cold,

2    prices really go up, and you could do well.  And potentially

3    even do better.  But that will be a choice.

4            All three settlements encapsulate this.  So it's not

5    just in one of the settlements.  It's in all three.  So that's

6    the background.

7            If we go to the next slide, Will.

8            This highlights how they work together.  And I'll go

9    through a little bit more detail, but it's a global settlement.

10   There's a bilateral agreement in the upper left.  We put here

11   this is the Commonwealth of Pennsylvania and Chesapeake.  For

12   that, Judge, as you know, procedurally, we're only seeking Rule

13   9019 because it's not a class, it's a Rule 9019 approval.

14           THE COURT:  Right.

15           MR. DANIEL DONOVAN:  There's no objection, Judge.

16   The Pennsylvania Attorney General joins in.  We think we've

17   provided the information.  We think it's in the best interest

18   of Chesapeake and its creditors, and in fact we hope it's good

19   for our royalty owners, as well.

20           The AG settlement was a reasonable exercise of

21   management's business judgment.  They've been before you,

22   Judge.  They are committed to the transparency and improving

23   the royalty relationship.  And this was inked at a time where

24   the Attorney General had made claims that are still pending in

25   this bankruptcy, in hundreds of millions of dollars, Judge,

1  with the biggest risk saying until we paid that, they could

2  shut down our franchise from operating in the Commonwealth.

3       To settle the claims, I went through the terms, but

4  you know, after the filing of the settlement, the Pennsylvania

5  Supreme Court ruled in Chesapeake's favor on a longstanding

6  issue of whether the Consumer Protection Law applied to

7  sellers.  And that was our legal position from the beginning.

8       But I want to make clear, that favorable decision

9  doesn't change our calculus, and didn't, of management.  The

10 settlement was good for Chesapeake and royalty owners before

11 that.  We think it's good now, for the reasons I said before.

12 This is not only to pay prior claims, but to reset the

13 relationship.  So we think it's fair, reasonable, and we ask

14 that it be approved.

15      Turning to the other two buckets, Judge, we do need

16 to satisfy Rule 9019 and Rule 23 for preliminary approval.  As

17 I've said before, there are over 200 claims from Pennsylvania

18 royalty owners still pending.  Those claims need to be resolved

19 individually or on a global basis.  We chose to do it through

20 the class settlements, as I've kept the Court apprised, since

21 day one that we intended to.

22      So we resolved the claims, and we have the

23 go-forward.  And again, I know there's an objection, but we

24 have to remember the go-forward is in the Attorney General's

25 settlement.  So it is also in these, but once the Attorney

1   General settlement is approved, since they all work together,

2   I'm not sure an objection solely with a class settlement really

3   provides much.  But I'll get to that in a minute.

4          Here, we believe we did provide sufficient

5   information.  The settlement is fair and reasonable.  And in

6   fact, a prior version, as I said, at the MEC settlement, at

7   least, was approved by Judge Mannion as -- at least the

8   settlement class still exists to this day.  The settlements are

9   really proof that hotly-contested issues can get resolved by

10  lawyers that really work hard and kind of keep their eye on the

11  prize, I would say.  So we're going to seek approval to send

12  out that notice at the end here.

13         So, Judge, third, I want to turn to the objectors.

14  And they object, again, only to the private party class action

15  settlements.  We responded in writing, but I want to highlight

16  a few points, if I may.

17         First, the first objection, I submit, this Court

18  plainly has subject matter jurisdiction and jurisdiction over

19  these.  The settlement addresses pending claims before Your

20  Honor.  The issues that were addressed in the bankruptcy.  And

21  indeed, if you add them all up, there's over a billion dollars

22  of claims still pending that this will resolve, including the

23  AG's.  I don't think there's any question that this Court has

24  jurisdiction.

25         Second, once we cross that rubicon, there's really no

1 reason for this Court to abstain.  All the parties supporting

2 the settlement want this Court to approve it.  It's where we

3 came.  We've been addressing it throughout the bankruptcy.  And

4 it will get it done, and we believe it's the right place to do

5 it.

6           And we've also -- by the way, Judge, we've kept Judge

7 Mannion apprised.  We told him when we filed this.  So he's

8 aware of it, as well.  And frankly, the objector -- it's a bit

9 curious to me that a royalty owner would want to delay these

10 settlements any further after seven years of litigation,

11 especially since -- if there is an objection, if someone

12 doesn't like the settlement, they will have notice and the

13 opportunity to opt out and litigate their claim before Your

14 Honor.

15           Third, Judge, the motion details that Rule 23 has

16 been satisfied.  We address this in the brief, but it's fair

17 and reasonable.  You're going to hear it's supported by class

18 counsel and the Attorney General.  We also -- we sent out again

19 CAFA notice, Judge.  We've gotten -- nobody's objected under --

20 from the government.  In fact, the Pennsylvania Attorney

21 General obviously supports it.  We've provided sufficient

22 information for the Court to preliminarily certify the class.

23 And again, everyone, including Mr. Richards' clients, will have

24 the right to object at the final fairness hearing if they stay

25 in the class.

1       But the one case that was cited was the <u>Hayes</u> case.

2  But that case -- after I read it, it actually supports our

3  position.  We've provided the sufficient information.  In that

4  case, the Court took the counsel's representations, just like

5  here, and in fact it granted preliminary approval like we're

6  seeking.  So I don't think those objections have any legs at

7  all.

8       And finally, I just want to clarify on the record, I

9  told Mr. Richards, there was an objection in there that there

10 was a certain lease called the WCLG.  It's Wyoming County

11 leases.  They have a provision, kind of a modified MEC, in

12 which Chesapeake is not permitted to take gathering deductions

13 if it's affiliate gathering.  Chesapeake built these systems.

14 They then spun them down and then sold them.  They're Williams'

15 systems today.  But we have continued to honor that, because

16 when the agreements were put into place they were kind of

17 Chesapeake to Chesapeake.

18      And we are committed to them, as the agreement

19 provides, they're going to get the netback based on their

20 lease.  That is, we will never consider the post-production

21 cost of that kind of Chesapeake agreement until it at least

22 expires.  So they kind of get the higher "higher of."  But I

23 wanted to clarify that, because to the extent it wasn't clear,

24 that would have been the objection.  And I made Mr. Richards

25 aware of that.

1          So, Judge, in conclusion, we think we've provided
2    sufficient information.  We think this is a great step.
3    Management is excited to put this into place and to start and
4    really -- now that we've come out -- we've already started the
5    process to get this ready -- to really reset that relationship,
6    including with the management, including the ombudsman in the
7    AG settlement agreement, and the funds we're providing.
8          So we'd ask that they be approved, Judge.  And we did
9    just upload -- we tweaked the MEC and the non-MEC preliminary
10   approvals to provide dates.  And in the non-MEC we had a couple
11   typos that we fixed.  We'll provide redlines later today,
12   Judge.  We weren't able to get those done in time, but those
13   were just uploaded.
14         With that, Judge, we'd submit and ask for approval.
15         THE COURT:  All right.  Thank you.  Let me just --
16   procedurally, let me just -- I want to walk through.  The
17   Pennsylvania AG settlement, as you noted, is just very simple
18   and easy.  And I am very comfortable with the -- with both my
19   jurisdiction and authority.
20         With respect to the class actions, is it contemplated
21   that you're going to seek preliminary approval from me, and
22   then I need to go get you an Article III to give -- no?  You
23   think that I can do all of this here?
24         MR. DANIEL DONOVAN:  We do, Judge.
25         THE COURT:  And just walk through that with me.

1    MR. DANIEL DONOVAN:  Sure.  We believe that the Court

2 has the power to do the preliminary approval and the final

3 approval of the settlement.

4    THE COURT:  Okay.

5    MR. DANIEL DONOVAN:  The notice will go out.  We then

6 set, kind of beyond the 90 days to have the final approval.

7 And we believe that's permissible.

8    Of course, if, you know, we research it, the Court

9 doesn't believe that's the appropriate path, we're happy to go

10 back to Judge Mannion.  But we do believe you have that power,

11 Judge.

12    THE COURT:  So here's -- and let me take a step back.

13 And so let me explain to you the concern that I have.  Again,

14 the Pennsylvania AG settlement, easy.  Approving the settlement

15 from the debtor's point of view with respect to the MEC and the

16 non-MEC, very easy and simple for me to get my hands around.

17    With respect to the ultimate certification, are there

18 current certified classes in both cases that were entered by

19 Judge Mannion?

20    MR. DANIEL DONOVAN:  So there is in the MEC, Judge.

21 There is not in the non-MEC.

22    THE COURT:  So -- and I'm going to draw a conclusion

23 -- or I'm going to draw a difference between the two, and we

24 just need to work through that issue.  Because, again, you

25 know, my power, if you will, derives from the power given to

1  the Article III district judges in the Southern District of

2  Texas.  That and 1334.

3       So, to the extent that there is a certified class, I

4  agree with you.  I can deal with that.  The problem that I have

5  is the Fifth Circuit has said that -- and it was my case that

6  went up -- that I only have the authority to actually certify a

7  class for all purposes if that class is within the district in

8  which I sit.

9       Obviously, a district court has all of the necessary

10  authority and power to do it.  And you know, I have done this

11  on multiple occasions where I handled the 9019 aspect of it,

12  and then I simply pick up the phone and call Chief Judge

13  Rosenthal.  And obviously, since my authority and power derive

14  from her, she then handles the actual certification issue.

15       I don't want there to be a -- you know, I cause a

16  problem because I stepped over the line of what I am authorized

17  to do.  I just want to make sure you all have thought about it.

18  I want to do this right.  I want -- if I'm going to approve

19  this, I don't want -- I don't want the citizens of the

20  Commonwealth of Pennsylvania to have any questions about it.

21       Quite frankly, for seven years of your life, I don't

22  want you to have any questions that it was buttoned up and done

23  right.  And so my thought is -- and again, I'm happy -- I want

24  to hear from everybody.  Pennsylvania AG settlement, easy.

25  It's not objected to.  I've read it.  I understand it.  It's

1  very simple and straightforward to me.  That's easy.

2       To the extent -- and I saw Mr. Richards shake his

3  head no when you told me that there is a sort of high class in

4  the MEC issue.  And I don't know how folks could disagree about

5  that.  There either is or there isn't.

6       But to the extent that there's a question about that,

7  what I would contemplate is to the extent that I approve a

8  notice, which I think I can do, I think I can make all of -- I

9  think I can make preliminary findings.  I think I can make

10 final findings with respect to -- from the debtor's

11 perspective.  But then with respect to that final hearing --

12 and I did some class action -- most of it was bankruptcy class

13 action, but I did some in my career.  I think the better place,

14 so that you get certainty, is in front of an Article III.

15      But if you all have done this research and -- I mean,

16 I would love to be wrong.  I would always rather have more

17 power than less power.  But I just -- looking at the law, I am

18 fairly convinced that that final hearing needs to be in front

19 of an Article III.

20      And again, I've done this a number of times.  I think

21 we've learned a lot.  It has worked seamlessly thus far.  But

22 again, if you think I'm wrong, I would love to be convinced.

23 You know, I secretly complain about that decision, since it was

24 my case, but it is the Circuit and I follow my Circuit without

25 question.

22

1          So but -- you know, what do you think -- and I'm

2    happy to hear from anyone.  If someone else wants to weigh in.

3    But you know, Jones, you haven't read this decision.  Or the

4    Supreme Court just said you're more important than you think

5    you are.  I'm happy to hear all of that.

6               MR. DANIEL DONOVAN:  So, Judge --

7               MR. RICHARDS:  Can I --

8               THE COURT:  Mr. Richards, I will get to you, but I

9    want to understand this procedural point, and then I'm going to

10   give you the podium.

11              MR. DANIEL DONOVAN:  So on that, Judge, we will go

12   back and look at it.  It seems like the safer route, based on

13   your experience, is just go back to Judge Mannion for final

14   approval.

15              THE COURT:  No.  It's -- it wouldn't be Judge

16   Mannion. It would be a --

17              MR. DANIEL DONOVAN:  Oh.  It would go up to the --

18   yeah.

19              THE COURT:  I would -- my course of action or my

20   course of proceeding would be as Chief Judge of the Bankruptcy

21   Court, I would contact Chief Judge of the District Court.  I

22   would have a conversation with the Chief Judge.  So far, she

23   has kept them all.  But she has the ability to then assign a

24   district judge to consider it.

25              Again, every time we've done it, she just kept it.

23

1  But I don't -- it would cross some jurisdictional boundaries,

2  and I probably wouldn't last very long if I started reporting

3  directly to a district judge in Pennsylvania.  We're like

4  marbles.  They like to -- you know, they like to keep us.

5        Mr. Donovan, do you have thoughts about this?  The

6  other Mr. Donovan.

7        MR. MICHAEL DONOVAN:  I do, Your Honor.  I do, Your

8  Honor.  I think your inclination would be acceptable to the

9  non-MEC people.  I'm very familiar with Judge Rosenthal.

10 (Audio interference) if it's your -- as it appears to be, your

11 inclination that that's the safer way to go, then I would

12 appreciate Your Honor reaching out and forewarning her.  And

13 I've been on several panels with her, so I think she would be

14 very familiar with the final approval process here, and I would

15 prefer that she would keep it (audio interference) --

16       THE COURT:  Like I said, she has thus far.  And it

17 also gives -- you know, it gives everybody the comfort that if

18 someone thinks that I've done -- that I've done something

19 wrong, you then have an Article III that you can go and raise

20 those issues with.  Again, I've been through this a couple of

21 times, and it has worked really, really well.  So I'm not --

22 I'm not too worried about that.  And I also think that she'll

23 keep it.  But she has the authority to do whatever she wants.

24 I want to make that clear.

25       Mr. Seltz, you want to tell me that I'm right or

1  wrong or that I ought to be thinking about it differently?

2          MR. SELTZ:  No, Your Honor.  (Audio interference)

3  moving forward the soonest way as possible.

4          THE COURT:  No, I got it.  This will not take long.

5          MR. SELTZ:  (Audio interference)

6          THE COURT:  I know that she's holding hearings.  I

7  know that she has held one fairness hearing during COVID on one

8  of my class action settlements.  So I don't think that it will

9  be -- you know, we have to work harder because we're only

10  Article I.  So, you know, we have to fit 27 hours into a

11  12-hour day. But she will get to it promptly.  I'm confident of

12  that.

13          And Mr. Butler, again, I can take care of yours.  I

14  have no concerns at all with the AG settlement.  So I assume

15  that you don't -- I mean, you're interested, but you don't

16  really care how that gets done. Is that a safe assumption?

17          MR. BUTLER:  Pretty much, Your Honor.  Nailed that

18  one.

19          THE COURT:  Got it.  Okay.  Ah, you know, one for

20  twelve today.

21          All right.  Mr. Richards, so tell me why -- and I

22  know that you've got your motion for permissive abstention not

23  set until April, but I've read it in preparing for today.  Tell

24  me why it is that you think that either I shouldn't -- that I

25  shouldn't proceed at all with the settlement, or the settlement

25

1  should proceed somewhere else, or that it's fatally flawed, or

2  all of the arguments that you want to make.

3        MR. RICHARDS:  Thanks, Judge.  Let me start with the

4  part that caused my head-shaking.

5        THE COURT:  Okay.

6        MR. RICHARDS:  And that was when Mr. Donovan

7  suggested (audio interference) there's a certified class in the

8  MEC settlement.  So there is a settlement pending before Judge

9  Mannion, or there was, that he preliminarily approved and

10 preliminarily certified the class.  There is no finally

11 certified class.

12       THE COURT:  Okay.

13       MR. RICHARDS:  My understanding -- and Mr. Donovan

14 can correct me if I'm wrong -- was that there were a

15 substantial number of opt-outs from that settlement.  As I

16 understand the current MEC settlement, people who opted out

17 already from the preliminarily certified class before Judge

18 Mannion are now back in the class, or would be back in the

19 class, subject to final certification.

20       So I think the class that is pending in the

21 settlement, in the motion today, has not been certified either

22 preliminarily or final.  So I think that's (audio interference)

23 different.

24       THE COURT:  Yeah.  You're reinforcing my argument

25 that the certification part of it should be done by an Article

1    III, regardless of what -- regardless of where it is.

2           MR. RICHARDS:  I think that's right, Judge.  And one

3    of the places where Mr. Donovan and I agree is that after seven

4    years, everybody should be doing this right.  And my concern is

5    that on the record before you today, Judge, you're being asked

6    to do something that isn't going to move the ball down the lane

7    after seven years of litigation.

8           THE COURT:  I know.

9           MR. RICHARDS:  Let me start with the Rule 23 piece of

10   it, and the question of whether you can preliminarily approve

11   the settlement.  So the debtor primarily focuses on -- or

12   entirely focuses on pre-2018 law under Rule 23.  In 2018, Rule

13   23 was amended, and the settlement procedure has been changed

14   entirely.  It's now front-loaded.

15          So where in the past that you could get drive-by

16   preliminary approval, the term "preliminary approval" almost

17   doesn't even exist anymore.  Now it's approving a request for

18   notice.  And at the time a request for notice is made, it's

19   required that a proponent of the settlement, not the defendant

20   but the class representative, create an evidentiary record

21   showing that the settlement is likely to be approved.  And it's

22   an evidentiary issue.  The Court has to make evidentiary

23   findings on fairness, reasonableness, and adequacy of the

24   settlement, based on the evidence submitted.

25          And lawyer's statements are lawyer's statements.

1  Judge, the cases are replete with rejections of settlements
2  just based on lawyers' promises.  It's got to be (audio
3  interference).

4        So the primary issue here is you have a settlement,
5  as Mr. Donovan described it, that resets the relationship or
6  supposedly resets the relationship with Chesapeake lessors
7  going forward in Pennsylvania.

8        The problem is that the main representatives have not
9  filed proofs of claim compared to the 58 land owners who I'm
10 representing here today.  There's been no explanation in the
11 record as to why they didn't file proofs of claim.  There's no
12 evidence in the record that there has been an economic analysis
13 showing that the proposed going forward terms of the settlement
14 -- and I'm hesitant to use the term "relief" -- actually
15 provide a benefit to every class member irrespective of lease
16 form.

17       And when you have potential differences in lease
18 language, like the difference between the Wyoming County land
19 owners' group lease and other potential leases within the MEC
20 class or the non-MEC class, there can be differences in
21 interest.

22       Those differences in interest may get heightened here
23 when you have a situation where the named representatives, for
24 whatever unexplained reason, chose not to file proofs of claim
25 here, in contrast to my clients did, including (indiscernible)

28

1    class proof of claims.  So those interests are going to be

2    different.

3          In terms of the jurisdictional and abstention issues,

4    in the plan, the leases rode through unimpaired.  The purpose

5    of this settlement, which -- these settlements which result in

6    lease amendments, result in impairment of the leases.  So this

7    is not a settlement implementing the plan.  It's a settlement

8    kind of differing from the plan.  It's kind of adding a layer

9    to it, and almost, in effect, not applying it, in a way that

10   nobody contemplated.

11         And back in the proceedings relating to plan

12   confirmation, we did file objections to plan confirmation which

13   addressed that very issue.

14         On the abstention piece, Mr. Donovan noted that

15   there's -- that Judge Mannion does have a pending class

16   certification order and settlement approval order relating to

17   the MEC settlement.  And he's been involved in these

18   settlements and involved in supervising these claims.  He's

19   familiar with the issues.

20         Recall that in the original MEC settlement, the

21   Demchak settlement, there was a different proposed going-

22   forward term that resulted in a change in the percentages of

23   post-production costs that would be deducted going forward.

24   The settlements today have a completely different going-forward

25   component.  There's been no evidence submitted that shows that

1 there's an actual benefit from that component, particularly

2 when compared -- in comparison to the going-forward relief that

3 was initially proposed.

4         So when you have, in the MEC settlement, the higher

5 of a netback price and the higher of an in-basin index, it is

6 not facially apparent that that's any different.  The index

7 price -- in-basin index price, the idea is to approximate a

8 wellhead (audio interference).  So if you have a claim that

9 says Chesapeake, you're breaching these leases because I have a

10 market enhancement clause or a ready for sale or use clause,

11 that prohibits you from deducting post-production costs in the

12 routine course of sale to a downstream point of sale, right, so

13 a netback is prohibited, then going forward, basically giving

14 you the higher of a netback or a netback, the higher of a

15 wellhead price or a wellhead price, there's been no showing in

16 any evidentiary way that that creates a benefit for every class

17 member, irrespective of lease forms, even more class members

18 than not.

19         So in the absence of an evidentiary record that

20 demonstrates that that creates an actual benefit, and the --

21         THE COURT:  So let me --

22         MR. RICHARDS:  -- kind of -- the --

23         THE COURT:  Sure.  Mr. --

24         MR. RICHARDS:  -- intangibles --

25         THE COURT:  So, Mr. Richards, if I can.  And I

30

1  disagree a lot with what you said, but I've got a more basic

2  question.  So you represent 58 folks that filed proofs of

3  claim, right?

4          MR. RICHARDS:  Correct.

5          THE COURT:  And so, I mean, I'm very clear you don't

6  like the settlement.  So aren't you just going to opt out?

7          MR. RICHARDS:  There's an opt-out penalty here,

8  Judge.  So we can either opt out or object, and that's the

9  choice.  And the cases are pretty clear that it's not enough to

10 say that you can just opt out.  So for some class members, or

11 potential class members --

12         THE COURT:  Let's just talk about your 58, because

13 those are the only ones that you have the ability to speak for,

14 right?

15         MR. RICHARDS:  That's right, Judge.  And --

16         THE COURT:  So your 58 --

17         MR. RICHARDS:  -- sitting here today -- correct.  And

18 sitting here today, I can't tell you that all 58 will opt out

19 or all 58 will object.  We haven't made that decision yet.  And

20 it may be different for different class members in different

21 settlements, depending on their circumstances.

22         THE COURT:  Okay.  And so for those that opt out --

23 I'm just trying to go down the decision tree.  I'm trying to

24 understand where this is headed.  For those that -- for those

25 of your -- so you're going to go talk with each of your 58

1  different clients, because everyone may have different

2  interests, concerns, whatever.  And you're going to give them

3  your best advice.  And they're either going to say, well, I'm

4  going to stay in the settlement or I'm going to opt out.  And

5  if they opt out, then they've got a proof of claim, which I

6  will then adjudicate one by one, correct?

7         MR. RICHARDS:  Correct.

8         THE COURT:  Then why isn't that -- I mean, I always

9  believe that choice is better than no choice, even if you make

10  a bad choice.  But why isn't -- why doesn't that give you all

11  of your options?

12         MR. RICHARDS:  There's a difference in availability

13  of relief.  So in these settlements there's a pool of cash

14  being made available --

15         THE COURT:  Sure.

16         MR. RICHARDS:  -- to people who didn't file proofs of

17  claim, as opposed to people who did file proofs of claim who,

18  if they're unsecured creditors, are limited to the relief under

19  the plan.  For the Wyoming County land owners, there's a --

20         THE COURT:  Can we take a --

21         MR. RICHARDS:  They're secured --

22         THE COURT:  Sure.  Can we take a step back?  I want

23  to go with you.  I want to understand this entire argument.  So

24  there's a pool of cash.  And you're telling me -- because I

25  didn't read it this way.  And maybe I need to go read it again.

32

1  You're telling me that if someone filed a proof of claim but

2  opts into the settlement, they don't get a pro rata share of

3  that cash?

4          MR. RICHARDS:  No, they do on the condition that they

5  amend their lease.

6          THE COURT:  Sure.

7          MR. RICHARDS:  I think they're (audio interference)

8  dividing it into two halves.

9          THE COURT:  Okay.

10         MR. RICHARDS:  And so we have proofs of claim that

11 were filed dealing with pre-effective date royalty --

12         THE COURT:  On paper -- right.

13         MR. RICHARDS:  -- (audio interference) administrative

14 claims or royalty claims.  And then there's the post-effective

15 date royalties, that through the plan is unimpaired.

16         THE COURT:  Right.

17         MR. RICHARDS:  So the choice is to opt out of the

18 class and accept the relief that is available in the --

19         THE COURT:  Bankruptcy case.

20         MR. RICHARDS:  -- through the plan --

21         THE COURT:  Right.

22         MR. RICHARDS:  -- or go outside the plan, stay in the

23 settlement and get cash, but on the condition that you amend

24 the lease and impair --

25         THE COURT:  Sure.

1    MR. RICHARDS:  So is that -- that (audio
2   interference) between the impairment of the lease going forward
3   and the terms of the plan create an issue here.

4    THE COURT:  So -- and I still don't understand the
5   issue, because you can either take what the law provides, which
6   is you liquidate your claim in bankruptcy, and you get whatever
7   you get, and then you have whatever rights you have under
8   applicable law.  That's option one.  You can't ever complain
9   about that.

10   Or number two, you can get something now, to which
11  you're not otherwise legally entitled, and you have to make a
12  give in order to get it.  I mean, that's the whole basis of
13  free choice, right?  I'm trying to understand what's wrong with
14  that.

15   MR. RICHARDS:  No, I think that's right, Judge.  And
16  it's the "not otherwise entitled" piece of it that's a little
17  troubling.

18   THE COURT:  Sure.

19   MR. RICHARDS:  Because we have a motion here that's
20  asking the Court to preliminarily approve and certify classes
21  where people who chose not to file proofs of claim have -- may
22  have different interests and different incentives than people
23  who chose to file proofs of claim and chose to litigate in this
24  Court.

25   THE COURT:  Right.

1          MR. RICHARDS:  So the settlement can't be approved,

2     preliminarily or otherwise, and the class can't be certified,

3     preliminarily or otherwise, absent a showing that the named

4     plaintiffs have the same interest as the absent class members

5     that they are seeking to represent.

6          THE COURT:  I got it.  So you're --

7          MR. RICHARDS:  So in the --

8          THE COURT:  You're really complaining -- what you're

9     saying -- and I'm shortcutting, and I don't mean to do that --

10    what you're really saying is you're asserting that the named

11    plaintiffs violated their duty to all class members because

12    they failed to file a proof of claim.  That's what you're

13    really telling me.

14         MR. RICHARDS:  And what I'm saying is I don't think

15    there's an evidentiary record here, Judge, that allows you to

16    make the determination that they fairly and adequately

17    represented the class.  There's been no explanation as to why

18    they didn't file proofs of claim.  There's been no explanation

19    of how their interests align with people who did file proofs of

20    claim.  And there's been no evidentiary record that (audio

21    interference) their leases and the difference in their lease

22    language and the relief that they've agreed (audio

23    interference) forward or the terms that they've agreed to going

24    forward adequately (audio interference) interests of all class

25    members, including the people who chose to file proofs of

35

1   claim.

2         THE COURT:  So it's --

3         MR. RICHARDS:  Now Mr. (audio interference) talks

4   about --

5         THE COURT:  So it's not only filed a proof of claim,

6   but also your belief is they have to have the exact same lease

7   as your 58 clients.

8         MR. RICHARDS:  Not necessarily the exact same lease.

9   But I think before you can certify the class, you have to be

10  able to show that the -- or the proponents of the settlement

11  have to be able to show and give you an analysis that shows

12  that there are enough similarities of lease language that their

13  interests are aligned with people who have different leases.

14        So a number of our clients have the Wyoming County

15  land owners' group lease, and we've put it in the record.  And

16  that lease specified a gross proceed downstream third-party

17  point of sale royalty valuation point.  And that's -- may be

18  different than someone who has a different lease without that

19  level of specificity.

20        The language in that lease that Mr. Donovan refers to

21  as a "market enhancement clause" is not quite the market

22  enhancement clause.  The language is written differently.  It's

23  sandwiched between two very important exclusions.  And that

24  lease has been interpreted by at least one arbitrator to

25  preclude the deduction of post-production costs, moving the gas

1  from the wellhead to a downstream point of sale in an (audio

2  interference) involving an assignee of Chesapeake.

3            So offering somebody with a Wyoming County group plan

4  -- land owners' group lease the option to amend their lease to

5  basically accept a netback, or to accept an index price-based

6  royalty calculation that an arbitrator has already found

7  violates the lease, is not really relief.

8            So, absent a showing that the plaintiffs who are

9  slated to represent the classes in these cases has sufficient

10  interest aligned with people with those leases and people with

11  other lease forms, including to the extent that they pursued

12  the claims in bankruptcy, because adequacy (audio interference)

13  is something that's measurable at every stage that (audio

14  interference) class can't be certified right now.

15            THE COURT:  So I still don't understand.  So with

16  respect to your 58 folks, you're just going to opt out.  You

17  filed your proof of claim.  And then you've got whatever legal

18  rights you have under applicable law.  How could you be any

19  better off?

20            MR. RICHARDS:  Because the issue, Judge, is not

21  whether we can opt out.  We have the choice of opting out or --

22            THE COURT:  No, but it is -- it may not be the issue,

23  but it is my question, which makes it relatively important

24  since this is my hearing.

25            MR. RICHARDS:  No, I understand, Judge, and I'm

1 trying to answer it, that we haven't determined yet whether the

2 particular member of the group of 58 on whose behalf we filed

3 objections (audio interference) opt out or object.  Right now,

4 we are members of the class as defined, and under Rule 23, as

5 currently written, we're objecting to the preliminary approval

6 of the settlement.

7      Whether ultimately we opt out, if we do opt out, then

8 we lose that ability to object.

9      THE COURT:  I got it.  All right.  And I interrupted

10 you a number of times.  Didn't mean to do that.  Anything else?

11      MR. RICHARDS:  No.  Just one other thing, Judge, and

12 this goes to the jurisdictional issue and the conversation that

13 Mr. Donovan and I had yesterday.  One of the questions that I

14 asked him is whether the money that's funding the settlement is

15 coming from new money post-effective date, from post-effective

16 date royalties for the reorganized debtor, post-effective date

17 revenue --

18      THE COURT:  Right.

19      MR. RICHARDS:  -- or it's some dedicated fund.  And

20 it's not clear to me that -- where it's coming from.  And based

21 on the settlement agreement, it appears that it's coming from

22 post-effective date funds, which would be another reason that

23 the Court doesn't have jurisdiction over the settlement or

24 should abstain.

25      The last point I want to make --

1        THE COURT:  How could where the money comes from

2   affect my jurisdiction?  I have the claims --

3        MR. RICHARDS:  (Audio interference)

4        THE COURT:  I have the claims.

5        MR. RICHARDS:  Sure.  (Audio interference) --

6        THE COURT:  The claims give me all the jurisdiction I

7   need.

8        MR. RICHARDS:  I think it matters because of the

9   distinction between post-effective date -- the post-effective

10  date focus of this settlement.  So if you have a settlement

11  that really is about amending the leases going forward and

12  changing what they look like for land owners after the

13  effective date, and for leases that rode through the plan

14  confirmation unimpaired, that the fact that there isn't some

15  dedicated fund that existed in -- pre-effective date, but is

16  really coming out of the reorganized debtor's operations,

17  undercuts the suggestion that the Court either has jurisdiction

18  right now or shouldn't abstain in favor of Judge Mannion who

19  has the ability to deal with (audio interference) going forward

20  with (indiscernible).

21        THE COURT:  All right.

22        MR. RICHARDS:  The one last point I want to make,

23  Judge, is there really is something a little bit unusual here

24  in that the debtors are the parties who -- that is moving for

25  preliminary approval.  As you pointed out at the beginning of

1   the hearing, the Rule 9019 inquiry of the fairness to the

2   debtor and the debtor's interests is quite different than the

3   lens through which preliminary approval has to be viewed.

4   That's fairness, reasonable and adequacy to the class members,

5   based on Amended Rule 23 that requires that evidentiary

6   determination now.

7          The class representatives have not filed any (audio

8   interference).  They have -- settlement agreement delegates to

9   the debtor the obligation to move for preliminary approval.

10  However, it's the class representatives who have the fiduciary

11  obligation to the class members to demonstrate to the class

12  members that this -- and to the Court that the settlement is

13  fair and adequate.

14         And it's their lack of creating an evidentiary -- or

15  an evidentiary record, their lack of pursuing the claims in

16  bankruptcy through proofs of claim undercut the ability of the

17  Court to both preliminarily certify the class, allow notice to

18  go out, and ultimately to finally certify the class.

19         THE COURT:  All right.  Thank you.  Anything else?

20         MR. RICHARDS:  Not (audio interference) Judge.

21         THE COURT:  All right.  Thank you.

22         I didn't give Mr. Seltz or Mr. Michael Donovan an

23  opportunity to talk to the substance.  I didn't mean to do

24  that.  I just realized I asked you a question and moved on.

25  My apologies.

1    Either one of you wish to address any of the issues

2 raised by Mr. Richards?

3    MR. SELTZ:  I would, Your Honor.  I do want to --

4 before I make a couple comments, mostly on the Rule 23 issues,

5 I wanted to make sure that my colleague, Mr. Moffett, is able

6 to speak.  I know he was having some technical difficulties

7 with his video.  But I do want to see if he's able to

8 participate by phone.  If he can hear us --

9    THE COURT:  Certainly.  Mr. Moffett, if you haven't

10 already done so, if you would hit "five star" on your phone so

11 I can see you raise your hand.

12    All right.  So I now know that Mr. Moffett can hear

13 us.

14    Mr. Moffett, can you say something so we know that we

15 can hear you?

16    MR. MOFFETT:  Yes, Your Honor.  This is Larry

17 Moffett.  Can you hear me now?

18    THE COURT:  Very well.  Thank you, sir.

19    MR. MOFFETT:  Well, Your Honor, first of all, I

20 apologize.  I had the unfortunate circumstance happen, my

21 computer crashed just a little while ago.  So I am bound by my

22 phone and I apologize for that, Your Honor.  I was hoping to

23 participate by video.  And I have been able to listen to Your

24 Honor's remarks and the remarks that have been made thus far by

25 counsel, and I appreciate being given an opportunity to weigh

41

1   in on just a couple of issues.  And certainly Mr. Seltz and I

2   are available to answer any questions Your Honor may have.

3            But, first of all, as Mr. Donovan -- Dan Donovan

4   mentioned, I and Mr. Seltz are part of a group of attorneys who

5   have been litigating these claims against Chesapeake in

6   Pennsylvania for quite a long time.  We had initiated our

7   proceeding in the Middle District Court of Pennsylvania back in

8   August of 2013.  And it's been a long road.  And as Mr. Donovan

9   mentioned, we've had several iterations, I guess you'd say, of

10  settlement agreements, which have been preliminarily approved

11  by Judge Mannion.

12           That proceeding slowed down for different reasons.

13  But -- and, of course, eventually, we ended up here in the

14  bankruptcy.  But the group that's involved on behalf of the

15  Demchaks as class counsel, we have substantial class action

16  experience, and we've been doing royalty owner payment claims

17  throughout the country for quite a long time.

18           And Your Honor, just to get right to the heart of the

19  matter here, we're very pleased with the settlement we've been

20  able to reach in this case.  And it's taken a long time.  But

21  we're excited about where we've ended up.  And of course, we

22  had to deal with the economic realities of Chesapeake's

23  bankruptcy, but this is a really good settlement for the class.

24  And the cash payment under the circumstances is reasonable.

25  And this future economic fit is very substantial.  And we join

42

1   in very strongly supporting on behalf of the class -- in our

2   role as class counsel, the Court's preliminary approval and the

3   sending of notice to the class as we move forward to final

4   approval.

5           And I was not able to say anything earlier about it,

6   but these issues you've raised about the Article III issues, we

7   have been at it a long time, and we don't want to get through

8   this process and get a little anxious right here at the end and

9   take a misstep.  So we certainly defer to your judgment on how

10  things ought to be handled going forward procedurally in front

11  of the district judge.

12          Now, in terms of the settlement itself, and the need

13  for evidence, Your Honor, the agreement speaks for itself.  And

14  it is -- when you look at the -- especially as the go-forward

15  relief, there really can be no doubt about the very substantial

16  economic benefit that the class members are going to receive

17  under this settlement.

18          A lot of the dispute that we had with Chesapeake, and

19  have had with Chesapeake throughout the years, including when

20  we first started talking to them about the problem, was our

21  concern about Chesapeake's taking of post-production costs for

22  gathering and compression operations to get the gas production

23  to the inlet of the interstate pipeline.

24          That has always been the primary focus of our concern

25  about the royalty payment calculation.  And under this

43

1  settlement agreement on the go-forward methodology, those costs

2  are not going to be imposed upon the land owners or the royalty

3  owners in the "higher of" formula that's being proposed here

4  where the land owners are going to be paid the higher of the

5  in-basin index with no deductions or the netback price.  So,

6  again, this is a very substantial increase in the royalty

7  payments that the land owners are going to receive.

8           Now, in terms of this issue that Mr. Richards has

9  raised about filing proofs of claim or not, again, what we've

10 been focused on is trying to resolve these claims on a class

11 basis.  It does not make sense for these many thousands of

12 royalty owners to individually prosecute, either through proofs

13 of claim or individual arbitrations or whatever, these types of

14 claims.  And our goal has always been to try to achieve a

15 reasonable settlement for these land owners on a class basis.

16          We have stayed in contact with Mr. Donovan throughout

17 the years, throughout the bankruptcy, and we believed, based

18 upon our discussions with Mr. Donovan, that we would at the end

19 of the day be able to achieve a settlement for the class on

20 terms that were reasonable to the class.  And we chose to focus

21 on that approach, rather than try to split this off into

22 individual proceedings through proofs of claim or whatever.

23 But at the end of the day, the question is, as Your Honor looks

24 at the settlement agreement, is this a fair and reasonable

25 settlement.  And it undoubtedly is.

44

1    And in terms of the question of potential differences

2  in the leases, all these class members are going to have the

3  same type of lease, in terms of the material provision that

4  links them all together.  And that is the presence of these

5  market enhancement clauses or ready for sale or use clauses in

6  the leases.  All the class members have it in the lease.

7    Now, to the extent that Mr. Richards is concerned

8  about the effects that the settlement might have on his

9  particular clients and his concern about that, Your Honor is

10  exactly right.  If Mr. Richards believes in his good judgment

11  that it would be better for his clients to not live with the

12  terms of this settlement agreement, he has a very obvious

13  option, and that is to opt out of the settlement agreement and

14  pursue his claims as he sees fit on behalf of his clients.

15    But that -- his concerns, he has the ability to do

16  that.  Nothing will stop him from doing that.  And he can have

17  his remedy wherever he wants to get it, and try to get whatever

18  relief he believes he might be entitled to achieve.  But we're

19  talking about thousands, thousands of land owners, who don't

20  have the ability to prosecute these claims on an individual

21  basis.

22    And that's the very purpose of a class action

23  settlement.  And we've achieved a good one for the class and

24  we're -- fully support it.  And we realize, you know, one of

25  the things I guess you learn as go along throughout life, Your

45

1 Honor, is -- and we've done a lot of these class actions.  It's

2 just hard to make everybody happy, and sometimes you're going

3 to have a settlement where somebody wishes you could have

4 gotten more, somebody wishes you could have gotten something

5 different, but that is the -- there -- any material concerns

6 people may have about that can be dealt with through their --

7 the option they have to opt out.

8          So we, again, think very strongly that this is a

9 really good settlement for the class.  It should be approved.

10 We shouldn't get too caught up in any individual concerns

11 Mr. Richards may have for his clients, in view of his ability

12 to deal with those in a different way.  And we respectfully

13 request that Your Honor allow these -- this settlement to move

14 forward, approving it from a preliminary, and let's have notice

15 go out, and move forward so that we can get these benefits to

16 the Pennsylvania land owners who've waited for these types of

17 -- this type of relief for so long.

18          So, those are my thoughts, Your Honor.  We're

19 certainly available to answer any additional questions you may

20 have.

21          THE COURT:  All right.  Thank you.

22          Mr. Michael Donovan, did you want to add anything?

23          MR. MICHAEL DONOVAN:  Yes, Your Honor, just briefly.

24 One, let me say, first thank you, and two, I agree with

25 everything that Mr. Moffett said.  Let me highlight for Your

46

1  Honor the fact that as I read the objections, it doesn't

2  involve any of the non-MEC leases.  It's focused on the MEC

3  leases (audio interference) leases that have market

4  enhancement-type attributes.  So I don't think the objection

5  nor the proofs of claims related to those Wyoming County leases

6  really embrace what the class is that we represent.

7          Two, the AG settlement is already implementing the

8  option, and it is going to provide that option to my client.

9  So it really doesn't have a bearing on -- as a go-forward with

10 regard to non-MEC leases, so I don't think the objection should

11 forestall the preliminary approval of the non-MEC claims.

12         Three, we didn't -- the non-MEC claimants here didn't

13 file a proof of claim because it was clear that Chesapeake

14 would have to deal with the (indiscernible) claims,

15 (indiscernible) in some way.  Whether -- but in that way, they

16 would be (indiscernible).  We would not see any cash really,

17 because the (indiscernible) damages were in fact -- basically

18 have a diminished recovery, due to (indiscernible), and the go-

19 forward really wouldn't be materially different from what it is

20 in this settlement.  So this settlement is a win-win.

21         Finally, let me address the real claims requirement.

22 There's no doubt there's numerosity in this case.  There's no

23 doubt that there's commonality, and there is little doubt what

24 the non-MEC claim is.  The non-MEC claim is not that you're

25 violating the lease, per se, in terms of the contractual claim.

47

1  The non-MEC claim is (indiscernible) claim that, in fact,

2  Chesapeake conspired with an affiliate to inflate the amount of

3  royalty deductions in order to pay back promised amounts on

4  bonds that it used to finance the construction of its gas

5  gathering operation.

6          That was the (indiscernible) conspiracy alleged.

7  That was the nature of the claim.  There's no doubt that for

8  these leases Chesapeake could subtract the amount of the gas

9  gathering costs and the transportation costs.

10          Our contention was that they -- those costs were

11  inflated due to the affiliate agreement.  There is no more

12  affiliate.  That entity was sold off to Williams.  So the

13  common question, there's no doubt there was a common question

14  for the class membership.  There's no doubt that my clients had

15  the typical claim, as all other non-MEC lease (indiscernible)

16  certify.  There's no doubt that handling that type of

17  (indiscernible)  claim on a class basis is far superior than a

18  -- handling the claim individually.  My clients are farmers,

19  and there's no doubt that many of the people in Bradford County

20  and Upstate Pennsylvania are, in fact, farmers.  They're not

21  going to pursue these claims by (indiscernible) claims or

22  otherwise.

23          So clearly, to the nature of the claim, and the

24  question that was a predominating question, we satisfied all of

25  Rule 23.  Now, is this settlement fair, reasonable, and

1  adequate?  I don't think that they dispute that it is.  It's

2  not materially different, except for the fact that it's

3  diminished due to the bankruptcy from the settlement that we

4  entered into in 2018 and filed with Judge Mannion for

5  preliminary approval.  Yes, the cash is low, but that's because

6  of the bankruptcy.  It -- we're -- the fact of the matter is,

7  even without preliminary approval here, the lease options will

8  be presented by the Attorney General settlement.  You're

9  inclined to approve that, I think.  So I believe that this

10  settlement, for the non-MEC class, should be preliminarily

11  approved, and then we should go out so my clients can get the

12  benefit of the settlement (indiscernible).  Thank you.

13          THE COURT:  All right.  Thank you.

14          I saw Mr. Betsko pop on.  Mr. Betsko, I didn't want

15  to ignore you.  I think that we've got the Commonwealth

16  covered, but if there's something that you wanted to say or

17  add, I certainly want to give you the opportunity.  Oh, and

18  Mr. Betsko, I am sorry.  Could you hit "five star" on your

19  phone?  There you go.  717.

20          MR. BETSKO:  Your Honor, I'm sorry, I had -- my line

21  had some issues here on my laptop.  I didn't have video.  I

22  just resort -- I resolved it.  But thank you for acknowledging

23  me, and, you know, again I just want to echo that the

24  settlement, you know, reflects, you know, a good faith

25  negotiation by, you know, Chesapeake, and that -- and also an

49

1  arm's length negotiation, and that we believe that the

2  settlement is in the public interest for our citizens, and

3  unless you have any further questions for me, that's all I

4  have.

5          THE COURT:  All right, thank you.  Mr. Dan Donovan, I

6  didn't give you an opportunity to respond to Mr. Richards.

7          MR. SELTZ:  Just before --

8          THE COURT:  I'm sorry, Mr. Seltz, I do apologize.

9          MR. SELTZ:  I -- thank you, Your Honor, and I'll be

10 very brief.  I don't want to belabor any of these issues, and I

11 just wanted to take a quick opportunity to respond to

12 Mr. Richards's --

13         THE COURT:  Sure.

14         MR. SELTZ:  -- arguments about the Rule 23

15 requirements, particularly post-December 2018 amendments, and

16 the changes to the process for this stage of cross-action

17 settlement approval.

18         If you look at the advisory committee notes to those

19 rules, it's very clear that the substance of the -- the

20 standard that the Court continues to apply hasn't changed, as

21 -- not as substance.  The committee was clear that the standard

22 remains fair, reasonable, and adequate, and although it refers

23 to the need to present a solid record to let the Court decide

24 whether notice should go out to the class, there's not a

25 particular evidentiary requirement.  There's -- the rule itself

50

1  refers to providing information sufficient to determine whether

2  notice should go out.  I'm not aware of oil and gas cases where

3  the kind of lease analysis that we may need to do on a

4  litigated class certification motion that would involve expert

5  analysis of lease form.  I'm not aware of that kind of analysis

6  ever being required at this stage, and, you know, the -- as

7  Mr. Moffett said, the information that's being provided to the

8  class, and the results of -- in the settlement agreement, and

9  the notice itself meets all of the requirements for -- to

10 satisfy due process under Rule 23(e).

11      So I just wanted to address that small issue around

12 the change to the rules in 2018, which again, was just intended

13 to sort of streamline the list of factors that the Court is to

14 look at, but it doesn't change the core question, which is

15 whether the settlement is fair and reasonable, and we think

16 that there's no question that this is.

17      THE COURT:  All right, thank you.

18      Mr. Dan Donovan.

19      MR. DANIEL DONOVAN:  Thank you, Judge.  Nothing on

20 the procedure that's been addressed, but I know there's some

21 Pennsylvania lessors listening, so I do want to make clear in

22 response to Mr. Richards.  No one is being impaired.  The offer

23 which was demanded by the Attorney General for the MEC class

24 and the non-MEC class, was that someone would have the option.

25 They could keep what they have, which is traditionally the

51

1  (indiscernible), or choose -- the MEC gets the higher of, the

2  non-MEC gets to choose.  So any suggestion -- and I just want

3  to make sure it's very clear no one is being impaired.  That

4  would be inconsistent with the whole resetting.

5          So that's my only point, Judge, thank you.

6          THE COURT:  All right, thank you.

7          Mr. Richards, I'll give you the last word.

8          MR. RICHARDS:  Judge, very quickly in response to

9  Mr. Seltz, the advisory committee note to Rule 23 is very clear

10 that at the preliminary approval stage, the proponents of the

11 settlements and the class representatives need to present the

12 record that they intend to rely on at final approval and (audio

13 interference) there.

14         In terms of the explanations you heard today to the

15 reasons for not filing proofs of claim, as I understand, Mr.

16 Moffett believes it's not fair to require people to file proofs

17 of claim in a bankruptcy unless it's on a class basis.  I'm not

18 quite sure I understand that reason.  And as I understand what

19 Mr. Donovan said, he did -- his clients didn't file proofs of

20 claim because they primarily wanted to pursue post-effective

21 date claims against Chesapeake, and it seems to me that that

22 statement undercuts the basis for jurisdiction.

23         But the final point that I'll make just with respect

24 to the non-MEC settlement.  Two of the clients I represent are

25 in the non-MEC class, Robert and Wendy Dunlop (phonetic) and

52

1  R.B. and J.H. Rutledge (phonetic).

2           THE COURT:  All right.  Thank you.  All right.

3           So folks, here's what I'm going to do, and I do this

4  doing my best to fit Bankruptcy Rule 9019, the plethora of

5  authority, as to what I'm supposed to do when a debtor in

6  bankruptcy is involved in a settlement, and I'm guided -- I'm

7  lucky to have a circuit that has written on this many times.

8  It started with In Re AWECO which was interpreting the Supreme

9  Court's decision in TMT Trailer, I've got cases such Jackson

10 Brewing, Foster Mortgage, and a progeny of cases that have

11 interpreted and followed those, what I consider to be landmark

12 decisions with respect to compromises.

13           I've got before me the debtor's motion to approve a

14 compromise.  It does more than that, but I'm -- it's a

15 compromise motion.  I do find that I have jurisdiction over the

16 motion pursuant to 28 U.S.C. Section 1334.  I do -- I just

17 reject the jurisdictional arguments that have been made.  I

18 just don't -- they don't make sense to me.

19           I do find that the matter constitutes a core

20 proceeding under 28 U.S.C. Section 157.  I further find that I

21 have the requisite constitutional authority to enter final

22 orders with respect to these matters under the Supreme Court's

23 holding, both with respect to consent as well as the inherent

24 authority given to me under the code.

25           With respect to -- and I want to divide this up.

1  With respect to the Pennsylvania AG's settlement, in my career

2  as a lawyer, and as well as observing the Pennsylvania AG while

3  I've been on the bench, I have -- I rarely see a state court

4  AG's Office that is as vigorous in the pursuit of justice for

5  its citizens as the Commonwealth of Pennsylvania.  I have seen

6  them as a litigant, I have seen them as a mediator, I've seen

7  them as a judge.  There isn't any question that they do their

8  absolute best to achieve the result that they think is best for

9  their citizens.  There is no question, and I have great

10  familiarity with Mr. Butler over the course of 30 years, there

11  is no question in my mind but that he is a vigorous advocate,

12  sometimes to my negative.  But there is no question that he is

13  a vigorous advocate for his client.

14          I have observed what they have done throughout the

15  end case since it filed back in 2020.  That was in June.  They

16  have been a participant in this case.  I am aware of the claims

17  that have been asserted, I am aware of the impact that it could

18  have upon this reorganized debtor at the time, the estate.  I

19  will find that the settlement was negotiated at arm's length,

20  and represents the best in terms of restructuring talent, and I

21  am comfortable that everyone has explored every option on

22  behalf of their respective clients, and the resulting

23  settlement is fair and equitable, not only to the debtors, but

24  to all parties concerned.  And so I will give final approval to

25  the Pennsylvania AG's settlement, and I'm going to come back to

54

1 this as to how we implement this.

2         With respect to the two class action settlements,

3 first from the 9019 point of view, I do find, based upon my

4 knowledge of the case, the review of the settlement itself,

5 given all of the issues that I observed during the case, I've

6 also considered the arguments of counsel.  There really isn't a

7 genuine dispute about the core issues.  I've reviewed the

8 settlement agreement.  I've got 30-plus years in the energy

9 industry.  Granted, it was substantially all Texas and

10 Louisiana, but oil and gas is oil and gas, subject to

11 regulatory messing everything up on an occasional basis, but

12 the core concepts are the same.

13         With respect to the 9019 aspect of it, I do find that

14 the proposed settlement satisfies the requirements that I am

15 required to apply, again, under Foster Mortgage and Jackson

16 Brewing, and I -- from the debtor's side, I will approve the

17 settlement.

18         With respect to the class action side, and

19 Mr. Richards, I want you to listen closely, because here's --

20 I'm trying to -- I know Rule 23 well, and I know that there are

21 certain -- it's not two perfect pieces of a puzzle.  I run into

22 it all the time when I apply Rule 23 with respect to class

23 proofs of claim that get filed, and I do my best to try to find

24 a way to make it all work.  I am comfortable, based upon what

25 I've read, that this settlement is appropriate.  It's fair,

1  it's reasonable.  It is intended to recognize reality.  So I am

2  very comfortable that it is fair and reasonable and adequate

3  with respect to all of the putative class members.

4        I -- with respect to the merits, very comfortable.

5  It just makes perfect sense to me, and I -- if I were

6  comfortable that I had the requisite ability to approve it on a

7  final basis, I would.  And that is -- that constitutes both a

8  finding as well as a recommendation to the district court.

9        However, I am cognizant of the decisions that have

10  been entered by my circuit regarding the extent of the

11  authority that I have with respect to the ultimate

12  certification of a class.  So for purposes of being able to

13  start the process, I am going to give preliminary approval to

14  the class.  I'm going to approve the form of notice and start

15  the process.  What I am doing, I'm specifically putting this on

16  the record, Mr. Richards, and I want you to look at the

17  language that goes into it.  I recognize that I hold the status

18  only of an Article I judge, and I do think that the -- I do

19  think that the final determinations with respect to

20  certification of a class should be done by an Article III.  I

21  think that's what the rules contemplate, I think that's what

22  the law contemplates, and so what I am putting on the record,

23  and I am recommending to the district court that will hear the

24  matter, is that you can raise all of the issues that you have

25  raised today.  You will not be precluded from re-raising those

1  issues.

2        My recommendations, my findings, my conclusions, they

3  mean what they mean, and again, I'm telling you that if I had

4  an Article III after my name, this would be an easy call for

5  me, but I don't, and so you're going to get the opportunity to

6  raise all of those issues in front of -- again, I will follow

7  my protocol, I -- as I've told you before, I will go to

8  Judge Rosenthal.  Judge Rosenthal will have the ability to

9  either keep the case, or keep the matter herself, or she can

10  assign another district judge to hear the matter as these --

11  the rules of the district court provide.

12        I want to make it very clear, you are free to

13  criticize what I've done.  You are free to say Jones doesn't

14  know what he's doing.  You know, I am the guy that won <u>Bolin</u>

15  (phonetic) twice, but I lost it three times at the Circuit, so,

16  you know, it's -- that's my claim to fame.

17        But you can raise all of those issues.  My goal is to

18  get it right.  This just makes really good sense to me.  I

19  understand that you're going to sit down and do the analysis

20  with respect to each of your individual clients.  That's what

21  good lawyers do, and I have every belief you will do that, but

22  to the extent that there are folks that just think that this

23  isn't right for whatever reason, you can raise all those issues

24  in front of the district court.  I'm going to start the

25  process, because I think it's inherently unfair for 58 people

1  to hold up tens of thousands, or thousands, when you always

2  have the ultimate ability to say, I'll simply take what the law

3  provides, and that is, litigate my claim for pre-effective date

4  in the Bankruptcy Court, and pursue whatever Pennsylvania law

5  allows for post-effective date.

6         That gives me a lot of comfort, because that's all

7  you were ever entitled to.  Anything more is something --

8  there's always a give for every take, and that just has to be

9  part of life.

10         So Mr. Donovan, what I would like for you to do --

11 and I make those findings and conclusions on the record,

12 pursuant to Bankruptcy Rule 7052, as made applicable to this

13 contested matter by Bankruptcy Rule 9014.  What I would like

14 for you to do, Mr. Donovan, is to -- and I -- this is a

15 question.  Do you want a separate order?  Does the Pennsylvania

16 AG want a separate order with respect to the Pennsylvania

17 settlement, and if so, does the order that was attached to the

18 original motion as I've supplemented on the record suffice for

19 the debtors and the Pennsylvania AG?

20         MR. DANIEL DONOVAN:  It does for the debtors, Judge.

21         THE COURT:  Please -- okay.

22         MR. MICHAEL DONOVAN:  Your Honor -- yes, for

23 Pennsylvania it does, too.

24         THE COURT:  All right.

25         MR. MICHAEL DONOVAN:  Thank you, Your Honor.

58

1    THE COURT:  So with respect to the order that was

2  attached to 3175, which was the Pennsylvania AG only, I will

3  sign that and get that on the docket momentarily.

4    MR. MICHAEL DONOVAN:  Thank you.

5    THE COURT:  With respect to the remainder,

6  Mr. Donovan, what I'd like for you to do is to craft an order

7  that provides a blank that says that the final hearing will be

8  heard by Judge blank, a United States District Judge, on blank.

9  And I will immediately reach out to Judge Rosenthal.  I don't

10  know if she's in the courthouse today or not, but she will

11  certainly be available by email and/or cell phone if she's not.

12    But if you will do that, and maybe -- maybe, you

13  know, let's do this; and I'm thinking out loud.  Perhaps it

14  would be better to include two blanks in the order, that one,

15  that the district court will hold a status conference, and I

16  will suggest that it be done in relatively short order, and

17  that may be accepted, it may be rejected, but so that you all

18  get acclimated with who your judge is going to be.  You find

19  out if it's going to be Judge Rosenthal or another district

20  judge, and then at that time, because I want the notice -- I'm

21  thinking out loud here, and I probably shouldn't do this.  That

22  order -- you probably need your final settlement hearing in

23  order to be able to send everything out.

24    MR. MICHAEL DONOVAN:  We do.

25    THE COURT:  So why don't --

59

1           MR. MICHAEL DONOVAN:  Judge, it'll take us a little

2    bit of time to get effect -- to get it ready anyhow, Judge, so

3    there's a little inherent --

4           THE COURT:  No, I got it, I'm just trying to figure

5    out what goes in that order.  I'm going to go back to where I

6    started.  Don't put in a status conference.  Just put in a

7    blank for a settlement hearing, and then if Judge Rosenthal or

8    somebody else wants to do anything different, I am very

9    confident that they will go, well, Jones didn't do it right,

10   we're going to do a new order, and so they'll just do whatever

11   they think they should do.  That work?

12              And what I would like --

13          MR. DANIEL DONOVAN:  Yes, Judge.

14          THE COURT:  What I would like you to do is, I would

15   like you to run that proposed form of order by Mr. Richards so

16   that he's comfortable that he can raise all of these issues,

17   again, Mr. Richards, so that I know that you've seen it, I

18   would like for you to approve the order as to form only.  I'll

19   put on the record here today that by approving as to form only,

20   you're not waiving any right of review, or complaint, or appeal

21   that you may have.  You're simply confirming that the order

22   corresponds to the findings that I've made on the record.  Does

23   that give you sufficient comfort that you can do that?

24          MR. RICHARDS:  It does, Judge.  Thank you.

25          THE COURT:  All right.  And Mr. Donovan, if you will

60

1  -- I'm going to start the process immediately, but if you --

2  and if I get an -- if I get a response from Judge Rosenthal, I

3  will have Mr. Alonso convey that to all of you, so that you can

4  go ahead and put that in the order, but if you don't hear from

5  him, if you would upload the order with blanks, as soon as

6  you're happy with it, Mr. Seltz has approved it, Mr. Donovan's

7  approved it, and then I will -- and let him know that it's

8  there, then I will get that done so that I can get you to the

9  right person so that you can move forward.

10          MR. DANIEL DONOVAN:  Thank you, Judge, we'll do that.

11          THE COURT:  All right.  Anything else we need to talk

12  about this morning?

13          MR. DANIEL DONOVAN:  Not from Chesapeake, Judge.

14          THE COURT:  All right, thank you all, and Mr. Butler,

15  Mr. Betsko, I'll get your order on the docket in the next ten

16  minutes.

17          MR. BETSKO:  Thank you, Your Honor.

18          THE COURT:  All right, thank you, everyone.

19          COUNSEL:  Thank you, Your Honor.

20          THE COURT:  Please continue to be safe.  Get your

21  shots, if you haven't.  And if you have, be a leader, let

22  everyone else know.  Thank you.  We'll be adjourned.

23          COUNSEL:  Thank you, Your Honor.

24      (Proceedings end at 10:26 a.m.)

25                      * * * * *

# **C E R T I F I C A T I O N**

1

2

3          I, Alicia Jarrett, court-approved transcriber, hereby

4   certify that the foregoing is a correct transcript from the

5   official electronic sound recording of the proceedings in the

6   above-entitled matter, and to the best of my ability.

7

8

9

10   _____

11   ALICIA JARRETT, AAERT NO. 428      DATE:  April 2, 2021

12   ACCESS TRANSCRIPTS, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**BANKRUPTCY COURT**

ENTERED
04/07/2021

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 20-33233 (DRJ**)** |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**ORDER (I) DIRECTING THE APPLICATION OF RULES 9014, 9019, AND 7023, (II)**
**GRANTING PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT,**
**(III) PRELIMINARILY CERTIFYING A CLASS FOR SETTLEMENT PURPOSES, (IV)**
**APPROVING FORM AND MANNER OF CLASS NOTICE, AND (V) SETTING  DATE**
**FOR FINAL APPROVAL HEARING ON FINAL APPROVAL OF SETTLEMENT**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

Upon the motion (the "Motion") of Chesapeake Energy Corporation ("Chesapeake") for entry of an order (this "Order"): (i) directing the application of Rules 9014, 9019, and 7023 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and, by incorporation, Rule 23 of the Federal Rules of Civil Procedure (the "Federal Rules"),  (ii) granting preliminary approval of the class action settlement attached as Exhibit 2 to the Motion (the "Settlement Agreement"); (iii) preliminarily certifying a class for settlement purposes, (iv) approving the form and manner of Class Notice to members of the Settlement Agreement, and (v) setting date for final approval hearing on final approval of the settlement, and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a preliminary order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is permissible pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted to the extent set forth herein.

2.     The Court has considered the objection filed by the "Pennsylvania Proof of Claims Lessors" (Dkt. No. 3335) and overrules the objection at this time, without prejudice to such lessors' rights to raise any issues in the District Court.

3.     Accordingly, the Settlement Agreement attached as Exhibit 2 to the Motion is hereby preliminarily approved.  The Court preliminarily finds that the Settlement Agreement complies with Federal Rule of Civil Procedure 23 and the Class Action Fairness Act of 2005 ("CAFA") (28 U.S.C. §1715).

4.     The form of the notice to be sent to the Class Members (the "Class Notice") attached to the Settlement Agreement as Exhibit D and the service of the Class Notice by the Epiq Corporate Restructuring LLC (the "Settlement Administrator") to each class Member, at the last known address of each Class Member according to the Debtors' books and records comports with all applicable law and is hereby approved.

5.     The Class Notice shall be mailed by first-class mail, postage prepaid, by the Notice Administrator within 15 business days following the entry of this Order.

6.     The parties shall file motions and memoranda in support of final approval of the Settlement Agreement and Class Counsel shall file their request for attorneys' fees and expense reimbursements 45 days from the date of this Order.

7.     Any member of the Class who wishes to object to or comment on the proposed settlement, or to object to Class Counsel's request for attorney's fees and expense reimbursements, must postmark and mail such objections or comments by 60 days from the order. In accordance with the procedures set forth in the Settlement Notice, any such objections or comments must be mailed to Class Counsel, Chesapeake's counsel, and the Court.

8.      Any member of the Class who wishes to exclude himself or herself from the Class Settlement must postmark and mail the exclusion request to Class Counsel and Chesapeake's counsel no later than 60 days from the order.

9.      Any class member who wishes to appear and be heard at the final approval hearing must postmark and mail notice of such intention by June 22, 2021.  Notice of such intention must be mailed to Class Counsel, Chesapeake's counsel, and the Court.

10.      By June 18, 2021, Class Counsel and Chesapeake may file a response to any Class Member's objections or comments.

11.      The final Fairness hearing will be resolved by an Article III court, and to that end, Chief Judge Rosenthal of the U.S. District Court for the Southern District of Texas has determined that the Fairness Hearing will be conducted on June 29, 2021 at 10:00 a.m. to consider final approval of the Settlement Agreement and Class Counsel's request for attorneys' fees and expense reimbursements.  The Court may adjourn the Fairness Hearing without further notice of any kind.

12.      This Court retains jurisdiction to construe, interpret, enforce, and implement the Settlement Agreement and this Order.

**Signed:  April 07, 2021.**

_____
**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

**APPROVED AS TO FORM BY
CLASS COUNSEL AND COUNSEL
FOR THE MEC PLAINTIFFS**

*/s/ Daniel E. Seltz (with permission)*

Daniel E. Seltz
Lieff, Cabraser, Heimann & Bernstein,
LLP
250 Hudson St., 8th Floor
New York, NY 10013

**APPROVED AS TO FORM BY
COUNSEL FOR THE
PENNSYLVANIA PROOF OF
CLAIM LESSORS**

*/s/ Ira Richards (with permission)*

Ira Neil Richards
Schnader Harrison Segal & Lewis LLP
1600 Market St
Suite 3600
Philadelphia, Pa 19106
(215)751-2503

**APPROVED AS TO FORM BY
COUNSEL FOR CHESAPEAKE:**

*/s/ Daniel T. Donovan*

Daniel T. Donovan
Ragan Naresh
Kirkland & Ellis LLP
1301 Pennsylvania Ave., N.W.
Washington DC 20004

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| | § | Case No. 20-33233 |
| CHESAPEAKE ENERGY | § | |
| CORPORATION *et al.*, | § | Jointly Administered |
| | § | |
| Reorganized Debtors. | § | |
| | § | |

**NOTICE OF APPEAL UNDER 11 U.S.C. § 158(a)(1)**
<u>**AND STATEMENT OF ELECTION**</u>

The Pennsylvania Proof of Claim Lessors, a group of Pennsylvania oil and gas lessors

(the "<u>Pennsylvania Proof of Claim Lessors</u>"), submit this Notice of Appeal in conformity with

Bankruptcy Rule 8003 and Official Bankruptcy Form 417A.

<u>**Part 1: Identify the appellants**</u>

Names of the appellants: The Pennsylvania Proof of Claim Lessors who are the

appellants for purposes of this Notice of Appeal are RDNJ Trowbridge and Robert & Wendy

Dunlap. These Lessors are included within the definition of the Class in what has been termed

"the Non-MEC Settlement."

The appellants are creditors in this bankruptcy case who have filed proofs of claim.

<u>**Part 2: Identify the subject of this appeal**</u>

This appeal is from the Bankruptcy Court's order granting the Reorganized Debtors' (the

"Debtors") motion for preliminary approval of a class settlement that Debtors refer to as "the

Non-MEC Settlement."  Appellants appeal the Bankruptcy Court's April 7, 2021 Order (I)

Directing the Application of Rules 9014, 9019, and 7023, (II) Granting Preliminary Approval of

Class Action Settlement, (III) Preliminarily Certifying a Class for Settlement Purposes, (IV)

Approving Form and Manner of Class Notice, and (V) Setting Date for Final Approval Hearing

on Final Approval of Settlement.  ECF No. 3415.  A copy of the Order is attached as Exhibit A.

**Part 3: Identify the other parties to the appeal**

The  Debtors are the other parties to this appeal.[1]  The named plaintiffs in the Non-MEC

Settlement are James L. Brown, Alice R. Brown, Sussenbach Family L.P., James S.

Suessenbach, and Gina M. Sussenbach ("Named Plaintiffs").  They have not filed proofs of

claim in these proceedings and did not make any filing in the Bankruptcy Court in connection

with the Debtors' motion that resulted in the order the Pennsylvania Proof of Claim Lessors

appeal from here, but they might take the position that they, too, are appellants.  The names,

addresses, and telephone numbers (where provided) of the parties' attorneys are as follows:

**Appellants' Attorneys:**

Ira N. Richards (admitted pro hac vice)
Richard A. Barkasy (admitted pro hac vice)
Arleigh Helfer  III (admitted pro hac vice)
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103-7286
Telephone: (215) 751-2000
Facsimile: (215) 751-2205
irichards@schnader.com
rbarkasy@schnader.com
ahelfer@schnader.com

Aaron D. Hovan (admitted pro hac vice)
Law Office of Aaron Hovan
154 Warren St.
Tunkhannock, PA 18657

---

[1]     The complete list of Reorganized Debtors in these chapter 11 cases may be obtained on
the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/
chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of
business and the Debtors' service address in these chapter 11 cases is 6100 North
Western Avenue, Oklahoma City, Oklahoma.

Telephone: (570) 836-3121
aaron@hovanlaw.com

**Appellee Reorganized Debtors' Attorneys:**

Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
JACKSON WALKER L.L.P.
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221
Email: mcavenaugh@jw.com
jwertz@jw.com
kpeguero@jw.com
vpolnick@jw.com

Daniel T. Donovan, Esq.
Ragan Naresh
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 389-5174
Email: daniel.donovan@kirkland.com
ragan.naresh@kirkland.com

Patrick J. Nash, Jr., P.C. (admitted pro hac vice)
Marc Kieselstein, P.C. (admitted pro hac vice)
Alexandra Schwarzman (admitted pro hac vice)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: patrick.nash@kirkland.com
marc.kieselstein@kirkland.com
alexandra.schwarzman@kirkland.com

Anna Rotman, P.C. (TX Bar No. 24046761)
Kenneth Young (TX Bar No. 24088688)
Dustin Womack (TX Bar No. 24115963)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
609 Main Street

Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
Email: anna.rotman@kirkland.com
kenneth.young@kirkland.com
dustin.womack@kirkland.com

**Named Plaintiffs' Attorneys**[2]

Noah Axler
Axler Goldich, LLC
1520 Locust St., Suite 301
Philadelphia, PA 19102

Michael D. Donovan
Donovan Litigation Group, LLC
1885 Swedesford Road
Malvern, PA 19355

Robert E. McCann
MCCANN & WALL, LLC
Two Penn Center Plaza
1500 JFK Blvd., Ste. 1110
Philadelphia, PA 19102

Joseph H. Meltzer
Tyler S. Graden
KESSLER TOPAZ MELTZER & CHECK, LLP
280 King of Prussia Rd.
Radnor, PA 19807

Robert D. Schaub
ROSENN, JENKINS & GREENWALD, LLP
15 South Franklin St.
Wilkes-Barre, PA 18711

---

[2]     Appellants include this information about the attorneys representing the Named
Plaintiffs—who did not file proofs of claim—for completeness only, reserving their right
to contest Named Plaintiffs' ability to participate in this appeal.  Most of Named
Plaintiffs' attorneys have not appeared in these proceedings; their contact information is
taken from the signature pages of the Non-MEC Settlement.

**Part 4: Optional election to have appeal heard by District Court (applicable only in certain districts)**

        Not applicable.


Dated:  April 9, 2021               SCHNADER HARRISON SEGAL & LEWIS LLP


               By: /s/ Ira N. Richards
               Ira N. Richards (admitted pro hac vice)
               Richard A. Barkasy (admitted pro hac vice)
               Arleigh P. Helfer III (admitted pro hac vice)
               Schnader Harrison Segal & Lewis LLP
               1600 Market Street
               Suite 3600
               Philadelphia, PA 19103-7286
               Telephone: (215) 751-2000
               Facsimile: (215) 751-2205
               irichards@schnader.com
               rbarkasy@schnader.com
               ahelfer@schnader.com

               Aaron D. Hovan (admitted pro hac vice)
               Law Office of Aaron Hovan
               154 Warren St.
               Tunkhannock, PA 18657
               Telephone: (570) 836-3121
               aaron@hovanlaw.com

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BANKRUPTCY COURT

ENTERED
04/07/2021

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 20-33233 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**ORDER (I) DIRECTING THE APPLICATION OF RULES 9014, 9019, AND 7023, (II) GRANTING PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT, (III) PRELIMINARILY CERTIFYING A CLASS FOR SETTLEMENT PURPOSES, (IV) APPROVING FORM AND MANNER OF CLASS NOTICE, AND (V) <u>SETTING DATE FOR FINAL APPROVAL HEARING ON FINAL APPROVAL OF SETTLEMENT</u>**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

Upon the motion (the "Motion") of Chesapeake Energy Corporation ("Chesapeake") for entry of an order (this "Order"): (i) directing the application of Rules 9014, 9019, and 7023 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and, by incorporation, Rule 23 of the Federal Rules of Civil Procedure (the "Federal Rules"), (ii) granting preliminary approval of the class action settlement attached as Exhibit 3 to the Motion (the "Settlement Agreement"); (iii) preliminarily certifying a class for settlement purposes, (iv) approving the form and manner of Class Notice to members of the Settlement Agreement, and (v) setting date for final approval hearing on final approval of the settlement, and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a preliminary order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is permissible pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Motion is granted to the extent set forth herein.

2.     The Court has considered the objection filed by the "Pennsylvania Proof of Claims Lessors" (Dkt. No. 3335) and overrules the objection at this time, without prejudice to such lessors' rights to raise any issues in the District Court.

3.     Accordingly, the Settlement Agreement attached as Exhibit 3 to the Motion is hereby preliminarily approved.  The Court preliminarily finds that the Settlement Agreement complies with Federal Rule of Civil Procedure 23 and the Class Action Fairness Act of 2005 ("CAFA") (28 U.S.C. §1715).

4.     The Plan of Allocation attached as Exhibit B to the Settlement Agreement is hereby preliminarily approved.

5.     The form of the notice to be sent to the Class Members (the "Class Notice") attached to the Settlement Agreement as Exhibit D and the service of the Class Notice by the Epiq Corporate Restructuring LLC (the "Settlement Administrator") to each class Member, at the last known address of each Class Member according to the Debtors' books and records comports with all applicable law and is hereby approved.

6.     The Class Notice shall be mailed by first-class mail, postage prepaid, by the Notice Administrator within 15 business days following the entry of this Order.

7.     The parties shall file motions and memoranda in support of final approval of the Settlement Agreement and Class Counsel shall file their request for attorneys' fees and expense reimbursements within 45 days of this Order.

8.     Any member of the Class who wishes to object to or comment on the proposed settlement, or to object to Class Counsel's request for attorney's fees and expense reimbursements, must postmark and mail such objections or comments by 60 days from the order. In accordance

with the procedures set forth in the Settlement Notice, any such objections or comments must be mailed to Class Counsel, Chesapeake's counsel, and the Court.

9.    Any member of the Class who wishes to exclude himself or herself from the Class Settlement must postmark and mail the exclusion request to Class Counsel and Chesapeake's counsel within 60 days of the order.

10.    Any class member who wishes to appear and be heard at the final approval hearing must postmark and mail notice of such intention by June 15, 2021. Notice of such intention must be mailed to Class Counsel, Chesapeake's counsel, and the Court.

11.    By June 18, 2021, Class Counsel and Chesapeake may file a response to any Class Member's objections or comments.

12.    The final Fairness hearing will be resolved by an Article III court, and to that end, Chief Judge Rosenthal of the U.S. District Court for the Southern District of Texas has determined that the Fairness Hearing will be conducted on June 29, 2021 at 10:00 a.m. to consider final approval of the Settlement Agreement and Class Counsel's request for attorneys' fees and expense reimbursements. The Court may adjourn the Fairness Hearing without further notice of any kind.

13.    This Court retains jurisdiction to construe, interpret, enforce, and implement the Settlement Agreement and this Order.

Signed:  April 07, 2021.

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

**APPROVED AS TO FORM BY CLASS COUNSEL AND COUNSEL FOR THE NON MEC PLAINTIFFS:**


*/s/ Michael D. Donovan (with permission)*
Michael D. Donovan
Donovan Litigation Group, LLC
1885 Swedesford Road
Malvern, PA 19355

*Class Counsel and Counsel for Brown Plaintiffs*

**APPROVED AS TO FORM BY COUNSEL FOR THE DEFENDANT:**

*/s/ Daniel T. Donovan*
Daniel T. Donovan
Ragan Naresh
Kirkland & Ellis LLP
1301 Pennsylvania Ave., N.W.
Washington DC 20004

Daniel T. Brier
Myers Brier & Kelly, LLP
425 Spruce Street, Ste. 200
Scranton, PA 18503

**APPROVED AS TO FORM BY COUNSEL FOR THE PENNSYLVANIA PROOF OF CLAIM LESSORS**

*/s/ Ira Richards (with permission)*
Ira Neil Richards
Schnader Harrison Segal & Lewis LLP
1600 Market St
Suite 3600
Philadelphia, Pa 19106
(215)751-2503

- 4 -

### CERTIFICATE OF SERVICE

I, Arleigh P. Helfer III, hereby certify that on this 9th day of April, 2021, I caused the foregoing Notice of Appeal to be filed and served on counsel of record via the Court's ECF system.

s/Arleigh P. Helfer III

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | Chapter 11 |
| In re: | § | |
| | § | Case No. 20-33233 |
| CHESAPEAKE ENERGY | § | |
| CORPORATION *et al*., | § | Jointly Administered |
| | § | |
| Reorganized Debtors. | § | |
| | § | |

**NOTICE OF APPEAL UNDER 11 U.S.C. § 158(a)(1)**
**AND STATEMENT OF ELECTION**

The Pennsylvania Proof of Claim Lessors, a group of Pennsylvania oil and gas lessors

(the "Pennsylvania Proof of Claim Lessors"), submit this Notice of Appeal in conformity with

Bankruptcy Rule 8003 and Official Bankruptcy Form 417A.

**Part 1: Identify the appellants**

Names of the appellants: The Pennsylvania Proof of Claim Lessors who are the

appellants for  purposes of this Notice of Appeal are listed on Exhibit A. These Lessors are

included within the definition of the Class in what has been termed "the MEC Settlement."

The appellants are creditors in this bankruptcy case who have filed proofs of claim.

**Part 2: Identify the subject of this appeal**

This appeal is from the Bankruptcy Court's order granting the Reorganized Debtors' (the

"Debtors") motion for preliminary approval of a class settlement that Debtors refer to as "the

MEC Settlement."  Appellants appeal the Bankruptcy Court's April 7, 2021 Order (I) Directing

the Application of Rules 9014, 9019, and 7023, (II) Granting Preliminary Approval of Class

Action Settlement, (III) Preliminarily Certifying a Class for Settlement Purposes, (IV)

Approving Form and Manner of Class Notice, and (V) Setting Date for Final Approval Hearing

on Final Approval of Settlement.  ECF No. 3416.  A copy of the Order is attached as Exhibit B.

**Part 3: Identify the other parties to the appeal**

The  Debtors are the other parties to this appeal.[1]  The named plaintiffs in the MEC

Settlement are Demchak Partners L.P., James P. Burger, Jr., Barbara H. Burger, William A.

Burke, II, Clara Burke, William A. Burke III, Edward J. Burke, Donald G. Fuller, Karen M.

Fuller, Randy K. Hemerly, Lamar R. King, Linda J. Schlick, Janet C. Young, Russell E. Burkett,

and Gayle Burkett ("Named Plaintiffs").  They have not filed proofs of claim in these

proceedings and did not make any filing in the Bankruptcy Court in connection with the Debtors'

motion that resulted in the order the Pennsylvania Proof of Claim Lessors appeal from here, but

they might take the position that they, too, are appellants.  The names, addresses, and telephone

numbers (where provided) of the parties' attorneys are as follows:

**Appellants' Attorneys:**

> Ira N. Richards (admitted pro hac vice)
> Richard A. Barkasy (admitted pro hac vice)
> Arleigh Helfer  III (admitted pro hac vice)
> Schnader Harrison Segal & Lewis LLP
> 1600 Market Street, Suite 3600
> Philadelphia, PA 19103-7286
> Telephone: (215) 751-2000
> Facsimile: (215) 751-2205
> irichards@schnader.com
> rbarkasy@schnader.com
> ahelfer@schnader.com
>
> Aaron D. Hovan (admitted pro hac vice)
> Law Office of Aaron Hovan

---

[1]     The complete list of Reorganized Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/ chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma.

154 Warren St.
Tunkhannock, PA 18657
Telephone: (570) 836-3121
aaron@hovanlaw.com

**Appellee Reorganized Debtors' Attorneys:**

Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
JACKSON WALKER L.L.P.
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221
Email: mcavenaugh@jw.com
jwertz@jw.com
kpeguero@jw.com
vpolnick@jw.com

Daniel T. Donovan, Esq.
Ragan Naresh
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 389-5174
Email: daniel.donovan@kirkland.com
ragan.naresh@kirkland.com

Patrick J. Nash, Jr., P.C. (admitted pro hac vice)
Marc Kieselstein, P.C. (admitted pro hac vice)
Alexandra Schwarzman (admitted pro hac vice)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: patrick.nash@kirkland.com
marc.kieselstein@kirkland.com
alexandra.schwarzman@kirkland.com

Anna Rotman, P.C. (TX Bar No. 24046761)
Kenneth Young (TX Bar No. 24088688)
Dustin Womack (TX Bar No. 24115963)
KIRKLAND & ELLIS LLP

KIRKLAND & ELLIS INTERNATIONAL LLP
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
Email: anna.rotman@kirkland.com
kenneth.young@kirkland.com
dustin.womack@kirkland.com

**Named Plaintiffs' Attorneys**[2]

Larry Moffett, Esq.
Law Office of Larry D. Moffett, PLLC
2086 Old Taylor Road, Suite 1012
Oxford, MS 38655
Telephone: (662) 298-4435
Email: lmoffett@danielcoker.com

Daniel Seltz, Esq.
Lief Cabraser Helmann & Bernstein LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212) 355-9500
Email: dseltz@lchb.com

Charles E. Schaffer
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Ste 500
Philadelphia, PA 19106

Charles J. LaDuca
Cuneo Gilbert & LaDuca, LLP
8120 Woodmont Avenue
Suite 810
Bethesda, MD 20814

John W. Barrett
Barrett Law Group
Post Office Drawer 927
Lexington, MS 39095

---

[2]     Appellants include this information about the attorneys representing the Named
Plaintiffs—who did not file proofs of claim—for completeness only, reserving their right
to contest Named Plaintiffs' ability to participate in this appeal.  Most of Named
Plaintiffs' attorneys have not appeared in these proceedings; their contact information is
taken from the signature pages of the MEC Settlement.

Michelle R. O'Brien
The O'Brien Law Group LLC
2800 Stafford Ave., Box 3034
Scranton, PA 18505

Douglas A. Clark
The Clark Law Finn
1563 Main Street
Peckville, PA 18452

Francis P. Karam
Francis P. Karam, Esq. P.C.
12 Debrosses Street
New York, NY 10013

Gerard M. Karam
Mazzoni, Karam Petorek & Valvano
321 Spruce Street #201
Scranton, PA 18503

Rachel Schulman
Rachel Schulman, Esq. P.C.
14 Bond Street, Suite 143
Great Neck, NY 11021

**Part 4: Optional election to have appeal heard by District Court (applicable only in certain districts)**

Not applicable.

Dated:  April 9, 2021                          SCHNADER HARRISON SEGAL & LEWIS LLP


By: /s/ Ira N. Richards
Ira N. Richards (admitted pro hac vice)
Richard A. Barkasy (admitted pro hac vice)
Arleigh P. Helfer III (admitted pro hac vice)
Schnader Harrison Segal & Lewis LLP
1600 Market Street
Suite 3600
Philadelphia, PA 19103-7286
Telephone: (215) 751-2000
Facsimile: (215) 751-2205

irichards@schnader.com
rbarkasy@schnader.com

Aaron D. Hovan (admitted *pro hac vice*)
Law Office of Aaron Hovan
154 Warren St.
Tunkhannock, PA 18657
Telephone: (570) 836-3121
aaron@hovanlaw.com

**Exhibit A**

**List of Pennsylvania Proof of Claim Lessors**

Roberta Baker

Kimberly Barna

Beebe's Farm FLP

Kyle Bethel

Elizabeth Booth

Boyanowski FLP

Jeff & Melinda Buckingham

Cecil Family LLC

Cemetery Road Hunt Club, Inc.

Rick & Mary Clark

John & Vilma Clark

Mike & Shellene Clark

Endless Mountain Water Co.

Hatokey LLC

Stephen Henning

Jennings Partners LP

Richard & Denise Kuffa

Charles & Carol Kuffa

Lake Carey Investments LLC

Dwayne Lockburner

Lyman Walters FLP

Alan & Carol Marbaker

Marty McGavin

Paul & Tracie McGavin

Gail McIntyre

Donald Miller

Mills PTR LP

Montague Partners LP

Mostek Family LP

Rodney & Diana Mowry

James & Sharon Neumane

Sam & Deborah Noone

Christina Pensworth

Leslie Pensworth

Adam & Erin Petlock

John & Megan Phillips

Pickering Sisters LP

Poepperling Partners LP

John Prevost

Russell Prevost

Alessio Prizzi

Paul & Deborah Roman

R&J Partners, L.P.

Charlotte E. Place Trust

Jesse C. Place

Richard E. & Charlotte E. Place

Richard E. Place Trust

Placewood Resource Management, L.L.C.

Placewood Resources, L.P

William R. Ruark

S & C Henning FLP

Stark Family LP

Herbert D. Steele & Leola B. Steele

Teetsel Family Trust

Timothy & Terri Tyler

Tim & Terri Tyler Family LP

Tyler 5 FLP

Chris & Lisa Vaskas

Raynold W. & Judith A. Wilson

Stephen Wintermute

WLR Family Partnership

Andrew Yanchick

# Exhibit B

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### BANKRUPTCY COURT

ENTERED
04/07/2021

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CHESAPEAKE ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 20-33233 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**ORDER (I) DIRECTING THE APPLICATION OF RULES 9014, 9019, AND 7023, (II)
GRANTING PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT,
(III) PRELIMINARILY CERTIFYING A CLASS FOR SETTLEMENT PURPOSES, (IV)
APPROVING FORM AND MANNER OF CLASS NOTICE, AND (V) SETTING  DATE
FOR FINAL APPROVAL HEARING ON FINAL APPROVAL OF SETTLEMENT**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/chesapeake. The location of Debtor Chesapeake Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

Case 21-30725 Document 341 Filed in TXSB on 04/07/21 Page 26 of 39
Case 20-33233 Document 3416 Filed in TXSB on 05/25/21 Page 26 of 1639

1626

Upon the motion (the "Motion") of Chesapeake Energy Corporation ("Chesapeake") for entry of an order (this "Order"): (i) directing the application of Rules 9014, 9019, and 7023 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and, by incorporation, Rule 23 of the Federal Rules of Civil Procedure (the "Federal Rules"),  (ii) granting preliminary approval of the class action settlement attached as Exhibit 2 to the Motion (the "Settlement Agreement"); (iii) preliminarily certifying a class for settlement purposes, (iv) approving the form and manner of Class Notice to members of the Settlement Agreement, and (v) setting date for final approval hearing on final approval of the settlement, and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a preliminary order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is permissible pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted to the extent set forth herein.

2.    The Court has considered the objection filed by the "Pennsylvania Proof of Claims Lessors" (Dkt. No. 3335) and overrules the objection at this time, without prejudice to such lessors' rights to raise any issues in the District Court.

3.    Accordingly, the Settlement Agreement attached as Exhibit 2 to the Motion is hereby preliminarily approved.  The Court preliminarily finds that the Settlement Agreement complies with Federal Rule of Civil Procedure 23 and the Class Action Fairness Act of 2005 ("CAFA") (28 U.S.C. §1715).

4.    The form of the notice to be sent to the Class Members (the "Class Notice") attached to the Settlement Agreement as Exhibit D and the service of the Class Notice by the Epiq Corporate Restructuring LLC (the "Settlement Administrator") to each class Member, at the last known address of each Class Member according to the Debtors' books and records comports with all applicable law and is hereby approved.

5.    The Class Notice shall be mailed by first-class mail, postage prepaid, by the Notice Administrator within 15 business days following the entry of this Order.

6.    The parties shall file motions and memoranda in support of final approval of the Settlement Agreement and Class Counsel shall file their request for attorneys' fees and expense reimbursements 45 days from the date of this Order.

7.    Any member of the Class who wishes to object to or comment on the proposed settlement, or to object to Class Counsel's request for attorney's fees and expense reimbursements, must postmark and mail such objections or comments by 60 days from the order. In accordance with the procedures set forth in the Settlement Notice, any such objections or comments must be mailed to Class Counsel, Chesapeake's counsel, and the Court.

8.      Any member of the Class who wishes to exclude himself or herself from the Class Settlement must postmark and mail the exclusion request to Class Counsel and Chesapeake's counsel no later than 60 days from the order.

9.      Any class member who wishes to appear and be heard at the final approval hearing must postmark and mail notice of such intention by June 22, 2021.  Notice of such intention must be mailed to Class Counsel, Chesapeake's counsel, and the Court.

10.      By June 18, 2021, Class Counsel and Chesapeake may file a response to any Class Member's objections or comments.

11.      The final Fairness hearing will be resolved by an Article III court, and to that end, Chief Judge Rosenthal of the U.S. District Court for the Southern District of Texas has determined that the Fairness Hearing will be conducted on June 29, 2021 at 10:00 a.m. to consider final approval of the Settlement Agreement and Class Counsel's request for attorneys' fees and expense reimbursements.  The Court may adjourn the Fairness Hearing without further notice of any kind.

12.      This Court retains jurisdiction to construe, interpret, enforce, and implement the Settlement Agreement and this Order.

  **Signed:  April 07, 2021.**

_____
**DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE**

**APPROVED AS TO FORM BY
CLASS COUNSEL AND COUNSEL
FOR THE MEC PLAINTIFFS**

*/s/ Daniel E. Seltz (with permission)*

Daniel E. Seltz
Lieff, Cabraser, Heimann & Bernstein, LLP
250 Hudson St., 8th Floor
New York, NY 10013

**APPROVED AS TO FORM BY
COUNSEL FOR THE
PENNSYLVANIA PROOF OF
CLAIM LESSORS**

*/s/ Ira Richards (with permission)*

Ira Neil Richards
Schnader Harrison Segal & Lewis LLP
1600 Market St
Suite 3600
Philadelphia, Pa 19106
(215)751-2503

**APPROVED AS TO FORM BY
COUNSEL FOR CHESAPEAKE:**

*/s/ Daniel T. Donovan*

Daniel T. Donovan
Ragan Naresh
Kirkland & Ellis LLP
1301 Pennsylvania Ave., N.W.
Washington DC 20004

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| In re: | § | |
| Chesapeake Energy Corporation | § | Civil Action No.  4:21-cv-01215 |
|     Debtor | § | |
| | § | Bankruptcy Case No.  20-33233 |
| RDNJ Trowbridge, Robert Dunlap, Wendy Dunlap | § | |
|     Appellant | § | |

# Notice of Filing of an Appeal

1. A notice of appeal to the district court was filed before the bankruptcy court on  April 9, 2021

2. This appeal has been assigned to United States District Judge Keith Ellison.

3. The appeal has been docketed as 4:21-cv-1215.

4. Motions affecting this appeal, or the judgment or order from which this appeal is taken must be filed in accordance with Fed. R. Bankr. P. 8006, 8007, 8008 and 8009(e).

5. Within 14 days after the notice of appeal was filed, the appellant must file a designation of the record. *See* Fed. R. Bankr. P. 8009. Within 14 days after being served with the appellant's designation, appellees may file additional designations.

6. Designations of the record must be filed with the bankruptcy court. Do not file copies of designated items that are already on file with the bankruptcy court. Parties must electronically file copies of admitted trial exhibits they designate for inclusion in the record.


Date: April 13, 2021

Nathan Ochsner, Clerk of Court

S. Arnow
Deputy Clerk

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| In re: | § | |
| Chesapeake Energy Corporation | § | Civil Action No.  4:21-cv-01218 |
| Debtor | § | |
| | § | Bankruptcy Case No.  20-33233 |
| Pennsylvania Proof of Claim Lessors | § | |
| Appellant | § | |

# Notice of Filing of an Appeal

1. A notice of appeal to the district court was filed before the bankruptcy court on  April 9, 2021

2. This appeal has been assigned to United States District Judge Keith Ellison.

3. The appeal has been docketed as 4:21-cv-1218.

4. Motions affecting this appeal, or the judgment or order from which this appeal is taken must be filed in accordance with Fed. R. Bankr. P. 8006, 8007, 8008 and 8009(e).

5. Within 14 days after the notice of appeal was filed, the appellant must file a designation of the record. *See* Fed. R. Bankr. P. 8009. Within 14 days after being served with the appellant's designation, appellees may file additional designations.

6. Designations of the record must be filed with the bankruptcy court. Do not file copies of designated items that are already on file with the bankruptcy court. Parties must electronically file copies of admitted trial exhibits they designate for inclusion in the record.

Date: April 13, 2021

Nathan Ochsner, Clerk of Court
S. Arnow
Deputy Clerk

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | § Chapter 11 |
| | § |
| | § Case No. 20-33233 |
| CHESAPEAKE ENERGY | § |
| CORPORATION *et al.*, | § Jointly Administered |
| | § |
| Reorganized Debtors. | § |
| | § |
| | § |

**APPELLANTS' DESIGNATION OF ITEMS TO BE INCLUDED
IN RECORD ON APPEAL AND STATEMENT OF ISSUES
PRESENTED ON APPEAL**

The Non-MEC Pennsylvania Proof of Claim Lessors,[1] a group of Pennsylvania oil and gas lessors (the "Non-MEC Pennsylvania Proof of Claim Lessors"), submit this designation of items to be included in record on appeal and statement of issues presented on appeal in conformity with Bankruptcy Rule 8009.  The appeal has been docketed as 4:21-CV-01215 in the U.S. District Court for the Southern District of Texas.

**Designation of Items to Include in Record on Appeal**

The Non-MEC Pennsylvania Proof of Claim Lessors designate the following items to be included in the record on appeal:

1.      List of docket entries;

2.      April 7, 2021 Order (ECF No. 3416);

3.      Notices of appeal (ECF Nos. 3480 and 3481);

---

[1]      The Non-MEC Pennsylvania Proof of Claim Lessors who are the appellants for purposes of this appeal are RDNJ Trowbridge and Robert & Wendy Dunlap.

4.      Reorganized Debtors' Motion for Approval of Settlement and attachments (ECF No. 3175);

5.      Objections to Motion for Approval of Settlement and attachments (ECF No. 3335);

6.      Debtors' Fifth Amended Chapter 11 Plan (ECF No. 2833);

7.      Order confirming Fifth Amended Chapter 11 Plan (ECF No. 2915);

8.      Notice of Entry of Order Confirming the Fifth Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates (ECF No. 3058);

9.      Transcript of proceedings on January 13, 2021 (ECF No. 2906); and

10.     Transcript of proceedings on March 31, 2021 (ECF 3386).

The Non-MEC Pennsylvania Proof of Claim Lessors reserve the right to designate additional materials as the appeal develops.

**<u>Statement of Issues Presented on Appeal</u>**

This appeal is from the Bankruptcy Court's order granting the Reorganized Debtors' motion for preliminary approval of a class settlement that Reorganized Debtors refer to as "the Non-MEC Settlement." The Non-MEC Pennsylvania Proof of Claim Lessors appeal the Bankruptcy Court's April 7, 2021 Order (I) Directing the Application of Rules 9014, 9019, and 7023, (II) Granting Preliminary Approval of Class Action Settlement, (III) Preliminarily Certifying a Class for Settlement Purposes, (IV) Approving Form and Manner of Class Notice, and (V) Setting Date for Final Approval Hearing on Final Approval of Settlement.

The questions to be presented on appeal include:

1.      Whether the bankruptcy court had subject matter jurisdiction over the class settlement.

2.      Whether the bankruptcy court abused its discretion by declining to abstain and by directing application of Bankruptcy Rule 7023 to the Reorganized Debtors' proposed class settlements.

2

3.    Whether the record supports the bankruptcy court's preliminary approval of a class settlement under Federal Rule of Civil Procedure 23(e), as amended December 1, 2018, including whether the bankruptcy court made adequate findings of fact to support its April 7, 2021 ruling.

4.    Whether the record supports the bankruptcy court's ruling preliminarily certifying a class pursuant to Federal Rule of Civil Procedure 23(a) and (b), including whether the bankruptcy court made adequate findings of fact to support its April 7, 2021 ruling.

5.    Where the putative class representatives did not file proofs of claim or a motion for preliminary approval of the class settlement, whether Reorganized Debtors met their burden, as proponents of the class settlement, to show that record evidence supports a finding that the bankruptcy court would likely be able to grant final approval of the class settlement in consideration of the factors listed in Federal Rule of Civil Procedure 23(e)(2), as amended December 1, 2018.

6.    Where the putative class representatives did not file proofs of claim or a motion for preliminary approval of the class settlement, whether Reorganized Debtors met their burden, as proponents of the class settlement, to show that record evidence supports a finding that the bankruptcy court would likely be able to certify a class in consideration of the requirements of Federal Rule of Civil Procedure 23(a) and (b).

7.    Whether the bankruptcy court erred in granting preliminary approval of a class settlement where the putative class representatives did not file proofs of claim or a motion for preliminary approval of the class settlement.

## Certificate Regarding Transcripts

Under Bankruptcy Rule 8009(b), the Non-MEC Pennsylvania Proof of Claim Lessors certify that transcripts designated for inclusion in the record on appeal have previously been ordered and filed with the Court.  *See* ECF Nos. 2906 (1/13/2021 Tr.) & ECF 3386 (3/31/2021 Tr.).  Thus, there is no need for Non-MEC Pennsylvania Proof of Claim Lessors to order these transcripts.

Dated:  April 23, 2021                    SCHNADER HARRISON SEGAL & LEWIS LLP


                                          By: /s/ Ira N. Richards
                                          Ira N. Richards (admitted pro hac vice)

Richard A. Barkasy (admitted pro hac vice)
Arleigh P. Helfer III (admitted pro hac vice)
Schnader Harrison Segal & Lewis LLP
1600 Market Street
Suite 3600
Philadelphia, PA 19103-7286
Telephone: (215) 751-2000
Facsimile: (215) 751-2205
irichards@schnader.com
rbarkasy@schnader.com
ahelfer@schnader.com

Aaron D. Hovan (admitted pro hac vice)
Law Office of Aaron Hovan
154 Warren St.
Tunkhannock, PA 18657
Telephone: (570) 836-3121
aaron@hovanlaw.com

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | § Chapter 11 |
| | § |
| | § Case No. 20-33233 |
| CHESAPEAKE ENERGY | § |
| CORPORATION *et al.*, | § Jointly Administered |
| | § |
| Reorganized Debtors. | § |
| | § |

**APPELLANTS' DESIGNATION OF ITEMS TO BE INCLUDED
IN RECORD ON APPEAL AND STATEMENT OF ISSUES
<u>PRESENTED ON APPEAL</u>**

The MEC Pennsylvania Proof of Claim Lessors,[1] a group of Pennsylvania oil and gas lessors (the "<u>MEC Pennsylvania Proof of Claim Lessors</u>"), submit this designation of items to be included in record on appeal and statement of issues presented on appeal in conformity with Bankruptcy Rule 8009.  The appeal has been docketed as 4:21-CV-01218 in the U.S. District Court for the Southern District of Texas.

**<u>Designation of Items to Include in Record on Appeal</u>**

The MEC Pennsylvania Proof of Claim Lessors designate the following items to be included in the record on appeal:

1. List of docket entries;

2. April 7, 2021 Order (ECF No. 3416);

3. Notices of appeal (ECF Nos. 3480 and 3481);

---

[1] The MEC Pennsylvania Proof of Claim Lessors are the appellants for purposes of this appeal are listed on Exhibit A to the Notice of Appeal (ECF No. 3459).

4.      Reorganized Debtors' Motion for Approval of Settlement and attachments (ECF No. 3175);

5.      Objections to Motion for Approval of Settlement and attachments (ECF No. 3335);

6.      Debtors' Fifth Amended Chapter 11 Plan (ECF No. 2833);

7.      Order confirming Fifth Amended Chapter 11 Plan (ECF No. 2915);

8.      Notice of Entry of Order Confirming the Fifth Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates (ECF No. 3058);

9.      Transcript of proceedings on January 13, 2021 (ECF No. 2906); and

10.     Transcript of proceedings on March 31, 2021 (ECF 3386).

The MEC Pennsylvania Proof of Claim Lessors reserve the right to designate additional materials as the appeal develops.

**Statement of Issues Presented on Appeal**

This appeal is from the Bankruptcy Court's order granting the Reorganized motion for preliminary approval of a class settlement that Reorganized Debtors refer to as "the MEC Settlement." The MEC Pennsylvania Proof of Claim Lessors appeal the Bankruptcy Court's April 7, 2021 Order (I) Directing the Application of Rules 9014, 9019, and 7023, (II) Granting Preliminary Approval of Class Action Settlement, (III) Preliminarily Certifying a Class for Settlement Purposes, (IV) Approving Form and Manner of Class Notice, and (V) Setting Date for Final Approval Hearing on Final Approval of Settlement.

The questions to be presented on appeal include:

1.      Whether the bankruptcy court had subject matter jurisdiction over the class settlement.

2.      Whether the bankruptcy court abused its discretion by declining to abstain and by directing application of Bankruptcy Rule 7023 to the Reorganized Debtors' proposed class settlements.

3.      Whether the record supports the bankruptcy court's preliminary approval of a class settlement under Federal Rule of Civil Procedure 23(e), as amended December 1, 2018, including whether the bankruptcy court made adequate findings of fact to support its April 7, 2021 ruling.

4.      Whether the record supports the bankruptcy court's ruling preliminarily certifying a class pursuant to Federal Rule of Civil Procedure 23(a) and (b), including whether the bankruptcy court made adequate findings of fact to support its April 7, 2021 ruling.

5.      Where the putative class representatives did not file proofs of claim or a motion for preliminary approval of the class settlement, whether Reorganized Debtors met their burden, as proponents of the class settlement, to show that record evidence supports a finding that the bankruptcy court would likely be able to grant final approval of the class settlement in consideration of the factors listed in Federal Rule of Civil Procedure 23(e)(2), as amended December 1, 2018.

6.      Where the putative class representatives did not file proofs of claim or a motion for preliminary approval of the class settlement, whether Reorganized Debtors met their burden, as proponents of the class settlement, to show that record evidence supports a finding that the bankruptcy court would likely be able to certify a class in consideration of the requirements of Federal Rule of Civil Procedure 23(a) and (b).

7.      Whether the bankruptcy court erred in granting preliminary approval of a class settlement where the putative class representatives did not file proofs of claim or a motion for preliminary approval of the class settlement.

**Certificate Regarding Transcripts**

Under Bankruptcy Rule 8009(b), the MEC Pennsylvania Proof of Claim Lessors certify that transcripts designated for inclusion in the record on appeal have previously been ordered and filed with the Court.  *See* ECF Nos. 2906 (1/13/2021 Tr.) & ECF 3386 (3/31/2021 Tr.).  Thus, there is no need for the MEC Pennsylvania Proof of Claim Lessors to order these transcripts.

Dated:  April 23, 2021                          SCHNADER HARRISON SEGAL & LEWIS LLP


                                                By: /s/ Ira N. Richards
                                                Ira N. Richards (admitted pro hac vice)
                                                Richard A. Barkasy (admitted pro hac vice)
                                                Arleigh P. Helfer III (admitted pro hac vice)

Schnader Harrison Segal & Lewis LLP
1600 Market Street
Suite 3600
Philadelphia, PA 19103-7286
Telephone: (215) 751-2000
Facsimile: (215) 751-2205
irichards@schnader.com
rbarkasy@schnader.com
ahelfer@schnader.com

Aaron D. Hovan (admitted pro hac vice)
Law Office of Aaron Hovan
154 Warren St.
Tunkhannock, PA 18657
Telephone: (570) 836-3121
aaron@hovanlaw.com