**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| | § | |
| | § | |
| IN RE: CHESAPEAKE ENERGY | § | |
| CORPORATION | § | CIVIL ACTION NO. H-21-1215 |
| | § | BANKRUPTCY NO. H-20-33233 |
| | § | |
| | § | |
| | § | |

**MEMORANDUM AND OPINION**

These consolidated appeals are from the bankruptcy court's orders certifying and preliminarily approving three class-action settlements. Oil-and-gas leaseholders in Pennsylvania, the bankruptcy claimants here, filed three class-action lawsuits in the Middle District of Pennsylvania against Chesapeake Energy Corp. for improperly calculating royalties owed under their leases. The Pennsylvania Attorney General also sued Chesapeake for improperly calculating royalties. The Pennsylvania lawsuits proceeded for nearly seven years, reaching but not concluding proposed settlements, until Chesapeake filed for bankruptcy in the Southern District of Texas in June 2020.

After roughly nine months in the bankruptcy court and mediation, the leaseholders, the Pennsylvania Attorney General, and Chesapeake reached a proposed settlement. They sought preliminary certification of three settlement classes and preliminary approval of the settlement terms. The appellants objected to two of the settlements. The bankruptcy court denied the preliminary objections, and they appeal.

The objector-appellants argue that the bankruptcy court erred by certifying the settlement classes and preliminarily approving the settlements. They argue that the court did not have an

adequate record to perform the analysis required under Federal Rule of Civil Procedure Rule 23(a) or to determine whether the proposed settlements were fair, reasonable, and adequate under Federal Rule of Civil Procedure 23(e). The objector-appellants argue that the bankruptcy court glossed over potential conflicts of interest between the named plaintiffs and the putative absent members of the two settlement classes before the court.

While there are some variations within the settlement classes, and while the cash relief is lower than in the two settlements at issue that were proposed before bankruptcy in the Middle District of Pennsylvania—which preliminarily approved one of those settlements—the bankruptcy court did not err in the orders preliminarily certifying the classes and approving the settlements. The record suggests that the majority of the leaseholders would effectively be unable to recover without the settlements; class counsel, Chesapeake's counsel, and the Pennsylvania Attorney General approve; the litigation has proceeded for nearly seven years; the settlements were reached after vigorous litigation, arm's-length negotiations, and mediation; and Chesapeake's bankruptcy may have wiped out the possibility of a larger recovery for the class members. At this preliminary stage, the record does not reveal "glaring deficiencies . . . that would make final certification untenable." *McNamara v. Bre-X Mins. Ltd.*, 214 F.R.D. 424, 428 (E.D. Tex. 2002).

Based on the record, the briefing, and the arguments of counsel presented at an oral hearing, the orders of the bankruptcy court are affirmed and this appeal is dismissed. The reasons for these rulings are set out below.

## I.     Background

In 2013, Pennsylvania oil-and-gas leaseholders filed three lawsuits in the Middle District of Pennsylvania against Chesapeake, alleging that it underpaid royalties due under each lease. (ROA 1264). In the first lawsuit, *Demchak v. Chesapeake*, the plaintiffs alleged that Chesapeake

improperly deducted postproduction costs. (*Demchak Partners Ltd., et al., v. Chesapeake Appalachia, LLC*, No. 13-2289 (M.D. Pa. 2013)). The plaintiffs in the *Demchak* class have leases with market-enhancement clauses, which preclude Chesapeake from "deducting [postproduction costs] incurred to transform leasehold gas into marketable form," but allow Chesapeake to "deduct a pro-rata share of [postproduction costs] incurred after the gas is marketable if they enhance the value of the marketable gas." (ROA 1288; *see also* ROA 1543). Postproduction costs are the costs of "gathering, compressing, treating, dehydrating, processing, transporting, or transmitting" gas. (ROA 1289). The *Demchak* plaintiffs alleged that Chesapeake improperly deducted postproduction costs for "gathering," dehydrating, and compressing gas to meet "the quality and pressure specifications of the interstate pipeline into which it is delivered." (*Demchak Partners Ltd.*, No. 13-2289, Docket Entry No. 1 at ¶ 23).

In 2015, Chesapeake and the *Demchak* plaintiffs entered into a classwide settlement agreement, which the Pennsylvania federal district court preliminarily approved in 2015. (ROA 1264). The agreement secured over $17,000,000 for the class members. (*Demchak Partners Ltd.*, No. 13-2289, Docket Entry No. 91). The settlement was awaiting final approval when Chesapeake declared bankruptcy.

In the second and third lawsuits, *Brown v. Access Midstream Partners, LP* and *Suessenbach v. Access Midstream Partners, LP*, the plaintiffs alleged that Chesapeake underpaid royalties by improperly deducting inflated postproduction costs. (*See Brown v. Access Midstream Partners, LP*, No. 14-00591 (M.D. Pa. 2014); *Suessenbach v. Access Midstream Partners, LP*, No. 14-01197 (M.D. Pa. 2014)). The leases involved in the *Brown* and *Suessenbach* cases do not have market-enhancement clauses. Chesapeake and the *Brown* and *Suessenbach* plaintiffs settled in

August 2018 in Pennsylvania. (ROA 1264). The settlement was awaiting preliminary court approval when the bankruptcy filing intervened. (ROA 1264).

The Pennsylvania Attorney General sued Chesapeake in May 2016 for allegedly violating Pennsylvania antitrust law and the Pennsylvania Unfair Trade Practices and Consumer Protection Law by inflating midstream prices, improperly deducting from royalty payments, and engaging in unfair leasing practices. (ROA 1286). An appeal before the Pennsylvania Supreme Court was pending when Chesapeake declared bankruptcy. (*Commonwealth v. Chesapeake Energy Corp., et al.*, No. 81-MAP-2019 (Pa. 2020); *see also Commonwealth v. Chesapeake Energy Corp.*, 247 A.3d 934 (Pa. 2021)).

In June 2020, Chesapeake filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code in the Southern District of Texas. (ROA 13, 1266). The automatic stay halted the *Demchak*, *Brown*, *Suessenbach*, and Pennsylvania Attorney General lawsuits. (ROA 1425). The Pennsylvania Attorney General filed a proof of claim before the bankruptcy court in the Southern District of Texas, as did 161 individual leaseholders. (ROA 1266). In January 2021, the bankruptcy court confirmed Chesapeake's plan of reorganization. (ROA 1266–67).

On February 9, 2021, Chesapeake reached a preliminary settlement with the Pennsylvania Attorney General. A month later, Chesapeake reached a preliminary settlement with the *Demchak*, *Brown*, and *Suessenbach* plaintiffs.[1] These settlements "resolve all royalty-related litigation and disputes in Pennsylvania." (ROA 1267). The settlement terms that bear most on the issues here are summarized below.

---

[1] The parties refer to the *Demchak* settlement as the MEC settlement, and the combined *Brown-Sussenbach* settlement as the Non-MEC settlement. (ROA 1259).

**The Pennsylvania Attorney General Settlement**

- Pennsylvania oil-and-gas leaseholders may choose whether to have their royalties calculated based on the in-basin price or the netback price. The in-basin price is the average of two oil-and-gas price indexes, without deducting postproduction costs. The netback price is the average sales price Chesapeake receives for its "production month sales to third parties minus a proportionate share" of postproduction costs. (ROA 1268).

- Chesapeake will pay Pennsylvania $5,300,000, which the state will distribute to Pennsylvania leaseholders. (ROA 1268).

**The *Demchak* (MEC) Settlement**

- Chesapeake will pay $5,000,000 to the class members. (ROA 1269).

- The class members may choose each month whether to have their royalties calculated based on the higher of the in-basin or netback price. (ROA 1269).

**The *Brown-Suessenbach* (Non-MEC) Settlement**

- Chesapeake will pay $1,250,000 to the class members. (ROA 1270).

- The class members may choose how to have their royalties calculated going forward, using either the in-basin or netback price. But they can only make their election once, not each month. (ROA 1547).

Together, the settlements make roughly $11.5 million available for Pennsylvania leaseholders with underpaid-royalty claims. (ROA 1546). The settlements also allow the Pennsylvania leaseholders to choose between "the higher of a calculated [in-basin] price or the netback" price. (ROA 1547). The *Demchak* plaintiffs may choose the higher valuation each month, while the *Brown* and *Suessenbach* plaintiffs may choose their valuation method once. (ROA 1547–48). All three settlements offer opt-out rights.

These settlement terms differ from the terms reached in Chesapeake's prebankruptcy proposed settlements with the *Demchak* and *Brown-Suessenbach* classes. In the prebankruptcy *Demchak* proposed settlement, the plaintiffs were to receive roughly $17,000,000, but without the right to choose monthly whether to have their royalties calculated based on the higher of the in-basin or netback price. (*In re Chesapeake Energy Corp.*, No. 20-33233, Docket Entry No. 3365-1). The prebankruptcy *Brown-Suessenbach* proposed settlement would have given the plaintiffs $7,750,000 and the option of having their royalties calculated based on either the in-basin or netback price. (*Brown*, No. 14-00591, Docket Entry No. 185 at 6).

The bankruptcy court certified the settlement classes and preliminarily approved all three settlements. (ROA 1587–93). The court found that the settlement classes and settlement terms satisfied the Rule 23 requirements, were negotiated at arm's-length, and were fair, adequate, and equitable. (*Id.*). Fifty-eight leaseholders, some in the *Demchak* class and some in the *Brown-Suessenbach* class, objected. (ROA 1591). The court found no basis in the objections to deny the certification and preliminary approval of the proposed settlement classes. (ROA 1591–92). The court also found that it was "inherently unfair for 58 [leaseholders] to hold up tens of thousands" of other leaseholders. (ROA 1591–92).

The objectors appealed the bankruptcy court's decision to preliminarily approve the class settlements. (Docket Entry No. 1). The consolidated appeals challenge the *Demchak* class settlement and the *Brown-Suessenbach* class settlement, not the Pennsylvania Attorney General settlement.

## II.    The Legal Standards

### A.    The Standard of Review

"When reviewing a bankruptcy court's decision . . . a district court functions as a[n] appellate court and applies the standard of review generally applied in federal court appeals." *In re Renaissance Hosp. Grand Prairie Inc.*, 713 F.3d 285, 293 (5th Cir. 2013) (internal quotation marks omitted). The court reviews the bankruptcy court's factual findings for clear error but reviews de novo its conclusions of law and resolution of mixed questions of law and fact. *In re San Patricio Cty. Cmty. Action Agency*, 575 F.3d 553, 557 (5th Cir. 2009).

### B.    Settlement Class Certification

Class certification requires a "rigorous analysis of [the] Rule 23 prerequisites." *Madison v. Chalmette Ref., L.L.C.*, 637 F.3d 551, 554 (5th Cir. 2011) (internal quotation marks omitted). Any proposed class must meet four requirements:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These requirements "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (citation and quotation marks omitted).

If a class has not been certified before settlement, courts apply the Rule 23(a) class-certification factors with heightened scrutiny. *See In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011) ("When a court is asked to certify a class and approve its settlement in one proceeding, the Rule 23(a) requirements designed to protect absent class members 'demand undiluted, even heightened, attention.'" (quoting *Amchem Prods., Inc. v.*

*Windsor*, 521 U.S. 591, 620 (1997)); *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 424 F. Supp. 3d 456, 484 (E.D. La. 2020) ("[T]he Court must 'make a preliminary determination that the proposed class satisfies the criteria set out in Rule 23(a) and at least one of the subsections of Rule 23(b).'" (quoting Fed. Judicial Ctr., *Manual for Complex Litigation* § 21.632 (3d. ed. 1997))). While a court need not determine if a class proposed for settlement would be manageable for trial, the court must "be particularly mindful of the other requirements in the rule because of the potential dangers to the absentees' interests that were presented when settlement classes are involved." 7B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1797.2 (3d ed. 2021); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1051 (S.D. Tex. 2012) ("A district court may not 'substitut[e] the fairness inquiry of Rule 23(e) for the certification requirements of Rule 23(a) and (b).'" (quoting *Thomas v. Albright*, 139 F.3d 227, 235 (D.C. Cir. 1998))).

### C.    Approval of Settlement Class Terms

Under Rule 23(e), a class action "may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e). Rule 23(e) requires notice to the proposed class members before the court can finally approve a class settlement. To send notice, the parties must show "that the court will likely be able to . . . approve the proposal under Rule 23(e)(2)" and "certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B). Rule 23(e)(2) states that the "the court may approve [the settlement] only after a hearing and only on finding that it is fair, reasonable, and adequate after considering" whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2); *In re Chinese-Manufactured Drywall*, 424 F. Supp. 3d at 484 ("Within the Fifth Circuit it is routine to conduct a preliminary fairness evaluation prior to the issuance of notice.").

The Fifth Circuit also requires trial courts considering preliminary class settlements under Rule 23(e)(2) to apply the following six *Reed* factors: (1) the existence of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings; (4) the plaintiffs' probability of success; (5) the range of possible recovery; and (6) the opinions of class counsel, class representatives, and absent class members. *See Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983).

After preliminary approval and notice, the court "conducts a more thorough and rigorous analysis of the same factors" to determine "the appropriateness of granting final approval." *In re Chinese-Manufactured Drywall*, 424 F. Supp. 3d at 484. Some courts allow objections to a preliminary class settlement; others wait until the final fairness hearing. 4 Newberg on Class Actions § 13:12 (5th ed. 2021) ("Some courts permit such objectors to be heard; others defer such a hearing to the final approval stage."). Both the bankruptcy court and this court allowed the objectors to be heard and considered their arguments and the responses. (ROA 1587–93).

## III.    Analysis

### A.    Challenges to the Class Certifications

The objector-appellants argue that the bankruptcy court made three errors in certifying the *Demchak* and *Brown-Suessenbach* classes. First, the bankruptcy court did not have a sufficient record to make the Rule 23(a) findings. Second, some of the lead plaintiffs did not sign the settlement agreements. Third, some of the lead plaintiffs had conflicts of interest with the putative class members.

### 1.    The Bankruptcy Court's Rule 23(a) Findings

The objector-appellants argue that the settlement parties did not provide enough evidence for the bankruptcy court or this court to "make any class certification findings." (Docket Entry No. 25 at 3). Before preliminarily approving the *Demchak* class settlement, the Pennsylvania federal court certified a nearly identical class. The Pennsylvania court found that the *Demchak* class satisfied the Rule 23(a) factors because it included more than 100 people; the named plaintiffs and putative class members were subject to the same "alleged[ly] improper royalty payment practices" under a "common lease provision"; and the "factual issues common to all" the class members included whether Chesapeake properly deducted postproduction costs under the common lease agreement. (*In re Chesapeake Energy Corp.*, No. 20-33233, Docket Entry No. 3365-1 at 9−10). The difference between the *Demchak* class and *Brown-Suessenbach* settlement classes is that the members of the *Brown-Suessenbach* class do not have market-enhancement clauses.   This difference does not change the Rule 23(a) analysis.

The record before the *Demchak* court was before the bankruptcy court. The parties provided the Pennsylvania federal district court's rulings in *Demchak* to the bankruptcy court. That court specifically noted the *Demchak* court's settlement class certification. (ROA 1554). The

bankruptcy court had access to the record before the *Demchak* court. The objector-appellants have not identified a flaw with the *Demchak* court's analysis. Nor have they identified a reason why the bankruptcy court could not, at the preliminary approval stage, rely on the *Demchak* court's decisions. This general point supports the bankruptcy court's conclusions as to the specific factors analyzed below.

## 2. Lead Plaintiff Approval

The objector-appellants argued that some of the named plaintiffs informally objected to, and did not sign, the *Demchak* and *Brown-Suessenbach* settlement agreements. They argue that the settlements cannot be preliminarily approved unless all of the named plaintiffs sign the written agreements.

Courts have consistently held that class representatives may object to a settlement without preventing a court from approving it. *See Marshall v. Nat'l Football League*, 787 F.3d 502, 513 (8th Cir. 2015) ("We have approved a class-action settlement even when all named plaintiffs opposed it."); *Hayes v. Harmony Gold Min. Co.*, 509 F. App'x 21, 23 (2d Cir. 2013) ("[T]his court has held that a class representative may not singlehandedly veto a proposed settlement."); *In re BankAmerica Corp. Sec. Litig.*, 210 F.R.D. 694, 703 (E.D. Mo. 2002) ("The fact that some of the class representatives object to the settlement does not itself prevent final approval of the settlement."); *Reed*, 703 F.2d at 174 (upholding a settlement approval over the objections of 23 out of the 27 named plaintiffs); *Flinn v. FMC Corp.*, 528 F.2d 1169, 1174 n.19 (4th Cir. 1975) ("Appellants do not argue, nor may they under the authorities, that assent of the class plaintiffs is essential to the settlement, provided the trial court finds it fair and reasonable."); *cf. Walsh v. Great Atl. & Pac. Tea Co.*, 726 F.2d 956, 964 (3d Cir. 1983) ("Class counsel's duty to the class as a whole frequently diverges from the opinion of either the named plaintiff or other objectors."); Fed.

Judicial Ctr., *Manual for Complex Litig.* § 30.44 (3d. ed. 1997) ("[W]hile the objections of a class representative must be considered by the court, they do not preclude a settlement that resolves the claims of the class, including those of the representatives.").

The fact that some of the class representatives failed to sign the settlement papers is not a reason to deny certification of the class settlements. That is particularly true when, as here, none of the named class representatives lodged an objection. The bankruptcy court did not err by certifying the *Demchak* and *Brown-Suessenbach* classes without the signatures of all the named class representatives, unless the absence of signatures reflects a structural conflict of interest. It does not.

### 3. Conflicts of Interest

The objector-appellants also argue that the named plaintiffs have conflicts of interest with the class members that prevent preliminary class settlement approval under Rule 23(a) and Rule 23(e)(2)(a). The objector-appellants first argue that the named plaintiffs are inadequate representatives because they did not file proofs of claims with the bankruptcy court, while some class members did. (Docket Entry No. 25 at 4). The objector-appellants argue that those who filed proofs of claims could have different settlement incentives than those who did not, because the leaseholders who did not file proofs of claims may have a weaker bargaining position compared to those who did. Only leaseholders who filed proofs of claims can pursue individual claims against Chesapeake in the bankruptcy court. Some courts have held that differences in bargaining position may raise questions about whether the named plaintiffs are typical of the absent class members and whether they can serve as adequate representatives. *See In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 490 (N.D. Cal. 2008) ("The wholesale purchasers therefore came

to the negotiating table in a fundamentally different position than the representative [individual consumer] plaintiffs.").

Filing a proof of claim in the bankruptcy court is not required to be a typical and adequate representative of the *Demchak* and *Brown-Suessenbach* classes. First, the record does not show that filing a proof of claim substantially improves an individual class member's bargaining position. Even if filing a proof of claim did improve some class members' bargaining position, the record does not show that "some difference in bargaining power would create antagonism between the class representatives and the class." *Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co., Ltd.*, No. 09- CV-0852, 2016 WL 3579953, at *3 (E.D. Wis. June 24, 2016).

Second, the *Demchak* and *Brown-Suessenbach* classes together contain roughly 15,000 class members, but only 161 filed proofs of claims. (ROA 1266). If anything, the class members who filed proofs of claims are the outliers; they are not typical or representative of the class. *See Fond Du Lac Bumper Exch.*, 2016 WL 3579953, at *3 (finding no conflicts of interest when the "class representatives' claims were [not] atypical of a large portion of the putative class," even though some class member "had substantially more bargaining power than other class members"); *Kramer v. Am. Bank & Tr. Co., N.A.*, No. 11-CV-8758, 2017 WL 1196965, at *5 (N.D. Ill. Mar. 31, 2017) ("Proceeding on a class-wide basis is also appropriate because, except for a few outliers, most class members do not have a sufficient stake in their fraud claims to go it alone.").

Those who filed proofs of claims are also protected by their opt-out rights. *See McKibben v. McMahon*, No. 14-CV-2171, 2019 WL 1109683, at *4 (C.D. Cal. Feb. 28, 2019) (approving a class settlement with a "recovery ceiling" "to ensure that outliers who have outsized claims do not distort the meaningfulness of the recovery to the remaining class members" because "[s]uch outliers would be entitled to opt out and pursue their own claims if they so chose."). The fact that

some filed proofs of claim, while most did not, is not a conflict of interest that undermines this class certification.

Third, the objector-appellants implicitly recognized that the *Demchak* named plaintiffs adequately represent the absent class members. The objector-appellants asked the bankruptcy court to send the *Demchak* and *Brown-Suessenbach* settlements back to the Middle District of Pennsylvania, even though the named class representatives in those settlement classes are also the named plaintiffs in the bankruptcy court. (Docket Entry No. 25 at 4).

The primary difference between the prebankruptcy and postbankruptcy settlements is that the postbankruptcy settlements are in the bankruptcy forum. The difference in forum does not make the class representatives inadequate or atypical. *See In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464, 504 (W.D. Pa. 2019) ("There may be factual differences among the various kinds of [plaintiffs] in the putative class, but, at this stage, the court cannot conclude that those differences create a conflict of interest between the named plaintiffs and the members of the putative class that render the claims of the named plaintiffs atypical compared to the claims of the putative class."); *Morrow v. Washington*, 277 F.R.D. 172, 196 (E.D. Tex. 2011) ("[A]ny differences in the specific factual circumstances giving rise to the claims of the proposed class representatives and the members of the class do not affect the alignment of the class representatives' interests with the interest of the class."); *City of San Antonio v. Hotels.com*, No. 06-CV-381, 2008 WL 2486043, at *8 (W.D. Tex. May 27, 2008) ("Defendants have not claimed that a conflict of interest exists between the [named plaintiff] and the putative class, and the evidence does not reflect any differences between them that would be significant enough to create a conflict."); 7A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1764 (3d ed. 2005) ("In general, the requirement [of typicality] may be satisfied even though varying fact

14

patterns support the claims or defenses of individual class members . . . or there is a disparity in the damages claimed by the representative parties and the other class members.").

The objector-appellants also argue that there are differences among the *Demchak* class members' leases that could raise conflicts of interest. The objector-appellants point to 26 leases negotiated by the Wyoming County Landowners Group that differ from other class members' leases. (ROA 1423). The Wyoming County leases appear to have a market-enhancement clause that, though not identical, is similar to those in the named plaintiffs' leases. *See In re Heartland*, 851 F. Supp. 2d at 1055 ("Despite possible state-by-state variations in the elements of these claims, they arise from a single course of conduct by [the defendant] and a single set of legal theories."). Wyoming County leaseholders have the option to choose a royalty of either "twenty percent" of the gas removed from the "leased premises" or the gross proceeds from the "total gross production attributable to the applicable well." (ROA 1509; *see also* ROA 1570, 1423). Chesapeake does not deduct "any expense required to make gas marketable" from royalties based on gross proceeds. (ROA 1510). Chesapeake does, however, deduct "actual costs paid to nonaffiliated third parties for gathering, compression, and transportation necessary to enhance the value of otherwise marketable gas." (ROA 1510).

The *Demchak* named plaintiffs also had market-enhancement clauses in their leases that precluded Chesapeake from deducting the postproduction costs incurred to reduce gas to marketable form, but permitted Chesapeake to deduct the postproduction costs incurred after the gas was marketable. (ROA 1288). The central disputes in *Demchak* were when the gas became marketable and whether Chesapeake could deduct costs incurred to gather, dehydrate, and compress the gas so that it met "the quality and pressure specifications of the interstate pipeline into which it is delivered." (*Demchak Partners Ltd.*, No. 13-2289, Docket Entry No. 1 at ¶ 23).

The record does not show, and the objector-appellants' briefing does not explain, how the Wyoming County leases were materially different from those held by the named plaintiffs. Both sets of leases leave open when gas becomes marketable. Notably, the objector-appellants did not raise this concern before the Middle District of Pennsylvania. (*Demchak Partners Ltd.*, No. 13-2289, Docket Entry No. 120). Instead, they argued that the Wyoming County leases contained a market- enhancement clause that "mirrors one of the example" market-enhancement clauses "in the class notice." (*Id.* at 11). The *Demchak* court did not find that the Wyoming County leases precluded certification of the settlement class. (*Demchak Partners Ltd.*, No. 13-2289, Docket Entry No. 91). The bankruptcy court did not err in reaching the same result.

### B.     The Settlements Appear Fair, Reasonable, and Adequate

The objector-appellants argue that the 2018 amendments to Rule 23(e) increased the scrutiny required for a preliminary approval of a class settlement because the amendments require the parties to show that the court will "likely" be able to finally approve the proposed settlement. The class representatives and Chesapeake respond that the record evidence was sufficient for the certification and preliminary approval findings.

### 1.     The 2018 Amendments

Before the 2018 amendments to Rule 23(e), courts warned "that a preliminary hearing should not be turned into a trial or rehearsal for trial on the merits, and that its purpose should be limited to a threshold examination of the overall fairness and adequacy of the settlement in light of the likely outcome and cost of continued litigation." 4 NEWBERG ON CLASS ACTIONS § 13:12 (5th ed. 2021) (citations and quotation marks omitted); *In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 330, 350 (N.D. Ohio 2001) ("[T]he Court, at this juncture, is not obligated to, nor could it reasonably, undertake a full and complete fairness review."). Courts made "a preliminary

fairness evaluation" based primarily on "the proposed terms of settlement submitted by counsel." *McNamara v. Bre-X Mins. Ltd.*, 214 F.R.D. 424, 426 (E.D. Tex. 2002). Courts would determine "whether there was probable cause to submit the [settlement] to class members and [to] hold a full-scale hearing as to its fairness." 4 NEWBERG ON CLASS ACTIONS § 13:13 (5th ed. 2021) (citations and quotation marks omitted).

The Committee Notes to the 2018 amendments emphasize that the amended Rules tilt more work to the earlier preliminary approval stage. The Notes state that the "decision to give notice of a proposed settlement to the class is an important event . . . [and] should be based on a solid record supporting the conclusion that the proposed settlement will likely earn final approval after notice and an opportunity to object." The Committee Notes also state that the "the proponents of the settlement should ordinarily provide the court with all available materials they intend to submit to support approval under Rule 23(e)(2)." *Id.* At the same time, as commentators have argued and courts have held, the "new Rule 23(e)" largely "codified . . . prior practice" and should not "generate a significant change in the settlement process or outcome." 4 NEWBERG ON CLASS ACTIONS § 13:13 (5th ed. 2021); *see also ODonnell v. Harris County*, No. 16-CV-1414, 2019 WL 6219933, at *9 (S.D. Tex. 2019) ("[I]n adopting the 2018 amendments to Rule 23(e), Congress essentially codified [the] prior practice." (citation and quotation marks omitted)); *Greer v. Dick's Sporting Goods, Inc.*, No. 15-CV-1063, 2019 WL 4034478, at *2 (E.D. Cal. 2019) ("Rule 23(e) essentially codified [federal courts'] prior practice." (citation and quotation marks omitted)).

The Pennsylvania court found in *Demchak* that the proposed settlement was "particularly beneficial to members" of the class because it avoided "protracted and expensive litigation," promoted "a mutually-productive business relationship" between the parties, and allowed the class members to avoid litigating their "claims through individualized arbitrations." (*In re Chesapeake*

17

*Energy Corp.*, No. 20-33233 (S.D. Tex. Bankr.), Docket Entry No. 3365-1 at 9). The objector-appellants argue that the record does not allow the court to conclude that the *Demchak* and *Brown-Suessenbach* class settlements were fair, reasonable, and adequate.

The Committee Notes to the 2018 amendments give examples of the categories of information settling parties should submit with their motion for preliminary approval of a settlement class:

- "the extent and type of benefits that the settlement will confer on the members of the class";

- "information about the likely range of litigated outcomes, and about the risks that might attend full litigation";

- "[i]nformation about the extent of discovery completed in the litigation or in parallel actions";

- "information about the existence of other pending or anticipated litigation on behalf of class members involving claims that would be released under the proposal"; and

- "any other topic that [the parties] regard as pertinent to the determination whether the proposal is fair, reasonable, and adequate."

Fed. R. Civ. P. 23 committee notes 2018 amends.; *see also* 4 Newberg on Class Actions § 13:12 (5th ed. 2021). Other courts have accepted "counsels' representations" in preliminarily determining whether a class settlement is fair, reasonable, and adequate. *Hays v. Eaton Grp. Att'ys, LLC*, No. 17-CV-88, 2019 WL 427331, at *10 (M.D. La. Feb. 4, 2019).

## 2. The Record Evidence

The settling parties submitted each type of evidence listed in the 2018 Committee Notes. The record shows that the settlement terms provide benefits within a "reasonable range of recovery." *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 656 (N.D. Tex. 2010). The current payouts

to the class members are: $5,000,000 to the *Demchak* class members, (ROA 1308); $1,250,000 to the *Brown-Suessenbach* class members, (ROA 1368); and $5,300,000 to all of the class members from the Pennsylvania Attorney General settlement, (ROA 1268, 1291, 1352).

Counsel for the *Demchak* and *Brown-Suessenbach* classes both argued that the recovery was the best they expected to get, given the circumstances. *See Stott v. Cap. Fin. Servs., Inc.*, 277 F.R.D. 316, 346 (N.D. Tex. 2011) ("[C]lass counsel has informed the Court that the amount contemplated by this settlement was simply the most that counsel could gather for the class from [the defendant]."). While it is true that the class members will receive less in cash payments than they would have under the class settlement before the Middle District of Pennsylvania, the record shows that Chesapeake's intervening bankruptcy reduced the cash available to pay the class members. *See id.* at 345 ("[I]f this litigation were to continue and the class was to emerge victorious, they would possess a judgment worth millions with no one to collect it from."). Class counsel and counsel for Chesapeake made clear at oral argument that these amounts will be paid immediately, removing the delays and uncertainties of continued litigation, including appeals.

The proposed settlement also allows the *Demchak* class members to choose each month between either the netback price or the in-basin price without deducting postproduction costs. (ROA 1309–10). Under the prebankruptcy *Demchak* proposed settlement, the class members had to bear 66% of the postproduction costs on a pro rata basis. (*Demchak Partners Ltd.*, No. 13-2289, Docket Entry No. 80-1 at 13–14). The ability to choose a valuation method each month is advantageous to the class members. This result could not be obtained through litigation and,

according to class counsel, will provide enduring benefits.[2] *Cf. In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 148 (E.D. La. 2013) (future medical monitoring benefits "could not be obtained through litigation"). The objector-appellants did not provide a reason to reject these arguments.

Under the proposed *Brown-Suessenbach* settlement, class members will be able to choose whether, going forward, their royalties are calculated using the netback price or the in-basin price without deducting postproduction costs. (ROA 1370–71). Under the settlement proposed but not approved in the Middle District of Pennsylvania before Chesapeake filed for bankruptcy, these class members could elect to calculate their royalties using an in-basin price or the netback price, with postproduction costs deducted on a pro rata basis. (*See Brown*, No. 14-00591, Docket Entry No. 185-1 at 16).

The record also contains evidence about the range of likely litigated outcomes and their risks. The parties have been litigating for nearly seven years in three cases and in two states. The class members have recovered nothing. *See Slipchenko v. Brunel Energy, Inc.*, No. 11-CV-1465, 2015 WL 338358, at *8 (S.D. Tex. Jan. 23, 2015) ("The parties vigorously and extensively litigated this case for more than three years before settling."). A similar class settlement was preliminarily approved by the Middle District of Pennsylvania before Chesapeake declared bankruptcy. (*Demchak Partners Ltd.*, No. 13-2289, Docket Entry No. 91).

The record shows that the class settlements are the most practical vehicle for recovery for most of the class members. *See Stott*, 277 F.R.D. at 345 ("This settlement at least provides class

---

[2] The settling parties did not provide an analysis of the extent to which this feature will benefit the class members as compared to the original *Demchak* settlement. This information may be submitted at the settlement at the final fairness hearing.

20

members with some measure of recovery, and the Court is of the opinion that the settlement should be approved when the alternative is no recovery at all."). According to counsel, the proposed *Demchak* class wraps in roughly 13,000 class members and the proposed *Brown-Suessenbach* class wraps in roughly 2,000 class members. (ROA 1579). Only 161 potential class members, across both settlements, filed proofs of claims, and no classwide proofs of claim were filed. (ROA 1266). For most class members, who did not file proofs of claim in the bankruptcy court, the bankruptcy extinguished their prepetition royalty valuation claims against Chesapeake. (ROA 585); *see also* 11 U.S.C. § 524(a); *Matter of Edgeworth*, 993 F.2d 51, 53 (5th Cir. 1993) ("A discharge in bankruptcy . . . releases the debtor from personal liability for the debt."). The settlement is their only practical vehicle for any recovery.

Even if the class members could pursue their claims in individual arbitrations, those claims are not a guaranteed success. *See In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 147 (E.D. La. 2013) ("Without a settlement, Plaintiffs face significant further expenses in time, money, and resources—with no assurance of recovery."). At oral argument, counsel for the *Demchak* class, an experienced oil-and-gas litigator, made clear that each leaseholder's claim turns on the factual question of when extracted gas becomes marketable, an issue on which reasonable minds may differ. The *Brown-Suessenbach* settlement also raises disputed factual questions about whether Chesapeake's alleged gas gathering and transportation deductions were unreasonably high. (*See Brown*, No. 14-00591, Docket Entry No. 57 at ¶ 37; Docket Entry No. 119 at 12). The current settlements provide prompt payment of a definite cash amount and future benefits.

The bankruptcy court was aware of the extent of discovery that preceded the settlement proposals in the bankruptcy case, as well as the discovery completed in the *Demchak*, *Brown*, and *Suessenbach* actions in Pennsylvania before the bankruptcy filing. (ROA 1554). The bankruptcy

court also considered evidence about the Middle District of Pennsylvania litigation on behalf of the class members. (ROA 1554, 1560, 1577–83).

The record contains other information relevant to determining whether the proposal is fair, reasonable, and adequate. Before the bankruptcy, the Pennsylvania court in *Demchak* considered several objections to, and motions in support of, the preliminary and final class settlement, including objections from the Pennsylvania Attorney General, who now approves of the class settlement. (*Demchak Partners Ltd.*, No. 13-2289, Docket Entry Nos. 80, 81, 109, 111, 113, 144). The court in *Brown* and *Suessenbach* considered dispositive motions and required monthly status updates while the case was being mediated. (*See Brown*, No. 14-00591, Docket Entry Nos. 119, 167). Before and after bankruptcy, the parties enlisted the help of two mediators to attempt to overcome the parties' disputes. (ROA 1301, 1361, 1544); *see Jones v. Singing River Health Servs. Found.*, 865 F.3d 285, 295 (5th Cir. 2017) ("[T]he district court relied heavily on the fact that a well-recognized neutral mediator oversaw settlement negotiations of the federal cases to ensure they were conducted at arms' length."); *Dallas v. Alcatel-Lucent USA, Inc.*, No. 09-CV-14596, 2013 WL 2197624, at *8 (E.D. Mich. May 20, 2013) ("The [parties] used the services of a federal judge as a neutral mediator, and . . . the parties engaged in extensive investigation and discovery so that [experienced] counsel . . . could assess the strengths and weaknesses of the claims and defenses, and to weigh the benefits and costs of settlement as opposed to those inherent in continued litigation.").

The bankruptcy court did not err by preliminarily finding the settlement terms fair, reasonable, and adequate based on the current record.

## IV. Conclusion

The objector-appellants may reassert their objections at the final fairness hearing. The findings and conclusions of the bankruptcy court are affirmed. This appeal is dismissed.

SIGNED on June 3, 2021, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge