United States District Court
Southern District of Texas
**ENTERED**
October 13, 2021
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| | § | |
| | § | |
| IN RE: CHESAPEAKE ENERGY | § | |
| CORPORATION | § | CIVIL ACTION NO. H-21-1215 |
| | § | |
| | § | |
| | § | |

**AMENDED MEMORANDUM OPINION AND ORDER**

On August 23, 2021, this court issued a memorandum opinion and order in this case. (Docket Entry No. 69).  The court withdraws that memorandum opinion to correct clerical errors, none of which change the court's underlying analysis.  This amended memorandum opinion and order supersedes the memorandum and order issued on August 23, 2021.

Oil-and-gas leaseholders in Pennsylvania, the bankruptcy claimants, filed three class-action lawsuits in the Middle District of Pennsylvania against Chesapeake Energy Corp. for improperly calculating royalties owed under their leases. The Pennsylvania Attorney General also sued Chesapeake for improperly calculating royalties. The Pennsylvania lawsuits had proceeded for nearly seven years when Chesapeake filed for bankruptcy in the Southern District of Texas in June 2020.

After roughly nine months in the bankruptcy court and mediation, the leaseholders, the Pennsylvania Attorney General, and Chesapeake reached three proposed settlements.  In February 2021, Chesapeake reached a preliminary settlement with the Pennsylvania Attorney General.  That settlement is not before the court.  The parties asked the bankruptcy court for preliminary certification of the two other settlement classes and preliminary approval of the settlement terms. The bankruptcy court denied objections, the objectors appealed, and this court affirmed the

bankruptcy court, holding that the two settlement classes should be preliminarily certified and the settlements approved.

The leaseholders and Chesapeake have moved to have the two settlement classes certified and the class settlements finally approved. (Docket Entry Nos. 41, 42, 43, 44, 45, 47). Counsel for both classes have also moved for approval of attorneys' fees, costs and expenses, and incentive awards for the named plaintiffs in one of the classes. (Docket Entry Nos. 43, 44, 45). Along with the proposed settlements, the settling parties submitted affidavits from counsel for the proposed classes and valuations of the proposed settlements. The objectors challenge the motions for final approval. (Docket Entry Nos. 50, 53).

While the immediate cash relief is lower than in the two settlements that were proposed in the Middle District of Pennsylvania—which preliminarily approved the settlement for leaseholders with market-enhancement clauses—the record shows that it is appropriate to finally certify the two proposed classes and approve the proposed class settlements. The majority of the leaseholders did not file proofs of claims in the bankruptcy court and will effectively be unable to recover without the settlements. Class counsel, Chesapeake's counsel, the named plaintiffs, and the Pennsylvania Attorney General approve both settlements. The litigation proceeded for nearly seven years before the bankruptcy. The settlements were reached after arm's-length negotiations and mediation. Finally, Chesapeake's bankruptcy likely eliminated the possibility of a larger immediate recovery for the class members. The record shows that the injunctive relief guaranteed by the settlements will provide immediate and long-lasting benefits to the Pennsylvania leaseholders, benefits that the lawsuits sought in the first place.

Based on the record, the briefing, and the arguments of counsel presented at the final fairness hearing, the motions for certification of the two settlement classes, final approval of the

proposed class settlement agreements, and for an award of attorneys' fees, costs and expenses, and incentive awards, (Docket Entry Nos. 41, 42, 43, 44, 45, 47), are granted.  The objections are overruled.  The reasons for these rulings are set out below.

## I.      Background

In late 2013 and early 2014, Pennsylvania oil-and-gas leaseholders filed three lawsuits in the Middle District of Pennsylvania against Chesapeake, alleging that it underpaid royalties due to the leaseholders under each lease.  (Docket Entry No. 8 at 1264).  In the first lawsuit, *Demchak v. Chesapeake*, the plaintiffs alleged that Chesapeake improperly deducted postproduction costs in calculating the royalties due.  (*Demchak Partners Ltd., et al., v. Chesapeake Appalachia, LLC*, No. 13-2289 (M.D. Pa. 2013)).   The plaintiffs in the *Demchak* class have leases with market-enhancement clauses, which preclude Chesapeake from "deducting [postproduction costs] incurred to transform leasehold gas into marketable form," but allow Chesapeake to "deduct a pro-rata share of [postproduction costs] incurred after the gas is marketable if they enhance the value of the marketable gas."  (Docket Entry No. 8 at 1288; *see also id.* 1543).  Postproduction costs are the costs of "gathering, compressing, treating, dehydrating, processing, transporting, or transmitting" gas.  (Docket Entry No. 8 at 1289).  The *Demchak* plaintiffs alleged that Chesapeake improperly deducted postproduction costs for "gathering," dehydrating, and compressing gas to meet "the quality and pressure specifications of the interstate pipeline into which it is delivered." (*Demchak Partners Ltd.*, No. 13-2289, Docket Entry No. 1 at ¶ 23).

At the same time the case was filed, Chesapeake and the *Demchak* plaintiffs entered into a classwide settlement agreement, which the Pennsylvania federal district court preliminarily approved in 2015.  (Docket Entry No. 8 at 1264).  The agreement secured over $17,000,000 for the class members.  (*Demchak Partners Ltd.*, No. 13-2289, Docket Entry No. 91).  Before reaching

the initial class settlement agreement, counsel for the *Demchak* plaintiffs investigated potential claims for royalty underpayments, interviewed Chesapeake's accounting employees, and reviewed production documents and royalty data.  (Docket Entry No. 46 at ¶ 7–10).  The settlement was awaiting final approval when Chesapeake declared bankruptcy.

In the second and third lawsuits, *Brown v. Access Midstream Partners, LP* and *Suessenbach v. Access Midstream Partners, LP*, the plaintiffs alleged that Chesapeake underpaid royalties by improperly inflating the postproduction costs it deducted from royalty payments, in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)–(d). (*See Brown v. Access Midstream Partners, LP*, No. 14-00591 (M.D. Pa. 2014); *Suessenbach v. Access Midstream Partners, LP*, No. 14-01197 (M.D. Pa. 2014)).  The leases involved in the *Brown* and *Suessenbach* cases do not have market-enhancement clauses.  Chesapeake and the *Brown* and *Suessenbach* plaintiffs settled in August 2018 in Pennsylvania.  (Docket Entry No. 8 at 1264).  The settlement was awaiting preliminary court approval when the bankruptcy filing intervened.  (Docket Entry No. 8 at 1264).

The Pennsylvania Attorney General sued Chesapeake in May 2016 for allegedly violating Pennsylvania antitrust law and the Pennsylvania Unfair Trade Practices and Consumer Protection Law by inflating midstream prices, improperly deducting postproduction costs from royalty payments, engaging in unfair leasing practices, and restraining trade.  (Docket Entry No. 8 at 1286).  An appeal before the Pennsylvania Supreme Court was pending when Chesapeake declared bankruptcy.  (*Commonwealth v. Chesapeake Energy Corp., et al.*, No. 81-MAP-2019 (Pa. 2020); *see also Commonwealth v. Chesapeake Energy Corp.*, 247 A.3d 934 (Pa. 2021)).

In June 2020, Chesapeake filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code in the Southern District of Texas.  (Docket Entry No. 8 at 13, 1266).  The

automatic stay halted the *Demchak*, *Brown*, *Suessenbach*, and Pennsylvania Attorney General lawsuits.  (Docket Entry No. 8 at 1425).  The Pennsylvania Attorney General filed a proof of claim before the bankruptcy court in the Southern District of Texas, as did 161 individual leaseholders.  (Docket Entry No. 8 at 1266).  In January 2021, the bankruptcy court confirmed Chesapeake's plan of reorganization.  (Docket Entry No. 8 at 1266–67).

On February 9, 2021, Chesapeake reached a preliminary settlement with the Pennsylvania Attorney General.  The terms of that settlement are as follows:

- Pennsylvania oil-and-gas leaseholders may choose whether to have their royalties calculated based on the in-basin index price or the netback price.  The in-basin index price is the average of two oil-and-gas price indexes, without deducting postproduction costs.  The netback price is the average sales price Chesapeake receives for its "production month sales to third parties minus a proportionate share" of postproduction costs.  (Docket Entry No. 8 at 1268).

- Chesapeake will pay Pennsylvania $5,300,000, which the state will distribute to Pennsylvania leaseholders.[1]  (Docket Entry No. 8 at 1268).

A month later, Chesapeake reached a preliminary settlement with the *Demchak*, *Brown*, and *Suessenbach* plaintiffs.  The *Demchak* plaintiffs entered what is identified as the MEC settlement, and the *Brown-Suessenbach* plaintiffs entered into the Non-MEC settlement.  These settlements were negotiated jointly and "resolve all royalty-related litigation and disputes in Pennsylvania."  (Docket Entry No. 8 at 1267).  The settlement terms that bear most on the issues here are summarized below.

---

[1] The Pennsylvania Attorney General Settlement is not before the court.

**The MEC Settlement**

- Chesapeake will pay $5,000,000 to the class members.  (Docket Entry No. 8 at 1269).

- The class members may choose each month whether to have their royalties calculated based on the higher of the in-basin index or netback price.  (Docket Entry No. 8 at 1269).

**The Non-MEC Settlement**

- Chesapeake will pay $1,250,000 to the class members.  (Docket Entry No. 8 at 1270).

- The class members may choose how to have their royalties calculated going forward, using either the in-basin index or netback price.  But they can only make their election once, not each month.  (Docket Entry No. 8 at 1547).

Together, the two settlements make roughly $6.25 million available for Pennsylvania leaseholders with underpaid-royalty claims.  (Docket Entry No. 8 at 1546).  The settlements also allow the Pennsylvania leaseholders to choose between "the higher of a calculated [in-basin] price or the netback" price.  (Docket Entry No. 8 at 1547).  The MEC plaintiffs may choose the higher valuation each month, while the Non-MEC plaintiffs may choose their valuation method once. (Docket Entry No. 8 at 1547–48).  All three settlements offer opt-out rights.

These settlement terms differ from the terms reached in Chesapeake's prebankruptcy proposed settlements with the *Demchak* and *Brown-Suessenbach* classes.  In the prebankruptcy *Demchak* proposed settlement, the plaintiffs were to receive roughly $17,000,000, but without the right to choose monthly whether to have their royalties calculated based on the higher of the in-basin index or netback price.  (*In re Chesapeake Energy Corp.*, No. 20-33233, Docket Entry No. 3365-1).  The prebankruptcy *Brown-Suessenbach* proposed settlement would have given the plaintiffs $7,750,000 and the option of having their royalties calculated based on either the in-basin index or netback price.  (*Brown*, No. 14-00591, Docket Entry No. 185 at 6).

6

The bankruptcy court certified the MEC and Non-MEC settlement classes and preliminarily approved the settlements. (Docket Entry No. 8 at 1587–93). The court preliminarily found that the settlement classes and settlement terms satisfied the Rule 23 requirements, were negotiated at arm's-length, and were fair, reasonable, adequate, and equitable. (*Id.*). Fifty-eight leaseholders, some in the MEC class and some in the Non-MEC class, objected. (Docket Entry No. 8 at 1591). The bankruptcy court found no basis in the objections to deny the certification and preliminary approval of the proposed settlement classes. (Docket Entry No. 8 at 1591–92). The court also found that it was "inherently unfair for 58 [leaseholders] to hold up tens of thousands" of other leaseholders. (*Id.*).

The objectors appealed the bankruptcy court's preliminary approval. (Docket Entry No. 1). This court affirmed the bankruptcy court's ruling and preliminarily certified the MEC and Non-MEC classes and approved the class settlements. (Docket Entry No. 37). The MEC and Non-MEC plaintiffs have moved to have the classes finally certified and the class settlements finally approved. (Docket Entry Nos. 41, 42, 43, 44, 45). Counsel for both classes have also moved for approval of attorneys' fees, costs and expenses, and incentive awards for the named plaintiffs in one of the classes. (Docket Entry Nos. 43, 44, 45). Two objectors challenge the motions for final approval. (Docket Entry Nos. 50, 53). On July 27, 2021, this court held a final fairness hearing and heard from counsel for the MEC and Non-MEC classes, Chesapeake, and the objectors. The rulings and reasons for them are set out below.

## II.     The Legal Standards

### A.     Class Certification

Class certification requires a "rigorous analysis of [the] Rule 23 prerequisites." *Madison v. Chalmette Ref., LLC*, 637 F.3d 551, 554 (5th Cir. 2011) (quotation marks omitted). Any proposed class must meet four requirements:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a). These requirements "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (citation and quotation marks omitted).

If a class has not been certified before settlement, courts apply the Rule 23(a) class-certification factors with heightened scrutiny. *See In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011) ("When a court is asked to certify a class and approve its settlement in one proceeding, the Rule 23(a) requirements designed to protect absent class members 'demand undiluted, even heightened, attention.'" (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)); *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 424 F. Supp. 3d 456, 484 (E.D. La. 2020) ("[T]he Court must 'make a preliminary determination that the proposed class satisfies the criteria set out in Rule 23(a) and at least one of the subsections of Rule 23(b).'" (quoting Fed. Judicial Ctr., *Manual for Complex Litigation* § 21.632 (3d ed. 1997))). While a court need not determine if a class proposed for settlement would be manageable for trial, the court must "be particularly mindful of the other requirements in the rule because of the potential dangers to the absentees' interests that were presented when settlement classes are involved." 7B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1797.2 (3d ed. 2021); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1051 (S.D. Tex. 2012) ("A district court may not 'substitut[e] the fairness inquiry of Rule 23(e) for the

8

certification requirements of Rule 23(a) and (b).'" (quoting *Thomas v. Albright*, 139 F.3d 227, 235 (D.C. Cir. 1998))).

### B.     Approval of Settlement Class Terms

Under Rule 23(e), a class action "may be settled, voluntarily dismissed, or compromised only with the court's approval." FED. R. CIV. P. 23(e).  Rule 23(e) requires notice to the proposed class members before the court can finally approve a class settlement.  To send notice, the parties must show "that the court will likely be able to . . . approve the proposal under Rule 23(e)(2)" and "certify the class for purposes of judgment on the proposal."  FED. R. CIV. P. 23(e)(1)(B).

Before 2018, the Fifth Circuit required district courts considering whether a class settlement was fair, reasonable, and adequate under Rule 23(e)(2) to apply the following six *Reed* factors: (1) the existence of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings; (4) the plaintiffs' probability of success; (5) the range of possible recovery; and (6) the opinions of class counsel, class representatives, and absent class members. *See Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983).

Rule 23(e)(2) was amended in 2018 to provide "uniform guidance" to courts evaluating class settlements.  Amended Rule 23(e)(2) states that a "court may approve [a settlement] only after a hearing and only on finding that it is fair, reasonable, and adequate after considering" whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

>    (i)    the costs, risks, and delay of trial and appeal;

>    (ii)   the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii)  the terms of any proposed award of attorney's fees, including timing of payment; and

(iv)  any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

FED. R. CIV. P. 23(e)(2).  The Advisory Committee notes to the 2018 amendments indicate that the changes to the rule are meant to "focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal," rather than "displace any factor" sanctioned by the circuit courts.  But because the Rule 23 and *Reed* factors overlap, "courts in this circuit often combine them in analyzing class settlements."  *ODonnell v. Harris Cty., Texas*, No. 16-CV-1414, 2019 WL 6219933, at *9 (S.D. Tex. Nov. 21, 2019); *see also In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 424 F. Supp. 3d 456, 485 (E.D. La. 2020) ("[T]he Court will consider the Rule 23 requirements as informed by the *Reed* factors.").

## III.  Analysis

### A.    Subject-Matter Jurisdiction

The objectors argue that the court lacks subject-matter jurisdiction over these settlement agreements because they were entered after the bankruptcy court confirmed the debtors' reorganization plan.

A bankruptcy court's subject-matter jurisdiction stems from 28 U.S.C. § 1334, which gives federal district courts jurisdiction over (1) "cases under title 11," (2) "proceedings arising under title 11," (3) proceedings "arising in" a case under title 11, and (4) proceedings "related to" a case under title 11.  *In re U.S. Brass Corp.*, 301 F.3d 296, 303 (5th Cir. 2002).  The broadest form of jurisdiction is "related to" jurisdiction.  *Id.*  District courts may refer, and a bankruptcy court may "hear and determine," "all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section."  28 U.S.C. § 157(b)(1).

Noncore proceedings that are "otherwise related to a case under title 11" may be heard by a bankruptcy judge, but any final order or judgment must be entered by the district court. *Id.* at § 157(c)(1).

The issue is whether the final fairness hearing is "related to" the debtors' bankruptcy. *In re U.S. Brass*, 301 F.3d at 304. After a debtor's reorganization plan is approved, a court's related-to jurisdiction shrinks: bankruptcy jurisdiction "ceases to exist, other than for matters pertaining to the implementation or execution of the plan." *Id.* (quoting *In re Craig's Stores of Tex., Inc.*, 266 F.3d 388, 390–91 (5th Cir. 2001)). Courts analyze several factors when determining whether a court retains postconfirmation subject-matter jurisdiction over a dispute: "(1) when the claim at issue arose; (2) what provisions in the confirmed plan exist for resolving disputes and whether there are provisions in the plan retaining jurisdiction for trying these suits; (3) whether the plan has been substantially consummated; (4) the nature of the parties involved; (5) whether state law or bankruptcy law applies; and (6) indices of forum shopping." *In re Encompass Servs. Corp.*, 337 B.R. 864, 873 (Bankr. S.D. Tex. 2006).

For example, in *U.S. Brass*, the Fifth Circuit affirmed the bankruptcy court's exercise of subject-matter jurisdiction when: (1) the plan had not been fully consummated; (2) there was a dispute over whether the relief requested was consistent with the plan and bankruptcy law would ultimately determine the dispute; (3) the outcome of the dispute could affect the parties' postconfirmation rights and responsibilities; and (4) the proceeding would impact compliance with, or completion of, the plan. 301 F.3d at 304–05.

Similarly, in *In re Senior Care Centers, LLC*, 622 B.R. 680, 689 (Bankr. N.D. Tex. 2020), the bankruptcy court exercised jurisdiction when: (1) the plan was not "fully consummated"; (2) the creditors had "not yet received distributions on their claims"; (3) the "outstanding obligation

that must be resolved prior to full consummation of the Plan was at the heart of [the] dispute"; and (4) the reorganization plan contained a retention-of-jurisdiction clause.

Here, several factors support subject-matter jurisdiction. The Pennsylvania oil-and-gas litigation arose seven years before Chesapeake declared bankruptcy. The debtors' confirmation plan is not fully consummated. The debtor, not a third party, is the defendant in the litigation. The parties have moved for final approval of their settlement agreements in the bankruptcy court. Finally, the settlements will affect the debtors' postconfirmation rights and responsibilities under each oil-and-gas lease. The confirmation order here makes clear that the bankruptcy court retained "exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan," including jurisdiction to:

- "adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date";

- "issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan"; and

- "enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with the Plan."

(Docket Entry No. 8 at 1248–49).

12

The court has subject-matter jurisdiction to address the MEC and Non-MEC settlement agreements.[2]

## B.     The Named MEC and Non-MEC Plaintiffs' Standing

The objectors argue that the named plaintiffs lack standing because they did not file proofs of claim for their breach-of-contract claims and claims under the Racketeer Influenced and Corrupt Organizations Act.  This standing argument appears to be based on mootness.  Standing is assessed when a complaint is filed.  *See Davis v. FEC*, 554 U.S. 724, 734 (2008).  Several courts have rejected similar mootness arguments. *See In re Brotman Med. Ctr., Inc.*, No. 08-BAP-1056, 2008 WL 8444797, at *4 (B.A.P. 9th Cir. Aug. 15, 2008) (failure to file a timely proof of claim does not moot an underlying cause of action); *see also In re Martin*, 617 B.R. 866, 877 (Bankr. S.D. Miss. 2020) ("[The creditor's] withdrawal of the proof of claim does not make the . . . count moot."); *In re Robinson*, 554 B.R. 800, 808 (Bankr. W.D. La. 2016) ("This Court holds that the claims . . . are not rendered moot by the withdrawal of the [proof of] claim.").  A proof of claim withdrawn or not presented before the bankruptcy court by the named plaintiffs does not make their claims moot or deprive them of standing.  (*In re Chesapeake Energy Corp.*, No. 20-33233, Docket Entry No. 2833 at 46).

## C.     The Rule 23(a) Factors

Any proposed class must meet four requirements:

(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

---

[2] Relatedly, the objectors argue that the court should abstain from deciding state-law issues and transfer the settlement to the Middle District of Pennsylvania.  The court has "broad discretion" under the permissive discretion doctrine to hear state law claims in Chapter 11 cases over which the court has subject-matter jurisdiction. *See Matter of Gober*, 100 F.3d 1195, 1206 (5th Cir. 1996).  There is no reason to abstain from hearing this case.

FED. R. CIV. P. 23(a).   These requirements "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims."   *Dukes*, 564 U.S. at 349 (citation and quotation marks omitted).

### 1.      Numerosity

The MEC class contains 8,925 leaseholders, and the Non-MEC class contains 14,060 class members.  (Docket Entry No. 58-1 at 3).  Numerosity is not challenged.

### 2.      Commonality

Commonality requires the class members' claims to "depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart Stores*, 564 U.S. at 350.  Commonality may "relate to the injurious effects experienced by the class members" and "the defendant's injurious conduct."  *In re Deepwater Horizon*, 739 F.3d 790, 811 (5th Cir. 2014); *Sullivan*, 667 F.3d at 297 (commonality "is informed by the defendant's conduct as to all class members and any resulting injuries common to all class members").

Both classes present common factual and legal questions related to Chesapeake's conduct and the effect it had on Chesapeake's royalty payment methodology.  The MEC named plaintiffs and putative class members were subject to the same "alleged[ly] improper royalty payment practices" under a common market-enhancement clause.  (*In re Chesapeake Energy Corp.*, No. 20-33233, Docket Entry No. 3365-1 at 9−10).  Each MEC class member's lease includes an identical market-enhancement clause that precludes Chesapeake from deducting postproduction costs, including the cost of "producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing" withdrawn oil and gas.  (*Demchak Partners Ltd.*, No. 13-2289, Docket Entry Nos. 1-1, 1-2, 1-3, 1-4, 1-5, 1-6, 1-7, 1-8, 1-9, 1-10).  The legal

14

and "factual issues common to all" class members include whether Chesapeake deducted these postproduction costs and, if so, whether those deductions were proper under the MEC class members' market-enhancement clauses.[3] (*In re Chesapeake Energy Corp.*, No. 20-33233, Docket Entry No. 3365-1 at 9−10).

The Non-MEC putative class members were also subject to a common, allegedly improper royalty payment scheme. The Non-MEC putative class members had leases that permitted Chesapeake to deduct postproduction costs. (*Brown*, No. 14-00591, Docket Entry Nos. 57-1, 57-2; *Suessenbach*, No. 14-1197, Docket Entry Nos. 1-6, 1-7, 1-8). The Non-MEC class members allege that Chesapeake artificially inflated postproduction costs after entering into a collusive agreement with Access Midstream to pay supracompetitive prices for "gas gathering and transportation services" and deducting the increased costs from royalties paid to the Non-MEC class members. (*Brown*, No. 14-00591, Docket Entry No. 57 at ¶¶ 52–53; *Suessenbach*, No. 14-1197, Docket Entry No. 1 at ¶ 46). The legal and factual questions common to the Non-MEC class members include whether Chesapeake artificially inflated postproduction costs through a collusive arrangement with Access Midstream and, if so, whether the artificially inflated costs were deducted from the Non-MEC class members' royalties, in violation the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)–(d). (*Id.*). Commonality is shown.

### 3.    Typicality

Typicality addresses "'whether the class representative's claims have the same essential characteristics of those of the putative class.'" *Ward v. Hellerstedt*, 753 F. App'x 236, 247 (5th Cir. 2018) (quoting *Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002)). Typicality does

---

[3] The Middle District of Pennsylvania court made similar commonality findings. (*In re Chesapeake Energy Corp.*, No. 20-33233, Docket Entry No. 3365-1 at 9−10).

15

not require "a complete identity of claims." *Stirman*, 280 F.3d at 562 (quotation marks and citation omitted); *see also* FED. R. CIV. P. 23(a)(3). Typicality is not as concerned with "strengths of the named and unnamed plaintiffs' cases" as with the "similarity of legal and remedial theories behind their claims." *Ibe v. Jones*, 836 F.3d 516, 528–29 (5th Cir. 2016) (internal quotation marks and citation omitted). Factual differences will not defeat typicality if the named plaintiffs and putative class members have claims that "arise from a similar course of conduct and share the same legal theory." *Stirman*, 280 F.3d at 562 (internal quotation marks and citations omitted). A named plaintiff who can show commonality can usually show typicality. *See Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982) ("The commonality and typicality requirements of Rule 23(a) tend to merge."); *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 768 (5th Cir. 2020) ("[I]f there is no common issue uniting the putative class, [the named plaintiff's] claim can't be typical of the claims or defenses of the class." (citation and quotation marks omitted).

The named MEC plaintiffs' claims are typical of the MEC class members' claims. They involve the same alleged royalty underpayment scheme, similar market-enhancement clauses, and similar breach-of-contract theories. Each MEC class member's lease included a market-enhancement clause that precluded Chesapeake from deducting postproduction costs, including the cost of "producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing" withdrawn oil and gas. (*Demchak Partners Ltd.*, No. 13-2289, Docket Entry Nos. 1-1, 1-2, 1-3, 1-4, 1-5, 1-6, 1-7, 1-8, 1-9, 1-10). The named plaintiffs allege that Chesapeake deducted the postproduction costs, causing it to underpay royalties to the MEC class members. *See Cleven v. Mid-Am. Apartment Communities, Inc.*, 328 F.R.D. 452, 471 (W.D. Tex. 2018) ("Plaintiffs' claims and those of the putative class members arise from common conduct: a uniform late-fee scheme was in effect for their leases and they were automatically

charged by Defendants' property management system according to that scheme when their rent was not timely paid."); *Altier v. Worley Catastrophe Response, LLC*, No. 11-CV-241, 2011 WL 3205229, at *8 (E.D. La. July 26, 2011) (the named plaintiffs' claims were "typical of the claims of all class members because they [were] based factually on the same underlying contract and legally on the same theory of breach of contract.").

The objectors argue that there are differences among the MEC named plaintiffs' leases that make them atypical of the other class members' leases. The objectors identify 26 leases negotiated by the Wyoming County Landowners Group that differ from other class members' leases. (Docket Entry No. 8 at 1423). But before the Middle District of Pennsylvania, the objectors argued that each Wyoming County lease contains a market-enhancement clause that "mirrors one of the example" market-enhancement clauses "in the class notice." (*Demchak Partners Ltd.*, No. 13-2289, Docket Entry No. 120 at 11).

The record confirms that the Wyoming County leases have market-enhancement clauses that do not differ materially from the clauses in the named MEC plaintiffs' leases. *See In re Heartland*, 851 F. Supp. 2d at 1055 ("Despite possible state-by-state variations in the elements of these claims, they arise from a single course of conduct by [the defendant] and a single set of legal theories."). The Wyoming County leases preclude Chesapeake from deducting "any expense required to make gas marketable," including "expenses of production, gathering, dehydration, compression, manufacturing, processing, treating, transporting or marketing" the withdrawn oil and gas. (Docket Entry No. 8 at 1510). The named MEC plaintiffs' market-enhancement clauses also preclude Chesapeake from deducting the cost of "producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing" withdrawn oil and gas. (*Demchak Partners Ltd.*, No. 13-2289, Docket Entry Nos. 1-1, 1-2, 1-3, 1-4, 1-5, 1-6, 1-7, 1-

17

8, 1-9, 1-10; Docket Entry No. 8 at 1288).  Chesapeake allegedly deducted postproduction costs, in violation of the MEC and Wyoming County market-enhancement clauses.  The central disputes under both sets of leases are when the withdrawn gas became marketable and whether Chesapeake could deduct the costs incurred to gather, dehydrate, and compress the gas so that it met "the quality and pressure specifications of the interstate pipeline into which it is delivered." (*Demchak Partners Ltd.*, No. 13-2289, Docket Entry No. 1 at ¶ 23).  Both sets of leaseholders allege a "similar course of conduct" and the "same [breach-of-contract] legal theory."  *Stirman*, 280 F.3d at 562.

The Non-MEC named plaintiffs also have claims that are typical of the Non-MEC class members.  The Non-MEC named plaintiffs allege that Chesapeake engaged in a scheme to artificially inflate postproduction costs by agreeing to pay Access Midstream supracompetitive prices for "gas gathering and transportation services" and deducting the increased costs from royalties owed to the Non-MEC class members.  (*Brown*, No. 14-00591, Docket Entry No. 57 at ¶¶ 52–53; *Suessenbach*, No. 14-1197, Docket Entry No. 1 at ¶¶ 53–58).  Typicality is shown.

### 4.    Adequacy of Representation

Adequacy of representation turns on three factors: "(1) the zeal and competence of the representatives' counsel; (2) the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of absentees; and (3) the risk of conflicts of interest between the named plaintiffs and the class they seek to represent."  *Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 412 (5th Cir. 2017) (quoting *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 130 (5th Cir. 2005)) (quotation marks and citation omitted).  Courts "must be especially vigilant to ensure that the due process rights of all class members are safeguarded through adequate representation at all times."  *Berger*, 257 F.3d at 480 (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985)).  Thus, to satisfy the adequacy of representation requirement, "the class representatives [must] possess a sufficient level of knowledge and understanding to be capable of

18

'controlling' or 'prosecuting' the litigation." *Ibe*, 836 F.3d at 529 (quoting *Berger*, 257 F.3d at 482–83) (quotation marks omitted).

**a.**      **The Zeal and Competence of Class Counsel**

Counsel for both classes are experienced in class actions and oil-and-gas disputes. (Docket Entry No. 41-1; Docket Entry No. 46 at ¶¶ 4–6). The MEC class counsel have zealously pursued this litigation for nearly eight years, in both the Middle District of Pennsylvania and in the Southern District of Texas bankruptcy and district courts. (Docket Entry No. 41-1 at ¶¶ 4–6; Docket Entry No. 46 at ¶¶ 7–27). Counsel for the MEC class investigated potential claims for royalty underpayments for a year before filing their complaint. Before filing their lawsuit, Chesapeake allowed MEC class counsel to interview Chesapeake's accounting employees and review production documents and royalty data. MEC class counsel and Chesapeake then hired Judge Edward N. Cahn, a retired federal judge, to mediate the MEC claims, which resulted in a preliminary settlement agreement. (*See Demchak*, 13-02289, Docket Entry No. 3-6). MEC class counsel filed their lawsuit and the proposed settlement agreement in the Middle District of Pennsylvania.

After filing the proposed settlement agreement, another group of Pennsylvania lessors, the Burketts, initiated a putative class arbitration against Chesapeake, moved to intervene in the Middle District of Pennsylvania, and moved to consolidate the MEC class claims with the claims in the pending arbitration. (*See Demchak*, No. 13-02289, Docket Entry Nos. 25, 40). Chesapeake, MEC class counsel, and the Burketts then mediated for three days under Judge Cahn and Richard Schiffrin, an attorney who had previously represented the Pennsylvania leaseholders. The parties reached a new settlement with amended terms, and the Burketts joined the settlement. The Middle District of Pennsylvania preliminarily approved the new settlement.

19

At the end of the opt-out and objection period, the Pennsylvania Attorney General objected to the settlement. The Pennsylvania Attorney General then sued Chesapeake for allegedly inflating midstream prices, improperly deducting them from royalty payments, and engaging in unfair leasing practices. (Docket Entry No. 8 at 1286). An appeal before the Pennsylvania Supreme Court was pending when Chesapeake declared bankruptcy. (*Commonwealth v. Chesapeake Energy Corp., et al.*, No. 81-MAP-2019 (Pa. 2020); *see also Commonwealth v. Chesapeake Energy Corp.*, 247 A.3d 934 (Pa. 2021)). After further negotiations in the bankruptcy court, MEC class counsel, Chesapeake, the Burketts, and the Pennsylvania Attorney General reached the settlement proposed here.

Non-MEC class counsel have been litigating for the last seven years, in the Middle District of Pennsylvania and the Southern District of Texas bankruptcy, and now district, courts. Before Chesapeake declared bankruptcy and before reaching a settlement agreement, the Non-MEC class counsel survived a motion to dismiss, conducted extensive discovery, and hired experts to help them understand the strengths and weaknesses of their claims. (Docket Entry No. 42-1 at ¶ 2). The parties mediated with Judge Cahn and John Perry, an oil-and-gas mediator, and reached a proposed settlement, which was also put on hold when the Pennsylvania Attorney General sued Chesapeake and objected to the MEC settlement. (*Id.* at ¶ 9). The parties continued mediating with Judge Cahn and Mr. Perry until they reached a final agreement, which was filed in 2018. (*Id.*). After Chesapeake filed for bankruptcy, Non-MEC class counsel negotiated a new settlement with a reduced cash payment but substantially similar injunctive relief. (*Id.* at ¶ 10). The Pennsylvania Attorney General approved the Non-MEC settlement before the court. (*Id.*).

MEC and Non-MEC class counsel have recovered significant benefits for the class members, despite the lengthy, complex litigation in multiple courts against a bankrupt defendant. The objectors do not challenge the zeal and competence of the class counsel.

### b.    The Named Plaintiffs' Role in the Litigation

MEC class counsel did not provide evidence of the named plaintiffs' specific roles in the litigation, but the record shows that the named plaintiffs approved and signed the settlement agreement.  Class counsel stated at oral argument that the named plaintiffs approved the settlement.

The Non-MEC named plaintiffs were involved in the litigation.  The named plaintiffs reviewed important pleadings and filings, and class counsel informed the named plaintiffs about mediation and settlement efforts.  (Docket Entry No. 41 at 26).  The Non-MEC named plaintiffs also provided information and input in drafting the complaint, participated in discovery, and communicated with Non-MEC class counsel throughout the more than seven-year litigation. (Docket Entry No. 44 at 23).  The named plaintiffs approved and signed the settlement agreement. (*Id.*).

### c.    Conflicts of Interest

The record does not reveal conflicts of interest between the named plaintiffs and the unnamed class members in the MEC or Non-MEC class.  Each MEC class member's lease included the same market-enhancement clause, precluding Chesapeake from deducting postproduction costs.  (*Demchak Partners Ltd.*, No. 13-2289, Docket Entry Nos. 1-1, 1-2, 1-3, 1-4, 1-5, 1-6, 1-7, 1-8, 1-9, 1-10).   The named plaintiffs allege that Chesapeake deducted postproduction costs, causing it to underpay royalties to the MEC class members.

Also as noted above, the Non-MEC putative class members had similar leases that permitted Chesapeake to deduct postproduction costs.  (*Brown*, No. 14-00591, Docket Entry Nos.

57-1, 57-2; *Suessenbach*, No. 14-1197, Docket Entry Nos. 1-6, 1-7, 1-8).  The Non-MEC class members allege that Chesapeake artificially inflated postproduction costs through a collusive agreement with Access Midstream to pay supracompetitive prices for "gas gathering and transportation services," and then deducted the increased costs from royalties owed to the Non-MEC class members.  (*Brown*, No. 14-00591, Docket Entry No. 57 at ¶¶ 52–53; *Suessenbach*, No. 14-1197, Docket Entry No. 1 at ¶ 46).

The objectors argue that the MEC and Non-MEC named plaintiffs are inadequate representatives because they did not file proofs of claims with the bankruptcy court, while some class members did.  The court rejected this argument when it affirmed the bankruptcy court's preliminary approval of the MEC and Non-MEC settlement classes.  (Docket Entry No. 37).  The argument is reviewed, and examined de novo, here.

While some courts have held that differences in bargaining position may raise questions about whether the named plaintiffs are adequate representatives, *see In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 490 (N.D. Cal. 2008) ("The wholesale purchasers therefore came to the negotiating table in a fundamentally different position than the representative [individual consumer] plaintiffs."), the record does not show that filing a proof of claim substantially improves an individual class member's bargaining position.  Even if a proof of claim did improve some class members' bargaining position, the record does not show that "some difference in bargaining power would create antagonism between the class representatives and the class."  *Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co., Ltd.*, No. 09- CV-0852, 2016 WL 3579953, at *3 (E.D. Wis. June 24, 2016).  The incentives of the named plaintiffs and those who filed proofs of claim are aligned, not antagonistic.  *See Morrow v. Washington*, 277 F.R.D. 172, 196 (E.D. Tex. 2011) ("[A]ny differences in the specific factual circumstances giving rise to the

22

claims of the proposed class representatives and the members of the class do not affect the alignment of the class representatives' interests with the interest of the class.").

The MEC and Non-MEC classes together have roughly 22,985 members, but only 161 filed proofs of claims.[4] (Docket Entry No. 8 at 1266). The class members who filed proofs of claims are the outliers and exceptions. *See Fond Du Lac Bumper Exch.*, 2016 WL 3579953, at *3 (finding no conflicts of interest when the "class representatives' claims were [not] atypical of a large portion of the putative class," even though some class members "had substantially more bargaining power than other class members"); *Kramer v. Am. Bank & Tr. Co., N.A.*, No. 11-CV-8758, 2017 WL 1196965, at *5 (N.D. Ill. Mar. 31, 2017) ("Proceeding on a class-wide basis is also appropriate because, except for a few outliers, most class members do not have a sufficient stake in their fraud claims to go it alone."). Those who filed proofs of claims are also protected by their opt-out rights. *See McKibben v. McMahon*, No. 14-CV-2171, 2019 WL 1109683, at *4 (C.D. Cal. Feb. 28, 2019) (approving a class settlement with a "recovery ceiling" "to ensure that outliers who have outsized claims do not distort the meaningfulness of the recovery to the remaining class members" because "[s]uch outliers would be entitled to opt out and pursue their own claims if they so chose.").

As this court previously noted, the primary difference between the prebankruptcy and postbankruptcy settlements is that the postbankruptcy settlements are in the bankruptcy forum. The difference in forum does not convert the named plaintiffs into inadequate representatives. *See In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464, 504 (W.D. Pa. 2019) ("There may be factual differences among the various kinds of [plaintiffs] in the putative class, but, at this

---

[4] The record shows some difficulty determining the exact number of leaseholders because leaseholders "can hold multiple leases . . . in different names." (Docket Entry No. 58-1 at 3).

stage, the court cannot conclude that those differences create a conflict of interest between the named plaintiffs and the members of the putative class that render the claims of the named plaintiffs atypical compared to the claims of the putative class."); *City of San Antonio v. Hotels.com*, No. 06-CV-381, 2008 WL 2486043, at *8 (W.D. Tex. May 27, 2008) ("Defendants have not claimed that a conflict of interest exists between the [named plaintiff] and the putative class, and the evidence does not reflect any differences between them that would be significant enough to create a conflict.").

Adequacy of representation is met.

### D.     The Rule 23(b)(3) Factors

In addition to satisfying the Rule 23(a) requirements, "[t]he proposed class must also satisfy the requirements of Rule 23(b)(1), (2), or (3)."  *In re Wilborn*, 609 F.3d 748, 755 (5th Cir. 2010).  Under Rule 23(b)(3), the MEC and Non-MEC plaintiffs must establish that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  FED. R. CIV. P. 23(b)(3).

### 1.     Predominance

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem*, 521 U.S. at 623; *cf.* AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 3.06 cmt. a (2010) ["Aggregate Litigation"] ("So long as there is sufficient commonality to establish that the class is generally cohesive, the propriety of a settlement need not depend on satisfaction of a 'predominance' requirement."). Predominance is "more demanding than the Rule 23(a) requirement of commonality" and requires the court to determine "how the matter will be tried on the merits, which entails identifying the substantive issues that will control the outcome, assessing

which issues will predominate, and then determining whether the issues are common to the class." *Wilborn*, 609 F.3d at 755 (quotation marks, footnotes, and citation omitted).

Common issues predominate in the MEC class.  The MEC class members' claims are governed solely by Pennsylvania law; Chesapeake has not raised affirmative defenses that might implicate individualized extrinsic proof; and classwide damages can be calculated and distributed pro rata, without undue burden, based on past royalty payments and oil-and-gas production volume records.  *See Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 255–58 (5th Cir. 2020) (predominance can be defeated by variations in state law, issues that require individualized extrinsic evidence, and damages that are not susceptible to classwide measurement).  The MEC class members' claims depend on the interpretation of a market-enhancement clause included in each class members' lease and whether Chesapeake properly deducted certain postproduction costs under the common market-enhancement clause.  *See id.* at 255 ("[S]uits involving form contracts often lend themselves to class treatment."); *Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 601 F.3d 1159, 1171 (11th Cir. 2010) ("It is the form contract, executed under like conditions by all class members, that best facilitates class treatment").  These inquiries will "affect all class member's claims."  *Frey v. First Nat. Bank Sw.*, 602 F. App'x 164, 170 (5th Cir. 2015).

Common issues also predominate in the Non-MEC class.  The Non-MEC class members' claims are governed by federal and Pennsylvania law.  The claims turn on whether Chesapeake's alleged conduct—agreeing to pay Access Midstream inflated prices for gas transportation and gathering in Pennsylvania and deducting those increased costs from royalties paid to the Non-MEC class members—harmed the class members.  *See Amchem*, 521 U.S. at 625 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the

antitrust laws."); *see also In re Heartland Payment Sys., Inc.*, 851 F. Supp. 2d at 1059 ("[T]his case presents several common questions of law and fact arising from a central issue: [the defendant's] conduct . . . and the resulting injury to each class member from that conduct."); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 304 (3d Cir. 2011) ("[W]e are confident that the several common questions of law or fact arising from a single central issue—namely, [the defendant's] alleged anticompetitive conduct and the resulting injury caused to each class member— predominate over any issues concerning individual class members." (quotation marks omitted)).

## 2.    Superiority

Superiority examines whether a class action is a better vehicle for resolving a case than other possible methods, such as individual litigation or consolidation.   The predominance and superiority inquiries are closely related.  *In re Heartland Payment Sys., Inc.*, 851 F. Supp. 2d at 1060 (citing *Sacred Heart*, 601 F.3d at  1184).   Rule 23(b)(3) lists four nonexhaustive factors relevant to superiority:

> (A) the class members' interest in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

FED. R. CIV. P. 23(b)(3).   Under *Amchem*, the fourth factor may be disregarded in a proposed settlement class. 521 U.S. at 620.

Common issues of law and fact predominate over individual issues.  *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 749 (5th Cir. 1996) (predominance informs the superiority analysis). Most of the class members did not file a proof of claim and do not have remaining claims against

Chesapeake, and these class members have not taken steps to individually litigate their claims. Neither class presents "complex choice-of-law or *Erie* problems," subclassing is unnecessary, and the classes consist of thousands, "instead of millions, of members," all of whom were easily located and notified of the settlement agreements.  *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 627 (5th Cir. 1999).

### E.  The Rule 23(e)(2) and *Reed* factors

#### 1.  Whether the Class Representatives and Counsel Have Adequately Represented the Class[5]

As discussed above, ample record evidence shows that the class has been ably and diligently represented, in a case filled with legal and factual complexities.  Counsel for both classes were competent and zealously litigated on behalf of the classes.  The named plaintiffs do not have conflicts of interest with the putative class members.

#### 2.  Whether the Proposed Class Settlement Was Negotiated at Arm's Length or Was a Product of Fraud or Collusion[6]

"The Court may . . . presume that no fraud or collusion occurred between opposing counsel in the absence of any evidence to the contrary."  *Welsh v. Navy Fed. Credit Union*, No. 16-CV-1062, 2018 WL 7283639, at \*12 (W.D. Tex. Aug. 20, 2018).  The MEC and Non-MEC class settlements were the product of rigorous, hard-fought negotiations conducted at arm's length.  The record shows the many hearings in the Middle District of Pennsylvania and the Southern District of Texas bankruptcy court, several mediations with experienced mediators, the involvement of the Pennsylvania Attorney General, and lengthy, difficult negotiations.  *See In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 910 F. Supp. 2d 891, 931 (E.D. La. 2012)

---

[5] *See* FED. R. CIV. P. 23(e)(2)(A).

[6] *See* FED. R. CIV. P. 23(e)(2)(B); *Reed*, 703 F.2d at 172.

(use of a mediator "further weigh[s] in favor of a finding that the Settlement was fairly negotiated"). The record amply demonstrates the zealous advocacy that all sides deployed.

### 3. Whether the Relief Was Adequate Considering the Duration, Costs, Risks, and Delay of Trial and Appeal[7]

"When the prospect of ongoing litigation threatens to impose high costs of time and money on the parties, the reasonableness of approving a mutually-agreeable settlement is strengthened." *In re Heartland*, 851 F. Supp. 2d at 1064 (quoting *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 651 (N.D. Tex. 2010)); *see also Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004) ("[S]ettling . . . avoids the risks and burdens of potentially protracted litigation.").

The MEC case has continued for nearly eight years, but the parties have not completed motions to dismiss, formal discovery, or dispositive motions. The Non-MEC case has proceeded for over seven years. The plaintiffs survived motions to dismiss, but the parties have not completed formal discovery or dispositive motion briefing. Chesapeake is now in bankruptcy, and few of the putative class members filed proofs of claim. If the class members could litigate their claims to trial, the result would be appealed, prolonging the litigation and delaying any recovery. Counsel for both classes have spent considerable resources litigating these claims in different courts, and further litigation would increase those costs. The settlement relief, discussed below, is easily found adequate in these circumstances. This factor favors approval.

### 4. The Stage of the Proceedings and the Amount of Discovery Completed[8]

The key issue under this factor is whether "the parties and the district court possess ample information with which to evaluate the merits of the competing positions." *Ayers*, 358 F.3d at 369. "A settlement can be approved under this factor even if the parties have not conducted much formal

---

[7] *See* FED. R. CIV. P. 23(e)(2)(C)(i); *Reed*, 703 F.2d at 172.

[8] *See Reed*, 703 F.2d at 172.

discovery." *Klein*, 705 F. Supp. 2d at 653 (citation omitted); *see also Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 639 (5th Cir. 2012) (agreeing with district court's conclusion that "formal discovery is not a prerequisite to approving a settlement as reasonable"). The "[s]ufficiency of information does not depend on the amount of formal discovery which has been taken because other sources of information may be available to show the settlement may be approved even when little or no formal discovery has been completed." *San Antonio Hispanic Police Officers' Org., Inc. v. City of San Antonio*, 188 F.R.D. 433, 459 (W.D. Tex. 1999). "The Court should consider all information which has been available to all parties." *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 292 (W.D. Tex. 2007).

The MEC parties did not engage in formal discovery, but MEC class counsel investigated the claims for a year before filing their complaint. MEC class counsel reviewed Chesapeake's operations, production volumes, gas quality analyses, royalty payment methodology and history, marketing, sales contracts, sales price information, and physical facilities used for gathering and transporting gas. (Docket Entry No. 46 at ¶¶ 9–11). MEC class counsel also interviewed a Chesapeake accountant about the royalty calculations and payments. (*Id.* at ¶ 10). After this initial investigation, the parties mediated at least six times with Judge Cahn and Richard Schiffrin before reaching agreement in March 2021. (*Id.* at ¶¶ 12, 13, 22, 23, 27). Class counsel drew on their previous experience in similar oil-and-gas class-action litigation. (*Id.* at ¶¶ 4–6). The MEC parties have shown that they possessed sufficient information to enable the bankruptcy court and this court to gauge the strengths and weaknesses of the claims and defenses.

Non-MEC class counsel also investigated the Non-MEC claims before filing suit. (Docket Entry 42-1 at ¶¶ 2, 8–10). The Non-MEC class members survived a motion to dismiss and engaged in discovery, including reviewing over 100,000 pages of documents, deposing a Chesapeake

employee, and soliciting the opinions of oil-and-gas experts.  (*Id.* at ¶ 8).  The parties mediated with Judge Cahn and John Perry on at least five occasions.  (*Id.* at ¶ 9).

Class counsel, the bankruptcy court, and this court can determine the settlement's adequacy in relation to the probability of success on the merits were this litigation to continue.  The court is well aware of the parties' positions in this case, the legal issues, and the risks to the Non-MEC class members should litigation continue. *See Stott v. Capital Fin. Servs., Inc.*, 277 F.R.D. 316, 344 (N.D. Tex. 2011).  This factor favors approval of the proposed settlement agreements.

### 5.    The Probability of Success on the Merits[9]

The probability of the plaintiffs' success on the merits is the most important *Reed* factor, "absent fraud and collusion."  *Santinac v. Worldwide Labor Support of Ill., Inc.*, No. 15-CV-25, 2017 WL 1098828, at *3 (S.D. Miss. Mar. 23, 2017) (citing *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. Unit A 1982)).  This factor relates to the "risks . . . of trial and appeal," a Rule 23(e)(2) consideration.  FED. R. CIV. P. 23(e)(2)(C)(i).  "In evaluating the likelihood of success, the Court must compare the terms of the settlement with the rewards the class would have been likely to receive following a successful trial."  *DeHoyos*, 240 F.R.D. at 287 (citing *Reed*, 703 F.2d at 172).  "This factor favors approving a settlement even when the likelihood of success on the merits is not certain."  *ODonnell*, 2019 WL 6219933, at *12 (citing *See In re Corrugated Container Antitrust Litig.*, 659 F.2d 1322, 1326–27 (5th Cir. Unit A Oct. 1981) ("A district court need not establish the plaintiffs' likelihood of prevailing to a certainty.")).

Here, only 161 class members filed proofs of claim in the bankruptcy court.  The class members who did not file proofs of claims are effectively hampered, if not unable, to pursue their individual claims.  *See* 11 U.S.C. § 524(a); *Matter of Edgeworth*, 993 F.2d 51, 53 (5th Cir. 1993)

---

[9] *See* FED. R. CIV. P. 23(e)(2)(C)(i); *Reed*, 703 F.2d at 172.

("A discharge in bankruptcy . . . releases the debtor from personal liability for the debt.").   The bankruptcy plan made clear that late proofs of claim filed after the bar date "shall be deemed disallowed and expunged."   (Docket Entry No. 8 at 629, 630).   The opt-out notice the class members received made clear that "all claims . . . against Chesapeake arising before February 9, 2021 have been discharged by the bankruptcy court."   (*In re Chesapeake Energy Corp.*, No. 20-33233, Docket Entry No. 3175-3 at 4).   Roughly 22,824 of the 22,985 class members do not have remaining claims against Chesapeake.   (Docket Entry No. 58-1 at 3).   The record shows that the class settlements are the most practical vehicle for recovery for most of the class members.   *See Stott*, 277 F.R.D. at 345 ("This settlement at least provides class members with some measure of recovery, and the Court is of the opinion that the settlement should be approved when the alternative is no recovery at all.").

This factor favors approving the proposed settlement agreements.

### 6.        The Range and Certainty of Recovery[10]

This factor requires the district court to "establish the range of possible damages that could be recovered at trial, and, then, by evaluating the likelihood of prevailing at trial and other relevant factors, determine whether the settlement is pegged at a point in the range that is fair to the plaintiff settlors."   *Maher v. Zapata Corp.*, 714 F.2d 436, 460 (5th Cir. 1983) (quoting *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 213 (5th Cir. Apr. 1981)).   "The court must be assured that the settlement secures an adequate advantage for the class in return for the surrender of litigation rights against the defendants."   *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 195 (5th Cir. 2010).   This factor "can take into account the challenges to recovery at trial that could preclude the class from collecting altogether . . . ."   *Klein*, 705 F. Supp. 2d at 656.   This factor also

---

[10] *See* FED. R. CIV. P. 23(e)(2)(C)(i); *Reed*, 703 F.2d at 172.

examines whether the defendant has "the financial means to pay a greater judgment than the settlement agreement." *Jones v. Singing River Health Servs. Found.*, 865 F.3d 285, 296–97 (5th Cir. 2017).

Settlements have been considered fair when "there would be almost insurmountable problems collecting any judgment against the Settling Defendants" due to their "financial insolvency." *Newby*, 394 F.3d at 302.  The question is not whether the parties have reached "exactly the remedy they would have asked the Court to enter absent the settlement," but instead "whether the settlement's terms fall within a reasonable range of recovery, given the likelihood of the plaintiffs' success on the merits." *Id.* (quoting *Frew v. Hawkins*, No. 93-CV-065, 2007 WL 2667985, at *6 (E.D. Tex. Sept. 5, 2007); *Turner v. Murphy Oil USA, Inc.*, 42 F. Supp. 2d 830, 849–50 (E.D. La. 2007)).

The lowest band of recovery for the MEC and Non-MEC class is no recovery at all—a foreseeable, and perhaps likely, result for all of the class members except the 161 who filed proofs of claim.  *See ODonnell*, 2019 WL 6219933, at *13 ("The lowest band is no recovery, after all legal challenges.").  The middle upper bands are contested.  The MEC settlement gives the class members the option, each month, to have their royalties calculated using the higher of the in-basin index price or the netback price.  (Docket Entry No. 8 at 1268).  The class members' royalties were calculated using the netback price before the lawsuit.  (*Id.*).  The objectors argue that the higher-of-the-royalties option is not as valuable as the prior *Demchak* settlement.

The settling parties relied on an opinion by Oscar Hartman, an accountant hired to value the higher-of-the-royalties option.  Hartman's estimates were based on each production month from January 2017 to August 2020.  (Docket Entry No. 46-12 at 3).  For each of the months, Hartman determined the higher of the in-basin index and netback price, and then calculated the

32

royalty payments to the MEC class members.  (*Id.*).  He determined that royalty payments to the MEC class members would have increased over that period by a total of $34,435,220.  (*Id.*).  The yearly increase during that period would have been $9,391,424, and the monthly increase would have been $782,618.  (*Id.*).

Hartman used these calculations to estimate the future value of the higher-of-the-royalties option.  He calculated two different values.  For the first, he assumed that Chesapeake's "production volumes, prices, and post-production costs" would remain "materially the same" over the next ten years, which gave the option a ten-year value of $86,974,280.  (*Id.*).  For the second, he assumed a five percent decrease per year in Chesapeake's royalty payments, which reduced the option's value to $65,980,218.  (*Id.*).  He used the same assumptions to produce his five-year option values: $45,192,020 and $39,710,999.  (*Id.*).  He discounted his estimates to present value using a 1.57% discount rate, the interest rate on a 10-year U.S. Treasury note.  (*Id.* at 4).

| Hartman's Valuation of the Higher-Of Royalty Option | |
| --- | --- |
| **5-Year Net Present Value** | **10-Year Net Present Value** |
| $45,192,020 – $39,710,999 | $86,974,280 – $65,980,218 |

The objector's economist, John C. Tysseling, argues that Hartman's calculations are flawed for five reasons.  He did not value the injunctive relief himself.

First, Tysseling argues that Hartman did not make clear how royalties were calculated in the baseline period.  (Docket Entry No. 53-2 at 5).  Without clarifying baseline royalty calculations, Tysseling argues, Hartman could not compare the estimated royalty payments with the class members' past royalty payments.

This argument is not persuasive because Hartman's baseline for comparison was the class members' past royalty payments, which incorporate the past royalty payment methodology and

past production levels.  As Hartman made clear, the class members previously calculated their royalties using the netback method.  Hartman's estimates are based on the same production levels that yielded the past netback royalties.  He took those production levels and multiplied them by the in-basin index price or the netback price, whichever was higher during the periods. He estimated that the higher-of-the-royalties option would have increased the MEC class members' royalty payments by $34,435,220 from January 2017 to August 2020.

Second, Tysseling argues that the prior *Demchak* settlement, which allowed Chesapeake to deduct 66%, rather than 100%, of its postproduction costs would provide a higher benefit to the class members than the higher-of-the-royalties option.  (Docket Entry No. 53-2 at 6).  While Hartman did not compare the *Demchak* 66% deduction method to the higher-of-the-royalties method, Angela Paslay, another accountant for the settling parties, compared both.  Paslay estimated that, from January 2017 to August 2020, the 66% deduction method would have increased the MEC class members' royalties by $9.5 million.  (Docket Entry No. 59 at 18).  The higher-of-the-royalties method would have increased them by roughly $34.4 million, or $24.9 million more than the 66% deduction method.  (*Id.*).

Tysseling's third argument is that Hartman should have, but did not, analyze whether the "market conditions" during his baseline period were "typical."  (Docket Entry No. 53-2 at 8). Fourth, Tysseling argues that Hartman's 5% decline rate does not have factual support.  (*Id.*).  He argues that oil-and-gas production in the Marcellus Formation declined in 2020 and prices have generally been flat or declined in recent years.  (*Id.*).  He admits in a footnote, however, that production began increasing in December 2020.  (*Id.* at 8 n.8).

Neither of these arguments is persuasive.  The MEC injunctive relief is meant to provide higher royalty payments than the previous netback method.  Hartman has shown, and Tysseling

does not contest, that the higher-of-the-royalties method produces higher royalties than the netback method and the 66% deduction method. Even if oil production or prices decline in the Marcellus Formation, the higher-of-the-royalties method will produce the highest royalties.

It is also unclear that oil prices are declining, as assumed, in the Marcellus Formation. Tysseling argues that prices declined in 2020, but the COVID-19 pandemic made 2020 an anomaly. The U.S. Department of Energy report that Tysseling cites as support for a steady decline in Marcellus Formation oil prices does not show a steady price decline, but rather, at most, volatile prices.

Fifth, Tysseling argues that Hartman's discount rate is too low because the natural-gas market is volatile. (*Id.* at 10). He argues that a discount rate between 10% and 15% is more appropriate. Using the lower discount rate reduces Hartman's 10-year net present-value estimate to a range from $49,575,730 to $42,216,165. (*Id.*). Even if Tysseling is correct that a higher discount rate is appropriate, the injunctive relief still results in a large increase in royalties to the MEC class members over the netback method and 66% deduction method.

Based on the opinions of both economists, the court finds that the middle-band value of the injunctive relief over the next 10 years ranges from $49,575,730 to $42,216,165. The upper band range across 10 years is $86,974,280 to $65,980,218. Both are improvements over the netback method and the previous settlement's 66% deduction method.

The non-MEC settlement provides similar benefits to the class members. The Non-MEC settlement allows the Non-MEC class members to base their future royalties on the in-basin index price, which is calculated without deducting the allegedly inflated postproduction costs that sparked the initial lawsuit. The increase in royalties that Hartman predicted for the MEC class members resulted from higher in-basin index prices than the netback prices. While the Non-MEC

class did not provide an economic analysis of the value of the injunctive relief, Hartman's analysis suggests that it will benefit the Non-MEC class members in a similar way.

The objectors also argue that the monetary settlement is too low.  Counsel for the MEC and Non-MEC classes both argued that the recovery was the best they can expect, given the circumstances.  *See Stott*, 277 F.R.D. at 346 ("[C]lass counsel has informed the Court that the amount contemplated by this settlement was simply the most that counsel could gather for the class from [the defendant].").  While it is true that the class members will receive less in cash than they would have under the class settlement before the Middle District of Pennsylvania, the record shows that Chesapeake's intervening bankruptcy reduced the cash available to pay the class members.  *See id.* at 345 ("[I]f this litigation were to continue and the class was to emerge victorious, they would possess a judgment worth millions with no one to collect it from.").  Class counsel and counsel for Chesapeake made clear at oral argument that these amounts will be paid immediately to the class members, removing the delays and uncertainties of continued litigation, including appeals.  The reduced cash is offset by the increased injunctive relief.

This factor favors approval of the proposed settlement agreements.

### 7.   The Opinions of the Participants, Including Class Counsel, Class Representatives, and the Absent Class Members[11]

"The endorsement of class counsel is entitled to deference, especially in light of class counsel's significant experience in complex civil litigation and their lengthy opportunity to evaluate the merits of the claims."  *DeHoyos*, 240 F.R.D. at 292; *see also Stott*, 277 F.R.D. at 346 ("As class counsel tend[ ] to be the most familiar with the intricacies of a class action lawsuit and settlement, 'the trial court is entitled to rely upon the judgment of experienced counsel for the

---

[11] *See Reed*, 703 F.2d at 172.

parties.'" (quoting *Cotton*, 559 F.2d at 1330)). A court may not simply defer to class counsel's opinion. "Rather, the Court must give class counsel's recommendations appropriate weight in light of all the factors surrounding the settlement." *Turner*, 472 F. Supp. 2d at 852.

Counsel for the MEC and Non-MEC classes strongly support the proposed settlements. The Pennsylvania Attorney General, the named plaintiffs, and the absent class members support the settlements. (Docket Entry No. 41 at 26; Docket Entry No. 37 at 12). Only two class members objected to the Non-MEC settlement, and 134 class members opted out. (Docket Entry No. 46 at 27). Only one class member objected to the MEC settlement, and 283 class members, roughly three percent of the MEC class, opted out. *See In re Oil Spill by Oil Rig Deepwater Horizon*, 910 F. Supp. 2d at 938 (collecting cases approving settlements with opt-out rates higher than 15% of the class).

This factor favors approving the proposed settlements.

### 8. Whether the Proposal Treats Class Members Equitably in Relation to Each Other[12]

Class members are entitled to the same equitable relief. *See Hays v. Eaton Grp. Att'ys, LLC*, No. 17-CV-88, 2019 WL 427331, at *13 (M.D. La. Feb. 4, 2019) (the equitable-treatment factor was "easily met as each class member, save the Class representative, will receive the same amount"). The MEC class members are given the higher-of-the-royalties option and pro-rata cash payments based on their lease production levels. The Non-MEC class members may choose whether to calculate their future royalties based on the in-basin index price or the netback price. The Non-MEC class members will also receive pro-rata cash payments. This factor supports approving the proposed settlements.

---

[12] *See* FED. R. CIV. P. 23(e)(2)(D).

### F.     Conclusion of the Rule 23(a), Rule 23(b), and Rule 23(e) Factors

The proposed classes meet the Rule 23(a) and Rule 23(b) requirements for certification as settlement-only damages class actions. The motions for class certification for settlement are granted.

The Rule 23(e) factors and the *Reed* factors favor approving the proposed settlements. The court concludes that the proposed settlements are fair, reasonable, and adequate under Rule 23(e). The terms are approved.

### G.     The Objections to the Class Notice

"There are no rigid rules to determine whether a settlement notice satisfies constitutional or Rule 23(e) requirements." *Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 114 (2d Cir. 2005). Instead, "a settlement notice need only satisfy the broad reasonableness standards imposed by due process." *In re Katrina Canal Breaches Litig.*, 628 F.3d at 197 (quotation marks omitted). Due process is satisfied if the notice provides class members with the "information reasonably necessary for them to make a decision whether to object to the settlement." *Id.*; *see also Wal-Mart Stores*, 396 F.3d at 114 ("[T]he settlement notice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings" (internal quotation marks omitted)); AGGREGATE LITIGATION § 3.04(a) ("The purpose of a notice of a proposed class settlement is to set forth the major contours of the proposal and to inform class members of their right to attend the fairness hearing and to lodge written objections by a prescribed date should they so desire.").

### 1.     The Contents of the Class Notice

The objectors argue that the contents of the MEC and Non-MEC class notice did not comply with Rule 23(c)(2)(B), which outlines what must be included in notices sent to members

of a damages class.  Rule 23(c)(2)(B) states that notice must clearly and concisely state in plain, easily understood language:

> (i) the nature of the action;
>
> (ii) the definition of the class certified;
>
> (iii) the class claims, issues, or defenses;
>
> (iv) that a class member may enter an appearance through an attorney if the member so desires;
>
> (v) that the court will exclude from the class any member who requests exclusion;
>
> (vi) the time and manner for requesting exclusion; and
>
> (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

FED. R. CIV. P. 23(c)(2)(B).

The notice sent to the absent MEC and Non-MEC class members was the best notice practicable under the circumstances, as required under Rule 23(e)(1).  The notice, sent directly to each MEC and Non-MEC class member, outlined the nature of the case, the definition of the proposed class, and the claims at issue.  (*In re Chesapeake Energy Corp.*, No. 20-33233, Docket Entry No. 3175-3).  The notice informed the class members that they could enter an appearance through an attorney and request to be excluded from the class.  The notice explained the time and manner for requesting exclusion and the binding effect of the class settlement under Rule 23(c)(3). The language was clear and easily understood.

## 2. The Opt-Out Procedures

The objectors argue that the MEC and Non-MEC opt-out procedures are unduly burdensome.  The MEC settlement notice requires a class member wishing to opt out to "send a letter personally signed by you that includes all of the following: (1) Your name, address, and telephone number; (2) Your Chesapeake owner number (if you know it); (3) The following Civil Action Number: 20-33233; and (4) A statement that you want to be excluded from the Settlement

39

Class."   (*In re Chesapeake Energy Corp.*, No. 20-33233, Docket Entry No. 3175-3).   Class members must mail the letters "first class, postage pre-paid" to the settlement administrator.   (*Id.*). The objectors argue that these are unduly burdensome because they: (1) required "wet ink" signatures, (2) required opters-out to mail their opt-out notice, and (3) restricted group out-outs.

The MEC class contains 8,925 landowners and has had 283 opt-outs.   (Docket Entry No. 58-1 at 3).   The Non-MEC class has 14,060 landowners and has had 134 opt-outs.   (*Id.*).   The opt-out requirements were the same for both classes.   Nearly 400 class members did not find it unduly burdensome to opt out of the class settlements.

"Wet ink signatures" are not unduly burdensome.   It is a "common and practical requirement" "that an opt out be signed by the class member . . . to ensure . . . express consent." *In re Deepwater Horizon*, 819 F.3d 190, 197 (5th Cir. 2016); *see also* 7AA Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*, § 1787 (3d ed. 2021) ("It certainly would be an undue burden on class members to require them to retain counsel and prepare a formal legal document; on the other hand, allowing too much informality might pose problems of authenticity and ambiguity.").

Mailing a request to opt-out is not unduly burdensome.   *See McDonough v. Toys R Us, Inc.*, 80 F. Supp. 3d 626, 641 (E.D. Pa. 2015) ("Mailing a request is not unreasonably burdensome."); *Murphy v. HRB Green Res., LLC*, No. 16-CV-04151, 2016 WL 11527027, at *5 (N.D. Cal. Oct. 14, 2016) (opting out through overnight mail was not unduly burdensome); MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.321 (2004) ("Typically, opt-out forms are filed with the clerk, although in large class actions the court can arrange for a special mailing address and designate an administrator retained by counsel and accountable to the court to assume responsibility for receiving, time-stamping, tabulating, and entering into a database the

information from responses.").   While some courts have found ink signature and mailing requirements burdensome in so-called negative value classes, with little benefit to individual class members, courts routinely approve ink signature and mailing requirements when, as here, the settlement provides individual class members with substantial benefits.  *See Arena v. Intuit Inc.*, No. 19-CV-02546, 2021 WL 834253, at *10 (N.D. Cal. Mar. 5, 2021) (collecting cases that approved ink signature and mail-in requirements when those opting out would give up thousands of dollars).

Group opt-outs are disfavored, and individual opt-out requirements are not unduly burdensome.  *See* 3 NEWBERG ON CLASS ACTIONS § 9:49 (5th ed. 2021) ("The right to opt out in a Rule 23(b)(3) class action is considered an individual right. Practically, this means that a plaintiff who chooses to opt out herself may not also opt out a group en masse without the express consent of each individual."); *Hanlon v. Chrysler* Corp., 150 F.3d 1011, 1024 (9th Cir. 1998) (permitting exclusions en masse "would infringe on the due process rights of the individual class members, who have the right to intelligently and individually choose whether to continue in a suit as class members").

### 3.    The Due Process Challenge to the Second Opt-Out Requirement

Rule 23(c)(2) codifies the constitutional opt-out requirement and requires courts to "direct to class members the best notice that is practicable under the circumstances."  Rule 23(e)(4) gives courts discretion whether to allow a second opt-out period.

The Advisory Committee notes to the 2003 amendments to Rule 23 state:

Rule 23(e)(3) [now (e)(4)] authorizes the court to refuse to approve a settlement unless the settlement affords a new opportunity to elect exclusion in a case that settles after a certification decision if the earlier opportunity to elect exclusion provided with the certification notice has expired by the time of the settlement notice. A decision to remain in the class is likely to be more carefully considered and is better informed when settlement terms are known.

FED. R. CIV. P. 23(e)(4) Committee Note (2003).

The objectors argue that the MEC settlement violates the due-process rights of the class members who opted out of the *Demchak* class.  While the MEC class was pending in the Middle District of Pennsylvania, that court preliminarily approved a settlement class, authorizing notice to the class members.  Roughly 20% of the class opted out.  (Docket Entry No. 50-2).  The objectors argue that the court should not require a second opt-out because executing two opt-outs is unduly burdensome.

The bankruptcy court correctly required a second opt-out from those who previously opted out.  Roughly 20% of the class members opted out of the original *Demchak* settlement.  (Docket Entry No. 50-2).  The record does not show that any of these class members decided to pursue individual litigation and arbitration.  But then, six years after the initial *Demchak* settlement agreement, Chesapeake declared bankruptcy and the *Demchak* litigation moved to the Southern District of Texas bankruptcy court.  The bankruptcy court sent notice to the *Demchak* class members, notifying them that their claims would be extinguished if they did not file timely proofs of claim.  Only 161 class members filed proofs of claim in the bankruptcy court.  The parties then entered into a new agreement, the MEC settlement agreement, which the bankruptcy court preliminarily approved.  The opt-out notice for the MEC settlement sent from the bankruptcy court made clear that "all claims . . . against Chesapeake arising before February 9, 2021 have been discharged by the bankruptcy court."  (*In re Chesapeake Energy Corp.*, No. 20-33233, Docket Entry No. 3175-3 at 4).  Roughly 22,824 of the 22,985 class members do not have remaining claims against Chesapeake.

The cases take divergent approaches, with some courts finding that a second opt-out is burdensome or not required, and others suggesting that it is required if a settlement agreement is materially altered after the first opportunity to opt out.

The objectors point to one case in which a court found that requiring class members to opt out two times was unduly burdensome. *See Olden v. LaFarge Corp.*, 472 F. Supp. 2d 922, 935 (E.D. Mich. 2007). In *LaFarge*, the court preliminarily certified a class and directed notice to the class members, 429 of whom opted out. *Id.* at 926. Several years later, the parties reached a proposed class settlement. *Id.* at 927. The proposed settlement required a new opt-out and forced all class members back into the litigation, even those who previously had opted out. *Id.* at 935. The court found that requiring a second opt-out adversely affected the fairness, reasonableness, and adequacy of the settlement because requiring individuals to twice voice their desire to be excluded was "unfair." *Id.* The opportunity to opt out was not meaningful if the original request for exclusion could be voided by the subsequent settlement agreement. *Id.*

Other courts have found that a second round of opt-out notice is unnecessary when an amended settlement is different but only because it provides additional benefits to the class members. *See, e.g.*, *Klee v. Nissan N. Am., Inc.*, 12-CV-08238, 2015 WL 4538426, at *5 (C.D. Cal. July 7, 2015) (not requiring a second opportunity to opt out for an amended settlement agreement that was more beneficial to the class members because it was "unlikely that a class member who chose not to opt out of the original settlement would choose to opt out of the amended settlement."); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 270 (2d Cir. 2006) ("Neither due process nor Rule 23(e)(3) requires, however, a second opt-out period whenever the final terms change after the initial opt-out period."); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 473 n.10 (D.N.J. 1997) (a new notice and opportunity to opt-out was not required

when amendments to the earlier settlement agreement enhanced the benefits to the class), *aff'd*, 148 F.3d 283 (3d Cir. 1998); *In re Diet Drugs, MDL 1203*, 2000 WL 1346904, at *4 (E.D. Pa. Aug. 16, 2000) (approving, after the opt-out period ended, an amended settlement agreement that added benefits to the class members).  These courts, however, have presumed that the new notice period would only target those who previously did not opt out.

Other courts take a different approach.  One court suggested in a footnote that "imposition of a materially different settlement" might require the court to reinstate the "class members' initial opt-out rights," but then found that the amended settlement agreement did not "materially alter" the agreement.  *In re Diet Drugs Prod. Liab. Litig.*, 93 F. App'x 338, 343 n.7 (3d Cir. 2004) ("[A]ppellants claim that the District Court's approval of the Fifth Amendment amounted to imposition of a materially different settlement, necessitating the reinstatement of class members' initial opt-out rights. Appellants are mistaken. The Fifth Amendment did not materially alter the Settlement Agreement. Rather, the amendment merely corrected an unexpected prejudice to some class members that arose after the Settlement Agreement was approved.").  Another court took a similar approach and directed notice to class members "who originally opted out of the class action" because the "new Settlement provided an increased recovery to the Settlement Class." *Izzio v. Century Golf Partners Mgmt., L.P.*, 14-CV-03194, 2019 WL 10589568, at *8 (N.D. Tex. Feb. 13, 2019), *aff'd*, 787 F. App'x 242 (5th Cir. 2019).

The right to opt out is meant to protect a class member's right to "litigate it on his own." *Shutts*, 472 U.S. at 813.  Only 161 class members—the ones who filed proofs of claim—are likely to be able to pursue their claims against Chesapeake.  The class members who did not file proofs of claims can no longer pursue their individual claims. *See Matter of Edgeworth*, 993 F.2d at 53. A new round of notice and opportunity to opt out were necessary to ensure that the class members

44

understood that their prebankruptcy claims were extinguished.  The parties had entered into a new agreement, in a new court, with new terms, and new, harsher consequences for opting out.  The *Demchak* opt-out period demonstrated that the MEC class members knew how to exercise the right to opt out.  And during the second round of notice, when presented with the new settlement agreement and notified that their claims were likely extinguished by Chesapeake's bankruptcy, only 397 class members opted out.[13]

The notice sent from the bankruptcy court did not violate due process.

## H.      Attorneys' Fees

The MEC and Non-MEC class counsel request attorneys' fees and costs.  MEC class counsel requests $2 million; Non-MEC class counsel requests $412,500.  (Docket Entry No. 45 at 16; Docket Entry No. 43 at 9).

Rule 23(h) authorizes a district court to "award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."  FED. R. CIV. P. 23(h).  The "claim for an award must be made by motion under Rule 54(d)(2)," and a "class member, or a party from whom payment is sought, may object."  FED. R. CIV. P. 23(h)(1)–(2). The court "must find the facts and state its legal conclusions under Rule 52(a)."  FED. R. CIV. P. 23(h)(3)

Courts in this circuit "have encouraged litigants to resolve fee issues by agreement, if possible."  *DeHoyos*, 240 F.R.D. at 322.  A court is not bound by the parties' agreement or fees. *Strong v. BellSouth Telecomms., Inc.*, 137 F.3d 844, 849 (5th Cir. 1998) (quotation marks omitted). The court must carefully review a proposed fee award to ensure reasonableness.  *See id.*  This

---

[13] The objectors argue that the smaller number of opt-outs shows that many class members did not believe they needed to opt out a second time.  The court disagrees.  If those opting out wanted to individually litigate their claims, they would have initiated individual lawsuits or filed proofs of claim.  Few did.  A more likely explanation is that those opting out recognized that they would collect little, if anything, from an entity in bankruptcy.

scrutiny is necessary to "guard[ ] against the public perception that attorneys exploit the class action device to obtain large fees at the expense of the class." *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 228 (5th Cir. 2008) (quotation marks omitted).

The Fifth Circuit gives "district courts the flexibility to choose between the percentage and lodestar methods in common fund cases." *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 644 (5th Cir. 2012). Under the lodestar method, the court "must first determine the reasonable number of hours expended on the litigation and the reasonable hourly rate for the participating attorney." *Sulfur*, 517 F.3d at 228. "The lodestar is then computed by multiplying the number of hours reasonably expended by the reasonable hourly rate." *Id.*

After using the percentage or lodestar method, district courts must cross-check "their analyses under either approach [with] the *Johnson* considerations." *Union Asset Mgmt. Holding A.G.*, 669 F.3d at 644. The twelve *Johnson* factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the issues; (3) the skill required to perform the legal service adequately; (4) the preclusion of other employment by the attorney because he accepted this case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Id.* at 642 n.25 (5th Cir. 2012) (citing *Johnson*, 488 F.2d at 717–19).

The court "must explain how each of the *Johnson* factors affects its award." *Sulfur*, 517 F.3d at 228. The explanation "need not be meticulously detailed to survive appellate review." *Id.* (quoting *Forbush v. J.C. Penney Co.*, 98 F.3d 817, 823 (5th Cir. 1996)). After reviewing the twelve factors, "the court may then apply a multiplier to the lodestar, adjusting the lodestar either upward or downward." *Strong*, 137 F.3d at 850. There is a "strong presumption" that the lodestar

number is reasonable.  *Ransom v. M. Patel Enters., Inc.*, 734 F.3d 377, 388 n.17 (5th Cir. 2013).
The court's fee award is reviewed for abuse of discretion.  *Strong*, 137 F.3d at 850.

### 1.    The Lodestar and Percentage Cross-Check

MEC class counsel request $2 million in attorneys' fees.  MEC class counsel spent 3,701.2
hours prosecuting this case.  Daniel Coker Horton and Bell, P.A. billed 1,286.3 hours; Cuneo
Gilbert and LaDuca, LLP billed 545 hours; Levin Sedran and Berman billed 422.5 hours; the
O'Brien Law Group LLC billed 596.7 hours; Barrett Law Group billed 169.8 hours; and Lieff,
Cabraser, Heimann and Bernstein, LLP billed 680.9 hours.  (Docket Entry No. 46 at ¶¶ 30–31).
MEC class counsel's total lodestar fee is $2,942,851.  (*Id.* at ¶ 31).  Counsel for the Burkett
intervenors billed 4,782.6 hours on this litigation, for a lodestar fee of $1,830,825.  (*Id.* at ¶ 32).
Together, MEC class counsel and counsel for the Burkett intervenors billed 8,483.8 hours, for a
total lodestar of $4,773,676, and have agreed to split the fee approved by this court.  (*Id.* at ¶ 33).
The attorneys and paralegal working on the case had billable hourly rates ranging from $1,250 to
$125.  (Docket Entry Nos. 46-1, 46-3, 46-4, 46-5, 46-6, 46-7, 46-8, 46-9, 46-10, 46-11).

MEC class counsel asks for $2 million in fees.  The number of hours MEC class counsel
worked to prosecute this litigation is reasonable.  As discussed above, it has been pending since
2013.  MEC class counsel conducted prefiling and postfiling discovery, attended numerous
mediations, survived Chesapeake's bankruptcy proceedings and intervention by the Burketts and
Pennsylvania Attorney General, and dealt with objectors and an appellate challenge.  (Docket
Entry No. 46 at ¶¶ 7–27).

Non-MEC class counsel seek $412,500 in fees, a fraction of the lodestar amount.  Non-
MEC class counsel spent a total of 12,251 hours working on this case.  Kessler Topaz Meltzer and
Check, LLP billed 9,561.79 hours; Axler Godlich billed 155.80 hours; Donovan Litigation Group
billed 1,628.45 hours; and McCann Dillon Jaffe and Lamb billed 905.50 hours.  (Docket Entry

No. 43-1 at 9). The attorneys and paralegal working on the case had billable hourly rates ranging from $950 to $250.  (*Id.* at 11, 25).  The total lodestar fee is $6,081,838.

The number of hours Non-MEC class counsel worked in prosecuting this case, while high, is reasonable.  *See Cole*, 2018 WL 2766028, at *13 ("While the number of hours expended is high, the amount is reasonable in light of the significant time required to effectively litigate this action."). This case has been pending since 2014, progressing through prefiling investigation, extensive discovery, numerous mediations, dispositive motions, intervention by the Pennsylvania Attorney General, and Chesapeake's bankruptcy proceedings.  (Docket Entry No. 43 at 14).

MEC and Non-MEC class counsel also presented evidence that the hourly rates used were reasonable.  "An attorney's requested hourly rate is prima facie reasonable when he requests that the lodestar be computed at his or her customary billing rate, the rate is within the range of prevailing market rates[,] and the rate is not contested."  *Altier v. Worley Catastrophe Response, LLC*, Nos. 11-241, 11-242, 2012 WL 161824, at *22 (E.D. La. Jan. 18, 2012) (citing *La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 328 (5th Cir. 1995)).  The rates range from $1,250 for an attorney to $125 for a paralegal.  Similar rates have been approved in other cases, (Docket Entry No. 43 at 14–15; Docket Entry No. 46 at ¶ 30), and the objectors do not challenge them.

Non-MEC class counsel requested only $412,500 of the $6,081,838 lodestar fee. Additional support for finding reasonableness is that this represents a downward adjustment of .07 from the lodestar amount.  MEC class counsel requested $2 million, which represents a downward multiplier of 0.42.

The percentage method confirms that the fees sought are reasonable.  $412,500 is 33% of the $1,250,000 Non-MEC common fund.  Taking the $5,000,000 cash payment and the lowest proposed value of the injunctive relief—$42,216,165—$2 million is less than 5% of the common

fund. *See, e.g.*, *Erica P. John Fund, Inc. v. Halliburton Co.*, 2018 WL 1942227, at *9 (N.D. Tex. Apr. 25, 2018) (collecting cases and concluding that "numerous courts in this Circuit have awarded fees in the 30% to 36% range").

The requested fees are reasonable under the lodestar and percentage methods.[14]

### 2.    The *Johnson* Factors

The first factor is the time and labor required. *ODonnell*, 2019 WL 6219933, at *25. These cases are both nearly eight years old. The parties have proceeded in two different courts, faced challenges from several third parties, mediated numerous times with experienced former judges and mediators, and survived one appellate challenge. (Docket Entry No. 45 at 24; Docket Entry No. 43 at 10–11). The efforts described by counsel for the MEC and Non-MEC classes support the requested fees.

The second factor is the novelty and difficulty of the issues. MEC and Non-MEC class counsel correctly argue that these cases presented complex legal issues that required litigating threshold issues of arbitrability, retaining experts on gas marketability, certifying a class, pursuing claims against a bankrupt defendant, and competing with intervenors, including the Burketts and the Pennsylvania Attorney General, who initiated competing litigations. (Docket Entry No. 45 at 24; Docket Entry No. 43 at 10–11). This factor favors the requested fees.

The third factor is the skill required to prosecute the claims. This factor is satisfied when "counsel performed diligently and skillfully, achieving a speedy and fair settlement, distinguished by the use of informal discovery and cooperative investigation to provide the information necessary to analyze the case and reach a resolution." *King v. United SA Fed. Credit Union*, 744

---

[14] The objectors argue that class counsel did not create a benefit for the class members. The court addressed this argument when discussing the range of recovery under the *Reed* factors.

F. Supp. 2d 607, 614 (W.D. Tex. 2010) (quoting *Di Giacomo v. Plains All Am. Pipeline*, Nos. H-99-4137, H-99-4212, 2001 WL 34633373, at *12 (S.D. Tex. Dec. 19, 2001)).   While the MEC class did not proceed to "formal discovery" or "dispositive motions," *In re Heartland*, 851 F. Supp. 2d at 1083, the legal and factual complexities required MEC class counsel to exercise a high degree of skill to conduct the extensive investigation and informal discovery, survive challenges from the Burketts and the Pennsylvania Attorney General, litigate in different courts, defend against objectors and an interlocutory appeal, navigate the bankruptcy process, and recover from a bankrupt defendant.   Non-MEC class counsel did all this, engaged in formal discovery, and survived dispositive motions.   MEC and Non-MEC class counsel faced attorneys with similarly excellent credentials and experience. *See Schwartz*, 2005 WL 3148350, at *30 ("The ability of Plaintiff's Counsel to obtain such a favorable settlement for the Class in the face of such formidable legal opposition confirms the superior quality of their representation.").   This factor favors the requested attorneys' fees.

The fourth factor asks whether litigating this case precluded class counsel from other employment.   Counsel the MEC and Non-MEC classes prosecuted these cases on a contingent basis.   MEC class counsel devoted over 8,483 hours, and Non-MEC counsel approximately 12,251 hours.   These hours, while spread over nearly eight years and across several law firms, precluded counsel for both classes from other employment.

The fifth factor requires the court to analyze customary fees for similar work in the community.   As discussed above, the hourly rates for MEC and Non-MEC class counsel were reasonable, and the total requested fees are reasonable under the percentage method.

Under the sixth factor, the court evaluates class counsel's fee arrangement.   MEC and Non-MEC class counsel worked on a contingent basis.   (Docket Entry No. 45 at 25; Docket Entry No.

43 at 19–20); *see Schwartz v. TXU Corp.*, No. 3:02-CV-2243-K, 2005 WL 3148350, at *31 (N.D. Tex. Nov. 8, 2005) ("Courts have consistently recognized that the risk of receiving little or no recovery is a major factor in considering an award of attorneys' fees.").

The seventh factor looks to the time limitations the circumstances imposed. This factor is not relevant here. *See Erica P. John Fund, Inc.*, 2018 WL 1942227, at *11 ("This factor does not apply in this case because there is no indication that Lead Plaintiff imposed any time limits in the prosecution of this case."); *see also In re Combustion, Inc.*, 968 F. Supp. at 1135 ("Even though it is apparent that the *Johnson* factors must be addressed to ensure that the resulting fee is reasonable, not every factor need be necessarily considered.").

The eighth factor, the amounts involved and the results obtained, are "the most critical . . . in determining the reasonableness of a fee award." *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1047 (5th Cir. 1998)); *Heartland*, 851 F. Supp. 2d at 1085 (citing *Farrar v. Hobby*, 506 U.S. 103, 114 (1992)). Class counsel have achieved beneficial results for their class clients. The MEC class members will promptly receive $5,000,000, and the Non-MEC class members will receive $1,250,000. Members from both classes will also receive an additional $5,300,000 from the Pennsylvania Attorney General settlement. The injunctive relief will also provide benefits to both classes. This factor supports the requested fee.

The ninth factor, class counsel's experience, reputation, and ability, supports approving the requested award. The experience and reputation of class counsel are "clear and unquestioned." *See Heartland*, 851 F. Supp. 2d at 1085. The court commends the lawyering shown by all counsel, for all the parties, throughout the years of vigorous litigation.

The tenth factor evaluates the "undesirability" of the case. This is closely related to class counsel's fee arrangement. Class actions carry "elevated risks" that can make them undesirable.

*Schwartz*, 2005 WL 3148350, at *33.  Litigating an expensive case involving a "well-financed corporate [defendant] on a contingent fee" can also make a case undesirable.  *Erica P. John Fund, Inc.*, 2018 WL 1942227, at *12 (citation and quotation marks omitted).  This factor supports the requested fee.

The eleventh factor looks to the length and nature of the relationship between class counsel and their clients.  Class counsel ably represented the named class representatives for nearly eight years.  *Id.* at *12 (serving as class counsel for "more than a decade" weighed in favor of the proposed fee).  The proposed settlements, a result of class counsel's skillful advocacy, will greatly benefit Pennsylvania leaseholders.

The final factor, a review of awards in similar cases, strongly favors holding that the claimed fees are reasonable. Courts routinely approve similar percentage awards in complex class-action cases.  *See Al's Pals Pet Care v. Woodforest Nat'l Bank, NA*, No. 4:17-CV-3852, 2019 WL 387409, at *4 (S.D. Tex. Jan. 30, 2019) (collecting cases awarding over 30% in common fund class action settlements).

The *Johnson* factors confirm the reasonableness of the fee award.  Class counsel have asked the court to decrease, not increase, the lodestar.  The record, with the "strong presumption" that the lodestar amount is reasonable, and the voluntary downward multiplier, presents no grounds to decrease or increase the requested fees.  *See Ransom*, 734 F.3d at 388 n.17.

**I.    Costs**

MEC class counsel request $292,362.33 for the costs expended in this action. (Docket Entry No. 45 at 26–27).  Non-MEC class counsel request $182,812 for costs.  (Docket Entry No. 44 at 22).

"In addition to being entitled to reasonable attorneys' fees, class counsel in common fund cases are also entitled to reasonable litigation expenses from that fund." *Heartland*, 851 F. Supp. 2d at 1089 (quoting *Radosti v. Envision EMI, LLC*, 760 F. Supp. 2d 73, 79 (D.D.C. 2011)).  Courts have approved requested costs when class counsel provided documents showing the costs, the court found the costs to be typical, and no class member or defendant objected.  *Heartland*, 851 F. Supp. 2d at 1089 (citing *Radosti*, 760 F. Supp. 2d at 79).  Those circumstances are present here. MEC and Non-MEC class counsel documented the costs and there are no objections.  The court has carefully reviewed those costs and finds them appropriate for a case of this nature.  The costs requested are reasonable and approved.

## J.    Incentive Awards

Non-MEC class counsel requests incentive awards of $5,000 for each named plaintiff. (Docket Entry No. 44 at 17).  MEC class counsel did not request incentive awards for the MEC named plaintiffs.  "Courts commonly permit payments to class members above those received in settlement by class members generally."  *Slipchenko v. Brunel Energy, Inc.*, No. 11-CV-1465, 2015 WL 338358, at *13 (S.D. Tex. Jan. 23, 2015) (quoting *In re Heartland*, 851 F. Supp. 2d at 1089).

The Non-MEC named plaintiffs provided information and input in drafting the complaint, participated in discovery, and communicated with Non-MEC class counsel throughout this litigation.  (Docket Entry No. 44 at 23).  The $5,000 incentive fees are supported by the evidence and well within the range approved in other cases.  *See, e.g.*, *Izzio*, 2019 WL 10589568, at *11 (approving incentive awards ranging from $10,000 to $3,000); *Slipchenko*, 2015 WL 338358, at *14 (collecting cases).  They are approved.

IV.     **Conclusion**

For the foregoing reasons, the MEC and Non-MEC motions for certification of the settlement class, final approval, and award of attorneys' fees and costs, (Docket Entry Nos. 41, 42, 43, 44, 45, 47), are granted.  It is ordered that:

1.     the MEC and Non-MEC settlement classes are certified;

2.     the MEC and Non-MEC settlements are approved in all respects;

3.     the request of MEC class counsel for fees is granted in the amount of $2 million;

4.     the request of Non-MEC class counsel for fees is granted in the amount of $412,500;

5.     the request of MEC class counsel for reimbursement of costs and expenses is granted in the amount of $292,362.33;

6.     the request of MEC class counsel for reimbursement of costs and expenses is granted in the amount of $182,812; and

7.     the request for service awards for each Non-MEC named plaintiff is granted in the amount of $5,000.

The parties will take the necessary steps to implement the MEC and Non-MEC settlements.  The court will retain jurisdiction for purposes of enforcing the settlements.

SIGNED on October 13, 2021, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge